IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
     vs.                           )
                                   )  CRIMINAL NO.: JKB-16-0363
GERALD JOHNSON, et al.,            )
                                   )
          Defendant.               )
                                   )
_____)


Transcript of Motions Hearing
Before the Honorable James K. Bredar
Friday, November 3rd, 2017
Baltimore, Maryland


For the Plaintiff:

     Peter J. Martinez, AUSA

     Christina A. Hoffman, AUSA

For Defendant Gerald Johnson:

     Paul F. Enzinna, Esquire

     Jeffrey B. O'Toole, Esquire

For the Defendant Wesley Jamal Brown:

     Harry J. Trainor, Jr., Esquire

     Christopher M. Davis, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
1                          APPEARANCES (Cont'd)

2

3    For Defendant Kenneth Jones:

4         Alan R.L. Bussard, Esquire

5    For Defendant Marquise McCants:

6         John R. Francomano, III, Esquire

7    For the Defendant Joseph Bonds:

8         David Solomon, Esquire

9

10   Also Present:  Special Agent Lisa Christy, ATF

11

12

13

14

15

16

17

18

19

20

21

22
     _____
23
                     Christine T. Asif, RPR, FCRR
24               Federal Official Court Reporter
                 101 W. Lombard Street, 4th Floor
25                  Baltimore, Maryland 21201
```

```
 1                        P R O C E E D I N G S
 2              THE COURT:  Good morning.  Be seated, please.
 3              Mr. Martinez, you may call the case.
 4              MR. MARTINEZ:  Good morning, Your Honor.  This is
 5     criminal case number JKB-16-0363, United States versus Gerald
 6     Johnson, Wesley Brown, Kenneth Jones, Joseph Bonds, and
 7     Marquise McCants.  Peter Martinez for the Government.  With me
 8     at counsel table are AUSA Christina Hoffman and Special Agent
 9     Lisa Christy of the ATF.  This matter is before the Court for
10     a motion hearing in connection with recordings taken at the
11     CDF detention facility.
12              THE COURT:  Appearances for Mr. Johnson.
13              MR. ENZINNA:  Good morning, Your Honor, Paul Enzinna
14     and Jeffrey O'Toole for Mr. Johnson.
15              THE COURT:  For Mr. Brown.
16              MR. DAVIS:  Christopher Davis and Harry Trainor on
17     behalf of Mr. Brown.
18              THE COURT:  Mr. Jones.
19              MR. BUSSARD:  Alan Bussard representing Mr. Jones.
20              THE COURT:  Mr. Bonds.
21              MR. SOLOMON:  David Solomon on behalf of Joseph
22     Bonds.
23              THE COURT:  And Mr. McCants.
24              MR. FRANCOMANO:  John Francomano on behalf of Mr.
25     McCants.
```

```
 1          THE COURT:  Good morning, Counsel.  We have a very

 2    focused hearing this morning.  This hearing is directed solely

 3    at the two late disclosed audio/video recordings that

 4    allegedly occurred on September 25 and September 26, inside of

 5    the Chesapeake Detention Facility, in a room where the FBI had

 6    evidently planted a bug in service of some other

 7    investigation, but allegedly picked up two conversations, one

 8    on each day, between defendants McCants and Handy, McCants

 9    being on trial in this particular case.  And the issue that is

10    presented is whether or not these overheard statements are

11    admissible during the trial, admissible during the

12    government's case in chief.

13          There are other motions in limine pending.  We'll

14    address those in the ordinary course at the pretrial

15    conference for next week, which is scheduled for what day?

16          MR. MARTINEZ:  Tuesday the 7th, Your Honor.

17          THE COURT:  Okay.  And just as a housekeeping

18    matter, Mr. Bussard, now that Mr. Jones is back in federal

19    custody, I assume we're going to keep him in federal custody?

