1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF MARYLAND

2

3   UNITED STATES OF AMERICA,          )
                                       )
4          Plaintiff,                  )
        vs.                            )
5                                      ) **CRIMINAL NO.:** JKB-16-0363
    GERALD JOHNSON, et al.,            ) **Jury Trial:**  Volume 3
6                                      )
           Defendant.                  )
7                                      )
    _____)

8

9              Transcript of Proceedings
          Before the Honorable James K. Bredar
10            Monday, November 27th, 2017
                 Baltimore, Maryland

11

12  For the Plaintiff:

13      Peter J. Martinez, AUSA

14      Christina A. Hoffman, AUSA

15  For Defendant Gerald Johnson:

16      Paul F. Enzinna, Esquire

17      Jeffrey B. O'Toole, Esquire

18  For Defendant Kenneth Jones:

19      Alan R.L. Bussard, Esquire

20  For Defendant Marquise McCants:

21      John R. Francomano, III, Esquire

22

23  _____

24              Christine T. Asif, RPR, FCRR
               Federal Official Court Reporter
25            101 W. Lombard Street, 4th Floor
                 Baltimore, Maryland 21201

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  Be seated, please.  Ready

3    to continue trial in United States versus Johnson JKB-16-0363.

4    Before we bring the jury in, I understand there's some issues

5    to address.  Mr. Martinez.

6            MR. MARTINEZ:  Yes, Your Honor, I see Mr. Bussard

7    standing up at the same time.  I think the first issue to

8    address is Mr. Bussard filed a motion in limine this weekend

9    to exclude some firearm evidence and I think the parties agree

10   that it makes sense to address that motion because it will

11   affect who we call in these first couple of days of the trial.

12   So there's that.  And then this morning after sharing our

13   slide deck for opening, Mr. Francomano raised a couple of

14   issues with respect to slides in the deck that we should

15   probably address as well before we show those to the jury.

16           THE COURT:  All right.  So I don't have a copy of

17   Mr. Bussard's motion, do you have an extra copy of it,

18   Mr. Bussard?  This is a nine-page memorandum you want me to

19   read here.

20           MR. BUSSARD:  Your Honor, this started Friday night

21   and I filed something -- I think it started Friday night.  In

22   essence, I was contact -- well, it starts with the evidence

23   review we had two weeks ago.  And it was clear at that time

24   when we went through the physical evidence that there was

25   several items that weren't there and we were told that they

1    would be found and we'd have another physical evidence review.

2            And then last week I was contacted by Mr. Martinez,

3    Ms. Hoffman, and Ms. Christy, and I was told that the one item

4    that pertains to Overt Act 23 was returned to its rightful

5    owner and can't be located at the present time.

6            THE COURT:  Is there any necessity to address this

7    before opening statements?

8            MS. HOFFMAN:  I think as Mr. Martinez said, it will

9    affect who we call in the beginning days of trial.  I think we

10   can address it fairly quickly, but if Your Honor would prefer

11   to wait until you've had a chance to read the motion, we

12   certainly understand.

13           THE COURT:  Bring it back to my attention at the

14   close of the trial day when we don't have the jury waiting for

15   us.

16           Okay.  What other issues?

17           MR. MARTINEZ:  We also have some objections to the

18   slide deck, which I'll pass up the paper copy to the Court.

19   And I'll let Mr. Francomano articulate those.

20           MR. FRANCOMANO:  Thank you.  Your Honor, I do have

21   two objections.  One, I believe Number 31, and that is a

22   picture of, I believe they're going to reference a GPS

23   coordinate.

24           THE COURT:  Are these numbered, how do I find 31?

25           MR. MARTINEZ:  I'll pass them up to the Court.

1          MR. FRANCOMANO:  Your Honor, this is going to be

2     contested in the litigation.

3          THE COURT:  All right.  So this is -- what I have in

4     front of me is a picture of what looks like an online map,

5     like a Google map.  It has 2/4/17, 10:50 p.m., and it shows a

6     pin at what appears to me -- I don't know, is that the CVS

7     store there at Greenmount and North?

8          MR. MARTINEZ:  It's in the area, Your Honor, yes.

9          THE COURT:  Okay.  So what about it?

10          MR. FRANCOMANO:  Your Honor, I believe that the

11     government is going to bring in that this is a GPS coordinate.

12     If it's just a dot where the shooting of Mr. Bess happened, we

13     have no issue with it whatsoever.  If they are going to bring

14     it in and try to explain to the jury this is where the GPS

15     occurred, as I said, we do have an issue with that.

16          THE COURT:  What is your -- what is the context of

17     this slide, Mr. Martinez?

18          MR. MARTINEZ:  We're going to say that at

19     10:50 p.m., February 4th, 2017, Baltimore police officers

20     received a ping hit from the phone company pursuant to an

21     exigent request that they had made that placed the target cell

22     phone there.  And that map with that pin in it will come in as

23     an exhibit during our case.  We will introduce through one or

24     both officers who were receiving the e-mail ping hits, the

25     actual e-mails that they got, which had links to Google maps.

1    And for this particular 10:50 ping hit on February 4th, 2017,

2    either or both of the officers can and will testify that when

3    they clicked on the link, that's what popped up.  That's what

4    the officers got in real time.

5              I appreciate that Mr. Francomano may dispute that.

6    He may call his own expert.  He still hasn't told us what that

7    expert is going to say or anything like that.  But simply the

8    fact that that's dis -- doesn't mean that that -- we don't

9    reasonably expect that that very map is coming into evidence,

10   and therefore, we ought to be able to refer to it in our

11   opening.

12             THE COURT:  What is the issue, Mr. Francomano, based

13   on the predicate that Mr. Martinez has just put on the record?

14             MR. FRANCOMANO:  Your Honor, just as I say, this is

15   a situation that's going to be contested.  It's going to be an

16   issue --

17             THE COURT:  But the government puts evidence in --

18   makes -- the government predicts the admission of evidence in

19   their opening statement and then attempts to introduce

20   evidence all the time that is disputed.  I mean, it's a

21   trial.

22             MR. FRANCOMANO:  I understand, Your Honor.

23             THE COURT:  So what's the point?

24             MR. FRANCOMANO:  Your Honor, I just wanted to make a

25   motion on that.

1          THE COURT:  Well, what is the motion, the motion --

2          MR. FRANCOMANO:  The motion to have that slide not

3    be presented in opening statement.

4          THE COURT:  Overruled.  All right.  What else?

5          MR. FRANCOMANO:  Your Honor, then there's a second

6    one in which I believe this is a Facebook from Wesley Brown,

7    which it says, "Free my N-word, Digga," obviously that's a

8    reference to that he is incarcerated.

9          THE COURT:  All right.  What's this about,

10   Mr. Martinez?

11         MR. MARTINEZ:  There will be a point during our

12   opening where we talk about Mr. McCants being caught during a

13   armed home invasion robbery in progress in Cecil County and

14   we're going to tell the jury that the day after that robbery

15   his fellow member of the BGF Greenmount Regime, Wesley Brown,

16   is posting on Facebook "free Digga," which we will tell the

17   jury, shows that even though the robbery happened in Cecil

18   County folks back at BGF headquarters were keeping tabs on

19   Mr. McCants's criminal exploits.

20         THE COURT:  What evidence, if any, will otherwise

21   indicate that the defendant was held in custody pending --

22   prior to this trial?  Are there jail calls?

23         MR. MARTINEZ:  There are jail calls and there's

24   actually going to be testimony --

25         THE COURT:  Are there jail calls including

1    Mr. McCants?

2             MR. MARTINEZ:  Yes, several.  And there will be

3    evidence that --

4             THE COURT:  Where's the prejudice, Mr. Francomano,

5    if there's other evidence coming in that's already going to

6    show the jury -- I mean, what we're trying to do here in

7    general is not prejudice a defendant with gratuitous evidence

8    that he's in custody prior to trial.  But if there is evidence

9    that goes to the core of the charges in the case, which

10   inherently reveals that a defendant is in custody, such as

11   jail calls, the notion that there is some special prejudice

12   associated with an exhibit or proof like this loses its punch;

13   right?

14            MR. FRANCOMANO:  Well, Your Honor, that text is from

15   2010 -- or that Facebook post is from 2010, I believe.

16            THE COURT:  Right.

17            MR. FRANCOMANO:  And the jail calls are from this

18   recent issues.

19            THE COURT:  So your point is that there's prejudice

20   that attaches uniquely to each particular instance of

21   incarceration and that the Court should be careful to protect

22   against that.

23            MR. FRANCOMANO:  Your Honor, that's exactly what I'm

24   saying because 2010 is different from 2016 or '17.

25            THE COURT:  Under Rule 403, I find that the

1    probativity outweighs the prejudice.  It will come in.

2              MR. FRANCOMANO:  Thank you.

3              THE COURT:  Anything else, any other preliminary

4    issues?  Anything from the defendants?

5              MR. ENZINNA:  No, Your Honor.

6              MR. BUSSARD:  No, Your Honor.

7              THE COURT:  Okay.  And did we note appearances this

8    morning?  Mr. Enzinna and Mr. O'Toole are here on behalf of

9    Mr. Johnson.  Mr. Bussard is here on behalf of Mr. Jones.

10   Mr. Francomano is here on behalf of Mr. McCants.  Okay.  We

11   have an issue now with Juror No. 4.  Please bring Juror No. 4

12   to the courtroom.

13             MR. MARTINEZ:  Your Honor, while we're waiting, can

14   I ask a scheduling question?

15             THE COURT:  Yes.

16             MR. MARTINEZ:  We notice that the Court has

17   proceedings on its calendar for this afternoon, Tuesday, and I

18   believe Thursday.  Just for planning purposes, can we

19   anticipate that those VOSRs and sentencings and such will go

20   forward at scheduled times?

21             THE COURT:  I have given my chambers some

22   instructions with respect to some of those.  That could

23   change, so let's talk at the next break.

24             MR. MARTINEZ:  All right.

25             THE COURT:  Please come on in, sir, have a seat in

1    your regular chair, No. 4.  There you go.  Good morning to

2    you.

3              JUROR NO. 4:  Good morning.

4              THE COURT:  I understand that you had a particularly

5    enjoyable Thanksgiving holiday because some news was delivered

6    to you about plans for January; is that right?

7              JUROR NO. 4:  Yes.

8              THE COURT:  Go ahead and tell me about what

9    development occurred in your family.

10             JUROR NO. 4:  So there was a family ski trip that

11   was scheduled and our reservations were made for the second

12   week in January.

13             THE COURT:  Okay.  So what date does that begin?

14             JUROR NO. 4:  It's the -- mind if I look at my

15   phone?

16             THE COURT:  Please do.

17             JUROR NO. 4:  I want to say the 8th through 16th.

18   It's the 6th through the 13th.  That's Saturday to Saturday.

19             THE COURT:  Okay.  I take it this was unknown to you

20   when the jury was selected last week.

21             JUROR NO. 4:  Correct.

22             THE COURT:  Okay.  And did you indicate that

23   someone, probably someone other than you, has prepaid for this

24   trip?

25             JUROR NO. 4:  Uh-huh, my father-in-law.

```
1              THE COURT:  Your father-in-law has prepaid for this

2       trip.  Okay.  And I take it that it is your wish to

3       participate in this family event?

4              JUROR NO. 4:  Yes.

5              THE COURT:  And that would include you, your spouse,

6       your in-laws?

7              JUROR NO. 4:  Uh-huh.

8              THE COURT:  Anyone else?

9              JUROR NO. 4:  My kids, my wife's sister and brother,

10      and their families.

11             THE COURT:  Okay.

12             JUROR NO. 4:  My wife's side.

13             THE COURT:  And this is to a resort or location that

14      is outside of Maryland?

15             JUROR NO. 4:  It's in Maine.

16             THE COURT:  Thank you very much.  You can return to

17      the jury room and thank you.

18             JUROR NO. 4:  All right.  Thank you.

19             (Jury left the courtroom.)

20             THE COURT:  Mr. Martinez, what's your position?

21             MR. MARTINEZ:  Your Honor, we hate to lose a jury

22      and seat an alternate so early in the trial, but under the

23      circumstances, we're certainly not going to stand in the way

24      of that juror attending that trip with his family, so we have

25      no objection to the Court excusing.
```

1           THE COURT:  Your expectation is that this trial will

2     still be underway on the dates that he indicated, January 6th

3     through the 13th; is that correct?

4           MR. MARTINEZ:  I don't want to definitively predict

5     that it won't.  I think that if we're efficient it's possible

6     that we could wrap up our case in chief during that first

7     trial week of January.  Some of that obviously depends on how

8     quickly we go and how long cross-examinations take and such.

9     But I don't know how long the defense case might take.  I

10    don't know if there will be a defense case, so I don't want to

11    tell the Court with any kind of certainty that we're going to

12    be done by the time that juror goes on vacation.

13          THE COURT:  Thank you.  Mr. Enzinna.

14          MR. ENZINNA:  Your Honor, I would note that

15    Juror No. 4 is one of, I think, only two or three males on the

16    jury.  Also, I -- in light of Mr. Martinez's estimate with

17    regard to scheduling, I think it would be preferable to keep

18    Juror No. 4 and if we do get to the point where we are in

19    January and it does look like this case is going to go that

20    long, which frankly would surprise me, then we could replace

21    him with an alternate if necessary.

22          THE COURT:  Thank you, Mr. Enzinna.  Mr. Bussard.

23          MR. BUSSARD:  That was my position exactly,

24    Your Honor.  I don't have anything further to add.

25          THE COURT:  Thank you.  Mr. Francomano.

1          MR. FRANCOMANO:  Nothing further, Your Honor.

2          THE COURT:  Thank you.  Juror No. 4 will be excused

3    and replaced by Alternate Juror No. 1.  Alternate 1 will be

4    instructed to take the No. 4 seat.  Juror No. 4 will be

5    excused by the courtroom deputy clerk.  He has not been sworn,

6    so just ask him to gather up his things and excuse him.

7    Please pull him aside and have that conversation with him

8    privately, not in the presence of any other members of the

9    jury.  Once you have accomplished that -- let's do this.  Ask

10   Juror No. 4 to gather his things and come into the courtroom.

11   I'll excuse him, then we'll go from there.

12         THE CLERK:  Yes, Your Honor.

13         (Jury entered the courtroom.)

14         THE COURT:  Juror No. 4, you are excused from this

15   trial.  Enjoy your ski trip and you may depart.

16         PROSPECTIVE JUROR:  Thank you, sir.

17         (Jury left the courtroom.)

18         THE COURT:  Ms. Powell, now, instruct Juror No. --

19   Alternate  No. 1 that he becomes Juror No. 4.  Instruct him

20   that he'll be seated in the 4th seat.  And that all of the

21   other alternates shall move down the row in the back so that

22   the seats remain full except for the one closest to you.

23   Thank you.

24         (Jury entered the courtroom.)

25         MR. MARTINEZ:  Your Honor, Agent Christy has just

1  brought an issue, and I apologize, the reason is the jury is

2  about to come out.

3          THE COURT:  Yes.

4          MR. MARTINEZ:  We got a witness list from

5  Mr. Johnson's counsel before trial that lists Keya Brady as a

6  potential defense witness.  Ms. Christy has just identified

7  this individual in the courtroom as Ms. Brady.  I confirmed

8  that with Mr. Enzinna.  I think having asked Mr. Enzinna, I

9  think we're in agreement that the rule on sequestration of

10  witnesses will apply.

11          THE COURT:  Court security officer will go in the

12  jury room, instruct the courtroom deputy not to bring the jury

13  into the courtroom until you come back in with that

14  instruction.  Thank you, sir.  In other words, get her

15  stopped.

16          Does the government request sequestration of

17  witnesses during this trial?

18          MR. MARTINEZ:  We do.

19          THE COURT:  One party having requested

20  sequestration -- thank you, sir.  Is that door shut tight?

21  Thank you.  One party having requested sequestration of

22  witnesses, the Court will grant the request.  Anyone who

23  expects that they will give testimony during the trial of this

24  case because they have been notified by counsel for one of the

25  parties that they will be called as a witness in this case is

1  now instructed that they may not be in the courtroom during

2  opening statements, nor may they be in the courtroom during

3  the testimony of any other witness, nor may they discuss their

4  testimony with that of any other person reasonably known to

5  them to be a witness in this case until the trial is over.

6  Anyone who believes that they may be a witness is now

7  excluded.

8          Now, Counsel, I don't recognize your witnesses.

9  That's your responsibility.  My having entered the order, if

10  you see someone in the courtroom who you believe is going to

11  be a witness in this case, it's your responsibility to get the

12  proceedings stopped until that person has left the courtroom.

13  And I do instruct all counsel over the course of the trial to

14  periodically scan the gallery and make sure that none of the

15  witnesses that you're planning to call are in the courtroom.

16          Any questions about the sequestration ruling,

17  Mr. Martinez?

18          MR. MARTINEZ:  No.

19          THE COURT:  Mr. Enzinna.

20          MR. ENZINNA:  No, Your Honor.  But may I just

21  explain to Ms. Brady what's going on.

22          THE COURT:  Yes, absolutely.  Mr. Bussard.

23          MR. BUSSARD:  I understand, Your Honor.

24          THE COURT:  Mr. Francomano.

25          MR. FRANCOMANO:  Yes, Your Honor.

1          THE COURT:  The court security officer can return to

2    the jury room and advise the courtroom deputy clerk that we're

3    ready for the jury.  Thank you, sir.

4          Mr. Bussard, did defense counsel in the state case

5    have the firearm examined for ballistics or shells?

6          MR. BUSSARD:  I don't know.

7          THE COURT:  More later.  You can remain seated.

8          (Jury entered the courtroom.)

9          THE COURT:  Be seated, please.  Good morning, ladies

10   and gentlemen.  Sorry that we've had some details that we had

11   to sort out outside of your presence, which explains why we're

12   starting a little bit late this morning.  Hopefully this will

13   not be a pattern.  We are now ready to begin.  The first order

14   of business is for the clerk to administer the oath to you

15   swearing you as the jury in this case.  Ms. Powell.

16         THE CLERK:  Members of the jury panel selected in

17   the present case, please raise your right hand to be placed

18   under oath.

19         (Jury sworn.)

20         THE CLERK:  Jury sworn, Your Honor.

21         THE COURT:  Thank you.  You may be seated.  Ladies

22   and gentlemen, in this case, at the government's request, a

23   grand jury has charged the defendants, Gerald Johnson,

24   Kenneth Jones, and Marquise McCants, with commission of the

25   crimes of conspiracy to participate in a racketeering

enterprise and conspiracy to distribute and possess with intent to distribute certain controlled substances.  In addition, Gerald Johnson is charged with conspiracy to commit murder in aid of racketeering, and murder in aid of racketeering, and possession of ammunition by a felon. Marquise McCants is also charged with possession of a firearm by a felon.  The defendants plead not guilty.  And thus, they may not be convicted on these charges unless and until after the trial, you the jury, unanimously find them guilty beyond a reasonable doubt.

The trial will proceed in the following way:  Each party has the right to make an opening statement for the purpose of outlining for you what that party expects to prove. The government's lawyer will make the first opening statement. And then each defendant's lawyer may choose whether to make an immediate opening statement or to wait to make an opening statement later in the trial or not to make an opening statement at all.  The government will then present evidence. After its case has been presented through witnesses and exhibits, then each defendant will have an opportunity to present evidence if he wishes.  He's not required to do so.

If a defendant elects to present evidence, then the government will be given an opportunity to present rebuttal evidence in reply.  Each witness is first examined by the party who calls the witness to testify, and then the opposing

1        party is permitted to cross-examine the witness.

2               During the trial the lawyers may make objections to

3        the introduction of evidence or may make motions concerning

4        the law.  Arguments in connection with objections or motions

5        are usually made out of the hearing of the jury either here at

6        the bench or after the jury has been excused from the

7        courtroom.  This is because question of law and admissibility

8        of evidence do not involve the jury.  They're decided by the

9        judge.  It's the duty of a lawyer to make objections and

10       motions that the lawyer believes are proper.  You should not

11       be influenced by the fact that a lawyer has made objections or

12       by the number of objections that have been made.  You should

13       draw no conclusions from my rulings either as to the merits of

14       the case or as to my views regarding any witness or the case

15       itself.

16              After the conclusion of all of the evidence, the

17       lawyers will make their closing arguments.  In their arguments

18       the lawyers will point out to you what they contend the

19       evidence has shown and the conclusions they would like you to

20       draw from the evidence.  The government's lawyer will make the

21       first closing argument and then each defendants' lawyer will

22       make a closing argument.  After the defendants' arguments, the

23       government will have the opportunity to make a final argument

24       in rebuttal to their arguments.  What the lawyers say in their

25       opening statements, in their closing arguments, and in making

1    objections or motions during the trial, is not evidence.

2         The reason the government goes first in each

3    instance and the reason the government is allowed rebuttal

4    time in closing argument is because the government has the

5    burden of proof.  After the conclusion of all of the evidence,

6    I will instruct you as to the law applicable to this case.

7    You must follow and apply the law as I will explain it to you.

8    Following my instructions you will retire to the jury room and

9    begin your deliberations.  It will then be your function and

10   responsibility to decide the facts.  You must base your

11   findings only upon the testimony, the exhibits received, the

12   stipulations of the parties, and any conclusions that may

13   fairly be drawn from that evidence.

14        You may not conduct any independent research, either

15   by using printed materials or electronic means, such as the

16   internet, about this case, its general or specific subject

17   matter, or anyone connected with the case.  Do not visit the

18   scene of any incident mentioned in the testimony or seek

19   advice from friends or acquaintances about issues in this case

20   or otherwise conduct investigation outside the courtroom.  The

21   reason for this is that you must decide the case only on the

22   evidence you've heard and seen in the courtroom and on nothing

23   else.

24        To reiterate ladies and gentlemen, it would be a

25   violation of your oaths as jurors if during the trial you were

to, say, conduct a Google search concerning a person or a subject that is a part of this trial.  Please don't do it. Similarly, it would be improper for you to use an encyclopedia to learn more about an issue before you or even to look up in a dictionary a word that you hear in the courtroom.  You must decide the case on information presented to you here in court and not based on information you acquire elsewhere.

The following general principles are intended to assist you in judging the evidence and to guide you in the performance of your duties as jurors during the course of the trial.  You are the sole judges of whether testimony should be believed.  In making this decision, you may apply your own common sense and every day experiences.  In determining whether a witness should be believed, you should carefully judge all the testimony and evidence and the circumstances under which each witness has testified.

Among the factors you should consider are the following:  First, the witness's behavior on the stand and way of testifying.  Second, the witness's opportunity to see or hear the things about which testimony was given.  Third, the accuracy of the witness's memory.  Fourth, whether the witness had a motive not to tell the truth.  Fifth, whether the witness has an interest in the outcome of the case.  Sixth, whether the witness's testimony was consistent.  Seventh, whether the witness's testimony was supported or contradicted

1    by other evidence.  Eighth, whether and the extent to which

2    the witness's testimony in the Court differed from the

3    statements made by the witness on any previous occasion.

4         You need not believe any witness even though the

5    testimony is uncontradicted.  You may believe all, part, or

6    none of the testimony of any given witness.  You must consider

7    and decide this case fairly and impartially.  You should not

8    be prejudiced for or against a person because of that person's

9    race, color, religion, age, national or ethnic origin,

10   political or social views, wealth or poverty.  You should not

11   even consider such matters.  You should not conclude from any

12   conduct or words of mine that I favor one party or another or

13   that I believe or disbelieve the testimony of any witness.

14   You, not I, are the sole judges of the believability of

15   witnesses and the weight of the evidence.  You must not be

16   influenced to favor or oppose any person or party by my

17   conduct during the course of the trial.

18        Now, ladies and gentlemen, as we've discussed

19   previously, I think this case will take about nine weeks to

20   conclude.  During that period there will be recesses and

21   adjournments of court when you will be excused.  Some of these

22   through the holidays are going to be quite extensive, as I

23   discussed with you when we disclosed the schedule for the

24   trial.  From this point forward, until the case is over and

25   you've rendered your verdict, you may not discuss the case

with anyone who's not on the jury.  You may not discuss the
case even with each other during the trial.  You must wait
until after you have heard all of the evidence, the closing
arguments, and my instructions as to the law.  You may not
expose yourself to any news articles or reports that touch
upon this case or issues it presents or involving any of the
participants in the case.

In fairness to all of the parties to the case, you
should keep an open mind throughout the trial.  You should
reach your final conclusions only during your deliberations
after having heard all of the evidence, my instructions as to
the law, and the lawyers' closing arguments.  Until the trial
is over, you must avoid all contact of any kind with any of
the participants in the trial, except for common courtesies
such as the exchange of simple greetings.  That includes the
parties, the lawyers, the witnesses, and any persons you see
in close contact with these individuals.  Avoid all of them.

Please remember that you must not use the internet
or any device to communicate with anyone about the trial while
you're serving as jurors.  During recesses when you are
outside of the courtroom, you may turn on your cell phone or
other device and contact family members or others about
matters that have no relation to this trial.  While we're in
the courtroom, however, all electronic devices must be turned
off, not merely placed in silent or vibrate mode.  We'll take

1    a moment now to let everybody check their electronic devices

2    one more time.  Make sure the power switch is off, it's not

3    merely on silent or vibrate.  Thank you, ladies and gentlemen.

4    All such devices must be turned off and may not be used while

5    the jury is deliberating upon its verdict in a few weeks when

6    it's given to you for deliberation.

7          Now, if anyone needs to deliver an urgent message to

8    you while we're in the courtroom, you might be concerned

9    because your electronic devices are turned off and you can't

10    receive a text message from your child or your parent or

11    someone who might be dependant upon you.  So here's how we

12    handle that:  You write down this telephone number and

13    Camille -- Ms. Powell will give it to you later as well, the

14    number is (410) 962-0950.  That's my judicial assistant's

15    telephone number in my chambers, which is about 15 feet away

16    from where I'm sitting right back there.  And if there was an

17    emergency and someone needed to contact you, they would call

18    that telephone number, and then my staff would send a note

19    into the courtroom immediately for me to see.  And if it's an

20    emergency, we stop the proceedings and get the message to you

21    right away.  So I don't want anyone to believe or fear that

22    they're sort of out of contact with their loved ones and

23    relatives in some sort of dangerous way.  Just pass this

24    number out freely to your friends, family, whoever it is that

25    might need to reach you and tell them that if there's an

emergency, that's how they would contact you, if they can't,
you know, can't reach you on your cell.

        Ladies and gentlemen, these restrictions are
necessary to ensure 100 percent attention during the trial and
ultimately to ensure a fair trial.  Ladies and gentlemen,
notebooks have been provided to you for you to take notes.
You are not required or expected to take notes.  The taking of
notes is purely optional.  It's allowed where doing so is
helpful to you, but this advice about note taking, it's
important not to become so intent upon your note taking that
you miss other testimony from the witness stand because you're
trying so hard to get down what you just heard and you think
it's, you know, very important potentially to the process and
you want to make sure you get that written down, and then as a
consequence, you don't hear the next thing that was said from
the witness stand.  So you have to reach a good balance there.
See if you can't -- if you want to take notes, make sure
you've got one ear still open to what's otherwise going on in
court.

        One of the reasons why we have 12 people on a jury
is, that's 12 sets of eyes, 12 sets of ears, 12 collective
memories.  And when it comes time to deliberate, our hope and
expectation is that with 12 of you sitting there and
listening, collectively you won't miss anything.  And you can
kind of rely on that a little bit too, in terms of your fear

1    about remembering absolutely everything that happened.

2    Somebody else will remember and will jog your memory of what

3    you heard.

4              If you do take notes, at recesses in the proceedings

5    and at the end of the court's proceedings each day, please

6    close your notebook, place it in the folder that we provided

7    to you, close that up, and then leave that folder on your

8    chair in the jury box right here in the courtroom.

9              Okay.  Ladies and gentlemen, we're ready to begin.

10   You'll recall the general game plan for the trial, which is

11   first opening statements, definitely from the government,

12   possibly from the defendants.  After those opening statements

13   are completed, then the evidence will begin.  In this case the

14   evidence will take many days to submit to you.  It will occur

15   over many weeks carrying us probably all the way into January,

16   given the long breaks that we're going to take during

17   December.  And then finally, when all of that evidence is

18   over, you'll hear the closing arguments or the summations from

19   counsel.  And then last of all, you'll hear my, what are

20   called jury instructions, instructions to you on the law.

21             The evidence is what is going to take the greatest

22   amount of time.  I suspect that the opening statements will be

23   finished today, probably easily, maybe into evidence today.

24   Down the road a ways, the closing arguments, also probably

25   wouldn't take anymore than a day.  The jury instructions,

 1    probably no more than half a day.  So when we're talking to

 2    you about a trial that's going to last as long as nine weeks,

 3    the bulk of your time is going to be listening to testimony

 4    and considering evidence.  The other elements of the trial,

 5    the opening statements, the closing arguments, and the jury

 6    instructions, relatively speaking, don't take so long.  Okay.

 7    We're ready to go into that first phase, which is opening

 8    statements.  Mr. Martinez --

 9            MR. FRANCOMANO:  Your Honor, before we get to

10    opening statements, can we approach briefly?

11            THE COURT:  Yes.

12            MR. FRANCOMANO:  Thank you, Your Honor.

13            THE COURT:  Mr. Johnson, can you hear me raise, your

14    hand if you can.

15            DEFENDANT JOHNSON:  (Indicating.)

16            THE COURT:  Mr. Jones, can you hear me, raise your

17    hand if you can.

18            DEFENDANT JONES:  (Indicating.)

19            THE COURT:  Mr. McCants, can you hear me, raise your

20    hand if you can hear me.

21            DEFENDANT McCANTS:  (Indicating.)

22            THE COURT:  All three defendants have indicated that

23    they can hear through the electronic earpieces.

24    Mr. Francomano.

25            MR. FRANCOMANO:  Your Honor, one of our witnesses is

1    here in the courtroom.  I just wanted to make sure that we can

2    have her removed.

3              THE COURT:  Yes.  So when that happens in the

4    future, unless there's something that would be obviously

5    inappropriate about it, the instruction is for counsel to just

6    sort of casually get up and move back to where the witness is.

7    I'll see you going near the gallery.  I'll know what you're

8    doing.  And you just, you know, get them out of there and come

9    back to your seat, hopefully without my having to say anything

10   to the jury.  If we run into some kind of a more disruptive

11   situation, then I'll have to send the jury out.  I don't want

12   to do that if we don't have to.

13             MR. FRANCOMANO:  Okay.  Thank you.  I can go do

14   that?

15             THE COURT:  Yes.

16             (The following proceedings were had in open court.)

17             THE COURT:  Okay.  I think we now have everything in

18   order.  Mr. Martinez, are you ready to deliver the

19   government's opening statement?

20             MR. MARTINEZ:  I am.

21             THE COURT:  You may proceed.

22             MR. MARTINEZ:  Ladies and gentlemen, good morning.

23   This case is about a violent, organized, and deeply entrenched

24   gang, the Black Guerilla Family's Greenmount Regime.  This

25   case is about the activity; murders, robberies, shootings,

drug dealing, witness tampering, and witness intimidation in which that gang engaged. Much of that activity happened in a small neighborhood in East Baltimore just a few miles from this courthouse between 2005 and 2017. This is a case about three men; Gerald Johnson, also known as Geezy; Kenneth Jones, also known as Slim; and Marquise McCants, also known as Digga, who all agree to join and participate in this gang knowing that they and other members of the gang would commit the kind of crimes I just described. These men joined the gang knowing that it ruled by the gun, knowing that it controlled street corners and alleyways and used them as open air drug shops, knowing that it robbed and killed outsiders who got in its way, and knowing that the gang protected itself from ever being accountable by terrorizing those who dared to cooperate with the police.

What do we mean by terrorizing? During the course of this trial, ladies and gentlemen, you will hear and see evidence that here on Greenmount Avenue, terror is a bullet in the head of a snitch, a bullet that's meant to send a message. When the BGF controls a neighborhood, the rule of law and those with the courage and decency to insist on its protection are the enemy. Here's an example: The guy on the screen here is Moses Malone. He was shot and killed by a BGF member named Wesley Brown in May of 2013. Know why he got killed? Because a few weeks prior to his death, he told the police that he had

1    been robbed and shot by Brown's half-brother and fellow member

2    of the BGF Greenmount Regime, Norman Handy.

3            Within a day or so of Malone's statement to the

4    police, the BGF Greenmount Regime learned that Malone was a

5    snitch who had implicated Handy in a crime.  That meant Malone

6    had to be killed.  You're going to learn, ladies and

7    gentlemen, that Malone's murder was green-lighted or

8    authorized by Gerald Johnson.  You're going to hear from

9    witness after witness that Gerald Johnson called the shots in

10   the BGF Greenmount Regime.  You're going to hear from Johnson

11   himself that he gets people shot just for running their

12   mouths.  You're also going to hear that BGF had an ironclad

13   rule against snitching, which was punishable by death.

14           You'll hear that BGF members took an oath to protect

15   fellow comrades.  And that breaking that oath was also

16   punishable by death.  That's important.  It means that the

17   responsibility for Moses Malone's murder doesn't end with the

18   man who pulled the trigger, Wesley Brown, or the man who

19   green-lighted the murder, Gerald Johnson.  Responsibility

20   extends to other members of the gang including Mr. Jones and

21   Mr. McCants, who all joined the Greenmount Regime knowing that

22   people like Moses Malone, people who were brave enough to come

23   forward and seek justice, would be murdered by BGF, murdered

24   because they were witnesses.

25           Think of it this way:  BGF was a company, murder was

1    part of its business plan.  Mr. Jones and Mr. McCants were

2    hardworking, active, and well-informed employees.  That will

3    be important later when we talk about the charges in this

4    case.  But for now, let's back up a bit.  I want to tell you

5    about the Black Guerilla Family or BGF.  BGF is a nationwide

6    gang.  It started as a prison gang.  It was founded by this

7    guy, George Lester Jackson, an inmate at San Quentin Prison in

8    California in the late 1960s or early '70s.  You'll sometimes

9    hear BGF called Jamaa.  That's the Swahili word for family.

10   You'll sometimes hear the gang referred to as J for short.  So

11   when you hear a person is J or he's in J, that means the

12   person is in BGF.

13        Here, you see Mr. Johnson with the word Jamaa

14   tattooed on his left forearm.  Another way of referring to BGF

15   is 276.  These are the alphanumeric members for BGF; B is the

16   second letter of the alphabet, G the seventh; F is the sixth.

17   Here's Mr. Jones with a 276 on his left shoulder.  And here's

18   a 276 on the right-hand side of Mr. McCants's chest.  You'll

19   see later that he's got another one on his arm.  You'll see

20   that his e-mail address is even Digga276@yahoo.com.  While

21   you're looking at this photo, note the picture of

22   George Lester Jackson.  On the left side of Mr. McCants's

23   chest, in case there's any doubt that's him, his name is

24   written on either side of McCants's chest.  You'll also see a

25   gorilla on the right side near his shoulder.

1           Ladies and gentlemen, you're going to hear in the

2  mid 1990s BGF made its way from California to the prisons of

3  Maryland.  The gang started in Maryland anyway, in the

4  Maryland House of Corrections, which is now closed.  The gang

5  then expanded to every single prison in the state.  And you're

6  going to hear that in those prisons BGF members banded

7  together to control the prison economy.  That includes

8  smuggling and the sale of contraband like marijuana, tobacco,

9  and cell phones.  And you're going to hear from BGF members

10  during this trial who engaged in those activities, some who

11  engaged in those activities with these defendants.

12           So in the mid 2000s as some of the original and more

13  powerful BGF members began coming home from prison, BGF took

14  control of the Baltimore Streets.  Over time, the gang set up

15  regimes, which you can think of as local chapters of a union,

16  throughout the city.  The BGF Greenmount Regime is one of

17  those chapters.  It's got its own unique history which we'll

18  tell you about in a moment.  First, I want to talk more about

19  the structure of BGF and how the regimes are set up.

20           BGF's rank structure is similar to what you'd see in

21  the military.  On the streets the guy at the top is the hodari

22  or the city-wide commander.  Under him is a group of senior

23  members called bushman.  These are like the four-star generals

24  of the gang.  They control neighbors and they keep tabs on the

25  activities of various BGF regimes throughout the city.  Now,

1    for the regimes.  Within each regime is a bubble.  This is the

2    immediate command structure for the group.  The bubble

3    includes all the various positions that you see here,

4    including commander, lieutenant commander, minister of

5    defense, minister of education, and so on.  Each of those

6    positions has a specialized responsibility.  And you'll hear

7    about exactly what those people within the gang did from our

8    various witnesses who will testify in this case.

9            Under the bubble is the field.  These are the rank

10   and file members or the soldiers within the regime.  Now, each

11   and every BGF member is expected to know and follow a set of

12   rules.  The rules are called the 22s and the 33s or together

13   the 55s.  Here are some of the 22 rules of BGF:  Never place

14   your hands on a brother.  Never speak in vain or in public of

15   Jamaa.  Never compromise the principles and concepts of J.

16   Every member must work together to show loyalty, honor, and

17   respect to keep the spirit alive and the fire burning.  Never

18   play the homeboy factor or choose one comrade over another.

19   There are no big I's and little U's in Jamaa, everyone is

20   subject to discipline.  You're going to hear, ladies and

21   gentlemen, that these rules were often honored in the breach

22   and you're going to hear about multiple instances in this case

23   in which BGF killed one another over petty internal gang

24   disputes.

25            Here are some examples of the 33 constitutions of

Government's Opening Statement

1    BGF:  Once you pledge you take it to the grave.  No revolving

2    doors.  Once you pledge you're in for life.  Never violate

3    protocol.  Discipline comes in three forms:  fines for minor

4    violations, beat downs for major, and death for extreme

5    situations.  If a member is selected to carry out a directive,

6    which sometimes you'll hear referred to as a mission, he will

7    be given a proper interview to carry out the directive and if

8    he refuses or fails to carry out the directive, then he

9    becomes the target.  If you're given a mission, say, to kill

10   someone or execute a hit and you refused to do it, you become

11   the target of the hit.  And lastly, this one's important, we

12   do not participate in snitching or working with the police.

13        BGF members also take an oath, sometimes called the

14   Oatmeal or the Two S's and the Three I's.  The oath is this:

15   Should I ever be untrue and forsake the chosen few, this oath

16   shall kill me.  Should I ever become lax in discipline at

17   times of strife, this oath shall kill me.  If ever I sought to

18   do harm or allow harm to come to my brother, this oath shall

19   kill me.  If ever at any time I refuse or deny to give

20   assistance to this oath, this oath shall kill me.  If ever I

21   reveal the sworn secrets of this oath, this oath shall kill

22   me.

23        Listen to that.  Every single line ends with "this

24   oath shall kill me."  And you saw in the 33s that you can be

25   killed for violating the rules or forced to kill someone as

1    part of your membership in BGF.  What the evidence in this

2    case will show you, ladies and gentlemen, is that it's

3    impossible to join BGF without understanding that at some

4    point in time you or some other member is going to be called

5    upon to take a life.  When you join BGF, murder is part of the

6    deal.

7         Now, let's talk about the BGF Greenmount Regime,

8    which was originally called the Young Guerilla Family or YGF.

9    The evidence will show you that YGF started in 2005.  At the

10   beginning it was basically a neighborhood gang.  Its members

11   were mostly younger guys from the 22-, 23-, 2400 blocks of

12   Guilford Avenue and Barclay Street, which you can see on the

13   map right here.  You're going to hear from multiple witnesses,

14   ladies and gentlemen, that Mr. Johnson and Mr. Jones were

15   original members of the YGF.  In fact, you'll hear that

16   Mr. Johnson has admitted being a member of that gang.  You'll

17   also see a Youtube video in which Mr. Johnson brags that YGF

18   was the murder king.  The evidence will show you that he was

19   right.  Several witnesses will tell you that from the very

20   beginning of YGF, Mr. Johnson was the one in charge.  They

21   will tell you that Mr. Jones was one of the gang's enforcers.

22   And Mr. McCants, or Digga, was relatively young at the time

23   but still tight with Johnson and closely associated with the

24   gang.

25         You're going to hear that between 2005 and 2007, YGF

1    did a lot of wild stuff.  Much of it involving the same cast

2    of characters:  Mr. Johnson, Mr. Jones, Kenneth Faison, also

3    known as Roscoe, this is Mr. Johnson's brother.  David Hunter

4    on the left here and Joseph Bonds.  You see them both throwing

5    up the X, which you'll learn is a symbol or sign for BGF.  And

6    both of these gentleman are wearing George Lester Jackson

7    T-shirts.  I told you about him earlier.  He's one of the

8    founders of the gang.  You're going to hear that these guys

9    and some other YGF members sold drugs, including crack,

10   heroin, marijuana, and ecstasy, basically every day.  You'll

11   see the houses they used to store, package, and stash drugs.

12   You'll hear about where they sold drugs and you'll hear from

13   multiple witnesses who participated.  You'll also hear about

14   robberies that YGF and its members committed, many of them

15   armed.  Not just in the Greenmount neighborhood, all over

16   Baltimore City.

17          But it wasn't the drug dealing and it wasn't the

18   robberies that earned YGF its reputation.  It was murders and

19   shootings, many of which you'll hear about during this trial.

20   One of those murders happened in 2007 and the victim of that

21   murder was a guy named Gregory Rochester or Craig Mack.

22   That's him here.  He was a YGF associate who sometimes dealt,

23   packaged, and stored drugs with the gang.  The evidence in

24   this case will show you, ladies and gentlemen, that on January

25   9th of 2007, Mr. Rochester was murdered.  The evidence will

1   show you that Mr. Jones and a guy named Charles Pace, also

2   known as Foo, murdered Gregory Rochester, that they did it in

3   a YGF stash house on East 25th Street, and that Mr. Johnson

4   authorized the murder both because he believed that.

5          Mr. Rochester was a snitch and that he had stolen

6   drugs from the gang.  You will learn, ladies and gentlemen,

7   that by mid 2007, senior members of BGF were starting to pay

8   attention to YGF.  They were starting to pay attention because

9   they thought that YGF was out of control.  They thought that

10  YGF was engaged in reckless violence.  And they thought that

11  YGF, which held itself out as a sort of junior varsity version

12  of BGF, was exposing BGF to unwanted heat from the police.

13         So around 2007, the senior members of BGF issued an

14  ultimatum to YGF and the ultimatum was this:  YGF could either

15  shut down or its members could join BGF and follow its rules.

16  You will learn that ultimately nearly every member of YGF,

17  including Mr. Johnson and Mr. Jones, crossed over to BGF and

18  became full-fledged members of the gang.  One of the witnesses

19  who will tell you about this merger or crossover between BGF

20  and YGF is a BGF member named Mike Gray.  Gray was one of the

21  original BGF members in Maryland.  He joined the gang at the

22  Maryland House of Corrections, the cut, the first prison where

23  the gang got started.  He's a bushman.  And he eventually

24  became the city-wide commander of BGF, the hodari, the guy who

25  called the shots on the streets.

 1          When Mike Gray testifies, and he'll testify early in

 2    this trial, he'll explain much of what we talked about over

 3    the last couple of minutes:  the history and the structure of

 4    BGF, its rules, its oath, the way that regimes are set up.

 5    He'll explain that he personally set up the BGF Greenmount

 6    Regime.  And he'll tell you that as long as he had anything to

 7    do with the Greenmount Regime, Geezy, Gerald Johnson was the

 8    guy in charge.  So now let's pick up after the merger.

 9          And you may be wondering, did this merger or

10    crossover between BGF and YGF change anything?  Did YGF change

11    its tune once it joined BGF and became the Greenmount Regime?

12    The answer is, and the evidence will show you, not really.

13    You will learn that the gang and its members kept dealing the

14    same drugs in the same neighborhood.  You're going to hear

15    about and you're going to see drugs that were seized from both

16    the gang and its customers from 2007 going forward.  You're

17    going to hear from multiple witnesses, both member and

18    associates of the gang, who will tell you about their drug

19    dealing activities.  The same is true of the robberies.

20    You're going to hear that members of the Greenmount Regime

21    kept committing robberies both inside and outside the

22    Greenmount neighborhood.

23          You're going to hear, for example, that Mr. McCants,

24    on August 26th, 2010, was caught while committing an armed

25    home invasion robbery up in Cecil County.  The day after he

Government's Opening Statement

was arrested, Wesley Brown, the guy who I mentioned earlier,
shot Moses Malone in May of 2013 and a fellow member of the
Greenmount Regime posted this on Facebook:  Free Digga.  So
the robbery might have happened up in Cecil County, but back
at BGF headquarters, McCants's fellow gang members were
definitely keeping tabs on his criminal exploits.  So the drug
dealing continued, the robberies continued, and so did the
murders and shootings.  You're going to hear about several
murders and shootings that took place for which the BGF
Greenmount Regime was responsible between 2011 and 2017.

You will hear, for example, that in June of 2011,
this guy, Henry Mills, also known as Nique, was gunned down
execution style in broad daylight on a busy city street in the
2400 block of Greenmount Avenue.

You will learn and the evidence will show you that
Mr. Mills was killed by David Hunter, a YGF and later BGF
member who we mentioned a moment ago.  He was the guy next to
Joseph Bonds making the X in the George Lester Jackson
T-shirt.  You're going to see, ladies and gentlemen, that
within hours of Mr. Mills's murder, David Hunter, Mr. Johnson,
and several other members of the gang participated in a BGF
gang meeting at a park on Greenmount Avenue that was caught by
a closed-circuit television camera.  You'll watch as during
that meeting Mr. Hunter's congratulated by Mr. Johnson and
others for a job well done.  And you'll see that on the very

1    day of the murder Mr. Johnson posted this on his Facebook

2    page:  Shootouts similar to Wild West, broad daylight without

3    a vest.  You live and you learn.  Value your life and protect

4    it by all means.  DBD.  Let that hammer go or go with it, you

5    dig me.  Get judged by 12, my N-words, the odds are better

6    than 6.

7            Six years later here we are.  Geezy is being judged

8    by 12.  You are the 12, plus the five of you sitting as

9    alternates.  And you're going to get to see and hear what this

10   defendant and what his gang were all about.

11           Speaking of the gang, you're going to learn that

12   after the merger or the cross over between YGF and BGF, the

13   original members of YGF, including Mr. Johnson and Mr. Jones,

14   were joined by a new generation.  These include the following

15   members of the Greenmount Regime, many of whom we've mentioned

16   already.  Here's Wesley Brown or Wes or Coasta.  He's the guy

17   who shot Moses Malone in 2013 to prevent him from testifying

18   in a state case against his brother Norman Handy.  This is him

19   wearing a sweatshirt that says "fuck a rat."  You can see the

20   rat here, it's Mickey Mouse caught in a trap dead.  You're

21   going to learn, if you don't know already, that a rat is a

22   snitch, someone who talks to a police.

23           You're also going to learn that Mr. Johnson

24   re-posted this photograph of Mr. Brown on his Instagram

25   account after Mr. Brown was acquited of murder in state court

1    in the fall of 2015.  This is Norman Handy or Norm.  As you've

2    heard, he's the one who robbed and shot Moses Malone in the

3    first place, which is why Wesley Brown killed him to keep him

4    from testifying.  After Wesley Brown murdered Moses Malone,

5    the state-attempted murder case against Mr. Handy was

6    dismissed.

7          On the right here is Montel Harvey or Telly.  You're

8    going to learn that he sold drugs and that he also committed

9    acts of violence, including a shooting outside a crowded

10   nightclub for the BGF Greenmount Regime.  You see Wesley Brown

11   on the left there.  In the middle is a guy named Sean Greg or

12   Hood.  You'll learn that Hood engaged in drug dealing,

13   including with Mr. McCants in the spring of 2016.

14         You're also going to learn that he murdered a guy

15   named Willy Ben Miller in June of 2013.  That murder was part

16   of a violent dispute within the BGF Greenmount Regime, which

17   you'll hear more about in just a moment.  At this point you

18   may be wondering, why aren't all these other guys on trial,

19   what happened to them?  The judge will tell you later and

20   we'll tell you now not to worry about it.  But keep in mind

21   that you need to know who they were and what they did because

22   under the law someone who participates in a conspiracy can be

23   held accountable for the acts of their co-conspirators so long

24   as those acts were foreseeable.

25         So next among the gang's younger crew is

Government's Opening Statement

1    Mr. McCants, Digga.  Here he is throwing up the X for BGF.

2    You're going to hear about robberies he committed like the one

3    in Cecil County in 2010.  You're going to hear wiretap calls

4    and see text messages in which he talked about dealing drugs.

5    And you're going to hear and see evidence that he shot a guy

6    named Gregory Bess near the intersection of Greenmount and

7    North Avenues on the night he was arrested in February 2017.

8    He was a fugitive from law enforcement at the time.

9             So now let's get back to the timeline.  The evidence

10   will show you that after these younger guys joined the

11   Greenmount Regime they all became more and more violent and

12   more and more independent.  So by the spring of 2013, the

13   gang's younger members started butting heads with the older

14   guys in the gang, including Slay, Joseph Bonds, whose picture

15   you saw earlier and Willie, Ben Miller.  The situation came to

16   a head on May 7th, 2013 when this guy, Trevon White, here he

17   is.  You guys ought to be getting familiar with that sign by

18   now.  You're going to see a lot more of that.  This guy,

19   Trevon White, on May 7th, 2013, was shot and killed in the 300

20   block of East 22nd street.

21             Country was an up and coming younger member, an

22   enforcer, in the Greenmount Regime.  The evidence will show

23   you that Mr. Jones and Ben Miller were part of a group that

24   were responsible for his murder.  Now, Country was especially

25   close with some of the younger guys in the gang, including

1    Wesley Brown, Montel Harvey, and Hood.  You're going to hear

2    that as retaliation for Country's murder, Hood and a guy named

3    Chop, who's going to testify in this case, walked Ben Miller

4    down to Maryland Avenue here, where Hood put a bullet in his

5    head.  You're going to hear that Hood killed Ben because he

6    suspected, suspected that Ben had given Mr. Jones the gun that

7    Mr. Jones used to shoot Country to death.

8            That's how justice works in BGF.  You don't get a

9    trial, you don't get a jury.  Get shot in the head and left to

10   die in an alley.  Here's Ben throwing up the X next to Geezy,

11   who as it happens, has the picture you just saw of Country

12   throwing up the X on his T-shirt.  Ladies and gentlemen,

13   you're going to hear that on the day after Ben's murder other

14   members of the Greenmount Regime already knew what had

15   happened and why.  That's going to show you how all of these

16   murders that happened in the gang are foreseeable consequences

17   of what they do.

18           You're going to hear, for example, a recorded jail

19   call between Telly, Montel Harvey, whose picture you just saw,

20   and Norman Handy.  And in that call you're going to hear Telly

21   explain to Norman, "Motherfucking Ben got his motherfucking

22   issue last night."  When Norman asked what did Ben do to die,

23   Telly explained that he had something to do with Country's

24   death.

25           "Yo had to go," Telly said, "yo had something to do

1    with that."  That's how justice works in BGF.  You're also

2    going to hear testimony that later in the summer of 2013,

3    Telly, Hood, and others tried to shoot at Slay, Mr. Jones.

4    But they missed.  Again, they were shooting at Slay because

5    they believed correctly, that he was the one who killed

6    Country on May 7th, 2013.

7            You're going to hear jail calls where Telly tells

8    Wesley Brown and Norman Handy that he and others went looking

9    for Slay with a gun.  You're going to learn that Slay believed

10   incorrectly that this guy, Lamontae Smith, had been involved

11   in the attempt on his life.  Lamontae Smith also goes by the

12   nickname Chop.  Here he is with Geezy.

13           Ladies and gentlemen, the evidence is going to show

14   you that on October 5th, 2013, Mr. Jones tried to kill Chop.

15   A shooting in the arm of the 300 block of East 24th Street.

16   Fortunately Chop survived and he himself will tell you how

17   Mr. Jones tried to kill him.  That brings us to the fall of

18   2013.  What happens next?  Well, Mr. Johnson and others in the

19   Greenmount Regime, including Wesley Brown and Mr. Jones, were

20   prosecuted in state court.  We'll tell you now that for the

21   most part the state case failed.  We'll tell you now that

22   Mr. Johnson was acquitted in the fall of 2015.  This time he

23   won't with so lucky.

24           So what happened after the acquittal?  Well, Geezy

25   went right back to Greenmount.  Here he is counting his money.

1    You're going to hear that after he went back to Greenmount,

2    one of the first things Geezy did was participate in the

3    filming of a Youtube video, which he called out two of the

4    witnesses, both of whom you'll hear from:  James Cornish, also

5    known as Nod, and Christopher Meadows, also known as Chris.

6    Both of these guys testified against Mr. Johnson in state

7    court.  You're going to see the video where Mr. Johnson says,

8    "Nod, you know what you did.  Chris, you know what you did.

9    N-words on the stand.  N-words on the stand like this.

10   N-words crazy."  You'll see him wag his finger at the camera.

11        Ladies and gentlemen, you will learn that those

12   statements and those gestures send the very same message that

13   Wesley Brown sent when he shot Moses Malone in 2013:  Snitch

14   on BGF and you will die.  Put it another way:  You have the

15   backbone to take the witness stand, to insist on this system

16   of justice instead of the one that handed death sentences to

17   Ben Miller, to Gregory Rochester, and to Moses Malone.  Well,

18   Mr. Johnson and the BGF are coming for you.

19        What else did Mr. Johnson do after the acquittal?

20   Kept dealing drugs, including pills and cocaine and living the

21   BGF life.  He went right on living that life until June of

22   2016.  The evidence will show you that on June 30th, 2016 he

23   was stopped by Baltimore police officers driving on a

24   suspended license and that he and his car were searched.  And

25   during the stop the officers recovered 7 rounds of .45 caliber

1    ammunition that were hidden inside a latex glove in the trunk

2    of the car.  They also recovered drug paraphernalia both from

3    the car and from Mr. Johnson.

4              Perhaps most importantly, they also took

5    Mr. Johnson's cell phone and you're going to see the contents

6    of that cell phone.  You're going to see that they include

7    text messages and photographs and how Mr. Johnson discussed

8    drugs, guns, and ammunition, including .45 caliber ammunition.

9    They also include a video in which Mr. Johnson and their drug

10   dealing confederates count their money in a corner store near

11   Greenmount and North.  That's just the tip of the iceberg.

12             Let's fast forward a little bit and talk more about

13   Digga, Mr. McCants.  You're going to hear that ATF started

14   making arrests in this case in November 2016.  But Digga was

15   nowhere to be found, so the ATF designated him a fugitive.  He

16   remained a fugitive until January of this year and that's when

17   he was caught on an FBI wiretap.  You'll hear calls from that

18   wiretap yourself and you'll hear that in some of the calls

19   Mr. McCants talks about drug dealing.  In others he talks

20   about planning a shooting.  You're going to hear him looking

21   for a guy on Greenmount Avenue.  You're going to hear him say

22   that the guy was clutching and strapped when he found him.

23             Then you'll hear a series of calls on February 4th,

24   2017 in which Mr. McCants planned to go looking for the guy to

25   take him out.  Ladies and gentlemen, you're going to learn and

1      the evidence will show that based on those calls, law

2      enforcement officers went to the phone company and they got

3      ping data, a real-time location information for Mr. McCants's

4      cell phone.  You're going to see that the first ping they got

5      put the phone here, near the intersection of Greenmount and

6      North on February 4th, 2017 at 10:50 p.m.  And you're going to

7      learn that almost exactly the same time as the ping hit, a guy

8      Gregory Bess was shot seven times with a .40 caliber handgun

9      right at that intersection.

10             So after the shooting the officers kept tracking

11     Mr. McCants's phone, and they tracked it here to

12     5617 Pioneer Drive.  The officers converged on this house,

13     they surrounded it, and they tried to get Mr. McCants to come

14     out.  You're going to hear that Mr. McCants tried to escape

15     climbing through a second floor window on the rear of the

16     house.  Eventually he changed his mind, went back inside, and

17     after some negotiation he agreed to come out.  When he came

18     out, the officers went inside and conducted a search.  Inside

19     the house they found scales, sifters, gel caps, other drug

20     paraphernalia, as well as .40 caliber ammunition.  You're

21     going to hear that they did not, at least during that search,

22     find a .40 caliber gun in the house.  But the evidence will

23     show you that there was a .40 caliber gun in this house.

24             After Mr. McCants was arrested, he made several

25     phone calls from jail, which he told his associates to go back

1    to PDR, Pioneer Drive, and to look for the "willow," the gun.

2    One particular call you'll hear him tell his associates in

3    coded language, or not-so-coded language really, where to

4    look.  But the police beat Digga's associates to the punch.

5    On February 9th having listened to the jail calls, they went

6    back to PDR, Pioneer Drive.  And they found the willow hidden

7    in a hole behind a bathroom wall.

8            You'll see, ladies and gentlemen, that the willow

9    was not a willow, but instead a .40 caliber disassembled Ruger

10   handgun.  You will learn that officers submitted that

11   .40 caliber handgun for ballistics testing and you'll learn

12   about the ballistic connection between that handgun and the

13   shooting of Gregory Bess at Greenmount and North on the night

14   of Mr. McCants's arrest just hours before he agreed to come

15   out of that house and was taken into custody.  That's not all

16   you'll hear about Digga or Mr. McCants.  There's going to be

17   other evidence including his own statements that will connect

18   him to multiple other guns and violent crimes.

19           So at the end of this case, ladies and gentlemen,

20   you're going to be asked to decide whether these defendants

21   are guilty of a crime.  So you should probably know what

22   crimes they're charged with.  All three defendants are charged

23   in Count 1 with conspiring to participate in a racketeering

24   enterprise.  They are also charged in Count 2 with conspiring

25   to traffic in certain controlled substances.  Counts 3 and 4,

1    Mr. Johnson alone is charged with conspiracy to commit murder

2    as well as murder in aid of racketeering.  Both of these

3    counts relate to the murder of the witness in 2013, Moses

4    Malone, who we told you about earlier.  Count 7, Mr. Johnson

5    is charged with being a felon in possession of ammunition.

6         This count is based on the seven rounds of .40

7    caliber ammo recovered from his car in June 2016.  You're

8    going to hear testimony and see evidence about that.  Count 8,

9    Mr. McCants is charged with being a felon in possession of a

10   firearm.  This is based on the willow, the .40 caliber handgun

11   that was recovered from Pioneer Drive that you just heard

12   about.

13        I want to take a few moments to talk about Count 1,

14   the racketeering conspiracy.  So the defendants are charged

15   with conspiring to participate in a racketeering enterprise

16   and you're going to learn that the enterprise is the BGF

17   Greenmount Regime.  These are the elements of the crime:

18   Needs to be an agreement between two or more people to

19   participant in an enterprise that would affect interstate

20   commerce through a pattern of racketeering activity, has to be

21   proven that the defendants knowingly and willfully became a

22   member of the agreement, and that the defendant or some other

23   member of the conspiracy agreed to commit two racketeering

24   acts.

25        So let's focus on what we need to prove and what we

1    don't need to prove so that you know what to look for as the

2    case goes forward.  We need to prove an agreement between two

3    or more people -- that two or more people joined the

4    BGF Greenmount Regime knowing that some member would commit

5    two racketeering acts.  Importantly, we don't need to prove

6    that a particular crime would be committed, just a category or

7    kind of crime.  We'll talk about those in a moment.  Keep in

8    mind, ladies and gentlemen, this is important.  We don't need

9    to prove for purposes of a racketeering conspiracy that any of

10   these defendants dealt a gram of drugs or that they committed

11   a single violent crime, although we will, and the evidence

12   will show you that they did.

13          All we need to prove is they agreed by joining the

14   BGF Greenmount Regime that some other member, not necessarily

15   them, would commit the kinds of crimes we're about to show

16   you.  So to make it real simple, we need to prove that the

17   gang existed, that it did all these bad things we're about to

18   talk about, and that the defendants were members knowing that

19   the gang would do all those bad things.

20          So these are the predicate crimes, the bad things:

21   murder, this includes attempted murder, conspiracy to commit

22   murder, robbery, drug trafficking, and then tampering with or

23   retaliating against a victim, witness, or informant.  Now, as

24   you think about these predicates, especially murder, keep in

25   the back of your mind the BGF oath, which you heard about a

1  few minutes ago.  Keep in the back of your mind its repeated

2  use of the phrase "this oath shall kill me."  Also remember

3  some of the 33 constitutions of BGF, including the ones that

4  say discipline could come in the form of death and that

5  members that refuse a directive or a mission become the target

6  of the mission themselves.

7       That oath and those rules are important, ladies and

8  gentlemen, because they show the moment you join BGF you know

9  that you might be called upon to kill someone who crosses the

10 gang or that another member might be called upon to kill you.

11 In other words, you join knowing that if a member violates the

12 BGF oath or certain of the 33s, he will be killed and that

13 will be a racketeering act.

14      What is a racketeering enterprise?  Well, the

15 evidence will show you that the BGF Greenmount Regime was

16 this:  A group of people who associated together for a common

17 purpose engaging in a course of conduct over a period of time.

18 This group of people, in addition to having a common purpose,

19 must have an ongoing organization, whether formal or informal

20 and must have personnel who function as a continuing unit.

21 This group of people does not have to be a legally recognized

22 entity such as a partnership or corporation.  This group may

23 be organized for a legitimate and lawful purpose or it may be

24 organized as here for an unlawful purpose.

25      You also heard earlier that the racketeering

Government's Opening Statement

1    enterprise has to affect interstate or foreign commerce.  What

2    does it mean to do that?  Well, you're going to hear that the

3    enterprise dealt drugs, that it used cell phones to further

4    its illegal activities.  That's evidence that would affect

5    interstate commerce.  So in the drug conspiracy count all

6    three defendants are charged with conspiring to distribute and

7    possess with intent to distribute 280 grams or more of crack

8    cocaine, 100 grams or more of heroin, and quantities of powder

9    cocaine, Oxycodone, and marijuana.  These are the elements of

10   that crime.

11          And again, it's important to keep in mind here that

12   the crime charged here is a conspiracy, it's an agreement.

13   It's not the actual drug deals or drug distributions

14   themselves.  You are going to hear evidence that each of these

15   defendants did deal drugs themselves.  But it's worth noting

16   that you can be part of a drug conspiracy without ever

17   touching the drugs.  You can discuss a drug deal, you can

18   impose discipline if someone in your drug organization steps

19   out of line, or you can tax a rival drug dealer or commit an

20   act of violence to protect your drug organization's character.

21   Those are examples, but you're going to hear about just those

22   kinds of examples during this case.

23          These are Counts 3 and 4, and again, these are based

24   on the murder of Moses Malone.  Mr. Johnson alone is charged

25   in these counts.  We've discussed Malone's murder already and

Government's Opening Statement

you're going to hear much more about it during this case,
likely during the second and third weeks of the trial.
Finally, in Count 7 and 8, as I mentioned, Mr. Johnson and
Mr. McCants are charged with being felons in possession of
ammunition in Mr. Johnson's case, and of a firearm in
Mr. McCants's case.  These are the elements of those offenses.

So how are we going to prove these crimes beyond a
reasonable doubt?  We're going to do it by presenting you with
a literal truckload of evidence and it's going to come in a
variety of forms.  First you're going to hear from several
witnesses, many of them are members of BGF, many were bushmen,
many were members of the Greenmount Regime.  You should know
now, ladies and gentlemen, that many of these witnesses
committed serious crimes.  They robbed, shot, they dealt
drugs.  They helped these defendants in the Greenmount Regime
terrorize a neighborhood in the city.  You're not going to
like these witnesses.  But they're the ones who know what the
Greenmount Regime did, what these defendants did, and how they
did it.

Fact of the matter is, ladies and gentlemen, that if
you want to know what happens in the inner circles of a
criminal gang, gang members are going to be your witnesses.
You should also know that some but not all of the witnesses
that you're going to hear from, the gang members, have pled
guilty in other cases entered into cooperation agreements with

1    the government.  Those witnesses haven't been sentenced yet

2    and they're testifying here because they're hoping for

3    leniency when they are sentenced, so you should consider their

4    testimony very carefully.  But as your consider their

5    testimony, keep in mind or consider whether that testimony is

6    corroborated, whether it's consistent with other evidence that

7    you're going to see and hear.

8         For example, you're going to hear from other

9    witnesses too.  You're going to hear from members of the

10   community and victims of the defendant's crimes.  You're going

11   to hear from law enforcement officers who responded to

12   murders, robbery, and shootings, as well as other officers who

13   executed search warrants at various locations.  You're going

14   to hear from ballistic experts who examined the firearms and

15   bullets and casings that were associated with the defendants'

16   violent crimes.  You're also going to see physical evidence.

17   You're going to see the guns and ammunition the defendants

18   carried with them to protect their gang and its turf.  You're

19   going to see the drugs they distributed, as well as the

20   paraphernalia that they used to package and store those drugs.

21        You will see, and you've already seen to some

22   extent, how the defendants mark themselves with tattoos to

23   show off their affiliation and membership in the gang.  You're

24   going to see photos and videos, many from cell phones and

25   social media that further show the defendants' association

1   with BGF, the Greenmount Regime, and each other.  You'll also

2   see photos from crime scenes.

3          Finally, at least for now, ladies and gentleman,

4   you're going to hear the defendants' own words.  You're going

5   to hear the words of their co-conspirators.  You're going to

6   see text messages they sent, you're going to see what they

7   posted on social media, and you'll hear recorded

8   conversations, including jail and wiretap calls, including

9   some other recorded conversations in which these defendants

10  participated.

11         So ladies and gentlemen, to wrap up, as all the

12  evidence comes in, use your common sense and think about how

13  each piece of the puzzle backs up and builds upon the next.

14  You're going to see that these defendants are guilty beyond a

15  reasonable doubt.  Before long you're going to see that the

16  evidence in this case is overwhelming, not because we told

17  you, because that's what the evidence will tell you.  That's

18  what it's going to show.  So at the end of this case we're

19  going to come back before you and we're going to ask you to

20  return a verdict, the only verdict that's consistent with all

21  the evidence in this case, and that's a verdict of guilty on

22  all counts.  Thank you.

23         THE COURT:  Thank you, Mr. Martinez.  Ladies and

24  gentlemen, we'll take our morning break now.  During this

25  recess do not discuss the case with anyone.  Do not discuss it

 1    even among yourselves.  You must wait until after you've heard

 2    all the evidence, the closing arguments, and my instructions

 3    as to the law.  Do not allow yourselves to be exposed to any

 4    news articles or reports that touch upon this case or the

 5    issues it presents or articles or reports that relate to any

 6    of the participants in the case.  Avoid all contact with any

 7    of the participants in the trial.  Do not make any independent

 8    investigation of the law or the facts of the case.  Do not

 9    look up anything on the internet.  Do not consult an

10    encyclopedia or a dictionary.  We'll take just under 15

11    minutes and we'll return at 11:25.  Please stand for the jury.

12    Please take the jury out.

13              (Jury left the courtroom.)

14              THE COURT:  Will there be an opening statement for

15    Mr. Johnson?

16              MR. ENZINNA:  Yes, Your Honor.

17              THE COURT:  Who will deliver it?

18              MR. ENZINNA:  I will.

19              THE COURT:  How about for Mr. Jones?

20              MR. BUSSARD:  There will be,  Your Honor.

21              THE COURT:  And Mr. McCants.

22              MR. FRANCOMANO:  Yes,  Your Honor.

23              THE COURT:  And all three of you plan to deliver

24    them immediately or are any of you waiting until the start of

25    your case?

1          MR. ENZINNA:  Today, Your Honor.

2          MR. BUSSARD:  Today.

3          MR. FRANCOMANO:  Today, Your Honor.

4          THE COURT:  We're in recess until 11:25.

5          (A recess was taken.)

6          THE COURT:  Are we ready for the jury?

7          MR. MARTINEZ:  Yes, Your Honor.

8          THE COURT:  Mr. Enzinna, Counsel.

9          MR. ENZINNA:  Yes, Your Honor.

10         THE COURT:  Let's bring them.

11         Electronics, Mr. Enzinna.

12         MR. ENZINNA:  All ready.

13         (Jury entered the courtroom.)

14         THE COURT:  Be seated, please.  Mr. Enzinna, on

15   behalf of Mr. Johnson, do you wish to make an opening

16   statement?

17         MR. ENZINNA:  Yes, Your Honor.

18         THE COURT:  You may proceed.

19         MR. ENZINNA:  Thank you.

20         Good morning, ladies and gentlemen.  Thank you for

21   serving on the jury in this case.  My name is Paul Enzinna and

22   with my colleague, Jeffrey O'Toole, I represent one of the

23   defendants in this case, Gerald Johnson.  Mr. Martinez

24   introduced you to the Greenmount neighborhood this morning.

25   It's not very far from here.  It's only about two miles from

1    the courthouse, but it is a world that I think is very

2    different from the world that most if not all of you live in.

3    It's a chaotic world.  It is a violent world.  It is a

4    dangerous world.  Drugs are everywhere, guns are everywhere,

5    young men are killed with appalling frequency.  You will see

6    evidence in this case; evidence of drugs, evidence of guns,

7    evidence of assaults, evidence of murders, evidence of

8    shootings that will shock you, disturb you, and possibly even

9    frighten you.

10           Gerald Johnson grew up in Greenmount and he's a

11   product of Greenmount.  And the government is going to put on

12   evidence in this case that Mr. Johnson broke the law.  They've

13   accused him of robbing and assaulting an individual; they've

14   accused him of being involved with illegal narcotics; they've

15   accused him of attempting to shoot people.  But what's

16   important to remember is that Mr. Johnson is not charged with

17   those acts.  Mr. Martinez showed you the charges in this case

18   and the charges are very specific and I'm going to come back

19   to that later.

20           One of the things that Mr. Martinez told you was --

21   when he showed you the charges, he said he showed you what

22   they don't have to prove.  And he said, "We don't have to

23   prove that anybody, any individual, sold any drugs.  We don't

24   have to prove that anybody shot anybody", and so on and so

25   forth.  The converse of that is true as well.  The mere fact

1    that an individual may have broken the law, may have sold

2    drugs, may have assaulted somebody, does not make them a

3    member of a conspiracy that does those same things.  And

4    that's the charge here.  The charge is conspiracy.

5              Now, an opening statement is kind of like the

6    picture on the box of the jigsaw puzzle.  It tells you what

7    you're trying to get to.  But anybody who's ever done a jigsaw

8    puzzle knows you don't always get there.  Sometimes there's --

9    you get can't the pieces together, sometimes you put the

10   pieces in the wrong place, sometimes pieces are missing.

11   Those pieces, of course, are the evidence in this case.  And

12   you in the end will decide whether the picture the government

13   puts together in this trial is the picture they told you about

14   in the opening statement.

15             That picture is very important though because that

16   picture sets the ground rules.  It tells you what -- as the

17   judge said, what the government is trying to prove and what

18   they have to prove to convict in this case.  Now, I could

19   take -- let's say, I took 100 pieces of the jigsaw puzzle and

20   I put them all together in a perfect order and I had a perfect

21   image of George Washington's face.  That's great, unless it's

22   a 500-piece puzzle and the picture on the box is a picture of

23   Mount Rushmore.  I've got one president, but I need all four.

24   That's the same in this case.  Those charges are the picture

25   on the cover of the big jigsaw puzzle here.

1          Count 1 in this case, Mr. Martinez showed you the

2    charge there.  It's conspiracy to participate in the affairs

3    of an enterprise through certain illegal activity.  The

4    enterprise of course is BGF.  So again, like I said,

5    Mr. Johnson is not charged with selling drugs.  He's not

6    charged with robbing anybody.  He's not charged with fighting

7    with anyone.  He is charged with conspiring, with agreeing to

8    be part of a conspiracy, with committing those acts to further

9    the interests of the conspiracy as opposed to his own

10   interests.

11         Now, Mr. Martinez told you about a group called YGF,

12   the Young Guerilla Family.  He called it -- I forget what he

13   said, but something like the preschool or something like that.

14   There will be evidence in this case of the Young Guerilla

15   Family and Mr. Johnson was a member -- well, was part of that.

16   The Young Guerilla Family were a bunch of wannabe's.  What

17   they were was young kids, kids who looked around their

18   neighborhood and saw the Black Guerilla Family and saw these

19   guys and they were the tough guys.  They were the guys who had

20   the money; they were the guys who had the cars; they were the

21   guys who had the girls.  That's what they wanted to be.  They

22   wanted to be like those guys, so they started calling

23   themselves the Young Guerilla Family.

24         Now, the government's theory here is that at some

25   point those wannabe's merged like corporations into the

1    Black Guerilla Family.  Now, there obviously aren't any --

2    like when corporations merge, obviously they -- there's piles

3    and piles of paper.  There aren't papers in this case.  There

4    aren't records of a merger.  Where's that evidence going to

5    come from?  That evidence is going to come from certain

6    witnesses.  And you, ladies and gentlemen, will be the judges

7    of the reliability of those witnesses.  You have to ask

8    yourself who are these people?  What are they saying?  Does it

9    make sense?  And what do they have to gain?  I think the judge

10   said it in his opening instructions, what do they have to gain

11   from the outcome of this case?

12           And you're going to see people on that stand --

13   Mr. Martinez talked about this.  You're going to see men who

14   were members of the Black Guerilla Family, men who will admit

15   on the stand to committing all kinds of violent acts, dozens

16   of murders.  And these are men who are in prison or facing

17   prison for long, long periods of time.  And these are men who

18   are desperate to save themselves, and they have one

19   opportunity to do that, and that opportunity is to please the

20   government by saying what the government wants them to say.

21   And that's what they will say.

22           MR. MARTINEZ:  Objection.

23           THE COURT:  Counsel may approach.

24           (Bench conference on the record.)

25           THE COURT:  Mr. Martinez.

1          MR. MARTINEZ:  Your Honor, we object to that

2     specific language, that the obligation of the witnesses is to

3     please the government by saying what we want them to say.

4     That is an attack on our integrity, it's prejudicial, and it's

5     not correct.

6          MR. ENZINNA:  I did not say they had the

7     obligation.

8          THE COURT:  Here's the problem with it.  If this was

9     closing argument, there's no problem with it.  The problem is

10    that it's argumentative, too much so for opening statement.

11    So please don't argue in your opening statement.  Beyond that,

12    no issue.  Sustained.

13          (The following proceedings were had in open court.)

14          MR. ENZINNA:  Now, ladies and gentlemen, in jury

15    selection the judge talked about the 5th Amendment and the

16    right against self-incrimination and he told you that the

17    defendants in this case have no obligation to testify.  You

18    all said that that would not affect your decision in this

19    case.  But Mr. Johnson will testify in this case.  He will get

20    up on the stand even though he does not need to do that.  And

21    he will explain to you how he lived, what he did, and what he

22    didn't do.

23          Now, with respect to Count 2, Mr. Johnson there is

24    charged with conspiring to distribute drugs.  Again, the issue

25    there is conspiracy.  It's not distribution of drugs.  It's

1    conspiracy.  Did he agree to join forces with anybody else to

2    distribute those drugs?  Now, I want to talk about Counts 3

3    and 4, which are the Moses Malone murder counts.  Mr. Martinez

4    talked a little bit about that.  He explained to you about the

5    events that led to Mr. Malone's murder.  I won't go into that

6    any further.  What you will find is that there is no evidence

7    in this case that Gerald Johnson ever raised a hand against

8    Moses Malone.  And I don't believe that anybody asserts that

9    he did.  Instead, the government's argument is that

10   Mr. Johnson green-lighted the murder, that he authorized the

11   murder.

12            Now, again, there are no records of this.  He didn't

13   fill out a form.  Again, this evidence will come from

14   witnesses, and again, you'll need to ask yourselves about

15   those witnesses and about their reliability.  There will be

16   lots of evidence in this case about BGF and about the

17   Black Guerilla Family.  You've already seen some of it.  But

18   with all due respect to Mr. Martinez, he said this case is

19   about a gang.  It's not about a gang.  This case is about

20   three individuals, including Gerald Johnson and we are

21   depending on you to focus on them as individuals.  The judge

22   talked to you about taking notes and I encourage you to take

23   notes in this case.  It's going to be a long trial.  There's

24   going to be a lot of evidence.  And it's important that you

25   focus on the evidence with respect to each individual.

1          Now, I'm not here to argue that Gerald Johnson is an
2   angel or a choir boy.  There aren't many of those in
3   Greenmount.  But he will testify about his life and tell you
4   how he lives, how he supports himself.  He will tell you that
5   he has a business organizing parties.  He's a party promoter.
6   He finds a location, he books entertainment, he sells tickets,
7   and he makes money from doing that.  He's also a rapper.  And
8   Mr. Martinez already touched on this.  And he will tell you
9   that he is a rapper, that he writes rap songs, he makes rap
10  videos, he performs professionally, and he puts videos up on
11  the internet in the effort to get noticed and develop a fan
12  base.
13         You're going to see those videos in this case.
14  Those videos are a very important piece of the government's
15  case.  In fact, Mr. Martinez in his opening compared them --
16  equated the videos to murders.  I'm going to show you one of
17  those videos.  Now, I'm not a fan of rap music.  I don't know
18  if any of you are.  People have different tastes.  Some of
19  this music is -- frankly, I find it unpleasant.  It's ugly,
20  it's violent, it can be misogynist, but the fact that I don't
21  like it or the fact that I find it obnoxious or the fact that
22  I'm upset or scared by it doesn't mean that it is not
23  legitimate, doesn't mean that it's not music, and it doesn't
24  make these videos what the government claims they are, which
25  is basically confessions by Mr. Johnson.

1          Now, we all know that artists often play a role in

2     their songs.  They say things that aren't true.  We all know

3     that Johnny Cash didn't shoot a man in Reno just to watch him

4     die.  We all know that Bob Marley didn't shoot the sheriff.

5     And I'd like you to keep that in mind.  Let me show you this

6     video and we'll talk about it a little bit after that.  About

7     three minutes long.  This is usually the part where I call my

8     teenage kids to show me how to do this.

9          (Video played.)

10         MR. ENZINNA:  As I said, it's not a very pretty

11    picture, a lot of talk about shooting people, about guns, the

12    B-word, the N-word, the F-word.  But rap artists are like any

13    other artists.  They talk about the world they see, the world

14    around them, and the world Mr. Johnson lives in is a world of

15    drugs and violence and some not very pretty things.  Like I

16    said, the government is going to argue that this isn't real

17    music, that these are really basically confessions by

18    Mr. Johnson.  But he'll explain what he was trying to say in

19    these videos and you'll hear other evidence about that as

20    well.

21         Now, like I said, these videos and a lot of the

22    evidence in this case you're going to find strange,

23    unpleasant, disturbing, and even frightening.  All we can ask

24    is that you look at all the evidence, pay careful attention to

25    all of it, keep an open mind, and ask yourself how it relates

1    to Gerald Johnson.  And has -- at the end you'll be asked, has

2    the government met its burden.  And it is the government's

3    burden.  The judge earlier said that the opening statements

4    will tell you what each party expects to prove.  That's not

5    quite correct because Mr. Johnson, as a defendant in this

6    case, is not required to prove anything.

7            It's the government's obligation to prove to you

8    beyond a reasonable doubt that he has committed each and every

9    one of the elements of the offenses with which he's charged.

10   And that's the picture on the box here, and as the pieces get

11   put together, I'd ask you to keep that in mind.  Thank you

12   very much.

13           THE COURT:  Thank you, Mr. Enzinna.  Mr. Bussard, do

14   you wish to make an opening statement on behalf of Mr. Jones?

15           MR. BUSSARD:  I do, Your Honor.

16           THE COURT:  You may proceed.

17           MR. BUSSARD:  Good morning, Your Honor.

18           THE COURT:  Good morning, Mr. Bussard.

19           MR. BUSSARD:  Good morning, ladies and gentlemen of

20   the jury.  My name a Alan Bussard.  I'm a solo practitioner in

21   Towson and it is my duty and honor to represent Kenneth Jones

22   today.  Would you stand up Kenny.  Thank you.  I also want to

23   introduce another person of our team over here, Ms. Krystal

24   Panas.  You were not introduced to her before.  She is a

25   paralegal and she will be assisting all of the counsel

Defendant Jones' Opening Statement

1    throughout the trial.  Thank you.

2         I don't mean to be repetitious of what Judge Bredar

3    has already told you, but I feel it's important that we go

4    over a couple things together.  One of those things is to

5    emphasize your patience and attention because this is only one

6    of two chances that I have to speak to you like this.  And I

7    apologize in advance for speaking behind the podium.  I don't

8    mean to be lecturing by any means, but it is part of the rules

9    of the Court.  On the other hand, as Judge Bredar explained to

10   you, the government gets three chances.

11        So you're going to hear from them two more times.

12   You've already heard one time and you've seen the Power Point

13   presentation and you've heard a media presentation by Mr.

14   Johnson's counsel.  I'm of the certain age that I touch a

15   computer as little as possible.  I don't understand it.  I

16   don't understand video and you will not see too many videos

17   from me.  Don't hold that against Mr. Jones.  Also, do not

18   believe that the government or any other party in this case

19   has an advantage over what I do.  There will be times when I

20   do do those kinds of things, however, if it becomes necessary.

21        As you've already heard, there's a lot of rules and

22   regulations here.  Judge Bredar went over the order of which

23   everything will be presented.  There's going to be testimony

24   from the government witnesses.  After they're finished

25   questioning those witnesses, we get a chance to question those

witnesses, then the government gets that one more chance again
to question those witnesses.  Those are strict rules and the
jury's responsibility is to attend to all those rules and
listen to everything that is said and done in this courtroom.

In the end, as Judge Bredar explained to you, you're
going to be asked to make a very difficult decision.  You're
going to be asked to, by the government, to convict someone of
the charges that were outlined earlier, beyond a reasonable
doubt, and to essentially take away someone's liberty.  And
that's an important thing that we have in our criminal justice
system.  A lot of countries do not have this system.  And I
for one am very proud of the way our system works.  It makes
it difficult, however, as we sit here in a United States
District Court.

We have the seal up there of the United States, we
have a United States district judge, we have United States
attorneys sitting here, we are in the U.S. courthouse.  And it
makes it very difficult because these young men sitting over
here are defending themselves against the power of the federal
government and that is a very difficult thing.

The government has indicated what they believe to be
the evidence in this case.  And it's going to be interesting
to see if they can keep their promise about that.  It's made a
little bit easier by the trapings that are in this courtroom.
But in the end, I believe Judge Bredar's going to instruct you

Defendant Jones' Opening Statement

1    that the fact that this case is brought in the name of the

2    United States should mean that they get no greater weight than

3    any other party to this case.

4            How did we get here?  We got here because a grand

5    jury up on the 8th floor of this courthouse heard some

6    testimony and they examined some documents and they decided --

7    they took a vote and they decided that Mr. Johnson and

8    Mr. Jones and Mr. McCants may have committed an offense.  And

9    they issued what's called an indictment.  That's an indictment

10   right here.  There's no magic to it.  And in fact, when you

11   look at it very carefully it's not much different from, and I

12   hope none of you have had this experience, but if you've ever

13   gotten a traffic ticket.  It is just a charging document.  It

14   is a document that starts the process.  And the process has

15   worked its way through since November of last year all the way

16   up till today when this trial starts.

17           It is a way of starting an orderly process.  And I

18   will tell you just a little bit about the grand jury.  There

19   was no judge sitting there.  There was no defense attorney

20   sitting there.  The defendants couldn't even be there to

21   defend themselves.  The testimony that was presented was

22   solely through the United States attorneys and their

23   witnesses.  There was no other people there to defend the name

24   and conduct of Mr. Johnson, Mr. Jones, and Mr. McCants.  There

25   was no rulings on evidence.  Judge Bredar was not there to

Defendant Jones' Opening Statement

1    make those rulings.  So what we have is a charging paper, an

2    outline of what the government believes and what the grand

3    jury believes may have occurred.

4         The evidence is going to be in several different

5    forms.  There's going to be documents.  There won't be many of

6    them, I don't believe.  There will be, however, recorded phone

7    calls.  And I want you to pay attention to the phone calls.

8    And I want you to think a little bit about it when the phone

9    calls are being played and the text messages are being

10   reviewed, about your own life.  You're not going to hear the

11   20 calls that came before the one that the government plays.

12   And you're not going to hear the 20 calls that came after

13   that.

14         What you're going to hear is a snippet, a moment in

15   time, and the government's going to ask you to believe that

16   that's what is being discussed on these calls.  It's context.

17   And think about it in your own personal lives as you're

18   listening to those.  Would you want somebody to just snatch a

19   text message at random off of your phone and believe that

20   that's true?  Because that's what's going to happen because

21   we're not going to be able to say, well, what happened the

22   week before or the month before that led up to this one text

23   message.  And that's an important thing to keep in mind, is

24   context.

25         You're also going to hear from law enforcement

Defendant Jones' Opening Statement

1    officers.  Most importantly, you're going to hear from

2    cooperating witnesses.  That's our term.  That's what the

3    government calls it.  Very early in this trial you're going to

4    hear from a person, I believe, by the name of Michael Gray.

5    And Michael Gray is going to sit in that witness box and he's

6    going to tell you without any reservation that he ordered

7    murders, that he took drugs, and that he was the leader of the

8    gang.

9            I want you to think carefully when you're looking at

10   him and listening to what he's saying because I agree if --

11   for no other reason, I agree with Mr. Martinez.  You're not

12   going to like this man.  You're not going to like almost every

13   cooperating witness who sits on that witness stand.  These are

14   bad people.  And I want you to think and look into their eyes

15   and see how cold they are because they're not going to

16   apologize for those murders.  They're not going to apologize

17   for ordering the murders.  They're going to just matter of

18   factly tell you this is what they did.  That's -- there's an

19   important distinction because they're still living the life.

20   They may not be out on the street, they're in jail, but

21   they're living the life.

22           I want you to pay attention to when they start

23   saying "they" and "them" and "those guys."  We are here in my

24   particular case for Kenneth Jones and what he did or didn't

25   do.  So when you hear a witness say, is he a member of BGF,

 1    how do you know that?  Well, they hung around at the park.

 2    They walked down the street together.  They have the tattoos

 3    together.  That doesn't make somebody a member of something.

 4    Would you like to be labeled just because of somebody you may

 5    hang out with?  You may hang out with some coworker and you

 6    don't know what that coworker does.  You may on occasion find

 7    out little things, but that doesn't make you a member of their

 8    group just because you have lunch with them one day or you

 9    hang out in the park.  The park's going to be an important

10    factor as we go along here.

11            Pay close attention to the witnesses.  Some of the

12    events in this case happened over ten years ago, maybe 12

13    years ago.  I think we're going to go back to 2005, maybe

14    earlier, and some of the people there made statements ten

15    years ago and they're going to sit on this witness stand and

16    they're going to rehash those same statements ten years later.

17    It may even sound exactly the same as the statement they said

18    ten years ago and that's no accident.  And the reason it's no

19    accident is, and there's nothing wrong with this, the

20    government has spoken to all these witnesses.

21            They've gone over and over the testimony with them,

22    preparing them to testify here today.  They may even have

23    shown them their prior testimony, their prior statements to

24    law enforcement.

25            Some of these witnesses will testify that when they

Defendant Jones' Opening Statement

observed certain events ten years ago, they were under the
influence of drugs.  I expect one government witness to say
that he had what is called a zombie addiction.  That he woke
up in the morning feeling horrible, but after he took a load
of drugs he felt normal.  And that's how he observed the day.
And that's the events that he observed, is what he's going to
testify about.  The arrogance of some of these witnesses, as
Mr. Martinez said, you're not going to like.  One of them in
particular I expect to say she showed up for a grand jury
proceeding in this courthouse, pursuant to a subpoena, under
the influence of marijuana.  That's the respect that she had
for the system.

      There will be another witness I expect that will say
before he spoke to the feds, meaning law enforcement, that he
had smoked a blunt.  That he had actually -- blunt is a large
cigar-shaped marijuana cigarette, and then he talks to the law
enforcement after he's smoked his rather large marijuana
cigarette.

      I want you to consider the benefits that these
people are getting.  And benefits take the form of -- many
forms.  As Mr. Martinez said, a lot of them have pending
charges and they're hoping to get a sentence reduction.  Well,
they're hoping to get a lower sentence down the road
somewhere.  And they're facing horrendous charges some of
them, but that's not the only benefit they get.  Some of them

Defendant Jones' Opening Statement

1    have already had sentence reductions.  Some of them had

2    charges dismissed.  Police officers came to them and the

3    police officer said, you know what, if you start working with

4    us, we just won't charge you.  That's the discretion that law

5    enforcement has to offer to some of these people, and so they

6    started working.  One in particular started working and then

7    kept on committing crimes.  He was being paid by law

8    enforcement at the same time that he was being picked up on a

9    wiretap committing crimes.

10            Why do these people cooperate?  Well, they cooperate

11   for a variety of reasons, but one, they're afraid of and I

12   already mentioned it, the United States Government.  They are

13   afraid of the power that the government can bring to bear on

14   these people.  They're also afraid that somebody else may come

15   in and tell them about something bad that they did.  And they

16   want to be the first one in the door so that they can get it

17   off their chest and maybe not get charged.  There's other

18   benefits besides the sentence reductions and the never getting

19   charged.  There are sometimes the state just decides not to

20   charge people.  They just -- we won't charge you as long as

21   you talk to us a little bit.

22            Well, ladies and gentlemen, some people may tell you

23   that's the way the world works.  But I'm here to tell you

24   there is no free rides and you all know that.  You know that

25   you don't get something for nothing.  I talked a little bit

Defendant Jones' Opening Statement

1    about the arrogance of some of the government witnesses.

2    They're going to tell you they ran the gang.  They're going to

3    tell you that they earned respect, such as it is, by

4    committing acts of violence.  They're going to tell you in a

5    very cold manner about the violence that they committed.

6            They will also tell you that when they take drugs,

7    as opposed to everybody else in this world, when they take

8    drugs it doesn't affect them, makes them feel normal.  Also,

9    they may tell you that they can take drugs, but they can stop

10   any time they want to.  You all know that's not the case.  You

11   see it on TV all the time, you hear it in your daily lives of

12   people that have gotten caught up on pills.  You're going to

13   hear a lot of people talk about being on opioids.  You don't

14   just stop because you want to.  It's too painful.  You need

15   help.  But a couple of these witnesses are going to say they

16   just stopped because they are the leaders.  They are all

17   powerful.

18           So use your common sense a little bit when you're

19   hearing everything.  I hate to keep using that word and I

20   think all three of us will be using that.  Common sense is a

21   way of dealing with this.  You don't need any special skills.

22   Judge Bredar has already given you an outline of how you

23   evaluate witnesses.  I want to point out one thing about

24   questioning of witnesses while I'm up here.  You'll notice

25   that when the government witnesses testify from this witness

1    stand starting this afternoon, it will go very smoothly

2    because they've met.  Mr. Martinez, Ms. Hoffman, have met

3    these witnesses before and they know exactly what's going to

4    be said.  The attorneys sitting over here for these young men

5    have never met these witnesses.

6            So when we start asking questions it gets bumpy.

7    They look at us, the witnesses look at us with this

8    incredulous look like, how dare you ask that question or I

9    don't know what you're asking, can you ask it again?  They

10   stutter and they stammer and they do whatever they do.  They

11   don't answer and that's because we can't talk to those

12   witnesses ahead of time.  So the first time you see these

13   witnesses is the first time we see these witnesses on the

14   witness stand.

15           I want to talk a little bit about witnesses and how

16   they're protecting their turf.  You all know what that means.

17   Cooperators are protecting their turf because they have a

18   vested interest in what's going on here today because they

19   want a sentence reduction or they want, in some cases, to get

20   some other benefits.  One of the benefits, I expect, is going

21   to be that one of these witnesses received about $51,000 for

22   being a paid cooperator over about a year and a half period of

23   time.  That's a substantial sum of money.  It's hard to make

24   $51,000.  And these are people, as you'll see on here, that

25   couldn't get a laborer's job, they couldn't work in a

1    warehouse, they couldn't work anywhere.  They're not hireable,

2    but they can become a government witness and they can make

3    $51,000 a year.  That's significant.

4         You also have law enforcement officers, and by law

5    enforcement, I mean the Baltimore City Police Department.

6    Yes, that Baltimore Police Department that we see on the news

7    every night.  They have done some atrocious things in this

8    case.  The government's first picture on the screen was a

9    person named Moses Malone.  You're going to hear that

10   indirectly his death could have been prevented by the

11   Baltimore Police Department.  It wasn't.  It was a lack of

12   communication between one department and another.  And the

13   person who I told you received $51,000 was right there and

14   could have stopped it all and he didn't.  The cooperator was

15   inside.

16        But law enforcement had every opportunity in the

17   world, but because of the lack of communication between one

18   department and another -- and I'll tell you, they took the

19   initial steps to protect that young man, Moses Malone.  They

20   put him in witness protection, but they forgot or they didn't

21   emphasize how necessary it was that he stay in witness

22   protection.  And so the other department that had him in

23   witness protection didn't appreciate the danger and they

24   kicked him out and he went back on the street.  In fact, they

25   dropped him off right near the same neighborhood and within

1    hours he was dead.  That's on Baltimore City Police

2    Department.

3              I'm going to tell you about Kenny Jones in a little

4    bit.  He's not perfect.  Grew up in the Greenmount area, he's

5    a long-term resident of Baltimore.  You're going to hear in

6    2011 he got convicted of possessing a firearm.  The firearm,

7    the way it was recovered is, Detective Austin Sailor is

8    driving down the road and he hears or sees something that

9    doesn't sound quite right and so he turns around and he's

10   coming back and he sees Mr. Jones running down the street.

11   And he decides he better stop Mr. Jones, so he pulls up beside

12   him in the car and he goes, "Stop," and Mr. Jones stops.  He

13   says, "Get down on the ground."  Mr. Jones gets down on the

14   ground.  Mr. Jones tells him, "Don't shoot, I'm armed."  And

15   Detective Sailor does a pat down and he finds down in his shin

16   area jammed tightly in his pants is a firearm.  It's tight --

17   so tight in his pants that they can't pull it out.  It has to

18   be cut out.

19             And you're going to see the pictures that Detective

20   Sailor and some other law enforcement actually had to use a

21   knife to pull this gun out.  It wasn't accessible to anybody

22   because it was jammed in his pants so tightly.  But Mr. Jones

23   was convicted of that in 2012 and he served his time in the

24   state system.

25             Mr. Jones also has tattoos.  You saw a picture of

1    him earlier.  Tattoos aren't illegal, and don't let the

2    government's theory of this case that when you have these

3    tattoos, you are automatically doing something illegal.

4            In the end, as Judge Bredar already explained, the

5    government has the burden of proof in this case.  Each

6    defendant, and Kenneth Jones in particular, is presumed to be

7    innocent as he sits there.  And that's the presumption of

8    innocence.  And at the end of this case, that presumption of

9    innocence becomes his strongest witness, because unless you're

10   convinced beyond a reasonable doubt, you're going to be

11   instructed that you must give Mr. Jones the benefit of that

12   doubt.  At the end of this case, I'm going to ask you, ladies

13   and gentlemen, to return a verdict of not guilty for

14   Mr. Jones.  Thank you.

15           THE COURT:  Thank you, Mr. Bussard.  Mr. Francomano,

16   on behalf of Mr. McCants, do you wish to make an opening

17   statement?

18           MR. FRANCOMANO:  I do, Your Honor.

19           THE COURT:  You may proceed.

20           MR. FRANCOMANO:  Thank you.

21           The government's right, this case is about the Black

22   Guerilla Family.  But it's not about Marquise McCants.  My

23   name is John Francomano, and I represent Marquise McCants.

24   Mr. McCants, please stand.  In this opening statement and in

25   this trial, I'm only going to talk about one person:  Marquise

1    McCants.  There will be a lot of evidence that you're going to

2    hear in this case that has nothing to do with him.  And

3    sometimes I may cross-examine a witness and ask them, did

4    Mr. McCants have anything to do with this case, and that will

5    probably be my only question.  What I want you to do is listen

6    to the witnesses in this case.  Listen and see if the evidence

7    is about Mr. McCants, see if it's about another person, and

8    that's the job that you've not been hired to do, but that's

9    the job why you're here.

10          And one of the most important rights that a

11   defendant has is a presumption of innocence.  My co-counsel

12   spoke about that, His Honor spoke about that.  At this moment

13   Mr. McCants is innocent of all crimes.  Mr. McCants is

14   innocent until proven guilty by the government.  The entire

15   burden of proof is on the government's shoulders.  They have

16   to prove everything.  They go first and present their case and

17   then Mr. McCants will be able to present his case if he

18   chooses to.  He does not have to put on a case.  The

19   government has to prove beyond a reasonable doubt that

20   Mr. McCants is guilty.  He doesn't have to disprove it.

21          Now, this opening statement I'm doing is comprised

22   of three parts.  Good news is the first part's done.  The

23   second part I want to talk a little bit about Mr. McCants,

24   talk about some of the evidence, the witnesses, and then

25   finally, I'd like to give you some concluding remarks.

1          Now, Mr. McCants is 25 years old.  He has two

2     children that are six and 10 years old.  He grew up in a tough

3     neighborhood in Baltimore City.  He -- his father wasn't there

4     for him, he didn't really know his father, and his mother

5     unfortunately was a drug addict, family had very little or no

6     money.  He was actually raised by his grandmother and his

7     three brothers and his sister.  Didn't have much supervision,

8     if any, supervision growing up.  And it was better for him to

9     be out of the house than to be in the house.  So he spent most

10    of his time on the streets of Baltimore hanging out with his

11    friends and the friends that he hung out with got in trouble.

12    Now, in his neighborhood if you didn't stand up for yourself

13    you got beaten up.  You got terrorized.

14         So that's the world that he lived in.  So when he

15    was hanging out with these individuals, as I said, they would

16    get into trouble.  Now, Mr. McCants got in trouble too.  He

17    was convicted of a crime and he went to jail.  In this case

18    you're going to hear a lot about the BGF.  You will hear its

19    structure; you're going to hear about its goals; you're going

20    to hear about who the members are; you're going to hear about

21    how they committed crimes.  But remember, this case is not

22    about the BGF.  This case, for my purposes, is about

23    Marquise McCants.

24         Everything the government just told you is not

25    evidence.  It's their theory of the case.  Evidence comes from

1    witnesses who testify, comes from exhibits that are put into

2    evidence.  The government is going to bring in 68 pieces of

3    physical evidence; from handguns to drugs to sneakers.  Not

4    one of those handguns is going to have Mr. McCants's

5    fingerprints or DNA on it.  Not one piece of the drugs, the

6    bags of the drugs, the paraphernalia, are going to have

7    Mr. McCants's fingerprints or DNA on it.  Not one piece of

8    physical evidence will have Mr. McCants's DNA or fingerprints

9    on it.

10           Government's making a big deal about tattoos; who

11   has them, what they are, linking them to the

12   Black Guerilla Family.  As Mr. Bussard said, having a tattoo

13   is not a crime.  People have tattoos, and you know, their

14   generation, I think everybody has tattoos nowadays.  The

15   government spoke to you about the shooting of Mr. Bess back on

16   February 4th, 2017.  What you didn't hear from the government

17   is that you will not hear from one eyewitness on North Avenue

18   that night.  There will be no evidence that the phone actually

19   belonged to Mr. McCants, that was tracked.  A search warrant

20   was executed the day after the shooting in which no gun was

21   found.  Four days later another search warrant was executed in

22   which a gun was found inside of a wall.  You will never

23   hear -- or not hear that Mr. McCants was ever tested for any

24   gunshot residue.

25           Now, the witness's going to bring in -- excuse me,

Defendant McCants' Opening Statement

1    the government's going to bring in a number of witnesses who

2    have criminal records or gang members who may have reasons to

3    lie.  You will hear from James Cornish.  He's one of the

4    witnesses who received $6,800 from the government.  You're

5    going to hear from Christopher Meadows, and he received

6    $26,000 from the government.

7         Finally, you're going to hear from Harry Caesar, and

8    he received $51,000 from the government.  You're going to hear

9    from witnesses who received lighter sentences.  You're going

10   to hear from witnesses that their cases were never prosecuted.

11   You're going to hear from witness who, for lack of a better

12   term, their cases were dismissed.

13        Credibility is going to be a huge issue in this

14   case.  The most important part of your job is to judge who is

15   telling the truth.  That's the job.  Does a witness have a

16   reason to lie?  What's their motivation for testifying?  Were

17   they even there when something happened?  Will they get the

18   benefit for testifying?  How do they act on the stand?  Do

19   they have a criminal record?  You'll have to weigh all these

20   factors in determining if they're telling the truth.

21        Now, you will have to judge the allegations in this

22   case separately.  You're going to hear about a lot of violence

23   and you're going to hear a lot of things that are disturbing.

24   And you're going to want to say, you know what, they're all

25   guilty.  This bad stuff that happened, they're all guilty.

1    You can't do that.  You have to judge each piece of evidence

2    for what it is or what it isn't.  Just because the government

3    filed these charges against Mr. McCants it does not mean that

4    he is guilty.  The government has to prove Mr. McCants is

5    guilty beyond a reasonable doubt.

6            Ladies and gentlemen of the jury, all I ask is that

7    you listen to all the evidence, don't make any judgments now.

8    Listen to all the evidence, keep your mind clear, and once

9    you've heard everything, I believe you'll find Mr. McCants not

10   guilty.  Thank you.

11           THE COURT:  Thank you, Mr. Francomano.  Ladies and

12   gentlemen, we're going to take our lunch break.  During this

13   break do not discuss the case with anyone.  Do not discuss it

14   even among yourselves.  You must wait until after you've heard

15   the evidence, the closing arguments, and my instructions as to

16   the law.  Do not allow yourselves to be exposed to any news

17   articles or reports that touch upon this case or the issues it

18   presents or any articles or reports that relate to any of the

19   participants in the case.  Avoid all contacts with any of the

20   participants in the trial.  Do not make any independent

21   investigation of the law or the facts of the case.  Do not

22   look up anything related to the case or its participants on

23   the internet.  Do not consult an encyclopedia or a dictionary.

24   Ladies and gentlemen, we'll be on lunch break for basically an

25   hour and 22 minutes, so please return at 1:45.  Please take

1    the jury out.

2                    (Jury left the courtroom.)

3            THE COURT:  Be seated, please.  Who's the first

4    witness going to be for the government?

5            MR. MARTINEZ:  We're calling Mr. Gray, Your Honor.

6            THE COURT:  Okay.  How long do you think he'll be on

7    the stand?

8            MR. MARTINEZ:  His direct will last, I would say,

9    between one and two hours, 90 minutes is my best ballpark.

10           THE COURT:  Very good.  All right.  Let's attempt to

11   deal with the issue Mr. Bussard raised that I postponed when

12   it was first presented earlier this morning.  So I take it

13   from reading the papers that this pertains to two different

14   firearms that the government believed they had in their

15   possession or had access to and in relation to which they wish

16   to present certain evidence during their case in chief.  Am I

17   correct that evidence relating to these same firearms was

18   previously presented in a trial against one or more of the

19   defendants in state court?

20           MS. HOFFMAN:  That's correct, Your Honor.

21   Mr. Jones, as I think Your Honor knows, was charged with the

22   murder of Gregory Rochester and the attempted murder of

23   Lamontae Smith in state court.  He was convicted of those

24   crimes in state court, and during that trial there was

25   evidence presented as to those firearms and the ballistic

1    testing that was done.

2        THE COURT:  Okay.  And Mr. Bussard, you agree with

3    that statement so far?

4        MR. BUSSARD:  So far.

5        THE COURT:  Now, it's also my understanding that the

6    government believed they were in a position to turn over the

7    actual physical firearms to counsel for the defendant, or more

8    likely, his investigators and experts, for forensic testing

9    and examination and the sort of thing that good defense

10   counsel always do when they are confronted with physical

11   evidence that has kind of a scientific quality to it.  Is that

12   fair, Ms. Hoffman?

13       MS. HOFFMAN:  That's correct, Your Honor.  We -- I

14   think it's important to note, however, that the defendant at

15   no point and his counsel at no point requested to actually

16   submit the firearms for testing by a different expert and no

17   expert -- no such expert was disclosed to us.  I also, in

18   conferring with the agent this morning, learned and I think

19   this may resolve the question as to the firearm that was used

20   to shoot Lamontae Smith.  We do still have the test-fired

21   casings for that gun.  And so if the defendant does indeed at

22   this late hour wish to have a different expert test the

23   evidence, we still have the evidence that's required for the

24   actual comparison to be made.

25       THE COURT:  All right.  So first of all, this is

1    casings, not ballistics.

2              MS. HOFFMAN:  This is test-fired casings and

3    projectiles from the gun --

4              THE COURT:  It is ballistics.

5              MS. HOFFMAN:  I'm sorry.

6              THE COURT:  It's both.

7              MS. HOFFMAN:  Yes, both.

8              THE COURT:  Both the bullet and the casing.

9              MS. HOFFMAN:  Yes.

10             THE COURT:  Okay.  So did you recover bullets, the

11   projectiles themselves, from the crime scene?

12             MS. HOFFMAN:  From the crime scene there were

13   five .45 caliber casings recovered.  And I don't believe there

14   were projectiles recovered.

15             THE COURT:  Okay.

16             MS. HOFFMAN:  So it's the casings that matter in any

17   case.

18             THE COURT:  So the projectiles that you recovered

19   from the testing have no evidentiary significance because they

20   weren't compared to anything.

21             MS. HOFFMAN:  Right, it's the test -- casings.

22             THE COURT:  It's a casings case, it's not a

23   ballistics case.

24             MS. HOFFMAN:  As to that shooting, yes.

25             THE COURT:  Okay.  So you have an expert who's going

1    to say that they came into possession of the firearm.  I take

2    it that you'll be able to prove the chain of custody up to the

3    point where the expert got the gun.

4         MS. HOFFMAN:  Yes.

5         THE COURT:  At least you believe you'll be able to.

6    And then the expert will say that he or she fired the weapon

7    and then recovered the casings and then made a comparison

8    between those casings that they generated in their test firing

9    to the casings that were collected from the crime scene.

10        MS. HOFFMAN:  Exactly.  And my understanding is that

11   that's the only way a comparison can be done.  So the casings

12   aren't compared to the firearm itself.  The firearm is first

13   test fired and the casings from the scene are compared to the

14   test-fired casings.

15        THE COURT:  Right.  And then is it your

16   representation that the expert's going to come to court and

17   testify that within a reasonable degree of forensic certainty

18   the test previously endorsed by the Court in pretrial motions,

19   he or she will offer the opinion that the casings came from

20   the same gun?

21        MS. HOFFMAN:  Yes, precisely.

22        THE COURT:  Okay.  And this gun was recovered where?

23        MS. HOFFMAN:  The gun was recovered from

24   4447 Pall Mall Avenue.  It was recovered after the recorded

25   jail calls made by the defendant were listened to by agents in

1       which he used coded language to instruct someone to dispose of

2       the firearm.  And that person was apprehended and law

3       enforcement talked to that person and he was able to direct

4       them to where the firearm was.

5              THE COURT:  All right.  And then is there an issue

6       with respect to a second gun?

7              MS. HOFFMAN:  Yes.  The second gun was a stolen

8       firearm and it was returned to its rightful owner.  So that

9       evidence was not destroyed, it still exists, and we're hopeful

10      that we'll be able to get our hands on the gun.  It's also --

11      the agent is still searching as of this minute to see whether

12      we have the test-fired casings and projectiles for that gun.

13      He's optimistic that we do, but I don't have an answer yet 100

14      percent.

15             THE COURT:  And that gun relates to what?

16             MS. HOFFMAN:  The murder of Gregory Rochester.

17             THE COURT:  What does the first gun relate to?

18             MS. HOFFMAN:  The attempted murder of

19      Lamontae Smith.

20             THE COURT:  Okay.  But otherwise, you hope to be in

21      the same situation with respect to the second firearm that you

22      believe you are in with respect to the first.

23             MS. HOFFMAN:  Yes, exactly.

24             THE COURT:  Okay.  So you would agree that by the

25      unavailability of the firearms, defense counsel is not in a

1    position to have his expert test fire the weapons and make

2    comparisons between the shell casings and -- from a test and

3    the shell casings arrive from -- recovered from the two crime

4    scenes; right?

5              MS. HOFFMAN:  Well, with respect to the gun that was

6    returned to the rightful owner, assuming that we can figure

7    out who that person is and get a subpoena for the gun, then

8    there is a chance that the defendant would be able to test

9    fire the gun himself, or through his expert.  With respect to

10   the other gun though, yes, the defendant would have to use the

11   test-fired casings that are already in existence.

12             THE COURT:  That's because that gun has been

13   destroyed.

14             MS. HOFFMAN:  That's correct.

15             THE COURT:  You have a record to that effect.

16             MS. HOFFMAN:  That's correct.

17             THE COURT:  Okay.  Thank you, Ms. Hoffman.  Okay.

18   Mr. Bussard.

19             MR. BUSSARD:  Your Honor, first of all, they have

20   not been examined yet.  There is in our submitted budget a

21   ballistics expert set aside for that.

22             THE COURT:  Well, ballistics is the science of

23   examining projectiles for marks that are left by the

24   experience of the projectile after the detonation of an

25   explosive traveling down the barrel of a firearm and certain

marks are left on the projectile from that experience.  As I

understand it, there isn't any ballistics evidence that's

going to be offered with respect to either of these two

weapons.  Is the government ready to reaffirm that?

MS. HOFFMAN:  Well, I believe we were talking about

the Lamontae Smith gun when Your Honor asked about ballistics.

THE COURT:  Okay.

MS. HOFFMAN:  As to the Gregory Rochester murder,

there are both casings and projectiles that were compared and

matched.

THE COURT:  So possibly you want to offer ballistics

evidence with respect to the second of the firearms.

MS. HOFFMAN:  Yes.  Although chronologically, it's

the first of the firearms.  But I did want to just push back a

little bit on what Mr. Bussard has said.  We have been

repeatedly requesting for months now that the defendants let

us know whether they intend to call any expert and we have not

received any notice from the defendant, Mr. Jones, that he

intends to call a ballistic expert until we informed him that

unfortunately these guns, unbeknownst to us, are not in our

possession anymore.

THE COURT:  Well, are you suggesting that somehow

they've waive the opportunity to challenge the evidence even

though it turns out you don't have it?  I don't think that's

very firm ground.  Go ahead, Mr. Bussard.

1          MR. BUSSARD:  Thank you, Your Honor.  As with a lot

2     of other physical evidence, we would like to have the experts

3     have a chance to examine the firearms and then report to us

4     whether in fact the reports that have been provided to us by

5     the government experts are in fact consistent with our expert.

6     If that's the case, then we would have disclosed those

7     experts, but we never had the opportunity to do so.

8          THE COURT:  Why aren't you in a good enough position

9     by virtue of the fact that you have all of the test data,

10    evidently, from the test firings and your expert right now can

11    sit down and put those shell casings under the microscope and

12    look and see whether or not they agree or disagree?  I mean,

13    isn't that where the fight would be regardless of whether the

14    guns were present or not, whether or not those shell casings

15    in fact match?  And if the fight is someplace else, then it's

16    no different than the position you otherwise would have been

17    in.  You know, you want to challenge the credibility of the

18    government's experts.  You're still able -- or their test

19    results.  You can still do it and say, look, these marks don't

20    line up and our expert shows how they don't line up.

21         MR. BUSSARD:  And we will be doing that, Your Honor.

22    I expect to do that.

23         MR. MARTINEZ:  Then we request a disclosure.

24         THE COURT:  Hold on.  Talking to Mr. Bussard.  Go

25    ahead.

1           MR. BUSSARD:  One of the issues was that these guns

2      were not the type of gun that was recovered from Mr. Jones.

3      They were recovered from third parties.  And the Court -- one

4      of its first questions was a chain of custody issue and the

5      chain of custody is going to become a major fight down the

6      road here.

7           THE COURT:  Why does the gun have to be present now

8      in order for you to fight that out?

9           MR. BUSSARD:  The gun -- two reasons.  If I saw the

10     gun and I was able to see at least one of the firearms and I

11     had a discussion with Special Agent Hayden about it during the

12     physical exam, I'd like to look at --

13          THE COURT:  Before these guns disappeared?

14          MR. BUSSARD:  No, no, it was another one of the

15     guns.

16          THE COURT:  Oh, a different gun, not one of these

17     two guns.

18          MR. BUSSARD:  And I'm always looking for traits of

19     the firearms, including smooth surfaces to -- you know, to

20     have the line of questioning about fingerprints, to see if

21     there was fingerprint dust left on these, had they been

22     cleaned up, had they been maintained in a fashion that maybe

23     they were decaying in some way or rusting.  I think the jury's

24     entitled to see something in the same condition as it was the

25     day it was recovered and some of these guns were recovered

1    four years ago.

2         THE COURT:  Aren't you in a perfectly fine position

3    to argue with respect to those issues when the agent -- when

4    you ask the agent on the stand, well, okay, you made all this

5    analyses of the gun, where's the gun?  Well, I don't have the

6    gun anymore.  What did you do with the gun?  I destroyed it.

7    Or in the second case, I gave it back to the rightful owner.

8    So you don't have the gun here in court, so there's no way for

9    us to now check that gun and see whether or not there are

10   fingerprints left on the gun, is there?

11        MR. BUSSARD:  That would be the line of questioning.

12        THE COURT:  Right.  I mean --

13        MR. BUSSARD:  It's what I don't know.

14        THE COURT:  How are you prejudiced?  Is it that --

15        MR. BUSSARD:  It's the unknown.  It's not seeing the

16   gun and having somebody who is familiar with firearms, I'm

17   not, have somebody look at those firearms, just tell me

18   anything they can tell me about that gun that may be helpful

19   in examining the government's expert.  But without the gun

20   it's just generalized talk about which model it is and ask

21   them this, ask them that regarding a generalized model, not

22   that model.  For all I know, there's a ding in the barrel.

23   There's something that would cause the -- whatever findings to

24   change.

25        THE COURT:  Okay.  But that doesn't -- none of that

1    undercuts the accuracy of the expert testimony about the shell

2    casing comparisons such that the government's expert shouldn't

3    be permitted to testify.  It goes to another question and that

4    is whether or not the evidence is available for you to look

5    for other facts and circumstances that might have been helpful

6    to your side; right?

7            MR. BUSSARD:  Yes, sir, and clearly it's not

8    available.

9            THE COURT:  Right.  But before I can find some kind

10   of *Brady* violation or something along those lines, I've got to

11   have a reason to believe there might have been something that

12   was helpful or exculpatory about the gun, beyond the

13   speculation that there might have been a flat surface that had

14   a fingerprint on it that could have been lifted but now can't

15   be and could have been shown that someone else possessed it

16   other than your client.  That's the best I can come up with so

17   far and that's all speculation.

18           MR. BUSSARD:  Without seeing the weapon it is

19   speculation.

20           MS. HOFFMAN:  Your Honor, I just wanted to make a

21   couple points.

22           THE COURT:  But I haven't called on you yet.  So

23   Mr. Bussard, is that the full extent of it?

24           MR. BUSSARD:  I think it is, Your Honor.  I realize

25   that it's non-testimonial evidence, but it's still a

confrontational issue.  I think if everybody is talking about
this firearm, the best I'm going to be left with is
cross-examining somebody and saying, do we have the firearm
here today, which may turn out to be a better line of
questioning based on my opening statement about the --

THE COURT:  Might end up better for you -- that
might end up better for you that there's no gun there.

MR. BUSSARD:  Your Honor, I felt like I had to make
the record for Mr. Jones's sake and especially in light of the
late announcement by the government that these items were not
available.

THE COURT:  Right.  When did you first request to
see these two firearms?

MR. BUSSARD:  These specific firearms, probably a
discussion at the evidence review on November 15th.  We were
requesting a show and tell, so to speak, a couple times,
verbally.  All of us, I think, were asking and that was the
most convenient time to do it.  I just noticed at that --
there was an array around this circular table, big circular
table, and you work your way down based on CC numbers and what
have you, overt act numbers.  And when I got to the part about
this, I noticed that those firearms were not in the
presentation.

THE COURT:  All right.  Well, I don't find that the
actual physical presence of the two firearms is necessary

1    foundation to the evidence that the government evidently

2    intends to offer with respect to the casings comparison

3    analysis on both guns and the ballistics analysis on what

4    we'll now refer to as the first gun, so that we have our time

5    sequence right, the alleged murder weapon.  Because the

6    question will be whether or not the data survives and whether

7    the data is available for reanalysis by a defense expert.  And

8    from what I've been told so far, it absolutely does continue

9    to exist and is available for that sort of reanalysis and

10   comparison by the defense expert.

11           I don't find that there's any prejudice to the

12   defendant in potentially admitting the comparison evidence of

13   the sort described by virtue of the fact that the gun isn't

14   here anymore.  That doesn't mean though that if defense

15   counsel wants to get into cross-examination of the expert or

16   anyone else relating to that gun, about where the gun is now,

17   and thinks that they have some sort of pathway to relevant

18   information by virtue of its not being present, then I won't

19   permit it.  I expect that I probably would permit it.  But the

20   motion in limine to exclude the expert testimony, which is

21   essentially what you're seeking to block; right?  The expert

22   testimony with reference to the shell casing comparisons and

23   the projectile comparisons as to one of the guns is denied.

24           All right.  Anything else we need to address before

25   we recess for lunch?

1          MR. O'TOOLE:  Very quickly.

2          THE COURT:  Mr. O'Toole.

3          MR. O'TOOLE:  Thank you, sir.  Very quickly, before

4    the cross-examination of Mr. Gray, I just want to ask a

5    question.  We can do it now or after the lunch break, but I

6    see in the previous testimony of his and I expect it today

7    too, there will be some showing him documents that are not

8    exhibits and showing him documents for his recollection.

9          THE COURT:  Yes.

10         MR. O'TOOLE:  Do you want those done on the ELMO or

11   do you want me to hand those to him?

12         THE COURT:  Don't put anything up.  This is a flat

13   policy:  Don't put anything up on the screen that is not in

14   evidence or not clearly coming into evidence by mutual

15   understanding.

16         MR. O'TOOLE:  So it can't be cut off, it can't be

17   cut off for the jury for your purposes and his.

18         THE COURT:  We probably have that capability in

19   here, but I don't have it.

20         MR. O'TOOLE:  Perfect.

21         THE COURT:  So if you're going to refresh a

22   witness's recollection, do it in the old way.  And you also

23   don't have to ask for permission to approach the witness, but

24   don't linger at the witness box either.  Go up there with the

25   document, give it to him, and then go back to wherever you

1    were conducting the examination from.  Then when you're

2    finished refreshing the recollection, you can either recover

3    it or ask the clerk to recover the document and we move on.

4    Important thing is, don't put content on the screen that's not

5    in evidence.

6            Other thing is, don't have the guy -- don't have the

7    witness read the content into the record.  You know, that's a

8    rule for both sides.  You know, we have to be somewhat

9    formalistic with respect to refreshing recollection, which is

10   look at the document, once you have refreshed your memory, put

11   the document down, and look up.  And that's what you should

12   say to the witness and that will signal them to answer the

13   question the appropriate way as opposed to what every other

14   witness wants to do, which is to start reading from the

15   document.

16           MR. O'TOOLE:  Thank you.

17           THE COURT:  Anything else before we take the bunch

18   lunch break?  Mr. Martinez.

19           MR. MARTINEZ:  I wanted to come back to the subject

20   of the 4:30 proceedings this afternoon.

21           THE COURT:  We are going to stop at 4:30 today.

22           MR. MARTINEZ:  3 o'clock tomorrow; is that right?

23           THE COURT:  I can't remember.  Pull up the calendar.

24   Oh, we're moving that.

25           MR. MARTINEZ:  Okay.

1          THE COURT:  No 3:00 o'clock tomorrow.  Okay.  So

2     back at 1:45.  We're in recess.  The defendants are remanded

3     until then.

4          (A recess was taken.)

5          THE COURT:  Be seated, please.  Counsel, obviously

6     Mr. Gray is in custody.  Many other witnesses who testify

7     during the course of this trial will be in custody.

8     Presumably they will be appearing in jail clothes.  It will be

9     apparent just from that that they're in custody.  They'll be

10    seated on the witness stand with a deputy Marshal in close

11    proximity to him.  That will also indicate that they're in

12    custody.

13          Does any counsel object to the fact that the jury is

14    going to see the witnesses who are in custody brought in

15    through the secure entrance, a final sort of indicia of their

16    being in custody?  Mr. Enzinna.

17          MR. ENZINNA:  No objection, Your Honor.

18          THE COURT:  Mr. Bussard.

19          MR. BUSSARD:  No objection.

20          THE COURT:  Mr. Francomano.

21          MR. FRANCOMANO:  No objection, Your Honor.

22          THE COURT:  Okay.  Are we ready for the jury,

23    Counsel?

24          MR. MARTINEZ:  We are.

25          THE COURT:  Let's bring them.

1              (Jury entered the courtroom.)

2              THE COURT:  Good afternoon, ladies and gentlemen.

3              The Government may call their first witness.

4              MR. MARTINEZ:  Your Honor, at this time, the

5    Government calls Michael Gray.

6              THE COURT:  Michael Gray.  Mr. Gray, please stand

7    there and face our clerk right over here.

8              THE CLERK:  And sir, if you would please raise your

9    right hand to be placed under oath.

10                        TIMOTHY MICHAEL GRAY,

11   called as a witness, being first duly sworn, was examined and

12   testified as follows:

13             THE WITNESS:  Yes.

14             THE CLERK:  Thank you, sir, you may have a seat.

15             And sir, if you would please pull the microphone

16   down, speak directly into the microphone.  State your first

17   and last name, and spell your first and last name.

18             THE WITNESS:  Timothy Gray, T-i-m-o-t-h-y,

19   G-r-a-y.

20             THE CLERK:  Thank you, sir.

21             THE COURT:  Mr. Martinez.

22                        DIRECT EXAMINATION

23   BY MR. MARTINEZ:

24   Q    Mr. Gray, good afternoon, sir.

25   A    Good afternoon.

Direct Examination – Gray (By Mr. Martinez)

```
 1              THE COURT:  Mr. Gray, if you would move your chair
 2   further, close to the microphone, it will pick you up better.
 3   Thank you.
 4              Go ahead.
 5   Q    (BY MR. MARTINEZ)  Could you tell us how old you are,
 6   sir?
 7   A    49.
 8   Q    Where are you from?
 9   A    Baltimore.
10   Q    I'm sorry.  Could you speak up?
11   A    Baltimore.
12   Q    Do you go by any nicknames?
13   A    Mike Gray, MG, Uncle Mike.
14   Q    What is -- the nickname Uncle Mike, could you explain
15   that for us?
16   A    Older member of the BGF.
17   Q    All right.  So are you a member of the BGF?
18   A    Was.
19   Q    What does the BGF stand for?
20   A    Black Guerilla Family.
21   Q    And when you say you were a member of the BGF, what do
22   you mean?
23   A    Because I can't be no more.
24   Q    Why is it you can't be a member of BGF anymore?
25   A    Because I testified.
```

Direct Examination – Gray (By Mr. Martinez)

1    Q    All right.  When did you become a member of the

2    Black Guerilla Family, Mr. Gray?

3    A    In '95.

4    Q    And where were you at the time when you became a member

5    of BGF?

6    A    Maryland House of Correction.

7    Q    Is that facility, the Maryland House of Corrections,

8    referred to by any other name or nicknames?

9    A    The Cut.

10   Q    Was BGF already in existence when you became a member?

11   A    Yes.

12   Q    Do you know how BGF got started?

13   A    Yeah, San Quentin by George Jackson.

14   Q    Where is San Quentin?

15   A    California.

16   Q    I'm showing you Government's Exhibit PHI 93, do you

17   recognize this individual?

18   A    Yes, George Jackson.

19   Q    He's the person who started BGF?

20   A    Yes.

21   Q    Could you tell the ladies and gentlemen of the jury how

22   BGF came to Maryland?

23   A    We had a brother, Uncle Ray, that was locked up in

24   California.

25            MR. O'TOOLE:  Objection, Your Honor.  Can we

1    approach the bench, please?

2              THE COURT:  You can approach.

3              (Bench conference on the record.)

4              THE COURT:  The question was, how did BGF come to

5    Maryland.  The answer was, we had a brother, Uncle Ray.

6              MR. O'TOOLE:  I think it's –– my objection is just

7    the whole line –– it's the line of questioning, I think, Your

8    Honor.  We have no idea.  He's not an expert witness.  He

9    hasn't told us how he knows any of this.

10             Mr. Martinez is going to put him on just to tell a

11   history story.  We have no basis of knowledge, we have no

12   foundation, and I object because I think he needs to lay some

13   sort of foundation to let him answer these types of

14   questions.

15             THE COURT:  Well, I'll sustain the objection on

16   foundational grounds.  And Mr. Martinez, please lay some

17   additional foundation for the basis of Mr. Gray's knowledge.

18   But if the testimony is presented as it was in the previous

19   trial, I have no doubt that there's an adequate foundation

20   that exists for his knowing something about the organization

21   of the Black Guerilla Family in Maryland.  But the point is

22   well taken, and the basis for his having that knowledge does

23   need to be constructed first.  Sustained.

24             (The following proceedings were had in open court.)

25             THE COURT:  Sustained.  You may inquire.

1          MR. MARTINEZ:  May I continue, Your Honor?

2          THE COURT:  You may.

3    Q    (BY MR. MARTINEZ)  Mr. Gray, I want to back up a few

4    questions to where you told us that you had been, but are no

5    longer, a member of BGF.  Remember that?

6    A    Yeah.

7    Q    Could you tell the ladies and gentlemen of the jury how

8    long you were in BGF?

9    A    From '95 to 2015.

10   Q    Were you one of the original BGF members in Maryland?

11   A    Yes.

12   Q    Were you a bushman?

13   A    Yes.

14   Q    What is a bushman?

15   A    Over -- when -- one of the people that runs the BGF.

16   Q    Okay.  And in addition to being a bushman, one of the

17   people who runs BGF, did there come a time where you rose to

18   become the city-wide commander of the gang?

19   A    Yes.

20   Q    And in fact, were you the city-wide commander of the gang

21   until you were charged under federal law in this Court?

22          MR. O'TOOLE:  Objection.  It's leading, Your

23   Honor.

24          THE COURT:  Overruled, but let me see counsel at the

25   bench.

Direct Examination – Gray (By Mr. Martinez)

1              (Bench conference on the record.)

2              THE COURT:  I would have sustained another

3     objection, that is, as to foundation, i.e. what is BGF?  What

4     is BGF?  We have no proof of it.

5              You can step back.

6              (The following proceedings were had in open court.)

7     Q    (BY MR. MARTINEZ)  Mr. Gray, we're going to back this up

8     even further and I'm going to ask you tell the ladies and

9     gentlemen of the jury, first of all, what is BGF?

10    A    Black Guerilla Family.

11    Q    All right.  Is the Black Guerilla Family a gang?

12    A    It didn't start out as a gang.  It was a political

13    organization.

14    Q    Did there come a time where it became a gang?

15    A    Yes.

16    Q    All right.  And so you were explaining that you joined

17    the gang; right?

18    A    Yes.

19    Q    All right.  And before the most recent bench conference,

20    I think you had explained that you were formerly the city-wide

21    commander; correct?

22    A    Yes.

23    Q    Over your 12 years in -- or over your time in BGF, did

24    you become familiar with the gang structure?

25    A    Yes.

Direct Examination - Gray (By Mr. Martinez)

1   Q    How about its rules?

2   A    Yes.

3   Q    How about its oath?

4   A    Yes.

5   Q    How about the way it's set up in different neighborhoods

6   in Baltimore City?

7   A    Yes.

8   Q    All right.  How about its history?

9   A    Yes.

10  Q    All right.  Now I want to go back to where we were before

11  and I had asked you how BGF came to Maryland.

12  A    Yes.

13  Q    Could you pick up with your answer to that question?

14  A    Oh, Uncle Ray was locked up in California and then he --

15        MR. O'TOOLE:  I'm sorry, Your Honor.  I couldn't

16  understand.

17        THE COURT:  Speak a little more slowly.  Go ahead.

18        THE WITNESS:  We had a brother, Uncle Ray.  He was

19  locked up in California.  He came to -- he came back to

20  Maryland with permission to start the gang.

21        MR. O'TOOLE:  Objection.  Same objection.

22        THE COURT:  Overruled.  Next question.

23  Q    (BY MR. MARTINEZ)  And so what, if anything, did Ray do

24  to start the gang in Maryland?

25  A    It was -- we started out -- it was seven of us that

1    started out.  We used to hang out together, and then he showed

2    us the rules, the regulations, the oaths, asked us did we

3    agree with it.  We agreed with it and then we just started

4    recruiting from there.

5    Q    And what was it -- once BGF was up and running in the

6    Maryland House of Corrections, what, if anything, did it do to

7    establish its presence in the jail?

8    A    Extort, rob.  I mean, we did whatever we had to do.

9    Q    All right.  So give us an example of extortion in the

10   jail that BGF committed while you were in the House of

11   Corrections.

12   A    If you was getting drugs or cigarettes or whatever, I'd

13   push up on you.  I'd come to you and tell you; look, this is

14   what we want, this is what we need, we need ten percent.  And

15   we'd go from there.

16   Q    Have you ever heard the phrase "either ride with us or

17   collide with us"?

18   A    Yeah, I used to say it.

19   Q    What does it mean?

20   A    It was, do what we say or we deal with you.

21   Q    So in addition to extorting, did BGF also smuggle things

22   into the jails?

23   A    Yeah.

24   Q    What kinds of things would BGF smuggle into the jails?

25   A    Drugs, tobacco, phones.

Direct Examination – Gray (By Mr. Martinez)

1    Q    How would BGF get those things into the jails?

2    A    Different ways.  Visiting room, officers.

3    Q    When you first joined BGF in the Maryland House of

4    Corrections, did you have a particular role?

5    A    Not when we first started.

6    Q    Did you eventually come to have a role in the gang?

7    A    Yeah.

8    Q    What was it?

9    A    First I was the MOD, the minister of defense.

10   Q    Okay.  And we'll come to that position and what it does

11   in a moment.  I want to direct your attention to 2015 and ask

12   you, did there come a time in 2015 when you were charged with

13   a racketeering conspiracy offense in this Court?

14   A    Yes.

15   Q    Did you plead guilty to that charge?

16   A    Yes.

17   Q    At the time you were charged, what was your rank or

18   status within BGF?

19   A    Hodari.

20   Q    What's the hodari?

21   A    The street commander.

22   Q    And at that time, Mr. Gray, was there a higher ranking

23   BGF member on the streets of Baltimore than you?

24   A    No.

25   Q    As part of your guilty plea in that prior case, did you

1    agree to cooperate with the government?

2    A    Yes.

3    Q    Does your cooperation agreement with the government

4    require you to testify fully and truthfully in this case?

5    A    Yes.

6    Q    Have you testified in any other cases pursuant to your

7    cooperation agreement?

8    A    Yes.

9    Q    If you do everything that's asked of you under your

10   cooperation agreement, what are you hoping to get?

11   A    Leniency from the judge on my sentencing day.

12   Q    Has anyone made any promises or guarantees about what

13   kind of sentence you can expect?

14   A    Nobody can promise me nothing.  It's up to the judge.

15   Q    Does your eligibility for a sentencing reduction, or

16   leniency as you say, depend in any way on what happens in this

17   case, whether there's a conviction in this case?

18   A    No.

19   Q    Under the terms of your cooperation agreement, what would

20   happen if we found out you didn't testify truthfully today?

21   A    Then they take the cooperation agreement away.

22   Q    What would happen if we found out you exaggerated?

23   A    Take the cooperation agreement away.

24   Q    All right.  Let's come back to BGF.  Does BGF have an

25   oath?

1    A    Yes.

2    Q    Could you recite the oath for us?

3    A    Should I ever be untrue and forsake the chosen few, this

4    oath should kill me.  Should I ever become lax of discipline

5    in times of strife and neglect my brother, this oath should

6    kill me.  If I ever sought to do harm or allow harm to come to

7    my brother, this oath should kill me.  If ever at any time I

8    refuse or deny to give assistance to this oath or reject my

9    brother, this oath should kill me.  If ever I reveal the sworn

10   secrecies of this oath, this oath should kill me.

11   Q    Let me show you what's been marked as

12   Government's Exhibit GP 1.  Do you recognize this?

13   A    Yes.

14   Q    What is it?

15   A    The oath.

16   Q    Does the oath have any different names, is it referred to

17   in any other way?

18   A    Yeah, the O, the Oatmeal.

19   Q    How about the first letters of each of these?

20   A    Two S's and three I's.

21   Q    Two S's and three I's?  Now, this oath says at various

22   points, at the end of every phrase, in fact:  this oath shall

23   kill me.  Can you explain for the ladies and gentlemen of the

24   jury what that means?

25   A    Self-explanatory.

Direct Examination - Gray (By Mr. Martinez)

1    Q    Well, could you go ahead and explain it?

2    A    It means it should kill you.  If you violate any one of

3    the rules, it's going to kill you.  You could die.

4    Q    And if someone violated the rules and was killed, by whom

5    would they be killed?  Who would kill them if they violated

6    the rules?

7    A    Whoever is assigned to kill you.

8    Q    Are there other BGF oaths?

9    A    Yeah, you got the bush oath.

10    Q    Have you ever heard of the fox oath?

11    A    Yeah, I heard of it.

12    Q    What's a fox?

13    A    A sympathizer.

14    Q    And do they take a separate oath?

15    A    Of late, yeah.

16    Q    Okay.  Are foxes full-fledged members?

17    A    No.

18    Q    What's the difference between a fox and a full-fledged

19    member?

20    A    A fox is just a sympathizer.  A full-fledged member, you

21    got the regular oath.

22    Q    What does a fox have to do to become a member of BGF?

23    A    I guess -- I really don't know, because I know

24    sympathizers are just people that sympathize with our cause.

25            MR. O'TOOLE:  Objection, Your Honor.  He says he

1    doesn't know.

2            THE COURT:  Overruled.

3    Q    (BY MR. MARTINEZ)  You can continue.

4    A    A sympathizer is somebody that just sympathize with our

5    cause.  A fox is something that people just made up.

6    Q    I understand.  How about a prospective member, if

7    somebody is wishing to become a member of BGF, what do they

8    have to do to join the gang?

9    A    It used to be that, you know, I might see somebody that I

10   think is a prospective member, we'll watch him and see is he

11   worthy to become a full-fledged member.

12   Q    What kinds of things are you watching for?

13   A    Mentality, how you carry yourself.  If he wanted to go --

14   if he was willing to put in work.

15   Q    What does it mean to put in work?

16   A    I mean, they might be -- might get sent to rob, might get

17   sent to extort somebody, might get sent to, you know, just do

18   the gang business.

19           MR. O'TOOLE:  I'm sorry, Judge.

20           THE COURT:  Could you --

21   Q    (BY MR. MARTINEZ)  Did you say "do the gang's business,"

22   Mr. Gray?

23   A    Yeah.

24   Q    So do I understand you to be saying that robbing and

25   extorting are part of the gang's business?

1   A     Yes.

2   Q     Okay.  You mentioned that there is a separate oath for

3   bushman; is that right?

4   A     Yes.

5   Q     All right.  And you mentioned that the bushman are the

6   people -- earlier you said the bushman are people who make

7   decisions in BGF; is that right?

8   A     Yes.

9   Q     What does one -- what does a BGF member have to do to

10  become a bushman?

11  A     Be a member for -- in good standing for a while, put in

12  work.  That's basically it.

13  Q     Can put in work include killing?

14  A     It can.

15  Q     Do bushmen have their own oath?

16  A     Yes.

17  Q     Do you know that oath?

18  A     Yes.

19  Q     Could you recite it for us, please?

20  A     There's a whole -- it's basically a song and dance that

21  we go through before we get there, and it's the regular oath

22  backwards.  Then you -- where do you sleep?  In the bush.  How

23  do you enter?  Under the ground beneath the sea, using the

24  dragon tooth as the key.  Who made thee a ruler and the judge?

25  The same dear God sent to be the ruler and delivered by the

1    hands of the angel which appears in the bush.  And then the

2    regular oath backwards, the three I's, then the two S's.

3    Q    Okay.  Does BGF have a written set of rules, Mr. Gray?

4    A    Yes.

5    Q    What are they called?

6    A    The 22s.

7    Q    How about a constitution, are there BGF constitutions as

8    well?

9    A    Yes.

10   Q    What are those called?

11   A    33s.

12   Q    And the 22s and 33s together --

13   A    55s.

14   Q    All right.  I want to show you -- actually, first, where

15   do those rules come from?

16   A    California.

17   Q    Do you know who came up with the rules?

18   A    Doc Holiday.

19   Q    And who is Doc Holiday?

20   A    One of the original members of BGF from San Quentin

21   Prison in California.

22   Q    Okay.  Now I want to show you Government's Exhibit GP 4.

23   I'll try and zoom in so you can see this.

24        MR. O'TOOLE:  Your Honor, is this in evidence -- is

25   this exhibit in evidence or not?

1          THE COURT:  It's been referred to and there was no

2     objection.

3          MR. O'TOOLE:  It was referred to as in evidence

4     or --

5          THE COURT:  Counsel, you can approach.

6          (Bench conference on the record.)

7          THE COURT:  Excuse me, I've got a scratchy throat.

8     Local rule in the District of Maryland, the first time an

9     exhibit is referred to -- first time an exhibit is referred to

10    in open court it is deemed admitted unless an objection is

11    immediately interposed, with the only qualification being that

12    if counsel sponsoring the exhibit refers to it as having been

13    marked for identification, then it is understood not to be

14    offered in evidence and no one need object in order to ensure

15    that it's not admitted.

16          MR. O'TOOLE:  Do you want to write this out?

17          THE COURT:  Ending where I started, the first time

18    an exhibit is referred to in open court, it's deemed admitted

19    unless an objection is interposed immediately.  It's a rule

20    that's been in place in the District of Maryland ever since I

21    came here in 1992.  Any confusion about that?

22          MR. O'TOOLE:  Then we'd be required to object to

23    every exhibit that's mentioned --

24          THE COURT:  You've got to move closer to the mike.

25          MR. O'TOOLE:  Then we'd be required to object to

1    every exhibit that's mentioned because there's no foundation

2    with that yet.

3              THE COURT:  If that's the position you want to take,

4    we can start down that route.  Generally what happens is that

5    counsel meet in advance of a criminal trial and sort those

6    issues out, and to the extent that there are real problems in

7    that regard, we address them through the motions in limine

8    process.  But --

9              MS. HOFFMAN:  We circulated our exhibit list last

10   week and you have our exhibit binder now.

11             MR. MARTINEZ:  This particular item has been in

12   discovery for a long time.  We're going to introduce it

13   through Detective Hayden later anyway.  He's the one who

14   recovered it.  And so to the extent there are issues about

15   where it came from or its authenticity, I'm happy to mark it

16   now for identification only.  The point is he's going to be

17   able to recognize it as the 22 rules of the gang.

18             MR. O'TOOLE:  I understand that, Your Honor.  The

19   reason I'm up here now is we're early in this trial --

20             THE COURT:  Yes.

21             MR. O'TOOLE:  -- and I want to make sure we don't

22   step on something you want to be done differently.  It's my

23   position that you say don't put anything on the screen unless

24   it's -- if it's in evidence.  This is not something I thought

25   was in evidence, so I wanted to know what's going on.  So

1    that's why I'm up here.  I'm not up here to cause a problem.

2            THE COURT:  The moment it shows up on the screen,

3    the moment it is first referred to is taken by the Court as

4    its being offered in evidence.  If an objection is interposed

5    immediately, then we'll hear the objection.  But if no

6    objection is made, it's deemed in, it's deemed admitted.

7            It's a rule that started originally by former

8    Chief Judge J. Frederick Motz in the 1980s, I understand.  But

9    I think it's unique, but nonetheless well-established in this

10   district, so I intend to adhere to it.

11           And Counsel, I guess if you haven't dealt with this

12   before, you're going to need to do some thinking about how

13   you're going to manage it.  Perhaps you want to take some time

14   to look at the government's witness list and identify those

15   exhibits with respect to which you feel you have objections

16   and then take those up with the Government.

17           MR. O'TOOLE:  When do you think that might happen?

18   We're in the middle of probably the first and most important

19   witness.

20           THE COURT:  Well, Mr. O'Toole, I operate under the

21   assumption that counsel have read our local rules.

22           MR. O'TOOLE:  Well, you know, I thought I had.  I'm

23   just telling the Court I did not -- I'm not aware of this rule

24   and I take full responsibility for that.  But the Court is now

25   suggesting that we do something, which obviously we can't do

Direct Examination - Gray (By Mr. Martinez)

1    on the fly right this second.  So the other option is to

2    either object to every single thing you see, which seems

3    ridiculous to me because then it just gets all -- I just

4    wanted to make sure.  It caused me to come up here because the

5    Court said don't put something on that's not in evidence and I

6    didn't think this was in evidence.  That's why we're up here.

7    Now, if I'm wrong about that, and I apparently am, then we'll

8    deal with it.

9              THE COURT:  Well, you are.  Step back.

10              (The following proceedings were had in open court.)

11              THE COURT:  Pull it off the screen.

12              Mr. O'Toole.

13              MR. O'TOOLE:  Sir?

14              THE COURT:  You objected.

15              MR. O'TOOLE:  It's withdrawn.

16              THE COURT:  You may proceed.

17    Q    (BY MR. MARTINEZ)  Mr. Gray, I'm putting up

18    Government's Exhibit GP 4 back on the screen.  Do you

19    recognize this document, do you know what's in this

20    document?

21    A    Yes.

22    Q    What is it?

23    A    22 laws, 22 rules.

24    Q    I want to go through some of these with you.  Actually,

25    first, let's talk about Jamaa.  What is Jamaa, what does it

1    mean?

2    A    It's Swahili for family.

3    Q    Does BGF use other Swahili terms?

4    A    Yes.

5    Q    Why does BGF use Swahili terms?

6    A    Disguise different things when we first started.

7    Q    Is Jamaa also a shorthand term for BGF?

8    A    No, it just mean family.

9    Q    What about J?

10   A    Short for Jamaa.

11   Q    Okay.  And if somebody said to you "he's J," what would

12   that mean to you?

13   A    He's BGF.

14   Q    Or "he's in J," what would that mean?

15   A    He's in BGF.

16   Q    Okay.  Let's go through some of these rules.  Could you

17   read us Rule No. 1?

18   A    Never place your hands on your brother.

19   Q    How about No. 2, never speak in vain of Jamaa?

20   A    Never talk bad about Jamaa.

21   Q    What's Rule No. 3?

22   A    Never talk bad about your brother.

23   Q    How about Rule No. 4?

24   A    Never argue in public with your brother.

25   Q    And No. 5?

Direct Examination – Gray (By Mr. Martinez)

```
1    A    Any verbal dispute shall cease when emotions come into

2    play with your comrade.

3    Q    What's a comrade?

4    A    A brother, another member of BGF.

5    Q    I'm going to zoom in on 6 a little bit more.  It's right

6    here, would you mind reading that for us?

7    A    We never take matters into our own hands unless it's

8    spontaneous action that warrants immediate action, but we

9    always go back to protocol.

10   Q    What's protocol?

11   A    A set of rules.  Protocol is the way that you do things.

12   Our order, the order in which you do things.

13   Q    Okay.  Is that the same or different than chain of

14   command?

15   A    Chain of command, protocol.

16   Q    So BGF has a chain of command?

17   A    Yeah.

18   Q    How about Rule No. 7?

19   A    Never speak Jamaa business in public.

20   Q    Why is it important not to talk about Jamaa business in

21   public?

22   A    Because it ain't no -- it ain't the public business.

23   Q    Rule No. 8?

24   A    If a meeting is called --

25   Q    Would it help if I handed you a copy of the document so
```

1    you could look at the original?

2    A    Yeah.

3            MR. MARTINEZ:  May I approach, Your Honor?

4            THE COURT:  Yes.

5    Q    (BY MR. MARTINEZ)  Can you read that now?

6    A    If a meeting is called, unless everyone must be there --

7    everybody must be at the meeting when they call it or it will

8    result in actions being taken by the MOJ.

9    Q    Who's the MOJ?

10   A    The minister of justice.

11   Q    What does he do?

12   A    He distribute justice, keeps order, hands out

13   sanctions.

14   Q    He hands out sanctions?

15   A    Yes.

16   Q    We'll get to that in a moment.  I want to draw your

17   attention to 19 here.  What's that rule?

18   A    We never move on a situation unless it's approved and

19   strategized by the MOD.

20   Q    What's the MOD?

21   A    Minister of defense.

22   Q    What does he do?

23   A    Plan, plot, and strategize.  Anything that need to be

24   done, always moving on something.

25   Q    What does it mean to move on something?

Direct Examination – Gray (By Mr. Martinez)

1    A    If you got a heist, if you got a -- if somebody violated,

2    MOD set it up.

3    Q    Okay.

4    A    A plan of action.  He make a plan of action.

5    Q    How about Rule No. 20?  It's the third from the bottom.

6    A    All channels of planting a seed must be closely followed.

7    Q    Does that say to avoid conflict, does that look right to

8    you?

9    A    Yeah.

10   Q    I just wanted to ask you what a seed is.

11   A    Potential member.

12   Q    So planting a seed is a potential member?

13   A    Yeah.

14   Q    I think earlier, Mr. Gray, you also mentioned that BGF,

15   in addition to 22 rules, has 33 constitutions; is that right?

16   A    Yes.

17   Q    Are you familiar with the 33 constitutions?

18   A    Yes.

19   Q    I'm going to show you Government's Exhibit 43.  Sorry.

20        Do you recognize what's in this document, Mr. Gray?

21   A    Yes.

22   Q    What do you recognize it to be?

23   A    Part of the constitution.

24   Q    All right.  Let's go through some of them.  See at the

25   top it says the only way to become a member of Eusi Gyedi

1    Jamaa is by sponsor or directive or to be specified by the C.

2    Do you see that?

3    A    Yes.

4    Q    Can you explain what that rule means?

5    A    The only way you can become a member of Jamaa, of BGF, is

6    to have a sponsor, somebody that's already a member of the

7    BGF.

8    Q    What does Eusi Gyedi Jamaa mean?

9    A    It's basically the family.

10   Q    What language is it?

11   A    Swahili.

12   Q    So Jamaa, you testified earlier, is family.

13   A    Yes.

14   Q    How about Eusi Gyedi Jamaa?

15   A    I forgot what it is.

16   Q    See the reference in this rule to a C, what does that

17   person do?

18   A    Huh?

19   Q    Right here, it says the only way to become a member is by

20   a sponsor or directive specified by C.  Who is the C?

21   A    Commander.

22   Q    All right.  What does he do?

23   A    Overrun the regime.

24   Q    All right.  Going back to Eusi Gyedi Jamaa, Mr. Gray, let

25   me ask it this way:  What is Swahili for Black Guerilla

1    Family?

2    A    Usually it's Gyedi Jamaa.

3    Q    Okay.  Thank you.  Let's look at Rule No. 2 or

4    Constitution No. 2, can you read that rule?

5    A    Once you pledge, you use this organization --

6    Q    Right here, once you pledge you take this organization to

7    your grave.  Under this particular constitution, is it

8    possible to get out of BGF once you're a member?

9    A    No.

10   Q    How about No. 5, discipline comes in three forms, fines

11   and beatdowns for major offenses, and death for extreme

12   violations.  Can you give us an example of an extreme

13   violation that would result in a sanction of death?

14   A    Me testifying.

15   Q    So is snitching an extreme violation?

16   A    Yes.

17   Q    And are you violating the BGF oath by snitching?

18   A    Yes.

19   Q    Are you violating the 33s?

20   A    Yes.

21   Q    Who can order a sanction of death?

22   A    The bush.

23   Q    Anybody else?

24   A    (No verbal response.)

25   Q    Could the C in a regime order a sanction of death?

1    A    No.

2    Q    Have you ever ordered a sanction of death?

3    A    Yes.

4    Q    How about No. 7, all allegations have proof -- must have

5    proof attached to it -- right here -- that will not exist

6    amongst Jamaa, and the author of the allegations will be

7    thoroughly disciplined, what does that rule mean?

8    A    It means that if you say somebody did something, you got

9    to have proof, black and white, like it got to be in black and

10    white.

11    Q    All right.  So let's take the example of somebody who's

12    accused of being a snitch or talking to the police.  How would

13    this rule requiring proof in black and white apply in that

14    context?

15    A    They got to be in the paperwork.  Their name going to

16    show up in the paperwork.

17    Q    I'm going to go down to No. 11 here.  I'm sorry, I'm just

18    holding it so that it -- if a member is selected to carry out

19    a directive, he/she will be given a proper interview to carry

20    out the said directive, and if he/she refuses or fails to

21    carry out the said directive, then he/she becomes the target.

22    What does that rule mean?

23    A    If you asked to do something and you don't do it, then

24    you become the target, and so we'll get somebody else to do

25    it.

1    Q    And what kinds of directives or things that people might

2    be asked to do is this rule referring to?

3    A    It could be anything from giving somebody a beatdown and

4    you don't want to give your friend a beatdown and you don't

5    want to beat them down, then you'll get a beatdown.  It could

6    be killing somebody.  If you don't do it, you become the

7    target.

8    Q    Okay.  So under this rule, if you're asked to kill

9    somebody and you refuse to do it or you fail to do it, what

10    happens to you --

11    A    You become the target.

12    Q    How about No. 12, right here, we do not participate in

13    snitching or working against -- working with the police

14    against -- and it's hard to read the last word.  What does

15    that rule mean?

16    A    Means we don't -- Jamaa don't participate in snitching or

17    working with the police.

18    Q    How about Rule 19, here towards the bottom, we do not

19    allow harm to come to a comrade without confrontation?

20    A    Confirmation.

21    Q    Confirmation, I'm sorry.  And you explained earlier that

22    a comrade is a member of BGF; right?

23    A    Yes.

24    Q    So under this rule, if a BGF member is robbed, what is

25    his fellow comrade required to do?

1    A    Rob with him.

2    Q    If a BGF member is shot, what is his fellow comrade

3    required to do?

4    A    Ride with them, if they don't come from the BGF.

5    Q    I'll turn the page over.  Let's skip down to 27 here,

6    never reveal the secrets of the dragon.  What's the dragon,

7    Mr. Gray?

8    A    Jamaa.

9    Q    Why is the dragon Jamaa, is it a symbol for the gang?

10   A    Yes.

11   Q    Okay.  And why are members required not to reveal the

12   secrets of the dragon?

13   A    Because it's supposed to be sacred.

14   Q    Why is it supposed to be a secret?

15   A    I said it's supposed to be sacred.

16   Q    Oh, okay.  How about the next rule, all acts of loyalty

17   are subject to reward, while all acts of treason are subject

18   to discipline, can you give us an example of an act of treason

19   that might be subject to discipline?

20   A    Me testifying.

21   Q    Any other examples?

22   A    You're breaking another rule.

23   Q    You break a rule of the gang?

24   A    Yeah.

25   Q    All right.  Last thing on this page, see here where it

1    says silver shield, and then shield, sword, and AK-47?

2    A    Yeah.

3    Q    Are those items, the shield, the sword, and the AK-47,

4    how are those associated with BGF?  Do they have any meaning

5    in the context of BGF?

6    A    Yeah, it was a tattoo, but -- the gun and the sword, but

7    it was more to it than the shield.

8    Q    So are you saying a tattoo with a gun and a sword on it

9    is a tattoo of BGF?

10   A    Yeah.

11   Q    Okay.  Let me show you Government's Exhibit PT 10, is

12   that the kind of tattoo you were talking about?

13   A    Yeah.

14   Q    And do you recognize that to be a BGF tattoo?

15   A    Yeah.

16   Q    So if you saw somebody -- if you were locked up in the

17   jail and somebody came in with that tattoo, what would you

18   think?

19   A    That they were J.

20   Q    And somebody being J means what?

21   A    That they Jamaa, they BGF.

22            THE COURT:  Let me see counsel.

23            (Bench conference on the record.)

24            How do you show that marked, as PH or as PT?

25            THE CLERK:  I was just --

1              THE COURT:  Same problem.

2              Okay.  So there's confusion between the clerk and

3    me -- among the clerk and me about how your exhibits are

4    marked.  I heard you refer to that as PT.

5              MR. MARTINEZ:  PHT, I'm sorry.

6              THE COURT:  So it should be PHT.  What are those

7    letters?

8              MR. MARTINEZ:  Photos of tattoos, photographs of

9    tattoos.

10             THE COURT:  Okay.  That's what that stands for.

11   Okay.  So the earlier initials that you were indicating, I

12   think there was G?

13             MR. MARTINEZ:  GP.

14             MS. HOFFMAN:  That's from -- I think you have to

15   correct -- on the record.  The originals are different.

16             MR. MARTINEZ:  Okay.

17             THE COURT:  Ms. Powell, let me see the exhibit list

18   that you're operating off of.

19             THE CLERK:  I was looking for PHT.  I do not see

20   that.

21             MS. HOFFMAN:  Some of the tattoos, we weren't able

22   to photograph until Tuesday.

23             THE CLERK:  Here they are --

24             MR. MARTINEZ:  So we need to add the one, PHT 10.

25             THE COURT:  Okay.  And you've got them organized in

1    a way that is logical, which is that anything beginning with P

2    comes before anything beginning with Q, R, S, or T?

3          MS. HOFFMAN:  Well, within each category they're

4    numbered, so --

5          THE COURT:  So the P exhibits come before the S

6    exhibits and T exhibits?

7          MS. HOFFMAN:  In the exhibit list, yes, but not

8    necessarily in the order in which they'll come in.

9          THE COURT:  It doesn't matter the order in which

10   they come in.  I don't care about that.  I just care about

11   whether the list is organized in a logical --

12         MS. HOFFMAN:  Yeah, it's alphabetical.

13         THE COURT:  -- sequence.  It's alphabetical all the

14   way through, so the PHs come before the PTs.

15         MS. HOFFMAN:  Yes.

16         THE COURT:  Okay.  I'm going to hold you to that.

17         (The following proceedings were had in open court.)

18         THE COURT:  Reference again to the exhibit and then

19   you may continue, Mr. Martinez.

20         MR. MARTINEZ:  The one that was just on the screen,

21   the tattoo?

22         THE COURT:  Yes.  That is?

23         MR. MARTINEZ:  That's Government's Exhibit PHT 10.

24         THE COURT:  You were referring to PHT 10.

25         MR. MARTINEZ:  Correct.

1          THE COURT:  Thank you.  Next question.

2  Q    (BY MR. MARTINEZ)  Mr. Gray, I want to come back to the

3  story you were telling about your time in BGF.  You said

4  earlier that you joined BGF in '95 while you were serving a

5  sentence in prison; is that correct?

6  A    Yes.

7  Q    What crime were you serving a sentence for?

8  A    Attempted murder.

9  Q    How long was that sentence?

10  A    12 years.

11  Q    12 years, you said?

12  A    Yes.

13  Q    During that 12-year sentence did there come a time where

14  you escaped from prison?

15  A    Yes.

16  Q    Could you explain for the ladies and gentlemen of the

17  jury how you escaped?

18  A    It was -- the jail tried to walk me from one jail to

19  another to play basketball and I ran.  I left.

20  Q    You just walked away?

21  A    Yes.

22  Q    Okay.  What jail were you in at the time?

23  A    The Maryland Penitentiary.

24  Q    Was there a reason why you decided you wanted to

25  escape?

 1   A    Yeah, my mother was sick and dying.

 2   Q    So what year was this?

 3   A    2005.

 4   Q    All right.  And so when you escaped in 2005, by that

 5   point in time had BGF established a presence on the streets of

 6   Baltimore in addition to in the jails?

 7   A    Yes.

 8   Q    At that time how was BGF organized on the streets of

 9   Baltimore?

10   A    We had one regime.

11   Q    And what's a regime?

12   A    Regime is like a unit.

13   Q    It's a unit.  So there was one unit for BGF for the whole

14   city in 2005; is that correct?

15   A    Yes.

16   Q    Did that change --

17   A    Yes.

18   Q    -- or did that stay the same?

19   A    Yes, it changed.

20   Q    How did it change?

21   A    Me and my friend Will, we was riding around and started

22   establishing regimes in different neighborhoods.

23   Q    Was Will in BGF?

24   A    Yes.

25   Q    What was Will's rank in the gang?

Direct Examination - Gray (By Mr. Martinez)

1   A    Bushman.

2   Q    I'll show you Government's Exhibit PHI 87.  Do you

3   recognize that person?

4   A    Yes.

5   Q    Who's that?

6   A    Will.

7   Q    So Will was a bushman, were you also a bushman at this

8   time?

9   A    Yes.

10  Q    All right.  So you said you and Will were riding around

11  different neighborhoods in Baltimore setting up regimes.

12  A    Yes.

13  Q    Can you remember where the first regime was?

14  A    On Kennedy.  The first regime was over east Baltimore,

15  Kennedy, then the second one was up Park Heights on Shirley.

16  Q    And why was it that you wanted to organize regimes by

17  neighborhood, what was the thought behind that, Mr. Gray?

18  A    Because it was easier than just doing it the way that we

19  was doing it with one regime because dudes trusted each other

20  in their neighborhoods before they would trust somebody

21  outside their neighborhood.

22  Q    So as you went from neighborhood to neighborhood with

23  Will and you guys were setting up regimes in different places

24  throughout the city, could you explain what -- what did it

25  look like to get a regime up and running, how would you

1    organize these regimes?

2    A    We would find somebody that was locked up with us that we

3    knew was already J, and he knew who was in his neighborhood.

4    He knew how many people that were J in his neighborhood and

5    then we'd build from there.

6    Q    So once you got started setting up these regimes, you

7    mentioned you did one in Kennedy and another in Park Heights.

8    Did there come a time where you went back to prison?

9    A    Yes.

10   Q    Why did you go back to prison?

11   A    I turned myself in.

12   Q    Why did you decide to turn yourself back in?

13   A    Because my mother asked me to.

14   Q    What year was this?

15   A    2005.

16   Q    Okay.

17   A    The end of 2005, yeah.

18   Q    So you weren't out very long after you had escaped.

19   A    Huh-uh.

20   Q    And when you went back to jail and you turned yourself

21   back in, how long did you stay there then?

22   A    Like two years.

23   Q    Okay.  So you were released again in 2007; is that

24   right?

25   A    Yeah, I got paroled.

Direct Examination – Gray (By Mr. Martinez)

1    Q    Okay.  And when you got paroled in 2007, what happened to

2    the process you had begun with Will where you were riding

3    around the city and organizing regimes in different places?

4    A    We continued.

5    Q    Okay.  Before we come back to that process, first let me

6    ask you, are you familiar with the term bubble?

7    A    Yes.

8    Q    What's a bubble?

9    A    It's the positions inside a regime.

10   Q    Okay.  So each regime includes a bubble; is that

11   correct?

12   A    Yes.

13   Q    And what are some of those positions in the bubble?

14   A    Field marshal, field general, MO -- the minister of

15   defense, minister of justice, minister of education, minister

16   of finance, commander, lieutenant commander.

17   Q    Let me show you Government's Exhibit DEM 2.  Does this

18   fairly depict what you were just describing in terms of the

19   positions within the bubble in a regime, see it in here?

20   A    Yes.

21   Q    All right.  So you already told us with respect to the

22   commander, the commander is the C; is that right?

23   A    Yes.

24   Q    And what's his role in the regime?

25   A    Oversee the whole regime --

Direct Examination - Gray (By Mr. Martinez)

1    Q    How about the --

2    A    -- and be the go-between between the regime and the

3    bush.

4    Q    I'm sorry, I cut you off.

5    A    He oversee the regime, but he the go-between between the

6    regime and the bush.

7    Q    So the bush is above the regime?

8    A    Yes.

9    Q    And the commander reports to the bush; is that right?

10   A    Yes.

11   Q    How about the lieutenant commander, the LTC?

12   A    He basically handle the day-to-day operations of the

13   regime.

14   Q    And the minister of justice, you explained earlier that

15   that person --

16   A    He dish out the justice, he give out the sanctions.

17   Q    What are sanctions given out for?

18   A    Breaking the rules.

19   Q    And what kind of sanctions are there for rules broken?

20   A    Anything from a fine to death.

21   Q    How about the minister of finance, what does he do?

22   A    Control the money.

23   Q    And how does BGF make money?

24   A    Hustling.

25   Q    What do you mean by hustling?

1   A     Sell drugs, you rob.  You know what I mean?  Whatever,
2   whatever you do.
3   Q     How about extortion, does BGF engage in that, too?
4   A     Yes.
5   Q     Does BGF collect dues, are there dues in BGF?
6   A     Yes.
7   Q     And how often are those supposed to be collected?
8   A     Once a week.
9   Q     And who's in charge of maintaining the dues or the
10  treasury with BGF?
11  A     Finance.
12  Q     Okay.  Minister of defense, we talked about that person
13  earlier.  You said he strategizes; is that correct?
14  A     Yes.
15  Q     So if the regime -- what kind of situation might the
16  minister of defense have to strategize about for the regime?
17  A     If we was beefing with somebody, if you had a problem
18  with somebody, he would tell you how to go about taking care
19  of it.  If we was going to rob somebody, he would set it up,
20  how we going to do it.
21  Q     How about if the gang was going to kill someone, or the
22  regime, rather?
23  A     Yeah, if need -- yeah, if he on a need-to-know basis.
24  Q     How about the minister of education, what does he do?
25  A     Teach the history of Jamaa, make sure everybody know

1    their 22s, 33s, and know the history.

2    Q    How about the oath?

3    A    Yeah.

4    Q    So are all BGF members expected to know their 22s and

5    33s?

6    A    And their oath.

7    Q    Let's move on to the sergeant of arms.  What does he

8    do?

9    A    Make sure that we have guns, knives, whatever.  He the

10   sergeant of arms.

11   Q    And then last, the field marshal and the field general,

12   how about them?

13   A    They deal with the -- they really the ones that really

14   deal with the day-to-day operation, find out what the dudes in

15   the field going through.  I mean, they report to them.

16   Q    So they are the liaison between the bubble and the field,

17   is that what you're saying?

18   A    Yes.

19   Q    What does it mean to be in the field?

20   A    Meaning that you don't have a position, but you're J.

21   You're not in the bubble.

22   Q    Basically everybody else who's not in the bubble; is that

23   right?

24   A    Yeah.

25   Q    So the regimes that you and Will were setting up

1    throughout Baltimore City, did they incorporate this

2    structure, a bubble and then a regime beneath it?

3    A    Yeah.

4    Q    Did there come a time when you and Will set up a BGF

5    regime in the Greenmount Avenue corridor?

6    A    Yes, Will did.

7    Q    I'm sorry?

8    A    Yes, Will did.

9    Q    When was that?

10   A    About 2006.  2005, 2006.

11   Q    All right.  I want to ask you about that, but before I

12   do, I want to ask you whether you've ever heard of an

13   organization called YGF.

14   A    Yes.

15   Q    What was YGF?

16   A    Young Guerilla Family.

17   Q    And can you tell us whether YGF operated in a particular

18   neighborhood of Baltimore?

19           MR. O'TOOLE:  Objection, Your Honor.

20           THE COURT:  You may approach.

21           (Bench conference on the record.)

22           THE COURT:  Okay.

23           MR. O'TOOLE:  It's the same objection we had in the

24   beginning.  He doesn't say what it is.  He says what is YGF,

25   he says -- he says what it stands for, and then he just goes

1    into --

2            MR. MARTINEZ:  I asked him if he was familiar with

3    the organization.

4            MR. O'TOOLE:  And he just says -- he didn't say what

5    it is.  He just said it's YGF, YGF is Young Guerilla Family.

6    It's assuming -- we've been very lenient and not objected to

7    anything because I think he's leading the witness and I

8    understand.  But I think at some point the witness ought to be

9    able to at least tell us what he's talking about.

10           THE COURT:  Well, I haven't heard any leading on

11   what I consider to be truly substantive matters.  There has

12   been some leading to try to link concepts to keep the

13   testimony flowing with a witness who is inarticulate, to say

14   the least.  This particular question was, whether you can tell

15   us whether YGF operated in a particular part of Baltimore.

16   What's your objection there?

17           MR. O'TOOLE:  Objection is he asks about YGF, and

18   then he says yes, then he says what was YGF, Young Guerilla

19   Family.  He doesn't say what it is, doesn't say it's an

20   organization, doesn't say that it's -- whatever it is.  It's

21   the same thing on the point that I made to you about BGF.

22           THE COURT:  Yeah, but now that we've had BGF

23   explained to us, it's a much smaller leap to what YGF is --

24           MR. O'TOOLE:  It's a leap nonetheless, I think.

25           THE COURT:  I don't think so.  Overruled.

1          (The following proceedings were had in open court.)

2          THE COURT:  Overruled.  You may continue --

3     Q    (BY MR. MARTINEZ)  Mr. Gray, I was asking you whether you

4     can tell the ladies and gentlemen of the jury whether YGF

5     operated in a particular neighborhood in Baltimore.

6     A    Yes, 22nd and Barclay.

7     Q    When did you first learn about YGF?

8     A    While I was out there in 2006.

9     Q    And from whom did you hear about YGF?

10    A    Will.

11    Q    What did Will tell you about YGF?

12    A    Basically, that they was just doing stuff -- no.  The

13    first place I heard about it was on the news, but then Will

14    told me more about them, who they was.

15    Q    All right.  Well, let's take that step by step.  What did

16    you hear on the news?

17    A    That it was a bunch of murders happening in a certain --

18    in that neighborhood and that's when Will told me who was

19    doing it.

20    Q    So you heard there were a bunch of neighbors in that

21    neighborhood, you're referring to the Greenmount, 22nd and

22    Barclay --

23    A    Yeah, around that area.

24    Q    -- that neighborhood?

25    A    Yeah.

 1   Q    All right.  So do I understand you then to be saying that

 2   you followed up with Will and you asked him about it?

 3   A    Yeah, because he said -- because I asked him was it us.

 4   Q    And what did Will say?

 5   A    He said no.

 6   Q    When you said was it us, what did you mean?

 7   A    BGF.

 8   Q    And when Will said no, did he then explain?

 9   A    Yeah --

10   Q    What did Will say?

11   A    -- yeah.  He told me that it was little dudes that call

12   themselves YGF.

13   Q    Uh-huh.  And what, if anything, did Will tell you about

14   what YGF had been up to?

15   A    They was just doing -- they was involved in all the

16   shootings.

17   Q    Okay.  And what, if anything, did you tell Will about the

18   situation, were you concerned?

19   A    Yes, because Will was talking about starting a regime

20   around there in that neighborhood, and I think he had already

21   told me that he had started a regime in the neighborhood or

22   was getting ready to start a regime in the neighborhood.  And

23   I was telling him -- I told him if they ain't -- let the

24   little dudes know that they need to become J.

25   Q    And why was it that you wanted the little dudes from YGF

Direct Examination - Gray (By Mr. Martinez)

1    to become J?

2    A    Because we was getting the blame for the stuff that they

3    was doing.

4    Q    Okay.  What does it mean for a neighborhood to become

5    hot?

6    A    Meaning that the police are going to constantly be around

7    there and can't nobody get no money.

8    Q    So were you concerned that Greenmount was becoming hot

9    because of YGF?

10   A    Yes.

11   Q    During these discussions did Will tell you -- well, you

12   said you told Will to tell YGF to shut it down or become J; is

13   that right?

14   A    Yes.

15   Q    And did Will do that?

16   A    Yeah, and then he came back and told me that they were

17   bucking, said some of them was bucking.  I told him that --

18   find out whoever -- whichever one was bucking, make an example

19   out of them.

20   Q    Well, let me ask you what it means -- what do you mean

21   when you say bucking?

22   A    Meaning that they wasn't going to be J, that they be

23   saying that they wasn't going to be J.

24   Q    Okay.  So they were YGF members who didn't want to become

25   BGF?

1    A    Yeah.

2    Q    That's what you mean by bucking, and that you told Will

3    to make an example out of the strongest one?

4    A    Yes.

5    Q    And how did you envision making an example out of that

6    particular individual?

7    A    Kill them.

8    Q    Okay.  As you're having these conversations with Will,

9    did he ever tell you who he was talking to in YGF when he was

10   communicating with them?

11   A    Yeah.

12   Q    Who?

13   A    Geezy.

14   Q    Do you see Geezy in the courtroom today?

15   A    Yes.

16   Q    Could you point him out?  And why don't you pick out an

17   article of clothing he's wearing just so the record is clear.

18   A    Blue polo shirt.

19         MR. O'TOOLE:  No objection.

20         THE COURT:  Record will reflect that the witness has

21   identified the Defendant Johnson.

22         You may continue.

23   Q    (BY MR. MARTINEZ)  Did Will explain to you whether at the

24   time he was having these discussions with Geezy, Geezy had a

25   particular role in YGF?

1   A    No.  He ain't never even go into detail.  He just say

2   that he could handle them.

3   Q    He could what?

4   A    He could handle them.

5   Q    Handle who?

6   A    YGF.

7   Q    Okay.  So Will told you that Geezy said he could handle

8   YGF?

9   A    Yes.

10  Q    Okay.  What do you mean by that, Mr. Gray?

11  A    Meaning that he could get done what I needed to get

12  done.

13  Q    And what was it that you wanted to be done?

14  A    Them to become J.

15  Q    Okay.  Now, you mentioned that you told Will to make an

16  example out of the toughest or strongest person who wouldn't

17  come over; is that right?

18  A    Yes.

19  Q    And you said that Will said he would do it?

20  A    Yes.

21  Q    Did you learn anything further about that instruction

22  that you gave to Will, what became of that instruction?

23  A    Will said somebody end up -- one of them end up getting

24  killed, somebody around there got killed.  Will said that it

25  was done.

Direct Examination - Gray (By Mr. Martinez)

1    Q    So there was a murder?

2    A    Yeah.

3    Q    And where did the murder happen?

4    A    On 22nd and Barclay, on Barclay.

5    Q    And Will told you what about that murder?

6    A    He just said it was done.

7    Q    Okay.  And he was referring back to the instruction you

8    gave, take care --

9    A    Yeah.

10   Q    -- of the strongest person?

11   A    Yeah.

12   Q    All right.  So you told us earlier that you got out of

13   jail on parole in '07; is that right?

14   A    Yes.

15   Q    Now, after you got out of jail, did there ever come a

16   time where you went to the Greenmount neighborhood to talk to

17   people in the neighborhood about YGF?

18   A    Yes.

19   Q    When was that, how soon after you got out of jail?

20   A    I was down Greenmount and Barclay first time that I

21   talked to anybody about it.

22   Q    Okay.  Who did you speak with when you went to -- or the

23   Barclay area to talk about YGF?

24   A    First time, I talked to Stimey.

25   Q    Did there ever come a time where you went to talk to

Direct Examination – Gray (By Mr. Martinez)

1   Geezy about YGF?

2   A    Yes.

3   Q    Okay.  Where did you talk to Geezy, can you remember?

4   A    On Greenmount and Barclay -- no, first time I talked to

5   Geezy was up -- about that was up on 22nd and Barclay.

6   Q    Okay.  Let me show you Government's Exhibit GM 30, do you

7   recognize that location?

8   A    Yes.

9   Q    What do you recognize it to be?

10  A    Where I talked to Geezy.

11  Q    Was anybody else there for this conversation?

12  A    Yeah, Will.

13  Q    All right.  Now, when you and Will and Geezy were in this

14  location having this conversation, what did you talk about?

15  A    About them shutting it down and about the situation about

16  the dude getting killed.

17  Q    Okay.

18  A    About the little dudes -- I asked them to shut it down

19  and I said little dudes running the neighborhood.  Only

20  thing -- like I said, only thing Geezy said was they don't run

21  the neighborhood, then I talked to Will and told him to handle

22  it.

23  Q    All right.  Let's unpack some of that.  You said you were

24  talking about little dudes running the neighborhood, what do

25  you mean by that?

1    A    About YGF running wild in the neighborhood.

2    Q    Okay.  So at this point you're out of prison and you're

3    still concerned that YGF is running wild in the neighborhood.

4    A    Yes.

5    Q    And you go to the Greenmount neighborhood and you go to

6    talk to Geezy about that.

7    A    Yes.

8    Q    All right.  So you just said that Mr. Johnson said they

9    don't run the neighborhood.

10   A    Yes.

11   Q    Was Mr. Johnson still YGF at this point or had he changed

12   his affiliation?

13   A    Will said that he was -- that he was going to make him

14   the C.

15   Q    Okay.  So if Will was going to make him the C, does that

16   mean he was YGF or does it mean he was something else?

17   A    He had to be J.

18   Q    So you mentioned that you and Will set up a BGF regime in

19   Greenmount; right?

20   A    Yes.

21   Q    And that regime included all the positions in the bubble

22   that we just went through?

23   A    Yes.

24   Q    Can you tell us who, as best you can remember, was the

25   first commander or C of the Greenmount Regime?

1   A    Rut.

2   Q    I'm sorry, I didn't hear the answer to that question.

3   A    The first regime was down Greenmount and Barclay.

4   Q    I'm talking about the regime -- and let's see if we can

5   get a map here.

6        Let me ask it this way:  Did there ever come a time where

7   you and Will set up a regime in the territory where YGF had

8   operated?

9   A    Yeah, Will set it up.

10  Q    Okay.  Who was the first C of that regime?

11  A    Geezy.

12  Q    Okay.  Now, after that Greenmount Regime was up and

13  running, did there come a time when you got locked up again?

14  A    Yes.

15  Q    When did you go back to jail?

16  A    In like 2007, 2008.  Yeah, 2007, 2008.

17  Q    And how long was it until you got out back on the street,

18  when did you get out?

19  A    2012.

20  Q    When you got back out of jail, who was running BGF on the

21  streets at the time?

22  A    When I first came home, Donnie was.

23  Q    Did Donnie have a title or role in the gang?

24  A    Yeah, he was the hodari.

25  Q    And what's the hodari?

Direct Examination - Gray (By Mr. Martinez)

1   A    The one who runs the streets.

2   Q    What eventually happened to Donnie?

3   A    He ended up getting federally indicted.

4   Q    When Donnie got federally indicted, who became the

5   hodari?

6   A    Me.

7   Q    So what was the reporting structure as between you as the

8   hodari, or the city-wide commander, and the bushmen who

9   reported to who?

10  A    The bushmen reported to me.

11  Q    And I think you explained earlier that the regimes

12  reported to the bushmen; is that correct?

13  A    Yes.

14  Q    So what was happening in the regimes filtered up to you

15  through the bushmen?

16  A    Yes.

17  Q    I'll show you another exhibit here, this is Government's

18  Exhibit DEM 1.  Mr. Gray, does this fairly capture the

19  hierarchy between the hodari, the bush, and the regimes that

20  you were just talking about?

21  A    Yes.

22  Q    When you became the hodari, were there occasions where

23  you visited the different regimes and neighborhoods around the

24  city from time to time?

25  A    Yes.

1    Q    How would you get around to visit those regimes?

2    A    Either Tim or Will.

3    Q    Who was Tim?

4    A    Dude -- he -- bush member.  Member of BGF, bush member.

5    Q    Okay.  So you would go to neighborhood to neighborhood

6    with him?

7    A    Yes.

8    Q    Who drove?

9    A    Tim.

10    Q    In fact, was Tim your driver?

11    A    Yes.

12    Q    Who's that?

13    A    Tim.

14    Q    For the record, this is Government's Exhibit PHI 89.

15        Mr. Gray, when you would ride around the city with Tim

16    checking in on different regimes, were there ever occasions

17    where you would get money from BGF members in the

18    neighborhood?

19    A    Yes.

20    Q    Why was it that you would just be able to get money from

21    BGF members when you went to visit the neighborhoods?

22    A    Because I asked.

23    Q    And why would they give it to you just because you

24    asked?

25    A    Because we was brothers.  We didn't -- they were members

1    of the BGF.

2    Q    Well, what if --

3    A    Because I was the highest-ranking member of the BGF.

4    Q    Mr. Gray, at that point in time, late 2012, early 2013,

5    were you using drugs?

6    A    Yes.

7    Q    What kind of drugs were you using?

8    A    Heroin, crack.

9    Q    How often were you using them?

10   A    Every day.

11   Q    When you and Tim Hurtt would ride around the city to

12   these neighborhoods checking in on the different regimes, were

13   there ever occasions you got drugs from BGF members to feed

14   your habit?

15   A    Yes.

16   Q    Would you have to pay for those drugs?

17   A    No.

18   Q    Why not?

19   A    Brothers usually give it to me.  I just ask for it, they

20   gave it to me.

21   Q    And again, why would the brothers just give it to you,

22   just because they were nice --

23   A    I was the highest-ranking member.

24   Q    I'm sorry?

25   A    I was the highest-ranking member.

1    Q    Were there ever occasions where you and Tim went together

2    to check on the BGF Greenmount Regime?

3    A    Yes.

4         MR. O'TOOLE:  Objection, Your Honor.

5         THE COURT:  You can approach.

6         (Bench conference on the record.)

7         THE COURT:  The one reaction I have was I never

8    heard the witness refer to Tim Hurtt, only Tim, but that's not

9    your objection.  Go ahead.

10        MR. O'TOOLE:  That's not my objection.  My objection

11   is this is -- with all respect to Mr. Martinez, this is

12   "The Mr. Martinez Show" with an occasional answer from the

13   witness.  And I know what you said before and I understand.  I

14   don't agree with it.  But I think at some point, he's guiding

15   the show too much.  He's telling -- he's putting words in the

16   record and the witness is saying yes or no.

17        THE COURT:  Here's what's an acceptable method of

18   examination for a witness of this sort and what's not:  What

19   is acceptable is for a prosecutor to ask a non-leading

20   question that elicits, whether it's in mumble form, jumbled

21   form, or whatever, but something that indicates that the

22   witness knows the answer to the question, and that then is in

23   the form of an answer to the question.  Once that has occurred

24   to the Court's satisfaction, there's nothing wrong with the

25   prosecutor backing up, and for clarification purposes, then

1    leading the witness only with the answer that the witness just

2    supplied in mumble, jumble form.

3         And to the extent that defense counsel feel that the

4    prosecutor has exceeded the scope of the mumbled, jumbled

5    answer in the first place as the prosecutor begins to back up

6    and lead the witness back through it, I'll entertain the

7    objection for certain.  But I have to say that most of the

8    time in following what Mr. Martinez has been doing here, I

9    have found his method to be acceptable and that it isn't just

10   all the prosecutor testifying, to use the old hackneyed

11   phrase, that he is proceeding in the proper way with an

12   inarticulate witness, which is that he is first eliciting from

13   the witness an answer to the question.  Sometimes he gets

14   three or four pieces of information in the answer, and then he

15   goes back and unpacks it one element at a time.

16        I'm saying this -- I'm laying this out in some

17   detail to explain to counsel what I think is the acceptable

18   procedure and what is not.  It's particularly important now,

19   as I sense that the focus of the inquiry is going to be more

20   on Greenmount.  And it's in that area in particular,

21   Mr. Martinez, where I am instructing you to adhere closely to

22   the procedure that I have outlined.  And while I understand

23   the need for you to back up and tease out what it is that your

24   witness is saying in his answer, before you launch into that

25   process, you're going to have to satisfy me that he -- that

1    the witness has supplied to you the foundational answer from

2    which you can go back and break up, whether it's into segments

3    or whatever, and through your own articulation make more clear

4    what it is the witness is saying.  But it's only making more

5    clear.  It's not supplying your words for his.  That's the

6    subtle difference here.

7         MR. MARTINEZ:  I do my best to keep that subtle

8    difference in mind, Your Honor.  And what I'm trying do is

9    make sure that we take the information this witness has and

10   get it before the jury.  And we're asking him, as you said,

11   open-ended questions, and then when he supplies an answer,

12   we're trying to organize it or come back and ask him to

13   explain --

14        THE COURT:  Okay.  And you're entitled to that and

15   it's a complicated task that you have and no one objected

16   previously.  But I specifically was listening because you know

17   I know the cast of characters and I saw -- heard the reference

18   to Tim.  I saw the picture of Tim.  Then all of a sudden,

19   you're referring to him as Tim Hurtt.  The witness never said

20   that.

21        MR. MARTINEZ:  That was an error, Your Honor.

22        THE COURT:  Okay.  But that's an example of what I'm

23   talking about and I don't think it's a simple task that you

24   have.  He's a difficult witness to examine, even though he's a

25   cooperator.  It has to do with the communication style.  And I

1    don't think that there's anything nefarious going on here in

2    terms of his trying to avoid or dodge or not answer or that

3    the Government is mishandling it in that respect.  It's just a

4    difficult situation.  He's very inarticulate.  So be

5    careful.

6           MR. O'TOOLE:  It's difficult -- if I may respond for

7    a second?

8           THE COURT:  Yeah.

9           MR. O'TOOLE:  It's difficult.  I realize that and I

10   appreciate that.  And I think there's also a situation where

11   we're assuming that it's not -- assuming facts not in

12   evidence.  He assumes that something was -- I can't come up

13   with something specific right now, but Mr. Martinez will

14   assume something happened, so he'll ask him that.  So he's

15   setting up -- he's setting up the wrong tee when he's asking

16   about it and fill it in.

17          THE COURT:  Well, I will listen for that.  I think I

18   have been listening for that.  To this point, no -- nothing

19   improper has occurred as far as the Court's concerned.

20          But Mr. Martinez, particularly as you start to go

21   into this area that now has much greater relevance and

22   sensitivity to what's going on, just make darn sure you're not

23   ahead of your witness.

24          MR. MARTINEZ:  I understand.

25          (The following proceedings were had in open court.)

1          THE COURT:  You may continue.

2    Q    (BY MR. MARTINEZ)  Mr. Gray, just to refresh your memory,

3    you told us a few minutes ago that you and Tim would go around

4    checking in on different regimes from time to time; right?

5    A    Yes.

6    Q    Did you ever go to Greenmount and check in on that

7    regime?

8    A    Yes.

9    Q    Now, you also told us that when you would check in on

10   regimes, sometimes BGF members would give you money because of

11   your rank; right?

12   A    Yes.

13   Q    Did you ever get money like that in Greenmount?

14   A    Yes.

15   Q    And when you got money from BGF members in Greenmount

16   because of your rank, who gave it to you?

17   A    I got money from Geezy.

18   Q    Do you recall how many times Mr. Geezy gave you money?

19   A    Three.

20   Q    Tell us about the first time, can you remember generally

21   where that happened?

22   A    Yeah, first time, I think was on 22nd.

23   Q    22nd, do you know what cross street?

24   A    And Greenmount -- no -- yeah, 22nd and Barclay.

25   Q    22nd and Barclay.  Can you point out on the map -- for

1    the record, this is Government's Exhibit GM 10 -- where the

2    location of that first meeting was?

3    A    Right here (indicating).

4    Q    So this was the first time Geezy gave you money; is that

5    correct, Mr. Gray?

6    A    Yes.

7    Q    Can you recall how much money he gave you?

8    A    Like $20.

9    Q    How about the second time, can you remember generally

10   where that happened?

11   A    Yeah, down on Lanvale.

12   Q    Lanvale and what cross street?

13   A    And Barclay.

14   Q    Could you mark that on the map?  I might need to move it

15   up, I'm sorry.

16   A    (Indicating.)

17   Q    Was anyone else there on that particular occasion?

18   A    Me, him, Stimey, and Mustafa.

19   Q    You mentioned Stimey and Mustafa; is that right?

20   A    Yeah.

21   Q    Let's start with Stimey, who is Stimey?  Is he a member

22   of BGF?

23   A    Yes.

24   Q    What, if any, rank does he have in the gang?

25   A    Bush.

1    Q    Let me show you Government's Exhibit PHI 81.  Do you

2    recognize that person?

3    A    Yes.

4    Q    Who is it?

5    A    Stimey.

6    Q    Now, you were explaining earlier that bush members have

7    oversight over regimes; is that correct?

8    A    Yes.

9    Q    What, if any, over -- what, if any, regimes did Stimey

10   have oversight as a bush member?

11   A    Greenmount and Barclay, 22nd and Barclay.

12   Q    All right.  Now, you mentioned that Mustafa was also

13   there, was he in BGF?

14   A    Yes.

15   Q    Was he in the bush?

16   A    No.

17   Q    Okay.  Who are we looking at here?  This is Government's

18   Exhibit PHI 29.

19   A    Mustafa.

20   Q    Okay.  So the three of you are hanging out at Lanvale and

21   Barclay, and I understand you to say that Geezy gave you money

22   on that occasion too; is that right?

23   A    Yeah.

24   Q    And how much money did he give you on that second

25   occasion?

Direct Examination - Gray (By Mr. Martinez)

1    A    $20 and two pills of crack.

2    Q    Two pills of crack.

3    A    Uh-huh.

4    Q    Why did he give you that crack?

5    A    Because I asked for it.

6    Q    Did you have to pay for it?

7    A    No.

8    Q    Why not?

9    A    Because we was all right.

10   Q    I'm sorry?

11   A    We was all right.

12   Q    How about on that first time on Greenmount -- Barclay and

13   22nd, rather, did you get any drugs on that occasion?

14   A    Yeah.

15   Q    What kind of drugs did you get?

16   A    Crack.

17   Q    All right.  And those were from -- who did you get those

18   drugs from?

19   A    Geezy.

20   Q    Now, was there a third time where you also got money from

21   Geezy?

22   A    Yeah, $40.  We was down on the same spot, Greenmount and

23   22nd -- I mean, Lanvale and Barclay.

24   Q    All right.  So just to make sure I have it straight:  One

25   time where it's drugs and money at Greenmount -- or Barclay

1    and 22nd, one time where it's drugs and money at Lanvale and

2    Barclay, and the third time where it's just money at Lanvale

3    and Barclay; is that right?

4    A    Yeah.

5    Q    Mr. Gray, during this time period when you and Tim were

6    checking in on the Greenmount Regime, did you ever come to

7    learn whether or not there were BGF drug shops in the

8    neighborhood?

9           THE COURT:  Whether there were?

10           MR. MARTINEZ:  BGF drug shops.

11           THE WITNESS:  Yes.

12    Q    (BY MR. MARTINEZ)  Did you come to learn who was in

13    charge of those drug shops?

14    A    Yes.

15    Q    Who was that?

16    A    Geezy.

17    Q    In your recollection, Mr. Gray, could you tell us who,

18    during this 2013 time frame, who was the biggest BGF drug

19    dealer in Greenmount?

20           MR. O'TOOLE:  Objection, Your Honor.

21           THE WITNESS:  Excuse me?

22           THE COURT:  Let's stop for a second.  Objection.

23           MR. O'TOOLE:  Objection.

24           THE COURT:  Overruled.  If he knows.

25    Q    (BY MR. MARTINEZ)  Let me rephrase it.  During the 2013

1    time frame can you tell us whether -- can you tell us who ran

2    BGF's drug operation in Greenmount?

3    A    Geezy.

4    Q    I want to switch gears for a moment.  You just told us

5    about a BGF member, a bush member named Stimey; right?

6    A    Yes.

7    Q    And you previously identified PHI 81 as his picture;

8    correct?

9    A    Yes.

10   Q    Now, I want to direct your attention to early 2013

11   shortly after you came out of prison.  Did there come a time

12   where Stimey asked you to go to a meeting with him?

13   A    Yes.

14   Q    Did he explain who he wanted you to meet with?

15   A    Yes.

16   Q    Who was that?

17   A    He wanted me to meet Geezy, Dorsey, and Taz.

18   Q    Did he explain where he wanted you to meet him?

19   A    Yeah, down at Taz's mother's house.

20   Q    Let's talk about some of those people who haven't been

21   mentioned yet and we'll start with Taz.  Who is Taz?

22   A    Bush member.

23   Q    So he's in BGF?

24   A    Yes.

25   Q    What part of the city is he from?

Direct Examination - Gray (By Mr. Martinez)

1    A    East.

2    Q    Does he have oversight over particular regimes or

3    neighborhoods in the city?

4    A    Belnord.

5    Q    Belnord, you said?

6    A    Yes.

7    Q    I'm going to show you Government's Exhibit PHI 91.

8    A    Taz.

9         THE COURT:  Wait for the question.

10   Q    (BY MR. MARTINEZ)  Do you recognize this individual?

11   A    Yes.

12   Q    You mentioned there was also -- Stimey also wanted you to

13   meet with a individual named Dorsey; is that correct?

14   A    Yes.

15   Q    Now, who was Dorsey, was he also in BGF?

16   A    Yes.

17   Q    What was his rank in the gang?

18   A    Bush.

19   Q    What part of the city was he from?

20   A    East.

21   Q    I'm showing you Government's Exhibit PHI 88, do you

22   recognize that person?

23   A    Yes.

24   Q    Who is that?

25   A    Dorsey.

1  Q    So this meeting that Stimey proposed at Taz's mom's
2  house, did you go?
3  A    Yes.
4  Q    And were the people that he described, Geezy, Taz and
5  Dorsey, were they there?
6  A    Yes.
7  Q    When you got there, did you learn why the meeting had
8  been called?
9  A    Yeah, somebody shot Geezy.
10 Q    Did you learn who shot Geezy?
11 A    Somebody named Porky.
12 Q    Did you know who Porky was?
13 A    No.
14 Q    Were you told whether Porky was in BGF?
15 A    No.
16 Q    What, if any, information were you given about how Porky
17 had come to shoot Geezy?
18 A    I know he got shot in the house on North Avenue.
19 Q    And what, if anything, did the group who was at Taz's
20 house -- Taz's mother's house, decide to do about the fact
21 that Geezy had been shot by Porky, how was that situation
22 handled?
23 A    Stimey did the most of the talking and then he --
24         THE COURT:  Could you repeat that answer, please?
25         THE WITNESS:  Stimey did most of the talking at the

1  meeting and at -- the end result said that Porky had to get

2  dealt with and Geezy said he would take care of it hisself.

3  Q    (BY MR. MARTINEZ)  Let's unpack some of that answer.  You

4  said the end result was Stimey saying that Porky had to get

5  dealt with.

6  A    Yeah.

7  Q    And I want you to ask the -- I want to ask you to tell

8  the ladies and gentlemen of the jury what your understanding

9  of that was.

10  A    That he had to get dealt with, either they were going to

11  shoot him -- either we was going to shoot him back or we were

12  going to kill him.

13  Q    So he was going to be shot or killed was your

14  understanding?

15  A    Yes.

16  Q    Okay.  And so then you just said Mr. Johnson responded?

17  A    He would do it himself.

18  Q    Thank you.  I want to show you one page from what's been

19  marked as Government's Exhibit SM 9.

20        MR. BUSSARD:  Can I have that number again, please?

21        MR. MARTINEZ:  SM-9.

22        THE COURT:  Let's get -- it's confusing.  Can you

23  get the other one off the screen?

24        MR. MARTINEZ:  Sorry.

25  Q    (BY MR. MARTINEZ)  Who's in the back between the young

1    women on the steps there, Mr. Gray?

2    A    Dorsey.

3    Q    Dorsey, and then who's in the front?

4    A    Geezy.

5    Q    I want to change gears again.  Have you ever heard of an

6    individual named Digga or who goes by the street name Digga?

7    A    Yeah.

8    Q    Can you tell us whether Digga was a member of BGF?

9              MR. FRANCOMANO:  Objection.

10             THE COURT:  Sustained.  Foundation.

11   Q    (BY MR. MARTINEZ)  You said you were familiar with --

12             THE COURT:  Ladies and gentlemen, there are a lot of

13   different reasons why a lawyer might object to the offering of

14   evidence.  In ruling on those objections, I'm enforcing

15   something called the Federal Rules of Evidence.  It's a

16   complicated book.  I could show it to you up here, it's about

17   this thick.  You don't have to learn the whole volume, I can

18   assure you.

19             But one of the requirements that we have is that a

20   question be premised on a proper foundation.  In other words,

21   there has to be proof from the witness that they have a basis

22   for their knowledge.  So when a lawyer objects and says lack

23   of foundation, they're contending that under the rules of

24   evidence, there hasn't yet been a sufficient showing as to how

25   or why the witness would know the answer to that question.

Direct Examination - Gray (By Mr. Martinez)

1    Just like a house, you've got to build the foundation first,

2    then you can build the rest of the house.  Foundational

3    principle.

4              Now, having given you that explanation, it's really

5    not for you to decide at all.  That's a gatekeeping

6    responsibility that the judge has.  But we're going to be

7    living with each other for some time here and you're going to

8    hear things like that expressed in open court and you're

9    entitled to know what that means.  And I'll explain a few more

10   concepts to you as we go along the way.

11             The objection was lack of foundation.  Sustained.

12   What does it mean when the judge says sustained?  That means

13   that the judge found that the objection was a sound one and

14   ruled in favor of the party objecting.  What does it mean when

15   the judge says overruled?  That means the judge is ruling

16   against the person or the lawyer who is making the objection

17   and that the question was deemed to be proper.

18             Okay.  So the last objection was sustained.  But now

19   Mr. Martinez will be given the opportunity to rephrase or

20   reframe his question, see if he can elicit whatever

21   information he's seeking in a way that's compliant with the

22   rules.

23             You may proceed, Mr. Martinez.

24   Q   (BY MR. MARTINEZ)  So Mr. Gray, you had told us that you

25   are familiar with an individual named Digga; is that

Direct Examination - Gray (By Mr. Martinez)

1    correct?

2    A    Yes.

3    Q    And how is it that you became familiar with an individual

4    named Digga?

5    A    Just name.

6    Q    And what were you -- what do you recall learning about

7    the name Digga or the individual named Digga?

8    A    Before I ended up seeing him, I used to just hear his

9    name a lot.

10   Q    And from whom would you hear his name?

11   A    Dude -- other bush members.

12   Q    And what would the other bush members tell you about

13   Digga?

14            MR. FRANCOMANO:  Objection.

15            THE COURT:  Sustained.  It's -- but it's

16   foundational.

17   Q    (BY MR. MARTINEZ)  So Mr. Gray, you mentioned earlier

18   that as of 2013, you were the city-wide commander of BGF on

19   the streets; correct?

20   A    Yes.

21   Q    And you told the ladies and gentlemen of the jury that

22   bush members would report to you as part of BGF's street-wide

23   operations; is that correct?

24   A    Yes.

25   Q    And so then in turn, the bush members would receive

1    reports from the regimes about what was happening there?

2    A    Yes.

3    Q    So to the extent that you got information from members of

4    the bush, was that in connection with the ongoing conspiracy

5    to operate BGF on Baltimore streets?

6    A    Yes.

7    Q    So now, returning to where we were before, you said that

8    bush members would come to you with information about Digga?

9    A    Yes.

10   Q    What would they tell you?

11              MR. FRANCOMANO:  Objection.

12              THE COURT:  Overruled.

13              THE WITNESS:  Just that he was into a whole lot of

14   different stuff.

15   Q    (BY MR. MARTINEZ)  What kind of different stuff?

16   A    Digga just kept coming up in miscellaneous stuff.  He did

17   this and he did that.  They didn't ever -- you know, sometimes

18   dudes be just griping, sometimes dudes don't like somebody.  I

19   mean, if they just -- they never say that he did this or he

20   did that.  They just said man, he stay in shit.

21   Q    He stay in shit?

22   A    Yeah.

23   Q    Could you explain that a little more for the jury,

24   please?

25   A    That, you know, like a mischievous child.

Direct Examination – Gray (By Mr. Martinez)

1    Q    Okay.

2    A    That's always into something.

3    Q    Did the bush members ever indicate to you whether or not

4    Digga was in J, was he BGF?

5              MR. FRANCOMANO:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    Q    (BY MR. MARTINEZ)  Yes, they did or yes, he was?

9    A    Yes.

10   Q    Did they indicate to you whether or not he was affiliated

11   with a particular regime in a particular neighborhood?

12   A    Yeah.  I thought he was part of two regimes though.

13   Q    Which two?

14   A    Greenmount and Barclay and 22nd and Barclay.

15   Q    Okay.  Do you see Digga in the courtroom today?

16   A    Yes.

17   Q    Can you identify him?

18   A    Yes.

19   Q    Would you point him out for the ladies and gentlemen of

20   the jury --

21   A    Sitting in the back.  He's sitting in the back, white

22   shirt.

23   Q    There's a bunch of people sitting in the back.  Could you

24   point out --

25   A    White shirt.

1    Q    -- an article of clothing he's wearing?

2    A    White shirt and glasses.

3         THE COURT:  Did you say white shirt and glasses?

4         THE WITNESS:  Yes.

5         THE COURT:  Anything else you can identify in terms

6    of his attire, his clothing?

7         THE WITNESS:  He's sitting beside his lawyer.  I

8    can't see through the computer.

9         THE COURT:  The record will reflect that the witness

10   has identified Mr. McCants.

11        You may continue.

12   Q    (BY MR. MARTINEZ)  Mr. Gray, we showed you one tattoo

13   earlier.  Do you remember that?

14   A    Yes.

15   Q    After all your years in BGF, can you recognize a BGF

16   tattoo when you see one?

17   A    Yes.

18   Q    All right.  I'm going to show you a few pictures first,

19   but with the Court's indulgence I want to make sure I have the

20   right exhibit numbers.

21        THE COURT:  Show them to counsel.

22   Q    (BY MR. MARTINEZ)  I'll start with PHT 11, Mr. Gray.

23   First, who are we looking at in this picture?

24   A    Digga.  Digga.

25        THE COURT:  Where does it say PHT 11 on that

1    document?  It should have a label on it.

2              MR. MARTINEZ:  Sorry, Your Honor.  Ms. Hoffman

3    handed me stickers and I just didn't put it on.

4    Q    (BY MR. MARTINEZ)  Now I'm marking PHT 12.

5         I want to zoom in and direct your attention here, can you

6    see the numbers above the pen there?

7    A    Yeah.  Yes.

8    Q    What are those numbers?

9    A    276.

10   Q    What do those numbers mean to you?

11   A    The second letter, the seventh letter, and the sixth

12   letter of the alphabet.

13   Q    And what are those letters?

14   A    BGF.

15   Q    How about the face here, who's that?

16   A    George Jackson.

17   Q    And so his name here, that name goes with the face; is

18   that correct?

19   A    Yes.

20   Q    How about the gorilla, what, if any, significance does

21   that have to you?

22   A    Black gorilla, but it's like dudes got the wrong

23   perception of it because guerilla was -- the guerilla that

24   you're talking about in BGF is an urban warrior.

25   Q    Have you ever seen a black gorilla used as a BGF

Direct Examination - Gray (By Mr. Martinez)

1   tattoo?

2   A    Yes.

3   Q    I'll show you now what I'm marking as PHT 13, can you

4   read those numbers at the top?

5   A    276.

6   Q    And underneath this image here, what is that?

7   A    A dragon.

8   Q    And did you explain to the jury earlier that a dragon is

9   an image associated with BGF?

10  A    Yeah.

11  Q    What's the connection between a dragon and BGF?

12  A    Because the original BGF tattoo is a dragon snatching a

13  guard out of a prison tower.

14  Q    So can you tell us whether or not you recognize this

15  tattoo to be associated with BGF?

16  A    Yes.

17  Q    Yes, it is?

18  A    Yes.

19  Q    Mr. Gray, I have a few more questions for you before I

20  wrap up.

21       You told the jury earlier that you testified previously

22  in a federal case; is that right?

23  A    Yes.

24  Q    And before you testified in that case, did you meet with

25  agents and prosecutors to prepare for your testimony?

1    A    Yes.

2    Q    Do you recall providing them a letter during one of those

3    prep meetings?

4    A    Yes.

5    Q    Before I show it to you, could you explain what you were

6    doing in sending that letter?

7    A    Trying to get out of testifying.

8    Q    Why did you want to get out of testifying?

9    A    Because I got cold feet.

10   Q    Why did you get cold feet?

11   A    Because I was scared.

12   Q    Why were you scared?

13   A    Because I was going to -- I thought I was going to die.

14   Q    Why did you think you were going to die?

15   A    Because I took a oath that said I was going to die.

16   Q    And why did you think you were going to die if you broke

17   the oath?

18   A    Because that's what I agreed to do.

19         MR. MARTINEZ:  So I'm just going to mark this for

20   identification only -- actually, I need to get a number for

21   this.

22         THE COURT:  If it's marked for identification only,

23   then don't display it.  And it's marked for identification

24   only as?

25         MR. MARTINEZ:  As --

 1          THE COURT:  Exhibit number?

 2          MR. MARTINEZ:  GP 13, your Honor.

 3          THE COURT:  GP 13 for identification only.  Mark

 4   it.

 5   Q    (BY MR. MARTINEZ)  Do you recognize this document,

 6   Mr. Gray?

 7   A    Yes.

 8   Q    Do you see in the middle here where it says, "Anything

 9   would have told you that I am not, nor ever was, the leader of

10   BGF"?

11   A    Yes.

12   Q    What were -- what were you trying to say there to the

13   prosecutor in the other case?

14   A    That I wasn't the leader of the BGF.

15   Q    Who was the leader of BGF?

16          MR. O'TOOLE:  Objection, Your Honor.  May we

17   approach, please?

18          THE COURT:  Yes.

19          (Bench conference on the record.)

20          THE COURT:  Objection.

21          MR. O'TOOLE:  First of all, I think he's reading

22   from the document that's not an exhibit.

23          THE COURT:  Yes, well, let's not do that.

24          MR. O'TOOLE:  Number one.  Number two --

25          THE COURT:  How come it's not just coming into

1    evidence?

2            MR. MARTINEZ:  I can put it into evidence, that's

3    fine.  We will.

4            THE COURT:  Any objection?

5            MR. O'TOOLE:  No.

6            THE COURT:  That solves it.

7            MR. O'TOOLE:  No, it doesn't.

8            THE COURT:  That solves problem number one.  What is

9    problem number two?

10           MR. O'TOOLE:  The big problem with two is the last

11   trial he remembers was -- was mispurpose whether it was the --

12   but it was to whom, was it to himself.  Mr. Martinez just

13   said, "Did you write a letter to the prosecutor?"  That's just

14   in bad faith.  That's a big question he established too and he

15   just said -- he just said, "Did you write a letter to the

16   prosecutor?"

17           THE COURT:  Is that an open question?

18           MR. O'TOOLE:  I think it is.

19           MR. MARTINEZ:  I didn't think it was.  We disclosed

20   the *Jencks* material from the prior case where he said, "I gave

21   this to the prosecutor" --

22           THE COURT:  Keep your voice down.

23           MR. MARTINEZ:  I gave this to the government during

24   a trial prep meeting, and so I emphatically reject the idea

25   that it's bad faith. --

1            THE COURT:  Keep your voice down.

2            MR. MARTINEZ:  I thought we were all using the --

3    we're all working from the same universe of information.  I

4    didn't understand it to be an open question.

5            THE COURT:  Hold on a second.  It's time for the

6    afternoon break anyway.  We'll continue in a second.

7            (The following proceedings were had in open court.)

8            THE COURT:  Ladies and gentlemen, we'll take our

9    afternoon recess.  During this recess do not discuss the case

10   with anyone.  Don't discuss it even among yourselves.  Do not

11   allow yourselves to be exposed to any news articles or reports

12   that touch upon the case or the issues it presents or any

13   articles or reports that relate to any of the participants in

14   the case.  Avoid all contact with any of the participants in

15   the trial.  Do not make any independent investigation of the

16   law or the facts of the case.  Do not look up anything on the

17   Internet.  Do not consult an encyclopedia or a dictionary.

18            We'll take a 20-minute break because we have some

19   matters to take up outside of your hearing, so we will resume

20   at 5 minutes before 4:00 o'clock, 3:55.  You're on recess

21   until then.

22            Please take the jury out.

23            (Jury left the courtroom.)

24            THE COURT:  Be seated, please.  All right.  The jury

25   is out of the courtroom, as is the witness.  The matter before

1    the Court is the admissibility of Exhibit GP 13, which I

2    understand the government offers at this time.

3            MR. MARTINEZ:  We will, Your Honor.

4            THE COURT:  And I understand that Defendant Johnson

5    objects to its admission, among other things; is that correct,

6    Mr. --

7            MR. O'TOOLE:  No, we don't object.

8            THE COURT:  You don't object to the --

9            MR. O'TOOLE:  No, we want it.

10            THE COURT:  Okay.  GP 13 is received.  Was there

11    another objection pending?

12            MR. O'TOOLE:  There was.

13            THE COURT:  Ms. Powell, you'll take custody of this

14    until the break is completed.

15            And what was the additional concern, Mr. O'Toole?

16            MR. O'TOOLE:  The concern was that in the previous

17    trial, the Bazemore case, where this letter was prominently

18    discussed both -- it was a little bit in direct, but also a

19    lot in cross-examination by Mr. Solomon and perhaps others.

20    The question, among others, was where did this letter -- or

21    where was it intended to be going?  Who were you sending it

22    to?  Who were you writing it for?  Why did you write it?  And

23    it went on, you might remember, quite a while.  And it never

24    was resolved, never was resolved.

25            THE COURT:  Was the letter admitted in that trial?

1         MR. O'TOOLE:  It was.

2         THE COURT:  Okay.

3         MR. O'TOOLE:  It was.  And it was discovered in a

4    patdown.  They found the letter.  It wasn't sent, it wasn't

5    given to anybody.  It was found in his pocket.  He was patted

6    down, they found the letter, it was turned over to somebody

7    else, then they ended up discussing it.

8         But a big question was whose -- who was this letter

9    for?  Why did you write it?  And that's when Mr. Solomon went

10   through every line of the letter trying to figure it out and

11   it never got resolved.

12        THE COURT:  Well, first of all, does the government

13   accept Mr. O'Toole's proffer that the letter was found, what's

14   implicit is, in the witness's possession?

15        MR. O'TOOLE:  Right.  It was his letter.  I don't

16   think there's any question about that.

17        THE COURT:  Do you accept that?

18        MR. MARTINEZ:  It was found in his possession, I

19   think, and the timing was at a trial prep session where he was

20   meeting with agents and prosecutors.  If I remember right from

21   Mr. Wallner's direct exam, he did say something to the effect

22   of "did you give this letter to the government."  And so that

23   was the universe of information I was working with.  That was

24   my understanding how that information came into the

25   government's possession.

1          THE COURT:  Well, it occurs to me that during the

2    break you might want to get straight with Mr. Wallner, who I

3    saw in the courtroom a few minutes ago, the question of what

4    the government's position is globally on whether the letter

5    was, in fact, delivered or whether it was simply discovered

6    during this search.  Because I do think that your question

7    before the break included the express statement that either

8    said or implied that the letter had been sent to the

9    prosecutor.  First of all, is that correct, is that how you

10   phrased it?

11         MR. MARTINEZ:  I think the exact phrasing was "did

12   you give it to the prosecutor."

13         THE COURT:  Yes, implying that he had.

14         MR. MARTINEZ:  Right.  And that was my

15   understanding, but I --

16         THE COURT:  That may well be your understanding, but

17   it may also be incorrect.  And that's the sort of thing that

18   you need to get straightened out because Mr. O'Toole is

19   objecting to that and that's why he made a rather sharp attack

20   on you at the bench conference, which was a little sharp, but

21   you might have deserved it, depending on what the facts are.

22   I don't really know what they are yet, so let's get that

23   sorted out first.

24         Then, what is the significance of whether or not he

25   gave it to the prosecutor or not?

1          MR. O'TOOLE:  I don't think the verb was "gave."  I

2     think the verb was "sent."  I think the purpose was to whom

3     was the letter -- or for whom was the letter intended.  And

4     depending on who it was intended depends on whether he was

5     saying, like he did today, I'm trying to get out of

6     testifying, I'm trying to do this, I'm trying to do that.

7          THE COURT:  I get it, but I don't understand the

8     global significance of it to you.  I mean, it seems to me that

9     if he actually sent it to the prosecutor, which he may not

10    have, it's even better for you.

11         MR. O'TOOLE:  Well, he said it in the letters.  I

12    don't know what he said to the prosecutors in terms of whether

13    he was a leader of BGF or not.  Here, he's told us he was the

14    highest person in the city in BGF --

15         THE COURT:  In his testimony here in court.

16         MR. O'TOOLE:  Yeah.

17         THE COURT:  And you contend the letter is a

18    recantation of that.

19         MR. O'TOOLE:  Yeah.  And the letter says, "I wasn't

20    and never was a leader in BGF."

21         THE COURT:  That's right.  So why wouldn't it be

22    better for you if he actually did send it to the prosecutor,

23    which might be an overstatement of what occurred?  But if

24    Mr. Martinez is guilty of overstatement, isn't it more in the

25    nature of scoring an own goal as opposed to putting one in

1    your net?

2          MR. O'TOOLE:  Because I think the difference is it

3    was a letter for a purpose.  He was trying -- he wasn't

4    recanting that he was, in fact, the leader of the BGF.  He was

5    just saying, I'm going to say some words to get out of

6    testifying.  So in the letter it says, "I am not and never was

7    a leader in BGF."  That means that he's lying about the

8    content and the import of his existence.

9          THE COURT:  Maybe so, but why does it matter whether

10   it was -- why is it his having -- why is Mr. Martinez having

11   said "you sent this to the prosecutor," and if that's a

12   misstatement, why is that harmful to your client?  If

13   anything, it seems to me it helps your client.

14         MR. O'TOOLE:  Court's indulgence for a second.

15         (Pause in the proceedings.)

16         MR. O'TOOLE:  I'm reminded in the colloquy back and

17   forth with Mr. Solomon he said, "I wasn't writing it to

18   anybody, I was writing to myself."  And there's only --

19         THE COURT:  He's only recanting to himself as

20   opposed to recanting to the government.  That would seem to be

21   of less significance -- less helpful to you.

22         MR. O'TOOLE:  Whether it's helpful or not, I think,

23   is a position that I think that we're taking, that in the

24   letter he was saying truthfully to himself "I am not, nor was

25   I ever, a leader in BGF."  And the point is that he's either

1    lying now or then.  And of course, we'll go into that.

2    But --

3            THE COURT:  Were you lying to a prosecutor or were

4    you just lying to yourself?

5            MR. O'TOOLE:  He probably wouldn't lie to himself.

6    You probably don't lie to yourself in writing.  When I lie to

7    myself, I just say it quietly.

8            THE COURT:  You're snatching defeat from the jaws of

9    victory.  Mr. Martinez is -- by your recount of the facts, has

10    stumbled and said something about the letter that is more than

11    is true.

12            MR. O'TOOLE:  I'm not looking to fall.  All I'm

13    looking to do is have the truth come out the way the testimony

14    really came out.

15            THE COURT:  Well, I'm just looking to have the truth

16    come out, period.  So what we'll do is allow the government

17    during the break to try to sort this issue out, then we'll

18    hear from the government before the jury is brought back in as

19    to what the government's position is with respect to whether

20    or not the letter was sent or not sent or maybe you don't

21    know.  Maybe you're just going to have to ask the witness and

22    you need to pull back any characterization or suggestion that

23    you made previously about what happened with the letter and

24    ask the witness what happened with it.

25            MR. MARTINEZ:  Understand.

1          THE COURT:  And Mr. O'Toole will have his

2     opportunity to cross-examine.  I promise you, that time is

3     coming.  It will happen.

4          MR. O'TOOLE:  I think whatever the facts develop, I

5     think my comment that it was in bad faith, I take back, and I

6     apologize to Mr. Martinez.

7          THE COURT:  I appreciate that.  And that's in the

8     spirit of how this bar should work with each other even though

9     you are adversaries.

10          So we will leave for the break on a positive note.

11     The defendants are remanded.  We'll reconvene at 5 minutes

12     before 4:00.

13          MR. O'TOOLE:  Your Honor, what time is the Court

14     going to leave today, 4:30?

15          THE COURT:  4:30.  We're only going to go until

16     4:30, may stretch it to 4:35.  But I've got to tuck something

17     in between 4:30 and 5:00 o'clock when I have to give a talk

18     somewhere else.

19          MR. O'TOOLE:  Would the Court consider doing

20     cross-examination beginning in the morning?

21          THE COURT:  Let's see where we are.  How close are

22     we to the end of the direct?

23          MR. MARTINEZ:  Within five or ten minutes.  I'm

24     wrapping up.

25          THE COURT:  We'll see where we are, Mr. O'Toole.

1    I'm not promising that.

2            MR. O'TOOLE:  That's good.  Thank you.

3            (A recess was taken.)

4            THE COURT:  Bring the jury in.  Oh, before you do,

5    do we have an answer to our question?

6            MR. MARTINEZ:  We do, Your Honor, and it's a little

7    complicated.  I talked to Mr. Wallner.  Mr. Wallner remembered

8    that Mr. Gray gave the letter to one of the case agents as he

9    was being transported from Talbot County -- from the detention

10   center where he was being held for an interview.  And then I

11   double checked with the case agent, and the case agent said

12   no, when we pulled him out and we were putting him in the van,

13   we found it on his person, but then it emerged during a

14   meeting that that was -- he wanted to give it to us, and he

15   was planning to give it to us at that meeting.

16            So I think the way I would propose clarifying the

17   record on this when he comes back and the jury's here, the

18   first question would be, Mr. Gray, let's talk about that

19   letter, to whom was it addressed or who was the audience for

20   that letter, and just go from there.

21            THE COURT:  Who did you intend to receive it?

22            MR. MARTINEZ:  Yes.

23            THE COURT:  All right.  Mr. O'Toole.

24            MR. O'TOOLE:  Your Honor, we'll just cross-examine

25   him.

1           THE COURT:  Sorry?

2           MR. O'TOOLE:  We'll just cross-examine him on that

3     issue.

4           THE COURT:  Of course you will.

5           MR. O'TOOLE:  Right.  So that's just the issue.  So

6     at least now we know it's not being introduced as fait

7     d'accompli.

8           THE COURT:  I think we have a satisfactory

9     resolution to that contretemps and we will proceed

10    accordingly.

11          Bring the jury in.

12          (Jury entered the courtroom.)

13          THE COURT:  Be seated, please.

14          Mr. Martinez, you may continue your direct

15    examination of Mr. Gray.

16          MR. MARTINEZ:  Thank you, Your Honor.

17    Q    (BY MR. MARTINEZ)  Mr. Gray, before the break we were

18    discussing the letter that we marked here as

19    Government's Exhibit GP 13, do you remember that discussion?

20    A    Yes.

21    Q    I want to circle back to a question I asked you earlier

22    and just rephrase it:  Who was the audience for this letter,

23    to whom were you sending it or writing it?

24    A    The prosecutor.

25    Q    Okay.  And before we ended and took our break, I was

1    directing your attention to a couple lines:  "Anything would

2    have told you that I'm not, nor was ever, the leader of BGF."

3    What were you saying here, Mr. Gray?

4    A    That I wasn't the leader.

5    Q    Who was the leader at this time?

6    A    Kevbo.

7    Q    And what was Kevbo's title within the gang?

8    A    Gyedi.

9    Q    How is the Gyedi different -- well, what was your

10   title?

11   A    Hodari.

12   Q    And so the hodari, you said earlier, was the city-wide

13   commander; is that correct?

14   A    Yes.

15   Q    What is the Gyedi?

16   A    The head of J, the head of Jamaa.

17   Q    The head of all of the BGF?

18   A    Yes.

19   Q    So does the Gyedi outrank the hodari?

20   A    Yes.

21   Q    Does the Gyedi have to be in prison or can he be on the

22   streets?

23   A    Prison.

24   Q    How about this next sentence, "I copped out to some shit

25   I didn't do.  It's going to come out when I have to tell the

1    truth," what were you talking about there, Mr. Gray?

2    A    In my plea agreement it said I actually killed somebody

3    and I didn't.

4    Q    So are you saying --

5    A    They said that I told somebody to kill somebody and I

6    didn't.

7    Q    Okay.  So are you telling the ladies and gentlemen of the

8    jury that at the time you wrote this letter there was a

9    mistake in your plea agreement?

10   A    Yes.

11   Q    Can you tell us whether or not that mistake was

12   corrected?

13   A    Yes.

14   Q    When was it corrected, if you remember?

15   A    The day that we discussed this letter, at my trial.

16   Q    At your trial?

17   A    Yes.

18   Q    So is that when you testified in the previous trial under

19   your cooperation agreement, is that what you're talking

20   about?

21   A    Yes.

22   Q    Okay.  Once that mistake in your plea agreement was

23   corrected, was this statement that you "copped out to shit you

24   didn't do," was that true anymore?

25   A    No.

1   Q    Did you go ahead and testify in that -- well, you

2   mentioned earlier that you sent this letter because you wanted

3   to get out of testifying; is that correct?

4   A    Yes.

5   Q    Did you go ahead and testify in that --

6           MR. O'TOOLE:  Objection, Your Honor.

7   Mischaracterization of the word "sent."

8           THE COURT:  Overruled.

9   Q    (BY MR. MARTINEZ)  Mr. Gray, you put this letter together

10  and you said earlier that the intent behind it was that you

11  wanted to get out of testifying; is that right?

12  A    Yes.

13  Q    Did you go ahead and testify?

14  A    Yes.

15  Q    Did you testify truthfully?

16  A    Yes.

17  Q    All right.  I want to circle back before we finish the

18  one topic that we addressed before, and we were talking

19  about -- do you remember talking about the MOJ and the

20  different sanctions that can be imposed?

21  A    Yes.

22  Q    And do you remember explaining to the jury that there

23  were three different kinds of sanctions?

24  A    Yes.

25  Q    Could you refresh our memory as to those three?

1    A    Fines, beatdowns, and death.

2    Q    And I was asking you some questions, remember, about, you

3    know, who could order a sanction of death and this and that;

4    right?

5    A    Yes.

6    Q    So I just want to make clear, sanctions are -- are those

7    within the gang or sanctions -- can those also be imposed on

8    people outside the gang?

9    A    Sanctions are for people within the gang.

10   Q    So only within J?

11   A    Yes.

12   Q    And so that whole chain of command that we were

13   discussing in terms of who can order which sanction, that only

14   applies to things that are ordered against BGF members; is

15   that correct?

16   A    Yes.

17              MR. MARTINEZ:  Just a moment, Your Honor.

18              Those are all the questions we have.

19              THE COURT:  Cross-examination, Mr. O'Toole.

20                        CROSS-EXAMINATION

21   BY MR. O'TOOLE:

22   Q    Mr. Gray, good afternoon.

23   A    Good afternoon.

24   Q    Mr. Gray, my name is Jeffrey O'Toole, and along with Paul

25   Enzinna, represent Mr. Gerald Johnson.  I'm going to ask you

Cross-examination – Gray (By Mr. O'Toole)

1  some questions.  Is that all right?

2  A    Yes.

3  Q    All right.  When you introduced yourself today, first

4  thing you said -- you remember what you called yourself, what

5  was your name?

6  A    Timothy Gray.

7  Q    Do you remember testifying in the trial we just talked

8  about previously, how did you introduce yourself in that

9  trial?

10 A    Timothy Gray.

11 Q    Are you sure you didn't introduce yourself as

12 Michael Gray?

13 A    Timothy Michael Gray, that's my name.

14 Q    All right.  But you didn't introduce yourself as Timothy

15 Michael Gray, you introduced yourself as Michael Gray;

16 correct?

17 A    I don't recall.

18 Q    All right.  You told Mr. Martinez that you call yourself

19 a number of things:  MG, Uncle Mike, Michael Gray,

20 Timothy Gray; is that right?

21 A    Yes.

22 Q    Is the reason you use so many different names is to hide

23 who you really are?

24 A    No.

25 Q    All right.  Have you ever used the name Michael Parker?

Cross-examination – Gray (By Mr. O'Toole)

1   A    Yes.

2   Q    Is Michael Parker one of your real names?

3   A    No, that's my family name.

4   Q    All right.  Isn't it true you use different names to try

5   to avoid sanctions, to try to avoid sanctions when you get

6   locked up?

7   A    No.

8   Q    Isn't it true that when you testified last time you said,

9   "I use different names when I get locked up," do you remember

10   that?

11   A    No, because I only used a different name one time when I

12   got locked up.

13   Q    But you did use a different name for the purpose of

14   hiding who you really were; correct?

15   A    If I used a different name, yes.

16   Q    So your answer is yes?

17   A    Yes.

18   Q    Okay.  You told Mr. Martinez about some of your

19   convictions.  I'd like to go back and look at those and try to

20   figure out, is it true your first conviction was in 1986, a

21   conviction for robbery with a deadly weapon?

22   A    Yes.

23   Q    All right.  And what was your -- in that case you were

24   how old?

25   A    17.

1   Q    17.

2   A    18.

3   Q    18, that was your first conviction?

4   A    Yes.

5   Q    All right.  You were born in '68?

6   A    Yes.

7   Q    All right.  So you're -- and what was your sentence in

8   that case, did you get jail time?

9   A    Yeah, like I think eight years.

10  Q    For your first conviction?

11  A    Yes.

12  Q    What was the weapon that you used?

13  A    They didn't never recover the weapon.

14  Q    But you were convicted of -- you pled guilty or were

15  convicted of robbery with a dangerous weapon?

16  A    Yes.

17  Q    What was the weapon that they accused you of?

18  A    They never -- they never said it.

19  Q    You just pled guilty to something, even though they

20  didn't have --

21  A    I was young.  Yes.

22  Q    You made a mistake?

23  A    No -- yeah, I was young.

24  Q    So you never had a weapon.  You were 18 years old, you

25  pled guilty to armed robbery with a dangerous weapon, and

 1    didn't have a weapon.

 2    A    I was scared.  I copped out.

 3    Q    All right.  So you copped out to a felony, you got how

 4    many years, seven years?

 5    A    Seven or eight.

 6    Q    Seven or eight years for robbery, unarmed robbery, and

 7    you went to jail for how long?

 8    A    Maybe six years.  Four, five years, six years.

 9    Q    All right.  So in '86 you went to jail until 1991?

10    A    Yeah.

11    Q    What happened after that, were you let out on parole?

12    A    Yes.

13    Q    And did you violate your parole?

14    A    Yes.

15    Q    What was the violation of parole for?

16    A    Attempt murder.

17    Q    I'm sorry?

18    A    I think attempt murder.

19    Q    Attempted murder, you think attempted murder?

20    A    Yeah, because they called it something else.  I say -- I

21    always say it's attempt murder.

22    Q    So you were on parole and you were told to mind the laws

23    and mind the regulations of society and you chose to violate

24    your parole; correct?

25    A    Yes.

1    Q    By attempting to kill somebody?

2    A    That's what the government said.

3    Q    That's what the government said?

4    A    Yeah.

5    Q    Were you convicted by a trial or were you convicted by a

6    plea?

7    A    A plea.

8    Q    So the Government said it and you just went ahead and

9    pled guilty?

10   A    Yes.

11   Q    Why is that?

12   A    I was young, I didn't know no better.

13   Q    In that case you were a little older.  You weren't 18,

14   now you were in your 20s; right?

15   A    Yes.

16   Q    And the first time you pled guilty to an armed robbery

17   with no gun and this time you pled guilty to what?

18   A    Attempt murder.

19   Q    Attempted murder.  And you got how much more time?

20   A    12 years.

21   Q    12 more years.  And when does that -- how much of that 12

22   years did you do?

23   A    Until like '98.

24   Q    You told Mr. Martinez that you were convicted of

25   selling -- possession with intent to distribute heroin; is

1    that correct?

2    A    Yes.

3    Q    And when was that?

4    A    Like 2001, somewhere around there.

5    Q    All right.  Let me ask you a question:  Were there any

6    crimes that you committed that you weren't ever caught for?

7        Let me ask you more specifically:  Toward the end of your

8    testimony with Mr. Martinez, I think you said that there was a

9    merger of the BGF -- of the YGF and BGF; right?

10   A    (Nodding.)

11   Q    And there were some young bucks who weren't going along

12   with the program, do you remember that?

13   A    Yes.

14   Q    All right.  And you sent the word down to take care of

15   one of those young bucks, didn't you?

16   A    Yes.

17   Q    All right.  So and at the end, that young buck was

18   killed; wasn't he?

19   A    I don't know.  I don't know who it was.

20   Q    But isn't it true that -- who was it that you sent down

21   to take care of that young buck, was it Will?

22   A    I told Will.

23   Q    All right.  And Will got back to you and said he took

24   care of it; right?

25   A    Yeah, he said it was tooken care of.

Cross-examination - Gray (By Mr. O'Toole)

1   Q    Do you remember Will ever telling that he took care of

2   something without having taken care of it?

3   A    No.

4   Q    So you knew that Will successfully took care of it,

5   didn't you?

6   A    I know it was taken care of, if he said it was taken care

7   of.

8   Q    I'm sorry?

9   A    If he said it was taken care of, I just assumed it was

10  taken care of.

11  Q    So you assumed that he was killed; right?

12  A    I assume -- okay, yeah.

13  Q    So you assume he was killed.  So you sent the word down

14  for the killing of a young person who did not want to become

15  BGF and you told Will to take care of it.  And Will knew what

16  you meant by taking care of it; right?

17  A    Yeah.

18  Q    Taking care of it --

19  A    Yes.

20  Q    -- means do the work, get it done?

21  A    Uh-huh.

22  Q    Kill him, because you're going to make a example out of

23  him; right?

24  A    Yes.

25  Q    So the purpose of the kill was to make an example out of

Cross-examination – Gray (By Mr. O'Toole)

```
 1    that person; right?
 2    A    Yes.
 3    Q    All right.  And as far as you know and assume, he was
 4    killed; right?
 5    A    Yes.
 6    Q    All right.  Did you feel bad about that?
 7    A    No.
 8    Q    Why not, did you feel any remorse?
 9    A    No.
10    Q    You didn't, did you know who it was?
11    A    No.
12    Q    Did you know who his family was?
13    A    No.
14    Q    Did you care?
15    A    No.
16    Q    All right.  Were you ever charged for it?
17    A    No.
18    Q    Did anybody ever find out that you were involved in the
19    conspiracy to kill and in fact killed somebody?
20    A    No.
21    Q    All right.
22    A    Until I told them.
23    Q    I'm sorry?
24    A    Until I told them.
25    Q    Until you told who?
```

Cross-examination - Gray (By Mr. O'Toole)

1   A    The government.

2   Q    All right.  And were you charged for that later?

3   A    No.

4   Q    So you actually, in the process of talking to the

5   government and working out your plea agreement that you talked

6   with Mr. Martinez about, that you had to come and testify

7   truthfully in the trials; correct?

8   A    Yes.

9   Q    Including this trial?

10   A    Yes.

11   Q    And other trials in the future?

12   A    If need be.

13   Q    All right.  And do you know whether there are other cases

14   planned for you to testify in?

15   A    No.

16   Q    You don't know?

17   A    No.

18   Q    Are you preparing for other cases to testify against?

19   A    No.

20   Q    No.  All right.  So with respect to the young buck that

21   got killed, you told the government about that when you were

22   debriefing; correct?

23   A    Yeah.

24   Q    All right.  And you were never charged?

25   A    No.

Cross-examination – Gray (By Mr. O'Toole)

1    Q    All right.  Let's talk for a minute about the Cut, you

2    told us the Cut was Maryland Correction Center?

3    A    Maryland House of Corrections.

4    Q    House of Corrections, where is that located?

5    A    In Jessup.

6    Q    I'm sorry, in Jessup?

7    A    Jessup.

8    Q    And why were you at the Cut?

9    A    For the 12 years.

10   Q    12 years for the attempted murder?

11   A    Yes.

12   Q    All right.  And how long had you been there when there

13   was an episode with Pizza and Mustafa?  You know what I'm

14   talking about; right?

15   A    About four years.

16   Q    When I say Mustafa and Pizza incident, you know what I'm

17   talking about?

18   A    Uh-huh.

19   Q    So when that incident -- and we'll talk about that in a

20   minute.  When that incident happened, how long had you been at

21   Jessup?

22   A    Four years.

23   Q    Four years.  And at that -- what was the year of that,

24   what was the year that took place, late '0 -- what would that

25   be?

Cross-examination - Gray (By Mr. O'Toole)

1    A    I can't recall.

2    Q    You don't recall.  All right.  We'll figure it out before

3    we finish.

4    A    Uh-huh.

5    Q    All right.  So what happened there -- and that case was a

6    friend of yours, somebody you knew was stabbed; is that

7    correct?

8    A    Yes.

9    Q    And that was Pizza?

10   A    Yes.

11   Q    Now, was Pizza BGF?

12   A    Yes.

13   Q    All right.  And you were BGF?

14   A    Yes.

15   Q    All right.  How long had you been BGF at that point?

16   A    Maybe a year, two.

17   Q    Some time.

18   A    Yeah.

19   Q    All right.  And were you friendly with Pizza or you just

20   knew he was BGF?

21   A    I knew he was BGF.

22   Q    All right.  But you weren't buddies?

23   A    Yeah, we were brothers.

24   Q    You were brothers, were you close to him or not close to

25   him?

```
 1   A    Yeah, we're brothers.

 2   Q    I'm asking were you close?

 3   A    We were brothers.  We were like brothers.

 4   Q    Like brothers, all right.  So what happened, Pizza gets

 5   stabbed by somebody?

 6   A    Yes.

 7   Q    Who stabbed Pizza?

 8   A    Mustafa, Jay, and Lineal.

 9   Q    I'm sorry, are you naming three different people?

10   A    Yeah.

11   Q    So three different people stabbed Pizza?

12   A    Yes.

13   Q    So what did you do -- was Pizza killed?

14   A    No.

15   Q    Was he badly injured or not badly injured?

16   A    He was taken to the ICU.

17   Q    In the prison itself?

18   A    No, he was sent out, medevac hospital.  They medevacked

19   him to the hospital.

20   Q    What did you do about it?

21   A    Stabbed Mustafa.

22   Q    I'm sorry?

23   A    I stabbed Mustafa.

24   Q    You stabbed Mustafa, where did you get the knife?

25   A    I made it in jail.
```

1    Q    Did you kill Mustafa?

2    A    No.

3    Q    All right.  Were you ever arrested for that?

4    A    Yeah.

5    Q    You were arrested for --

6    A    No, not prison arrested.  I was locked up in jail.  I

7    went on lockup.  I was under investigation.

8    Q    I'm sorry, I interrupted you.  Go ahead.

9    A    I said I went on lockup for it.

10   Q    All right.  You were caught for stabbing Mustafa?

11   A    No.

12   Q    So why --

13   A    I was under investigation.

14   Q    Were you ever arrested for stabbing Mustafa?

15   A    No.

16   Q    So you got away with stabbing Mustafa; right?  Yes?

17   A    Yeah, I guess so.

18   Q    Yes.  All right.  So you, in retaliation -- is that a

19   good word to use -- in retaliation for Mustafa stabbing Pizza,

20   you stabbed Mustafa?

21   A    Yes.

22   Q    And how badly was Mustafa hurt?

23   A    He laid beside Pizza.

24   Q    Say that again?

25   A    He laid beside Pizza in the ICU.

Cross-examination - Gray (By Mr. O'Toole)

1    Q    Oh, he laid beside Pizza, is that what you said?

2    A    Yes.

3    Q    After that happened did that give you a certain

4    credibility, a certain position in the jail?

5    A    No, because what you don't know is, I wasn't the only one

6    that stabbed him.

7    Q    Would you say that again, please?

8    A    I said no, because what you don't know is that I wasn't

9    the only one that stabbed him.

10   Q    I only know what you're telling me, so I'm going to ask

11   you.  In the previous trial, isn't it true that you said after

12   you stabbed Mustafa it gave you a certain credibility, a

13   certain position as an enforcer in the prison?

14   A    No, I didn't say that.

15   Q    You never said that, you never said that after you

16   stabbed Mustafa you were given -- you were seen as bigger and

17   tougher than you were before you stabbed Mustafa?

18   A    No, because I was always me.  I was always me.  That's

19   why BGF chose me, because I was always me.

20   Q    Okay.  So you're saying now that you were not given any

21   more belief or credibility --

22   A    No, I got a position.

23   Q    You got a position?

24   A    They made me the MOD.

25   Q    They made you MOD, what's MOD?

1    A    Minister of defense.

2    Q    So they made you MOD, minister of defense, after you

3    stabbed Mustafa?

4    A    Yeah.

5    Q    And because you stabbed Mustafa, they made you MOD.  So

6    are you telling us because you stabbed Mustafa, you got a

7    position in the BGF?

8    A    No, you saying that.  I'm saying --

9    Q    I'm asking you is that true?

10   A    I don't know why they gave me the position.  They might

11   have needed the position filled.

12   Q    All right.  So you're telling us you got the position as

13   an MOD after you stabbed Mustafa, but you don't know why?

14   A    Yeah.

15   Q    All right.  When you stabbed Mustafa, you were trying to

16   kill him; correct?

17   A    I didn't care if I did or not.

18   Q    You didn't care if you killed him or not.  Did you care

19   that you were taking a human life or trying to take a human

20   life?

21   A    Not at the time.

22   Q    Did you feel any remorse, any contrition because of

23   that?

24   A    Yeah, we ended up being all right.

25   Q    It ended up being all right?

1   A    Yeah, me and him ended up being all right.

2   Q    All right.  At the time you put the knife to his body,

3   you didn't care if he died or lived; correct?

4   A    Correct.

5            MR. MARTINEZ:  Asked and answered.

6            THE COURT:  Overruled.

7   Q    (BY MR. O'TOOLE) Correct?

8   A    Correct.

9   Q    Thank you.  After you served time for your escape, was

10  that the last time you served until 2012, 2013?

11  A    No, that's when I came home, 2012.

12  Q    Right.  And you came home because you served all your

13  time for having escaped; right?

14  A    Yes.

15  Q    And you didn't take parole because you didn't want

16  parole; right?

17  A    Right.

18  Q    You didn't want parole because you weren't that good on

19  parole; right?

20  A    Exactly.

21  Q    You decided just to do your time, get it over with, and

22  hit the street?

23  A    Yes.

24  Q    All right.  When you hit the street, did you have a role

25  in BGF?

Cross-examination – Gray (By Mr. O'Toole)

1   A    Yes.

2   Q    What was your role?

3   A    I was the highest-ranking member of the BGF.

4   Q    Why were you the highest-ranking member?

5   A    Because I was one of the original seven.  So when I came

6   home, I was the highest-ranking member on the street.  I was

7   the highest-ranking member in prison.

8   Q    Okay.  And what was the title that you were given?

9   A    None.  When I first came home, none.  I didn't want no

10  title.

11  Q    You said that you were the highest-ranking person, does

12  the highest-ranking person have a label, a title?

13  A    No, because I put somebody else and made them the

14  hodari.

15  Q    So you were the highest-ranking person and then you said,

16  I'm going to use my highest-ranking position to name somebody

17  else as the highest-ranking person?

18  A    I've been doing it the whole time I was BGF.

19  Q    Just yes or no; is that correct?

20  A    Yes.

21  Q    All right.  And who was that that you made the

22  highest-ranking -- that you made the top of the heap --

23  A    Donnie.

24  Q    Say that again?

25  A    Donnie.

Cross-examination – Gray (By Mr. O'Toole)

1   Q    Donnie.  All right.  We'll get back to Donnie in a

2   minute.

3         You were shown an exhibit by Mr. Martinez, the 22s and

4   the 33s; correct?

5   A    Yes.

6   Q    Was that your handwriting?

7   A    No.

8   Q    Somebody else's handwriting?

9   A    Yes.

10  Q    All right.  What are the -- what are they in general,

11  these 22s?  When you came out of prison -- strike my -- when

12  you came out of prison, did you have to take an oath?

13  A    No.

14  Q    You didn't take an oath when you came out of prison?

15  A    No.

16  Q    Did you have to prove that you knew the 22s and the

17  33s?

18  A    No.

19  Q    All right.  Did you have to -- when somebody else becomes

20  BGF, do they take an oath or do they learn the 22s and the 33s

21  first?

22  A    They learn the 22s and 33s.

23  Q    They learn those before they take an oath?

24  A    Yes.

25  Q    All right.  So they learn the rules and they learn the

1    constitution and then they take an oath?

2    A    Yes.

3    Q    All right.  These rules -- the first rule says don't put

4    your hand on another BGF member; right?

5    A    Yes.

6    Q    All right.  Have you ever violated that rule?

7    A    I haven't.

8    Q    You have or haven't?

9    A    I haven't.

10    Q    I'm sorry?

11    A    I said I haven't.

12    Q    Have not?

13    A    Yes.

14    Q    Have not.  All right.  Have you had others do that in

15    your stead, instead of you?

16    A    If it's a sanction.

17    Q    All right.  So you've ordered people to do that, put

18    their hand on other BGF members, you just haven't done it

19    yourself?

20    A    It says don't put your hand on a brother without

21    confirmation.

22    Q    All right.

23    A    I gave confirmation.

24    Q    Confirmation that it was --

25    A    Okay to do it.

Cross-examination – Gray (By Mr. O'Toole)

1    Q    -- justified?

2    A    Yes.

3    Q    All right.  Do you think you have ever violated any of

4    the 22s or 33s, any of the --

5    A    Yes.

6    Q    Pardon me?

7    A    Yes, I violated them -- I violated many of them

8    probably.

9    Q    Were you ever sanctioned?

10    A    No.

11    Q    All right.  Have any of your -- the people underneath you

12    violated the 22s or the 33s?

13    A    Yes.

14    Q    Have they been sanctioned?

15    A    Some of them.

16    Q    All right.  So other people in the organization get

17    sanctioned, but you didn't get sanctioned?

18    A    Exactly, as with any organization.

19    Q    Any organization, meaning the people at the top don't

20    have to answer to the same rules as the people down below?

21    A    Any organization in the world.

22    Q    Is that a yes?

23    A    Yes.

24    Q    All right.  You talked to Mr. Martinez about the plea

25    agreement and your plea in the case, what was the name of that

1    case?

2    A    The name of it was --

3    Q    Was it Bazemore?

4    A    There's 14 of us.

5    Q    But it was called -- the main name was Bazemore; is that

6    correct?

7    A    No.  My name was at the top of the indictment.

8    Q    All right.  So you -- the plea that you took, you were

9    actually a defendant in the case that you testified in

10   eventually; is that correct?

11   A    Yes.

12   Q    All right.  And you were -- you pled guilty to what, to a

13   RICO racketeering conspiracy?

14   A    Yes.

15   Q    And you know what the racketeering is?

16   A    Yes.

17   Q    All right.  And you told us before that you pled guilty

18   to a murder or a robbery, an armed robbery, but you hadn't

19   really been armed, and then you pled guilty to attempted

20   murder, but you really hadn't attempted it and you went to

21   jail for something that you maybe hadn't done.

22         In this case when you pled guilty to the racketeering,

23   were you really guilty?

24   A    Yes.

25   Q    All right.  So you pled guilty to Count 1 of the

1   indictment; is that correct?

2   A    Yes.

3   Q    All right.  Now, that wasn't the only count in the

4   indictment, was it?

5   A    That I pled guilty to, no.

6   Q    I'm sorry?

7   A    No.

8   Q    There were other counts?

9   A    Yes.

10  Q    And the second count of the indictment was conspiracy to

11  possess with intent to distribute controlled dangerous

12  substances; correct?

13  A    Yes.

14  Q    And that was dropped when you pled guilty to Count 1;

15  correct?

16  A    No.

17  Q    No?

18  A    No.  I got found guilty of the first count, the second

19  count, and the sixth count.

20  Q    You pled guilty to the first count?

21  A    The second count and the sixth count.

22  Q    You pled guilty to three counts in the indictment?

23  A    Yes.

24  Q    All right.  We'll get back to that also in a minute.  And

25  you told Mr. Martinez that the purpose of pleading guilty was

1    that you didn't want to spend the rest of your life in jail?

2             MR. MARTINEZ:  Objection --

3             THE WITNESS:  I never told him that.

4    Q    (BY MR. O'TOOLE)  But you told him that you wanted to cut

5    back the time that you would have to spend in jail --

6             THE COURT:  There's an objection pending.  Do you

7    want to withdraw the question and rephrase?

8             MR. O'TOOLE:  I'll rephrase it, Your Honor.

9             THE COURT:  The question has been withdrawn.  You

10   may continue.

11   Q    (BY MR. O'TOOLE)  Mr. Gray, I thought you told

12   Mr. Martinez something to the effect that the reason that you

13   pled guilty was that you were afraid that if you were

14   convicted you would spend a lot of time in jail.

15   A    No, I never said that.

16   Q    You never said that?

17   A    No.

18   Q    What's the reason that you pled guilty then?

19   A    That's the reason why, because I don't want to spend the

20   rest of my life in jail.

21   Q    I thought that's what I asked you.

22   A    No, that ain't what you asked me.

23   Q    All right.  Well, I'm asking you now:  Is the purpose

24   that you're cooperating in this plea agreement -- the plea

25   agreement called for you to cooperate with the government;

1    correct?

2    A    Uh-huh.

3    Q    And they called for you to cooperate not only in that

4    case, the Bazemore case, the case that you were a defendant

5    in, but in any other case the government wants to use your

6    testimony; correct?

7    A    Yes.

8    Q    All right.  And one of the conditions of your accepting

9    the plea of -- the deal that you got, was that you testify,

10   you told Mr. Martinez, truthfully; is that right?

11   A    Yes.

12   Q    Is that a word that the government told you that you're

13   supposed to tell the -- in your testimony, that you're

14   supposed to testify truthfully?

15               MR. MARTINEZ:  Objection.

16               THE COURT:  Overruled.  He can answer.

17               THE WITNESS:  No.

18   Q    (BY MR. O'TOOLE)  And where did the word "truthfully"

19   come from?

20   A    Yeah, it said "truthfully" and it said -- it's written.

21   Q    All right.  So --

22   A    In the -- yeah, the government didn't tell me that.  It's

23   written -- because it's written in the plea agreement.

24   Q    All right.  So one of the conditions of your deal is that

25   you testify and tell the truth; correct?

1    A    Yes.

2    Q    All right.  So if you testify in court in this case or in

3    any case and don't tell the truth, it's a big deal; right?

4    A    Yeah.

5    Q    And you could lose your deal; correct?

6    A    Yeah.

7    Q    All right.  Now, do you know what you're hoping for --

8    what -- when you testified in the Bazemore case, you were

9    hoping that that would cause you to get your deal reduced a

10   little bit; right, or some; correct?

11   A    Yeah.

12   Q    And your hope here is today, in front of this jury, in

13   this court, that you'll testify and get your sentence reduced

14   a little bit more; correct?

15   A    Yeah, I'm not sentenced though.

16   Q    I'm sorry?

17   A    I'm not sentenced yet.

18   Q    You're not sentenced yet.  Right.  Your sentence is being

19   withheld; correct?  It's being put off until your work is

20   done; correct?

21   A    Yes.

22   Q    All right.  So your hope is that by cooperating today

23   that your sentence will be reduced even a little bit more?

24   A    Yes.

25   Q    All right.  And the gentleman to your right, His Honor --

1    to your left rather, His Honor is the one who's going to

2    sentence you; right?

3    A    Yes.

4    Q    And he saw you testify last time; right?

5    A    Yes.

6    Q    And he's watching you testify this time?

7    A    Yes.

8    Q    All right.  And if there's another case, you'll testify

9    again, hoping to get your sentence reduced a little bit more;

10    won't you?

11    A    Yes.

12    Q    All right.  So your purpose here is to help Mr. Gray and

13    for no other reason; correct?

14    A    Yes.

15    Q    Your purpose is not here to tell the truth or to see

16    justice, but rather to help Mr. Gray get out of jail before he

17    might have otherwise?

18    A    I've got to tell the truth to help Mr. Gray.

19    Q    Right.  So the telling the truth is a requirement so that

20    you can help Mr. Gray?

21    A    Yes.

22    Q    All right.  And so Mr. Gray's sentence to your case that

23    you pled guilty to, the conspiracy to racketeering, your

24    sentence is the most important thing in the world to you;

25    correct?

```
1    A    Yeah.

2    Q    All right.  And -- all right.

3              THE COURT:  I'll see counsel at the bench.

4              (Bench conference on the record.)

5              THE COURT:  How much more have you got?

6              MR. O'TOOLE:  An hour.

7              THE COURT:  We'll stop here.  You can resume your

8    positions.  We're going to stop for the day.

9              (The following proceedings were had in open court.)

10             THE COURT:  Ladies and gentlemen, we're going to

11   stop a little early today because I have another hearing that

12   I have to conduct that has nothing to do with this case.

13             The Marshal can take Mr. Gray out.  We'll stop now

14   and resume tomorrow morning at 9:30.

15             So during this overnight recess do not discuss the

16   case with anyone.  Do not discuss it with your fellow jurors.

17   Do not discuss it with any of your friends or family.

18   Remember, you're allowed to tell people who ask you that

19   you're serving on a jury in federal court in a criminal case,

20   the trial's expected to last until about the third week of

21   January, that you've been instructed by the judge that you're

22   not allowed to talk with anyone about the case.  And if this

23   is true, you'll be happy to speak with them after the trial is

24   over, just not while it's underway.

25             Do not allow yourselves to be exposed to any news
```

articles or reports that touch upon the case or the issues it
presents or the participants in the trial.  Avoid all contact
of any kind with any of the participants in the trial.  Do not
make any independent investigation of the law or the facts in
the case.  Do not conduct internet searches with respect to
the issues presented or the persons participating in the
trial.  Do not consult external sources such as encyclopedias
or dictionaries in reference to the issues and terms that have
been presented to you here.

I would ask that you do try to get here at 9:15,
9:20.  Leave yourself a little bit of a cushion in case
there's a traffic problem or something along those lines.
Hopefully we'll be able to begin promptly at 9:30 tomorrow
morning.

The jury is excused until then.  Please take the
jury out.

(Jury left the courtroom.)

THE COURT:  What's the lineup for tomorrow after
Mr. Gray?

MR. MARTINEZ:  I think it's the same lineup as we
had indicated last Tuesday.  We had mentioned Brian Rainey and
Task Force Officer Hayden.

I think now is probably a good time to mention we're
going to have a bunch of witnesses in this trial, Your Honor,
who have expressly asked us to avoid, to the greatest extent

218

1    possible, letting people know when they're going to be

2    testifying because they're afraid they're going to follow them

3    into the courthouse or out of the courthouse and that they'll

4    be waiting.  So there are going to be more than a few

5    witnesses, who because of discussions we've had with them

6    during prep, we feel inclined to sort of honor their --

7    promises we made them about, you know, withholding the timing

8    of their testimony with as much latitude as we have under the

9    law.

10           THE COURT:  Well, we'll handle that on a day-to-day

11   basis.  In general, I will always ask you at the end of one

12   trial day who's going to testify the next day.  I think

13   defense counsel are entitled to that opportunity to plan,

14   especially in a trial of this length where there are so many

15   witnesses and so much evidence.  But that being said, I'll

16   hear you if you think in a specific instance that presents a

17   special problem.

18           Perhaps we'll have to work out special arrangements

19   in relation to that witness, but we're not going to compromise

20   a defendant's fundamental right to confront his accusers, and

21   included in that is some reasonable opportunity to anticipate

22   who's going to be testifying next just so counsel can be

23   reasonably ready.  Otherwise, you know, you're sitting here as

24   a lawyer on the defense side and you've got to be ready at a

25   moment's notice to cross-examine any one of 100 different

1    witnesses.  So that's not fair either, so we'll have to work

2    out something.  As for tomorrow, it sounds like we have a

3    reasonable expectation as to who the witnesses are going to

4    be.

5            MR. O'TOOLE:  I think we only have two -- we only

6    have two witnesses for tomorrow so far.

7            MR. MARTINEZ:  Well, between those two and two and a

8    half more cross-examinations for Mr. Gray, I think that may

9    fill a day.

10           THE COURT:  Okay.  Well, let's just make sure that

11   the day is filled so that we don't waste any jury time.  I

12   don't know how long these witnesses are going to be on the

13   stand, so I defer to you on that.  So use your best judgment,

14   but don't leave us with unused time.  Doing a little mental

15   math up here during one of your opening statements, and I

16   won't say who, but my mind wandered for just one moment as I

17   was counting heads in the courtroom.  And my calculation is

18   that this trial probably cost the taxpayers about $30,000 a

19   day, about $3,000 an hour, and that's an expenditure that the

20   community is happy to make in order to honor the promise of

21   due process, but it's also the kind of money we shouldn't

22   waste.

23           All right.  Anything else before we adjourn for the

24   evening, Mr. Martinez?

25           MR. MARTINEZ:  Not from us, Your Honor.

1              THE COURT:  Defense counsel?

2              MR. ENZINNA:  No, Your Honor.

3              THE COURT:  The defendants are remanded, counsel are

4    excused, and we'll start on the next matter, Counsel, just as

5    soon as we have the courtroom cleared.

6              I'll be back in a moment or two.

7              (The proceedings were concluded.)

8

9              I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
     record of proceedings in the above-entitled matter.
10

                    _____/s/_____
11                      Christine T. Asif
                      Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2   Witness Name                                    Page

 3   Government's Opening Statement .......................... 26

 4   Defendant Johnson's Opening Statement .................. 55

 5   Defendant Jones' Opening Statement ..................... 64

 6   Defendant McCants' Opening Statement ................... 77

 7   Timothy Michael Gray

 8       Direct Examination By Mr. Martinez ........................ 99

 9       Cross-examination By Mr. O'Toole.......................... 189

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
., February 4th,
  2017 4:19.
2/4/17 4:5.
4:30, may 183:16.
August 26th, 2010
  36:24.
February 2017
  40:7.
February 4th, 2017
  5:1, 44:23, 45:6,
  80:16.
February 9th 46:5.
January 6th 11:2.
January 9th 34:24.
June 2016 47:7.
May 7th, 2013 40:16,
  40:19, 42:6.
November 15th
  94:15.
November 2016
  44:14.
November 27th, 2017
  1:19.
October 5th, 2013
  42:14.
$20 157:8, 159:1.
$26,000 81:6.
$3,000 219:19.
$30,000 219:18.
$40. 159:22.
$51,000 74:21, 75:3,
  75:13, 81:8.
$51,000. 74:24.
$6,800 81:4.
'0 199:24.
'07 145:13.
'17 7:24.
'68 192:5.
'86 193:9.
'95 101:3, 103:9,
  130:4.
'98 194:23.
.40 45:8, 45:20,
  45:22, 45:23,
  46:9, 46:11, 47:6,
  47:10.
.45 43:25, 44:8,
  85:13.
.

.
< 1 >.
1 12:3, 12:19,
  46:23, 47:13,
  58:1, 118:17,
  210:25, 211:14.
1. 12:3, 109:12,
  149:18.
10 79:2, 127:11,
  128:24, 129:23,
  129:24, 157:1.
100 23:4, 50:8,
  57:19, 87:13,
  218:25.
101 1:48.
10:50 4:5, 4:19,
  5:1, 45:6.
11 124:17, 170:22,
  170:25.
11:25. 54:11,
  55:4.
12 23:20, 23:21,
  23:23, 38:5, 38:8,
  70:12, 104:23,
  125:12, 130:10,
  130:11, 194:20,
  194:21, 199:9,
  199:10.
12-year 130:13.
12. 38:8, 171:4.
13 172:3, 174:2,
  174:3, 177:1,
  177:10, 185:19.
13th 9:18, 11:3.
14 210:4.
15 22:15, 54:10.
16th 9:17.
17 191:25.
17. 192:1.
18 192:2, 192:3,
  192:24, 194:13.
189 221:17.
19 120:17, 125:18.
1960s 29:8.
1980s 116:8.
1986 191:20.
1990s 30:2.
1991 193:9.
1992. 114:21.
1:45. 82:25, 98:2.

.
.
< 2 >.
2 46:24, 60:23,
  118:19, 123:3,
  123:4.
2. 134:17.
20 68:11, 68:12,
  121:5.
20-minute 176:18.
2000s 30:12.
2001 195:4.
2005 27:4, 33:25,
  70:13, 131:3,
  131:4, 131:14,
  133:15, 133:17,
  138:10.
2005. 33:9.
2006 138:10.
2006. 138:10,
  140:8.
2007 33:25, 34:20,
  34:25, 35:7,
  35:13, 36:16,
  133:23, 134:1,
  148:16.
2008 148:16.
2008. 148:16.
2010 7:15, 7:24.
2010. 40:3.
2011 37:10, 37:11,
  76:6.
2012 76:23, 148:19,
  151:4, 205:10,
  205:11.
2013 37:2, 38:17,
  40:12, 42:2, 47:3,
  151:4, 160:18,
  160:25, 161:10,
  167:18, 205:10.
2013. 27:24, 39:15,
  42:18.
2013: 43:13.
2015 103:9, 107:11,
  107:12.
2015. 39:1, 42:22.
2016 7:24, 43:22.
2016. 39:13,
  43:22.
2017. 27:4, 37:10.

20s 194:14.
21201 1:49.
22 31:13, 82:25,
   115:17, 117:23,
   121:15.
22- 33:11.
22nd 40:20, 140:6,
   140:21, 145:4,
   146:5, 156:22,
   156:23, 156:24,
   156:25, 158:11,
   159:13, 159:23,
   160:1, 169:14.
22s 31:12, 113:6,
   113:12, 137:1,
   137:4, 207:3,
   207:11, 207:16,
   207:20, 207:22,
   209:4, 209:12.
23 3:4.
23- 33:11.
2400 33:11, 37:14.
24th 42:15.
25 79:1.
25th 35:3.
26 221:5.
27 126:5.
276 29:17, 29:18,
   171:9, 172:5.
276. 29:15.
280 50:7.
29. 158:18.
.
.
< 3 >.
3 1:10, 46:25,
   50:23, 61:2,
   97:22, 118:21.
30 146:6.
300 40:19, 42:15.
30th 43:22.
31 3:21, 3:24.
33 31:25, 49:3,
   121:15, 121:17.
33s 31:12, 32:24,
   49:12, 113:11,
   113:12, 123:19,
   137:1, 137:5,
   207:4, 207:17,
   207:20, 207:22,

209:4, 209:12.
3:00 98:1.
3:55. 176:20.
.
.
< 4 >.
4 8:11, 11:15,
   11:18, 12:2, 12:4,
   12:10, 12:14,
   46:25, 50:23,
   61:3, 117:18,
   118:23.
4. 8:11, 9:1, 12:19,
   113:22.
403 7:25.
410 22:14.
43. 121:19.
4447 86:24.
49 100:7.
4: 9:3, 9:7, 9:10,
   9:14, 9:17, 9:21,
   9:25, 10:4, 10:7,
   10:9, 10:12,
   10:15, 10:18.
4:00 176:20,
   183:12.
4:30 97:20, 97:21,
   183:14, 183:16,
   183:17.
4:30. 183:15.
4:35. 183:16.
4th 1:48, 12:20.
.
.
< 5 >.
5 118:25, 123:10,
   176:20, 183:11.
500-piece 57:22.
55 221:7.
55s 31:13, 113:13.
5617 45:12.
5:00 183:17.
5th 60:15.
.
.
< 6 >.
6 119:5.
6. 38:6.
64 221:9.
68 80:2.

6th 9:18.
.
.
< 7 >.
7 43:25, 47:4, 51:3,
   119:18, 124:4.
70s 29:8.
77 221:11.
.
.
< 8 >.
8 47:8, 51:3,
   119:23.
81 161:7.
81. 158:1.
87. 132:2.
88 162:21.
89. 150:14.
8th 9:17, 67:5.
.
.
< 9 >.
9. 164:19.
90 83:9.
91. 162:7.
93 101:16.
962-0950 22:14.
99 221:15.
9:15 217:10.
9:20. 217:11.
9:30 217:13.
9:30. 216:14.
_____/s/_____
   _____ 220:13.
.
.
< A >.
A. 1:27.
able 5:10, 68:21,
   78:17, 86:2, 86:5,
   87:3, 87:10, 88:8,
   90:18, 91:10,
   115:17, 128:21,
   139:9, 150:20,
   217:13.
above 135:7,
   171:6.
above-entitled
   220:11.
absolutely 14:22,

24:1, 95:8.
accept 178:13,
  178:17.
acceptable 152:17,
  152:19, 153:9,
  153:17.
accepting 213:8.
access 83:15.
accessible 76:21.
accident 70:18,
  70:19.
accomplished 12:9.
accordingly
  185:10.
account 38:25.
accountable 27:14,
  39:23.
accuracy 19:21,
  93:1.
accused 56:13,
  56:14, 56:15,
  124:12, 192:17.
accusers 218:20.
acquaintances
  18:19.
acquire 19:7.
acquited 38:25.
acquittal 42:24,
  43:19.
acquitted 42:22.
Act 3:4, 49:13,
  50:20, 81:18,
  94:21, 126:18.
action 119:8,
  121:4.
actions 120:8.
active 29:2.
activities 30:10,
  30:11, 30:25,
  36:19, 50:4.
activity 26:25,
  27:2, 47:20,
  58:3.
acts 39:9, 39:23,
  39:24, 47:24,
  48:5, 56:17, 58:8,
  59:15, 73:4,
  126:16, 126:17.
actual 4:25, 50:13,
  84:7, 84:24,

94:25.
Actually 6:24,
  71:15, 76:20,
  79:6, 80:18,
  84:15, 113:14,
  117:24, 173:20,
  180:9, 180:22,
  187:2, 198:4,
  210:9.
add 11:24, 128:24.
addict 79:5.
addiction 71:3.
addition 16:3,
  49:18, 103:16,
  106:21, 121:15,
  131:6.
additional 102:17,
  177:15.
address 2:5, 2:8,
  2:10, 2:15, 3:6,
  3:10, 29:20,
  95:24, 115:7.
addressed 184:19,
  188:18.
adequate 102:19.
adhere 116:10,
  153:21.
adjourn 219:23.
adjournments
  20:21.
administer 15:14.
admissibility 17:7,
  177:1.
admission 5:18,
  177:5.
admit 59:14.
admitted 33:16,
  114:10, 114:15,
  114:18, 116:6,
  177:25.
admitting 95:12.
advance 65:7,
  115:5.
advantage 65:19.
adversaries 183:9.
advice 18:19,
  23:9.
advise 15:2.
affairs 58:2.
affect 2:11, 3:9,

47:19, 50:1, 50:4,
  60:18, 73:8.
affiliated 169:10.
affiliation 52:23,
  147:12.
afraid 72:11, 72:13,
  72:14, 212:13,
  218:2.
afternoon 8:17,
  74:1, 97:20, 99:2,
  99:24, 99:25,
  176:6, 176:9,
  189:22, 189:23.
age 20:9, 65:14.
Agent 12:25, 84:18,
  87:11, 91:11,
  92:3, 92:4,
  184:11.
agents 86:25,
  172:25, 178:20,
  184:8.
ago 2:23, 37:17,
  49:1, 70:12,
  70:13, 70:15,
  70:18, 71:1, 92:1,
  156:3, 179:3.
agree 2:9, 27:7,
  61:1, 69:10,
  69:11, 84:2,
  87:24, 90:12,
  106:3, 108:1,
  152:14.
agreed 45:17, 46:14,
  47:23, 48:13,
  106:3, 173:18.
agreeing 58:7.
agreement 13:9,
  47:18, 47:22,
  48:2, 50:12,
  108:3, 108:7,
  108:10, 108:19,
  108:21, 108:23,
  187:2, 187:9,
  187:19, 187:22,
  198:5, 209:25,
  212:24, 212:25,
  213:23.
agreements 51:25.
ahead 9:8, 74:12,
  89:25, 90:25,

100:4, 105:17,
110:1, 152:9,
155:23, 188:1,
188:5, 188:13,
194:8, 202:8.
aid 16:4, 47:2.
ain't 119:22,
141:23, 144:1,
212:22.
air 27:11.
AK-47 127:1,
127:3.
al 1:10.
Alan 1:37, 64:20.
alive 31:17.
allegations 81:21,
124:4, 124:6.
alleged 95:5.
alley 41:10.
alleyways 27:11.
allow 32:18, 54:3,
82:16, 109:6,
125:19, 176:11,
182:16, 216:25.
allowed 18:3, 23:8,
216:18, 216:22.
almost 45:7,
69:12.
alone 47:1, 50:24.
alphabet 29:16,
171:12.
alphabetical 129:12,
129:13.
alphanumeric
29:15.
already 7:5, 38:16,
38:21, 41:14,
50:25, 52:21,
61:17, 62:8, 65:3,
65:12, 65:21,
72:1, 72:12,
73:22, 77:4,
88:11, 101:10,
122:6, 133:3,
134:21, 141:20.
Alternate 10:22,
11:21, 12:3,
12:19.
alternates 12:21,
38:9.

Although 48:11,
89:13.
Amendment 60:15.
AMERICA 1:5.
ammo 47:7.
ammunition 16:5,
44:1, 44:8, 45:20,
47:5, 51:5,
52:17.
Among 19:17, 39:25,
54:1, 82:14,
128:3, 176:10,
177:5, 177:20.
amongst 124:6.
amount 24:22.
analyses 92:5.
analysis 95:3.
angel 62:2, 113:1.
announcement
94:10.
answer 36:12, 74:11,
87:13, 97:12,
102:5, 102:13,
105:13, 148:2,
152:12, 152:22,
152:23, 153:1,
153:5, 153:13,
153:14, 153:24,
154:1, 154:11,
155:2, 163:24,
164:3, 165:25,
184:5, 191:16,
209:20, 213:16.
answered 205:5.
anticipate 8:19,
218:21.
Anybody 56:23,
56:24, 57:7, 58:6,
61:1, 61:8, 76:21,
123:23, 145:21,
146:11, 178:5,
181:18, 197:18.
anyway 30:3, 115:13,
176:6.
apologize 13:1,
65:7, 69:16,
183:6.
appalling 56:5.
apparent 98:9.
apparently 117:7.

appearances 8:7.
appearing 98:8.
appears 4:6,
113:1.
applicable 18:6.
applies 189:14.
apply 13:10, 18:7,
19:12, 124:13.
appreciate 5:5,
75:23, 155:10,
183:7.
apprehended 87:2.
approach 25:10,
59:23, 96:23,
102:1, 102:2,
114:5, 120:3,
138:20, 152:5,
174:17.
appropriate 97:13.
approved 120:18.
area 4:8, 76:4,
76:16, 140:23,
145:23, 153:20,
155:21.
argue 60:11, 62:1,
63:16, 92:3,
118:24.
argument 17:21,
17:22, 17:23,
18:4, 60:9,
61:9.
argumentative
60:10.
Arguments 17:4,
17:17, 17:22,
17:24, 17:25,
21:4, 21:12,
24:18, 24:24,
25:5, 54:2,
82:15.
arm 29:19, 42:15.
armed 6:13, 34:15,
36:24, 192:25,
194:16, 210:18,
210:19.
armed. 76:14.
arms 137:7,
137:10.
around 35:13, 58:17,
63:14, 70:1, 76:9,

94:19, 131:21,
132:10, 134:3,
140:23, 141:20,
142:6, 144:24,
149:23, 150:1,
150:15, 151:11,
156:3, 195:4.
arrangements
218:18.
array 94:19.
arrest 46:14.
arrested 37:1, 40:7,
45:24, 202:3,
202:5, 202:6,
202:14.
arrests 44:14.
arrive 88:3.
arrogance 71:7,
73:1.
article 143:17,
170:1.
articles 21:5, 54:4,
54:5, 82:17,
82:18, 176:11,
176:13, 217:1.
articulate 3:19.
articulation
154:3.
artists 63:1, 63:12,
63:13.
aside 12:7, 88:21.
Asif 1:46, 220:9,
220:14.
asks 139:17.
assaulted 57:2.
assaulting 56:13.
assaults 56:7.
asserts 61:8.
assigned 110:7.
assist 19:9.
assistance 32:20,
109:8.
assistant 22:14.
assisting 64:25.
associate 34:22.
associated 7:12,
33:23, 49:16,
52:15, 127:4,
172:9, 172:15.
associates 36:18,

45:25, 46:2,
46:4.
association 52:25.
assume 155:14,
196:12, 196:13,
197:3.
assumed 196:9,
196:11.
assumes 155:12.
assuming 88:6,
139:6, 155:11.
assumption 116:21.
assure 165:18.
ATF 44:13, 44:15.
atrocious 75:7.
attached 124:5.
attaches 7:20.
attack 60:4,
179:19.
Attempt 42:11,
83:10, 193:16,
193:18, 193:21,
194:18.
Attempted 48:21,
83:22, 87:18,
130:8, 193:19,
194:19, 199:10,
210:19, 210:20.
attempting 56:15,
194:1.
attempts 5:19.
attend 66:3.
attending 10:24.
attention 3:13,
23:4, 35:8, 63:24,
65:5, 68:7, 69:22,
70:11, 107:11,
120:17, 161:10,
171:5, 186:1.
attire 170:6.
attorney 67:19.
attorneys 66:17,
67:22, 74:4.
audience 184:19,
185:22.
AUSA 1:25, 1:27.
Austin 76:7.
authenticity
115:15.
author 124:6.

authorized 28:8,
35:4, 61:10.
automatically
77:3.
available 93:4,
93:8, 94:11, 95:7,
95:9.
Avenue 27:18, 33:12,
37:14, 37:22,
41:4, 44:21,
80:17, 86:24,
138:5, 163:18.
Avenues 40:7.
Avoid 21:13, 21:17,
54:6, 82:19,
121:7, 155:2,
176:14, 191:5,
217:2, 217:25.
aware 116:23.
away 22:15, 22:21,
66:9, 108:21,
108:23, 130:20,
202:16.
.
.
< B >.
B-word 63:12.
B. 1:33.
backbone 43:15.
backing 152:25.
backs 53:13.
backwards 112:22,
113:2.
bad 48:17, 48:19,
48:20, 69:14,
72:15, 81:25,
118:20, 118:22,
175:14, 175:25,
183:5, 197:6.
badly 201:15,
202:22.
bags 80:6.
balance 23:16.
ballistic 46:12,
52:14, 83:25,
89:19.
ballistics 15:5,
46:11, 85:1, 85:4,
85:23, 88:21,
88:22, 89:2, 89:6,

89:11, 95:3.
ballpark 83:9.
Baltimore 1:20,
   1:49, 4:19, 27:3,
   30:14, 34:16,
   43:23, 75:5, 75:6,
   75:11, 76:1, 76:5,
   79:3, 79:10,
   100:9, 100:11,
   105:6, 107:23,
   131:6, 131:9,
   132:11, 132:14,
   138:1, 138:18,
   139:15, 140:5,
   168:5.
banded 30:6.
bar 183:8.
Barclay 33:12,
   140:6, 140:22,
   145:4, 145:20,
   145:23, 146:4,
   146:5, 148:3,
   156:24, 156:25,
   157:13, 158:11,
   158:21, 159:12,
   159:23, 159:25,
   160:2, 160:3,
   169:14.
barrel 88:25,
   92:22.
base 18:10, 62:12.
based 5:12, 19:7,
   45:1, 47:6, 47:10,
   50:23, 94:5,
   94:20.
Basically 33:10,
   34:10, 62:25,
   63:17, 82:24,
   112:12, 112:20,
   122:9, 135:12,
   137:22, 140:12.
basis 102:11,
   102:17, 102:22,
   136:23, 165:21,
   218:11.
basketball 130:19.
bathroom 46:7.
Bazemore 177:17,
   210:3, 210:5,
   213:4, 214:8.

bear 72:13.
beat 32:4, 46:4,
   125:5.
beatdown 125:3,
   125:4, 125:5.
beatdowns 123:11,
   189:1.
beaten 79:13.
became 35:18, 35:24,
   36:11, 40:11,
   47:21, 101:4,
   101:10, 104:14,
   144:22, 149:4,
   149:22, 167:3.
become 23:10, 32:10,
   32:16, 49:5, 75:2,
   91:5, 101:1,
   103:18, 104:24,
   109:4, 110:22,
   111:7, 111:11,
   112:10, 121:25,
   122:5, 122:19,
   124:24, 125:6,
   125:11, 141:24,
   142:1, 142:4,
   142:12, 142:24,
   144:14, 196:14.
becomes 12:19, 32:9,
   65:20, 77:9,
   124:21, 207:19.
becoming 142:8.
beefing 136:17.
began 30:13.
begin 9:13, 15:13,
   18:9, 24:9, 24:13,
   217:13.
beginning 3:9,
   33:10, 33:20,
   129:1, 129:2,
   138:24, 183:20.
begins 153:5.
begun 134:2.
behalf 8:8, 8:9,
   8:10, 55:15,
   64:14, 77:16.
behavior 19:18.
behind 46:7, 65:7,
   132:17, 188:10.
belief 203:21.
believability

20:14.
believe 3:21, 3:22,
   4:10, 6:6, 7:15,
   8:18, 14:10, 20:4,
   20:5, 20:13,
   22:21, 61:8,
   65:18, 66:21,
   66:25, 68:6,
   68:15, 68:19,
   69:4, 82:9, 85:13,
   86:5, 87:22, 89:5,
   93:11.
believed 19:12,
   19:14, 35:4, 42:5,
   42:9, 83:14,
   84:6.
believes 14:6,
   17:10, 68:2,
   68:3.
Belnord 162:4,
   162:5.
belonged 80:19.
below 209:20.
Ben 39:15, 40:15,
   40:23, 41:3, 41:5,
   41:6, 41:10,
   41:13, 41:21,
   41:22, 43:17.
Bench 17:6, 59:24,
   102:1, 102:3,
   103:25, 104:1,
   104:19, 114:6,
   127:23, 138:21,
   152:6, 174:19,
   179:20, 216:3,
   216:4.
beneath 112:23,
   138:2.
benefit 71:25,
   77:11, 81:18.
benefits 71:19,
   71:20, 72:18,
   74:20.
beside 76:11, 170:7,
   202:23, 202:25,
   203:1.
besides 72:18.
Bess 4:12, 40:6,
   45:8, 46:13,
   80:15.

best 83:9, 93:16,
    94:2, 147:24,
    154:7, 219:13.
better 38:5, 76:11,
    79:8, 81:11, 94:4,
    94:6, 94:7, 100:2,
    180:10, 180:22,
    194:12.
Beyond 16:9, 51:7,
    53:14, 60:11,
    64:8, 66:8, 77:10,
    78:19, 82:5,
    93:12.
BGF. 180:20, 181:7,
    181:25, 186:2.
big 31:19, 57:25,
    80:10, 94:19,
    175:10, 175:14,
    178:8, 214:3.
bigger 203:16.
biggest 160:18.
binder 115:10.
bit 15:12, 23:25,
    29:4, 44:12, 61:4,
    63:6, 66:24,
    67:18, 68:8,
    72:21, 72:25,
    73:18, 74:15,
    76:4, 78:23,
    89:15, 119:5,
    177:18, 214:10,
    214:14, 214:23,
    215:9, 217:11.
Black 26:24, 29:5,
    58:18, 59:1,
    59:14, 61:17,
    77:21, 80:12,
    100:20, 101:2,
    102:21, 104:10,
    104:11, 122:25,
    124:9, 124:13,
    171:22, 171:25.
blame 142:2.
block 37:14, 40:20,
    42:15, 95:21.
blocks 33:11.
Blue 143:18.
blunt 71:15.
Bob 63:4.
body 205:2.

Bonds 34:4, 37:18,
    40:14.
book 165:16.
books 62:6.
born 192:5.
bottom 121:5,
    125:18.
box 24:8, 57:6,
    57:22, 64:10,
    69:5, 96:24.
boy 62:2.
Brady 13:5, 13:7,
    14:21, 93:10.
brags 33:17.
brave 28:22.
breach 31:21.
break 8:23, 53:24,
    82:12, 82:13,
    82:24, 96:5,
    97:18, 126:23,
    154:2, 176:6,
    176:18, 177:14,
    179:2, 179:7,
    182:17, 183:10,
    185:17, 185:25.
Breaking 28:15,
    126:22, 135:18.
breaks 24:16.
Bredar 1:18, 65:2,
    65:9, 65:22, 66:5,
    66:25, 67:25,
    73:22, 77:4.
Brian 217:21.
briefly 25:10.
Bring 2:4, 3:13,
    4:11, 4:13, 8:11,
    13:12, 55:10,
    72:13, 80:2,
    80:25, 81:1,
    98:25, 184:4,
    185:11.
brings 42:17.
broad 37:13, 38:2.
broke 56:12,
    173:16.
broken 57:1,
    135:19.
brother 10:9, 31:14,
    32:18, 34:3,
    38:18, 101:23,

102:5, 105:18,
    109:5, 109:7,
    109:9, 118:18,
    118:22, 118:24,
    119:4, 208:20.
Brothers 79:7,
    150:25, 151:19,
    151:21, 200:23,
    200:24, 201:1,
    201:3, 201:4.
brought 13:1, 67:1,
    98:14, 182:18.
Brown 6:6, 6:15,
    27:24, 28:1,
    28:18, 37:1,
    38:16, 38:24,
    38:25, 39:3, 39:4,
    39:10, 41:1, 42:8,
    42:19, 43:13.
bubble 31:1, 31:2,
    31:9, 134:6,
    134:8, 134:10,
    134:13, 134:19,
    137:16, 137:21,
    137:22, 138:2,
    147:21.
buck 195:17, 195:21,
    198:20.
bucking 142:17,
    142:18, 142:21,
    143:2.
bucks 195:11,
    195:15.
buddies 200:22.
budget 88:20.
build 133:5, 166:1,
    166:2.
builds 53:13.
bulk 25:3.
bullet 27:18, 27:19,
    41:4, 85:8.
bullets 52:15,
    85:10.
bumpy 74:6.
bunch 58:16, 97:17,
    140:17, 140:20,
    169:23, 217:24.
burden 18:5, 64:2,
    64:3, 77:5,
    78:15.

burning 31:17.
Bush 110:9, 112:22,
    113:1, 123:22,
    135:3, 135:6,
    135:7, 135:9,
    149:19, 150:4,
    157:25, 158:6,
    158:10, 158:15,
    161:5, 161:22,
    162:18, 167:11,
    167:12, 167:22,
    167:25, 168:4,
    168:8, 169:3.
Bushman 30:23,
    35:23, 103:12,
    103:14, 103:16,
    112:3, 112:5,
    112:6, 112:10,
    132:1, 132:7.
bushmen 51:11,
    112:15, 149:8,
    149:10, 149:12,
    149:15.
business 15:14,
    29:1, 62:5,
    111:18, 111:21,
    111:25, 119:19,
    119:20, 119:22.
busy 37:13.
butting 40:13.
.
.
< C >.
C. 122:1, 122:20.
Caesar 81:7.
calculation
    219:17.
calendar 8:17,
    97:23.
caliber 43:25, 44:8,
    45:8, 45:20,
    45:22, 45:23,
    46:9, 46:11, 47:7,
    47:10, 85:13.
California 29:8,
    30:2, 101:15,
    101:24, 105:14,
    105:19, 113:16,
    113:21.
call 2:11, 3:9, 5:6,

14:15, 22:17,
    41:19, 41:20,
    46:2, 63:7, 89:17,
    89:19, 99:3,
    120:7, 141:11,
    190:18.
calling 58:22,
    83:5.
calls 6:22, 6:23,
    6:25, 7:11, 7:17,
    16:25, 40:3, 42:7,
    44:17, 44:18,
    44:23, 45:1,
    45:25, 46:5, 53:8,
    68:7, 68:9, 68:11,
    68:12, 68:16,
    69:3, 86:25,
    99:5.
camera 37:23,
    43:10.
Camille 22:13.
capability 96:18.
caps 45:19.
capture 149:18.
car 43:24, 44:2,
    44:3, 47:7,
    76:12.
care 129:10, 136:18,
    145:8, 164:2,
    195:14, 195:21,
    195:24, 195:25,
    196:1, 196:2,
    196:4, 196:6,
    196:9, 196:10,
    196:15, 196:16,
    196:18, 197:14,
    204:17, 204:18,
    205:3.
careful 7:21, 63:24,
    155:5.
carefully 19:14,
    52:4, 67:11,
    69:9.
carried 52:18.
carry 32:5, 32:7,
    32:8, 111:13,
    124:18, 124:19,
    124:21.
carrying 24:15.
cars 58:20.

cases 51:25, 74:19,
    81:10, 81:12,
    108:6, 198:13,
    198:18.
Cash 63:3.
casing 85:8, 93:2,
    95:22.
casings 52:15,
    84:21, 85:1, 85:2,
    85:13, 85:16,
    85:21, 85:22,
    86:7, 86:8, 86:9,
    86:11, 86:13,
    86:14, 86:19,
    87:12, 88:2, 88:3,
    88:11, 89:9,
    90:11, 90:14,
    95:2.
cast 34:1, 154:17.
casually 26:6.
category 48:6,
    129:3.
caught 6:12, 36:24,
    37:22, 38:20,
    44:17, 73:12,
    195:6, 202:10.
cause 92:23, 110:24,
    111:5, 116:1,
    214:9.
caused 117:4.
CC 94:20.
cease 119:1.
Cecil 6:13, 6:17,
    36:25, 37:4,
    40:3.
cell 4:21, 21:21,
    23:2, 30:9, 44:5,
    44:6, 45:4, 50:3,
    52:24.
Center 184:10,
    199:2.
certain 16:2, 46:25,
    49:12, 58:3, 59:5,
    65:14, 71:1,
    83:16, 88:25,
    140:17, 153:7,
    203:3, 203:4,
    203:12, 203:13.
certainly 3:12,
    10:23.

certainty 11:11,
   86:17.
certify 220:9.
Chain 86:2, 91:4,
   91:5, 119:13,
   119:15, 119:16,
   189:12.
chair 9:1, 24:8,
   100:1.
challenge 89:23,
   90:17.
chambers 8:21,
   22:15.
chance 3:11, 65:25,
   66:1, 88:8,
   90:3.
chances 65:6,
   65:10.
change 8:23, 36:10,
   92:24, 131:16,
   131:20, 165:5.
changed 45:16,
   131:19, 147:11.
channels 121:6.
chaotic 56:3.
chapters 30:15,
   30:17.
character 50:20.
characterization
   182:22.
characters 34:2,
   154:17.
charge 33:20, 36:8,
   57:4, 58:2, 72:4,
   72:20, 107:15,
   136:9, 160:13.
charged 15:23, 16:3,
   16:6, 46:22,
   46:24, 47:1, 47:5,
   47:9, 47:14, 50:6,
   50:12, 50:24,
   51:4, 56:16, 58:5,
   58:6, 58:7, 60:24,
   64:9, 72:17,
   72:19, 83:21,
   103:21, 107:12,
   107:17, 197:16,
   198:2, 198:24.
charges 7:9, 16:8,
   29:3, 56:17,

56:18, 56:21,
   57:24, 66:8,
   71:22, 71:24,
   72:2, 82:3.
charging 67:13,
   68:1.
Charles 35:1.
check 22:1, 92:9,
   152:2, 156:6,
   156:9.
checked 184:11.
checking 150:16,
   151:12, 156:4,
   160:6.
chest 29:18, 29:23,
   29:24, 72:17.
Chief 11:6, 83:16,
   116:8.
child 22:10,
   168:25.
children 79:2.
choir 62:2.
choose 16:15,
   31:18.
chooses 78:18.
Chop 41:3, 42:12,
   42:14, 42:16.
chose 193:23,
   203:19.
chosen 32:15,
   109:3.
Chris 43:5, 43:8.
Christina 1:27.
Christine 1:46,
   220:9, 220:14.
Christopher 43:5,
   81:5.
Christy 3:3, 12:25,
   13:6.
chronologically
   89:13.
cigar-shaped
   71:16.
cigarette 71:16,
   71:18.
cigarettes 106:12.
circle 185:21,
   188:17.
circles 51:21.
circular 94:19.

circulated 115:9.
circumstances 10:23,
   19:15, 93:5.
City 30:16, 30:25,
   34:16, 37:13,
   51:16, 75:5, 76:1,
   79:3, 105:6,
   131:14, 132:24,
   134:3, 138:1,
   149:24, 150:15,
   151:11, 161:25,
   162:3, 162:19,
   180:14.
city-wide 30:22,
   35:24, 103:18,
   103:20, 104:20,
   149:8, 167:18,
   186:12.
claims 62:24.
clarification
   152:25.
clarifying 184:16.
cleaned 91:22.
clear 2:23, 82:8,
   143:17, 154:3,
   154:5, 189:6.
cleared 220:5.
clearly 93:7,
   96:14.
CLERK 12:5, 12:12,
   15:2, 15:14,
   15:16, 15:20,
   97:3, 99:7, 99:8,
   99:14, 99:20,
   127:25, 128:2,
   128:3, 128:19,
   128:23.
clicked 5:3.
client 93:16,
   181:12, 181:13.
climbing 45:15.
close 3:14, 21:17,
   24:6, 24:7, 40:25,
   70:11, 98:10,
   100:2, 183:21,
   200:24, 201:2.
closed 30:4.
closed-circuit
   37:23.
closely 33:23,

121:6, 153:21.
closer 114:24.
closest 12:22.
closing 17:17,
 17:21, 17:22,
 17:25, 18:4, 21:3,
 21:12, 24:18,
 24:24, 25:5, 54:2,
 60:9, 82:15.
clothes 98:8.
clothing 143:17,
 170:1, 170:6.
clutching 44:22.
co-conspirators
 39:23, 53:5.
co-counsel 78:11.
Coasta 38:16.
cocaine 43:20, 50:8,
 50:9.
coded 46:3, 87:1.
cold 69:15, 73:5,
 173:9, 173:10.
colleague 55:22.
collect 136:5.
collected 86:9,
 136:7.
collective 23:21.
collectively
 23:24.
collide 106:17.
colloquy 181:16.
color 20:9.
com 29:20.
comes 23:22, 32:3,
 53:12, 79:25,
 80:1, 123:10,
 129:2, 184:17.
coming 5:9, 7:5,
 30:13, 40:21,
 43:18, 76:10,
 96:14, 168:16,
 174:25, 183:3.
command 31:2,
 119:14, 119:15,
 119:16, 189:12.
Commander 30:22,
 31:4, 35:24,
 103:18, 103:20,
 104:21, 107:21,
 122:21, 134:16,

134:22, 135:9,
 135:11, 147:25,
 149:8, 167:18,
 186:13.
comment 183:5.
commerce 47:20,
 50:1, 50:5.
commission 15:24.
commit 16:3, 27:8,
 47:1, 47:23, 48:4,
 48:15, 48:21,
 50:19.
committed 34:14,
 39:8, 40:2, 48:6,
 48:10, 51:14,
 64:8, 67:8, 73:5,
 79:21, 106:10,
 195:6.
committing 36:21,
 36:24, 58:8,
 59:15, 72:7, 72:9,
 73:4.
Common 19:13, 21:14,
 49:16, 49:18,
 53:12, 73:18,
 73:20.
communicate 21:19.
communicating
 143:10.
communication 75:12,
 75:17, 154:25.
community 52:10,
 219:20.
company 4:20, 28:25,
 45:2.
compared 62:15,
 85:20, 86:12,
 86:13, 89:9.
comparison 84:24,
 86:7, 86:11, 95:2,
 95:10, 95:12.
comparisons 88:2,
 93:2, 95:22,
 95:23.
completed 24:13,
 177:14.
compliant 166:21.
complicated 154:15,
 165:16, 184:7.
comprised 78:21.

compromise 31:15,
 218:19.
computer 65:15,
 170:8.
comrade 31:18,
 119:2, 119:3,
 125:19, 125:22,
 125:25, 126:2.
comrades 28:15.
concepts 31:15,
 139:12, 166:10.
concern 177:15,
 177:16.
concerned 22:8,
 141:18, 142:8,
 147:3, 155:19.
concerning 17:3,
 19:1.
conclude 20:11,
 20:20.
concluded. 220:7.
concluding 78:25.
conclusion 17:16,
 18:5.
conclusions 17:13,
 17:19, 18:12,
 21:10.
condition 91:24.
conditions 213:8,
 213:24.
conduct 18:14,
 18:20, 19:1,
 20:12, 20:17,
 49:17, 67:24,
 216:12, 217:5.
conducted 45:18.
conducting 97:1.
confederates
 44:10.
conference 59:24,
 102:3, 104:1,
 104:19, 114:6,
 127:23, 138:21,
 152:6, 174:19,
 179:20, 216:4.
conferring 84:18.
confessions 62:25,
 63:17.
Confirmation 125:20,
 125:21, 208:21,

208:23, 208:24.
confirmed 13:7.
conflict 121:7.
confront 218:20.
confrontation
  125:19.
confrontational
  94:1.
confronted 84:10.
confusing 164:22.
confusion 114:21,
  128:2.
congratulated
  37:24.
connect 46:17.
connected 18:17.
connection 17:4,
  46:12, 168:4,
  172:11.
consequence 23:15.
consequences
  41:16.
consider 19:17,
  20:6, 20:11, 52:3,
  52:4, 52:5, 71:19,
  139:11, 183:19.
considering 25:4.
consistent 19:24,
  52:6, 53:20,
  90:5.
conspiracy 15:25,
  16:1, 16:3, 39:22,
  47:1, 47:14,
  47:23, 48:9,
  48:21, 50:5,
  50:12, 50:16,
  57:3, 57:4, 58:2,
  58:8, 58:9, 60:25,
  61:1, 107:13,
  168:4, 197:19,
  210:13, 211:10,
  215:23.
conspiring 46:23,
  46:24, 47:15,
  50:6, 58:7,
  60:24.
constantly 142:6.
Constitution 113:7,
  121:23, 123:4,
  123:7, 208:1.

constitutions 31:25,
  49:3, 113:7,
  121:15, 121:17.
constructed
  102:23.
consult 54:9, 82:23,
  176:17, 217:7.
contact 2:22, 21:13,
  21:17, 21:22,
  22:17, 22:22,
  23:1, 54:6,
  176:14, 217:2.
contacted 3:2.
contacts 82:19.
contend 17:18,
  180:17.
contending 165:23.
content 97:4, 97:7,
  181:8.
contents 44:5.
contested 4:2,
  5:15.
context 4:16, 68:16,
  68:24, 124:14,
  127:5.
continue 2:3, 95:8,
  103:1, 111:3,
  129:19, 140:2,
  143:22, 156:1,
  170:11, 176:6,
  185:14, 212:10.
continued 37:7,
  134:4.
continuing 49:20.
contraband 30:8.
contradicted
  19:25.
contretemps 185:9.
contrition 204:22.
Control 30:7, 30:14,
  30:24, 35:9,
  135:22.
controlled 16:2,
  27:10, 46:25,
  211:11.
controls 27:20.
convenient 94:18.
converged 45:12.
conversation 12:7,
  146:11, 146:14.

conversations 53:8,
  53:9, 143:8.
converse 56:25.
convict 57:18,
  66:7.
convicted 16:8,
  76:6, 76:23,
  79:17, 83:23,
  192:14, 192:15,
  194:5, 194:24,
  212:14.
conviction 108:17,
  191:20, 191:21,
  192:3, 192:10.
convictions
  191:19.
convinced 77:10.
cooperate 27:14,
  72:10, 108:1,
  212:25, 213:3.
cooperating 69:2,
  69:13, 212:24,
  214:22.
cooperation 51:25,
  108:3, 108:7,
  108:10, 108:19,
  108:21, 108:23,
  187:19.
cooperator 74:22,
  75:14, 154:25.
Cooperators 74:17.
coordinate 3:23,
  4:11.
copped 186:24,
  187:23, 193:2,
  193:3.
copy 2:16, 2:17,
  3:18, 119:25.
core 7:9.
corner 44:10.
corners 27:11.
Cornish 43:4,
  81:3.
corporation 49:22.
corporations 58:25,
  59:2.
corrected 187:12,
  187:14, 187:23.
Correction 101:6,
  199:2.

Corrections 30:4,
35:22, 101:7,
106:6, 106:11,
107:4, 199:3,
199:4.
correctly 42:5.
corridor 138:5.
corroborated 52:6.
cost 219:18.
Count 44:10, 46:23,
46:24, 47:4, 47:6,
47:8, 47:13, 50:5,
51:3, 58:1, 60:23,
210:25, 211:3,
211:10, 211:14,
211:18, 211:19,
211:20, 211:21.
counting 42:25,
219:17.
countries 66:11.
Country 40:21,
40:24, 41:2, 41:7,
41:11, 41:23,
42:6.
Counts 46:25, 47:3,
50:23, 50:25,
53:22, 61:2, 61:3,
211:8, 211:22.
County 6:13, 6:18,
36:25, 37:4, 40:3,
184:9.
couple 2:11, 2:13,
36:3, 65:4, 73:15,
93:21, 94:16,
186:1.
courage 27:21.
course 14:13, 19:10,
20:17, 27:16,
49:17, 57:11,
58:4, 98:7, 182:1,
185:4.
court. 26:16, 60:13,
102:24, 104:6,
117:10, 129:17,
140:1, 155:25,
176:7, 216:9.
courtesies 21:14.
courthouse 27:4,
56:1, 66:17, 67:5,
71:10, 218:3.

courtroom 8:12,
12:5, 12:10, 13:7,
13:12, 13:13,
14:1, 14:2, 14:10,
14:12, 14:15,
15:2, 17:7, 18:20,
18:22, 19:5,
21:21, 21:24,
22:8, 22:19, 24:8,
26:1, 66:4, 66:24,
143:14, 169:15,
176:25, 179:3,
219:17, 220:5.
courtroom. 10:19,
12:13, 12:17,
12:24, 15:8,
54:13, 55:13,
83:2, 99:1,
176:23, 185:12,
217:17.
cover 57:25.
coworker 70:5,
70:6.
Crack 34:9, 50:7,
151:8, 159:1,
159:2, 159:4,
159:16.
Craig 34:21.
crazy. 43:10.
Credibility 81:13,
90:17, 203:4,
203:12, 203:21.
crew 39:25.
crime 28:5, 46:21,
47:17, 48:6, 48:7,
48:11, 50:10,
50:12, 53:2,
79:17, 80:13,
85:11, 85:12,
86:9, 88:3,
130:7.
crimes 15:25, 27:9,
46:18, 46:22,
48:15, 48:20,
51:7, 51:14,
52:10, 52:16,
72:7, 72:9, 78:13,
79:21, 83:24,
195:6.
CRIMINAL 1:9, 6:19,

37:6, 51:22,
66:10, 81:2,
81:19, 115:5,
216:19.
cross 38:12, 156:23,
157:12.
Cross-examination
95:15, 96:4,
177:19, 183:20,
189:19, 189:20,
221:17.
cross-examinations
11:8, 219:8.
cross-examine 17:1,
78:3, 183:2,
184:24, 185:2,
218:25.
cross-examining
94:3.
crossed 35:17.
crosses 49:9.
crossover 35:19,
36:10.
crowded 39:9.
cushion 217:11.
custody 6:21, 7:8,
7:10, 46:15, 86:2,
91:4, 91:5, 98:6,
98:7, 98:9, 98:12,
98:14, 98:16,
177:13.
customers 36:16.
Cut 35:22, 76:18,
96:16, 96:17,
101:9, 135:4,
199:1, 199:2,
199:8, 212:4.
CVS 4:6.
.
.
< D >.
d'accompli 185:7.
daily 73:11.
dance 112:20.
danger 75:23.
dangerous 22:23,
56:4, 192:15,
192:25, 211:11.
dare 74:8.
dared 27:14.

darn 155:22.
data 45:3, 90:9,
 95:6, 95:7.
date 9:13.
dates 11:2.
David 34:3, 37:16,
 37:20.
day 3:14, 6:14,
 19:13, 24:5,
 24:25, 25:1, 28:3,
 34:10, 36:25,
 38:1, 41:13, 70:8,
 71:5, 80:20,
 91:25, 108:11,
 151:10, 187:15,
 216:8, 218:12,
 219:9, 219:11,
 219:19.
day-to-day 135:12,
 137:14, 218:10.
daylight 37:13,
 38:2.
days 2:11, 3:9,
 24:14, 80:21.
DBD 38:4.
dead 38:20, 76:1.
deadly 191:21.
deal 33:6, 50:15,
 50:17, 80:10,
 83:11, 106:20,
 117:8, 137:13,
 137:14, 213:9,
 213:24, 214:3,
 214:5, 214:9.
dealer 50:19,
 160:19.
dealing 27:1, 34:17,
 36:13, 36:19,
 37:7, 39:12, 40:4,
 43:20, 44:10,
 44:19, 73:21.
deals 50:13.
dealt 34:22, 48:10,
 50:3, 51:14,
 116:11, 164:2,
 164:5, 164:10.
dear 112:25.
death 27:25, 28:13,
 28:16, 32:4, 41:7,
 41:24, 43:16,

49:4, 75:10,
 123:11, 123:13,
 123:21, 123:25,
 124:2, 135:20,
 189:1, 189:3.
debriefing 198:22.
decaying 91:23.
December 24:17.
decency 27:21.
decide 18:10, 18:21,
 19:6, 20:7, 46:20,
 57:12, 133:12,
 163:20, 166:5.
decided 17:8, 67:6,
 67:7, 130:24,
 205:21.
decides 72:19,
 76:11.
decision 19:12,
 60:18, 66:6.
decisions 112:7.
deck 2:13, 2:14,
 3:18.
deemed 114:10,
 114:18, 116:6,
 166:17.
deeply 26:23.
defeat 182:8.
defend 67:21,
 67:23.
defending 66:19.
Defense 11:9, 11:10,
 13:6, 15:4, 31:5,
 67:19, 84:9,
 87:25, 95:7,
 95:10, 95:14,
 107:9, 120:21,
 134:15, 136:12,
 136:16, 153:3,
 204:1, 204:2,
 218:13, 218:24,
 220:1.
defer 219:13.
definitely 24:11,
 37:6.
definitively 11:4.
degree 86:17.
deliberate 23:22.
deliberating 22:5.
deliberation 22:6.

deliberations 18:9,
 21:10.
deliver 22:7, 26:18,
 54:17, 54:23.
delivered 9:5,
 112:25, 179:5.
DEM 134:17,
 149:18.
denied 95:23.
deny 32:19, 109:8.
depart 12:15.
Department 75:5,
 75:6, 75:11,
 75:12, 75:18,
 75:22, 76:2.
depend 108:16.
dependant 22:11.
depending 61:21,
 179:21, 180:4.
depends 11:7,
 180:4.
depict 134:18.
deputy 12:5, 13:12,
 15:2, 98:10.
described 27:9,
 95:13, 163:4.
describing 134:18.
deserved 179:21.
designated 44:15.
desperate 59:18.
destroyed 87:9,
 88:13, 92:6.
detail 144:1,
 153:17.
details 15:10.
Detective 76:7,
 76:15, 76:19,
 115:13.
detention 184:9.
determining 19:13,
 81:20.
detonation 88:24.
develop 62:11,
 183:4.
development 9:9.
device 21:19,
 21:22.
devices 21:24, 22:1,
 22:4, 22:9.
dictionaries

217:8.
dictionary 19:5,
  54:10, 82:23,
  176:17.
die 41:10, 41:22,
  43:14, 63:4,
  110:3, 173:13,
  173:14, 173:15,
  173:16.
died 205:3.
differed 20:2.
difference 110:18,
  154:6, 154:8,
  181:2.
differently
  115:22.
difficult 66:6,
  66:13, 66:18,
  66:20, 154:24,
  155:4, 155:6,
  155:9.
dig 38:5.
Digga 6:7, 6:16,
  27:6, 33:22, 37:3,
  40:1, 44:13,
  44:14, 46:4,
  46:16, 165:6,
  165:8, 166:25,
  167:4, 167:7,
  167:13, 168:8,
  168:16, 169:4,
  169:15, 170:24.
Digga276@yahoo
  29:20.
ding 92:22.
Direct 83:8, 87:3,
  99:22, 107:11,
  161:10, 171:5,
  177:18, 178:21,
  183:22, 185:14,
  221:15.
directing 186:1.
directive 32:5,
  32:7, 32:8, 49:5,
  122:1, 122:20,
  124:19, 124:20,
  124:21.
directives 125:1.
directly 99:16.
dis 5:8.

disagree 90:12.
disappeared 91:13.
disassembled 46:9.
disbelieve 20:13.
Discipline 31:20,
  32:3, 32:16, 49:4,
  50:18, 109:4,
  123:10, 126:18,
  126:19.
disciplined 124:7.
disclosed 20:23,
  84:17, 90:6,
  175:19.
disclosure 90:23.
discovered 178:3,
  179:5.
discovery 115:12.
discretion 72:4.
discuss 14:3, 20:25,
  21:1, 50:17,
  53:25, 82:13,
  176:9, 176:10,
  216:15, 216:16,
  216:17.
discussed 20:18,
  20:23, 44:7,
  50:25, 68:16,
  177:18, 187:15.
discussing 178:7,
  185:18, 189:13.
discussion 91:11,
  94:15, 185:19.
discussions 142:11,
  143:24, 218:5.
Disguise 118:6.
dish 135:16.
dismissed 39:6,
  72:2, 81:12.
display 173:23.
dispose 87:1.
disprove 78:20.
dispute 5:5, 39:16,
  119:1.
disputed 5:20.
disputes 31:24.
disruptive 26:10.
distinction 69:19.
distribute 16:1,
  16:2, 50:6, 50:7,
  60:24, 61:2,

120:12, 194:25,
  211:11.
distributed 52:19.
distribution
  60:25.
distributions
  50:13.
District 1:1, 1:2,
  66:14, 66:16,
  114:8, 114:20,
  116:10.
disturb 56:8.
disturbing 63:23,
  81:23.
DNA 80:5, 80:7,
  80:8.
Doc 113:18,
  113:19.
document 67:13,
  67:14, 96:25,
  97:3, 97:10,
  97:11, 97:15,
  117:19, 117:20,
  119:25, 121:20,
  171:1, 174:5,
  174:22.
documents 67:6,
  68:5, 96:7,
  96:8.
dodge 155:2.
Doing 23:8, 26:8,
  62:7, 77:3, 78:21,
  90:21, 132:18,
  132:19, 140:12,
  140:19, 141:15,
  142:3, 153:8,
  173:6, 183:19,
  206:18, 219:14.
done 11:12, 37:25,
  57:7, 66:4, 75:7,
  78:22, 84:1,
  86:11, 96:10,
  115:22, 120:24,
  144:11, 144:12,
  144:13, 144:25,
  145:6, 196:20,
  208:18, 210:21,
  214:20.
Donnie 148:22,
  148:23, 149:2,

236

149:4, 206:23,
206:25, 207:1.
door 13:20, 72:16.
doors 32:2.
Dorsey 161:17,
162:13, 162:15,
162:25, 163:5,
165:2, 165:3.
dot 4:12.
double 184:11.
doubt 16:10, 29:23,
51:8, 53:15, 64:8,
66:9, 77:10,
77:12, 78:19,
82:5, 102:19.
downs 32:4.
dozens 59:15.
dragon 112:24,
126:6, 126:9,
126:12, 172:7,
172:8, 172:11,
172:12.
draw 17:13, 17:20,
120:16.
drawn 18:13.
Drive 45:12, 46:1,
46:6, 47:11.
driver 150:10.
driving 43:23,
76:8.
dropped 75:25,
211:14.
drove 150:8.
drug 27:1, 27:11,
34:17, 36:18,
37:6, 39:12, 44:2,
44:9, 44:19,
45:19, 48:22,
50:5, 50:13,
50:16, 50:17,
50:18, 50:19,
50:20, 79:5,
160:7, 160:10,
160:13, 160:18,
161:2.
Dude 146:16, 150:4,
167:11.
dudes 132:19,
137:14, 141:11,
141:24, 141:25,

146:18, 146:19,
146:24, 168:18,
171:22.
due 61:18, 219:21.
dues 136:5, 136:9.
duly 99:11.
dust 91:21.
duties 19:10.
duty 17:9, 64:21.
dying 131:1.
.
.
< E >.
e-mail 4:24,
29:20.
e-mails 4:25.
ear 23:18.
earlier 34:7, 37:1,
40:15, 47:4,
49:25, 64:3, 66:8,
70:14, 77:1,
83:12, 112:6,
121:14, 122:12,
125:21, 128:11,
130:4, 135:14,
136:13, 145:12,
149:11, 158:6,
167:17, 170:13,
172:8, 172:21,
185:21, 186:12,
188:2, 188:10.
early 10:22, 29:8,
36:1, 69:3,
115:19, 151:4,
161:10, 216:11.
earned 34:18,
73:3.
earpieces 25:23.
ears 23:21.
easier 66:24,
132:18.
easily 24:23.
East 27:3, 35:3,
40:20, 42:15,
132:14, 162:1,
162:20.
economy 30:7.
ecstasy 34:10.
education 31:5,
134:15, 136:24.

effect 88:15,
178:21, 212:12.
efficient 11:5.
effort 62:11.
eight 192:9, 193:5,
193:6.
Eighth 20:1.
Either 5:2, 17:5,
17:13, 18:14,
29:24, 35:14,
89:3, 96:24, 97:2,
106:16, 117:2,
150:2, 164:10,
164:11, 179:7,
181:25, 219:1.
electronic 18:15,
21:24, 22:1, 22:9,
25:23.
Electronics 55:11.
elects 16:22.
element 153:15.
elements 25:4,
47:17, 50:9, 51:6,
64:9.
elicit 166:20.
eliciting 153:12.
elicits 152:20.
eligibility
108:15.
ELMO 96:10.
elsewhere 19:7.
emerged 184:13.
emergency 22:17,
22:20, 23:1.
emotions 119:1.
emphasize 65:5,
75:21.
emphatically
175:24.
employees 29:2.
encourage 61:22.
encyclopedia 19:3,
54:10, 82:23,
176:17.
encyclopedias
217:7.
end 24:5, 28:17,
46:19, 53:18,
57:12, 64:1, 66:5,
66:25, 77:4, 77:8,

77:12, 94:6, 94:7,
 109:22, 133:17,
 144:23, 164:1,
 164:4, 183:22,
 195:7, 195:17,
 218:11.
ended 149:3, 167:8,
 178:7, 185:25,
 204:24, 204:25,
 205:1.
Ending 114:17.
endorsed 86:18.
ends 32:23.
enemy 27:22.
enforcement 40:8,
 45:2, 52:11,
 68:25, 70:24,
 71:14, 71:17,
 72:5, 72:8, 75:4,
 75:5, 75:16,
 76:20, 87:3.
enforcer 40:22,
 203:13.
enforcers 33:21.
enforcing 165:14.
engage 136:3.
engaged 27:2, 30:10,
 30:11, 35:10,
 39:12.
engaging 49:17.
Enjoy 12:15.
enjoyable 9:5.
enough 28:22,
 90:8.
ensure 23:4, 23:5,
 114:14.
enter 112:23.
entered 12:13,
 12:24, 14:9, 15:8,
 51:25, 55:13,
 99:1, 185:12.
enterprise 16:1,
 46:24, 47:15,
 47:16, 47:19,
 49:14, 50:1, 50:3,
 58:3, 58:4.
entertain 153:6.
entertainment
 62:6.
entire 78:14.

entitled 91:24,
 154:14, 166:9,
 218:13.
entity 49:22.
entrance 98:15.
entrenched 26:23.
envision 143:5.
ENZINNA 1:31, 8:5,
 8:8, 11:13, 11:14,
 11:22, 13:8,
 14:19, 14:20,
 54:16, 54:18,
 55:1, 55:8, 55:9,
 55:11, 55:12,
 55:14, 55:17,
 55:19, 55:21,
 60:6, 60:14,
 63:10, 64:13,
 98:16, 98:17,
 189:25, 220:2.
episode 199:13.
equated 62:16.
error 154:21.
escape 45:14,
 130:25, 205:9.
escaped 130:14,
 130:17, 131:4,
 133:18, 205:13.
especially 40:24,
 48:24, 94:9,
 218:14.
Esquire 1:31, 1:33,
 1:37, 1:41.
essence 2:22.
essentially 66:9,
 95:21.
establish 106:7.
established 131:5,
 175:14.
establishing
 131:22.
estimate 11:16.
et 1:10.
ethnic 20:9.
Eusi 121:25, 122:8,
 122:14, 122:24.
evaluate 73:23.
evening 219:24.
event 10:3.
events 61:5, 70:12,

71:1, 71:6.
Eventually 35:23,
 45:16, 107:6,
 149:2, 210:10.
everybody 22:1,
 73:7, 80:14, 94:1,
 120:7, 136:25,
 137:22.
everyone 31:19,
 120:6.
Everything 24:1,
 26:17, 65:23,
 66:4, 73:19,
 78:16, 79:24,
 82:9, 108:9.
everywhere 56:4.
evidentiary 85:19.
evidently 90:10,
 95:1.
exact 179:11.
Exactly 7:23, 11:23,
 31:7, 45:7, 70:17,
 74:3, 86:10,
 87:23, 205:20,
 209:18.
exaggerated
 108:22.
exam 91:12,
 178:21.
Examination 84:9,
 97:1, 99:22,
 152:18, 185:15,
 221:15.
examine 90:3,
 154:24.
examined 15:5,
 16:24, 52:14,
 67:6, 88:20,
 99:11.
examining 88:23,
 92:19.
example 27:22,
 36:23, 37:11,
 41:18, 52:8,
 106:9, 123:12,
 124:11, 126:18,
 142:18, 143:3,
 143:5, 144:16,
 154:22, 196:22,
 196:25.

examples 31:25,
50:21, 50:22,
126:21.
exceeded 153:4.
except 12:22,
21:14.
exchange 21:15.
exclude 2:9,
95:20.
excluded 14:7.
exculpatory 93:12.
Excuse 12:6, 12:11,
80:25, 114:7,
160:21.
excused 12:2, 12:5,
12:14, 17:6,
20:21, 217:15,
220:4.
excusing 10:25.
execute 32:10.
executed 52:13,
80:20, 80:21.
execution 37:13.
exhibits 16:20,
18:11, 80:1, 96:8,
116:15, 128:3,
129:5, 129:6.
exigent 4:21.
exist 95:9, 124:5.
existed 48:17.
existence 88:11,
101:10, 181:8.
exists 87:9,
102:20.
expanded 30:5.
expect 5:9, 71:2,
71:9, 71:13,
74:20, 90:22,
95:19, 96:6,
108:13.
expectation 11:1,
23:23, 219:3.
expected 23:7,
31:11, 137:4,
216:20.
expects 13:23,
16:13, 64:4.
expenditure
219:19.
experience 67:12,

88:24, 89:1.
experiences 19:13.
expert 5:6, 5:7,
84:16, 84:17,
84:22, 85:25,
86:3, 86:6, 86:16,
88:1, 88:9, 88:21,
89:17, 89:19,
90:5, 90:10,
90:20, 92:19,
93:1, 93:2, 95:7,
95:10, 95:15,
95:20, 95:21,
102:8.
experts 52:14, 84:8,
90:2, 90:5, 90:7,
90:18.
explain 4:14, 14:21,
18:7, 36:2, 36:5,
41:21, 60:21,
63:18, 100:14,
109:23, 110:1,
122:4, 130:16,
132:24, 141:8,
143:23, 153:17,
154:13, 161:14,
161:18, 166:9,
168:23, 172:8,
173:5.
explained 41:23,
61:4, 65:9, 66:5,
77:4, 104:20,
125:21, 135:14,
139:23, 149:11.
explaining 104:16,
158:6, 188:22.
explains 15:11.
explanation 166:4.
exploits 6:19,
37:6.
explosive 88:25.
expose 21:5.
exposed 54:3, 82:16,
176:11, 216:25.
exposing 35:12.
express 179:7.
expressed 166:8.
expressly 217:25.
extends 28:20.
extensive 20:22.

extent 20:1, 52:22,
93:23, 115:6,
115:14, 153:3,
168:3, 217:25.
external 217:7.
Extort 106:8,
111:17.
extorting 106:21,
111:25.
extortion 106:9,
136:3.
extra 2:17.
extreme 32:4,
123:11, 123:12,
123:15.
eyes 23:21, 69:14.
eyewitness 80:17.
.
.
< F >.
F-word 63:12.
F. 1:31.
face 57:21, 99:7,
171:15, 171:17.
Facebook 6:6, 6:16,
7:15, 37:3,
38:1.
facility 101:7.
facing 59:16,
71:24.
Fact 5:8, 17:11,
33:15, 51:20,
56:25, 62:15,
62:20, 62:21,
67:1, 67:10,
75:24, 90:4, 90:5,
90:9, 90:15,
95:13, 98:13,
103:20, 109:22,
150:10, 163:20,
179:5, 181:4,
197:19.
factly 69:18.
factor 31:18,
70:10.
factors 19:17,
81:20.
facts 18:10, 54:8,
82:21, 93:5,
155:11, 176:16,

179:21, 182:9,
183:4, 217:4.
fail 125:9.
failed 42:21.
fails 32:8,
124:20.
fair 23:5, 84:12,
219:1.
fairly 3:10, 18:13,
20:7, 134:18,
149:18.
fairness 21:8.
Faison 34:2.
fait 185:6.
faith 175:14,
175:25, 183:5.
fall 39:1, 42:17,
42:22, 182:12.
familiar 40:17,
92:16, 104:24,
121:17, 134:6,
139:2, 165:11,
166:25, 167:3.
families 10:10.
fan 62:11, 62:17.
far 55:25, 84:3,
84:4, 93:17, 95:8,
155:19, 197:3,
219:6.
fashion 91:22.
fast 44:12.
father 79:3, 79:4.
father-in-law 9:25,
10:1.
favor 20:12, 20:16,
166:14.
FBI 44:17.
FCRR 1:46, 220:9.
fear 22:21, 23:25.
Federal 1:47, 66:19,
103:21, 165:15,
172:22, 216:19.
federally 149:3,
149:4.
feds 71:14.
feed 151:13.
feel 65:3, 73:8,
116:15, 153:3,
197:6, 197:8,
204:22, 218:6.

feeling 71:4.
feet 22:15, 173:9,
173:10.
fellow 6:15, 28:1,
28:15, 37:2, 37:5,
125:25, 126:2,
216:16.
felon 16:5, 16:7,
47:5, 47:9.
felons 51:4.
felony 193:3.
felt 71:5, 94:8.
few 22:5, 27:3,
27:25, 32:15,
47:13, 49:1,
103:3, 109:3,
156:3, 166:9,
170:18, 172:19,
179:3, 218:4.
Field 31:9, 134:14,
137:11, 137:15,
137:16, 137:19.
Fifth 19:22.
fight 90:13, 90:15,
91:5, 91:8.
fighting 58:6.
figure 88:6, 178:10,
191:20, 200:2.
file 31:10.
filed 2:8, 2:21,
82:3.
fill 61:13, 155:16,
219:9.
filled 204:11,
219:11.
filming 43:3.
filtered 149:14.
final 17:23, 21:10,
98:15.
Finally 24:17, 51:3,
53:3, 78:25,
81:7.
Finance 134:16,
135:21, 136:11.
find 3:24, 7:25,
16:9, 45:22, 61:6,
62:19, 62:21,
63:22, 70:6, 82:9,
93:9, 94:24,
95:11, 133:2,

137:14, 142:18,
197:18.
findings 18:11,
92:23.
finds 62:6, 76:15.
fine 92:2, 135:20,
175:3.
Fines 32:3, 123:10,
189:1.
finger 43:10.
fingerprint 91:21,
93:14.
fingerprints 80:5,
80:7, 80:8, 91:20,
92:10.
finish 188:17,
200:3.
finished 24:23,
65:24, 97:2.
fire 31:17, 88:1,
88:9.
firearm 2:9, 15:5,
16:6, 47:10, 51:5,
76:6, 76:16,
84:19, 86:1,
86:12, 87:2, 87:4,
87:8, 87:21,
88:25, 94:2,
94:3.
firearms 52:14,
83:14, 83:17,
83:25, 84:7,
84:16, 87:25,
89:12, 89:14,
90:3, 91:10,
91:19, 92:16,
92:17, 94:13,
94:14, 94:22,
94:25.
fired 86:6, 86:13.
firing 86:8.
firings 90:10.
firm 89:25.
five 38:8, 85:13,
183:23, 193:8.
flat 93:13, 96:12.
Floor 1:48, 45:15,
67:5.
flowing 139:13.
fly 117:1.

focus 47:25, 61:21,
  61:25, 153:19.
folder 24:6, 24:7.
folks 6:18.
follow 18:7, 31:11,
  35:15, 218:2.
followed 121:6,
  141:2.
Following 16:11,
  18:8, 19:8, 19:18,
  26:16, 38:14,
  60:13, 102:24,
  104:6, 117:10,
  129:17, 140:1,
  153:8, 155:25,
  176:7, 216:9.
follows 99:12.
Foo 35:2.
Force 217:22.
forced 32:25.
forces 61:1.
forearm 29:14.
foregoing 220:10.
foreign 50:1.
forensic 84:8,
  86:17.
foreseeable 39:24,
  41:16.
forget 58:12.
forgot 75:20,
  122:15.
form 49:4, 61:13,
  71:20, 152:20,
  152:21, 152:23,
  153:2.
formal 49:19.
formalistic 97:9.
former 116:7.
formerly 104:20.
forms 32:3, 51:10,
  68:5, 71:21,
  123:10.
forsake 32:15,
  109:3.
forth 56:25,
  181:17.
Fortunately 42:16.
forward 8:20, 20:24,
  28:23, 36:16,
  44:12, 48:2.

found 3:1, 44:15,
  44:22, 45:19,
  46:6, 80:21,
  80:22, 108:20,
  108:22, 153:9,
  166:13, 178:4,
  178:5, 178:6,
  178:13, 178:18,
  184:13, 211:18.
Foundation 95:1,
  102:12, 102:13,
  102:17, 102:19,
  104:3, 115:1,
  165:10, 165:20,
  165:23, 166:1,
  166:11.
Foundational 102:16,
  154:1, 166:2,
  167:16.
founded 29:6.
founders 34:8.
Four 80:21, 92:1,
  153:14, 193:8,
  199:15, 199:22,
  199:23.
four-star 30:23.
four. 57:23.
Fourth 19:21.
fox 110:10, 110:12,
  110:18, 110:20,
  110:22, 111:5.
foxes 110:16.
frame 160:18,
  161:1.
frankly 11:20,
  62:19.
Frederick 116:8.
Free 6:7, 6:16,
  37:3, 72:24.
freely 22:24.
frequency 56:5.
Friday 2:20, 2:21.
friend 125:4,
  131:21, 200:6.
friendly 200:19.
friends 18:19,
  22:24, 79:11,
  216:17.
frighten 56:9.
frightening 63:23.

front 4:4, 165:3,
  214:12.
fuck 38:19.
fugitive 40:8,
  44:15, 44:16.
full 12:22, 93:23,
  116:24.
full-fledged 35:18,
  110:16, 110:18,
  110:20, 111:11.
fully 108:4.
function 18:9,
  49:20.
fundamental
  218:20.
future 26:4,
  198:11.
.
.
< G >.
G-r-a-y 99:19.
gain 59:9, 59:10.
gallery 14:14,
  26:7.
game 24:10.
gatekeeping 166:5.
gather 12:6,
  12:10.
gave 92:7, 144:22,
  145:8, 151:20,
  156:16, 156:18,
  157:4, 157:7,
  158:21, 175:20,
  175:23, 179:25,
  184:8, 203:12,
  204:10, 208:23.
gave. 180:1.
gears 161:4,
  165:5.
gel 45:19.
general 7:7, 18:16,
  19:8, 24:10,
  134:14, 137:11,
  207:10, 218:11.
generalized 92:20,
  92:21.
Generally 115:4,
  156:20, 157:9.
generals 30:23.
generated 86:8.

generation 38:14,
  80:14.
gentleman 34:6,
  53:3, 214:25.
George 29:7, 29:22,
  34:6, 37:18,
  57:21, 101:13,
  101:18, 171:16.
Gerald 1:10, 1:29,
  15:23, 16:3, 27:5,
  28:8, 28:9, 28:19,
  36:7, 55:23,
  56:10, 61:7,
  61:20, 62:1, 64:1,
  189:25.
gestures 43:12.
gets 28:11, 65:10,
  66:1, 74:6, 76:13,
  117:3, 153:13,
  201:4.
getting 40:17,
  71:20, 72:18,
  106:12, 141:22,
  142:2, 144:23,
  146:16, 149:3.
girls 58:21.
give 13:23, 22:13,
  32:19, 77:11,
  78:25, 96:25,
  106:9, 109:8,
  123:12, 125:4,
  126:18, 135:16,
  150:23, 151:19,
  151:21, 156:10,
  158:24, 159:4,
  178:22, 179:12,
  183:17, 184:14,
  184:15, 203:3.
given 8:21, 16:23,
  19:20, 20:6, 22:6,
  24:16, 32:7, 32:9,
  41:6, 73:22,
  124:19, 135:17,
  163:16, 166:4,
  166:19, 178:5,
  203:16, 203:20,
  206:8.
giving 125:3.
glasses 170:2,
  170:3.

global 180:8.
globally 179:4.
glove 44:1.
GM 146:6, 157:1.
go-between 135:2,
  135:5.
goal 180:25.
goals 79:19.
God 112:25.
Google 4:5, 4:25,
  19:1.
gorilla 29:25,
  171:20, 171:22,
  171:25.
gotten 67:13,
  73:12.
government.
  178:22.
GP 109:12, 113:22,
  117:18, 128:13,
  174:2, 174:3,
  177:1, 177:10,
  185:19.
GPS 3:22, 4:11,
  4:14.
gram 48:10.
grams 50:7, 50:8.
grand 15:23, 67:4,
  67:18, 68:2,
  71:9.
grandmother 79:6.
grant 13:22.
gratuitous 7:7.
grave 32:1, 123:7.
great 57:21.
greater 67:2,
  155:21.
greatest 24:21,
  217:25.
green-lighted 28:7,
  28:19, 61:10.
greetings 21:15.
Greg 39:11.
Gregory 34:21, 35:2,
  40:6, 43:17, 45:8,
  46:13, 83:22,
  87:16, 89:8.
Grew 56:10, 76:4,
  79:2.
griping 168:18.

ground 57:16, 76:14,
  89:25, 112:23.
ground. 76:13.
grounds 102:16.
group 30:22, 31:2,
  40:23, 49:16,
  49:18, 49:21,
  49:22, 58:11,
  70:8, 163:19.
growing 79:8.
guarantees 108:12.
guard 172:13.
Guerilla 26:24,
  29:5, 33:8, 58:12,
  58:14, 58:16,
  58:18, 58:23,
  59:1, 59:14,
  61:17, 77:22,
  80:12, 100:20,
  101:2, 102:21,
  104:10, 104:11,
  122:25, 138:16,
  139:5, 139:18,
  171:23.
guess 110:23,
  116:11, 202:17.
guide 19:9.
guiding 152:14.
Guilford 33:12.
gunned 37:12.
guns 44:8, 46:18,
  52:17, 56:4, 56:6,
  63:11, 89:20,
  90:14, 91:1,
  91:13, 91:15,
  91:17, 91:25,
  95:3, 95:23,
  137:9.
gunshot 80:24.
guy 27:22, 29:7,
  30:21, 34:21,
  35:1, 35:24, 36:8,
  37:1, 37:12,
  37:17, 38:16,
  39:11, 39:14,
  40:5, 40:16,
  40:18, 41:2,
  42:10, 44:21,
  44:22, 44:24,
  45:7, 97:6.

guys 33:11, 34:8,
  39:18, 40:10,
  40:14, 40:17,
  40:25, 43:6,
  58:19, 58:20,
  58:21, 58:22,
  132:23.
guys. 69:23.
Gyedi 121:25, 122:8,
  122:14, 122:24,
  123:2, 186:8,
  186:9, 186:15,
  186:19, 186:21.
.
.
< H >.
habit 151:14.
hackneyed 153:10.
half 25:1, 74:22,
  219:8.
half-brother 28:1.
hammer 38:4.
hand 15:17, 25:14,
  25:17, 25:20,
  61:7, 65:9, 96:11,
  99:9, 208:4,
  208:18, 208:20.
handed 43:16,
  119:25, 171:3.
handgun 45:8, 46:10,
  46:11, 46:12,
  47:10.
handguns 80:3,
  80:4.
Handle 22:12,
  135:12, 144:2,
  144:4, 144:5,
  144:7, 146:21,
  218:10.
handled 163:22.
hands 31:14, 87:10,
  113:1, 118:18,
  119:7, 120:12,
  120:14.
handwriting 207:6,
  207:8.
Handy 28:2, 28:5,
  38:18, 39:1, 39:5,
  41:20, 42:8.
hang 70:5, 70:9,

  106:1.
hanging 79:10,
  79:15, 158:20.
happen 68:20,
  108:20, 108:22,
  116:17, 145:3,
  183:3.
happened 4:12, 6:17,
  24:1, 27:2, 34:20,
  37:4, 39:19,
  41:15, 41:16,
  42:24, 68:21,
  70:12, 81:17,
  81:25, 134:1,
  149:2, 155:14,
  156:21, 157:10,
  182:23, 182:24,
  193:11, 199:20,
  200:5, 201:4,
  203:3.
happening 140:17,
  149:14, 168:1.
happens 26:3, 41:11,
  42:18, 51:21,
  108:16, 115:4,
  125:10.
happy 115:15,
  216:23, 219:20.
hard 23:12, 74:23,
  125:14.
hardworking 29:2.
harm 32:18, 109:6,
  125:19.
harmful 181:12.
Harry 81:7.
Harvey 39:7, 41:1,
  41:19.
hate 10:21, 73:19.
Hayden 91:11,
  115:13, 217:22.
He'll 12:20, 36:1,
  36:2, 36:5, 36:6,
  63:18, 83:6,
  155:14.
he/she 124:19,
  124:20, 124:21.
head 27:19, 40:16,
  41:5, 41:9,
  186:16, 186:17.
headquarters 6:18,

  37:5.
heads 40:13,
  219:17.
heap 206:22.
heard 18:22, 21:3,
  21:11, 23:12,
  24:3, 39:2, 47:11,
  48:25, 49:25,
  54:1, 65:12,
  65:13, 65:21,
  67:5, 82:9, 82:14,
  106:16, 110:10,
  110:11, 128:4,
  138:12, 139:10,
  140:13, 140:20,
  152:8, 154:17,
  165:5.
hearing 17:5, 73:19,
  176:19, 216:11.
hears 76:8.
heat 35:12.
Heights 132:15,
  133:7.
heist 121:1.
held 6:21, 35:11,
  39:23, 184:10.
help 73:15, 119:25,
  215:12, 215:16,
  215:18, 215:20.
helped 51:15.
helpful 23:9, 92:18,
  93:5, 93:12,
  181:21, 181:22.
helps 181:13.
Henry 37:12.
hereby 220:9.
Heroin 34:10, 50:8,
  151:8, 194:25.
hidden 44:1, 46:6.
hide 190:22.
hiding 191:14.
hierarchy 149:19.
higher 107:22.
highest 180:14.
highest-ranking
  151:3, 151:23,
  151:25, 206:3,
  206:4, 206:6,
  206:7, 206:11,
  206:12, 206:15,

206:16, 206:17,
206:22.
hireable 75:1.
hired 78:8.
hisself 164:2.
history 30:17, 36:3,
102:11, 105:8,
136:25, 137:1.
hit 4:20, 5:1,
32:10, 32:11,
45:7, 205:22,
205:24.
hits 4:24.
Hodari 30:21, 35:24,
107:19, 107:20,
148:24, 148:25,
149:5, 149:8,
149:19, 149:22,
186:11, 186:12,
186:19, 206:14.
Hold 65:17, 90:24,
129:16, 176:5.
holding 124:18.
hole 46:7.
Holiday 9:5, 113:18,
113:19.
holidays 20:22.
home 6:13, 30:13,
36:25, 148:22,
205:11, 205:12,
206:6, 206:9.
homeboy 31:18.
Honorable 1:18.
honored 31:21.
Hood 39:12, 41:1,
41:2, 41:4, 41:5,
42:3.
hope 23:22, 67:12,
87:20, 214:12,
214:22.
hopeful 87:9.
Hopefully 15:12,
26:9, 217:13.
hoping 52:2, 71:22,
71:23, 108:10,
214:7, 214:9,
215:9.
horrendous 71:24.
horrible 71:4.
hospital 201:18,

201:19.
hot 142:5, 142:8.
hour 82:25, 84:22,
216:6, 219:19.
hours 37:20, 46:14,
76:1, 83:9.
House 30:4, 35:3,
35:22, 45:12,
45:16, 45:19,
45:22, 45:23,
46:15, 79:9,
101:6, 101:7,
106:6, 106:10,
107:3, 161:19,
163:2, 163:18,
163:20, 166:1,
166:2, 199:3,
199:4.
houses 34:11.
huge 81:13.
Huh-uh 133:19.
human 204:19.
hung 70:1, 79:11.
Hunter 34:3, 37:16,
37:20, 37:24.
hurt 202:22.
Hurtt 151:11, 152:8,
154:19.
Hustling 135:24,
135:25.
.
.
< I >.
iceberg 44:11.
ICU 201:16,
202:25.
idea 102:8,
175:24.
identification
114:13, 115:16,
173:20, 173:22,
173:23, 174:3.
identified 13:6,
143:21, 161:7,
170:10.
identify 116:14,
169:17, 170:5.
III 1:41.
illegal 50:4, 56:14,
58:3, 77:1,

77:3.
image 57:21, 172:6,
172:9.
immediate 16:16,
31:2, 119:8.
immediately 22:19,
54:24, 114:11,
114:19, 116:5.
impartially 20:7.
implicated 28:5.
implicit 178:14.
implied 179:8.
implying 179:13.
import 181:8.
Important 23:10,
23:13, 28:16,
29:3, 32:11, 48:8,
49:7, 50:11,
56:16, 57:15,
61:24, 62:14,
65:3, 66:10,
68:23, 69:19,
70:9, 78:10,
81:14, 84:14,
97:4, 116:18,
119:20, 153:18,
215:24.
Importantly 44:4,
48:5, 69:1.
impose 50:18.
imposed 188:20,
189:7.
impossible 33:3.
improper 19:3,
155:19.
in-laws 10:6.
in. 8:1, 56:2,
79:14, 90:17,
129:10, 184:4.
inappropriate
26:5.
inarticulate 139:13,
153:12, 155:4.
incarcerated 6:8.
incarceration
7:21.
incident 18:18,
199:16, 199:19,
199:20.
inclined 218:6.

include 10:5, 38:14,
    44:6, 44:9,
    112:13.
included 147:21,
    179:7, 218:21.
includes 21:15,
    30:7, 31:3, 48:21,
    134:10.
Including 6:25,
    28:20, 31:4, 34:9,
    35:17, 38:13,
    39:9, 39:13,
    40:14, 40:25,
    42:19, 43:20,
    44:8, 46:17, 49:3,
    53:8, 61:20,
    91:19, 198:9.
incorporate 138:1.
incorrect 179:17.
incorrectly 42:10.
incredulous 74:8.
independent 18:14,
    40:12, 54:7,
    82:20, 176:15,
    217:4.
INDEX 221:1.
indicate 6:21, 9:22,
    98:11, 169:3,
    169:10.
indicated 11:2,
    25:22, 66:21,
    217:21.
indicates 152:21.
indicating 128:11,
    157:3.
Indicating. 25:15,
    25:18, 25:21,
    157:16.
indicia 98:15.
indicted 149:3,
    149:4.
indictment 67:9,
    210:7, 211:1,
    211:4, 211:10,
    211:22.
indirectly 75:10.
individual 13:7,
    56:13, 56:23,
    57:1, 61:25,
    101:17, 143:6,

162:10, 162:13,
    165:6, 166:25,
    167:3, 167:7.
individuals 21:17,
    61:20, 61:21,
    79:15.
indulgence 170:19,
    181:14.
influence 71:2,
    71:11.
influenced 17:11,
    20:16.
informal 49:19.
informant 48:23.
information 19:6,
    19:7, 45:3, 95:18,
    153:14, 154:9,
    163:16, 166:21,
    168:3, 168:8,
    176:3, 178:23,
    178:24.
informed 89:19.
inherently 7:10.
initial 75:19.
initials 128:11.
injured 201:15.
inmate 29:7.
inner 51:21.
innocence 77:8,
    77:9, 78:11.
innocent 77:7,
    78:13, 78:14.
inquire 102:25.
inquiry 153:19.
Inside 36:21, 44:1,
    45:16, 45:18,
    75:15, 80:22,
    134:9.
insist 27:21,
    43:15.
Instagram 38:24.
instance 7:20, 18:3,
    218:16.
instances 31:22.
Instead 43:16, 46:9,
    61:9, 208:15.
Instruct 12:18,
    12:19, 13:12,
    14:13, 18:6,
    66:25, 87:1.

instructed 12:4,
    14:1, 77:11,
    216:21.
instructing
    153:21.
instruction 13:14,
    26:5, 144:21,
    144:22, 145:7.
instructions 8:22,
    18:8, 21:4, 21:11,
    24:20, 24:25,
    25:6, 54:2, 59:10,
    82:15.
integrity 60:4.
intend 89:17,
    116:10, 184:21.
intended 19:8,
    177:21, 180:3,
    180:4.
intends 89:19,
    95:2.
intent 16:2, 23:10,
    50:7, 188:10,
    194:25, 211:11.
interest 19:23,
    74:18.
interesting 66:22.
interests 58:9,
    58:10.
internal 31:23.
Internet 18:16,
    21:18, 54:9,
    62:11, 82:23,
    176:17, 217:5.
interposed 114:11,
    114:19, 116:4.
interrupted 202:8.
intersection 40:6,
    45:5, 45:9.
interstate 47:19,
    50:1, 50:5.
interview 32:7,
    124:19, 184:10.
intimidation 27:1.
introduce 4:23,
    5:19, 64:23,
    115:12, 190:8,
    190:11, 190:14.
introduced 55:24,
    64:24, 185:6,

190:3, 190:15.
introduction 17:3.
invasion 6:13,
  36:25.
investigation 18:20,
  54:8, 82:21,
  176:15, 202:7,
  202:13, 217:4.
investigators
  84:8.
involve 17:8.
involved 42:10,
  56:14, 141:15,
  197:18.
involving 21:6,
  34:1.
ironclad 28:12.
issue 2:7, 4:13,
  4:15, 5:12, 5:16,
  8:11, 13:1, 19:4,
  41:22, 60:12,
  60:24, 81:13,
  83:11, 87:5, 91:4,
  94:1, 182:17,
  185:3, 185:5.
issued 35:13,
  67:9.
issues 2:4, 2:14,
  3:16, 7:18, 8:4,
  18:19, 21:6, 54:5,
  82:17, 91:1, 92:3,
  115:6, 115:14,
  176:12, 217:1,
  217:6, 217:8.
item 3:3, 115:11.
items 2:25, 94:10,
  127:3.
itself 17:15, 27:13,
  35:11, 86:12,
  201:17.
.
.
< J >.
J. 1:25, 31:15,
  116:8, 137:20.
Jackson 29:7, 29:22,
  34:6, 37:18,
  101:13, 101:18,
  171:16.
jails 106:22,

106:24, 107:1,
  131:6.
Jamaa 29:9, 29:13,
  31:15, 31:19,
  117:25, 118:7,
  118:10, 118:19,
  118:20, 119:19,
  119:20, 122:1,
  122:5, 122:8,
  122:12, 122:14,
  122:24, 123:2,
  124:6, 125:16,
  126:8, 126:9,
  127:21, 136:25,
  186:16.
James 1:18, 43:4,
  81:3.
jammed 76:16,
  76:22.
January 9:6, 9:12,
  11:7, 11:19,
  24:15, 44:16,
  216:21.
jaws 182:8.
Jay 201:8.
Jeffrey 1:33, 55:22,
  189:24.
Jencks 175:20.
Jessup 199:5, 199:6,
  199:7, 199:21.
jigsaw 57:6, 57:7,
  57:19, 57:25.
JKB-16-0363 1:9,
  2:3.
job 37:25, 74:25,
  78:8, 78:9, 81:14,
  81:15.
jog 24:2.
John 1:41, 77:23.
Johnny 63:3.
join 27:7, 33:3,
  33:5, 35:15, 49:8,
  49:11, 61:1,
  111:8.
joined 27:9, 28:21,
  35:21, 36:11,
  38:14, 40:10,
  48:3, 104:16,
  107:3, 130:4.
joining 48:13.

Joseph 34:4, 37:18,
  40:14.
judged 38:5, 38:7.
judges 19:11, 20:14,
  59:6.
judging 19:9.
judgment 219:13.
judgments 82:7.
judicial 22:14.
jumble 153:2.
jumbled 152:20,
  153:4.
June 37:11, 39:15,
  43:21, 43:22.
junior 35:11.
Juror 8:11, 9:3,
  9:7, 9:10, 9:14,
  9:17, 9:21, 9:25,
  10:4, 10:7, 10:9,
  10:12, 10:15,
  10:18, 10:24,
  11:12, 11:15,
  11:18, 12:2, 12:3,
  12:4, 12:10,
  12:14, 12:16,
  12:18, 12:19.
jurors 18:25, 19:10,
  21:20, 216:16.
justice 28:23, 41:8,
  42:1, 43:16,
  66:10, 120:10,
  120:12, 134:15,
  135:14, 135:16,
  215:16.
justified 209:1.
.
.
< K >.
K. 1:18.
Keep 11:17, 21:9,
  30:24, 31:17,
  39:3, 39:20, 48:7,
  48:24, 49:1,
  50:11, 52:5, 63:5,
  63:25, 64:11,
  66:23, 68:23,
  73:19, 82:8,
  139:12, 154:7,
  175:22, 176:1.
keeping 6:18,

37:6.
keeps 120:12.
Kennedy 132:14,
  132:15, 133:7.
Kenneth 1:35, 15:24,
  27:5, 34:2, 64:21,
  69:24, 77:6.
Kenny 64:22, 76:3.
Kept 36:13, 36:21,
  43:20, 45:10,
  72:7, 168:16.
Kevbo 186:6,
  186:7.
key 112:24.
Keya 13:5.
kicked 75:24.
kids 10:9, 58:17,
  63:8.
killed 27:12, 27:23,
  27:24, 28:6,
  31:23, 32:25,
  37:16, 39:3,
  40:19, 41:5, 42:5,
  49:12, 56:5,
  110:4, 110:5,
  144:24, 146:16,
  164:13, 187:2,
  195:18, 196:11,
  196:13, 197:4,
  197:19, 198:21,
  201:13, 204:18.
killing 112:13,
  125:6, 196:14.
kind 11:11, 21:13,
  23:25, 26:10,
  27:8, 48:7, 57:5,
  84:11, 93:9,
  108:13, 127:12,
  135:19, 136:15,
  151:7, 159:15,
  168:15, 217:3,
  219:21.
kinds 48:15, 50:22,
  59:15, 65:20,
  106:24, 111:12,
  125:1, 188:23.
king 33:18.
knife 76:21, 201:24,
  205:2.
knives 137:9.

knowing 27:7, 27:9,
  27:10, 27:12,
  27:13, 28:21,
  48:4, 48:18,
  49:11, 102:20.
knowingly 47:21.
knowledge 102:11,
  102:17, 102:22,
  165:22.
known 14:4, 27:5,
  27:6, 34:3, 35:2,
  37:12, 43:5.
knows 57:8, 83:21,
  102:9, 152:22,
  160:24.
Krystal 64:23.
.
.
< L >.
label 171:1,
  206:12.
labeled 70:4.
laborer 74:25.
lack 75:11, 75:17,
  81:11, 165:22,
  166:11.
laid 202:23, 202:25,
  203:1.
Lamontae 42:10,
  42:11, 83:23,
  84:20, 87:19,
  89:6.
language 46:3, 60:2,
  87:1, 122:10.
Lanvale 157:11,
  157:12, 158:20,
  159:23, 160:1,
  160:2.
large 71:15,
  71:17.
Last 3:2, 9:20,
  24:19, 25:2, 36:3,
  41:22, 67:15,
  83:8, 99:17,
  115:9, 125:14,
  126:25, 137:11,
  166:18, 175:10,
  191:8, 205:10,
  215:4, 216:20,
  217:21.

lastly 32:11.
late 15:12, 29:8,
  84:22, 94:10,
  110:15, 151:4,
  199:24.
later 15:7, 16:17,
  22:13, 29:3,
  29:19, 37:16,
  38:7, 39:19, 42:2,
  56:19, 70:16,
  80:21, 115:13,
  198:2.
latex 44:1.
latitude 218:8.
launch 153:24.
lawful 49:23.
laws 117:23,
  193:22.
lawyer 16:14, 16:15,
  17:9, 17:10,
  17:11, 17:20,
  17:21, 165:13,
  165:22, 166:16,
  170:7, 218:24.
lawyers 17:2, 17:17,
  17:18, 17:24,
  21:12, 21:16.
lax 32:16, 109:4.
lay 102:12,
  102:16.
laying 153:16.
lead 153:6.
leader 69:7, 174:9,
  174:14, 174:15,
  180:13, 180:20,
  181:4, 181:7,
  181:25, 186:2,
  186:4, 186:5.
leaders 73:16.
leading 103:22,
  139:7, 139:10,
  139:12, 153:1.
leap 139:23,
  139:24.
learned 28:4,
  84:18.
learning 167:6.
least 45:21, 53:3,
  86:5, 91:10,
  139:9, 139:14,

185:6.
Leave 24:7, 183:10,
  183:14, 217:11,
  219:14.
lecturing 65:8.
led 61:5, 68:22.
left 10:19, 12:17,
  14:12, 29:14,
  29:17, 29:22,
  34:4, 39:11, 41:9,
  54:13, 83:2,
  88:23, 89:1,
  91:21, 92:10,
  94:2, 130:19,
  176:23, 215:1,
  217:17.
legally 49:21.
legitimate 49:23,
  62:23.
length 218:14.
Leniency 52:3,
  108:11, 108:16.
lenient 139:6.
less 181:21.
Lester 29:7, 29:22,
  34:6, 37:18.
letters 109:19,
  128:7, 171:13,
  180:11.
letting 218:1.
liaison 137:16.
liberty 66:9.
license 43:24.
lie 81:3, 81:16,
  182:5, 182:6.
lieutenant 31:4,
  134:16, 135:11.
life 32:2, 33:5,
  38:3, 42:11,
  43:21, 62:3,
  68:10, 69:19,
  69:21, 204:19,
  204:20, 212:1,
  212:20.
lifted 93:14.
light 11:16, 94:9.
lighter 81:9.
likely 51:2, 84:8.
limine 2:8, 95:20,
  115:7.

line 32:23, 50:19,
  90:20, 91:20,
  92:11, 94:4,
  102:7, 178:10.
Lineal 201:8.
lines 93:10, 186:1,
  217:12.
lineup 217:18,
  217:20.
linger 96:24.
link 5:3, 139:12.
linking 80:11.
links 4:25.
list 13:4, 115:9,
  116:14, 128:17,
  129:7, 129:11.
Listen 32:23, 66:4,
  78:5, 78:6, 82:7,
  82:8, 155:17.
listened 46:5,
  86:25.
listening 23:24,
  25:3, 68:18,
  69:10, 154:16,
  155:18.
lists 13:5.
literal 51:9.
litigation 4:2.
live 38:3, 56:2.
lived 60:21, 79:14,
  205:3.
lives 62:4, 63:14,
  68:17, 73:11.
living 43:20, 43:21,
  69:19, 69:21,
  166:7.
load 71:4.
Local 30:15, 114:8,
  116:21.
located 3:5,
  199:4.
location 10:13,
  45:3, 62:6, 146:7,
  146:14, 157:2.
locations 52:13.
locked 101:23,
  105:14, 105:19,
  127:16, 133:2,
  148:13, 191:6,
  191:9, 191:12,

202:6.
lockup 202:7,
  202:9.
logical 129:1,
  129:11.
Lombard 1:48.
long 11:8, 11:9,
  11:20, 24:16,
  25:2, 25:6, 36:6,
  39:23, 53:15,
  59:17, 61:23,
  63:7, 72:20, 83:6,
  103:8, 115:12,
  130:9, 133:18,
  133:21, 148:17,
  193:7, 199:12,
  199:20, 200:15,
  219:12.
long-term 76:5.
longer 103:5.
look 9:14, 11:19,
  19:4, 46:1, 46:4,
  48:1, 54:9, 63:24,
  67:11, 69:14,
  74:7, 74:8, 82:22,
  90:12, 90:19,
  91:12, 92:17,
  93:4, 97:10,
  97:11, 106:13,
  116:14, 120:1,
  121:7, 123:3,
  132:25, 176:16,
  191:19.
looked 58:17.
looking 29:21, 42:8,
  44:20, 44:24,
  69:9, 91:18,
  128:19, 158:17,
  170:23, 182:12,
  182:13, 182:15.
looks 4:4.
lose 10:21, 214:5.
loses 7:12.
lot 34:1, 40:18,
  61:24, 63:11,
  63:21, 65:21,
  66:11, 71:21,
  73:13, 78:1,
  79:18, 81:22,
  81:23, 90:1,

165:12, 167:9,
168:13, 177:19,
212:14.
lots 61:16.
loved 22:22.
lower 71:23.
loyalty 31:16,
126:16.
LTC 135:11.
lucky 42:23.
lunch 70:8, 82:12,
82:24, 95:25,
96:5, 97:18.
lying 181:7, 182:1,
182:3, 182:4.
.
.
< M >.
Mack 34:21.
magic 67:10.
main 210:5.
Maine 10:15.
maintained 91:22.
maintaining 136:9.
major 32:4, 91:5,
123:11.
males 11:15.
Mall 86:24.
Malone 27:23, 28:3,
28:4, 28:5, 28:7,
28:17, 28:22,
37:2, 38:17, 39:2,
39:4, 43:13,
43:17, 47:4,
50:24, 50:25,
61:3, 61:5, 61:8,
75:9, 75:19.
man 28:18, 63:3,
69:12, 75:19,
168:20.
manage 116:13.
manner 73:5.
map 4:4, 4:5, 4:22,
5:9, 33:13, 148:5,
156:25, 157:14.
maps 4:25.
marijuana 30:8,
34:10, 50:9,
71:11, 71:16,
71:17.

Mark 52:22, 115:15,
157:14, 173:19,
174:3.
marked 109:11,
114:13, 127:24,
128:4, 164:19,
173:22, 173:23,
185:18.
marking 171:4,
172:3.
marks 88:23, 89:1,
90:19.
Marley 63:4.
Marquise 1:39,
15:24, 16:6, 27:6,
77:22, 77:23,
77:25, 79:23.
Marshal 98:10,
134:14, 137:11,
216:13.
Maryland 1:2, 1:20,
1:49, 10:14, 30:3,
30:4, 35:21,
35:22, 41:4,
101:6, 101:7,
101:22, 102:5,
102:21, 103:10,
105:11, 105:20,
105:24, 106:6,
107:3, 114:8,
114:20, 130:23,
199:2, 199:3.
match 90:15.
matched 89:10.
material 175:20.
materials 18:15.
math 219:15.
matter 18:17, 51:20,
69:17, 85:16,
129:9, 176:25,
181:9, 220:4,
220:11.
matters 20:11,
21:23, 119:7,
139:11, 176:19.
me. 32:24, 49:2.
Meadows 43:5,
81:5.
Meaning 71:14,
127:4, 137:20,

142:6, 142:22,
144:11, 209:19.
Means 18:15, 28:16,
29:11, 38:4, 65:8,
74:16, 109:24,
110:2, 122:4,
124:8, 125:16,
127:20, 142:20,
166:9, 166:12,
166:15, 181:7,
196:20.
meant 27:19, 28:5,
196:16.
medevac 201:18.
medevacked 201:18.
media 52:25, 53:7,
65:13.
meet 115:5, 161:14,
161:17, 161:18,
162:13, 172:24.
meeting 37:22,
37:24, 119:24,
120:6, 120:7,
157:2, 161:12,
163:1, 163:7,
164:1, 175:24,
178:20, 184:14,
184:15.
meetings 173:3.
membership 33:1,
52:23.
memorandum 2:18.
memories 23:22.
memory 19:21, 24:2,
97:10, 156:2,
188:25.
men 27:5, 27:9,
56:5, 59:13,
59:14, 59:16,
59:17, 66:18,
74:4.
mental 219:14.
Mentality 111:13.
mention 217:23.
mentioned 18:18,
37:1, 37:17,
38:15, 51:3,
72:12, 112:2,
112:5, 114:23,
115:1, 121:14,

133:7, 144:15,
147:18, 157:19,
158:12, 161:21,
162:12, 167:17,
188:2, 217:21.
mere 56:25.
merely 21:25,
22:3.
merge 59:2.
merged 58:25.
merger 35:19, 36:8,
36:9, 38:12, 59:4,
195:9.
merits 17:13.
message 22:7, 22:10,
22:20, 27:19,
43:12, 68:19,
68:23.
messages 40:4, 44:7,
53:6, 68:9.
met 64:2, 74:2,
74:5.
method 152:17,
153:9.
MG 100:13, 190:19.
Michael 69:4, 69:5,
99:5, 99:6, 99:10,
190:12, 190:13,
190:15, 190:19,
190:25, 191:2,
221:13.
Mickey 38:20.
microphone 99:15,
99:16, 100:2.
microscope 90:11.
mid 30:2, 30:12,
35:7.
middle 39:11,
116:18, 174:8.
Mike 35:20, 36:1,
100:13, 100:14,
114:24, 190:19.
miles 27:3, 55:25.
military 30:21.
Miller 39:15, 40:15,
40:23, 41:3,
43:17.
Mills 37:12, 37:16,
37:20.
mind 9:14, 21:9,

39:20, 45:16,
48:8, 48:25, 49:1,
50:11, 52:5, 63:5,
63:25, 64:11,
68:23, 82:8,
119:6, 154:8,
193:22, 193:23,
219:16.
mine 20:12.
Minister 31:4, 31:5,
107:9, 120:10,
120:21, 134:14,
134:15, 135:14,
135:21, 136:12,
136:16, 136:24,
204:1, 204:2.
minor 32:3.
minute 87:11, 199:1,
199:20, 207:2,
211:24.
minutes 36:3, 49:1,
54:11, 63:7,
82:25, 83:9,
156:3, 176:20,
179:3, 183:11,
183:23.
miscellaneous
168:16.
Mischaracterization
188:7.
mischievous
168:25.
mishandling 155:3.
misogynist 62:20.
mispurpose 175:11.
missed 42:4.
missing 57:10.
mission 32:6, 32:9,
49:5, 49:6.
misstatement
181:12.
mistake 187:9,
187:11, 187:22,
192:22.
MO 134:14.
MOD 107:9, 120:19,
120:20, 121:2,
203:24, 203:25,
204:2, 204:5,
204:13.

mode 21:25.
model 92:20, 92:21,
92:22.
MOJ 120:8, 120:9,
188:19.
mom 163:1.
moment 22:1, 30:18,
37:17, 39:17,
48:7, 49:8, 68:14,
78:12, 107:11,
116:2, 116:3,
120:16, 161:4,
189:17, 218:25,
219:16, 220:6.
moments 47:13.
Monday 1:19.
money 42:25, 44:10,
58:20, 62:7,
74:23, 79:6,
135:22, 135:23,
142:7, 150:17,
150:20, 156:10,
156:13, 156:15,
156:17, 156:18,
157:4, 157:7,
158:21, 158:24,
159:20, 159:25,
160:1, 160:2,
219:21.
Montel 39:7, 41:1,
41:19.
month 68:22.
months 89:16.
morning 2:2, 2:12,
8:8, 9:1, 9:3,
15:9, 15:12,
26:22, 53:24,
55:20, 55:24,
64:17, 64:18,
64:19, 71:4,
83:12, 84:18,
183:20, 216:14,
217:14.
Moses 27:23, 28:17,
28:22, 37:2,
38:17, 39:2, 39:4,
43:13, 43:17,
47:3, 50:24, 61:3,
61:8, 75:9,
75:19.

mostly 33:11.
mother 79:4, 131:1,
   133:13, 161:19,
   163:20.
Motherfucking
   41:21.
motion 2:8, 2:10,
   2:17, 3:11, 5:25,
   6:1, 6:2, 95:20.
motions 17:3, 17:4,
   17:10, 18:1,
   86:18, 115:7.
motivation 81:16.
motive 19:22.
Motz 116:8.
Mount 57:23.
Mouse 38:20.
mouths 28:12.
move 12:21, 26:6,
   97:3, 100:1,
   114:24, 120:18,
   120:25, 137:7,
   157:14.
moving 97:24,
   120:24.
multiple 31:22,
   33:13, 34:13,
   36:17, 46:18.
mumble 152:20,
   153:2.
mumbled 153:4.
murdered 28:23,
   34:25, 35:2, 39:4,
   39:14.
murders 26:25,
   34:18, 34:20,
   37:8, 37:9, 41:16,
   52:12, 56:7,
   59:16, 62:16,
   69:7, 69:16,
   69:17, 140:17.
music 62:17, 62:19,
   62:23, 63:17.
Mustafa 157:18,
   157:19, 158:12,
   158:19, 199:13,
   199:16, 201:8,
   201:21, 201:23,
   201:24, 202:1,
   202:10, 202:14,

202:16, 202:19,
   202:20, 202:22,
   203:12, 203:16,
   203:17, 204:3,
   204:5, 204:6,
   204:13, 204:15.
mutual 96:14.
myself 133:11,
   182:7.
myself. 181:18.
.
.
< N >.
N-word 6:7, 63:12.
N-words 38:5, 43:9,
   43:10.
Name 29:23, 55:21,
   64:20, 67:1,
   67:23, 69:4,
   77:23, 99:17,
   101:8, 124:15,
   165:6, 167:5,
   167:7, 167:9,
   167:10, 171:17,
   189:24, 190:5,
   190:13, 190:25,
   191:3, 191:11,
   191:13, 191:15,
   206:16, 209:25,
   210:2, 210:5,
   210:7, 221:3.
named 27:23, 34:21,
   35:1, 35:20,
   39:11, 39:15,
   40:6, 41:2, 75:9,
   161:5, 162:13,
   163:11, 165:6,
   166:25, 167:4,
   167:7.
names 109:16,
   190:22, 191:2,
   191:4, 191:9.
naming 201:9.
narcotics 56:14.
national 20:9.
nationwide 29:5.
nature 180:25.
near 26:7, 29:25,
   40:6, 44:10, 45:5,
   75:25.

nearly 35:16.
necessarily 48:14,
   129:8.
necessary 11:21,
   23:4, 65:20,
   75:21, 94:25.
necessity 3:6.
need 20:4, 22:25,
   39:21, 47:25,
   48:1, 48:2, 48:5,
   48:8, 48:13,
   48:16, 57:23,
   60:20, 61:14,
   73:14, 73:21,
   95:24, 102:23,
   106:14, 114:14,
   116:12, 120:23,
   128:24, 136:23,
   141:24, 153:23,
   157:14, 173:20,
   179:18, 182:22,
   198:12.
need-to-know
   136:23.
needed 22:17,
   144:11, 204:11.
Needs 22:7, 47:18,
   102:12.
nefarious 155:1.
neglect 109:5.
negotiation 45:17.
neighborhoods 105:5,
   131:22, 132:11,
   132:20, 149:23,
   150:21, 151:12,
   162:3.
neighbors 30:24,
   140:20.
net 181:1.
new 38:14.
news 9:5, 21:5,
   54:4, 75:6, 78:22,
   82:16, 140:13,
   140:16, 176:11,
   216:25.
Next 8:23, 23:15,
   37:17, 39:25,
   41:10, 42:18,
   53:13, 105:22,
   126:16, 130:1,

186:24, 218:12,
218:22, 220:4.
nice 151:22.
nickname 42:12,
100:14.
nicknames 100:12,
101:8.
night 2:20, 2:21,
40:7, 46:13, 75:7,
80:18.
night. 41:22.
nightclub 39:10.
nine 20:19, 25:2.
nine-page 2:18.
Nique 37:12.
Nobody 108:14,
142:7.
Nod 43:5, 43:8.
Nodding. 195:10.
non-leading
152:19.
non-testimonial
93:25.
None 14:14, 20:6,
67:12, 92:25,
206:9.
nonetheless 116:9,
139:24.
nor 14:2, 14:3,
174:9, 181:24,
186:2.
Norm 39:1.
normal 71:5, 73:8.
Norman 28:2, 38:18,
39:1, 41:20,
41:21, 41:22,
42:8.
North 4:7, 40:7,
44:11, 45:6,
46:13, 80:17,
163:18.
NORTHERN 1:2.
not-so-coded 46:3.
note 8:7, 11:14,
22:18, 23:9,
23:10, 29:21,
84:14, 183:10.
notebook 24:6.
notebooks 23:6.
notes 23:6, 23:7,

23:8, 23:17, 24:4,
61:22, 61:23.
Nothing 12:1, 18:22,
70:19, 72:25,
78:2, 108:14,
152:24, 155:18,
216:12.
notice 8:16, 73:24,
89:18, 218:25.
noticed 62:11,
94:18, 94:22.
notified 13:24.
noting 50:15.
notion 7:11.
November 67:15.
nowadays 80:14.
nowhere 44:15.
Number 3:21, 17:12,
22:12, 22:14,
22:15, 22:18,
22:24, 81:1,
164:20, 173:20,
174:1, 174:24,
175:8, 175:9,
190:19.
numbered 3:24,
129:4.
numbers 94:20,
94:21, 170:20,
171:6, 171:8,
171:10, 172:4.
.
.
< O >.
o'clock 97:22, 98:1,
176:20, 183:17.
oaths 18:25, 106:2,
110:8.
Oatmeal 32:14,
109:18.
object 60:1, 98:13,
102:12, 114:14,
114:22, 114:25,
117:2, 165:13,
177:7, 177:8.
objected 117:14,
139:6, 154:15.
objecting 166:14,
179:19.
objections 3:17,

3:21, 17:2, 17:4,
17:9, 17:11,
17:12, 18:1,
116:15, 165:14.
objects 165:22,
177:5.
obligation 60:2,
60:7, 60:17,
64:7.
obnoxious 62:21.
observed 71:1, 71:5,
71:6.
obviously 6:7, 11:7,
26:4, 59:1, 59:2,
98:5, 116:25.
occasion 20:3, 70:6,
157:17, 158:22,
158:25, 159:13.
occasional 152:12.
occasions 149:22,
150:16, 151:13,
152:1.
occur 24:14.
occurred 4:15, 9:9,
68:3, 152:23,
155:19, 180:23.
occurs 179:1.
odds 38:5.
offense 67:8,
107:13.
offenses 51:6, 64:9,
123:11.
offer 72:5, 86:19,
89:11, 95:2.
offered 89:3,
114:14, 116:4.
offering 165:13.
offers 177:2.
Officer 13:11, 15:1,
72:3, 217:22.
officers 4:19, 4:24,
5:2, 5:4, 43:23,
43:25, 45:2,
45:10, 45:12,
45:18, 46:10,
52:11, 52:12,
69:1, 72:2, 75:4,
107:2.
Official 1:47,
220:15.

often 31:21, 63:1,
    136:7, 151:9.
old 79:1, 79:2,
    96:22, 100:5,
    153:10, 191:24,
    192:24.
Older 40:13, 100:16,
    194:13.
Once 12:9, 32:1,
    32:2, 36:11, 82:8,
    97:10, 106:5,
    123:5, 123:6,
    123:8, 133:6,
    136:8, 152:23,
    187:22.
one. 174:24,
    175:8.
ones 22:22, 49:3,
    51:17, 137:13.
ongoing 49:19,
    168:4.
online 4:4.
open 21:9, 23:18,
    26:16, 27:11,
    60:13, 63:25,
    102:24, 104:6,
    114:10, 114:18,
    117:10, 129:17,
    140:1, 155:25,
    166:8, 175:17,
    176:4, 176:7,
    216:9.
open-ended 154:11.
operate 116:20,
    168:5.
operated 138:17,
    139:15, 140:5,
    148:8.
operating 128:18.
operation 137:14,
    161:2.
operations 135:12,
    167:23.
opinion 86:19.
opioids 73:13.
opportunity 16:20,
    16:23, 17:23,
    19:19, 59:19,
    75:16, 89:23,
    90:7, 166:19,

183:2, 218:13,
    218:21.
oppose 20:16.
opposed 58:9, 73:7,
    97:13, 180:25,
    181:20.
opposing 16:25.
optimistic 87:13.
option 117:1.
optional 23:8.
order 14:9, 15:13,
    26:18, 57:20,
    65:22, 91:8,
    114:14, 119:12,
    120:12, 123:21,
    123:25, 129:8,
    129:9, 189:3,
    189:13, 219:20.
ordered 69:6, 124:2,
    189:14, 208:17.
ordering 69:17.
orderly 67:17.
organization 49:19,
    50:18, 50:20,
    102:20, 104:13,
    123:5, 123:6,
    138:13, 139:3,
    139:20, 209:16,
    209:18, 209:19,
    209:21.
organize 132:16,
    133:1, 154:12.
organized 26:23,
    49:23, 49:24,
    128:25, 129:11,
    131:8.
organizing 62:5,
    134:3.
origin 20:9.
original 30:12,
    33:15, 35:21,
    38:13, 103:10,
    113:20, 120:1,
    172:12, 206:5.
originally 33:8,
    116:7.
originals 128:15.
others 21:22, 37:25,
    42:3, 42:8, 42:18,
    44:19, 177:19,

177:20, 208:14.
Otherwise 6:20,
    18:20, 23:18,
    87:20, 90:16,
    215:17, 218:23.
ought 5:10, 40:17,
    139:8.
outcome 19:23,
    59:11.
outline 68:2,
    73:22.
outlined 66:8,
    153:22.
outlining 16:13.
outrank 186:19.
outside 10:14,
    15:11, 18:20,
    21:21, 36:21,
    39:9, 132:21,
    176:19, 189:8.
outsiders 27:12.
outweighs 8:1.
overnight 216:15.
Overruled 6:4,
    103:24, 105:22,
    111:2, 139:25,
    140:2, 160:24,
    166:15, 168:12,
    169:6, 188:8,
    205:6, 213:16.
Overrun 122:23.
Oversee 134:25,
    135:5.
oversight 158:7,
    158:10, 162:2.
overstatement
    180:23, 180:24.
Overt 3:4, 94:21.
overwhelming
    53:16.
own 5:6, 19:12,
    30:17, 46:17,
    53:4, 58:9, 68:10,
    68:17, 112:15,
    119:7, 154:3,
    180:25.
owner 3:5, 87:8,
    88:6, 92:7.
Oxycodone 50:9.
.

.

< P >.

p.m. 4:5, 4:19, 45:6.
Pace 35:1.
package 34:11, 52:20.
packaged 34:23.
Page 38:2, 126:5, 126:25, 164:18, 221:3.
paid 72:7, 74:22.
painful 73:14.
Pall 86:24.
Panas 64:24.
panel 15:16.
pants 76:16, 76:17, 76:22.
paper 3:18, 59:3, 68:1.
papers 59:3, 83:13.
paperwork 124:15, 124:16.
paralegal 64:25.
paraphernalia 44:2, 45:20, 52:20, 80:6.
Pardon 209:6.
parent 22:10.
Park 37:22, 70:1, 70:9, 132:15, 133:7.
Parker 190:25, 191:2.
parole 145:13, 193:11, 193:13, 193:15, 193:22, 193:24, 205:15, 205:16, 205:18, 205:19.
paroled 133:25, 134:1.
Part 19:2, 20:5, 29:1, 33:1, 33:5, 39:15, 40:23, 42:21, 50:16, 58:8, 58:15, 63:7, 65:8, 78:22, 78:23, 81:14,

94:21, 107:25, 111:25, 121:23, 139:15, 161:25, 162:19, 167:22, 169:12.
participant 47:19.
participants 21:7, 21:14, 54:6, 54:7, 82:19, 82:20, 82:22, 176:13, 176:14, 217:2, 217:3.
participate 10:3, 15:25, 27:7, 32:12, 43:2, 46:23, 47:15, 58:2, 125:12, 125:16.
participated 34:13, 37:21, 53:10.
participates 39:22.
participating 217:6.
particular 5:1, 7:20, 46:2, 48:6, 69:24, 71:9, 72:6, 77:6, 107:4, 115:11, 123:7, 138:17, 139:14, 139:15, 140:5, 143:6, 143:25, 153:20, 157:17, 162:2, 169:11.
particularly 9:4, 153:18, 155:20.
parties 2:9, 13:25, 18:12, 21:8, 21:16, 62:5, 91:3.
partnership 49:22.
parts 78:22.
party 13:19, 13:21, 16:12, 16:13, 16:25, 17:1, 20:12, 20:16, 62:5, 64:4, 65:18, 67:3, 166:14.
pass 3:18, 3:25, 22:23.

pat 76:15.
patdown 178:4.
pathway 95:17.
patience 65:5.
patted 178:5.
pattern 15:13, 47:20.
Paul 1:31, 55:21, 189:24.
Pause 181:15.
Pay 35:7, 35:8, 63:24, 68:7, 69:22, 70:11, 151:16, 159:6.
PDR 46:1, 46:6.
pen 171:6.
pending 6:21, 71:21, 177:11, 212:6.
Penitentiary 130:23.
percent 23:4, 87:14, 106:14.
perception 171:23.
Perfect 57:20, 76:4, 96:20.
perfectly 92:2.
performance 19:10.
performs 62:10.
Perhaps 44:4, 116:13, 177:19, 218:18.
period 20:20, 49:17, 74:22, 160:5, 182:16.
periodically 14:14.
periods 59:17.
permission 96:23, 105:20.
permit 95:19.
permitted 17:1, 93:3.
personal 68:17.
personally 36:5.
personnel 49:20.
persons 21:16, 217:6.
pertains 3:4, 83:13.
Peter 1:25.

petty 31:23.
PH 127:24.
phase 25:7.
PHI 101:16, 132:2,
  150:14, 158:1,
  158:18, 161:7,
  162:7, 162:21.
phone 4:20, 4:22,
  9:15, 21:21, 44:5,
  44:6, 45:2, 45:4,
  45:5, 45:11,
  45:25, 68:6, 68:7,
  68:8, 68:19,
  80:18.
phones 30:9, 50:3,
  52:24, 106:25.
photo 29:21.
photograph 38:24,
  128:22.
photographs 44:7,
  128:8.
Photos 52:24, 53:2,
  128:8.
phrase 49:2, 106:16,
  109:22, 153:11.
phrased 179:10.
phrasing 179:11.
Phs 129:14.
PHT 128:5, 128:6,
  128:19, 128:24,
  129:23, 129:24,
  170:22, 170:25,
  171:4, 172:3.
physical 2:24, 3:1,
  52:16, 80:3, 80:8,
  84:7, 84:10, 90:2,
  91:12, 94:25.
pick 36:8, 100:2,
  105:13, 143:16.
picked 72:8.
picture 3:22, 4:4,
  29:21, 40:14,
  41:11, 41:19,
  57:6, 57:12,
  57:13, 57:15,
  57:16, 57:22,
  57:24, 63:11,
  64:10, 75:8,
  76:25, 154:18,
  161:7, 170:23.

pictures 76:19,
  170:18.
piece 53:13, 62:14,
  80:5, 80:7,
  82:1.
pieces 57:9, 57:10,
  57:11, 57:19,
  64:10, 80:2,
  153:14.
piles 59:2, 59:3.
pills 43:20, 73:12,
  159:1, 159:2.
pin 4:6, 4:22.
ping 4:20, 4:24,
  5:1, 45:3, 45:4,
  45:7.
Pioneer 45:12, 46:1,
  46:6, 47:11.
Pizza 199:13,
  199:16, 200:9,
  200:11, 200:19,
  201:4, 201:7,
  201:11, 201:13,
  202:19, 202:23,
  202:25, 203:1.
place 24:6, 31:13,
  37:9, 39:3, 57:10,
  114:20, 118:18,
  140:13, 153:5,
  199:24.
placed 4:21, 15:17,
  21:25, 99:9.
places 132:23,
  134:3.
Plaintiff 1:7,
  1:23.
Plan 24:10, 29:1,
  54:23, 120:23,
  121:4, 218:13.
planned 44:24,
  198:14.
planning 8:18,
  14:15, 44:20,
  184:15.
plans 9:6.
planting 121:6,
  121:12.
play 31:18, 63:1,
  119:2, 130:19.
played 68:9.

played. 63:9.
plays 68:11.
plea 107:25, 187:2,
  187:9, 187:22,
  194:6, 194:7,
  198:5, 209:24,
  209:25, 210:8,
  212:24, 213:9,
  213:23.
plead 16:7,
  107:15.
pleading 211:25.
pled 51:24, 192:14,
  192:19, 192:25,
  194:9, 194:16,
  194:17, 210:12,
  210:17, 210:19,
  210:22, 210:25,
  211:5, 211:14,
  211:20, 211:22,
  212:13, 212:18,
  215:23.
pledge 32:1, 32:2,
  123:5, 123:6.
plot 120:23.
plus 38:8.
pocket 178:5.
podium 65:7.
Point 5:23, 6:11,
  7:19, 11:18,
  17:18, 20:24,
  33:4, 39:17,
  58:25, 65:12,
  73:23, 84:15,
  86:3, 102:21,
  115:16, 131:5,
  139:8, 139:21,
  143:16, 147:2,
  147:11, 151:4,
  152:14, 155:18,
  156:25, 169:19,
  169:24, 181:25,
  200:15.
points 93:21,
  109:22.
Police 4:19, 27:15,
  27:25, 28:4,
  32:12, 35:12,
  38:22, 43:23,
  46:4, 72:2, 72:3,

75:5, 75:6, 75:11,
76:1, 124:12,
125:13, 125:17,
142:6.
policy 96:13.
political 20:10,
104:12.
polo 143:18.
popped 5:3.
Porky 163:11,
163:12, 163:14,
163:16, 163:21,
164:1, 164:4.
position 10:20,
11:23, 84:6, 88:1,
90:8, 90:16, 92:2,
107:10, 115:3,
115:23, 137:20,
179:4, 181:23,
182:19, 203:4,
203:13, 203:22,
203:23, 204:7,
204:10, 204:11,
204:12, 206:16.
positions 31:3,
31:6, 134:9,
134:13, 134:19,
147:21, 216:8.
positive 183:10.
possess 16:1, 50:7,
211:11.
possessed 93:15.
possessing 76:6.
possession 16:5,
16:6, 47:5, 47:9,
51:4, 83:15, 86:1,
89:21, 178:14,
178:18, 178:25,
194:25.
possible 11:5,
65:15, 123:8,
218:1.
possibly 24:12,
56:8, 89:11.
post 7:15.
posted 37:3, 38:1,
53:7.
posting 6:16.
postponed 83:11.
Potential 13:6,

121:11, 121:12.
potentially 23:13,
95:12.
poverty 20:10.
powder 50:8.
Powell 12:18, 15:15,
22:13, 128:17,
177:13.
Power 22:2, 65:12,
66:19, 72:13.
powerful 30:13,
73:17.
practitioner
64:20.
precisely 86:21.
predicate 5:13,
48:20.
predicates 48:24.
predict 11:4.
predicts 5:18.
prefer 3:10.
preferable 11:17.
prejudice 7:4, 7:7,
7:11, 7:19, 8:1,
95:11.
prejudiced 20:8,
92:14.
prejudicial 60:4.
preliminary 8:3.
premised 165:20.
prep 173:3, 175:24,
178:19, 218:6.
prepaid 9:23,
10:1.
prepare 172:25.
preparing 70:22,
198:18.
preschool 58:13.
presence 12:8,
15:11, 94:25,
106:7, 131:5.
present 3:5, 15:17,
16:18, 16:21,
16:22, 16:23,
78:16, 78:17,
83:16, 90:14,
91:7, 95:18.
presentation 65:13,
94:23.
presented 6:3,

16:19, 19:6,
65:23, 67:21,
83:12, 83:18,
83:25, 102:18,
217:6, 217:9.
presenting 51:8.
presents 21:6, 54:5,
82:18, 176:12,
217:2, 218:16.
president 57:23.
Presumably 98:8.
presumed 77:6.
presumption 77:7,
77:8, 78:11.
pretrial 86:18.
pretty 63:10,
63:15.
prevent 38:17.
prevented 75:10.
previous 20:3, 96:6,
102:18, 177:16,
187:18, 203:11.
previously 20:19,
83:18, 86:18,
154:16, 161:7,
172:21, 182:23,
190:8.
principle 166:3.
principles 19:8,
31:15.
printed 18:15.
prior 6:22, 7:8,
27:25, 70:23,
107:25, 175:20.
Prison 29:6, 29:7,
30:5, 30:7, 30:13,
35:22, 59:16,
59:17, 113:21,
130:5, 130:14,
133:8, 133:10,
147:2, 161:11,
172:13, 186:21,
186:23, 201:17,
202:6, 203:13,
206:7, 207:11,
207:12, 207:14.
prisons 30:2,
30:6.
privately 12:8.
probably 2:15, 9:23,

24:15, 24:23,
24:24, 25:1,
46:21, 78:5,
94:14, 95:19,
96:18, 116:18,
182:5, 182:6,
209:8, 217:23,
219:18.
probativity 8:1.
problem 60:8, 60:9,
116:1, 128:1,
136:17, 175:8,
175:9, 175:10,
217:12, 218:17.
problems 115:6.
procedure 153:18,
153:22.
proceed 16:11,
26:21, 55:18,
64:16, 77:19,
117:16, 166:23,
185:9.
proceeding 71:10,
153:11.
Proceedings 1:17,
8:17, 14:12,
22:20, 24:4, 24:5,
26:16, 60:13,
97:20, 102:24,
104:6, 117:10,
129:17, 140:1,
155:25, 176:7,
216:9, 220:7,
220:11.
proceedings.
181:15.
process 23:13,
67:14, 67:17,
115:8, 134:2,
134:5, 153:25,
198:4, 219:21.
product 56:11.
professionally
62:10.
proffer 178:13.
program 195:12.
progress 6:13.
projectile 88:24,
89:1, 95:23.
projectiles 85:3,

85:11, 85:14,
85:18, 87:12,
88:23, 89:9.
prominently
177:17.
promise 66:23,
108:14, 183:2,
219:20.
promises 108:12,
218:7.
promising 184:1.
promoter 62:5.
promptly 217:13.
proof 7:12, 18:5,
77:5, 78:15,
104:4, 124:4,
124:5, 124:9,
124:13, 165:21.
proper 17:10, 32:7,
124:19, 153:11,
165:20, 166:17.
propose 184:16.
proposed 163:1.
prosecuted 42:20,
81:10.
prosecutor 152:19,
152:25, 153:4,
153:5, 153:10,
174:13, 175:13,
175:16, 175:21,
179:9, 179:25,
180:9, 180:22,
181:11, 182:3,
185:24.
prosecutor.
179:12.
prosecutors 172:25,
178:20, 180:12.
PROSPECTIVE 12:16,
111:6, 111:10.
protect 7:21, 28:14,
38:3, 50:20,
52:18, 75:19.
protected 27:13.
protecting 74:16,
74:17.
protection 27:21,
75:20, 75:22,
75:23.
Protocol 32:3,

119:9, 119:10,
119:11, 119:15.
proud 66:12.
prove 16:13, 47:25,
48:1, 48:2, 48:5,
48:9, 48:13,
48:16, 51:7,
56:22, 56:23,
56:24, 57:17,
57:18, 64:4, 64:6,
64:7, 78:16,
78:19, 82:4, 86:2,
207:16.
proven 47:21,
78:14.
provided 23:6, 24:6,
90:4.
providing 173:2.
proximity 98:11.
PT 127:11, 127:24,
128:4.
Pts 129:14.
public 31:14,
118:24, 119:19,
119:21, 119:22.
Pull 12:7, 76:17,
76:21, 97:23,
99:15, 117:11,
182:22.
pulled 28:18,
184:12.
pulls 76:11.
punch 7:12, 46:4.
punishable 28:13,
28:16.
purely 23:8.
purpose 16:13,
49:17, 49:18,
49:23, 49:24,
180:2, 181:3,
191:13, 196:25,
211:25, 212:23,
215:12, 215:15.
purposes 8:18, 48:9,
79:22, 96:17,
152:25.
pursuant 4:20,
71:10, 108:6.
push 89:14,
106:13.

puts 5:17, 57:13,
  62:10.
putting 117:17,
  152:15, 180:25,
  184:12.
puzzle 53:13, 57:6,
  57:8, 57:19,
  57:22, 57:25.
.
.
< Q >.
qualification
  114:11.
quality 84:11.
quantities 50:8.
Quentin 29:7,
  101:13, 101:14,
  113:20.
questioning 65:25,
  73:24, 91:20,
  92:11, 94:5,
  102:7.
questions 14:16,
  74:6, 91:4,
  102:14, 103:4,
  154:11, 172:19,
  189:2, 189:18,
  190:1.
quickly 3:10, 11:8,
  96:1, 96:3.
quietly 182:7.
quite 20:22, 64:5,
  76:9, 177:23.
.
.
< R >.
R. 1:41.
race 20:9.
racketeering 15:25,
  16:4, 16:5, 46:23,
  47:2, 47:14,
  47:15, 47:20,
  47:23, 48:5, 48:9,
  49:13, 49:14,
  49:25, 107:13,
  210:13, 210:15,
  210:22, 215:23.
Rainey 217:21.
raise 15:17, 25:13,
  25:16, 25:19,

99:8.
raised 2:13, 61:7,
  79:6, 83:11.
ran 73:2, 130:19,
  161:1.
random 68:19.
rank 30:20, 31:9,
  107:17, 131:25,
  156:11, 156:16,
  157:24, 162:17.
ranking 107:22.
rap 62:9, 62:17,
  63:12.
rapper 62:7, 62:9.
rat 38:20, 38:21.
rat. 38:19.
rather 71:17,
  136:22, 159:13,
  179:19, 215:1,
  215:16.
Ray 101:23, 102:5,
  105:14, 105:18,
  105:23.
re-posted 38:24.
reach 21:10, 22:25,
  23:2, 23:16.
reaction 152:7.
read 2:19, 3:11,
  97:7, 116:21,
  118:17, 120:5,
  123:4, 125:14,
  172:4.
reading 83:13,
  97:14, 119:6,
  174:21.
Ready 2:2, 15:3,
  15:13, 24:9, 25:7,
  26:18, 55:6,
  55:12, 89:4,
  98:22, 141:22,
  218:23, 218:24.
reaffirm 89:4.
real 5:4, 48:16,
  63:16, 115:6,
  191:2.
real-time 45:3.
realize 93:24,
  155:9.
really 36:12, 46:3,
  63:17, 79:4,

110:23, 137:13,
  166:4, 179:22,
  182:14, 190:23,
  191:14, 210:19,
  210:20, 210:23.
reanalysis 95:7,
  95:9.
rear 45:15.
reason 13:1, 18:2,
  18:3, 18:21,
  69:11, 70:18,
  81:16, 93:11,
  115:19, 130:24,
  190:22, 212:12,
  212:18, 212:19,
  215:13.
reasonable 16:10,
  51:8, 53:15, 64:8,
  66:8, 77:10,
  78:19, 82:5,
  86:17, 218:21,
  219:3.
reasonably 5:9,
  14:4, 218:23.
reasons 23:20,
  72:11, 81:2, 91:9,
  165:13.
rebuttal 16:23,
  17:24, 18:3.
recall 24:10,
  156:18, 157:7,
  167:6, 173:2,
  190:17, 200:1,
  200:2.
recantation
  180:18.
recanting 181:4,
  181:19, 181:20.
receive 22:10,
  167:25, 184:21.
received 4:20,
  18:11, 74:21,
  75:13, 81:4, 81:5,
  81:8, 81:9, 89:18,
  177:10.
receiving 4:24.
recent 7:18,
  104:19.
recess 53:25, 55:4,
  55:5, 95:25, 98:2,

98:4, 176:9,
176:20, 184:3,
216:15.
recesses 20:20,
21:20, 24:4.
recite 109:2,
112:19.
reckless 35:10.
recognize 14:8,
101:17, 109:12,
115:17, 117:19,
121:20, 121:22,
127:14, 132:3,
146:7, 146:9,
158:2, 162:10,
162:22, 170:15,
172:14, 174:5.
recognized 49:21.
recollection 96:8,
96:22, 97:2, 97:9,
160:17.
reconvene 183:11.
Record 5:13, 81:19,
88:15, 94:9, 97:7,
128:15, 143:17,
143:20, 150:14,
152:16, 157:1,
170:9, 184:17,
220:11.
record. 59:24,
102:3, 104:1,
114:6, 127:23,
138:21, 152:6,
174:19, 216:4.
recorded 41:18,
53:7, 53:9, 68:6,
86:24.
records 59:4, 61:12,
81:2.
recount 182:9.
recover 85:10, 97:2,
97:3, 192:13.
recovered 43:25,
44:2, 47:7, 47:11,
76:7, 85:13,
85:14, 85:18,
86:7, 86:22,
86:23, 86:24,
88:3, 91:2, 91:3,
91:25, 115:14.

recruiting 106:4.
reduced 214:9,
214:13, 214:23,
215:9.
reduction 71:22,
74:19, 108:15.
reductions 72:1,
72:18.
refer 5:10, 95:4,
128:4, 152:8.
Reference 3:22, 6:8,
95:22, 122:16,
129:18, 154:17,
217:8.
referred 29:10,
32:6, 101:8,
109:16, 114:1,
114:3, 114:9,
114:18, 116:3.
referring 29:14,
125:2, 129:24,
140:21, 145:7,
154:19.
refers 114:12.
reflect 143:20,
170:9.
reframe 166:20.
refresh 96:21,
156:2, 188:25.
refreshed 97:10.
refreshing 97:2,
97:9.
refuse 32:19, 49:5,
109:8, 125:9.
refused 32:10.
refuses 32:8,
124:20.
regard 11:17,
115:7.
regarding 17:14,
92:21.
regardless 90:13.
regimes 30:15,
30:19, 30:25,
31:1, 36:4,
131:22, 132:11,
132:16, 132:23,
133:1, 133:6,
134:3, 137:25,
149:11, 149:14,

149:19, 149:23,
150:1, 150:16,
151:12, 156:4,
156:10, 158:7,
158:9, 162:2,
168:1, 169:12.
regular 9:1, 110:21,
112:21, 113:2.
regulations 65:22,
106:2, 193:23.
rehash 70:16.
reiterate 18:24.
reject 109:8,
175:24.
relate 47:3, 54:5,
82:18, 87:17,
176:13.
related 82:22.
relates 63:25,
87:15.
relating 83:17,
95:16.
relation 21:23,
83:15, 218:19.
relatively 25:6,
33:22.
relatives 22:23.
released 133:23.
relevance 155:21.
relevant 95:17.
reliability 59:7,
61:15.
religion 20:9.
rely 23:25.
remain 12:22,
15:7.
remained 44:16.
remanded 98:2,
183:11, 220:3.
remarks 78:25.
Remember 21:18,
24:2, 49:2, 56:16,
79:21, 97:23,
103:5, 132:13,
146:3, 147:24,
156:20, 157:9,
170:13, 177:23,
178:20, 185:19,
187:14, 188:19,
188:22, 189:2,

190:4, 190:7,
191:9, 195:12,
196:1, 216:18.
remembered 184:7.
remembering 24:1.
remembers 175:11.
reminded 181:16.
remorse 197:8,
204:22.
removed 26:2.
rendered 20:25.
Reno 63:3.
repeat 163:24.
repeated 49:1.
repeatedly 89:16.
repetitious 65:2.
rephrase 160:25,
166:19, 185:22,
212:7, 212:8.
replace 11:20.
replaced 12:3.
reply 16:24.
report 90:3, 137:15,
167:22.
reported 149:9,
149:10, 149:12.
Reporter 1:47,
220:15.
reporting 149:7.
reports 21:5, 54:4,
54:5, 82:17,
82:18, 90:4,
135:9, 168:1,
176:11, 176:13,
217:1.
represent 55:22,
64:21, 77:23,
189:25.
representation
86:16.
reputation 34:18.
request 4:21, 13:16,
13:22, 15:22,
90:23, 94:12.
requested 13:19,
13:21, 84:15.
requesting 89:16,
94:16.
require 108:4.
required 16:21,

23:7, 64:6, 84:23,
114:22, 114:25,
125:25, 126:3,
126:11.
requirement
215:19.
requirements
165:19.
requiring 124:13.
research 18:14.
reservation 69:6.
reservations 9:11.
resident 76:5.
residue 80:24.
resolution 185:9.
resolve 84:19.
resolved 177:24,
178:11.
resort 10:13.
respect 2:14, 8:22,
31:17, 60:23,
61:18, 61:25,
71:11, 73:3, 87:6,
87:21, 87:22,
88:5, 88:9, 89:3,
89:12, 92:3, 95:2,
97:9, 116:15,
134:21, 152:11,
155:3, 182:19,
198:20, 217:5.
respond 155:6.
responded 52:11,
164:16.
response. 123:24.
Responsibility 14:9,
14:11, 18:10,
28:17, 28:19,
31:6, 66:3,
116:24, 166:6.
responsible 37:10,
40:24.
rest 166:2, 212:1,
212:20.
restrictions 23:3.
result 120:8,
123:13, 164:1,
164:4.
results 90:19.
resume 176:19,
216:7, 216:14.

retaliating 48:23.
retaliation 41:2,
202:18, 202:19.
retire 18:8.
return 10:16, 15:1,
53:20, 54:11,
77:13, 82:25.
returned 3:4, 87:8,
88:6.
returning 168:7.
reveal 32:21, 109:9,
126:6, 126:11.
reveals 7:10.
review 2:23, 3:1,
94:15.
reviewed 68:10.
revolving 32:1.
reward 126:17.
RICO 210:13.
Ride 106:16, 126:4,
150:15, 151:11.
rides 72:24.
ridiculous 117:3.
riding 131:21,
132:10, 134:2.
right-hand 29:18.
rightful 3:4, 87:8,
88:6, 92:7.
rights 78:10.
rival 50:19.
road 24:24, 71:23,
76:8, 91:6.
Rob 106:8, 111:16,
126:1, 136:1,
136:19.
robbed 27:12, 28:1,
39:2, 51:14,
125:24.
robberies 26:25,
34:14, 34:18,
36:19, 36:21,
37:7, 40:2.
robbery 6:13, 6:14,
6:17, 36:25, 37:4,
48:22, 52:12,
191:21, 192:15,
192:25, 193:6,
194:16, 210:18.
robbing 56:13, 58:6,
111:24.

Rochester 34:21,
    34:25, 35:2, 35:5,
    43:17, 83:22,
    87:16, 89:8.
role 63:1, 107:4,
    107:6, 134:24,
    143:25, 148:23,
    205:24, 206:2.
room 10:17, 13:12,
    15:2, 18:8,
    107:2.
Roscoe 34:3.
rose 103:17.
rounds 43:25,
    47:6.
route 115:4.
row 12:21.
RPR 1:46, 220:9.
Ruger 46:9.
ruled 27:10,
    166:14.
ruler 112:24,
    112:25.
ruling 14:16,
    165:14, 166:15.
rulings 17:13,
    67:25, 68:1.
run 26:10, 146:20,
    147:9.
running 28:11,
    76:10, 106:5,
    132:25, 146:19,
    146:24, 147:1,
    147:3, 148:13,
    148:20.
runs 103:15, 103:17,
    149:1.
Rushmore 57:23.
rusting 91:23.
Rut 148:1.
.
.
< S >.
sacred 126:13,
    126:15.
Sailor 76:7, 76:15,
    76:20.
sake 94:9.
sale 30:8.
San 29:7, 101:13,

101:14, 113:20.
sanction 123:13,
    123:21, 123:25,
    124:2, 189:3,
    189:13, 208:16.
sanctioned 209:9,
    209:14, 209:17.
Sanctions 120:13,
    120:14, 135:16,
    135:17, 135:19,
    188:20, 188:23,
    189:6, 189:7,
    189:9, 191:5.
satisfaction
    152:24.
satisfactory
    185:8.
satisfy 153:25.
Saturday 9:18.
save 59:18.
saw 32:24, 40:15,
    41:11, 41:19,
    58:18, 76:25,
    91:9, 127:16,
    154:17, 154:18,
    179:3, 215:4.
saying 7:24, 59:8,
    59:20, 60:3,
    69:10, 69:23,
    94:3, 111:24,
    127:8, 137:17,
    141:1, 142:23,
    152:16, 153:16,
    153:24, 154:4,
    164:4, 180:5,
    181:5, 181:24,
    186:3, 187:4,
    203:20, 204:8.
says 6:7, 38:19,
    43:7, 76:13,
    109:21, 110:25,
    121:25, 122:19,
    127:1, 138:24,
    138:25, 139:4,
    139:18, 165:22,
    166:12, 166:15,
    174:8, 180:19,
    181:6, 208:3,
    208:20.
scales 45:19.

scan 14:14.
scared 62:22,
    173:11, 173:12,
    193:2.
scene 18:18, 85:11,
    85:12, 86:9,
    86:13.
scenes 53:2, 88:4.
schedule 20:23.
scheduled 8:20,
    9:11.
scheduling 8:14,
    11:17.
science 88:22.
scientific 84:11.
scope 153:4.
scoring 180:25.
scratchy 114:7.
screen 27:22, 75:8,
    96:13, 97:4,
    115:23, 116:2,
    117:11, 117:18,
    129:20, 164:23.
sea 112:23.
seal 66:15.
Sean 39:11.
search 19:1, 45:18,
    45:21, 52:13,
    80:19, 80:21,
    179:6.
searched 43:24.
searches 217:5.
searching 87:11.
seat 8:25, 10:22,
    12:4, 12:20, 26:9,
    99:14.
seated 2:2, 12:20,
    15:7, 15:9, 15:21,
    55:14, 83:3, 98:5,
    98:10, 176:24,
    185:13.
seats 12:22.
Second 6:5, 9:11,
    19:19, 29:16,
    45:15, 51:2,
    78:23, 87:6, 87:7,
    87:21, 89:12,
    92:7, 117:1,
    132:15, 155:7,
    157:9, 158:24,

160:22, 171:11,
176:5, 176:6,
181:14, 211:10,
211:18, 211:21.
secrecies 109:10.
secret 126:14.
secrets 32:21,
126:6, 126:12.
secure 98:15.
security 13:11,
15:1.
seed 121:6, 121:10,
121:12.
seeing 92:15, 93:18,
167:8.
seek 18:18, 28:23.
seeking 95:21,
166:21.
seem 181:20.
seems 117:2, 180:8,
181:13.
seen 18:22, 52:21,
61:17, 65:12,
171:25, 203:16.
sees 76:8, 76:10.
segments 154:2.
seized 36:15.
selected 9:20,
15:16, 32:5,
124:18.
selection 60:15.
Self-explanatory
109:25.
self-incrimination
60:16.
Sell 136:1.
selling 58:5,
194:25.
sells 62:6.
send 22:18, 26:11,
27:19, 43:12,
180:22.
sending 173:6,
177:21, 185:23.
senior 30:22, 35:7,
35:13.
sense 2:10, 19:13,
53:12, 59:9,
73:18, 73:20,
153:19.

sensitivity
155:22.
sent 43:13, 53:6,
111:16, 111:17,
112:25, 178:4,
179:8, 180:9,
181:11, 182:20,
188:2, 195:14,
195:20, 196:13,
201:18.
sent. 180:2,
188:7.
sentence 71:22,
71:23, 72:1,
72:18, 74:19,
108:13, 130:5,
130:7, 130:9,
130:13, 186:24,
192:7, 214:13,
214:18, 214:23,
215:2, 215:9,
215:22, 215:24.
sentenced 52:1,
52:3, 214:15,
214:17, 214:18.
sentences 43:16,
81:9.
sentencing 108:11,
108:15.
sentencings 8:19.
separate 110:14,
112:2.
separately 81:22.
sequence 95:5,
129:13.
sequestration 13:9,
13:16, 13:20,
13:21, 14:16.
sergeant 137:7,
137:10.
series 44:23.
serious 51:14.
served 76:23, 205:9,
205:10, 205:12.
serving 21:20,
55:21, 130:4,
130:7, 216:19.
session 178:19.
set 30:14, 30:19,
31:11, 36:4, 36:5,

88:21, 105:5,
113:3, 119:11,
121:2, 136:19,
138:4, 147:18,
148:7, 148:9.
sets 23:21, 57:16.
setting 132:11,
132:23, 133:6,
137:25, 155:15.
Seven 45:8, 47:6,
105:25, 193:4,
193:5, 193:6.
seven. 206:5.
Seventh 19:24,
29:16, 171:11.
Several 2:25, 7:2,
33:19, 37:8,
37:21, 45:24,
51:10, 68:4.
shall 12:21, 32:16,
32:17, 32:18,
32:20, 32:21,
32:24, 49:2,
109:22, 119:1.
sharing 2:12.
sharp 179:19,
179:20.
shell 88:2, 88:3,
90:11, 90:14,
93:1, 95:22.
shells 15:5.
sheriff 63:4.
shield 127:1, 127:3,
127:7.
shin 76:15.
Shirley 132:15.
shirt 143:18,
169:22, 169:25,
170:2, 170:3.
shit 168:20, 168:21,
186:24, 187:23.
shock 56:8.
shoot 41:7, 42:3,
56:15, 63:3, 63:4,
76:14, 84:20,
163:17, 164:11.
shooting 4:12, 39:9,
42:4, 42:15,
44:20, 45:10,
46:13, 63:11,

80:15, 80:20,
85:24.
shootings 26:25,
34:19, 37:8, 37:9,
52:12, 56:8,
141:16.
Shootouts 38:2.
shops 27:11, 160:7,
160:10, 160:13.
Short 29:10,
118:10.
shorthand 118:7.
shortly 161:11.
shot 27:23, 28:1,
28:11, 37:2,
38:17, 39:2, 40:5,
40:19, 41:9,
43:13, 45:8,
51:14, 56:24,
126:2, 163:9,
163:10, 163:18,
163:21, 164:13.
shots 28:9, 35:25.
shoulder 29:17,
29:25.
shoulders 78:15.
shouldn't 93:2,
219:21.
showed 56:17, 56:21,
58:1, 71:9, 106:1,
170:12.
showing 96:7, 96:8,
101:16, 162:21,
165:24.
shown 17:19, 70:23,
93:15, 207:3.
shows 4:5, 6:17,
90:20, 116:2.
shut 13:20, 35:15,
142:12, 146:18.
shutting 146:15.
sick 131:1.
side 10:12, 29:18,
29:22, 29:24,
29:25, 93:6,
218:24.
sides 97:8.
sifters 45:19.
sign 34:5, 40:17.
signal 97:12.

significance 85:19,
171:20, 179:24,
180:8, 181:21.
significant 75:3.
silent 21:25,
22:3.
silver 127:1.
similar 30:20,
38:2.
Similarly 19:3.
simple 21:15, 48:16,
154:23.
simply 5:7, 179:5.
single 30:5, 32:23,
48:11, 117:2.
Sir 8:25, 12:16,
13:14, 13:20,
15:3, 93:7, 96:3,
99:8, 99:14,
99:15, 99:20,
99:24, 100:6,
117:13.
sister 10:9, 79:7.
sit 66:13, 69:5,
70:15, 90:11.
sits 69:13, 77:7.
Sitting 22:16,
23:23, 38:8,
66:17, 66:18,
67:19, 67:20,
74:4, 169:21,
169:23, 170:7,
218:23.
situation 5:15,
26:11, 40:15,
87:21, 120:18,
136:15, 141:18,
146:15, 155:4,
155:10, 163:21.
situations 32:5.
Six 38:7, 79:2,
193:8.
Sixth 19:23, 29:16,
171:11, 211:19,
211:21.
ski 9:10, 12:15.
skills 73:21.
skip 126:5.
Slay 40:14, 42:3,
42:4, 42:9.

sleep 112:22.
slide 2:13, 3:18,
4:17, 6:2.
slides 2:14.
Slim 27:6.
slowly 105:17.
SM 164:19.
SM-9 164:21.
small 27:3.
smaller 139:23.
Smith 42:10, 42:11,
83:23, 84:20,
87:19, 89:6.
smoked 71:15,
71:17.
smooth 91:19.
smoothly 74:1.
smuggle 106:21,
106:24.
smuggling 30:8.
snatch 68:18.
snatching 172:12,
182:8.
sneakers 80:3.
snippet 68:14.
Snitch 27:19, 28:5,
35:5, 38:22,
43:13, 124:12.
snitching 28:13,
32:12, 123:15,
123:17, 125:13,
125:16.
social 20:10, 52:25,
53:7.
society 193:23.
sold 34:9, 34:12,
39:8, 56:23,
57:1.
soldiers 31:10.
sole 19:11, 20:14.
solely 67:22.
solo 64:20.
Solomon 177:19,
178:9, 181:17.
solves 175:6,
175:8.
somehow 89:22.
someone 9:23, 14:10,
22:11, 22:17,
32:10, 32:25,

38:22, 39:22,
49:9, 50:18, 66:7,
66:9, 87:1, 93:15,
110:4, 136:21.
someplace 90:15.
Sometimes 29:8,
29:10, 32:6,
32:13, 34:22,
57:8, 57:9, 57:10,
72:19, 78:3,
153:13, 156:10,
168:17, 168:18.
somewhat 97:8.
somewhere 71:24,
183:18, 195:4.
song 112:20.
songs 62:9, 63:2.
soon 145:19,
220:5.
Sorry 15:10, 85:5,
100:10, 105:15,
111:19, 121:19,
124:17, 125:21,
128:5, 135:4,
138:7, 148:2,
151:24, 157:15,
159:10, 164:24,
171:2, 185:1,
193:17, 196:8,
197:23, 199:6,
201:9, 201:22,
202:8, 208:10,
211:6, 214:16.
sort 15:11, 22:22,
22:23, 26:6,
35:11, 84:9, 95:9,
95:13, 95:17,
98:15, 102:13,
115:5, 152:18,
179:17, 182:17,
218:6.
sorted 179:23.
sought 32:17,
109:6.
sound 70:17, 76:9,
166:13.
sounds 219:2.
sources 217:7.
Speaking 25:6,
38:11, 65:7.

Special 7:11, 73:21,
91:11, 218:17,
218:18.
specialized 31:6.
specific 18:16,
56:18, 60:2,
94:14, 155:13,
218:16.
specifically 154:16,
195:7.
specified 122:1,
122:20.
speculation 93:13,
93:17, 93:19.
spell 99:17.
spend 212:1, 212:5,
212:14, 212:19.
spent 79:9.
spirit 31:17,
183:8.
spoke 71:14, 78:12,
80:15.
spoken 70:20.
sponsor 122:1,
122:6, 122:20.
sponsoring 114:12.
spontaneous 119:8.
spot 159:22.
spouse 10:5.
spring 39:13,
40:12.
Stabbed 200:6,
201:5, 201:7,
201:11, 201:21,
201:23, 201:24,
202:20, 203:6,
203:9, 203:12,
203:16, 203:17,
204:3, 204:5,
204:6, 204:13,
204:15.
stabbing 202:10,
202:14, 202:16,
202:19.
staff 22:18.
stammer 74:10.
stand 10:23, 19:18,
23:11, 23:16,
43:9, 43:15,
54:11, 59:12,

59:15, 60:20,
64:22, 69:13,
70:15, 74:1,
74:14, 77:24,
79:12, 81:18,
83:7, 92:4, 98:10,
99:6, 100:19,
219:13.
standing 2:7,
112:11.
stands 128:10,
138:25.
start 54:24, 69:22,
72:3, 74:6, 97:14,
104:12, 105:20,
105:24, 115:4,
141:22, 155:20,
157:21, 161:21,
170:22, 220:4.
started 2:20, 2:21,
29:6, 30:3, 33:9,
35:23, 40:13,
44:13, 58:22,
72:6, 101:12,
101:19, 105:25,
106:1, 106:3,
107:5, 114:17,
116:7, 118:6,
131:21, 133:6,
141:21.
starting 15:12,
35:7, 35:8, 67:17,
74:1, 141:19.
starts 2:22, 67:14,
67:16.
stash 34:11, 35:3.
State 15:4, 30:5,
38:18, 38:25,
42:20, 42:21,
43:6, 72:19,
76:24, 83:19,
83:23, 83:24,
99:16.
state-attempted
39:5.
Statement 5:19, 6:3,
16:12, 16:14,
16:16, 16:17,
16:18, 26:19,
28:3, 54:14,

55:16, 57:5,
57:14, 60:10,
60:11, 64:14,
70:17, 77:17,
77:24, 78:21,
84:3, 94:5, 179:7,
187:23, 221:5,
221:7, 221:9,
221:11.
statements 3:7,
14:2, 17:25, 20:3,
24:11, 24:12,
24:22, 25:5, 25:8,
25:10, 43:12,
46:17, 64:3,
70:14, 70:16,
70:23, 219:15.
States 1:1, 1:5,
2:3, 66:13, 66:15,
66:16, 67:2,
67:22, 72:12.
status 107:18.
stay 75:21, 131:18,
133:21, 168:20,
168:21.
stead 208:15.
stenographic
220:10.
Step 104:5, 115:22,
117:9, 140:15.
steps 50:18, 75:19,
165:1.
stickers 171:3.
Stimey 145:24,
157:18, 157:19,
157:21, 158:5,
158:9, 161:5,
161:12, 162:12,
163:1, 163:23,
163:25, 164:4.
stipulations
18:12.
stolen 35:5, 87:7.
Stop 22:20, 43:25,
73:9, 73:14,
76:11, 76:12,
97:21, 160:22,
216:7, 216:8,
216:11, 216:13.
stopped 13:15,

14:12, 43:23,
73:16, 75:14.
stops 76:12.
store 4:7, 34:11,
44:10, 52:20.
stored 34:23.
story 102:11,
130:3.
straight 159:24,
179:2.
straightened
179:18.
strange 63:22.
strapped 44:22.
strategize 120:23,
136:16.
strategized
120:19.
strategizes
136:13.
Street 1:48, 27:10,
33:12, 35:3,
37:13, 40:20,
42:15, 69:20,
70:2, 75:24,
76:10, 107:21,
148:17, 156:23,
157:12, 165:6,
205:22, 205:24,
206:6.
street-wide
167:22.
Streets 30:14,
30:21, 35:25,
79:10, 107:23,
131:5, 131:8,
148:21, 149:1,
167:19, 168:5,
186:22.
stretch 183:16.
strict 66:2.
strife 32:17,
109:5.
strike 207:11.
strongest 77:9,
143:3, 144:16,
145:10.
structure 30:19,
30:20, 31:2, 36:3,
79:19, 104:24,

138:2, 149:7.
stuff 34:1, 81:25,
140:12, 142:2,
168:14, 168:15,
168:16.
stumbled 182:10.
stutter 74:10.
style 37:13,
154:25.
subject 18:16, 19:2,
31:20, 97:19,
126:17, 126:19.
submit 24:14,
84:16.
submitted 46:10,
88:20.
subpoena 71:10,
88:7.
substances 16:2,
46:25, 211:12.
substantial 74:23.
substantive
139:11.
subtle 154:6,
154:7.
successfully
196:4.
sudden 154:18.
sufficient 165:24.
suggesting 89:22,
116:25.
suggestion 182:22.
sum 74:23.
summations 24:18.
summer 42:2.
supervision 79:7,
79:8.
supplied 153:2,
154:1.
supplies 154:11.
supplying 154:5.
supported 19:25.
supports 62:4.
supposed 126:13,
126:14, 126:15,
136:7, 213:13,
213:14.
surface 93:13.
surfaces 91:19.
surprise 11:20.

surrounded 45:13.
survived 42:16.
survives 95:6.
suspect 24:22.
suspected 41:6.
suspended 43:24.
sustain 102:15.
Sustained 60:12,
    102:23, 102:25,
    104:2, 165:10,
    166:11, 166:12,
    166:18, 167:15.
Swahili 29:9, 118:2,
    118:3, 118:5,
    122:11, 122:25.
swearing 15:15.
sweatshirt 38:19.
switch 22:2,
    161:4.
sword 127:1, 127:3,
    127:6, 127:8.
sworn 12:5, 15:20,
    32:21, 99:11,
    109:9.
sworn. 15:19.
symbol 34:5,
    126:9.
sympathize 110:24,
    111:4.
sympathizer 110:13,
    110:20, 111:4.
sympathizers
    110:24.
system 43:15, 66:11,
    66:12, 71:12,
    76:24.
.
.
< T >.
T-i-m-o-t-h-y
    99:18.
T-shirt 37:19,
    41:12.
T-shirts 34:7.
T. 1:46, 220:14.
table 94:19,
    94:20.
tabs 6:18, 30:24,
    37:6.
taken. 55:5, 98:4,

184:3.
Talbot 184:9.
talked 36:2, 40:4,
    59:13, 60:15,
    61:4, 61:22,
    72:25, 87:3,
    136:12, 145:21,
    145:24, 146:4,
    146:10, 146:21,
    184:7, 190:7,
    198:5, 209:24.
talks 38:22, 44:19,
    71:16.
tampering 27:1,
    48:22.
target 4:21, 32:9,
    32:11, 49:5,
    124:21, 124:24,
    125:7, 125:11.
Task 154:15, 154:23,
    217:22.
tastes 62:18.
tattoo 80:12, 127:6,
    127:8, 127:9,
    127:12, 127:14,
    127:17, 129:21,
    170:12, 170:16,
    172:1, 172:12,
    172:15.
tattooed 29:14.
Tattoos 52:22, 70:2,
    76:25, 77:1, 77:3,
    80:10, 80:13,
    80:14, 128:8,
    128:9, 128:21.
tax 50:19.
taxpayers 219:18.
Taz 161:17, 161:19,
    161:21, 162:8,
    163:1, 163:4,
    163:19, 163:20.
Teach 136:25.
team 64:23.
tease 153:23.
tee 155:15.
teenage 63:8.
telephone 22:12,
    22:15, 22:18.
television 37:23.
tells 42:7, 57:6,

57:16, 76:14.
Telly 39:7, 41:19,
    41:20, 41:23,
    41:25, 42:3,
    42:7.
ten 70:12, 70:14,
    70:16, 70:18,
    71:1, 106:14,
    183:23.
term 69:2, 81:12,
    118:7, 134:6.
terms 23:25, 108:19,
    118:3, 118:5,
    134:18, 155:2,
    170:5, 180:12,
    189:13, 217:8.
territory 148:7.
terror 27:18.
terrorize 51:16.
terrorized 79:13.
terrorizing 27:14,
    27:16.
test 84:22, 85:21,
    86:8, 86:13,
    86:18, 88:1, 88:2,
    88:8, 90:9, 90:10,
    90:18.
test-fired 84:20,
    85:2, 86:14,
    87:12, 88:11.
tested 80:23.
testified 19:16,
    43:6, 99:12,
    100:25, 108:6,
    122:12, 172:21,
    172:24, 187:18,
    191:8, 210:9,
    214:8.
testifies 36:1.
testifying 19:19,
    38:17, 39:4, 52:2,
    81:16, 81:18,
    123:14, 126:20,
    153:10, 173:7,
    173:8, 180:6,
    181:6, 188:3,
    188:11, 190:7,
    218:2, 218:22.
testing 46:11, 84:1,
    84:8, 84:16,

85:19.
text 7:14, 22:10,
  40:4, 44:7, 53:6,
  68:9, 68:19,
  68:22.
Thanksgiving 9:5.
that. 42:1.
thee 112:24.
themselves 49:6,
  50:14, 50:15,
  52:22, 58:23,
  59:18, 66:19,
  67:21, 85:11,
  141:12.
theory 58:24, 77:2,
  79:25.
They'll 98:9, 129:8,
  218:3.
They've 56:12,
  56:13, 56:14,
  70:21, 74:2,
  89:23.
thick 165:17.
thinking 116:12.
thinks 95:17.
Third 19:20, 51:2,
  91:3, 121:5,
  159:20, 160:2,
  216:20.
thoroughly 124:7.
though 6:17, 20:4,
  57:15, 60:20,
  88:10, 89:24,
  95:14, 154:24,
  169:12, 183:8,
  192:19, 214:15.
Three 11:15, 25:22,
  27:5, 32:3, 32:14,
  46:22, 50:6,
  54:23, 61:20,
  63:7, 65:10,
  73:20, 78:22,
  79:7, 109:20,
  109:21, 113:2,
  123:10, 153:14,
  156:19, 158:20,
  188:23, 188:25,
  201:9, 201:11,
  211:22.
throat 114:7.

throughout 21:9,
  30:16, 30:25,
  65:1, 132:24,
  138:1.
throwing 34:4, 40:1,
  41:10, 41:12.
Thursday 8:18.
ticket 67:13.
tickets 62:6.
tight 13:20, 33:23,
  76:16, 76:17.
tightly 76:16,
  76:22.
till 67:16.
Tim 150:2, 150:3,
  150:9, 150:10,
  150:13, 150:15,
  151:11, 152:1,
  152:8, 154:18,
  154:19, 156:3,
  160:5.
timeline 40:9.
timing 178:19,
  218:7.
Timothy 99:10,
  99:18, 190:6,
  190:10, 190:13,
  190:14, 190:20,
  221:13.
tip 44:11.
title 148:23, 186:7,
  186:10, 206:8,
  206:10, 206:12.
tobacco 30:8,
  106:25.
Today 24:23, 55:1,
  55:2, 55:3, 64:22,
  67:16, 70:22,
  74:18, 94:4, 96:6,
  97:21, 108:20,
  143:14, 169:15,
  180:5, 183:14,
  190:3, 214:12,
  214:22, 216:11.
together 30:7,
  31:12, 31:16,
  49:16, 57:9,
  57:13, 57:20,
  64:11, 65:4, 70:2,
  70:3, 106:1,

113:12, 152:1,
  188:9.
tomorrow 97:22,
  98:1, 216:14,
  217:13, 217:18,
  219:2, 219:6.
took 28:14, 30:13,
  37:9, 44:4, 57:19,
  67:7, 69:7, 71:4,
  75:18, 173:15,
  185:25, 195:23,
  196:1, 196:4,
  199:24, 210:8.
tooken 195:25.
tooth 112:24.
top 30:21, 121:25,
  172:4, 206:22,
  209:19, 210:7.
topic 188:18.
touch 21:5, 54:4,
  65:14, 82:17,
  176:12, 217:1.
touched 62:8.
touching 50:17.
tough 58:19, 79:2.
tougher 203:17.
toughest 144:16.
Toward 195:7.
towards 125:18.
tower 172:13.
Towson 64:21.
tracked 45:11,
  80:19.
tracking 45:10.
traffic 46:25,
  67:13, 217:12.
trafficking 48:22.
traits 91:18.
Transcript 1:17,
  220:10.
transported 184:9.
trap 38:20.
trapings 66:24.
traveling 88:25.
treason 126:17,
  126:18.
treasury 136:10.
Trevon 40:16,
  40:19.
trials 198:7,

198:11.
tried 42:3, 42:14,
  42:17, 45:13,
  45:14, 130:18.
trigger 28:18.
trip 9:10, 9:24,
  10:2, 10:24,
  12:15.
trouble 79:11,
  79:16.
truckload 51:9.
true 36:19, 56:25,
  63:2, 68:20,
  182:11, 187:24,
  191:4, 191:8,
  191:20, 195:20,
  203:11, 204:9,
  216:23.
truly 139:11.
trunk 44:1.
trust 132:20.
trusted 132:19.
truth 19:22, 81:15,
  81:20, 182:13,
  182:15, 187:1,
  213:25, 214:3,
  215:15, 215:18,
  215:19.
truthfully 108:4,
  108:20, 181:24,
  188:15, 198:7,
  213:10, 213:14,
  213:18, 213:20.
try 4:14, 113:23,
  139:12, 182:17,
  191:4, 191:5,
  191:19, 217:10.
Trying 7:6, 23:12,
  57:7, 57:17,
  63:18, 154:8,
  154:12, 155:2,
  173:7, 174:12,
  178:10, 180:5,
  180:6, 181:3,
  204:15, 204:19.
tuck 183:16.
Tuesday 8:17,
  128:22, 217:21.
tune 36:11.
turf 52:18, 74:16,

74:17.
turn 21:21, 84:6,
  94:4, 126:5,
  133:12, 167:25.
turned 21:24, 22:4,
  22:9, 133:11,
  133:20, 178:6.
turns 76:9, 89:24.
TV 73:11.
two. 220:6.
type 91:2.
types 102:13.
.
.
< U >.
ugly 62:19.
ultimately 23:5,
  35:16.
ultimatum 35:14.
unanimously 16:9.
unarmed 193:6.
unavailability
  87:25.
unbeknownst 89:20.
Uncle 100:13,
  100:14, 101:23,
  102:5, 105:14,
  105:18, 190:19.
uncontradicted
  20:5.
undercuts 93:1.
underneath 172:6,
  209:11.
Understand 2:4,
  3:12, 5:22, 9:4,
  14:23, 65:15,
  65:16, 89:2,
  105:16, 111:6,
  111:24, 115:18,
  116:8, 139:8,
  141:1, 152:13,
  153:22, 155:24,
  158:21, 176:4,
  177:2, 177:4,
  180:7, 182:25.
understanding 33:3,
  84:5, 86:10,
  96:15, 164:8,
  164:14, 178:24,
  179:15, 179:16.

understood 114:13.
underway 11:2,
  216:24.
unfortunately 79:5,
  89:20.
union 30:15.
unique 30:17,
  116:9.
uniquely 7:20.
unit 49:20, 131:12,
  131:13.
United 1:1, 1:5,
  2:3, 66:13, 66:15,
  66:16, 67:2,
  67:22, 72:12.
universe 176:3,
  178:23.
unknown 9:19,
  92:15.
unlawful 49:24.
unless 16:8, 26:4,
  57:21, 77:9,
  114:10, 114:19,
  115:23, 119:7,
  120:6, 120:18.
unpack 146:23,
  164:3.
unpacks 153:15.
unpleasant 62:19,
  63:23.
untrue 32:15,
  109:3.
unused 219:14.
unwanted 35:12.
upset 62:22.
urban 171:24.
urgent 22:7.
using 18:15, 73:19,
  73:20, 112:23,
  151:5, 151:7,
  151:9, 176:2.
.
.
< V >.
vacation 11:12.
vain 31:14,
  118:19.
Value 38:3.
van 184:12.
variety 51:10,

72:11.
various 30:25, 31:3,
  31:8, 52:13,
  109:21.
varsity 35:11.
verb 180:1, 180:2.
verbal 119:1,
  123:24.
verbally 94:17.
verdict 20:25, 22:5,
  53:20, 53:21,
  77:13.
version 35:11.
versus 2:3.
vest 38:3.
vested 74:18.
vibrate 21:25,
  22:3.
victim 34:20,
  48:23.
victims 52:10.
victory 182:9.
Video 33:17, 43:3,
  43:7, 44:9, 63:6,
  63:9, 65:16.
videos 52:24, 62:10,
  62:13, 62:14,
  62:16, 62:17,
  62:24, 63:19,
  63:21, 65:16.
views 17:14,
  20:10.
violate 32:2, 110:2,
  193:13, 193:23.
violated 110:4,
  110:5, 121:1,
  208:6, 209:3,
  209:7, 209:12.
violates 49:11.
violating 32:25,
  123:17, 123:19.
violation 18:25,
  93:10, 123:13,
  123:15, 193:15.
violations 32:4,
  123:12.
violence 35:10,
  39:9, 50:20,
  63:15, 73:4, 73:5,
  81:22.

violent 26:23,
  39:16, 40:11,
  46:18, 48:11,
  52:16, 56:3,
  59:15, 62:20.
virtue 90:9, 95:13,
  95:18.
visit 18:17, 150:1,
  150:21.
visited 149:23.
Visiting 107:2.
voice 175:22,
  176:1.
Volume 1:10,
  165:17.
Vosrs 8:19.
vote 67:7.
vs 1:8.
.
.
< W >.
W. 1:48.
wag 43:10.
Wait 3:11, 16:16,
  21:2, 54:1, 82:14,
  162:9.
waiting 3:14, 8:13,
  54:24, 218:4.
waive 89:23.
walk 130:18.
walked 41:3, 70:2,
  130:20.
wall 46:7, 80:22.
Wallner 178:21,
  179:2, 184:7.
wandered 219:16.
wannabe 58:16,
  58:25.
wanted 5:24, 26:1,
  58:21, 58:22,
  93:20, 97:19,
  111:13, 115:25,
  117:4, 121:10,
  130:24, 132:16,
  141:25, 144:13,
  161:14, 161:17,
  161:18, 162:12,
  184:14, 188:2,
  188:11, 212:4.
wants 59:20, 95:15,

97:14, 213:5.
warehouse 75:1.
warrant 80:19,
  80:21.
warrants 52:13,
  119:8.
warrior 171:24.
Washington 57:21.
waste 219:11,
  219:22.
watch 37:23, 63:3,
  111:10.
watching 111:12,
  215:6.
ways 24:24, 107:2.
wealth 20:10.
weapon 86:6, 93:18,
  95:5, 191:21,
  192:12, 192:13,
  192:15, 192:17,
  192:24, 192:25,
  193:1.
weapons 88:1,
  89:4.
wearing 34:6, 38:19,
  143:17, 170:1.
week 3:2, 9:12,
  9:20, 11:7, 68:22,
  115:10, 136:8,
  216:20.
weekend 2:8.
weeks 2:23, 20:19,
  22:5, 24:15, 25:2,
  27:25, 51:2.
weigh 81:19.
weight 20:15,
  67:2.
well-established
  116:9.
well-informed
  29:2.
Wes 38:16.
Wesley 6:6, 6:15,
  27:24, 28:18,
  37:1, 38:16, 39:3,
  39:4, 39:10, 41:1,
  42:8, 42:19,
  43:13.
West 38:2.
Whatever 74:10,

92:23, 106:8,
106:12, 136:1,
136:2, 137:9,
139:20, 152:21,
154:3, 166:20,
183:4.
whatsoever 4:13.
wherever 96:25.
whichever 142:18.
White 40:16, 40:19,
124:9, 124:10,
124:13, 169:21,
169:25, 170:2,
170:3.
Whoever 22:24,
110:7, 142:18.
whole 102:7, 112:20,
131:13, 134:25,
165:17, 168:13,
189:12, 206:18.
whom 38:15, 43:4,
110:4, 140:9,
167:10, 175:12,
180:2, 180:3,
184:19, 185:23.
wife 10:9, 10:12.
Wild 34:1, 38:2,
147:1, 147:3.
willfully 47:21.
Willie 40:15.
willing 111:14.
willow 46:1, 46:6,
46:8, 46:9,
47:10.
Willy 39:15.
window 45:15.
wiretap 40:3, 44:17,
44:18, 53:8,
72:9.
wish 10:2, 55:15,
64:14, 77:16,
83:15, 84:22.
wishes 16:21.
wishing 111:7.
withdraw 212:7.
withdrawn 117:15,
212:9.
withheld 214:19.
withholding 218:7.
Within 28:3, 31:1,

31:7, 31:10,
37:20, 39:16,
75:25, 86:17,
107:18, 129:3,
134:19, 183:23,
186:7, 189:7,
189:9, 189:10.
Without 26:9, 33:3,
38:2, 50:16, 69:6,
92:19, 93:18,
125:19, 196:2,
208:20.
woke 71:3.
women 165:1.
wondering 36:9,
39:18.
word 19:5, 29:9,
29:13, 73:19,
125:14, 188:7,
195:14, 196:13,
202:19, 213:12,
213:18.
words 13:14, 20:12,
49:11, 53:4, 53:5,
152:15, 154:5,
165:20, 181:5.
work 31:16, 74:25,
75:1, 94:20,
111:14, 111:15,
112:12, 112:13,
183:8, 196:20,
214:19, 218:18,
219:1.
worked 67:15.
working 32:12, 72:3,
72:6, 125:13,
125:17, 176:3,
178:23, 198:5.
works 41:8, 42:1,
66:12, 72:23.
world 56:1, 56:2,
56:3, 56:4, 63:13,
63:14, 72:23,
73:7, 75:17,
79:14, 209:21,
215:24.
worry 39:20.
worth 50:15.
worthy 111:11.
wrap 11:6, 53:11,

172:20.
wrapping 183:24.
write 22:12, 114:16,
175:13, 175:15,
177:22, 178:9.
writes 62:9.
writing 177:22,
181:17, 181:18,
182:6, 185:23.
written 23:14,
29:24, 113:3,
213:20, 213:23.
wrote 187:8.
.
.
< Y >.
year 44:16, 67:15,
74:22, 75:3,
131:2, 133:14,
199:23, 199:24,
200:16.
years 38:7, 70:12,
70:13, 70:15,
70:16, 70:18,
71:1, 79:1, 79:2,
92:1, 104:23,
130:10, 130:11,
133:22, 170:15,
192:9, 192:24,
193:4, 193:6,
193:8, 194:20,
194:21, 194:22,
199:9, 199:10,
199:15, 199:22,
199:23.
Yo 41:25.
Young 33:8, 33:22,
56:5, 58:12,
58:14, 58:16,
58:17, 58:23,
66:18, 74:4,
75:19, 138:16,
139:5, 139:18,
164:25, 192:21,
192:23, 194:12,
195:11, 195:15,
195:17, 195:21,
196:14, 198:20.
younger 33:11,
39:25, 40:10,

40:13, 40:21,
40:25.
yourself 21:5,
44:18, 59:8,
63:25, 79:12,
111:13, 133:12,
133:20, 182:4,
182:6, 190:3,
190:4, 190:8,
190:11, 190:14,
190:15, 190:18,
208:19, 217:11.
yourselves 54:1,
54:3, 61:14,
82:14, 82:16,
176:10, 176:11,
216:25.
Youtube 33:17,
43:3.
.
.
< Z >.
zombie 71:3.
zoom 113:23, 119:5,
171:5.