```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF MARYLAND
 2

 3   UNITED STATES OF AMERICA,        )
                                      )
 4            Plaintiff,              )
           vs.                        )
 5                                    )  CRIMINAL NO.: JKB-16-0363
     GERALD JOHNSON, et al.,          )  Jury Trial:  Volume 5
 6                                    )
              Defendant.              )
 7                                    )
     _____)
 8

 9                  Transcript of Proceedings
              Before the Honorable James K. Bredar
10               Wednesday, November 29th, 2017
                      Baltimore, Maryland
11

12   For the Plaintiff:

13        Peter J. Martinez, AUSA

14        Christina A. Hoffman, AUSA

15   For Defendant Gerald Johnson:

16        Paul F. Enzinna, Esquire

17        Jeffrey B. O'Toole, Esquire

18   For Defendant Kenneth Jones:

19        Alan R.L. Bussard, Esquire

20   For Defendant Marquise McCants:

21        John R. Francomano, III, Esquire

22
     _____
23
                    Christine T. Asif, RPR, FCRR
24                 Federal Official Court Reporter
                   101 W. Lombard Street, 4th Floor
25                    Baltimore, Maryland 21201
```

```
1                     P R O C E E D I N G S

2            THE COURT:  Good morning.  Are we ready for -- we

3     have some issues we need to take up.  Be seated, please.

4            Mr. Martinez.

5            MR. MARTINEZ:  Just a couple, Your Honor.  First, on

6     the issue of scheduling, I wanted to give the Court as much

7     notice as possible.  We mentioned a witness line up to

8     counsel.  We're going to pick up with Detective Hayden.

9     Christopher Meadows is going to testify after him.  I think

10    that's going to get us through a good portion of the day.

11           THE COURT:  Meadows is an officer?

12           MR. MARTINEZ:  He's a civilian.

13           THE COURT:  Civilian, thank you.

14           MR. MARTINEZ:  But after him it's quite possible

15    that he takes us through the day.  But what we're trying to do

16    is come up with contingency plans in the event that he does

17    not.  The complicated factor is that many of the witnesses on

18    our roster for the rest of the week are law enforcement.  And

19    Detective Suiter's funeral is today and many of them are going

20    to be there.  It had been my understanding, until I was

21    corrected at the end of the trial day yesterday, that the

22    funeral was going be between 9:00 and 12:00 in the morning.  I

23    now understand that it's going to be pretty much an all day

24    affair, at least for some of the homicide detectives we had

25    planned to call.
```

1          So we made a bunch of efforts to reach out to

2   witnesses who aren't in the BPD to try and get them here in

3   the afternoon.  Those are still ongoing.  We've identified one

4   civilian who can be here.  We've identified that person to

5   defense counsel.  They know that he or she might follow

6   Meadows and we wanted to let the Court know all that is in the

7   works right now in the event --

8          THE COURT:  I understand.  We'll see how it evolves.

9   What else?

10          MS. HOFFMAN:  Your Honor, I wanted to correct two

11   exhibit numbers that I got wrong yesterday.  I had marked a

12   photo of Wesley Brown as PHI 8 and it should be PHI 9.

13          THE COURT:  Okay.  Have you explained these

14   discrepancies to counsel?

15          MS. HOFFMAN:  No, but I think they have in their

16   binders the correctly marked PHI 9 for Wesley Brown.  I just

17   said it wrong on the record yesterday.

18          THE COURT:  Let's make the record explicit and

19   crystal clear now.  How did you refer to the exhibit

20   yesterday?

21          MS. HOFFMAN:  PHI 8.

22          THE COURT:  And in fact you should have referred to

23   it as PHI 9.

24          MS. HOFFMAN:  9.

25          THE COURT:  And you wish the document that was

1   referred to yesterday as PHI 8, the photograph of

2   Wesley Brown, to instead be marked and noted and admitted as

3   PHI 9; is that correct?

4           MS. HOFFMAN:  That's right.

5           THE COURT:  Any objection?

6           MR. ENZINNA:  No.

7           MR. FRANCOMANO:  No, Your Honor.

8           THE COURT:  It is now redesignated PHI 9.  Next.

9           MS. HOFFMAN:  There's one other that I incorrectly

10  entered yesterday.  This -- I entered it as PHI 13.

11          THE COURT:  PHT, as in Tom, 13.

12          MS. HOFFMAN:  And it's a photograph of

13  Marquise McCants's tattoos.

14          THE COURT:  Yes, and it was admitted as PHI 13,

15  tattoos of Marquise McCants.

16          MS. HOFFMAN:  And it should have been PHI 15.

17          THE COURT:  PHI 15, redesignated as PHI 15; is that

18  your request?

19          MS. HOFFMAN:  That's right.

20          THE COURT:  Any objection?  None.

21          MR. FRANCOMANO:  None.

22          THE COURT:  It is so designated.  Mr. Bussard.

23          MR. BUSSARD:  Just very briefly, following up on the

24  discussion we had at the bench yesterday about the local rules

25  and Mr. O'Toole, the -- if the government --

1           THE COURT:  Was that yesterday?

2           MR. BUSSARD:  I think it was yesterday about

3      objecting, if you don't object.

4           THE COURT:  I think that was two days ago, but --

5           MR. BUSSARD:  May we ask the government to slow down

6      just slightly.  I know the procedure is, you know, showing you

7      what's been marked as -- we've got two huge binders to go

8      through and we're just barely hanging on sometimes.

9           THE COURT:  Okay.

10          MR. BUSSARD:  So just --

11          THE COURT:  Fair enough.

12          MR. BUSSARD:  A little bit of a pause there.

13          THE COURT:  So I'm going to ask government counsel

14     as they're running through the drill, when you first refer to

15     the exhibit, before you put it on the document camera, look

16     up, look at defense counsel, and look for some indication that

17     somebody is about to object.  And make a reasonable judgment

18     about that before you proceed.  Build a little time in there.

19     Mr. O'Toole.

20          MR. O'TOOLE:  Very slight comment on the same

21     category.  I'm finding that the P's and D's and E's all sound

22     the same to me when I'm hearing it.  If there's some way to

23     either label it as picture of something, exhibit number or

24     something that gives us, as Mr. Bussard said, a little bit of

25     time to find it.  We're finding that all the letters sound --

1    we're looking at each other saying, which exhibit is that.

2              THE COURT:  Okay.

3              MR. O'TOOLE:  We're paying attention, but it's still

4    difficult.

5              THE COURT:  Okay.  Let's slow the process down.

6    Let's make sure we're looking at counsel to see whether

7    they're going to object and let's enunciate.  How are we doing

8    in terms of overall hearing?  I've had to turn up my speakers

9    on the bench, but you don't have the benefit of those out

10   where you are.  I think we have our room level all the way up,

11   Ms. Powell, do we?

12             THE CLERK:  They're as high as they should -- if I

13   go any higher --

14             THE COURT:  You're starting to get feedback.

15   Ms. Hoffman, you could speak up a little bit louder when

16   you're examining witnesses.  And there has been a problem or

17   two with a particular witness that's been on the borderline,

18   but that's for me to address and I'll watch that more

19   carefully.  Let's see if we can do a little better in that

20   regard.  The reporter points out to me that we do have lapel

21   mikes.  The problem with lapel mikes, in our experience, is

22   they work beautifully and then lawyers forget to turn them off

23   and we've had one or two inappropriate things broadcast

24   throughout the room.  Nothing about me of course.

25             MS. HOFFMAN:  I'm happy to wear one if that would

1      make it easier.

2              THE COURT:  All right.  Maybe we'll experiment with

3      that today.  We may not do that until after the morning break,

4      though, because we've got to get that set up.  All right.

5      We've had an inquiry from the jury about what is the full

6      scope of my rule that they're not allowed to discuss the case

7      until the case is given to them for deliberation.  Of course,

8      different judges and different judges in this very courthouse

9      have different rules in that regard.  I know at least one of

10     my colleagues doesn't put jurors under that restriction at all

11     anymore.  I still believe it's correct.

12              I think it's necessary to help jurors to keep an

13     open mind and not start locking into views and so forth, given

14     what we know about social dynamics and so forth.  I think it

15     makes it hard for a juror to sort of change their position

16     when they've said something or committed to something early

17     on.  That's why I forbid them from speaking with themselves,

18     among themselves about the case.  But evidently there was

19     communication with the courtroom deputy in the form of a

20     question which was, well, does that mean we can't even talk

21     about like, something that the lawyers said that we thought

22     was funny, or you know, something that's not really that

23     substantive.  Is that a correct characterization of the query

24     that was put to you, Ms. Powell?

25              THE CLERK:  Yes, Your Honor.

1          THE COURT:  And my intention is to take that up with

2    the jury when I bring them back in, and basically, you know,

3    be hard-nosed because I think that it's once the conversation

4    begins, it's a slippery slope.  And I just don't think that

5    jurors should be talking about anything relating to the case,

6    the personalities, the individuals who are before them, until

7    they have the whole package.  I'll hear the thoughts of

8    counsel on that, but that's my inclination.

9          MR. O'TOOLE:  Can we find out what they thought was

10   funny?

11         THE COURT:  That might be very risky for you,

12   Mr. O'Toole.  It could go one of two ways.  Anybody have a

13   view they want to express on that?

14         MR. MARTINEZ:  We're comfortable with your approach,

15   Your Honor.

16         MR. O'TOOLE:  That's fine, Your Honor.

17         THE COURT:  Okay.  Bring them in.  I'll explain to

18   them some of my sociology analysis.

19         MR. MARTINEZ:  Your Honor, can we redistribute the

20   transcript binders?  Ms. Hoffman is going to need to use them

21   earlier in her --

22         THE COURT:  Sure, with Ms. Powell's assistance.  Why

23   don't you do that quickly.

24         Okay.  Great.  Are you ready to bring them in?

25         (Jury entered the courtroom.)

1          THE COURT:  Be seated, please.  Good morning, ladies

2     and gentlemen.  Ladies and gentlemen, one or more of you in

3     very informal conversation with Ms. Powell, my courtroom

4     deputy clerk, asked a very reasonable question.  And the

5     question was, you know, we understand that we're not allowed

6     to talk about the case and talk among ourselves about it and

7     so forth until the case has been given to us for deliberation

8     at the end of the trial, some weeks from now.  But you know,

9     is there anything wrong with our just having the most casual

10    of conversations with each other about, you know, something

11    that maybe one of the lawyers said that was funny or something

12    that really doesn't go to the substance of the evidence?  Is

13    it okay for us if we have a little bit of innocent chitchat

14    about that where we're not getting into the actual substance

15    of the proof?

16          I understand the question completely.  It's a

17    completely reasonable question in the circumstances.

18    Unfortunately, though, my answer is no, you actually can't do

19    that.  And to the extent that that's gone on to this point, no

20    problem, nobody's in any trouble or whatever.  But I do want

21    to take the opportunity to explain to you that no, you can't

22    even have that sort of casual conversation about the lawyers,

23    the clothes that they're wearing, their manner of speaking,

24    whether you can hear them or not hear them, anything about

25    them.

1          The reason is, that experience teaches that once

2     a -- once you get onto the slippery slope, and it's okay to

3     discuss a little bit, then maybe it's okay to discuss it a

4     little bit more and so forth.  And then where is the line?

5     And messages start to get telegraphed from one juror to

6     another about, well, maybe it's not explicit, but there's a

7     subliminal message of, I find one lawyer more credible or

8     believable than another lawyer and so forth.  It's just a bad

9     place to go.

10          And so from years of experience, I have concluded

11    that the best policy is to keep the jury under just an

12    absolute prohibition about talking among themselves about

13    anything that goes on in a courtroom in terms of what's being

14    said or anything that the lawyers are talking about and so

15    forth.  Now, even I have a couple of exceptions.  If you want

16    to complain to each other about the fact that it's too hot or

17    too cold in the courtroom, I think that's fair game.  If you

18    want to complain to each other about the fact that the judge

19    doesn't seem to run a very efficient courtroom and leaves us

20    sitting in here, and you know, when can we possibly get -- I

21    think that's fair game.  I think you're entitled to that sort

22    of thing.  But that's not about the case itself or the

23    participants in the case.

24          Don't talk about the lawyers, the witnesses, anyone

25    that you see in relation to them, or any of the proof.  Your

1   collective experience as jurors, problems you're having with

2   parking, you know, you don't like the brand of coffee in the

3   jury room, as I say, frustrations that are inevitable because

4   you're told to get here at 9:30 and you never get pulled in

5   here until 10:05, you know, that sort of thing, that's fair

6   game.  Anything about the case or the participants, please,

7   no, can't go there.

8           Okay.  Are we ready to continue with our examination

9   of Detective Hayden?

10          MS. HOFFMAN:  Yes, we are.

11          THE COURT:  Okay.  Detective Hayden.

12          We'll constantly try to do better in terms of the

13  efficient use of your time.  I promise you, we're doing our

14  best.

15          You may resume the witness stand, Detective Hayden.

16  I remind you that you remain under oath.  Ms. Hoffman, your

17  witness.

18                  DETECTIVE JONATHAN HAYDEN

19  called as a witness, being previously duly sworn, was examined

20  and testified as follows:

21          THE WITNESS:  Thank you.

22                  DIRECT EXAMINATION

23  BY MS. HOFFMAN:

24  Q    Good morning, Detective Hayden.

25  A    Good day to you.

Direct Examination - Hayden (By Ms. Hoffman)

1    Q    I'm going to show you Government's Exhibit P, as in Paul,

2    HI, No. 37.  Who are we looking at here?

3    A    That is Ronnie Hall, who also goes by Cakes.

4    Q    Did you execute a search warrant on a Facebook account

5    belonging to Ronnie Hall?

6    A    Yes, I did.

7    Q    I'm going to show you Government's Exhibit No. SM 5.  Can

8    you tell us what we're looking at here on the first page?

9    A    So partial Facebook business record again, with the name

10   first name of Ronnie, last name of Hall with the registered

11   user ronniehall@yahoo.com, and an e-mail address of

12   Ronnie.Hall.56232@facebook.com, and a vanity name of

13   Ronnie.Hall.56232, and a registration date of

14   November 18, 2013.

15   Q    I'm going to show you page 2 of that same document.  Can

16   you read the text in the box for us here?

17   A    The summary says Ronnie Hall replied, "Yo, you know I got

18   that savage shit in my blood.  That didn't come from the dark

19   skin niggas, it from real niggas, Dave and Slay shit."

20   Q    Going to show you page 3 of the same document.  Can you

21   tell us what we're looking at here?

22   A    It's a photo of Mr. Jones.

23   Q    I'm going to show you page 4 of the same document.  Can

24   you read the text in the red box here, please?

25   A    Sure.  From Ronnie Hall it says, "Free my nigga.  Fuck

1   the law, old bitch ass niggas, and fuck girls told on my man,

2   fuck da too ily, bro."

3       From Christian Dodd, it then says, "That's Fucking crazy,

4   man."

5       And then from Nigel Smith it says, "Free my motherfucking

6   nigga."

7   Q   Going to show you page 5 of the same document.  Can you

8   read the text in the red box here?

9   A   Sure.  From user Ronnie Hall it says, "Digga even told

10  his ass get the fuck away from him before he leave his ass,

11  told Beetle we ain't cool no more and all."

12  Q   I believe you testified yesterday that Digga is an alias

13  of the defendant Mr. McCants; is that right?

14  A   That is correct.

15  Q   I'm going to show you page 6 of the same document.  What

16  are we looking at here?

17  A   It's a post on his page that has a reverse gun that says,

18  "Free guns for snitches, call 1-800-423-RATS."

19  Q   And can you note the date of this post?

20  A   It was posted 6/14 of 2016.

21  Q   Going to show you page 7 of the same document.  Can you

22  read the text in the red box here?

23  A   Sure.  This one was posted on June 10th, 2016.  And it

24  says, "What happened, bro, my man just got found guilty and

25  all these fuck niggas get off."

1   Q    And can you read the --

2   A    And the status post is, "All these bitch ass niggas beat

3   the shit, my dog get found guilty.  Fuck the law.  SMH."

4   Q    Thank you.  And the date of that status?

5   A    Was June 10th, 2016.

6   Q    Going to show you page 8 of the same document.  Can you

7   read the text here for us?

8   A    Sure.  This one was from May 24th, 2016.  It says, "Free

9   my brothers, Dave, Slay, Carrdai, and ily niggas."

10  Q    I'm going to show you page 9 of the same document.

11              THE COURT:  Detective, what is this document again?

12              THE WITNESS:  This is a Facebook -- business record

13  from the Facebook search warrant from the business record of

14  Ronnie Hall, who's also known as Cakes.

15              THE COURT:  Next question.

16  Q    (BY MS. HOFFMAN)  Can you tell us who we're looking at

17  here?

18  A    The individual on the left is Trevon White, also known as

19  Country.

20  Q    Going to show you page 11 of the same document.  What are

21  we looking at here?

22  A    It's a collage of -- from left to right is Trevon White,

23  Country; Shawn Gregg, Hood; Delando Belton, Eggy; and

24  Wes Brown, Wes.

25  Q    I'm going to show you page 12 of the same document.  Can

1    you read the text in the box there, please?

2    A    Sure.  It was sent on December 7th of 2016.  Says, "Bro,

3    Slay said send him some bread."

4    Q    Thank you.  Going to show you page 15 of Government's

5    Exhibit SM 8, which you previously identified as the Facebook

6    account belonging to Gerald Johnson.  What are we looking at

7    here?

8    A    That's a photo of Wes Brown on the left, Gerald Johnson

9    in the red hat turned backwards, and Ronnie Hall with the

10   Adidas shirt, and three other individuals.

11   Q    And I'm going to show you page 47 of the same exhibit,

12   Government's Exhibit SM 8.  What are we looking at here?

13   A    This is a picture of Gerald Johnson bent over with the

14   red hat backwards, and then Ronnie Hall, Cakes, on the left

15   with the blue hat and white shirt making a picture like he's

16   holding a gun, with Will Harris, who's also known as Will I

17   am, on the right making the same gesture with his hand with

18   the red hat.

19   Q    Thank you.  I'm going to show you Government's

20   Exhibit No. P, as in Paul, HI 39.  Who are we looking at

21   here?

22   A    That's Will Harris, who also goes by Will I am.

23   Q    And did you execute a search warrant on a Facebook

24   account belonging to Mr. Harris?

25   A    Yes, I did.

Direct Examination – Hayden (By Ms. Hoffman)

1    Q    Going to show you Government's Exhibit No. SM 7.  What

2    are we looking at here?

3    A    This is another Facebook –– partial Facebook business

4    record with the name Will, last name I am, with the registered

5    e-mail of willgreenmount@yahoo.com and a vanity name of

6    Strapped U Shawdy and a registration date of July 29th, 2011.

7    Q    I'm going to show you page 2 of the same document.  Can

8    you read the text in the red box there?

9    A    It says, "My brother shot video last night.  Shit crazy,

10   that shit was fun as hell.  Shout out to my big brother

11   Black Haze.  You going to get niggers out the hood, oh yeah,

12   big ups" –– I'm sorry, "big ups to my nigga Murder and my big

13   brother, Geezy the Prince.  Love you all, niggas.  Flat out

14   big X's, Capital J all day.  Fuck you all.  I'm out this

15   coochie today."

16   Q    Does Will Harris appear in any publicly available YouTube

17   videos with Gerald Johnson?

18   A    Yes, he does.

19   Q    Going to show you a short clip from Government's

20   Exhibit CD 9, which you identified yesterday as the CD

21   containing YouTube videos featuring Mr. Johnson.

22        And if the jurors could turn to the YouTube videos tab in

23   the transcript binders, they'll find a transcript prepared by

24   the government on page 7 within that tab.

25             (Video played.)

Direct Examination – Hayden (By Ms. Hoffman)

1    Q    (BY MS. HOFFMAN)  Can you identify the people who we saw

2    in this clip just now?

3    A    Right here, it's Gerald Johnson with the black hat with

4    the glasses and Will Harris with the blue hat with his hand in

5    the air at that point.

6              MR. O'TOOLE:  Your Honor, could counsel approach

7    briefly?

8              THE COURT:  Yes.

9              (Bench conference on the record.)

10             MR. O'TOOLE:  I hope this is not necessary.  First,

11   I want to make sure that all of our pretrial motions on all of

12   these things -- all these different photos and videos that we

13   may try to keep them out of where ever they're preserved.  You

14   don't expect us to make or need to make an objection each time

15   something we moved on previously.

16             THE COURT:  No.  The record is complete by virtue of

17   the motions to suppress and to exclude and in limine that you

18   made previously.  And it is not necessary that you renew those

19   motions when the evidence is actually first presented to the

20   jury pursuant to the Court's earlier order that it is in fact

21   admissible.  It's understood that the defendants' objections,

22   motions to suppress, motions in limine that were articulated

23   in the pretrial process continue right through this

24   proceeding.

25             MR. O'TOOLE:  Thank you very much.

1              (The following proceedings were had in open court.)

2     Q    (BY MS. HOFFMAN)  Detective Hayden, I'm going to show you

3     page 65 now of --

4              THE COURT:  Binders closed.

5     Q    (BY MS. HOFFMAN)  I'm going to show you page 65 now of

6     Government's Exhibit SM 8, which we were looking at just a

7     minute ago.  What are we looking at here?

8     A    It's a grainy picture, but it's a picture of individuals

9     sitting on steps and standing next to it.  It's Gerald Johnson

10    on the left, Will Harris is standing on the stairs, looks like

11    Ronnie Hall in the blue shirt.

12    Q    Can you read the comment in the red box below, please?

13    A    It states, "We on the trap bitch."

14    Q    Going to show you Government's Exhibit P, as in Paul,

15    HI 42.  Who are we looking at here?

16    A    That is Tangier Hitchens, who also goes by Tangie and

17    Hannah Montana.

18    Q    I'm going to show you page 17 of Government's

19    Exhibit SM 9, which you previously identified as the Instagram

20    account belonging to Gerald Johnson.  What are we looking at

21    here?

22    A    It's a group photo.  Tangier Hitchens is up in the front

23    in the blue; Anthony Hunter, Banks, is right there;

24    Mr. Johnson's in the back; and it's kind of hard to make out

25    some of the other faces.

Direct Examination – Hayden (By Ms. Hoffman)

1    Q    I'm going to show you page 64 of Government's

2    Exhibit SM 8, which you identified as the Facebook account of

3    Gerald Johnson.  What are we looking at here?

4    A    It's a picture of Gerald Johnson and Tangier Hitchens.

5    Q    And can you read the text in the red box below?

6    A    Text underneath says, "hashtag you already hashtag

7    guerillas, XX in the box 'cuz ain't nobody checking, check

8    blowing big high."

9    Q    I'm going to show you Government's Exhibit P, as in Paul

10   HI 24.  Who are we looking at here?

11   A    That's Shareiff Dupree, who also goes by the name Reef.

12   Q    And I'm going to show you page -- I'm going to show you

13   page 31 of Government's Exhibit SM 9.  What are we looking at

14   here?

15   A    It's Gerald Johnson, Henry walker, and looks like

16   Shareiff Dupree.

17   Q    And can you identify which one is which in this

18   picture?

19   A    Henry Walker, Gerald Johnson, Sharieff Dupree.

20   Q    Thank you.  Going to show you page 26 of Government's

21   Exhibit SM 3.  What are we looking at here?

22   A    The photo, again, from a Facebook business record, with

23   three individuals, kind of grainy.

24        MS. HOFFMAN:  Your Honor, may I approach with this

25   exhibit?

1            THE COURT:  Yes.

2    A    It's Shareiff Dupree on the left, Wes Brown in the

3    middle, and Carrdai Butler on the right.

4    Q    (BY MS. HOFFMAN)  I'm going to show you Government's

5    Exhibit P, as in Paul, HI 11.  Who are we looking at here?

6    A    It's a picture of Carrdai Butler.

7    Q    And is this the same Carrdai Butler that we viewed in a

8    YouTube video with Gerald Johnson yesterday?

9    A    Yes, it is.

10   Q    I'm going to show you page 35 of Government's

11   Exhibit SM 9, which you identified as the Instagram account of

12   Gerald Johnson.  What are we looking at here?

13   A    It's a picture of Gerald Johnson and Carrdai Butler and

14   another individual on the street.

15   Q    And I'm going to show you page 9 of Government's

16   Exhibit SM 3, which you identified yesterday as Wesley Brown's

17   Facebook account.  What are we looking at here?

18   A    That's a post, again from Facebook, at the top it says,

19   "Free my niggas" -- but if I can see it again because the

20   glare is making it bad.

21   Q    I'll approach with this exhibit.

22   A    It's Norman Handy on the left, Carrdai Butler underneath,

23   and I don't want to --

24   Q    Thank you.

25   A    -- misspeak about the other two.

Direct Examination – Hayden (By Ms. Hoffman)

1    Q    And I've just put it on the screen again.  Did you say --

2    A    Norman Handy and Mr. Butler.

3    Q    Thank you.  Going to show you Government's Exhibit P, as

4    in Paul, HI 29.  Who are we looking at here?

5    A    His name is Jason French and his nickname is Mustafa.

6    Q    And I'm going to show you page 41 of Government's

7    Exhibit SM 9, which you identified as Gerald Johnson's

8    Instagram account.  What are we looking at here?

9    A    Again, it's a group of individuals.  It's kind of grainy,

10   but you can actually make out Mr. French right here with the

11   long braids and Mr. Johnson in the superman shirt.

12   Q    I'm going to show you Government's Exhibit P, as in Paul,

13   HI 66.  Who are we looking at here?

14   A    That's Elliott Reed, who also goes by Tech.

15   Q    And I'm going to show you Government P, as in Paul,

16   HI 62.  Who are we looking at here?

17   A    That's Charles Pace, who also goes by Foo.

18   Q    And is he alive or dead?

19   A    He's dead.

20   Q    I'm going to show you Government's Exhibit P, as in Paul,

21   HI 28.  Who are we looking at here?

22   A    That's Donatello Fenner, who goes by Don or Little Don

23   and he's also deceased.

24   Q    Going to show you Government's Exhibit P, as in Paul,

25   HI 67.  Who are we looking at here?

Direct Examination - Hayden (By Ms. Hoffman)

1    A    That's Michael Robinson, who goes by Mike Mike.

2    Q    And is he alive or dead?

3    A    He is actually deceased as well.

4    Q    All right.  So we've discussed a lot of names and

5    nicknames yesterday and today.  And I'd now like to approach

6    and show you Government's Exhibit DEM 8.  Are you familiar

7    with this document?

8    A    Yes, I am.

9    Q    What is it?

10   A    It's basically photographs, names, and nicknames of all

11   the individuals that I've gone over the last day and a half.

12   Q    Have you had a chance to review it thoroughly before

13   today?

14   A    Yes, I have.

15   Q    Does it accurately reflect the photos, names, and

16   nicknames of the individuals from the Greenmount neighborhood

17   who we've discussed today and yesterday?

18   A    Yes, it does.

19   Q    Is it an exhaustive list of every single person that came

20   up during the investigation of the BGF Greenmount Regime?

21   A    No, it's not.

22   Q    And -- okay.

23         MS. HOFFMAN:  At this point I'd like to publish this

24   exhibit to the jury.

25         THE COURT:  Is there any reason why we can't just

1    use the document camera?

2              MS. HOFFMAN:  We can use the document camera.  I

3    just wanted to give defense counsel an opportunity to object

4    if they wanted to.

5              MR. FRANCOMANO:  No objection.

6              THE COURT:  You may.

7    Q    (BY MS. HOFFMAN)  Now, Detective Hayden, some of the

8    faces here have red boxes around them.  What is the

9    significance of that?

10   A    The ones that have the red boxes on them are all dead.

11   Q    Now, you mentioned earlier that you investigated murders

12   and shootings as part of the investigation into the

13   BGF Greenmount Regime; is that right?

14   A    Yes.

15   Q    And without getting into the substance of those murder

16   and shooting investigations, can you give the jury an overview

17   of the dates and the names of the victims whose homicides and

18   shootings you investigated?

19   A    Some of the homicides and shootings we investigated --

20   I'll try to go chronological, was in 2005 Dante Jordan was

21   killed.  And then 2007, Antonio Oliver was shot.  Couple days

22   after that in 2007, Gregory Rochester was murdered.  And then

23   2011 Henry Mills was murdered.  After that, an individual by

24   the name of Thabiti Wheeler was killed in 2013, then

25   Moses Malone was murdered in 2013.  Trevon White, who is

1    Country, was also murdered in 2013.  Willie Ben Miller, after

2    that, was then murdered in 2013.  An individual by the name of

3    Lamar Tucker was shot in 2013.  Also, Lamontae Smith, who goes

4    by Chop, was shot in 2013.  And then another individual,

5    Gregory Bess, was shot in February of this year.

6    Q    I'm going to approach with Government's Exhibit DEM 4.

7    Are you familiar with this document?

8    A    Yes.

9    Q    What is it?

10   A    It's a timeline of the murders and shootings that I just

11   discussed with the actual exact dates on them and photos of

12   the individuals that were either shot or murdered.

13   Q    And have you had a chance to review it thoroughly before

14   today?

15   A    Yes.

16   Q    And is it an accurate timeline of the murders and

17   shootings that you've just discussed?

18   A    Yes, it is.

19   Q    All right.

20         MS. HOFFMAN:  I'm going to move Government's Exhibit

21   DEM 4 into evidence.

22         THE COURT:  Received by operation of local rule.

23   Q    (BY MS. HOFFMAN)  And Detective Hayden, would you mind

24   just going through the murders and shootings one more time

25   with the exact dates?

Direct Examination – Hayden (By Ms. Hoffman)

1    A    Sure.  On July 20th, 2005, Dante Jordan was murdered.

2    The next one was Antonio Oliver, was shot on

3    January 4th, 2007.  Five days after that, Gregory Rochester

4    was murdered on January 9th of 2007.  I'll move forward to

5    June 14th of 2011, Henry Mills was murdered.  And then Thabiti

6    Wheeler was murdered on March 2nd, 2013.  Moses Malone was

7    murdered March 2nd, 2013, and five days after, that

8    Trevon White was murdered on May 7th, 2013.  Little less than

9    a month after that Willie Ben Miller was murdered on

10    June 3rd, 2013.  Lamar Tucker was shot on June 8th, 2013,

11    Lamontae Smith was shot then on October 5th, 2013, and

12    Gregory Bess was shot on February 4th of 2017.

13    Q    Thank you.  Detective Hayden, I'm going to approach with

14    Government's Exhibit No. DEM 7.  Are you familiar with this

15    document?

16    A    Yes, I am.

17    Q    What is it?

18    A    This is actually a map with the locations on the

19    right-hand side of the -- where the shootings and murders took

20    place.  And on the left it's a list to correspond with the

21    dots on the map of where the incidents took place.

22    Q    And have you had a chance to review it thoroughly before

23    today?

24    A    Yes.

25    Q    And is it an accurate map of where those murders and

1   shootings took place?

2   A    Yes, it is.

3   Q    I'll put Government's Exhibit DEM 7 on the screen here.

4   And would you mind pointing out the locations of each of these

5   murders and shootings?

6   A    Okay.  So again, the chronological -- Number one,

7   Dante Jordan was killed right here, 200 block of East 22nd.

8   Antonio Oliver was shot 300 block of 21st.  Gregory Rochester

9   was killed in the 200 block of 25th -- actually, at

10  221 East 25th.  Henry Mills was then murdered, 2400

11  Greenmount.  Thabiti Wheeler was killed, 311 East 23rd Street.

12  Moses Malone was killed, 650 Cokesbury.  Trevon White was

13  murdered, 200 block of East 22nd Street.  Sorry, it's covered

14  up by the other arrow.  Willie Ben Miller was then killed,

15  10 West 20th, which is also Maryland and 20th, which is over

16  here, Number 8.  Number 9 was Lamontae Smith, was shot a

17  300 block of East 24th.  And Gregory Bess was shot on

18  North Avenue, 400 block of East North Avenue.  And the

19  individual I mentioned, Lamarr Tucker, was actually shot

20  downtown outside of a nightclub.

21  Q    Thank you, Detective Hayden.

22       MS. HOFFMAN:  I have no further questions.  Thank

23  you.

24       THE COURT:  Thank you.

25       MR. O'TOOLE:  Your Honor, we have no questions of

1    Detective Hayden.

2              THE COURT:  Mr. Bussard.

3              MR. BUSSARD:  Yes, Your Honor.

4                      CROSS-EXAMINATION

5    BY MR. BUSSARD:

6    Q    Good morning, Detective.

7    A    Good day to you.

8    Q    I don't know whether to call you special agent because

9    you're assigned to ATF; is that correct?

10   A    That is correct.

11   Q    So are you a special agent?

12   A    No, sir.  Technically, a task force officer or

13   detective.

14   Q    And you were assigned approximately 2012, 2013, in that

15   general area from the Baltimore City Police Department?

16   A    That's when we started our -- we were assigned to the

17   Eastern District, that's when we started the investigation,

18   was late 2012.

19   Q    All right.  And as part of the investigation you went

20   over, I think you said to Eastern District, first of all,

21   started talking to the detectives over there and started

22   reviewing documents.

23   A    Correct.  The district detective unit at the time.

24   Q    And that consisted of or included people like

25   Detective Bradley Hood; is that correct?

1    A    He was not assigned to the Eastern District at the

2    time.

3    Q    Was Detective Frank Golimowski?

4    A    He was part of the Eastern District.  I believe they were

5    called Violent Crime Impact Section at the time.

6    Q    And Detective or Sergeant Landsman was also part of

7    that?

8    A    I believe Sergeant Landsman at the time was actually in

9    homicide.

10    Q    Did you have occasion to interview the -- those gentleman

11    that I mentioned just now, as part of your --

12    A    Yeah, I talked to them and worked with them, yes.

13    Q    And also as part of your investigation, you looked at

14    some historical cases that were potentially involved in your

15    investigation.

16    A    That is correct.

17    Q    And you went all the way back, I think you said to about

18    2005?

19    A    Correct.

20    Q    And you also said -- I believe you participated in

21    surveillance.

22    A    Correct.

23    Q    So you went out there one or two days a week sitting in a

24    plain car or a van or in a vacant house and watched the

25    activities in the Greenmount area?

Cross-examination – Hayden (By Mr. Bussard)

1   A     Could be in a car, wasn't a fan of vacant houses, I kept

2   falling through the floors.  Or I used the closed circuit TVs,

3   cameras around the area.

4   Q     Is the closed circuit TVs the same as the blue light

5   cameras?

6   A     No.  Well, yes and no.  Some of the blue light cameras

7   they are closed circuit TVs.  Some of them that have the

8   actual boxes around them, you have to have an actual remote

9   control to use them from line of sight.  And the blue light

10  camera -- a lot of the blue light cameras are the closed

11  circuit.

12  Q     And but they are maneuverable?

13  A     Correct.

14  Q     And are they real time?

15  A     When you're watching it, yes.

16  Q     So you're back -- or you in a unit like a vehicle or are

17  you back at --

18  A     No.  I can actually be at the district observing -- the

19  way it's broken down, there's cameras all over the thing.  If

20  I want to watch the Eastern District, I could actually go to

21  the Eastern District, pull up all the cameras for the Eastern

22  District, and pull up the cameras to watch from the station.

23  Q     And you saw -- some of the people that you just mentioned

24  in response to government questions, you saw them on your

25  surveillance runs?

1    A    Yes.

2    Q    And in addition, there was also a wiretap.  You mentioned

3    there was eight lines that were tapped as part of the state

4    investigation.

5    A    Yes, there was.

6    Q    And was one of those persons that was the target of those

7    initial investigations, was it James Cornish?

8    A    He was not the target.  He was actually a cooperator at

9    the time, who then -- because of him coming up on the line, we

10   then went up on his line as well.

11   Q    So when you were listening to the lines of others,

12   James Cornish was intercepted on the lines of these other

13   persons; is that correct?

14   A    Correct.

15   Q    And did you come to find out -- and just so the jury

16   knows who we're talking about, showing you Government's

17   Exhibit PHI 21, is that in fact James Cornish?

18   A    Yes, it is.

19   Q    Did you have occasion to interview Mr. Cornish?

20   A    Yes.

21   Q    You found out also in talking with Detective Golimowski,

22   I hope I'm pronouncing that correctly, that he was, for want

23   of a better word, Mr. Cornish's handler?

24   A    Correct.

25   Q    And was it also your understanding in talking with law

1    enforcement that James Cornish was a paid confidential

2    informant?

3    A    Yes.

4    Q    Now, you also learned through the wiretap and through

5    your investigation that you've just spoken about that

6    Mr. Cornish was selling drugs?

7    A    That is correct.

8    Q    While he was a cooperator?

9    A    That is correct.

10   Q    Was he also using drugs when he was a cooperator?

11   A    That I don't know, maybe marijuana.  But I never found

12   him to be using drugs.

13   Q    Was he buying drugs as a cooperator?

14   A    Not for us, no.

15   Q    But he was selling narcotics?

16   A    He came across the line, yes, discussing the packaging of

17   narcotics.

18   Q    And was that actually captured on CCTV, him out on the

19   corner selling drugs?

20   A    No.  Just -- it was just through the audio, collecting

21   the phone calls.

22   Q    Were you ever part of any interviews with Mr. Cornish

23   when you were talking about his cooperative activities?

24   A    Yes.

25   Q    And did he admit during that time that he was also

 1   selling drugs to you?

 2   A    Yes.

 3   Q    He admitted during those meetings?

 4   A    Yeah.  After -- when we basically told him that we knew

 5   he was selling drugs and he admitted it, yes.

 6   Q    And you continued to use him anyway as a cooperative

 7   person?

 8   A    Well, I mean, we used him because you can't find someone

 9   that's not involved in the trade to actually know information

10   about what's going on on the street, who's not -- I mean,

11   basically -- he's trying to make ends meet, we knew he was

12   selling drugs, that's how he became a cooperator.  So you have

13   to have someone from the life to tell you about the life.

14   Q    I just want to be sure I understand, was the police

15   department authorizing him to --

16   A    No.

17   Q    -- or giving him a pass?

18   A    No.  Basically, the way confidential informants work is,

19   a lot of times they will be arrested, caught selling drugs,

20   doing something illegal.  They will then say, hey, you know

21   what, I want to help myself out or make something better.  So

22   then they'll continue to give you information, but you also

23   have to understand that if a person all the sudden is selling

24   drugs with other individuals, and they all the sudden stop and

25   say, nope, I can't do this right now and start asking

1    questions, then at that point they're going to be either made

2    as an informant or made into someone that other people can't

3    trust, and therefore, they're no longer a use or can provide

4    any information because they will be outed by the individuals

5    they're working with.  So no, it's not a pass.  If he gets

6    caught selling drugs, then yes, he will be arrested because

7    he's told at the front when you are a CI you cannot go out and

8    sell drugs or buy drugs, basically, without the permission.

9    Q    But he did continue -- and your understanding of the

10   investigation, he did continue to sell drugs?

11   A    Through the phone calls, yes.

12   Q    Now, you've also talked at times about the surveillance

13   and there's been some testimony about meetings, gatherings,

14   what have you, did you have occasion to observe some

15   meetings?

16   A    I wouldn't call them formal meetings.  I mean, yes, I

17   would watch more gatherings.  There was no gavel, I couldn't

18   hear anybody taking minutes or anything of that nature.  But

19   on a daily basis a group of individuals would join up on a

20   corner, engage in narcotics activity, go off -- be off camera.

21   So depending what your term of a meeting is, either -- no, no

22   formal meetings, but yes, numerous gatherings.

23   Q    Did you see James Cornish in any of those meetings?

24   A    No.

25   Q    Did you ever see -- well, I'm going to show you

1    Government's Exhibit PHI 58, which has already been admitted

2    in evidence.  Can you identify this person?

3    A    That is Christopher Meadows.

4    Q    And did you ever see Christopher Meadows attending any of

5    these informal gatherings that you talked about?

6    A    In 2013, no.

7    Q    Okay.  Did you see him since you -- when you were in the

8    investigation, it was 2013; is that correct?

9    A    Well, 2012, '13, so after that point, no, I didn't see

10   him.

11   Q    Did you ever see Brian Rainey, do you know

12   Brian Rainey?

13   A    Yes, I've met him.

14   Q    Did you see Brian Rainey at any of these gatherings?

15   A    No.

16   Q    Now, I'm going to show you a picture -- I'm not sure this

17   one was admitted, this will be Kenneth Jones No. 1.  Maybe it

18   was admitted.  Can you identify that person, please?

19   A    That's actually David Hunter.

20             THE COURT:  Let's be clear, is this already in

21   evidence?

22             MR. BUSSARD:  It may be, Your Honor.

23             MS. HOFFMAN:  It is already in.

24             THE COURT:  So let's have exhibits referenced by

25   just one exhibit number and let's make sure that the record

Cross-examination – Hayden (By Mr. Bussard)

1    reflects what exhibit number we're talking about.

2              MR. BUSSARD:  I believe the government number is

3    PHI 5.  In my haste this morning --

4              THE CLERK:  PHI 5 is not in.

5              THE COURT:  PHI 5 is not in evidence.

6              MS. HOFFMAN:  It's PHI 45.

7              THE CLERK:  Yes.

8              THE COURT:  PHI 45 has been received and the

9    government verifies that this is the same image; is that

10   right, Ms. Hoffman?

11             MS. HOFFMAN:  Yes, Your Honor.

12             THE COURT:  Mr. Bussard, PHI 45 is the exhibit

13   you're referring to, you may continue.

14             MR. BUSSARD:  Thank you, Your Honor.

15   Q    (BY MR. BUSSARD)  Now, I want to ask you about another

16   person who was -- you just briefly mentioned yesterday a

17   Mr. Montel Harvey.

18   A    Yes.

19   Q    And --

20             MR. BUSSARD:  Court's indulgence for a brief moment.

21   Q    (BY MR. BUSSARD)  Showing you what's been admitted into

22   evidence as Government's Exhibit PHI 41, is that a picture of

23   Mr. Harvey?

24   A    Yes, it is.

25   Q    And was he a subject of your investigation or part of

1    your investigation?

2    A    He came to be part of it, yes.

3    Q    And I'm showing you what's -- I don't have the right one.

4    It was PHI 42.  You just entered it a few minutes ago or

5    identified it as Tangier Hitchens.

6    A    Yes.

7    Q    Is this Ms. Hitchens?

8    A    Yes, that is her.

9    Q    And finally, showing you Government's Exhibit PHI 38.

10    Can you identify this person again, please?

11    A    That's Norman Handy.

12    Q    And is he also a subject of your investigation?

13    A    Yes.

14    Q    Now, going back for just a minute, Mr. Cornish was

15    arrested during the time of your investigation around 2013; is

16    that correct?

17    A    No.  He was arrested, I believe, afterwards at

18    Lexington Market, if that's the arrest you're speaking of.

19    Q    In June 2013?

20    A    Okay.  Yes.

21    Q    For possession with intent to distribute.

22    A    Yes, that's the one arrested by Detective Golimowski.

23    Q    And that took place around the 2000 block of Barclay.

24    A    I believe so, yes.

25    Q    Mr. Harvey that we just talked about, I want to ask you

1    about the specific conduct.  Was Mr. Harvey also arrested

2    around May 29th, 2013 for possession with intent to

3    distribute?

4    A    Yes, he was.

5    Q    And that was -- and then he was also arrested

6    March 12th, 2012.  Are you familiar with that arrest, the

7    distribution arrest?

8    A    Sounds familiar, yes.

9    Q    Ms. Hitchens was arrested July 28th, 2011, are you

10   familiar with that from your review of the historical cases?

11   A    It sounds familiar, but that one doesn't jump out at me,

12   no.

13   Q    November 25th, 2011, arrest for possession with intent to

14   distribute cocaine of Ms. Hitchens.

15   A    I believe so, yes.

16   Q    And then finally, January 20th, 2012, for possession of

17   cocaine and heroin, are you familiar with that arrest?

18   A    Relatively.

19   Q    She was with Mr. Harvey.

20   A    With Mr. Harvey, yes.

21   Q    Now, Mr. Handy -- talking about specific conduct of

22   Mr. Handy on March 23rd, 2013, do you have information to

23   believe he was involved in a robbery?

24   A    Yes.

25   Q    And the victim of that robbery was?

1   A    Moses Malone.

2   Q    And the Moses Malone that was eventually the victim of a

3   murder; is that correct?

4   A    That is correct.

5   Q    And did Mr. -- based on your -- I'm sorry, I don't know

6   how to get this off of the screen.  Thank you.

7        Now, as an experienced law enforcement detective, you're

8   familiar with drug language, somewhat?

9   A    To a point yes, it's always evolving, but yes.

10  Q    What is nodding?

11  A    Knotting?

12  Q    Yes.

13  A    Is probably tying up packs.

14  Q    Not knotting, nodding, N-o-d.

15  A    Oh, like nodding out?

16  Q    Yes.

17  A    Is when -- a lot of times -- normally use it -- we use it

18  for heroin users when they take heroin and you see them

19  stand --

20              MS. HOFFMAN:  Your Honor, may we approach?

21              THE COURT:  You may.

22              (Bench conference on the record.)

23              THE COURT:  Yes, ma'am.

24              MR. MARTINEZ:  Your Honor, we asked to approach in

25  an abundance of caution.  Detective Hayden is testifying as a

 1    fact witness.  We're aware of the line of cases in the Fourth

 2    Circuit Garcia, in particular, which flags the jury confusion

 3    that can result when a fact witness begins testifying about

 4    the interpretation of drug terminology, which I think is where

 5    Mr. Bussard is going now.  I understand it's being elicited by

 6    defense counsel and a different standard may apply when

 7    defense counsel is the one who's drawing it out.  But because

 8    of the line of cases that deal with government eliciting that

 9    kind of information from a law enforcement fact witness, we

10    just wanted to flag it for the Court to the extent that there

11    is case law talking about jury confusion in this situation

12    being problematic.

13            THE COURT:  Well, sure.  And I appreciate that.  But

14    Mr. Bussard by virtue of his having asked the question has

15    waived any such objection.  And if Mr. Francomano,

16    Mr. O'Toole, Mr. Enzinna don't object, they're waiving too, so

17    we'll see if that happens or not.

18            MR. MARTINEZ:  So I want to make a record on that.

19            THE COURT:  That's fine.

20            MR. FRANCOMANO:  We're not objecting.

21            MR. ENZINNA:  No objection.

22            THE COURT:  So you can plow ahead, Mr. Bussard.

23            (The following proceedings were had in open court.)

24    Q    (BY MR. BUSSARD)  So Detective Hayden, I asked you what

25    nodding was and could you just repeat your answer?

1    A    It's basically after you take a dose of drugs and you're

2    basically in between conscious and unconscious, just kind

3    of -- almost like when you're about to fall asleep and you

4    don't fall asleep, just kind of nodding back and forth.

5    Q    And based on your training, knowledge, and experience,

6    with this investigation and specifically regarding

7    James Cornish, what was his nickname?

8    A    His nickname was Nod.

9    Q    And that's N-o-d; correct?

10    A    Correct.

11    Q    Thank you.  Did you have occasion -- I believe I asked

12    you this, but did you have occasion to interview

13    Mr. Cornish?

14    A    Yes.

15    Q    And was he -- when he told you that he was distributing

16    drugs, was he also under the influence of drugs at any time

17    you met with him?

18    A    Not that I'm aware of, no.

19    Q    Did he ever talk to you about the fact that he was taking

20    large quantities of opiates in the morning?

21    A    Not to me, no.

22    Q    Are you aware through your investigation that Mr. Cornish

23    was in fact taking opiates during a large portion of this

24    investigation?

25    A    I didn't hear opiates.  I heard he was smoking

1    marijuana.

2    Q    You know nothing about the pills that he was taking?

3    A    I mean, not specifically, no.

4    Q    Does that mean that his handler never told you about

5    that?

6    A    It means that he may have -- it may have come up, I don't

7    specific -- I actually don't remember anything about large

8    doses of opiates.

9    Q    The government asked you a lot of questions about the

10   social media, the SM with the number after it, various

11   accounts of Ronnie Hall and Mr. Johnson and what have you, do

12   you recall that?

13   A    Yes.

14   Q    And do you have any evidence that Mr. -- was there any

15   postings by Mr. Jones on any of these or was it just his name

16   being mentioned?

17   A    His name was mentioned.  I don't remember any specifics

18   from Mr. Jones.

19   Q    So Mr. Jones never put anything up on social media that

20   you're aware of?

21   A    No.

22          MR. BUSSARD:  I have no other questions,

23   Your Honor.

24          THE COURT:  Thank you.  Mr. Francomano.

25          MR. FRANCOMANO:  Thank you, Your Honor.

1                       CROSS-EXAMINATION

2    BY MR. FRANCOMANO:

3    Q    Good morning, Detective Hayden.

4    A    Good day to you, sir.

5    Q    You spoke about the social media; correct?

6    A    Correct.

7    Q    The social media you pulled up for Mr. McCants, are you

8    saying that that was his social media?

9    A    Yes.  It was under -- well, based on our investigation,

10   it came up under Digga McCants, who through our investigation

11   and cooperation, we found Mr. McCants's nickname is Digga.

12   Q    So you're assuming it's his; correct?

13   A    I would say more than assume, yes.

14   Q    But that's the only, I guess, information you have that

15   it's his; is that correct?

16   A    Besides that and his pictures on it, then yes.

17   Q    Okay.  In the social media pictures that you reviewed and

18   all the group photos, Mr. McCants is not in any of those group

19   photos; correct?

20   A    Not that I recall at this point, no.

21   Q    And the meetings you spoke about, Mr. McCants was never

22   at any of those meetings; correct?

23   A    You mean the gatherings?  No.

24   Q    Gatherings, meetings, whatever terminology.

25   A    Correct, no.

1    Q    You spoke a little bit about Christopher Meadows.  Now,

2    he's an informant as well; is that correct?

3    A    He was never inform -- I just know him as a cooperator,

4    not an informant.

5    Q    As a cooperator.

6    A    Correct.

7    Q    And he was also paid by the government, $26,000; is that

8    correct?

9    A    I don't know the exact amount, but roughly.  Well, he

10   wasn't actually paid.  It was --

11   Q    How did he receive the money?

12   A    A lot of it was lodging for safety.  Some of it was for

13   substance, to buy food when he was in between jobs, to

14   actually assist with living, to make sure that he was in a

15   safe environment so he could continue with his life.  So it

16   wasn't an outright payment of $26,000, no.

17   Q    Correct, he got it in increments?

18   A    Well, increments of some were when he had to be moved to

19   different hotels, some for different lodging, some for food,

20   and then some were just payments to assist with bills, food,

21   clothing, whatever.

22   Q    Were they regular payments, like would he get a check

23   every week?

24   A    No, it varied.

25   Q    So when he came in and gave information, would he get

1    paid?

2    A    No, it would -- we would talk to him.  He would -- if he

3    had an issue and we needed to move him, his physical location,

4    we would move him.  If not, if he was in between jobs or

5    anything, it would probably be anywhere from two weeks to a

6    month, month and a half that we would make sure that he was

7    supported so he could continue to be safe.

8    Q    To continue to be safe.

9    A    Yes.

10   Q    And to provide information.

11   A    Correct.  Well, not information, but it's -- because

12   basically his information -- he had already come and he had

13   already testified several times, he was worried about his

14   safety.  We can't just leave a witness out in the wind.  So

15   yes, if we have to give them money to provide them lodging,

16   food, so he doesn't have to come back to an environment where

17   it's unsafe for him or he feels unsafe, then that's provided

18   for them.

19   Q    None of the drugs that were seized and put into evidence

20   have a direct link to Mr. McCants; correct?

21   A    Today -- the drugs this week?

22   Q    Correct.

23   A    No.

24            MR. FRANCOMANO:  Thank you.

25            THE COURT:  Redirect.

                         REDIRECT EXAMINATION

1

2   BY MS. HOFFMAN:

3   Q    Detective Hayden, you mentioned that James Cornish, also

4   known as Nod, was a paid informant for the government in 2013.

5   A    That is correct.

6   Q    And at some point while he was an informant for the

7   government, you said that he was intercepted on the wiretap

8   you were conducting; is that right?

9   A    That is correct.

10  Q    And some of those calls involved discussions of drug

11  dealing, I think you said.

12  A    That is correct.

13  Q    And was he engage -- who he was engaged in those

14  conversations with?

15  A    He was engaged with Muggy and Paul Wilson, also known as

16  Twin.

17  Q    What about any of the defendants?

18  A    He would call Mr. Johnson asking about either weed or

19  30s.

20  Q    Now, when Mr. Cornish came up on that wiretap, did the

21  government confront him about those illegal activities?

22  A    Yes.

23  Q    And did he admit that he was selling drugs?

24  A    Yes, he actually admitted it.  We told him he was

25  actually going to be deactivated as a confidential informant

Redirect Examination - Hayden (By Ms. Hoffman)

1    and even after deactivating he still provided information.

2    Q    Was he in fact charged with that drug activity?

3    A    Yes, he was.

4    Q    You were asked about Christopher Meadows on

5    cross-examination.  And I believe you said that he -- you did

6    not see him at gatherings in the Greenmount neighborhood in

7    2013; is that right?

8    A    Correct.

9    Q    At this point was Mr. Meadows living in the Greenmount

10   neighborhood?

11   A    Not that I'm aware of, no.

12   Q    Why not?

13   A    I believe at that time he may have been locked up or he

14   was -- actually, he had already cooperated in another case and

15   I know he had been moved out of the area for his own safety as

16   well.

17              MS. HOFFMAN:  Thank you, no further questions.

18              THE COURT:  May the witness be excused, defense

19   counsel?

20              MR. O'TOOLE:  Yes, Your Honor.

21              MR. FRANCOMANO:  Yes, Your Honor.

22              THE COURT:  You're excused.

23              THE WITNESS:  Thank you, Your Honor.

24              THE COURT:  Thank you.  Next witness.

25              MR. MARTINEZ:  Your Honor, the government calls

Direct Examination – Meadows (By Mr. Martinez)

1   Christopher Meadows.

2          THE COURT:  Christopher Meadows.  Please come

3   forward, sir, all the way up here to the front of the

4   courtroom and stand right here next to this witness box.  Stop

5   there and face our clerk, please.

6          THE CLERK:  Sir, if you would please raise your

7   right hand.

8                    CHRISTOPHER MEADOWS,

9   called as a witness, being first duly sworn, was examined and

10  testified as follows:

11         THE WITNESS:  Yes.

12         THE CLERK:  You may have a seat in the witness box,

13  sir, and watch your step.  And sir, if you would please speak

14  directly into the microphone, state your first and last name

15  and spell your first and last name.

16         THE WITNESS:  Christopher Meadows,

17  C-h-r-i-s-t-o-p-h-e-r, M-e-a-d-o-w-s.

18         THE CLERK:  Thank you.

19         THE COURT:  Your witness, Mr. Martinez.

20                    DIRECT EXAMINATION

21  BY MR. MARTINEZ:

22  Q    Mr. Meadows, good morning.

23  A    Good morning.

24  Q    Could you tell us where you're from, sir?

25  A    Baltimore.

Direct Examination – Meadows (By Mr. Martinez)

1  Q   What part of Baltimore did you grow up in?

2  A   East Baltimore.

3  Q   How old are you now?

4  A   35.

5  Q   Are you familiar with an organization called YGF?

6  A   Yes.

7  Q   What is YGF?

8  A   Young Guerilla Family.

9  Q   Was the YGF a gang?

10  A   Yes.

11  Q   Were you a member of the YGF gang?

12  A   Yes.

13  Q   Are you familiar with an organization called BGF?

14  A   Yes.

15  Q   What does BGF stand for?

16  A   Black Guerilla Family.

17  Q   Is BGF a gang?

18  A   Yes.

19  Q   Were you a member of the BGF gang?

20  A   Yes.

21  Q   Now, before I get further into YGF and BGF, there are a

22  few things I want to go over with you.  Have you previously

23  been convicted of a felony offense?

24  A   Yes.

25  Q   Do you know how many prior felonies you have?

1    A     Yes.

2    Q     What have you been convicted of?

3    A     Just two -- I got two felonies of distribution and

4    possession of a handgun.

5    Q     And the possession of a handgun, did that mature into a

6    federal prosecution in this court?

7    A     Yes.

8    Q     Are you testifying today pursuant to any kind of

9    cooperation agreement with the government?

10   A     No.

11   Q     Dating back to July of 2016, Mr. Meadows, have you

12   received payments or have payments been made on your behalf by

13   the ATF?

14   A     Yes.

15   Q     And before those payments were made, had you testified

16   previously in other cases?

17   A     Yes.

18   Q     Did those other cases involve members of the BGF?

19   A     Yes.

20   Q     Based on your testimony in those other cases, what, if

21   any safety concerns did you have?

22   A     Safety was a concern as far as about my whereabouts,

23   where I live at, getting home safe, finding housing, because

24   after I testified, it was the fact that I know my life would

25   have been on jeopardy.

1    Q    And why did you believe your life was in jeopardy?

2    A    Because there's some threats and then the -- some of the

3    cases, how serious they was.

4    Q    Where did you think -- where did you understand that the

5    threats were coming from?

6    A    The organization.

7    Q    What organization?

8    A    BGF.

9    Q    So what, if any, relationship was there between the

10   payments that were made on your behalf by the ATF and the

11   safety concerns that you just explained?

12   A    As far as to help me relocate, find housing, get me

13   transportation to get back and forth to work safe.

14   Q    Do you know how much money you received from the ATF?

15   A    Not exactly, but I could say roughly somewhere about

16   27 --

17   Q    All right.  I want to change topics and talk about YGF.

18   I want to start by focusing your attention on the 2005 time

19   period.  Where were you living at the time?

20   A    Guilford Avenue.

21   Q    What neighborhood of Baltimore City is that?

22   A    East Baltimore.  Greenmount, Barclay.

23   Q    And you mentioned earlier that you were a member of YGF,

24   can you tell the jury when you became a member of YGF?

25   A    End of 2005, somewhere between 2005, 2006.

1    Q    Could you explain for the ladies and gentlemen of the

2    jury how you became a member of YGF?

3    A    First became a member, we started off as beating each

4    other in for like 30 seconds.  It was semblance of -- from the

5    Bloods, how they used to beat each other in.

6    Q    So are you saying beating each other was an initiation

7    ritual into the gang?

8    A    Starting out, yes.

9    Q    When you joined YGF, who else was in the gang?

10   A    Me, Slay, Dave, Roscoe, Geezy, Joe, Larry, Digga, Carlos,

11   Fool, Don, Bigs, Black.

12   Q    I want to start by showing you some pictures -- well,

13   actually, first, you mentioned an individual named Slay was in

14   the gang, do you see Slay in the courtroom today?

15   A    Yes.

16   Q    Could you point him out for the ladies and gentlemen of

17   the jury and identify an article of clothing he's wearing?

18   A    Got a blue dress shirt on, to the left.

19   Q    And you mentioned Geezy, could you point out Geezy and

20   identify an article of clothing he's wearing?

21   A    Purple shirt on.

22   Q    Could you indicate where he's sitting?

23   A    To the front, next to the lawyer with a burgundy, like

24   purple tie on.

25   Q    And finally, you mentioned Digga, could you point him out

Direct Examination - Meadows (By Mr. Martinez)

1   and identify an article of clothing?

2   A    In the back, can't really tell because of the computer in

3   the way, wearing like a gray suit.

4   Q    Thank you.  Now, I want to show you some pictures and

5   have you put some names to faces.  This has come into evidence

6   as PHI 45, do you recognize this individual?

7   A    Yes.

8   Q    Who's that?

9   A    David.

10  Q    And you had identified him as being in YGF; correct?

11  A    Correct.

12  Q    How about this, this has come into evidence as

13  Government's PHI 27, who are we looking at here,

14  Mr. Meadows?

15  A    Roscoe.

16  Q    Was Roscoe in YGF?

17  A    Yes.

18  Q    And actually, what, if any -- did Roscoe have any family

19  relationship to anyone else in the gang?

20  A    Yes.

21  Q    What was that?

22  A    Geezy's brother.

23  Q    This has come into evidence as Government's

24  Exhibit PHI 6.  Who is this, Mr. Meadows?

25  A    Joe Bonds.

Direct Examination – Meadows (By Mr. Martinez)

1    Q    The Joe you identified as being a member of YGF?

2    A    Yes.

3    Q    This is Government's PHI 28, who's this?

4    A    Donatello.

5    Q    You've identified him as being a member of YGF;

6    correct?

7    A    Correct.

8              MR. ENZINNA:  Your Honor, I'm going to object to the

9    leading.

10             THE COURT:  Overruled.

11   Q    (BY MR. MARTINEZ)  Showing you Government's PHI 43, who's

12   this?

13   A    Murda, name Carlos.

14   Q    So this is the Carlos you just identified as being in the

15   YGF?

16   A    Yes.

17   Q    Show you a couple more pictures.  This is PHI 84, do you

18   recognize this picture?

19   A    Yes.

20   Q    Who's that?

21   A    Brian Williams, B-time.

22   Q    Was B-time also a member of YGF?

23   A    Yes.

24   Q    This has come into evidence as Government's

25   Exhibit PHI 62, who's this?

1    A    Fool.

2    Q    Was Fool in YGF?

3    A    Yes.

4    Q    This is PHI 69, who's that?

5    A    Craig Mack.

6    Q    Was Craig Mack in YGF?

7    A    Yes.

8    Q    Did other people join YGF over time?

9    A    Yes.

10   Q    How long were you a member of YGF?

11   A    Until we crossed over to BGF.

12   Q    And when did that cross over happen?

13   A    Like the end of 2006, probably beginning of 2007.

14   Q    In what neighborhood did YGF operate?

15   A    Guilford, Barclay, Greenmount, 22nd, 23rd, 24th,

16   25th Street.

17   Q    I want to talk to you about some of the activities that

18   YGF engaged in.  Did you participate in drug activity as a

19   member of YGF?

20   A    Yes.

21   Q    Did you participate in robberies as a member of YGF?

22   A    Yes.

23   Q    Do you have personal knowledge of murders that were

24   committed by members of YGF?

25   A    Yes.

1    Q    And do you have personal knowledge regarding shootings or

2    attempted shootings that were committed by members of YGF?

3    A    Yes.

4    Q    All right.  Let's start with the drug activity.  The drug

5    activity that you engaged in during your membership in YGF,

6    did that include selling drugs?

7    A    Yes.

8    Q    How about packaging drugs?

9    A    Yes.

10    Q    And how about storing drugs?

11    A    Yes.

12    Q    Through those activities, did you become familiar with

13    the locations that YGF used to package and store their

14    narcotics?

15    A    Yes.

16    Q    Are you familiar with the term "stash house"?

17    A    Yes.

18    Q    What's a stash house?

19    A    Stash house is where you use a house as a stash, you

20    stash your drugs, guns, money.

21    Q    How about a trap house?

22    A    Same thing, you just trap out the house by selling out of

23    it.

24    Q    What is the first location that you can remember being

25    used as a stash house or a trap house for YGF?

1    A    25th Street.

2    Q    I want to show you a page from Government's Exhibit P, as

3    in Peter, HCS 2.  Do you recognize this location?

4    A    Yes.

5    Q    What is it?

6    A    Geezy house.

7    Q    And was this the stash house you were talking about on

8    25th Street?

9    A    Yes.

10    Q    So when you say Geezy's house, did Geezy live there?

11    A    Yes.

12    Q    Did you ever participate in packaging drugs at this

13    house?

14    A    Yes.

15    Q    How often?

16    A    A lot.

17    Q    Every day, every other day, what are we talking about

18    here?

19    A    Just about every day, maybe five days out of a week.

20    Q    What kind of drugs would you package in this house?

21    A    Coke, heroin.

22    Q    Anything else?

23    A    Not at that house, no, just coke and dope.

24    Q    When you say coke and dope, so cocaine -- what kind of

25    cocaine, powder or --

1    A    Ready, hard.

2    Q    And when you say it's "hard," what -- could you translate

3    "hard" for us?

4    A    Crack, it's cocaine.  Once it's cooked up, it comes to

5    hard rocks, once you mix the solutions.

6    Q    Are there any other street terms for crack cocaine that

7    you know?

8    A    Crack, ready rock, hard.

9    Q    And you said dope.  What does dope mean, what kind of

10    drug is that?

11    A    Heroin.

12    Q    While we're talking about drug terminology, what does the

13    term "girl" mean in the drug context?

14    A    Girl means just straight coke.

15    Q    So that's powder cocaine?

16    A    Powder, yes.

17    Q    How about boy?

18    A    That means it's raw dope.

19    Q    And dope means heroin, you said earlier; right?

20    A    Yes.

21    Q    I want to talk to you about some of the crack cocaine

22    that you participated in packaging as a member of YGF.  What's

23    the largest amount of crack that you can remember packaging in

24    one sitting?

25    A    A half a key.

Direct Examination – Meadows (By Mr. Martinez)

1    Q    When you say a half key, could you translate that to

2    us?

3    A    A half a kilogram.

4    Q    What are some slang or street terms for a kilo, you said

5    a key, is there anything else?

6    A    A key is a brick.

7    Q    Okay.  Where did that half kilo of crack come from?

8    A    Geezy.

9    Q    What happened to the half kilo after it was packaged?

10   A    We sold it.

11   Q    What happened after that?

12   A    We found out that it was mixed with Super Glue.

13   Q    How did you find that out?

14   A    Customer came back and told us.

15   Q    Mr. Meadows, based on your experience as a drug dealer,

16   do you know what it means to "step on" or "stretch" a package

17   of drugs?

18   A    Yes.

19   Q    What does that mean?

20   A    It means it stretches your drug or cut it by adding

21   something else to it to make it less potent than what it is to

22   get more quantity out of it for your money.

23   Q    So if you add something you have more to sell, which

24   means more money comes back; is that right?

25   A    Correct.

1    Q    So why would someone, based on your experience as a drug

2    dealer, put Super Glue in a package of drugs they intended to

3    sell?

4    A    They're trying to stretch their money or try to get over

5    on the next person.

6    Q    So going back to this house on 25th Street, can you tell

7    us what other YGF members participated in packaging drugs

8    there?

9    A    Me, Slay, Don, Foo, Geezy, Craig Mack, and two

10   crackheads.

11   Q    Two crackheads, we'll come back to them later.  The drugs

12   that you packaged in the house, you mentioned that the half

13   kilo on that one particular occasion came from Geezy, but

14   where, generally, would you get the drugs that you were

15   packaging and getting ready to sell?

16   A    The coke would come from Geezy and the dope would come

17   from Fats.

18   Q    Was Fats also in the gang, had you mentioned him

19   previously?

20   A    Yes, he was in the gang.

21   Q    And in addition to packaging drugs in the house, were you

22   also selling drugs on the street?

23   A    Yes.

24   Q    Where on the street would you sell?

25   A    Barclay, 24th, Guilford, 24th, 22nd Street, Greenmount.

Direct Examination - Meadows (By Mr. Martinez)

 1   Q    I'm going to put what's come into evidence as GM 10 on

 2   the screen here.  And I'm going to ask if you can use the

 3   screen to your left and point out, just with your finger, some

 4   of the general blocks where you used to sell drugs.

 5   A    (Indicating.)

 6   Q    Thank you.  What drugs would you sell on the street?

 7   A    Ready and heroin.

 8   Q    How often would you be out there selling?

 9   A    Every day all day.

10   Q    Were other YGF members also out there selling with you at

11   those same locations?

12   A    Yes.

13   Q    Who?

14   A    Geezy, myself, Roscoe, Don, Foo, Slay, Digga, Joe, Black,

15   just about everybody that was in our organization.

16   Q    How often would you see Digga selling drugs?

17           MR. FRANCOMANO:  Objection.

18           THE COURT:  Basis?

19           MR. FRANCOMANO:  Foundation.

20           THE COURT:  You may approach.

21           (Bench conference on the record.)

22           THE COURT:  Okay.  Leaning to your side as far as I

23   can on this, when I heard him say -- I did think I heard

24   "nigga" as a posed to "Digga," but the court reporter heard

25   "Digga."

Direct Examination - Meadows (By Mr. Martinez)

1              MR. FRANCOMANO:  I heard Digga.

2              THE COURT:  Okay.  So if Digga is what he said, then

3    how is that not a foundation?

4              MR. FRANCOMANO:  Your Honor, the issue -- I want to

5    bring this up, I think we're going to run into is that this

6    defendant left the gang in 2008.

7              MR. MARTINEZ:  Yeah, we're talking about YGF,

8    between '05 and '07.

9              MR. FRANCOMANO:  That's just my concern.  I just

10   want to make sure if anything he testifies to after 2008, that

11   would be hearsay.

12             MR. MARTINEZ:  He's talking about YGF.

13             MR. FRANCOMANO:  Let me finish.

14             THE COURT:  Hold on.  So the indictment alleges

15   misconduct beginning in 2005.

16             MR. FRANCOMANO:  Correct, Your Honor.

17             THE COURT:  So how would this not fall within the

18   scope of that?

19             MR. FRANCOMANO:  Then I withdraw my objection.

20             THE COURT:  Okay.  You're foreshadowing, is what

21   you're saying.

22             MR. FRANCOMANO:  Exactly, Your Honor.

23             THE COURT:  I appreciate that, but overruled.

24             (The following proceedings were had in open court.)

25             THE COURT:  Overruled.  You may continue.

1    Q    (BY MR. MARTINEZ)  I had asked you, Mr. Meadows, how

2    often you saw Digga selling drugs?

3    A    Just about every day.

4    Q    Do you know what kind of drugs he sold?

5    A    Ready.

6    Q    I'm sorry?

7    A    Ready.

8    Q    Thank you.  Do you know where Digga got those drugs?

9    A    Geezy.

10   Q    How do you know that?

11   A    Because there been times I was there Geezy always gave

12   all us the ready.  We'd get the cocaine, as far as ready, from

13   him and the heroin was from Fats.

14   Q    Where would you see Digga selling drugs?

15   A    Barclay Street.

16   Q    Was there any particular house where you saw him?

17   A    24th Street, Barclay.

18   Q    I'm going to show you what's been marked as Government's

19   Exhibit GM, for Google maps, 11.  Mr. Meadows, do you

20   recognize this location?

21   A    Yes.

22   Q    What are we looking at here?

23   A    House on 24th Street.

24   Q    And is this -- what connection, if any, is there between

25   this location and the drug activity you were just describing

Direct Examination - Meadows (By Mr. Martinez)

1   you saw Digga engaged in?

2   A    It was a house that we all used to sit around, sit out

3   front, and sell drugs on the front.

4   Q    Let's go back to you.  On a typical day selling drugs,

5   Mr. Meadows, how much crack would you sell?

6   A    Typical day, 5 to 2,000.  $500, maybe $2,000 on a typical

7   random day.

8              MR. BUSSARD:  Your Honor, could we ask the witness

9   to speak up a little bit?

10             THE COURT:  Yes.  Speak up closer to the microphone,

11  Mr. Meadows.  Please keep your voice up.  Next question.

12  Q    (BY MR. MARTINEZ)  At this time period, Mr. Meadows, so

13  we're talking about in 2005 to 2007 period, could you tell the

14  jury, on the street how much an ounce of crack cocaine costs,

15  roughly?

16  A    An ounce of crack back then was only costing roughly

17  $900.

18  Q    So if you took in $1,000 on a day, that translates to

19  about --

20  A    An ounce of crack.

21  Q    -- an ounce of crack.  Of the money that you took in, in

22  a particular day, Mr. Meadows, how much was your cut?

23  A    If I brought 2,000, maybe 5-, 6-.

24  Q    $5-, $600?

25  A    Yeah.

1    Q    What would happen to the rest of the money?

2    A    Gave it to Geezy.

3    Q    Why would you give the rest of the money to Geezy?

4    A    Because the product came from him.

5    Q    Were you in a position to know how much crack the other

6    guys in the gang were selling?

7    A    It came a time, yes.

8    Q    I'm sorry?

9    A    There came a time that I -- yes.

10    Q    Okay.  How were you in a position to know that?

11    A    Because once the house had got raided -- well, not

12    raided, but once the house got taped up from the murder on

13    25th, we started using a house that I had.  It was an

14    apartment on 25th and Greenmount.

15    Q    Okay.  So are you saying that there came a time where the

16    stash house moved and actually became a place where you

17    lived?

18    A    Yes.

19    Q    And that house was on 25th and Greenmount?

20    A    Yes.

21    Q    I think you said apartment, I'm sorry.  Let me show you

22    what's marked as GM 13.  What are we looking at here?

23    A    The apartment where I was staying at.

24    Q    Okay.  So you -- are you telling the jury that YGF drugs

25    were packaged in this apartment?

1    A    Yes.

2         MR. ENZINNA:  Objection, Your Honor.  Object to

3    leading.

4         THE COURT:  You can approach.

5         (Bench conference on the record.)

6         THE COURT:  A leading question is a question that

7    implies its answer in the asking.  A leading question is not

8    always objectionable.  A leading question is objectionable

9    when it implies an answer that has not been previously given

10   by that witness.  But a leading question is not objectionable

11   when it seeks to develop or reiterate information that was

12   supplied initially in response to a nonleading question, for

13   the purpose of better illuminating or clarifying what the

14   answer is.

15        The danger with a leading question is that it will

16   be the lawyer's information that is in fact being communicated

17   to the jury, not the witness's.  But that danger is eliminated

18   when the information has been elicited for the first time from

19   the witness, demonstrating that actually the witness is the

20   source of that knowledge, not the lawyer.  The lawyer's

21   entitled to develop the full contours of the information.

22        And in some cases, with an inarticulate witness,

23   which is a recurring problem during this trial, simply make

24   sure that the witness's knowledge is actually being

25   communicated to the jury.  Certainly, to the extent that a

1    lawyer embellishes or adds to the information that was

2    initially supplied by the witness in the follow-up question,

3    it's subject to an objection as being leading.

4            That's to set out the basic foundational principles

5    with respect to leading questions.  Having gotten that stated

6    for the record, what's your objection, Mr. Enzinna?

7            MR. ENZINNA:  That's what I thought, Your Honor.  I

8    heard him say, "So at some point the stash house moved;

9    correct, to an apartment?"  "Correct."  "So are you telling

10   the jury that you packaged drugs there?"  And I thought that

11   was a lead saying the stash house moved, to saying that

12   packaging of drugs took place there.

13           THE COURT:  Not when you consider that he's already

14   explained what goes on in stash houses, which is the packaging

15   of drugs.  That's how I interpreted it.  Overruled.

16           (The following proceedings were had in open court.)

17           THE COURT:  You may continue.

18   Q    (BY MR. MARTINEZ)  Mr. Meadows, as we were about to

19   approach the bench, you had circled this location on the

20   second floor.  Is that where your apartment was?

21   A    Yes.

22   Q    Okay.  So before the bench conference, you had indicated

23   you were in a position to know how much crack the gang was

24   selling because, in fact, drugs were being packaged in your

25   apartment.  Based on those observations, can you tell us on a

1  typical day how much crack YGF would sell?

2          MR. BUSSARD:  Can we have the time frame, please?

3  Q   (BY MR. MARTINEZ)  During the time that drugs were being

4  packaged in your apartment.

5          THE COURT:  Well, fair enough.  Sustained.

6  Foundational.

7  Q   (BY MR. MARTINEZ)  When were drugs being packaged in your

8  apartment, can you give us your best ballpark recollection of

9  the time frame?

10 A    When?  2007.

11 Q    So in that time period, can you tell us, based on your

12 observations, how much crack YGF would sell as a group?

13          THE COURT:  Daily, weekly, monthly?

14          MR. MARTINEZ:  Daily.

15          THE COURT:  Daily.

16 A   7-, 10,000 roughly --

17 Q   (BY MR. MARTINEZ)  And so --

18 A   -- through everybody together.

19 Q    Is the 900 per ounce estimate that you gave us previously

20 still a good rule of thumb for the price of an ounce of crack

21 on the streets in those days?

22 A    Yes.

23 Q    Okay.  How about heroin, how much heroin did YGF sell on

24 a typical day during that same time period?

25 A    Maybe about 25 to about 5,000.

Direct Examination - Meadows (By Mr. Martinez)

1    Q    Okay.  And how does that translate in terms of weight?

2    A    A gram is $100.  So you take a finger, which is

3    100 grams, it's roughly 10,000.

4    Q    Okay.  Thank you, Mr. Meadows.  I want to change topics

5    now and I want to focus on the summer of 2005.

6                THE COURT:  Good moment for a break, Mr. Martinez?

7                MR. MARTINEZ:  Sure, Your Honor.

8                THE COURT:  Ladies and gentlemen, we'll take our

9    morning recess.  During the recess please do not discuss the

10   case among yourselves.  Don't discuss it with anybody else.

11   Do not allow yourselves to be exposed to any news articles or

12   reports that touch upon this case or the issues it presents or

13   any articles or reports that relate to any of the participants

14   in the case.  Avoid all contact with any of the participants

15   in the trial.  Do not make any independent investigation of

16   the law or the facts of the case.  Do not look up anything

17   related to the case or its participants on the internet.  Do

18   not consult an encyclopedia or a dictionary.  15 minutes.

19   Please take the jury out.

20                (Jury left the courtroom.)

21                THE COURT:  Mr. Meadows, you may step down from the

22   witness stand and step out of the courtroom.  You must return

23   in 15 minutes.

24                About how much more on direct?

25                MR. MARTINEZ:  I'm maybe 25 percent into it.

Direct Examination – Meadows (By Mr. Martinez)

1      THE COURT:  You're at 25 percent, you have

2  three-quarters to go.  Okay, we'll take our recess.  15

3  minutes.

4      (A recess was taken.)

5      THE COURT:  Ready for the jury?  Let's bring them.

6      (Jury entered the courtroom.)

7      THE COURT:  Be seated, please.

8      Mr. Meadows, you remain under oath.

9      Mr. Martinez, you may continue your examination.

10  Q   (BY MR. MARTINEZ)  Mr. Meadows, as we were heading into

11  the break, we were about to change topics and I was going to

12  focus you on July of 2005.  Did there come a time in July of

13  2005 when you witnessed a murder?

14  A   Yes.

15  Q   Can you tell us where that murder happened?

16  A   Guilford and 22nd.

17  Q   I'm going to show you what's been marked as Government's

18  Exhibit GM 15.  Are you familiar with that location?

19  A   Yes.

20  Q   What is this?

21  A   22nd and Guilford where the murder happened at.

22  Q   What time of day did this murder happen?

23  A   Nighttime.

24  Q   Where were you when the murder took place?

25  A   I was sitting on the front, like the third or fourth

Direct Examination - Meadows (By Mr. Martinez)

1   house from the corner, with two females.

2   Q    You can actually use your finger just as you did before

3   the break to point out roughly where you remember sitting.

4   A    (Indicating.)

5   Q    And I caught -- I didn't catch the tail end of your

6   question, you said you were sitting on the front?

7   A    I was sitting on the front with two females that live

8   right there.

9   Q    So as you were sitting on the front with the two females

10  in the location that you just circled, could you tell the

11  ladies and gentlemen of the jury what you saw?

12  A    I was sitting there with two females.  We was sitting

13  there talking.  And earlier that night two dudes was running

14  from the police, one name was Chevy, can't remember the other

15  dude name.  But they ran and threw a gun into one of the

16  homeboys that hang with us, named Scutter, car.

17  Q    Let me stop you for a minute.  Can you circle on the map

18  where you remember seeing the guys throw the gun into

19  Scutter's car?

20  A    On Guilford.

21  Q    So this is earlier that night?

22  A    Yes.

23  Q    Okay.  So you were explaining that earlier in the night

24  they had thrown the gun into Scutter's car.

25  A    They got chased by the police.  They threw the gun in his

 1    car.  He was asleep, the window was down.  Can't remember

 2    which one, it might have been Dave or Slay, but somebody took

 3    the gun out of his car and hid it.  Dude came back around the

 4    corner couple hours later, maybe an hour or two later.  I was

 5    on 22nd Street, Dave was standing on the corner of 22nd and

 6    Guilford.  The dude came around the corner saying "if I don't

 7    get my gun back it's going to be problems."

 8    Q    All right.  And just let me stop you for a minute.  So

 9    the guy who had thrown -- one of the guys who had thrown the

10    gun into the car came back looking for his gun; is that what

11    you're saying?

12    A    Yes.

13    Q    Okay.  And Dave was standing at the corner of 22nd and

14    Guilford?

15    A    Yes.

16    Q    Can you point that out on the map?

17    A    (Indicating.)

18    Q    Okay.  So the dude said --

19           MR. BUSSARD:  Your Honor, I'm not getting any -- I

20    don't think we're getting any of the highlights on our

21    screen.

22           MR. O'TOOLE:  It's right there.

23           THE COURT:  It's yellow, can you see it?

24           MR. BUSSARD:  Barely, but we can see it.

25           THE COURT:  Well, it is a bit faint, but I think --

1    okay.  You may proceed.

2    Q    (BY MR. MARTINEZ)  So the dude came back and said "y'all

3    better get my gun or there are going to be problems," what

4    happens next?

5    A    Dave pulled out a gun, started shooting at him.  The dude

6    started running down towards me.  Bullets flew past me and the

7    girls.  The dude ran down to about right here where the park

8    was at and he dropped, collapsed.  At that time I told the

9    females to go in the house.  They went in the house.  I told

10   them shut the door, don't say nothing.  We left, me and Dave

11   at that time left going to my house.  My cousin told him don't

12   give him the gun back, told him to take the gun with him.

13   Q    Okay.  What kind of gun are we talking about, did you see

14   what kind of gun David used?

15   A    .32.

16   Q    Where had he gotten that gun, do you know?

17   A    He had gotten the gun from my cousin.

18   Q    All right.  And I just want to make sure everybody

19   realizes the names and faces.  So when you say Dave, is it the

20   same individual you identified as Dave earlier?

21   A    Yes.

22   Q    And your cousin, who was your cousin?

23   A    Joe Bonds.

24   Q    Okay.  So you said after the murder, you and Dave went to

25   Joe, and Dave tried to give him the gun.

Direct Examination - Meadows (By Mr. Martinez)

1    A    To the apartment building where I was staying at on

2    25th Street.  Joe was there because my cousin Terrell and my

3    aunt lived there as well.  He tried to give the gun back, he

4    told him no.  Joe told him to keep the gun, I mean, because

5    you just used it and you're going to need it.  So he took the

6    gun with him.  I went outside with him.  He caught a hack,

7    went home.

8    Q    Do you know how long Dave kept that gun?

9    A    For a few days, I ain't -- ever since it got back in his

10   hand, like, when my cousin told him to keep it, I ain't seen

11   it since then, like, since he's the last person with it.

12   Q    When you pointed out earlier on this -- on the map that

13   we have in front of you, GM 15, you pointed out on this

14   location where you saw the victim collapse and die.  Have you

15   ever seen crime scene photos or any, you know, law enforcement

16   material pertaining to this homicide that you're describing?

17   A    No.

18   Q    So you're just telling us based on your memory; is that

19   right?

20   A    Yes.

21   Q    I want to shift gears again and talk about robberies.

22   You mentioned earlier before the break that you participated

23   in robberies as a member of YGF.  Do you remember that?

24   A    Yes.

25   Q    Can you tell us about the first robbery in which you

Direct Examination - Meadows (By Mr. Martinez)

1  participated as a member of YGF?

2  A    Dutch Village.

3  Q    Is that where the robbery happened?

4  A    Yes.

5  Q    Is Dutch Village in Baltimore?

6  A    Yes, city and county line.

7  Q    Okay.  What part of Baltimore, like what quadrant of the

8  city?

9  A    Northeast Baltimore.

10  Q    Do you remember a particular intersection where this

11  robbery took place?

12  A    Between McClean -- on McClean Boulevard between

13  Northern Parkway and Perring Parkway.

14  Q    Is that near Greenmount?

15  A    No.

16  Q    Who else participated in this robbery?

17  A    Joe, Roscoe, Manny Mo.

18  Q    This is PHI 27, we showed you this earlier.  This is the

19  individual you identified as Roscoe earlier.  Is this the same

20  Roscoe who that participated in the robbery?

21  A    Yes.

22  Q    How was it that you decided to go to Dutch Village to do

23  this robbery?

24  A    Because of Manny Mo, one of the persons that he was

25  locked up with lived over there.  And he told him about some

Direct Examination - Meadows (By Mr. Martinez)

1    dudes that was over there that was making some money that was

2    hustling.

3    Q    When you were in YGF, was it common or uncommon for the

4    gang to do robberies outside of the Greenmount neighborhood?

5    A    Common.

6    Q    Why would you want to commit a robbery outside of the

7    neighborhood, as opposed to in Greenmount where you lived?

8    A    Because it was easy access outside the neighborhood.  And

9    most the people that was in our neighborhoods, we was all

10   getting along with.  So we didn't bring harm to nobody that

11   was in the neighborhood as far as robbing them.

12   Q    Okay.  So back to the robbery in Dutch Village, how did

13   you get there?

14   A    Drove.

15   Q    Do you remember whose car you drove?

16   A    My cousin Joe, sedan.

17   Q    What happened when you got to the scene of the robbery?

18   A    We pulled up to the scene of the robbery, me, Joe, Manny

19   Mo, went around to the corner where the dudes was at, asked

20   them did they have some grass and e-pills.  They said they

21   didn't have no e-pills, they just had some grass.  At that

22   time Manny Mo pulled out a .40 caliber and Joe had his gun.

23   Q    What kind of gun did Joe have?

24   A    A .32.

25   Q    And when you said the dudes, how many people did you

1    approach to rob?

2    A    Three.

3    Q    And forgive me if this is obvious to anyone, but you said

4    you asked if they had weed and e-pills, weed is what?

5    A    Marijuana.

6    Q    And e-pills is what?

7    A    Ecstasy pills.

8    Q    So what, if anything, did you take from these folks

9    during the robbery?

10   A    Just some weed because one of the dudes said they didn't

11   have no e-pills on them, so we just took the weed and the

12   money.

13   Q    Do you remember how much money?

14   A    No.

15   Q    What happened after the robbery was over?

16   A    We left, went back down Greenmount.

17   Q    And I forgot to ask you earlier, did this robbery take

18   place during the daytime or nighttime?

19   A    This was during the daytime.

20   Q    Did you participate in other robberies later that

21   night?

22   A    Yes.

23   Q    Let's take them in order.  Where did the second robbery

24   happen?

25   A    Second robbery happened on -- over West Baltimore,

Direct Examination - Meadows (By Mr. Martinez)

1    between the area of Arlington and Carey.

2    Q    Who participated in that one?

3    A    Dave, Roscoe, Joe, myself.

4    Q    Did anybody have a gun?

5    A    Dave and Roscoe jumped out of the car.  They had the guns

6    on them.  It was like three little teenage kids.  Only thing

7    they took from them was cell phones.

8    Q    What kind of -- do you know what kinds of guns Dave and

9    Roscoe had?

10   A    One was a .40 caliber and the other one was a .32.

11   Q    Now, I meant to ask you this earlier, but was it common

12   or uncommon for YGF members, when you were in the gang, to

13   share and use the same guns?

14   A    It was only common to share a gun if you and the person

15   that was in the circle, as far as you on Guilford you only

16   shared the gun with the people that was in the circle right

17   there.  Even though all us was YGF, everybody didn't let each

18   other hold each other guns.  Like Barclay Street had their

19   own.  We didn't give Barclay Street a gun, unless it was a

20   particular person there that dealt with somebody that was on

21   Guilford.

22   Q    So were there some YGF guys that lived on

23   Barclay Street?

24   A    Say that again.

25   Q    I'm saying, were there some YGF guys who lived on

1   Barclay Street?

2   A    Yes.

3   Q    And did others live on Guilford?

4   A    Yes.

5   Q    And are you saying that there were cliques within the

6   gang based on who lived on what street?

7   A    Yes.

8   Q    Okay.  So you said that in the second robbery, two --

9   couple of teenagers had some phones taken from them, that was

10  it; is that right?

11  A    Correct.

12  Q    Was there a third robbery?

13  A    Yes, a couple.

14  Q    Where did that happen in relation to the second one,

15  which you said was Arlington?

16  A    The second one was probably -- and it was in the same

17  area, maybe two to five minutes away from it, closer to

18  Edmondson Avenue.

19  Q    Do you remember who the victims were or what they looked

20  like, a description?

21  A    It was a female and a dude, heavy-set dude, didn't

22  really -- it was nighttime, so I really didn't get a good look

23  at him.  Parked the car on the opposite side of the street

24  from where they was at.

25  Q    What happened after that?

Direct Examination – Meadows (By Mr. Martinez)

1  A    Dave jumped out of the car, Roscoe jumped out of the car,

2  approached them.  Words was getting -- were exchanged and Dave

3  smacked him with the gun.  Dude started like tumbling

4  towards the forward.  They went in the apartments, took the

5  money, they didn't harm the female though.

6  Q    Okay.  Let's move into another area.  And now I want to

7  focus you on the very end of 2006, like December of 2006.  You

8  told us earlier that you sold drugs for YGF; is that right?

9  A    Yes.

10 Q    Were you still selling drugs for YGF at the end of

11 2006?

12 A    Yes.

13 Q    Were you still packaging drugs for -- in this house,

14 Government's PHCS 2 that you identified earlier?

15 A    Yes.

16 Q    And you also identified earlier some of the YGF members

17 who also packaged drugs here, do you remember that?

18 A    Yes.

19 Q    And you talked about, in addition to a bunch of the YGF

20 members, you mentioned a couple of crackheads, in your words,

21 do you remember that?

22 A    Yes.

23 Q    Were the crackheads -- what else can you remember about

24 them?

25 A    Female was white, male was white, older male.

Direct Examination - Meadows (By Mr. Martinez)

1    Q    And what, if any, involvement did they have in YGF's drug

2    operations from out of that house?

3    A    They was like -- basically you could say testers.  When

4    we get certain drugs, we use them as the test, help package up

5    drugs.  Any time we got drugs, as far as when we got ready, we

6    wanted to make sure it was good drugs, bad drugs.  We would

7    let them test it out.

8    Q    So -- and I just want to make sure that's fully

9    explained.  So when you give someone a tester and let them

10   test it out, what happens?

11   A    A tester is basically it's like a tea, you give somebody

12   a tester of a drug and they tell you whether or not if it's a

13   good drug, if it's bad, if it's stepped on, foul, fake,

14   real.

15   Q    Okay.  So it's like a sample?

16   A    Yes.

17   Q    Mr. Meadows, do you remember a time towards the very end

18   of 2006 when some drugs went missing from this stash house?

19   A    Yes.

20   Q    Do you know who those drugs belonged to?

21   A    Geezy.

22   Q    Did you talk to Geezy about the missing drugs?

23   A    Yes.

24   Q    The white couple that you just mentioned, did they come

25   up during that conversation?

1    A    Yes.

2    Q    I should have done this earlier, but I'm going to show

3    you now what's marked as Government's Exhibit PHI 18, do you

4    recognize that individual?

5    A    Yes.

6    Q    Who's he?

7    A    That was the white dude that was in the house, the

8    crackhead.

9    Q    So while you're having this conversation with Geezy after

10   the drugs had gone missing, you said the white couple had come

11   up.  What, if anything, did Geezy tell you about the white

12   couple when you were talking about the missing drugs?

13   A    That they stole some drugs from out of the house.  And he

14   was trying to figure a way to kill two birds with one stone.

15   Q    All right.  We'll come back to that in a minute.  But can

16   you tell us whether shortly before this conversation, do you

17   recall hearing shots fired outside the house that we just

18   showed you?

19   A    Yes.

20   Q    All right.  So in your conversation with Geezy about the

21   missing drugs, did he tell you how specifically he dealt with

22   the situation involving the white couple?

23   A    He said that he killed two birds with one stone.

24   Q    What does that mean?

25   A    Most time you say you kill two birds with one stone,

Direct Examination – Meadows (By Mr. Martinez)

1   you're dealing with two situations and you're trying to deal

2   with both of them at the same time, means you can knock both

3   of them out of the box all at one token.

4   Q    So are you telling us that there was another situation

5   being dealt with at this time?

6   A    Yes.

7   Q    What situation are you referring to?

8   A    Craig Mack.

9   Q    And Craig Mack is the gentleman you identified in this

10  picture here?

11  A    Yes.

12  Q    What was the situation involving Craig Mack at this time,

13  and as it relates to the missing drugs?

14  A    Dude from down L and B was telling Geezy and a few other

15  people that Craig Mack was already snitching.

16  Q    Okay.  You mentioned L and B, what's L and B?

17  A    Lanvale and Barclay.

18  Q    Is that an organization of people?

19  A    It's a neighborhood, but it's also an organization of

20  people.

21  Q    Is it a gang?

22  A    You can say, yeah, because most of the people that's on

23  Lanvale and Barclay is in a gang.

24  Q    All right.  So as of this time period, late 2006, early

25  '07, how would you describe the relationship between YGF and

1    L and B?

2    A    Is was like a beef, but not a beef beef.  They just had

3    animosity because simple fact that we had a person that they

4    no longer had down at their neighborhood hanging with them and

5    we had them up there with us.

6    Q    And who are you talking about, that person?

7    A    Craig Mack.

8    Q    All right.  And earlier you said that YGF had an issue

9    with Craig Mack?

10   A    Yes.

11   Q    What was that?

12   A    The issue was the fact that L and B was saying something

13   to Geezy about how he was hiring a person that they told him

14   that was telling.

15   Q    Did L and B say whether they had any proof Craig Mack was

16   telling?

17   A    The one person said something about the proof was Face.

18   He said that he seen the paperwork.

19   Q    All right.  We'll come back to Face in a minute.  Were

20   there other issues pertaining to Craig Mack at this time?  Did

21   YGF have its own issues with Craig Mack?

22   A    As far as money-wise, shorts.

23   Q    So what's shorts, in the money context, what are you

24   talking about?

25   A    As far as drugs and give a person a package and they keep

1    coming back short every time.

2    Q    So what does it mean to come back short after you've been

3    given a pack?

4    A    Come back short mean if somebody give you a 50 pack and

5    you don't bring the straight money back, or if it's short more

6    than $40 or $50, then they know you're taking money off the

7    top.

8    Q    Okay.  And is that what Craig Mack was suspected of by

9    members of YGF?

10   A    Yes.

11   Q    All right.  So now bringing this back to the conversation

12   about the shots fired outside the 25th Street house and the

13   white couple and Geezy saying he wanted to kill two birds with

14   one stone, can you now fully explain to us what was going on

15   there?

16   A    Due to the fact he already was trying to deal with the

17   Craig Mack situation and the fact that they already took the

18   drugs from -- and the drugs came missing, he was trying to

19   deal with them and deal with Craig Mack.  Most of the time we

20   hear shots around there, we don't run from it.  We always run

21   towards it, typical, because we want to either notice if

22   somebody over there got shot, if it's one of our peoples.

23   Q    So based on the conversation you had with Geezy, who was

24   your understanding who was shot at outside the house on

25   25th Street?

Direct Examination - Meadows (By Mr. Martinez)

1    A    The white couple.

2    Q    What about Craig Mack?

3    A    He was trying to shoot at Craig Mack as well.

4    Q    Okay.  So let's fast forward like a week or two.  You

5    mentioned that there were discussions between YGF and the

6    group called L and B about Craig Mack.  And you said that

7    there was a gentleman from L and B who claimed to have

8    paperwork proving that Craig Mack was snitching; is that

9    right?

10   A    Yes.

11   Q    Do you recall a name or street name for that person?

12   A    Face.

13   Q    I'm going to show you what we marked as Government's

14   Exhibit PHI 32, who's that?

15   A    Face.

16   Q    Did there come a time where you participated in a meeting

17   with Face and other members of YGF?

18   A    Yes.

19   Q    Do you remember where that meeting happened?

20   A    Yes.

21   Q    Where?

22   A    At the house Barclay Street.

23   Q    On Barclay Street, you said, who was present from YGF?

24   A    Geezy, Foo, Slay, Don, myself.

25   Q    And was this the meeting where the gentleman on the

1  screen, Face, articulated the concerns about Craig Mack

2  snitching?

3  A    Yes.

4  Q    All right.  After those conversations, did YGF have later

5  meetings where the gang discussed what to do about

6  Craig Mack?

7  A    Yes.

8  Q    Can you recall was there one meeting or more than one?

9  A    Two meetings.

10  Q    Where was the first one?

11  A    First one was in the house on 25th Street and the next

12  one was in the park.

13  Q    And when you say the house on 25th Street, is that the

14  same house you identified in the photograph earlier?

15  A    Yes.

16  Q    Who was present for that one?  And for the record, I'm

17  putting up PHCS 2 on the screen.  Who was present for that

18  meeting?

19  A    Geezy, Foo, Slay.

20  Q    Anybody else?

21  A    And Don.

22  Q    What was discussed during that meeting?

23  A    Craig Mack had to go.

24  Q    And can you remember who said what?

25  A    Geezy say he had the green light from them saying that

1  they had the paperwork and that he was given a green light to

2  go ahead, so he had to go.

3  Q    And did anybody respond to that?

4  A    Yeah.

5  Q    Who?

6  A    Foo.

7  Q    What did Foo say?

8  A    That they would take care of it, him and Slay.

9  Q    Did Foo say anything else, did he say where they planned

10  to execute this green light?

11  A    They was going to do it outside at first.

12  Q    And what happened to that plan?

13  A    They decided to change it.  They just didn't go with it,

14  they said.

15  Q    So what change was made to the plan?

16  A    When they had a second meeting.

17  Q    Second meeting.  And this is the one -- where did the

18  second meeting happen?

19  A    By the park.

20  Q    Who was present for that meeting?

21  A    For that particular meeting was Geezy, me, Roscoe, Slay,

22  Foo, Don, couple other YGF members, but it was like we was all

23  in -- different people was in different individual meetings.

24  Q    So you explained a minute ago that during this meeting a

25  change was made to the plans about getting to Craig Mack; is

1    that right?

2    A    Yes.

3    Q    Can you explain what that change was?

4    A    The change was that Don wanted to be a part of it and

5    that they decided that they was going to do it while they was

6    in the house.

7    Q    This house on the screen?

8    A    Yeah.

9    Q    Was there any other -- were there any other plans made?

10   A    On how they was going to go about doing it, getting away

11   with it without it coming back to Geezy.

12   Q    What was said with respect to that?

13   A    If they do it in the house, how they going to get away

14   with it without it falling back on him because it was his trap

15   house and his house.

16   Q    And when you talk about "they" doing it in the house, who

17   are you talking about?

18   A    Slay, Don, Foo.

19   Q    Did Slay say anything during this exchange?

20   A    Foo was doing most the talking.  I can't really recall

21   everything, if Slay said anything.

22   Q    Okay.  When you talked about Don, is it the same Don that

23   you identified earlier as being a member of YGF, is that the

24   guy?

25   A    Yes.

1          THE COURT:  Exhibit number?

2          MR. MARTINEZ:  Yes, that's PHI 28.

3     Q    (BY MR. MARTINEZ)  What ultimately happened to

4     Craig Mack?

5     A    He got killed in Geezy house.

6     Q    When did you learn that?

7     A    The next day.

8     Q    How did you learn it?

9     A    Conversation, talking.

10    Q    Who was present during the conversation where you learned

11    about what happened to Craig Mack?

12    A    Geezy.

13    Q    Anybody else?

14    A    Slay, Don, couple other members that was outside that was

15    from YGF, Joe.

16    Q    Tell us about that conversation and what you learned

17    about how Craig Mack was killed.

18    A    Geezy made a joke about it, how he was taking a shit

19    using the bathroom.  And he was laughing like, motherfuckers

20    just killed him while I was in the bathroom.

21    Q    Did you learn who had killed him?

22    A    Yes.

23    Q    Who?

24    A    Slay, Foo, Don.

25    Q    And what was said during the conversation that revealed

1    that to you?

2    A    Conversation was that how they was talking about how they

3    was just planning on -- Geezy said that he used the bathroom

4    and to wait till he had to use the bathroom.  As he was

5    waiting, shots got fired.  And he said the first bullet that

6    hit him killed him.

7    Q    Who said that?

8    A    Slay.

9    Q    Did you have a later conversation with Slay about

10   Craig Mack's murder?

11   A    Yes.

12   Q    How long after that first conversation did the second one

13   take place?

14   A    Not that long, right behind it, maybe a few days.

15   Q    Where did that second conversation take place?

16   A    On Guilford.

17   Q    Any particular place on Guilford?

18   A    My house.

19   Q    So you were living on Guilford at the time?

20   A    Yes.

21   Q    So during that second conversation, what, if anything,

22   else did Slay tell you about the murder?

23   A    How they was going to wait till after Geezy used the

24   bathroom and they was going to kill him, but then they just

25   got tired of waiting.

1    Q    They got tired of waiting, so what?

2    A    Waiting for Geezy to come out the bathroom, and they say

3    they shot him.

4    Q    And when you said "they," it's Slay and who else?

5    A    Foo and Don.

6    Q    Okay.  At some point after this, did you have another

7    conversation with Slay about a guy named Bubba?

8    A    Yes.

9    Q    Who is Bubba?

10   A    Bubba was a member that grew up with -- well, a person

11   that grew up with them.

12   Q    Was Bubba --

13   A    That lived in the neighborhood.

14   Q    -- YGF?

15   A    Bubba wasn't YGF.

16   Q    He was or was not?

17   A    He was not.

18   Q    Do you know whether Bubba dealt drugs in the

19   neighborhood?

20   A    Yes.

21   Q    Did you ever see him selling drugs in the neighborhood?

22   A    Yes.

23   Q    What was the relationship like between Bubba and the

24   members of YGF in early 2007?

25   A    Stable, cultural.

Direct Examination - Meadows (By Mr. Martinez)

1   Q    Did a dispute ever arise?

2   A    Yes.

3   Q    What was the nature of that dispute?

4   A    Because they wanted Bubba and his little crew to switch

5   over to YGF.  And Bubba refused to switch over because he

6   already had it like his own little crew and stable.

7   Q    And when you say "they wanted Bubba to switch over," who

8   is they?

9   A    YGF, Slay, Foo.

10  Q    Was there ever an incident involving Foo, Slay, and

11  Bubba?

12  A    Yes.

13  Q    Did you ever have a conversation -- I don't want to hear

14  about anything you heard from Bubba, but did you ever have a

15  conversation with Slay about that incident?

16  A    Yes.

17  Q    What did he say?

18  A    He said how they tried to get Bubba and them to switch

19  over and that's how the beef actually occurred with Bubba and

20  them.  Because by Bubba and them didn't want to switch over,

21  they shot him.

22  Q    Did he say where Bubba was shot?

23  A    He was shot in the hand.

24  Q    Did he say who shot Bubba?

25  A    Foo.

Direct Examination – Meadows (By Mr. Martinez)

1   Q   Let's fast forward to June of '07.  You mentioned earlier

2   when we were going through your prior felonies, at one point

3   you were charged in a gun case that became a federal case.  Do

4   you remember that?

5   A   Yes.

6   Q   And in that case before it ended, did you cooperate?

7   A   You said before that?

8   Q   Well, so in connection with that prior federal case, did

9   you cooperate under an agreement in that case?

10   A   Yes.

11   Q   And while you were under that cooperation agreement, did

12   there come a time where you answered questions from law

13   enforcement about Craig Mack's murder?

14   A   Yes.

15   Q   Did you complete any photo arrays while you were talking

16   to law enforcement about Craig Mack's murder?

17   A   Yes.

18   Q   I want to approach and show you -- I'll ask you to look

19   at both sides of that document.  Do you recognize it?

20   A   Yes.

21   Q   What do you recognize it to be?

22   A   Photo array.

23   Q   Is this one of the ones you completed when you were

24   answering questions about the murder of Craig Mack?

25   A   Yes.

1    Q    I want to start by focusing your attention on the

2    instructions at the top.  Were those instructions read to you

3    before you completed the photo array?

4    A    Yes.

5    Q    And who's initials are to the right on the bottom corner

6    there?

7    A    Mine's.

8    Q    By putting your initials there, what were you

9    indicating?

10   A    Indicated that I understood what they was reading to

11   me.

12   Q    Okay.  Did you pick anyone out of this array?

13   A    Yes.

14   Q    Who did you pick out?

15   A    Slay.

16   Q    Is that his picture in the bottom -- middle of the bottom

17   row?

18   A    Yes.

19   Q    Is that your signature above the picture?

20   A    Yes.

21   Q    And the remarks field here, Mr. Meadows, where did that

22   information come from?

23   A    Me.

24   Q    And whose signature is at the end of that?

25   A    Mine's.

1    Q    Whose handwriting is in the box?

2    A    Mine's.

3    Q    Could you read that for the jury?

4    A    "Kenny told me that him and Foo killed Craig Mack in

5    Geezy house and that they both, Kenny and Foo, shot and killed

6    Craig Mack because there was a rumor going around that Craig

7    Mack was telling.  And the boys from Lanvale and Barclay

8    wanted him dead, and they told Foo and Kenny to get him from

9    around y'all.  So Kenny and Foo killed him in Geezy house and

10   they left him there.  Kenny and Foo left out.  Kenny told me

11   that he was the one that shot Craig Mack and killed him.  And

12   Kenny told me that the first shot was the one that killed

13   him."

14   Q    Mr. Meadows, I'm going to approach and show you what's

15   been marked as PHA 3.  I'll ask you to look at both sides of

16   this.  Do you recognize that document?

17   A    Yes.

18   Q    What do you recognize it to be?

19   A    Photo array.

20   Q    Is this another photo array you completed in answering

21   questions about Craig Mack?

22   A    Yes.

23   Q    We'll start with the instructions at the top, were those

24   read to you before you completed this array?

25   A    Yes.

Direct Examination - Meadows (By Mr. Martinez)

1    Q    Did you pick anyone out of this array?

2    A    Yes.

3    Q    Who?

4    A    Foo.

5    Q    Is that Foo in the top right-hand corner where there's

6    handwriting?

7    A    Yes.

8    Q    Is that your signature above Foo?

9    A    Yes.

10   Q    I'm going to put PHA 4 back on the screen.  These are the

11   remarks that we just went over for your first photo array

12   where you described the fact that Kenny and Foo had killed

13   Craig Mack at Geezy's house.  Did those remarks also apply to

14   the second photo array --

15   A    Yes.

16   Q    -- pertaining to Foo?

17        Did anyone ever suggest to you on either of these arrays

18   who you should pick out?

19   A    No.

20   Q    At the time --

21        MR. BUSSARD:  Objection, Your Honor.  May we

22   approach?

23        THE COURT:  You may.

24        (Bench conference on the record.)

25        MR. BUSSARD:  The last couple questions have all

1    been leading.  And I don't think it has anything to do with

2    inarticulate witnesses in this case.

3              THE COURT:  Well, the question that's before the

4    Court is, did anyone tell you who to pick out of the photo

5    array?

6              MR. MARTINEZ:  Would you like me to say did or did

7    they not?

8              MR. BUSSARD:  Which means yes or no.  What, if

9    anything, was said to -- who, what, when, where question.

10              THE COURT:  It's maybe a little close, but not close

11   enough.  Overruled.

12              (The following proceedings were had in open court.)

13              THE COURT:  You may continue.

14   Q    (BY MR. MARTINEZ)  Mr. Meadows, when you completed those

15   first two arrays, you did it because you were being asked

16   about Craig Mack's murder; right, you've explained that?

17   A    Say that again.

18   Q    So you've explained that you completed those two photo

19   arrays in connection with interviews where you're being asked

20   about Craig Mack's murder; right?

21   A    Yes.

22   Q    And when you were first asked for information about the

23   murder, what did you focus on in terms of the information you

24   provided?

25   A    The person who did it.

Direct Examination - Meadows (By Mr. Martinez)

1   Q    Were you focused at that time on the person who approved

2   it?

3   A    No.

4   Q    Okay.  Oh, before I move on, I do want to show you

5   something.  Back to the remarks section on the first array,

6   there are a couple references here to Kenny.  First of all, is

7   Kenny here?

8   A    Yes.

9   Q    Is that the same person you identified as Slay?

10  A    Yes.

11  Q    Okay.  So after you completed those first two arrays, did

12  there come a time where you did another interview several

13  months later where you were also asked about the Craig Mack

14  murder?

15  A    Yes.

16  Q    And during that interview did you provide additional

17  information about how it all had gone down?

18  A    Yes.

19  Q    What else did you tell them?

20  A    That Don was also there.

21  Q    Did you tell them anything else?

22  A    That Don was a part of the murder.

23  Q    Did you tell them anything about how the murder had been

24  authorized?

25  A    No.

1    Q    I want to show you a document that we've marked as PHA 5,

2    ask you to look at both sides of this.  Do you recognize that,

3    Mr. Meadows?

4    A    Yes.

5    Q    What do you recognize it to be?

6    A    Photo array.

7    Q    This is the third photo array you did, this one a few

8    months after the first two, in response to questions about

9    Craig Mack; right?

10   A    Yes.

11   Q    So on this one the instructions are on this side.  Were

12   these instructions read to you?

13   A    Yes.

14   Q    Are those your initials?

15   A    Yes.

16   Q    Did you -- what were you conveying by signing your

17   initials there?

18   A    That I was understanding what was being read to me.

19   Q    All right.  Now, I'll do the remarks or comments first.

20   First of all, whose signature is at the bottom?

21   A    Mine's.

22   Q    And the date?

23   A    Mine's.

24   Q    What date though?

25   A    1-23-08.

Direct Examination - Meadows (By Mr. Martinez)

1   Q    All right.  Now I'll ask you to read the comments for the
2   jury.
3   A    "The person in the picture is Don and he was with Kenny
4   and Foo at Geezy house when Craig Mack was killed.  Kenny had
5   told me that all of them was there together.  Kenny and Don is
6   first cousins and they was given an order to kill Craig Mack
7   by Geezy.  It was over something about Craig Mack had told --
8   had to be telling on somebody from Lanvale and Barclay."
9   Q    Okay.  So now I'll ask you -- or I'll come back to a
10  question I asked you before, which was, in addition to telling
11  officers during this second interview that Don was involved,
12  did you also give them information about how the murder had
13  been authorized?
14  A    Yes.
15  Q    Okay.  And what did you tell them?
16  A    That it was given -- it was an order given.
17  Q    By who?
18  A    Geezy.
19  Q    And then did you pick anyone out from the second array?
20  A    Yes.
21  Q    And is that the person in the middle of the bottom row
22  there, where the signature is?
23  A    Yes.
24  Q    Who's that?
25  A    Don.

1    Q    Now, the Don we looked at earlier, this guy, had long

2    hair, is it the same person?

3    A    Yes.

4    Q    Just without the hair?

5    A    Yes.

6    Q    Okay.

7              THE COURT:  I think we'll stop at this point and

8    take our lunch break.

9              Ladies and gentlemen, do not discuss the case with

10   anyone.  Don't discuss it even among yourselves.  Do not allow

11   yourselves to be exposed to news articles or reports that

12   touch upon the case or the issues it presents or any articles

13   or reports that relate to any of the participants in the case.

14   Avoid all contact with any of the participants in the trial.

15   Do not make any independent investigation of the law or the

16   facts in the case.  Do not look up anything related to the

17   case or its participants on the internet.  Do not consult an

18   encyclopedia or dictionary.  We'll be in recess until 2:15.

19   2:15.  Take the jury out, please.

20              (Jury left the courtroom.)

21              THE COURT:  Mr. Meadows, you may step down and leave

22   the courtroom, but you must return at 2:15.  Recess until

23   2:15.

24              (A recess was taken.)

25              THE COURT:  Ready for the jury?

1              MR. MARTINEZ:  Yes.

2              MR. ENZINNA:  Yes, Your Honor.

3              (Jury entered the courtroom.)

4              THE COURT:  Be seated, please.  Good afternoon,

5       ladies and gentlemen.

6              Mr. Martinez, are we ready to continue the

7       examination?  Let's bring the witness in.

8              Mr. Meadows, you remain under oath.

9              Mr. Martinez, your witness.

10             MR. MARTINEZ:  Thank you.

11      Q    (BY MR. MARTINEZ)  Mr. Meadows, before the break we had

12      just finished up regarding the murder of Craig Mack.  And I

13      want to move to a new topic now.

14             The house on 25th Street that we were talking about where

15      Craig Mack was killed, did there come a time when YGF stopped

16      using that house as a stash house?

17      A    Yes.

18      Q    Why did YGF stop using that house?

19      A    Because Craig Mack got killed in it.

20      Q    Why did the fact that Craig Mack got killed there make it

21      less desirable to use as a stash house?

22      A    Because it was like a crime scene.

23      Q    Did YGF move to a new stash house after the 25th Street

24      house?

25      A    Yes.

Direct Examination - Meadows (By Mr. Martinez)

1    Q    Where was that one?

2    A    My apartment.

3    Q    And we showed you a picture of that.  Was there another

4    one after that?

5    A    Yes, on Barclay Street.

6    Q    Do you remember what block of Barclay?

7    A    24th.

8    Q    I want to show you what's been marked as Government's

9    Exhibit GM 12.  I'll ask you whether you recognize that

10   picture.

11   A    Yes.

12   Q    The house and the green door here, what house is that?

13   A    That's the house we was using.

14   Q    Using for what?

15   A    Stash drugs, package up drugs.

16   Q    Whose house was it?

17   A    A female house that lived there with her mother and

18   brother.

19   Q    And what was the connection between that house and YGF?

20   A    Geezy stash house.

21   Q    What kind of drugs would you package there?

22   A    E-pills, ready, heroin.

23   Q    And you explained that e-pills were ecstasy?

24   A    Yes.

25   Q    Was ecstasy something -- did YGF normally sell ecstasy or

 1    was that only once in a while?

 2    A    No, it was something that we just -- that Geezy got that

 3    particular time, but it wasn't nothing we dealt with.  Other

 4    people in the community dealt with that.

 5    Q    Can you recall an occasion in 2007 where YGF came upon a

 6    especially large quantity of e-pills?

 7    A    Yes.

 8    Q    Do you know where those pills came from?

 9    A    Not per se, but like I heard.  It was told to me that it

10    came from this --

11              MR. BUSSARD:  Objection, Your Honor.

12              THE COURT:  Sustained.

13    Q    (BY MR. MARTINEZ)  Let me ask it this way:  Did you have

14    a conversation with Geezy about where that large quantity of

15    e-pills had came from?

16    A    Yes.

17    Q    What did Geezy tell you about where the pills came

18    from?

19    A    From the connect.

20    Q    Did he explain how the pills had been procured from the

21    connect, were they purchased?

22    A    No.

23    Q    How were they procured?

24    A    On a rob.

25    Q    On the rob?

1    A    Robbery tip off.

2    Q    Can you explain any information you obtained about how

3    the connect was robbed of the e-pills?

4    A    Creed went on a mission to do a robbery; him, one other

5    person, and Digga.

6    Q    And the mission was to rob the supplier of e-pills?

7    A    Yeah.

8    Q    Did Geezy tell you where in Baltimore that robbery

9    happened?

10   A    West Baltimore.

11   Q    Did you participate in packaging those e-pills once they

12   were brought back to the YGF stash house?

13   A    Yes.

14   Q    And as you were doing that, did Geezy say anything about

15   whether or not YGF could expect future shipments of e-pills or

16   supplies of e-pills in the future?

17            MR. O'TOOLE:  Objection.

18            THE COURT:  Sustained.

19            MR. O'TOOLE:  Got to be objection.

20            THE COURT:  Foundation.  Leading.

21   Q    (BY MR. MARTINEZ)  I'll move on.  Sticking with the topic

22   of stash houses, was there another one in addition to the

23   three now that we've reviewed?

24   A    Say that again.

25   Q    Did YGF use another stash house in addition to the three

Direct Examination - Meadows (By Mr. Martinez)

1    that we've reviewed?

2    A    Not to my knowledge.

3    Q    Okay.  Let's go to a new subject.  You mentioned earlier,

4    around early 2007, I think you said, YGF transitioned into

5    BGF.

6    A    Yes.

7    Q    And in early 2007, did there come a time where you

8    participated in some meetings about the transition from YGF

9    into BGF?

10   A    Yes.

11   Q    I want to talk about the first of the meetings on that

12   topic.  Do you remember who was there from BGF?

13   A    Uncle Ray.

14   Q    You say Uncle Ray?

15   A    Uncle Ray.

16   Q    Where was the meeting?

17   A    On Barclay Street.

18   Q    Who from YGF was there?

19   A    Geezy, myself, Slay, Roscoe, Dave, Joe, Fennell.

20   Q    And what, if anything, do you remember Ray conveying on

21   behalf of BGF during the meeting?

22   A    What you mean?

23   Q    What did Ray say during the meeting?

24   A    At the time at -- the first meeting was based off they

25   just wanted only nine people to convert over.

Direct Examination - Meadows (By Mr. Martinez)

1    Q    BGF wanted nine guys from YGF?

2    A    From YGF to convert over, the top nine people.

3    Q    And following that meeting, did YGF have discussions

4    amongst itself about how to respond to that proposal?

5    A    We -- the discussion was, if you're not going to bring

6    everybody over, then nobody's coming.

7    Q    So all or none?

8    A    Right.

9    Q    Was there a second meeting about the merger or crossover

10   that you participated in?

11   A    The second meeting, yes, was at the park.

12   Q    Which park?

13   A    Between 22nd and 23rd behind Guilford.

14   Q    Was that on the picture that I showed you when we were

15   talking about the murder in 2005?

16   A    Yes.

17   Q    I want to put GM 15 back on the screen.  Can you point

18   out where the park was, Mr. Meadows?

19   A    It ain't doing it, but I pointed it out.  Right where the

20   basketball court is.

21   Q    The blue basketball court, right in the middle?

22   A    Right.

23   Q    Who from YGF was at this meeting?

24   A    Geezy, Joe, Slay, myself, Dave, Roscoe, Larry.

25   Q    Who was there from BGF?

Direct Examination - Meadows (By Mr. Martinez)

1    A    Naim.

2    Q    I'm sorry, did you say Naim?

3    A    Naim.

4    Q    Who was Naim?

5    A    Naim was a person who just came home from jail.

6    Q    Was he from the Greenmount neighborhood?

7    A    Yeah.

8    Q    Let me show you what we've marked as Government's

9    Exhibit PHI 51.  Who's that?

10   A    Naim.

11   Q    What did Naim say during this second meeting at the

12   basketball court?

13   A    That his LTC inside of jail wanted him to come home and

14   shut us down because we was making a lot of noise and that we

15   wasn't under them.  So he told them by him -- that was his

16   neighborhood, that he was going to come home and get everybody

17   right, bring everybody over, and help along with the

18   paperwork.

19   Q    And help along with the paperwork, is that what you

20   said?

21   A    Right.

22   Q    So what did Naim tell you about whether or not members of

23   YGF would be allowed to cross over to BGF?

24   A    He said everybody.  Once they took -- everybody would get

25   their paperwork, fox paperwork, and once you took it, you'll

1    cross over, but you'll start following the rules under BGF.

2    And as far as neighborhood-wise, as far as the drugs, he was

3    getting everybody that want to sell crack, deal with crack.

4    If you wanted to sell dope, everybody was going to be dealing

5    with -- everybody was getting drugs from the same person.

6    That's the level he was trying to get us all on.

7    Q    So you mentioned paperwork and you said fox paperwork;

8    right?

9    A    Right.

10   Q    What's fox paperwork?

11   A    Foxes is like an oath, but it's before you take your

12   oath.  It's a symp -- it's a stage as you're foot soldiers,

13   before you actually come into an actual being a J.

14   Q    So symp as in sympathizer?

15   A    Yes.

16           MR. O'TOOLE:  Objection.

17           THE COURT:  Sustained.  Don't lead.

18   Q    (BY MR. MARTINEZ)  What do you mean by symp,

19   Mr. Meadows?

20   A    A symp is a person that's basically like a foot soldier.

21   You got to follow directions from anybody that's above you.

22   Q    And is a symp a full-fledged member of J?

23   A    You're a full member of BGF, but you're not J.  It's

24   different ranks that inside of BGF.  Fox is like the beginning

25   stage.

1   Q    I understand.  What eventually happened, did YGF cross

2   over?

3   A    Yes.

4   Q    Did you cross over?

5   A    Yes.

6   Q    Did you take an oath?

7   A    Yes and no.

8   Q    What do you mean by that?

9   A    Because at the time, like, when they gave us the

10  paperwork, Dave that had -- Dave had the paperwork.  So they

11  wanted us to learn the paperwork within three days.  Dave said

12  fuck it, it don't matter if we don't learn it or not.  We

13  already was YGF.  So he gave everybody paperwork and said if

14  you don't learn it, don't worry.  We still going to say that

15  you all learned it.

16  Q    Okay.  But did Dave give you an oath?

17  A    It was a paper, yes.

18  Q    Okay.  And so after that point in time, Mr. Meadows, were

19  you still YGF or were you BGF?

20  A    BGF.

21  Q    And as you went through the process of becoming part of

22  BGF, did you become familiar with the structure of the gang?

23  A    Yes.

24  Q    Did you become familiar with the gang signs and

25  symbols?

1    A    Yes.

2    Q    So if you encounter a person on the street and they make

3    an X with their arms like I'm doing right now, what does that

4    mean to you in the context of BGF?

5    A    It's a symbol, it's a sign to notify, to let another

6    member know that you J, BGF, that you're affiliated somehow.

7    Q    Can you tell us whether BGF members sometimes get tattoos

8    to show their affiliation with the gang?

9    A    Yes.

10   Q    I'm going to show you a couple of pictures, just to --

11   the first has already come into evidence it's PHT 7.  And I'm

12   not going to show you the face.  First I'll ask you whether

13   you recognize this tattoo.

14   A    Say that again.

15   Q    First I'm going to ask, do you recognize this tattoo?

16   A    Yes.

17   Q    And without seeing the face, can you tell me who it

18   belongs to?

19   A    Slay.

20   Q    The 276 on the shoulder, what does that mean?

21   A    BGF.

22   Q    This has come into evidence as PH 10, same thing, without

23   seeing the face, can you tell me whose tattoo that is?

24   A    Slay.

25   Q    And the crossed sword and rifle or shotgun there, what

1    does that symbol mean?

2    A    It's another symbol for BGF; live by the gun, you die by

3    the sword.

4    Q    Mr. Meadows, in addition to testifying here today, have

5    you testified in a prior proceeding against Mr. Johnson in

6    state court?

7    A    Yes.

8    Q    And were you asked all the same questions that you were

9    asked today?

10   A    Yes.

11   Q    Were you?

12   A    Not all of them, majority.

13            MR. ENZINNA:  Objection.

14            THE COURT:  There's an objection?

15            MR. ENZINNA:  Yes, objection.

16            THE COURT:  What is it?

17            MR. ENZINNA:  Leading.

18            THE COURT:  Overruled.  You may inquire.

19   Q    (BY MR. MARTINEZ)  I was just asking, are you sure about

20   your response to the questions in state court were the same as

21   the questions today?

22   A    Some of them was and some of them was different.

23   Q    Fair enough.  But more importantly, after you testified,

24   did there come a time where you saw a rap video on YouTube

25   called "Welcome home, Geezy"?

1    A    Yes.

2              MR. MARTINEZ:  With the Court's permission, I'd like

3    to play Mr. Meadows a clip of that video, which is part of

4    Government's Exhibit CD 9.

5              THE COURT:  Yes.  Is there a transcript?

6              MR. MARTINEZ:  There is.

7              THE COURT:  Transcript books, ladies and

8    gentlemen.

9              MR. MARTINEZ:  If you go to the YouTube videos

10   page -- this is the middle of page 2, it's 4:56 to 5:37.

11             THE COURT:  Middle of page 2 under YouTube videos,

12   4:56 to 5:37, is that what you're suggesting, Mr. Martinez?

13             MR. MARTINEZ:  Yes, Your Honor.

14             THE COURT:  Ladies and gentlemen, look up when

15   you've got the right section.  Okay.  We're ready.

16             (Video played.)

17   Q    (BY MR. MARTINEZ)  Mr. Meadows, did you hear those

18   lyrics?

19   A    Yes.

20   Q    What, if any, message do those lyrics send to you?

21   A    Basically, he was saying by me testifying on the stand,

22   he was basically putting it out there by trying to make it so

23   that he let people know that I told on him, but made sure that

24   it didn't incriminate him by saying it.

25   Q    What did the term -- what did you understand the term

1    "weirdo" to mean?

2    A    Snitch.

3    Q    When he's going like this (gesturing) at the camera, what

4    did that mean to you?

5    A    That I pointed him out on the stand.

6    Q    Mr. Meadows, at the very beginning you told us that you

7    weren't testifying here under any kind of agreement with the

8    government, do you remember that?

9    A    Right.

10   Q    Can you tell the jury why you took the stand to testify

11   today?

12   A    Because in order for me to move forward with my life and

13   put everything behind me, I had to come here and tell the

14   truth.  Because when I'm done with that lifestyle back in

15   2007, I know I have to put it behind me.  But in order for me

16   to do that, I know there's still an obstacle course for me to

17   get past for me to do that.

18              MR. MARTINEZ:  Court's indulgence.

19              THE COURT:  Are we finished the transcript books?

20              MR. MARTINEZ:  We are.

21              THE COURT:  Close your books, ladies and

22   gentlemen.

23              MR. MARTINEZ:  Those are all the questions we have,

24   Your Honor.

25              THE COURT:  Thank you.  Cross, Mr. Enzinna?

```
 1              MR. ENZINNA:  Yes.  Thank you, Your Honor.
 2                       CROSS-EXAMINATION
 3   BY MR. ENZINNA:
 4   Q    Mr. Meadows, you just talked about this video that's up
 5   on the screen right now.  When was the first time you saw that
 6   video?
 7   A    Right after the trial.
 8   Q    Right after the trial.  Which trial?
 9   A    His trial, your client's trial.
10   Q    Okay.
11              THE COURT:  Mr. Meadows, do me a favor and move the
12   microphone down a little bit, get a position more right in
13   front of your mouth.  Thank you very much, sir.  You may
14   continue.
15   Q    (BY MR. ENZINNA) Where did you see it?
16   A    On YouTube.
17   Q    On YouTube.
18   A    Yeah.
19   Q    Did you go look for it?
20   A    Nah, somebody told me about it.
21   Q    Who told you?
22   A    A relative.
23   Q    All right.
24   A    As well as an officer.
25   Q    Which officer?
```

Cross-examination - Meadows (By Mr. Enzinna)

1   A    I can't remember, it was a couple.

2   Q    Was it one of the officers that you were working with

3   in --

4   A    No.

5   Q    -- in terms of cooperating against Mr. Johnson?

6   A    No.

7   Q    No.  All right.  You testified this morning that you

8   joined YGF in late 2005, early 2006; is that right?

9   A    Yes.

10  Q    And then you -- that YGF transitioned to BGF late '06,

11  early '07; right?

12  A    Correct.

13  Q    And I think you said that you were in BGF for

14  approximately a year; correct?

15  A    That ain't what I said.

16  Q    What did you say?

17  A    I said we transferred -- we transitioned over 2006 till

18  2007.

19  Q    Right.

20  A    So I wasn't in it for a year.

21  Q    No, I said you were in BGF.

22  A    And I wasn't in it, in BGF for a year.  We transferred

23  over from 2006 to 2007.

24  Q    So how long were you in BGF?

25  A    Until I got locked up, which was in June.

1    Q    June of what year?

2    A    2007.

3    Q    So you would have been in BGF about six months?

4    A    That's what you say, yeah.

5    Q    Well, is that -- is it right?

6    A    If I -- from the end of 2006 till beginning of 2007.

7    Q    That's when you --

8    A    That's when we crossed over.

9    Q    Right.  And then you got locked up?

10   A    So it could be six months, it could be seven months.  I

11   can't say.  It's around there.

12   Q    Okay.  Good enough.  Now, at that point in time, late in

13   '05, '06, how old were you?

14   A    About 23, 24, somewhere around there.

15   Q    Mr. Johnson's around the same age?

16   A    I guess.

17   Q    Well, were the other members of YGF around the same age

18   as you?

19   A    Not everybody, no.

20   Q    How old were they?

21   A    Some younger, some older.

22   Q    How young?

23   A    How young?  16, maybe 15.

24   Q    Really?  Anybody younger than that?

25   A    Yeah.

Cross-examination – Meadows (By Mr. Enzinna)

1    Q    Really?  Who?

2    A    There's a couple people that was younger than that, but

3    they wasn't YGF.

4    Q    They weren't?

5    A    They was just running around saying young YGF because a

6    lot of us that was YGF, they followed in them footsteps and

7    looked up to us.

8    Q    Okay.  Well, you named a group of people this morning who

9    you said were in YGF.

10   A    Right.

11   Q    Right.  Those are the people I'm talking about, I'm not

12   talking about --

13   A    You didn't say that just now.

14   Q    Okay.  Well, I apologize.  I'll try to be more clear.

15   The members of YGF, how old were they?

16   A    Youngest probably 15, 16.

17   Q    15 or 16.

18   A    Might be 14, I can't say.  They was younger than me some

19   of them.

20   Q    Okay.  Anybody 12?

21   A    Possible.

22   Q    Possible?

23   A    Yeah.

24   Q    All right.  So you met Mr. Johnson in 2005; is that

25   correct?

1    A    Yes.

2    Q    Okay.  And then you were locked up in June of '07;

3    correct?

4    A    Correct.

5    Q    And so during that time period, how much time did you

6    spend with Mr. Johnson?

7    A    From that whole time until I got incarcerated, on and

8    off.

9    Q    Every day?

10    A    From 2005, because I sold on Barclay Street, so you could

11    say every day.

12    Q    You saw him every day?

13    A    Just about.  When he wasn't around or times he got

14    incarcerated.

15    Q    You spent a lot of time together?

16    A    Spent a lot of time with everybody in the neighborhood.

17    Q    Did you ever appear in any videos with Mr. Johnson?

18    A    Say that again.

19    Q    Did you ever appear in any of Mr. Johnson's videos?

20    A    What do you mean, what videos?

21    Q    You just saw his video, the rap video.

22    A    That's a rap video, you just said video.

23    Q    Okay.  I'll be a little more specific then.  Did you ever

24    appear in any of Mr. Johnson's rap videos?

25    A    No.

1   Q    Did you ever appear in any photographs with Mr. Johnson
2   on social media?
3   A    No.
4   Q    In fact, I think you testified that you were not friends
5   with Mr. Johnson Facebook; is that right?
6   A    No.
7   Q    It's not right?
8   A    I never testified nothing about Facebook, if me and him
9   was connected.
10  Q    Okay.  Were you friends with Mr. Johnson on Facebook?
11  A    No.  I wasn't friends with a lot of people that was in
12  that organization on Facebook.
13  Q    Okay.  Did you -- did you follow him on Instagram?
14  A    Didn't follow nobody.  Instagram wasn't out like that
15  when we was out there.
16  Q    Oh, good point.  So YGF did not communicate through
17  social media then?
18  A    We communicated through word advice, word of talking to
19  each other, phone conversation, twerps, buttes, Nextels.
20  Q    I don't -- what is a twerp?
21  A    Nextel.  You know what a Nextel phone is?  That's a
22  twerp.
23  Q    Okay.  But you didn't communicate through social media?
24  A    Social media wasn't our thing at that time.
25  Q    Okay.  All right.  Now, there was some discussion at the

1    end of your testimony about why you are here testifying;

2    right?

3    A    Yes.

4    Q    Okay.  Let me back up a minute.  You testified this

5    morning that you have, I think you said you have two felonies.

6    A    No, that ain't what I said.

7    Q    What did you say?

8    A    I have three felonies.

9    Q    Three felonies?

10   A    Yes.

11   Q    What are those?

12   A    Two distributions and a possession of a handgun.

13   Q    And the handgun charge is a federal charge?

14   A    It was state charge, but it picked up federal.

15   Q    And the other two are state charges?

16   A    Yes.

17   Q    Okay.  Now, in June '07 you were arrested for the gun

18   charge; correct?

19   A    Correct.

20   Q    And you entered into a cooperation agreement; correct?

21   A    Correct.

22   Q    And as part of that cooperation agreement, you spoke with

23   law enforcement; correct?

24   A    I did that before I made that cooperation agreement.

25   Q    Did you do it before you were charged?

Cross-examination – Meadows (By Mr. Enzinna)

1    A    Yes, I did.

2    Q    When did you first begin to cooperate with law

3    enforcement?

4    A    Be more specific.

5    Q    I don't know how I can be more specific --

6    A    You said when I started cooperating, as far as when?

7    Q    That's what I'm asking:  When?

8    A    2005.

9    Q    2005.  So you were cooperating with law enforcement while

10    you were a member of YGF?

11    A    No.

12    Q    Okay.  Well, I understood you to say that you --

13    A    I said 2005.  And you asked a question was I cooperating

14    while I was a member of YGF and I answered no.

15    Q    Can you explain that to me?

16    A    I wasn't a member when I first cooperated at the time.

17    When I first said something about a case, I wasn't no YGF

18    member.  I was living in Greenmount area, YGF hadn't even

19    started yet.

20    Q    So you cooperated with law enforcement?

21    A    I didn't cooperate.  I just gave information and that was

22    it.

23    Q    Okay.  Well, you told me that you started cooperating in

24    2005.

25    A    That's still the same.  Me giving information is still

1    cooperation with a law enforcement.

2    Q    And you did that in 2005?

3    A    Yeah.

4    Q    And then later in 2005 you joined YGF?

5    A    Later down the line.

6    Q    But you had stopped cooperating at that point?

7    A    I never -- yes, I only made a statement with them.

8    Q    Okay.  When was the next time you cooperated?

9    A    2007.

10    Q    When?

11    A    When I got incarcerated.

12    Q    So after you were arrested?

13    A    Right.

14    Q    Okay.  And as part of that cooperation deal, you spoke

15    with law enforcement agents; correct?

16    A    Wasn't no deal.

17    Q    There was no deal.  Okay.  Well, I think we just said you

18    had a cooperation agreement.

19    A    That's with the feds.  You said in 2007 I had a

20    cooperation deal, I did not.  2007 I got locked up, told them

21    about a murder and everything.  So that was no cooperation

22    deal.

23    Q    When did you have a cooperation deal?

24    A    When the feds picked my case up and they told me the

25    stipulations and said from this point on you got to cooperate,

Cross-examination - Meadows (By Mr. Enzinna)

1    any information that you know, any information you're involved

2    in, make sure you cooperate and tell the truth.

3    Q    And when did that happen?

4    A    Feds picked my case up in October.  I didn't see the feds

5    probably, I think, until October somewhere, the end of that

6    year, 2007.  And I didn't find out about the agreement until

7    actually I went and took my plea deal.

8    Q    Okay.  So you were arrested in June by the state.  The

9    charge -- the feds picked up your case in October.  And then

10   sometime later, maybe the end of the year, you first met with

11   the federal law enforcement?

12   A    Never federal law enforcement, just the judge, because I

13   was already incarcerated at the time, still in the state.

14   Q    Well, what exactly did you do to cooperate?

15   A    What you mean?

16   Q    Well, you said you had a cooperation agreement?

17   A    It's in any federal law.  They tell you when you get a

18   plea agreement, they tell you any cooperation, anything like

19   that, you make sure you report any information over into the

20   law enforcement.  You was already cooperating, continue to

21   do -- continue to cooperate and tell the truth.  That's not an

22   agreement that you agree to, that's in paperwork when you sign

23   it.

24            THE COURT:  Take the jury out.

25            (Jury left the courtroom.)

Cross-examination – Meadows (By Mr. Enzinna)

1              (Pause in the proceedings.)

2              THE COURT:  Okay.  Let's bring the jury back in,

3     Ms. Powell.

4              (Jury entered the courtroom.)

5              THE COURT:  Ladies and gentlemen, that was not your

6     afternoon break.  Sometimes there are matters that need to be

7     taken up outside of your hearing.  It was resolved relatively

8     quickly.  We're ready to continue.

9              Mr. Enzinna, you may inquire.

10             Mr. Meadows, you remain under oath.

11             MR. ENZINNA:  Thank you, Your Honor.

12    Q    (BY MR. ENZINNA)  Mr. Meadows, the gun charge in June of

13    '07, did you plead guilty to that charge?

14    A    No.

15    Q    Were you tried?

16    A    No.

17    Q    What happened to it?

18    A    I was going to trial in the state case, they gave me a

19    nonprocess.  Feds, federal picked it up because of my record.

20    So when the feds picked it up, I pled guilty.

21    Q    So you did plead guilty to it?

22    A    (No verbal response.)

23    Q    What was your sentence?

24    A    Guidelines was somewhere between five to ten years.

25    Q    And how much time have you served on that sentence?

Cross-examination - Meadows (By Mr. Enzinna)

1    A    All together on that sentence?

2    Q    Yes.

3    A    That's what you asked?

4    Q    Yes.

5    A    Five years.

6    Q    So you entered prison in 2008?

7    A    No, I was locked up 2007.

8    Q    I see.  When were you released?

9    A    I didn't come home till 2000 and what, 11 -- '10, '11.

10   Q    Well, that would have been three or four years?

11   A    Right.

12   Q    Is that correct?

13   A    Right.  I had a violation that took me right back with

14   the feds to continue to finish the rest of my time.

15   Q    After you were released?

16   A    Right.

17   Q    So when did you come out after that?

18   A    End of 2011.

19   Q    Okay.  So all together you've served approximately four

20   and a half years?

21   A    Five.

22   Q    Well, from June of '07 until the end of 2011?

23   A    Five years total.

24   Q    All right.  Now -- all right.  Do you recall meeting -- a

25   meeting on June 11th, 2007, that you had with a

1    Detective James Lloyd?

2    A    I remember the detective, I can't recall the day or the

3    meeting.

4    Q    Okay.  But it was a meeting in which you gave a taped

5    statement talking about the murder of Craig Mack, do you

6    remember that?

7    A    I don't remember it, but yes, I know what you're talking

8    about.

9    Q    You don't remember, but you remember --

10   A    I don't remember word for word.

11   Q    Oh, of course not.

12   A    Right.  But I know what you're talking about.

13   Q    All right.  So that was June 11th, 2007.  When was that

14   in relation to when you got arrested for the gun charge?

15   A    What you mean, in relation?

16   Q    Was it before or after?

17   A    If I got locked up in June 2007, then that was after.

18   Q    After?

19   A    While I was already incarcerated.

20   Q    Okay.  So you were arrested, incarcerated, then you met

21   with Detective Lloyd?

22   A    Right.

23   Q    Okay.  Why did you meet with Detective Lloyd?

24   A    Because he was the one that was handling the case.

25   Q    And you talked to him; right, you answered his

1    questions?

2    A    Yes, sir.

3    Q    Why did you answer his questions?

4    A    What you mean why I answered it?

5    Q    Did he advise you you were under no obligation to answer

6    his questions?

7    A    Right.

8    Q    And you understood that under the 5th Amendment; right?

9    A    Right.

10    Q    But you answered his questions anyway?

11    A    Right.

12    Q    Why?

13    A    Why?  Because when you see a 16-year-old boy get murdered

14    in front of you, that go against everything that you said.  A

15    little kid that didn't have nothing to do with nothing.  Then

16    you sit there, you analyze everything that you standing there

17    for, that you're totally against.  Especially when a kid get

18    killed in front of you.

19    Q    Okay.

20    A    You'll feel some type of way too.

21    Q    I'm sorry, say that again?

22    A    I said you'll feel some type of way too, if a kid got

23    killed in front of you.

24    Q    I'm sorry, what kid are you talking about?

25    A    You asked me a question why I test -- why I felt as

1    though I opened up and I gave you an answer.

2    Q    But you said you talked -- you waived your 5th Amendment

3    right and you spoke with Detective Lloyd.

4    A    Right.  And you said why did I do that.  And I said when

5    you see a person get killed in front of you that's 16, that's

6    a kid, that change everything that you stand for.  So you'll

7    open your mouth and say something too.

8    Q    What are you talking about, what kid?

9    A    You just asked me a question, so I gave you an answer.

10   Q    Okay.  What kid are you talking about?

11   A    The kid that was murdered, one of the kids that I had to

12   testify against for in a trial, another BGF member killed.

13   Q    A 16-year-old kid who BGF killed?

14   A    Right.  That was the whole reason of me talking with

15   Lloyd, because it's about that murder and another murder.

16   Q    Okay.  Now, did you talk to Detective Lloyd about that

17   murder?

18   A    I talked to him about that and several others.

19   Q    About that and certain others?

20   A    Yes.

21   Q    And one of those was Craig Mack; correct?

22   A    Correct.

23   Q    And Craig Mack wasn't the 16-year-old boy?

24   A    No.

25   Q    And you didn't see Craig Mack get murdered?

1    A    No.

2    Q    All right.  So let me get this straight.  You were

3    arrested on a gun charge -- and by the way, you mentioned you

4    had three felonies, ever been convicted of anything else

5    besides those three felonies?

6    A    Yeah, I've been convicted of --

7            MR. MARTINEZ:  Objection.

8            THE COURT:  You may approach.

9            (Bench conference on the record.)

10           THE COURT:  Where are you going with that?

11           MR. ENZINNA:  I want to see if he's telling the

12   truth.

13           THE COURT:  Rule 609 ring any bells?  Sustained.

14   Don't let that happen again.

15           (The following proceedings were had in open court.)

16           THE COURT:  Next question.

17   Q    (BY MR. ENZINNA)  You were arrested on the gun charge and

18   then you decided to speak with Detective Lloyd because of your

19   concern over the murder you had seen; is that correct?

20   A    Yes.

21   Q    Your decision to speak with Detective Lloyd was not

22   influenced by the fact that you were facing charges?

23   A    No.

24   Q    When you spoke with Detective Lloyd, you talked earlier

25   about the murder of Craig Mack; correct?

Cross-examination – Meadows (By Mr. Enzinna)

1   A    Yeah.

2   Q    And I believe what you said was that Kenny and Foo killed

3   him?

4   A    That's what you're asking me?

5   Q    Yes.

6   A    That ain't all I said, but yes, that was part of it.

7   Q    I'm going to get to that.  You said that and you said

8   also that Don was involved?

9   A    Correct.

10  Q    And you said that Geezy had authorized it?

11  A    That's same -- yeah, that's the same, that's it.

12  Q    You didn't tell all that to Detective Lloyd, did you?

13  A    Not right at the moment, no.

14  Q    No.  What you told him was that Kenny and Foo had killed

15  Craig Mack; right?

16  A    Right.

17  Q    You told him that the Lanvale-Barclay boys had come up

18  and complained about Mack snitching; right?

19  A    That's what you're asking or you're just saying "right"?

20  Q    That's a question.

21  A    Yes.

22  Q    And you told him that they told Kenny and Foo and Geezy

23  and Roscoe and Little Dave and all them that you all need to

24  stop having Craig Mack around; right?

25  A    Is that what I said?

1    Q    Yes, it is.  Would you like to see it?

2    A    State what you just said.

3    Q    Well --

4         THE COURT:  Listen, this process goes by a certain

5    procedure.  The procedure is the lawyer asks the question, the

6    witness answers it truthfully to the best of his ability.  The

7    lawyer asks the next question.  It's not a conversation.  It's

8    not a witness asking a lawyer questions.  It's not the lawyer

9    answering questions.  The lawyer asks questions, the witness

10   answers it.  Next question.

11   Q    (BY MR. ENZINNA) You told Detective Lloyd that the

12   Lanvale and Barclay boys came up and told Kenny and Foo and

13   Geezy and Roscoe and Little Dave and all them that you all

14   need to stop having Craig Mack around; is that correct?

15   A    Yes.

16   Q    You didn't say that Geezy, who you mentioned there, was

17   involved in that, in the murder, did you?

18   A    No.

19   Q    And you also told Detective Lloyd -- Detective Lloyd

20   asked you a question whether there was any additional

21   information that you could share with him in regards to that

22   incident.  Do you remember him asking you that question?

23   A    I don't recall, but it's possible they did ask that.

24   Q    Do you remember telling him that "all the information I

25   have given you, that's all I have known about it from

1    Kenny"?

2    A    Correct.

3    Q    So was that true?

4    A    Yeah.  At that time, yes, it was true.  And it still is

5    true.

6    Q    It was true at that time?

7    A    Yeah, and it still is.  Because at that time I was only

8    focused on the people that killed him.  So my focus on him

9    saying, oh, Geezy ordered it, no, that wasn't in my mind.

10    Q    So when he said, is there other information --

11    A    It still wasn't in my mind.

12    Q    Let me finish the question, please.  When he said, is

13    there any other information you have about this murder, you

14    didn't think, I ought to tell him about who authorized it?

15    A    Again, it was not on my mind.  Just the persons that

16    killed him.

17    Q    Okay.  Now, you talked earlier about an incident

18    involving what you called a couple of crackheads; right?

19            THE COURT:  You have to answer out loud.

20            THE WITNESS:  I don't know if he's asking a

21    question.  He's just saying right.

22            THE COURT:  That's a permissible way for him to ask

23    you a question.

24            THE WITNESS:  Okay.

25            THE COURT:  In your mind you should imagine there's

1    a statement and then a comma and then the word "right" after

2    it with a question mark.  That's a question.  So if you hear

3    that, that's a question.  If you can answer it, do so.  If you

4    can't, you can't.

5              THE WITNESS:  Can you repeat it?

6              THE COURT:  Restate the question.

7    Q    (BY MR. ENZINNA)  You testified earlier about an incident

8    involving what you call two crackheads; is that right?

9    A    Correct.

10   Q    And I think what you -- well, let me make sure I

11   understand this, you said that you heard shots; correct?  Is

12   that correct?

13   A    Yes.

14   Q    Okay.  You heard shots.  And then you went outside and

15   spoke with Mr. Johnson?

16   A    That ain't what I said.

17   Q    Tell me what did happen.

18   A    We heard shots, everybody ran towards it to see where it

19   was coming from, see who got hit.

20   Q    Okay.  And then what happened?

21   A    Later on, that's when I talked with Geezy.

22   Q    Later on, how much later on?

23   A    Couple hours.

24   Q    And you said that Mr. Johnson told you something about

25   killing two birds with one stone; is that right?

1  A    Yes.

2  Q    So were you saying that Mr. Johnson told you that when

3  you heard those shots that was him shooting at the crackheads

4  and Craig Mack?

5  A    He didn't say.  I took it as when he said it that he was

6  the one who was doing the shooting.

7  Q    That's what you understood?

8  A    That's what I understood.

9  Q    So this obviously occurred before Craig Mack was

10  killed?

11  A    Correct.

12  Q    Did Mr. Johnson ever tell you that he was not shooting at

13  this white couple, the crackheads?

14  A    He never indicated that he was or that he wasn't.  I took

15  it as him saying what he said, that he was the one that was

16  doing the shooting, that he was trying to kill two birds at

17  once.

18  Q    Mr. Meadows, do you recall meeting with the special

19  agents from the Bureau of Alcohol, Tobacco, Firearms and

20  Explosives on April 13th of 2016?

21  A    I don't recall.

22  Q    Do you remember telling agents of the Bureau of Alcohol,

23  Tobacco, and Firearms that within a couple hours of the

24  shooting Geezy told you that he wasn't actually shooting at

25  the white couple?

1    A    I don't recall.  I don't remember.

2    Q    Would it refresh your recollection if I showed you the --

3    A    Even if you showed me I probably still wouldn't remember

4    because it's a few years ago.

5              MR. MARTINEZ:  Your Honor, may we approach before

6    this is done?

7              THE COURT:  Yes.

8              (Bench conference on the record.)

9              MR. MARTINEZ:  Before this is done, I just want to

10   make sure you're just going to refresh his recollection.

11   That's an agent's report.  I just don't want that to be on the

12   screen because it's not his statement.

13             THE COURT:  You've got another problem, though, he

14   told you it probably wouldn't refresh his recollection.  What

15   are you going to do about that?

16             MR. ENZINNA:  It might, though.  It might.

17             THE COURT:  Well, I propose we should -- we'll give

18   that the most liberal interpretation possible, probably

19   doesn't mean definitely not.  I'll let you try it, but I

20   honestly haven't heard that answer before.

21             (The following proceedings were had in open court.)

22             THE COURT:  You may approach the witness.

23   Q    (BY MR. ENZINNA)  I'd like you to look -- did you look at

24   that?

25   A    Uh-huh.

Cross-examination - Meadows (By Mr. Enzinna)

1    Q    Does that refresh your recollection?

2    A    No.

3    Q    Thank you.  All right.  Now, we were talking about the

4    murder of Craig Mack, whose name -- real -- never mind.

5        I want to make sure I understand what you said earlier.

6    You said there were a couple of meetings before Craig Mack was

7    killed; correct?  Is that correct?

8    A    Correct.

9    Q    Did you say that at the first meeting a decision was made

10   that Kenny and Foo would do the killing and it would be

11   outside?

12   A    Correct.

13   Q    And did you say that at the second meeting the plan was

14   changed and the decision was made to bring it inside?

15   A    Correct.

16   Q    And did you say that at the second meeting one of the

17   concerns discussed was how to do this without incriminating

18   Mr. Johnson; right?

19   A    Correct.

20   Q    So the plan that was arrived at was to kill Mr. Mack in

21   Mr. Johnson's house; is that correct?

22   A    Say that again.

23   Q    So the plan that was arrived at that would prevent

24   Mr. Johnson from being incriminated was to kill Mr. Mack in

25   Mr. Johnson's house?

1   A    You said the plan was to rob what --

2   Q    The plan was arrived at.

3   A    Arrived at, what you mean by that?

4   Q    Let me rephrase.  So in this meeting, the concern -- one

5   of the concerns was, we want to do this, but we want to do it

6   in a way that doesn't incriminate Mr. Johnson.  So I've got a

7   great idea, let's kill him in Mr. Johnson's house.  Is that

8   what happened?

9   A    That ain't what I said, but yeah.

10  Q    And that also was your stash house; right?

11  A    Uh-huh.

12  Q    At the time?

13  A    Yes.

14  Q    At the time?

15  A    Yeah, it was a stash house.

16  Q    But after the murder it became a crime scene; correct?

17  A    Correct.

18  Q    So you had to move; correct?

19  A    Correct.

20  Q    And that was not something that you wanted to do, was it?

21  I mean, if the house wasn't a crime scene you wouldn't have

22  moved, would you?

23  A    Eventually probably so.

24  Q    Eventually?

25  A    Yeah.

1   Q     But not then?

2   A     I can't say.

3   Q     Okay.  Was -- now, you were shown a couple of photo

4   arrays earlier by Mr. Martinez, do you remember that?

5   A     Yes, sir.

6   Q     Okay.

7           MR. ENZINNA:  And, Your Honor, may I just get my

8   copies of those?

9           THE COURT:  Yes.

10  Q     (BY MR. ENZINNA)  Mr. Meadows, I'd like to show you

11  what's been marked as Government's Exhibit PHA 3, which I

12  believe you looked at earlier today, and it's a photograph of

13  a photo array that I think you identified.  Do you recall

14  that?

15  A     Yes.

16  Q     And in this you identified the person in the upper right

17  as one of the shooters; correct?

18  A     Correct.

19  Q     And that's Foo; right?

20  A     Correct.

21  Q     And the date on this is June 11th, 2007; correct?

22  A     Correct.

23  Q     And you were also shown PHA -- what's been marked

24  Government Exhibit PHA 4, which is another photo array.  And

25  on that one you identified the photograph in the middle of the

1    bottom row as one of the shooters; correct?

2    A    Correct.

3    Q    And that's dated June 11th, '07; correct?

4    A    Correct.

5    Q    And what you said on the back, is that "Kenny told you

6    that he and Foo killed Craig Mack in Geezy's house and that

7    they both, Kenny and Foo shot and killed Craig Mack because it

8    was a rumor going around that Craig Mack was telling.  And the

9    boys from Lanvale and Barclay wanted him dead and they told

10   Foo and Kenny to get him from around you all.  So Kenny and

11   Foo killed him in Geezy house and they left him there.  And

12   Kenny and Foo left out."  Do you see that?

13   A    Yeah.

14   Q    And this is what you told the Detective Lloyd on

15   June 11th, '07; correct?

16   A    Correct.

17   Q    So what you told them then was that the Lanvale and

18   Barclay people told them to kill Mack; correct?

19   A    Correct.

20   Q    So were you thinking about who put this plan in motion?

21   A    That's what original person that came and told us.  So

22   they told us, that's what I said.  I didn't say -- wasn't on

23   my mind to say, okay, hey, this order originally came from

24   Geezy to give it as a green light.  I just said where the

25   rumor came from, that they told us that they didn't want it,

1    to go ahead and kill him.

2    Q    Now, I want to -- I'd like to show you what's been marked

3    Government Exhibit PHA 5.  You looked at that earlier today

4    too.  And that's this one where you identified the photograph

5    in the middle of the bottom row, as Mr. -- I think you said

6    Don; correct?

7    A    Donatello.

8    Q    And the date on this is January 23rd, '08; correct?

9    A    Correct.

10   Q    And on the back of that document you explain the person

11   in the picture is Don and he was with them at the house when

12   Craig Mack was killed.  And then a couple of sentences down

13   you say, "They was given the order to kill Craig Mack by

14   Geezy," do you see that?

15             THE COURT:  Can we sharpen that focus?  Do you know

16   how to do that?

17             MR. ENZINNA:  I can try.

18   Q    (BY MR. ENZINNA)  Do you see it in the fourth line down,

19   it says, "They was given the order to kill Craig Mack by

20   Geezy"?

21   A    Correct.

22   Q    And down at the bottom it's witnessed -- do you see the

23   signature down there looks like Detective J. Lloyd -- oh, I'm

24   sorry, do you see that down there?

25   A    Yeah.

1    Q    And there's another signature underneath that, do you

2    know who that is?

3    A    It's another detective name.

4    Q    So you went from June 11th, '07, when you were talking

5    about Kenny and Foo and the Lanvale and Barclay boys, to

6    January 23rd, '08, when you suddenly started talking about

7    Geezy giving the order; correct?

8    A    Correct.

9    Q    What happened in between then?

10   A    What you mean what happened in between there?

11   Q    Why did you suddenly start talking about Geezy?

12   A    Because at the time they asked only about the murder and

13   I told them about who did the murder.

14   Q    Okay.  So --

15   A    When it came down initially they -- when they brought me

16   back out on a writ, they asked me -- well, everything that

17   happened.  So that's when I went into everything, how it took

18   place.

19   Q    So that was different from when Detective Lloyd asked you

20   on June 11th, '07, do you have any other information about

21   this murder; was it?

22   A    Correct.

23   Q    That was different?

24   A    Yeah.

25   Q    Okay.  Now, January 23rd, '08, what else had happened in

Cross-examination – Meadows (By Mr. Enzinna)

1   your case?

2   A    What you mean?

3   Q    Well, June 11th, '07, you were looking at a state charge;

4   right?

5   A    Correct.

6   Q    And then you said that the feds took the charge in

7   October; correct?

8   A    Correct.

9   Q    So by January it was a federal charge; right?

10  A    Correct.

11  Q    Did that have any effect on your change?

12  A    What you mean?

13  Q    Well, you changed what you said; right?

14  A    Okay.

15  Q    Is it right?

16  A    What you mean did I change -- I never changed what I

17  said.

18  Q    Okay.  Well, in June of '07 you said, "All the

19  information I have is that Kenny and Foo committed the

20  murder."

21  A    Correct, because they asked about a murder.  They didn't

22  say, who ordered the murder.  Hey, who gave the order.  They

23  asked simply about a murder, so I gave them an answer and

24  said, hey, this is what happened with the murder.

25  Q    I understand.  But now in January you've said more;

1    right?

2    A    Well, they brought me back out on a writ, right.

3    Q    I'm sorry.

4    A    When they took me back out on a writ.

5    Q    Okay.  And now you've added this additional

6    information?

7    A    I told them the additional information, correct.

8    Q    Because they asked it a different way?

9    A    Correct.  They asked everything what happened, what took

10   place, why did Craig Mack get killed.

11   Q    Okay.

12   A    When they asked that, then I gave them an answer on why

13   he got killed.

14   Q    So when they asked you to tell them all the information

15   you had about the murder, you didn't understand that to mean

16   tell them all --

17   A    When they said tell us what happened with the murder,

18   right, I told him who killed him.  They didn't say, well, what

19   is the reason behind him getting killed.

20   Q    Uh-huh.

21   A    I said it was a rumor.  They didn't say, well, who

22   ordered it at the time, no.  They didn't say, hey, what was

23   the reason why he was given an order to kill him or what was

24   that.  They didn't say any of that.

25   Q    They didn't say any of that.

1    A    No.

2    Q    And in January they did?

3    A    In January they asked me more information and said, hey,

4    well, what was the reason, the connection on why did he get

5    killed.

6    Q    Okay.

7    A    So that's when I told them what happened, everything.

8    Q    All right.  Okay.  Let's talk about YGF.  You mentioned

9    YGF.  Well, let me back up for a second.  Have you met with

10   the federal government agents in preparation for your

11   testimony today?

12   A    What you mean?

13   Q    Well, before you came in here today to testify, have you

14   met with the prosecutors in the case or the agents in the case

15   to talk about your testimony?

16   A    No, not to talk about my testimony.

17   Q    What did you talk about?

18   A    The scenarios of the case, as far as me coming into

19   court, knowing what I'm coming to court to do, if I'm going to

20   come to court to tell the truth, knowing that I'd be under

21   oath.

22   Q    And, in fact, you met with them last night; right?

23   A    Correct.

24   Q    And you discussed the video that you testified about this

25   morning?

1    A    No.

2    Q    No, you didn't?

3    A    Not last night.

4    Q    Okay.

5              THE COURT:  Next question.

6              MR. ENZINNA:  I'm sorry, Your Honor, I need to --

7    yes.

8    Q    (BY MR. ENZINNA)  All right.  Now, you said that you

9    joined YGF in around 2005; right?

10   A    Correct.

11   Q    And is it true that YGF had a human resources person who

12   helped people find jobs?

13   A    YGF?

14   Q    Yes.

15   A    No.

16   Q    No?

17   A    That was our goal when we first started out.  We -- that

18   was our goal, that we planned to have somebody help people

19   with jobs, help people be selling drugs, have somebody to deal

20   with you dealing with drugs, have somebody find you a job.

21   That was our plan, it never took place.

22   Q    So when you -- okay.  So that was the original plan.  And

23   then the plan changed to what?

24   A    What you mean to what?

25   Q    Well, you said that was your original plan?

1    A    That was originally planned to -- but we didn't do it, so

2    it wasn't like no plans.  YGF didn't have plans.  We didn't

3    have goals.  We didn't have structure at the time.  BGF had

4    the structures, they had the goals and everything.

5    Q    I see.  Okay.  Now, the initial leader of YGF was

6    David Hunter; right?

7    A    No.

8    Q    No?

9    A    No.  He was one of them, he's not the initial leader.

10   Q    He was one of them.

11   A    Right.

12   Q    Who else was a leader?

13   A    The main person that brought it to our attention was

14   Fennell.

15   Q    Okay.

16   A    It was a military structure and barrack, that's how it

17   was brought to us.

18   Q    All right.  And you talked earlier about the transition

19   from YGF to BGF; is that right?

20   A    Correct.

21   Q    All right.  And this was in 2006, 2007?

22   A    Correct.

23   Q    Correct.  And you said there were meetings to discuss

24   this transition; correct?

25   A    Correct.

1    Q    And did those meetings take place in January of '07?

2    A    I don't remember if they took place in January or what.

3    I just know it's between '06 and '07.

4    Q    Between what day in '06?

5    A    I don't know, it's between '06 and '07.

6    Q    Okay.  All right.  And I wanted to ask you, you mentioned

7    something earlier about taking the oath; right?  And you

8    said -- I think your answer when you were asked whether you

9    took an oath, your answer was yes and no; is that right?

10   A    Correct.

11   Q    And I think what you said was that Mr. Hunter gave you

12   the paperwork and said here's the paperwork, you don't have to

13   learn it, you're just members now?

14   A    Lot of people that we -- when you become a member of BGF,

15   yes, you supposed to take an oath and supposed to remember it.

16   But by most of us was transferring from YGF to BGF, we didn't

17   give two F's, two fucks, about the paperwork.

18   Q    Okay.

19   A    As long as somebody that was in the organization and

20   vouched for us said, nah, they good, they bypass everything.

21   Q    So did you not take an oath?

22   A    Yes.

23   Q    You did take an oath?

24   A    Uh-huh.

25   Q    Okay.  Did the other members of YGF take the BGF oath?

1    A    Yes.

2    Q    Did you all take it at the same time?

3    A    No.

4    Q    Were you there when the other people took it?

5    A    No.  Some, but not everybody.

6    Q    And you -- I think you said earlier that you left BGF in

7    2007.

8    A    Correct.

9    Q    That's correct?

10   A    Correct.

11   Q    When you got locked up?

12   A    Correct.

13   Q    And then you were in prison until 2012.

14   A    2011.

15   Q    2011, I apologize 2011.  And then you got out of prison.

16   A    Correct.

17   Q    Have you been out of prison since then?

18   A    Correct.

19   Q    But you have not gone back to BGF?

20   A    No.

21   Q    Did the oath that you took say anything about how you

22   could leave BGF?

23   A    It wasn't the oath that told you that, it's just part of

24   the paperwork that tells you.

25   Q    Tells you what?

Cross-examination – Meadows (By Mr. Enzinna)

1    A    When you leave BGF.

2    Q    What does it say?

3    A    What it say?  Only times you can leave BGF is when the

4    doors open up.  If the door's not open up and you choose to

5    leave out, then the only way out is somebody killing you.

6    Q    Okay.

7    A    Get a sanction.

8    Q    Did the doors open up for you?

9    A    When the doors open up?  The doors opened up the minute I

10   opened my mouth.

11   Q    I see.  Now, you testified in Mr. Johnson's state trial;

12   correct?

13   A    Correct.

14   Q    And there you talked about -- you described some of the

15   features of the Black Guerilla Family; correct?

16   A    Correct.

17   Q    And you testified there that the term J is a rank;

18   correct?

19   A    Correct.

20   Q    It's like a foot soldier?

21   A    I didn't say J was a foot soldier, fox is a foot

22   soldier.

23   Q    I stand corrected then.  What is a J?

24   A    Jamaa.

25   Q    And what --

1    A    It's the next rank after fox.

2    Q    Okay.  And what does that person in BGF do, what's their

3    role?

4    A    They follow the rules of BGF.  Some people that's J might

5    have a higher rank of J that can tell other J's what to do.

6    Q    And you also testified that the person in BGF who handles

7    the finances is called the enforcer -- I'm sorry, not the

8    enforcer, the treasurer.

9    A    That's what I said?

10   Q    Is that right?

11   A    I didn't say that on the stand, no.

12   Q    You didn't?

13   A    But that is one person that handles the treasury.  But I

14   never said that out of my mouth on the stand.

15   Q    Okay.  Now, you did say you did take a oath; right, a BGF

16   oath?

17   A    Yeah.

18   Q    And did part of that oath involve silver back gorillas?

19   A    That's the fox oath, yes.

20         MR. ENZINNA:  Nothing further, Your Honor.

21         THE COURT:  Mr. Bussard.

22         MR. BUSSARD:  Could I have just a few moments to get

23   the exhibits together, if the Court would indulge me for a few

24   seconds.

25         THE COURT:  I'll indulge you for 15 minutes.

1              Ladies and gentlemen, we'll take the afternoon

2    recess now.  During this recess do not discuss the case among

3    yourselves.  Don't discuss it with anyone.  Do not allow

4    yourselves to be exposed to any news articles or reports that

5    touch upon the case or the issues it presents or any articles

6    or reports that relate to any of the participants in the case.

7    Avoid all contact with any of the participants in the trial.

8    Do not make any independent investigation of the law or the

9    facts of the case.  Do not look up anything related to the

10   case or its participants on the internet.  Do not consult an

11   encyclopedia or a dictionary.  15 minutes.  Take the jury out.

12             (Jury left the courtroom.)

13             THE COURT:  Mr. Meadows, you may step down from the

14   witness stand and leave the courtroom.  You must return in 15

15   minutes.  We're in recess 15 minutes.

16             (A recess was taken.)

17             THE COURT:  Ready for the jury, Mr. Bussard?

18             MR. BUSSARD:  Yes, Your Honor.

19             THE COURT:  Bring them in.

20             (Jury entered the courtroom.)

21             THE COURT:  Be seated, please.

22             Cross-examination, Mr. Bussard.

23             Mr. Meadows, you remain under oath.

24             MR. BUSSARD:  Thank you, Your Honor.

25                       CROSS-EXAMINATION

1    BY MR. BUSSARD:

2    Q    Good afternoon, Mr. Meadows.

3    A    Good afternoon, sir.

4    Q    Who is this young man over here?

5    A    Slay.

6    Q    Know him by any other name?

7    A    Kenneth.

8    Q    Do you know his last name?

9    A    Jones.

10   Q    Okay.  Now, do you recall testifying back in 2015 in the

11   circuit court for Baltimore City and you were asked those same

12   questions?

13   A    Yes.

14   Q    And do you recall what your answer was at that time?

15   A    Kenny.

16   Q    When counsel asked you about his last name, you didn't

17   recall?

18   A    No, I didn't.

19   Q    You didn't recall that day?

20   A    No.

21   Q    You know now?

22   A    Correct.

23   Q    Okay.  Showing you Government's Exhibit PHI 45, who is

24   that?

25   A    Dave.

1    Q    And what's his last name?

2    A    Hunter.

3    Q    Showing you Government's Exhibit PHI 6, who is that?

4    A    Joseph Bonds.

5    Q    And showing you PHT 76, who is that?

6    A    EC.

7    Q    And what's his last name?

8    A    Tate.

9    Q    And you knew their last names back in September of 2015,

10   but on that day you didn't know Mr. Jones's last name; is that

11   right?

12   A    I just didn't recall his last name.

13   Q    All right.  Now, we're talking about a time period -- the

14   government asked you a time period starting 2005; correct?

15   A    Correct.

16   Q    And you came over to the Greenmount area.  You're not

17   from Greenmount, though, are you?

18   A    No, my family was.

19   Q    You had some relatives over there?

20   A    Yes.

21   Q    Okay.  And what -- when you came over there, did you have

22   somebody that introduced you to everybody?

23   A    In 2005 that wasn't my first time coming around there.  I

24   was around there a couple years ago, way before that.

25   Q    Did the person you've been speaking about, Don, have some

1    influence on taking you around, showing you around?

2    A    No.

3    Q    Don didn't introduce you to anybody?

4    A    He -- probably so, but not -- he wasn't the one that

5    introduced me to people.  My cousin was.

6    Q    And your cousin was?

7    A    Joseph Bonds.

8    Q    Who we just saw his picture --

9    A    Correct.

10   Q    -- is that correct?  Okay.  2005 when you did come over

11   to Greenmount, you met Kenny at some point?

12   A    Correct.

13   Q    And you met him just hanging out on the corner, is

14   that --

15   A    He lived across the street from me.

16   Q    On Guilford?

17   A    Yes.

18   Q    And after that there came a time when Kenny got locked

19   up; is that right?

20   A    I guess.

21   Q    In fact, it was a day or two after the Craig Mack

22   murders; correct?

23   A    I guess so.

24   Q    And what day did the Craig Mack murders allegedly --

25   A    I don't remember.  I can't say.  It was over ten years.

Cross-examination - Meadows (By Mr. Bussard)

1   Q    I'm sorry.  If I tell you January 9th, would that be
2   correct?
3   A    If I don't remember, it still ain't going to make me
4   recall the date.
5   Q    And is it your understanding from your relationship with
6   Kenny that he was in jail for the rest of 2007?
7   A    Correct.
8   Q    And you've testified a little bit about these various BGF
9   meetings, the conversion, I think is one of the words that was
10  used, from YGF to BGF?
11  A    Correct.
12  Q    I'm sure you may have a different name for it, but you
13  know what I'm talking about.  And I think you mentioned three
14  meetings, did you have -- apparently three gatherings, one
15  with Uncle Ray; is that correct?
16  A    Correct.
17  Q    Did you ever meet somebody -- and you were at that
18  meeting; correct?
19  A    The first one, yes, I was.
20  Q    All right.  Did -- were you at the second meeting?
21  A    Yeah.
22  Q    And what was the date of that meeting?
23  A    I don't know the date.
24  Q    2006, 2007?
25  A    It was somewhere between 2006 going into 2007.  I don't

Cross-examination – Meadows (By Mr. Bussard)

1    know the exact date.

2    Q    And then there was a -- do you know a person by the name

3    of Brian Rainey?

4    A    Say that again.

5    Q    Brian Rainey.

6    A    Brian?

7    Q    Do you know a person by the name of Sister Kim?

8    A    Yeah.  Yes.

9    Q    And at that second meeting or gathering, was Brian Rainey

10   and Sister Kim at that meeting?

11   A    Person you calling by Brian Rainey, I don't recall that

12   name.  I only know him by a nickname.  So I don't know who

13   that person is you speak of by that first name or last name

14   that you're giving.

15   Q    How about Sister Kim?

16   A    Yes.  But she wasn't staying with us, she spoke with the

17   females.

18   Q    I'm showing you what's been admitted into evidence as

19   PHI -- Government's PHI 65.  Does that person look familiar?

20   A    No.  His face do, but I can't picture his face -- like

21   his name with it, no.

22   Q    Was that person at the meeting, the second meeting with

23   Sister Kim?

24   A    I can't recall because she wasn't there with us.  She was

25   there with the females.

Cross-examination – Meadows (By Mr. Bussard)

1    Q    Now, does Uncle Ray have another name?

2    A    I only know him by Uncle Ray.

3    Q    Never heard the name Ray Olivas?

4    A    I only knew him by Uncle Ray.

5    Q    And while we're talking about basic things here, did you

6    ever commit any robberies with Kenny?

7    A    Yeah.

8    Q    Okay.  Do you recall your testimony back in -- last

9    year?

10   A    I don't recall it.

11   Q    Kenny's state case?

12   A    I don't recall it.

13   Q    Do you recall being asked whether you had done any

14   robberies, carjackings, burglaries with Kenny?

15   A    Possibly.

16   Q    Do you recall what your answer was?

17   A    I don't recall what it was.

18   Q    If I show you a copy of the transcript would that refresh

19   your memory?

20   A    It's possible.

21           MR. BUSSARD:  May I approach, Your Honor?

22           THE COURT:  Yes.

23           Have you refreshed your memory, sir?

24           THE WITNESS:  He just set it down.  I don't know

25   what I'm supposed to be looking at.  He just set it down.

Cross-examination - Meadows (By Mr. Bussard)

1          THE COURT:  Is there a particular portion that you
2    want him to read or you want him to read the entire document?
3          MR. BUSSARD:  No, the half page here.
4          THE COURT:  Take the document, read from half the
5    page down.
6          THE WITNESS:  It's 25 pages -- I mean, it's 25
7    lines, so which half?
8          THE COURT:  Start at the halfway point in the middle
9    of the page and read to the bottom of the page.
10          THE WITNESS:  "The Court almost" --
11          THE COURT:  No, you don't have to read it out loud.
12    You can read it quietly to yourself and then look up when
13    you're finished.
14    Q    (BY MR. BUSSARD)  Does that refresh your memory,
15    Mr. Meadows?
16    A    It don't, but --
17    Q    Are those answers --
18          MR. MARTINEZ:  Could I --
19    Q    (BY MR. BUSSARD)  Mr. Meadows, did you testify truthfully
20    in Mr. Jones's state trial?
21    A    Yes, I did.
22    Q    And are those answers that you just read truthful?
23    A    That's what I said, yes.
24    Q    So when you were asked, "Did you commit any murders with
25    Kenny?" you said, "No, sir"; is that right?

1    A    That's what I said.

2    Q    And when you said -- "did you commit any robberies with

3    Kenny?" you said, "No, sir"; correct?

4    A    Correct.

5    Q    And when you were asked, "Did you commit any

6    carjackings?" you said, "No"?

7    A    Correct.

8    Q    In fact, Kenny really wasn't the go-to guy when you were

9    committing your crimes that you described in answer to the

10   government's questions; isn't that right?

11   A    I never said he was a go-to guy.

12   Q    He didn't go along with you on that robbery up to

13   Dutch Village?

14   A    No, he didn't.

15   Q    Or the other three that night?

16   A    Say that again.

17   Q    Or the other three robberies that night?  I'll move on.

18             THE COURT:  Let him answer the question.

19   A    No, I can't remember.  No, he didn't.

20             THE COURT:  Next question.

21   Q    (BY MR. BUSSARD)  Nobody's really asked you this yet, but

22   since you were the age of 18, Mr. Meadows, have you ever

23   committed any crime when you were represented by an attorney

24   or gave up your right to an attorney and those crimes are

25   felonies or crimes of moral turpitude?

Cross-examination - Meadows (By Mr. Bussard)

1   A    What do you mean?

2   Q    Or waived your right to an attorney?

3   A    What type of question are you asking me?

4   Q    I'm just asking whether we have had a complete list of

5   your convictions.

6   A    I don't understand your question that you're asking,

7   sir.

8              THE COURT:  Let me see counsel.

9              (Bench conference on the record.)

10             THE COURT:  So I can't quarrel with the legal form

11  of the question.  It's right out of the rule.  But it's not

12  something that I would expect that this defendant is going to

13  be able to decipher because it's legalistic --

14             MR. MARTINEZ:  Do you mean witness?

15             THE COURT:  -- the witness able to decipher because

16  it's legalistic.  Number two, it strikes me that the defendant

17  has already -- the witness has already, in his testimony,

18  indicated that he has been convicted of three prior felonies.

19  Wouldn't it be more efficient -- I'll allow you to reiterate

20  that, but wouldn't it have been more efficient to simply go

21  down that road as opposed to trying to quiz him in that

22  legalistic language?

23             MR. BUSSARD:  Might be habit that I did it that way.

24  I'm trying to follow the format.  But I'll be happy to just

25  move on.

1          THE COURT:  As long as you stick to felonies, each

2    lawyer will get the opportunity once to impeach with the prior

3    felony criminal history and any crimen falsi offenses.  Are

4    there any?

5          MR. BUSSARD:  There is a theft.

6          THE COURT:  That's borderline.  That's always a

7    debate.  You want to have that debate or do you want to stay

8    away from it?

9          MR. BUSSARD:  I don't need it.

10          THE COURT:  Okay.  So we're going to hear about

11    three felony convictions; right?

12          MR. BUSSARD:  Yes.

13          THE COURT:  Okay.  Let's go.

14          (The following proceedings were had in open court.)

15          THE COURT:  Mr. Bussard, you may rephrase your

16    question.

17          MR. BUSSARD:  Thank you, Your Honor.

18    Q    (BY MR. BUSSARD)  2011, Mr. Meadows, were you convicted

19    of distribution of controlled substance?

20    A    Say was I convicted in 2011?  No.

21    Q    I'm sorry, 2001.  I'm sorry.

22    A    Yes.

23    Q    And you received a sentence of seven years, suspend five

24    years; is that correct?

25    A    No.

Cross-examination - Meadows (By Mr. Bussard)

1    Q    That's not correct?

2    A    No, that's not correct.

3    Q    What was the sentence in that case?

4    A    18 months.  It was two distribution charges consolidated

5    together and I got 18 months jail time.

6    Q    Is that case number 2011130?

7        MR. MARTINEZ:  Objection.  Your Honor, we can go

8    through the felonies, but the case numbers?

9        THE COURT:  Well, it's Mr. Bussard's examination.

10   He's entitled to ask the witness.  If the witness happens to

11   remember his case number --

12       THE WITNESS:  No, I don't.

13       THE COURT:  -- that might be too.  So overruled.

14   You may inquire.

15   Q    (BY MR. BUSSARD)  Were you convicted in 2006 of

16   distribution of a controlled dangerous substance?

17   A    Yes.

18   Q    And did you receive a sentence of 15 years, suspend 14

19   years of that sentence?

20   A    What, jail time, is that what you're saying?

21   Q    Yes.

22   A    No.

23   Q    15-year sentence, but 14 of those years was suspended.

24   I'm just asking if that's correct.

25   A    Correct.

Cross-examination - Meadows (By Mr. Bussard)

1    Q    And you were placed on probation?

2    A    Correct.  Ten years suspended.

3    Q    So you really didn't get any jail time?

4    A    Yes, I did.

5    Q    Time served?

6    A    No.

7    Q    You had to serve about a year?

8    A    No.

9    Q    Little bit less?  Eventually you did because you violated

10   probation; is that right?

11   A    My violation of probation came with my gun charge.

12   Q    I'm talking about a different violation of probation.

13   A    No, that was the only violation I had.  Besides the two

14   years -- no, I had another violation, my 18 months.  I got

15   sentenced to two years for that violation, that you're

16   speaking on.

17   Q    In 2006 you did get another distribution of a

18   non-controlled substance, fake drugs?

19   A    Correct.

20   Q    What were the fake drugs?

21   A    Super Glue, fake shit that got put together.

22   Q    And you got a four-year suspended sentence for that; is

23   that correct?

24   A    No.

25   Q    Is that the one that was linked to the other one that we

1    were talking about?

2    A    That's not the one I got four years suspended.  I got ten

3    years on it.

4    Q    Moving on.  June 8th, 2007, you get arrested; is that

5    correct?  And you had a handgun in your possession; is that

6    right?

7    A    Correct.

8    Q    In fact, there was -- I think there was a -- the police

9    stop and you take off running; is that right?

10   A    Correct.

11   Q    And they eventually apprehended you and you had a .22

12   handgun; is that right?

13   A    Not on possession, not on person, but they recovered

14   it.

15   Q    Because you --

16   A    Yes.

17   Q    -- you tossed it?

18   A    I never tossed it.

19   Q    Okay.  You discarded it?

20   A    Didn't do discard it, it slid out my pants.

21   Q    It slid out of your pants.

22   A    There you go.

23   Q    It was in your possession and then it wasn't in your

24   possession.

25   A    There you go.

1    Q    And three days later you find yourself with

2    Detective Lloyd; correct?

3    A    No.

4    Q    You didn't talk to Detective Lloyd on June 11th, 2007?

5    A    Yes, I did.

6    Q    And that's three days after June 8th, 2011?

7    A    Correct.

8    Q    2007, excuse me.

9    A    There you go.

10   Q    And when he asked you about what do you know and the

11   murders in the neighborhood, you're sitting there thinking,

12   I've got 14 years backed up on that distribution charge; is

13   that right?

14   A    No, it wasn't 14.

15   Q    It wasn't?

16   A    No.  It was two sentence --

17   Q    You got a modification?

18   A    One was ten, one was four years.

19   Q    So it adds up to 14.

20   A    No, because the 10 -- it was consolidated.  It wasn't

21   never 14.

22   Q    We'll agree to disagree.  I was ten years you had backed

23   up; correct?

24   A    Correct.

25   Q    Okay.  That's a lot of time.  Up till June 2007, how much

1    time had you ever spent if jail?

2    A    How much time all together?

3    Q    Yeah.

4    A    Over the years spent most my life in jail.

5    Q    All right.  And --

6    A    In and out.

7    Q    Excuse me.

8    A    I said in and out.

9    Q    And when I'm thinking about jail, were you ever in the

10   Division of Correction?

11   A    Yes.

12   Q    And you were in city jail?

13   A    Yes.

14   Q    The old city jail?

15   A    Yes.

16   Q    Did you ever get approached to be a member of BGF?

17   A    Over there?

18   Q    Yeah.

19   A    No.

20   Q    Were you a member of BGF at that time?

21   A    When?

22   Q    When you were in city jail?

23   A    What time, what --

24   Q    Prior to 2007?

25   A    Prior?

Cross-examination – Meadows (By Mr. Bussard)

1    Q    Prior to 2007.

2    A    You mean before that?

3    Q    Before.

4    A    No.

5    Q    So you never became a member of BGF --

6    A    I didn't say I never became a member.  You said prior,

7    before 2007.  I was not a member of BGF in jail.

8    Q    Before -- well, we can get the time straight.  Before

9    June 8th, 2007, were you a member of BGF in prison?

10   A    Yeah.

11   Q    Were you recruited in prison or are you talking about the

12   conversion that we were talking about?

13   A    No, talking about the conversion of it.  Back in 2007

14   from June, once I got locked up, I wasn't a BGF member no

15   more.

16   Q    So you went through your prison time, you said a good

17   portion of your adult life, and you never were approached to

18   become a member of BGF?

19   A    No.

20   Q    Nobody tried to shake you down?

21   A    No.

22   Q    Nobody tried to extort taxes from you?

23   A    Never.

24   Q    Nobody bothered you?

25   A    Not during that time except for when I made testimony of

1    me getting locked up in June.

2    Q    Nobody asked you to come over to the BGF side?

3    A    No.

4    Q    Were you a member of any other gang?

5    A    Yes.

6    Q    What was the name of that gang?

7    A    YGF.

8    Q    Okay.  YGF, that was in the prison system?

9    A    That wasn't in the prison system.

10   Q    That was on the street.

11   A    There you go.

12   Q    After you moved to Greenmount in 2005?

13   A    It started in 2005.

14   Q    You got arrested June 8th, 2007 and you've already

15   testified and we're going to skip over all this.  And you had

16   some federal charges brought against you and you signed a

17   cooperation deal; is that correct?

18   A    I didn't sign a cooperation deal until after I was

19   getting sentenced.

20   Q    And you did that?

21   A    Yes.  Once I got sentenced, they took my plea.

22   Q    Okay.  And there came a time when you had Judge Quarles

23   in this courthouse; correct?

24   A    Yes, I did.

25   Q    And Judge Quarles -- you were represented by counsel?

Cross-examination - Meadows (By Mr. Bussard)

1    A    I sure was.

2    Q    And Judge Quarles gave you a sentence; is that right?

3    A    Sure did.

4    Q    And you went to the Bureau of Prisons?

5    A    I sure did.

6    Q    Okay.  Some point you got released; is that right?

7    A    Right.

8    Q    And part of Judge Quarles's order was that you had to be

9    on supervised release; is that correct?

10   A    Correct.

11   Q    And you also had to attend a drug program; is that

12   correct?

13   A    Yup.  Yes.

14   Q    Did you go?

15   A    Yes.  Did I complete it or did I keep going?

16   Q    Did you -- when you were released -- trying to go in a

17   straight line here.  When you got released from the Bureau of

18   Prisons, you came home; correct?

19   A    Correct.

20   Q    And Judge Quarles had ordered you to go to a drug

21   treatment program as part of your supervised release;

22   correct?

23   A    Uh-huh.

24   Q    Did you go to your supervised release?

25   A    Did I go?  Yes.

Cross-examination – Meadows (By Mr. Bussard)

1    Q    Did you report?

2    A    Yes, I did.

3    Q    Did you walk away from it?

4    A    As far as like, walk away how?

5    Q    Did you walk away --

6    A    Explain.

7    Q    -- from the drug program after you went in?

8    A    No.  I went a few times before I decided -- couple months

9    later I decide to stop going.

10   Q    Did you get violated for not attending?

11   A    No.  I got violated for catching a new charge.  But as

12   the violation came up, that was one of the violations, but

13   that ain't what violated me getting locked up.

14         MR. BUSSARD:  Court's indulgence for a brief moment.

15   Q    (BY MR. BUSSARD)  Mr. Meadows, you remember appearing

16   before Judge Quarles on February 11th, 2011?  I'll be happy to

17   show you something to see if it refreshes --

18   A    When I got sentenced, that's when I got sentenced to the

19   ten months.  Yup.

20   Q    Do you recall what the -- that was for a violation of

21   supervised release; is that correct?

22   A    Correct.  Because I caught a new charge.

23   Q    Do you -- did you also violate some other rules?

24   A    It was other rules I violated, yes.  But that's not what

25   got me locked up with them.

 1              MR. BUSSARD:  Marking this as Kenneth Jones No. 1, I
 2    believe.  Showing you what's been marked as --
 3              THE COURT:  Wait a minute.
 4              MR. MARTINEZ:  Can we see it?  May we approach?
 5              THE COURT:  Yes.
 6              (Bench conference on the record.)
 7              THE COURT:  All right.  On the assumption,
 8    Mr. Bussard, that you're offering this as extrinsic evidence
 9    in support of your effort to impeach by prior inconsistent
10    statement and this is not in the nature of prior testimony but
11    is an independent court record -- first of all, am I right so
12    far in terms of what your intention is?  My question is,
13    where's the inconsistency?  It's got to be inconsistent in
14    order for it to be admissible.
15              The Judgment and Commitment Order in front of me,
16    which is marked as Kenneth Jones Exhibit No. 1 and also as
17    Document No. 55 from case number WDQ-07-0462 in this court,
18    this judgment indicates the defendant is found in violation of
19    supervised release on the following grounds:  Failure to
20    submit monthly reports, failure to report for drug treatment,
21    failure to notify the USPO of change of address, and failure
22    to notify USPO of his new arrest on 11/3/2010.  What I've
23    heard the witness say so far is that it was -- he's insisting
24    that he really was in trouble for the fact for, quote,
25    "catching a new charge," which would seem to be consistent

1    with this provision, failure to notify USPO of his new arrest.

2              Then he also, with some reluctance, but you got out

3    of him, oh, it was also for violating some other rules.  That

4    would seem to be consistent with the first three accusations

5    against him.  What's your theory on admissibility of the

6    document in light of that?

7              MR. BUSSARD:  Your Honor, I think I can explore --

8    he's only right on one of three, where he has denied that he

9    failed to report to a drug treatment program.  I have another

10   document, Judge Grimm's initial order of detention, which says

11   that he detained him in light of the fact that the allegations

12   were that he failed to attend --

13             THE COURT:  I don't really see any inconsistency

14   based on the testimony he's given.  I agree that it's somewhat

15   muddled.  I'll let you take one more crack at him by leading

16   him through what he is -- what he was found to -- the bases

17   for the violation, with you taking it right from the Judgment

18   and Commitment order.  And we'll see if there's an

19   inconsistency, but I haven't really heard one yet.

20             MR. MARTINEZ:  Where is the statement in the

21   Judgment and Commitment order, even if we get there?  And I

22   think with respect to the drug treatment, I think he did

23   say -- he said he didn't walk away, but then he said, "I

24   decided to stop going."  Which -- so to the extent this would

25   be coming in to show that -- he's already admitted he didn't

1    keep going to drug treatment.  So I don't think that there's

2    impeachment that needs to be done with respect to that.  But

3    even if we get to the point where Mr. Bussard thinks there's

4    something that needs to be impeached, how is it the J and C --

5              THE COURT:  Technically, you're right, you don't

6    have the right document.  What you need is the transcript of

7    the violation hearing where he admits.  That would be the

8    actual statement as opposed to the J and C.  I think that

9    that's a fair point.

10             MR. BUSSARD:  I'll have to order and we'll have to

11   recall him.

12             MR. MARTINEZ:  It's too late in the day for that.

13             THE COURT:  Well, let's see where we go.  Why don't

14   we proceed in the way that the Court has suggested and see

15   where we go.

16             (The following proceedings were had in open court.)

17   Q    (BY MR. BUSSARD)  Mr. Meadows, in fact, on January 20th,

18   were you brought before U.S. Magistrate Judge Paul Grimm for a

19   detention hearing.

20             MR. MARTINEZ:  Objection.

21   A    I don't remember --

22             THE COURT:  Sustained.  I thought we were going with

23   the judgment.

24   Q    (BY MR. BUSSARD)  Mr. Meadows, you've indicated that you

25   were violated for your supervised release because you had a

Cross-examination - Meadows (By Mr. Bussard)

1   new arrest and forgot -- or failed to notify your U.S.

2   probation officer?

3   A     Correct.

4   Q     Did you also fail to do monthly reports as required to

5   do?

6   A     No, I just didn't report to Gaudenzia house.  I still

7   went and reported to see my PO and still did urinalysis.

8   Q     Did you also fail to notify your U.S. probation officer

9   of a change of address?

10  A     No, because the address was still the same.  They just

11  never had that address on file.

12  Q     So is it your testimony that you admitted guilt to things

13  that you didn't do?

14  A     No.  I admitted that I was guilty on my offenses that I

15  pled guilty to.  They was doing the violations that they had

16  online, but that's not what I got found guilty on the

17  violations.

18  Q     What was the sentence imposed by Judge Quarles?

19  A     I don't remember what the sentence was.  It was only ten

20  months, though.

21  Q     In the Bureau of Prisons again?

22  A     It was additional off my -- off of the original bit that

23  I had.  I had ten years and still had to come home with two

24  years probation after the ten months, I mean.

25  Q     You met Kenny in 2005, thereabout?

1   A    Right.

2   Q    You didn't know him until you moved to the neighborhood;

3   right?

4   A    Correct.

5   Q    You became friends?

6   A    Associates.

7   Q    So you socialized with him?

8   A    Correct.

9   Q    Had some drinks?

10  A    We all drank.

11  Q    Okay.  Did he bring you over to his house sometimes?

12  A    Yes.

13  Q    You lived across the street; right?

14  A    Yeah.

15  Q    Did you ever have him over at your house?

16  A    Yeah, he been in my house.

17  Q    You know what school Kenny attended?

18  A    If I met him in 2005, I don't know nothing past that.  So

19  he wasn't in school when I met him.

20  Q    And you didn't talk about past life?

21  A    What you talk about past life when you just meet

22  somebody?  No.

23  Q    2005, Kenny was how old, 17?

24  A    17, 18.

25  Q    You were 24?

1    A    Possible, yeah.

2    Q    Two young men don't talk about what schools they go to,

3    didn't talk about the women, didn't talk about girlfriends?

4    A    That age this time when we was out there, no, we didn't

5    talk about school.  Only thing we talked about was having sex,

6    getting high, and getting money.  School wasn't in the

7    equation.  I was out of school.  He wasn't going to school.

8    He was already out of school.

9    Q    You talked about Don and do you know Don's last name?

10   A    No.  I just know a first name.

11   Q    Was he a close friend of yours?

12   A    Not close friend, but he was close.

13   Q    Based on your experience with the YGF, didn't have too

14   many rules, I think you said; right?

15   A    Correct.

16   Q    Didn't have much structure?

17   A    Correct.

18   Q    Just a bunch of kids that all grew up in the

19   neighborhood?

20   A    For the most part.

21   Q    And you were a little bit of an outsider, but you were

22   let into the group?

23   A    Because I had relatives that lived in the neighborhood

24   and I used to be around there years prior to that.

25   Q    So they were somewhat vouching for you, I guess, they

Cross-examination - Meadows (By Mr. Bussard)

1    were saying you were okay.  If they had a decent reputation in

2    the neighborhood, you got one because you were a relation;

3    correct?

4    A    I guess if that's how you look at it.

5    Q    All right.  YGF actually had -- they wanted to try to

6    help some people, didn't they?

7    A    What you mean by that?

8    Q    Did they ever want to, you know, try to make the

9    neighborhood better?

10    A    That was the discussion before we came into YGF.  When we

11    first brought to our attention, that's what we discussed or

12    how we was going to do the neighborhood.

13    Q    At some point things changed?

14    A    Yes.

15    Q    It changed because of this guy?

16    A    No.

17    Q    No?

18    A    It changed because of the whole community, not because of

19    one person.

20              THE COURT:  For the record, the exhibit you're

21    displaying is?

22              MR. BUSSARD:  Government's PHI 45.

23              THE COURT:  Thank you.

24    Q    (BY MR. BUSSARD)  And this is David Hunter; correct?

25    A    Correct.

Cross-examination - Meadows (By Mr. Bussard)

1    Q    And this is the same David Hunter that you talked about

2    sitting on the steps with two young women and two guys ran by;

3    right?

4    A    He wasn't sitting on the steps, I was.

5    Q    You were sitting on the steps; correct?

6    A    Correct.

7    Q    Two guys ran by?

8    A    It wasn't two guys when that happened.  At the

9    incident -- I was sitting on the steps with two females when a

10   shooting happened.  When the two guys ran by, it wasn't

11   sitting on no steps.

12   Q    And eventually, Mr. Hunter, Government's Exhibit PHI 45,

13   was the one that comes into possession of that firearm; is

14   that correct?

15   A    No.  He already had a possession of a gun on him.

16   Q    He had -- that was a different gun than the one that was

17   on the seat --

18   A    Correct.

19   Q    -- of the car; is that correct?

20   A    Correct.

21   Q    Now, you said somebody came along and they wanted to get

22   that back?

23   A    The same person that was running with the other dude

24   Chevy.

25   Q    Was that a name --

1    A    I said -- yes, it was a name.  Chevy was one of the

2    dudes, but the other dude that came back, I didn't remember

3    his name.

4    Q    And Mr. Hunter stood up to him?

5    A    He came around -- stood up how?

6    Q    Well, said no.  He said no, I'm not going to give you the

7    gun back.  Is that what Mr. Hunter did?

8    A    You say that.

9    Q    And then he pulled a gun out, scared them away; right?

10   A    He killed him.

11   Q    Okay.  Mr. Hunter killed him?

12   A    That's not a scaring a person when you kill them.  It's a

13   difference.

14   Q    All right.  Just asking you what Mr. Hunter did.

15   A    Right.  And I told you, gave you an answer.

16   Q    Talk about the Craig Mack murder.  You've been in that

17   house numerous times, 221 East 25th Street?

18   A    Yeah.

19   Q    How many floors did that house have?

20   A    I don't remember, probably three.  Basement, first floor,

21   top floor.

22   Q    Have you been on all three floors?

23   A    I don't remember.  It's been over ten years, can't recall

24   if I did or not.

25   Q    It was kind of a boarding house, wasn't it?  Rooming

Cross-examination - Meadows (By Mr. Bussard)

1    house?  Other people lived there; correct?

2    A    It's a drug house, of course people want to live there.

3    When you got druggies, people that get high, or people that

4    you have using for testers, of course you're going to have

5    them living with you.

6    Q    And do you recall testifying at some point and telling

7    the Court back in May 27th, where the murder took place?

8    A    No, I don't remember.

9    Q    In fact, that's your exact words.  You don't remember

10   testifying, you don't remember the words?

11   A    No, I don't remember the words that you just said.

12   Q    You don't know where the murder happened in that house?

13   A    No, that ain't what you just said.

14   Q    I'm asking you if you testified on May 27th, 2016.

15   A    You said May 27th, you didn't give a year.

16   Q    2016.

17   A    Okay.

18   Q    Kenny's trial.

19   A    Yes, I did testify in there.

20   Q    Okay.  And you were asked a question, where did Kenny say

21   the murder took place in Geezy's house, do you recall what

22   your answer is?

23   A    I don't recall what my answer was, no.

24        MR. BUSSARD:  Court's indulgence for a brief moment.

25   Q    (BY MR. BUSSARD)  Is there a document that you believe

Cross-examination - Meadows (By Mr. Bussard)

1    may refresh your memory of what your response was?

2    A    No, it would not.

3    Q    No document would refresh your memory?

4    A    I don't recall what I would have wrote on there.

5    Q    Do you remember being asked that same time, how many

6    people did Kenny tell you were present at the murder?

7    A    Can't recall it.

8    Q    Do you recall talking to the detectives later on about

9    that, the details of that murder?

10   A    I can't recall it.  I remember talking them, but I don't

11   remember a date or what was said.

12   Q    So you met with the detectives on June 11th, 2007,

13   January 23rd, 2008, and October 25th, 2013.  Does that sound

14   about right?

15   A    I don't remember when the next time they came and talked

16   to me after 2008.  I know it was a couple times after that,

17   after I had came home.

18   Q    You mentioned a person named Foo; correct?

19   A    Correct.

20   Q    Do you know his real name?

21   A    No.

22   Q    Showing you Government's Exhibit PHA 3, which has been

23   admitted into evidence.  And I think you identified this

24   person in the upper right-hand corner as Foo; is that

25   correct?

1    A    Correct.

2    Q    What happened to Foo?

3    A    He was murdered.

4    Q    Who murdered him?

5    A    I can't recall.

6    Q    Anybody tell you they murdered him?

7    A    Can't -- yeah, somebody did tell me.

8    Q    Yeah, who's that?  Name Bubba sounds familiar?

9          THE COURT:  Who told him or who did the murder?

10          MR. BUSSARD:  Who told him that they had killed Foo.

11          MR. MARTINEZ:  Objection, Your Honor.  Well beyond

12    the scope of direct examination at this point.

13          THE COURT:  Overruled.  I'm unclear on the question.

14    Restate the question.

15    Q    (BY MR. BUSSARD)  Mr. Meadows, did you have a

16    conversation with a person who admitted that they had killed

17    Foo?

18    A    Yes.

19    Q    And who is that person?

20    A    Bubba.

21    Q    And that's the same Bubba that you talked about when you

22    were answering Mr. Martinez's questions; is that correct?

23    A    Correct.

24    Q    And Bubba, I believe your testimony was and correct me if

25    I'm wrong, Bubba said that Foo had shot him; correct?

1    A    Correct.

2    Q    And that Kenny was somewhere, he was nearby; right?

3    A    He was standing next to him.

4    Q    But Foo is the one that shot him, that's what Bubba told

5    you; right?

6    A    Correct.

7    Q    January 11th, 2007, do you recall mentioning the name Don

8    during your discussion with Mr. Lloyd?  It was the first

9    conversation you had with Detective Lloyd.

10            MR. MARTINEZ:  Your Honor, we're unclear on the

11    dates.  You said --

12            MR. BUSSARD:  I'm sorry, June 11th, 2007.

13            THE COURT:  Rephrase your question.

14    June 11th, 2007.  Go ahead, Mr. Bussard.

15    Q    (BY MR. BUSSARD)  Did you have a meeting with

16    Detective Lloyd on that date?

17    A    In June?

18    Q    June 11th, 2007.

19    A    Yes.

20    Q    That's your first meeting with Detective Lloyd.

21    A    I don't know if it's the first meeting, but I know it's

22    in June.

23    Q    Do you recall then mentioning the name Don?

24    A    Yes.

25    Q    Do you recall mentioning that Don was involved in some

Cross-examination – Meadows (By Mr. Bussard)

 1   manner of the -- with the murder -- a murder of Craig Mack?

 2   A    I don't think I mentioned it right then and then, but I

 3   mentioned his name to him about --

 4   Q    Was it mentioning -- try to speed this up, was it

 5   mentioning Don because you believed that he may have been

 6   Kenny's cousin?

 7   A    No, I mentioned him because he was there.  But I didn't

 8   mention him as far as him to play into the murder.

 9   Q    So at your first meeting you put Kenny and Mr. Pace;

10   correct?

11   A    Correct.

12   Q    Don had nothing to do with it; correct?

13   A    I never said Don didn't have nothing to do with it.  I

14   just put Kenny and Foo name in it.

15   Q    And then about six months later on January 23rd, 2008 --

16          MR. MARTINEZ:  Objection, I think that's another --

17          MR. BUSSARD:  January 23rd --

18          MR. MARTINEZ:  I'm sorry, you're right.

19          THE COURT:  Overruled.  Go ahead.

20   Q    (BY MR. BUSSARD)  January 23rd, 2008, did you mention

21   that Don was now the third person involved in the murder of

22   Craig Mack?

23   A    Yeah.

24   Q    Okay.  Did something happen between June 11, 2007 and

25   January 23rd, 2008 that caused you to want to add Don's name

 1    to this --

 2    A    Yeah, because at the time I didn't remember.  And I

 3    reached out to them and I told them, hey, I wasn't truthful

 4    all the way.  I forgot to tell you the other person that was

 5    there.  So they brought me back out on a writ.  And when they

 6    brought me back out on a writ, that's when I did the

 7    statement.  To let them know, to clear it up that he was the

 8    third person that was there.

 9    Q    Mr. Meadows, you're aware the first interview you did on

10    June 11th, 2007 was recorded; is that correct?

11    A    Correct.

12    Q    Okay.  Are you also aware that the January 23rd, 2008

13    meeting with you and Detective Lloyd was also recorded?

14    A    Correct.

15    Q    Is it your understanding that that recording has now been

16    lost?

17    A    I'm --

18            MR. MARTINEZ:  Objection.

19            THE WITNESS:  I don't know nothing about that.

20            THE COURT:  Basis.

21            MR. MARTINEZ:  How is he in a position to know?

22            THE COURT:  Well, I think he just answered in that

23    manner.  The process actually works.  Keep going.

24    Q    (BY MR. BUSSARD)  Have you ever been shown the recordings

25    of your interviews with Detective Lloyd or any other law

1    enforcement?

2    A    No.

3    Q    Have you been shown any documents that you were shown

4    during those three meetings with law enforcement at a later

5    time?

6    A    No, except for during the trial procedures.  Other than

7    that, I can't recall or remember.

8    Q    Do you have any tattoos, Mr. Meadows?

9    A    Yes, I do.

10   Q    Do you have any BGF tattoos?

11   A    None.

12         MR. BUSSARD:  I don't have any other questions.

13         THE COURT:  Mr. Francomano.

14         MR. FRANCOMANO:  Thank you, Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. FRANCOMANO:

17   Q    Mr. Meadows, do you know that Mr. McCants was 12 years

18   old in 2005?

19   A    Back then, no.  It's a lot of people that hung around us,

20   even younger ones.  We didn't know as far as their age wise.

21   We knew they was younger than us.

22   Q    Okay.  So you were 24 and he was 12, that's 12 years

23   difference; correct?

24   A    Okay.

25   Q    Is that correct?

Cross-examination – Meadows (By Mr. Francomano)

1    A    If you say if I was 24 and he's 12, yes.

2    Q    Okay.  So there are 24-year-old men in a gang with

3    12-year-old boys?

4    A    Didn't say he was in a gang at 12 years old.

5    Q    Okay.  So he's not part of YGF?

6    A    You had the younger kids that's around his age at the

7    time that ran around as the younger YGF,

8    Young Guerilla Family.

9    Q    Okay.  But weren't --

10   A    They looked up after us.  Over a year or two, they still

11   followed in our footsteps and they knew -- they did everything

12   we did as YGF because YGF we didn't have paperwork.  We didn't

13   have none of that.  So if you was in the neighborhood and you

14   was hanging around us, you was YGF.  You was a younger version

15   of people that was in our circle.  You didn't get paperwork or

16   didn't get approved or none of that until you crossed over.

17   Q    So YGF is not even an organization, it's just a bunch of

18   people hanging out?

19   A    YGF was the gang that we started in the neighborhood.

20   Q    That's my question, Mr. Meadows.

21   A    That wasn't the question you just asked.

22   Q    Here's my question:  Were 12-year-olds in the gang YGF?

23   A    Yes.

24   Q    Okay.  And 24-year-olds were in that gang as well?

25   A    Yes.

Cross-examination - Meadows (By Mr. Francomano)

1   Q    And 24-year-olds hung out with 12-year-olds; correct?

2   A    Yes.

3   Q    But you hesitated.

4   A    No, I said yes.  No hesitation.

5   Q    How old is Creed?

6   A    Creed probably --

7        THE COURT:  When, now?

8   Q    (BY MR. FRANCOMANO)  No, how old is Creed in 2005?

9   A    2005, that I wouldn't know.

10  Q    How old would he be now?

11  A    Somewhere probably in his late 20s, early 30s.

12  Q    So 12 years ago he would be in his late teens, 18?

13  A    That I don't know.

14  Q    So you said at some point Creed went out on an e-pill

15  robbery; correct?

16  A    Not an e-pill robbery, they went and robbed an e-pill

17  connect.

18  Q    They robbed an e-pill connect.  So that's different than

19  an e-pill robbery?

20  A    E-pill robbery is saying like you going out there to rob

21  somebody standing on the corner selling e-pills.  That's an

22  e-pill robbery.  When you go rob a connect that's selling

23  them, that's something totally different.

24  Q    So you're saying that an 18-year-old went out with a

25  12-year-old to commit a robbery; correct?

Cross-examination – Meadows (By Mr. Francomano)

1    A    Back then there's a lot of people going out doing

2    robberies, younger, age don't matter back then.

3    Q    What middle school did Mr. McCants go to?

4    A    I don't know what middle school he went to.  I don't know

5    a lot of middle schools or high schools they went to.

6    Q    Do you know his mother's name?

7    A    No.  I didn't know his family.  I only know the people

8    that dealt with us that was in the circle.  He hung around us

9    every day.

10   Q    Do you know where he lived?

11   A    No, I know where he be at.

12   Q    Okay.  Did you ever talk to him?

13   A    Every now and then.  Not holding a conversation because

14   he wasn't a person that I held a conversation with.

15   Q    So you didn't know if he had a girlfriend back then?

16   A    He had a little girlfriend that ran around with him.

17   That, I wouldn't know her name.  There was always a little

18   brown-skinned chick that used to be around him.  And she had a

19   little cousin.

20   Q    Back in April of 2016, April 27th, 2016, you had a

21   meeting with the government, do you remember that?

22   A    No, I don't.

23          MR. FRANCOMANO:  Your Honor, if I could approach.

24   Marking this as identification, 1A.

25          MR. MARTINEZ:  Can we approach?

1          THE COURT:  Are we refreshing his recollection?

2          MR. FRANCOMANO:  Yes, Your Honor.

3          MR. MARTINEZ:  He hasn't asked him whether a

4    document -- can we approach?

5          THE COURT:  Mr. Francomano.

6    Q    (BY MR. FRANCOMANO)  What I'm identifying as

7    identification only 1A, would that help to refresh your

8    recollection?

9    A    Recollection on what?

10   Q    Whether or not you had a meeting --

11   A    I'm not saying I didn't have a meeting.  I just don't

12   remember what month or what day it was.  I know I had a

13   meeting sometime around that time last, what, 2016, just don't

14   know what month or day.

15   Q    What I'm going to do is, if I approach and show you this

16   identification only document, 1A, would that help to refresh

17   your recollection?

18   A    No, because I met with them several times after that.  So

19   I wouldn't know per se that, oh, I can recall this.

20   Q    Okay.  Do you remember what you said to them on that

21   date?

22   A    No, I don't.  Because I --

23   Q    Do you recall --

24   A    -- I said a few things to them on different days and

25   different occasions.  So I can't per se to say, hey, I

Cross-examination - Meadows (By Mr. Francomano)

1    remember this day per se.

2    Q    Do you remember talking about the YGF on that day?

3    A    We talked about YGF on a lot of cases.

4    Q    Do you remember talking about the members of YGF?

5    A    We talked about them on several occasions.

6    Q    Do you remember talking about Mr. Johnson on that day?

7    A    Talked about him on every occasions.

8    Q    Do you remember talking about Roscoe?

9    A    Same thing.

10   Q    Do you remember talking about Mr. Hunter on that day?

11   A    Same thing.

12   Q    Do you remember talking about Slay on that day?

13   A    Same thing.

14   Q    Do you remember talking about Joe Bonds on that day?

15   A    Sure did.

16   Q    Do you remember talking about Terrell Bonds on that

17   day?

18   A    Sure did.

19   Q    Do you remember talking about Byron Bonds?

20   A    Not too much about Byron Bonds, but --

21   Q    Ever talk about Donatello Fenner?

22   A    A few times.  I don't know if it was that day, though.

23   Q    Ever talk about Bigs?

24   A    Not on that day, I don't think I did.

25   Q    If I showed you this document, would that help you to

1   refresh your recollection?

2   A    No, because I talked about him previous, before then.

3   Q    Do you remember talking about Black?

4   A    Yes.

5   Q    Do you remember talking about Creed?

6   A    Yes.

7   Q    Do you remember talking about Bubba?

8   A    Possible.

9   Q    If I showed you this document, would that help refresh

10  your recollection?

11  A    Again, no, it would not.

12  Q    Do you remember talking about Little James?

13  A    Yeah.

14  Q    Remember talking about Porky?

15  A    Yeah.

16  Q    Do you remember talking about Fats?

17  A    Yeah.

18  Q    Do you remember talking about Ace?

19  A    In 2016, no.

20  Q    If I showed you this document --

21  A    That still won't, no.

22  Q    Do you remember talking about Eric Tate?

23  A    Yeah.

24  Q    Do you remember talking about Jesse Tate?

25  A    Yeah.

Cross-examination - Meadows (By Mr. Francomano)

1    Q    Do you remember talking about Nut?

2    A    Yeah.

3    Q    Do you remember talking about Roscoe?

4    A    You already asked that.

5    Q    Do you remember talking about Slim?

6    A    Yeah.

7    Q    These are all members of YGF; right?

8    A    Yeah.

9    Q    Do you remember not talking about Mr. McCants?

10   A    Mr. McCants, no.

11   Q    So you didn't talk about him; correct?

12   A    Not on that probably, particular day.

13   Q    Now, there was another time you met, August 17th, 2016.

14   You met with the government that day as well; correct?

15   A    Possible, I don't recall what day it was.

16   Q    Would McCants 1B help to refresh that recollection?

17   A    No, it would not.

18   Q    Do you remember talking about Porky that day?

19   A    It's possible.

20   Q    Would this document help to refresh your recollection?

21   A    No, it would not.

22   Q    Do you remember talking about Geezy that day?

23   A    Talked about him all the time on cases.

24   Q    Do you remember talking about Fats?

25   A    Yeah.

Cross-examination – Meadows (By Mr. Francomano)

1   Q    Do you remember talking about Hunter?

2   A    Possibly.

3   Q    Would this document help to refresh your recollection?

4   A    No, it would not.

5   Q    Do you remember talking about Slay?

6   A    Yeah.

7   Q    Do you remember talking about Will?

8   A    Who?

9   Q    Will.

10  A    Yeah.

11  Q    What about Roscoe?

12  A    You just asked me that.

13  Q    What about Murda?

14  A    Yeah.

15  Q    What about Joe Bonds?

16  A    Yeah.

17  Q    What about B-time?

18  A    Yeah.

19  Q    You remember talking about all them as YGF; correct?

20  A    Correct.

21  Q    But you don't remember talking about Mr. McCants that

22  day; right?

23  A    His name wasn't brought up.  And he wasn't -- and he was

24  younger at the time when I was out there.  So the questions

25  that was asked to me at the time about YGF members was when I

1    was active out there around that time.  He was still a

2    juvenile running around doing juvenile stuff.  He was still a

3    member, but he didn't interact and do the things we was doing,

4    but he still sold drugs.

5    Q    You didn't bring his name up; correct?

6    A    I just answered that.

7    Q    I don't think you did, but can you answer --

8    A    I did just answer you.

9    Q    Did you bring his name up at that meeting?

10   A    No.

11   Q    There came a time when you actually testified on

12   September 25th, 2015 in a trial, do you remember that?

13   A    No, I don't, but I remember testifying in trial, though.

14   I don't remember what trial you're talking about.

15   Q    I apologize, I didn't mean to talk over you.  Do you

16   remember testifying in Mr. Johnson's trial?

17   A    Correct.

18   Q    And you testified you were there at the beginning of YGF,

19   do you remember that?

20   A    Correct.

21   Q    And you remember when they asked you, are there any other

22   members of YGF, what are their names, do you remember that?

23   A    Correct.

24   Q    Do you remember saying Hunter?

25   A    Uh-huh.

1    Q    Do you remember saying Slay, do you remember that?

2    A    Yeah, I remember.

3    Q    I'm sorry, I didn't hear you.

4    A    I said yes.

5    Q    Do you remember saying Joe?

6    A    Yeah.

7    Q    Do you remember saying Geezy?

8    A    Uh-huh.

9    Q    Do you remember saying Fennell?

10   A    Yes.

11   Q    You remember saying yourself; correct?

12   A    Correct.

13   Q    And then you were asked, do you remember anybody else;

14   right?  Do you remember that?

15   A    Correct.

16   Q    And you said Nigel.

17   A    Uh-huh.

18   Q    So in that testimony, you never said anything about

19   Mr. McCants again; correct?

20   A    Okay.

21   Q    Correct?

22   A    Correct.

23   Q    Then again you testified May of -- May 27th, 2016, do you

24   remember that?

25   A    No, I don't.

Redirect Examination - Meadows (By Mr. Martinez)

1    Q    Do you remember testifying in Mr. Jones's trial?

2    A    Yeah, I remember testifying in his case.

3    Q    All right.  Once again, in that trial you testified in

4    2006, 2007 -- or 2006, you were a member of YGF; correct?

5    A    Correct.

6    Q    Then you were asked the individuals that transitioned

7    from YGF to BGF, do you remember doing that?

8    A    Yes.

9    Q    People you said were Joe?

10   A    Uh-huh.

11   Q    Geezy?

12   A    Uh-huh.

13   Q    Diaz?

14   A    Uh-huh.

15   Q    But you never said Mr. McCants, did you?

16   A    Mr. McCants was a YGF, but didn't transfer over to BGF

17   with us because he was still juvenile.  So at that time only

18   people that was active that transferred was the ones that was

19   out there, even with Miguel being his age, he was out there

20   with us more than anybody --

21            MR. FRANCOMANO:  I have no further questions.

22   A    -- that was his age.

23            MR. FRANCOMANO:  I have no further questions.

24            THE COURT:  Redirect.

25                    REDIRECT EXAMINATION

Redirect Examination – Meadows (By Mr. Martinez)

1    BY MR. MARTINEZ:

2    Q    Mr. Meadows, when you participated in proffers or

3    interviews with the government, did you give every piece of

4    information you had or did you just answer the questions that

5    were asked of you?

6    A    Just answered the questions that they asked me at the

7    time.

8            MR. MARTINEZ:  I've got nothing further, Your

9    Honor.

10           THE COURT:  May the witness be excused?

11           MR. ENZINNA:  Yes, Your Honor.

12           MR. FRANCOMANO:  Yes, Your Honor.

13           THE COURT:  You're excused, Mr. Meadows.  You may

14   depart.  I'll see counsel.

15           (Bench conference on the record.)

16           THE COURT:  Ms. Powell indicated that you have some

17   kind of a witness problem.

18           MR. MARTINEZ:  We do.  So we're trying to make

19   contingency plans for today because we were afraid we wouldn't

20   have law enforcement witnesses.  We made a call to a civilian

21   witness, Ms. Lillian Beverly, who's a victim of a violent

22   crime -- or witness to a violent crime.  And she is one of the

23   people who had security concerns about testifying, so she has

24   brought her husband here with her.  He's a naval officer and

25   taken the day off work and they have their child with them.

```
 1    So there's actually people planning to watch their child while

 2    she testifies.  I think she's going to be relatively --

 3    Ms. Hoffman's witness.  How long do you think for direct?

 4              MS. HOFFMAN:  10, 15 minutes.

 5              THE COURT:  We'll double that, half an hour.

 6              MR. FRANCOMANO:  I think she's probably correct.

 7    She'll be 10 minutes.

 8              THE COURT:  You think it's going to be very short?

 9              MR. FRANCOMANO:  I think -- my cross will be 5, if

10    that.

11              THE COURT:  Will you have any cross?

12              MR. BUSSARD:  No.

13              THE COURT:  Will you?

14              MR. ENZINNA:  No.

15              THE COURT:  Let's do it.

16              MR. MARTINEZ:  Thank you.  I appreciate that,

17    Your Honor.

18              (The following proceedings were had in open court.)

19              THE COURT:  Ladies and gentlemen, we're going to go

20    for another little bit here because of some logistical issues.

21              Government may call their next witness.

22              MS. HOFFMAN:  Government calls

23    Lillian Scott Beverly.

24              THE COURT:  Tell me the name again.

25              MS. HOFFMAN:  It's Lillian Scott Beverly.
```

 1                THE COURT:  Lillian Scott Beverly.

 2                Please come forward, ma'am, all the way to the front

 3      of our courtroom and stand right by this witness box right

 4      there.  Turn and face the court clerk, please.  Right over

 5      here.

 6                THE CLERK:  If you would please raise your right

 7      hand to be placed under oath.

 8                         LILLIAN SCOTT BEVERLY,

 9      called as a witness, being first duly sworn, was examined and

10      testified as follows:

11                THE WITNESS:  Yes.

12                THE CLERK:  Thank you, ma'am.  You may enter the

13      witness box and please watch your step.  And ma'am, if you

14      would sit up and speak directly into the microphone, state

15      your first and last name and spell your first and last name.

16                THE WITNESS:  Lillian Beverly, L-i-l-l-i-a-n,

17      B-e-v-e-r-l-y.

18                THE CLERK:  Thank you, ma'am.

19                THE COURT:  Your witness, ma'am.

20                         DIRECT EXAMINATION

21      BY MS. HOFFMAN:

22      Q    Good afternoon, Ms. Beverly.

23      A    Good afternoon.

24      Q    How old are you?

25      A    22.

Direct Examination – Beverly (By Ms. Hoffman)

1    Q    Did you grow up here in Baltimore, Maryland?

2    A    Yes.

3    Q    Where in Baltimore did you grow up?

4    A    Greenmount Avenue.

5    Q    Are you familiar with the BGF gang?

6    A    Yes.

7    Q    Was there a BGF presence in the neighborhood when you

8    were growing up?

9    A    Yes.

10   Q    Did BGF members use signals to indicate that they were in

11   the gang?

12   A    Yes.

13   Q    Did you become familiar with those signals?

14   A    Yes.

15   Q    How could you tell when someone was in BGF?

16   A    Gang symbols (indicating) and black bandanas.

17   Q    And for the record, you just crossed your arms into an X

18   in front of your body; is that right?

19   A    Yes.

20   Q    And you also mentioned black bandanas?

21   A    Yes.

22   Q    Going to show you Government's Exhibit No. CP 3.  Is this

23   an example of what you're talking about?

24   A    Yes.

25   Q    I'm going to show you page 2 of the same document.  The

Direct Examination - Beverly (By Ms. Hoffman)

1   gentleman wearing the black bandana here, is that also an

2   example of what you're talking about?

3   A    Yes.

4   Q    I'm going to show you page 22 of Government's

5   Exhibit SM 8.  You mentioned crossing your arms into an X in

6   front of your body, is this an example of what you're talking

7   about?

8   A    Yes.

9   Q    I'm showing you page 32 of Government's Exhibit SM 8.  Is

10  this also an example of what you're talking about?

11  A    Yes.

12  Q    Can you name some of the people in the neighborhood who

13  you knew to be in BGF growing up?

14       MR. FRANCOMANO:  Objection, Your Honor.

15       THE COURT:  Foundation?  Overruled.  You may answer,

16  ma'am.

17  A    Marquise, Ronnie, Norman, Wesley, Carrdai.

18  Q    (BY MS. HOFFMAN)  Going to show you Government's

19  Exhibit PHI 56.  Who are we looking at here?

20  A    Marquise.

21  Q    Did he have any street names that he went by?

22  A    Digga.

23  Q    Going to show you Government's Exhibit No. PHI 9.  Who

24  are we looking at here?

25  A    Wesley.

Direct Examination – Beverly (By Ms. Hoffman)

1    Q    I'm going to show you Government's Exhibit No. PHI 38.

2    Who are we looking at here?

3    A    Norman.

4    Q    I want to direct your attention to May 9th of 2008.  Did

5    there come a time when you witnessed a stabbing in the

6    neighborhood?

7    A    Yes.

8    Q    Where were you at the time?

9    A    On my doorstep.

10   Q    And where was that?

11   A    Between 25th and 24th Street on Greenmount Avenue.

12   Q    What time of day was it?

13   A    The evening.

14   Q    How old were you at the time?

15   A    About 12 or 13 years old.

16   Q    Was the victim of the stabbing someone you knew?

17   A    Yes.

18   Q    Who was it?

19   A    A childhood friend.

20   Q    What was his name?

21   A    Jerome Brice.

22   Q    And was Jerome Brice a member of BGF?

23   A    No.

24   Q    Was he a member of a different gang?

25   A    Yes.

Direct Examination – Beverly (By Ms. Hoffman)

1    Q    What gang was that?

2    A    Bloods gang.

3    Q    Was that a rival gang to BGF?

4    A    Yes.

5    Q    Can you tell us what you saw on that evening?

6    A    Jerome left my house.  He was walking down the street.

7    As always, I watched him walk away until he'd get to

8    24th Street and turn left until I can't see him anymore.  But

9    unfortunately, that day he never made it to 24th Street.  He

10   was approached by a group of guys.  One and who I recognize,

11   which is Digga, and he was stabbed in his lung.  That's what I

12   observed that day.

13   Q    Could you see who led that group that attacked Jerome?

14   A    Yes.

15   Q    Who was it?

16   A    Digga.

17   Q    Was Mr. Brice taken to the hospital?

18   A    Yes.

19   Q    And after the assault took place, did you participate in

20   an interview with a detective?

21   A    Yes.

22   Q    And when did that interview take place?

23   A    Shortly after.

24   Q    Did you complete a photo array during that interview?

25   A    Yes.

Direct Examination – Beverly (By Ms. Hoffman)

1    Q    I'm going to show you Government's Exhibit PHA 7.  Do you

2    recognize this document?

3    A    Yes.

4    Q    Did you pick someone out in this photo array?

5    A    Yes.

6    Q    Who did you pick out?

7    A    No. 2.

8    Q    Can you read what you wrote below?

9    A    Photo No. 2 is known to me as Digga.

10   Q    I'm going to turn this sheet over.  Were these

11   instructions read to you before you completed the photo array?

12       Let me ask you this way:  Are those your initials after

13   the instructions at the top?

14   A    Yes.

15   Q    And can you read what you wrote in the comments section

16   below?

17   A    Photo No. 2 shows the person who approached and then

18   attacked Jerome Brice.

19   Q    And is that your signature underneath?

20   A    Yes.

21   Q    Did anyone tell you who to pick out of this photo

22   array?

23   A    No.

24   Q    Did anyone make any threats or promises to induce you to

25   identify someone?

Direct Examination - Beverly (By Ms. Hoffman)

1    A    No.

2    Q    Did you complete the photo array freely and

3    voluntarily?

4    A    Yes.

5    Q    After you witnessed the stabbing, did members of BGF do

6    anything to intimidate you?

7    A    Yes.

8    Q    What happened?

9    A    They kept walking back and forth in front of my house,

10   giving me hard looks.

11   Q    And were those people who you knew to be in BGF based on

12   the signals we talked about before?

13   A    Yes.

14   Q    Did it intimidate you?

15   A    Yes.

16   Q    What was your understanding of what they were trying to

17   do when they did that?

18   A    To tell me to keep my mouth closed.

19   Q    As a result of what happened to you and what you

20   witnessed, did you end up moving out of the neighborhood?

21   A    Yes.

22   Q    Why?

23   A    Because my mother feared for my life.

24        MS. HOFFMAN:  No further questions.

25        THE COURT:  Mr. O'Toole.

Cross-examination - Beverly (By Mr. Francomano)

1          MR. O'TOOLE:  No questions.

2          THE COURT:  Mr. Bussard.

3          MR. BUSSARD:  No questions.  Thank you.

4          THE COURT:  Mr. Francomano.

5          MR. FRANCOMANO:  Yes, Your Honor.

6                    CROSS-EXAMINATION

7   BY MR. FRANCOMANO:

8   Q    Ms. Scott, you gave a taped statement on May 15th, 2008;

9   is that correct?

10  A    I understand and to my knowledge, I gave a statement that

11  day.

12  Q    What is -- I'm not sure what that means.

13  A    What can I make more clear for you?

14  Q    You gave a taped -- do you remember giving a taped

15  statement that day?

16  A    I was told that I was giving -- that I gave a statement

17  that day and that it's on video.  So if you have a recording

18  you would like to play, go ahead.

19          MR. FRANCOMANO:  Actually, I do, Your Honor.  If I

20  could play that recording?

21          THE COURT:  Next question.

22  Q    (BY MR. FRANCOMANO)  The statement you gave on that date

23  that was taped, it was only six days after the incident; is

24  that correct?

25  A    I'm not 100 percent certain as to amount of days, but

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

Cross-examination - Beverly (By Mr. Francomano)

1   afterwards I did give a statement.

2   Q    All right.  It's very clear in your mind?

3   A    Yes, very clear in my mind that I gave a statement.

4   Uh-huh.

5   Q    And you said that Mr. McCants approached Mr. Brice?

6   A    Yes, he did.  How else would they have gotten into an

7   altercation if he didn't approach him?

8   Q    Right.  And that's when you said they started fighting;

9   correct?

10  A    Don't pick at my words.  Let me be as --

11          THE COURT:  Ma'am, just answer the --

12  A    -- clear as possible --

13          THE COURT:  Ma'am, don't interrupt the judge.

14  That's rule No. 1.  Rule No. 2, answer the question and only

15  answer the question.

16          Next question, Mr. Francomano.

17  Q    (BY MR. FRANCOMANO)  That's when you said they started

18  fighting; correct?

19  A    They got into an altercation where Jerome was attacked.

20  Q    Okay.  And you said Eggy jumped in; correct?

21  A    I don't exactly remember thoroughly, as this did take

22  place when I was 13 years old and I am now 22.

23  Q    So you don't even know who threw the first punch?

24  A    It doesn't matter who threw the first punch because I

25  know who stabbed him.  That's what I'm here for.

Cross-examination – Beverly (By Mr. Francomano)

1   Q    But in that taped statement you said you didn't know who

2   stabbed him?

3   A    Okay.

4   Q    Am I correct?

5   A    You're incorrect.

6   Q    In that taped statement you're saying that you said you

7   knew who stabbed him; is that --

8   A    Okay.

9   Q    Can you answer my question?

10  A    Can you be as specific and clear as possible, can you not

11  try to trick me with your words?

12  Q    I'm not trying to trick you.  I'm not trying to trick

13  you.

14          THE COURT:  Ma'am, I'm not going to warn you again.

15  Answer the question that is put to you.  Do not editorialize.

16  Do not supply information beyond what is asked of you.  Only

17  answer the question.  Do you understand me?

18          THE WITNESS:  Yes.

19          THE COURT:  Ask the next question.

20  Q    (BY MR. FRANCOMANO)  You stated in that taped statement

21  you couldn't see because you were too far away.  Is that

22  correct or incorrect?

23  A    I'm not sure.

24  Q    You don't remember saying that?

25  A    I'm not sure.

1    Q    You also said you can't see because -- you couldn't see

2    that good because you were far away at the house; correct?

3    A    I'm not sure.  Although, I do remember not being that far

4    away, less than a block away actually.

5    Q    How far is a block?

6    A    Not that long, as the incident occurred between 24th and

7    25th Street and I live directly in the middle.

8    Q    So from where you're sitting to this wall right here,

9    farther, closer?

10   A    I'm not -- I'm not sure.

11   Q    Would -- if we played the taped statement, would that

12   refresh your recollection as to what you actually said that

13   day?

14   A    I mean, it might --

15              MS. HOFFMAN:  Your Honor, may we approach?

16              THE COURT:  First of all, I haven't heard the answer

17   to the question.

18   A    Can you repeat the question, please?

19   Q    (BY MR. FRANCOMANO)  Sure.  If we were to play the taped

20   statement for you, would that help you to remember what you

21   said that day?

22   A    It may.

23              THE COURT:  Okay.  Are you able to play it?

24              MS. HOFFMAN:  Would --

25              THE COURT:  Mr. Francomano, are you in a position to

 1    play the tape?

 2              MR. FRANCOMANO:  Your Honor, if I could approach?

 3              THE COURT:  All right.

 4              (Bench conference on the record.)

 5              MR. FRANCOMANO:  Your Honor, I talked to

 6    Mr. Martinez and they said they would bring the tape over.  I

 7    didn't know this witness was coming today.

 8              MR. MARTINEZ:  We produced this in discovery.

 9              THE COURT:  Well, wait a minute, that's not what

10    he's saying.  He's saying that he has some informal

11    understanding with you, you would bring the tape over.

12              MR. FRANCOMANO:  I said, do you have the tape, and

13    you said yes, it's at the office, I'll bring it over.

14              MR. MARTINEZ:  I'm sorry, but --

15              MR. FRANCOMANO:  Seriously?

16              MR. MARTINEZ:  I don't have it here.

17              THE COURT:  All right.  Well, how long will it take

18    you to get it?

19              MR. MARTINEZ:  Ten minutes.

20              THE COURT:  Okay.  We're going to have to play it

21    outside the hearing of the jury anyway.  We'll send the jury

22    out.  Call somebody, do whatever you have to do to get the

23    tape over here.  Assuming that that's what you want to do.

24    You've laid the foundation.

25              MR. FRANCOMANO:  I do want to hear the tape.

 1              THE COURT:  Well, it's not that you want to hear it,

 2    the witness is going to hear it outside the hearing of the

 3    jury.

 4              MR. FRANCOMANO:  I'm understand.

 5              MR. MARTINEZ:  Counsel, I'm sorry.

 6              (The following proceedings were had in open court.)

 7              THE COURT:  Ladies and gentlemen, we have to take a

 8    break, but we're not finished for the day.  During this break

 9    do not discuss the case among yourselves.  Don't discuss it

10    with anybody else.  Do not expose yourselves to any media that

11    might touch upon this case or the participants in this

12    proceeding.  Do not conduct any independent investigation with

13    respect to the matters that are before you.  Do not make -- do

14    not have any contact with any of the participants in the

15    trial.  Take the jury out.

16              (Jury left the courtroom.)

17              THE COURT:  Let the record reflect the jury has left

18    the courtroom.  Be seated, please.  Have we got it?

19              MS. HOFFMAN:  We're working on it.

20              THE COURT:  All right.

21              MR. FRANCOMANO:  Your Honor, if I could leave the

22    courtroom for one minute to get my computer.  I may have it.

23              THE COURT:  Yes.

24              (Pause in the proceedings.)

25              THE COURT:  We're back on the record.  I understand

 1    that we're ready to play the tape; is that correct?

 2              MS. HOFFMAN:  We just have to hook up the computer

 3    to the system.

 4              THE COURT:  Play the tape.  About how long is it?

 5              MS. HOFFMAN:  We'll see when it opens up.  I think

 6    it's under 15 minutes.  It's 12 minutes long, but the audio

 7    doesn't seem to be working.

 8              THE COURT:  So we're going to see if we can play it

 9    directly from the computer in front of one of the microphones?

10              MS. HOFFMAN:  We're going to try to plug it into

11    this one here.

12              THE COURT:  Ms. Beverly, can you hear the tape?

13              THE WITNESS:  A little.

14              (Audio played.)

15              THE COURT:  Do you need all of this, Mr. Francomano?

16              MR. FRANCOMANO:  No.

17              THE COURT:  Okay.  Bring the jury back in.

18              (Jury entered the courtroom.)

19              THE COURT:  Be seated, please.

20              Next question, Mr. Francomano.

21    Q    (BY MR. FRANCOMANO)  After you made your taped statement,

22    you didn't meet with the government again until August 2017;

23    correct?

24    A    Yes.

25    Q    Do you remember meeting with them on August 15th, 2017?

1    A    Yes.

2    Q    And you gave them another statement, but that one wasn't

3    taped; right?

4    A    I'm not sure.

5    Q    And they asked you to name some individuals who were BGF;

6    right?

7    A    Yes.

8    Q    All right.  And you said Wesley; correct?

9    A    Yes.

10   Q    You said Ronnie?

11   A    Yes.

12   Q    You said Joshua Carroll?

13   A    Yes.

14   Q    Carrdai?

15   A    Yes.

16   Q    Norman?

17   A    Yup.

18   Q    Montray McNair; is that right?

19   A    Yes.

20   Q    And Shareiff Dupree; correct?

21   A    Yes.

22   Q    But you didn't say Marquise McCants, did you?

23   A    I mean, that was obvious.  I mean, they came to me about

24   him.  So I didn't think it would make sense to say his name

25   again if they already there.  Obviously, they already know

1    that I know him.

2    Q    Right, but they asked you who was in BGF and you didn't

3    say he was?

4    A    Okay.

5    Q    You named all these other people; right?

6    A    Yes.

7    Q    Now, you said in this statement that Brice left the house

8    and started walking down the street; correct?

9    A    Yes.

10   Q    Why didn't you walk with him?

11   A    Because I didn't want to walk with him.

12   Q    Is that the only reason?

13   A    No.  But that's my reason.  I didn't want -- I never

14   walked with him before, so I didn't see a need to walk with

15   him this time.

16   Q    Well, what's the other reason?

17   A    I don't think it's important.

18            THE COURT:  You have to answer, ma'am.

19   A    I was unable to leave the house.

20   Q    (BY MR. FRANCOMANO)  Why?

21   A    Because my mother didn't want me to.

22   Q    Is that the reason why?

23   A    That's another reason why.

24   Q    Well, can you tell us another reason why you couldn't

25   leave the house?

Cross-examination - Beverly (By Mr. Francomano)

1  A    Because I chose not to leave the house.

2  Q    I'm going to show you what's going to be marked as

3  McCants Exhibit, for identification only, 2A.  Will this

4  document help to refresh your recollection?

5           THE COURT:  How does she know?  She hasn't seen it

6  yet.

7           MR. MARTINEZ:  Objection, Your Honor.  May we

8  approach?

9           THE COURT:  First of all, show the document to

10  counsel.  Still have an objection?

11           MR. MARTINEZ:  Yes.

12           (Bench conference on the record.)

13           MS. HOFFMAN:  Your Honor, she was 12 years old --

14           THE COURT:  Hold on a second.  Okay.

15           MR. MARTINEZ:  Your Honor --

16           MS. HOFFMAN:  She was 12 years old when she was

17  arrested for something that she didn't do.  The charges were

18  dropped.

19           MR. MARTINEZ:  She was on house arrest.  And I don't

20  know what interpretation of 609 allows impeachment by that.

21           THE COURT:  First of all, all we're trying to do at

22  this point is refresh her recollection.  So it's showing her

23  the document that's technically in question right now.  I

24  don't see anything improper about showing her the document.

25  It's the next question after that that the government is

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    objecting to, and that is, wasn't it true there that there was

2    some other reason that you were in some kind of trouble or

3    something with the law; is that right?

4        MR. FRANCOMANO:  I'm not going ask her if she's in

5    trouble, why did she have to stay at the house.

6        MS. HOFFMAN:  You're trying to bring out the fact

7    that she was on house arrest for an offense where the charges

8    were dropped.  She was 12 years old.  She was defending

9    herself against an assault.  She doesn't want to talk about it

10   and it's not pertinent.

11       THE COURT:  What is your purpose for trying to bring

12   it out, how does it -- what is it probative of?

13       MR. FRANCOMANO:  Well, where she was that she had to

14   be at the house.

15       THE COURT:  Is there any dispute about whether she

16   was in the house?

17       MR. FRANCOMANO:  If there's not, Your Honor, then

18   I'll withdraw.

19       THE COURT:  Thank you.  It's withdrawn.

20       (The following proceedings were had in open court.)

21       THE COURT:  Next question.

22   Q    (BY MR. FRANCOMANO)  Now, the government asked you if you

23   could identify who was there at the assault; correct?

24   A    Can you repeat that?

25   Q    Yes, you were there at that meeting in August --

1    A    Which meeting?

2    Q    I'm sorry.

3    A    Which meeting?

4    Q    The August 15th, 2017, meeting with the government.

5    A    Okay.

6    Q    Okay.  When you were there, the government asked you who

7    was assaulted and can you identify who assaulted and you said

8    Jerome Brice; right?

9    A    Yes.

10   Q    And you said, yeah, I know Digga was there; correct?

11   A    Yes.

12   Q    And then a follow-up question they asked you, did Digga

13   stab Brice, and you stated, I couldn't be certain; is that

14   correct?

15   A    I'm not sure.

16   Q    Would anything help to refresh your recollection?

17   A    I don't think so.

18   Q    So it's your testimony you don't remember or nothing

19   would help to refresh your recollection?

20   A    Nothing will help me refresh my recollection.

21   Q    So you don't remember saying, "I didn't see with my own

22   eyes"?

23   A    I do not recall.

24   Q    Do you remember saying --

25              THE COURT:  Is your testimony that you don't recall

Cross-examination – Beverly (By Mr. Francomano)

1    what you said in August or you don't recall what you saw the

2    many years ago?

3              THE WITNESS:  I don't recall what I said in

4    August.

5              THE COURT:  Next question.

6    Q    (BY MR. FRANCOMANO)  You don't remember what you said

7    about three months ago; correct?

8    A    Correct.

9    Q    But you remember everything you said back in 2008;

10   correct?

11   A    Some of it.  It has been a long time, you know.

12   Q    But you don't remember what you said three months ago, is

13   my question?

14   A    Some I remember, some I don't.  This is something I

15   really try to put behind me.

16   Q    But today you remember it, but not three months ago?

17   A    Some.

18             MR. FRANCOMANO:  I have no further questions,

19   Your Honor.

20             THE COURT:  Redirect.

21             MR. MARTINEZ:  No redirect.

22             THE COURT:  May the witness be excused, Counsel?

23             MR. BUSSARD:  Yes.

24             THE COURT:  Ma'am, you are excused and you may

25   depart.

1          Ladies and gentlemen, it's time to recess for the

2   day.  During this overnight recess do not discuss the case

3   with anyone.  Do not discuss it with your fellow jurors.  Do

4   not discuss it with any of your friends or family.  Do not

5   allow yourselves to be exposed to any news articles or reports

6   that touch upon the case or the issues it presents or the

7   participates in the trial.  Avoid all contact of any kind with

8   any of the participants in the trial.  Do not make any

9   independent investigation of the law or the facts relevant to

10  the case.  Do not conduct internet searches with respect to

11  the issues presented or the persons participating in the

12  trial.  Do not consult external sources such as encyclopedias

13  or dictionaries in reference to the issues and terms that have

14  been presented to you here.

15          Please return tomorrow in time to start court at

16  9:30.  The jury is excused overnight.  Please take the jury

17  out.

18          (Jury left the courtroom.)

19          THE COURT:  Anything we need to address outside the

20  hearing of the jury, Counsel?

21          MR. MARTINEZ:  Not from us.

22          MR. FRANCOMANO:  No, Your Honor.

23          THE COURT:  Recess for the evening.  The defendants

24  are remanded.

25          (The proceedings were concluded.)

1

2          I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
3     record of proceedings in the above-entitled matter.

4                    _____/s/_____
                      Christine T. Asif
5                    Official Court Reporter

6

7                              INDEX

8     Witness Name                                          Page

9     Detective Jonathan Hayden

10        Direct Examination By Ms. Hoffman......................... 11

11        Cross-examination By Mr. Bussard.......................... 27

12        Cross-examination By Mr. Francomano ...................... 42

13        Redirect Examination By Ms. Hoffman ..................... 45

14    Christopher Meadows

15        Direct Examination By Mr. Martinez ...................... 47

16        Cross-examination By Mr. Enzinna.......................... 115

17        Cross-examination By Mr. Bussard.......................... 152

18        Cross-examination By Mr. Francomano ...................... 187

19        Redirect Examination By Mr. Martinez..................... 198

20    Lillian Scott Beverly

21        Direct Examination By Ms. Hoffman......................... 201

22        Cross-examination By Mr. Francomano ...................... 208

23

24

25

< Dates >
1-23-08 99:24.
11/3/2010. 172:21.
2007, January 23rd,
  2008 182:12.
2016, April 27th,
  2016 190:19.
August 15th, 2017
  214:24, 219:3.
August 17th, 2016
  194:12.
August 2017
  214:21.
December 7th 15:1.
February 4th
  25:11.
January 23rd
  185:16.
January 23rd, '08
  141:7, 142:5,
  142:24.
January 23rd, 2008
  185:14, 185:19,
  185:24, 186:11.
January 4th, 2007
  25:2.
January 9th 25:3,
  155:25.
July 28th, 2011
  37:8.
July 29th, 2011
  16:5.
June '07 121:16.
June 11, 2007
  185:23.
June 14th 25:4.
June 2007 127:16,
  166:24.
June 2013 36:18.
June 3rd, 2013
  25:9.
June 8th, 2007
  165:3, 168:8,
  169:13.
June 8th, 2011
  166:5.
June 8th, 2013
  25:9.
March 23rd, 2013
  37:21.

March 2nd, 2013
  25:5, 25:6.
May 15th, 2008
  208:7.
May 24th, 2016
  14:7.
May 27th 181:6,
  181:14.
May 27th, 2016
  181:13, 197:22.
May 29th, 2013
  37:1.
May 7th, 2013
  25:7.
May 9th 204:3.
November 18, 2013
  12:13.
November 25th, 2011
  37:12.
November 29th
  1:19.
October 25th, 2013
  182:12.
October 5th, 2013
  25:10.
September 25th, 2015
  196:11.
$1,000 63:17.
$100. 68:1.
$2,000 63:5.
$26,000 43:6,
  43:15.
$40 84:5.
$5- 63:23.
$50 84:5.
$500 63:5.
$600 63:23.
$900 63:16.
'05 61:7, 117:12.
'06 116:9, 117:12,
  148:2, 148:3,
  148:4.
'07 61:7, 82:24,
  116:10, 119:1,
  125:12, 126:21,
  140:2, 140:14,
  142:3, 142:19,
  143:2, 143:17,
  147:25, 148:2,
  148:4.

'07. 92:25.
'10 126:8.
'11 126:8.
'13 34:8.
.22 165:10.
.32 72:14, 75:23,
  77:9.
.40 75:21, 77:9.
.
.
< 1 >.
1 171:25, 172:15.
1-800-423-RATS.
  13:17.
1. 34:16, 209:13.
10 26:14, 59:25,
  111:21, 166:19,
  200:3, 200:6.
10,000 67:15,
  68:2.
100 68:2, 208:24.
101 1:48.
10:05 11:4.
10th 13:22, 14:4.
11 14:19, 126:8,
  222:17.
11. 20:4, 62:18.
115 222:29.
11th 126:24, 127:12,
  139:20, 140:2,
  140:14, 142:3,
  142:19, 143:2,
  166:3, 171:15,
  182:11, 184:6,
  184:11, 184:13,
  184:17, 186:9.
12 14:24, 118:19,
  187:16, 187:21,
  187:25, 188:3,
  189:11, 204:14,
  214:5, 217:12,
  217:15, 218:7.
12-year-old 188:2,
  189:24.
12-year-olds 188:21,
  188:25.
12. 103:8.
12:00 2:22.
12th 37:5.
13 4:9, 4:10, 4:13,

204:14, 209:21.
13. 64:21.
13th 135:19.
14 118:17, 163:17,
    163:22, 166:11,
    166:13, 166:20.
14. 166:18.
15 4:15, 4:16, 15:3,
    68:17, 68:22,
    69:1, 73:12,
    107:16, 117:22,
    118:15, 118:16,
    151:24, 152:10,
    152:13, 152:14,
    163:17, 200:3,
    214:5.
15-year 163:22.
15. 69:17.
152 222:31.
16 117:22, 118:15,
    129:4.
16-year-old 128:12,
    129:12, 129:22.
16. 118:16.
17 18:17, 176:22,
    176:23.
18 81:2, 160:21,
    163:3, 163:4,
    164:13, 176:23,
    189:11.
18-year-old
    189:23.
187 222:33.
198 222:35.
1A 190:23, 191:6,
    191:15.
1B 194:15.
.
.
< 2 >.
2 12:14, 16:6,
    79:13, 86:16,
    113:9, 113:10,
    202:24, 206:6,
    206:8, 206:16,
    209:13.
2,000 63:22.
2,000. 63:5.
2. 56:2.
200 26:6, 26:8,

26:12.
2000 36:22, 126:8.
2001. 162:20.
2005 23:19, 24:25,
    28:17, 50:17,
    50:24, 61:14,
    63:12, 69:12,
    107:14, 116:7,
    118:23, 119:9,
    122:7, 123:1,
    123:3, 146:8,
    154:13, 154:22,
    155:9, 169:11,
    169:12, 175:24,
    176:17, 176:22,
    187:17, 189:7,
    189:8.
2005. 68:4, 69:11,
    122:8, 122:12,
    122:23.
2006 50:24, 54:12,
    79:6, 79:10,
    80:17, 82:23,
    116:7, 116:16,
    116:22, 117:5,
    147:20, 156:23,
    156:24, 163:14,
    164:16, 198:3.
2006. 79:6.
2007. 25:3, 124:5,
    127:12, 149:6,
    156:24, 167:25,
    168:6, 184:13,
    184:17.
2008 61:5, 61:9,
    126:5, 220:8.
2008. 182:15,
    204:3.
201 222:39.
2011 23:22, 25:4,
    126:17, 126:21,
    149:13, 149:14,
    162:17, 162:19,
    171:15.
2011. 149:14.
2011130 163:5.
2012 27:13, 27:17,
    34:8, 37:15.
2012. 37:5,
    149:12.

2013 23:23, 27:13,
    34:5, 34:7, 36:14,
    46:6.
2013. 23:24, 23:25,
    24:1, 24:2, 24:3,
    45:3.
2015 153:9, 154:8.
2016 13:19, 14:4,
    49:10, 135:19,
    190:19, 191:12,
    193:18.
2016. 13:22, 15:1,
    181:15.
2017 1:19, 25:11.
208 222:41.
20s 189:10.
20th 24:25, 26:14,
    37:15, 174:16.
21 30:16.
21201 1:49.
21st 26:7.
22 201:24, 203:3,
    209:21.
221 26:9, 180:16.
22nd 26:6, 26:12,
    54:14, 59:24,
    69:15, 69:20,
    71:4, 71:12,
    107:12.
23 117:13.
23rd 26:10, 54:14,
    107:12.
24 117:13, 176:24,
    187:21, 187:25.
24-year-old 188:1.
24-year-olds 188:23,
    188:25.
24. 19:9.
2400 26:9.
24th 26:16, 54:14,
    59:24, 62:16,
    62:22, 103:6,
    204:10, 205:7,
    205:8, 211:5.
25 67:24, 68:24,
    68:25, 159:5.
25th 26:8, 26:9,
    54:15, 55:25,
    56:7, 59:5, 64:12,
    64:13, 64:18,

73:1, 84:11,
84:24, 86:10,
86:12, 102:13,
102:22, 180:16,
204:10, 211:6.
26 19:19.
27 50:15, 52:12,
74:17, 222:19.
276 111:19.
28 53:2, 89:1.
28. 21:20.
29. 21:3.
2:15. 101:17,
101:18, 101:21,
101:22.
2A 217:2.
.
.
< 3 >.
3 12:19, 20:15,
139:10, 182:21.
3. 19:20, 95:14,
202:21.
30 51:3.
300 26:7, 26:16.
30s 45:18, 189:10.
31 19:12.
311 26:10.
32 85:13, 203:8.
35 20:9, 48:3.
37. 12:1.
38. 36:8, 203:25.
39. 15:19.
.
.
< 4 >.
4 12:22, 24:20,
96:9, 139:23.
4. 24:5.
400 26:17.
41 21:5, 35:21.
42 222:21.
42. 18:14, 36:3.
43 53:10.
45 35:5, 35:7,
35:11, 52:5,
153:22, 178:21,
179:11, 222:23.
47 15:10, 222:27.
4:56 113:9,

113:11.
4th 1:48.
.
.
< 5 >.
5 1:10, 13:6, 35:3,
35:4, 63:5, 98:25,
200:8.
5,000 67:24.
5- 63:22.
5. 12:6, 35:2,
141:2.
50 84:3.
51. 108:8.
55 172:16.
56. 203:18.
58 33:25.
5:37 113:9,
113:11.
5th 128:7, 129:1.
.
.
< 6 >.
6 13:14, 154:2.
6- 63:22.
6. 52:23.
6/14 13:19.
609 130:12,
217:19.
62 53:24.
62. 21:15.
64 18:25.
65 18:2, 18:4.
65. 157:18.
650 26:11.
66. 21:12.
67. 21:24.
69 54:3.
.
.
< 7 >.
7 13:20, 16:23,
26:2.
7- 67:15.
7. 15:25, 25:13,
111:10, 205:25.
76 154:4.
.
.
< 8 >.

8 3:11, 3:20, 3:25,
14:5, 15:4, 18:5,
19:1.
8. 15:11, 22:5,
26:15, 203:4,
203:8.
84 53:16.
.
.
< 9 >.
9 3:11, 3:15, 3:22,
3:23, 4:2, 14:9,
16:19, 18:18,
20:10, 20:14,
21:6, 26:15.
9. 4:7, 19:12,
113:3, 203:22.
900 67:18.
9:00 2:22.
9:30 11:3.
9:30. 221:15.
_____/s/_____
_____ 222:5.
.
.
< A >.
A. 1:27.
ability 132:5.
able 161:12, 161:14,
211:22.
above 94:18, 96:7,
109:20.
above-entitled
222:3.
absolute 10:11.
abundance 38:24.
access 75:7.
account 12:3, 15:5,
15:23, 18:19,
19:1, 20:10,
20:16, 21:7.
accounts 41:10.
accurate 24:15,
25:24.
accurately 22:14.
accusations 173:3.
Ace 193:17.
across 31:15,
155:14, 176:12.
active 195:25,

198:17.
activities 28:24,
  31:22, 45:20,
  54:16, 55:11.
activity 33:19,
  46:1, 54:17, 55:3,
  55:4, 62:24.
actual 9:13, 24:10,
  29:7, 109:12,
  174:7.
add 58:22, 185:24.
added 144:4.
adding 58:19.
addition 30:1,
  59:20, 79:18,
  100:9, 105:21,
  105:24, 112:3.
additional 98:15,
  132:19, 144:4,
  144:6, 175:21.
address 6:17, 12:10,
  172:20, 175:8,
  175:9, 175:10,
  221:18.
adds 65:25,
  166:18.
Adidas 15:9.
admissibility
  173:4.
admissible 17:20,
  172:13.
admit 31:24,
  45:22.
admits 174:6.
admitted 4:1, 4:13,
  32:2, 32:4, 33:25,
  34:16, 34:17,
  35:20, 45:23,
  157:17, 173:24,
  175:11, 175:13,
  182:22, 183:15.
adult 168:16.
advice 120:17.
advise 128:4.
affair 2:24.
affiliated 111:5.
affiliation 111:7.
afraid 199:18.
afternoon 3:2,
  102:3, 125:5,

151:25, 153:1,
  153:2, 201:21,
  201:22.
afterwards 36:16,
  208:25.
age 117:14, 117:16,
  160:21, 177:3,
  187:19, 188:5,
  190:1, 198:18,
  198:21.
agent 27:7, 27:10,
  136:10.
agents 123:14,
  135:18, 135:21,
  145:9, 145:13.
ago 5:3, 18:6, 36:3,
  87:23, 136:3,
  154:23, 189:11,
  220:1, 220:6,
  220:11, 220:15.
agree 124:21,
  166:21, 173:13.
agreement 49:8,
  93:8, 93:10,
  114:6, 121:19,
  121:21, 121:23,
  123:17, 124:5,
  124:15, 124:17,
  124:21.
ahead 39:21, 87:1,
  140:25, 184:13,
  185:18, 208:17.
ain't 13:10, 19:6,
  73:8, 73:9,
  107:18, 116:14,
  121:5, 131:5,
  134:15, 138:8,
  156:2, 171:12,
  181:12.
air 17:4.
Alan 1:37.
Alcohol 135:18,
  135:21.
alias 13:11.
alive 21:17, 22:1.
all. 13:10.
allegations
  173:10.
allegedly 155:23.
alleges 61:13.

allow 68:10, 101:9,
  152:2, 161:18,
  221:4.
allowed 7:5, 9:4,
  108:22.
allows 217:19.
almost 40:2,
  159:9.
already 19:5, 33:25,
  34:19, 34:22,
  44:11, 44:12,
  46:13, 66:12,
  82:14, 84:15,
  84:16, 92:5,
  110:12, 111:10,
  124:12, 124:19,
  127:18, 161:16,
  169:13, 173:24,
  177:7, 179:14,
  194:3, 215:24.
altercation 209:6,
  209:18.
Although 211:2.
Amendment 128:7,
  129:1.
AMERICA 1:5.
among 7:17, 9:5,
  10:11, 68:9,
  101:9, 152:1,
  213:8.
amongst 107:3.
amount 43:8, 57:22,
  208:24.
analysis 8:17.
analyze 128:15.
animosity 83:2.
answered 93:11,
  122:13, 127:24,
  128:3, 128:9,
  186:21, 196:5,
  199:5.
answering 93:23,
  95:19, 132:8,
  183:21.
answers 132:5,
  132:9, 159:16,
  159:21.
Anthony 18:22.
Antonio 23:20, 25:1,
  26:7.

Anybody 8:11, 33:17,
68:9, 77:3, 86:19,
87:2, 89:12,
109:20, 117:23,
118:19, 155:2,
183:5, 197:12,
198:19, 213:9.
anyway 32:5, 128:9,
212:20.
apartment 64:13,
64:20, 64:22,
64:24, 66:8,
66:19, 66:24,
67:3, 67:7, 72:25,
103:1.
apartments 79:3.
apologize 118:13,
149:14, 196:14.
apparently 156:13.
appear 16:15,
119:16, 119:18,
119:23, 119:25.
appearing 171:14.
apply 39:5, 96:12.
appreciate 39:12,
61:22, 200:15.
apprehended
165:10.
approach 8:13, 17:5,
19:23, 20:20,
22:4, 24:5, 25:12,
38:19, 38:23,
60:19, 65:3,
66:18, 75:25,
93:17, 95:13,
96:21, 130:7,
136:4, 136:21,
158:20, 172:3,
190:22, 190:24,
191:3, 191:14,
209:6, 211:14,
212:1, 217:7.
approached 79:1,
167:15, 168:16,
205:9, 206:16,
209:4.
approved 97:25,
188:15.
approximately 27:13,
116:13, 126:18.

April 135:19,
190:19.
area 27:14, 28:24,
29:2, 46:14,
76:25, 78:16,
79:5, 122:17,
154:15.
arise 91:25.
Arlington 76:25,
78:14.
arms 111:2, 202:16,
203:4.
array 93:21, 94:2,
94:11, 95:18,
95:19, 95:23,
95:25, 96:10,
96:13, 97:4, 98:4,
99:5, 99:6,
100:18, 139:12,
139:23, 205:23,
206:3, 206:10,
206:21, 207:1.
arrays 93:14, 96:16,
97:14, 97:18,
98:10, 139:3.
arrest 36:17, 37:5,
37:6, 37:12,
37:16, 172:21,
172:25, 174:25,
217:18, 218:6.
arrested 32:18,
33:5, 36:14,
36:16, 36:21,
36:25, 37:4, 37:8,
121:16, 123:11,
124:7, 127:13,
127:19, 130:2,
130:16, 165:3,
169:13, 217:16.
Arrived 137:19,
137:22, 138:1,
138:2.
arrow 26:13.
article 51:16,
51:19, 51:25.
articles 68:10,
68:12, 101:10,
101:11, 152:3,
152:4, 221:4.
articulated 17:21,

85:25.
Asif 1:46, 222:1,
222:6.
asks 132:4, 132:6,
132:8.
asleep 40:2, 40:3,
70:25.
ass 12:25, 13:9,
14:1.
assault 205:18,
218:8, 218:22.
assaulted 219:6.
assigned 27:8,
27:13, 27:15,
27:25.
assist 43:13,
43:19.
assistance 8:21.
Associates 176:5.
assume 42:12.
Assuming 42:11,
212:22.
assumption 172:6.
ATF 27:8, 49:12,
50:9, 50:13.
attacked 205:12,
206:17, 209:18.
attempted 55:1.
attend 170:10,
173:11.
attended 176:16.
attending 34:3,
171:9.
attention 6:2,
50:17, 93:25,
147:12, 178:10,
204:3.
attorney 160:22,
160:23, 161:1.
Audio 31:19, 214:5,
214:13.
August 218:24,
219:25, 220:3.
aunt 73:2.
AUSA 1:25, 1:27.
authorized 98:23,
100:12, 131:9,
133:13.
authorizing 32:14.
available 16:15.

228

Avenue 26:17, 50:19,
  78:17, 202:3,
  204:10.
Avoid 68:13, 101:13,
  152:6, 221:6.
aware 38:25, 40:17,
  40:21, 41:19,
  46:10, 186:8,
  186:11.
away 13:9, 78:16,
  88:9, 88:12,
  162:7, 171:2,
  171:3, 171:4,
  173:22, 180:8,
  205:6, 210:20,
  211:1, 211:3.
.
.
< B >.
B-e-v-e-r-l-y
  201:16.
B-time 53:20, 53:21,
  195:16.
B. 1:33.
backed 166:11,
  166:21.
backwards 15:8,
  15:13.
bad 10:7, 20:19,
  80:5, 80:12.
ballpark 67:7.
Baltimore 1:20,
  1:49, 27:14,
  47:24, 47:25,
  48:1, 50:20,
  50:21, 74:4, 74:6,
  74:8, 76:24,
  105:7, 105:9,
  153:10, 201:25,
  202:2.
bandana 202:25.
bandanas 202:15,
  202:19.
Banks 18:22.
Barclay 36:22,
  50:21, 54:14,
  59:24, 62:14,
  62:16, 77:17,
  77:18, 77:22,
  77:25, 82:16,

82:22, 85:21,
  85:22, 95:6,
  103:4, 103:5,
  106:16, 119:9,
  132:11, 140:8,
  140:17, 142:4.
Barclay. 100:7.
Barely 5:7, 71:23.
barrack 147:15.
Based 38:4, 40:4,
  42:8, 49:19,
  58:14, 58:25,
  66:24, 67:10,
  73:17, 78:5,
  84:22, 106:23,
  173:13, 177:12,
  207:10.
Basement 180:19.
bases 173:15.
basic 66:3, 158:4.
Basically 8:1, 22:9,
  32:3, 32:10,
  32:17, 33:7,
  39:25, 40:1,
  44:11, 80:2,
  80:10, 109:19,
  113:20, 113:21.
Basis 33:18, 60:17,
  186:19.
basketball 107:19,
  107:20, 108:11.
bathroom 89:18,
  89:19, 90:2, 90:3,
  90:23, 91:1.
beat 14:1, 51:4.
beating 51:2,
  51:5.
beautifully 6:21.
became 32:11, 50:23,
  51:1, 51:2, 64:15,
  93:2, 138:15,
  168:4, 168:5,
  176:4.
become 55:11,
  110:21, 110:23,
  148:13, 168:17,
  202:12.
becoming 110:20.
beef 83:1, 92:18.
Beetle 13:10.

begin 122:1.
beginning 54:12,
  61:14, 109:23,
  114:5, 117:5,
  196:17.
begins 8:3, 39:2.
behalf 49:11, 50:9,
  106:20.
behind 90:13,
  107:12, 114:12,
  114:14, 144:18,
  220:14.
believable 10:7.
believe 7:10, 13:11,
  28:3, 28:7, 28:19,
  35:1, 36:16,
  36:23, 37:14,
  37:22, 40:10,
  46:4, 46:12,
  49:25, 131:1,
  139:11, 172:1,
  181:24, 183:23.
believed 185:4.
bells 130:12.
belonged 80:19.
belonging 12:4,
  15:5, 15:23,
  18:19.
belongs 111:17.
below 18:11, 19:4,
  206:7, 206:15.
Belton 14:22.
Ben 23:25, 25:8,
  26:13.
Bench 4:23, 6:8,
  17:8, 38:21,
  60:20, 65:4,
  66:18, 66:21,
  96:23, 130:8,
  136:7, 161:8,
  172:5, 199:14,
  212:3, 217:11.
benefit 6:8.
bent 15:12.
Besides 42:15,
  130:4, 164:12.
Bess 24:4, 25:11,
  26:16.
best 10:10, 11:13,
  67:7, 132:5.

better 6:18, 11:11,
  30:22, 32:20,
  65:12, 72:2,
  178:8.
Beverly 199:20,
  200:22, 200:24,
  200:25, 201:7,
  201:15, 201:21,
  214:11, 222:37.
beyond 183:10,
  210:15.
big 16:9, 16:11,
  16:13, 19:7.
Bigs 51:10,
  192:22.
bills 43:19.
Binders 3:15, 5:6,
  8:19, 16:22,
  18:3.
birds 81:13, 81:22,
  81:24, 84:12,
  134:24, 135:15.
bit 5:11, 5:23,
  6:14, 9:12, 10:2,
  10:3, 42:25, 63:8,
  71:24, 115:11,
  156:7, 164:8,
  175:21, 177:20,
  200:19.
bitch 12:25, 14:1.
bitch. 18:12.
Black 16:10, 17:2,
  48:15, 51:10,
  60:13, 150:14,
  193:2, 202:15,
  202:19, 202:25.
block 26:6, 26:7,
  26:8, 26:12,
  26:16, 26:17,
  36:22, 103:5,
  211:3, 211:4.
blocks 60:3.
blood 12:17.
Bloods 51:4,
  205:1.
blowing 19:7.
blue 15:14, 17:3,
  18:10, 18:22,
  29:3, 29:5, 29:8,
  29:9, 51:17,

  107:20.
boarding 180:24.
body 202:17,
  203:5.
Bonds 52:24, 72:22,
  154:3, 155:6,
  192:13, 192:15,
  192:18, 192:19,
  195:14.
books 113:6, 114:18,
  114:20.
borderline 6:16,
  162:5.
bothered 168:23.
bottom 94:4, 94:15,
  99:19, 100:20,
  139:25, 141:4,
  141:21, 159:8.
Boulevard 74:11.
box 12:15, 12:23,
  13:7, 13:21,
  14:25, 16:7,
  18:11, 19:4, 19:6,
  47:3, 47:11, 82:2,
  94:25, 201:2,
  201:12.
boxes 23:7, 23:9,
  29:7.
boy 57:16, 128:12,
  129:22.
boys 95:6, 131:16,
  132:11, 140:8,
  142:4, 188:2.
BPD 3:1.
Bradley 27:24.
braids 21:10.
brand 11:1.
bread. 15:2.
break 7:2, 68:5,
  69:10, 70:2,
  73:21, 101:7,
  102:10, 125:5,
  213:7.
Brian 34:10, 34:11,
  34:13, 53:20,
  157:2, 157:4,
  157:5, 157:8,
  157:10.
Brice 204:20,
  204:21, 205:16,

  206:17, 209:4,
  216:6, 219:7,
  219:12.
brick 58:5.
brief 35:19, 171:13,
  181:23.
briefly 4:22, 17:6,
  35:15.
Bring 8:1, 8:16,
  8:23, 61:4, 69:4,
  75:9, 84:4, 102:6,
  107:4, 108:16,
  125:1, 137:13,
  152:18, 176:10,
  196:4, 196:8,
  212:5, 212:10,
  212:12, 214:16,
  218:5, 218:10.
bringing 84:10.
Bro 13:23, 15:1.
bro. 13:1.
broadcast 6:22.
broken 29:18.
brother 16:8, 16:9,
  16:12, 52:21,
  103:17.
brothers 14:8.
brought 63:22,
  105:11, 142:14,
  144:1, 147:12,
  147:16, 169:15,
  174:17, 178:10,
  186:4, 186:5,
  195:22, 199:23.
Brown 3:11, 3:15,
  4:1, 14:23, 15:7,
  20:1, 20:15.
brown-skinned
  190:17.
Bubba 91:6, 91:8,
  91:9, 91:11,
  91:14, 91:17,
  91:22, 92:3, 92:4,
  92:6, 92:10,
  92:13, 92:17,
  92:18, 92:19,
  92:21, 92:23,
  183:7, 183:19,
  183:20, 183:23,
  183:24, 184:3,

193:6.
Build 5:17.
building 72:25.
bullet 90:4.
Bullets 72:5.
bunch 2:25, 79:18,
  177:17, 188:16.
Bureau 135:18,
  135:21, 170:3,
  170:16, 175:20.
burglaries 158:13.
burgundy 51:22.
business 12:8,
  14:11, 14:12,
  16:2, 19:21.
Bussard 1:37, 4:21,
  5:23, 27:1, 35:11,
  39:4, 39:13,
  39:21, 151:20,
  152:16, 152:21,
  162:14, 162:16,
  163:8, 172:7,
  174:2, 184:13,
  208:1, 222:19,
  222:31.
Butler 20:2, 20:5,
  20:6, 20:12,
  20:21, 21:1.
buttes 120:18.
buy 33:7, 43:12.
buying 31:12.
bypass 148:19.
Byron 192:18,
  192:19.
.
.
< C >.
C-h-r-i-s-t-o-p-h-e-
  r 47:16.
C. 174:7.
Cakes 12:2, 14:13,
  15:13.
caliber 75:21,
  77:9.
Call 2:25, 13:17,
  27:7, 33:15,
  45:17, 134:7,
  199:19, 200:20,
  212:21.
called 11:18, 28:4,

47:8, 48:4, 48:12,
  85:5, 112:24,
  133:17, 151:6,
  201:8.
calling 157:10.
calls 31:20, 33:10,
  45:9, 46:24,
  200:21.
camera 5:14, 22:25,
  23:1, 29:9, 33:19,
  114:2.
cameras 29:2, 29:4,
  29:5, 29:9, 29:18,
  29:20, 29:21.
Capital 16:13.
captured 31:17.
car 28:23, 28:25,
  70:15, 70:18,
  70:23, 70:25,
  71:2, 71:9, 75:14,
  77:4, 78:22,
  78:25, 179:18.
care 87:7.
carefully 6:18.
Carey 76:25.
carjackings 158:13,
  160:5.
Carlos 51:9, 53:12,
  53:13.
Carrdai 14:8, 20:2,
  20:5, 20:6, 20:12,
  20:21, 203:16,
  215:13.
Carroll 215:11.
cases 28:13, 37:9,
  38:25, 39:7,
  49:15, 49:17,
  49:19, 50:2,
  65:21, 192:2,
  194:22.
casual 9:8, 9:21.
catch 70:4.
catching 171:10,
  172:24.
category 5:20.
caught 32:18, 33:5,
  70:4, 73:5,
  171:21.
caused 185:24.
caution 38:24.

CCTV 31:17.
CD 16:19, 113:3.
cell 77:6.
certain 80:3,
  129:18, 132:3,
  208:24, 219:12.
Certainly 65:24.
certify 222:1.
chance 22:11, 24:12,
  25:21.
change 7:14, 50:16,
  68:3, 69:10,
  87:12, 87:14,
  87:24, 88:2, 88:3,
  129:5, 143:10,
  143:15, 172:20,
  175:8.
changed 137:13,
  143:12, 143:15,
  146:22, 178:12,
  178:14, 178:17.
characterization
  7:22.
charge 121:12,
  121:13, 121:17,
  124:8, 125:11,
  125:12, 127:13,
  130:2, 130:16,
  143:2, 143:5,
  143:8, 164:10,
  166:11, 171:10,
  171:21, 172:24.
charged 46:1, 93:2,
  121:24.
charges 121:14,
  130:21, 163:3,
  169:15, 217:16,
  218:6.
Charles 21:16.
chased 70:24.
check 19:6, 43:21.
checking 19:6.
Chevy 70:13, 179:23,
  179:25.
chick 190:17.
child 199:24,
  199:25.
childhood 204:18.
chitchat 9:12.
choose 150:3.

Chop 24:3.
chose 216:25.
Christian 13:2.
Christina 1:27.
Christine 1:46,
  222:1, 222:6.
Christopher 2:9,
  34:2, 34:3, 42:25,
  46:3, 46:25, 47:1,
  47:7, 47:15,
  222:25.
chronological 23:19,
  26:5.
CI 33:6.
circle 70:16, 77:14,
  77:15, 188:14,
  190:7.
circled 66:18,
  70:9.
Circuit 29:1, 29:3,
  29:6, 29:10, 39:1,
  153:10.
circumstances
  9:16.
City 27:14, 50:20,
  74:5, 74:7,
  153:10, 167:11,
  167:13, 167:21.
Civilian 2:12, 2:13,
  3:3, 199:19.
claimed 85:6.
clarifying 65:12.
clear 3:18, 34:19,
  118:13, 186:6,
  208:12, 209:1,
  209:2, 209:11,
  210:9.
CLERK 9:3, 35:6,
  47:4, 201:3,
  201:5.
client 115:8.
clip 16:18, 17:1,
  113:2.
cliques 78:4.
Close 97:9, 114:20,
  177:10, 177:11.
closed 18:3, 29:1,
  29:3, 29:6, 29:9,
  207:17.
closer 63:9, 78:16,

211:8.
clothes 9:22.
clothing 43:20,
  51:16, 51:19,
  51:25.
cocaine 37:13,
  37:16, 56:23,
  56:24, 57:3, 57:5,
  57:14, 57:20,
  62:11, 63:13.
coffee 11:1.
Coke 56:20, 56:22,
  56:23, 57:13,
  59:15.
Cokesbury 26:11.
cold 10:16.
collage 14:21.
collapse 73:13.
collapsed 72:7.
colleagues 7:9.
collecting 31:19.
collective 10:25.
comes 57:3, 58:23,
  179:12.
comfortable 8:13.
coming 30:8, 50:4,
  83:25, 88:10,
  107:5, 134:18,
  145:17, 145:18,
  154:22, 173:24,
  212:6.
comma 133:25.
comment 5:19,
  18:11.
comments 99:18,
  99:25, 206:14.
commit 75:5, 158:5,
  159:23, 160:1,
  160:4, 189:24.
Commitment 172:14,
  173:17, 173:20.
committed 7:15,
  54:23, 55:1,
  143:18, 160:22.
committing 160:8.
Common 75:2, 75:4,
  77:10, 77:13.
communicate 120:15,
  120:22.
communicated 65:15,

65:24, 120:17.
communication
  7:18.
community 104:3,
  178:17.
complain 10:15,
  10:17.
complained 131:17.
complete 17:15,
  93:14, 161:3,
  170:14, 205:23,
  207:1.
completed 93:22,
  94:2, 95:19,
  95:23, 97:13,
  97:17, 98:10,
  206:10.
completely 9:15,
  9:16.
complicated 2:17.
computer 52:1,
  213:21, 214:1,
  214:8.
concern 49:21, 61:8,
  130:18, 138:3.
concerns 49:20,
  50:10, 85:25,
  137:16, 138:4,
  199:22.
concluded 10:9.
concluded. 221:24.
conduct 36:25,
  37:20, 213:11,
  221:9.
conducting 45:7.
conference 17:8,
  38:21, 60:20,
  65:4, 66:21,
  96:23, 130:8,
  136:7, 161:8,
  172:5, 199:14,
  212:3, 217:11.
confidential 30:25,
  32:17, 45:24.
confront 45:20.
confusion 39:1,
  39:10.
connect 104:18,
  104:20, 105:2,
  189:16, 189:17,

189:21.
connected 120:8.
connection 62:23,
    93:7, 97:18,
    103:18, 145:3.
conscious 40:1.
consider 66:12.
consisted 27:23.
consistent 172:24,
    173:3.
consolidated 163:3,
    166:19.
constantly 11:11.
consult 68:17,
    101:16, 152:9,
    221:11.
contact 68:13,
    101:13, 152:6,
    213:13, 221:6.
containing 16:20.
context 57:12,
    83:22, 111:3.
contingency 2:16,
    199:18.
continue 11:7,
    17:22, 32:21,
    33:8, 33:9, 35:12,
    43:14, 44:6, 44:7,
    61:24, 66:16,
    69:8, 97:12,
    102:5, 115:13,
    124:19, 124:20,
    125:7, 126:13.
continued 32:5.
contours 65:20.
control 29:8.
controlled 162:18,
    163:15.
Conversation 8:2,
    9:2, 9:21, 80:24,
    81:8, 81:15,
    81:19, 84:10,
    84:22, 89:8, 89:9,
    89:15, 89:24,
    90:1, 90:8, 90:11,
    90:14, 90:20,
    91:6, 92:12,
    92:14, 104:13,
    120:18, 132:6,
    183:15, 184:8,

190:12, 190:13.
conversations 9:9,
    45:13, 86:3.
conversion 156:8,
    168:11, 168:12.
convert 106:24,
    107:1.
conveying 99:15,
    106:19.
convicted 48:22,
    49:1, 130:3,
    130:5, 161:17,
    162:17, 162:19,
    163:14.
convictions 161:4,
    162:10.
coochie 16:14.
cooked 57:3.
cool 13:10.
cooperate 93:5,
    93:8, 122:1,
    122:20, 123:24,
    124:1, 124:13,
    124:20.
cooperated 46:13,
    122:15, 122:19,
    123:7.
cooperating 116:4,
    122:5, 122:8,
    122:12, 122:22,
    123:5, 124:19.
cooperation 42:10,
    49:8, 93:10,
    121:19, 121:21,
    121:23, 122:25,
    123:13, 123:17,
    123:19, 123:20,
    123:22, 124:15,
    124:17, 169:16,
    169:17.
cooperative 31:22,
    32:5.
cooperator 30:7,
    31:7, 31:9, 31:12,
    32:11, 43:2,
    43:4.
copies 139:7.
copy 158:17.
corner 31:18, 33:19,
    69:25, 71:3, 71:4,

71:5, 71:12,
    75:18, 94:4, 96:4,
    155:12, 182:23,
    189:20.
Cornish 30:6, 30:11,
    30:16, 30:18,
    30:22, 30:25,
    31:5, 31:21,
    33:22, 36:13,
    40:6, 40:12,
    40:21, 45:2,
    45:19.
Correct. 66:8.
corrected 2:21,
    150:22.
Correction 167:9.
correctly 3:15,
    30:21.
correspond 25:19.
costing 63:15.
costs 63:13.
Counsel 2:8, 3:4,
    3:13, 5:12, 5:15,
    6:5, 8:7, 17:5,
    23:2, 39:5, 39:6,
    46:18, 153:15,
    161:7, 169:24,
    199:13, 213:4,
    217:9, 220:21,
    221:19.
Country 14:18,
    14:22, 23:25.
county 74:5.
course 6:23, 7:6,
    114:15, 127:10,
    181:1, 181:3.
court. 17:25, 39:22,
    61:23, 66:15,
    97:11, 130:14,
    136:20, 162:13,
    174:15, 200:17,
    213:5, 218:19.
courthouse 7:7,
    169:22.
courtroom 7:18, 9:2,
    10:12, 10:16,
    10:18, 47:3,
    51:13, 68:21,
    101:21, 152:13,
    201:2, 213:17,

213:21.
courtroom. 8:24,
  68:19, 69:5,
  101:19, 102:2,
  124:24, 125:3,
  152:11, 152:19,
  213:15, 214:17,
  221:17.
cousin 72:10, 72:16,
  72:21, 73:1, 73:9,
  75:15, 155:4,
  155:5, 185:5,
  190:18.
cousins 100:5.
covered 26:12.
CP 202:21.
Crack 57:3, 57:5,
  57:7, 57:20,
  57:22, 58:6, 63:4,
  63:13, 63:15,
  63:19, 63:20,
  64:4, 66:22,
  66:25, 67:11,
  67:19, 109:2,
  173:14.
crackhead 81:7.
crackheads 59:9,
  59:10, 79:19,
  79:22, 133:17,
  134:7, 135:2,
  135:12.
crazy 13:2, 16:8.
credible 10:6.
Creed 105:3, 189:4,
  189:5, 189:7,
  189:13, 193:4.
crew 92:3, 92:5.
Crime 28:4, 73:14,
  102:21, 138:15,
  138:20, 160:22,
  199:21.
crimen 162:2.
crimes 160:8,
  160:23, 160:24.
CRIMINAL 1:9,
  162:2.
Cross 54:11, 108:22,
  108:25, 109:25,
  110:3, 114:24,
  200:8, 200:10.

Cross-examination
  27:3, 41:25, 46:4,
  115:1, 152:21,
  152:24, 187:14,
  208:5, 222:19,
  222:21, 222:29,
  222:31, 222:33,
  222:41.
crossed 54:10,
  111:24, 117:7,
  188:15, 202:16.
crossing 203:4.
crossover 107:8.
crystal 3:18.
cultural 91:24.
Customer 58:13.
cut 58:19, 63:21.
cuz 19:6.
.
.
.
< D >.
da 13:1.
Daily 33:18, 67:12,
  67:13, 67:14.
danger 65:14,
  65:16.
dangerous 163:15.
Dante 23:19, 24:25,
  26:6.
dark 12:17.
date 12:12, 13:18,
  14:3, 16:5, 99:21,
  99:23, 139:20,
  141:7, 156:3,
  156:21, 156:22,
  156:25, 182:10,
  184:15, 191:20,
  208:21.
dated 140:2.
dates 23:16, 24:10,
  24:24, 184:10.
Dating 49:10.
Dave 12:18, 14:8,
  51:9, 71:1, 71:4,
  71:12, 72:4, 72:9,
  72:18, 72:19,
  72:23, 72:24,
  73:7, 77:2, 77:4,
  77:7, 78:25, 79:1,
  106:18, 107:23,

110:9, 110:10,
  110:15, 131:22,
  132:12, 153:24.
David 34:18, 52:8,
  72:13, 147:5,
  178:23, 178:25.
days 5:3, 23:20,
  25:2, 25:6, 28:22,
  56:18, 67:20,
  73:8, 90:13,
  110:10, 165:25,
  166:5, 191:23,
  208:22, 208:24.
daytime 76:17,
  76:18.
deactivated 45:24.
deactivating
  45:25.
dead 21:17, 21:18,
  22:1, 23:9, 95:7,
  140:8.
deal 39:7, 81:25,
  84:15, 84:18,
  109:2, 123:13,
  123:15, 123:16,
  123:19, 123:21,
  123:22, 124:6,
  146:18, 169:16,
  169:17.
dealer 58:14,
  59:1.
dealing 45:10,
  81:25, 109:3,
  146:19.
dealt 77:19, 81:20,
  82:4, 91:17,
  104:2, 104:3,
  190:7.
debate 162:6.
deceased 21:22,
  22:2.
December 79:6.
decent 177:25.
decide 171:8.
decided 74:21,
  87:12, 88:4,
  130:17, 171:7,
  173:23.
decipher 161:12,
  161:14.

decision 130:20,
    137:8, 137:13.
Defendant 1:12,
    1:29, 1:35, 1:39,
    13:12, 61:5,
    161:11, 161:15,
    172:17.
defendants 17:20,
    45:16, 221:22.
defending 218:7.
defense 3:4, 5:15,
    23:2, 39:5, 39:6,
    46:17.
definitely 136:18.
Delando 14:22.
deliberation 7:6,
    9:6.
DEM 22:5, 24:5,
    24:20, 25:13,
    26:2.
demonstrating
    65:18.
denied 173:7.
depart 199:13,
    220:24.
Department 27:14,
    32:14.
depending 33:20.
deputy 7:18, 9:3.
describe 82:24.
described 96:11,
    150:13, 160:8.
describing 62:24,
    73:15.
description 78:19.
designated 4:21.
desirable 102:20.
details 182:8.
detained 173:10.
detectives 2:24,
    27:20, 182:7,
    182:11.
detention 173:9,
    174:18.
develop 65:10,
    65:20.
Diaz 198:12.
dictionaries
    221:12.
dictionary 68:17,

101:17, 152:10.
die 73:13, 112:1.
difference 180:12,
    187:22.
different 7:7, 7:8,
    17:11, 39:5,
    43:18, 87:22,
    109:23, 112:21,
    142:18, 142:22,
    144:7, 156:11,
    164:11, 179:15,
    189:17, 189:22,
    191:23, 191:24,
    204:23.
difficult 6:3.
Digga 13:8, 13:11,
    42:9, 42:10, 51:9,
    51:24, 60:13,
    60:15, 60:23,
    60:25, 61:1, 62:1,
    62:7, 62:13,
    62:25, 105:4,
    203:21, 205:10,
    205:15, 206:8,
    219:9, 219:11.
Digga. 60:24.
Direct 11:21, 44:19,
    47:19, 68:23,
    183:11, 200:2,
    201:19, 204:3,
    222:17, 222:27,
    222:39.
directions 109:20.
directly 47:13,
    201:13, 211:6,
    214:8.
disagree 166:21.
discard 165:19.
discarded 165:18.
discovery 212:7.
discrepancies
    3:13.
discuss 7:5, 10:2,
    68:8, 68:9, 101:8,
    101:9, 147:22,
    152:1, 152:2,
    213:8, 221:1,
    221:2, 221:3.
discussed 22:3,
    22:16, 24:10,

24:16, 86:4,
    86:21, 137:16,
    145:23, 178:10.
discussing 31:15.
discussion 4:23,
    107:4, 120:24,
    178:9, 184:7.
discussions 45:9,
    85:4, 107:2.
displaying 178:20.
dispute 91:25, 92:2,
    218:14.
distribute 36:20,
    37:2, 37:13.
distributing
    40:14.
distribution 37:6,
    49:2, 162:18,
    163:3, 163:15,
    164:16, 166:11.
distributions
    121:11.
District 1:1, 1:2,
    27:16, 27:19,
    27:22, 27:25,
    28:3, 29:17,
    29:19, 29:20,
    29:21.
Division 167:9.
documents 27:21,
    187:2.
Dodd 13:2.
dog 14:2.
doing 6:6, 11:12,
    32:19, 88:9,
    88:15, 88:19,
    105:13, 107:18,
    111:2, 135:5,
    135:15, 175:14,
    189:25, 196:1,
    196:2, 198:6.
Donatello 21:21,
    53:3, 141:6,
    192:20.
done 81:1, 114:13,
    136:5, 136:8,
    158:12, 174:1.
door 72:9, 103:11,
    150:3.
doors 150:3, 150:7,

150:8.
doorstep 204:8.
dope 56:22, 56:23,
  57:8, 57:17,
  57:18, 59:15,
  109:3.
dose 39:25.
doses 41:7.
dots 25:20.
double 200:4.
down 5:4, 6:4,
  29:18, 68:20,
  70:25, 72:5, 72:6,
  76:15, 82:13,
  83:3, 98:16,
  101:20, 108:13,
  115:11, 123:4,
  141:11, 141:17,
  141:21, 141:22,
  141:23, 142:14,
  152:12, 158:23,
  158:24, 159:4,
  161:20, 168:19,
  205:5, 216:7.
downtown 26:19.
drank 176:9.
drawing 39:6.
dress 51:17.
drill 5:13.
drinks 176:8.
dropped 72:7,
  217:17, 218:7.
Drove 75:13,
  75:14.
drug 38:7, 39:3,
  45:9, 46:1, 54:17,
  55:3, 57:9, 57:11,
  57:12, 58:14,
  58:19, 58:25,
  62:24, 79:25,
  80:11, 80:12,
  170:10, 170:19,
  171:6, 172:19,
  173:8, 173:21,
  173:25, 181:1.
druggies 181:2.
Dude 70:14, 71:2,
  71:5, 71:17, 72:1,
  72:4, 72:6, 78:20,
  79:2, 81:6, 82:13,
  179:22, 180:1.
dudes 70:12, 74:25,
  75:18, 75:24,
  76:9, 180:1.
Due 84:15.
duly 11:18, 47:8,
  201:8.
Dupree 19:10, 19:15,
  19:18, 20:1,
  215:19.
Dutch 74:1, 74:4,
  74:21, 75:11,
  160:12.
dynamics 7:13.
.
.
< E >.
e-mail 12:10,
  16:4.
E-pill 189:13,
  189:15, 189:17,
  189:18, 189:19,
  189:21.
E-pills 75:19,
  75:20, 76:3, 76:5,
  76:10, 103:21,
  103:22, 104:5,
  104:14, 105:2,
  105:5, 105:10,
  105:14, 105:15,
  189:20.
early 7:15, 82:23,
  91:23, 106:3,
  106:6, 116:7,
  116:10, 189:10.
easier 6:25.
East 26:6, 26:9,
  26:10, 26:12,
  26:16, 26:17,
  48:1, 50:21,
  180:16.
Eastern 27:16,
  27:19, 27:25,
  28:3, 29:19,
  29:20.
easy 75:7.
EC 154:5.
Ecstasy 76:6,
  103:22, 103:24.
editorialize
210:14.
Edmondson 78:17.
effect 143:10.
efficient 10:18,
  11:12, 161:18,
  161:19.
effort 172:8.
efforts 2:25.
Eggy 14:22,
  209:19.
eight 30:2.
either 5:22, 24:11,
  32:25, 33:20,
  45:17, 84:20,
  96:16.
elicited 39:4,
  65:17.
eliciting 39:7.
eliminated 65:16.
Elliott 21:13.
embellishes 65:25.
encounter 111:1.
encyclopedia 68:17,
  101:17, 152:10.
encyclopedias
  221:11.
End 2:21, 9:7,
  50:24, 54:12,
  70:4, 79:6, 79:9,
  80:16, 94:23,
  117:5, 120:25,
  124:4, 124:9,
  126:17, 126:21,
  207:19.
ended 93:5.
ends 32:10.
enforcement 2:18,
  30:25, 38:6, 39:8,
  73:14, 93:12,
  93:15, 121:22,
  122:2, 122:8,
  122:19, 122:25,
  123:14, 124:10,
  124:11, 124:19,
  186:25, 187:3,
  199:19.
enforcer 151:6,
  151:7.
engage 33:19,
  45:12.

engaged 45:12, 45:14, 54:17, 55:4, 62:25.
enough 5:10, 67:4, 97:10, 112:22, 117:11.
enter 201:11.
entered 4:9, 8:24, 36:3, 69:5, 102:2, 121:19, 125:3, 126:5, 152:19, 214:17.
entire 159:1.
entitled 10:20, 65:20, 163:9.
enunciate 6:6.
environment 43:14, 44:15.
Enzinna 39:15, 66:5, 114:24, 125:8, 139:6, 222:29.
equation 177:6.
Eric 193:21.
Especially 104:5, 128:16.
Esquire 1:31, 1:33, 1:37, 1:41.
estimate 67:18.
evening 204:12, 205:4, 221:22.
event 2:16, 3:6.
Eventually 38:1, 109:25, 138:22, 138:23, 164:8, 165:10, 179:11.
everybody 60:14, 67:17, 72:17, 77:16, 107:5, 108:15, 108:16, 108:23, 109:2, 109:3, 109:4, 110:12, 117:18, 119:15, 134:17, 149:4, 154:21.
everything 88:20, 114:12, 123:20, 128:13, 128:15, 129:5, 142:15, 142:16, 144:8, 145:6, 147:3,

148:19, 188:10, 220:8.
evidence 9:11, 17:18, 24:20, 34:1, 34:20, 35:4, 35:21, 41:13, 44:18, 52:4, 52:11, 52:22, 53:23, 59:25, 111:10, 111:21, 157:17, 172:7, 182:22.
evidently 7:17.
evolves 3:7.
evolving 38:8.
exact 24:10, 24:24, 43:8, 156:25, 181:8.
Exactly 50:14, 61:21, 124:13, 209:20.
Examination 11:7, 11:21, 44:25, 47:19, 69:8, 102:6, 163:8, 183:11, 198:24, 201:19, 222:17, 222:23, 222:27, 222:35, 222:39.
examined 11:18, 47:8, 201:8.
examining 6:15.
example 202:22, 203:1, 203:5, 203:9.
except 168:24, 187:5.
exceptions 10:14.
exchange 88:18.
exchanged 79:1.
exclude 17:16.
Excuse 166:7, 167:6.
excused 46:17, 46:21, 199:9, 199:12, 220:21, 220:23, 221:15.
execute 12:3, 15:22, 87:9.
exhaustive 22:18.

exhibits 34:23, 151:22.
expect 17:13, 105:14, 161:11.
experience 6:20, 9:25, 10:9, 10:25, 40:4, 58:14, 58:25, 177:12.
experienced 38:6.
experiment 7:1.
Explain 8:16, 9:20, 50:25, 84:13, 88:2, 104:19, 105:1, 122:14, 141:9, 171:5.
explained 3:12, 50:10, 66:13, 80:8, 87:23, 97:15, 97:17, 103:22.
explaining 70:22.
explicit 3:17, 10:5.
explore 173:6.
Explosives 135:19.
expose 213:9.
exposed 68:10, 101:10, 152:3, 221:4.
express 8:12.
extent 9:18, 39:9, 65:24, 173:23.
external 221:11.
extort 168:21.
extrinsic 172:7.
eyes 219:21.
.
.
< F >.
Face 47:4, 83:16, 83:18, 85:11, 85:14, 85:16, 85:25, 111:11, 111:16, 111:22, 157:19, 201:3.
Facebook 12:3, 12:8, 14:11, 14:12, 15:4, 15:22, 16:2, 19:1, 19:21, 20:16, 20:17,

120:4, 120:7,
  120:9, 120:11.
faces 18:24, 23:7,
  52:4, 72:18.
facing 130:21.
factor 2:17.
facts 68:15, 101:15,
  152:8, 221:8.
fail 175:3, 175:7.
failed 173:8,
  173:11, 174:25.
Failure 172:18,
  172:19, 172:20,
  172:25.
faint 71:24.
Fair 5:10, 10:16,
  10:20, 11:4, 67:4,
  112:22, 174:8.
fake 80:12, 164:17,
  164:19, 164:20.
fall 40:2, 40:3,
  61:16.
falling 29:1,
  88:13.
falsi 162:2.
familiar 22:5, 24:6,
  25:13, 37:5, 37:7,
  37:9, 37:10,
  37:16, 38:7, 48:4,
  48:12, 55:11,
  55:15, 69:17,
  110:21, 110:23,
  157:18, 183:7,
  202:4, 202:12.
Family 48:7, 48:15,
  52:17, 150:14,
  154:17, 188:7,
  190:6, 221:3.
fan 28:25.
far 49:21, 50:11,
  60:21, 62:11,
  75:10, 77:14,
  80:4, 83:21,
  83:24, 109:1,
  122:5, 145:17,
  171:3, 172:11,
  172:22, 185:7,
  187:19, 210:20,
  211:1, 211:2,
  211:4.

farther 211:8.
fast 85:3, 92:25.
Fats 59:16, 59:17,
  62:12, 193:15,
  194:23.
favor 115:10.
FCRR 1:46, 222:1.
feared 207:22.
features 150:14.
featuring 16:20.
February 24:4,
  171:15.
Federal 1:47, 49:5,
  93:2, 93:7,
  121:12, 121:13,
  124:10, 124:11,
  124:16, 125:18,
  143:8, 145:9,
  169:15.
Feds 123:18, 123:23,
  124:3, 124:8,
  125:18, 125:19,
  126:13, 143:5.
feedback 6:13.
feel 128:19,
  128:21.
feels 44:16.
fellow 221:2.
felonies 48:24,
  49:2, 93:1, 121:4,
  121:7, 121:8,
  130:3, 130:4,
  160:24, 161:17,
  161:25, 163:7.
felony 48:22, 162:2,
  162:10.
felt 128:24.
Female 78:20, 79:4,
  79:24, 103:16.
females 69:25, 70:6,
  70:8, 70:11, 72:8,
  157:16, 157:24,
  179:8.
Fennell 106:18,
  147:13, 197:8.
Fenner 21:21,
  192:20.
few 36:3, 48:21,
  73:8, 82:13,
  90:13, 99:6,

136:3, 151:21,
  151:22, 171:7,
  191:23, 192:21.
field 94:20.
fighting 209:7,
  209:17.
figure 81:13.
file 175:10.
finally 36:8, 37:15,
  51:24.
finances 151:6.
find 5:24, 8:8,
  10:6, 16:22,
  30:14, 32:7,
  50:11, 58:12,
  124:5, 146:11,
  146:19, 165:25.
finding 5:20, 5:24,
  49:22.
fine 8:15, 39:18.
finger 60:2, 68:1,
  70:1.
finish 61:12,
  126:13, 133:11.
finished 102:11,
  114:18, 159:12,
  213:7.
firearm 179:12.
Firearms 135:18,
  135:22.
fired 81:16, 84:11,
  90:4.
Five 25:2, 25:6,
  56:18, 78:16,
  125:23, 126:4,
  126:20, 126:22,
  162:22.
flag 39:9.
flags 39:1.
Flat 16:12.
flew 72:5.
Floor 1:48, 66:19,
  180:19, 180:20.
floors 29:1, 180:18,
  180:21.
focus 68:4, 69:11,
  79:6, 97:22,
  133:7, 141:14.
focused 97:25,
  133:7.

238

focusing 50:17,
  93:25.
folks 76:7.
follow 3:4, 109:20,
  120:12, 120:13,
  151:3, 161:23.
follow-up 66:1,
  219:11.
followed 118:5,
  188:10.
following 4:22,
  17:25, 39:22,
  61:23, 66:15,
  97:11, 107:2,
  108:25, 130:14,
  136:20, 162:13,
  172:18, 174:15,
  200:17, 213:5,
  218:19.
follows 11:19, 47:9,
  201:9.
food 43:12, 43:18,
  43:19, 44:15.
Fool 51:10, 53:25,
  54:1.
foot 109:11, 109:19,
  150:19, 150:20.
footsteps 118:5,
  188:10.
forbid 7:16.
force 27:11.
foregoing 222:2.
foreshadowing
  61:19.
forget 6:21.
forgive 76:2.
forgot 76:16,
  174:25, 186:3.
form 7:18, 161:9.
formal 33:15,
  33:21.
format 161:23.
forth 7:12, 7:13,
  9:6, 10:3, 10:7,
  10:14, 40:3,
  50:12, 207:8.
forward 25:3, 47:2,
  79:3, 85:3, 92:25,
  114:11, 201:1.
foul 80:12.

found 13:23, 14:2,
  30:20, 31:10,
  42:10, 58:11,
  172:17, 173:15,
  175:15.
Foundation 60:18,
  61:2, 105:19,
  203:14, 212:23.
Foundational 66:3,
  67:5.
four 126:9, 126:18,
  165:1, 166:17.
four-year 164:21.
Fourth 38:25, 69:24,
  141:17.
Fox 108:24, 109:6,
  109:9, 109:23,
  150:20, 150:25,
  151:18.
Foxes 109:10.
frame 67:1, 67:8.
Francomano 1:41,
  39:14, 41:23,
  61:12, 187:12,
  191:1, 191:4,
  198:20, 208:3,
  208:18, 209:15,
  211:24, 214:14,
  214:19, 216:19,
  222:21, 222:33,
  222:41.
Frank 28:2.
Free 12:24, 13:4,
  13:17, 14:7,
  20:18.
freely 207:1.
French 21:4, 21:9.
friend 177:10,
  177:11, 204:18.
friends 120:3,
  120:9, 120:10,
  176:4, 221:3.
front 18:21, 33:6,
  47:2, 51:22, 63:2,
  69:24, 70:5, 70:6,
  70:8, 73:12,
  115:12, 128:13,
  128:17, 128:22,
  129:4, 172:14,
  201:1, 202:17,

  203:5, 207:8,
  214:8.
frustrations 11:2.
Fuck 12:24, 12:25,
  13:1, 13:9, 13:24,
  14:2, 16:13,
  110:11.
Fucking 13:2.
fucks 148:16.
full 7:4, 65:20,
  109:22.
full-fledged
  109:21.
fully 80:7, 84:13.
fun 16:9.
funeral 2:19,
  2:22.
funny 7:21, 8:9,
  9:10.
future 105:14,
  105:15.
.
.
< G >.
game 10:16, 10:20,
  11:5.
Garcia 39:1.
gathering 157:8.
Gatherings 33:12,
  33:16, 33:21,
  34:4, 34:13,
  42:22, 42:23,
  46:5, 156:13.
Gaudenzia 175:5.
Gave 43:24, 62:10,
  64:1, 67:18,
  110:8, 110:12,
  122:20, 125:17,
  127:3, 128:25,
  129:8, 143:21,
  143:22, 144:11,
  148:10, 160:23,
  170:1, 180:14,
  208:7, 208:9,
  208:13, 208:15,
  208:21, 209:2,
  215:1.
gavel 33:16.
gears 73:20.
general 27:14,

60:3.
generally 59:13.
gentleman 28:9,
  82:8, 85:6, 85:24,
  202:25.
gentlemen 9:1,
  50:25, 51:15,
  68:7, 70:10,
  101:8, 102:4,
  113:7, 113:13,
  114:21, 125:4,
  151:25, 200:18,
  213:6, 220:25.
Gerald 1:29, 15:5,
  15:7, 15:12,
  16:16, 17:2, 18:8,
  18:19, 19:2, 19:3,
  19:14, 19:18,
  20:7, 20:11,
  20:12, 21:6.
GERALD JOHNSON, et
  al. 1:10.
gesture 15:16.
gesturing 114:2.
gets 33:4.
getting 9:13, 23:14,
  49:22, 59:14,
  71:18, 71:19,
  75:9, 79:1, 87:24,
  88:9, 109:2,
  109:4, 144:18,
  168:25, 169:18,
  171:12, 177:5.
Girl 57:12, 57:13.
girlfriend 190:14,
  190:15.
girlfriends 177:2.
girls 12:25, 72:6.
give 2:6, 23:2,
  23:15, 32:21,
  44:14, 64:2, 67:7,
  72:11, 72:24,
  73:2, 77:18, 80:8,
  80:10, 83:24,
  84:3, 100:11,
  110:15, 136:16,
  140:23, 148:16,
  180:5, 181:14,
  199:2, 208:25.
given 7:6, 7:12,

9:6, 65:8, 84:2,
  86:25, 100:5,
  100:15, 132:24,
  141:12, 141:18,
  144:22, 173:13.
gives 5:23.
giving 32:16,
  122:24, 142:6,
  157:13, 207:9,
  208:13, 208:15.
glare 20:19.
glasses 17:3.
Glue 58:11, 59:1,
  164:20.
GM 59:25, 62:18,
  64:21, 69:17,
  73:12, 103:8,
  107:16.
go-to 160:7,
  160:10.
goal 146:16,
  146:17.
goals 147:2,
  147:3.
going. 173:23.
Golimowski 28:2,
  30:20, 36:21.
Google 62:18.
gorillas 151:17.
gotten 66:4, 72:15,
  72:16, 209:5.
grainy 18:7, 19:22,
  21:8.
gram 68:1.
grams 68:2.
grass 75:19,
  75:20.
gray 52:2.
Great 8:23, 138:6.
green 86:24, 86:25,
  87:9, 103:11,
  140:23.
Greenmount 22:15,
  22:19, 23:12,
  26:10, 28:24,
  46:5, 46:8, 50:21,
  54:14, 59:24,
  64:13, 64:18,
  74:13, 75:3, 75:6,
  76:15, 108:5,

122:17, 154:15,
  154:16, 155:10,
  169:11, 202:3,
  204:10.
Gregg 14:22.
Gregory 23:21, 24:4,
  25:2, 25:11, 26:7,
  26:16.
grew 91:9, 91:10,
  177:17.
Grimm 173:9,
  174:17.
grounds 172:18.
group 18:21, 21:8,
  33:18, 42:17,
  67:11, 85:5,
  118:7, 177:21,
  205:9, 205:12.
grow 47:25, 201:25,
  202:2.
growing 202:7,
  203:12.
Guerilla 48:7,
  48:15, 150:14,
  188:7.
guerillas 19:6.
guess 42:13, 117:15,
  155:19, 155:22,
  177:24, 178:3.
Guidelines 125:23.
Guilford 50:19,
  54:14, 59:24,
  69:15, 69:20,
  70:19, 71:5,
  71:13, 77:14,
  77:20, 78:2,
  90:15, 90:16,
  90:18, 107:12,
  155:15.
guilt 175:11.
guilty 13:23, 14:2,
  125:12, 125:19,
  125:20, 175:13,
  175:14, 175:15.
guns 13:17, 55:19,
  77:4, 77:7, 77:12,
  77:17.
guy 71:8, 88:23,
  91:6, 100:25,
  160:7, 160:10,

178:14.
guys 64:5, 70:17,
  71:8, 77:21,
  77:24, 106:25,
  179:1, 179:6,
  179:7, 179:9,
  205:9.
.
.
< H >.
habit 161:22.
hack 73:5.
hair 101:1, 101:3.
half 22:10, 44:5,
  57:24, 57:25,
  58:2, 58:6, 58:8,
  59:11, 126:19,
  159:2, 159:3,
  159:6, 200:4.
halfway 159:7.
Hall 12:2, 12:4,
  12:9, 12:16,
  12:24, 13:8,
  14:13, 15:8,
  15:13, 18:10,
  41:10.
hand 15:16, 17:3,
  47:6, 73:9, 92:22,
  201:6.
handgun 49:3, 49:4,
  121:11, 121:12,
  165:4, 165:11.
handler 30:22,
  41:3.
handles 151:5,
  151:12.
handling 127:23.
handwriting 94:25,
  96:5.
Handy 20:21, 21:1,
  36:10, 37:20,
  37:21.
hang 70:15.
hanging 5:7, 83:3,
  155:12, 188:13,
  188:17.
Hannah 18:16.
happen 54:11, 63:25,
  69:21, 76:23,
  78:13, 87:17,

124:2, 130:13,
  134:16, 185:23.
happens 39:16, 72:3,
  80:9, 163:9.
happy 6:24, 161:23,
  171:15.
hard 7:14, 18:23,
  56:25, 57:1, 57:2,
  57:4, 57:7,
  207:9.
hard-nosed 8:2.
harm 75:9, 79:4.
Harris 15:15, 15:21,
  15:23, 16:15,
  17:3, 18:9.
Harvey 35:16, 35:22,
  36:24, 36:25,
  37:18, 37:19.
hashtag 19:5.
haste 35:2.
hat 15:8, 15:13,
  15:14, 15:17,
  17:2, 17:3.
Hayden 2:8, 11:8,
  11:10, 11:14,
  11:17, 11:23,
  18:1, 23:6, 24:22,
  25:12, 26:20,
  26:25, 38:24,
  39:23, 42:2, 45:2,
  222:15.
Haze 16:10.
HCS 56:2.
heading 69:9.
hear 8:6, 9:23,
  33:17, 40:24,
  84:19, 92:12,
  113:16, 134:1,
  162:9, 197:2,
  212:24, 212:25,
  213:1, 214:11.
heard 40:24, 60:22,
  60:23, 60:25,
  66:7, 92:13,
  104:8, 134:10,
  134:13, 134:17,
  135:2, 136:19,
  158:2, 172:22,
  173:18, 211:15.
hearing 5:21, 6:7,

81:16, 125:6,
  174:6, 174:18,
  212:20, 213:1,
  221:19.
hearsay 61:10.
heavy-set 78:20.
held 190:13.
hell 16:9.
help 7:11, 32:20,
  50:11, 80:3,
  108:16, 108:18,
  146:17, 146:18,
  178:5, 191:6,
  191:15, 192:24,
  193:8, 194:15,
  194:19, 195:2,
  211:19, 217:3,
  219:15, 219:18,
  219:19.
helped 146:11.
Henry 19:14, 19:18,
  23:22, 25:4,
  26:9.
hereby 222:1.
Heroin 37:16, 38:17,
  56:20, 57:10,
  57:18, 60:6,
  62:12, 67:22,
  103:21.
herself 218:8.
hesitated 189:2.
hesitation 189:3.
hid 71:2.
high 6:11, 177:5,
  181:2, 190:4.
high. 19:7.
higher 6:12,
  151:4.
highlights 71:19.
him. 95:12.
hiring 83:12.
historical 28:13,
  37:9.
history 162:2.
hit 90:5, 134:18.
Hitchens 18:15,
  18:21, 19:3, 36:4,
  36:6, 37:8,
  37:13.
Hoffman 1:27, 6:14,

8:19, 11:15, 35:9,
200:2, 217:12,
222:17, 222:23,
222:39.
Hold 61:13, 77:17,
217:13.
holding 15:15,
190:12.
home 49:22, 73:6,
108:4, 108:12,
108:15, 112:24,
126:8, 170:17,
175:22, 182:16.
homeboys 70:15.
homicide 2:24, 28:8,
73:15.
homicides 23:16,
23:18.
honestly 136:19.
Honorable 1:18.
Hood 14:22, 16:10,
27:24.
hook 214:1.
hope 17:9, 30:21.
hospital 205:16.
hot 10:15.
hotels 43:18.
hour 71:3, 200:4.
hours 71:3, 134:22,
135:22.
houses 28:25, 66:13,
105:21.
housing 49:22,
50:11.
huge 5:6.
human 146:10.
hung 187:18, 188:25,
190:7.
Hunter 18:22, 34:18,
147:5, 148:10,
154:1, 178:23,
178:25, 179:11,
180:3, 180:6,
180:10, 180:13,
192:9, 194:25,
196:23.
husband 199:23.
hustling 75:1.
.
.

< I >.
idea 138:6.
identification
190:23, 191:6,
191:15, 217:2.
identified 3:2, 3:3,
15:4, 16:19,
18:18, 19:1,
20:10, 20:15,
21:6, 36:4, 52:9,
52:25, 53:4,
53:13, 72:19,
74:18, 79:13,
79:15, 82:8,
86:13, 88:22,
98:8, 139:12,
139:15, 139:24,
141:3, 182:22.
identify 16:25,
19:16, 34:1,
34:17, 36:9,
51:16, 51:19,
51:25, 206:24,
218:22, 219:6.
identifying 191:5.
III 1:41.
illegal 32:19,
45:20.
illuminating
65:12.
ily 13:1, 14:8.
image 35:8.
imagine 133:24.
Impact 28:4.
impeach 162:1,
172:8.
impeached 174:3.
impeachment 174:1,
217:19.
implies 65:6,
65:8.
important 216:16.
importantly
112:22.
imposed 175:17.
improper 217:23.
in. 8:16, 54:17,
102:6.
inappropriate
6:22.

inarticulate 65:21,
97:1.
incarcerated 119:6,
119:13, 123:10,
124:12, 127:18,
127:19.
incident 92:9,
92:14, 132:21,
133:16, 134:6,
179:8, 208:22,
211:5.
incidents 25:20.
inclination 8:7.
include 55:5.
included 27:23.
inconsistency
172:12, 173:12,
173:18.
inconsistent 172:8,
172:12.
incorrect 210:4,
210:21.
incorrectly 4:8.
increments 43:16,
43:17.
incriminate 113:23,
138:5.
incriminated
137:23.
incriminating
137:16.
independent 68:14,
101:14, 152:7,
172:10, 213:11,
221:8.
INDEX 222:11.
indicate 51:21,
202:9.
Indicated 66:21,
94:9, 135:13,
161:17, 174:23,
199:15.
indicates 172:17.
indicating 94:8,
202:15.
Indicating. 60:4,
70:3, 71:16.
indication 5:15.
indictment 61:13.
individual 14:17,

20:13, 23:22,
24:1, 24:3, 26:18,
51:12, 52:5,
72:19, 74:18,
81:3, 87:22.
individuals 8:5,
15:9, 18:7, 19:22,
21:8, 22:10,
22:15, 24:11,
32:23, 33:3,
33:18, 198:5,
215:4.
induce 206:23.
indulge 151:22,
151:24.
indulgence 35:19,
114:17, 171:13,
181:23.
inevitable 11:2.
influence 40:15,
154:25.
influenced 130:21.
inform 43:2.
informal 9:2, 34:4,
212:9.
informant 31:1,
33:1, 43:1, 43:3,
45:3, 45:5,
45:24.
informants 32:17.
initial 30:6, 147:4,
147:8, 173:9.
initially 65:11,
66:1, 142:14.
initials 94:4, 94:7,
99:13, 99:16,
206:11.
initiation 51:5.
innocent 9:12.
inquire 112:17,
125:8, 163:13.
inquiry 7:4.
inside 108:12,
109:23, 137:13.
insisting 172:22.
Instagram 18:18,
20:10, 21:7,
120:12, 120:13.
instead 4:1.
instructions 94:1,

95:22, 99:10,
99:11, 206:10,
206:12.
intended 59:1.
intent 36:20, 37:1,
37:12.
intention 7:25,
172:11.
interact 196:2.
intercepted 30:11,
45:6.
internet 68:16,
101:16, 152:9,
221:9.
interpretation 39:3,
136:17, 217:19.
interpreted 66:14.
interrupt 209:12.
intersection 74:9.
interview 28:9,
30:18, 40:11,
98:11, 98:15,
100:10, 186:8,
205:19, 205:21,
205:23.
interviews 31:21,
97:18, 186:24,
199:2.
intimidate 207:5,
207:13.
introduce 155:2.
introduced 154:21,
155:4.
investigated 23:10,
23:17, 23:18.
investigation 22:19,
23:11, 27:16,
27:18, 28:12,
28:14, 30:3, 31:4,
33:9, 34:7, 35:24,
35:25, 36:11,
36:14, 40:5,
40:21, 40:23,
42:8, 42:9, 68:14,
101:14, 152:7,
213:11, 221:8.
investigations
23:15, 30:6.
involve 49:17,
151:17.

involved 28:13,
32:8, 37:22, 45:9,
100:10, 123:25,
131:7, 132:16,
184:24, 185:20.
involvement 79:25.
involving 81:21,
82:11, 92:9,
133:17, 134:7.
issue 2:6, 44:2,
61:3, 83:7,
83:11.
issues 2:3, 68:11,
83:19, 83:20,
101:11, 152:4,
200:19, 221:5,
221:10, 221:12.
itself 10:21,
107:3.
.
.
.
< J >.
J. 109:22, 141:22.
jail 108:4, 108:12,
156:5, 163:4,
163:19, 164:2,
166:25, 167:3,
167:8, 167:11,
167:13, 167:21,
168:6.
Jamaa 150:23.
James 30:6, 30:11,
30:16, 30:25,
33:22, 40:6, 45:2,
126:25, 193:11.
James K. Bredar
1:18.
January 37:15,
143:8, 143:24,
145:1, 145:2,
147:25, 148:1,
174:16, 184:6.
Jason 21:4.
Jeffrey 1:33.
jeopardy 49:24,
49:25.
Jerome 204:20,
204:21, 205:5,
205:12, 206:17,
209:18, 219:7.

Jesse 193:23.
JKB-16-0363 1:9.
job 146:19.
jobs 43:12, 44:3,
    146:11, 146:18.
Joe 51:9, 52:24,
    52:25, 60:13,
    72:22, 72:24,
    73:1, 73:3, 74:16,
    75:15, 75:17,
    75:21, 75:22,
    77:2, 89:14,
    106:18, 107:23,
    192:13, 195:14,
    197:4, 198:8.
John 1:41.
join 33:18, 54:7.
joined 51:8, 116:7,
    123:3, 146:8.
joke 89:17.
Jonathan 11:17,
    222:15.
Jones 1:35, 12:21,
    34:16, 41:14,
    41:17, 41:18,
    153:8, 154:9,
    159:19, 171:25,
    172:15, 197:25.
Jordan 23:19, 24:25,
    26:6.
Joseph 154:3,
    155:6.
Joshua 215:11.
Judge 10:17, 124:11,
    169:21, 169:24,
    170:1, 170:7,
    170:19, 171:15,
    173:9, 174:17,
    175:17, 209:12.
judges 7:7.
Judgment 5:16,
    172:14, 172:17,
    173:16, 173:20,
    174:22.
July 24:25, 49:10,
    69:11.
jump 37:10.
jumped 77:4, 78:25,
    209:19.
June 13:22, 14:4,

92:25, 116:24,
    116:25, 119:1,
    124:7, 125:11,
    126:21, 126:24,
    127:12, 139:20,
    140:2, 140:14,
    142:3, 142:19,
    143:2, 143:17,
    166:3, 168:13,
    168:25, 182:11,
    184:11, 184:13,
    184:16, 184:17,
    184:21, 186:9.
juror 7:14, 10:4.
jurors 7:9, 7:11,
    8:4, 10:25, 16:21,
    221:2.
juvenile 196:1,
    198:16.
.
.
.
< K >.
Keep 7:11, 10:10,
    17:12, 63:10,
    73:3, 73:9, 83:24,
    170:14, 173:25,
    186:22, 207:17.
Kenneth 1:35, 34:16,
    153:6, 171:25,
    172:15.
kept 28:25, 73:7,
    207:8.
key 57:24, 57:25,
    58:4, 58:5.
kid 128:14, 128:16,
    128:21, 128:23,
    129:5, 129:7,
    129:9, 129:10,
    129:12.
kids 77:5, 129:10,
    177:17, 188:5.
kill 81:13, 81:24,
    84:12, 90:23,
    100:5, 135:15,
    137:19, 137:23,
    138:6, 140:17,
    140:25, 141:12,
    141:18, 144:22,
    180:11.
killing 134:24,

137:9, 150:4.
kilo 58:3, 58:6,
    58:8, 59:12.
kilogram 58:2.
Kim 157:6, 157:9,
    157:14, 157:22.
kind 18:23, 19:22,
    21:8, 39:8, 40:1,
    40:3, 49:7, 56:19,
    56:23, 57:8, 62:3,
    72:12, 72:13,
    75:22, 77:7,
    103:20, 114:6,
    180:24, 199:16,
    218:1, 221:6.
kinds 77:7.
knock 82:1.
Knotting 38:10,
    38:13.
knowing 145:18,
    145:19.
knowledge 40:4,
    54:22, 54:25,
    65:19, 65:23,
    106:1, 208:9.
known 14:13, 14:17,
    15:15, 45:3,
    45:14, 132:24,
    206:8.
knows 30:15.
.
.
< L >.
L-i-l-l-i-a-n
    201:15.
label 5:22.
Ladies 8:25, 9:1,
    50:25, 51:15,
    68:7, 70:10,
    101:8, 102:4,
    113:6, 113:13,
    114:20, 125:4,
    151:25, 200:18,
    213:6, 220:25.
laid 212:23.
Lamar 24:2, 25:9.
Lamarr 26:18.
Lamontae 24:2,
    25:10, 26:15.
Landsman 28:5,

28:7.
language 38:7,
    161:21.
Lanvale 82:16,
    82:22, 95:6,
    100:7, 132:11,
    140:8, 140:16,
    142:4.
Lanvale-barclay
    131:16.
lapel 6:19, 6:20.
large 40:19, 40:22,
    41:6, 104:5,
    104:13.
largest 57:22.
Larry 51:9,
    107:23.
last 12:9, 16:3,
    16:8, 22:10,
    47:13, 47:14,
    73:10, 96:24,
    145:21, 146:2,
    153:7, 153:15,
    153:25, 154:6,
    154:8, 154:9,
    154:11, 157:12,
    158:7, 177:8,
    191:12, 201:14.
late 27:17, 82:23,
    116:7, 116:9,
    117:11, 174:11,
    189:10, 189:11.
Later 59:10, 71:3,
    76:19, 86:3, 90:8,
    98:12, 123:3,
    123:4, 124:9,
    134:20, 134:21,
    165:25, 171:8,
    182:7, 185:14,
    187:3.
laughing 89:18.
law 2:18, 12:25,
    14:2, 30:24, 38:6,
    39:8, 39:10,
    68:15, 73:14,
    93:11, 93:15,
    101:14, 121:22,
    122:1, 122:8,
    122:19, 122:25,
    123:14, 124:10,

124:11, 124:16,
    124:19, 152:7,
    186:24, 187:3,
    199:19, 218:2,
    221:8.
lawyer 10:6, 10:7,
    51:22, 65:15,
    65:19, 65:25,
    132:4, 132:6,
    132:7, 132:8,
    162:1.
lawyers 6:21, 7:20,
    9:10, 9:21, 10:13,
    10:23.
lead 66:10,
    109:16.
leader 147:4, 147:8,
    147:11.
Leading 53:8, 65:2,
    65:5, 65:6, 65:7,
    65:9, 65:14, 66:2,
    66:4, 96:25,
    105:19, 112:16,
    173:14.
Leaning 60:21.
learn 89:5, 89:7,
    89:20, 110:10,
    110:11, 110:13,
    148:12.
learned 31:3, 89:9,
    89:15, 110:14.
least 2:24, 7:8.
leave 13:9, 44:13,
    101:20, 149:21,
    149:25, 150:2,
    150:4, 152:13,
    213:20, 216:18,
    216:24, 216:25.
leaves 10:18.
led 205:12.
left 14:17, 14:21,
    15:7, 15:13, 18:9,
    20:1, 20:21,
    25:19, 51:17,
    60:2, 61:5, 68:19,
    72:9, 72:10,
    76:15, 95:9,
    101:19, 124:24,
    140:10, 140:11,
    149:5, 152:11,

205:5, 205:7,
    213:15, 213:16,
    216:6, 221:17.
legal 161:9.
legalistic 161:12,
    161:15, 161:21.
less 25:7, 58:20,
    102:20, 164:8,
    211:3.
letters 5:24.
level 6:9, 109:5.
Lexington 36:17.
liberal 136:17.
life 32:12, 43:14,
    49:23, 49:25,
    114:11, 167:3,
    168:16, 176:19,
    176:20, 207:22.
lifestyle 114:13.
light 29:3, 29:5,
    29:8, 29:9, 86:24,
    86:25, 87:9,
    140:23, 173:5,
    173:10.
Lillian 199:20,
    200:22, 200:24,
    200:25, 201:7,
    201:15, 222:37.
limine 17:16,
    17:21.
line 2:7, 10:3,
    29:8, 30:8, 30:9,
    31:15, 38:25,
    39:7, 74:5, 123:4,
    141:17, 170:16.
lines 30:2, 30:10,
    30:11, 159:6.
link 44:19.
linked 164:24.
list 22:18, 25:19,
    161:3.
Listen 132:3.
listening 30:10.
Little 5:11, 5:17,
    5:23, 6:14, 6:18,
    9:12, 10:2, 10:3,
    21:21, 25:7,
    42:25, 63:8, 77:5,
    92:3, 92:5, 97:9,
    115:11, 119:22,

128:14, 131:22,
132:12, 156:7,
164:8, 177:20,
190:15, 190:16,
190:18, 193:11,
200:19, 214:12.
live 49:22, 56:9,
70:6, 78:2, 112:1,
181:1, 211:6.
lived 64:16, 73:2,
74:24, 75:6,
77:21, 77:24,
78:5, 91:12,
103:16, 155:14,
176:12, 177:22,
180:25, 190:9.
living 43:13, 46:8,
50:18, 90:18,
122:17, 181:4.
Lloyd 126:25,
127:20, 127:22,
129:2, 129:14,
129:15, 130:17,
130:20, 130:23,
131:11, 132:10,
132:18, 140:13,
141:22, 142:18,
166:1, 166:3,
184:7, 184:8,
184:15, 184:19,
186:12, 186:24.
local 4:23, 24:21.
location 44:2,
55:23, 56:2,
62:19, 62:24,
66:18, 69:17,
70:9, 73:13.
locations 25:17,
26:3, 55:12,
60:10.
locked 46:12, 74:24,
116:24, 117:8,
119:1, 123:19,
126:6, 127:16,
149:10, 155:17,
168:13, 168:25,
171:12, 171:24.
locking 7:12.
lodging 43:11,
43:18, 44:14.

logistical 200:19.
Lombard 1:48.
long 21:10, 54:9,
73:7, 90:11,
90:13, 100:25,
116:23, 148:18,
161:25, 200:2,
211:5, 212:16,
214:3, 214:5,
220:10.
longer 33:2, 83:3.
look 5:14, 5:15,
68:15, 78:21,
93:17, 95:14,
99:1, 101:15,
113:13, 115:18,
136:22, 152:8,
157:18, 159:11,
178:3.
looked 28:12, 78:18,
100:25, 118:6,
139:11, 141:2,
188:9.
looks 18:9, 19:14,
141:22, 207:9.
lost 186:15.
Lot 22:3, 29:9,
32:18, 38:16,
41:8, 43:11,
56:15, 108:13,
118:5, 119:14,
119:15, 120:10,
148:13, 166:24,
187:18, 189:25,
190:4, 192:2.
loud 133:18,
159:10.
louder 6:14.
Love 16:12.
LTC 108:12.
lunch 101:7.
lung 205:10.
lyrics 113:17,
113:19.
.
.
< M >.
M-e-a-d-o-w-s
47:16.
Ma'am 38:22, 201:1,

201:11, 201:12,
201:17, 201:18,
203:15, 209:10,
209:12, 210:13,
216:17, 220:23.
Magistrate 174:17.
main 147:12.
majority 112:11.
male 79:24.
Malone 23:24, 25:5,
26:11, 37:25,
38:1.
man 12:25, 13:23,
153:3.
man. 13:3.
maneuverable
29:11.
manner 9:22, 184:25,
186:22.
Manny 74:16, 74:23,
75:17, 75:21.
map 25:17, 25:20,
25:24, 70:16,
71:15, 73:11.
maps 62:18.
March 37:5.
Marijuana 31:10,
40:25, 76:4.
mark 134:1.
marked 3:10, 3:15,
4:1, 5:6, 62:17,
64:21, 69:16,
81:2, 85:12,
95:14, 98:25,
103:7, 108:7,
139:10, 139:22,
141:1, 172:1,
172:15, 217:1.
Market 36:17.
Marking 171:25,
190:23.
Marquise 1:39, 4:12,
4:14, 203:16,
203:19, 215:21.
Martinez 2:4, 47:18,
68:5, 69:8, 102:5,
102:8, 113:1,
113:11, 139:3,
161:13, 183:21,
212:5, 222:27,

222:35.
Maryland 1:2, 1:20,
   1:49, 26:14,
   201:25.
material 73:15.
matter 110:11,
   190:1, 209:23,
   222:3.
matters 125:5,
   213:12.
mature 49:4.
Mccants 1:39, 4:12,
   4:14, 13:12, 42:6,
   42:9, 42:10,
   42:17, 42:20,
   44:19, 187:16,
   190:2, 194:8,
   194:9, 194:15,
   195:20, 197:18,
   198:14, 198:15,
   209:4, 215:21,
   217:2.
Mcclean 74:11.
Mcnair 215:17.
means 41:5, 57:13,
   57:17, 57:18,
   58:15, 58:19,
   58:23, 82:1, 97:7,
   208:11.
meant 77:10.
media 41:9, 41:18,
   42:4, 42:6, 42:7,
   42:16, 120:1,
   120:16, 120:22,
   120:23, 213:9.
meet 32:10, 127:22,
   156:16, 176:20,
   214:21.
meetings 32:2,
   33:12, 33:14,
   33:15, 33:21,
   33:22, 42:20,
   42:21, 42:23,
   86:4, 86:8, 87:22,
   106:7, 106:10,
   137:5, 147:22,
   147:25, 156:8,
   156:13, 187:3.
members 49:17,
   54:23, 55:1, 59:6,

60:9, 77:11,
   79:15, 79:19,
   84:8, 85:16,
   87:21, 89:13,
   91:23, 108:21,
   111:6, 117:16,
   118:14, 148:12,
   148:24, 192:3,
   194:6, 195:24,
   196:21, 202:9,
   207:4.
membership 55:4.
memory 73:17,
   158:18, 158:22,
   159:13, 181:25,
   182:2.
men 177:1, 188:1.
mention 185:7,
   185:19.
mentioning 184:6,
   184:22, 184:24,
   185:3, 185:4.
merger 107:8.
message 10:6,
   113:19.
messages 10:4.
met 34:12, 40:16,
   118:23, 124:9,
   127:19, 145:8,
   145:13, 145:21,
   155:10, 155:12,
   175:24, 176:17,
   176:18, 182:11,
   191:17, 194:12,
   194:13.
Michael 21:25.
microphone 47:13,
   63:9, 115:11,
   201:13.
microphones 214:8.
Middle 20:2, 94:15,
   100:20, 107:20,
   113:9, 113:10,
   139:24, 141:4,
   159:7, 190:2,
   190:3, 190:4,
   211:6.
Miguel 198:18.
Mike 21:25.
mikes 6:20.

military 147:15.
Miller 23:25, 25:8,
   26:13.
Mills 23:22, 25:4,
   26:9.
mind 7:12, 24:22,
   26:3, 133:8,
   133:10, 133:14,
   133:24, 137:3,
   140:22, 209:1,
   209:2.
Mine 94:6, 94:24,
   95:1, 99:20,
   99:22.
minute 18:6, 36:13,
   70:16, 71:7,
   81:14, 83:18,
   87:23, 121:3,
   150:8, 172:2,
   212:8, 213:21.
minutes 33:17, 36:3,
   68:17, 68:22,
   69:2, 78:16,
   151:24, 152:10,
   152:14, 200:3,
   200:6, 212:18,
   214:5.
misconduct 61:14.
missing 80:17,
   80:21, 81:9,
   81:11, 81:20,
   82:12, 84:17.
mission 105:3,
   105:5.
misspeak 20:24.
mix 57:4.
mixed 58:11.
Mo 74:16, 74:23,
   75:18, 75:21.
modification
   166:16.
moment 35:19, 68:5,
   131:12, 171:13,
   181:23.
moments 151:21.
money 43:10, 44:14,
   50:13, 55:19,
   58:21, 58:23,
   59:3, 63:20,
   63:25, 64:2,

74:25, 76:11,
76:12, 79:4,
83:22, 84:4, 84:5,
177:5.
money-wise 83:21.
Montana 18:16.
Montel 35:16.
month 25:8, 44:5,
191:11, 191:13.
monthly 67:12,
172:19, 175:3.
months 98:12, 99:7,
117:2, 117:9,
163:3, 163:4,
164:13, 171:7,
171:18, 175:19,
175:23, 185:14,
220:6, 220:11,
220:15.
Montray 215:17.
moral 160:24.
morning 2:2, 2:22,
7:2, 8:25, 11:23,
27:5, 35:2, 40:19,
42:2, 47:21,
47:22, 68:8,
116:6, 118:7,
121:4, 145:24.
Moses 23:24, 25:5,
26:11, 37:25,
38:1.
mother 103:16,
190:5, 207:22,
216:20.
motherfuckers
89:18.
motherfucking
13:4.
motion 140:19.
motions 17:10,
17:16, 17:18,
17:21.
mouth 115:12, 129:6,
150:9, 151:13,
207:17.
move 24:19, 25:3,
44:2, 44:3, 79:5,
98:3, 102:12,
102:22, 105:20,
114:11, 115:10,

138:17, 160:16,
161:24.
moved 17:14, 43:17,
46:14, 64:15,
66:7, 66:10,
138:21, 169:11,
176:1.
Moving 165:3,
207:19.
MR. ENZINNA 4:5,
39:20, 53:7, 65:1,
66:6, 102:1,
112:12, 112:14,
112:16, 114:25,
115:2, 115:14,
125:10, 125:11,
130:10, 130:16,
132:10, 134:6,
136:15, 136:22,
139:9, 141:16,
141:17, 146:5,
146:7, 151:19,
199:10, 200:13.
MR. O'TOOLE 5:19,
6:2, 8:8, 8:15,
17:5, 17:9, 17:24,
26:24, 46:19,
71:21, 105:16,
109:15, 207:25.
muddled 173:14.
Muggy 45:14.
Murda 53:12,
195:12.
murder. 143:19.
murdered 23:21,
23:22, 23:24,
23:25, 24:1,
24:11, 24:25,
25:3, 25:4, 25:5,
25:6, 25:7, 25:8,
26:9, 26:12,
128:12, 129:10,
129:24, 183:2,
183:3, 183:5.
murders 23:10, 24:9,
24:15, 24:23,
25:18, 25:24,
26:4, 54:22,
155:21, 155:23,
159:23, 166:10.

Mustafa 21:4.
myself 32:20, 60:13,
77:2, 85:23,
106:18, 107:23.
.
.
< N >.
N-o-d 38:13, 40:8.
Nah 115:19,
148:19.
Naim 107:25, 108:1,
108:2, 108:3,
108:4, 108:9,
108:10, 108:21.
named 51:12, 70:15,
91:6, 118:7,
182:17, 216:4.
names 22:3, 22:9,
22:14, 23:16,
52:4, 72:18,
154:8, 196:21,
203:20.
narcotics 31:14,
31:16, 33:19,
55:13.
nature 33:17, 92:2,
172:9.
naval 199:23.
near 74:13.
nearby 184:1.
necessary 7:11,
17:9, 17:17.
need 2:3, 8:19,
17:13, 73:4,
125:5, 131:22,
132:13, 146:5,
162:8, 174:5,
214:14, 216:13,
221:18.
needed 44:2.
needs 174:1,
174:3.
neighborhood 22:15,
46:5, 46:9, 50:20,
54:13, 75:3, 75:6,
75:7, 75:10,
82:18, 83:3,
91:12, 91:18,
91:20, 108:5,
108:15, 119:15,

166:10, 176:1,
177:18, 177:22,
178:1, 178:8,
178:11, 188:12,
188:18, 202:6,
203:11, 204:5,
207:19.
neighborhood-wise
109:1.
neighborhoods
75:8.
new 102:12, 102:22,
106:2, 171:10,
171:21, 172:21,
172:24, 172:25,
174:25.
news 68:10, 101:10,
152:3, 221:4.
Next 4:7, 14:14,
18:8, 25:1, 46:23,
47:3, 51:22, 59:4,
63:10, 72:3,
86:10, 89:6,
123:7, 130:15,
132:6, 132:9,
146:4, 150:25,
160:19, 182:14,
184:2, 200:20,
208:20, 209:15,
210:18, 214:19,
217:24, 218:20,
220:4.
Nextel 120:20.
Nextels 120:18.
nickname 21:4, 40:6,
40:7, 42:10,
157:11.
nicknames 22:4,
22:9, 22:15.
Nigel 13:4,
197:15.
nigga 12:24, 16:11,
60:23.
nigga. 13:5.
niggas 12:18, 12:25,
13:24, 14:1,
16:12, 20:18.
niggas. 14:8.
niggers 16:10.
night 16:8, 70:12,

70:20, 70:22,
76:20, 145:21,
146:2, 160:14,
160:16.
nightclub 26:19.
Nighttime 69:22,
76:17, 78:21.
nine 106:24, 106:25,
107:1.
Nobody 9:19, 19:6,
75:9, 107:5,
120:13, 160:20,
168:19, 168:21,
168:23, 169:1.
Nod 40:7, 45:3.
nodding 38:9, 38:13,
38:14, 39:24,
40:3.
noise 108:13.
non-controlled
164:17.
None 4:19, 4:20,
44:18, 107:6,
187:10, 188:12,
188:15.
nonleading 65:11.
nonprocess 125:18.
nope 32:24.
normally 38:16,
103:24.
Norman 20:21, 21:1,
36:10, 203:16,
204:2, 215:15.
North 26:17.
Northeast 74:8.
Northern 1:2,
74:12.
note 13:18.
noted 4:1.
Nothing 6:23, 41:1,
72:9, 104:2,
120:7, 128:14,
151:19, 176:17,
185:11, 185:12,
186:18, 199:7,
219:17, 219:19.
notice 2:7, 84:20.
notify 111:4,
172:20, 172:21,
172:25, 174:25,

175:7.
Number 5:22, 26:5,
26:15, 34:24,
34:25, 35:1, 41:9,
88:25, 161:15,
163:5, 163:10,
172:16.
numbers 3:10,
163:7.
numerous 33:21,
180:16.
Nut 193:25.
.
.
< O >.
O'toole 1:33, 4:24,
5:18, 8:11, 39:15,
105:18, 207:24.
oath 11:15, 69:7,
102:7, 109:10,
109:11, 110:5,
110:15, 125:9,
145:20, 148:6,
148:8, 148:14,
148:20, 148:22,
148:24, 149:20,
149:22, 151:14,
151:15, 151:17,
151:18, 152:22,
201:6.
Object 5:2, 5:16,
6:6, 23:2, 39:15,
53:7, 65:1.
objecting 5:2,
39:19, 217:25.
Objection 4:4, 4:19,
17:13, 23:4,
39:14, 39:20,
60:16, 61:18,
65:1, 66:2, 66:5,
96:20, 104:10,
105:16, 105:18,
109:15, 112:12,
112:13, 112:14,
130:6, 163:6,
174:19, 183:10,
185:15, 186:17,
203:13, 217:6,
217:9.
objectionable 65:7,

65:9.
objections 17:20.
obligation 128:4.
observations 66:24,
  67:11.
observe 33:13.
observed 205:11.
observing 29:17.
obstacle 114:15.
obtained 105:1.
obvious 76:2,
  215:22.
Obviously 135:8,
  215:24.
occasion 28:9,
  30:18, 33:13,
  40:10, 40:11,
  59:12, 104:4.
occasions 191:24,
  192:4, 192:6.
occurred 92:18,
  135:8, 211:5.
October 124:3,
  124:4, 124:8,
  143:6.
off. 13:24.
offense 48:22,
  218:6.
offenses 162:2,
  175:13.
offering 172:7.
office 212:12.
officer 2:11, 27:11,
  115:23, 115:24,
  175:1, 175:7,
  199:23.
officers 100:10,
  116:1.
Official 1:47,
  222:7.
often 56:14, 60:7,
  60:15, 62:1.
old 12:25, 48:2,
  117:12, 117:19,
  118:14, 167:13,
  176:22, 187:17,
  188:3, 189:4,
  189:7, 189:9,
  201:23, 204:13,
  204:14, 209:21,

217:12, 217:15,
  218:7.
older 79:24,
  117:20.
Olivas 158:2.
Oliver 23:20, 25:1,
  26:7.
Once 8:2, 9:25,
  10:1, 57:3, 57:4,
  64:10, 64:11,
  103:25, 105:10,
  108:23, 108:24,
  135:16, 162:1,
  168:13, 169:20,
  198:2.
one. 36:2.
ones 23:9, 93:22,
  187:19, 198:17.
ongoing 3:2.
online 175:15.
open 7:12, 17:25,
  39:22, 61:23,
  66:15, 97:11,
  129:6, 130:14,
  136:20, 150:3,
  150:7, 150:8,
  162:13, 174:15,
  200:17, 213:5,
  218:19.
opened 128:25,
  150:8, 150:9.
opens 214:4.
operate 54:13.
operation 24:21.
operations 80:1.
opiates 40:19,
  40:22, 40:24,
  41:7.
opportunity 9:20,
  23:2, 162:1.
opposed 75:6,
  161:20, 174:7.
opposite 78:22.
Order 17:19, 76:22,
  100:5, 100:15,
  114:11, 114:14,
  140:22, 141:12,
  141:18, 142:6,
  143:21, 144:22,
  170:7, 172:13,

172:14, 173:9,
  173:17, 173:20,
  174:9.
ordered 133:8,
  143:21, 144:21,
  170:19.
organization 48:4,
  48:12, 50:5, 50:6,
  60:14, 82:17,
  82:18, 120:11,
  148:18, 188:16.
original 140:20,
  146:21, 146:24,
  175:21.
originally 140:22,
  146:25.
others 30:10, 78:2,
  129:17, 129:18.
ought 133:13.
ounce 63:13, 63:15,
  63:19, 63:20,
  67:18, 67:19.
ourselves 9:5.
out. 140:11.
outed 33:3.
outright 43:15.
outside 26:19, 73:5,
  75:3, 75:5, 75:7,
  81:16, 84:11,
  84:23, 87:10,
  89:13, 125:6,
  134:13, 137:10,
  212:20, 213:1,
  221:18.
outsider 177:20.
overall 6:7.
overnight 221:1,
  221:15.
Overruled 53:9,
  61:22, 61:24,
  66:14, 97:10,
  112:17, 163:12,
  183:12, 185:18,
  203:14.
overview 23:15.
own 46:14, 77:18,
  83:20, 92:5,
  219:20.
.
.

< P >.
Pace 21:16, 185:8.
pack 84:2, 84:3.
package 8:6, 55:12,
  56:19, 58:15,
  59:1, 80:3, 83:24,
  103:14, 103:20.
packaged 58:8,
  59:11, 64:24,
  66:9, 66:23, 67:3,
  67:6, 79:16.
packaging 31:15,
  55:7, 56:11,
  57:21, 57:22,
  59:6, 59:14,
  59:20, 66:11,
  66:13, 79:12,
  105:10.
packs 38:12.
pages 159:5.
paid 30:25, 43:6,
  43:9, 43:25,
  45:3.
pants 165:19,
  165:20.
paper 110:16.
paperwork 83:17,
  85:7, 86:25,
  108:17, 108:18,
  108:24, 109:6,
  109:9, 110:9,
  110:10, 110:12,
  124:21, 148:11,
  148:16, 149:23,
  188:11, 188:14.
park 72:6, 86:11,
  87:18, 107:10,
  107:11, 107:17.
Parked 78:22.
parking 11:1.
Parkway 74:12.
part 23:11, 27:18,
  28:3, 28:5, 28:10,
  28:12, 30:2,
  31:21, 35:24,
  36:1, 47:25, 74:6,
  88:3, 98:21,
  110:20, 113:2,
  121:21, 123:13,
  131:5, 149:22,

151:17, 170:7,
  170:20, 177:19,
  188:4.
partial 12:8,
  16:2.
participants 10:22,
  11:5, 68:12,
  68:13, 68:16,
  101:12, 101:13,
  101:16, 152:5,
  152:6, 152:9,
  213:10, 213:13,
  221:7.
participate 54:17,
  54:20, 56:11,
  76:19, 105:10,
  205:18.
participated 28:19,
  57:21, 59:6,
  73:21, 73:25,
  74:15, 74:19,
  77:1, 85:15,
  106:7, 107:9,
  199:1.
participates
  221:6.
participating
  221:10.
particular 6:16,
  39:1, 59:12,
  62:15, 63:21,
  74:9, 77:19,
  87:20, 90:16,
  104:2, 158:25,
  194:11.
pass 32:16, 33:4.
past 72:5, 114:16,
  176:17, 176:19,
  176:20.
Paul 11:25, 15:19,
  18:13, 19:8, 20:4,
  21:3, 21:11,
  21:14, 21:19,
  21:23, 45:14,
  174:17.
Paul F. Enzinna
  1:31.
Pause 5:11, 124:25,
  213:23.
paying 6:2.

payment 43:15.
payments 43:19,
  43:21, 49:11,
  49:14, 50:9.
peoples 84:21.
per 67:18, 104:8,
  191:18, 191:24,
  191:25.
percent 68:24,
  68:25, 208:24.
period 50:18, 63:11,
  63:12, 67:10,
  67:23, 82:23,
  119:4, 154:12,
  154:13.
permissible
  133:21.
permission 33:7,
  113:1.
Perring 74:12.
personal 54:22,
  54:25.
personalities 8:5.
persons 30:5, 30:12,
  74:23, 133:14,
  221:10.
pertaining 73:15,
  83:19, 96:15.
pertinent 218:9.
Peter 56:2.
Peter J. Martinez
  1:25.
PH 111:21.
PHA 95:14, 96:9,
  98:25, 139:10,
  139:22, 139:23,
  141:2, 182:21,
  205:25.
PHCS 79:13, 86:16.
phone 31:20, 33:10,
  120:18, 120:20.
phones 77:6, 78:8.
Photo 3:11, 12:21,
  15:7, 18:21,
  19:21, 93:14,
  93:21, 94:2,
  95:18, 95:19,
  96:10, 96:13,
  97:3, 97:17, 99:5,
  99:6, 139:2,

139:12, 139:23,
205:23, 206:3,
206:8, 206:10,
206:16, 206:20,
207:1.
photograph 3:25,
4:11, 86:13,
139:11, 139:24,
141:3.
photographs 22:9,
119:25.
photos 17:11, 22:14,
24:10, 42:17,
42:18, 73:14.
PHT 4:10, 111:10,
154:4.
physical 44:2.
pick 2:8, 94:11,
94:13, 95:25,
96:17, 97:3,
100:18, 206:3,
206:5, 206:20,
209:9.
picked 121:13,
123:23, 124:3,
124:8, 125:18,
125:19.
picture 5:22, 15:12,
15:14, 18:7, 19:3,
19:17, 20:5,
20:12, 34:15,
35:21, 53:17,
82:9, 94:15,
94:18, 100:2,
103:2, 103:9,
107:13, 141:10,
155:7, 157:19.
pictures 42:15,
42:16, 51:11,
52:3, 53:16,
111:9.
piece 199:2.
pills 41:1, 76:6,
104:7, 104:16,
104:19.
place 10:8, 25:19,
25:20, 25:25,
36:22, 64:15,
66:11, 69:23,
74:10, 76:17,

90:12, 90:14,
90:16, 142:17,
144:9, 146:20,
147:25, 148:1,
181:6, 181:20,
205:18, 205:21,
209:21.
placed 163:25,
201:6.
plain 28:23.
Plaintiff 1:7,
1:23.
plan 87:11, 87:14,
137:12, 137:19,
137:22, 137:25,
138:1, 140:19,
146:20, 146:21,
146:22, 146:24.
planned 2:25, 87:8,
146:17, 146:25.
planning 90:2,
199:25.
plans 2:16, 87:24,
88:8, 147:1,
199:18.
Play 113:2, 185:7,
208:17, 208:19,
211:18, 211:22,
211:25, 212:19,
213:25, 214:3,
214:7.
played 211:10.
played. 16:24,
113:15, 214:13.
plea 124:6, 124:17,
169:20.
plead 125:12,
125:20.
Please 2:3, 8:25,
11:5, 12:23,
14:25, 18:11,
34:17, 36:9, 47:1,
47:4, 47:5, 47:12,
63:10, 67:1, 68:8,
68:18, 69:6,
101:18, 102:3,
133:11, 152:20,
201:1, 201:3,
201:5, 201:12,
211:17, 213:17,

214:18, 221:14,
221:15.
pled 125:19,
175:14.
plow 39:21.
plug 214:9.
PO 175:6.
point. 120:15.
pointed 73:11,
73:12, 107:18,
114:4.
pointing 26:3.
points 6:19.
Police 27:14, 32:13,
70:13, 70:24,
165:7.
policy 10:10.
Porky 193:13,
194:17.
portion 2:10, 40:22,
158:25, 168:16.
posed 60:23.
position 7:14, 64:4,
64:9, 66:22,
115:11, 186:20,
211:24.
possession 36:20,
37:1, 37:12,
37:15, 49:3, 49:4,
121:11, 165:4,
165:12, 165:22,
165:23, 179:12,
179:14.
Possible 2:7, 2:14,
118:20, 118:21,
132:22, 136:17,
158:19, 176:25,
193:7, 194:14,
194:18, 209:11,
210:9.
Possibly 10:19,
158:14, 195:1.
post 13:16, 13:18,
14:1, 20:17.
posted 13:19,
13:22.
postings 41:14.
potent 58:20.
potentially 28:13.
Powder 56:24, 57:14,

57:15.
Powell 6:10, 7:23,
  8:21, 9:2, 125:2,
  199:15.
preparation 145:9.
prepared 16:22.
presence 202:6.
present 85:22,
  86:15, 86:16,
  87:19, 89:9,
  182:5.
presented 17:18,
  221:10, 221:13.
presents 68:11,
  101:11, 152:4,
  221:5.
preserved 17:12.
pretrial 17:10,
  17:22.
pretty 2:23.
prevent 137:22.
previous 193:1.
previously 11:18,
  15:4, 17:14,
  17:17, 18:18,
  48:21, 49:15,
  59:18, 65:8,
  67:18.
price 67:19.
Prince 16:12.
principles 66:3.
Prior 48:24, 93:1,
  93:7, 112:4,
  161:17, 162:1,
  167:23, 167:24,
  167:25, 168:5,
  172:8, 172:9,
  177:23.
prison 126:5,
  149:12, 149:14,
  149:16, 168:8,
  168:10, 168:15,
  169:7, 169:8.
Prisons 170:3,
  170:17, 175:20.
probably 38:12,
  44:4, 54:12,
  78:15, 118:15,
  124:4, 136:2,
  136:13, 136:17,

138:22, 155:3,
  180:19, 189:5,
  189:10, 194:11,
  200:5.
probation 163:25,
  164:9, 164:10,
  164:11, 175:1,
  175:7, 175:23.
probative 218:11.
problem 6:15, 6:20,
  9:19, 65:22,
  136:12, 199:16.
problematic 39:11.
problems 10:25,
  72:2.
problems. 71:6.
procedure 5:5,
  132:4.
procedures 187:5.
proceed 5:17, 71:25,
  174:13.
proceeding 17:23,
  112:4, 213:11.
Proceedings 1:17,
  17:25, 39:22,
  61:23, 66:15,
  97:11, 130:14,
  136:20, 162:13,
  174:15, 200:17,
  213:5, 218:19,
  221:24, 222:3.
proceedings. 124:25,
  213:23.
process 6:4, 17:22,
  110:20, 132:3,
  186:22.
procured 104:19,
  104:22.
produced 212:7.
product 64:3.
proffers 199:1.
program 170:10,
  170:20, 171:6,
  173:8.
prohibition 10:11.
promise 11:12.
promises 206:23.
pronouncing 30:21.
proof 9:14, 10:24,
  83:14, 83:16.

proposal 107:3.
propose 136:16.
prosecution 49:5.
prosecutors
  145:13.
provide 33:2, 44:9,
  44:14, 98:15.
provided 44:16,
  45:25, 97:23.
proving 85:7.
provision 172:25.
publicly 16:15.
publish 22:22.
pull 29:20, 29:21.
pulled 11:3, 42:6,
  72:4, 75:17,
  75:21, 180:8.
punch 209:22,
  209:23.
purchased 104:20.
Purple 51:20,
  51:23.
purpose 65:12,
  218:10.
pursuant 17:19,
  49:7.
put 5:14, 7:9, 7:23,
  20:25, 26:2,
  41:18, 44:18,
  52:4, 59:1, 59:25,
  96:9, 107:16,
  114:12, 114:14,
  140:19, 164:20,
  185:8, 185:13,
  210:14, 220:14.
putting 86:16, 94:7,
  113:21.
.
.
< Q >.
quadrant 74:6.
quantities 40:19.
quantity 58:21,
  104:5, 104:13.
Quarles 169:21,
  169:24, 170:1,
  170:7, 170:19,
  171:15, 175:17.
quarrel 161:9.
query 7:22.

quickly 8:22,
    125:7.
quietly 159:11.
quite 2:14.
quiz 161:20.
quote 172:23.
.
.
< R >.
R. 1:41.
raided 64:10,
    64:11.
Rainey 34:10, 34:11,
    34:13, 157:2,
    157:4, 157:8,
    157:10.
raise 47:5, 201:5.
ran 70:14, 72:6,
    134:17, 179:1,
    179:6, 179:9,
    188:6, 190:15.
random 63:6.
rank 150:16, 150:25,
    151:4.
ranks 109:23.
rap 112:23, 119:20,
    119:21, 119:23.
raw 57:17.
Ray 106:12, 106:13,
    106:14, 106:19,
    106:22, 156:14,
    157:25, 158:1,
    158:2, 158:3.
reach 2:25.
reached 186:2.
read 12:15, 12:23,
    13:7, 13:21,
    13:25, 14:6,
    14:25, 16:7,
    18:11, 19:4, 94:1,
    95:2, 95:23,
    99:11, 99:17,
    99:25, 159:1,
    159:3, 159:8,
    159:10, 159:11,
    159:21, 206:7,
    206:10, 206:14.
reading 94:9.
Ready 2:2, 8:23,
    11:7, 56:25, 57:7,

59:14, 60:6, 62:4,
    62:6, 62:11, 69:4,
    80:4, 101:24,
    102:5, 103:21,
    113:14, 125:7,
    152:16, 213:25.
real 12:18, 29:13,
    80:13, 137:3,
    182:19.
realizes 72:18.
Really 7:21, 9:11,
    52:1, 78:21,
    88:19, 117:23,
    117:25, 160:7,
    160:20, 164:2,
    172:23, 173:12,
    173:18, 220:14.
reason 9:25, 22:24,
    129:13, 144:18,
    144:22, 145:3,
    216:11, 216:12,
    216:15, 216:21,
    216:22, 216:23,
    218:1.
reasonable 5:16,
    9:3, 9:16.
receive 43:10,
    163:17.
Received 24:21,
    35:7, 49:11,
    50:13, 162:22.
Recess 68:8, 69:1,
    69:3, 101:17,
    101:21, 101:23,
    152:1, 152:14,
    152:15, 220:25,
    221:1, 221:22.
recognize 52:5,
    53:17, 56:2,
    62:19, 81:3,
    93:18, 93:20,
    95:15, 95:17,
    99:1, 99:4, 103:8,
    111:12, 111:14,
    205:9, 206:1.
Recollection 67:7,
    136:1, 136:9,
    136:13, 136:25,
    190:25, 191:7,
    191:8, 191:16,

192:25, 193:9,
    194:15, 194:19,
    195:2, 211:11,
    217:3, 217:21,
    219:15, 219:18,
    219:19.
record 3:16, 3:17,
    12:8, 14:11,
    14:12, 16:3,
    17:15, 19:21,
    34:24, 39:17,
    66:5, 86:15,
    125:18, 172:10,
    178:19, 202:16,
    213:16, 213:24,
    222:3.
record. 17:8, 38:21,
    60:20, 65:4,
    96:23, 130:8,
    136:7, 161:8,
    172:5, 199:14,
    212:3, 217:11.
recorded 186:9,
    186:12.
recording 186:14,
    208:16, 208:19.
recordings 186:23.
recovered 165:12.
recruited 168:10.
recurring 65:22.
red 12:23, 13:7,
    13:21, 15:8,
    15:13, 15:17,
    16:7, 18:11, 19:4,
    23:7, 23:9.
redesignated 4:7,
    4:16.
Redirect 44:24,
    44:25, 198:23,
    198:24, 220:19,
    220:20, 222:23,
    222:35.
redistribute 8:18.
Reed 21:13.
Reef 19:10.
refer 3:18, 5:13.
reference 221:12.
referenced 34:23.
references 98:5.
referred 3:21,

3:25.
referring 35:12,
  82:6.
reflect 22:14,
  213:16.
reflects 34:25.
refresh 136:1,
  136:9, 136:13,
  136:25, 158:17,
  159:13, 181:25,
  182:2, 191:6,
  191:15, 192:25,
  193:8, 194:15,
  194:19, 195:2,
  211:11, 217:3,
  217:21, 219:15,
  219:18, 219:19.
refreshed 158:22.
refreshes 171:16.
refreshing 190:25.
refused 92:4.
regard 6:19, 7:8.
regarding 40:5,
  54:25, 102:11.
regards 132:20.
Regime 22:19,
  23:12.
registered 12:9,
  16:3.
registration 12:12,
  16:5.
regular 43:21.
reiterate 65:10,
  161:18.
relate 68:12,
  101:12, 152:5.
related 68:16,
  101:15, 152:8.
relates 82:12.
relating 8:4.
relation 10:24,
  78:13, 127:13,
  127:14, 178:1.
relationship 50:8,
  52:18, 82:24,
  91:22, 156:4.
relative 115:21.
Relatively 37:17,
  125:6, 200:1.
relatives 154:18,

177:22.
release 170:8,
  170:20, 170:23,
  171:20, 172:18,
  174:24.
released 126:7,
  126:14, 170:5,
  170:15, 170:16.
relevant 221:8.
relocate 50:11.
reluctance 173:1.
remain 11:15, 69:7,
  102:7, 125:9,
  152:22.
remanded 221:23.
remarks 94:20,
  96:10, 96:12,
  98:4, 99:18.
remind 11:15.
remote 29:7.
renew 17:17.
repeat 39:24, 134:4,
  211:17, 218:23.
Rephrase 138:3,
  162:14, 184:12.
replied 12:16.
report 124:18,
  136:10, 170:25,
  172:19, 173:8,
  175:5.
reported 175:6.
Reporter 1:47, 6:19,
  60:23, 222:7.
reports 68:11,
  68:12, 101:10,
  101:12, 152:3,
  152:5, 172:19,
  175:3, 221:4.
represented 160:22,
  169:24.
reputation 177:25.
request 4:17.
required 175:3.
resolved 125:6.
resources 146:10.
respect 66:4, 88:11,
  173:21, 174:1,
  213:12, 221:9.
respond 87:2,
  107:3.

response 29:23,
  65:11, 99:7,
  112:19, 181:25.
response. 125:21.
rest 2:18, 63:25,
  64:2, 126:13,
  156:5.
Restate 134:5,
  183:13.
restriction 7:9.
result 39:2,
  207:18.
resume 11:14.
return 68:21,
  101:21, 152:13,
  221:14.
revealed 89:24.
reverse 13:16.
review 22:11, 24:12,
  25:21, 37:9.
reviewed 42:16,
  105:22, 105:25.
reviewing 27:21.
rifle 111:24.
right-hand 25:18,
  96:4, 182:23.
ring 130:12.
risky 8:10.
ritual 51:6.
rival 205:2.
road 161:20.
rob 75:25, 104:23,
  104:24, 105:5,
  137:25, 189:19,
  189:21.
robbed 105:2,
  189:15, 189:17.
robberies 54:20,
  73:20, 73:22,
  75:3, 76:19,
  158:5, 158:13,
  160:1, 160:16,
  190:1.
Robbery 37:22,
  37:24, 73:24,
  74:2, 74:10,
  74:15, 74:19,
  74:22, 75:5,
  75:11, 75:16,
  75:17, 76:8,

76:14, 76:16,
76:22, 76:24,
78:7, 78:11,
104:25, 105:3,
105:7, 160:11,
189:14, 189:15,
189:18, 189:19,
189:21, 189:24.
robbing 75:10.
Robinson 21:25.
Rochester 23:21,
25:2, 26:7.
rock 57:7.
rocks 57:4.
role 151:2.
Ronnie 12:2, 12:4,
12:9, 12:16,
12:24, 13:8,
14:13, 15:8,
15:13, 18:10,
41:10, 203:16,
215:9.
Ronnie.hall.56232
12:12.
Ronnie.hall.56232@fa
cebook.com
12:11.
ronniehall@yahoo.com
12:10.
room 6:9, 6:23,
11:2.
Rooming 180:24.
Roscoe 51:9, 52:14,
52:15, 52:17,
60:13, 74:16,
74:18, 74:19,
77:2, 77:4, 77:8,
78:25, 87:20,
106:18, 107:23,
131:22, 132:12,
192:7, 194:2,
195:10.
roster 2:18.
roughly 43:8, 50:14,
63:14, 63:15,
67:15, 68:2,
70:2.
row 94:16, 100:20,
139:25, 141:4.
RPR 1:46, 222:1.

Rule 7:5, 24:21,
67:19, 130:12,
161:10, 209:13.
rules 4:23, 7:8,
108:25, 151:3,
171:22, 171:23,
173:2, 177:13.
rumor 95:5, 140:7,
140:24, 144:20.
run 10:18, 61:4,
84:19.
running 5:13, 70:12,
72:5, 118:4,
165:8, 179:22,
196:1.
runs 29:24.
.
.
.
< S >.
safe 43:14, 44:6,
44:7, 49:22,
50:12.
Safety 43:11, 44:13,
46:14, 49:20,
49:21, 50:10.
sample 80:14.
sanction 150:6.
savage 12:17.
saw 16:25, 29:22,
29:23, 62:1,
62:15, 62:25,
70:10, 73:13,
112:23, 115:4,
119:11, 119:20,
155:7, 205:4,
219:25.
Says 12:16, 12:24,
13:2, 13:4, 13:8,
13:16, 13:23,
14:7, 15:1, 16:8,
19:5, 20:17,
141:18, 173:9.
scared 180:8.
scaring 180:11.
scenarios 145:17.
scene 73:14, 75:16,
75:17, 102:21,
138:15, 138:20.
scheduling 2:6.
School 176:16,

176:18, 177:4,
177:5, 177:6,
177:7, 190:2,
190:3.
schools 177:1,
190:4.
scope 7:5, 61:17,
183:11.
Scott 200:22,
200:24, 200:25,
201:7, 208:7,
222:37.
screen 20:25, 26:2,
38:5, 60:1, 60:2,
71:20, 85:25,
86:16, 88:6, 96:9,
107:16, 115:4,
136:11.
Scutter 70:15,
70:18, 70:23.
se 104:8, 191:18,
191:24, 191:25.
search 12:3, 14:12,
15:22.
searches 221:9.
seat 47:11,
179:16.
seated 2:3, 8:25,
69:6, 102:3,
152:20, 213:17,
214:18.
Second 66:19, 76:22,
76:24, 78:7,
78:13, 78:15,
87:15, 87:16,
87:17, 90:11,
90:14, 90:20,
96:13, 100:10,
100:18, 107:8,
107:10, 108:10,
137:12, 137:15,
145:8, 156:19,
157:8, 157:21,
217:13.
seconds 51:3,
151:23.
Section 28:4, 98:4,
113:14, 206:14.
security 199:22.
sedan 75:15.

seeing 70:17,
  111:16, 111:22.
seeks 65:10.
seem 10:18, 172:24,
  173:3, 214:6.
seen 73:9, 73:14,
  83:17, 130:18,
  217:4.
seized 44:18.
sell 33:7, 33:9,
  58:22, 59:2,
  59:14, 59:23,
  60:3, 60:5, 63:2,
  63:4, 66:25,
  67:11, 67:22,
  103:24, 109:2,
  109:3.
selling 31:5, 31:14,
  31:18, 31:25,
  32:4, 32:11,
  32:18, 32:22,
  33:5, 45:22, 55:5,
  55:21, 59:21,
  60:7, 60:9, 60:15,
  62:1, 62:13, 63:3,
  64:5, 66:23, 79:9,
  91:20, 146:18,
  189:20, 189:21.
semblance 51:3.
send 15:2, 113:19,
  212:20.
sense 215:23.
sent 15:1.
sentence 125:22,
  125:24, 125:25,
  162:22, 163:2,
  163:17, 163:18,
  163:22, 164:21,
  166:15, 170:1,
  175:17, 175:18.
sentenced 164:14,
  169:18, 169:20,
  171:17.
sentences 141:11.
September 154:8.
Sergeant 28:5,
  28:7.
serious 50:2.
Seriously 212:14.
serve 164:6.

served 125:24,
  126:18, 164:4.
set 7:3, 66:3,
  158:23, 158:24.
seven 117:9,
  162:22.
several 44:12,
  98:11, 129:17,
  191:17, 192:4.
sex 177:4.
shake 168:19.
share 77:12, 77:13,
  132:20.
shared 77:15.
Shareiff 19:10,
  19:15, 20:1,
  215:19.
Sharieff 19:18.
sharpen 141:14.
Shawdy 16:5.
Shawn 14:22.
She'll 200:6.
sheet 206:9.
shift 73:20.
shipments 105:14.
shirt 15:9, 15:14,
  18:10, 21:10,
  51:17, 51:20.
Shit 12:17, 14:2,
  16:8, 16:9, 89:17,
  164:20.
shit. 12:18.
shoot 85:2.
shooters 139:16,
  139:25.
shooting 23:15,
  72:4, 135:2,
  135:5, 135:11,
  135:15, 135:23,
  179:9.
shootings 23:11,
  23:17, 23:18,
  24:9, 24:16,
  24:23, 25:18,
  25:25, 26:4,
  54:25, 55:1.
short 16:18, 83:25,
  84:1, 84:3, 84:4,
  200:7.
Shortly 81:15,

205:22.
shorts 83:21,
  83:22.
shot 16:8, 23:20,
  24:2, 24:3, 24:4,
  24:11, 25:1, 25:9,
  25:10, 25:11,
  26:7, 26:15,
  26:16, 26:18,
  84:21, 84:23,
  91:2, 92:20,
  92:21, 92:22,
  92:23, 95:4,
  95:10, 95:11,
  140:6, 183:24,
  184:3.
shotgun 111:24.
shots 81:16, 84:11,
  84:19, 90:4,
  134:10, 134:13,
  134:17, 135:2.
shoulder 111:19.
Shout 16:9.
showed 74:17, 81:17,
  103:2, 107:13,
  136:1, 136:2,
  192:24, 193:8,
  193:19.
Showing 5:5, 30:15,
  35:20, 36:2, 36:8,
  51:11, 53:10,
  153:22, 154:2,
  154:4, 154:25,
  157:17, 172:1,
  182:21, 203:8,
  217:21, 217:23.
shown 139:2, 139:22,
  186:23, 187:2.
shows 206:16.
shut 72:9, 108:13.
side 25:18, 60:21,
  78:22, 99:10,
  169:1.
sides 93:18, 95:14,
  99:1.
sight 29:8.
sign 111:4, 124:21,
  169:17.
signals 202:9,
  202:12, 207:11.

signature 94:18,
    94:23, 96:7,
    99:19, 100:21,
    141:22, 141:25,
    206:18.
signed 169:15.
significance 23:8.
signing 99:15.
signs 110:23.
silver 151:17.
simple 83:2.
simply 65:22,
    143:22, 161:19.
single 22:18.
Sir 27:11, 42:3,
    47:2, 47:5, 47:12,
    47:23, 115:12,
    128:1, 139:4,
    153:2, 158:22,
    159:24, 160:2,
    161:6.
Sister 157:6, 157:9,
    157:14, 157:22.
sit 63:1, 128:15,
    201:13.
sitting 10:19, 18:8,
    28:22, 51:21,
    57:23, 69:24,
    70:2, 70:5, 70:6,
    70:8, 70:11,
    166:10, 179:1,
    179:3, 179:4,
    179:8, 179:10,
    211:7.
situation 39:10,
    81:21, 82:3, 82:6,
    82:11, 84:16.
situations 81:25.
six 117:2, 117:9,
    185:14, 208:22.
skin 12:18.
skip 169:14.
slang 58:3.
slid 165:19,
    165:20.
slight 5:19.
slightly 5:5.
Slim 194:4.
slippery 8:3,
    10:1.

slope 8:3, 10:1.
slow 5:4, 6:4.
SM 12:6, 15:4,
    15:11, 15:25,
    18:5, 18:18, 19:1,
    19:12, 19:20,
    20:10, 20:15,
    21:6, 41:9, 203:4,
    203:8.
smacked 79:2.
SMH. 14:2.
Smith 13:4, 24:2,
    25:10, 26:15.
smoking 40:24.
Snitch 114:1.
snitches 13:17.
snitching 82:14,
    85:7, 86:1,
    131:17.
Social 7:13, 41:9,
    41:18, 42:4, 42:6,
    42:7, 42:16,
    120:1, 120:16,
    120:22, 120:23.
socialized 176:6.
sociology 8:17.
sold 58:9, 62:3,
    79:7, 119:9,
    196:3.
soldier 109:19,
    150:19, 150:20,
    150:21.
soldiers 109:11.
solutions 57:4.
somebody 5:16, 71:1,
    77:19, 80:10,
    84:3, 84:21,
    100:7, 115:19,
    146:17, 146:18,
    146:19, 148:18,
    150:4, 154:21,
    156:16, 176:21,
    179:20, 183:6,
    189:20, 212:21.
somehow 111:5.
someone 32:7, 32:12,
    33:1, 58:25, 80:8,
    202:14, 204:15,
    206:3, 206:24.
sometime 124:9,

191:12.
Sometimes 5:7,
    111:6, 125:5,
    176:10.
somewhat 38:7,
    173:13, 177:24.
Somewhere 50:14,
    50:24, 117:13,
    124:4, 125:23,
    156:24, 184:1,
    189:10.
Sorry 16:11, 26:12,
    38:4, 62:5, 64:7,
    64:20, 108:1,
    128:20, 128:23,
    141:23, 144:2,
    146:5, 151:6,
    155:25, 162:20,
    184:11, 185:17,
    197:2, 212:13,
    213:4, 219:1.
sort 7:14, 9:21,
    10:20, 11:4.
sound 5:20, 5:24,
    182:12.
Sounds 37:7, 37:10,
    183:7.
source 65:19.
sources 221:11.
speakers 6:7.
speaking 7:16, 9:22,
    36:17, 154:24,
    164:15.
special 27:7, 27:10,
    135:17.
specific 36:25,
    37:20, 41:6,
    119:22, 122:3,
    122:4, 210:9.
specifically 40:5,
    41:2, 81:20.
specifics 41:16.
speed 185:3.
spell 47:14,
    201:14.
spend 119:5.
Spent 119:14,
    119:15, 166:25,
    167:3.
spoke 42:4, 42:20,

42:25, 121:21,
123:13, 129:2,
130:23, 134:14,
157:15.
spoken 31:4.
stab 219:12.
stabbed 205:10,
209:24, 210:1,
210:6.
stabbing 204:4,
204:15, 207:4.
Stable 91:24,
92:5.
stage 109:11,
109:24.
stairs 18:9.
stand 11:14, 38:18,
47:3, 48:14,
68:21, 113:20,
114:4, 114:9,
129:5, 150:22,
151:10, 151:13,
152:13, 201:2.
standard 39:5.
standing 18:8, 18:9,
71:4, 71:12,
128:15, 184:2,
189:20.
Start 7:12, 10:4,
32:24, 50:17,
51:11, 55:3,
93:25, 95:22,
108:25, 142:10,
159:7, 221:14.
started 27:15,
27:16, 27:20,
51:2, 64:12, 72:4,
72:5, 79:2, 122:5,
122:18, 122:22,
142:5, 146:16,
169:12, 188:18,
209:7, 209:16,
216:7.
Starting 6:13, 51:7,
154:13.
Stash 55:15, 55:17,
55:18, 55:19,
55:24, 56:6,
64:15, 66:7,
66:10, 66:13,

80:17, 102:15,
102:20, 102:22,
103:14, 103:19,
105:11, 105:21,
105:24, 138:9,
138:14.
State 30:2, 47:13,
112:5, 112:19,
121:13, 121:14,
124:7, 124:12,
125:17, 132:1,
143:2, 150:10,
158:10, 159:19,
201:13.
stated 66:4, 210:19,
219:12.
statement 123:6,
127:4, 133:25,
136:11, 172:9,
173:19, 174:7,
186:6, 208:7,
208:9, 208:14,
208:15, 208:21,
208:25, 209:2,
209:25, 210:5,
210:19, 211:10,
211:19, 214:20,
215:1, 216:6.
STATES 1:1, 1:5,
18:12.
station 29:21.
status 14:1, 14:3.
stay 162:6, 218:4.
staying 64:22,
72:25, 157:15.
stenographic
222:2.
step 47:12, 58:15,
68:20, 68:21,
101:20, 152:12,
201:12.
stepped 80:12.
steps 18:8, 179:1,
179:3, 179:4,
179:8, 179:10.
stick 161:25.
Sticking 105:20.
stipulations
123:24.
stole 81:12.

stone 81:13, 81:22,
81:24, 84:13,
134:24.
stood 180:3,
180:4.
Stop 32:23, 47:3,
70:16, 71:7,
101:6, 102:17,
131:23, 132:13,
165:8, 171:8,
173:23.
stopped 102:14,
123:5.
store 55:12.
storing 55:9.
straight 57:13,
84:4, 130:1,
168:7, 170:16.
Strapped 16:4.
streets 67:20.
stretch 58:15,
59:3.
stretches 58:19.
strikes 161:15.
structure 110:21,
147:2, 147:15,
177:15.
structures 147:3.
stuff 196:1.
subject 35:24,
36:11, 66:2,
106:2.
subliminal 10:6.
submit 172:19.
substance 9:11,
9:13, 23:14,
43:12, 162:18,
163:15, 164:17.
substantive 7:22.
sudden 32:22,
32:23.
suddenly 142:5,
142:10.
suggest 96:16.
suggested 174:13.
suggesting 113:11.
suit 52:2.
Suiter 2:19.
summary 12:16.
summer 68:4.

Super 58:11, 59:1,
  164:20.
superman 21:10.
supervised 170:8,
  170:20, 170:23,
  171:20, 172:18,
  174:24.
supplied 65:11,
  66:1.
supplier 105:5.
supplies 105:15.
supply 210:15.
support 172:8.
supported 44:6.
supposed 148:14,
  158:24.
suppress 17:16,
  17:21.
surveillance 28:20,
  29:24, 33:11.
suspected 84:7.
suspend 162:22,
  163:17.
suspended 163:22,
  164:1, 164:21,
  165:1.
Sustained 67:4,
  104:11, 105:17,
  109:16, 130:12,
  174:21.
switch 92:3, 92:4,
  92:6, 92:17,
  92:19.
sword 111:24,
  112:2.
sworn 11:18, 47:8,
  201:8.
symbol 111:4,
  111:25, 112:1.
symbols 110:24,
  202:15.
symp 109:11, 109:13,
  109:17, 109:19,
  109:21.
sympathizer
  109:13.
system 169:7, 169:8,
  214:2.
.
.

< T >.
T. 1:46, 222:6.
tab 16:21, 16:23.
tail 70:4.
taken. 69:3, 101:23,
  152:15.
Talked 28:11, 33:11,
  34:4, 36:24,
  79:18, 88:21,
  115:3, 127:24,
  129:1, 129:17,
  130:23, 133:16,
  134:20, 147:17,
  150:13, 177:4,
  177:8, 178:25,
  182:14, 183:20,
  192:2, 192:4,
  192:6, 193:1,
  194:22, 207:11,
  212:4.
Tangie 18:15.
Tangier 18:15,
  18:21, 19:3,
  36:4.
tape 211:25, 212:5,
  212:10, 212:11,
  212:22, 212:24,
  213:25, 214:3,
  214:11.
taped 64:11, 127:3,
  208:7, 208:13,
  208:22, 209:25,
  210:5, 210:19,
  211:10, 211:18,
  214:20, 215:2.
tapped 30:2.
target 30:5, 30:7.
task 27:11.
Tate 154:7, 193:21,
  193:23.
tattoo 111:12,
  111:14, 111:22.
tattoos 4:12, 4:14,
  111:6, 187:7,
  187:9.
taxes 168:21.
tea 80:10.
teaches 9:25.
Tech 21:13.
Technically 27:11,

  174:4, 217:22.
teenage 77:5.
teenagers 78:8.
teens 189:11.
telegraphed 10:4.
Tells 149:23,
  149:24.
Ten 125:23, 155:24,
  164:1, 165:1,
  166:17, 166:21,
  171:18, 175:18,
  175:22, 175:23,
  180:22, 212:18.
term 33:20, 55:15,
  57:12, 113:24,
  150:16.
terminology 39:3,
  42:23, 57:11.
terms 6:7, 10:12,
  11:11, 57:5, 58:3,
  67:25, 97:22,
  116:4, 172:11,
  221:12.
Terrell 73:1,
  192:15.
test 80:3, 80:6,
  80:9, 128:24.
tester 80:8, 80:10,
  80:11.
testers 80:2,
  181:3.
testified 11:19,
  13:11, 44:12,
  47:9, 49:14,
  49:23, 112:4,
  112:22, 116:6,
  120:3, 120:7,
  121:3, 134:6,
  145:23, 150:10,
  150:16, 151:5,
  156:7, 169:14,
  181:13, 196:10,
  196:17, 197:22,
  198:2, 201:9.
testifies 61:9,
  200:1.
testify 2:9, 114:9,
  129:11, 145:12,
  159:18, 181:18.
testifying 38:24,

39:2, 49:7, 112:3,
113:20, 114:6,
120:25, 153:9,
181:5, 181:9,
196:12, 196:15,
197:25, 198:1,
199:22.
testimony 33:12,
49:19, 120:25,
145:10, 145:14,
145:15, 158:7,
161:16, 168:24,
172:9, 173:13,
175:11, 183:23,
197:17, 219:17,
219:24.
Text 12:15, 12:23,
13:7, 13:21, 14:6,
14:25, 16:7, 19:4,
19:5.
Thabiti 23:23, 25:4,
26:10.
THE CLERK 6:11,
7:24, 35:3, 47:5,
47:11, 47:17,
201:11, 201:17.
THE WITNESS 14:11,
46:22, 47:15,
133:23, 210:17,
214:12, 220:2.
theft 162:4.
themselves 7:16,
7:17, 10:11.
theory 173:4.
thereabout 175:24.
they'll 16:22,
32:21.
they've 7:15.
thinking 140:19,
166:10, 167:8.
thinks 174:2.
third 69:24, 78:11,
99:6, 185:20,
186:7.
thoroughly 22:11,
24:12, 25:21,
209:20.
though 7:3, 9:17,
77:16, 79:4,
99:23, 128:25,

136:12, 136:15,
154:16, 175:19,
192:21, 196:12.
thoughts 8:6.
threats 50:1, 50:4,
206:23.
Three 15:9, 19:22,
76:1, 77:5,
105:22, 105:24,
110:10, 121:7,
121:8, 126:9,
130:3, 130:4,
156:12, 156:13,
160:14, 160:16,
161:17, 162:10,
165:25, 166:5,
173:3, 173:7,
180:21, 187:3,
220:6, 220:11,
220:15.
three-quarters
69:1.
three. 180:19.
threw 70:14, 70:24,
209:22, 209:23.
throughout 6:23.
throw 70:17.
thrown 70:23,
71:8.
thumb 67:19.
tie 51:23.
till 90:3, 90:22,
116:16, 117:5,
126:8, 166:24.
timeline 24:9,
24:15.
tip 104:25.
tired 90:24,
90:25.
Tobacco 135:18,
135:22.
Today 2:19, 7:2,
22:4, 22:12,
22:16, 24:13,
25:22, 44:20,
49:7, 51:13,
112:3, 112:8,
112:20, 114:10,
139:11, 141:2,
145:10, 145:12,

199:18, 212:6,
220:15.
today. 16:14.
together 67:17,
100:4, 119:14,
125:25, 126:18,
151:22, 163:4,
164:20, 167:1.
token 82:2.
Tom 4:10.
tomorrow 221:14.
top 20:17, 84:6,
94:1, 95:22, 96:4,
107:1, 180:20,
206:12.
topic 102:12,
105:20, 106:11.
topics 50:16, 68:3,
69:10.
tossed 165:16,
165:17.
total 126:22.
totally 128:16,
189:22.
touch 68:11, 101:11,
152:4, 213:10,
221:5.
towards 72:5, 79:3,
80:16, 84:20,
134:17.
trade 32:8.
training 40:4.
Transcript 1:17,
8:19, 16:22,
113:4, 113:6,
114:18, 158:17,
174:5, 222:2.
transfer 198:15.
transferred 116:16,
116:21, 198:17.
transferring
148:15.
transition 106:7,
147:17, 147:23.
transitioned 106:3,
116:9, 116:16,
198:5.
translate 57:1,
57:25, 67:25.
translates 63:17.

transportation
  50:12.
trap 18:12, 55:20,
  55:21, 55:24,
  88:13.
treasurer 151:7.
treasury 151:12.
treatment 170:20,
  172:19, 173:8,
  173:21, 173:25.
Trevon 14:17, 14:21,
  23:24, 25:7,
  26:11.
Trial 1:10, 2:21,
  9:7, 65:22, 68:14,
  101:13, 115:6,
  115:7, 115:8,
  125:17, 129:11,
  150:10, 152:6,
  159:19, 181:17,
  187:5, 196:11,
  196:12, 196:13,
  196:15, 197:25,
  198:2, 213:14,
  221:6, 221:7,
  221:11.
trick 210:10,
  210:11.
tried 72:24, 73:2,
  92:17, 125:14,
  168:19, 168:21.
trouble 9:19,
  172:23, 218:1,
  218:4.
true 133:2, 133:3,
  133:4, 133:5,
  146:10, 217:25.
trust 33:2.
truth 114:13, 124:1,
  124:20, 130:11,
  145:19.
truthful 159:21,
  186:2.
truthfully 132:5,
  159:18.
try 3:1, 11:11,
  17:12, 23:19,
  59:3, 118:13,
  136:18, 141:16,
  178:4, 178:7,

185:3, 210:10,
  214:9, 220:14.
trying 2:15, 32:10,
  59:3, 81:13,
  81:25, 84:15,
  84:17, 85:2,
  109:5, 113:21,
  135:15, 161:20,
  161:23, 170:15,
  199:17, 207:15,
  210:11, 217:20,
  218:5, 218:10.
Tucker 24:2, 25:9,
  26:18.
tumbling 79:2.
Turn 6:7, 6:21,
  16:21, 201:3,
  205:7, 206:9.
turned 15:8.
turpitude 160:24.
Tvs 29:1, 29:3,
  29:6.
twerp 120:19,
  120:21.
twerps 120:18.
Twin 45:15.
two. 85:3.
tying 38:12.
type 128:19, 128:21,
  161:2.
Typical 63:3, 63:5,
  66:25, 67:23,
  84:20.
.
.
< U >.
ultimately 89:2.
unable 216:18.
Uncle 106:12,
  106:13, 106:14,
  156:14, 157:25,
  158:1, 158:3.
unclear 183:12,
  184:9.
uncommon 75:2,
  77:11.
unconscious 40:1.
underneath 19:5,
  20:21, 141:25,
  206:18.

understand 2:23,
  3:7, 9:4, 9:15,
  32:13, 32:22,
  39:4, 50:3,
  109:25, 113:24,
  134:10, 137:4,
  143:24, 144:14,
  161:5, 208:9,
  210:16, 213:3,
  213:24.
understanding 2:20,
  30:24, 33:8,
  84:23, 99:17,
  156:4, 186:14,
  207:15, 212:10.
understood 17:20,
  94:9, 122:11,
  128:7, 135:6,
  135:7.
Unfortunately 9:17,
  205:8.
unit 27:22, 29:15.
UNITED 1:1, 1:5.
unless 77:18.
unsafe 44:16.
Until 2:20, 7:2,
  7:6, 8:5, 9:6,
  11:4, 54:10,
  101:17, 101:21,
  116:24, 119:6,
  124:4, 124:5,
  126:21, 149:12,
  169:17, 176:1,
  188:15, 205:6,
  205:7, 214:21.
upper 139:15,
  182:23.
ups 16:11.
urinalysis 175:6.
user 12:10, 13:8.
users 38:17.
Using 31:9, 31:11,
  64:12, 89:18,
  102:15, 102:17,
  103:12, 103:13,
  181:3.
USPO 172:20, 172:21,
  172:25.
.
.

< V >.
vacant 28:23, 28:25.
van 28:23.
vanity 12:11, 16:4.
varied 43:23.
various 41:9, 156:7.
vehicle 29:15.
verbal 125:21.
verifies 35:8.
version 188:13.
victim 37:24, 38:1, 73:13, 199:20, 204:15.
victims 23:16, 78:18.
Video 16:8, 16:24, 20:7, 112:23, 113:2, 113:15, 115:3, 115:5, 119:20, 119:21, 145:23, 208:16.
videos 16:16, 16:20, 16:21, 17:11, 113:8, 113:10, 119:16, 119:18, 119:19, 119:23.
view 8:12.
viewed 20:6.
views 7:12.
Village 74:1, 74:4, 74:21, 75:11, 160:12.
violate 171:22.
violated 164:8, 171:9, 171:10, 171:12, 171:23, 174:24.
violating 173:2.
violation 126:12, 164:10, 164:11, 164:12, 164:13, 164:14, 171:11, 171:19, 172:17, 173:16, 174:6.
violations 171:11, 175:14, 175:16.
Violent 28:4,

199:20, 199:21.
virtue 17:15, 39:13.
voice 63:10.
Volume 1:10.
voluntarily 207:2.
vouched 148:19.
vouching 177:24.
vs 1:8.
.
.
.
< W >.
W. 1:48.
Wait 90:3, 90:22, 172:2, 212:8.
Waiting 90:4, 90:24, 90:25, 91:1.
waived 39:14, 129:1, 161:1.
waiving 39:15.
walk 171:2, 171:3, 171:4, 173:22, 205:6, 216:9, 216:10, 216:13.
walked 216:13.
Walker 19:14, 19:18.
walking 205:5, 207:8, 216:7.
wall 211:7.
wanted 2:6, 3:5, 3:9, 23:2, 23:3, 39:9, 80:5, 84:12, 88:3, 92:3, 92:6, 95:7, 106:24, 106:25, 108:12, 109:3, 110:10, 138:19, 140:8, 148:5, 178:4, 179:20.
warn 210:13.
warrant 12:3, 14:12, 15:22.
watch 6:17, 29:19, 29:21, 33:16, 47:12, 199:25, 201:12.
watched 28:23, 205:6.
watching 29:14.

ways 8:11.
WDQ-07-0462 172:16.
wear 6:24.
wearing 9:22, 51:16, 51:19, 52:2, 202:25.
Wednesday 1:19.
weed 45:17, 76:3, 76:9, 76:10.
week 2:18, 28:22, 43:22, 44:20, 56:18, 85:3.
weekly 67:12.
weeks 9:7, 44:4.
weight 67:25.
weirdo 113:25.
Welcome 112:24.
Wes 14:23, 15:7, 20:1.
Wesley 3:11, 3:15, 4:1, 20:15, 203:16, 203:24, 215:7.
West 26:14, 76:24, 105:9.
whatever 9:19, 42:23, 43:20, 212:21.
Wheeler 23:23, 25:5, 26:10.
whereabouts 49:21.
Whether 6:5, 9:23, 27:7, 80:11, 81:15, 83:14, 91:17, 103:8, 105:14, 108:21, 111:6, 111:11, 132:19, 148:7, 158:12, 161:3, 191:2, 191:9, 218:14.
White 14:17, 14:21, 15:14, 23:24, 25:7, 26:11, 79:24, 80:23, 81:6, 81:9, 81:10, 81:21, 84:12, 84:25, 135:12, 135:24.

whole 8:6, 119:6,
  129:13, 178:17.
Will 15:15, 15:21,
  16:3, 16:15, 17:3,
  18:9, 32:18,
  32:19, 33:3, 33:5,
  34:16, 65:14,
  162:1, 195:6,
  195:8, 200:8,
  200:10, 200:12,
  212:16, 217:2,
  219:19.
willgreenmount@yahoo
  .com 16:4.
Williams 53:20.
Willie 23:25, 25:8,
  26:13.
Wilson 45:14.
wind 44:13.
window 70:25.
wiretap 30:1, 31:3,
  45:6, 45:19.
wise 187:19.
wish 3:24.
withdraw 61:18,
  218:17.
withdrawn 218:18.
within 16:23, 61:16,
  78:4, 110:10,
  135:22.
without 23:14, 33:7,
  88:10, 88:13,
  101:3, 111:16,
  111:21, 137:16.
witnessed 69:12,
  141:21, 204:4,
  207:4, 207:19.
witnesses 2:17, 3:1,
  6:15, 10:23, 97:1,
  199:19.
women 177:2,
  179:1.
word 30:22, 120:17,
  127:9, 133:25.
Words 79:1, 79:19,
  156:8, 181:8,
  181:9, 181:10,
  209:9, 210:10.
work 6:21, 32:17,
  50:12, 199:24.

worked 28:11.
working 33:4, 116:1,
  213:18, 214:6.
works 3:6, 186:22.
worried 44:12.
worry 110:13.
writ 142:15, 144:1,
  144:3, 186:4,
  186:5.
wrote 182:3, 206:7,
  206:14.
.
.
< X >.
XX 19:6.
.
.
< Y >.
y'all 72:1, 95:8.
year 24:4, 116:13,
  116:19, 116:21,
  116:25, 124:5,
  124:9, 158:8,
  164:6, 181:14,
  188:9.
yellow 71:22.
yesterday 2:21,
  3:10, 3:16, 3:19,
  3:25, 4:9, 4:23,
  4:25, 5:1, 13:11,
  16:19, 20:7,
  20:15, 22:4,
  22:16, 35:15.
Yo 12:16.
Young 48:7, 117:21,
  117:22, 118:4,
  153:3, 177:1,
  179:1, 188:7.
younger 117:20,
  117:23, 118:1,
  118:17, 187:19,
  187:20, 188:5,
  188:6, 188:13,
  190:1, 195:23.
Youngest 118:15.
yourself 159:11,
  165:25, 197:10.
yourselves 68:9,
  68:10, 101:9,
  101:10, 152:2,

152:3, 213:8,
  213:9, 221:4.
Youtube 16:15,
  16:20, 16:21,
  20:7, 112:23,
  113:8, 113:10,
  115:15, 115:16.
Yup 170:12, 171:18,
  215:16.