20          MR. BUSSARD:  I briefly discussed it with Mr. Jones

21    before he entered court and we have a little bit more talking

22    to do.  He's going to make a decision whether he stays in

23    federal custody or returns.  He has programs down --

24          THE COURT:  Does he have any right to return to

25    state custody?
```

1          MR. BUSSARD:  He is serving a sentence.

2          THE COURT:  Yes, I understand that.  But if his

3    presence is needed in federal court now for the adjudication

4    of the federal charges against him, and he's been brought over

5    here pursuant to a writ, why should he not remain now in

6    continuous federal custody until we have completed this

7    federal matter.

8          MR. BUSSARD:  I'm not sure whether the writs are

9    just specific to today and then next Tuesday or if they are

10   covering the entire trial.

11         THE COURT:  Well, it raises enormous logistical

12   problems now at this stage for him to be going back and forth.

13   Especially, given the fact that we've had some late motions

14   and the Marshals Service literally needed to move heaven and

15   earth to get your client here today because of just

16   bureaucratic challenges that are faced when we have a sudden

17   hearing, as was necessary here.

18          So my strong inclination at this point is to direct

19   the Marshals to simply keep your client now in federal custody

20   until the completion of these federal proceedings.  Given that

21   that's my inclination, the Marshals are directed not to return

22   the defendant to state custody without further order of this

23   court.  In the meantime, Mr. Bussard, and Mr. Martinez, you

24   should sort out where we stand with respect to a writ, whether

25   there needs to be some different writ served and alert the

1    Court as to any legal obstacles that stand in the way of what

2    the Court's intention is at this point.

3            MR. MARTINEZ:  Understood, Your Honor.

4            MR. BUSSARD:  The only issue I have and I think Mr.

5    Jones will probably have his -- his property is still there.

6    If there was some way of securing his personal property at

7    DOC.  I may have to talk to somebody in the Division of

8    Correction.

9            THE COURT:  Right.  So yeah, this is a sudden

10   development and if you need some assistance from the Court in

11   that regard, please feel free to ask.  But in terms of his

12   actual physical body, I think we're done with moving back and

13   forth between federal custody and state custody in the run up

14   to this proceeding, which starts on November 20th and will run

15   for nine weeks.  It's very complicated to do that.

16           So absent, Mr. Bussard, your showing me he's got

17   some legal right to return to state custody -- and I have an

18   open mind on that question, I'll consider anything you submit

19   to me -- but absent that he's going to remain in federal

20   custody.

21           Okay.  As I said, we have this other hearing that

22   will begin next Tuesday.  And it is during that proceeding

23   that the Court will address the bulk of the motions in limine

24   that have been filed in this case, as well as other issues

25   that are appropriate for a pretrial conference.  But it became

1    clear when this issue erupted over the last week, that it --

2    that this issue, with respect to these recordings was unique

3    and different, and had particular complications that might not

4    be present with respect to more garden variety motions in

5    limine.

6            And as a consequence it was the Court's judgment

7    that this should separately be set in.  It also had

8    implications for the timing for the disclosure of the *Jencks*.

9    So we've -- we're holding this special hearing on this issue

10   today.  And I hope to get this issue resolved either during

11   this hearing or possibly shortly after the hearing through a

12   written ruling.

13           We've got two statements in particular, I appreciate

14   the briefs that counsel submitted.  As I said, there's some

15   complexity to the issue.  Let's turn our attention to the

16   first tape first, first recording, by that I mean the

17   September 25 recording.

18           Mr. Francomano, you would agree that if the Court

19   finds that the statements were co-conspirator statements, that

20   is statements made during the conspiracy and in furtherance of

21   the conspiracy, and if the Court further finds that there

22   is -- that the Rule 403 balancing test does not tip in your

23   favor, that the statements would be admissible?

24           MR. FRANCOMANO:  Yes, your --

25           THE COURT:  Do you want to argue Fourth Amendment or

1    Title III issues, or do you want to stand on your submissions?

2          MR. FRANCOMANO:  No, I'll stand on all those issues

3    in our motion.  As to the Title III, we're not going to argue

4    that.  We're not going to argue the 801(d)(2)(A) or the

5    authenticity.

6          THE COURT:  Where you really want to fight is on

7    801(d)(2)(E) and 403; right?

8          MR. FRANCOMANO:  Correct, Your Honor.

9          THE COURT:  Okay.  Is there any other defendant that

10   wants to be heard in oral argument on topics other than

11   801(d)(2)(E) and Rule 403?  In other words, somebody want to

12   pick up the flag on the Fourth Amendment or Title III and

13   argue that?

14         All right.  How about any other ground other than

15   Title III and the Fourth Amendment, except for the

16   co-conspirator exception and Rule 403?

17         MR. FRANCOMANO:  Your Honor, I would also like to

18   argue 404(b) as well.

19         THE COURT:  Okay.  You can reserve on that.

20         MR. FRANCOMANO:  Thank you.

21         THE COURT:  All right.  So the -- I don't see any

22   issue under either the 4th Amendment or Title III with respect

23   to the placement of this listening device.  I don't think that

24   the defendants, starting with Mr. McCants, and certainly not

25   anybody else, has standing.  So I expect to dispose of that in

1    a written ruling in a manner consistent with that.  And no one

2    has requested argument on that.

3            Okay.  So let's then turn to what I think is the

4    central issue and perhaps defense counsel have had the

5    opportunity to confer among themselves about who they request

6    among themselves take the lead on this, Mr. Francomano, to my

7    knowledge it's been you.

8            MR. FRANCOMANO:  I have a feeling it will be me,

9    Your Honor.

10           THE COURT:  Okay.  So let's go.  What have you got?

11           MR. FRANCOMANO:  Your Honor, if I could I'd like to

12   argue both conversations separately.

13           THE COURT:  Yeah, one after the other.

14           MR. FRANCOMANO:  Yeah, if I can start with the

15   26th.

16           THE COURT:  Why do you want to argue the 26th first?

17           MR. FRANCOMANO:  Because I think it has more

18   potential impact on my client than the 25th.

19           THE COURT:  Well, I would prefer you stick with just

20   the sequence in time.

21           MR. FRANCOMANO:  Your Honor we can start with --

22   that's -- whatever Your Honor would like.  We'll start with

23   the 25th.

24           Your Honor, in the government's motion in limine,

25   they break it up into different sections and I'd like to

1    address each section they broke it up into as well.  Because

2    there's different sections in which Mr. McCants is talking,

3    allegedly talking about other things that are going on in that

4    room.  First, there was an issue where he says that the

5    government alleges that he's trying to smuggle weed into the

6    jail.

7              THE COURT:  Yes.

8              MR. FRANCOMANO:  Marijuana into the jail.  And he

9    allegedly says, "I ain't trying to get no bupe," which they

10   mean to be buprenorphine, "man, I'm trying to get some weed

11   now."  Now, even if we agree he's trying to get weed or bring

12   weed into the jail, I don't see how any of that has to do with

13   any of the racketeering charges or it has anything to do with

14   the BGF or anything such as that, Your Honor.  I think it

15   would be considered 404(b) evidence.

16             THE COURT:  There is case law out there that talks

17   about the fact that if the defendants -- if it's a completely

18   different conspiracy, but they're in it, it could be

19   admissible.  The problem is that that might, for the

20   Government, only go as far as Handy and McCants.

21             MR. FRANCOMANO:  Well, not only that, Your Honor, we

22   have to still go through -- if it is not 404(b) and it is only

23   403(b) evidence, we still have to weigh the probative versus

24   the prejudice.  In this case this is a situation where he is

25   only -- it's mere idle chatter that he's talking about.  He's

1    not actually talking about getting weed.  He's talking about

2    that he would like to have some weed.

3              THE COURT:  Let me advance the argument a little bit

4    by telling you that I'm not particularly persuaded by the

5    government's theory on smuggling into the prison, and somehow

6    the BGF -- that that is somehow encompassed in their wider

7    conspiracy, the racketeering conspiracy.  I'm much more

8    interested in hearing what you have to say about this

9    government -- about the contention from the government that

10   conversations that occurred on those days were in the nature

11   of maintaining, building, cultivating, nurturing, trust and

12   cohesiveness among the members of the conspiracy, all in the

13   context of an organization that from other evidence, clearly,

14   so highly valued those ties and bonds.

15             Why isn't this conversation viewed properly, as

16   being a continuation of that dimension of the conspiratorial

17   activity.  And thus, in furtherance of that portion of the

18   conspiratorial activity, by a preponderance of the evidence.

19             MR. FRANCOMANO:  Well, Your Honor, as to the 25th,

20   as I stated before, these are two inmates discussing their

21   cases.  At one point Mr. McCants was allegedly discussing

22   about the marijuana, and then another point he's allegedly

23   talking about a revolver.  They're not discussing any

24   advancements in the Black Guerilla Family Greenmount regime --

25             THE COURT:  What about your client's alleged

1    reference to the fact that he's not telling.

2         MR. FRANCOMANO:  I'm sorry, Your Honor?

3         THE COURT:  What about your client's alleged

4    reference and being picked up, recorded, having said something

5    to the effect of "I'm not telling."

6         MR. FRANCOMANO:  Well --

7         THE COURT:  Because, you know, clearly, it seems

8    from the context, at least the way the government would

9    present it, it's just reflective of that constant hanging

10   question who's telling?  You telling?  Am I going to tell?

11   I'm not going to tell.  Are you going to tell?

12        MR. FRANCOMANO:  Well, Your Honor, they're not

13   saying that if you tell that, you know, I'm going to hurt you

14   perform some type of violence on you.  What he's saying is I'm

15   not going to say anything, whether or not he's going to say

16   anything to the government, whether or not he's going to say

17   anything about the case itself, they're not in furtherance of

18   the conspiracy --

19        THE COURT:  Why is it not perpetuating a culture of

20   nobody tells on anybody else, stop snitching, whatever

21   Baltimore vernacular, why isn't that?  Why isn't that part of

22   it?

23        MR. FRANCOMANO:  Because he's not telling Mr. Handy

24   to stop snitching.  He's making a statement, I'm not going to

25   say anything.

1          THE COURT:  But isn't that his providing assurance

2     that he isn't, and isn't going to, and that he is continuing

3     to respect and honor the code.

4          MR. FRANCOMANO:  Well, Your Honor, it's also his 5th

5     Amendment right to not say anything.  So, I mean, it can be

6     taken that way as well, saying I'm not going to say anything

7     because I don't want to incriminate myself, or it could be for

8     a thousand different reasons other than --

9          THE COURT:  I think that's an interesting run at a

10    constitutional issue there, but I don't think that's the --

11    even close to the best and most logical interpretation of that

12    comment.  I'm not telling isn't I'm not telling on myself.

13         MR. FRANCOMANO:  Well, Your Honor, he doesn't say

14    I'm not telling on anyone.  He says, I'm not telling.  And

15    that's, in that conversation --

16         THE COURT:  People tell they get a benefit for

17    themselves by testifying against others.

18         MR. FRANCOMANO:  Absolutely, Your Honor.  But they

19    also -- saying I'm not telling could mean in the reference to

20    a number of other things besides perpetuating the conspiracy.

21    I don't think that that is something that automatically says,

22    well, it's in furtherance of a conspiracy saying that I'm not

23    going to tell, okay.  Like I said, he doesn't have to tell

24    anyone.

25         THE COURT:  No, but the context is, I'm not telling,

1    implying we're having a conversation about who might be

2    telling.

3           MR. FRANCOMANO:  But, Your Honor, that's not the

4    conversation.  There is no conversation of who's telling, I'm

5    not going to tell.  He just says I'm not telling.  That's it.

6    It's not I'm not telling because it's part of a conspiracy,

7    I'm not telling because -- it's I'm not telling.  And like I

8    said he has a right not to tell.

9           THE COURT:  He doesn't have a right to conspire with

10    others in an overall scheme to create a culture where nobody

11    tells.

12           MR. FRANCOMANO:  And I agree with Your Honor.  But

13    he's not saying I'm not telling, you shouldn't tell either.

14           THE COURT:  But isn't that implicit?

15           MR. FRANCOMANO:  I don't think so, Your Honor.  I

16    think he is referring only to himself.  And he doesn't say

17    that I'm not telling, you shouldn't tell, the other

18    co-defendants shouldn't tell.  He doesn't say that at all.  He

19    says, I'm not telling, which is his absolute right.

20           THE COURT:  All right.  What else have you got?

21           MR. FRANCOMANO:  Your Honor, as to the 25th, there

22    is a mention of a revolver and issues with a pistol, things

23    like that.

24           THE COURT:  What about mention -- aren't there some

25    mentions of his deal or something on the 25th --

1           MR. FRANCOMANO:  On Mr. McCants's deal?

2           THE COURT:  Or who's that, Mr. Brown?

3           MR. FRANCOMANO:  That's not Mr. McCants, Your

4    Honor.

5           THE COURT:  Okay.

6           MR. FRANCOMANO:  On the 25th there's reference to a

7    revolver and that he, I can read it, "I don't F with

8    revolvers, they got to be 10 shots or better for me to F with

9    them."  This sentence has nothing to do with anything,

10   basically he's just saying, I don't use revolvers.

11          THE COURT:  Why isn't it properly viewed as, you

12   know, kind of team building.  One, you know, idle chatter in

13   one context, which this might be in some context, in a

14   different context, in an environment where there is -- that's

15   infused with this tension about who's going to stay on the

16   team, who's not going to stay on the team.  Are we still

17   hanging with each other, are we not hanging with each other,

18   conversations then that go into, you know, what happened to

19   the gun, you know, who sold it.  What happened and then this

20   starts to slop over into what I want to talk about in terms of

21   the 26th, you know --

22          MR. FRANCOMANO:  His discussing --

23          THE COURT:  Why isn't that just the sort of team

24   building conversations that are occurring not as idle chatter,

25   but in service of the very important interest of keeping the

1    team together.

2          MR. FRANCOMANO:  I don't think that's true at all,

3    Your Honor.  If you listen to the -- I'm sure you have read

4    and listened to the tapes themselves.  He's talking about not

5    in reference to a shooting, not in reference to anything, but

6    if he has a gun, allegedly, that he would use a gun instead of

7    a revolver.  That's like any other situation if you were with

8    two hunters, I like a 12-gauge better than a 10-gauge.  It has

9    nothing to do -- or there's no reference whatsoever into any

10   type of gang-related activity or saying, hey, you know, Mr.

11   Handy, you should also use this type of gun too.  He's just

12   making a statement, Your Honor.

13         THE COURT:  Unless you indulge the notion that the

14   whole premise of the whole conversation is, I'm staying tight

15   with my pals here.  And, you know, we're maintaining this

16   cohesiveness.

17         MR. FRANCOMANO:  I respectfully disagree.  If he

18   would have said --

19         THE COURT:  Well, I hope you do, because it's your

20   job.  But this is the problem.  This is the problem.

21         MR. FRANCOMANO:  Right, Your Honor.  But I would

22   agree if he was saying, hey, this is the type of gun that I

23   use and you should use it too.

24         THE COURT:  Yeah, well, that would be worse.

25         MR. FRANCOMANO:  Or everybody should do this.  But

1    he's not saying that.  What he's saying is, allegedly, is that

2    I would -- I prefer this over this.  I prefer chocolate cake

3    or vanilla cake.  I prefer this -- it's not in any type of

4    context.

5              THE COURT:  Two guys are in a eating club together

6    every month they go out to a different place, to a different

7    dessert place, now they're sitting around the gym talking to

8    each other.  Yeah, I prefer chocolate cake over vanilla cake.

9    Well, is that idle chatter or is that somehow connected with

10   the fact they're in a club together that goes to a different

11   dessert place every month, or used to.

12             MR. FRANCOMANO:  Your Honor, the context is the

13   whole thing.  It could be either, but most likely it's

14   probably just one guy likes chocolate better than he does

15   vanilla.  And that's my point.  There's no way to show that

16   this is any type of team building, all he's doing is

17   explaining this is my preference and that's it.

18             THE COURT:  Let's imagine that during the course of

19   the trial the Court makes its own determination, independent

20   of the jury, that the government has proven that there is a

21   conspiracy, and that it includes your client and the other

22   gentleman who are here, and others who are not here.  And that

23   it is the BGF Greenmount set or whatever that -- however it's

24   going to be referred to.  And that there being such a

25   conspiracy, that the activities of the conspiracy extended to

1    the time when they were locked up, including on the 25th and

2    26th of September, such that these statements were made during

3    that conspiracy.  And because they were not mere idle chatter,

4    but instead were conversations that had a purpose to them,

5    which was to cultivate and maintain the trust and cohesiveness

6    of the group to hopefully hold it together.

7            Let's imagine that the Court comes to all of those

8    conclusions.  And then, accordingly, is prepared to admit

9    evidence as co-conspirator statements that tends to ad -- to

10   show conversations directed at cohesiveness, trust building,

11   holding the team together and so forth.  But then it turns out

12   that some of those conversations are themselves highly

13   impactful for other reasons, in that they tend to reflect on

14   disputed questions like the presence of a gun, the disposition

15   of a gun, or in the case of the September 26th conversation,

16   even another murder in the most graphic terms imaginable.

17   Where are we then?

18           MR. FRANCOMANO:  Your Honor, then we're at the 403

19   balancing test.  At that point if you're -- if all these ifs

20   come into play.

21           THE COURT:  Right.

22           MR. FRANCOMANO:  I think even if it is found to be

23   relevant and be probative, it is still way too prejudicial for

24   it to come in.

25           THE COURT:  What's prejudicial about it when it's

1    offered in the context of a weeks long, many weeks long trial,

2    where there is substantial other evidence of what would

3    otherwise in regular life be considered to be outrageous

4    behavior.

5              MR. FRANCOMANO:  Well, Your Honor --

6              THE COURT:  One of the cases I read last night talks

7    about evidence that somebody committed sexual assault against

8    their own child, oh, but it's in the context of a case where

9    he's been charged with multiple sexual assaults on children.

10   Well, then maybe it's not quite so explosive.  It's that

11   issue.

12             MR. FRANCOMANO:  Well, and I did read that case as

13   well, Your Honor.  But the situation we have here is, in that

14   case they were talking about a sexual assault that occurred.

15   Okay.  In this case we're talking about on the 25th, the issue

16   is he's talking about a revolver versus a pistol.  He's

17   talking about marijuana.  He's not talking about a crime that

18   he committed.  He's talking about basically just those two

19   incidents.  And I don't see how those can come in at a

20   charge -- a racketeering charge when they have no impact

21   whatsoever on that.  Meaning that they're way too prejudicial.

22   And I don't think they're probative, to be honest with you,

23   but in our fact scenario they are.

24             THE COURT:  Why don't they just tend to provide a

25   window on his thinking, his intent, how the -- how he, you

1    know, the tricks of the trade, you know, the methods and the

2    approaches and tools that he prefers.

3            MR. FRANCOMANO:  Your Honor, I don't --

4            THE COURT:  In the broader context of an

5    organization that with some regularity kills people by various

6    means.

7            MR. FRANCOMANO:  Your Honor, I don't believe it goes

8    to intent or motive or anything such as that.  It goes to --

9    it doesn't really go to anything to be honest with you, it's

10   just a conversation on the 25th, that has nothing to do with

11   whether or not he committed any crime, whether or not these

12   actual conversations have anything to actually do with the

13   charges here, the racketeering.  For them to be even relevant

14   I think that there's an issue with that.  But that's our

15   position, Your Honor, even if they do come in, they're too

16   highly prejudicial, they have no impact whatsoever.  And the

17   government can prove the intent with other overt acts that

18   they've already alleged.

19           THE COURT:  So they may not be particularly

20   probative, they may be somewhat probative not hugely

21   probative, because there is a lot of other evidence reflecting

22   on the same subjects, but by the same token, not so terribly

23   prejudicial either, because there's also lots of other really,

24   for lack of a better term, nasty proof in this case.  In terms

25   of sullying someone's, I don't know, what someone's, you know

1    intentions and mindset seems to be.

2              MR. FRANCOMANO:  Your Honor, I understand what

3    you're saying, is that there are allegedly going to be a

4    number of murders and things brought out in this case.  And

5    that him talking about a revolver or a gun and marijuana is

6    not going to be anything that is too prejudicial to him.  Is

7    that correct?

8              THE COURT:  YeS.

9              MR. FRANCOMANO:  Your Honor, I don't think that's

10   the standard.  I think the standard is whether or not it's

11   going to influence the jury and have them think of him as,

12   well, if he's talking about guns and he's talking about

13   marijuana at the jail, it's probably likely that he did this

14   other stuff too, so he's guilty.  So I think that those two

15   things would lead a jury to believe, well, you know he did

16   this stuff so he probably did all the other stuff too.

17             THE COURT:  That's a 404(b) type analysis.  And I'm

18   resisting the notion that it's really other crimes, wrongs,

19   bad acts evidence, and more just a statement from him that

20   exposes his thinking and intention and beliefs and methods,

21   tools and approaches, to engaging in the general activity that

22   is not other crimes, wrongs, bad acts, but this crime, a

23   racketeering conspiracy.

24             MR. FRANCOMANO:  Right and --

25             THE COURT:  How he does it.

1          MR. FRANCOMANO:  And I would agree with you --

2          THE COURT:  You have a big problem here, Mr.

3    Francomano, in how the grand jury has charged it and the scope

4    of the crime itself.  It's not like, well, this bank robbery

5    is totally different from that bank robbery.  And he's not

6    charged with that bank robbery, he's only charged with this

7    bank robbery.

8          MR. FRANCOMANO:  There's no question that the

9    racketeering charge is --

10          THE COURT:  Racketeering conspiracy.

11          MR. FRANCOMANO:  I'm sorry, the racketeering

12    charge -- conspiracy racketeering charge is large in its

13    breadth.  But at some point, Your Honor, there has to be kind

14    of a limiting of it.  These conversations on the 25th, do not

15    really show anything or any type of issues where Mr. McCants

16    is in furtherance or is team building or has tools or has any

17    type of motivation towards advancing the gang's objectives.

18    Like I said, I think that those conversations on the 25th

19    really don't have anything -- any probative value.  And I

20    think that there's no question they're prejudicial.

21          THE COURT:  What do you talk openly and frankly

22    about -- with?  Who do you talk openly and frankly with when

23    the topic is what particular gun you like to use when you're

24    killing people?

25          MR. FRANCOMANO:  Well, Your Honor, I don't think

1    that that ever came in.  There was nothing about killing

2    people.  It was I prefer a pistol to a revolver.  And they

3    never --

4              THE COURT:  The revolver is a pistol, Mr.

5    Francomano --

6              MR. FRANCOMANO:  I mean, the automatic --

7              THE COURT:  Yeah, a revolver as opposed to a large

8    magazine, semi-automatic handgun.  He's not a revolver guy, he

9    wants more fire power.

10             MR. FRANCOMANO:  And that may be true, Your Honor,

11   but what he says is I prefer -- I do not like revolvers.

12             THE COURT:  Yeah.

13             MR. FRANCOMANO:  But he never said I prefer to use

14   them when killing someone.  That was never said, Your Honor.

15   I want to make sure that that's clear.

16             THE COURT:  No, that's crystal clear.  And the tape

17   will speak for itself regardless of whether it's crystal clear

18   to you or me, but there's a context.

19             MR. FRANCOMANO:  Like I said, Your Honor, at this

20   point it is not probative, and it really has nothing to do

21   with in furtherance of the case itself.

22             THE COURT:  Let's talk about the 26th.

23             MR. FRANCOMANO:  Yes, Your Honor.

24             THE COURT:  And maybe -- and I think it might be

25   your co-counsel who might want to more address what goes on on

 1    the 26th, because your guy's the one making the statement,

 2    we're not really even in a co-conspirator setting there, it's

 3    just is this an admission against his interest.

 4                MR. FRANCOMANO:  Correct, Your Honor.

 5                THE COURT:  That's your biggest problem.

 6                MR. FRANCOMANO:  Do you want me to address that or

 7    wait?

 8                THE COURT:  Well, I would think you should address

 9    that since you've got the floor.

10                MR. FRANCOMANO:  Your Honor, first of all, the 26th

11    conversation, No. 1, there's no proof that it even happened.

12    The government makes a number of allegations, they say that

13    if, you know, if Ronnie is Ronald hall, if --

14                THE COURT:  So you're not saying that there's no

15    proof that the conversation actually happened, you're saying

16    there's no proof that the murder actually happened.

17                MR. FRANCOMANO:  Correct, Your Honor.  So there's no

18    proof whatsoever that the murder happened.  Like I say, they

19    take a number of suppositions to say that this might have been

20    this person, this might have been Joe, might have been Joseph

21    Bonds, Moose's little brother, could have been Kevin Evans.

22    There was somebody that was murdered in Baltimore named Mike.

23    Your Honor, all of these things taken together do not prove

24    circumstantially, or otherwise, that a murder even took

25    place.

1          THE COURT:  Well, let's first start with the notion

2     that it might have been just another one of these team

3     building conversations and that it might come in for that

4     purpose.  I mean, you could have, I suppose a team building

5     conversation where the substance of it wasn't even true, it's

6     just bragging, trying to impress each other, but it still is

7     probative of the question of whether or not they're in a group

8     with each other, whether they're united, whether they're

9     co-conspirators, and directed at trying to promote

10    cohesiveness.  So that would pretty quickly flip it from -- it

11    would have relevance for that purpose.  And then it would be

12    back to a 403 problem.

13          MR. FRANCOMANO:  Correct, Your Honor.  And there is

14    case law on that, Your Honor.  Evidence of an uncharged murder

15    is highly prejudicial.  *United States v. Khan*, 591 F.Supp.2d

16    202.  And in the *Khan* case there was -- the government sought

17    to admit circumstantial evidence of two uncharged murders.

18          THE COURT:  Was it in the context of a case where

19    there were multiple other murders for which they, at least

20    purportedly, had more direct evidence and it was a RICO

21    conspiracy?

22          MR. FRANCOMANO:  Your Honor, in that case --

23          THE COURT:  This is the old prejudice comes down

24    argument from the sexual assault argument you and I were

25    having a few minutes ago.

1          MR. FRANCOMANO:  Right.  In that case, Your Honor,

2    it was a cocaine conspiracy.

3          THE COURT:  Well, cocaine conspiracies and murders

4    are pretty different species.

5          MR. FRANCOMANO:  That's correct, Your Honor.  But

6    what they said was that the probative value gained, the proof

7    of the defendant's leadership role is substantially outweighed

8    by the risk of undue prejudice to them bringing that in.  And

9    I understand Your Honor's argument that it was not another

10   murder.

11         THE COURT:  I mean, not to be crass, but you know,

12   we -- context is everything.  It's just one more murder.

13         MR. FRANCOMANO:  Well, I understand that, Your

14   Honor.  But there is another case as well, the *Acosta* case

15   that is *United States versus Acosta* 181 F.Supp.2d 482.  In

16   that the testimony -- the defendant boasted of committing a

17   murder, would have likely -- and would have the likely --

18   excuse me, the testimony that a defendant boasted of

19   committing a murder would have the likely tendency of leaving

20   at least some jurors to conclude that the defendant had

21   committed that murder.  In that case -- there was a murder in

22   that case, Your Honor.  So in that situation --

23         THE COURT:  So your view would be that if the

24   government could prove, I don't know by what standard, that

25   this murder actually happened, that would greatly strengthen

1    their argument for its admissibility in this case, even though

2    it's not specifically alleged as one of the overt acts in

3    furtherance of this particular conspiracy.

4              MR. FRANCOMANO:  Well, I would, Your Honor, but then

5    we would have to go back to the 404(b) balancing.

6              THE COURT:  404(b) or 403?

7              MR. FRANCOMANO:  404, because it would be other

8    crimes.

9              THE COURT:  Would it?

10             MR. FRANCOMANO:  I would think so, Your Honor.

11             THE COURT:  Well, they certainly can prove uncharged

12   overt acts, and to the extent that they prove that the conduct

13   occurred as part of this conspiratorial activity, it's not

14   404(b) anymore, it's just an uncharged overt act that's

15   intrinsic to this crime.

16             MR. FRANCOMANO:  Like I said, there still has to be

17   the balancing test.  And you know, this statement that he

18   allegedly committed a murder, there's no proof it ever

19   happened.  There's no question it's going to inflame the jury.

20   Mr. McCants is not charged with committing any murders in this

21   racketeering conspiracy.

22             THE COURT:  Well, what are the objectives of the

23   racketeering conspiracy?  What are the means and methods?  I

24   think murder.  Am I wrong about that?

25             MR. MARTINEZ:  No, Your Honor.

1          THE COURT:  So --

2          MR. FRANCOMANO:  I understand that, Your Honor.  But

3    what I'm saying is his statements, or his alleged statements

4    are in reference to a murder that he is not charged with in

5    this case.  So if a jury were to hear these statements --

6          THE COURT:  Well, he's charged with engaging in

7    murder as a means and method, method and means of carrying out

8    the racketeering conspiracy offense.

9          MR. FRANCOMANO:  In the conspiracy, Your Honor, not

10   substantively.

11         THE COURT:  Well, right, but for this purpose,

12   what's the difference?  I mean, lots of other murders are

13   going to be -- they're going to attempt to prove.  And the

14   Court's certainly not going to prevent that on the theory

15   that, well, they're not charged with those substantive

16   murders.  Well, they're charged with racketeering conspiracy

17   where the murders are intrinsic and a part of the means and

18   methods.

19         MR. FRANCOMANO:  But they're not murders that are

20   charged against Mr. McCants, and that's what I'm saying, if

21   this conversation were allowed to come in, it is still such a

22   situation where it is highly prejudicial to Mr. McCants, with

23   zero probative value.

24         THE COURT:  Well, why doesn't it help tend to prove

25   whether or not he committed murders as a method and means of

1    carrying out the objectives of the conspiracy.

2         MR. FRANCOMANO:  Your Honor, as I said, there is

3    nothing to show that this alleged murder even took place.

4         THE COURT:  Well, that's a different point.

5         MR. FRANCOMANO:  Yes, Your Honor.

6         THE COURT:  And the government, you know, we'll find

7    out from them in a minute how they intend to otherwise -- it's

8    not even corroborate -- prove that the murder occurred.  All

9    right.

10         MR. FRANCOMANO:  Thank you.

11         THE COURT:  Thank you, Mr. Francomano.  All right.

12    I'll come back to the other defendants on the question of --

13    well, I'll let anybody address 801(d)(2)(E) that wants to, but

14    I think the more real salient question is what do we do about

15    the fact -- what do we do in the circumstance, hypothetical at

16    this point, that I plan to allow the government to introduce

17    the September 26th statement about the murder and the

18    twitching and all the horrible stuff against Mr. McCants.

19    What are your client's entitled to if that is going to come in

20    during this joint trial?

21         But before we get to that, let's go back to the

22    government.  If you have anything you want to generally say

23    about the 801(d)(2)(E) conversation that I had with Mr.

24    Francomano, feel free.  But I'm most interested in talking to

25    you about the September 26th statements of McCants, about some

1    murder that I take it you are rapidly trying to solve perhaps

2    even as we speak.

3            MR. MARTINEZ:  Your Honor's correct that the

4    investigation of the murder is ongoing, and just in the last

5    couple days there have been additional facts uncovered that

6    tend to corroborate the account Mr. McCants provided.  We

7    learned, for example, that the individual Rondo or Ronnie,

8    when Mr. Handy asks, you're talking about his residence, which

9    residence was it, the one on Druid Hill or the one on Barclay.

10   Ronnie Hall, who witnesses would testify is a BGF member

11   happens to have addresses at 2357 Druid Hill Avenue and 2319

12   Barclay.  That goes a long way to corroborate that the Ronnie

13   who's being spoken of in the recorded statement on September

14   26th is Ronnie Hall.

15           But getting back to the issue I think the Court is

16   interested in, do I understand you to be asking about the

17   prejudicial impact versus probative value of the September

18   26th --

19           THE COURT:  I want to know whether or not you're

20   actually going to really be able to otherwise prove that the

21   murder that you think Mr. McCants was talking about, actually

22   happened.

23           MR. MARTINEZ:  I believe --

24           THE COURT:  And if it did, was it within -- was it

25   within the scope of the crime that the grand jury indicted in

1    this case, the racketeering conspiracy.

2         MR. MARTINEZ:  I believe we will, Your Honor, and

3    I'll get to the reasons why in a moment.  But I want to put a

4    marker down here to say that even if we couldn't, the

5    statements about that murder are still relevant and probative

6    for the reasons the Court was just discussing with Mr.

7    Francomano.  And that is that this case isn't about individual

8    racketeering acts, or which murders are charged or uncharged.

9    The crime charged at least in Count 1 is the agreement.  And

10   the question before the jury is what is the scope of the

11   agreement.

12        If Mr. -- if the jury decides that Mr. McCants

13   agreed to be a member of the BGF Greenmount regime, was it --

14   did he agree that he or some other member of the gang would

15   commit murders in furtherance of the enterprise.  And so the

16   fact alone that he is in that room discussing with Handy the

17   details of this brutal murder, goes directly to his knowledge

18   and intent with respect to the agreement.  So even if there is

19   no further factual development of who the victim was, who the

20   accomplice was, where the murder happened, et cetera, all of

21   the questions that Mr. Francomano raises in his motion, the

22   statement still has immense probative value for the purpose of

23   showing the scope of Mr. McCants' agreement.

24        Now, with respect to the facts of this particular

25   murder, there already is substantial evidence that Rondo,

1    Ronnie, is a co-conspirator.  Witnesses will testify, have

2    testified already, that Ronnie Hall is a member of the BGF

3    Greenmount regime and a member of the gang.  Mr. Handy in the

4    recorded conversation talks about Rondo having an address in

5    Druid Hill Avenue and Barclay.  There are records from MVA and

6    from search warrants that were executed at the Barclay Street

7    residence that confirm that.

8         Mr. Handy and Mr. McCants talked about Joe being

9    involved.  There are text messages on Joe's phone with Rondo

10   and Digga, some of which reference criminal activity,

11   including going to a gas station to get a mask.  All of those

12   tend to corroborate, and this like I said, Your Honor, this is

13   still in its early stages, I'm sure there will be further

14   factual development.  But all of those go to corroborate the

15   notion that Mr. McCants and Mr. Handy were discussing a crime

16   that actually happened.

17        With respect to some of the other information in the

18   factual section of the paper we submitted last night, there

19   was a murder in April, on April 25th of 2016 of an individual

20   named Michael Tillman.  In the conversation Mr. McCants says

21   the victim's name was a boy named Mike.  He also talks about

22   how the confrontation that precipitated the murder was the

23   shooting of Rondo's house on Druid Hill, and that they

24   believed that Moose's brother set it up.

25        This gentleman Michael Tillman was murdered on April

1    25th, of 2016, he was shot multiple times in the neck and

2    torso.  There were seven gunshot wounds in the autopsy.

3    Witnesses have testified that he had a connection to Kevin

4    Evans, who is Moose's brother, as well as to Cakes, which is

5    another name or alias for Ronnie Hall, the Rondo or Ronnie

6    that's being discussed during the conversation.

7            There's a witness whose account is roughly

8    consistent with what Mr. McCants describes during the video.

9    She said she heard one or two gunshots and somebody screaming,

10   then a bunch of additional gunshots then a car fled the scene.

11   She also said the shooter got out of the back seat, which

12   again, is consistent with the narrative that's being

13   described.

14           But I just want to circle back to the point, Your

15   Honor, that for purposes of RICO conspiracy, we're not in

16   Baltimore City Circuit Court, we haven't charged Mr. McCants

17   with first degree murder.  We don't need to prove that murder

18   happened beyond a reasonable doubt.  Just as we don't need to

19   prove that any of these defendants dealt a gram of drugs.

20   It's about the agreement.  Did they agree -- did Mr. McCants

21   agree that he or another member of the gang would commit

22   murder.  This conversation shows, unquestionably, of course he

23   did.  It goes to his knowledge and intent with respect to that

24   agreement.

25           So I appreciate the Court's factual questions about

1    how are we going to be able to develop what happened with

2    respect to this murder.  We will and there will be more

3    development, but I respectfully submit we don't need to.

4              THE COURT:  Thank you, Mr. Martinez.

5              All right.  Who else wants to be heard on the

6    question of these two recordings and the very real possibility

7    that the government would be permitted to introduce them

8    during their case in chief.  Why -- I see Mr. Enzinna eagerly

9    bouncing in his chair.  Why should they not be broadly

10   admitted as co-conspirator statements and, therefore, without

11   restriction or limiting instruction in terms of, you know, who

12   they can be admitted against?

13             MR. ENZINNA:  Your Honor, I'd like to address two

14   things.  First, on the conversation of the 26th.  And the

15   conversation we had in here about how that goes to Mr.

16   McCants's state of mind and his agreement and scope of his

17   agreement, et cetera, et cetera.  That gets to the part of the

18   problem here in that there are two ways this stuff can come

19   in, one is --

20             THE COURT:  Two ways?

21             MR. ENZINNA:  Two ways these tapes can come in.

22             THE COURT:  Yes.

23             MR. ENZINNA:  One as co-conspirator hearsay against

24   everybody, one is as an admission by Mr. McCants, in which

25   case it was not admissible against everybody.  And our

1    clients, including Mr. Johnson, would be entitled at the very

2    least to a limiting instruction.  But the question is when you

3    have this kind of evidence, this kind of long narrative of

4    this murder, this uncharged murder that we don't even know

5    happened and that we don't know the motivation for, we don't

6    know if it's connected to the conspiracy, that is

7    extraordinarily prejudicial against people like Mr. Johnson.

8              THE COURT:  Is it in the context of the proof that

9    you know is otherwise going to be offered during the

10    government's case in chief?

11             MR. ENZINNA:  Well, I think is, Your Honor.  Because

12    like I've said, we have no proof that this murder took place

13    or why it took place or that it had anything to do with this

14    agreement.

15             THE COURT:  What do you mean there is no proof?  Mr.

16    McCants himself says he did it.  You're wandering away from

17    the microphone and your voice is a bit --

18             MR. ENZINNA:  I apologize, I'll stay here.  The

19    point is, Your Honor, if Mr. McCants committed a murder that

20    had nothing to do with this conspiracy, let's suppose for

21    example he killed his -- somebody who sold him a car because

22    he didn't like the car.  That has nothing to do with the

23    conspiracy.  It may go to the question of whether or not Mr.

24    McCants was likely to have agreed to commit murders, as an

25    admission by Mr. McCants.  But it does not go to any other

1    defendant in the case, if it has nothing do to do with the

2    conspiracy.  And that brings me to my second point --

3            THE COURT:  I don't want to hear that yet.  Mr.

4    Martinez, what about that?  What about your responsibility,

5    what about your obligation to connect the murder to the

6    conspiracy and how are you going to do that such that I am not

7    in danger of admitting evidence about an unrelated murder.

8            MR. MARTINEZ:  Well, yes, Your Honor.  So I think

9    there are a number of different ways that that can be done.  I

10   think the place to start here from an analytical perspective,

11   is to recognize that for purposes of the legal standard for

12   admitting co-conspirator statements, the 4th Circuit has

13   interpreted the in furtherance aspect of it very broadly.  And

14   Your Honor was touching a moment ago on how statements

15   meant -- you used a term "team building," I think the cases

16   refer to fostering trust and cohesiveness, as well as bringing

17   co-conspirators up to speed.

18           So the first layer here is the conversation between

19   Mr. McCants and Mr. Handy occurs in the context of a

20   discussion where before they start talking about the murder,

21   Mr. McCants assures Mr. Handy "I ain't telling."  That goes to

22   fostering a kind of trust and cohesiveness the Court was

23   talking about a minute ago.  Ronnie is brought up.  And Norman

24   says, "Ronnie's supposed to send me some money."  And in the

25   *Graham case* that we cited in our papers, the 4th Circuit

1    talked about how money owed by one co-conspirator to another

2    is the type of topic that renders a statement in furtherance

3    of a conspiracy for purposes of 801(d)(2)(E).

4              THE COURT:  Is that money about drugs being sold in

5    the jail, though?

6              MR. MARTINEZ:  No, but we do allege -- so first of

7    all, and this goes to I think the pendency of the conspiracy.

8    The overarching premise of the indictment is that BGF is a

9    prison gang.  They -- this Greenmount regime had a presence on

10   the street.  But their conspiratorial activity, the

11   racketeering activity doesn't cease once they go to jail.  And

12   there's language in the manner and means section about members

13   of the gang sending money to one another in prison, and

14   supporting their fellow comrades when they get locked up.

15   That's the premise of the whole gang.

16             And so when one gang member who's locked up says,

17   about a gang member who's on the street, Ronnie's supposed to

18   send me money, that's part of what BGF members do for one

19   another when one is locked up.  That is how this is teed up.

20   That's the discussion that leads into Mr. McCants's recounting

21   of the murder.  He talks about how it's triggered by a

22   shooting of Ronnie's house or Ronnie's house was shot up.  And

23   then Joe comes and they go find the guy, they --

24             THE COURT:  I was told to get over there, my house

25   got shot up.

1          MR. MARTINEZ:  Correct.  And he's telling Norman

2     about that as a way of bringing him up to speed, as a way of

3     boasting that he came to the aid of a fellow gang member, who

4     is, I will repeat, multiple witnesses can testify during the

5     course of this trial that he was in the regime.  In fact, one

6     will testify that he was the person who introduced him to the

7     gang.

8          We pointed out in our papers how one of the

9     fundamental principles of the gang, one of the 22 rules and 33

10    constitutions, is that we do not allow harm to come to a

11    comrade without confrontation.  That's a foundational

12    principle of this gang.  Foundational principle that Mr.

13    McCants agreed to honor, that Mr. Handy agreed to honor.  Mr.

14    McCants is telling Mr. Handy what he did in response to the

15    shooting of Ronnie's house.  He's saying, hey, look, I'm

16    following the code.  It's in the same conversation where he's

17    saying, hey, look, I'm following the code because I'm not

18    telling.  So that, in and of itself, Your Honor, is more than

19    sufficient to tie this to the conspiracy that we've charged.

20         THE COURT:  All right.  Mr. Enzinna, I'll let you

21    make your second point now.

22         MR. ENZINNA:  My second point actually picks up

23    right there, because Mr. Martinez is talking about the

24    conversation on the 25th.  And I'm specifically talking about

25    a part of that conversation that occurs on the third page of

1    the transcript at the very bottom.  And that's the part where

2    Mr. McCants is quoted as saying, "I tell him all the time like

3    I" --

4         THE COURT:  Hold on.  Let me catch up.  Okay.  Carry

5    over, I got it.  Go ahead.

6         MR. ENZINNA:  "Man, what the F I'm going to tell

7    about.  For real, what I'm going to tell about?  I don't know

8    shit.  Unintelligible.  We ain't been together in years.  What

9    I'm going to tell about?  Geezy he in all that type of shit.

10   I can't say nothing about him.  Yeah, he J.  He that."  And it

11   goes on.

12        Now, Mr. Martinez just argued that what Mr. McCants

13   said in this conversation was, I'm not telling because I'm

14   following the constitution.  I'm following our gang rules.

15   But what Mr. McCants is saying here is, I'm not telling

16   because I ain't got nothing to tell.  He's not saying, I'm

17   doing this as part of a conspiracy.  He's not saying, I'm

18   following our rules.  He's saying I've got nothing to tell.  I

19   don't know anything.  We haven't been together in years.  What

20   am I going to tell about?

21        Now, whatever piece of this conversation may be in

22   furtherance of the conspiracy, this particular portion of it

23   certainly is not.  Because what Mr. McCants is saying, is

24   implying is, if I could tell, I would tell.

25        THE COURT:  I don't think that's the fairest

1    interpretation.

2            MR. ENZINNA:  Well, he's certainly not saying,

3    believe me I know stuff, but I'm not going to tell it because

4    I'm a good BGF member.

5            THE COURT:  Well, in those few lines, correct.

6            MR. ENZINNA:  Right.  So what I'm saying is, now the

7    question here is admissibility.  And the admissibility

8    question is not decided -- the admissibility question is

9    divisible in that if one piece of this conversation is

10   801(d)(2)(E), co-conspirator hearsay.

11           THE COURT:  Right.

12           MR. ENZINNA:  That doesn't bring the whole

13   conversation in.

14           THE COURT:  Agreed.  But --

15           MR. ENZINNA:  What I'm saying is that this

16   particular piece of the conversation is not in furtherance of

17   the conspiracy and ought to be kept out.  Particularly, the

18   part where it says, "Geezy, he in all that type of shit."  And

19   then it says, "Yeah, he J," because that's extraordinarily

20   prejudicial to my client.

21           THE COURT:  But why isn't that just in the general

22   context of the team building.  We're all talking about each

23   other.  We're all pulling together.  We're all sticking

24   together.

25           MR. ENZINNA:  Your Honor with all due respect, that

1    swallows the rule.  Because what it means is that if we talk

2    about anything that has a -- in fact, I think Your Honor used

3    the word earlier, a connection to the conspiracy, it comes in.

4    But the rule is not a connection.  The rule is not the same

5    subject.  The rule is in furtherance of.  You talked about the

6    eating club and the two people who go to the eating club.  And

7    one day at the gym they're talking and one says I really like

8    chocolate cake better than vanilla, is that in furtherance of

9    their agreement of their group?

10          THE COURT:  If it's fostering pride in their club,

11   the argument would be yes.

12          MR. ENZINNA:  Well, how is it fostering pride to

13   say, I'm not telling because I don't know anything.

14          THE COURT:  If --

15          MR. ENZINNA:  He's saying I am -- he's basically

16   saying that --

17          THE COURT:  Do you have the tape cued up?

18          MR. MARTINEZ:  We do, Your Honor.

19          THE COURT:  Let's listen to that segment in

20   particular, so that we -- I can make a judgment as to how

21   intonation and nonverbal cues express meaning in this

22   communication.

23          MR. MARTINEZ:  So we can certainly do that, Your

24   Honor.  The particular portion in which the statement Mr.

25   Enzinna just referenced is between 8 minutes and 32 second and

1    12 minutes and 10 seconds.

2         THE COURT:  So you have to fish for it is what

3    you're saying.

4         MR. MARTINEZ:  Yes.  We're going to fish for it.

5    But there are other places.

6         THE COURT:  Well, while Ms. Hoffman is fishing,

7    which I hope you're doing or do you need to play it to fish?

8         MR. MARTINEZ:  There are other places in both

9    conversations where this kind of topic is discussed, and in

10   fact, on September 26th, before the murder is discussed, they

11   talk about whether any co-defendants are testifying.  And when

12   Mr. Handy confirms his relief that no other co-defendants are

13   testifying, Mr. McCants says, "yeah, that would be a good

14   look."  So the whole thing is going towards building --

15        THE COURT:  All right.  I've let you set that sort

16   of contextual marker for us.  But it's really Mr. Enzinna's

17   turn until we stop for a moment to play the tape.  Are you

18   ready to do that now?

19        MS. HOFFMAN:  Sure.

20        THE COURT:  Okay.  Mr. Martinez, do you have an

21   image?

22        MR. MARTINEZ:  No, I do not.

23        THE COURT:  A minute ago there was a image from

24   inside of CDF.

25        MR. MARTINEZ:  Yeah, I think I --

1              THE COURT:  There it is.  Do you have it, Ms.
2    Hoffman?  Do you have the image?
3              MS. HOFFMAN:  I think I -- if I play it -- try
4    playing it now the sound might go.
5              (video played.)
6              THE COURT:  All right.  So let's back up and play
7    the last 60 or 90 seconds again, please.  60 seconds will
8    catch it.
9              (Video played.)
10             THE COURT:  Okay.  Mr. Enzinna.
11             MR. ENZINNA:  Your Honor, I apologize, can we hear
12   that again, I -- I think there may be a mistake in the
13   transcript.
14             THE COURT:  Why don't you tell me what you think the
15   mistake is and then we will play it again.
16             MR. ENZINNA:  Well, to be perfectly honest with you,
17   I have a great deal of difficulty understanding it, but my
18   client told me that what he heard is different from what the
19   transcript --
20             THE COURT:  Well how's it going to help me to
21   relisten to it, I mean, you can listen to it outside of court,
22   but if you've trying to make a point with me you've got to
23   proffer to me what it is that you think I should hear that I'm
24   not hearing.
25             MS. HOFFMAN:  Your Honor, this is a draft

 1    transcript.  So we're certainly amenable to having these

 2    conversations with defense counsel about changes.

 3              MR. ENZINNA:  Well, potentially it's extremely

 4    important, because this is the one mention of my client in

 5    here.  It's very important that we understand what it's

 6    saying.  Because if you read this -- if you look at what we

 7    just listened to, basically what they're talking about,

 8    they're not talking about BGF and the constitution and the

 9    rule that they don't snitch, they're talking about everybody

10    who is talking.

11              THE COURT:  They're talking about what?

12              MR. ENZINNA:  They're talking about everybody who is

13    talking.

14              THE COURT:  Uh-huh.

15              MR. ENZINNA:  If you look, he says -- if you look

16    on -- he says, "Some stuff they're saying true, but a lot they

17    saying ain't true."  And then Handy says, "They got a lot of

18    specific shit, that's how you know Niggas telling."

19              THE COURT:  Where are you?

20              MR. ENZINNA:  I'm on page 2 of the transcript, about

21    two-thirds of the way down.  After the break in the middle of

22    the page it's the fourth --

23              THE COURT:  Yes.

24              MR. ENZINNA:  "They've got a lot of specific shit

25    that's how you know Niggas telling."  Then he says, "That was

```
1    probably -- like drugs, this whole Country situation.  That

2    was specific."

3              THE COURT:  I still haven't found you.  "Okay.  Like

4    drugs.  This thing, the whole Country situation."

5              MR. ENZINNA:  "That was specific."  And then McCants

6    says, "That was probably Chop.  He knew all about that.  You

7    feel me?"  And then they go on to talk about the possibility

8    that Chop has been talking.

9              THE COURT:  Right.

10             MR. ENZINNA:  Cooperating.  So this is not a

11   conversation about, hey, we need to buck up and be tough and

12   not cooperate.  It's about everybody -- people are

13   cooperating.  And McCants is saying, I can't, because I just

14   don't have any information.  He's not saying I would never do

15   that or I can't do that or I won't do that, he's saying I'm

16   unable to do that.

17             THE COURT:  Well, you can try to sell that

18   interpretation of it, but that's not mine.

19             MR. ENZINNA:  And I believe that what they say

20   here -- what they say is, "We ain't been together in years."

21             THE COURT:  Now where are you?

22             MR. ENZINNA:  I'm at the very bottom now.

23             THE COURT:  In the same -- "I tell that all the

24   time, like, I ain't a cooperating man."

25             MR. ENZINNA:  Yes.  "What am I going to tell about?
```

1    I don't know anything.  We ain't been together in years.

2    Like, what am I going to tell about?"  Then most importantly,

3    for my purposes, my client says --

4            THE COURT:  One thing I note that the transcript

5    doesn't record in there is the other participant in the

6    conversation, Mr. Handy, laughing.

7            MR. ENZINNA:  Correct.

8            THE COURT:  And in a way that suggests, a-ha, that's

9    a way to sell this.  It's about intonation and it's about

10   interpretation, no question about it, Mr. Enzinna.  And I've

11   got to draw my own best inferences and make my own

12   interpretation in support of the ruling that I've got to make,

13   or that I don't make, with respect to the admissibility of the

14   evidence.  I'm telling you, the inference that I draw from

15   it.

16           MR. ENZINNA:  Okay.  But it goes on to say, "Geezy,

17   he in all that type of shit.  I can't say nothing about him."

18   Now, first of all, I don't know that that is correct.  I think

19   that what it may be saying is he's saying they got Geezy as

20   the head of the indictment in all that shit, which means

21   something different.  So I guess in a -- the jury's ultimately

22   going to decide what it means.

23           THE COURT:  Yeah.  And there may well be a

24   transition in McCant's statements there, that transitions

25   from, well, I'm not cooperating, which is about the gang

1    rules, but then goes on to, no for real, in the context of

2    Geezy, I couldn't any way.

3              MR. ENZINNA:  Right.  But then he goes on to say

4    that Geezy is in all that stuff and he J.  J means BGF.

5              THE COURT:  No, he says, Geezy, he in all that type

6    of stuff, shit, question mark.  I can't say nothing about

7    him.

8              MR. ENZINNA:  Yeah, he J.

9              THE COURT:  Yeah, he J.  He that.

10             MR. ENZINNA:  So what he's saying there is that --

11             THE COURT:  That he's not implicating your client.

12             MR. ENZINNA:  He sure is, he says "he J," J is BGF.

13   J is jamaa, which stands for BGF.

14             THE COURT:  What is Geezy?

15             MR. ENZINNA:  Geezy is Mr. Johnson's street name.

16             THE COURT:  Yeah.  "Geezy, he in all that type of

17   shit, question mark, I can't say nothing about him.  Yeah, he

18   J.  He that."  Well, if he is saying J is BGF, then the

19   statement immediately preceding, I can't say nothing about

20   him, takes you right back into the place where we have been,

21   and why can't he say, he just said that he knows that he is

22   BGF.  I can't say nothing about it, then it must be because of

23   the rules.  That's an inference that is reasonably drawn from

24   it all.

25             MR. ENZINNA:  Your Honor, with all due respect, I

1    think that is an unreasonable inference, because what he says

2    is we ain't been together in years.  We ain't been together

3    for so long.  He's not saying I can't talk -- say anything

4    about Geezy because of the rules.  He's saying I can't say

5    because I don't know anything.  Why would he say --

6                THE COURT:  What did you mean a second ago when you

7    were saying that, yeah, he J, he that.

8                MR. ENZINNA:  Uh-huh.

9                THE COURT:  He J, he that.  And you told me that

10   means that's McCants saying that J is BGF.

11               MR. ENZINNA:  Correct.  How is that in furtherance

12   of the conspiracy?

13               THE COURT:  Well, he's -- it's in the general

14   context that we've been discussing all day.

15               MR. ENZINNA:  Again, in the context of a rule that

16   is not even a rule.  Because, again, it's saying that anything

17   that touches on the conspiracy is admissible.  And that's not

18   what the law is.  The law is it has to be in furtherance.  And

19   for him to say --

20               THE COURT:  Yeah, but you're missing the premise on

21   which I am proposing it is appropriate to operate here.  And

22   that premise is that a conversation that has a team building,

23   trust building, cohesiveness enhancing quality to it, is

24   itself an act that is in furtherance of the conspiracy,

25   because the way the conspiracy is charged, No. 1, and No. 2,

1    because of the ample other evidence that indicates that that

2    that code of loyalty and absolutely fealty to each other is at

3    the center of the conspiracy, the organization, how it

4    operates, its expectations, its rules, its constitutions, it's

5    22s and 33s.

6                MR. ENZINNA:  Well, where in the conversation is

7    there a reference to the code, the constitution, the rules

8    or --

9                THE COURT:  It doesn't all have to be in this

10   particular conversation.  The Court's entitled to take into

11   account the broader context.  And all of this assumes that the

12   government is actually going to prove up the existence of the

13   Black Guerilla Family, this particular set, the existence of

14   the rules, et cetera.  It isn't all set out in this particular

15   conversation.  And I'm making assumptions about what the

16   government will prove.  But I think those are prudent

17   assumptions, in light of the proof that we've all previously

18   been exposed to.  And all this is subject to counsel arguing

19   at the conclusion of the government's case that the

20   assumptions that the Court made about what was going to be

21   proven actually never happened.

22                MR. ENZINNA:  But, Your Honor, we are -- the

23   point --

24                THE COURT:  I have to make some gatekeeping

25   decisions up front about whether I'm going to allow them to do

it in the first place.  And what we don't do, you're old
enough to remember *United States versus James,* and what was
the 5th Circuit's thinking about what needed to be done before
co-conspirator statements could come in and so forth.  That
stuff didn't -- I don't think the 4th Circuit ever embraced
it, there were circuits beyond the 5th that did.  And then it
completely fell out of favor in the late 80s.  We don't have
minitrials and prove the conspiracy before the judge first.
It is all subject to being connected up.

        And that should be implicit.  And the record should
be clear that it's implicit in my thinking with respect to
this.  I still have this gatekeeping function of whether I'm
going to let them start down the road.

        MR. ENZINNA:  Right.  And that great keeping
function requires that the Court review the statement that's
supposed to come in, and draw reasonable inferences from that
statement about whether it is in furtherance of the
conspiracy, not whether it touches on the conspiracy or is
connected.

        THE COURT:  Agreed.  It has to be in furtherance.

        MR. ENZINNA:  And you have a conversation where
these guys are talking and they assume that they are not being
observed, and so we can assume that they're being honest with
each other.  And they're having a conversation about people
cooperating with the government.  And nowhere in here did they

1    say, you can't do that because of our rules.  I won't do that

2    because of our rules.

3            THE COURT:  Right.  I understand your argument, Mr.

4    Enzinna, what I'm telling you is that the whole situation

5    more -- this conversation in the context of all of the other

6    evidence that's presented, creates a wider context, which is

7    you never can cooperate, you never can testify.  And what this

8    is, is a conversation down around the margins about how are we

9    going to implement that rule and follow that policy in the

10   context of the particular details that we're aware of with

11   respect to particular individuals, including to some extent

12   ourselves, people who are around us and so forth.

13           You're right, it does require the importation from

14   other evidence and information gathered in this case, this

15   broader context of there's a rule, there's a code that you

16   can't cooperate.  And then from that, the extension to the

17   notion that this is the execution of that rule.  This is a

18   conversation about how to implement it in this context.

19           MR. ENZINNA:  Your Honor, with all due respect, it's

20   not at all about the implementation of that rule.  It is about

21   the people who are violating the rule and the fact that this

22   particular speaker can't violate it, because he doesn't know

23   anything.

24           THE COURT:  Why isn't the violation of the rule a

25   conversation about the rule?

1          MR. ENZINNA:  It is not a conversation about the

2     implementation of the rule, about how are we going to

3     implement it.  It's a conversation where the speaker says all

4     these people are doing this.  And I would do it too if I

5     could, but I can't, because I don't know anything.

6          THE COURT:  All right.

7          MR. ENZINNA:  That's exactly what he says.

8          THE COURT:  I hear your interpretation of it.  It's

9     not mine.  Where else are we going with this?

10         MR. DAVIS:  Your Honor, I'm just going to join

11    everyone's argument with respect to everything that doesn't

12    directly have to do with me.  Does Your Honor want to hear

13    from me on the things that --

14              THE COURT:  YeS.  I think you probably have

15    some specific concerns.

16         MR. DAVIS:  I do.  And if Your Honor's inclined to

17    admit it, I'm prepared to address it.

18         THE COURT:  You should operate on the assumption

19    that I'm inclined to admit it.  I'm not going to rule during

20    this hearing.  I'm going to rule in writing.  It's complicated

21    and I think that it requires a nuanced ruling.

22         MR. DAVIS:  Well, in addition to the arguments

23    contained in our pleading, I would point out that Mr. Brown --

24    the representations regarding what Mr. Brown said, none of

25    them indicate that he's plotting anything.  None of them

1    indicate that he's targeting witnesses or trying to decide

2    who's going to -- who has testified or who has cooperated

3    before --

4            THE COURT:  Let's get zeroed in on the portion of

5    the relevant transcript that is relevant to your client and

6    your concerns.

7            MR. DAVIS:  That's contained in my pleading,

8    document 380, I think I pulled them out.

9            THE COURT:  Walk me back through it.  Are we in --

10   let's see are we in the 25th or the 26th?

11           MR. DAVIS:  We're on the 25th.  And the first thing

12   we start out with is at page 2, 8:32 to 12:10, the first

13   couple of sentences.  "Wes got" --

14           THE COURT:  "Wes got offered 40 then 30."

15           MR. DAVIS:  Yes.  I would indicate -- I would argue

16   to the Court that that -- there's no way in the world that

17   that can be indicative of being in furtherance of the

18   conspiracy.

19           THE COURT:  How is that admissible, Mr. Martinez?

20           MR. MARTINEZ:  Your Honor, this is the lead in to

21   the discussion that actually we just played, in which they

22   talk about who's violating the rule.  And Mr. McCants assisted

23   he's not going to.  But to the extent Mr. Davis is raising an

24   objection to the negotiations between the government and his

25   client regarding a plea, I think that's reasonable.  I think

1    we're prepared to concede that that doesn't come in and can

2    redact it from the transcript.  It won't be part of the

3    excerpt played to the jury.

4            THE COURT:  Okay.  Let's make sure that when we

5    start excising the tape, that we are faithful to this.

6    Because I don't want anything in this tape played in front of

7    this jury about Mr. Brown's deal.

8            MR. MARTINEZ:  Understood, Your Honor.  I think

9    that's a reasonable concern.

10           THE COURT:  Starting off, Mr. Davis, we've got

11   "McCants:  Wes got offered 40 then 30."  That line is stricken

12   on the motion of Defendant Brown.

13           MR. DAVIS:  And I think that also includes the

14   second line, "He said he trying to get" --

15           THE COURT:  "Handy:  Yeah, he said he's trying to

16   get 15.  He said he got all the -- he said he got all the way

17   to 15, he'll take it."  That's gone too.  And that comes out

18   because it's -- I find it's either over the line or

19   dangerously close to the line of intruding on a dimension that

20   Mr. Brown is entitled to have kept from the jury.  They're not

21   entitled to know -- if he was in such a conversation, who

22   knows if it's true, but even if he was they're not entitled to

23   know about that.

24           Okay.  Now, I think we're done with the deal, Mr.

25   Davis, at the very next line, some shit they saying true, but

1    a lot of shit saying ain't true --

2              MR. DAVIS:  Well --

3              THE COURT:  And --

4              MR. DAVIS:  After we deal with the two lines that

5    Your Honor just said, and the United States conceded they're

6    not going to use, then we flip over to the second to the last

7    page, beginning at 32:07 and 33:30.

8              THE COURT:  Hold on.  Yes.

9              MR. DAVIS:  "That's what he got found guilty for,"

10   they're talking about Mr. Brown now.

11             THE COURT:  Right.

12             MR. DAVIS:  Now first going back to the comments

13   about the plea, if a -- these are nontestimonial statements.

14   So under *Crawford* they come in, if they come in under firmly

15   rooted hearsay exception.  And here the United States is

16   relying on the co-conspirator hearsay exception.

17             THE COURT:  Right.

18             MR. DAVIS:  I would submit that the fact Mr.

19   Brown --

20             THE COURT:  Wait a minute, why are you talking about

21   that, we already took those out?

22             MR. DAVIS:  I know.  We already took those -- well,

23   actually all these statements are nontestimonial, so they all

24   have to come in under the -- but the reason I'm bringing that

25   up is if he's talking about pleading guilty --

1             THE COURT:  Right.

2             MR. DAVIS:  -- according to the people that are

3    talking there, and then when you go to 32:07 and 33:30 he's

4    talking about all the reasons that he's pleading guilty.  I

5    don't -- I think that amounts to an affirmative step to

6    withdraw from the conspiracy based on the evidence that the

7    United States has in the transcripts.  I mean, he's pleading

8    guilty, this was --

9             THE COURT:  You think it does amount to an

10   affirmative step to withdraw from the conspiracy.

11            MR. DAVIS:  I do, certainly.  I think he's out.

12   He's talking about pleading.  He's going to plead and he's

13   going to plead because -- and then he goes through, according

14   to them, they start reciting the evidence that's in the

15   indictment and in the discovery.  I mean, everything in these

16   statements, later on, is in discovery, it's in the indictment,

17   it's -- so I mean, I think that is an affirmative step on Mr.

18   Brown's behalf to withdraw from the conspiracy, based on the

19   evidence that we have before us --

20            THE COURT:  Well, that's an interesting theoretical

21   question.  Are you necessarily withdrawing from a conspiracy

22   when you plead guilty to some reduced version of it and get

23   some disposition?  I mean, is it theoretically impossible that

24   someone is still a member of the Black Guerilla Family, still

25   interested in punishing people who have broken the rules and

1    the code and so forth by agreeing to testify and so forth,

2    even though you are yourself pleading guilty.

3            MR. DAVIS:  Well, in the absence of anything to

4    indicate as much, I think yes, I think that is an affirmative

5    step to get out.  There's nothing else to indicate that he was

6    staying in.  According to the two individuals that are having

7    this conversation --

8            THE COURT:  Fair enough.  But does it really tell me

9    that he's getting out?

10           MR. DAVIS:  Well, if he's pleading guilty, and he's

11   pointing out why, what indicates he's going to stay in?  I

12   mean, there's nothing.  You can't hold him in with nothing.

13   But you've got to give him credit for taking the affirmative

14   step to get out.  Pleading guilty isn't in the BGF --

15           THE COURT:  Getting out is I don't want to be in

16   this gang anymore that kills people and sells drugs.  That's

17   getting out of a conspiracy.  They got me on this one, and I'm

18   going to have to plead on this one, and I'm going to have to

19   do some time on this, you know, I'll do the ten years standing

20   on my head, whatever, we can make up all kinds of stuff, that

21   doesn't mean you're not necessarily still in the group.

22           MR. DAVIS:  We would submit that is an affirmative

23   step to withdraw from the group in the absence of anything --

24           THE COURT:  What is then?  The -- but he didn't

25   plead guilty.

1          MR. DAVIS:  We haven't gone to trial yet.  I mean,
2   we're here --
3          THE COURT:  Well, if he pleads guilty and we don't
4   go to trial, then you know what, I'm going to concede to you
5   Mr. Davis.
6          MR. DAVIS:  Well, let's move on from the conspiracy.
7   Let's move on from the conspiracy.  I -- the plea is out, what
8   we're left with now is on the second to the last page,
9   beginning at 8:32 going through 12:10.
10          THE COURT:  Okay.  Hold on --
11          MR. DAVIS:  Oh, no, I'm sorry, I read the wrong
12   numbers 32:07 to 33:30, the last two pages.  I'll give Your
13   Honor a second to scan that.
14          THE COURT:  Okay.  This is McCants and Handy again,
15   hold on.  Okay.
16          MR. DAVIS:  Now, with respect to this, this is all
17   about the murder that Mr. Brown was charged with.
18          THE COURT:  Are we talking about Malone?
19          MR. DAVIS:  That is correct.  And Brown would submit
20   that everything that's contained in this conversation between
21   Handy and McCants, is basically a rehash of the state case and
22   the evidence that came in during the state case, the discovery
23   that we've received here in this case, which Mr. Brown has
24   reviewed every bit of it.  And the only thing that's different
25   is the speculation about who might testify.  But there is

1    nothing indicating that anyone's being targeted.  There's

2    nothing indicating that anything nefarious is going to happen

3    to anyone if they testify.  There's just a comment there, I

4    believe at the end --

5            THE COURT:  So you're -- the thrust of what you're

6    trying to argue to me right now is another argument of not in

7    furtherance.

8            MR. DAVIS:  That is it, yes.  It's not in

9    furtherance.  It's just a rehash of everything everyone knows.

10   And actually, it's not that accurate, as I look at it.  I

11   mean, the reference to they got a text message from Country,

12   that's not even accurate.  It's not only a rehash of the

13   evidence, the indictment, and the discovery that everybody has

14   had access to, it's mixing it up.  And I just don't think any

15   of that, it's all retrospective, it's not prospective.

16           THE COURT:  Right.

17           MR. DAVIS:  And I don't think that these amount to

18   in furtherance of the conspiracy.  And speculation on a

19   defendant's part about who's going to testify against him, how

20   can that be in furtherance of the conspiracy.  I mean, aside

21   from -- privilege aside, if my client and I sit down and we

22   talk about who we expect is going to testify against him, is

23   that in furtherance --

24           THE COURT:  As has probably become clear to you and

25   your colleagues on your side of the courtroom, the

breakthrough moment for the Government came in my shifting my

view about what was really going on between McCants and Handy

in these conversations.  And the big shift that's happened for

me, which I'll own completely, is that I have started to buy,

and am largely buying into the notion that a critical thing

that's going on here is the affirming and nurturing and

building of solidarity between McCants and Handy, in the

context of their membership in the wider gang.

        And that's -- and once -- once the Court goes over

the top of that mountain, becomes a very hard problem for your

side in terms of trying to knock pieces out of it.  Because

it's all in the -- yeah, it's a retrospective conversation,

absolutely, but retrospective conversations in the case are

legion, where retrospective conversations to bring everybody

up to speed and what the gang's been involved in, so forth.

That can absolutely be admissible under the co-conspirator

exception.

        It's just got to be that -- what I thought the

government was missing previously, but now don't feel so

strongly, is that they weren't spending enough time and energy

focusing on whether or not the conspiracy is still alive and

still going.  And it's this notion of sort of keeping up the

spirit of the team, building the team, keeping track of, you

know, not just keeping track of who's still in the team, but

affirmatively conversing with each other in such a way as to

1      promote that cohesiveness and loyalty to the gang and to the

2      organization, that I am concluding is continuing

3      conspiratorial activity.

4              MR. DAVIS:  Well, unfortunately, to Mr. Brown, an

5      individual who, according to those two individuals that Your

6      Honor has characterized as being actively involved in the

7      gang, has indicated, according to them, that he's pleading

8      guilty and he's getting out.  And then when I look at the

9      statements at the end that the United States is trying to get

10     in against Mr. Brown, it is all a rehash of the discovery.  It

11     may not even be coming from Mr. Brown.

12             I'm looking at the last page, "But they saying they

13     got Wes on the phone trying to get rid of the gun he shot such

14     and such in the head with."  That's in the indictment.  It's

15     in the discovery.  It's in the lead cooperator that testified

16     against Mr. Brown, his hours-long videotaped statement.  All

17     of this.  Eggy, everything is in there.  And it's, you know, I

18     guess I should shift to the 403 argument at this point in

19     time --

20             THE COURT:  Well, I think you have to.  Because I

21     think that it's -- otherwise it's admissible because they're

22     talking about what they're up against and kind of buoying each

23     other's spirits and keeping things moving ahead and keeping

24     the group together.  We're not defeated yet.

25             MR. DAVIS:  Were they direct statements from Mr.

1    Brown, that were only attributed to Mr. Brown, that were not

2    generally made available --

3              THE COURT:  Yes.

4              MR. DAVIS:  -- to these two men that are the

5    speakers in this case, through discovery, through the

6    indictment, through every means that they could have --

7              THE COURT:  That's a 403 argument, that is -- you

8    are stuck with the co-conspirator exception.

9              MR. DAVIS:  Well, I'm in 403.

10             THE COURT:  All right.  We're in 403, because I

11   don't think you're beating the co-conspirator argument on that

12   theory.  Now, the question is what's unfair about this, what

13   is unfair in a prejudicial sense?

14             MR. DAVIS:  Well, everything that they're talking

15   about is available to them from a source other than Wesley

16   Brown.

17             THE COURT:  How about this point, why do they need

18   much more evidence to show that they're all in the gang with

19   each other?

20             MR. DAVIS:  Well, that's definitely --

21             THE COURT:  It's kind of cumulative.

22             MR. DAVIS:  Well, it's certainly cumulative, because

23   as I just said, everything they're talking about is in the

24   indictment and in the discovery --

25             THE COURT:  That's not going to be an argument that

1   causes me to knock out both of these statements, but when we

2   start getting into things like deals, pleas, stuff like that,

3   and it starts to have kind of a smelly prejudicial dimension

4   to it --

5            MR. DAVIS:  I think it's unfairly prejudicial.

6            THE COURT:  We start to weigh it against the

7   cumulative aspect of it.

8            MR. DAVIS:  It's cumulative.  There's No question

9   it's cumulative.  It's misleading, because it's not coming

10  from Mr. Brown directly, it's probably coming from the

11  evidence.  And there's no allegation that all of this is

12  coming directly from Mr. Brown.  And it's just unfairly

13  prejudicial, given the fact that it's misleading and it's

14  cumulative.

15           THE COURT:  Thanks, Mr. Davis.

16           Mr. Martinez.  Why do you need it?

17           MR. MARTINEZ:  Well as to --

18           THE COURT:  I know why you want it, but why are you

19  entitled to it?

20           MR. MARTINEZ:  As to the discussion about the murder

21  of Moses Malone and the details --

22           THE COURT:  Are we talking about the 32:07 to the

23  33:30 segment in particular?

24           MR. MARTINEZ:  Yes, Your Honor, that's exactly what

25  I'm talking about.

1            So a couple of things, first, not all of this

2    information is coming from the discovery or the indictment,

3    certainly the names of the individuals being discussed; eggy,

4    Deandre, those aren't things that were disclosed in discovery.

5    There were text messages between Mr. Brown and Eggy disclosed

6    during discovery, but there wasn't anything disclosed that

7    said Eggy's the one that got rid of the joint.  That's the

8    defendants filling in the gaps.

9            THE COURT:  Hold on.  Hold on, where is this?

10            MR. MARTINEZ:  This is on page 3.

11            THE COURT:  The last page?

12            MR. MARTINEZ:  Yeah, the last page.  But --

13            THE COURT:  I want to go over -- where's the joint

14    thing?  Oh, yeah, Eggy got rid of the joint.

15            MR. MARTINEZ:  And then McCants says, "Yeah, he got

16    rid of it to Deandre."  And I can assure the Court that the

17    name Deandre does not appear anywhere in our discovery.

18    That's actually showing the independent knowledge that Mr.

19    Handy and Mr. McCants have of this crime.  And it proves up,

20    it corroborates the notion that the crime was committed for

21    the gang.  But the most important point I want to come back --

22            THE COURT:  But this is admissible at this point,

23    because it shows that they're still talking to each other,

24    that they're building the team, that they've got solidarity

25    with each other and so forth.  You've already got a lot of

1    that.

2          MR. MARTINEZ:  No, I appreciate that, Your Honor.

3    But I want to get back to the question of cumulativeness.

4          THE COURT:  Yes.

5          MR. MARTINEZ:  And I think the key point here

6    emerges at the beginning of the discussion we're talking

7    about.  Where they're talking about how Mr. Brown beat the

8    bodies in state court.  And how Nod was all the evidence they

9    had.  Nod's testified before, he's been outed, so we can talk

10   about this.  At the state trial the witness known as Nod came

11   forward and said that in the days following the murder of

12   Malone, Mr. Brown came to him and said, hey, I need to get rid

13   of a gun that's dirty, because I used it to shoot a witness

14   who was testifying against Norman.  State prosecutors didn't

15   have much if anything to corroborate that statement and Mr.

16   Brown was acquitted.  And so one of the keys --

17         THE COURT:  Are you prepared to say whether or not

18   he's going to testify in our trial.

19         MR. MARTINEZ:  Yeah.  We do expect to call him.

20         THE COURT:  Okay.  And you expect him to say the

21   same thing?

22         MR. MARTINEZ:  We do.  One of the key disputed

23   issues with respect to the murder, is going to be the extent

24   to which that witness is credibility, and the extent to which

25   his account is corroborated.  And so that's where the text

1    messages with Eggy come in, because they corroborate the

2    notion that Mr. Brown is trying to get rid of the gun.  That's

3    where this conversation comes in, because it makes clear that

4    that's in fact what happened.  And so we fully expect that --

5         THE COURT:  All right.  But how is this conversation

6    in furtherance of that part of the conspiracy?  I understand

7    that this conversation is in furtherance of the other part of

8    the conspiracy, which is to keep the team together, promote

9    solidarity, stick to the rules, don't rat anybody out, et

10    cetera.  But now we're looped back to it being introduced as

11    direct proof on some other aspect of the conspiracy, which is

12    what happened to the gun, how was the murder done and so

13    forth.

14         How is this conversation that McCants and Handy are

15    having in furtherance?  It's not the question of whether or

16    not getting rid of the gun was in furtherance of the

17    conspiracy, clearly it was.  But that's not the question.  The

18    question on the admissibility of this statement is whether or

19    not this conversation at CDF was in furtherance of the

20    conspiracy.  Now, it was in furtherance of the team building

21    part of it.

22         MR. MARTINEZ:  Well, I think, Your Honor, the

23    purpose or the manner in which a particular statement furthers

24    the conspiracy doesn't, under the law, limit -- once it comes

25    in as a co-conspirator statement, if Your Honor decides this

1    statement was in furtherance of the conspiracy, because it was

2    team building or because it was intended to foster

3    cohesiveness --

4        THE COURT:  I think you're technically right about

5    that, but I don't think that's the end of the analysis,

6    because I still have a 403 decision to make.  And knowing that

7    I only let it in because it got in through this back door

8    about team building, and yet it ends -- it's of limited

9    probativity on team building, because you've already got a

10   whole bunch of evidence, included elsewhere in these

11   statements that show that they're still building the team.  It

12   just doesn't add that much more, but whoa, on this other

13   element it's, you know, it's a pretty powerful piece of

14   evidence.

15        MR. MARTINEZ:  But I don't --

16        THE COURT:  So does the prejudice analysis, you

17   know, how does 403 work in this specific context?  Is it -- do

18   I stop making the prejudice analysis once I've ruled that it's

19   in?

20        MR. MARTINEZ:  No.  I think that Your Honor rules

21   that it's in because it's in furtherance of the conspiracy for

22   the purpose you just described.  And then we put 801(d)(2)(E)

23   to the side, and we say we're operating under Rule 403 here,

24   what is the probative value of the statement.  And the weight

25   that you assign to the probative value --

1              THE COURT:  So in the prejudice analysis, I

2    shouldn't be anymore thinking about the door through which it

3    came in?

4              MR. MARTINEZ:  Correct.

5              THE COURT:  It's in.

6              MR. MARTINEZ:  It's in.

7              THE COURT:  Now, is it somehow unfairly prejudicial?

8              MR. MARTINEZ:  Yes.  And --

9              THE COURT:  All right.  I got that part.  Who wants

10    to take that on?  Mr. Davis?

11              MR. DAVIS:  Your Honor, I just want to kind of put

12    this into context.  We're talking about a cooperator by the

13    name of Cornish.  Now, I may be speaking out of turn, but I

14    just reviewed his videotaped statement that he gave.  Let's

15    put Mr. Cornish into perspective.  After the murder, period of

16    time after the murder, Cornish gets arrested with drugs.  And

17    the police offer him an opportunity not to go to jail.  So he

18    signs on as a confidential informant and he's working with the

19    police.  He tries to buy the gun from Mr. Brown that the

20    United States is alleging was used in the murder of Malone.

21    He's trying to -- he's doing this via text messages, all this

22    is in the indictment.

23              THE COURT:  He's doing this as a cooperator?

24              MR. DAVIS:  As a cooperator.  He's trying to get the

25    gun.  Now, when he gets arrested for the drugs, he sits down

1    and he tells the city police, hey, Brown did the murder.  He

2    admitted to the murder to me.  He tried to -- I tried to get

3    the gun from him but --

4             THE COURT:  So he's buying the gun, he wasn't a

5    government agent.

6             MR. DAVIS:  Oh, he was.  He was.  He was a

7    government agent then.  And here's where it gets even more

8    interesting, Eggy --

9             THE COURT:  How does he get arrested after he's a

10   government agent?

11            MR. DAVIS:  No, he gets arrested and becomes a

12   government agent.  And then he tries to start gather

13   information on this murder.  He tells them --

14            THE COURT:  Yeah, but when did he try to buy the

15   gun -- allegedly when did he try to buy the gun --

16            MR. DAVIS:  Few days after the murder.

17            THE COURT:  Was he then an active cooperator?

18            MR. DAVIS:  He was.

19            THE COURT:  So he was trying to buy the gun at the

20   behest of the police?

21            MR. DAVIS:  Yes.

22            THE COURT:  And then he was arrested subsequent to

23   that.

24            MR. DAVIS:  Well, yeah, actually he was, but that

25   really doesn't have anything --

1          THE COURT:  But he had been arrested prior to this

2     as well.

3          MR. DAVIS:  That's when he decided to become an

4     informant.  And he gave a videotaped statement.  And he tells

5     the authorities that I tried to buy the gun from Wes, this was

6     before -- he tells them that he tried to buy the gun from Wes,

7     this is after all this occurred, and he's doing this videotape

8     statement.  He says he tries to buy the gun from Wes, but

9     Wes --

10         THE COURT:  Referring to when he was trying to buy

11    it for the police?

12         MR. DAVIS:  Yes.  And then he mentions Eggy.  Well,

13    Eggy is his brother.  And he tells on Eggy.  And I believe

14    Eggy references Dre, which is Deandre's name.  Dre is Deandre.

15    So all of this is a rehash.  None of this necessarily comes

16    directly from Mr. Brown.  It's all a rehash of what is in the

17    discovery, what is in the discovery both in the state case and

18    in the federal case.  And it's just -- it's not in furtherance

19    of the conspiracy, because it's just a rehash of what had

20    happened before --

21         THE COURT:  But we already got past the furtherance

22    issue.

23         MR. DAVIS:  And it's cumulative to let this in.  And

24    the reason it's a problem and the reason it's unfairly

25    prejudicial, is because I'm not going to vouch for these two

1    guys credibility and reliability, and I certainly don't

2    think --

3              THE COURT:  Which two guys?

4              MR. DAVIS:  McCants and Handy.  And I'm certain the

5    United States isn't.  And what they're saying is misleading.

6    And it's just their interpretation of all of this.  And

7    they're just sitting there shooting the breeze with each

8    other, and I'm getting dragged into this.  And I may not even

9    have necessarily been involved with them.  Nobody's -- I mean,

10   Mr. Brown does not appear on this tape.  It's unfairly

11   prejudicial.  And it is more than a little bit cumulative.

12             The jury will use this as evidence.  It's not

13   evidence.  The United States is going to present evidence.

14   This is just a pile of mish mash that's being thrown on that

15   will only confuse the jury, mislead them, and what little bit

16   of it is accurate is going to be cumulative to the real

17   evidence.  They have text messages, they have the testimony of

18   Cornish.  They probably have Deandre coming -- Dre coming in

19   to testify.  We don't need this.  At least Mr. Brown doesn't.

20   And I think it's unfairly prejudicial to bring it in.

21             At the heart of all of this is reliability and I

22   just don't think this is a good --

23             THE COURT:  Well, I think that's actually what your

24   point is, for everything that's just been said, Mr. Davis, I

25   think that you're -- I'm not sure -- you're no longer making

1    an 801(d)(2)(E) argument.  At least you shouldn't be.  That's

2    over for purposes of our conversation.  Your argument on 403,

3    I think the government has the stronger argument on that too,

4    if it is what they say it is.  And then I think what your real

5    problem with is it is you're saying, but what is it?  It's

6    just some guys talking about some stuff that they might have

7    heard from their lawyers or in the discovery or whatever.

8    It's not -- you're saying it isn't -- it doesn't have sort of

9    a separate reliability to it.

10    MR. DAVIS:  Most of it's in the indictment.  And

11    what's not in the indictment is in the discovery.

12    THE COURT:  All right.  I think that tees it up, Mr.

13    Martinez, so --

14    MR. DAVIS:  I'm not going to concede these

15    statements are in furtherance of the conspiracy.  Because I

16    think this is a rehash.  It's reckless.  I do not think that

17    these are in furtherance of the conspiracy.  And when you look

18    at the reliability goes directly to the probative value of the

19    evidence.  I mean, that's -- I mean that's what we're doing

20    here.  We're balancing unfair prejudice --

21    THE COURT:  Fair enough.  I am interested in the

22    last, and only the last piece of your argument here.  What's

23    new in this?

24    MR. MARTINEZ:  You know what's new, Your Honor,

25    what's not in the discovery or the indictment, the line where

1    Handy says, Eggy probably --

2            THE COURT:  Point it to me physically so I can read

3    along, last page.

4            MR. MARTINEZ:  Sorry, I've got to find the right

5    transcript.  Yeah, it's the last page the first block during

6    which Handy is talking.  "Eggy probably telling on yo.  That's

7    what he said he keep worrying about."  That's a statement by

8    Mr. Brown.  That's nowhere in the discovery.  That's nowhere

9    in the indictment.

10           THE COURT:  Okay.  That's Handy's purporting to

11   claim to know what Brown is worried about, because Brown,

12   according to Handy, told Handy that that's what he's worried

13   about.

14           MR. MARTINEZ:  Yes and while --

15           THE COURT:  He's worried about --

16           MR. MARTINEZ:  Eggy telling.

17           THE COURT:  Eggy telling.

18           MR. MARTINEZ:  And we got to keep in mind, this is

19   in the context of a witness murder that Mr. Brown committed to

20   benefit Mr. Handy.  And so, of course, they're going to have

21   discussions about what the exposure is with respect to this

22   and who the witnesses are going to be.  But this is important,

23   this is Mr. Brown's own statement.  And while Mr. Brown may be

24   entitled not to have the jury consider statements to the

25   effect of, I might take a plea, I want to negotiate all the

1    way down to 15, this is not that kind of statement.  This is

2    Mr. Brown talking about what snitches he's worried about.

3            So then later, at the very last line, when they're

4    talking about whether or not Deandre is telling, Wes said the

5    N-word that Eggy gave the joint to telling on him.  None of

6    that's in the discovery.  That is not cumulative.  This

7    recorded conversation is the only source of that information.

8    So that's more than sufficient to defeat any Rule 403

9    argument.  And this is enormously probative to the extent that

10    when James Cornish gets on the witness stand and is

11    cross-examined about all the motives Mr. Davis just referred

12    to about why he may have been cooperating with law enforcement

13    and whether he can be trusted, these statements by Mr. Brown

14    himself corroborate Mr. Cornish and build his credibility --

15            THE COURT:  Mr. Davis, have you got anything

16    specifically on the middle of that big block, in the very last

17    line, to indicate that that was commonly known, it's in the

18    discovery, "Eggy probably telling on him, yo, that's what

19    he -- i.e. Brown -- said he keep worrying about."  And then

20    bottom of that transcript, "Wes said the N word that Eggy gave

21    the joint to telling on him."

22            MR. DAVIS:  Eggy gave the joint to, that would be

23    Dre, that would be Deandre.  I believe that --

24            THE COURT:  Wes said that -- Wes said that Dre's

25    telling on him.  That's the interpretation?

1           MR. MARTINEZ:  Yes, Your Honor.

2           THE COURT:  Yeah.

3           MR. MARTINEZ:  That's the defendant's statement as

4  reflected in this transcript.

5           MR. DAVIS:  And I believe that Mr. Cornish addresses

6  both Eggy and Dre in his videotaped statement, I believe.

7           MR. MARTINEZ:  But Mr. Cornish cannot testify as to

8  what the defendant said, this statement is a vehicle for

9  that.

10          MR. DAVIS:  See therein lies the hitch, because what

11  we've heard over the past five minutes is this is Brown's

12  statement.  I can see this being hammered away to the jury.

13  And if the United States is standing up and they're vouching

14  for the credibility and reliability of Mr. McCants and Mr.

15  Handy, I -- I would be shocked.  I would be absolutely

16  shocked.  And to allow -- to allow this to come in in that

17  context, under these circumstances, I think the reliability of

18  these two men under these circumstances, and the fact that

19  they know most of this information from beforehand, I think

20  that undercuts the probative value.  Mr. Brown is not making

21  any of these statements and it just -- it just undercuts -- it

22  undercuts the probative value of these statements.

23          THE COURT:  The law -- the law punishes joining a

24  conspiracy.  I don't mean it just gives you five years for a

25  371, I mean it punishes you, procedurally, it does.

1        MR. DAVIS:  And you look at Mr. Cornish and Mr.
2   Cornish's videotaped statement that Mr. Brown saw when he went
3   to the state trial about how Eggy got the gun and how Dre had
4   got the gun.  And now he's being reprosecuted for the same
5   murder, for him to believe that Eggy is testifying against
6   him, plus Eggy is in the indictment.  And I don't recall if
7   Dre is in the indictment.
8        MR. MARTINEZ:  Eggy's name is not in the indictment,
9   nor is Dre's.
10       MR. DAVIS:  Well, they're in the discovery and
11  they're in Mr. Cornish's videotaped statement.
12       Well, Your Honor, we'd submit No. 1 he withdrew from
13  the conspiracy.  No. 2 these statements are not in furtherance
14  of the conspiracy because the United States is not arguing
15  this is furthering any aspect of this conspiracy.  They're
16  arguing this is evidence of guilt.  That he said it and it's
17  evidence of guilt.  And that's not the case.  This is evidence
18  of these two guys in there.  And it's misleading and it's
19  cumulative of the actual evidence they're going to introduce,
20  because they're probably going to produce Deandre.  They're
21  probably going to produce Eggy.  Eggy is Mr. Cornish's
22  brother.  They're going to produce Mr. Cornish.  This is
23  cumulative.  It's misleading.  And it's not reliable and we
24  ask Your Honor to exclude it.
25       THE COURT:  Thank you, Mr. Davis.  Anybody else want

1    to be heard on that?  Mr. Bussard.

2          MR. BUSSARD:  Thank you, Your Honor.  As I mentioned

3    in my motion, we're in a little bit of a dilemma, there are

4    portions of these calls that -- and I can do this briefly,

5    Your Honor -- that impact Mr. Jones, maybe tangentially

6    because of what the discussion is going on.  But there is a

7    segment that clearly, and the government presented it to me in

8    the form of a *Brady* disclosure, that helps him.  So I stand

9    here today actually wanting portions of this to be played for

10   the jury.  And, in fact, it was played to the Court earlier in

11   the lead up to the earlier discussion about Mr. Johnson.

12   The -- Mr. Jones is in --

13         THE COURT:  So you and the government are --

14         MR. BUSSARD:  Only for that statement.

15         THE COURT:  Fine.  I love peace and harmony in my

16   courtroom.

17         MR. BUSSARD:  I don't know how much more of that

18   there will, be we'll see.  Mr. Jones is in a unique position,

19   Your Honor, he has not had --

20         THE COURT:  So he wants some segments in and some

21   segments excluded.

22         MR. BUSSARD:  Yes, Your Honor.  And I can't get

23   around that.  We're not conceding the in furtherance argument.

24   I think the horse has been beat pretty badly on that.  The

25   403, cumulative, yes, every mention of Mr. Jones, every

1    mention of a potential murder that hasn't been proven yet,

2    every mention of talking about cooperators, piles on to this

3    voluminous evidence in discovery that has taken over my

4    office, because I have the state discovery as well.  I have

5    about a hundred thousand pages total when you pile up all this

6    stuff.  And the fact of the matter is that --

7            THE COURT:  I hear you, but these arguments about

8    prejudice, it's -- you know, a tornado is bad until a

9    hurricane comes, then the tornado gets overtaken by the

10   hurricane.  The tornado evaluated against the hurricane, it's

11   not so significant anymore.

12           MR. BUSSARD:  I realize that, Your Honor.

13           THE COURT:  You try a tornado by itself, yeah, by

14   itself, big deal big prejudice.  In the context of a lengthy

15   trial that is evidently going to be about murder after murder

16   after murder, the prejudicial side of this that you're arguing

17   it loses some of its bite.

18           MR. BUSSARD:  Understand.  Can I address an issue --

19           THE COURT:  Absolutely.

20           MR. BUSSARD:  -- brought up.  The Court started this

21   segment of the motions hearing by asking what are the

22   potential options.  And, obviously, one of the options is

23   severance, the other is redaction of part of this.

24           THE COURT:  We're already redacting the part about

25   the Brown plea agreement.

1          MR. BUSSARD:  At a minimum, Your Honor, I am asking

2    that a very firm limiting instruction be given.  And I wanted

3    to include the fact that Mr. Jones neither condoned, affirmed,

4    or participated in this conversation in any way, that this is

5    only between two other people --

6          THE COURT:  Why do you get that limiting instruction

7    in the context of the law on co-conspirator statements?  All

8    for one, one for all.

9          MR. BUSSARD:  It is --

10         THE COURT:  It's -- the law treats it as his

11   statement, not a law I wrote.

12         MR. BUSSARD:  I understand that.  It is just

13   extremely frustrating when Mr. Jones, of all people, can't

14   even defend himself or go in there and say, but you all don't

15   have it right.  You know, and they force him to get on the

16   stand.  And that's the prejudice that we have here, that how

17   else do I rebut something, like he's telling for instance, the

18   statements in here that Slay may be telling.  That's a lawyer

19   just speculating, I think, on who may or may not be

20   cooperating.  That doesn't bother me that much.  But it does

21   bother me when they are attributing certain things to Mr.

22   Jones potentially that he can't even --

23         THE COURT:  All right.  What?  Help me, focus my

24   attention.

25         MR. BUSSARD:  Well, that goes back to the portion

1    that I really want in --

2              THE COURT:  Well, I can't help you with that.

3              MR. BUSSARD:  And I guess I have to ask you --

4              THE COURT:  You have to choose.  You're going to

5    have to argue, Mr. Bussard, whether you want that segment in

6    or you don't want that segment in, you can't --

7              MR. BUSSARD:  Your Honor, from Mr. Jones's point of

8    view we want that segment in.

9              THE COURT:  Well, then you can't argue that it

10   should be excluded and I don't think you have anything else to

11   say.

12             MR. BUSSARD:  Fair enough.

13             THE COURT:  I mean --

14             MR. BUSSARD:  -- redact, I'm just asking the Court

15   to consider redaction --

16             THE COURT:  Tell me exactly what redaction you

17   want.

18             MR. BUSSARD:  There is --

19             THE COURT:  You told me you weren't that worried

20   about the Slay may be telling.

21             MR. BUSSARD:  There are in the -- Court's indulgence

22   for a moment.  Your Honor I think I would agree with

23   everything except one particular portion, and it doesn't -- it

24   references, from the government's motion to admit the

25   statements, it is on the June -- the September 26th, 2017,

1    there is a discussion about Mr. Cornish and --

2            THE COURT:  Hold on, on the 26th, you've got to give

3    me a page.

4            MR. BUSSARD:  Mr. Cornish, it's probably the -- the

5    front page.

6            THE COURT:  The front page.

7            MR. BUSSARD:  Front page, it's down at the bottom of

8    page 1 of September 26th, there's some talk about --

9            THE COURT:  He said James Cornish telling for sure,

10   everybody know that.  Who the F name he say?

11           MR. BUSSARD:  There was no secret that Mr. Cornish,

12   also known as Nod, was testifying.

13           THE COURT:  Yes.  You say Cornish telling.  He told

14   you off the break.  I ain't going to lie.

15           MR. BUSSARD:  And then it goes on in the next

16   segment, the 26:58 segment on page 2.  There is a reference.

17           THE COURT:  26:58, 36:35?

18           MR. BUSSARD:  Yes.  There is a reference to Ronnie,

19   do you see that in the first --

20           THE COURT:  Oh, yeah, you been talking to Ronnie.

21   Punk ass, he was supposed to send some money too.  Okay.  Now

22   what?

23           MR. BUSSARD:  And this is going to come up next

24   week, Your Honor, at the motions hearing.  However, the

25   government intends to, I believe, introduce Youtube videos and

1    what have you --

2              THE COURT:  Yes.

3              MR. BUSSARD:  And this is the same kind of argument

4    that I just put forth a couple minutes ago that Mr. Jones has

5    no control over.  They are people talking about him, putting

6    things up on Facebook, that he can't even respond to, what the

7    government placed in the response was the -- or their motion,

8    was that when Mr. Jones was convicted in state court,

9    everybody started talking about allegedly disposing of

10   cooperators, people, snitches and what have you.  That's a

11   danger to Mr. Jones, because he didn't call these people and

12   say, put this all up on Facebook about what happened to me

13   over here.  It's just people on their own initiative taking

14   those steps.  That's my concern.

15             THE COURT:  Yes, but if it's -- was it done during

16   the life of the conspiracy?  Was it done in furtherance of the

17   conspiracy?  If so, and if it's -- unless you have some

18   argument that it's not foreseeable to him, it's all admissible

19   against him.

20             MR. BUSSARD:  As that, but then the Court has to get

21   through 403.  I'm still asserting that it is prejudicial to

22   Mr. Jones, because obviously he didn't say it, but obviously

23   he didn't even encourage, do anything to have these statements

24   be made --

25             THE COURT:  But he's in the gang, and he is the --

1    he's the putative beneficiary of it.  All right.  I've got the

2    argument, Mr. Bussard.

3              MR. BUSSARD:  That's it.

4              THE COURT:  I've got it.  I think a lot of the

5    arguments that are being made are understandable frustrations

6    from defense lawyers about the circumstances they find

7    themselves in when facing a wide-ranging racketeering

8    conspiracy charge, and the scope of it is quite broad, and not

9    all conspirators are going to be shown to have been involved

10   in all aspects of the conspiracy.  But that's garden variety

11   conspiracy trial.  That's what happens.

12             And that doesn't give rise to 403 problems, unfair

13   prejudice problems in this context, anymore than it does in so

14   many other conspiracy cases tried in this courthouse, with

15   similar problems, where there is not equity or parity between

16   the proof that's offered against different members of the

17   conspiracy.  And, you know, takes me right back to the jury

18   instruction on conspiracy, what we tell jurors, which is that

19   some conspirators may be deeply involved and some may be only

20   minimally involved.  But if you're in the agreement, you're in

21   it.  If you're not, you're not.

22             All right.  What else have we got?  Somebody else --

23   Mr. Enzinna.

24             MR. ENZINNA:  Your Honor, I apologize, I don't want

25   to rehash my argument, but I do want to make clear, I don't

1    think I was very clear about specifically what relief we were

2    asking for on Mr. Johnson's behalf.

3            THE COURT:  Okay.

4            MR. ENZINNA:  What relief we're asking for is the

5    redaction of one word, and that is his name at the end of that

6    where he says --

7            THE COURT:  The J or the Geezy or what?

8            MR. ENZINNA:  Where he says, Geezy, he in all that

9    type of stuff.  And I think we're both clear on our positions

10   on whether it's in furtherance.  But under Rule 403 the

11   question is weigh the probative value against the prejudice,

12   the prejudice is pretty clear.  The probative value, he says,

13   we ain't been together in years.  Then he says, Geezy's in all

14   that type of stuff.  Then he says again, we ain't been

15   together for so long.  I can't say anything.  Now, if I could

16   cross-examine Mr. McCants, I could point that out to the jury

17   and say you said Mr. Johnson is in all this stuff, but seconds

18   before that you said you haven't been together in years, and

19   after that you say the same thing.

20            And furthermore, I think it's cumulative evidence.

21   I mean, the question is whether or not Mr. Johnson is a member

22   of BGF.  The government is going to be putting on --

23            THE COURT:  Well, you can certainly still -- you may

24   not be able to conduct the cross-examine that you would like

25   to, but you can certainly argue, based on how the evidence is

1    presented, that --

2              MR. ENZINNA:  Sure.

3              THE COURT:  -- it doesn't -- this doesn't prove what

4    the government says it proves.  You're not being blocked from

5    that.  And, you know, counsel are permitted to certainly argue

6    their inferences.

7              MR. ENZINNA:  But my point is under 403 that goes to

8    the probative value, which is certainly lessened.  And in

9    addition it's cumulative, because the government's going to be

10   putting on videotapes, pictures of tattoos, witnesses,

11   evidence and evidence and evidence of who belongs to BGF.

12   This is really not necessary evidence.  It's cumulative.  And

13   under 403 I don't think it ought to come in.

14             THE COURT:  Thank you, Mr. Enzinna.

15             All right.  Anything else?

16             MR. FRANCOMANO:  Yes, Your Honor.  I do have to

17   address the 26th conversation by Mr. McCants.  Your Honor, as

18   I stated before, there is no way to know that this even

19   happened.  There is no records of any shooting going on.

20   There's no records, 911 tape saying that this happened at

21   supposedly Mr. Ronnie Hall's home.  Your Honor, in listening

22   to the actual tape, it doesn't -- I'm hearing Ronald, not

23   Ronnie, Your Honor.  And that's on page 2 where it says

24   McCants says you been talking to Ronnie.  And I'm hearing

25   Ronald.

1          THE COURT:  How about Rondo.

2          MR. FRANCOMANO:  Your Honor, whether or not Rondo,

3    they still have to link Rondo to Ronnie Hall.  And I think

4    he's saying Ronald, who is not Ronnie Hall.  So at this point

5    Your Honor, there's just nothing to link this conversation to

6    an actual real event.  The government's trying to say, well,

7    Mike Tillman was murdered.  The alleged facts that Mr. McCants

8    puts forth are nothing like this murder that took place with

9    Mr. Michael Tillman.  Thank you, Your Honor.

10         THE COURT:  Thank you, Mr. Francomano.

11         And to the extent that the Court, in its written

12   ruling later today or early next week, permits this, it's

13   going to be always with the -- it's always with the caveat

14   that it's subject to being connected up by the government

15   during their case in chief.  The government has to prove the

16   underlying conspiracy that supports all of this.  And if they

17   don't, at Rule 29 time, then the arguments that the defendants

18   have made energetically today will undoubtedly be presented

19   again.  And they will be evaluated then in the context of,

20   well, what was the predicate conspiracy ever actually proven.

21   And the Court will revisit it.  This is the first round of

22   whether the government gets to try to before the jury.

23         All right.  Anything -- Mr. Solomon.

24         MR. SOLOMON:  Can we just make it clear that unless

25   otherwise stated, even those defendants who are silent are

1    joining in on all the motions that are being presented to the

2    Court.

3              THE COURT:  All five defendants today, present in

4    court, are understood to object to the admission of these two

5    pieces of evidence, the recordings from September 25 and

6    September 26th, from the FBI bug that was surreptitiously

7    placed inside of the Super -- not Supermax, but Chesapeake

8    Detention Facility, on the basis that they were -- that

9    they're not properly admitted co-conspirator statements.

10             MR. SOLOMON:  Thank you.

11             THE COURT:  And that if they are, they nonetheless

12   should be excluded by application of the Rule 403 probative

13   prejudice balancing test.

14             MR. SOLOMON:  Thank you.

15             THE COURT:  Anything else from the defense side?

16   All right.  So our next hearing is on Tuesday, which is the

17   pretrial conference in the case, where we have a lot of

18   housekeeping matters to address, but also some motions in

19   limine that were presented by the deadline.  Has the

20   government responded to the motions in limine yet?

21             MR. MARTINEZ:  Yes, Your Honor, we made our

22   submission on Tuesday evening.

23             THE COURT:  Okay.  So how many motions in limine are

24   there about?

25             MR. MARTINEZ:  Quite a few.  I don't have them all

1    in front of me, but in the department of ten.

2              THE COURT:  So we've got like videotapes --

3              MR. MARTINEZ:  There's one addressing rap videos.

4    One addressing co-defendants' guilty pleas.  Several

5    addressing whether text messages can be authenticated.

6    Several addressing the admissibility of ballistics evidence.

7    And then several, which candidly are just relitigation of Mr.

8    McCants's efforts at the prior motions hearing.  And there's

9    our motion on forfeiture by wrongdoing and we submitted three

10   others.

11             THE COURT:  Oh, yes, what they can argue and so

12   forth.  There was one thing on my mind, but it must not have

13   been that important.

14             All right.  The defendants are remanded to the

15   custody of the Marshal.  Counsel are excused.  We'll reconvene

16   next Tuesday in the pretrial conference.  Thank you, everyone.

17             (The proceedings were concluded.)

18

19             I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.
20
                     _____/s/_____
21                        Christine T. Asif
                        Official Court Reporter
22

23

24

25

< Dates >.
April 25th 32:19,
  32:25.
September 25 4:4,
  7:17, 87:5.
September 26 4:4.
September 26th
  18:15, 29:17,
  29:25, 30:13,
  30:17, 42:10,
  81:8, 87:6.
September 26th, 2017
  80:25.
.
.
< 1 >.
1 24:11, 31:9,
  48:25, 76:12,
  81:8.
10 15:8, 42:1.
10-gauge 16:8.
101 1:48, 2:47.
11th 1:19.
12 42:1.
12-gauge 16:8.
12:10 53:12, 58:9.
15 54:17, 74:1.
15. 54:16.
181 26:15.
.
.
< 2 >.
2 44:20, 48:25,
  53:12, 76:13,
  85:23.
2. 81:16.
2016 32:19, 33:1.
2017 1:19.
202. 25:16.
20th 6:14.
21201 1:49, 2:48.
22 38:9.
22s 49:5.
2319 30:11.
2357 30:11.
25th 9:18, 9:23,
  11:19, 14:21,
  14:25, 15:6, 18:1,
  19:15, 20:10,
  22:14, 22:18,

38:24, 53:10,
  53:11.
26:58 81:16,
  81:17.
26th 9:15, 9:16,
  15:21, 18:2,
  23:22, 24:1,
  24:10, 34:14,
  53:10, 81:2,
  85:17.
29 86:17.
.
.
< 3 >.
3 64:10.
30. 53:14, 54:11.
32 41:25.
32:07 55:7, 56:3,
  58:12, 63:22.
33 38:9.
33:30 55:7, 56:3,
  58:12, 63:23.
33s 49:5.
36:35 81:17.
371 75:25.
380 53:8.
.
.
< 4 >.
40 53:14, 54:11.
403 7:22, 8:7, 8:11,
  8:16, 18:18,
  25:12, 27:6,
  61:18, 62:7, 62:9,
  62:10, 67:6,
  67:17, 67:23,
  72:2, 74:8, 77:25,
  83:12, 84:10,
  85:7, 85:13,
  87:12.
403(b 10:23.
403. 82:21.
404 27:7.
404(b 8:18, 10:15,
  10:22, 21:17,
  27:5, 27:6,
  27:14.
482. 26:15.
4th 1:48, 2:47,
  8:22, 36:12,

36:25, 50:5.
.
.
< 5 >.
591 25:15.
5th 13:4, 50:3,
  50:6.
.
.
< 6 >.
60 43:7.
.
.
< 7 >.
7th 4:16.
.
.
< 8 >.
8 41:25.
801(d)(2)(a 8:4.
801(d)(2)(e 8:7,
  8:11, 29:13,
  29:23, 37:3,
  40:10, 67:22,
  72:1.
80s 50:7.
8:32 53:12, 58:9.
.
.
< 9 >.
90 43:7.
911 85:20.
_____/s/_____
  _____ 88:23.
.
.
< A >.
a-ha 46:8.
A. 1:27.
able 30:20, 34:1,
  84:24.
about. 73:7,
  74:19.
above-entitled
  88:21.
absence 57:3,
  57:23.
absent 6:16, 6:19.
absolute 14:19.
Absolutely 13:18,

49:2, 60:13,
60:16, 75:15,
78:19.
access 59:14.
accomplice 31:20.
According 56:2,
56:13, 57:6, 61:5,
61:7, 73:12.
accordingly 18:8.
account 30:6, 33:7,
49:11, 65:25.
accurate 59:10,
59:12, 71:16.
Acosta 26:14,
26:15.
acquitted 65:16.
act 27:14, 48:24.
active 69:17.
actively 61:6.
activities 17:25.
activity 11:17,
11:18, 16:10,
21:21, 27:13,
32:10, 37:10,
37:11, 61:3.
acts 20:17, 21:19,
21:22, 27:2,
27:12, 31:8.
actual 6:12, 20:12,
76:19, 85:22,
86:6.
actually 11:1,
20:12, 24:15,
24:16, 26:25,
30:20, 30:21,
32:16, 38:22,
49:12, 49:21,
53:21, 55:23,
59:10, 64:18,
69:24, 71:23,
77:9, 86:20.
ad 18:9.
add 67:12.
addition 52:22,
85:9.
additional 30:5,
33:10.
address 4:14, 6:23,
10:1, 23:25, 24:6,
24:8, 29:13, 32:4,

34:13, 52:17,
78:18, 85:17,
87:18.
addresses 30:11,
75:5.
addressing 88:3,
88:4, 88:5,
88:6.
adjudication 5:3.
admissibility 27:1,
40:7, 40:8, 46:13,
66:18, 88:6.
admissible 4:11,
7:23, 10:19,
34:25, 48:17,
53:19, 60:16,
61:21, 64:22,
82:18.
admission 24:3,
34:24, 35:25,
87:4.
admit 18:8, 25:17,
52:17, 52:19,
80:24.
admitted 34:10,
34:12, 69:2,
87:9.
admitting 36:7,
36:12.
advance 11:3.
advancements
11:24.
advancing 22:17.
affirmative 56:5,
56:10, 56:17,
57:4, 57:13,
57:22.
affirmatively
60:25.
affirmed 79:3.
affirming 60:6.
Agent 2:18, 3:8,
69:5, 69:7, 69:10,
69:12.
ago 25:25, 36:14,
36:23, 42:23,
48:6, 82:4.
agree 7:18, 10:11,
14:12, 16:22,
22:1, 31:14,

33:20, 33:21,
80:22.
Agreed 31:13, 35:24,
38:13, 40:14,
50:20.
agreeing 57:1.
agreement 31:9,
31:11, 31:18,
31:23, 33:20,
33:24, 34:16,
34:17, 35:14,
41:9, 78:25,
83:20.
ahead 39:5, 61:23.
aid 38:3.
ain't 10:9, 36:21,
39:8, 39:16,
44:17, 45:20,
45:24, 46:1, 48:2,
55:1, 81:14,
84:13, 84:14.
al 1:10.
Alan 2:6, 3:19.
alert 5:25.
alias 33:5.
alive 60:21.
allegation 63:11.
allegations 24:12.
allege 37:6.
alleged 11:25, 12:3,
20:18, 27:2, 28:3,
29:3, 86:7.
allegedly 4:4, 4:7,
10:3, 10:9, 11:21,
11:22, 16:6, 17:1,
21:3, 27:18,
69:15, 82:9.
alleges 10:5.
alleging 68:20.
allow 29:16, 38:10,
49:25, 75:16.
allowed 28:21.
alone 31:16.
already 20:18,
31:25, 32:2,
55:21, 55:22,
64:25, 67:9,
70:21, 78:24.
amenable 44:1.
Amendment 7:25,

8:12, 8:15, 8:22,
  13:5.
AMERICA 1:5.
among 9:5, 9:6,
  11:12.
amount 56:9,
  59:17.
amounts 56:5.
ample 49:1.
analysis 21:17,
  67:5, 67:16,
  67:18, 68:1.
analytical 36:10.
Anybody 8:25, 12:20,
  29:13, 66:9,
  76:25.
apologize 35:18,
  43:11, 83:24.
appear 64:17,
  71:10.
Appearances 2:1,
  3:12.
application 87:12.
appreciate 7:13,
  33:25, 65:2.
approaches 20:2,
  21:21.
appropriate 6:25,
  48:21.
April 32:19.
argue 7:25, 8:3,
  8:4, 8:13, 8:18,
  9:12, 9:16, 53:15,
  59:6, 80:5, 80:9,
  84:25, 85:5,
  88:11.
argued 39:12.
arguing 49:18,
  76:14, 76:16,
  78:16.
argument 8:10, 9:2,
  11:3, 25:24, 26:9,
  27:1, 41:11, 51:3,
  52:11, 59:6,
  61:18, 62:7,
  62:11, 62:25,
  72:1, 72:2, 72:3,
  72:22, 74:9,
  77:23, 82:3,
  82:18, 83:2,

83:25.
arguments 52:22,
  78:7, 83:5,
  86:17.
around 17:7, 51:8,
  51:12, 77:23.
arrested 68:16,
  68:25, 69:9,
  69:11, 69:22,
  70:1.
aside 59:20,
  59:21.
Asif 1:46, 2:45,
  88:19, 88:24.
asks 30:8.
aspect 36:13, 63:7,
  66:11, 76:15.
aspects 83:10.
ass 81:21.
assault 19:7, 19:14,
  25:24.
assaults 19:9.
asserting 82:21.
assign 67:25.
assistance 6:10.
assisted 53:22.
assume 4:19, 50:22,
  50:23.
assumes 49:11.
assumption 52:18.
assumptions 49:15,
  49:17, 49:20.
assurance 13:1.
assure 64:16.
assures 36:21.
ATF 2:18, 3:9.
attempt 28:13.
attention 7:15,
  79:24.
attributed 62:1.
attributing 79:21.
audio/video 4:3.
AUSA 1:25, 1:27,
  3:8.
authenticated
  88:5.
authenticity 8:5.
authorities 70:5.
automatic 23:6.
automatically

13:21.
autopsy 33:2.
available 62:2,
  62:15.
Avenue 30:11,
  32:5.
aware 51:10.
away 35:16, 75:12.
.
.
< B >.
B. 1:33.
back 4:18, 5:12,
  6:12, 25:12, 27:5,
  29:12, 29:21,
  30:15, 33:11,
  33:14, 43:6,
  47:20, 53:9,
  55:12, 64:21,
  65:3, 66:10, 67:7,
  79:25, 83:17.
bad 21:19, 21:22,
  78:8.
badly 77:24.
balancing 7:22,
  18:19, 27:5,
  27:17, 72:20,
  87:13.
ballistics 88:6.
Baltimore 1:20,
  1:49, 2:48, 12:21,
  24:22, 33:16.
bank 22:4, 22:5,
  22:6, 22:7.
Barclay 30:9, 30:12,
  32:5, 32:6.
based 56:6, 56:18,
  84:25.
basically 15:10,
  19:18, 41:15,
  44:7, 58:21.
basis 87:8.
beat 65:7, 77:24.
beating 62:11.
became 6:25.
become 59:24,
  70:3.
becomes 60:10,
  69:11.
beforehand 75:19.

begin 6:22.
beginning 55:7,
  58:9, 65:6.
behalf 3:17, 3:21,
  3:24, 56:18,
  84:2.
behavior 19:4.
behest 69:20.
beliefs 21:20.
believe 20:7, 21:15,
  30:23, 31:2, 40:3,
  45:19, 59:4,
  70:13, 74:23,
  75:5, 75:6, 76:5,
  81:25.
believed 32:24.
belongs 85:11.
beneficiary 83:1.
benefit 13:16,
  73:20.
besides 13:20.
best 13:11, 46:11.
better 15:8, 16:8,
  17:14, 20:24,
  41:8.
beyond 33:18,
  50:6.
BGF 10:14, 11:6,
  17:23, 30:10,
  31:13, 32:2, 37:8,
  37:18, 40:4, 44:8,
  47:4, 47:12,
  47:13, 47:18,
  47:22, 48:10,
  57:14, 84:22,
  85:11.
big 22:2, 60:3,
  74:16, 78:14.
biggest 24:5.
bit 4:21, 11:3,
  35:17, 58:24,
  71:11, 71:15,
  77:3.
bite 78:17.
Black 11:24, 49:13,
  56:24.
block 73:5, 74:16.
blocked 85:4.
boasted 26:16,
  26:18.

boasting 38:3.
bodies 65:8.
body 6:12.
Bonds 2:12, 3:6,
  3:20, 3:22, 11:14,
  24:21.
bother 79:20,
  79:21.
bottom 39:1, 45:22,
  74:20, 81:7.
bouncing 34:9.
boy 32:21.
Brady 77:8.
bragging 25:6.
breadth 22:13.
break 9:25, 44:21,
  81:14.
breakthrough 60:1.
Bredar 1:18.
breeze 71:7.
briefly 4:20,
  77:4.
briefs 7:14.
bring 10:11, 40:12,
  60:14, 71:20.
bringing 26:8,
  36:16, 38:2,
  55:24.
brings 36:2.
broad 83:8.
broader 20:4, 49:11,
  51:15.
broadly 34:9,
  36:13.
broke 10:1.
broken 56:25.
brother 24:21,
  32:24, 33:4,
  70:13, 76:22.
brought 5:4, 21:4,
  36:23, 78:20.
brutal 31:17.
buck 45:11.
bug 4:6, 87:6.
build 74:14.
building 11:11,
  15:12, 15:24,
  17:16, 18:10,
  22:16, 25:3, 25:4,
  36:15, 40:22,

42:14, 48:22,
  48:23, 60:7,
  60:23, 64:24,
  66:20, 67:2, 67:8,
  67:9, 67:11.
bulk 6:23.
bunch 33:10,
  67:10.
buoying 61:22.
bupe 10:9.
buprenorphine
  10:10.
bureaucratic 5:16.
Bussard 2:6, 3:19,
  4:18, 5:23, 6:16,
  77:1, 80:5, 80:14,
  83:2.
buy 60:4, 68:19,
  69:14, 69:15,
  69:19, 70:5, 70:6,
  70:8, 70:10.
buying 60:5, 69:4.
.
.
< C >.
cake 17:2, 17:3,
  17:8, 41:8.
Cakes 33:4.
call 3:3, 65:19,
  82:11.
calls 37:4.
candidly 88:7.
car 33:10, 35:21,
  35:22.
Carry 39:4.
carrying 28:7,
  29:1.
cases 11:21, 19:6,
  36:15, 83:14.
catch 39:4, 43:8.
causes 63:1.
caveat 86:13.
CDF 3:11, 42:24,
  66:19.
cease 37:11.
center 49:3.
central 9:4.
certain 71:4,
  79:21.
certainly 8:24,

27:11, 28:14,
39:23, 40:2,
41:23, 44:1,
56:11, 62:22,
64:3, 71:1, 84:23,
84:25, 85:5,
85:8.
certify 88:19.
cetera 31:20, 34:17,
49:14, 66:10.
chair 34:9.
challenges 5:16.
changes 44:2.
characterized
61:6.
charge 19:20, 22:9,
22:12, 83:8.
charged 19:9, 22:3,
22:6, 27:20, 28:4,
28:6, 28:15,
28:16, 28:20,
31:8, 31:9, 33:16,
38:19, 48:25,
58:17.
charges 5:4, 10:13,
20:13.
chatter 10:25,
15:12, 15:24,
17:9, 18:3.
Chesapeake 4:5,
87:7.
chief 4:12, 34:8,
35:10, 86:15.
child 19:8.
children 19:9.
chocolate 17:2,
17:8, 17:14,
41:8.
choose 80:4.
Chop 45:6, 45:8.
Christina 1:27,
3:8.
Christine 1:46,
2:45, 88:19,
88:24.
Christopher 1:39,
3:16.
Christy 2:18, 3:9.
circle 33:14.
Circuit 33:16,

36:12, 36:25,
50:3, 50:5.
circuits 50:6.
circumstance
29:15.
circumstances 75:17,
75:18, 83:6.
circumstantial
25:17.
circumstantially
24:24.
cited 36:25.
City 33:16, 69:1.
claim 73:11.
clear 7:1, 23:15,
23:16, 23:17,
50:11, 59:24,
66:3, 83:25, 84:1,
84:9, 84:12,
86:24.
clearly 11:13, 12:7,
66:17, 77:7.
client 5:15, 5:19,
9:18, 11:25, 12:3,
17:21, 29:19,
40:20, 43:18,
44:4, 46:3, 47:11,
53:5, 53:25,
59:21.
clients 35:1.
close 13:11,
54:19.
club 17:5, 17:10,
41:6, 41:10.
co-conspirator 7:19,
8:16, 18:9, 24:2,
32:1, 34:10,
34:23, 36:12,
37:1, 40:10, 50:4,
55:16, 60:16,
62:8, 62:11,
66:25, 79:7,
87:9.
co-conspirators
25:9, 36:17.
co-counsel 23:25.
co-defendants 14:18,
42:11, 42:12,
88:4.
cocaine 26:2,

26:3.
code 13:3, 38:16,
38:17, 49:2, 49:7,
51:15, 57:1.
cohesiveness 11:12,
16:16, 18:5,
18:10, 25:10,
36:16, 36:22,
48:23, 61:1,
67:3.
colleagues 59:25.
comes 18:7, 25:23,
37:23, 41:3,
54:17, 66:3,
66:24, 70:15,
78:9.
coming 61:11, 63:9,
63:10, 63:12,
64:2, 71:18.
comment 13:12,
59:3.
comments 55:12.
commit 31:15, 33:21,
35:24.
committed 19:7,
19:18, 20:11,
26:21, 27:18,
28:25, 35:19,
64:20, 73:19.
committing 26:16,
26:19, 27:20.
commonly 74:17.
communication
41:22.
completed 5:6.
completely 10:17,
50:7, 60:4.
completion 5:20.
complexity 7:15.
complicated 6:15,
52:20.
complications 7:3.
comrade 38:11.
comrades 37:14.
concede 54:1, 58:4,
72:14.
conceded 55:5.
conceding 77:23.
concern 54:9,
82:14.

concerns 52:15,
  53:6.
conclude 26:20.
concluded. 88:17.
concluding 61:2.
conclusion 49:19.
conclusions 18:8.
condoned 79:3.
conduct 27:12,
  84:24.
confer 9:5.
conference 4:15,
  6:25, 87:17,
  88:16.
confidential
  68:18.
confirm 32:7.
confirms 42:12.
confrontation 32:22,
  38:11.
confuse 71:15.
connect 36:5.
connected 17:9,
  35:6, 50:9, 50:19,
  86:14.
connection 3:10,
  33:3, 41:3,
  41:4.
consequence 7:6.
consider 6:18,
  73:24, 80:15.
considered 10:15,
  19:3.
consistent 9:1,
  33:8, 33:12.
conspiracies 26:3.
conspiratorial
  11:16, 11:18,
  27:13, 37:10,
  61:3.
conspirators 83:9,
  83:19.
conspire 14:9.
constant 12:9.
constitution 39:14,
  44:8, 49:7.
constitutional
  13:10.
constitutions 38:10,
  49:4.

Cont'd 2:1.
contained 52:23,
  53:7, 58:20.
contention 11:9.
contextual 42:16.
continuation
  11:16.
continuing 13:2,
  61:2.
continuous 5:6.
control 82:5.
conversations 4:7,
  9:12, 11:10,
  15:18, 15:24,
  18:4, 18:10,
  18:12, 20:12,
  22:14, 22:18,
  25:3, 42:9, 44:2,
  60:3, 60:13,
  60:14.
conversing 60:25.
convicted 82:8.
cooperate 45:12,
  51:7, 51:16.
cooperated 53:2.
Cooperating 45:10,
  45:13, 45:24,
  46:25, 50:25,
  74:12, 79:20.
cooperator 61:15,
  68:12, 68:23,
  68:24, 69:17.
cooperators 78:2,
  82:10.
Cornish 68:13,
  68:15, 68:16,
  71:18, 74:10,
  74:14, 75:5, 75:7,
  76:1, 76:2, 76:11,
  76:21, 76:22,
  81:1, 81:4, 81:9,
  81:11, 81:13.
Correct 8:8, 21:7,
  24:4, 24:17,
  25:13, 26:5, 30:3,
  38:1, 40:5, 46:7,
  46:18, 48:11,
  58:19, 68:4,
  88:20.
Correction 6:8.

corroborate 29:8,
  30:6, 30:12,
  32:12, 32:14,
  65:15, 66:1,
  74:14.
corroborated
  65:25.
corroborates
  64:20.
Counsel 3:8, 4:1,
  7:14, 9:4, 44:2,
  49:18, 85:5,
  88:15.
Count 31:9.
Country 45:1, 45:4,
  59:11.
couple 30:5, 53:13,
  64:1, 82:4.
course 4:14, 17:18,
  33:22, 38:5,
  73:20.
courthouse 83:14.
courtroom 59:25,
  77:16.
covering 5:10.
crass 26:11.
Crawford 55:14.
create 14:10.
creates 51:6.
credibility 65:24,
  71:1, 74:14,
  75:14.
credit 57:13.
crime 19:17, 20:11,
  21:22, 22:4,
  27:15, 30:25,
  31:9, 32:15,
  64:19, 64:20.
crimes 21:18, 21:22,
  27:8.
CRIMINAL 1:9, 3:5,
  32:10.
critical 60:5.
cross-examine 84:16,
  84:24.
cross-examined
  74:11.
crystal 23:16,
  23:17.
cued 41:17.

cues 41:21.
cultivate 18:5.
cultivating 11:11.
culture 12:19,
  14:10.
cumulative 62:21,
  62:22, 63:7, 63:8,
  63:9, 63:14,
  70:23, 71:11,
  71:16, 74:6,
  76:19, 76:23,
  77:25, 84:20,
  85:9, 85:12.
cumulativeness
  65:3.
custody 4:19, 4:23,
  4:25, 5:6, 5:19,
  5:22, 6:13, 6:17,
  6:20, 88:15.
.
.
< D >.
danger 36:7,
  82:11.
dangerously 54:19.
David 2:14, 3:21.
Davis 1:39, 3:16,
  53:23, 54:10,
  54:25, 58:5,
  63:15, 68:10,
  71:24, 74:11,
  74:15, 76:25.
day 4:8, 4:15, 41:7,
  48:14.
days 11:10, 30:5,
  65:11, 69:16.
deadline 87:19.
deal 14:25, 15:1,
  43:17, 54:7,
  54:24, 55:4,
  78:14.
deals 63:2.
dealt 33:19.
Deandre 64:4, 64:17,
  70:14, 71:18,
  74:4, 74:23,
  76:20.
Deandre. 64:16.
decide 46:22,
  53:1.

decided 40:8,
  70:3.
decides 31:12,
  66:25.
decision 4:22,
  67:6.
decisions 49:25.
deeply 83:19.
defeat 74:8.
defeated 61:24.
defend 79:14.
Defendant 1:12,
  1:29, 1:35, 2:4,
  2:8, 2:12, 5:22,
  8:9, 26:7, 26:16,
  26:18, 26:20,
  36:1, 54:12,
  59:19, 75:3,
  75:8.
defendants 4:8,
  8:24, 10:17,
  29:12, 33:19,
  64:8, 86:17,
  86:25, 87:3,
  88:14.
defense 9:4, 44:2,
  83:6, 87:15.
definitely 62:20.
degree 33:17.
department 88:1.
described 33:13,
  67:22.
describes 33:8.
dessert 17:7,
  17:11.
details 31:17,
  51:10, 63:21.
Detention 3:11, 4:5,
  87:8.
determination
  17:19.
develop 34:1.
development 6:10,
  31:19, 32:14,
  34:3.
device 8:23.
difference 28:12.
different 5:25, 7:3,
  9:25, 10:2, 10:18,
  13:8, 15:14, 17:6,

  17:10, 22:5, 26:4,
  29:4, 36:9, 43:18,
  46:21, 58:24,
  83:16.
difficulty 43:17.
Digga 32:10.
dilemma 77:3.
dimension 11:16,
  54:19, 63:3.
direct 5:18, 25:20,
  61:25, 66:11.
directed 4:2, 5:21,
  18:10, 25:9.
directly 31:17,
  52:12, 63:10,
  63:12, 70:16,
  72:18.
dirty 65:13.
disagree 16:17.
disclosed 4:3, 64:4,
  64:5, 64:6.
disclosure 7:8,
  77:8.
discovery 56:15,
  56:16, 58:22,
  59:13, 61:10,
  61:15, 62:5,
  62:24, 64:2, 64:4,
  64:6, 64:17,
  70:17, 72:7,
  72:11, 72:25,
  73:8, 74:6, 74:18,
  76:10, 78:3,
  78:4.
discussed 4:20,
  33:6, 42:9, 42:10,
  64:3.
discussing 11:20,
  11:21, 11:23,
  15:22, 31:6,
  31:16, 32:15,
  48:14.
discussion 36:20,
  37:20, 53:21,
  63:20, 65:6, 77:6,
  77:11, 81:1.
discussions 73:21.
dispose 8:25.
disposing 82:9.
disposition 18:14,

56:23.
disputed 18:14,
    65:22.
DISTRICT 1:1, 1:2.
divisible 40:9.
Division 6:7.
DOC 6:7.
document 53:8.
doing 17:16, 39:17,
    42:7, 52:4, 68:21,
    68:23, 70:7,
    72:19.
done 6:12, 36:9,
    50:3, 54:24,
    66:12, 82:15,
    82:16.
door 67:7, 68:2.
doubt 33:18.
down 4:23, 25:23,
    31:4, 44:21,
    50:13, 51:8,
    59:21, 68:25,
    74:1, 81:7.
draft 43:25.
dragged 71:8.
draw 46:11, 46:14,
    50:16.
drawn 47:23.
Dre 70:14, 71:18,
    74:23, 74:24,
    75:6, 76:3, 76:7,
    76:9.
drugs 33:19, 37:4,
    45:1, 45:4, 57:16,
    68:16, 68:25.
Druid 30:9, 30:11,
    32:5, 32:23.
due 40:25, 47:25,
    51:19.
during 4:11, 6:22,
    7:10, 7:20, 17:18,
    18:2, 29:20, 33:6,
    33:8, 34:8, 35:9,
    38:4, 52:19,
    58:22, 64:6, 73:5,
    82:15, 86:15.
.
.
< E >.
eagerly 34:8.

earlier 41:3, 77:10,
    77:11.
early 32:13,
    86:12.
earth 5:15.
eating 17:5, 41:6.
effect 12:5,
    73:25.
efforts 88:8.
Eggy 61:17, 64:3,
    64:5, 64:7, 64:14,
    66:1, 69:8, 70:12,
    70:13, 70:14,
    73:1, 73:6, 73:16,
    73:17, 74:5,
    74:18, 74:20,
    74:22, 75:6, 76:3,
    76:5, 76:6, 76:8,
    76:21.
either 7:10, 8:22,
    14:13, 17:13,
    20:23, 54:18.
element 67:13.
elsewhere 67:10.
embraced 50:5.
emerges 65:6.
encompassed 11:6.
encourage 82:23.
end 59:4, 61:9,
    67:5, 84:5.
ends 67:8.
energetically
    86:18.
energy 60:20.
enforcement 74:12.
engaging 21:21,
    28:6.
enhancing 48:23.
enormous 5:11.
enormously 74:9.
enough 50:2, 57:8,
    60:20, 72:21,
    80:12.
entered 4:21.
enterprise 31:15.
entire 5:10.
entitled 29:19,
    35:1, 49:10,
    54:20, 54:21,
    54:22, 63:19,

73:24.
environment 15:14.
Enzinna 1:31, 3:13,
    34:8, 38:20,
    41:25, 42:16,
    43:10, 46:10,
    49:6, 51:4, 83:23,
    84:4, 85:14.
equity 83:15.
erupted 7:1.
Especially 5:13.
Esquire 1:31, 1:33,
    1:37, 1:39, 2:6,
    2:10, 2:14.
et 1:10, 31:20,
    34:17, 49:14,
    66:9.
evaluated 78:10,
    86:19.
Evans 24:21, 33:4.
evening 87:22.
event 86:6.
everybody 16:25,
    34:24, 34:25,
    44:9, 44:12,
    45:12, 59:13,
    60:14, 81:10,
    82:9.
everyone 52:11,
    59:9, 88:16.
everything 26:12,
    52:11, 56:15,
    58:20, 59:9,
    61:17, 62:14,
    62:23, 71:24,
    80:23.
evidently 4:6,
    78:15.
exactly 52:7, 63:24,
    80:16.
example 30:7,
    35:21.
except 8:15,
    80:23.
exception 8:16,
    55:15, 55:16,
    60:17, 62:8.
excerpt 54:3.
excising 54:5.
exclude 76:24.

excluded 77:21,
  80:10, 87:12.
excuse 26:18.
excused 88:15.
executed 32:6.
execution 51:17.
existence 49:12,
  49:13.
expect 8:25, 59:22,
  65:19, 65:20,
  66:4.
expectations 49:4.
explaining 17:17.
explosive 19:10.
exposed 49:18.
exposes 21:20.
exposure 73:21.
express 41:21.
extended 17:25.
extension 51:16.
extent 27:12, 51:11,
  53:23, 65:23,
  65:24, 74:9,
  86:11.
extraordinarily
  35:7, 40:19.
extremely 44:3,
  79:13.
.
.
< F >.
F. 1:31.
F.supp.2d 25:15,
  26:15.
Facebook 82:6,
  82:12.
faced 5:16.
Facility 3:11, 4:5,
  87:8.
facing 83:7.
fact 5:13, 10:17,
  12:1, 17:10,
  19:23, 29:15,
  31:16, 38:5, 41:2,
  42:10, 51:21,
  55:18, 63:13,
  66:4, 75:18,
  77:10, 78:6,
  79:3.
facts 30:5, 31:24,

86:7.
factual 31:19,
  32:14, 32:18,
  33:25.
Fair 57:8, 72:21,
  80:12.
fairest 39:25.
faithful 54:5.
Family 11:24, 49:13,
  56:24.
far 10:20.
favor 7:23, 50:7.
FBI 4:5, 87:6.
FCRR 1:46, 2:45,
  88:19.
fealty 49:2.
Federal 1:47, 2:46,
  4:18, 4:19, 4:23,
  5:3, 5:4, 5:6,
  5:7, 5:19, 5:20,
  6:13, 6:19,
  70:18.
feel 6:11, 29:24,
  45:7, 60:19.
feeling 9:8.
fell 50:7.
fellow 37:14,
  38:3.
Few 25:25, 40:5,
  69:16, 87:25.
fight 8:6.
filed 6:24.
filling 64:8.
find 29:6, 37:23,
  54:18, 73:4,
  83:6.
finds 7:19, 7:21.
Fine 77:15.
fire 23:9.
firm 79:2.
firmly 55:14.
First 7:16, 9:16,
  10:4, 24:10, 25:1,
  33:17, 34:14,
  36:18, 37:6,
  46:18, 50:1, 50:8,
  53:11, 53:12,
  55:12, 64:1, 73:5,
  81:19, 86:21.
fish 42:2, 42:4,

42:7.
fishing 42:6.
five 75:11, 75:24,
  87:3.
flag 8:12.
fled 33:10.
flip 25:10, 55:6.
Floor 1:48, 2:47,
  24:9.
focus 79:23.
focused 4:2.
focusing 60:21.
follow 51:9.
following 38:16,
  38:17, 39:14,
  39:18, 65:11.
force 79:15.
foregoing 88:20.
foreseeable 82:18.
forfeiture 88:9.
form 77:8.
forth 5:12, 6:13,
  18:11, 50:4,
  51:12, 57:1,
  60:15, 64:25,
  66:13, 82:4, 86:8,
  88:12.
forward 65:11.
foster 67:2.
fostering 36:16,
  36:22, 41:10,
  41:12.
found 18:22, 45:3,
  55:9.
Foundational 38:11,
  38:12.
Fourth 7:25, 8:12,
  8:15, 44:22.
Francomano 2:10,
  3:24, 7:18, 9:6,
  21:2, 22:3, 23:5,
  23:6, 29:11,
  29:24, 31:7,
  31:21, 86:10.
frankly 22:21,
  22:22.
free 6:11, 29:24.
Front 49:25, 54:6,
  81:5, 81:6, 81:7,
  88:1.

frustrating 79:13.
frustrations 83:5.
fully 66:4.
function 50:12,
  50:15.
fundamental 38:9.
furthering 76:15.
furthers 66:23.
.
.
< G >.
gained 26:6.
gang 22:17, 31:14,
  32:3, 33:21, 37:9,
  37:13, 37:15,
  37:16, 37:17,
  38:3, 38:7, 38:9,
  38:12, 39:14,
  46:25, 57:16,
  60:8, 60:15, 61:1,
  61:7, 62:18,
  64:21, 82:25.
gang-related
  16:10.
gaps 64:8.
garden 7:4, 83:10.
gas 32:11.
gatekeeping 49:24,
  50:12.
gather 69:12.
gathered 51:14.
gave 68:14, 70:4,
  74:5, 74:20,
  74:22.
Geezy 39:9, 40:18,
  46:16, 46:19,
  47:2, 47:4, 47:5,
  47:14, 47:15,
  47:16, 48:4, 84:7,
  84:8, 84:13.
general 21:21,
  40:21, 48:13.
generally 29:22,
  62:2.
gentleman 17:22,
  32:25.
Gerald 1:10, 1:29,
  3:5.
gets 34:17, 68:16,
  68:25, 69:7,

69:11, 74:10,
  78:9, 86:22.
Getting 11:1, 30:15,
  57:9, 57:15,
  57:17, 61:8, 63:2,
  66:16, 71:8.
give 57:13, 58:12,
  81:2, 83:12.
Given 5:13, 5:20,
  63:13, 79:2.
gives 75:24.
Graham 36:25.
gram 33:19.
grand 22:3, 30:25.
graphic 18:16.
great 43:17,
  50:14.
greatly 26:25.
Greenmount 11:24,
  17:23, 31:13,
  32:3, 37:9.
ground 8:14.
group 18:6, 25:7,
  41:9, 57:21,
  57:23, 61:24.
Guerilla 11:24,
  49:13, 56:24.
guess 46:21, 61:18,
  80:3.
guilt 76:16,
  76:17.
guilty 21:14, 55:9,
  55:25, 56:4, 56:8,
  56:22, 57:2,
  57:10, 57:14,
  57:25, 58:3, 61:8,
  88:4.
gun 15:19, 16:6,
  16:11, 16:22,
  18:14, 18:15,
  21:5, 22:23,
  61:13, 65:13,
  66:2, 66:12,
  66:16, 68:19,
  68:25, 69:3, 69:4,
  69:15, 69:19,
  70:5, 70:6, 70:8,
  76:3, 76:4.
guns 21:12.
gunshot 33:2.

gunshots 33:9,
  33:10.
guy 17:14, 23:8,
  24:1, 37:23.
guys 17:5, 50:22,
  71:1, 71:3, 72:6,
  76:18.
gym 17:7, 41:7.
.
.
< H >.
Hall 24:13, 30:10,
  30:14, 32:2, 33:5,
  85:21, 86:3,
  86:4.
hammered 75:12.
handgun 23:8.
Handy 4:8, 10:20,
  12:23, 16:11,
  30:8, 31:16, 32:3,
  32:8, 32:15,
  36:19, 36:21,
  38:13, 38:14,
  42:12, 44:17,
  46:6, 54:15,
  58:14, 58:21,
  60:2, 60:7, 64:19,
  66:14, 71:4, 73:1,
  73:6, 73:10,
  73:12, 73:20,
  75:15.
hanging 12:9,
  15:17.
happen 59:2.
happened 15:18,
  15:19, 24:11,
  24:15, 24:16,
  24:18, 26:25,
  27:19, 30:22,
  31:20, 32:16,
  33:18, 34:1, 35:5,
  49:21, 60:3, 66:4,
  66:12, 70:20,
  82:12, 85:19,
  85:20.
happens 30:11,
  83:11.
hard 60:10.
harm 38:10.
harmony 77:15.

Harry 1:37, 3:16.
he'll 54:17.
head 46:20, 57:20,
   61:14.
hear 28:5, 36:3,
   43:11, 43:23,
   52:8, 52:12,
   78:7.
heard 8:10, 33:9,
   34:5, 43:18, 72:7,
   75:11, 77:1.
Hearing 1:17, 3:10,
   4:2, 5:17, 6:21,
   7:9, 7:11, 11:8,
   43:24, 52:20,
   78:21, 81:24,
   85:22, 85:24,
   87:16, 88:8.
hearsay 34:23,
   40:10, 55:15,
   55:16.
heart 71:21.
heaven 5:14.
Help 28:24, 43:20,
   79:23, 80:2.
helps 77:8.
hereby 88:19.
highly 11:14, 18:12,
   20:16, 25:15,
   28:22.
Hill 30:9, 30:11,
   32:5, 32:23.
him. 46:17, 74:21.
hitch 75:10.
Hoffman 1:27, 3:8,
   42:6, 43:2.
Hold 18:6, 39:4,
   55:8, 57:12,
   58:10, 58:15,
   64:9, 81:2.
holding 7:9,
   18:11.
home 85:21.
honest 19:22, 20:9,
   43:16, 50:23.
Honorable 1:18.
hope 7:10, 16:19,
   42:7.
hopefully 18:6.
horrible 29:18.

horse 77:24.
hours-long 61:16.
house 32:23, 37:22,
   37:24, 38:15.
housekeeping 4:17,
   87:18.
hugely 20:20.
hundred 78:5.
hunters 16:8.
hurricane 78:9,
   78:10.
hurt 12:13.
hypothetical
   29:15.
.
.
< I >.
idle 10:25, 15:12,
   15:24, 17:9,
   18:3.
ifs 18:19.
III 2:10, 8:1, 8:3,
   8:12, 8:15,
   8:22.
image 42:21, 42:23,
   43:2.
imaginable 18:16.
imagine 17:18,
   18:7.
immediately 47:19.
immense 31:22.
impact 9:18, 19:20,
   20:16, 30:17,
   77:5.
impactful 18:13.
implement 51:9,
   51:18, 52:3.
implementation
   51:20, 52:2.
implicating 47:11.
implications 7:8.
implicit 14:14,
   50:10, 50:11.
implying 14:1,
   39:24.
important 15:25,
   44:4, 44:5, 64:21,
   73:22, 88:13.
importantly 46:2.
importation 51:13.

impossible 56:23.
impress 25:6.
in. 7:7, 23:1, 26:8,
   41:3, 57:6, 70:23,
   71:20.
incidents 19:19.
inclination 5:18,
   5:21.
inclined 52:16,
   52:19.
include 79:3.
included 67:10.
includes 17:21,
   54:13.
including 18:1,
   32:11, 35:1,
   51:11.
incriminate 13:7.
independent 17:19,
   64:18.
indicate 52:25,
   53:1, 53:15, 57:4,
   57:5, 74:17.
indicated 61:7.
indicates 49:1,
   57:11.
indicating 59:1,
   59:2.
indicative 53:17.
indicted 30:25.
indictment 37:8,
   46:20, 56:15,
   56:16, 59:13,
   61:14, 62:6,
   62:24, 64:2,
   68:22, 72:10,
   72:11, 72:25,
   73:9, 76:6, 76:7,
   76:8.
individual 30:7,
   31:7, 32:19,
   61:5.
individuals 51:11,
   57:6, 61:5,
   64:3.
indulge 16:13.
indulgence 80:21.
inference 46:14,
   47:23, 48:1.
inferences 46:11,

50:16, 85:6.
inflame 27:19.
influence 21:11.
informant 68:18,
  70:4.
information 32:17,
  45:14, 51:14,
  64:2, 69:13, 74:7,
  75:19.
infused 15:15.
initiative 82:13.
inmates 11:20.
inside 4:4, 42:24,
  87:7.
instance 79:17.
instead 16:6,
  18:4.
instruction 34:11,
  35:2, 79:2, 79:6,
  83:18.
intend 29:7.
intended 67:2.
intends 81:25.
intent 19:25, 20:8,
  20:17, 31:18,
  33:23.
intention 6:2,
  21:20.
intentions 21:1.
interest 15:25,
  24:3.
interested 11:8,
  29:24, 30:16,
  56:25, 72:21.
interesting 13:9,
  56:20, 69:8.
interpretation
  13:11, 40:1,
  45:18, 46:10,
  46:12, 52:8, 71:6,
  74:25.
interpreted 36:13.
intonation 41:21,
  46:9.
intrinsic 27:15,
  28:17.
introduce 29:16,
  34:7, 76:19,
  81:25.
introduced 38:6,

66:10.
intruding 54:19.
investigation 4:7,
  30:4.
involved 32:9,
  60:15, 61:6, 71:9,
  83:9, 83:19,
  83:20.
issue 4:9, 6:4, 7:1,
  7:2, 7:9, 7:10,
  7:15, 8:22, 9:4,
  10:4, 13:10,
  19:11, 19:15,
  20:14, 30:15,
  70:22, 78:18.
issues 6:24, 8:1,
  8:2, 14:22, 22:15,
  65:23.
it. 54:17.
itself 12:17, 22:4,
  23:17, 23:21,
  38:18, 48:24,
  78:13, 78:14.
.
.
< J >.
J. 1:25, 1:37,
  39:10, 47:4, 47:9,
  47:18.
jail 10:6, 10:8,
  10:12, 21:13,
  37:5, 37:11,
  68:17.
jamaa 47:13.
Jamal 1:35.
James 1:18, 50:2,
  74:10, 81:9.
Jeffrey 1:33,
  3:14.
Jencks 7:8.
JKB-16-0363 1:9,
  3:5.
job 16:20.
Joe 24:20, 32:8,
  32:9, 37:23.
John 2:10, 3:24.
Johnson 1:10, 1:29,
  3:6, 3:12, 3:14,
  35:1, 35:7, 47:15,
  77:11, 84:2,

84:17, 84:21.
join 52:10.
joining 75:23,
  87:1.
joint 29:20, 64:7,
  64:13, 64:14,
  74:5, 74:21,
  74:22.
Jones 2:4, 3:6,
  3:18, 3:19, 4:18,
  4:20, 6:5, 77:5,
  77:12, 77:18,
  77:25, 79:3,
  79:13, 79:22,
  80:7, 82:4, 82:8,
  82:11, 82:22.
Joseph 2:12, 3:6,
  3:21, 24:20.
Jr 1:37.
judge 50:8.
judgment 7:6,
  41:20.
June 80:25.
jurors 26:20,
  83:18.
jury 17:20, 21:11,
  21:15, 22:3,
  27:19, 28:5,
  30:25, 31:10,
  31:12, 46:21,
  54:3, 54:7, 54:20,
  71:12, 71:15,
  73:24, 75:12,
  77:10, 83:17,
  84:16, 86:22.
.
.
< K >.
K. 1:18.
keep 4:19, 5:19,
  66:8, 73:7, 73:18,
  74:19.
keeping 15:25,
  50:14, 60:22,
  60:23, 60:24,
  61:23.
Kenneth 2:4, 3:6.
kept 40:17, 54:20.
Kevin 24:21, 33:3.
key 65:5, 65:22.

keys 65:16.
Khan 25:15, 25:16.
killed 35:21.
killing 22:24, 23:1,
  23:14.
kills 20:5, 57:16.
kind 15:12, 22:13,
  35:3, 36:22, 42:9,
  61:22, 62:21,
  63:3, 68:11, 74:1,
  82:3.
kinds 57:20.
knock 60:11, 63:1.
knowing 67:6.
knowledge 9:7,
  31:17, 33:23,
  64:18.
known 65:10, 74:17,
  81:12.
knows 47:21, 54:22,
  59:9.
.
.
< L >.
lack 20:24.
language 37:12.
large 22:12, 23:7.
largely 60:5.
last 7:1, 19:6,
  30:4, 32:18, 43:7,
  55:6, 58:8, 58:12,
  61:12, 64:11,
  64:12, 72:22,
  73:3, 73:5, 74:3,
  74:16.
late 4:3, 5:13,
  50:7.
later 56:16, 74:3,
  86:12.
laughing 46:6.
law 10:16, 25:14,
  48:18, 66:24,
  74:12, 75:23,
  79:7, 79:10,
  79:11.
lawyer 79:18.
lawyers 72:7,
  83:6.
layer 36:18.
lead 9:6, 21:15,

53:20, 61:15,
  77:11.
leadership 26:7.
leads 37:20.
learned 30:7.
least 12:8, 25:19,
  26:20, 31:9, 35:2,
  71:19, 72:1.
leaving 26:19.
left 58:8.
legal 6:1, 6:17,
  36:11.
legion 60:14.
lengthy 78:14.
lessened 85:8.
lie 81:14.
lies 75:10.
life 19:3, 82:16.
light 49:17.
likely 17:13, 21:13,
  26:17, 26:19,
  35:24.
likes 17:14.
limine 4:13, 6:23,
  7:5, 9:24, 87:19,
  87:20, 87:23.
limit 66:24.
limited 67:8.
limiting 22:14,
  34:11, 35:2, 79:2,
  79:6.
line 54:11, 54:14,
  54:18, 54:19,
  54:25, 72:25,
  74:3, 74:17.
lines 40:5, 55:4.
link 86:3, 86:5.
Lisa 2:18, 3:9.
listen 16:3, 41:19,
  43:21.
listened 16:4,
  44:7.
listening 8:23,
  85:21.
literally 5:14.
little 4:21, 11:3,
  24:21, 71:11,
  71:15, 77:3.
locked 18:1, 37:14,
  37:16, 37:19.

logical 13:11.
logistical 5:11.
Lombard 1:48,
  2:47.
long 19:1, 30:12,
  35:3, 48:3,
  84:15.
longer 71:25.
look 38:15, 38:17,
  44:6, 44:15,
  59:10, 61:8,
  72:17, 76:1.
look. 42:14.
looking 61:12.
looped 66:10.
loses 78:17.
lot 20:21, 44:16,
  44:17, 44:24,
  55:1, 64:25, 83:4,
  87:17.
lots 20:23, 28:12.
love 77:15.
loyalty 49:2,
  61:1.
.
.
< M >.
M. 1:39.
magazine 23:8.
maintain 18:5.
maintaining 11:11,
  16:15.
Malone 58:18, 63:21,
  65:12, 68:20.
Man 10:10, 39:6.
man. 45:24.
manner 9:1, 37:12,
  66:23.
margins 51:8.
Marijuana 10:8,
  11:22, 19:17,
  21:5, 21:13.
mark 47:6, 47:17.
marker 31:4,
  42:16.
Marquise 2:8, 3:7.
Marshal 88:15.
Marshals 5:14, 5:19,
  5:21.
Martinez 1:25, 3:3,

3:7, 5:23, 34:4,
36:4, 38:23,
39:12, 42:20,
53:19, 63:16,
72:13.
Maryland 1:2, 1:20,
1:49, 2:48.
mash 71:14.
mask 32:11.
matter 3:9, 4:18,
5:7, 78:6,
88:21.
matters 87:18.
Mccant 46:24.
mean 7:16, 10:10,
13:5, 13:19, 23:6,
25:4, 26:11,
28:12, 35:15,
43:21, 48:6, 56:7,
56:15, 56:17,
56:23, 57:12,
57:21, 58:1,
59:11, 59:20,
71:9, 72:19,
75:24, 75:25,
80:13, 84:21.
Meaning 19:21,
41:21.
means 20:6, 27:23,
28:7, 28:17,
28:25, 37:12,
41:1, 46:20,
46:22, 47:4,
48:10, 62:6.
meant 36:15.
meantime 5:23.
member 30:10, 31:13,
31:14, 32:2, 32:3,
33:21, 37:16,
37:17, 38:3, 40:4,
56:24, 84:21.
members 11:12,
37:12, 37:18,
83:16.
membership 60:8.
men 62:4, 75:18.
mention 14:22,
14:24, 44:4,
77:25, 78:1,
78:2.

mentioned 77:2.
mentions 14:25,
70:12.
mere 10:25, 18:3.
message 59:11.
messages 32:9, 64:5,
66:1, 68:21,
71:17, 88:5.
method 28:7,
28:25.
methods 20:1, 21:20,
27:23, 28:18.
Michael 32:20,
32:25, 86:9.
microphone 35:17.
middle 44:21,
74:16.
Mike 24:22, 32:21,
86:7.
mind 6:18, 34:16,
73:18, 88:12.
mindset 21:1.
mine 45:18, 52:9.
minimally 83:20.
minimum 79:1.
minitrials 50:8.
minute 29:7, 36:23,
42:23, 55:20.
minutes 25:25,
41:25, 42:1,
75:11, 82:4.
mish 71:14.
mislead 71:15.
misleading 63:9,
63:13, 71:5,
76:18, 76:23.
missing 48:20,
60:19.
mistake 43:12,
43:15.
mixing 59:14.
moment 31:3, 36:14,
42:17, 60:1,
80:22.
money 37:1, 37:4,
37:13, 37:18,
81:21.
money. 36:24.
month 17:6, 17:11.
Moose 24:21, 32:24,

33:4.
morning 3:2, 3:4,
3:13, 4:1, 4:2.
Moses 63:21.
motion 3:10, 8:3,
9:24, 31:21,
54:12, 77:3,
80:24, 82:7,
88:9.
Motions 1:17, 4:13,
5:13, 6:23, 7:4,
78:21, 81:24,
87:1, 87:18,
87:20, 87:23,
88:8.
motivation 22:17,
35:5.
motive 20:8.
motives 74:11.
mountain 60:10.
move 5:14, 58:6,
58:7.
moving 6:12,
61:23.
MR. BUSSARD 3:19,
4:20, 5:1, 5:8,
6:4, 77:2, 77:14,
77:17, 77:22,
78:12, 78:18,
78:20, 79:1, 79:9,
79:12, 79:25,
80:3, 80:7, 80:12,
80:18, 80:21,
81:4, 81:7, 81:11,
81:15, 81:18,
81:23, 82:3,
82:20, 83:3.
MR. SOLOMON 86:24,
87:10, 87:14.
MS. HOFFMAN 42:19,
43:3, 43:25.
multiple 19:9,
25:19, 33:1,
38:4.
murdered 24:22,
32:25, 86:7.
murders 21:4, 25:17,
25:19, 26:3,
27:20, 28:12,
28:16, 28:17,

28:19, 28:25,
31:8, 31:15,
35:24.
MVA 32:5.
myself 13:7,
13:12.
.
.
< N >.
N-word 74:5.
name 32:21, 33:5,
47:15, 64:17,
68:13, 70:14,
76:8, 81:10,
84:5.
named 24:22, 32:20,
32:21.
names 64:3.
narrative 33:12,
35:3.
nasty 20:24.
nature 11:10.
necessarily 56:21,
57:21, 70:15,
71:9.
necessary 5:17,
85:12.
neck 33:1.
need 6:10, 33:17,
33:18, 34:3, 42:7,
45:11, 62:17,
63:16, 65:12,
71:19.
needed 5:3, 5:14,
50:3.
needs 5:25.
nefarious 59:2.
negotiate 73:25.
negotiations
53:24.
neither 79:3.
new 72:23, 72:24.
next 4:15, 5:9,
6:22, 54:25,
81:15, 81:23,
86:12, 87:16,
88:16.
Niggas 44:18,
44:25.
night 19:6, 32:18.

nine 6:15.
No. 1:9, 24:11,
48:25, 67:20,
76:12, 76:13.
Nobody 12:20, 14:10,
71:9.
Nod 65:8, 65:9,
65:10, 81:12.
None 52:24, 52:25,
70:15, 74:5.
nonetheless 87:11.
nontestimonial
55:13, 55:23.
nonverbal 41:21.
nor 76:9.
Norman 36:23, 38:1,
65:14.
NORTHERN 1:2.
note 46:4.
nothing 15:9, 16:9,
20:10, 23:1,
23:20, 29:3,
35:20, 35:22,
36:1, 39:10,
39:16, 39:18,
46:17, 47:6,
47:17, 47:19,
47:22, 57:5,
57:12, 59:1, 59:2,
86:5, 86:8.
notion 16:13, 21:18,
25:1, 32:15,
51:17, 60:5,
60:22, 64:20,
66:2.
November 6:14.
now. 10:11.
nowhere 50:25,
73:8.
nuanced 52:21.
number 3:5, 13:20,
21:4, 24:12,
24:19, 36:9.
numbers 58:12.
nurturing 11:11,
60:6.
.
.
< O >.
O'toole 1:33,

3:14.
object 87:4.
objection 53:24.
objectives 22:17,
27:22, 29:1.
obligation 36:5.
observed 50:23.
obstacles 6:1.
obviously 78:22,
82:22.
occurred 4:4, 11:10,
19:14, 27:13,
29:8, 70:7.
occurring 15:24.
occurs 36:19,
38:25.
October 1:19.
offense 28:8.
offer 68:17.
offered 19:1, 35:9,
53:14, 54:11,
83:16.
office 78:4.
Official 1:47, 2:46,
88:25.
Okay 4:17, 6:21,
8:9, 8:19, 9:3,
9:10, 13:23, 15:5,
19:15, 39:4,
42:20, 43:10,
45:3, 46:16, 54:4,
54:24, 58:10,
58:14, 58:15,
65:20, 73:10,
81:21, 84:3,
87:23.
old 25:23, 50:1.
once 37:11, 60:9,
66:24, 67:18.
ongoing 30:4.
open 6:18.
openly 22:21,
22:22.
operate 48:21,
52:18.
operates 49:4.
operating 67:23.
opportunity 9:5,
68:17.
opposed 23:7.

options 78:22.
oral 8:10.
order 5:22.
ordinary 4:14.
organization 11:13,
  20:5, 49:3,
  61:2.
others 13:17, 14:10,
  17:22, 88:10.
otherwise 19:3,
  24:24, 29:7,
  30:20, 35:9,
  61:21, 86:25.
ought 40:17,
  85:13.
ourselves 51:12.
outed 65:9.
outrageous 19:3.
outside 43:21.
outweighed 26:7.
overall 14:10.
overarching 37:8.
overheard 4:10.
overt 20:17, 27:2,
  27:12, 27:14.
overtaken 78:9.
owed 37:1.
own 17:19, 19:8,
  46:11, 60:4,
  73:23, 82:13.

.

.

< P >.
page 38:25, 44:20,
  44:22, 53:12,
  55:7, 58:8, 61:12,
  64:10, 64:11,
  64:12, 73:3, 73:5,
  81:3, 81:5, 81:6,
  81:7, 81:8, 81:16,
  85:23.
pages 58:12, 78:5.
pals 16:15.
paper 32:18.
papers 36:25,
  38:8.
parity 83:15.
part 12:21, 14:6,
  27:13, 28:17,
  34:17, 37:18,

38:25, 39:1,
  39:17, 40:18,
  54:2, 59:19, 66:6,
  66:7, 66:21, 68:9,
  78:23, 78:24.
participant 46:5.
participated 79:4.
particular 4:9, 7:3,
  7:13, 22:23, 27:3,
  31:24, 39:22,
  40:16, 41:20,
  41:24, 49:10,
  49:13, 49:14,
  51:10, 51:11,
  51:22, 63:23,
  66:23, 80:23.
Particularly 11:4,
  20:19, 40:17.
past 70:21, 75:11.
Paul 1:31, 3:13.
peace 77:15.
pendency 37:7.
pending 4:13.
People 13:16, 20:5,
  22:24, 23:2, 35:7,
  41:6, 45:12,
  50:24, 51:12,
  51:21, 52:4, 56:2,
  56:25, 57:16,
  79:5, 79:13, 82:5,
  82:10, 82:11,
  82:13.
perfectly 43:16.
perform 12:14.
perhaps 9:4, 30:1.
period 68:15.
permits 86:12.
permitted 34:7,
  85:5.
perpetuating 12:19,
  13:20.
person 24:20,
  38:6.
personal 6:6.
perspective 36:10,
  68:15.
persuaded 11:4.
Peter 1:25, 3:7.
phone 32:9, 61:13.
physical 6:12.

physically 73:2.
pick 8:12.
picked 4:7, 12:4.
picks 38:22.
pictures 85:10.
piece 39:21, 40:9,
  40:16, 67:13,
  72:22.
pieces 60:11,
  87:5.
pile 71:14, 78:5.
piles 78:2.
pistol 14:22, 19:16,
  23:2, 23:4.
place 17:6, 17:7,
  17:11, 24:25,
  29:3, 35:12,
  35:13, 36:10,
  47:20, 50:1,
  86:8.
placed 82:7, 87:7.
placement 8:23.
places 42:5, 42:8.
Plaintiff 1:7,
  1:23.
plan 29:16.
planted 4:6.
play 18:20, 42:7,
  42:17, 43:3, 43:6,
  43:15.
played 53:21, 54:3,
  54:6, 77:9,
  77:10.
played. 43:5,
  43:9.
playing 43:4.
plea 53:25, 55:13,
  58:7, 73:25,
  78:25.
plead 56:12, 56:13,
  56:22, 57:18,
  57:25.
Pleading 52:23,
  53:7, 55:25, 56:4,
  56:7, 56:12, 57:2,
  57:10, 57:14,
  61:7.
pleads 58:3.
pleas 63:2, 88:4.
please 3:2, 6:11,

43:7.
plotting 52:25.
plus 76:6.
Point 5:18, 6:2,
  11:21, 11:22,
  18:19, 22:13,
  23:20, 29:4,
  29:16, 33:14,
  35:19, 36:2,
  38:21, 38:22,
  43:22, 49:23,
  52:23, 61:18,
  62:17, 64:21,
  64:22, 65:5,
  71:24, 73:2, 80:7,
  84:16, 85:7,
  86:4.
point. 17:15.
pointed 38:8.
pointing 57:11.
police 68:17, 68:19,
  69:1, 69:20,
  70:11.
policy 51:9.
portion 11:17,
  39:22, 41:24,
  53:4, 79:25,
  80:23.
portions 77:4,
  77:9.
position 20:15,
  77:18.
positions 84:9.
possibility 34:6,
  45:7.
possibly 7:11.
potential 9:18,
  78:1, 78:22.
potentially 44:3,
  79:22.
power 23:9.
powerful 67:13.
preceding 47:19.
precipitated
  32:22.
predicate 86:20.
prefer 9:19, 17:2,
  17:3, 17:8, 23:2,
  23:11, 23:13.
preference 17:17.

prefers 20:2.
prejudice 10:24,
  25:23, 26:8,
  67:16, 67:18,
  68:1, 72:20, 78:8,
  78:14, 79:16,
  83:13, 84:11,
  84:12, 87:13.
prejudicial 18:23,
  18:25, 19:21,
  20:16, 20:23,
  21:6, 22:20,
  25:15, 28:22,
  30:17, 35:7,
  40:20, 62:13,
  63:3, 63:5, 63:13,
  68:7, 70:25,
  71:11, 71:20,
  78:16, 82:21.
premise 16:14, 37:8,
  37:15, 48:20,
  48:22.
prepared 18:8,
  52:17, 54:1,
  65:17.
preponderance
  11:18.
presence 5:3, 18:14,
  37:9.
Present 2:18, 7:4,
  12:9, 71:13,
  87:3.
presented 4:10,
  51:6, 77:7, 85:1,
  86:18, 87:1,
  87:19.
pretrial 4:14, 6:25,
  87:17, 88:16.
pretty 25:10, 26:4,
  67:13, 77:24,
  84:12.
prevent 28:14.
previously 49:17,
  60:19.
pride 41:10,
  41:12.
principle 38:12.
principles 38:9.
prior 70:1, 88:8.
prison 11:5, 37:9,

37:13.
privilege 59:21.
probably 6:5, 17:14,
  21:13, 21:16,
  45:1, 45:6, 52:14,
  59:24, 63:10,
  71:18, 73:1, 73:6,
  74:18, 76:20,
  76:21, 81:4.
probative 10:23,
  18:23, 19:22,
  20:20, 20:21,
  22:19, 23:20,
  25:7, 26:6, 28:23,
  30:17, 31:5,
  31:22, 67:24,
  67:25, 72:18,
  74:9, 75:20,
  75:22, 84:11,
  84:12, 85:8,
  87:12.
probativity 67:9.
problem 10:19,
  16:20, 22:2, 24:5,
  25:12, 34:18,
  60:10, 70:24,
  72:5.
problems 5:12,
  83:12, 83:13,
  83:15.
procedurally
  75:25.
proceeding 6:14,
  6:22.
proceedings 5:20,
  88:17, 88:21.
produce 76:20,
  76:21, 76:22.
proffer 43:23.
programs 4:23.
promote 25:9, 61:1,
  66:8.
proof 20:24, 24:11,
  24:15, 24:16,
  24:18, 26:6,
  27:18, 35:8,
  35:12, 35:15,
  49:17, 66:11,
  83:16.
properly 11:15,

15:11, 87:9.
property 6:5, 6:6.
proposing 48:21.
prosecutors 65:14.
prospective 59:15.
prove 20:17, 24:23,
    26:24, 27:11,
    27:12, 28:13,
    28:24, 29:8,
    30:20, 33:17,
    33:19, 49:12,
    49:16, 50:8, 85:3,
    86:15.
proven 17:20, 49:21,
    78:1, 86:20.
proves 64:19,
    85:4.
provide 19:24.
provided 30:6.
providing 13:1.
prudent 49:16.
pulled 53:8.
pulling 40:23.
punishes 75:23,
    75:25.
punishing 56:25.
Punk 81:21.
purportedly 25:20.
purporting 73:10.
purpose 18:4, 25:4,
    25:11, 28:11,
    31:22, 66:23,
    67:22.
purposes 33:15,
    36:11, 37:3, 46:3,
    72:2.
pursuant 5:5.
put 31:3, 67:22,
    68:11, 68:15,
    82:4, 82:12.
putative 83:1.
puts 86:8.
putting 82:5, 84:22,
    85:10.
.
.
< Q >.
quality 48:23.
question 6:18,
    12:10, 22:8,

22:20, 25:7,
    27:19, 29:12,
    29:14, 31:10,
    34:6, 35:2, 35:23,
    40:7, 40:8, 46:10,
    47:6, 47:17,
    56:21, 62:12,
    63:8, 65:3, 66:15,
    66:17, 66:18,
    84:11, 84:21.
questions 18:14,
    31:21, 33:25.
quickly 25:10.
Quite 19:10, 83:8,
    87:25.
quoted 39:2.
.
.
< R >.
R. 2:10.
Racketeering 10:13,
    11:7, 19:20,
    20:13, 21:23,
    22:9, 22:10,
    22:11, 22:12,
    27:21, 27:23,
    28:8, 28:16, 31:1,
    31:8, 37:11,
    83:7.
raises 5:11,
    31:21.
raising 53:23.
rap 88:3.
rapidly 30:1.
rat 66:9.
read 15:7, 16:3,
    19:6, 19:12, 44:6,
    58:11, 73:2.
ready 42:18.
real 29:14, 34:6,
    39:7, 47:1, 71:16,
    72:4, 86:6.
realize 78:12.
really 8:6, 20:9,
    20:23, 21:18,
    22:15, 22:19,
    23:20, 24:2,
    30:20, 41:7,
    42:16, 57:8, 60:2,
    69:25, 80:1,

85:12.
reason 55:24,
    70:24.
reasonable 33:18,
    50:16, 53:25,
    54:9.
reasonably 47:23.
reasons 13:8, 18:13,
    31:3, 31:6,
    56:4.
rebut 79:17.
recall 76:6.
received 58:23.
reciting 56:14.
reckless 72:16.
recognize 36:11.
reconvene 88:15.
record 46:5, 50:10,
    88:21.
recorded 12:4,
    30:13, 32:4,
    74:7.
recording 7:16,
    7:17.
recordings 3:10,
    4:3, 7:2, 34:6,
    87:5.
records 32:5, 85:19,
    85:20.
recounting 37:20.
redact 54:2,
    80:14.
redacting 78:24.
redaction 78:23,
    80:15, 80:16,
    84:5.
reduced 56:22.
refer 36:16.
reference 12:1,
    12:4, 13:19, 15:6,
    16:5, 16:9, 28:4,
    32:10, 49:7,
    59:11, 81:16,
    81:18.
referenced 41:25.
references 70:14,
    80:24.
referred 17:24,
    74:11.
Referring 14:16,

70:10.
reflect 18:13.
reflected 75:4.
reflecting 20:21.
reflective 12:9.
regard 6:11.
regarding 52:24,
  53:25.
regardless 23:17.
regime 11:24, 31:13,
  32:3, 37:9,
  38:5.
regular 19:3.
regularity 20:5.
rehash 58:21, 59:9,
  59:12, 61:10,
  70:15, 70:16,
  70:19, 72:16,
  83:25.
relevance 25:11.
relevant 18:23,
  20:13, 31:5,
  53:5.
reliability 71:1,
  71:21, 72:9,
  72:18, 75:14,
  75:17.
reliable 76:23.
relief 42:12, 84:1,
  84:4.
relisten 43:21.
relitigation 88:7.
relying 55:16.
remain 5:5, 6:19.
remanded 88:14.
remember 50:2.
renders 37:2.
repeat 38:4.
Reporter 1:47, 2:46,
  88:25.
representations
  52:24.
representing 3:19.
reprosecuted 76:4.
request 9:5.
requested 9:2.
require 51:13.
requires 50:15,
  52:21.
reserve 8:19.

residence 30:8,
  30:9, 32:7.
resisting 21:18.
resolved 7:10.
respect 5:24, 7:2,
  7:4, 8:22, 13:3,
  31:18, 31:24,
  32:17, 33:23,
  34:2, 40:25,
  46:13, 47:25,
  50:11, 51:11,
  51:19, 52:11,
  58:16, 65:23,
  73:21.
respectfully 16:17,
  34:3.
respond 82:6.
responded 87:20.
response 38:14,
  82:7.
responsibility
  36:4.
restriction 34:11.
retrospective 59:15,
  60:12, 60:13,
  60:14.
return 4:24, 5:21,
  6:17.
returns 4:23.
review 50:15.
reviewed 58:24,
  68:14.
revisit 86:21.
revolver 11:23,
  14:22, 15:7, 16:7,
  19:16, 21:5, 23:2,
  23:4, 23:7,
  23:8.
revolvers 15:8,
  15:10, 23:11.
RICO 25:20, 33:15.
rid 61:13, 64:7,
  64:14, 64:16,
  65:12, 66:2,
  66:16.
rise 83:12.
risk 26:8.
road 50:13.
robbery 22:4, 22:5,
  22:6, 22:7.

role 26:7.
Ronald 24:13, 85:22,
  85:25, 86:4.
Rondo 30:7, 31:25,
  32:4, 32:9, 32:23,
  33:5, 86:1, 86:2,
  86:3.
Ronnie 24:13, 30:7,
  30:10, 30:12,
  30:14, 32:1, 32:2,
  33:5, 36:23,
  36:24, 37:17,
  37:22, 38:15,
  81:18, 81:20,
  85:21, 85:23,
  85:24, 86:3,
  86:4.
room 4:5, 10:4,
  31:16.
rooted 55:15.
roughly 33:7.
round 86:21.
RPR 1:46, 2:45,
  88:19.
Rule 7:22, 8:11,
  8:16, 41:1, 41:4,
  41:5, 44:9, 48:15,
  48:16, 51:9,
  51:15, 51:17,
  51:20, 51:21,
  51:24, 51:25,
  52:2, 52:19,
  52:20, 53:22,
  67:23, 74:8,
  84:10, 86:17,
  87:12.
ruled 67:18.
rules 38:9, 39:14,
  39:18, 47:1,
  47:23, 48:4, 49:4,
  49:7, 49:14, 51:1,
  51:2, 56:25, 66:9,
  67:20.
ruling 7:12, 9:1,
  46:12, 52:21,
  86:12.
run 6:13, 6:14,
  13:9.
.
.

< S >.
salient 29:14.
saw 76:2.
scan 58:13.
scenario 19:23.
scene 33:10.
scheduled 4:15.
scheme 14:10.
scope 22:3, 30:25,
    31:10, 31:23,
    34:16, 83:8.
screaming 33:9.
search 32:6.
seat 33:11.
seated 3:2.
second 36:2, 38:21,
    38:22, 41:25,
    48:6, 54:14, 55:6,
    58:8, 58:13.
seconds 42:1, 43:7,
    84:17.
secret 81:11.
section 10:1, 32:18,
    37:12.
sections 9:25,
    10:2.
securing 6:6.
seems 12:7, 21:1.
segment 41:19,
    63:23, 77:7,
    78:21, 80:5, 80:6,
    80:8, 81:16.
segments 77:20,
    77:21.
sell 45:17, 46:9.
sells 57:16.
semi-automatic
    23:8.
send 36:24, 37:18,
    81:21.
sending 37:13.
sense 62:13.
sentence 5:1,
    15:9.
sentences 53:13.
separate 72:9.
separately 7:7,
    9:12.
September 18:2.
sequence 9:20.

served 5:25.
Service 4:6, 5:14,
    15:25.
serving 5:1.
set 7:7, 17:23,
    32:24, 42:15,
    49:13, 49:14.
setting 24:2.
seven 33:2.
Several 88:4, 88:6,
    88:7.
severance 78:23.
sexual 19:7, 19:9,
    19:14, 25:24.
shift 60:3, 61:18.
shifting 60:1.
shit 39:8, 39:9,
    44:18, 44:24,
    46:17, 46:20,
    47:6, 47:17,
    54:25, 55:1.
shit. 40:18.
shocked 75:15,
    75:16.
shoot 65:13.
shooter 33:11.
shooting 16:5,
    32:23, 37:22,
    38:15, 71:7,
    85:19.
shortly 7:11.
shot 33:1, 37:22,
    37:25, 61:13.
shots 15:8.
shouldn't 14:13,
    14:17, 14:18,
    68:2, 72:1.
show 17:15, 18:10,
    22:15, 29:3,
    62:18, 67:11.
showing 6:16, 31:23,
    64:18.
shown 83:9.
shows 33:22,
    64:23.
side 59:25, 60:11,
    67:23, 78:16,
    87:15.
significant 78:11.
signs 68:18.

silent 86:25.
similar 83:15.
simply 5:19.
sit 59:21.
sits 68:25.
sitting 17:7,
    71:7.
situation 10:24,
    16:7, 19:13,
    26:22, 28:22,
    45:1, 51:4.
situation. 45:4.
Slay 79:18, 80:20.
slop 15:20.
smelly 63:3.
smuggle 10:5.
smuggling 11:5.
snitch 44:9.
snitches 74:2,
    82:10.
snitching 12:20,
    12:24.
sold 15:19, 35:21,
    37:4.
solely 4:2.
solidarity 60:7,
    64:24, 66:9.
Solomon 2:14, 3:21,
    86:23.
solve 30:1.
Somebody 6:7, 8:11,
    19:7, 24:22, 33:9,
    35:21, 83:22.
somehow 11:5, 11:6,
    17:9, 68:7.
someone 20:25,
    23:14, 56:24.
somewhat 20:20.
Sorry 12:2, 22:11,
    58:11, 73:4.
sort 5:24, 15:23,
    42:15, 60:22,
    72:8.
sought 25:16.
sound 43:4.
source 62:15,
    74:7.
speaker 51:22,
    52:3.
speakers 62:5.

speaking 68:13.
Special 2:18, 3:8,
  7:9.
species 26:4.
specific 5:9, 44:18,
  44:24, 52:15,
  67:17.
specific. 45:2,
  45:5.
specifically 27:2,
  38:24, 74:16,
  84:1.
speculating 79:19.
speculation 58:25,
  59:18.
speed 36:17, 38:2,
  60:15.
spending 60:20.
spirit 60:23.
spirits 61:23.
spoken 30:13.
stage 5:12.
stages 32:13.
stand 5:24, 6:1,
  8:1, 8:2, 74:10,
  77:8, 79:16.
standard 21:10,
  26:24, 36:11.
standing 8:25,
  57:19, 75:13.
stands 47:13.
start 9:14, 9:21,
  9:22, 25:1, 36:10,
  36:20, 50:13,
  53:12, 54:5,
  56:14, 63:2, 63:6,
  69:12.
started 60:4, 78:20,
  82:9.
Starting 8:24,
  54:10.
starts 6:14, 15:20,
  63:3.
State 4:25, 5:22,
  6:13, 6:17, 34:16,
  58:21, 58:22,
  65:8, 65:10,
  65:14, 70:17,
  76:3, 78:4,
  82:8.

stated 11:20, 85:18,
  86:25.
States 1:1, 1:5,
  3:5, 25:15, 26:15,
  50:2, 55:5, 55:15,
  56:7, 61:9, 68:20,
  71:5, 71:13,
  75:13, 76:14.
station 32:11.
stay 15:15, 15:16,
  35:18, 57:11.
staying 16:14,
  57:6.
stays 4:22.
stenographic
  88:20.
step 56:5, 56:10,
  56:17, 57:5,
  57:14, 57:23.
steps 82:14.
stick 9:19, 66:9.
sticking 40:23.
stop 12:20, 12:24,
  42:17, 67:18.
Street 1:48, 2:47,
  32:6, 37:10,
  37:17, 47:15.
strengthen 26:25.
stricken 54:11.
strong 5:18.
stronger 72:3.
strongly 60:20.
stuck 62:8.
stuff 21:14, 21:16,
  29:18, 34:18,
  40:3, 44:16, 47:4,
  47:6, 50:5, 57:20,
  63:2, 72:6, 78:6,
  84:9, 84:14,
  84:17.
subject 41:5, 49:18,
  50:9, 86:14.
subjects 20:22.
submission 87:22.
submissions 8:1.
submit 6:18, 34:3,
  55:18, 57:22,
  58:19, 76:12.
submitted 7:14,
  32:18, 88:9.

subsequent 69:22.
substance 25:5.
substantial 19:2,
  31:25.
substantially
  26:7.
substantive 28:15.
substantively
  28:10.
sudden 5:16, 6:9.
sufficient 38:19,
  74:8.
suggests 46:8.
sullying 20:25.
Super 87:7.
Supermax 87:7.
support 46:12.
supporting 37:14.
supports 86:16.
suppose 25:4,
  35:20.
supposed 36:24,
  37:17, 50:16,
  81:21.
supposedly 85:21.
suppositions
  24:19.
surreptitiously
  87:6.
swallows 41:1.
.
.
< T >.
T. 1:46, 2:45,
  88:24.
table 3:8.
talked 32:8, 37:1,
  41:5.
talks 10:16, 19:6,
  32:4, 32:21,
  37:21.
tangentially 77:5.
tape 7:16, 23:16,
  41:17, 42:17,
  54:5, 54:6, 71:10,
  85:20, 85:22.
tapes 16:4, 34:21.
targeted 59:1.
targeting 53:1.
tattoos 85:10.

team 15:12, 15:16,
  15:23, 16:1,
  17:16, 18:11,
  22:16, 25:2, 25:4,
  36:15, 40:22,
  48:22, 60:23,
  60:24, 64:24,
  66:8, 66:20, 67:2,
  67:8, 67:9,
  67:11.
technically 67:4.
teed 37:19.
tees 72:12.
telling. 12:5,
  36:21, 44:18,
  44:25.
tells 12:20, 14:11,
  69:1, 69:13, 70:4,
  70:6, 70:13.
ten 57:19, 88:1.
tend 18:13, 19:24,
  28:24, 30:6,
  32:12.
tendency 26:19.
tends 18:9.
tension 15:15.
term 20:24, 36:15.
terms 6:11, 15:20,
  18:16, 20:24,
  34:11, 60:11.
terribly 20:22.
test 7:22, 18:19,
  27:17, 87:13.
testified 32:2,
  33:3, 53:2, 61:15,
  65:9.
testify 30:10, 32:1,
  38:4, 38:6, 51:7,
  57:1, 58:25, 59:3,
  59:19, 59:22,
  65:18, 71:19,
  75:7.
testifying 13:17,
  42:11, 42:13,
  65:14, 76:5,
  81:12.
testimony 26:16,
  26:18, 71:17.
text 32:9, 59:11,
  64:5, 65:25,

68:21, 71:17,
  88:5.
Thanks 63:15.
that. 39:10,
  47:18.
them. 15:9.
themselves 9:5, 9:6,
  13:17, 16:4,
  18:12, 83:7.
theoretical 56:20.
theoretically
  56:23.
theory 11:5, 28:14,
  62:12.
therein 75:10.
They've 20:18,
  44:24, 64:24.
thinking 19:25,
  21:20, 50:3,
  50:11, 68:2.
third 38:25.
though 27:1, 37:5,
  57:2.
thousand 13:8,
  78:5.
three 88:9.
thrown 71:14.
thrust 59:5.
tie 38:19.
ties 11:14.
tight 16:14.
Tillman 32:20,
  32:25, 86:7,
  86:9.
timing 7:8.
tip 7:22.
Title 8:1, 8:3,
  8:12, 8:15,
  8:22.
today 5:9, 5:15,
  7:10, 77:9, 86:12,
  86:18, 87:3.
together 16:1, 17:5,
  17:10, 18:6,
  18:11, 24:23,
  39:8, 39:19,
  40:23, 40:24,
  45:20, 46:1, 48:2,
  61:24, 66:8,
  84:13, 84:15,

84:18.
token 20:22.
took 24:24, 29:3,
  35:12, 35:13,
  55:21, 55:22,
  86:8.
tools 20:2, 21:21,
  22:16.
top 60:10.
topic 22:23, 37:2,
  42:9.
topics 8:10.
tornado 78:8, 78:9,
  78:10, 78:13.
torso 33:2.
total 78:5.
totally 22:5.
touches 48:17,
  50:18.
touching 36:14.
tough 45:11.
towards 22:17,
  42:14.
track 60:23,
  60:24.
trade 20:1.
Trainor 1:37,
  3:16.
Transcript 1:17,
  39:1, 43:13,
  43:19, 44:1,
  44:20, 46:4, 53:5,
  54:2, 73:5, 74:20,
  75:4, 88:20.
transcripts 56:7.
transition 46:24.
transitions 46:24.
treats 79:10.
trial 4:9, 4:11,
  5:10, 17:19, 19:1,
  29:20, 38:5, 58:1,
  58:4, 65:10,
  65:18, 76:3,
  78:15, 83:11.
tricks 20:1.
tried 69:2, 70:5,
  70:6, 83:14.
tries 68:19, 69:12,
  70:8.
triggered 37:21.

true 16:2, 23:10,
  25:5, 44:16,
  54:22, 54:25,
  55:1.
true. 44:17.
trust 11:11, 18:5,
  18:10, 36:16,
  36:22, 48:23.
trusted 74:13.
try 43:3, 45:17,
  69:14, 69:15,
  78:13, 86:22.
trying 10:5, 10:9,
  10:10, 10:11,
  25:6, 25:9, 30:1,
  43:22, 53:1,
  54:14, 54:15,
  59:6, 60:11, 61:9,
  61:13, 66:2,
  68:21, 68:24,
  69:19, 70:10,
  86:6.
Tuesday 4:16, 5:9,
  6:22, 87:16,
  87:22, 88:16.
turn 7:15, 9:3,
  42:17, 68:13.
turns 18:11.
twitching 29:18.
Two 4:3, 4:7, 7:13,
  11:20, 16:8, 17:5,
  19:18, 21:14,
  25:17, 33:9, 34:6,
  34:13, 34:18,
  34:20, 34:21,
  41:6, 55:4, 57:6,
  58:12, 61:5, 62:4,
  70:25, 71:3,
  75:18, 76:18,
  79:5, 87:4.
two-thirds 44:21.
type 12:14, 16:10,
  16:11, 16:22,
  17:3, 17:16,
  21:17, 22:15,
  22:17, 37:2, 39:9,
  40:18, 46:17,
  47:5, 47:16, 84:9,
  84:14.
.

.
< U >.
ultimately 46:21.
unable 45:16.
uncharged 25:14,
  25:17, 27:11,
  27:14, 31:8,
  35:4.
uncovered 30:5.
undercuts 75:20,
  75:21, 75:22.
underlying 86:16.
Understand 5:2,
  21:2, 26:9, 26:13,
  28:2, 30:16, 44:5,
  51:3, 66:6, 78:18,
  79:12.
understandable
  83:5.
understanding
  43:17.
Understood 6:3,
  54:8, 87:4.
undoubtedly 86:18.
undue 26:8.
unfair 62:12, 62:13,
  72:20, 83:12.
unfairly 63:5,
  63:12, 68:7,
  70:24, 71:10,
  71:20.
unfortunately
  61:4.
Unintelligible
  39:8.
unique 7:2, 77:18.
United 1:1, 1:5,
  3:5, 25:8, 25:15,
  26:15, 50:2, 55:5,
  55:15, 56:7, 61:9,
  68:20, 71:5,
  71:13, 75:13,
  76:14.
Unless 16:13, 82:17,
  86:24.
unquestionably
  33:22.
unreasonable 48:1.
unrelated 36:7.
until 5:6, 5:20,

  42:17, 78:8.
.
.
< V >.
v. 25:15.
value 22:19, 26:6,
  28:23, 30:17,
  31:22, 67:24,
  67:25, 72:18,
  75:20, 75:22,
  84:11, 84:12,
  85:8.
valued 11:14.
vanilla 17:3, 17:8,
  17:15, 41:8.
variety 7:4,
  83:10.
various 20:5.
vehicle 75:8.
vernacular 12:21.
version 56:22.
versus 3:5, 10:23,
  19:16, 26:15,
  30:17, 50:2.
via 68:21.
victim 31:19,
  32:21.
Video 33:8, 43:5,
  43:9.
videos 81:25,
  88:3.
videotape 70:7.
videotaped 61:16,
  68:14, 70:4, 75:6,
  76:2, 76:11.
videotapes 85:10,
  88:2.
view 26:23, 60:2,
  80:8.
viewed 11:15,
  15:11.
violate 51:22.
violating 51:21,
  53:22.
violation 51:24.
violence 12:14.
voice 35:17.
voluminous 78:3.
vouch 70:25.
vouching 75:13.

vs 1:8.
.
.
< W >.
W. 1:48, 2:47.
Wait 24:7, 55:20.
Walk 53:9.
wandering 35:16.
wanted 79:2.
wanting 77:9.
wants 8:10, 23:9,
   29:13, 34:5, 68:9,
   77:20.
warrants 32:6.
ways 34:18, 34:20,
   34:21, 36:9.
Wednesday 1:19.
weed 10:5, 10:10,
   10:11, 10:12,
   11:1, 11:2.
week 4:15, 7:1,
   81:24, 86:12.
weeks 6:15, 19:1.
weigh 10:23, 63:6,
   84:11.
weight 67:24.
Wes 53:13, 53:14,
   54:11, 61:13,
   70:5, 70:6, 70:8,
   70:9, 74:4, 74:20,
   74:24.
Wesley 1:35, 3:6,
   62:15.
whatever 9:22,
   12:20, 17:23,
   39:21, 57:20,
   72:7.
whatsoever 16:9,
   19:21, 20:16,
   24:18.
whoa 67:12.
whole 16:14, 17:13,
   37:15, 40:12,
   42:14, 45:1, 45:4,
   51:4, 67:10.
wide-ranging 83:7.
wider 11:6, 51:6,
   60:8.
will 6:5, 6:14,
   6:22, 6:23, 9:8,

23:17, 31:2, 32:1,
   32:13, 34:2, 38:4,
   38:6, 43:7, 43:15,
   49:16, 71:12,
   71:15, 77:18,
   86:18, 86:19,
   86:21.
window 19:25.
with. 61:14.
withdraw 56:6,
   56:10, 56:18,
   57:23.
withdrawing 56:21.
withdrew 76:12.
within 30:24,
   30:25.
without 5:22, 34:10,
   38:11.
witness 33:7, 65:10,
   65:13, 65:24,
   73:19, 74:10.
Witnesses 30:10,
   32:1, 33:3, 38:4,
   53:1, 73:22,
   85:10.
word 41:3, 74:20,
   84:5.
words 8:11.
work 67:17.
working 68:18.
world 53:16.
worried 73:11,
   73:12, 73:15,
   74:2, 80:19.
worrying 73:7,
   74:19.
worse 16:24.
wounds 33:2.
writ 5:5, 5:24,
   5:25.
writing 52:20.
writs 5:8.
written 7:12, 9:1,
   86:11.
wrongdoing 88:9.
wrongs 21:18,
   21:22.
wrote 79:11.
.
.

< Y >.
years 39:8, 39:19,
   46:1, 48:2, 57:19,
   75:24, 84:13,
   84:18.
years. 45:20.
yo 73:6, 74:18.
yourself 57:2.
Youtube 81:25.
.
.
< Z >.
zero 28:23.
zeroed 53:4.