IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,                )
                                         )
            Plaintiff,                    )
        vs.                              )
                                         )  **CRIMINAL NO.:** JKB-16-0363
GERALD JOHNSON, et al.,                  )  **Jury Trial:**  Volume 6
                                         )
            Defendant.                   )
                                         )
_____)

Transcript of Proceedings
Before the Honorable James K. Bredar
Thursday, November 30th, 2017
Baltimore, Maryland

For the Plaintiff:

        Peter J. Martinez, AUSA

        Christina A. Hoffman, AUSA

For Defendant Gerald Johnson:

        Paul F. Enzinna, Esquire

        Jeffrey B. O'Toole, Esquire

For Defendant Kenneth Jones:

        Alan R.L. Bussard, Esquire

For Defendant Marquise McCants:

        John R. Francomano, III, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
 1                     P R O C E E D I N G S

 2          THE COURT:  Good morning.  Be seated, please.  All

 3   right.  We're ready to start our trial day, but I understand

 4   there's some issues that counsel wanted to raise outside the

 5   hearing of the jury.  Is that right, Mr. Martinez?

 6          MR. MARTINEZ:  Yes, Your Honor.  There are two and I

 7   thought it was more efficient to address them now, then while

 8   on the fly when the jury is here.  Our second witness this

 9   morning after a witness who I believe will take only five or

10   ten minutes is Sergeant James Lloyd from BPD Homicide.  He was

11   the primary investigator on the murder of Gregory Rochester

12   about which Mr. Meadows testified yesterday.

13          And we got a request from Mr. Bussard this morning

14   to provide him with a note from Detective Lloyd's file

15   regarding a conversation he had with an assistant state's

16   attorney nine or ten years ago about Christopher Meadows.  And

17   there's a note in the file to the effect that because a

18   related shooting was nolle prossed, AUSA Giblin believed at

19   the time that Meadows was less credible.  And we want to

20   object preemptively to any use of Detective Lloyd, or Sergeant

21   Lloyd now, as a vehicle for presenting the jury with an

22   assistant state's attorney's mental impression about a

23   cooperating witness ten years ago.

24          THE COURT:  You're not going to -- you're not

25   attempting to offer anything like that.
```

1          MR. BUSSARD:  Here's where it came up.

2          THE COURT:  You're entitled to have it.

3          MR. BUSSARD:  I'm happy to show it.

4          THE COURT:  I don't need it.

5          MR. BUSSARD:  Here's my point:  I'm reading the

6    transcript from Mr. Jones's state trial.

7          THE COURT:  Yes.

8          MR. BUSSARD:  I see a question to Sergeant Lloyd

9    that says, did you write in your progress notes on so-and-so

10   date, Christopher Meadows appears to be less credible in his

11   witness information concerning suspects involved.  That was

12   the quote.  That's -- now, when I tried to find this and I

13   went through the progress notes, it's blacked out.  I don't

14   know what's under there.  So this sounds like *Brady* to me, the

15   transcript.

16         THE COURT:  Well, what does the note say?

17         MR. BUSSARD:  I don't know because I --

18         MR. MARTINEZ:  We just said it, so --

19         MR. BUSSARD:  We don't have it.

20         MR. MARTINEZ:  The initial version we produced had

21   been redacted because it identified Mr. Meadows, who was an

22   as-yet undisclosed witness.  We unredacted it.  Mr. Bussard

23   requested it at 7:00 or so this morning.  At 7:24, five

24   minutes later, I sent an e-mail with the unredacted version,

25   which he --

1          THE COURT:  Oh, okay.  Well, what's the unredacted

2     version say?

3          MR. BUSSARD:  I don't know.  We haven't gotten it.

4     Mr. O'Toole -- we have not seen it.

5          THE COURT:  Oh, well, let's read it out in open

6     court.

7          MR. BUSSARD:  For whatever reason, it never came.  I

8     got an e-mail, but there's no attachment to it.

9          MR. MARTINEZ:  I can open it on my phone and show

10    you all.

11         MR. BUSSARD:  Mr. O'Toole's -- I guess I turned my

12    phone off.

13         THE COURT:  All right.  Well, what does it say,

14    what's the redacted part say?

15         MR. MARTINEZ:  Your Honor, hold on.

16         MR. BUSSARD:  It is not a quote from -- wait a

17    minute.  Christopher Meadows appears less credible in his

18    witness information concerning the suspects involved,

19    according to AUSA Giblin.  That's what I didn't know.

20         THE COURT:  Okay.  So end of issue?

21         MR. BUSSARD:  It was abundance of caution --

22         THE COURT:  It's no problem.  I wanted to make sure

23    the defense is not going to try to offer that as

24    cross-examination of Detective Lloyd; right?

25         MR. BUSSARD:  I was, but now I know the whole

1    story.

2              THE COURT:  Now that you know what it says, that

3    it's a recounting of what somebody else said, it's hearsay,

4    hearsay, hearsay.

5              MR. BUSSARD:  No, I don't have an objection I -- I

6    mean, I would like to --

7              THE COURT:  I'm in the business of solving problems,

8    not writing law review articles.  We're past it, we don't have

9    a problem.  Next issue.

10             MR. MARTINEZ:  Ms. Hoffman has an issue regarding

11   our expert this morning.

12             THE COURT:  Expert.

13             MS. HOFFMAN:  Firearms examination expert

14   Sandra Bohlen will be testifying today and I talked with her

15   earlier this week about the formulation that Your Honor ruled

16   she should use in making -- explaining her conclusions with

17   respect to firearms evidence.

18             THE COURT:  Right.

19             MS. HOFFMAN:  And that she not express any greater

20   certainty than a reasonable degree of ballistic certainty.

21             THE COURT:  Forensic ballistic certainty.

22             MS. HOFFMAN:  And she wrote back to me and I wanted

23   to read it for Your Honor.  She says quote, "We do not use

24   verbiage to a reasonable degree of ballistic certainty.

25   Really what I do is not considered ballistics at all, but

1    rather, firearms identification.  Ballistics is the study of a

2    bullet in flight.  Since 2007, we have changed the way we word

3    our reporting.  Nothing has technically changed.  We just

4    wanted to ensure greater clarity for our customers who receive

5    the report.  The reports now include the words 'sufficient

6    agreement,' which is necessary for an identification and

7    include the definition of sufficient agreement."

8         And then she provided the definition of sufficient

9    agreement.  And I'm going to read that too.  The definition

10   is, "sufficient agreement is related to the significant

11   duplication of random tool marks as evidenced by a pattern or

12   combination of patterns of surface contours.  Sufficient

13   agreement exists between two tool marks, means that the

14   agreement is of a quantity and quality that the likelihood

15   another tool could have made the mark is so remote as to be

16   considered a practical impossibility."

17        THE COURT:  Yes, well, I won't permit that.  That

18   exceeds the scope of the science -- the capability of the

19   science, as far as the Court is concerned.  I doubt the view

20   expressed by Judge Grimm, so make sure she doesn't exceed

21   that.  Let's get going with this jury.  Anything else?

22        MR. MARTINEZ:  No.

23        THE COURT:  Okay.  Let's bring them in.  Anything

24   that implies identification or certainty is what's

25   problematic.  She needs to understand that -- well, she

1    doesn't need to understand anything.  I just want the

2    government to understand where the line is.  A reasonable

3    degree of certainty within the scope of that science or

4    profession is what will allow.  It's that a test was passed or

5    that an identification is made that is not allowed.  Somehow

6    that concept is -- well, she's going to have to conform to

7    that or I won't permit it.  The expert is not the final

8    arbiter on the science, the Court is.  That's where the

9    tension lies.  And the expert has to conform their testimony

10   to what -- stop them -- stop.  The principle is that the

11   expert has to conform her testimony to what the standard is as

12   set by the Court, not vice versa.  That's what's problematic.

13   The second part of this that is troubling is, this was

14   addressed pretrial.  Okay.  Now let's bring them in.

15             (Jury entered the courtroom.)

16             THE COURT:  Be seated, please.  Good morning, ladies

17   and gentlemen.  We're ready to continue with the government's

18   case in chief.  Mr. Martinez, you may call your next

19   witness.

20             MR. MARTINEZ:  Your Honor, the government calls

21   Detective Mark Veney of the Baltimore Police Department.

22             THE COURT:  Detective Mark Veney.

23             MR. MARTINEZ:  Yes.

24             THE COURT:  Thank you.  Please come all the way

25   forward to the front of the courtroom, sir.  Stand next to the

1    witness box and face our clerk over here on the other side of

2    the bench.

3            THE CLERK:  Detective, if you would raise your right

4    hand to be placed under oath.

5                        DETECTIVE MARK VENEY

6    called as a witness, being first duly sworn, was examined and

7    testified as follows:

8            THE WITNESS:  I do.

9            THE CLERK:  Thank you.  You may enter the witness

10   box and watch your step.  And Detective, if you need to adjust

11   the microphone, speak directly into the microphone.  State

12   your first and last name and spell your first and last name.

13           THE WITNESS:  My name is Detective Mark Veney.  My

14   first name is spelled M-a-r-k; my last name is spelled V, as

15   in Victor, e-n-e-y.

16           THE CLERK:  Thank you, sir.

17           THE COURT:  Your witness.

18                        DIRECT EXAMINATION

19   BY MR. MARTINEZ:

20   Q    Detective Veney, good morning.

21   A    Good morning.

22   Q    Can you tell the ladies and gentlemen of the jury where

23   you work?

24   A    I work for the Baltimore City Police Department homicide

25   unit.

Direct Examination - Veney (By Mr. Martinez)

1    Q    And what is your rank or title at BPD?

2    A    Detective.

3    Q    How long have you been with homicide?

4    A    I've been with homicide -- I'm serving in my 16th year

5    now.

6    Q    And approximately how many homicides would you say you've

7    investigated over the course of your career with BPD?

8    A    As a primary detective, I would say anywhere from between

9    80 and 100.  And as a secondary detective, meaning assisting

10   with my partner, somewhere in the hundreds.

11   Q    So roughly how many homicides per year do you

12   investigate?

13   A    On average anywhere between five to six per year.  And

14   that depends on the rate of homicides that we have in a given

15   year.

16   Q    Detective, I want to direct your attention to the early

17   morning hours of July 20th, 2005.  Were you working and on

18   duty at the time?

19   A    Yes, I was.

20   Q    Did there come a time early that morning when you were

21   asked to go to the scene of a homicide?

22   A    Yes.  I was asked to go to the scene of a homicide in the

23   200 block of East 22nd Street.  I was on the midnight shift

24   that particular day.

25   Q    And I want to show you what's already come into evidence

1    as Government's Exhibit GM 15.  Do you recognize that

2    location, Detective?

3    A    Yes, I do.

4    Q    What do you recognize that to be?

5    A    This is the site of the homicide scene.

6    Q    Do you recall approximately what time you arrived on the

7    scene?

8             MR. BUSSARD:  Your Honor, I hate to interrupt, but

9    our monitor's not working.

10            THE COURT:  Okay.  See if the miracle worker can

11   work a miracle.  Ms. Panas, is your monitor working?

12            MS. PANAS:  It was.

13            MR. BUSSARD:  Can I sit back there?

14            THE CLERK:  I'm going to turn them off and back on.

15   Can the jury see?

16            THE COURT:  Monitors off?  Blank?

17            THE CLERK:  Can everybody see?

18            MR. BUSSARD:  Yes, thank you very much.

19            THE COURT:  Amazing how that works.

20            MR. MARTINEZ:  May I continue, Your Honor?

21            THE COURT:  You may.

22   Q    (BY MR. MARTINEZ)  Detective, I was asking you,

23   approximately what time did you arrive at the scene of this

24   homicide?

25   A    I arrived there at approximately 2:49 a.m.

Direct Examination - Veney (By Mr. Martinez)

1    Q    When you arrived at the scene, was anyone else present?

2    A    The uniformed officer, Officer Sharpley, he was present

3    and paramedics had already left the scene with the victim.

4    Q    So the victim was no longer present?

5    A    That's correct.

6    Q    Could you show us roughly where on this map -- well,

7    actually, let me do it this way.  I'll show you a page from

8    what's been marked as Government's Exhibit P, as in Paul,

9    HCS-1.

10   A    Yes.

11   Q    What are we looking at there, Detective?

12   A    This is the site of the crime scene.  You can see the

13   pool of blood where the victim was found when the uniformed

14   officer arrived on the scene and where the paramedics

15   retrieved his body from.

16   Q    All right.  So the pool of blood is here on the left;

17   correct?

18   A    That's correct.

19   Q    And I just want to put on the screen GM 15, which you

20   just looked at and I want to ask you to point out where on

21   GM 15 that pool of blood was.

22   A    Right over -- just above -- well, it's kind of hard to

23   put it here, but right in this area near where the trees

24   are.

25            THE COURT:  You can mark with your finger, it will

1    show up.

2    A    Can you go back to the first exhibit?

3    Q    (BY MR. MARTINEZ)  Sure.

4    A    You can almost see the tree right there, okay.  So right

5    here where this tree is, is in this area where the victim's

6    body was found.  This side street --

7              THE COURT:  So we're not seeing -- try to draw a

8    circle around the area you're talking about, touch with your

9    finger.

10             THE WITNESS:  Is it working?

11             THE COURT:  Ms. Powell.  Just a second, Detective.

12   You'll have to move out of her way for a second.

13             THE CLERK:  I'm just resetting the annotation

14   system.

15             THE WITNESS:  Is it working?

16             THE CLERK:  No, I don't see it.

17             THE COURT:  Just randomly put your finger on the

18   screen and run your finger up and down.  It's not working.

19   All right.  Call IT, meanwhile, Mr. Martinez --

20   Q    (BY MR. MARTINEZ)  Detective, let's do it this way:

21   We'll go old school.  Can I approach and you can use a pen and

22   circle the location with the pen?

23   A    That's fine, as long as it's okay with the judge.

24             THE COURT:  Yes, it is.

25   Q    (BY MR. MARTINEZ)  If you could just circle roughly where

Direct Examination - Veney (By Mr. Martinez)

1    you saw the victim's body and we'll put that on the document

2    camera.

3    A    Okay.  In this area.

4    Q    For the record, Detective, where my pen is here, just

5    above that, that's the location you circled; correct?

6    A    Yes, that's correct.

7    Q    Okay.  I'll show you another page from

8    Government's PHCS 1.  What are we looking at here?

9    A    That's the -- C, Item C is the pool of blood.  And Item B

10   is the victim's tennis shoes.

11   Q    All right.  Detective, did you recover any ballistics or

12   firearms evidence from the scene such as projectiles or

13   cartridges or casings?

14   A    There was no ballistic evidence recovered from the

15   scene.

16   Q    Did you eventually learn the identity of the victim?

17   A    Yes.  Eventually I learned the identity of the victim.

18   His name was Dante Jordan, nickname Tata Bug.

19   Q    Did you eventually attend the victim's autopsy?

20   A    Yes, I did.

21   Q    Did you see the victim yourself in the morgue?

22   A    Yes.

23   Q    I'm going to show you --

24        Counsel, before I do that --

25        I'll show you a page from AP-1.  What are we looking at

1    there, Detective?

2    A    That's a picture of the victim at the morgue.

3         THE COURT:  Counsel, you can approach.

4         (Bench conference on the record.)

5         THE COURT:  Okay.  Generally speaking, Mr. Martinez,

6    I didn't warn you about this, but I like to give a jury

7    advance warning before gruesome photos are going to be shown,

8    to include autopsy photos, dead remains at crime scenes, that

9    sort of thing.  So -- but I don't want you to do that.  I want

10   to be the source of that.  Your having given me a heads up, so

11   where are we going?

12        MR. MARTINEZ:  Well, no further down the road with

13   this witness, but when Ms. Hoffman puts on Detective Lloyd

14   there are crime scene photos.  We'll make sure she gives you a

15   head up when she's about to introduce those.

16        THE COURT:  Yes, she should just ask to approach the

17   bench, that will be the signal.  Bring up the hard copies to

18   me, just say, may I approach the bench.  I know that's what

19   you mean.  I'll see them and I'll come up with some kind of

20   appropriate statement to the jury.

21        MR. O'TOOLE:  We can address those pictures at that

22   point at the bench?  We can address those pictures at the

23   bench at that time?

24        THE COURT:  If there's going to be an objection with

25   respect to the evidence in the normal fashion, you should

1    absolutely make your objections and we'll go through that.

2            MR. O'TOOLE:  Thank you.

3            THE COURT:  And let me just make a record on this

4    issue, does any defendant have an objection to the Court's

5    practice of essentially, and I hate this term, but we all know

6    what it means because we all read the popular press, giving --

7    is there any objection to the Court giving a trigger warning

8    to the jury before the gruesome photos are shown?

9            MR. FRANCOMANO:  No, Your Honor.

10           MR. BUSSARD:  No.

11           MR. O'TOOLE:  I don't think so.

12           THE COURT:  And this is purely about warning the

13   jury to protect their sensibilities.  This has nothing to do

14   with admissibility of evidence.  You retain all of the normal

15   rights and procedures that would attain.  And I suppose

16   through this process of -- well, let's do this:  When

17   Ms. Hoffman asks to approach the bench to show the Court the

18   photos, counsel should all come up.  We'll kill two birds with

19   one stone.

20           MR. MARTINEZ:  Understood.  Sorry, I didn't know the

21   policy.

22           (The following proceedings were had in open court.)

23           THE COURT:  Next question, Mr. Martinez.

24   Q    (BY MR. MARTINEZ)  Detective, following the autopsy, did

25   you conduct an investigation of Mr. Jordan's homicide?

Direct Examination - Veney (By Mr. Martinez)

1  A    Yes, I did.

2  Q    As part of that investigation, did you interview

3  witnesses?

4  A    Yes, I did.

5  Q    Did there come a point in time where the trail of your

6  investigation went cold?

7  A    Yes.

8  Q    And then directing your attention to late 2013, did there

9  come a time where you located an actual eyewitness to

10 Mr. Jordan's homicide?

11 A    Yes.

12 Q    Who was that?

13 A    I located a witness by the name of Christopher Meadows.

14 Q    I want to show you Government's Exhibit P, as in Paul,

15 HI-58.  What are we looking at there?

16 A    That's Christopher Meadows.

17 Q    Detective, did you interview Mr. Meadows regarding what

18 he saw on the night Jordan was killed?

19 A    Yes, I did.

20       MR. MARTINEZ:  Your Honor, those are all the

21 questions we have for Detective Veney.

22       THE COURT:  Cross-examination.

23       MR. O'TOOLE:  No questions on behalf of

24 Mr. Jones.

25       THE COURT:  Mr. Bussard.

Direct Examination – Veney (By Mr. Martinez)

1       MR. BUSSARD:  No, Your Honor.

2       THE COURT:  Mr. Francomano.

3       MR. FRANCOMANO:  No, Your Honor.

4       THE COURT:  Thank you, sir, you are excused.

5       THE WITNESS:  Thank you.

6       THE COURT:  We've consulted with our IT experts and

7   the advice is to reboot the whole system, but that takes a

8   while, so we're not going to do that until the morning break.

9   So between now and the morning break, you'll have to -- to the

10  extent you want exhibits marked, you'll have to do it in the

11  fashion you followed previously.  Unless you or Ms. Hoffman

12  tell me that it's going to be extensive, in which case we'll

13  pause and do the reboot.  But how long does that take, four or

14  five minutes?

15      THE CLERK:  Yeah, it shouldn't take long.

16      MR. MARTINEZ:  Let me just confer with Ms. Hoffman

17  and ask her what she --

18      THE COURT:  Yes.

19      MR. MARTINEZ:  I understand there won't be much in

20  the way of annotation, so I think we can make do until the

21  break.

22      THE COURT:  Thank you.

23      MS. HOFFMAN:  Your Honor, the government calls

24  Sergeant James Lloyd.

25      THE COURT:  Mr. Lloyd, please come forward.  Stand

1    right by our witness box here and face our clerk.

2              THE CLERK:  Sir, if you would please raise your

3    right hand to be placed under oath.

4                         SERGEANT JAMES LLOYD

5    called as a witness, being first duly sworn, was examined and

6    testified as follows:

7              THE WITNESS:  Yes, ma'am, I do.

8              THE CLERK:  Thank you.  You may enter the witness

9    box and watch your step.  And if you would please speak

10   directly into the microphone, state your first and last name

11   and spell your first and last name.

12             THE WITNESS:  James Lloyd.  First name, J-a-m-e-s;

13   last name, L-l-o-y-d.

14             THE CLERK:  Thank you.

15             THE COURT:  Your witness, ma'am.

16                         DIRECT EXAMINATION

17   BY MS. HOFFMAN:

18   Q    Good morning, Sergeant Lloyd.

19   A    Good morning, ma'am.

20   Q    With which law enforcement agency are you employed?

21   A    The Baltimore City Police Department.

22   Q    And what's your rank and title?

23   A    Detective sergeant.

24   Q    How long have you worked with the Baltimore Police

25   Department?

Direct Examination - Lloyd (By Ms. Hoffman)

1    A    18 years.

2    Q    And what unit of the BPD are you in?

3    A    The homicide section, ma'am.

4    Q    How long have you been with homicide?

5    A    About 15 and a half years.

6    Q    Approximately how many homicides would you say you've

7    investigated over the course of your career?

8    A    Just about 100.

9    Q    Approximately how many homicides per year do you

10   investigate?

11   A    I'd say too many, 30 to 45.

12   Q    Directing your attention to the early morning hours of

13   January 9th, 2007, were you working and on duty on that day?

14   A    As a detective, yes, ma'am.

15   Q    Did there come a time when you were asked to respond to

16   the scene of a homicide?

17   A    Yes, ma'am.

18   Q    Where were you asked to go?

19   A    I believe it was 221 East 25th Street in Baltimore

20   City.

21   Q    And about what time of day did that call come in?

22   A    Early morning hours, ma'am, between 5:16 to 5:22 a.m.

23   Q    Was the victim present on the scene when you arrived?

24   A    Yes, ma'am, he was.

25   Q    And what kind of building is 221 East 25th Street?

Direct Examination - Lloyd (By Ms. Hoffman)

1    A    It's a multi-unit dwelling, ma'am, with a commonplace

2    area on the first floor, I do believe.

3    Q    Were photographs taken of the crime scene?

4    A    Yes, ma'am, by a crime lab technician with Baltimore

5    City.

6            MS. HOFFMAN:  Your Honor, may I approach?

7            THE COURT:  Yes.  Counsel.

8            (Bench conference on the record.)

9            THE COURT:  How many you got?

10           MS. HOFFMAN:  There's a whole bunch.  We don't

11   intend to offer any actual autopsy photos of this victim, just

12   the crime scene photos.  We will have a witness testify later

13   in the proceeding that he heard the defendant Gerald Johnson

14   describe Mr. Rochester's brains as looking like spaghetti

15   sauce.

16           THE COURT:  Okay.

17           MS. HOFFMAN:  So we do want to present pictures, as

18   gruesome as they are, to corroborate that witness's account.

19           THE COURT:  Okay.  So I have before me -- are these

20   individual --

21           MS. HOFFMAN:  No, they're all one.

22           THE COURT:  That's not going to work.  How do I

23   discriminate if I don't have them separately marked?

24           MR. MARTINEZ:  We can bring up another set of

25   stickers.

1          THE COURT:  How about this, PHCS 2, they're all in

2     that category, and then give them hyphens and letters.

3          MS. HOFFMAN:  Sure.

4          THE COURT:  All right.  Do that quickly.

5     Ms. Powell, you're going to need a separate sheet somehow to

6     record this.  The government can get it prepared for you

7     somehow overnight so that it otherwise dovetails into your

8     exhibit list.  But you're going to need an informal sheet that

9     you write out for yourself to keep track of this today.  And

10    specially considering the real possibility that some photos

11    might come in and some might be excluded.  You need a record

12    of that.  I would say just handwrite it on a pad.

13          (Pause in the proceedings.)

14          THE COURT:  Okay.  We're back on the record.  Okay.

15    I have -- so we've done it with numbers, is that how you did

16    it?

17          MR. MARTINEZ:  Yes, 2-1, 2-2, et cetera.

18          THE COURT:  PHC 2-1, I'll be referring to these by

19    2-1, for instance.  So are you proposing, with proper

20    foundation, to offer all of these exhibits, Ms. Hoffman?

21          MS. HOFFMAN:  I mean, I'd like to offer -- some of

22    them are redundant, honestly, so I don't need to offer all of

23    them.

24          THE COURT:  Sort them.

25          MS. HOFFMAN:  I would like to offer this one.

Direct Examination – Lloyd (By Ms. Hoffman)

1          THE COURT:  Make your two stacks right now and then

2     we'll go through them, all of the ones that you want.

3          (Pause in the proceedings.)

4          THE COURT:  Okay.  Counsel, for the record, the

5     government proposes to offer the following exhibits in

6     evidence:  PHCS 2-1, I'm going to go through them all first.

7     You don't need to interpose your objections yet.  First, we're

8     going to go through them and see them as a set and then we'll

9     go through them one by one.  2-1, 2-2, 2-3, 2-5, 2-9, 2-11,

10    2-12, 2-15.

11         MR. MARTINEZ:  Correct.

12         THE COURT:  Is your witness going to say that's a

13    shell casing?

14         MS. HOFFMAN:  Uh-huh.

15         THE COURT:  2-16, 2-18, 2-19, 2-20, and 2-21.  Here

16    we go, 2-1.

17         MR. O'TOOLE:  No objection.

18         MR. BUSSARD:  No objection.

19         MR. FRANCOMANO:  No objection.

20         THE COURT:  2-2.

21         MR. O'TOOLE:  No objection.

22         MR. BUSSARD:  No objection.

23         MR. FRANCOMANO:  No objection.

24         THE COURT:  2-3.

25         MR. O'TOOLE:  No objection.

1              MR. BUSSARD:  No objection.

2              MR. FRANCOMANO:  No objection.

3              THE COURT:  2-5.

4              MR. O'TOOLE:  No objection.

5              MR. BUSSARD:  No objection.

6              MR. FRANCOMANO:  No objection.

7              THE COURT:  2-9.

8              MR. O'TOOLE:  Objection.

9              THE COURT:  What's the objection?

10              MR. O'TOOLE:  It's redundant to five.  It shows

11     body -- shows a different perspective of the room.  It's still

12     redundant, we have a dead body on the floor.

13              MS. HOFFMAN:  Can I see the other one, compare it?

14     I was trying to show different angles.

15              MR. O'TOOLE:  Virtually the same picture.

16              MS. HOFFMAN:  That's fine, we can just use this one

17     then.

18              THE COURT:  2-5 is withdrawn?

19              MR. O'TOOLE:  What -- it's --

20              THE COURT:  Hold on, let me see what her position

21     is.

22              MS. HOFFMAN:  Let's use this one.  Yes, we'll use

23     this one.

24              THE COURT:  2-9 has been withdrawn.  Defendant's

25     position with respect to 2-5?

1        MR. O'TOOLE:  We have no objection.

2        THE COURT:  2-11.

3        MR. O'TOOLE:  Objection.

4        MR. BUSSARD:  Objection.

5        THE COURT:  Same objection?

6        MR. O'TOOLE:  Virtually the same objection.  We have

7   a dead body on the floor.  This is just a close-up picture of

8   the dead body on the floor.  It's even less useful than the

9   other picture because it doesn't show anything that they're

10  talking about in terms of position or anything else.  It's

11  just a dead body on the floor, which we already know is lying

12  there.

13        THE COURT:  Government's position.

14        MS. HOFFMAN:  Well, I think it -- so I wanted to

15  show before the casings had been marked and after the casings

16  had been marked.  This is before they had put the markers up

17  and it shows -- and it's a close up that shows that he's lying

18  on his back.  And I think that you can see -- well, maybe you

19  can't see where the casings are.  But that was my intent, was

20  to show before and after the markers were put down.

21        MR. O'TOOLE:  The casings -- the casings with

22  respect to where they are on the body, I submit that it

23  doesn't make any difference at all.  The man is dead and

24  they're going to show is there casings on the floor.

25        THE COURT:  I don't think there's a strong argument

Direct Examination - Lloyd (By Ms. Hoffman)

1   either way.  I don't find the photo to be particularly

2   gruesome other than the fact that it clearly depicts someone

3   who is deceased.  But there's no blood, there's no gore, that

4   is evident.  And the individual clearly looks to be deceased.

5   But in the context in which we are proceeding in this trial, I

6   do not find Exhibit 2-11 to be unduly inflammatory or that

7   it's admission would violate Rule 403.  That is to say, it

8   would be more prejudicial than probative.  So while it is

9   somewhat duplicative of other photos that have come in, it

10  also doesn't strike the Court in context as being terribly

11  prejudicial.  2-11 will come in provided there's a proper

12  foundation laid.  These are of course preliminary rulings.  We

13  haven't laid the foundation yet.  Next exhibit is 2-11.

14          MR. O'TOOLE:  We object, Your Honor.

15          THE COURT:  All right.  So 2-11.

16          MR. O'TOOLE:  I'm sorry, Your Honor, 12 is what I

17  object to.

18          THE COURT:  Right.

19          MR. BUSSARD:  And object to that also.

20          THE COURT:  All three defendants object to 2-12.

21  Government's position.

22          MS. HOFFMAN:  We can take that one out.

23          THE COURT:  2-12 is withdrawn.  The next exhibit is

24  2-15.

25          MR. O'TOOLE:  Object.

1              MR. BUSSARD:  Objection on behalf of Mr. Jones.

2              THE COURT:  Okay.  All three defendants object.

3    Mr. O'Toole, you want to argue it?

4              MR. O'TOOLE:  Based on Rule 403, based on the

5    gruesomeness of that picture, the fact that he is certainly

6    dead, there will be attempted testimony by somebody that it

7    looked like spaghetti sauce.  First of all, it doesn't look

8    like spaghetti sauce, but second of all, I would suggest that

9    the spaghetti sauce comment is not in furtherance of the

10   conspiracy, and therefore, should not come in as hearsay

11   testimony.  And I don't think it adds anything to the picture.

12   And finally, the jury -- if someone said he was dead with

13   blood on his face, saying it looked like spaghetti sauce, the

14   jury can imagine that.  The jury does not have to be shown a

15   picture of a man with his eyes open with bullet holes in his

16   head and some subject matter on the floor that's grotesque and

17   gross and ask the Court to keep it out.  It's more prejudicial

18   than probative.

19             THE COURT:  Sadly the topic is murder.  And the

20   circumstances of the murder allegedly are a gunshot wound to

21   the head.  In that context, I find it is appropriate to place

22   before the jury a single gruesome photograph that --

23             MR. O'TOOLE:  Can we look at all of them and see --

24             THE COURT:  I don't think they're offering any

25   others.

1          MS. HOFFMAN:  That's the very important one because

2     I think it does corroborate that witness's testimony about

3     what Gerald Johnson said.

4          MR. O'TOOLE:  Can we look at the one prior to that

5     to see if --

6          THE COURT:  I think she already pulled it.

7          MR. O'TOOLE:  Maybe the Court had already decided.

8          THE COURT:  The government's position is -- let me

9     see 2-14.

10          MR. MARTINEZ:  2-14.

11          MR. O'TOOLE:  No, we need 15 -- you mean 12.

12          MR. MARTINEZ:  Ms. Hoffman probably pulled out.

13          MS. HOFFMAN:  Your Honor, this picture shows the

14     casing and it also shows the blood looking much more like

15     spaghetti sauce.

16          THE COURT:  The government withdrew 2-14, and

17     looking at 2-14, it's a hideously graphic photograph that is

18     terribly gruesome, also doesn't appear to depict a shell

19     casing.  And so as between the two, the Court's judgment is

20     that 2-15 is less gruesome than 2-14.  So the fact that that

21     is the -- 2-14 has been taken out of the equation is of some

22     significance here.  So this -- of the truly gruesome photos

23     that are in this set, I take it that the government is only

24     intending to offer 2-15.

25          MS. HOFFMAN:  Well, yeah, I mean, assuming -- there

1    are a couple others that could be considered gruesome.

2        THE COURT:  Well, not on this scale.  This is a

3    photograph that depicts a dead individual, eye open, shell

4    casing, certainly coagulated blood having drained from the

5    skull.  There's a pinkish material, which the Court suspects

6    is brain tissue, that is on this carpet.  It's a gruesome

7    photo.  I don't see anything else in the set proffered by the

8    government that is of this scale in terms of the gruesomeness

9    of the photo.

10       MR. O'TOOLE:  Your Honor, if I could just make one

11   comment.

12       THE COURT:  Yes.

13       MR. O'TOOLE:  Just because there are only two photos

14   that are gruesome, and this is in the Court's estimation the

15   less gruesome of the two, it does not make it appropriate.

16       THE COURT:  No, not by itself.  I agree with that

17   analysis, but it's also -- go ahead and finish your

18   argument.

19       MR. O'TOOLE:  Well, I think that -- two things.  If

20   the Court does let it in over objection, over strong

21   objection, I think the government should be instructed to put

22   it on and take it off.  We don't need it on for more than a

23   millisecond, number one.

24       THE COURT:  Well, a millisecond is pretty hard to

25   achieve.  But the government will be under instruction with

Direct Examination – Lloyd (By Ms. Hoffman)

1    respect to these photos to put them on, elicit the testimony

2    that is directly relevant, and then pull the photo off the

3    document camera, and certainly don't leave it up there

4    lingering while the testimony goes in another direction.

5            MS. HOFFMAN:  Of course.

6            MR. O'TOOLE:  Testimony --

7            THE COURT:  Hold on a second.  Government understand

8    that instruction?

9            MS. HOFFMAN:  Yes.

10           THE COURT:  Now, Mr. O'Toole.

11           MR. O'TOOLE:  What I was going to suggest and ask

12   the Court to do is elicit the testimony before the picture is

13   on the screen and then say, I'm going to show you an exhibit

14   to see if that's what your testimony just was.  Put it on the

15   screen and take it off.

16           THE COURT:  I'm not going to choreograph the

17   government's testimony that tightly.  That's artificial.  I

18   will count on the professionalism of the prosecutor.  She

19   understands exactly what the drill is here.  If we stray away

20   from that, I will intervene, but she's got to be given the

21   opportunity to make her case, present her case.

22           MR. O'TOOLE:  The last point I want to make, and I

23   will stop it, this is, in my estimation, I think the other

24   picture is less gruesome.  I think this with the open eye and

25   the gross stuff coming out of the head, even if this is a

Direct Examination – Lloyd (By Ms. Hoffman)

1    murder case, I think this one's more gruesome than the other,

2    even though the Court thinks the other way around.

3         THE COURT:  Well, let's make sure that Exhibit 2-14

4    is in the record of this case so the record is complete,

5    because it is true that the Court is making a comparison

6    between the two, limiting the government to only one so-called

7    gruesome photograph and the Court's making its determination

8    that 2-15 is less gruesome than 2-14.  So 2-14 will be

9    received and made a part of the record in this case, not to be

10   displayed to the jury.  Not to be displayed to the jury,

11   2-14's received, not to be displayed to the jury.  Okay.

12   You'll need to segregate that exhibit, Ms. Powell, from this

13   point forward, as will the government, so that eight weeks

14   from now we don't forget and allow that exhibit back

15   mistakenly.

16        MS. HOFFMAN:  Your Honor, the question is not merely

17   which photo is more gruesome but which one is more probative.

18   This one clearly is more probative since it shows both the

19   casing and it shows a better view of the blood looking like

20   spaghetti sauce.

21        THE COURT:  I understand the government's position.

22   Regardless, that's my ruling.  2-15 is coming in.  And I think

23   I said this previously, I'll amplify it.  That is to say that

24   given the context, given the testimony that we've heard, the

25   government is entitled to present a single photograph that

1    records visually the evidence that has been otherwise

2    described verbally.  So 2-15 is coming in over objection.

3    2-16.

4              MR. O'TOOLE:  Objection.

5              MR. BUSSARD:  Same objection.

6              THE COURT:  Now that it's cumulative and --

7              MR. O'TOOLE:  It's the markers, but who cares.

8              MS. HOFFMAN:  The markers show where the casings are

9    in relation to the body.

10             MR. O'TOOLE:  Doesn't make him more dead or less

11   dead.  The casings are in the room.

12             THE COURT:  The Court, in looking at 2-16, would not

13   classify it as a gruesome photograph.  There clearly is a dead

14   body depicted, but there is the additional information

15   indicating where shell casings were found.  2-16's coming in

16   over objection.  2-18.

17             MR. O'TOOLE:  No objection.

18             THE COURT:  2-19.

19             MR. O'TOOLE:  No objection.

20             MR. FRANCOMANO:  No, Your Honor.

21             MR. BUSSARD:  No objection.

22             THE COURT:  I should be ruling on which of these --

23   2-16 is in, 2-18 is in, 2-19 is in.  Mr. Bussard.

24             MR. BUSSARD:  Only objection I have, I don't believe

25   this is the one that actually places the little plaque cards

1    there.  I think it's the crime scene tech, is the person

2    actually who did this.

3              THE COURT:  Well, we'll see if the witness has

4    enough knowledge as sort of ordinary practices of the police

5    department to be able to testify to that foundation.  2-20.

6              MR. O'TOOLE:  No objection.

7              MR. FRANCOMANO:  No objection.

8              MR. BUSSARD:  Same objection.

9              THE COURT:  Same objection.  So defendant Jones

10   objects, defendant Johnson does not object, defendant McCants

11   does not object.  2-20 is coming in, subject to the laying of

12   an appropriate foundation.  That's true with respect to all

13   these photographs.  Last of all, what is that?

14             MS. HOFFMAN:  I think it's just meant to mark the

15   casing, not whatever that is.  There's a casing just above

16   the -- right here.

17             THE COURT:  I'm just curious what that object is

18   that's depicted in Exhibit 2-21 in the lower left of the

19   photograph.

20             MS. HOFFMAN:  I'm not sure.  I think it's a piece of

21   trash.

22             MR. O'TOOLE:  Since nobody knows, we object and

23   based on the objection of Mr. Bussard, we would join the

24   objection and object to this one as well.

25             THE COURT:  I have no idea what that is, but that

Direct Examination – Lloyd (By Ms. Hoffman)

1    doesn't strike the Court as anything prejudicial.  It doesn't

2    seem to -- I don't know what it is.  It looks like a piece of

3    plastic.  Nothing prejudicial about it.  2-21 is coming in,

4    also subject to the laying of a proper foundation.

5         MS. HOFFMAN:  Thank you.

6         THE COURT:  Okay.  You may step back.

7         (The following proceedings were had in open court.)

8         THE COURT:  Ladies and gentlemen, you have heard

9    testimony so far in this case that has described the

10   commission of homicides.  In a few moments the government is

11   going to attempt to introduce photographs in relation to one

12   of those events that witnesses have spoken of in recent days.

13   Solely out of a concern for your own feelings and

14   sensitivities, I wish to warn you that some of the pictures

15   that you will be -- that you may be shown in a few moments are

16   graphic.  You may proceed.

17        MS. HOFFMAN:  Thank you, Your Honor.

18   Q    (BY MS. HOFFMAN)  Sergeant Lloyd, you testified that when

19   you responded to the crime scene, the victim was still

20   present; is that right?

21   A    Yes, ma'am.

22   Q    And did you observe the position in which the victim's

23   body laid there?

24   A    Yes, ma'am.

25   Q    And you testified that photographs were taken of the

Direct Examination – Lloyd (By Ms. Hoffman)

1    crime scene; is that right?

2    A    That is correct, ma'am.

3    Q    Have you reviewed those photographs?

4    A    Yes, ma'am, I did.

5    Q    Do they accurately depict the crime scene as you observed

6    it?

7    A    Yes, ma'am.

8    Q    Going to show you Government's Exhibit No. P, as in Paul,

9    HCS 2-1.  What are we looking at here?

10   A    We're looking at an envelope, ma'am, that normally

11   contains photographs ascribed to this investigation with the

12   central complaint number.

13   Q    Could you read the central complaint?

14   A    07-5A, as in Adam, 03994.

15   Q    I'm going to show you Government's Exhibit No. PHCS 2-2.

16   What are we looking at here?

17   A    That's the front of the residence, ma'am, of

18   221 East 25th Street in Baltimore, the crime scene.

19   Q    Going to show you what's been marked as

20   Government's Exhibit PHCS 2-3.  What are we looking at here?

21   A    This is the open door of the front entrance, ma'am, of

22   221 East 25th Street, ma'am.

23   Q    Going to show you Government's Exhibit No. PHCS 2-5.  Can

24   you tell us what we're looking at here?

25   A    Looking at a picture that depicts the victim laying in

1    the commonplace I described earlier of the first floor of

2    221 East 25th Street.

3    Q    And is this an accurate depiction of how you found the

4    victim when you arrived on the scene?

5    A    Yes, ma'am, it is.

6    Q    I'm going to show you Government's Exhibit No. PHCS 2-11.

7    What are we looking at here?

8    A    This is a closer up view of a photograph taken of the

9    victim as he lay at the crime scene, ma'am.

10    Q    And can you describe his position for the record?

11    A    He's laying on his back, ma'am, fully clothed.  He had

12    obvious signs of gunshot injuries.

13    Q    Going to show you Government's Exhibit No. PHCS 2-15.

14    What are we looking at here?

15    A    This is a close up view, ma'am, of the victim involved in

16    this matter.  It depicts, as you can see in the picture, his

17    head, brain matter, and ballistic evidence, which is just

18    adjacent to his head, ma'am, indicative that he was shot at

19    close range.

20    Q    When you say ballistic evidence, what do you mean?

21    A    That's a casing, ma'am, known as a casing.

22    Q    Going to show you Government's Exhibit PHCS 2-16.  What

23    are we looking at here?

24    A    This is another view, ma'am, a photograph of our victim.

25    Again, fully clothed, around him are indicators that are

Direct Examination - Lloyd (By Ms. Hoffman)

1    numbered and citing ballistic evidence or evidence involved in

2    this case.

3    Q    Going to show you Government's Exhibit No. PHCS 2-18.

4    What are we looking at here?

5    A    As I just made reference, ma'am, of those markers.  Mark

6    No. 1, and what you're looking at is a casing.

7    Q    I'm going to show you Government's Exhibit PHCS 2-19.

8    What are we looking at here?

9    A    Another photograph, ma'am, of ballistic evidence, also

10   known as a casing, marked No. 3.

11   Q    Going to show you Government's Exhibit No. PHCS 2-20.

12   What are we looking at here?

13   A    It's another photograph, ma'am, depicting ballistic

14   evidence, but this is a cartridge and it's marked No. 4.  That

15   was recovered from the crime scene, ma'am, just adjacent to

16   his body.

17   Q    And what's the difference between a cartridge and a

18   casing, if you know?

19   A    With a firearm you have two types of firearms, handgun,

20   should I say.  One of which is a semi-automatic weapon and a

21   semi-automatic weapon, it ejects what we know as cartridges --

22   I'm sorry, casings.  Before it ejects a casing, you have

23   what's known as a cartridge, ma'am, and at the tip of that

24   cartridge is what we know as a bullet.  A bullet goes in you

25   and ejects a casing.  The whole thing is known as a cartridge.

Direct Examination - Lloyd (By Ms. Hoffman)

1    That's what you're looking at now.

2    Q    So you recovered this cartridge from the crime scene?

3    A    Yes, ma'am.

4    Q    And that's an unfired round of ammunition; is that

5    correct?

6    A    That is correct.

7    Q    Going to show you Government's Exhibit No. PHCS 2-21.

8    What are we looking at here?

9            THE COURT:  Can we sharpen that focus?

10           MS. HOFFMAN:  It's actually not showing up on the

11   screen right here.

12   A    Okay.  Other evidence, ma'am, recovered.  Marked 5 and 6,

13   photographs, depicts casings, ma'am.

14   Q    (BY MS. HOFFMAN)  Were the casings and the projectile

15   recovered from the scene?

16   A    Yes, ma'am.

17   Q    And were they submitted to evidence?

18   A    Yes, ma'am, they were.

19   Q    I'm going to approach and show you

20   Government's Exhibit 25.  Are you familiar with this

21   exhibit?

22   A    Yes, ma'am.

23   Q    And what is it?

24   A    This is our evidence envelope, ma'am, that contains the

25   ballistic evidence recovered from the crime scene.

Direct Examination - Lloyd (By Ms. Hoffman)

1    Q    And can you tell us specifically what caliber casings

2    were recovered?

3    A    9mm, ma'am.

4    Q    And how many?

5    A    Five casings and one cartridge.

6    Q    And backing up just a --

7         MR. BUSSARD:  Your Honor, objection.

8         THE COURT:  You may approach.

9         (Bench conference on the record.)

10         THE COURT:  Yes, sir.

11         MR. BUSSARD:  Your Honor, the word that's being

12    entered around here is the word "recovered."  In fact, there's

13    a chain of custody.  The chain of custody is going through the

14    crime scene tech, who actually picks it up with the rubber

15    gloves and puts it in a packet and then puts it inside this

16    package there.  So he's using the word recovered as a team

17    effort instead of as an individual effort.  And unless he can

18    identify that he's the one that actually picked it up and did

19    it, we're missing a step in there.

20         MS. HOFFMAN:  I can clarify that it was a crime

21    scene tech who physically picked up the items.  I thought I

22    had worded it "were they recovered."

23         THE COURT:  And how does he know that the crime

24    scene tech picked up these exhibits?

25         MS. HOFFMAN:  Right.

1          THE COURT:  Sustained.  You may continue.

2          (The following proceedings were had in open court.)

3          THE COURT:  Sustained.  Next question.

4    Q    (BY MS. HOFFMAN)  Sergeant Lloyd, I asked you about the

5    recovery of the casings and cartridge from the scene, were you

6    personally the person who physically picked them up at the

7    scene?

8    A    No, ma'am.

9    Q    Who was that?

10   A    A crime lab technician, ma'am, under my direction.

11   Q    Did you observe these items being recovered?

12   A    Yes, ma'am.

13   Q    I'm going to show you Government's Exhibit No. P, as in

14   Paul, HE25.  And what are we looking at here?

15   A    Again, we're looking at photographs of the ballistic

16   evidence, ma'am, in reference to this case, which are casings

17   and a cartridge, ma'am.

18   Q    And are those the casings and cartridge that you have in

19   front of you?

20   A    Yes, ma'am.

21   Q    Did you ultimately learn the identity of the victim?

22   A    Yes, ma'am.

23   Q    Who was it?

24   A    His name was Gregory Rochester, ma'am, also known as

25   Craig Mack.

Direct Examination - Lloyd (By Ms. Hoffman)

1    Q    Did you identify any -- I'm sorry, backing up a step,

2    were there any other occupants of the building present when

3    you arrived on the scene?

4    A    Yes, ma'am, as I recall.

5    Q    Who were they?

6    A    Mr. Gerald Johnson, Ms. Tyra Wheatley, and

7    Mrs. Coco Stackhouse, if my memory proves correct.

8    Q    And are any of those individuals sitting in the courtroom

9    today?

10   A    Yes, ma'am.

11   Q    Who is that?

12   A    Mr. Gerald Johnson, also known as Geezy.

13   Q    Can you point him out -- I'm sorry.

14   A    Right here, the young man in the red vest and the plaits

15   in his hair and glasses.

16   Q    Thank you.  Did you identify any witnesses to the

17   murder?

18   A    No, ma'am.

19   Q    Did you attend the autopsy of the victim?

20   A    Yes, ma'am, I did.

21   Q    And based on your attendance of the autopsy, did you

22   learn the victim's cause of death?

23   A    Yes, ma'am, I did.

24   Q    What was it?

25   A    A homicide by way of multiple gunshot injuries.

1        MS. HOFFMAN:  Your Honor, at this point I'd like to

2   read part of Stipulation No. 3 into the record, specifically

3   paragraph 2 of Stipulation No. 3.

4        THE COURT:  Without objection.  Ladies and

5   gentlemen, you'll recall that a stipulation is a factual

6   statement that the parties, all of them, the government and

7   the defendants, agree is true.  So what's about to be read to

8   you you're to take as proven as true.  There's nothing for you

9   to decide with respect to this.  You're to accept it as true.

10  Go ahead.

11       MS. HOFFMAN:  Paragraph 2 of Stipulation No. 3

12  reads:  Government's Exhibit No. AR 2 is an autopsy report

13  prepared by Dr. Patricia Aronica-Pollak of Maryland's OCME in

14  connection with the death of Gregory Rochester on

15  January 9th, 2007.  It is agreed and stipulated by the parties

16  that Dr. Aronica-Pollak determined that Rochester's manner of

17  death was homicide and cause of death was nine gunshot wounds,

18  specifically four gunshot wounds to the head, one gunshot

19  wound to the neck and four gunshot wounds to the upper

20  extremities.  Government's Exhibit No. AR 2 is admitted into

21  evidence without the necessity of testimony by

22  Dr. Aronica-Pollak.  And I'd like to move

23  Government's Exhibit AR 2 into the record by stipulation.

24       THE COURT:  Without objection.

25       MR. O'TOOLE:  No objection.

Direct Examination – Lloyd (By Ms. Hoffman)

1           THE COURT:  It is received.  Is there also a

2   stipulation of the parties that OCME stands for Office of the

3   Chief Medical Examiner, is that also your stipulation,

4   Ms. Hoffman?

5           MS. HOFFMAN:  Yes, I believe that's correct.

6           THE COURT:  Mr. O'Toole.

7           MR. O'TOOLE:  Yes, sir.

8           THE COURT:  Mr. Bussard.

9           MR. BUSSARD:  No objection.

10          THE COURT:  Mr. Francomano.

11          MR. FRANCOMANO:  Correct, Your Honor.

12          THE COURT:  OCME means the Office of the Chief

13  Medical Examiner, you can accept that as true as well.  The

14  report is received in evidence.  You may continue.

15  Q    (BY MS. HOFFMAN)  Was there any ballistic evidence

16  recovered at the time of the autopsy?

17  A    Yes, ma'am.

18  Q    I'm going to show you Government's Exhibit No. PHE 26.

19  And also, let me approach and show you

20  Government's Exhibit 26.

21          MR. BUSSARD:  Your Honor, objection again, same

22  objection.

23          THE COURT:  Let's approach.

24          (Bench conference on the record.)

25          THE COURT:  So Mr. Bussard, do we have a genuine

1    dispute then as to the chain of custody of the ballistic

2    evidence in this case?

3            MR. BUSSARD:  Yes.

4            THE COURT:  All right.  Well, what's the

5    government's point of view given that you don't seem to have

6    an agreement?

7            MS. HOFFMAN:  Well, I mean, he attended the

8    autopsy --

9            THE COURT:  Has he kept these items in his personal

10    possession at all times except when they were logged into the

11    evidence room at the Baltimore City Police Department?

12            MS. HOFFMAN:  I think the chain of custody has

13    probably included other individuals, although I'm not certain.

14    I didn't realize that that was in dispute, and so I hadn't

15    questioned the witness about it.

16            THE COURT:  All right.  Well, you don't seem to have

17    an agreement with at least one of the three lawyers.  So we'll

18    go as far as we can, but the chain of custody is an

19    evidentiary prerequisite.  It's a prerequisite to admission of

20    the exhibits.  Well, actually the exhibits have already been

21    received.  I suppose what it is, is a prerequisite to the

22    testimony about the exhibits in terms of what they might tell

23    us because the issue with respect to a suspect's chain of

24    custody is that perhaps the evidence was altered somehow.

25            So that then raises the question of whether that's a

1    reasonable -- is chain of custody necessary in order to put in

2    this sort of evidence that you want to admit here?  If it's a

3    chemical question, like a blood sample, that sort of thing,

4    there's really no way around it.  The chain of custody has to

5    be absolutely proven from A to Z.  Physical objects sometimes

6    can have evidentiary value even without the chain of custody

7    being clear if the aspect of the object that is of evidentiary

8    value has probativity by its nature would survive and be, you

9    know, probative, regardless of whether it was continuously in

10   the custody of a particular witness.  All that has to be

11   determined on a step-by-step basis if we really have a dispute

12   here.

13        MS. HOFFMAN:  Don't we have to -- in order to prove

14   that chain of custody, don't we have to first identify -- have

15   the recovering --

16        THE COURT:  You absolutely do, and you have, I

17   think, proven the first step, which was that the -- these

18   particular shell casings and this cartridge were recovered

19   from that scene.  And without challenge this witness testified

20   that the casings that are in front of him right now are

21   exactly the same ones.  So there's no real issue about that.

22   If there was one, it was waived by virtue of their not having

23   objected during the entry.  But what's left is the aspect of

24   chain of custody while it has to do with potential alteration

25   of evidence during its passage from the crime scene to the

Direct Examination – Lloyd (By Ms. Hoffman)

courtroom.  And that's where there still may be some
ambiguity.  What's not resolved in my mind is the question
that I raised, probably somewhat inarticulately, which is
that, does chain of custody ambiguity pose a question about
the validity of all types of physical evidence or only certain
types of physical evidence?

MS. HOFFMAN:  I'm not sure and I'm not sure what the
nature of the dispute is and it's hard to say without knowing
whether the argument is that they were altered in some way or
that different ones were substituted completely or what the
argument is.

THE COURT:  Well, if you were able to bring
witnesses to the courtroom who were able to say, I know the
evidence was recovered from thus and such location and placed
in a sealed uncontaminated environment and was taped shut, and
there was a signature across it that shows it was not
disturbed and that witness or someone else then says, then I
took it from that person and lodged it in the evidence vault
and here are the records that were maintained in the evidence
vault to show when the evidence came in, when the evidence
went out.

And it's ordinary practice to operate the evidence
vault in that way such that we can have confidence that the
evidence never left the evidence vault until it was taken to
the forensic examiner, who signed for the item, who can so

Direct Examination - Lloyd (By Ms. Hoffman)

testify and it went back and was lodged back -- I mean, that's
how it's done.  It's almost never required, but if they're not
going to agree to it, I don't know that you have any option if
you want to be certain of its admission other than to take it
through that drill.  So -- I -- to the extent -- I take it
this was not raised pretrial.

MS. HOFFMAN:  No.

THE COURT:  I will give the government a lot of
latitude, if you need a postponement, if you need to stop the
trial for a few days in order to round up those witnesses.
You know, I don't -- it's a bit of an ambush.  That said, I
don't mean to suggest that a defendant doesn't have the
absolute right to insist that the rules of evidence be
complied with.  I'm not going to allow the government to
shortcut it.  But in terms of just how we actually conduct the
trial, I don't really fault the government here.  So do you
want to talk among yourselves for a few minutes see how you
want to do it?

MR. MARTINEZ:  What we would request is a minimum --
a brief break so that we can confer amongst ourselves.  And
then we may either ask for a continuance to go get records,
such as evidence control property sheets that perhaps this
detective could testify to that.  But if we determine that the
rabbit hole is deeper and we need to unearth additional law
enforcement witnesses to deal with the ambush, then we might

Direct Examination - Lloyd (By Ms. Hoffman)

1    need more time.

2          THE COURT: Yes, I think that it's probably the

3    latter because I can't imagine that one homicide detective is

4    responsible for an entire chain of custody on ballistics

5    evidence. It's going to be crime scene technicians, it's

6    going to be the detective overseeing it. It's going to be the

7    crime tech who gathers the evidence, if it's like other cases,

8    and is responsible for taking it to the evidence custodian.

9          It gets signed in there, so somebody has to have

10   signed it. To find that person or if you -- if they're

11   unavailable, then you have to do it through documentary

12   records, then you have to bring in someone who is the

13   custodian of the evidence vault to explain what the ordinary

14   practices are, what the various signatures mean, how envelopes

15   are signed, and so forth, and to explain that whole process.

16   Then also, the evidence left the vault and went to an

17   examiner. You have to take it out of the vault, then you're

18   going to have to examine it.

19          MS. HOFFMAN: Might have to call agent -- our case

20   agent.

21          THE COURT: Then it's going to go back in the vault,

22   then it's got to come into the courthouse.

23          MR. MARTINEZ: We understand. And I think all of

24   this plays up the importance of notice. And you know,

25   Mr. Bussard was probably the most prolific filer of pretrial

1    motions, both motions to suppress and motions in limine.  This

2    did not come up.  We certainly recognize that a defendant has

3    the right to insist that a chain of custody be proven up.

4              THE COURT:  Right.

5              MR. MARTINEZ:  But the -- had we known this was

6    going to be disputed, our order of proof would have looked

7    different.  And I do think -- I appreciate the Court's offer

8    of additional time to allow the government to deal with this

9    issue.

10             THE COURT:  I think it's also on the government

11   though.  I think the government, you have evidence like this,

12   it's to you to go to defense counsel and, you know, we don't

13   have a chain of custody dispute here; right, and to try get

14   something like that locked in.  If that had happened, I'm sure

15   I would have heard about it, so I don't think that occurred

16   here either.

17             MR. MARTINEZ:  We did this --

18             THE COURT:  A defendant is always entitled to lay in

19   the weeds and not say a word.  And you know, when they're --

20   if there's really something to this, you know, that is not

21   only their right, it's their responsibility.  If it turns out

22   that there actually isn't a chain of custody problem here,

23   it's just going through the steps.  Well, it's Mr. Bussard's

24   prerogative.  And you know, the law is the law.  Government's

25   responsible for proving chain of custody.

Direct Examination - Lloyd (By Ms. Hoffman)

1          MR. BUSSARD:  Your Honor, if I may.

2          THE COURT:  Yes.

3          MR. BUSSARD:  It wasn't a complete ambush because I

4    filed a motion last week and the chain of custody issue was

5    discussed and when the lost firearms issue came up.  And I did

6    talk about that slightly.  I think the Court even talked about

7    chain of custody.  I also filed pretrial motions.  What I want

8    to point out, Your Honor, is the crux of Mr. Jones's -- the

9    prosecution's case against Mr. Jones is going to be this

10   afternoon when the firearms expert starts linking up or

11   attempting to link up items from this and another -- at least

12   one more incident and maybe two incidents down the road.  And

13   since there's no eyewitnesses or anything else, this is my

14   defense, I have to fight it at the point of when the evidence

15   starts coming in.

16         THE COURT:  It's messy work.  We are where we are.

17   I think the important point for the government is that I am

18   flexible and will give you the latitude.  We could stop for

19   the day.  This is Thursday.  It's the end of the trial week,

20   that would give you over the weekend to sort of pull the proof

21   together in a way that you evidently didn't anticipate was

22   necessary.  Perhaps there's other things that can be

23   accomplished during the day that won't require the chain of

24   custody.  I put it in your hands.  Why don't we take the

25   morning break, at the end of the morning break, before I bring

Direct Examination – Lloyd (By Ms. Hoffman)

1    the jury back in, I'll find out where counsel stand with

2    respect to the entire matter and we'll decide where we're

3    going to go from there.

4              MR. MARTINEZ:  Thank you.

5              (The following proceedings were had in open court.)

6              THE COURT:  Ladies and gentlemen, we'll take our

7    morning break.  During the break do not discuss the case with

8    anyone.  Do not discuss the case even among yourselves.  Do

9    not allow yourselves to be exposed to any news articles or

10   reports that touch upon the case or the issues that it

11   presents or any articles or reports that relate to any of the

12   participants in the case.  Avoid all contact with any of the

13   participants in the trial.  Do not make any independent

14   investigation of the law or the facts in the case.  Do not

15   look up anything on the internet.  Do not consult an

16   encyclopedia or a dictionary.  15 minutes.  Please take the

17   jury out.

18             (Jury left the courtroom.)

19             THE COURT:  Detective Lloyd, you may step down.

20   You're required to return in 15 minutes.  Court is in recess

21   for 15 minutes.

22             (A recess was taken.)

23             THE COURT:  The jury is not present.  We're going to

24   take up the issue that we were discussing at the bench a few

25   moments ago.  Sometimes consulting the rule book is the best

Direct Examination - Lloyd (By Ms. Hoffman)

1    strategy.  In fact, oftentimes in law.  I think we have a

2    tempest in a teapot here.  Rule 901 B4 would seem to be the

3    most applicable provision of the many rules of evidence that

4    are implicated by the problem that we confront and that

5    Mr. Bussard has raised.  There are many ways to authenticate

6    and identify an item of evidence, such that a sufficient

7    foundation is laid for its admission.

8         With respect to physical objects and evidence of

9    that sort, certainly proving up a chain of custody is one way

10   and can be an element of how the process should work in order

11   to demonstrate the proper foundation.  But depending upon the

12   particular type of evidence and its character, proving up a

13   chain of custody might not be the only way to establish the

14   necessary foundation.  Rule 901 B4 reads -- well, first of

15   all, let me read 901 A:  To satisfy the requirement of

16   authenticating or identifying an item of evidence produce

17   evidence sufficient to support a finding that the item is what

18   the proponent claims it is.  Then we go to subsection B, with

19   many examples:  Four, distinctive characteristics and the

20   like, the appearance, contents, substance, internal patterns,

21   or other distinctive characteristics of the item taken

22   together with all the circumstances.

23        That can be a basis by which authentication and

24   identification occurs.  Let's imagine the following scenario:

25   There's a murder.  A police officer comes to the scene of the

1    murder and collects evidence, including shell casings, puts

2    them in his or her pocket, takes them home, and forgets about

3    them.  Retires, leaves them in his uniform trousers for five

4    or six years, moves a few times.  And then years later, with

5    there being absolutely no way of proving a chain of custody

6    because, who knows where those shell casings have been since

7    they left the crime scene, they're rediscovered and brought

8    back to light.

9         And no one claims any ability whatsoever to be able

10   to prove exactly where those shell casings have been in the

11   intervening five or ten years.  Are they now of no probative

12   value?  Do they lack any indicia of admissibility because the

13   chain of evidence can't be proven?  Well, let's suppose that

14   that evidence was a little small, little baggie of marijuana

15   that was lurking in some officer -- or some retired officer's

16   trouser pocket.  Well, there would be a problem because how

17   can you tell one little baggy of marijuana from another baggy

18   of marijuana?  How do you know it's the same one?  You don't

19   know.

20        So unable to prove the chain of custody, there's a

21   problem in terms of foundation for that document.  But these

22   are shell casings, and the question is, do they have an

23   appearance or contents or substance, internal patterns, or

24   other distinctive characteristics that nonetheless

25   authenticate them and identify them despite where they might

1    have been?  I would have to imagine that that's very possibly

2    true here.  It hasn't been demonstrated yet, but it might

3    easily be demonstrated without any reference to a chain of

4    custody.

5            Certainly, the government would have to be able to

6    connect the shell casings, but the shell casings in this case

7    where we are at this moment in time, they're already in

8    evidence.  They were admitted.  There was no objection,

9    they've been admitted, and this detective has testified that

10   these are the shell casings.  How did he know that?  Perhaps

11   by looking at an -- the envelope that contained them.  Had

12   there been a dispute, we might have gotten into another

13   battle, which probably would have been resolved under Rule 901

14   B9, evidence about a process or system, evidence describing a

15   process or system in showing that it produces an accurate

16   result.

17           You know, maybe we would have gone into that before

18   the casings were admitted, if it had been disputed, but it

19   wasn't.  So the casings are in.  The question is, do the

20   casings have evidentiary value?  I take it that the government

21   intends to call an expert witness who's going to identify the

22   same casings that Detective Lloyd says were collected from the

23   murder scene and say that he or she examined these casings and

24   then somehow through analysis connects them, I take it, to a

25   particular firearm.  And you know, where the story goes from

1    there, I, you know, I don't know, but I assume that that's

2    where the government is headed.

3         And if the testimony of a qualified expert is, I can

4    say within a reasonable degree of certainty that these shell

5    casings came from that gun, then the foundation is laid,

6    without any reference to a chain of custody.

7         Mr. Bussard, what's wrong with that analysis?

8         MR. BUSSARD:  Your Honor, the Court indicated that

9    the wording of 901, and I don't have it in front of me, is any

10   "distinctive characteristics."  A shell casing doesn't have

11   distinctive characteristics.

12        THE COURT:  Well, a generic shell casing doesn't,

13   but we're making assumptions here.  I don't know if this is

14   what the proof is going to be, but given fact that we're

15   having this argument, it's reasonable, I think, to make a few

16   assumptions here.  The jury is not in the courtroom.  The

17   assumption that I'm making is that there's going to be an

18   expert who's going to come in and say, I found distinctive

19   markings on this shell casing.  It is no longer a generic

20   shell casing.  It's a shell casing that has a particular

21   pattern of marks on it.  It's distinctive.  That's what I'm

22   anticipating.  So I'm asking you to assume that circumstance

23   for purposes of this debate.  Sure, the government still has

24   to prove that, but if they do, then where are we?

25        MR. BUSSARD:  No objection as to that analysis, but

Direct Examination - Lloyd (By Ms. Hoffman)

1    there will be in the future to every -- putting everybody on

2    notice, there's going to be an objection to every other shell

3    casing that comes in from the beginning.

4         THE COURT:  That's fine, if the objection though, is

5    solely that it's inadmissible because the government can't

6    prove an absolute chain of custody in the manner that we were

7    describing at the bench conference, which is the sort of thing

8    that the Court would expect and would typically require if

9    we're dealing with something generic, say like a little bag of

10   marijuana.  You have to show that that's the same bag of

11   marijuana and because it's so common and so hard to

12   distinguish and there's nothing distinctive about it, the fall

13   back is that you prove the chain of custody.  That's how you

14   prove it's the same one.  But the point is, that under 901 B4

15   there's an alternative means by which you can prove that it is

16   the same thing.  You know, I don't know if the government can

17   do it, but I imagine that they believe that they can.  This

18   whole part of the case is predicated on that, presumably.

19   So.

20        MR. BUSSARD:  Your Honor, I'll turn the argument

21   around.  The shell casing is almost a fungible item except for

22   that one identifiable distinguishing item that is on the

23   firing pin.  That's what's going to be the crux of this whole

24   thing when Sandra Bohlen gets on the stand.  So it is

25   distinctive and this witness cannot testify that that -- that

Direct Examination - Lloyd (By Ms. Hoffman)

1    that in fact is the same casing that was picked up as he's

2    looking at it today.  He didn't -- he didn't pick it up.  He

3    didn't put it in the envelope.  Somebody else did all that and

4    then it's been out of his control since that time.

5         THE COURT:  That's not true.  He did testify that he

6    saw these casings get picked up by a crime lab technician and

7    he said -- he murmured it, I heard him say it, he said, "under

8    my supervision."  So he did testify to that, that those very

9    casings, those ones that were right in front of him, depicted

10   in the little glassine envelopes and the manila bag in front

11   of him, were the casings that were picked up from that

12   scene.

13        MR. BUSSARD:  And he said that by not even opening

14   the package.  He looked at the photograph, he looked at the

15   outside of the package, and said that was the same casings.

16   He did not examine those.  He didn't put a laser mark on it or

17   some -- whatever they use, black marker to mark these as a

18   unique marking that he saw that happen.

19        THE COURT:  Well, my assumption from watching him

20   testify was that he was examining the packaging when he

21   offered that testimony.  And certainly that's fertile ground

22   for cross-examination.  And the problem you face is that the

23   shells themselves are already in evidence and came in without

24   objection.  It's the -- all you've got left is an objection to

25   whether or not there can be a connection made between them and

1    this firearm that I assume is coming.

2         Perhaps the government intends to further develop

3    the testimony with the detective about how he knows those are

4    the same shells from the packaging, I don't know.  But I don't

5    think we're at a point where the identifying of the marks or

6    the authentication, actually, of the marks on the shell

7    casings are yet an issue.  We're just at a point where we have

8    proof that these particular shell casings that are in the

9    courtroom are the ones that were picked up at the crime scene.

10   And the detective has said that they were.  I think you're

11   entitled to attack that if you want to on cross-examination

12   about, you know, how could he possibly know.  I mean, he

13   didn't look at them under a microscope or whatever.  We'll see

14   what his answer is to that.  Mr. O'Toole.

15        MR. O'TOOLE:  Your Honor, two things:  First, going

16   back to the -- we're going to join this objection of course

17   and I want to make sure the Court either expects or doesn't

18   expect us with these objections to specifically and out loud

19   join it, but we are joining this objection.  But the second

20   point is that I thought the issue we discussed at the bench

21   was the potential for these pieces of evidence to have been

22   altered from the time they were on the floor and picked up by

23   somebody and put into the envelopes and sometime later when

24   the expert viewed them.  And there's no evidence now, without

25   the chain of custody testimony that we, I think, are entitled

1    to, to know that these individual casings were not altered.

2    THE COURT:  Yes.  Okay.  And that will come down to

3    the forensic scientist and that's fair game.  I think it's

4    very unlikely that you'll persuade the Court that there is any

5    significant chance whatsoever that there could have been

6    randomly placed on the shell casing some mark that coincides

7    with the mark that shows up on a test casing fired from the

8    same weapon.  But we'll see what the expert has to say about

9    that.

10   MR. O'TOOLE:  All right.  But the first point is, is

11   the Court approving that we should or should not be

12   specifically joining every objection?

13   THE COURT:  I think that it goes -- I think that you

14   should join objections, yes.

15   MR. O'TOOLE:  Then we do.

16   THE COURT:  Yes, Mr. Francomano, you have as well.

17   MR. FRANCOMANO:  We do as well, Your Honor.

18   THE COURT:  All right.  In light of that, I think

19   we're ready to pick up with where we left off, unless the

20   government wants to go down some other road.

21   MS. HOFFMAN:  If I could just have maybe one minute

22   with co-counsel.

23   THE COURT:  Yes.

24   (Counsel conferring.)

25   MR. MARTINEZ:  We're ready to go.

1          THE COURT:  We're ready.  Let's bring them in.  And

2     let's get the detective back on the stand.

3               (Jury entered the courtroom.)

4          THE COURT:  Be seated, please.  Sergeant Lloyd, you

5     remain under oath.  Your witness, ma'am.

6     Q    (BY MS. HOFFMAN)  When we left off, Sergeant Lloyd, you

7     testified that you attended the autopsy of the victim,

8     Gregory Rochester; is that right?

9     A    Yes, ma'am.

10    Q    I believe you also testified that you observed as

11    ballistic evidence was recovered at the time of the autopsy;

12    is that right?

13    A    That's right.

14    Q    What ballistic evidence was recovered?

15    A    It was eight pieces of projectiles recovered from the

16    body of the -- the remains, I should say, of

17    Gregory Rochester, ma'am.

18    Q    And were those -- who submitted those projectiles into

19    evidence?

20    A    I did, ma'am.

21    Q    You personally submitted them --

22               MR. BUSSARD:  Objection.

23               THE COURT:  Sustained.

24    Q    (BY MS. HOFFMAN)  Were are the projectiles submitted into

25    evidence?

 1    A     Yes, they --

 2              MR. BUSSARD:  Objection.

 3              THE COURT:  You may approach.

 4              (Bench conference on the record.)

 5              THE COURT:  I don't know what the objection is, but

 6    my problem is what you're saying is "into evidence" is

 7    confusing in front of the jury.  I understand what you mean by

 8    it, he understands what you mean by it, but they have no idea

 9    what you mean by it.  They think you mean here in court.

10    That's what evidence is to them.  You need to come up with

11    some other terminology, I don't know if it's the evidence room

12    or the --

13              MS. HOFFMAN:  Yeah.

14              THE COURT:  -- or the evidence custodian at the

15    police department --

16              MS. HOFFMAN:  Got it.

17              THE COURT:  -- or whatever else.  Now, was there

18    some other objection besides that?

19              MR. BUSSARD:  No, that was it.

20              THE COURT:  Thank you.

21              (The following proceedings were had in open court.)

22              THE COURT:  Sustained.  You may continue.

23    Q    (BY MR. MARTINEZ)  Sergeant Lloyd, were those projectiles

24    submitted to the Evidence Control Unit at

25    Baltimore City Police Department Headquarters?

Direct Examination - Lloyd (By Ms. Hoffman)

1    A    Yes, ma'am, they were.

2    Q    And who submitted those projectiles to the Evidence

3    Control Unit?

4    A    That was me, ma'am.

5    Q    As part of your investigation, Sergeant Lloyd, did you

6    canvass the area of 221 East 25th Street for potential

7    witnesses?

8    A    Yes, ma'am, I did.

9    Q    Did you identify any witnesses?

10    A    No, ma'am.

11    Q    Were there any closed circuit television cameras or

12    surveillance cameras in the area of the murder?

13    A    No, ma'am.

14    Q    In the first five months after the murder, did you

15    identify any suspects?

16    A    Not during that time, no, ma'am.

17    Q    I want to direct your attention to June 11th of 2007.

18    Did there come a time when a witness came forward with

19    information about the murder of Gregory Rochester?

20    A    Yes, ma'am.

21    Q    And who was that?

22    A    Mr. Christopher Meadows.

23    Q    I'm going to show you Government's Exhibit No. P, as in

24    Paul, HI58.  Who are we looking at here?

25    A    That is Mr. Christopher Meadows, ma'am.

1    Q    Was Mr. Meadows in custody when he came to speak with

2    you?

3    A    Yes, ma'am, he was.

4    Q    Do you know what offense he had been charged with?

5    A    I think it was unrelated firearm offense, ma'am.

6    Q    Was that a state or federal charge?

7    A    I believe it was state, ma'am, if I'm not mistaken.

8              THE COURT:  I need you to keep your voice up, sir.

9              THE WITNESS:  I believe it was state, sir, I'm

10   sorry.

11   Q    (BY MS. HOFFMAN)  To your knowledge, did Mr. Meadows have

12   a cooperation agreement with the government at the time he

13   spoke to you?

14   A    No, ma'am.

15   Q    Did you interview Mr. Meadows?

16   A    Yes, ma'am, I did.

17   Q    And was that interview recorded?

18   A    Yes, ma'am, it was.

19   Q    During the recorded interview, did Mr. Meadows provide

20   information about who killed Gregory Rochester?

21   A    Yes, ma'am, he did.

22   Q    Did Mr. Meadows complete a photo array in connection with

23   what he told you?

24   A    Yes, ma'am.

25   Q    I'm going to show you Government's Exhibit P, as in Paul,

Direct Examination – Lloyd (By Ms. Hoffman)

1    HA4, which has already been admitted into evidence.  What are

2    we looking at here?

3    A    This is the photographic array, ma'am.

4    Q    And is it the photographic array that Christopher Meadows

5    completed?

6    A    Yes, ma'am, it is.

7    Q    Did he pick anyone out of the photo array?

8    A    Yes, ma'am, he did.

9    Q    What procedures did you use in showing him this photo

10   array?

11   A    A legal caption, ma'am, depicted on the upper portion of

12   this array, that's read to him, ma'am.  And he's asked if he

13   understands it.  To acknowledge that, he places his initials,

14   which you see at the top right portion, CM,

15   Christopher Meadows.  During this time, ma'am, it's placed

16   along with photographs consistent with similarities such as

17   race, hairstyles, and so forth, and he's asked whether or not

18   he confirmed the person that he identified more or less as the

19   person who committed this offense.

20   Q    And did Mr. Meadows select someone from this photo

21   array?

22   A    Yes, ma'am.

23   Q    Who did he select?

24   A    Kenneth Jones, also known as Slay.

25   Q    And is that the person in the bottom middle depicted

Direct Examination - Lloyd (By Ms. Hoffman)

1    here?

2    A    Yes, ma'am.

3    Q    And is that Christopher Meadows's signature above that

4    picture?

5    A    Yes, ma'am, it is.

6    Q    Did Mr. Meadows also write comments in the comments

7    section of this photo array?

8    A    That's on the reverse side, yes, ma'am.

9    Q    Could I have you read this for us, Sergeant Lloyd?

10   A    Yes, ma'am.  "Kenny told me that him and Foo killed

11   Craig Mack in Geezy's house and that they, both Kenny and Foo,

12   shot and killed Craig Mack because there was a rumor going

13   around Craig Mack was telling and the boys from Lanvale and

14   Barclay wanted him dead.  And they told Foo and Kenny to get

15   him from around y'all.  So Kenny and Foo killed him in Geezy's

16   house and they left him there and Kenny and Foo left out.

17   Kenny told me he was the one that shot Craig Mack and killed

18   him.  Kenny told me that the first shot was the one that

19   killed Craig Mack."  And he provided his signature there.

20   Q    Is that Mr. Christopher Meadows's handwriting in the

21   comments section?

22   A    Yes, ma'am, it is.

23   Q    Were you able to identify who Foo was?

24   A    Yes, ma'am.

25   Q    I'm going to show you Government's Exhibit No. P, as in

Direct Examination – Lloyd (By Ms. Hoffman)

1   Paul, HA3, which has already come into evidence as well.  And
2   what are we looking at here?
3   A    This is another photographic array, ma'am, consistent
4   with the one that was presented before.
5   Q    And did Mr. Meadows select anyone from this array?
6   A    Yes, ma'am, he did.
7   Q    Who did he select?
8   A    His name was Charles Pace, also known as Foo.  The top
9   right photograph, ma'am.  Above that is his signature as well
10  as date and time.
11  Q    And did you use the same procedure in showing this photo
12  array to Mr. Meadows?
13  A    Yes, ma'am.
14  Q    Did you make any suggestion to Mr. Meadows about what to
15  say or who to pick out of these photo arrays?
16  A    No, ma'am.
17            MR. BUSSARD:  Objection.
18            THE COURT:  Basis.
19            MR. BUSSARD:  Leading.
20            THE COURT:  Overruled.  You may answer.
21  A    Never, ma'am.  Thank you, sir.
22  Q    (BY MS. HOFFMAN)  In fact, did you have any suspect at
23  that point in time?
24  A    No, ma'am.
25  Q    Did you make any promises or threats to induce

Direct Examination - Lloyd (By Ms. Hoffman)

1    Mr. Meadows to pick anyone out of the photo array?

2    A    No, ma'am.

3    Q    Did he complete the photo arrays freely and

4    voluntarily?

5    A    Yes, he did, ma'am.

6    Q    Does the Baltimore Police Department have a firearms

7    examination unit?

8    A    Yes, we do.

9    Q    And what do they do?

10   A    They examine ballistic evidence, ma'am, as recovered from

11   crime scenes that we investigate to determine whether or not

12   they're fired from a certain weapon or if there's any

13   characteristics or connectivity with other cases.

14   Q    Did you ask the firearms examination unit to compare the

15   shell casings that you recovered from the murder scene to

16   evidence recovered from another crime scene?

17             MR. BUSSARD:  Objection.

18             THE COURT:  Basis?  You can approach.

19             (Bench conference on the record.)

20             THE COURT:  He can't offer any opinions, that's for

21   sure.  But did he ask for a comparison from one scene to

22   another, what's wrong with that?

23             MR. BUSSARD:  Well, it's kind of an open-ended

24   question because we don't have evidence of another crime scene

25   at this point, so the jury is left wondering how many --

1           THE COURT:  Well, maybe that's where she's headed,

2      but it's still a -- I don't think there's anything wrong with

3      that question.  My assumption was that you were concerned that

4      he was going to get into the actual comparing, which would

5      seem to be beyond the scope of his abilities, at least as

6      to -- as far as he's testified so far.  Overruled.

7           (The following proceedings were had in open court.)

8           THE COURT:  Overruled.  You may answer.

9      A    Yes.

10     Q    (BY MS. HOFFMAN)  And I'll just repeat the question for

11     the record:  Was -- did you ask the firearms examination unit

12     to compare the shell casings recovered from the Rochester

13     murder scene to evidence from another crime scene?

14     A    Yes, ma'am.

15     Q    And which crime scene was that?

16     A    It was a nonfatal shooting that concerned another

17     individual.

18          THE COURT:  Can't hear you.

19          MR. BUSSARD:  Objection.

20          THE COURT:  First -- to the question or to the

21     answer?

22          MR. BUSSARD:  Both.

23          THE COURT:  You may approach.

24          (Bench conference on the record.)

25          THE COURT:  Ms. Hoffman, give me a proffer of

 1    where -- what answer do you expect from the question and

 2    where's your question going to go from there?

 3              MS. HOFFMAN:  He's simply going to testify about the

 4    request that he made.  He can't testify about what evidence

 5    was recovered.

 6              THE COURT:  Okay.  But what crime scene?  You asked

 7    him for a particular crime scene.  I take it he's about to

 8    identify some other shooting.

 9              MS. HOFFMAN:  The nonfatal shooting of

10    Antonio Oliver, a/k/a Bubba.

11              THE COURT:  What's wrong with that?

12              MR. BUSSARD:  We don't have any evidence of that.

13    He's already saying it's a nonfatal shooting.  We don't know

14    it's a shooting.

15              MS. HOFFMAN:  We actually do through John Hayden.

16              MR. MARTINEZ:  Chris Meadows testified yesterday

17    that Slay said he shot Bubba in the hand.

18              THE COURT:  Bubba, he did.  He said he shot him in

19    the hand.

20              THE COURT:  Overruled.

21              (The following proceedings were had in open court.)

22              THE COURT:  Overruled.  Restate the question.

23    Q    (BY MS. HOFFMAN)  Which crime scene was that?

24    A    Antonio Oliver.

25    Q    And does Antonio Oliver have a nickname, to your

Direct Examination - Lloyd (By Ms. Hoffman)

1   knowledge?

2   A    At this time I can't recall, ma'am.

3   Q    That's okay.  Why did you ask for that comparison to be

4   made?

5   A    To see if the same firearm that was used in the killing

6   of Gregory Rochester matched that scene, and to my knowledge,

7   that Mr. Jones had been charged.

8   Q    Mr. Jones had been charged with that --

9   A    With that offense.

10  Q    -- nonfatal shooting of Antonio Oliver?

11  A    Yes, ma'am.

12  Q    And is that the same Mr. Jones who Christopher Meadows

13  identified as Kenny in the photo array we just looked at?

14  A    The exact one.

15  Q    Did you interview Mr. Meadows again after that first

16  interview?

17  A    Yes, ma'am, I did.

18  Q    I'm going to show you Government's Exhibit P, as in

19  Paul -- well, first of all, let me ask you, did Mr. Meadows

20  complete another photo array during that second interview?

21  A    Yes, ma'am, I believe he did.

22  Q    And I'm going to show you Government's Exhibit P, as in

23  Paul, HA5, which has also been admitted into evidence.  What

24  are we looking at here?

25  A    This is another photographic array, ma'am, containing the

Direct Examination - Lloyd (By Ms. Hoffman)

1    photograph of another person adjoined to the investigation.

2    Q    And can you -- is that Mr. Meadows's signature on the

3    photo array?

4    A    Yes, ma'am, along with the date and time.

5    Q    And who did he select?

6    A    I recall his name is Donatello Fenner, if I'm not

7    mistaken.

8    Q    Can you read -- it might be a little hard to see, but can

9    you read the date above that photograph that he selected?

10   A    Looks like March 23rd, 2008, if I'm not mistaken.  Yes,

11   ma'am.

12   Q    Is it -- well, here, let me flip the page over.

13   A    Yes, ma'am, March 23rd, 2008.

14   Q    Did you say March?

15   A    I'm sorry, forgive me, ma'am.  I'm tired as I don't know

16   what.  January 23rd, 2008, thank you.

17   Q    Thank you.  Did Mr. Meadows also write comments here in

18   the comments section?

19   A    Yes, ma'am, he did.

20   Q    Is that his handwriting there?

21   A    Yes, ma'am.

22   Q    Can you read what he wrote?

23          MR. O'TOOLE:  Objection, Your Honor, can we

24   approach, and take it off the screen?

25          THE COURT:  Pull it off.

Direct Examination - Lloyd (By Ms. Hoffman)

1          (Bench conference on the record.)

2          THE COURT:  The exhibit -- the number of the exhibit

3     that was just on the screen is?

4          MS. HOFFMAN:  PHA 5.

5          THE COURT:  PHA 5.

6          MS. HOFFMAN:  Yeah, it's already in evidence.

7          THE COURT:  Do you agree, Ms. Powell, that PHA 5 is

8     in evidence?  The courtroom deputy's record indicates that it

9     is in evidence.  Mr. O'Toole.

10         MR. O'TOOLE:  Your Honor, in this situation what the

11    witness is going to testify to, I think, is that Mr. Meadows

12    told him that there was an order to kill the victim by Geezy

13    because there had been somebody at L and B, a different

14    neighborhood, a different gang, a different part of the city,

15    had suspected the victim of telling on somebody.  But my

16    position is that that would be hearsay and not covered by

17    conspiracy.

18         THE COURT:  It would be hearsay, but his reading the

19    statement that is on the exhibit that's already in evidence

20    would not be hearsay.

21         MR. O'TOOLE:  All right.  Any conversation he has

22    about Geezy or anything he heard from Meadows is hearsay.

23         THE COURT:  Sure.  We haven't -- hasn't been any

24    suggestion that the government intends to offer such evidence,

25    if they do, I'll hear your objection.

Direct Examination - Lloyd (By Ms. Hoffman)

1          MR. O'TOOLE:  Thank you.

2          (The following proceedings were had in open court.)

3          THE COURT:  Overruled, you may continue.

4     Q    (BY MR. MARTINEZ)  Sergeant Lloyd, could you read the

5     statement that Mr. Meadows wrote here?

6     A    Yes, ma'am.  "The person in the picture is Don and he was

7     with Kenny and Foo at Geezy's house when Craig Mack was

8     killed.  And Kenny had told me that all of them were there

9     together.  Kenny and Don is first cousins and they was given

10    the order to kill Craig Mack by Geezy.  It was over something

11    about Craig Mack had to be telling on somebody from Lanvale

12    and Barclay."  He placed his signature there, ma'am, along

13    with that date again, which is January 23rd, 2008.

14    Q    Did you make any suggestion to Mr. Meadows as to whom he

15    should pick out of this photo array?

16    A    No, ma'am.

17    Q    Did you make any promises or threats to induce him to

18    pick someone out?

19    A    No, ma'am.

20    Q    Did he complete the photo array freely and voluntarily?

21    A    Yes he did.

22    Q    Now, you testified earlier that the first time you met

23    with Mr. Meadows he completed a photo array in which he said

24    that Kenny and Foo killed Gregory Rochester in Geezy's house;

25    is that right?

Direct Examination - Lloyd (By Ms. Hoffman)

1    A    Yes, ma'am.

2    Q    And you just testified that the second time you met with

3    him he completed this photo array in which he said that Geezy

4    had ordered the murder and Don was also involved; is that

5    right?

6    A    Yes, ma'am.

7    Q    Do you know why he provided more information the second

8    time you met with him?

9    A    It's not uncommon to meet with a person initially --

10           MR. O'TOOLE:  Objection, Your Honor.  State of mind

11   of somebody else, Your Honor.

12           THE COURT:  Sustained.  Next question.

13   Q    (BY MS. HOFFMAN)  Is it common or uncommon, in your

14   experience, to learn more information from someone the second

15   time you interview them?

16   A    Extremely common, ma'am.

17   Q    Why is that?

18   A    Their recollection during their initial encounter with

19   police, the emotional state, and the briefness and complexity

20   more or less of the questions that are given by the

21   investigator to the person they're speaking to.

22   Q    When you first talked to Mr. Meadows on June 11th of

23   2007, did he tell you everything that he knew about the murder

24   of Gregory Rochester?

25           MR. O'TOOLE:  Objection.

Direct Examination - Lloyd (By Ms. Hoffman)

1              THE COURT:  Sustained.  Sustained.  Next question.

2    Q    (BY MS. HOFFMAN)  Did Mr. Meadows answer the questions

3    that you asked him?

4    A    Yes, ma'am.

5    Q    And when you met with Mr. Meadows on June 11th of 2007,

6    what investigation were you conducting?

7    A    Initially, ma'am?  The murder of Gregory Rochester.

8    Q    And you're a homicide detective; is that right?

9    A    Yes, ma'am.

10   Q    You're not in the gang unit?

11   A    No, ma'am.

12   Q    To your knowledge, did Mr. Meadows go on to testify in

13   court about the information he provided you?

14   A    Yes, ma'am.

15   Q    Did you have a chance to speak with him afterward?

16   A    Yes, ma'am, I did.

17   Q    Without telling me the substance of what was said, can

18   you tell me, did he convey any mental impressions about what

19   that experience of testifying was like for him?

20             MR. O'TOOLE:  Objection.

21             THE COURT:  Relevance?

22             MR. O'TOOLE:  Relevancy to this witness.

23             THE COURT:  Right.  Sustained.  You may approach.

24             (Bench conference on the record.)

25             THE COURT:  His mental impressions about the

1    experience of testifying in a state court trial.

2              MS. HOFFMAN:  Well, Your Honor, yesterday counsel

3    called into question Mr. Meadows's motives for testifying and

4    I'd like to elicit that this detective is aware, based on

5    observing him after testifying, that he was very scared about

6    testifying.

7              THE COURT:  Keep your voice down.

8              MS. HOFFMAN:  And I think it's -- it bears on his

9    motives for doing it.

10             MR. O'TOOLE:  It's pure hearsay.

11             THE COURT:  Let's see what happens in

12   cross-examination with this particular witness.  I'm not going

13   to allow it now.  But it's possible on redirect that it might

14   be admissible, depending upon where defense counsel go in

15   their cross-examinations.  But not right now.  Sustained.

16             (The following proceedings were had in open court.)

17             THE COURT:  Sustained.  Next question.

18   Q    (BY MS. HOFFMAN)  Sergeant Lloyd, is it common or

19   uncommon, in your experience as a homicide detective, to, as

20   an investigation develops, come up with additional questions

21   that you want to ask of witnesses in the case?

22   A    Extremely common, ma'am.

23   Q    And did that happen in this case?

24   A    Yes, it did.

25   Q    Have you kept in touch with Mr. Meadows over the years?

Direct Examination - Lloyd (By Ms. Hoffman)

1    A    Yes, I have.

2    Q    Have there been any material inconsistencies in his story

3    about what happened?

4              MR. O'TOOLE:  Objection.

5              THE COURT:  Well, the witness can answer from his

6    perspective.  Overruled.

7    A    Never.

8    Q    (BY MS. HOFFMAN)  In the course of your investigation

9    into the murder of Gregory Rochester, did you pull historical

10   911 reports relating to that residence, 221

11   East 25th Street?

12   A    Yes, ma'am, I did.

13   Q    What did you find?

14   A    There was a nonfatal shooting which occurred at that

15   location, ma'am, I believe the month prior.

16   Q    Were you able to identify who the caller was?

17   A    Yes, ma'am.

18   Q    Who was it?

19   A    I believe his name was Stephen Cioffoni, if I'm not

20   mispronouncing his name.

21   Q    I'm going to show you Government Exhibit P, as in Paul

22   HI18, which has already been admitted into evidence.  Who are

23   we looking at here?

24   A    Mr. Stephen Cioffoni, ma'am.

25   Q    Did you interview Mr. Cioffoni about this incident?

1    A    Yes, I did.

2    Q    Without telling me what Mr. Cioffoni might have said, can

3    you tell me, did he complete a photo array?

4    A    Yes, ma'am, he did.

5    Q    Did you interview any witnesses in relation to that

6    incident?

7    A    Yes, ma'am, I did.

8    Q    Who was that?

9    A    I think it was his girlfriend at the time,

10   Ms. Mary Ray Lane, if I'm not mistaken.

11   Q    Again, without telling me what Ms. Lane might have said,

12   can you tell me, did she complete a photo array?

13   A    Yes, ma'am, she did.

14   Q    Did you ultimately charge someone with that shooting?

15   A    Yes, ma'am, I did.

16   Q    Who was that?

17   A    Mr. Gerald Johnson, also known as Geezy, seated here in

18   the courtroom.

19   Q    Can you -- I think you already pointed out an article of

20   his clothing actually.  I'm going to show you

21   Government's Exhibit No. SC 9.  And first let me ask you, to

22   your knowledge, was Mr. Johnson convicted of some or all of

23   those charges?

24   A    Yes, ma'am, he was.

25   Q    Do you recognize this document?

1   A    Yes, ma'am.

2   Q    I'm going to direct your attention to page 5 of the

3   document.

4   A    Okay.

5   Q    Can you tell us what this indicates?

6   A    This is the disposition document with the results of that

7   event there in court.  You want the date that's ascribed to

8   it?

9   Q    Yes, if you could read the disposition, the date, and the

10  charge.

11  A    The disposition, ma'am, is that he was convicted.  Again,

12  guilty.  And the date on it, ma'am, is March 31st, 2008,

13  military time almost.  And he's charged with second degree

14  assault, ma'am.

15  Q    And turning your attention to page 6 of the document, can

16  you read the same three items for us here; disposition, date,

17  and charge?

18  A    Yes, ma'am.  Disposition of guilt, ma'am.  The date again

19  is March 31st, 2008, and the charge was second degree assault,

20  ma'am.

21  Q    And then turning your attention to page 8 of the same

22  document.

23  A    Uh-huh.  Guilty, ma'am.  The date of that is

24  March 31st, 2008, and he was charged with handgun on person,

25  ma'am.

Cross-examination - Lloyd (By Mr. O'Toole)

1          MS. HOFFMAN:  No further questions, thank you.

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  Cross-examination.  Mr. O'Toole.

4          MR. O'TOOLE:  Yes, Your Honor.

5                    CROSS-EXAMINATION

6    BY MR. O'TOOLE:

7    Q    Good afternoon or good morning -- good afternoon.

8    A    Good afternoon.

9    Q    I'm Jeffrey O'Toole, I represent Mr. Johnson.

10   A    A pleasure.

11   Q    I want to ask you about the first time you met

12   Mr. Meadows.  Where was it that you met him?

13   A    My office, 601 -- which is at 601 East Fayette Street on

14   the 5th floor.

15   Q    And that was back in June of -- in June of 07; correct?

16   A    Yes, ma'am -- I'm sorry, yes, sir.  Please forgive me.

17   Q    Had you spoken to him before or communicated with

18   Mr. Meadows before you met him in your office?

19   A    Prior to that date, no, sir.

20   Q    So before the day that you met him in your office you had

21   never spoken to him or met him before?

22   A    Never.

23   Q    How was it that he ended up in your office?

24   A    He was transported to my office by --

25   Q    I'm sorry?

1   A    Transported to my office, sir.  By whom, I can't recall.

2   I know it was uniformed officers.

3   Q    Did you request he be brought to your office?

4   A    I don't recall, sir.

5   Q    He didn't show up all by himself accompanied by somebody

6   else; correct, or did he?

7   A    He showed up in the company of officers that had him in

8   custody.

9   Q    So he was in custody, was he in state custody or federal

10  custody?

11  A    I think that was state, sir, if I'm not mistaken.

12  Q    State custody?

13  A    Yes.

14  Q    Did he tell you why he was there?

15  A    Yes.

16  Q    All right.  And was he in handcuffs, did they take him

17  out of the handcuffs, how did that work?

18  A    He was initially in handcuffs but taken out of handcuffs

19  by myself, sir.

20  Q    What is the environment like in your office, is it

21  intimidating or is it fairly comfortable?

22          MS. HOFFMAN:  Objection.

23          THE COURT:  Well, intimidating is a relative

24  concept.  Maybe you could rephrase the question.  Sustained.

25  Q    (BY MR. O'TOOLE)  Sure.  Is it a comfortable place to

1    talk to you?

2    A    I try to make it as comfortable as I can make it, sir,

3    but I can't speak on the perception of the other individual.

4    Q    Right.  But you spend time there and you try to make it

5    comfortable; right?

6    A    Yes, I do.

7    Q    So if somebody comes in, you want them to be comfortable

8    as well; correct?

9    A    Yes, sir.

10    Q    So when Mr. Meadows came into your office, did he feel

11    like he was comfortable enough to talk --

12            MS. HOFFMAN:  Objection.

13            THE COURT:  Sustained.

14    Q    (BY MR. O'TOOLE)  Was there any reason for you the

15    believe -- did he appear to be uncomfortable to you?

16    A    No, sir.

17    Q    All right.  And did he appear to be under the influence

18    of any narcotics or alcohol or anything?

19    A    He wasn't, no, sir.

20    Q    Did he appear to be -- did he appear to you to be nervous

21    or afraid to be talking to you?

22    A    As I recall, maybe somewhat apprehensive, if I can use

23    that word.

24    Q    Isn't it true that he arrived in your office because he

25    sought to talk to you; isn't that correct?

Cross-examination – Lloyd (By Mr. O'Toole)

1    A    I would have to say --

2            MS. HOFFMAN:  Objection.  Asked and answered.

3            THE COURT:  It's cross-examination.  Overruled.

4    Q    (BY MR. O'TOOLE)  Isn't it true that he sought to come to

5    you to talk to you about the crime that you talked about on

6    direct examination; correct?

7    A    Not seeking me out particularly, sir, but I would say

8    yes.

9    Q    Because you were involved in the investigation of that

10   murder; right?

11   A    Yes, sir.

12   Q    All right.  So when he arrived, did he say to you

13   anything about why he was there at the very beginning?

14   A    Not that I recall, sir.

15   Q    Did he go right into saying to you that, I'm here because

16   I -- or something to the effect of, I have something to tell

17   you about the crime on the murder that we're talking about in

18   this case?

19   A    Yes, sir.

20   Q    All right.  So that's -- he told you right away that's

21   why he was here to talk to you; correct?

22            MS. HOFFMAN:  Objection.

23            THE COURT:  Basis.

24            MR. MARTINEZ:  Hearsay.

25            THE COURT:  Overruled.

1    A    I don't recall, sir --

2    Q    (BY MR. O'TOOLE)  All right.

3    A    -- how much time --

4    Q    But at some point pretty early in the conversation, you

5    began talking about the murder that took place in January of

6    the same year?

7    A    At some point during the discourse, sir, yes.

8    Q    I'm sorry, could you speak up?

9    A    At some point during that discourse, yes.

10   Q    Did he say anything to you to the effect of, I'm here

11   because I saw a murder of a 16-year-old person recently, to

12   your memory?

13   A    That's, I think, an additional investigation that I was

14   the detective on during that time, yes, sir.

15   Q    But in that conversation did he say to you, I'm here

16   because the guns in the street are too much and I just have to

17   talk to you?  He didn't say that, did he, sir?

18   A    I don't recall, sir.

19   Q    All right.  You spoke to him for how long, if you

20   remember?

21   A    I don't recall, sir.

22   Q    I mean, an hour, two hours, how long does something like

23   this take?

24   A    There's was no typical time frame, sir.

25   Q    All right.  But you had to take time, enough time, to

Cross-examination - Lloyd (By Mr. O'Toole)

1   show him -- or for you to show him a photo spread; right?

2   A    Yes, sir.

3   Q    All right.  And he told you his story and you read him

4   the warning on the front of the photo spread.

5   A    It's not a warning, sir, it's instructions.

6   Q    Right.  And he picked out a picture and then he turned it

7   over and written something on the back; correct?

8   A    He confirmed the identity of the person that he made

9   mention about, yes, sir.

10  Q    So that's the routine, so that's what you talk about.  In

11  your direct testimony, you told us that the murder was done by

12  two people; correct?

13  A    Yes, sir, as he told me.

14  Q    All right.  And he mentioned the name Geezy by saying

15  that it was in Geezy's house; correct?

16  A    Yes, sir.

17  Q    All right.  Now, at that point Geezy was not in any way a

18  suspect in your investigation, was he?

19  A    No, sir.

20  Q    All right.  He was just -- he was the occupant of the

21  building some floors above where the murder took place;

22  correct?

23  A    During that time, yes, sir.

24  Q    All right.  So is there anything about your memory of the

25  conversation you had with Mr. Meadows that would have

Cross-examination - Lloyd (By Mr. O'Toole)

1    prevented him from telling you everything that you knew --

2    that he knew at that time?

3    A    Aside from my form of questions, sir, no, just a typical

4    conversation during that time.

5    Q    And you've been -- you've been a homicide detective for

6    how long, how many years, 19 years, 18 years?

7    A    18 years, sir.

8    Q    So you're pretty experienced, aren't you?

9    A    Probably.

10   Q    All right.  Not as old as some of us, but you're

11   experienced?

12   A    I'm getting there, sir.

13   Q    Now, so when -- you have your means and you have your

14   ideas of how to conduct an investigation, don't you?

15   A    Yes, sir.

16   Q    And when Mr. Meadows came to you and told you that he --

17   and he came to you in custody, he initiated the conversation,

18   and you had him in front of you trying to solve an unsolved

19   murder; correct?

20   A    Correct, sir.

21   Q    So when you had that conversation, isn't it true that you

22   would have found out from him everything that he knew about at

23   that time?

24   A    On that particular portion of the investigation, yes, but

25   I would also conduct follow-up investigations based on that

1    information and as it evolves, yes, if I have further

2    questions.

3    Q    Correct.  But as you told counsel, as you're telling us,

4    when you talked to him that day in your office, did he mention

5    anything about the murder being ordered by anybody?

6    A    Not during that time, no, sir.

7    Q    All right.  Did he talk about another neighborhood,

8    another gang somewhere else all together?

9    A    Not during that time, that I recall.

10   Q    What is L and B, do you know what L and B stands for?

11   A    Say that again, sir.

12   Q    L and B.

13   A    L and B.

14   Q    Yeah, a neighborhood, L and B.

15   A    Lanvale and Barclay.

16   Q    Correct.  And what is that, is that a nearby

17   neighborhood?

18   A    Yes, it is.

19   Q    And did Mr. Meadows talk about that neighborhood?

20   A    Not that I recall, sir.

21   Q    All right.  And if he had talked about it, you would have

22   written it down in your notes; correct?

23   A    Probably, sir.

24   Q    And if he had told you that anybody ordered any kind of a

25   killing, you would have written that down, wouldn't you

1    have?

2    A    Either then or audio preserved it, yes.

3    Q    All right.  And this interview was recorded; correct?

4    A    Correct, sir.

5    Q    And have you gone back and reviewed the recording?

6    A    Not recently, no.

7    Q    All right.  Have you ever reviewed it or listened to

8    it?

9    A    It's been quite some time, sir.

10    Q    All right.  Do you have any memory that was not written

11    down in your notes that he talked about who -- that somebody

12    ordered this killing, that you didn't write down?

13    A    During the follow up interview, yes.

14    Q    All right.  So there came a time when Mr. Meadows came

15    back to see you; is that correct, sometime later?

16    A    That's correct, yes, sir.

17    Q    You talked about January 23rd, 2008; correct?

18    A    Can't recall the date, but he did come back.

19    Q    Approximately six months later; right?

20    A    Yes, sir.

21    Q    Did you see him or talk to him in the meantime?

22    A    Not that I recall, sir.

23    Q    All right.  Did he come back to your office in custody

24    with somebody else bringing him back to your office to talk to

25    you again before that time in January?

Cross-examination - Lloyd (By Mr. Bussard)

1    A    I don't believe so, sir.

2    Q    So it was a good six months before he came back to see

3    you; correct?

4    A    If the dates are accurate.

5    Q    Approximately.

6    A    Yes.

7    Q    And at this time he had occasion to give you more

8    information and filled out another -- or looked at another

9    photo spread; correct?

10    A    I developed additional information, sir, regards and I

11    went to speak with him, yes.

12    Q    All right.  And it was only then, six months later that

13    he had something to say about the L and B neighborhood and

14    some ordering of something; correct?

15    A    If my memory is correct, that portion of the questioning

16    and his responses, yes, sir.

17    Q    All right.

18         MR. O'TOOLE:  Your Honor, I have no further

19    questions.  Thank you.

20         THE COURT:  Thank you.  Mr. Bussard.

21                    CROSS-EXAMINATION

22    BY MR. BUSSARD:

23    Q    Good afternoon, Detective.

24    A    How are you doing, sir?

25    Q    You were the lead detective in January 2007?

1    A    Yes, sir, I was.

2    Q    And that assignment's made from higher up in the chain of

3    command in Baltimore Police Department?

4    A    I would say so, yes.

5    Q    And you were investigating the homicide of

6    Gregory Rochester on January 9th, 2007; correct?

7    A    Correct, sir.

8    Q    And you -- the -- I think you've already testified that

9    as a result of the investigation, and we'll talk about that in

10   a few minutes, but the investigation between January of 2007

11   and June 11th, '07 was essentially an open case with no known

12   suspects; is that right?

13   A    Correct, sir.

14   Q    Until Mr. Meadows --

15   A    Yes, sir.

16   Q    -- came in?

17        So Mr. Meadows is brought over at his request on

18   June 11th, '07 to speak to law enforcement?

19   A    I would say yes, sir.

20   Q    And law enforcement brought him over, he didn't -- he was

21   already in custody; is that right?

22   A    Yes, sir.

23   Q    He had been arrested on some unrelated charge; is that

24   right?

25   A    That's correct.

Cross-examination - Lloyd (By Mr. Bussard)

1  Q    And you had occasion to meet with him and you were

2  accompanied by Detective Nickelson?

3  A    I can't recall who was with me, but --

4  Q    You're not disputing that, I guess?

5  A    I'm not going to dispute it, no.

6  Q    And the meeting room that you had was one of the

7  interview rooms about an eight by ten or ten by ten room?

8  A    Around about.

9  Q    Give your take?

10  A    Yes.

11  Q    Was it equipped with audio and video recording devices?

12  A    During that time, sir.  We didn't have video, but we had

13  audio.

14  Q    And was there a recording in fact made of the

15  interview?

16  A    Yes, sir.

17  Q    That was an audio recording?

18  A    Correct, sir.

19  Q    And after that recording is obtained, what do you do with

20  it?

21  A    That's submitted to our evidence control section, sir.

22  Q    Do you do that personally?

23  A    Yes, sir, most oftentimes.

24  Q    And have you -- I think counsel asked you a few minutes

25  ago, have you had a chance to review that audio recording of

Cross-examination - Lloyd (By Mr. Bussard)

1    the interview?

2    A    Again, it's been a while, yes.

3    Q    Have you also reviewed a transcript of that interview

4    that you conducted with Mr. Meadows?

5    A    Sometime ago.

6    Q    Would that have been last year at Mr. Jones's state

7    trial?

8    A    I think so.

9    Q    Now, when you meet with Mr. Meadows -- one of the first

10   questions you always ask at the interview is are they under

11   the influence of any drugs or alcohol.

12   A    Drugs or alcohol, uh-huh.

13   Q    That's an important factor to consider because if they're

14   under the influence of some substance --

15   A    Yes, sir.

16   Q    -- their credibility might be in jeopardy; is that

17   correct?

18   A    I would say so, yes.

19   Q    So you did ask that question?

20   A    Yes, sir.

21   Q    And medications as well?

22   A    Yes, sir.

23   Q    And when you have this first meeting -- you indicated

24   that the room is equipped with recording devices.  Was the

25   initial -- was there an initial meeting with Mr. Meadows

1    before the recording device was turned on?

2    A    No, sir, it's concurrent.

3    Q    So the first words that would appear on that tape are the

4    first words that were between you and Mr. Meadows?

5    A    No, sir.

6    Q    Is there -- what's a preinterview meeting?

7    A    There's actually no such thing as a preinterview.  It's

8    concurrent, it's like if you walk into a doctor's office.  We

9    have to assess what may be wrong with you.  If something's

10   wrong, you see the doctor.  So in our particular avenue of a

11   discussion, we're asking whether you do have information

12   pertinent to an investigation.  We speak about that to see if

13   that information is relevant to the investigation.  If it is,

14   we seek your permission to record you and then we do such and

15   we memorialize that.

16   Q    And then the recording device is turned on to conduct the

17   interview?

18   A    With their permission, yes.

19   Q    Thank you.  Now, is it fair to say and accurate to say

20   that when Mr. Meadows came over, you didn't have a photo array

21   waiting for him?

22   A    No, sir.  We didn't have any suspects at that point in

23   time, sir.

24   Q    So did you create the photo array yourself?

25   A    Yes, sir.

Cross-examination - Lloyd (By Mr. Bussard)

1    Q    And the -- when you construct a photo array, you're

2    working, first off, off information that Mr. Meadows gave you;

3    is that correct?

4    A    That is correct, sir.

5    Q    And Mr. Meadows provided a street name, a full name, a

6    partial name, what kind of information did he provide about

7    Mr. Jones?

8    A    My recollection proves correct, I think he knew the name,

9    sir, along with the nickname.

10            MR. BUSSARD:  Court's indulgence.

11   Q    (BY MR. BUSSARD)  So when you -- he gave you, you believe

12   a street name or a nickname?

13   A    I think both.

14   Q    Both?

15   A    If I'm wrong, I think it was both.

16   Q    I think it was Kenny and Slay?

17   A    Yes.

18   Q    And from that information you were able to identify

19   Mr. Jones?

20   A    Yes.

21   Q    And when you construct the photo array, was that done

22   manually or by a computer?

23   A    Both.

24   Q    Both?

25   A    I had to manually work the computer.

Cross-examination - Lloyd (By Mr. Bussard)

1    Q    And the manual part is -- do you decide which photographs

2    go into the photo array?

3    A    Along with the person that the person described, which is

4    Mr. Christopher Meadows, yes, sir.

5    Q    Are these photographs only of persons from the specific

6    neighborhood where Mr. Jones lives?

7    A    No, sir.

8    Q    So they may not even be from the Baltimore area?

9    A    That is correct, sir.

10   Q    So in fact, this photo array, and I'll show you what's

11   been admitted into evidence as PH -- Government's PHA 4.  Can

12   you see that?

13   A    Yes, sir, I do.

14   Q    And the -- this is Mr. Jones; correct?

15   A    Yes, sir.

16   Q    And then the five other people may be people who are not

17   even from Greenmount area.

18   A    That's correct.

19   Q    And that's the area we're talking about, the Greenmount

20   area of Baltimore City.

21   A    That is correct, sir.

22   Q    And these people may in fact have absolutely nothing to

23   even do with Baltimore area; is that correct?

24   A    That's correct, sir.

25   Q    And you don't have any reason to believe that any of

1    these five other people may have the name Kenny or Slay?

2    A    I have no reason whatsoever, sir.

3    Q    So when you pick it out, you isolate Mr. Jones by saying

4    that this is the only Kenny in the photo array?

5    A    Based on the person that we're speaking with, in this

6    particular instance, Mr. Christopher Meadows, he's confirming

7    that this is the person that he's describing.

8    Q    And when you construct this photo array, I take it the

9    computer part of the photo array is the -- when you put it in

10   some kind of software to print out, this -- what we're looking

11   at here, PHA 4, which has the instructions up at the top and

12   then --

13   A    Yes, sir.

14   Q    -- six pictures underneath.

15   A    Yes, sir.

16   Q    And is it a -- actually, a two-sided document like this

17   with blank writing space on the back?

18   A    Yes, sir.

19   Q    Now, are you familiar with the term "double-blind"?

20   A    Yes, sir.

21   Q    Okay.  What is a double-blind?

22   A    It's a recently developed method, which is similar to

23   this photographic array.  It's a different process.

24   Q    And the difference is that although you would do it --

25   the interview of the person providing the information, you

Cross-examination - Lloyd (By Mr. Bussard)

 1    would not be the person presenting the information; is that

 2    correct?

 3    A    That is correct.

 4    Q    In 2007 was the -- and that -- well, let me back up for a

 5    minute.  Is that to ensure that there won't be any sense

 6    coming from you, for want of a better word --

 7    A    I would call it suggestiveness.

 8    Q    -- to the person making that identification?

 9    A    That is correct, sir.

10    Q    And was the double-blind photo array technique being used

11    in Baltimore City in 2007?

12    A    No, sir, it wasn't.

13    Q    And it's fairly recent?

14    A    Yes, sir.

15    Q    Innovation?

16    A    Yes, sir.

17    Q    So it's your testimony that you presented this photo

18    array, Government's PHA 4?

19    A    Yes, sir.

20    Q    To Mr. Meadows?

21    A    Yes, sir.

22    Q    Now, in -- in the course of your investigation, starting

23    January 9th all the way up through June 11th, 2007, before

24    speaking with Mr. Meadows, it was clear that Mr. Meadows was

25    not an eyewitness to the murder; is that correct?

1    A    That is correct, sir.

2    Q    And regarding the June 11th meeting, aside from the

3    interview and Government's Exhibit PHA 4, which is the photo

4    array, did Mr. Meadows provide you with any other documents?

5    A    During that time, sir?

6    Q    At that time, June 11th, 2007.

7    A    Is that the second encounter?

8    Q    That's the first meeting with Mr. Meadows.

9    A    No, sir.

10    Q    And are there any other notes that you may have

11    maintained memorializing this meeting aside from PHA 4?

12    A    Not that I recall, sir.

13    Q    Now, there was also a second photo array, and I'll ask

14    the same questions.  Mr. Meadows also mentioned somebody by

15    the name of Foo; is that correct?

16    A    That's correct.

17    Q    And Foo -- he did not know the person's real name; is

18    that correct?

19    A    This I don't recall, sir.

20    Q    Did you, in the construction of the photo array, simply

21    put in the name Foo, spelled F-o-o and --

22    A    That's a possibility, sir.

23    Q    You don't have a recollection of exactly how you

24    constructed the government -- this is Government's Exhibit

25    PHA 3 on the screen.

Cross-examination – Lloyd (By Mr. Bussard)

1    A    As I recall the investigation, sir, this person was also

2    implicated by way of his nickname to another endeavor under

3    investigation, and this person was enveloped in that endeavor

4    to be in that area.  So based on my investigation, this person

5    corresponded to Mr. Charles Pace as his government name, to

6    also include that nickname.

7    Q    And again, the same questions:  Do you have any knowledge

8    of whether the other five people in this photo array are from

9    the Greenmount area of Baltimore City?

10   A    They're probably not, sir.

11   Q    And do you have any information to believe that their

12   name is Foo or Charles Pace or any other name, for that

13   matter?

14   A    I'm sure they're not Foo or Charles Pace, no.

15   Q    When you're talking to Mr. Meadows, does Mr. Meadows

16   during his interview, provide you with any descriptions as far

17   as height, weight, tattoos, any unique features of any the

18   individuals he's talking about?

19   A    He may have, sir, but I don't recall right now aside from

20   the nickname and maybe the -- excuse me, the government

21   name.

22   Q    Would that be a factor that you would taken into

23   consideration when you're putting together these photo

24   arrays?

25   A    If I need to, yes.

1    Q    Mr. Meadows had no control over the photo array; is that

2    correct?  He didn't go through a series of pictures before and

3    say, you know, this one.  It wasn't a one-shot deal of

4    Kenny Jones; is that right?  There was --

5    A    I don't understand what you mean.

6              THE COURT:  I don't understand the question.

7    Rephrase the question.

8    Q    (BY MR. BUSSARD)  Let me try to rephrase that.  Did he

9    have any control over the information or the photographs, the

10   six photographs that were placed in PHA 4 that's on the screen

11   there?

12   A    He has full control, complete control, sir.

13   Q    In the sense of composing the array itself?

14   A    No, sir.  No.

15   Q    So you interviewed -- let me make sure I understand, you

16   interviewed Mr. Meadows in a preinterview; correct?

17   A    No.

18   Q    There is no preinterview?

19   A    I don't describe a preinterview, no, sir.

20   Q    So that -- I'll go back again.  Does the tape recording

21   start the minute he walks in --

22   A    No, sir.

23   Q    Okay.  So there is some kind of -- maybe I'm using the

24   wrong terminology, there is an interaction between you and

25   whoever's being interviewed, in this case Mr. Meadows?

1    A    Yes, sir.

2    Q    As to the information that he may or may not provide to

3    you?

4    A    Yes, there is.  Yes.

5    Q    And then there's the determination made to turn on the

6    tape player.

7    A    To memorialize it.

8    Q    The recording device.

9    A    Yes, sir, with their permission.

10    Q    So the first words that you would hear on the recording

11    device are not the first words that were exchanged between you

12    and Mr. Meadows?

13    A    No, sir.

14    Q    Now, there came a time in January 23rd of 2008 that

15    Mr. Meadows was again interviewed; is that correct?

16    A    I'm sorry, say that again, sir.

17    Q    January 23rd, 2008, about six months after the first

18    interview.

19    A    I can't recall the exact date, but is that second

20    interview, sir?

21    Q    The second interview.

22    A    Yes, sir.

23    Q    And I think you answered counsel's questions earlier that

24    it was approximately six months.

25    A    Yes, sir.

Cross-examination - Lloyd (By Mr. Bussard)

1    Q    After the first interview.

2    A    Okay.

3    Q    Was that at your invitation or did he ask to come over

4    for that interview?

5    A    My invitation.

6    Q    So he was still in custody at that time?

7    A    I don't recall, sir.

8    Q    And that interview was conducted again at police

9    headquarters?

10   A    Yes, sir.

11   Q    In the same kind of room that you previously described?

12   A    That's correct, sir.

13   Q    And was that interview also recorded video and

14   auditory -- audio fashion?

15   A    Audio, yes, sir.

16   Q    And did you again take the recording of that interview

17   and maintain it in the Baltimore City Evidence Control Unit?

18   A    If I took a recorded statement, yes, sir, I did.

19   Q    Did there come a time in 2016 that you learned that that

20   recording no longer exists?

21   A    Yes, sir, I did.

22   Q    And did you have any information personally as to what,

23   if anything, happened to that recording of the

24   January 23rd, 2008 interview?

25   A    If my recollection proves correctly, sir, I think it

Cross-examination - Lloyd (By Mr. Bussard)

1    might have been a flood.  I'm not too sure.  I know our office

2    did flood at some point in time.

3    Q    Would that have been a flood at the

4    Baltimore Police Department?

5    A    Yes, sir, uh-huh.

6    Q    And when you went to retrieve it for Mr. Jones's trial,

7    it was not available; is that correct?

8    A    I didn't retrieve it for a trial --

9    Q    But you learned through the process that it was not

10   available even for review?

11   A    That's correct.

12   Q    So the interview that was conducted on

13   January 23rd, 2008, is there anything to memorialize that

14   interview with Mr. Meadows?

15   A    I would hope that maybe a transcript, but not that I

16   recall, sir.  You have to speak to the investigators

17   involved.

18   Q    And that would have required having the audio recording

19   in order to make the transcript; correct?

20   A    Correct, sir.

21   Q    There was nobody sitting there with like

22   Madame Court Reporter here taking down Mr. Meadows's word; is

23   that correct?

24   A    No, we don't have a person like that.

25   Q    It all happens later on?

1    A    Yes, sir, that's correct.

2    Q    And those transcripts are prepared, for the most part, by

3    a department within the Baltimore Police Department?

4    A    A transcriber, uh-huh.

5    Q    What happened to Mr. Pace?

6    A    He was murdered.

7    Q    Okay.  And then the person that was identified -- there

8    was a person identified, I think you answered government

9    counsel's questions.  There was a person interviewed on

10   January 23rd, 2008, Mr. Fenner, I'm showing

11   Government's Exhibit PHA 5 that's been admitted.

12   A    Yes, sir.

13   Q    And do you know this person?

14   A    Do I know him?

15   Q    I mean, do you know his name?

16   A    Donatello Fenner.

17   Q    What happened to Mr. Fenner?

18   A    He was murdered.

19   Q    So two of -- and Mr. Meadows's first saying there was two

20   people involved in the shooting of Mr. Rochester, then

21   Mr. Meadows on January 23rd, added Mr. Fenner to the list to

22   make it three persons involved; is that correct?

23   A    He initially described two shooters and then thereafter

24   Mr. Fenner, yes.

25   Q    As a participant?

Cross-examination - Lloyd (By Mr. Bussard)

1    A    Yes, uh-huh.

2    Q    And Mr. Fenner is no longer with us; is that right, he's

3    deceased?

4    A    He's gone.

5    Q    I want to ask you a little bit about the crime scene.

6    You get assigned to the crime scene and you go to that

7    location; is that correct?

8    A    Yes, sir.

9    Q    And when you arrive in the early morning hours of

10   January 9th, 2007 at 221 25th Street --

11   A    East 25th Street.

12   Q    Was there law enforcement already on the scene that

13   day?

14   A    Yes, sir.

15   Q    And are they the normal patrol officers that get the

16   call?

17   A    That is correct, sir.

18   Q    Was the crime scene -- well, what is the crime scene

19   unit?

20   A    I beg your pardon, sir?

21   Q    What is the Crime Scene Unit?

22   A    They're a technical unit that's assigned to the

23   Baltimore Police Department that operates at our discretion to

24   respond as we facilitate the collection of evidence and to

25   collect those things called evidence.

Cross-examination – Lloyd (By Mr. Bussard)

1   Q    Were they on the scene at that point when you arrived?

2   A    Not that I recall, but I don't think so.  I think we

3   called them out.

4   Q    Is that your duty as lead detective to call the mobile

5   crime scene unit or does somebody else make that assignment?

6   A    Most oftentimes it's myself, the detective, I'm sorry.

7   Q    And the CC number, you know what a CC number is?

8   A    Yes, sir, I do.

9   Q    And what is the CC number?

10  A    That's the report number, complaint number, is what it's

11  called.

12  Q    And that follows the entire investigation; is that

13  correct?

14  A    Yes, sir, it does.

15  Q    And do you assign that number or is that, again, assigned

16  internally at the Baltimore Police Department?

17  A    The operator, the dispatcher.

18  Q    And once you have that number, that number goes on every

19  document that's prepared; is that correct?

20  A    Yes, sir for the most part.

21  Q    Now, you arrived at the scene, there's law enforcement on

22  the scene.  Had any witnesses been identified at that point?

23  A    Just subjects that were there, but no witnesses, sir.

24  Q    And 221 East 25th Street is a multi-unit dwelling; is

25  that correct?

1    A    Yes, sir.

2    Q    Would it be described as a rooming house, a boarding

3    house or --

4    A    Yes, sir.

5    Q    -- were there actual apartments within that building?

6    A    It had individuals, to my understanding, that were

7    squatting there, but it was a rooming house, to my

8    understanding, at some point.

9    Q    And when you arrived, had certain residents already been

10   identified for you?

11   A    I believe so.

12   Q    And then is it your testimony, I just want to be clear,

13   you called the mobile crime scene tech unit?

14   A    I believe so.

15   Q    And they eventually arrive on the scene, is it one person

16   more than one person that arrives?

17   A    I can't recall, but sometimes it's more than one.

18   Q    And do you know who -- is there one particular person

19   that's the lead mobile crime scene tech for each --

20   A    No, sir.

21   Q    Do you recall who the crime scene tech was that was

22   assigned to this investigation?

23   A    I think --

24   Q    On January 9th, 2007.

25   A    Yes, sir.  If my recollection proves correct, sir, it's

1    Technician Nuttroy, N–u–t–t–r–o–y.  And there might have been

2    someone else with that technician, but I can't recall their

3    names.

4    Q    Is her first name Carmella, does that sound familiar?

5    A    I --

6    Q    I know, it's been ten years.

7    A    I couldn't tell you.

8    Q    Had you taken any photographs of your own before they

9    arrived, before crime scene tech had arrived?

10   A    No, sir.

11   Q    Had you identified in any manner what you would call the

12   crime scene?

13   A    Yes, sir.

14   Q    Okay.  And the crime scene was essentially on what floor

15   in the -- in 221 East 25th Street?

16   A    The first floor.

17   Q    First floor?

18   A    Uh-huh.

19   Q    And this is a three-story dwelling, I think is what you

20   said.

21   A    Yes, sir, around about.

22   Q    So you were on the first floor and the first floor is

23   actually at the top of the front steps there?

24   A    As soon as you come into the front door, yes, sir.

25   Q    You don't walk in straight off the street.  You go up the

Cross-examination - Lloyd (By Mr. Bussard)

1   steps and into -- is there a porch of some sort?

2   A    There's a porch coming from the steps, from the sidewalk,

3   onto the porch, into the front, and there you are.

4   Q    So this dwelling then has what's called a basement, I

5   guess underneath of that?

6   A    I believe so.

7   Q    And then it has a floor above, the third floor?

8   A    Correct.

9   Q    And one photograph that government's counsel showed you

10  had several doors around the periphery of this common area.

11  A    Yes, sir.

12  Q    Were they each individual dwellings?

13  A    Rooms, I would say.

14  Q    Rooms?

15  A    Yes, sir.

16  Q    And so is it fair to say the crime scene was that common

17  area --

18  A    It was.

19  Q    -- where Mr. Rochester's body --

20  A    Yes, sir.

21  Q    Did there come a time that you spoke to all the residents

22  of 221 East 25th Street?

23  A    Yes, sir.

24  Q    And as a result of that, were you able to develop any

25  eyewitnesses?

Cross-examination - Lloyd (By Mr. Bussard)

1    A    No, sir.

2    Q    Did there come a time that you further identified a

3    larger or expanded the area of the crime scene in any manner

4    to include outside?

5    A    As far as -- the crime scene itself was contained inside

6    the house.  What we do is called an area canvass, which is not

7    in the area particular of the crime scene but to ascertain if

8    there's any potential witnesses outside of that crime scene,

9    yes.

10   Q    As a result of doing that, were any eyewitnesses

11   developed?

12   A    No, sir.

13   Q    And did you also have occasion to examine CCTV and blue

14   light cameras and anything else that might have been in the

15   area?

16   A    An attempt to locate, yes, sir.

17   Q    And as a result of that examination, was there any

18   eyewitnesses?

19   A    No, sir.

20   Q    And you did find some recordings of CCTV or --

21   A    No, sir.

22   Q    No?

23   A    No, sir.

24   Q    Now, when -- going back to when the crime scene tech is

25   there.  There were some photographs shown to you earlier,

1    shell casings, and they had these little yellow placards with

2    numbers on them.

3    A    Yes, sir.

4    Q    Do you place those placards there?

5    A    No, sir.

6    Q    That's all crime scene?

7    A    Correct.

8    Q    Do you walk around before that's even done and with the

9    crime scene tech to point out individual locations?

10   A    Yes, sir.

11   Q    So you are making a determination of what you consider to

12   be evidence that you want documented; is that correct?

13   A    I would say we, but I facilitate it largely, yes.

14   Q    So when you walk around and you see a shell casing, for

15   instance, you point to it and the crime scene tech places that

16   little placard there?

17   A    Yes, sir.

18   Q    Is the photograph taken right away?

19   A    No, sir.

20   Q    And do you immediately after it's identified and picked

21   up, do you pick it up -- you just pick it up as the lead

22   detective?

23   A    No.

24   Q    So you said Crime Scene Tech Nuttroy, I hope I'm

25   pronouncing that correctly, that -- she's the person that

Cross-examination - Lloyd (By Mr. Bussard)

1   picks it up?

2   A    The technician, yes.

3   Q    And does she do anything special when she's picking up

4   this item?

5   A    Submit it to our Evidence Control Section per our

6   discretion.

7   Q    Well, I'm being a little more basic than that.  When she

8   bends over to pick it up, is she gloved?

9   A    Yes, sir.

10  Q    And she puts it in an envelope, and we had -- Court's

11  indulgence for a moment.  We had Government's Exhibit 25, it

12  was a package of cartridges, do you recall that?

13  A    Yes, sir, I do.

14  Q    And there was writing on that package on the outside?

15  A    Yes, sir.

16  Q    Is that your writing?

17  A    No, sir, that's not.

18  Q    That's --

19  A    The technician.

20  Q    That's the technician's writing?

21  A    Correct, sir.

22  Q    So the only thing you have given her at some point is the

23  CC number?

24  A    She already has it, but yes.

25  Q    And then everything else that appears on that package is

Cross-examination - Lloyd (By Mr. Bussard)

1    her writing?

2    A    Correct.

3    Q    And everything that's in that package is collected by

4    her, not you; correct?

5    A    It's picked up by her and facilitated by me.

6    Q    So she -- is it a sealing process that goes on, does she

7    seal that package after she hands it -- before she hands it to

8    you?

9    A    Say that again, sir.

10   Q    When she puts the cartridges in the package?

11   A    Uh-huh.

12   Q    Is there a sealing process, does she seal the package

13   before she hands it to you?

14   A    She doesn't hand it to me, sir.  She keeps it maintains

15   it.  It's sealed and is transported to the Evidence Control

16   Section.

17   Q    So it's her responsibility to preserve that evidence for

18   later use?

19   A    Correct, sir.

20   Q    And it is also the crime scene tech's responsibility to

21   take it to Baltimore Police Headquarters?

22   A    Yes, sir.

23   Q    And that unit is called ECU; is that correct?

24   A    The Evidence Control Unit, yes, sir.

25   Q    And can you just very briefly describe what happens, if

Cross-examination - Lloyd (By Mr. Bussard)

1  you know, what happens once an item is submitted to ECU?

2  A    It's logged into a database system, sir, and then it's

3  storaged and maintain there.  That's pretty much it.

4  Q    Do you -- did you have any occasion to take that package,

5  GS25, out of ECU?

6  A    No.

7  Q    So it was -- it stayed in ECU as long as you're aware,

8  forever?

9  A    Unless it's removed for examination by way of our firearm

10 examiners, I don't touch it until we come to court, sir, if we

11 do get to court.

12 Q    You never saw that package again until Mr. Jones's trial

13 on -- last year?

14 A    I believe you're right.

15 Q    And the photograph of those cartridges, it was PHP25,

16 that was shown to you earlier, you again said you didn't take

17 any photographs?

18 A    Personal photographs?

19 Q    Personally.

20 A    No, sir.  No.

21 Q    Do you have any knowledge at all of where, if any, that

22 package, GS25, do you know what happens to it after it gets

23 into ECU and goes through the database, do you know what --

24 how it's handled after that?

25 A    Chain of custody, sir, would be in this particular

Cross-examination - Lloyd (By Mr. Bussard)

 1    instance in the investigation, if it's compared to another

 2    investigation at my direction, the firearms examiner would

 3    retrieve that, and then return it back to ECU.  That would be

 4    it.

 5    Q    And you're talking general terms because you're not the

 6    person that took it out for the firearms exam; is that

 7    correct?

 8    A    No, sir.

 9    Q    In fact, your testimony is that you didn't touch it

10    anymore.

11    A    No, sir.

12    Q    You had other investigators during -- that took over this

13    investigation around 2013; is that correct?

14    A    That is correct, sir.

15    Q    That would be Detective Veney?

16    A    Detective Mark Veney, yes.

17    Q    And was it Detective Sergeant Landsman?

18    A    Landsman, yes, sir.

19    Q    And they were part of another investigation; is that

20    correct?

21    A    Yes, sir.

22    Q    Okay.  And you have no other responsibilities as far as

23    the events of January 9th, 2007 after that time or did you

24    remain a part of the large investigation?

25    A    No, sir, actually, I was -- been promoted and reassigned

1    briefly.

2    Q    So the best of your knowledge, when the crime scene tech

3    was at the location of 221 East 25th Street, did -- were

4    fingerprints attempted to be lifted?

5    A    Yes, sir.

6    Q    And is that a common request made by the lead detective

7    of the crime scene tech?

8    A    Sometimes, yes.

9    Q    Okay.  And as a result of the investigation on January

10   9th, 2007, were any fingerprints ever lifted that would

11   identify Kenneth Jones?

12   A    We were unable to get any prints, no, sir.

13   Q    And you said you attended the autopsy of Mr. Rochester;

14   is that correct?

15   A    That is correct, sir.

16   Q    And did they take DNA sampling of when you were there, in

17   your presence, of the -- of Mr. Rochester's fingernails, under

18   his fingernails?

19   A    Nail clippings, yes, sir.

20   Q    Based on your knowledge, was there ever any DNA results

21   that would have linked Mr. Jones to Mr. Rochester?

22   A    Not to my knowledge, sir.

23   Q    And the same questions for Mr. Pace and Mr. Fenner.

24   A    Beg your --

25   Q    Was there any fingerprints of Mr. Pace or Mr. Fenner?

1   A    No, sir.

2   Q    Ever listed at the crime scene -- lifted, I mean?

3   A    No, sir.

4   Q    Now, when Mr. Meadows came in six months later and

5   then -- did he have any kind of recording that had been made

6   of a conversation between him and Mr. Jones?

7   A    Can you repeat that, sir?

8   Q    Like a cell phone recording?

9   A    Not that I recall, sir.

10  Q    Did he tell you that -- he told you that he had talked to

11  Mr. Jones; is that correct?

12  A    Correct, sir.

13  Q    After the murder?

14  A    Correct, sir.

15  Q    And did he have a recording of that on a cell phone or

16  any other electronic device?

17  A    Not that I recall, sir.

18  Q    Did he ever tell you that he had a written document from

19  Mr. Jones that's, in essence, Mr. Jones confessed to

20  participating in the murder of Gregory Rochester?

21  A    No, sir.

22  Q    So it's just Mr. Meadows's word; is that correct?

23  A    That's correct.

24  Q    Did you participate in a further interview of Mr. Meadows

25  in October of 2013?

1    A    No, sir.

2    Q    That was part of another investigation?

3    A    Yes, sir.  Uh-huh.

4              MR. BUSSARD:  I have no other questions.

5              THE COURT:  Thank you.  Mr. Francomano.

6                         CROSS-EXAMINATION

7    BY MR. FRANCOMANO:

8    Q    Detective, Marquise McCants was not a suspect in this

9    specific crime; correct?

10   A    Who?

11   Q    Exactly.  Thank you.

12             THE COURT:  Redirect.

13                        REDIRECT EXAMINATION

14   BY MS. HOFFMAN:

15   Q    Just briefly, Sergeant Lloyd.  There were a lot of

16   questions asked of you about the photo arrays that were

17   provided to Mr. Meadows.  Let's start with June 11th of 2007,

18   that first meeting that you had with him.

19       When you showed those photo arrays to Mr. Meadows, had he

20   already identified suspects at this point?

21   A    Yes, ma'am.

22   Q    So you were, I believe you testified on direct, simply

23   confirming the identities of the people he had named?

24   A    That's correct.

25   Q    And what about on January 23rd of 2008, was the same true

1    then?

2    A    That is true.

3              MS. HOFFMAN:  No further questions.

4              MR. BUSSARD:  Your Honor, may I just ask two very

5    brief questions?

6              THE COURT:  Within the scope of the redirect.

7              MR. BUSSARD:  Yes.

8              THE COURT:  From there.

9                        RECROSS-EXAMINATION

10   BY MR. BUSSARD:

11   Q    You indicated Mr. Jones had -- I mean, Mr. Meadows had

12   identified Mr. Jones.  Was a photograph shown of Mr. Jones

13   before?

14   A    No, no, sir.

15   Q    So he just identified him by what you said?

16   A    Verbally.

17   Q    Kenny and Slay, no photographs?

18   A    No.

19              MR. BUSSARD:  No further questions.

20              THE COURT:  May the witness be excused, Mr. Bussard?

21              MR. BUSSARD:  Yes, Your Honor.

22              THE COURT:  Mr. O'Toole.

23              MR. O'TOOLE:  Yes, Your Honor.

24              THE COURT:  Mr. Francomano.

25              MR. FRANCOMANO:  Yes, Your Honor.

1          THE COURT:  Ladies and gentlemen, we'll take the

2    lunch break now.  During the lunch break, do not discuss the

3    case with anyone.  Do not discuss the case even among

4    yourselves.  Do not allow yourselves to be exposed to any news

5    articles or reports that touch upon the case or the issues it

6    presents or articles or reports that relate to any

7    participants in the case.  Avoid all contact with any of the

8    participants in trial.  Do not make any independent

9    investigation of the law or the facts in the case.  Do not

10   look up anything related to the case or its participants on

11   the internet.  Do not consult an encyclopedia or a dictionary.

12   2:15.  Hour and 15 minutes.  Please take the jury out.

13          (Jury left the courtroom.)

14          THE COURT:

15          MR. O'TOOLE:  Your Honor, what is this thing you

16   referred to as an encyclopedia, what is that?

17          THE COURT:  Mr. O'Toole, it's particularly alarming

18   if you at your age don't know what I'm talking about.  I have

19   serious concerns about that.  Who's next?

20          MR. MARTINEZ:  Next we have Sergeant Kurt Roepcke of

21   the Baltimore Police.  He'll be a short witness.

22          THE COURT:  And then after that?

23          MR. MARTINEZ:  Then we have the firearm examiner,

24   Ms. Bohlen -- I'm sorry, Sandra Forsythe, who -- Ms. Forsythe

25   is a homicide detective, who is formerly with shootings.  She

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

```
 1        secured the crime scene of the shooting of Bubba, also known

 2        as Antonio Oliver, a few days before the Rochester homicide.

 3        They were -- there's evidence recovered from that that was

 4        then the subject of Ms. Bohlen's comparison and she will be

 5        following.

 6                  THE COURT:  That's how the government plans to try

 7        to link it back?

 8                  MR. MARTINEZ:  Yes.

 9                  THE COURT:  Okay.  2:15.

10                  (A recess was taken.)

11                  THE COURT:  Are we ready for the jury?

12                  MR. MARTINEZ:  Yes.

13                  THE COURT:  And the next witness is?

14                  MR. MARTINEZ:  Sergeant Roepcke of the

15        Baltimore Police Department.

16                  THE COURT:  Okay.  We can bring him forward and

17        bring the jury in.  Sergeant Roepcke.

18                  (Jury entered the courtroom.)

19                  THE COURT:  Be seated, please.  Mr. Martinez, the

20        government may call their next witness.

21                  MR. MARTINEZ:  Government calls

22        Sergeant Kurt Roepcke of the Baltimore Police Department.

23                  THE COURT:  Sergeant Roepcke.

24                  THE CLERK:  Sir, raise your right hand.

25                            SERGEANT CURT ROEPCKE
```

 1    called as a witness, being first duly sworn, was examined and

 2    testified as follows:

 3                    THE WITNESS:  I do.

 4                    THE CLERK:  Thank you.  You may have a seat in the

 5    witness box and watch your step.  And Sergeant, if you would

 6    adjust that microphone, speak directly into it, state your

 7    first and last name, and spell your first and last name.

 8                    THE WITNESS:  Sergeant Kurt Roepcke, K-u-r-t; last

 9    name is Roepcke, R-o-e-p-c-k-e.

10                    THE COURT:  R-o-e-p-c-k-e.

11                    THE WITNESS:  Yes, sir.

12                    THE COURT:  Thank you, your witness.

13                              DIRECT EXAMINATION

14    BY MR. MARTINEZ:

15    Q    Thank you.  Sergeant Roepcke, good afternoon.

16    A    Good afternoon, sir.

17    Q    Tell us where you work, please.

18    A    I work for Baltimore City Police Department.

19    Q    And your rank is sergeant; correct?

20    A    Yes, sir.

21    Q    How long have you been with the BPD?

22    A    The 22 years.

23    Q    Could you briefly walk us through the various positions

24    you've held?

25    A    I've been a patrol officer in patrol; I was in the Quick

1    Response Team, which became SWAT; I worked in the

2    Pennsylvania Avenue Task Force with the Flex Squad; taught at

3    the Academy; and now with the Marine Unit.

4    Q    So the Marine Unit, that's on boats?

5    A    Yes, sir.  The Marine Unit with the boats and the

6    Underwater Recovery Team.

7    Q    Could you tell us what your rank and assignment was as of

8    March 2007?

9    A    I was an officer in SWAT.

10   Q    I want to direct your attention to March 3rd, 2007 just a

11   few minutes before midnight.  Were you working and on duty at

12   the time?

13   A    Yes, sir.

14   Q    Did there come a time where you witnessed a traffic

15   violation near the intersection of Oliver and Gay Streets in

16   East Baltimore?

17   A    Yes, sir.

18   Q    I want to show you what's been marked as

19   Government's Exhibit 17.  And I'm going to ask you whether you

20   recognize that location.

21   A    Yes, sir, that's the intersection.

22   Q    Could you show us where you were when you witnessed this

23   traffic violation?

24   A    What, do you want me to point at the screen?

25            THE COURT:  Just touch the screen and it will show

 1    up.

 2                THE WITNESS:  Okay.

 3                THE COURT:  Yeah, amazing.

 4                THE WITNESS:  Yeah.

 5                THE COURT:  Did you touch it?

 6                THE WITNESS:  Yes, sir.

 7                THE COURT:  We've got some tech problems, hold on.

 8    Ms. Powell, let's try again.  It's because I was bragging

 9    about it.  So same problem.

10                THE CLERK:  Yeah, it's not --

11                THE COURT:  So recover the -- hand the exhibit to

12    the witness.

13                MR. MARTINEZ:  Oh, and just for the record, I said

14    this was Exhibit 17.  This is GM, for Google maps, 17.

15    Q    (BY MR. MARTINEZ)  Sergeant, I'm going to show you GM 17

16    and hand you a pen here and ask you to circle as best you can

17    the location where you were when you saw the traffic

18    violation.

19    A    Can I use my pen?  This one isn't working too well.

20    Q    Sure.  Our technology failed too.

21    A    It's the paper.

22                THE COURT:  Here, Sharpie.

23    A    I was in the southbound lane.

24                THE COURT:  Just keep all of them.

25    Q    (BY MR. MARTINEZ)  Okay.  Sergeant, so the red circle is

Direct Examination - Roepcke (By Mr. Martinez)

1    the position of your -- it was your position?

2    A    Yes, sir.  We were in an unmarked crown Vic.

3    Q    Crown Vic, that's a Crown Victoria?

4    A    Yes, sir.

5    Q    All right.  So let's talk about what happened, what type

6    of traffic violation did you see?

7    A    The light turned green, we were getting ready to proceed

8    south.  A gray vehicle went through the light where the driver

9    was talking on a phone, almost another struck another

10   vehicle.

11   Q    Now, from right to left on the screen, in which direction

12   was the --

13   A    Going from west to east.

14   Q    Gotcha.

15   A    So that -- yeah.  The right side here of this.

16   Q    What did you do when you saw the Honda run a red light?

17   A    We did a U-turn and went to pull the vehicle over.

18   Q    And when you went to pull the vehicle, over what

19   happened?

20   A    We activated our emergency equipment, the lights and

21   sirens.  The vehicle attempted to elude us, making a series of

22   turns.

23   Q    And where did it go next?

24   A    I'm not sure the exact streets, but it finally came back

25   up on Oliver Street, striking another vehicle, where the

Direct Examination – Roepcke (By Mr. Martinez)

1    driver then bailed out of the vehicle.

2    Q    So you said after a series of turns it ended up on

3    Oliver Street; is that right?

4    A    Yes, sir.

5    Q    Want to show you Government's Exhibit GM 16 and ask you

6    whether you recognize that location.

7    A    That's Oliver Street.

8    Q    Okay.  And is this the location where you saw the driver

9    bail out of the car you were chasing?

10   A    Yes, sir, after he struck the vehicle.

11   Q    And did you chase the driver after he bailed out of that

12   vehicle?

13   A    Yes, sir, I did.

14   Q    Were you able the catch him?

15   A    Yes, sir, I was.

16   Q    Did you place him under arrest?

17   A    Yes, sir, I did.

18   Q    Were you able to identify the driver after you placed him

19   under arrest?

20   A    Yes, he was identified as Donatello Fenner.

21   Q    Like to show you now what's already in evidence as

22   Government's Exhibit PHI 28.  Can you identify that

23   individual?

24   A    That's Donatello Fenner.  It's a different photo.  He has

25   dreadlocks different than when I arrested him, but it's the

1    same person.

2    Q    So this individual has shorter hair on the day you

3    encountered him; is that correct?

4    A    Yes.

5    Q    Okay.  Did you conduct a search incident to arrest when

6    you took Mr. Fenner into custody?

7    A    Yes, I did.

8    Q    What, if anything, did you find during that search?

9    A    He had a .38 caliber revolver in his coat pocket.

10   Q    All right.  I don't need to ask you anymore -- well, did

11   he have any other firearms in his pocket?

12   A    Yes, another gun was recovered in the vehicle.

13   Q    Oh, I'm sorry, well, let's finish the search of the

14   person.  Was the .38 -- was the .38 loaded?

15   A    I believe so.  I'd have to refer to my notes to know

16   exactly.

17   Q    Well, if there's -- is there something that would refresh

18   your recollection as to that?

19   A    Yes, sir, statement of probable cause or police report.

20            MR. MARTINEZ:  May I approach?

21            THE COURT:  Yes.  Look at that document, once you've

22   refreshed your memory, look up, and we'll know you've finished

23   reading.

24            THE WITNESS:  Okay, sir.

25   Q    (BY MR. MARTINEZ)  Having consulted this document, is

1  your memory refreshed?

2  A    Yes, sir.

3  Q    Can you tell us whether the .38 that you recovered from

4  Donatello Fenner's person was loaded?

5  A    Yes, sir, it was.

6  Q    Okay.  After you searched Mr. Fenner's person, did you

7  also search the gray Honda he had been driving?

8  A    Yes, sir, we did.

9  Q    What, if anything, did you find in the Honda?

10 A    There was a Sig Sauer semi-automatic handgun on the

11 floorboard of the driver's side.

12 Q    And the Sig Sauer, what caliber was that firearm?

13 A    9mm.

14 Q    Do you recall the serial number?

15 A    Not -- I've got to refresh so I get it right.

16 Q    Would looking at the document refresh your

17 recollection?

18 A    Yes, sir.  It's all in there.  That's why we write it

19 down there.

20 Q    Have you looked at the Statement of Probable Cause,

21 Sergeant, is your recollection refreshed?

22 A    Yes, sir, it is.

23 Q    You tell us the serial number of the 9mm that you found

24 in the vehicle?

25 A    Yes, sir, it's U union 11, 6968.

Direct Examination - Roepcke (By Mr. Martinez)

1    Q    U116968; is that correct?

2    A    Yes, sir.

3    Q    Was that gun loaded?

4    A    Yes, sir.

5    Q    Were you able to tell whether that Sig Sauer 9mm had

6    previously been reported as stolen?

7    A    Yes.  We ran it through the dispatcher, it came back

8    stolen.

9    Q    And since that time have, have you learned whether or not

10   the firearm has been returned, the 9mm that is, has been

11   returned to its lawful owner?

12   A    Yes, sir.  I learned today that it was.

13   Q    After you recovered the 9mm, what, if anything, did you

14   do with it?

15   A    We recovered both weapons and we submitted them to

16   evidence control, after making them safe.

17            MR. MARTINEZ:  Court's indulgence.

18   Q    (BY MR. MARTINEZ)  Detective -- or Sergeant, rather, do

19   you recall the CC number associated with this incident?

20   A    No, I do not.  I'd have to --

21   Q    Is there anything that would refresh your recollection?

22   A    Yes, sir, I'm sorry.

23   Q    And while I'm at it, just to save us a trip, also, do you

24   recall the serial number associated with the .38 you took

25   Mr. Fenner's person?

1    A    No.  I need to see the statement.

2    Q    All right.

3    A    Can I read it off this or read it to you?  I'm not going

4    to remember both of them.  I'll probably get them screwed

5    up.

6              THE COURT:  No objection.  Read the two numbers.

7              THE WITNESS:  Okay.  Sorry.  Serial number for the

8    revolver is N Nancy, A Adam, 47280.  And the CC number is

9    03 Charles 1479.

10             MR. MARTINEZ:  Thank you, Sergeant.

11             Those are all the questions we have.

12             THE COURT:  Mr. O'Toole.

13             MR. O'TOOLE:  We have no questions.

14             THE COURT:  Mr. Bussard.

15             MR. BUSSARD:  Thank you.  May I question from my

16   position?

17             THE COURT:  Absolutely.

18             MR. BUSSARD:  Thank you.

19                         CROSS-EXAMINATION

20   BY MR. BUSSARD:

21   Q    Good afternoon, Sergeant Roepcke.

22   A    Good afternoon.

23   Q    Looking at a statement from years ago -- when you stopped

24   this vehicle, was Mr. Fenner the only occupant of that

25   vehicle?

Cross-examination – Roepcke (By Mr. Bussard)

1    A    Yes, sir.

2    Q    Only one person bailed out and ran away?

3    A    Correct.

4    Q    Is that correct?

5         And you've been using the pronoun "we," was there more

6    than one officer on the scene?

7    A    Yes, sir, I had my partner with me.

8    Q    And who made the actual apprehension of Mr. Fenner?

9    A    I did, sir.

10   Q    And you're the one that did the search then of his pocket

11   and found the weapon?

12   A    Yes, sir.

13   Q    Is that correct?

14        And that was the Taurus -- or is it the other one?

15   A    No, the .38 was in his pocket.

16   Q    The .38 was in his pocket and the Sig Sauer then was back

17   in the vehicle?

18   A    Correct.

19   Q    Okay.  And regarding the CC number, do you assign the

20   CC?

21   A    No, sir, we do not.

22   Q    How do you get that CC number?

23   A    We call on the radio to our dispatcher and they give us a

24   CC number.

25   Q    And that goes on every package that you have after

1    that?

2    A    Every police report?

3    Q    Let me back up.  When you seized the .38, were you

4    wearing gloves that day?

5    A    I'm not 100 percent sure, sir.

6    Q    So when you pull the .38 out of his pocket and you --

7    what do you with it after that?

8    A    So I pull the .38 out of his pocket, we render it safe,

9    if possible, if the scene is safe.  So we -- that's a

10   revolver, so we empty it out.  It's got a cylinder, so you

11   pull it out, push it forward, and drop the rounds out.

12   Q    And what do you do with the rounds and the firearm after

13   you render it safe?

14   A    We put them in an envelope.  It's a weapons envelope.  So

15   the casings go in a smaller envelope and the weapon goes in a

16   bigger white envelope.

17   Q    Are those envelopes then sealed by you?

18   A    We put Evidence Control tape on them.

19   Q    And what do you do with them after this?

20   A    They're submitted to Evidence Control.

21   Q    And where is Evidence Control?

22   A    601 East Fayette.  It used to be in the basement, but now

23   it's the first floor.

24   Q    Is that because of the floods in the basement?

25   A    I'm not sure exactly all the reasons why.

1    Q    Once it goes into the Evidence Control Unit, do you have

2    any occasion -- do you have any knowledge of what happens to

3    it after that?

4    A    No, sir, unless we need it for court.

5    Q    Had you ever had occasion to pull it out of court?

6    A    No, sir.  Not that I know of.

7    Q    Do you have the Taurus .38 now?

8    A    No, sir.  I think -- I found it this morning that they

9    disposed of it, the Evidence Control people did.

10   Q    The .38 --

11   A    Correct.

12   Q    -- was disposed of and the Sig Sauer was returned to its

13   owner?

14   A    Yes, sir.

15   Q    So the Baltimore City Police Department is not in

16   possession of either one of those weapons at this point?

17   A    Correct.

18          MR. BUSSARD:  I have no other questions,

19   Your Honor.

20          THE COURT:  Mr. Francomano.

21          MR. FRANCOMANO:  No questions, Your Honor.

22          THE COURT:  Redirect.

23          MR. MARTINEZ:  No, thank you.

24          THE COURT:  May the witness be excused?

25          MR. BUSSARD:  Yes, sir.

1          MR. FRANCOMANO:  Yes, Your Honor.

2          THE COURT:  You're excused, sir, you may depart.

3          We're rebooting the system, so you're not going to

4    have any amplification for a few minutes.  Let's see if you

5    can't get started.  Who's next?

6          MS. HOFFMAN:  The government calls

7    Detective Sandra Forsythe.

8          THE COURT:  Who?

9          MS. HOFFMAN:  Detective Sandra Forsythe.

10         THE COURT:  Detective Forsythe.  Ladies and

11   gentlemen, I always marvel at those old courtrooms from the

12   19th century which have those big cavernous courtrooms.  And

13   you remember, there was no amplification.  The lawyers must

14   have had louder voices in the 19th century.

15         MS. HOFFMAN:  Sorry, Your Honor.

16         THE COURT:  I was speaking more for myself.  I think

17   all of us benefit from amplification.  Also, it's tiring.

18         COURT SECURITY OFFICER:  Your Honor, the witness is

19   going to be delayed a couple minutes.

20         THE COURT:  All right.  You want to look into that?

21         MR. MARTINEZ:  Yes, Your Honor.

22         (Pause in the proceedings.)

23         THE COURT:  Back on the record.  Come forward,

24   ma'am, please.  If you'll come up to our witness box, stop

25   there, face our clerk.

Direct Examination - Forsythe (By Ms. Hoffman)

1          THE CLERK:  Okay.  Now it's not deleting, Judge.

2          THE COURT:  Stop there for a second.  Go ahead and

3   swear the witness.

4                    DETECTIVE SANDRA FORSYTHE

5   called as a witness, being first duly sworn, was examined and

6   testified as follows:

7          THE WITNESS:  I do.

8          THE CLERK:  Thank you, ma'am, you may have a seat.

9   And ma'am, if you would speak directly into the microphone,

10  state your first and last name and spell your first and last

11  name.

12         THE WITNESS:  Sandra Forsythe, S, as in Sam,

13  S-a-n-d-r-a, F-o-r-s-y-t-h-e.

14         THE CLERK:  Thank you, ma'am.

15         THE COURT:  F-o-r-s-y- --

16         THE WITNESS:  -t-h-e.

17         THE COURT:  Your witness.

18                    DIRECT EXAMINATION

19  BY MS. HOFFMAN:

20  Q    Good afternoon, Detective Forsythe.

21  A    Good morning.

22  Q    Are you employed?

23  A    Baltimore City Homicide.

24  Q    What's your rank in the Homicide Unit?

25  A    Detective.

Direct Examination - Forsythe (By Ms. Hoffman)

1  Q    How long have you worked for the Baltimore Police

2  Department?

3  A    24 years completed.

4  Q    How long have you been in the Homicide Unit?

5  A    Eight years.

6  Q    Prior to that, what did you do for BPD?

7  A    I was a -- district detective unit, K-9, domestic

8  violence, and patrol.

9  Q    And where were you as of January 2007?

10  A    District Detective Unit.

11  Q    I want to direct your attention to January 4th of 2007.

12  Were you working and on duty that day?

13  A    Yes.

14  Q    Did there come a time when you were asked to respond to

15  the scene of a shooting?

16  A    Yes.

17  Q    What time of day was it?

18  A    Evening time.

19  Q    And where were you asked to go?

20  A    Barclay and 21st.

21  Q    And did you respond there?

22  A    Yes.

23  Q    Was the victim present on the scene when you arrived?

24  A    No.

25  Q    Did you eventually learn the identity of the victim?

1    A    Yes.

2    Q    Who was it?

3    A    Antonio Oliver.

4    Q    Where specifically was the crime scene located?

5    A    In front of 345 East 21st Street.

6    Q    And did you secure the crime scene?

7    A    Yes.

8    Q    What does it mean to secure a crime scene?

9    A    Well, basically, I didn't secure it.  It was already

10   secured by patrol.  We respond out once the crime scene is

11   secured.

12   Q    Were there photographs taken of the crime scene?

13   A    Yes.

14   Q    I'm going to show you Government's Exhibit PHCS 12.  What

15   are we looking at here?

16   A    That is an Evidence Control envelope.

17   Q    And can you read the CC number here?

18   A    CC number is 073A1853.

19   Q    And --

20        MR. BUSSARD:  Your Honor, may we approach?

21        THE COURT:  Yes.

22        (Bench conference on the record.)

23        THE COURT:  Mr. Bussard.

24        MR. BUSSARD:  Your Honor, out of an abundance of

25   caution, as a result of the last one, I'm objecting to the

1    introduction and admission of the shell casing that we're

2    about to hear.  This was not recovered by Detective Forsythe,

3    although she may have signed a paper.  It was actually

4    recovered by Crime Scene Tech Dimakakos and her name appears

5    on that document there at the top as the crime scene tech.

6         THE COURT:  Let's at least let the government

7    attempt to lay a foundation before the objection is

8    interposed.  Let's see if they haven't -- well, let's go down

9    that road.  I note the objection, it's pending.  The exhibit

10   has not been admitted and it won't be admitted now that

11   there's been an objection, unless the government formerly

12   moves it.  In other words, you can't rely on the local rule

13   once an objection has been made.

14         (The following proceedings were had in open court.)

15         THE COURT:  You may continue.

16   Q    (BY MS. HOFFMAN)  Detective Forsythe, when we left off, I

17   had you read the CC number here.  Is this the CC number

18   pertaining to the shooting to which you responded?

19   A    Yes.

20         MS. HOFFMAN:  Your Honor, I'm sorry to interrupt,

21   but I think the screens are off now.

22         THE COURT:  You may continue.

23   Q    (BY MS. HOFFMAN)  Detective Forsythe, was anything of --

24   what, if anything, of evidentiary value was recovered from the

25   crime scene?

Direct Examination - Forsythe (By Ms. Hoffman)

1    A    A 9mm shell casing.

2    Q    And did you observe that shell casing be recovered?

3    A    Yes.

4    Q    Was it you personally who physically picked it up?

5    A    No.

6    Q    But you were there on the scene when it was recovered?

7    A    Yes.

8    Q    I'd like to show you page 2 of --

9         MR. BUSSARD:  Objection, Your Honor.

10        THE COURT:  Overruled.  You may continue.

11   Q    (BY MS. HOFFMAN)  Page two of PHSC 12.

12        MR. BUSSARD:  Can we have that number again, please,

13   Counsel?

14        MS. HOFFMAN:  It's PHSC 12.

15        THE COURT:  Page 2.

16   Q    (BY MS. HOFFMAN)  What are we looking at here?

17   A    That is the crime scene.

18   Q    And I'm going to show you another page from that

19   document.  What are we looking at here?

20   A    A photograph of the street sign, Barclay and

21   East 21st Street.

22   Q    I'm going to show you one more page of that document.

23   What are we looking at here?

24   A    Another photo of a crime scene, but it has the markings

25   where the crime lab puts down the markings.

Direct Examination - Forsythe (By Ms. Hoffman)

1    Q    And finally, I'm going to show you one more page of that

2    document.  What are we looking at here?

3    A    The 9mm shell casing and the marking No. 1.

4    Q    Okay.

5         MR. BUSSARD:  Your Honor, just for the record,

6    objecting.

7         THE COURT:  Noted.  Overruled.

8    Q    (BY MS. HOFFMAN)  Detective Forsythe, what happens when

9    evidence is recovered from a crime scene?

10   A    Well, what happens first, the crime lab tech numbers the

11   envelope that she's going to put it in and where exactly she

12   recovered it from.  Then after that, after the crime scene has

13   been secured, she takes everything back to Evidence Control to

14   be submitted.

15        MR. BUSSARD:  Objection, Your Honor.

16        THE COURT:  Do you want a continuing objection to

17   the whole line of questions, Mr. Bussard?

18        MR. BUSSARD:  Yes, Your Honor.

19        THE COURT:  You have it.  Overruled.

20        MR. BUSSARD:  Thank you.

21   Q    (BY MS. HOFFMAN)  And we talked earlier about the CC

22   number.  When evidence is recovered, is it assigned a

23   particular CC number?

24   A    Yes.

25   Q    And is it also assigned a property number?

Direct Examination – Forsythe (By Ms. Hoffman)

1   A    Yes.

2   Q    Can you tell us the difference between a CC number and a

3   property number?

4   A    CC number is the CC number you use for the whole entire

5   case, property number is given individually on each item.

6   Q    And once evidence is submitted to the Evidence Control

7   Unit, does the Evidence Control Unit keep track of when, if

8   ever, that evidence is removed from the Evidence Control

9   Unit?

10  A    Yes.

11  Q    So they document a chain of custody?

12  A    Yes.

13  Q    Detective Forsythe, once evidence has assigned a CC

14  number and submitted to the ECU, does that CC number follow

15  the evidence for the length of the case?

16  A    Yes.

17  Q    I'm going to approach and show you

18  Government's Exhibit No. 24 -- I'm sorry, it's

19  Government's Exhibit 23.

20          THE COURT:  Government's Exhibit 23.  Let me see it.

21  Ms. Hoffman.

22          MR. BUSSARD:  Again, Your Honor, objection.

23          THE COURT:  Noted.  Overruled.

24  Q    (BY MS. HOFFMAN)  Can you read what's written on the

25  envelope I just handed you?

Direct Examination - Forsythe (By Ms. Hoffman)

1    A    What's written on the envelope it says, 9mm shell casing;

2    the date recovered is 1/4/07; from whom recovered; crime

3    scene, 300 block of East 21st Street; the victim's name,

4    Antonio Oliver.  Officer in the case, Peckoo and District

5    CID.

6    Q    And would you mind opening it and looking at what's

7    inside.  Detective Forsythe, do you recognize this item?

8    A    Yes.

9    Q    What is it?

10   A    The 9mm shell casing.

11   Q    And does it appear to be the shell casing that you

12   observed on the scene of the Antonio Oliver shooting?

13   A    Yes.

14            THE COURT:  Why do you think it's the same one?

15   A    Because I'm going by the label of the -- that they put

16   with it, and this is the exact envelope that they put it in at

17   the crime scene.  See it has the date -- it has the date,

18   shooting, it has Complaint No. -- No. 1, 9mm shell casing, 345

19   East 21st Street.  It's the same envelope that she would put

20   this one in.

21            THE COURT:  Were any other shell casings seized

22   there?

23            THE WITNESS:  No.

24            THE COURT:  Next question.

25            MR. BUSSARD:  Again, Your Honor, continuing

1    objection.

2              THE COURT:  I note your objection.  But where are we

3    with respect to the exhibit, is the government offering the

4    exhibit?

5              MS. HOFFMAN:  Yes, we are.

6              THE COURT:  Anything further, Mr. Bussard?

7              MR. BUSSARD:  Yes.

8              THE COURT:  You have something further?

9              MR. BUSSARD:  The same objection.

10             THE COURT:  Same objection, but you've already

11   articulated it; right?

12             MR. BUSSARD:  Yes, plus -- may we approach again,

13   Your Honor?

14             THE COURT:  Okay.

15             (Bench conference on the record.)

16             THE COURT:  Mr. Bussard.

17             MR. BUSSARD:  Your Honor, it becomes she's only

18   identifying the outside package of this.  She can't identify

19   the actual object that's in there.  She didn't do anything to

20   the object to mark it to identify it, other than the fact it

21   looks like the same envelope and packaging, so we don't know

22   it's the same one.  All we know is it's the same package.

23             THE COURT:  Thank you, Mr. Bussard.  I find that the

24   exhibit's admissible pursuant to Rule 901 B9, which is the

25   rule that allows a court to rely at the authentication

1    identification stage on regular ordinary reliable processes.

2    And the detective has testified at some length about how

3    evidence is gathered from a crime scene, how it is placed in a

4    discrete envelope, how a particular number is attached to it,

5    how that evidence is then logged into the Evidence Control

6    Unit of the police department.  And there's nothing to suggest

7    that something other than that normal operating procedure was

8    followed here.

9            I'm impressed by the professionalism and sobriety of

10   the detective and the consistency of her testimony and her

11   description of how this process operates.  It causes me to

12   have faith that the process was operated as she describes in

13   this particular instance.  And accordingly, I find that a

14   sufficient foundation has been laid to allow this shell casing

15   to be admitted as the shell casing, the single shell casing

16   that was recovered from this particular crime scene.  The

17   objection's overruled.

18            (The following proceedings were had in open court.)

19            THE COURT:  Overruled.  Next question.

20            MS. HOFFMAN:  No further questions.

21            THE COURT:  Mr. O'Toole.

22            MR. O'TOOLE:  No, sir, no questions.

23            THE COURT:  Mr. Bussard.

24                      CROSS-EXAMINATION

25   BY MR. BUSSARD:

Cross-examination – Forsythe (By Mr. Bussard)

1    Q    Good afternoon, Detective Forsythe.

2    A    Good afternoon.

3    Q    On January 4th, 2007, you were serving as a detective; is

4    that correct?

5    A    Yes.

6    Q    The lead detective that day was David Peckoo?

7    A    Peckoo, yes.

8    Q    Am I pronouncing it correctly?

9    A    Yes.

10   Q    When you arrived on the scene, did you arrive with

11   Detective Peckoo?

12   A    No.

13   Q    When you arrived on the scene, was law enforcement

14   already on the scene?

15   A    Yes.

16   Q    Okay.  So I think there was an Officer Taylor, maybe an

17   Officer Cummings there that day?

18   A    I couldn't tell you, sir.

19   Q    Okay.  You don't recall?

20   A    No.

21   Q    Okay.  But there was law enforcement there that day?

22   A    Yes, sir.

23   Q    And in the course of your duties, did you also have

24   occasion to examine some CCTV of that location?

25   A    Sir, I wasn't the primary, I don't -- no, I was just

Cross-examination - Forsythe (By Mr. Bussard)

 1    called in to secure the crime scene, that was it.

 2    Q    I'm showing you -- I'm not sure which page it is of the

 3    exhibit, PHSC 12 -- oh, I'm sorry -- it does work?

 4              THE COURT:  It's working.

 5    Q    (BY MR. BUSSARD)  Can you see that, ma'am?

 6    A    Yes, sir.

 7    Q    And there appears to be a space between the blue car and

 8    the car to the left, which is slightly out of view; is that

 9    right?

10    A    Yes, sir.

11    Q    Do you have any information that there was another car in

12    that position at one time earlier in the evening?

13    A    Sir, I -- I don't have anything -- I don't know.

14    Q    And have you had -- were you ever a crime scene tech?

15    A    No.

16    Q    Before you became a police officer?

17    A    No.

18    Q    Do you -- did you receive training in crime scene tech?

19    A    No.

20    Q    Okay.  So when you arrive on the scene, were these little

21    placards already -- little placards 1 and 4 that are in the

22    picture, were they already there sitting on the ground?

23    A    Yes.

24    Q    So somebody else other than you had identified this?

25    A    The crime scene tech, yes.

Cross-examination – Forsythe (By Mr. Bussard)

1    Q    These items?

2    A    Yes, and Detective Peckoo.

3    Q    And do you know -- but you didn't see him do that?

4    A    He was the only one there --

5    Q    Law enforcement --

6    A    -- from the detective unit.

7    Q    I'm sorry, I didn't mean to talk over you.

8    A    That's okay.  He was the only one there from the

9    detective unit.

10   Q    But there were other police officers there?

11   A    Yes, sir.

12   Q    Now, it doesn't show up in these photographs, was the

13   yellow tape put around a larger area?

14   A    If it was secured off, it should have been, sir.

15   Q    But you don't see it in this --

16   A    The photo.

17   Q    -- picture?

18   A    Right, sir.

19   Q    And do you know -- and the purpose of putting the yellow

20   tape up there is so people don't walk through a crime scene;

21   is that correct?

22   A    Yes, sir.

23   Q    And you already indicated that the victim wasn't there,

24   so there wasn't any way to have an interview with the victim

25   at this location on 21st Street?

1    A    Correct, sir.

2    Q    Okay.  Do you know if there was cars still going up and

3    down 21st Street while you were doing your investigation?

4    A    No, sir.

5    Q    Okay.  Was the whole street blocked off?

6            THE COURT:  No, you don't know or no, there were no

7    cars?

8            THE WITNESS:  No cars going up and down the street.

9    Q    (BY MR. BUSSARD)  So the whole block was blocked off?

10   A    Yes, sir.

11   Q    Do you know how soon before you arrived at the

12   location -- 21st Street had been blocked off so there would be

13   no cars going back and forth?

14   A    No, sir.

15   Q    Okay.  So it could be a few minutes, an hour, you don't

16   know?

17   A    I don't know.

18   Q    Okay.  Now, just to be clear, showing you another page

19   from PHSC 12, can you see that, Detective?

20   A    It's blurry.

21   Q    I hope it --

22   A    It's --

23   Q    I don't know how to make it clear.

24           THE COURT:  Almost --

25   Q    (BY MR. BUSSARD)  There it is.  Is that better?

1    A    Yes.

2    Q    And again, you said you didn't put these little placards

3    there, somebody else did?

4    A    Crime lab techs put placards down.

5    Q    And this is a shell casing here?

6    A    Yes, sir.

7    Q    And looking at that shell casing, is there anything

8    unique about that shell casing?

9    A    No.  No, sir.

10   Q    Do you have any idea when that shell casing got there in

11   the street?

12   A    No, sir.

13   Q    Okay.  Could have been there an hour, a day, you have no

14   idea?

15   A    No idea, sir.

16   Q    Somebody else made a decision that that was an important

17   piece of evidence to collect?

18   A    Yes, sir.

19   Q    Not you?

20   A    No.

21   Q    Now, looking again at the exhibit of the shell casing,

22   based on your knowledge, when that item, the shell casing

23   here -- and the shell casing is what is ejected from a

24   semi-automatic handgun; is that correct?

25   A    Yes, sir.

1    Q    So if it's a revolver, I guess, a lot of people know that

2    as a six-shooter or something in the westerns, that doesn't

3    eject anything; correct?

4    A    Correct, sir.

5    Q    So this is from the kind that after it shoots the bullet

6    out it drops this out.

7    A    Yes, sir.

8    Q    Or shoots it out, does something to it.  After -- when

9    that comes out, is there anything -- just you looking at this

10   shell casing, is there anything unique about that shell casing

11   as opposed to any other shell casing you've seen?

12   A    No.

13   Q    And when it's collected -- and you said you observed the

14   crime scene tech actually collect this, do you know who that

15   crime scene tech was that day?

16   A    Andrenna Dimakos.

17   Q    And when Ms. Dimakos picked this up off the ground and

18   dropped it in the envelope like you've testified to, do they

19   put any unique markings on that to indicate that that's the

20   one that's -- the one item that was picked up off the ground

21   or is there an envelope --

22   A    That's the envelope right --

23   Q    The envelope is the only unique thing?

24   A    Yes.

25   Q    There's nothing done to the shell casing to identify

Cross-examination – Forsythe (By Mr. Bussard)

1 the -- even a black magic marker of some sort that can be

2 taken off later?

3 A No, sir.

4 Q So it's all based on, for want of a better word, faith in

5 the system, that that cartridge stays in that envelope;

6 correct?

7 A Correct, sir.

8 Q And the object of doing it this way is to try to preserve

9 evidence; is that right?

10 A Correct, sir.

11 Q In the form -- whatever form it's in when it's

12 collected?

13 A Correct, sir.

14 Q And just to be clear, you have no idea what happened

15 before your arrival at the scene of this crime?

16 A No, sir.

17 Q And you have no way of knowing when the crime scene tape

18 may have been put up to start preventing cars and people

19 walking through that area, whenever that was put up, you have

20 no idea?

21 A No, sir.

22 Q And as we sit here, again, just to reiterate, you don't

23 have a recollection of whether the crime scene tape was

24 actually put up?

25 A No, sir.

Cross-examination - Forsythe (By Mr. Bussard)

1   Q    It's your testimony that it should have been put up?

2   A    Correct, sir.

3   Q    Okay.  But 11 years later, it's not the easiest --

4   A    The 24 years I've been in the police department crime

5   scene tape has always been put up.

6            MR. BUSSARD:  I have no further questions,

7   Your Honor.

8            THE COURT:  Mr. Francomano.

9            MR. FRANCOMANO:  No questions.

10           THE COURT:  Redirect.

11           MS. HOFFMAN:  No redirect, Your Honor.

12           THE COURT:  Can the witness be excused, Counsel?

13           MR. O'TOOLE:  Yes, sir.

14           THE COURT:  You may depart, ma'am.  Close that

15   exhibit back up.  Perfect.  Ms. Powell, will you recover the

16   exhibit and return it to the government.

17           Next witness.

18           MS. HOFFMAN:  Your Honor, may we approach?

19           THE COURT:  Yes.

20           (Bench conference on the record.)

21           MS. HOFFMAN:  Your Honor, the next witness is

22   Sandra Bohlen, the firearms examiner, and I just want to make

23   sure before she goes on that we're going to be in compliance

24   with your ruling.  So what she's prepared to say is that when

25   she compared X and Y, she was able to determine that there was

1    sufficient agreement to enable her to be reasonably certain

2    that X was fired using Y.

3              THE COURT:  That's compliant.

4              MS. HOFFMAN:  Okay.  Thank you.  Just wanted to make

5    sure.

6              THE COURT:  That's the ruling.

7              (The following proceedings were had in open court.)

8              THE COURT:  Government may call their next

9    witness.

10             MS. HOFFMAN:  The government calls firearms examiner

11   Sandra Bohlen.

12             THE COURT:  Please come forward, ma'am, all the way

13   up here to the front to the witness box.  Stop there and turn

14   and face our clerk.

15             THE CLERK:  Ma'am, if you would please raise your

16   right hand.

17                         SANDRA BOHLEN

18   called as a witness, being first duly sworn, was examined and

19   testified as follows:

20             THE WITNESS:  I do.

21             THE CLERK:  Thank you, ma'am.  You may have a seat

22   in the witness box and watch your step.  And if you would

23   please speak directly into the microphone, state your first

24   and last name and spell your first and last name.

25             THE WITNESS:  My name the Sandra Bohlen,

1    S-a-n-d-r-a; last name is spelled B-o-h-l-e-n, Bohlen.

2              THE COURT:  B-o-h-l-e-n.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Your witness, Ms. Hoffman.

5                        DIRECT EXAMINATION

6    BY MS. HOFFMAN:

7    Q    Good afternoon.  Where do you work, Ms. Bohlen?

8    A    I'm actually the supervisor of the firearms laboratory

9    for the Baltimore Police Department.

10   Q    And can you tell the ladies and gentlemen of the jury a

11   little bit about what your job entails?

12   A    Yes.  Well, in addition to supervising the firearms unit,

13   I am also a firearms examiner myself.  And that entails

14   analyzing any firearms evidence that may come into the

15   laboratory.  That may be a firearm itself or it may be fired

16   ammunition components that we try to determine whether or not

17   they were fired with the same firearm or not.

18   Q    How long have you been employed with the Baltimore Police

19   Department's Firearms Examination Unit?

20   A    Actually with the police department over 27 years and

21   I've been with the firearms unit for about 23.

22   Q    Do you have specialized training that assists you in the

23   performance of your duties?

24   A    Absolutely.  It's very extensive training to become a

25   firearms examiner.  I can go over all of that with you, if you

Direct Examination - Bohlen (By Ms. Hoffman)

1    like.

2    Q    That would be great.

3    A    First of all, I have a bachelors of science in biology

4    from Salisbury University.  I've attended numerous armor's

5    courses for various firearms.  I can list all of those for

6    you.  For the Walther P series pistol from Inner Arms; for all

7    of the Glock pistols from Glock, Incorporated.  Excuse me,

8    apparently I'm losing my voice.  From Savage Arms for the

9    Savage Bolt Action rifles; from Smith and Wesson for the P

10   series pistols as well as -- I'm sorry, that was Ruger for the

11   P series pistol as well as the 1200 series shotgun.  For Smith

12   and Wesson for the Sigma series pistol; from Beretta for the

13   92 and 96 series pistols as well as the 1200 series shotgun.

14        Other courses I've attended are the FBI Gunshot and Gun

15   Powder Residue course.  The IBIS, which is the Integrated

16   Ballistic Identification System, which is a computer system

17   that we have within the laboratory course for operation of

18   that system.  Additionally, the ATF Serial Number Restoration

19   course.  I've toured the facilities of various firearms

20   manufacturers and that's to observe the manufacturing

21   processes of those manufacturers.  I can list those for you as

22   well, those are Inner Arms, Beretta USA, Mossberg and Son,

23   Colt, Ruger, Smith and Wesson, Wilson Arms, and also the

24   Winchester Olin manufacturing facility.

25        I've conducted thousands of hours of microscopic

Direct Examination – Bohlen (By Ms. Hoffman)

1    comparisons on fired ammunition components.  And finally, I've

2    testified as an expert well over 100 times in firearms

3    identification and circuit district and federal court in

4    Baltimore City.

5    Q    Thank you, Ms. Bohlen.  And just so you know, there is a

6    pitcher of water next to you.

7    A    I would actually appreciate that at this point.

8    Q    I think there are cups there too.

9    A    Right here.

10   Q    Take your time, please.

11             MS. HOFFMAN:  Your Honor, actually, at this point I

12   would ask that firearms examiner Sandra Bohlen be admitted as

13   an expert in the field of firearms examination and analysis.

14             THE COURT:  Any voir dire?

15             MR. O'TOOLE:  No, Your Honor.

16             MR. BUSSARD:  Your Honor, no objection subject to

17   the -- what are the limitations.

18             THE COURT:  Yes.  Any voir dire?

19             MR. BUSSARD:  No, Your Honor.

20             THE COURT:  Mr. Francomano.

21             MR. FRANCOMANO:  No, Your Honor.

22             THE COURT:  Any objection on behalf of Mr. Johnson?

23             MR. ENZINNA:  No, Your Honor.

24             THE COURT:  On behalf of Mr. Jones?

25             MR. BUSSARD:  Again, only subject to what we

1    discussed.

2              THE COURT:  And on behalf of Mr. McCants?

3              MR. FRANCOMANO:  No, Your Honor.

4              THE COURT:  Very well.  Ladies and gentlemen, the

5    witness, Ms. Bohlen, has been offered to you and the Court as

6    a potential expert witness.  An expert witness is a witness

7    who's allowed to express his or her opinion on those matters

8    which he or she has special knowledge and training.  Expert

9    testimony is presented to you and the rules permit it, on the

10   theory that someone who is experienced in the field can assist

11   you in understanding the evidence or in reaching an

12   independent decision on the facts.

13             We permit expert testimony on topics where the

14   regular ordinary juror probably lacks the technical or

15   specialized knowledge or education or experience to on their

16   own be able to assess the evidence independently.  So expert

17   witnesses are permitted in those special circumstances where

18   the Court determines that the jury would probably be assisted

19   in their consideration of the evidence by the expertise that

20   the expert can offer.

21             Again, an unusual circumstance with respect to

22   expert witnesses is that they are permitted to provide their

23   opinion with respect to certain matters that might be relevant

24   to the proceedings in ways that regular lay witnesses are not

25   permitted to provide an opinion.  In weighing an expert's

1    testimony, you should consider the expert's qualifications,

2    his or her opinions, his or her reasons for testifying, as

3    well as all the other considerations that ordinarily apply

4    when you're deciding whether or not to believe a witness's

5    testimony.  You may give the expert testimony whatever weight,

6    if any, you find it deserves, in light of all of the evidence

7    in the case.

8              You should not, however, accept an expert witness's

9    testimony merely because they have been acknowledged by the

10   Court as an expert.  Nor should you substitute it for your own

11   reason, judgment, and common sense.  The determination of the

12   facts in the case rests exclusively and solely with you.  It

13   is my finding that Ms. Bohlen is qualified to testify as an

14   expert in the field of firearms -- was it also ammunition?

15             MS. HOFFMAN:  Firearms examination and analysis,

16   which I think includes ammunition and ammunition components.

17             THE COURT:  Well, I will expand it to include that

18   for -- explicitly, firearms examination, ammunition and

19   ammunition components, examination, and analysis.  She's

20   permitted to testify as an expert in that specified field and

21   to offer expert opinions within that field.  You may

22   inquire.

23             MS. HOFFMAN:  Thank you, Your Honor.

24   Q    (BY MS. HOFFMAN)  Ms. Bohlen, I'd like to ask you about

25   how a cartridge is structured and I believe you may have

1    brought a diagram with you; is that right?

2    A    I do have a diagram of a cartridge.

3              MS. HOFFMAN:  May I approach?

4              THE COURT:  Yes.

5              MS. HOFFMAN:  I'm going to put it on the screen up

6    here.

7              THE COURT:  Well, let's mark it and it's for

8    demonstrative purposes only.  Any objection to it being

9    displayed?

10             MR. BUSSARD:  We haven't seen it yet.

11             THE COURT:  I thought she just showed it to you, I'm

12   sorry.

13             MR. BUSSARD:  I'm sorry, I was looking at --

14             MR. ENZINNA:  We have no objection.

15             THE COURT:  Any objection?

16             MR. BUSSARD:  No objection.

17             THE COURT:  Mr. Francomano.

18             MR. FRANCOMANO:  No objection.

19             THE COURT:  This is not being received in evidence,

20   but it's permitted to be shown to the jury for demonstrative

21   purposes to aid the witness in her testimony.

22             MS. HOFFMAN:  I'm going to mark it as

23   Government's Exhibit DEM 11.

24             THE COURT:  DEM 11.

25   Q    (BY MS. HOFFMAN)  Ms. Bohlen, can you see that okay on

1    the screen in front of you?

2    A    I can.

3    Q    Okay.  Thank you.  Can you explain to the members of the

4    jury how a cartridge is structured?

5    A    Certainly, so a cartridge is what some people might refer

6    to as a bullet, mistakenly.  A cartridge is unfired

7    ammunition.  It's in its full sense before it's been fired in

8    a firearm.  Sometimes people refer to them as bullets though,

9    even though they're -- that's not really correct.  So a

10   cartridge is made up of numerous parts.  The cartridge case,

11   which in this diagram is the silver portion to the left, I

12   think you can see it's -- it's got a label to it.  And bear in

13   mind that this actual diagram is a cutaway, so the left half

14   would be what you would see, and then if you cut through the

15   middle of the cartridge, you would see the internal parts of

16   everything and that's on the right-hand side.

17        So the cartridge case is on the left-hand side.  And

18   it actually holds the bullet, which is the copper colored item

19   that's loaded down into the cartridge case.  It also has

20   powder within the cartridge.  It's actually below the bullet

21   in the cartridge case.  And the cartridge case also has a

22   primer at the very bottom of it.  So those are all the parts

23   of the cartridge.

24   Q    Thank you.  Are cartridge cases sometimes referred to as

25   shells or shell casings?

Direct Examination - Bohlen (By Ms. Hoffman)

1    A    Yes, they are.

2    Q    Can you explain to the jury the difference between a

3    revolver and a semi-automatic firearm?

4    A    Sure.  Well, a revolver is what you would typically think

5    of if you were to watch maybe an old west type movie.  A

6    revolver has what's known as a cylinder in it, which it's

7    round and the cartridges load in the cylinder.  And during

8    firing the cylinder actually revolves, which is where the name

9    of the firearm comes from.  So each time the trigger is pulled

10   the cylinder will revolve, allowing the next cartridge under

11   the hammer to be discharged.  Now, what's special about a

12   revolver is, once you've discharged all of the cartridges, the

13   cartridge cases remain in that cylinder until you remove them

14   physically.

15         Now, the other type of firearm is a semi-automatic.

16   A semi-automatic pistol has an entirely different loading type

17   of mechanism.  It uses what's known as a magazine.  And a

18   magazine is basically a metal column that has a spring inside

19   of it that the cartridges are loaded, stacked one on another

20   on top of.  The magazine is typically loaded into the grip of

21   the firearm.  And when the slide is pulled to the rear and

22   then allowed to go forward, it strips one of the cartridges

23   off into the chamber.

24         When the firearm is discharged, that explosion

25   causes that slide to move to the rear again, the cartridge

Direct Examination – Bohlen (By Ms. Hoffman)

1    case is ejected out of the firearm, which remember as we said,

2    those cartridge cases remain in the revolver, but they're

3    ejected out of the semi-auto.  When the slide comes back

4    forward again, if there's more ammunition, it will pull a

5    cartridge into the chamber again.  With each pull it will

6    either discharge or you run out of ammunition, so.

7    Q    Thank you.  So when a semi-automatic firearm is fired,

8    presumably the casings will be ejected somewhere in the

9    vicinity of where the gun is fired; is that right?

10   A    Yes.  Without any other external forces involved.  They

11   could be kicked or blown or any numerous number of things.

12   But yes, if nothing else happens to them, they should be, you

13   know, fairly close to the discharge.

14   Q    Now, you mentioned that you conduct comparisons of

15   firearms and ammunitions components; is that right?

16   A    That's correct.

17   Q    And how do you conduct that analysis?

18   A    Okay.  We should probably talk about firearms

19   identification at its very base.  So firearms identification,

20   the basis for it is that during the manufacturing of the

21   firearm, different portions of the firearm receive tool marks

22   from that manufacturing process.  Those tool marks, later when

23   the gun is assembled and fired, those tool marks can be

24   actually transferred or imparted onto the different parts of

25   the cartridge case.  The bullet traveling down the barrel will

1    receive tool marks potentially from the barrel when it was

2    manufactured.  And the cartridge case will receive tool marks

3    from the manufacturer of the breach face and from the firing

4    pin and other portions of the gun.

5         So we -- that's what we look for, we look for those tool

6    marks.  Microscopic comparisons conducted on a large

7    comparison microscope that allows us to put two cartridge

8    cases or two bullets on side by side and that's what we're

9    looking for when we conduct those comparisons, those

10   microscopic tool marks, to try to determine whether or not two

11   cartridge cases or two bullets were fired with the same

12   firearm.

13   Q    Can you explain to the members of the jury what test

14   firing is?

15   A    Yes.  Well, we conduct test fires of firearms for

16   operability, and we also have to conduct that to capture

17   cartridge -- test fire cartridge cases or test fire bullets

18   from a particular firearm to be able to conduct that

19   microscopic comparison between a potential evidence cartridge

20   case or bullet and the test fired cartridge case or bullet

21   from a firearm.  We have a water tank within the laboratory

22   that we test fire the firearm into, and then we can collect

23   the bullets and the cartridge cases.

24   Q    So the -- is the ammunition -- are the ammunition

25   components compared directly to the firearm?

1   A    No.  No, that's -- there's nothing to compare directly.

2   So like I said, we have to test fire the firearm to get

3   something to compare against the cartridge cases and bullets.

4   So we test fire, you know, a cartridge in the firearm,

5   retrieve the test-fired cartridge cases to allow us to compare

6   them to evidence cartridge cases and retrieve the test-fired

7   bullets to allow us to compare to evidence bullets.

8   Q    And you mentioned the word tool marks, can you explain to

9   the members of the jury what rifling characteristics are?

10  A    Yes.  So in rifled firearms -- not all firearms are

11  rifled.  The most common example of a non-rifled firearm is a

12  shotgun, although there are actually some rifled shotguns as

13  well.  Rifling is composed of what's known as lands and

14  grooves, down the barrel of a firearm.  The land is actually a

15  raised portion within the barrel, and the groove is the

16  portion that's not raised.  Different manufacturers place

17  different numbers, different sizes of these lands and grooves

18  within the barrel.

19      And they also have a twist to them.  So that twist

20  actually imparts a spin to the bullet to give it a straighter

21  trajectory to its target.  So if you hear someone say that the

22  bullet or that gun is six lands and grooves to the right hand

23  of twist or six right, that's what they're talking about,

24  they're talking about the rifling within the barrel.

25  Q    Now, you mentioned that you use a microscope to try to

1   determine whether certain ammunition components are fired with

2   a certain firearm.  Are you always able to make a conclusion

3   about the markings on every ammunition component?

4   A    No.  No, we can't always make a conclusion.  Really we

5   can only say a few things.  We can say yes, it was fired with

6   the same gun; no, it wasn't fired with the same gun --

7              MR. BUSSARD:  Objection, Your Honor.

8              THE COURT:  Sustained.

9   Q    (BY MS. HOFFMAN)  And just to be clear --

10             THE COURT:  Ladies and gentlemen, the last two

11  answers that you heard you should strike from your memory.  A

12  notion that the expert can say that the bullet was -- the

13  round was fired with the same gun, that's ordered stricken.

14  Next question.

15  Q    (BY MS. HOFFMAN)  Ms. Bohlen, can you ever tell with 100

16  percent certainty whether a particular ammunition components

17  were fired with a particular gun?

18             MR. BUSSARD:  Objection.

19             THE COURT:  I have to hear the answer.

20  A    Because I can't have seen every single cartridge case or

21  bullet or test-fired cartridge case, then no, not with 100

22  percent certainty.

23             THE COURT:  Overruled.  You may inquire.

24  Q    (BY MS. HOFFMAN)  I believe you were explaining that

25  there are times when you cannot make a comparison, and why

1    might you not be able to make a comparison?

2    A    Certainly items could be damaged, too damaged to be able

3    to make a conclusion.  Also, not all firearms mark very well.

4    So potentially there may not be enough marks even if the items

5    aren't damaged to be able to make a conclusion.

6    Q    Can you tell the members of the jury what a CC number

7    is?

8    A    Yes.  A CC number stands for central complaint number.

9    For the Baltimore Police Department the complaint number at --

10   it's changed recently, but historically, it was composed of

11   the year, which was two digits, the district, which was one

12   numerical digit for the district that it occurred in, the

13   letter of the alphabet of the month, A for January, and then

14   the number of cases for that month would be the rest of the

15   number.

16   Q    Thank you.  And when you examine firearms evidence, does

17   it come to you with a particular CC number?

18   A    Yes, it does.

19   Q    And is that how you're able to determine where it comes

20   from?

21   A    Yes.

22   Q    I'd like to ask you about CC number 075A03994, which has

23   previously been identified as the homicide of

24   Gregory Rochester.

25               MR. BUSSARD:  Objection, characterization.

1          THE COURT:  You may approach.

2          (Bench conference on the record.)

3          THE COURT:  Ms. Hoffman, refresh my memory about how

4     that number was characterized by the homicide of

5     Mr. Rochester.

6          MS. HOFFMAN:  It was actually Detective Lloyd, I

7     think, who testified to that.  So I can have her -- I can put

8     something in front of her and have her explain that herself if

9     that's better.

10         MR. BUSSARD:  Well, it was the way it came out.  It

11    said "and is this the murder of," it should be the number

12    associated with the investigation of the murder.

13         MS. HOFFMAN:  Oh, yeah.

14         THE COURT:  That's fair.  Rephrase your --

15    sustained, rephrase your question.

16         (The following proceedings were had in open court.)

17         THE COURT:  Sustained.  You may rephrase your

18    question.

19  Q    (BY MS. HOFFMAN)   Ms. Bohlen, were you asked to examine

20    firearms evidence connected to the CC number associated with

21    the homicide of Gregory Rochester?

22  A    Could you --

23         MR. BUSSARD:  Objection, Your Honor.

24         THE COURT:  Sustained.  You can rephrase.

25  Q    (BY MS. HOFFMAN)  Ms. Bohlen, I'd like to show you

1   Government's Exhibit 25, which has previously come into

2   evidence and it's been identified as cartridge casings and

3   cartridge from the scene of the Gregory Rochester homicide.

4            MR. BUSSARD:  Objection, Your Honor.

5            THE COURT:  Overruled.

6   A    Would you like me to open it?

7   Q    (BY MS. HOFFMAN)  Yes, that would be great.  Thank you.

8   Were you asked to examine this firearm's evidence?

9   A    I was.

10  Q    Can you tell us what the firearms evidence consists of?

11  A    Yes.  There are five 9mm cartridge cases and a live

12  cartridge as well.

13  Q    Now, before we get into your analysis, I want to ask you

14  one more definitional question.  Can you explain the

15  difference between a bullet specimen and a lead fragment?

16  A    Sure.  So if we look –– let's look back at the diagram of

17  the cartridge again.  So the bullet, like I said, it –– bear

18  with me because it is cut away, but if you see that the –– if

19  the bullet were whole, it would be completely covered in that

20  copper jacket, is actually what that's called, a copper jacket

21  of material.  But inside of that is typically a softer metal,

22  which composes the core of the bullet.  That's typically lead

23  or like I said, some other soft metal.

24        So when a bullet impacts something, it potentially breaks

25  apart.  We could have a bullet that stays fairly whole and

Direct Examination - Bohlen (By Ms. Hoffman)

1    that would be -- what we would have as -- what would be called

2    a bullet specimen.  But if that bullet breaks apart and the

3    jacket separates, we potentially only have a piece of lead

4    from that core.  And that's what would be considered a lead

5    fragment.  It's typically not much left of it.

6    Q    And so when you testified earlier that you're not always

7    able to make a comparison, are you sometimes not able to make

8    comparisons when all you have is a lead fragment?

9    A    Yes.  I mean, if you think about what a lead fragment

10   actually is, it never even would have come in contact with any

11   portion of the gun.  It was inside the bullet as it traveled

12   down the barrel.

13   Q    Now, you referred a moment ago to the casings being 9mm

14   caliber, what does the term caliber refer to in relation to a

15   gun or bullet?

16   A    In the most general terms it's the size of it.  Firearms

17   are manufactured to hold basically -- or fire a certain size

18   ammunition.  And 9mm happens to be the size of these.

19   Q    All right.  I'd like to approach and show you

20   Government's Exhibit -- well, first of all, I'm going to show

21   you Government's Exhibit PHE, as in photos of evidence, 25.

22   What are we looking at here?

23   A    Yes, this is a -- that's a photograph of the evidence I

24   have here.

25   Q    Okay.  And I'd like to approach now and show you

Direct Examination – Bohlen (By Ms. Hoffman)

1    Government's Exhibit No. 23, which has previously been

2    admitted into evidence as the casing from the scene of the

3    Antonio Oliver shooting.  And feel free to open it up and look

4    inside.  I'm also going to show you on the screen here

5    Government's Exhibit PHE 24.  And what are we looking at

6    here?

7    A    Yes, that's a photograph of the evidence that I have in

8    my hand.

9    Q    Ms. Bohlen, were you asked to conduct a comparison

10   analysis of this firearms evidence?

11   A    I was.

12   Q    And did you create a report or reports to document your

13   analysis?

14   A    I did.

15   Q    And when you conduct a comparison, do you do that by

16   yourself or do you have someone else do it with you?

17   A    No.  We have co-examiner that conducts their own

18   examination of the evidence.  Basically, the only thing that

19   the co-examiner doesn't do independently would be -- whoever's

20   the examiner, whoever's case it is, they first receive the

21   evidence, they mark the evidence, if any evidence needs to be

22   decontaminated, they do that.  They first conduct the

23   microscopic comparisons, and then the co-examiner conducts

24   their own microscopic comparisons.  Once both conclusions have

25   been determined and they determine that they agree upon the

Direct Examination – Bohlen (By Ms. Hoffman)

1    conclusion, then the initial examiner, which is me in these

2    cases, writes the reports.  And then the co-examiner will

3    review the reports to ensure that they say in fact what they

4    want them to say, what was agreed upon from the comparisons,

5    and they sign the report.

6    Q    I'm going to show you for identification only what's been

7    marked as Government's Exhibit BR 1.  Are these the reports

8    that you authored with respect to this firearms comparison

9    analysis?

10   A    Bear with me, there's a lot of pages here.

11        MR. BUSSARD:  Your Honor, can we approach for a

12   minute while she's examining?

13        THE COURT:  Yes.

14        (Bench conference on the record.)

15        MR. BUSSARD:  Your Honor, I realize we're at the

16   stage of only identification, but the word "determined if

17   matched and fired" is on here and then it goes on to talk

18   about other matches.  There --

19        MS. HOFFMAN:  We're not offering it in evidence.

20        THE COURT:  You're not going to offer this report.

21        MS. HOFFMAN:  In case she needs to refer to it.

22        THE COURT:  I can't imagine a scenario in which the

23   content of this report is coming into evidence.  She can

24   refresh her recollection with it as necessary and she by now

25   should be aware that any term like "match," "identification,"

1    "same gun," that sort of thing is going to be a problem.  All

2    right.

3            (The following proceedings were had in open court.)

4            THE COURT:  You may inquire.

5    Q    (BY MS. HOFFMAN)  Ms. Bohlen, are these the -- is BR 1

6    the reports that you authored with respect to this firearms

7    comparison analysis?

8    A    Yes.

9    Q    And I'd like to start with Government's Exhibit 25, which

10   was the five -- what you identified as the five 9mm cartridge

11   cases and one 9mm cartridge from the scene of the

12   Gregory Rochester homicide.  Can you first start by describing

13   your analysis and conclusions with respect to just that

14   evidence?

15   A    Yes.  So the five 9mm cartridge cases, those were all

16   microscopically, and the conclusion is, in my opinion, that

17   the cartridge cases were fired with the same unknown

18   firearm.

19   Q    And you testified earlier that you can never be 100

20   percent certain; is that right?

21   A    Correct.

22   Q    And so --

23            MR. BUSSARD:  Objection, Your Honor.

24            THE COURT:  Sustained.

25            MR. BUSSARD:  Can we approach, Your Honor?

Direct Examination - Bohlen (By Ms. Hoffman)

1          THE COURT:  Yes.

2          (Bench conference on the record.)

3          THE COURT:  I'm about to strike her testimony.

4          MS. HOFFMAN:  I can just ask her, were you able to

5    conclude to a reasonable degree of certainty whether they were

6    fired with the same firearm.

7          THE COURT:  That's fine.

8          MS. HOFFMAN:  But she has to use the word "same."

9          THE COURT:  Yes.  Same's not the problem.  It's that

10   it needs to be qualified.

11          MS. HOFFMAN:  Right.

12          THE COURT:  With the true capability of the

13   science.

14          MS. HOFFMAN:  Right.

15          THE COURT:  As determined by the Court, not by

16   her.

17          MS. HOFFMAN:  And I think she --

18          THE COURT:  That's what -- that's what her testimony

19   periodically does not come forth with.  So I'll allow you to

20   lead her and we'll see if you are able to accomplish what

21   you're trying to achieve through that method.  But the

22   difficulty is that the witness doesn't seem to embrace the

23   ruling of the Court.  And I don't know how else to make it

24   more clear.  We dealt with this on a pretrial basis.

25   Judge Grimm's opinion has been published.  This court has

1    adopted it.  It's the law.  She doesn't have the freedom, nor

2    does the government, to try to take the evidence in a place

3    that's noncompliant with the law.

4        MS. HOFFMAN:  And I don't think she intends to.  I

5    think she agrees that you can't be 100 percent certain and

6    she's trying to figure out a way to say it.

7        THE COURT:  Well, not 100 percent certain is not the

8    standard.  The standard is that an expert may be able to say,

9    at the high water mark, that within a reasonable degree of

10   certainty, she concludes that the shell casing came from the

11   same gun.  But every time "same" is used, there needs to be --

12   it needs to be qualified by a reasonable degree of certainty,

13   reasonable degree of forensic certainty, reasonable degree of

14   ballistics certainty.  And words like "match," "identified,"

15   those kinds of absolute terms are not appropriate in light of

16   the foundation.  So --

17       MS. HOFFMAN:  So each time --

18       THE COURT:  It's the Court's determination that the

19   most efficient way for this issue to be handled, moving

20   forward from here in these circumstances is, I'm going to

21   permit the government to lead the witness.  The justification

22   for allowing the leading is that I'm convinced that this

23   witness personally believes that it is a match and that it is

24   identified.  So there's no danger here that in the

25   government's leading, that the witness is going to be caused

1    to say something that she doesn't otherwise believe.  In other

2    words, the ordinary danger associated with a leading question,

3    that is, that the government is actually supplying the answer

4    to the question, doesn't exist here.

5           There's ample evidence that the witness actually

6    believes something even beyond what the Court is prepared to

7    accept.  That's why it is an odd circumstance where the

8    leading of the witness on this narrow question is

9    non-problematic.  Therefore, lead her.  Use the standard

10   yourself, just elicit yes and no answers from her.

11          MR. BUSSARD:  With all respect, I respectfully

12   disagree.  I object to leading questions.  I understand the

13   Court's ruling.

14          THE COURT:  You have your objection.

15          MR. FRANCOMANO:  We join that objection.

16          THE COURT:  All counsel object to the leading of the

17   expert despite the government's -- Court's explanation why

18   it's being permitted.  Those objections are overruled.

19          (The following proceedings were had in open court.)

20          THE COURT:  Next question.

21   Q    (BY MS. HOFFMAN)  Ms. Bohlen, were you able to determine

22   to a reasonable degree of certainty whether those five 9mm

23   cartridge cases were fired with the same unknown firearm?

24          THE COURT:  That's a yes or no question.

25   A    Yes.

Direct Examination - Bohlen (By Ms. Hoffman)

1   Q     (BY MS. HOFFMAN)  Ms. Bohlen, did you also compare the

2   five 9mm cartridge cases, which are Government's Exhibit 25,

3   to the one 9mm cartridge case that is

4   Government's Exhibit 24?

5   A     Just to be clear, that's from CC number 073A01853.

6   Q     That's correct.

7   A     Yes, I did make a comparison.

8   Q     Can you tell us whether you were able to -- and again,

9   I'm looking for a yes or no answer, were you able to determine

10  to a reasonable degree of certainty whether those -- the

11  casing from CC number 073A1853 was fired with the same firearm

12  as the casings from CC number 075A03994?

13  A     Yes.

14  Q     And were you able to conclude that based on a microscopic

15  comparison that you described earlier?

16  A     Yes.  The comparison conducted both by myself and my

17  co-examiner.

18  Q     Did there come a point in time when you were asked to

19  compare these cartridge casings with test-fired cartridge

20  casings from an actual firearm?

21  A     Yes, there did come a time.

22          THE COURT:  You may approach.

23          (Bench conference on the record.)

24          THE COURT:  It would be inappropriate for the Court

25  to weigh into the questioning process with any intention of

1    assisting either party in trying to accomplish their purposes

2    in the examination that is being conducted.  However, the

3    Court does have a responsibility during the course of a trial

4    in listening to the questioning that is occurring, to assist

5    the process from the perspective of the jury in understanding

6    exactly what is being asked and what is being answered.  In

7    that spirit, I point out to you, Ms. Hoffman, that you have

8    asked --

9         MR. O'TOOLE:  Your Honor, I would just like to say

10   that I object.

11        THE COURT:  I understand.  That's why I preceded the

12   statement with the finding that I've just made, that there is

13   a responsibility on the part of the Court to ask -- to

14   highlight those matters where there is simply, created

15   perhaps, inadvertently confusion in the information that was

16   being presented to the jury.  So the objection is noted and

17   overruled.  Ms. Hoffman, I note that you have asked whether

18   the expert was able to make the comparison and the expert has

19   responded that she was.  No evidence has been presented though

20   as to what the result of that comparison was, only whether she

21   was able to make a comparison.  That's pointed out for the

22   benefit of the jury, that I believe is left hanging in this

23   circumstance and not understanding what has been presented to

24   them.

25        MR. ENZINNA:  Your Honor, while we're here on this

Direct Examination – Bohlen (By Ms. Hoffman)

1    issue, I just want to note the last time we were up here, we

2    objected to the witness's testimony about the casings coming

3    from the same firearm and I believe that that testimony was

4    stricken.

5            MS. HOFFMAN:  It's --

6            MR. ENZINNA:  I would just note that the last time

7    we objected up at the bench in response to a response --

8            THE COURT:  I remember it.

9            MR. ENZINNA:  The bullets came from the same firearm

10    and I would ask that that testimony be stricken.

11            THE COURT:  I understand your position.  I would

12    have granted the motion then.  Now too much time has passed to

13    re -- to return to that subject.  It's my finding would simply

14    re-emphasize something that probably shouldn't have come in,

15    but wasn't the subject of a motion to strike, an objection was

16    granted -- or an objection -- yes, was granted but no motion

17    to strike was made, so none was granted.  Now to return to

18    that would simply confuse the jury.  So the request is denied.

19            MR. BUSSARD:  Your Honor, I join with the objection,

20    however, of Mr. Enzinna.

21            THE COURT:  About the motion to strike?

22            MR. BUSSARD:  Yes.

23            THE COURT:  And does Mr. Francomano?  All denied.

24            MR. BUSSARD:  Can I just have clarification on CC

25    number ending in 53, is that Oliver?

1          MS. HOFFMAN:  Yeah, I can clarify that.

2          MR. BUSSARD:  What about 79, then, it was Fenner?

3          MS. HOFFMAN:  Fenner is 1479.

4          MR. BUSSARD:  79.

5          (The following proceedings were had in open court.)

6     Q    (BY MS. HOFFMAN)  Ms. Bohlen, I asked you whether you

7     were able to determine to a reasonable degree of certainty

8     whether the 9mm casings from the Gregory Rochester homicide

9     were fired with the same unknown firearm as the casing from

10    the Antonio Oliver shooting, but I failed to follow up and ask

11    you, what was your conclusion, again, to a reasonable degree

12    of certainty?

13         MR. BUSSARD:  Objection, Your Honor.

14         THE COURT:  Overruled.

15    A    That the five cartridge cases from 075A03994 and 07 --

16    and the one cartridge case from 073A01853 were fired with the

17    same unknown firearm.

18    Q    (BY MS. HOFFMAN)  And when you --

19         MR. BUSSARD:  Objection, Your Honor.

20    Q    (BY MS. HOFFMAN)  And implicit in my question was that

21    you were able to determine that with a reasonable degree of

22    certainty; correct?

23    A    Correct.

24         MR. BUSSARD:  Objection, Your Honor.

25         THE COURT:  Ladies and gentlemen, the expert is

1    testifying generally in the field of forensic -- firearms

2    forensics comparison between ammunition fired from the same

3    weapon, different weapons, and so forth.  It is the Court's

4    finding and you're required to take this view into

5    consideration.  This is a legal instruction, that the science

6    with respect to which the expert is testifying is only so

7    precise.  Despite what the expert might testify to, whether

8    inadvertently or advertently, the science in which she is

9    engaged is incapable of determining with absolute certainty

10   that a shell casing or a bullet came from the same gun as some

11   other shell casing or bullet did.  The high water mark of that

12   science, the best it can achieve, is that an expert can

13   testify, can find from an examination that they've conducted,

14   that within a reasonable degree of forensic certainty a shell

15   casing or the bullet came from the same gun.  Within a

16   reasonable degree of certainty, but not absolute certainty.

17   The science is not capable of that.  And I so instruct you.

18   Next question.

19   Q    (BY MS. HOFFMAN)  Ms. Bohlen, did there come a point in

20   time when you were asked to compare the cartridge casings

21   we've been talking about to test-fired cartridge casings from

22   an actual firearm?

23   A    There was a time, yes.

24   Q    And was that firearm recovered -- was that the firearm

25   recovered in association with CC number 073C01479?

Direct Examination – Bohlen (By Ms. Hoffman)

1    A    Yes.

2    Q    What kind of firearm was it?

3    A    Sig Sauer model P 226 pistol.

4    Q    And can you describe your analysis with respect to that

5    comparison, just the analysis?

6    A    Yes.  Well, as we discussed before, so we want to compare

7    cartridge cases to a firearm.  So we need to get cartridge

8    cases from the firearm.  So the firearm is test fired to get

9    those cartridge cases to be able to make that comparison.  So

10   once that's done, then cartridge cases are all marked and that

11   comparison is conducted on the comparison microscope, evidence

12   cartridge case to a test-fired cartridge case.

13   Q    And were you able to determine to a reasonable degree of

14   certainty whether the cartridge casings from the

15   Antonio Oliver shooting, which is CC number 073A1853,

16   cartridge casings from the Gregory Rochester murder, which is

17   CC number 075A03994, were fired with the same firearm?

18            MR. BUSSARD:  Objection, Your Honor.

19            THE COURT:  Overruled.

20   Q    (BY MS. HOFFMAN)  Associated with CC number 073C01479?

21   A    Yes, that's correct.

22            THE COURT:  To a reasonable degree of forensic

23   certainty only?

24            THE WITNESS:  To a reasonable degree of certainty.

25   Q    (BY MR. MARTINEZ)  Was there another firearm recovered

1    associated with that same CC number that you also compared?

2    A    There was.

3    Q    And what firearm was that?

4    A    There was a Taurus revolver, .38 revolver recovered.

5    Q    And did you conduct the same analysis with respect to

6    that firearm?

7    A    Yes, I did.

8    Q    And what were your conclusions with respect to that

9    firearm?

10   A    Well, in reference to the revolver, if you recall,

11   typically you may not have cartridge cases to compare and it's

12   a revolver because they remain in the gun.  So in reference to

13   the comparison for the revolver, it was actually a bullet

14   specimen that was compared against test-fired bullets from the

15   Taurus revolver.  And the conclusion regarding the bullet

16   specimen to the gun was that we really couldn't tell.  We

17   couldn't identify or eliminate that bullet as having been

18   fired with that gun.

19   Q    Now, one final question, Ms. Bohlen, do your microscopic

20   comparisons tell you who pulled the trigger?

21   A    Absolutely not.

22        MS. HOFFMAN:  No further questions.

23        THE COURT:  So ladies and gentlemen, we'll take our

24   afternoon recess.  During this recess do not discuss the case

25   with anyone.  Do not discuss the case even among yourselves.

1    Do not allow yourselves to be exposed to any news articles or

2    reports that touch upon the case or the issues it presents or

3    any articles or reports that relate to any of the participants

4    in case.  Avoid all contact with any of the participants in

5    the trial.  Do not make any make independent investigation of

6    the law or the facts of the case.  Do not look up anything on

7    the internet related to this case or its participants.  Do not

8    consult an encyclopedia or a dictionary.  15 minutes.  Please

9    take the jury out.

10               (Jury left the courtroom.)

11               THE COURT:  Ms. Bohlen, you may step down.  You're

12   required to return in 15 minutes.  One matter that I want to

13   address with the government that's been slipping my mind with

14   respect to these multi-page exhibits, it's not going to work

15   to have individual photographs that aren't separately marked.

16   I doubt there's anything you can do about it today.  And maybe

17   you're not going to get into any such exhibits beyond today.

18   But after today, beginning next week, no more pages that don't

19   have their own submarking on them.  Otherwise, how do we make

20   a record?  We can't say one of the pages in -- you know,

21   there's no way for the Court of Appeals to make any sense of

22   that.  It's got to be right down to the actual -- the actual

23   page has got to have an identifier on it.

24               MS. HOFFMAN:  We can fix that problem.

25               THE COURT:  15 minutes.

1          MR. BUSSARD:  Your Honor, could I just very briefly?

2          THE COURT:  Yes.  Still on the record.

3          MR. BUSSARD:  The Exhibit BR 1, we've had testimony

4    about the Rochester murder that -- and CC number ends in

5    994.

6          THE COURT:  I think it would also be helpful outside

7    the hearing of the jury to correlate the Rochester homicide to

8    the nickname because it's so regularly referred to by that

9    name, so please use both names.  Go ahead.

10          MR. BUSSARD:  There's also a reference to the 70.

11          THE COURT:  I don't think you heard me,

12    Mr. Bussard.

13          MR. ENZINNA:  Craig Mack.

14          THE COURT:  The Rochester a/k/a Craig Mack homicide.

15    Go ahead.

16          MR. BUSSARD:  There's also a reference to --

17          THE COURT:  It's Craig not Greg; right?

18          MR. ENZINNA:  Craig with C.

19          MR. BUSSARD:  There's also a reference to the CC

20    number ending in 79, which was Fenner, the traffic stop we

21    heard about earlier today.  There was also reference to --

22          THE COURT:  The recovery of the firearm.

23          MR. BUSSARD:  Yes, reference to the 53 CC number,

24    the one ending in 53, which is the Oliver shooting that

25    Detective Forsythe testified about.  There's no reference to

1    53, the 53 documents in this Exhibit BR 1, the 94 and 79 but

2    not the Oliver, so is there another -- another document.  Do

3    you understand --

4            THE COURT:  Refresh my memory, 53 is associated with

5    which incident?

6            MR. BUSSARD:  Oliver, the non -- the one

7    Detective Forsythe testified to --

8            THE COURT:  That's a single shell casing, non-fatal

9    shooting.

10           MR. BUSSARD:  Correct.

11           THE COURT:  Detective Forsythe.

12           MR. BUSSARD:  Yes.  And there's been testimony about

13   that, but in this exhibit, the 53 CC is not -- is not in here,

14   not in this exhibit.

15           THE COURT:  All right.  Well, perhaps that's

16   something you can take up with government counsel at a break

17   and see if you can't get that sorted out.  I think she just

18   purported to make -- have made a comparison between the single

19   shell casing that was recovered from the Oliver Street

20   shooting and offered the view within a reasonable degree of

21   forensic certainty that that shell casing had been ejected

22   from the weapon recovered from the car stop at Gay and

23   Oliver.

24           MR. MARTINEZ:  Your Honor, we have the document that

25   shows all three CC numbers.

1          THE COURT:  Out of the BR?

2          MR. MARTINEZ:  Out of BR 1.

3          THE COURT:  Okay.  Well, why don't you show

4    Mr. Bussard.  And I'll see if there's any continuing

5    controversy when I return to the courtroom.  Anything else we

6    need to address outside the hearing of the jury?

7          MR. MARTINEZ:  No, sir.

8          THE COURT:  Okay.  Who's going to cross-examine the

9    firearms examiner, are you Mr. O'Toole or you Mr. Enzinna?

10         MR. ENZINNA:  We will not.

11         THE COURT:  Neither of you will.  Mr. Bussard, you

12   will.

13         MR. BUSSARD:  Yes, sir.

14         THE COURT:  Mr. Francomano.

15         MR. FRANCOMANO:  No, Your Honor.

16         THE COURT:  Mr. Bussard, how long do you think?

17         MR. BUSSARD:  At most a half hour.

18         THE COURT:  About half an hour, so we probably have

19   time for another witness.

20         MR. MARTINEZ:  We have two more.

21         THE COURT:  Okay.  15 minutes.  Well, now it's ten

22   minutes.

23         (A recess was taken.)

24         THE COURT:  Are we ready for the jury?

25         MR. MARTINEZ:  Yes.

Cross-examination – Bohlen (By Mr. Bussard)

1          THE COURT:  Let's bring them.

2          (Jury entered the courtroom.)

3          THE COURT:  Be seated, please.  Ms. Bohlen, you

4    remain under oath.  Mr. Bussard, you may cross-examine.

5                    CROSS-EXAMINATION

6    BY MR. BUSSARD:

7    Q    Good afternoon, Ms. Bohlen.

8    A    Good afternoon.

9    Q    When you examined shell cartridge casings -- and I

10   apologize if I'm not the best with the terminology, but the

11   casings, and looking at your demonstration here, this would be

12   the casing?

13   A    That's correct, yes.

14   Q    Okay.  And this down here at the bottom?

15   A    Yes.  That's the picture without the bullet loaded in it.

16   Yes.

17   Q    And that's the part that on a semi-automatic pistol is

18   the part that's kicked out; is that right?

19   A    Correct.

20   Q    For want of a better word, it's ejected?

21   A    Ejected out of the firearm, yes.

22   Q    So when it's ejected, it hits the street, hits the

23   sidewalk, hits something?

24   A    Yes.

25   Q    And the part in a revolver, just to reiterate, this part,

1  this cartridge case, and this -- remain in the revolver; is

2  that correct?

3  A    Yes, until someone actually physically removes them,

4  yes.

5  Q    Now, when -- there's different kinds of identifying marks

6  that you look for on -- when you get a specimen?

7  A    Correct.

8  Q    And one of these is what's called a breach face?

9  A    Correct.

10  Q    And can you just briefly explain, breach face on it

11  occurs in semi-automatics; right?

12  A    No, breach face is pretty much in any firearm.

13  Q    Looking at your example again, is the breach face this

14  part back here?

15  A    Actually, the breach face is actually part of the gun,

16  okay.  So when the firearm is manufactured and that breach

17  face receives those tool marks that we talked about during the

18  manufacturing process, the breach face is actually the part

19  that the -- sir, if you'd put the diagram back up we could --

20  okay.  Is actually the portion at the very base of that

21  cartridge that that's going to come into contact with the

22  breach face.  So the cartridge has been loaded into the

23  firearm and it's sitting up against that breach face.  Okay.

24      Typically there's a hole in the middle of the breach face

25  that the firing pin is going to protrude through when you

Cross-examination – Bohlen (By Mr. Bussard)

1   discharge the firearm.  That's actually going to strike the

2   bottom portion there of the primer.  The primer has a

3   propellant in it.  When that's struck by the firing pin, a

4   small explosion occurs.  That explosion ignites the powder in

5   the cartridge case and the pressure builds up in the cartridge

6   case which then sends the bullet down.  So when that explosion

7   occurs, that cartridge case slams up against the back of the

8   cartridge case, against the back of the breach face.  So the

9   harder metal of the breach face is going to impart those

10  markings onto that breach face where the primer and the head

11  portion of that cartridge case.

12  Q    And you said it's both in semi-automatic pistols and

13  revolvers?

14  A    It's in every firearm, yes.

15  Q    And with regards to the examination you did in CC number

16  ending in 94 and the examination ending in 53, the

17  government's counsel was referencing as Rochester or

18  Craig Mack homicide or the Oliver, do you recall those?

19  A    The CC --

20  Q    Those two --

21  A    By the CC numbers, yes.

22  Q    And if there had been a breach face mark left a unique

23  mark, you would put that in your report; correct?

24  A    Well, that's what we look at to conduct our comparisons.

25  We look at that, we look at potentially firing pin

1    impressions, as well as other markings.  So whatever we look

2    at during our comparison, that's what's -- that's what brings

3    us to our conclusion.

4    Q    And the other mark I think you look for is ejector

5    mark?

6    A    Potentially.  Sometimes we may not even have to go that

7    far if breach face and firing pin marks are, you know,

8    exceptional.

9    Q    Now, these marks -- if it's a used gun, a lot of wear and

10   tear on the gun or a lot of wear and tear on the ejector or a

11   lot of wear and tear on the firing pin, do those marks change

12   over time?

13   A    They certainly can over a long period of time or with a

14   dramatic amount of use, yes, they can potentially change.

15   Q    And the same way the mechanism of the pistol itself or

16   the revolver, that can wear and tear too, that mechanism can

17   also wear away and change the marks that you are seeing; is

18   that correct?  Am I being clear?

19   A    I think what we said to begin with is that through either

20   potentially, you know, a lot of firing occurring through a

21   particular firearm, that that could potentially change some of

22   the marks over time, yes.

23   Q    And looking at -- or thinking about the CC number that

24   ends in 94.

25   A    Yes.

1   Q     That was the five casings.

2   A     Yes.

3   Q     Brass cases.

4   A     Yes.

5   Q     Okay.  You identified that as being 9mm?

6   A     Correct.

7   Q     Casing?

8         And I think there was some reference to the fact that it

9   was a Luger.  I think you mentioned the word Luger?

10  A     9mm Luger is the name of the caliber.

11  Q     9mm Luger is the name of the manufacturer?

12  A     No, it's the name of the caliber.  9mm Luger is the name

13  of the caliber.  There's also 9mm Bergmann-Bayard, there's 9mm

14  Corto, there's Short.  Those are names of the calibers.

15  Typically it's shortened just to 9mm and 9mm Luger is the most

16  common of the 9mms, but it's full and proper name is 9mm

17  Luger.

18  Q     Is Luger also a manufacturer though?

19  A     Luger was a pistol, a German pistol in history, is what

20  Luger is.

21  Q     Now, when you identify something, I think in your reports

22  you call Q1B and Q1B means -- that means the first

23  questionable bullet; is that correct?

24  A     Yes, question --

25  Q     B is for bullet?

Cross-examination – Bohlen (By Mr. Bussard)

1   A    Question bullet 1.

2   Q    And looking at your diagram, that's the part that

3   actually gets fired out of the cartridge?

4   A    Correct.

5   Q    And when it says Q1, that means it's a casing, a question

6   casing?

7   A    Correct.

8   Q    So in 94, which has been associated with the

9   investigation of the Rochester homicide, you had five

10  casings?

11  A    Correct.

12  Q    Of Luger style, is that what --

13  A    9mm Luger caliber.

14  Q    I don't want to misrepresent it.

15  A    The caliber of the cartridge cases was 9mm Luger.

16  Q    And is it also accurate that when you first examined

17  those five, they were from an unknown firearm?

18  A    Correct, yes.  I had no firearm at the initial

19  comparison.

20  Q    You had no manufacturer of that firearm to go by?

21  A    I had no firearm to compare those cartridge cases to

22  initially.

23  Q    So you couldn't look at the casing itself and just say

24  what kind of firearm?

25  A    There are a few firearms that we can generally get an

Cross-examination – Bohlen (By Mr. Bussard)

1    idea what firearm it may be just by class characteristics, but

2    these cartridge cases did not give us that kind of

3    information.

4    Q    But there came a time when you had a known firearm?

5    A    Yes.

6    Q    And you test-fired, that's what you spoke about earlier?

7    A    Yes.

8    Q    And that was consistent with, I believe you said -- that

9    firearm was a Sig Sauer; is that correct?

10   A    Yes, it was.

11   Q    And that Sig Sauer was associated with CC number ending

12   in 79?

13   A    79, yes.

14   Q    Now, there was another item in the 79 CC; is that

15   correct, there was Q3B?

16   A    Yes.  Well, actually, that's from 94.  Q3B is from --

17   Q    94.  And there was some similarities to -- that are

18   consistent with certain types of firearms, but you couldn't

19   make an identification; is that correct?

20   A    Right.  23B, if you recall, we talked about we compared

21   it to the test-fired bullets from the Taurus revolver.

22           THE COURT:  94 is associated with what?

23           MR. BUSSARD:  94 is associated with the Rochester or

24   the Craig Mack, the other name used, the investigation of that

25   murder.

1    THE COURT:  When we question and reference the CC

2    number, let's also reference the broader description so that

3    it's clear to the jury what it is you're talking about.  Next

4    question.

5    MR. BUSSARD:  I'm talking about the Q3B from -- I

6    believe from the 79 CC number.

7    THE COURT:  And the 79 is?

8    MR. BUSSARD:  Is the Fenner traffic stop.

9    THE COURT:  Thank you.

10   Q   (BY MR. BUSSARD)  Am I correct, Ms. Bohlen?

11   A   Bear with me one second here.  No, Q3B is from the 94.

12   Q   94, the Rochester investigation?

13   A   The 94.  I apologize, I don't know what number is

14   associated with what.  I just know the CC numbers.

15   Q   Okay.  So you made a finding that there was some

16   similarities in the rifling?

17   A   Right.  So --

18   Q   That are consistent with the traits of a K1 Taurus

19   revolver?

20   A   So the comparison of the Q3B, we conducted it against the

21   test fires from the Taurus revolver.  We could not identify or

22   eliminate whether that bullet had actually been fired with the

23   Taurus revolver.  However, it did have similar rifling class

24   characteristics.  So if you remember, we talked about the

25   lands and the grooves.  So what that means is that it had

1    similar number of lands and grooves and the lands and grooves

2    were similar in size.  But again, we could not tell whether

3    that bullet came from the Taurus revolver.

4    Q    So it could have?

5    A    It could, it could have.  It may have, it may not have.

6    I can't tell.

7    Q    And is it fair to say that looking at the reports that

8    you prepared in this case that were admitted only for

9    identification purposes, there's no reference to benchmark or

10   ejector mark in there, you didn't find that necessary?

11   A    There's -- we don't put that in the report.  We just put

12   the conclusions regarding the comparisons in the report.

13   Q    So there could have been, but you didn't find them

14   significant enough to put them in the reports?

15   A    In the reports there's no mention of the specifics of the

16   comparison, merely the conclusion.

17   Q    Talking about -- we've talked about something called a

18   Sig Sauer, Sig Sauer's a manufacturer?

19   A    That's correct.

20   Q    From another country.

21   A    Yes.

22   Q    Correct, those guns are imported into the

23   United States?

24   A    That's correct.

25   Q    Okay.  You can buy a Sig Sauer in a lot of different

1    places; correct?

2    A    That's correct.

3    Q    Wal-Mart, Dick's, places like that, gun shops --

4    A    I'm not sure that Wal-Mart is selling firearms anymore.

5    But most places that sell firearms, a Sig Sauer should be

6    available.

7    Q    And the other one that you mentioned earlier, Taurus,

8    Taurus is no -- you can buy that just about --

9    A    Yes.  Taurus is actually probably easier to get than a

10   Sig Sauer.

11   Q    In fact, you went through a whole list of manufacturers,

12   it's not many are manufactured in the United States anymore.

13   A    That's correct.

14   Q    Now, based on your analysis, can you -- of the items that

15   were presented to you in -- I'm just going to put these on the

16   screens if that's okay.  This is Government's Exhibit 25, do

17   you recall this package?

18   A    Yes.

19   Q    Okay.  And when you look at this package, you're simply

20   looking at the CC number; is that correct?

21   A    Yes, and it also has a property number as well.

22   Q    Okay.  You can't tell from that package or even the

23   contents of what order any of these casings or cartridges that

24   you're talking about, what order they were fired in, can

25   you?

Cross-examination – Bohlen (By Mr. Bussard)

1    A    No.

2    Q    You can't make a determination even when they were fired,

3    can you?

4    A    No, I can't.

5    Q    And the same with this exhibit, which is

6    Government's Exhibit 23.  And do you see that?

7    A    Yes.

8    Q    And the same questions regarding that, you are simply

9    identifying the objects in the package from looking at the

10   package number, the CC number?

11   A    Yes.

12   Q    And you have no idea what it's gone through to get into

13   your hands, other than it was submitted to the firearms

14   examiner?

15   A    Correct.  It's submitted under a property number and a

16   complaint number to us.

17   Q    This is Government's Exhibit PHE 24, which I'm putting up

18   on the screen.  And I think you identified this as related

19   to -- this is a CC number, although the CC is not there.  Is

20   that the CC number?

21   A    Yes, that's the CC number.

22   Q    Where my pen is.  Okay.  And this was one cartridge;

23   correct?

24   A    Cartridge case.

25   Q    Case, excuse me.  And you cannot tell by looking at that

Cross-examination - Bohlen (By Mr. Bussard)

1    when that was fired, can you?

2    A    No, I can't.

3    Q    Can cartridge casings sometimes, if they're on the street

4    and subjected to the environment, can change over time;

5    correct?

6    A    Well, they tend to oxidize.  I can say that typically if

7    we see that sort of oxidation, just like anything that gets

8    left out in the weather for any amount of time.  You can kind

9    of tell that it's been out there for a while.  Typically, if

10   we note any kind of oxidation like that on the metal of the

11   cartridge case, we would note that in the report.

12   Q    But by the same token, you can't tell if it was fired at

13   4:00 o'clock in the afternoon versus 8:00 o'clock?

14   A    Absolutely not, no.

15   Q    And if it passed through -- talking about bullets for a

16   moment, I'm showing you Government's Exhibit PHE 25.  This is

17   a bullet; correct?

18   A    That's a --

19   Q    Is it showing up on the screen?

20   A    It appears to be a cartridge.

21   Q    Cartridge, yes, which to a laymen is a bullet?

22   A    That's not -- right, but that's a live ammunition.

23   Q    And if that was -- if that had passed through wood for

24   instance, if it was -- this is a live one, but say you get a

25   bullet that passes through something, does it necessarily

Cross-examination – Bohlen (By Mr. Bussard)

1    leave marks on it, say a piece of wood?

2    A    Would the wood leave marks on it?

3    Q    Yes.

4    A    I don't know about marks, but it would certainly damage

5    it to the extent that it may not be of any value to us.

6    Q    On the same --

7              THE COURT:  What would damage what; the wood would

8    damage the bullet, or the bullet would damage the wood?

9              THE WITNESS:  Well, both.  Both for sure.

10             THE COURT:  What are we talking about?

11             THE WITNESS:  He asked if the wood would leave any

12   marks behind on the bullet.  Potentially, yes.  And it could

13   very much so damage the bullet should that occur.

14   Q    (BY MR. BUSSARD)  I'm sorry, didn't mean to speak over

15   you.  When -- and I hate to be real raw about this, but when a

16   bullet passes through a human body, for instance, does it

17   leave any trace evidence on that bullet?

18   A    It potentially can, yes.

19   Q    And as a firearms examiner, that would be something that

20   you would look for?

21   A    Yes.  If there was any visible evidence, we have the

22   trace laboratory would come and take a sample from the bullet.

23   Otherwise, we decontaminate the bullets before we handle

24   them.

25   Q    Does that mean radiating them or dipping them in a

Cross-examination – Bohlen (By Mr. Bussard)

1    solution?

2    A    Yeah, soaking them in a 10 percent bleach solution.

3    Q    Based on your numerous years of experience as a firearms

4    examiner, do you know whether in fact the Office of the Chief

5    Medical Examiner cleans the bullets when they find them?

6    A    I really do not know that.

7    Q    And do you ever have any questions when you've had to ask

8    whether in fact there's trace evidence on it -- is that the

9    person -- you make the decision?

10    A    I'm not sure I understand your question.

11    Q    Okay.  Let me go back.  You receive a single bullet and

12    it came from the Office of the Chief Medical Examiner.

13    A    Yes.

14    Q    And when you're doing the microscopic examination, if you

15    see something on the bullet, the cartridge.

16    A    It would have to be before we conducted the microscopic

17    comparison if it was something that we thought was of value

18    for trace, because before we conduct our microscopic

19    comparison, we're decontaminating it.

20    Q    So that would take away, clean everything off of those

21    cartridges?

22    A    Yes.

23    Q    Anything you are looking at; correct?

24    A    In terms of biohazardous -- potential biohazardous

25    materials, yes.

Cross-examination – Bohlen (By Mr. Bussard)

1    Q    And showing you Government's PHE 25, when you received

2    these, do you know whether or not they've been cleaned before

3    you get them?

4    A    I don't know that.

5    Q    Decontaminated, I think was your word?

6    A    I don't know that, and because I don't know that, we

7    typically decontaminate ourselves so that we know that we can

8    safely handle.

9    Q    Do you know if they've ever -- they've already been

10   subjected to fingerprint analysis?

11   A    I --

12   Q    I'm just asking if you know.

13   A    I don't know specifically about these.  Typically if our

14   mobile unit would recover them, they would fingerprint them.

15   Q    And would you know also if they've been subjected to DNA

16   analysis?

17   A    I do not know that.

18   Q    Do you have any information as to where the items are --

19   when you receive a package like Government's Exhibit 25, do

20   you ever get a fact scenario of how they were located, how the

21   items in these packages were --

22   A    No.  There may be -- the evidence inside that evidence

23   envelope, a smaller coin box envelope for the individual

24   pieces, it may have a description of where the person

25   recovered it from.  And typically they label it with some sort

1    of letter or number for their own purposes.

2    Q    Is that an important thing for a firearms examiner to

3    know whether it was found in the street or found in a pocket

4    or found --

5    A    It's not for us at all.

6    Q    You don't care?

7    A    I really don't.

8    Q    The only thing you can really testify about is that a

9    cartridge had been fired; correct, or not fired, and then it

10   would go from there?

11   A    Yes, and potentially how they relate to each other.

12   Q    But if you got a cartridge and it hadn't been fired, it

13   just would not have breach mark --

14   A    Right, there would be no breach face marks on it.

15   Q    There would be no ejector mark on it?

16   A    It could potentially have an extractor mark on it, had it

17   been in the gun and extracted from the gun without having been

18   fired.  It's usually unlikely, but sometimes that is

19   possible.

20   Q    And again, it wouldn't have that firing pin --

21   A    Correct.

22   Q    -- mark --

23   A    That's correct.

24   Q    -- if it had not been fired.

25   A    That's correct.

Cross-examination – Bohlen (By Mr. Bussard)

1   Q    In your examination of the items in G -- or

2   Government's 25, the one that's on the screen --

3   A    Yes.

4   Q    -- and Government's 23, did you find any trace evidence

5   on any of these items?

6   A    No, I did not.

7   Q    Okay.  And trace evidence, I mean, would be human tissue,

8   blood --

9   A    Right.  Typically, any time we see fibers or any kind of

10  foreign material that may be on the bullet, is when we're

11  going to call the Trace Analysis Unit.

12  Q    And if you had --

13  A    And no, I didn't -- did not see anything like that on

14  these items.

15          MR. BUSSARD:  No further questions, Your Honor.

16          THE COURT:  Mr. Francomano.

17          MR. FRANCOMANO:  No questions, Your Honor.

18          THE COURT:  Redirect.

19          MS. HOFFMAN:  No redirect, Your Honor.

20          THE COURT:  May the witness be excused?

21          MR. FRANCOMANO:  Yes, Your Honor.

22          THE COURT:  Mr. Bussard.

23          MR. BUSSARD:  Yes, Your Honor.

24          THE COURT:  Ma'am, you may be excused.  You may

25  depart.

```
 1                 THE WITNESS:  Thank you.

 2                 THE COURT:  Next witness.

 3                 MS. HOFFMAN:  The government will call

 4       Detective Ryan Reass.

 5                 THE COURT:  Ryan Reass.  Please come forward, sir,

 6       all the way to our witness box stand there and face our

 7       clerk.

 8                 THE CLERK:  Sir, raise your right hand.

 9                         DETECTIVE RYAN REASS

10       called as a witness, being first duly sworn, was examined and

11       testified as follows:

12                 THE WITNESS:  I do.

13                 THE CLERK:  Thank you, sir.  You may enter the

14       witness box and watch your step.  And if you would please

15       speak directly into the microphone, state your first and last

16       name and spell your first and last name.

17                 THE WITNESS:  Ryan Reass, R-y-a-n, R-e-a-s-s.

18                 THE CLERK:  Thank you.

19                 THE COURT:  R-e-a-s-s.

20                 THE WITNESS:  Yes, sir.

21                 THE COURT:  Thank you.  Your witness, ma'am.

22                         DIRECT EXAMINATION

23       BY MS. HOFFMAN:

24       Q    Good afternoon, Detective Reass, where are you

25       employed?
```

1    A    With the Baltimore City Police Department.

2    Q    And what's your rank and position?

3    A    I'm a detective and I am currently assigned to the

4    Homicide Unit.

5    Q    How long have you worked for the Baltimore Police

6    Department?

7    A    I have 16 years complete.

8    Q    And how long have you worked for the homicide unit?

9    A    Approximately five years.

10   Q    Can you walk us through the various positions you've held

11   with BPD?

12   A    Yes.  After I got out of the academy, the police academy,

13   I went to the Northern District where I did patrol.  After

14   patrol, I was signed to what is called a District Flex Unit,

15   basically don't handle any 911 calls but do regular street

16   enforcement.  From there, I went to the Homicide Operations

17   Unit.  I was there for about a year.  And then I left and went

18   to the Eastern District, District Detective Unit, where I was

19   first assigned to aggravated assaults and then to nonfatal

20   shootings.  From there, I left and went back to the Homicide

21   Unit where I've been for the last five years.

22   Q    Thank you.  I want to direct your attention to May 9th of

23   2008.  Where were you working at that point?

24   A    I was assigned to the Eastern District Detective Unit.

25   Q    And did there come a point in time on that day when you

Direct Examination - Reass (By Ms. Hoffman)

1    were asked to respond to the scene of a cutting?

2    A    Yes.

3    Q    What time of day did you get that request?

4    A    I believe it was around 5:30 in the evening.

5    Q    And where were you asked to go?

6    A    The -- I believe the call came out from the 2400 block of

7    Lock Raven.

8    Q    And did you respond there?

9    A    Yes.

10   Q    And was the victim present when you arrived on the

11   scene?

12   A    From my recollection, the victim was being attended to by

13   an ambulance, which time I'm not going to interfere with that,

14   and then being transported to Johns Hopkins Hospital.

15   Q    And did you locate the crime scene?

16   A    The crime scene was located in the 2400 block of

17   Greenmount Avenue, right around the corner.

18   Q    Were you eventually able to identify the victim?

19   A    Yes.

20   Q    Who was it?

21   A    His name is Jerome Brice.

22   Q    And how old was he?

23   A    I believe he was 13.

24   Q    Were there photographs taken of the crime scene?

25   A    Yes.  The crime lab tech was ordered and crime scene

Direct Examination - Reass (By Ms. Hoffman)

 1    photos were taken.

 2    Q    And did you eventually respond to the hospital where

 3    Mr. Brice was being treated?

 4    A    Yes.

 5    Q    Were there also photographs taken of Mr. Brice's injuries

 6    at the hospital?

 7    A    Yes.

 8              MS. HOFFMAN:  Your Honor, may I approach?

 9              THE COURT:  Yes.  Counsel.

10              (Bench conference on the record.)

11              THE COURT:  Show me the ones you want to use.

12              MS. HOFFMAN:  PHCS 11-1, PHCS 11-2, PHCS 11-3, PHCS

13    11-4, PHCS 11-5, PHCS 11-6, PHCS 11-7.

14              THE COURT:  PHCS 11-1.

15              MR. ENZINNA:  No objection.

16              MR. BUSSARD:  No objection.

17              MR. FRANCOMANO:  No objection.

18              THE COURT:  PHCS 11-2.

19              MR. O'TOOLE:  No objection.

20              MR. BUSSARD:  No objection.

21              MR. FRANCOMANO:  No objection.

22              THE COURT:  PHCS 11-3.

23              MR. FRANCOMANO:  No objection.

24              MR. BUSSARD:  No objection.

25              MR. O'TOOLE:  No objection.

1            THE COURT:  PHCS 11-4.

2            MR. FRANCOMANO:  No objection.

3            MR. BUSSARD:  No objection.

4            MR. O'TOOLE:  No objection.

5            THE COURT:  PHCS 11-5.

6            MR. FRANCOMANO:  I'm just going to object 403(b).  I

7    believe that it's more prejudicial than probative.  The

8    detective can testify as to where he was injured.

9            THE COURT:  The photograph is not gruesome.  It

10   depicts an injury to the left cheekbone and I'm not even sure

11   what is depicted in the area of the left armpit.  I'm not even

12   sure that's an injury.

13           MS. HOFFMAN:  No, I think that's just medical

14   tape.

15           MR. MARTINEZ:  Or a crease --

16           THE COURT:  A crease with hair, is what it looks

17   like to me.

18           MS. HOFFMAN:  Oh, sorry.

19           THE COURT:  So I find nothing prejudicial from the

20   standpoint of it being unduly gruesome or anything along those

21   lines.  The objection's overruled and provided an appropriate

22   foundation is laid, PHCS 11-5 will be admitted.  PHCS 11-6.

23           MR. FRANCOMANO:  Same objection.

24           THE COURT:  First of all, let's get oriented as to

25   the anatomy here.

Direct Examination - Reass (By Ms. Hoffman)

1          MS. HOFFMAN:  That's his arm, left arm.

2          MR. BUSSARD:  I think if you rotate to the right,

3     the other way.

4          MS. HOFFMAN:  Yeah.

5          THE COURT:  Okay.  Yes, we have the upper arm is

6     depicted, an area of the left humerus extending from the

7     shoulder to the elbow with lacerations that are small

8     lacerations and punctures which -- and the lacerations are

9     gaping with blood stains.  Mr. Francomano.

10         MR. FRANCOMANO:  Same objection, Your Honor.

11         THE COURT:  I don't find this to be unduly gruesome

12    or prejudicial in that respect and it's reflective of injuries

13    that were sustained, provided an appropriate foundation can be

14    laid.  PHCS 11-6 will be admitted.

15         MS. HOFFMAN:  He had a collapsed lung.  That's the

16    tape that was keeping his lung functioning.

17         THE COURT:  Got it.  This is PHCS 11-7.  It depicts

18    a close up of a person's body with some injuries apparent with

19    a special sort of bandage over the top of them, which is

20    clear, such that you can see through the bandage to see

21    puncture injuries to a number -- there's some other minor

22    injuries that are apparent, scrapes, that sort of thing.

23    Mr. Francomano.

24         MR. FRANCOMANO:  Your Honor, the same objection.  I

25    do have a question, if that's an injury or is that a medical

1    procedure that was done?

2         MS. HOFFMAN:  Well, I mean, it's both.  It's the

3    injury and then the tape, I believe.

4         MR. FRANCOMANO:  No, I'm talking about if the lung

5    was collapsed, they have to go into the chest cavity.  If that

6    was caused by the hospital, then I object.

7         MS. HOFFMAN:  No, he had a collapsed lung from the

8    stabbing.  The hospital treated him for it.

9         THE COURT:  We'll have to see what the witness has

10   to say about what is depicted in the picture.  But that -- and

11   that will figure in the ultimate admissibility of the picture.

12   Right now I'm ruling on the question of whether it's unduly

13   gruesome or offensive from the standpoint of 403 and should

14   not be admitted.  I do not so find.  I do not find it to be

15   unduly gruesome or graphic such that it should be barred on

16   that ground.  PHCS 11-7 will be admitted, provided otherwise a

17   foundation can be appropriately laid.

18        MS. HOFFMAN:  Thank you.

19        (The following proceedings were had in open court.)

20        THE COURT:  You may inquire.

21   Q    (BY MS. HOFFMAN)  Detective Reass, we were talking about

22   photographs of the crime scene.  I'd like to start by showing

23   you Government's Exhibit PHCS 11-1.  What are we looking at

24   here?

25   A    That's a copy of the photo card that would have been

 1    filled out by the crime lab technician.  It contains the

 2    central complaint number that was in reference to the

 3    incident.

 4    Q    And would you mind reading the central complaint number

 5    for us?

 6    A    083E, as in Edward, 4711.

 7    Q    Going to show you now Government's Exhibit No. PHCS 11-2.

 8    Can you tell us what we're looking at here?

 9    A    That's the 2400 block of Greenmount Avenue.

10    Q    And is this the scene of the -- is this the crime scene

11    that you responded to?

12    A    Yes.

13    Q    Going to show you Government's Exhibit PHCS 11-3.  What

14    are we looking at here?

15    A    It's also a photo of the 2400 block of Greenmount Avenue,

16    just from a different angle, the crime scene that I responded

17    to.

18    Q    Going to show you Government's Exhibit No. PHCS 11-4.

19    A    Photographs of blood spatter.

20    Q    And was the blood spatter located at the crime scene?

21    A    Yes, on the 2400 block on the sidewalk.

22    Q    Now, you said you also responded to the hospital where

23    Mr. Brice was being treated; is that right?

24    A    That's correct.

25    Q    And did you have a chance to observe his injuries

1    there?

2    A    Yes.

3    Q    I'd like to show you Government's Exhibit No. PHCS 11-5.

4         MS. HOFFMAN:  And Your Honor, I'll pause here

5    because I didn't know if you wanted to give -- okay.

6    Q    (BY MS. HOFFMAN)  What are we looking at here?

7    A    That's a picture of Jerome Brice with a cut to his face,

8    the left side of his face.

9    Q    Going to show you Government's Exhibit No. PHCS 11-6.

10   A    That is also Jerome Brice's left arm, also with wounds to

11   his -- to his left arm.

12   Q    And finally, I'm going to show you

13   Government's Exhibit PHCS 11-7.  Can you explain what we're

14   looking at here?

15   A    There are puncture wounds to the left side of his body

16   around like -- little higher than the abdomen, second one

17   might be close to the abdomen, both puncture wounds.

18   Q    Without telling me what was said, can you tell me, did

19   you interview Mr. Brice?

20   A    Yes.

21   Q    And again, without telling me what was said, was

22   Mr. Brice cooperative or uncooperative during your

23   interview?

24   A    Uncooperative.

25   Q    I want to turn back to the 2400 block of

1    Greenmount Avenue.  Again, without telling me what they might

2    have said, did you identify any eyewitnesses to the cutting?

3    A    Yes.

4    Q    Who did you identify?

5    A    A Lillian Scott and Mark Nickelson.

6    Q    I want to talk about Lillian Scott.  How old was she?

7    A    13 years old.

8    Q    Did Ms. Scott agree to participate in an interview with

9    you?

10   A    An interview was conducted with her on the 15th of May,

11   2008.

12   Q    And was that interview with Ms. Scott recorded?

13   A    It was.

14   Q    Did she complete a photo array during that interview?

15   A    She did.

16   Q    Going to show you Government's Exhibit PHA 7, which has

17   already been admitted into evidence.  What are we looking at

18   here?

19   A    It's a photographic array.

20   Q    Which photographic array is it?

21   A    This is the photographic array that I showed to Lillian

22   Scott on the 15th of May.

23   Q    And can you -- first of all, did Ms. Scott pick anyone

24   out from this array?

25   A    Yeah, Ms. Scott picked out photograph No. 2.

Direct Examination - Reass (By Ms. Hoffman)

1    Q    And is that her handwriting underneath the photographs?

2    A    Yes.

3    Q    Can you read what she wrote there?

4    A    Photo No. 2 is known to me as -- and I believe it's

5    supposed to be Digga, might have been cut off there.

6    Q    And for the record can you identify who is pictured in

7    photograph No. 2?

8    A    Marquise McCants.

9    Q    Is he seated here in the courtroom today?

10   A    He is.

11   Q    Can you point him out for the record?

12   A    He is sitting at the back table next to counsel with the

13   red shirt.

14            THE COURT:  So reflected.

15   Q    (BY MR. MARTINEZ)  Is that Ms. Scott's signature at the

16   bottom of the page?

17   A    Yes.

18   Q    Flip this over.  Did Ms. Scott write comments here in the

19   box?

20   A    She did.

21   Q    And what did she write?

22   A    Photo No. 2 shows the person who approached and then

23   attacked Jerome Brice.

24   Q    And is that her signature again underneath?

25   A    It is.

Direct Examination – Reass (By Ms. Hoffman)

1    Q    Can you read the date there?

2    A    It says 5/15/2008.

3    Q    Is that your name under the slanted line there?

4    A    Yes.  And the 14:23 would be the time that it was

5    signed.

6    Q    Did you make any suggestion to Ms. Scott as to who she

7    should pick out of this photo array?

8    A    No.

9    Q    Did you make any suggestion to her as to what she should

10   write in the comments?

11   A    No.

12   Q    Did you make any threats or promises to induce her to

13   identify someone?

14   A    No.

15   Q    Did she complete the photo array freely and

16   voluntarily?

17   A    Yes.

18            MS. HOFFMAN:  No further questions.

19            THE COURT:  Counsel, you may approach.

20            (Bench conference on the record.)

21            THE COURT:  How long is your cross going to take?

22            MR. FRANCOMANO:  Couple minutes.

23            THE COURT:  Okay.  I have a 5:10 meeting, which I

24   can keep holding for a short amount of time.  We also have to

25   excuse the jury for the weekend.  I also have to take up a

1    legal matter with counsel.  So I don't want you to refrain

2    from any examination that you think is appropriate, but here

3    we go.

4                (The following proceedings were had in open court.)

5                THE COURT:  Mr. O'Toole, any cross-examination?

6                MR. O'TOOLE:  We have no questions, Your Honor.

7    Thank you.

8                THE COURT:  Mr. Bussard.

9                MR. BUSSARD:  No questions.  Thank you.

10               THE COURT:  Mr. Francomano.

11               MR. FRANCOMANO:  Yes, Your Honor.

12               THE COURT:  You may proceed.

13                         CROSS-EXAMINATION

14   BY MR. FRANCOMANO:

15   Q    Detective Reass, Mr. Brice never told you Mr. McCants

16   stabbed him; correct?

17   A    Correct.

18   Q    And you were at the meeting on August 15th, 2017 -- or

19   excuse me, on May 15th, 2008 with Ms. Scott; is that

20   correct?

21   A    Yes.

22   Q    Okay.  And in that meeting she said she didn't actually

23   see him get stabbed with her own eyes; correct?

24   A    I don't recall that.  I don't recall that.

25   Q    You don't remember?

```
1    A    I don't remember that.

2    Q    Okay.  Would anything help to refresh your

3    recollection?

4              MS. HOFFMAN:  Objection, Your Honor.

5              THE COURT:  Overruled.  Would something help to

6    refresh your recollection?

7              THE WITNESS:  Possibly.

8              THE COURT:  Like what?

9              THE WITNESS:  Transcripts of maybe the taped

10   statement.

11             MR. FRANCOMANO:  Your Honor, if I could approach?

12   Charging statement.

13             THE COURT:  Charging statement.

14   Q    (BY MR. FRANCOMANO)  Would the general incident synopsis

15   refresh your recollection?

16   A    A transcript of the taped statement would be in more

17   depth than a synopsis that was put on Lotus Notes.

18             THE COURT:  But that wasn't the question.  The

19   question is whether or not -- what's the document called?

20             MR. FRANCOMANO:  It's called a general synopsis of

21   incident.

22   A    No, I don't believe that would help me.

23   Q    (BY MR. FRANCOMANO)  But the taped statement would

24   refresh your recollection?

25   A    I believe so, yes.
```

1          THE COURT:  Okay.  You can approach, counsel.

2          MR. FRANCOMANO:  I apologize, Your Honor.

3          (Bench conference on the record.)

4          THE COURT:  Obviously we don't have enough time to

5     get it done.

6          MR. FRANCOMANO:  No.

7          THE COURT:  So we'll have to stop at this point and

8     resume Monday morning.  Well, that's all we need to discuss.

9          MS. HOFFMAN:  Your Honor, could I simply note that

10    whatever Ms. Scott told Detective Reass is hearsay, it's not

11    admissible.

12         THE COURT:  Yes.

13         MS. HOFFMAN:  So we object to this line of

14    questioning.

15         THE COURT:  Okay.  Noted.  I don't think it's ripe

16    yet.  He hasn't asked what Ms. Scott said.

17         MS. HOFFMAN:  Well, I think he did ask that.

18         THE COURT:  What was the question?

19         MR. FRANCOMANO:  That's exactly what I said,

20    Your Honor.  I asked if -- Number one, when they brought in

21    her statements from 5 -- or excuse me, 5/15/2008.

22         THE COURT:  When they brought them in to where?

23         MR. FRANCOMANO:  When they brought in her statement

24    that she wrote on the back of the card.

25         THE COURT:  Oh, when the government did, you mean?

```
 1          MR. FRANCOMANO:  Yes.  They opened the door to

 2   asking about the rest of that interview.

 3          MS. HOFFMAN:  I don't believe that's right.

 4          THE COURT:  It brought in her statement.

 5          MR. FRANCOMANO:  Her statement which she wrote on

 6   the back, what happened at the interview.

 7          THE COURT:  Right.

 8          MR. FRANCOMANO:  So at that point they opened up

 9   what happened at the actual interview.

10          MS. HOFFMAN:  That was an incident that was already

11   in evidence.  It came in --

12          THE COURT:  Hold on, Ms. Hoffman, I'll call on you

13   when it's your turn.

14          Explain to me the theory, there's a piece of paper

15   on which she wrote out a statement.

16          MR. FRANCOMANO:  Exactly.

17          THE COURT:  She acknowledged it yesterday.

18          MR. FRANCOMANO:  Correct.

19          THE COURT:  She read it into the record, plus the

20   document itself is in evidence.

21          MR. FRANCOMANO:  Right, and I just had the detective

22   read that hearsay statement.

23          THE COURT:  It's not hearsay, it's an exhibit that's

24   in evidence.

25          MR. FRANCOMANO:  It's still -- with the document
```

1    itself when he read it in, was about the meeting that they had

2    on May 15th, 2008.  I think I'm allowed to go into what

3    happened at that meeting.

4              THE COURT:  Don't shake your head.  It's just --

5    okay.  Why are you allowed to go into that in any greater

6    depth?

7              MR. FRANCOMANO:  Number one, Your Honor, I think

8    because they opened the door to that, and number two --

9              THE COURT:  Okay.  What do you mean --

10             MR. FRANCOMANO:  For completeness.  It says on that

11   document that Mr. McCants -- "I saw Mr. McCants assault

12   Jerome Brice."

13             THE COURT:  Right.

14             MR. FRANCOMANO:  For the rest of what he said, I

15   mean, in that taped statement she doesn't say that.  She

16   doesn't say that she saw him.  She saw that they got into a

17   beef, that they were fighting, nothing about him stabbing him,

18   so that's why I think we should be allowed to go into it.

19             THE COURT:  But he hasn't testified -- what has he

20   testified about the interview?  All he's done is read an

21   exhibit that's already in evidence.

22             MR. FRANCOMANO:  Right.

23             THE COURT:  And nothing beyond that has occurred.

24             MR. FRANCOMANO:  I understand that, Your Honor.  But

25   that's our position.

```
 1              THE COURT:  Overruled.  All right.  So now where

 2    does that leave us?  What did you want to refresh his

 3    recollection about?

 4              MR. FRANCOMANO:  Then we're done.

 5              THE COURT:  Yeah.  Okay.

 6              (The following proceedings were had in open court.)

 7              THE COURT:  Any further questions, Mr. Francomano?

 8              MR. FRANCOMANO:  Nothing further.

 9              THE COURT:  Redirect.

10              MS. HOFFMAN:  No redirect, Your Honor.

11              THE COURT:  May the witness be excused?

12              MR. FRANCOMANO:  Yes, Your Honor.

13              THE COURT:  No objection from defense counsel.  Sir,

14    you are excused, you may depart.

15              THE WITNESS:  Thank you, Your Honor.

16              THE COURT:  Ladies and gentlemen, we have come to

17    the end of the trial day and we have come to the end of the

18    trial week.  You'll recall that I previously advised you that

19    we would not be sitting on Fridays during this trial, so that

20    means that we will not see each other again until Monday.

21    Before I give you your instructions again for overnight, let's

22    just review again what I have told you about what is the

23    overall schedule of this trial.  We will be in session next

24    week, Monday through Thursday.  We will not sit on Friday next

25    week, and then the following week the Court will not sit.  It
```

1    will not sit on any of the days of that week.  The following

2    week after that, the Court will sit all week.  And that is --

3    someone help me with the dates.

4              MR. MARTINEZ:  18th to the --

5              THE COURT:  Begins Monday the 18th.  18th, 19th,

6    20th, and 21st.  And then on Thursday the 21st, the Court will

7    recess until Tuesday the 2nd of January, when we will then sit

8    for three days that week, not sit on Friday, and then the next

9    week after that in January, we will sit for four days.

10   Somewhere in there is the MLK holiday, we won't sit on that

11   Monday.  I forget which of the weeks that falls on, but at

12   this point the expectation is that we would sit for three

13   weeks during January and then we would be at the end of the

14   trial.  Just to refresh what I had originally set out so that

15   you can clear your mind on what the trial is.

16              Ladies and gentlemen, during this three-day recess

17   do not discuss the case with anyone.  Do not discuss it with

18   your fellow jurors.  Do not discuss it with any of your

19   friends or family members.  Do not allow yourselves to be

20   exposed to any news articles or reports that touch upon the

21   case or the issues it presents or the participants in the

22   trial.  Avoid all contact of any kind with the participates in

23   the trial.  Do not make any independent investigation of the

24   law or the facts relevant to the case.  Do not conduct

25   internet searches with respect to the issues presented or the

1    persons participating in trial.  Do not consult external

2    sources such as encyclopedias or dictionaries in reference to

3    the issues and terms that have been presented to you here.

4            Ladies and gentlemen, as you take a break for three

5    days, I want to especially emphasize one of the instructions

6    that I gave to you at the beginning of the trial.  And that is

7    I want you to focus on the importance of keeping an open mind.

8    The trial is very much underway.  You've heard a substantial

9    amount of evidence at this point, but by no means have you

10   heard all of the evidence that will be ultimately relevant to

11   your consideration of the issues that are before you in this

12   case.  So it would be a mistake, it would be wrong to allow

13   yourself to start reaching conclusions about any of the

14   matters that are before you.

15           Your responsibility as a juror is to the best of

16   your ability keep an open mind.  Now, I'm not naive.  I know

17   that it's not possible to instruct people, well, don't think

18   about everything you've seen for the last four days.  That's

19   inevitable that that's going to occur.  Do the best to the

20   extent your mind goes there to remind yourself always that you

21   have not heard all the evidence in this case.  You haven't

22   heard the final arguments of counsel.  You haven't heard the

23   instructions from the Court on what the law of the case is.

24   You're very far from being at a point where it's appropriate

25   to start to reach any sort of conclusion about any matter

1    before you.  Process is still very much underway and open.

2    With those thoughts in mind, I wish all of you a good weekend

3    and we'll see you -- what's our situation Monday morning?

4    Let's start at 9:45, 9:45 on Monday morning.  The jury will

5    return then.  Please take the jury out.

6              (Jury left the courtroom.)

7              THE COURT:  Be seated, please.  Couple of matters

8    that I want to take up.  First of all, trial lawyers are high

9    strung, reactive people by nature, at least that's my

10   experience.  I was a trial lawyer and I would certainly

11   describe myself that way.  Nonetheless, there's a

12   responsibility that's incumbent upon all of us who are

13   involved in this process to remember what is appropriate sort

14   of display and conduct in a courtroom when the case is

15   underway.  Nonverbal communication in the form of facial

16   expressions and disappointment, agreement, whatever, all of

17   that should be suppressed.  Head shaking, head nodding,

18   cringing, reactions to rulings that you might be disappointed

19   in or not agree with, things that you are thrilled with or

20   happy with, please keep in mind the basic responsibility that

21   all of us have who are participating in this process to keep

22   the emotions underground.  Do your communicating when it's

23   your turn to talk, to present evidence, and to argue, but not

24   otherwise.  That's number one.

25              Number two, with respect to those government

1    exhibits, I just want to reiterate what I said, we really need

2    to have those separately and specially marked so that we know

3    exactly what we're referring to and so the record is

4    absolutely clear.

5             The third topic is a legal question that I want to

6    ask.  At the time of the alleged stabbing that we've just been

7    hearing about and the last witness's testimony, Mr. Martinez,

8    how old was Mr. McCants, in the government's view?

9             MR. MARTINEZ:  16, I believe.

10            THE COURT:  Okay.  Is that --

11            MR. MARTINEZ:  Wait, 15.

12            THE COURT:  15.  And is that assault, alleged

13   assault, charged as an overt act in furtherance of the

14   racketeering conspiracy?

15            MR. MARTINEZ:  It is.

16            THE COURT:  Okay.  So there's probably a great

17   likelihood that you have already looked into the question that

18   I want to raise with you now, and that is, what does the law

19   say about a conspiracy that has a long period of running, some

20   12 years in this case, from 2005 to 2017?  What does it say

21   about the legal culpability in an adult proceeding of an

22   individual who is alleged to have been a member of the

23   conspiracy and engaging in overt acts in furtherance of that

24   conspiracy, both when they were a juvenile and when they were

25   an adult?  And can they be held culpable on the conspiracy

1  charge for those overt acts that they allegedly committed

2  before they had reached the age of 18?

3       MR. MARTINEZ:  So I think there are a number of

4  important things to point out in response to the Court's

5  question.  First, there is a circuit split -- well, when a

6  defendant continues to participate in a conspiracy after he's

7  attained the age of majority, evidence of premajority conduct,

8  I think is typically admissible.  There's a circuit split as

9  to the scope of the purposes for which premajority conduct is

10  admissible.  Some circuits say that so long as they continue

11  to participate in the conspiracy after attaining the age of 18

12  and thereby, for lack of a better term, ratified their

13  premajority conduct, it all comes in --

14       THE COURT:  Substantively on culpability on the

15  charge as charged.

16       MR. MARTINEZ:  Correct.

17       THE COURT:  From 2005 to 2012.

18       MR. MARTINEZ:  Yes, or to 2017.

19       THE COURT:  Excuse me, 2017, I meant the 12 years.

20       MR. MARTINEZ:  I believe -- I don't have the case in

21  front of me, I wasn't prepared to present argument on this.  I

22  believe there's a case from the 4th Circuit called *Spoone*.  I

23  can't remember if it's spelled spoon like the utensil or

24  Spoone with an E on the end.  Just working off my memory, my

25  recollection of what *Spoone* stands for is that in that context

1  where somebody began participating in a conspiracy before 18,

2  continued participating afterwards, I believe in the

3  4th Circuit, evidence of premajority conduct comes in to show

4  their involvement in the conspiracy and when they became

5  involved.

6        But it's not -- I think a defendant would be

7  entitled to a limiting instruction, that in terms of

8  identifying the racketeering predicates that were foreseeable

9  to a defendant, if, for example, Jerome Brice were murdered.

10  And murder is a predicate that we charged.  The jury couldn't

11  find murder just based on the Brice incident.  But here it's a

12  stabbing.  And we -- there's no predicate crime alleged in our

13  RICO conspiracy count that would -- stabbing would fall into

14  that bucket.  So from the government's point of view, the

15  evidence presented regarding Mr. Brice's assault goes to put

16  Mr. McCants in the conspiracy, which he continued to

17  participate in after attaining the age of majority.  Ms. Scott

18  did testify and there was testimony about his involvement in

19  the gang from her.  So that's the primary theory of relevance

20  from our point of view.

21        THE COURT:  No problem as far as that goes.  But

22  what about as an overt act in furtherance of the racketeering

23  conspiracy, is it charged?

24        MR. MARTINEZ:  It is.

25        THE COURT:  I thought it was.

227

1          MR. MARTINEZ:  Yeah.

2          THE COURT:  Okay.

3          MR. MARTINEZ:  And I do recall there being some

4   consultation with the Organized Crime and Gang Section about

5   that and that they approved it.  For what it's worth, I need

6   to go back and do the legal research and refamiliarize myself

7   with why.  And Ms. Hoffman also points out that, you know,

8   we're not required to prove any particular overt acts.

9          THE COURT:  No.  But at the same time, an overt act

10  that's alleged that is not unlawful conduct that does -- that

11  is not by law an act in furtherance of the conspiracy, doesn't

12  belong in the count.  Wouldn't you agree with that?

13         MR. MARTINEZ:  I'm sorry.  An overt act that is not

14  unlawful --

15         THE COURT:  An overt act -- it's really not the

16  overt act, it's the suggestion of unlawful conspiratorial

17  conduct on the part of the juvenile before they've reached the

18  age of 18.  There's nothing that violates the adult statute

19  that is expressed through the accusation of involvement by a

20  juvenile in the conspiracy.  It's hard for me to articulate it

21  because I think the issue is a subtle one.  But I have

22  concerns about it.

23         MR. MARTINEZ:  Well --

24         THE COURT:  Mr. Francomano, is this a matter that

25  you have thoughts about?

1          MR. FRANCOMANO:  I do, Your Honor, and I will

2     thoroughly research it this weekend.

3          THE COURT:  Okay.  It's -- I've caught everyone

4     without warning on the issue.  I think it's enough to have

5     sort of raised the issue and I'm not saying that it has to be

6     resolved with certainty by Monday, but the testimony is

7     already in the record of the case.  It only occurred to me as

8     it was coming in, and really, frankly, after it had gotten in.

9     The suggestion from government counsel that it is admissible

10    on some ground seems likely to me.  So the need to purge it

11    from the record seems extremely unlikely.  But I think it's an

12    open question what use it can be put to and what instructions

13    might eventually be appropriate around this topic.  I would be

14    interested in seeing your respective submissions on that

15    question simultaneously before we start on Monday and we'll

16    continue the discussion after that point.  Hopefully this

17    doesn't require a lengthy brief from either of you, but I'll

18    read whatever either of you submit.  Okay.

19         MR. MARTINEZ:  And Your Honor, it just wouldn't

20    shock me if we get to the end of that research and there is

21    some agreement that a limiting instruction of some sort is

22    appropriate and if that's where we wind up, that's what we

23    will agree to.

24         THE COURT:  I think you should look at that

25    question.  I think you should also look at the appropriateness

1    of the allegation being set out as an overt act that was

2    committed in furtherance of the conspiracy offense.  That

3    wouldn't -- even if it was stricken, that wouldn't necessarily

4    mean in fact it would bear little relationship to the question

5    of whether or not it's admissible evidence.

6            MR. MARTINEZ:  And when you say stricken, you mean

7    stricken from the indictment?

8            THE COURT:  Yes, not from the case.  It could be

9    admissible for other purposes.

10           MR. MARTINEZ:  I understand.

11           THE COURT:  I'm just not convinced yet that the

12   grand jury was on solid legal grounds when they made that

13   conduct a part of the accusation against, frankly, all of the

14   defendants, but especially Mr. McCants.  That's what I think

15   needs to be sorted out.  Where -- how does all of the proof

16   here intersect with the law that distinguishes between adults

17   and juveniles in terms of culpability for criminal conduct?

18   Okay.  Anything else we can productively address before we

19   adjourn for the weekend, Mr. Martinez?

20           MR. MARTINEZ:  Not from us.

21           THE COURT:  On behalf of Mr. Johnson?

22           MR. O'TOOLE:  No, sir.

23           THE COURT:  Mr. Jones.

24           MR. BUSSARD:  No, Your Honor.

25           THE COURT:  Mr. McCants.

1              MR. FRANCOMANO:  No, Your Honor.

2              THE COURT:  Thank you.  We are in recess until

3     Monday morning at 9:45.

4              (The proceedings were concluded.)

5

6              I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
      record of proceedings in the above-entitled matter.

7

8                     _____/s/_____
                           Christine T. Asif
                         Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2     Witness Name                                          Page

3     Detective Mark Veney

4          Direct Examination By Mr. Martinez ....................... 8

5     Sergeant James Lloyd

6          Direct Examination By Ms. Hoffman ....................... 18

7          Cross-examination By Mr. O'Toole.......................... 79

8          Cross-examination By Mr. Bussard.......................... 88

9          Cross-examination By Mr. Francomano ..................... 117

10         Redirect Examination By Ms. Hoffman ..................... 117

11         Recross-examination By Mr. Bussard ..................... 118

12    Sergeant Curt Roepcke

13         Direct Examination By Mr. Martinez ..................... 121

14         Cross-examination By Mr. Bussard.......................... 129

15    Detective Sandra Forsythe

16         Direct Examination By Ms. Hoffman ..................... 134

17         Cross-examination By Mr. Bussard.......................... 143

18    Sandra Bohlen

19         Direct Examination By Ms. Hoffman ..................... 153

20         Cross-examination By Mr. Bussard.......................... 186

21    Detective Ryan Reass

22         Direct Examination By Ms. Hoffman ..................... 203

23         Cross-examination By Mr. Francomano ..................... 215

24

25



                Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

< Dates >.
1/4/07 141:2.
5/15/2008 214:2,
  217:21.
August 15th, 2017
  215:18.
January 2007 88:25,
  135:9.
January 23rd 100:14,
  103:21, 117:25.
January 23rd, 2008
  70:16, 72:13,
  87:17, 100:17,
  101:24, 102:13,
  103:10.
January 4th
  135:11.
January 4th, 2007
  144:3.
January 9th 96:23.
January 9th, 2007
  19:13, 41:15,
  89:6, 104:10,
  106:24, 114:23,
  115:9.
March 2007 122:8.
March 23rd, 2008
  70:10, 70:13.
March 31st, 2008
  78:12, 78:19,
  78:24.
March 3rd, 2007
  122:10.
May 15th, 2008
  215:19, 219:2.
May 9th 204:22.
May, 2008 212:10.
'07 89:11, 89:18.
-t-h-e 134:16.
.38 126:9, 126:14,
  127:3, 128:24,
  130:15, 130:16,
  131:3, 131:6,
  131:8, 132:7,
  132:10, 181:4.
.
.
< 0 >.
03 129:9.
03994 34:14.

07 79:15, 178:15.
07-5A 34:14.
073A01853 175:5,
  178:16.
073A1853 136:18,
  175:11, 180:15.
073C01479 179:25,
  180:20.
075A03994 165:22,
  175:12, 178:15,
  180:17.
083E 210:6.
.
.
< 1 >.
1 36:6, 141:18,
  145:21, 171:5,
  183:3, 184:1,
  185:2, 191:1.
1. 13:8, 139:3,
  170:7.
10 199:2.
100 19:8, 131:5,
  155:2, 164:15,
  164:21, 171:19,
  173:5, 173:7.
100. 9:9.
101 1:48.
11 127:25, 151:3,
  158:23, 158:24.
11-1 206:12,
  206:14.
11-1. 209:23.
11-2 206:12,
  206:18.
11-2. 210:7.
11-3 206:12,
  206:22.
11-3. 210:13.
11-4 206:13,
  207:1.
11-4. 210:18.
11-5 206:13, 207:5,
  207:22.
11-5. 211:3.
11-6 206:13,
  208:14.
11-6. 207:22,
  211:9.
11-7 209:16.

11-7. 206:13,
  208:17, 211:13.
11th 61:17, 73:22,
  74:5, 89:11,
  89:18, 96:23,
  97:2, 97:6,
  117:17.
12 25:16, 27:11,
  138:14, 145:3,
  147:19, 224:20,
  225:19.
12. 136:14,
  138:11.
1200 154:11,
  154:13.
13 205:23, 212:7.
1479 129:9, 178:3.
14:23 214:4.
15 11:19, 11:21,
  19:5, 27:11,
  50:16, 50:20,
  50:21, 119:12,
  182:8, 182:12,
  182:25, 185:21,
  224:11.
15. 10:1, 224:12.
15th 212:10,
  212:22.
16 125:5, 204:7,
  224:9.
16-year-old 83:11.
16th 9:4.
17 123:14, 123:15.
17. 122:19,
  123:14.
18 19:1, 85:6, 85:7,
  225:2, 225:11,
  226:1.
18. 227:18.
18th 221:4, 221:5.
19 85:6.
19th 133:12, 133:14,
  221:5.
.
.
< 2 >.
2 21:1, 41:3, 41:11,
  41:12, 41:20,
  41:23, 138:8,
  138:15, 212:25,

213:4, 213:7,
213:22.
2-1 21:17, 21:18,
21:19, 22:6, 22:9,
22:16.
2-1. 34:9.
2-11 22:9, 24:2,
25:6, 25:11,
25:13, 25:15.
2-11. 35:6.
2-12 22:10, 25:23.
2-12. 25:20.
2-14 27:9, 27:10,
27:16, 27:17,
27:21, 30:3, 30:8,
30:11.
2-14. 27:20, 30:8.
2-15 25:24, 27:20,
30:8, 30:22,
31:2.
2-15. 22:10, 27:24,
35:13.
2-16 22:15, 31:3,
31:12, 31:15,
31:23.
2-16. 35:22.
2-18 22:15, 31:16,
31:23.
2-18. 36:3.
2-19 22:15, 31:18,
31:23.
2-19. 36:7.
2-2 21:17, 22:9,
22:20.
2-2. 34:15.
2-20 22:15, 32:5,
32:11.
2-20. 36:11.
2-21 32:18, 33:3.
2-21. 22:15, 37:7.
2-3 22:9, 22:24.
2-3. 34:20.
2-5 22:9, 23:3,
23:18, 23:25.
2-5. 34:23.
2-9 22:9, 23:7,
23:24.
200 9:23.
2005 224:20,
225:17.

2005. 9:17.
2007 6:2, 73:23,
74:5, 89:10, 96:4,
96:11, 96:23,
117:17.
2007. 61:17, 97:6,
135:11.
2008 100:14,
117:25.
2008. 204:23.
2012 225:17.
2013 16:8, 114:13,
116:25.
2016 101:19.
2017 1:19, 224:20,
225:18, 225:19.
20th 9:17, 221:6.
21201 1:49.
21st 135:20, 136:5,
138:21, 141:3,
141:19, 146:25,
147:3, 147:12,
221:6.
22 121:22.
221 19:19, 19:25,
34:18, 34:22,
35:2, 61:6, 76:10,
104:10, 105:24,
107:15, 108:22,
115:3.
226 180:3.
22nd 9:23.
23 153:21, 169:1,
202:4.
23. 140:19, 140:20,
196:6.
23B 192:20.
24 135:3, 140:18,
151:4, 175:4,
196:17.
24. 169:5.
2400 205:6, 205:16,
210:9, 210:15,
210:21, 211:25.
25 111:11, 167:1,
171:9, 175:2,
195:16, 200:1,
200:19, 202:2.
25. 37:20, 168:21,
197:16.

25th 19:19, 19:25,
34:18, 34:22,
35:2, 61:6, 76:11,
104:10, 104:11,
105:24, 107:15,
108:22, 115:3.
26. 42:18, 42:20.
27 153:20.
28. 125:22.
2:15. 119:12,
120:9.
2:49 10:25.
2nd 221:7.
.
.
< 3 >.
3 36:10, 41:2, 41:3,
41:11, 97:25.
30 19:11.
300 141:3.
30th 1:19.
345 136:5, 141:18.
.
.
< 4 >.
4 95:11, 96:18,
97:3, 97:11,
99:10, 145:21.
4. 36:14, 94:11.
403 26:4, 209:13.
403(b 207:6.
403. 25:7.
45 19:11.
4711 210:6.
47280. 129:8.
4:00 197:13.
4th 1:48, 225:22,
226:3.
.
.
< 5 >.
5 37:12, 71:4, 71:5,
71:7, 78:2,
103:11, 217:21.
53 177:25, 183:23,
183:24, 184:1,
184:4, 184:13,
188:16.
5:10 214:23.
5:16 19:22.

5:22 19:22.
5:30 205:4.
5th 79:14.
.
.
< 6 >.
6 1:10, 37:12,
  78:15.
601 79:13, 131:22.
6968 127:25.
.
.
< 7 >.
7 212:16.
70 183:10.
79 178:2, 183:20,
  184:1, 192:12,
  192:13, 192:14,
  193:6, 193:7.
79. 178:4.
7:00 3:23.
7:24 3:23.
.
.
< 8 >.
8 78:21.
80 9:9.
8:00 197:13.
.
.
< 9 >.
9. 77:21.
901 51:2, 51:14,
  51:15, 53:13,
  54:9, 55:14,
  142:24.
911 76:10, 204:15.
92 154:13.
94 184:1, 188:16,
  191:8, 192:22,
  192:23, 193:11,
  193:12.
94. 189:24, 192:16,
  192:17, 193:13.
96 154:13.
994 183:5.
9:45 223:4.
9:45. 230:3.
9mm 38:3, 127:13,
  127:23, 128:5,

128:10, 128:13,
138:1, 139:3,
141:1, 141:10,
141:18, 167:11,
168:13, 168:18,
171:10, 171:11,
171:15, 174:22,
175:2, 175:3,
178:8, 190:5,
190:10, 190:11,
190:12, 190:13,
190:15, 190:16,
191:13, 191:15.
9mms 190:16.
_____/s/_____
_____ 230:10.
.
.
< A >.
A. 1:27.
a.m 19:22.
a.m. 10:25.
a/k/a 68:10,
  183:14.
abdomen 211:16,
  211:17.
abilities 67:5.
ability 52:9,
  222:16.
Above 11:22, 13:5,
  32:15, 64:3, 65:9,
  70:9, 84:21,
  108:7.
above-entitled
  230:8.
absolute 46:13,
  55:6, 173:15,
  179:9, 179:16.
Absolutely 15:1,
  44:5, 44:16, 52:5,
  94:22, 129:17,
  153:24, 181:21,
  197:14, 224:4.
abundance 4:21,
  136:24.
Academy 122:3,
  204:12.
accept 41:9, 42:13,
  157:8, 174:7.
accompanied 80:5,

90:2.
accomplish 172:20,
  176:1.
accomplished
  49:23.
according 4:19.
accordingly
  143:13.
account 20:18.
accurate 35:3,
  53:15, 88:4,
  92:19, 191:16.
accurately 34:5.
accusation 227:19,
  229:13.
achieve 28:25,
  172:21, 179:12.
acknowledge 63:13.
acknowledged 157:9,
  218:17.
across 45:16.
act 224:13, 226:22,
  227:9, 227:11,
  227:13, 227:15,
  227:16, 229:1.
Action 154:9.
activated 124:20.
acts 224:23, 225:1,
  227:8.
actual 16:9, 20:11,
  67:4, 106:5,
  130:8, 142:19,
  159:13, 175:20,
  179:22, 182:22,
  218:9.
Adam 34:14, 129:8.
added 103:21.
addition 153:12.
additional 31:14,
  46:24, 48:8,
  75:20, 83:13,
  88:10.
Additionally
  154:18.
address 2:7, 14:21,
  14:22, 182:13,
  185:6, 229:18.
addressed 7:14.
adds 26:11.
adjacent 35:18,

36:15.
adjoined 70:1.
adjourn 229:19.
adjust 8:10,
  121:6.
admissibility 15:14,
  52:12, 209:11.
admissible 75:14,
  142:24, 217:11,
  225:8, 225:10,
  228:9, 229:5,
  229:9.
admission 25:7,
  43:19, 46:4, 51:7,
  137:1.
admit 44:2.
admitted 41:20,
  53:8, 53:9, 53:18,
  63:1, 69:23,
  76:22, 94:11,
  103:11, 137:10,
  143:15, 155:12,
  169:2, 194:8,
  207:22, 208:14,
  209:14, 209:16,
  212:17.
adopted 173:1.
adult 224:21,
  224:25, 227:18.
adults 229:16.
advance 14:7.
advertently 179:8.
advice 17:7.
advised 220:18.
afraid 81:21.
afternoon 49:10,
  79:7, 79:8, 88:23,
  121:15, 121:16,
  129:21, 129:22,
  134:20, 144:1,
  144:2, 153:7,
  181:24, 186:7,
  186:8, 197:13,
  203:24.
afterward 74:15.
afterwards 226:2.
age 119:18, 225:2,
  225:7, 225:11,
  226:17, 227:18.
agency 18:20.

agent 47:19,
  47:20.
aggravated 204:19.
ago 2:16, 2:23,
  50:25, 90:25,
  91:5, 129:23,
  168:13.
agree 28:16, 41:7,
  46:3, 71:7,
  169:25, 212:8,
  223:19, 227:12,
  228:23.
agreed 41:15,
  170:4.
agreement 6:6, 6:9,
  6:10, 6:13, 6:14,
  43:6, 43:17,
  62:12, 152:1,
  223:16, 228:21.
agreement. 6:7.
agrees 173:5.
ahead 28:17, 41:10,
  134:2, 183:9,
  183:15.
aid 158:21.
al 1:10.
Alan 1:37.
alarming 119:17.
alcohol 81:18,
  91:11, 91:12.
allegation 229:1.
alleged 224:6,
  224:12, 224:22,
  226:12, 227:10.
allegedly 26:20,
  225:1.
allow 7:4, 30:14,
  46:14, 48:8, 50:9,
  75:13, 119:4,
  143:14, 163:5,
  163:7, 172:19,
  182:1, 221:19,
  222:12.
allowed 7:5, 156:7,
  160:22, 219:2,
  219:5, 219:18.
allowing 160:10,
  173:22.
allows 142:25,
  162:7.

Almost 12:4, 46:2,
  55:21, 78:13,
  124:9, 147:24.
alphabet 165:13.
alteration 44:24.
altered 43:24, 45:9,
  57:22, 58:1.
alternative 55:15.
although 43:13,
  95:24, 137:3,
  163:12, 196:19.
Amazing 10:19,
  123:3.
ambiguity 45:2,
  45:4.
ambulance 205:13.
ambush 46:11, 46:25,
  49:3.
AMERICA 1:5.
ammunition 37:4,
  153:16, 155:1,
  157:14, 157:16,
  157:18, 157:19,
  159:7, 161:4,
  161:6, 162:24,
  164:1, 164:3,
  164:16, 168:18,
  179:2, 197:22.
ammunitions
  161:15.
among 46:17, 50:8,
  119:3, 181:25.
amongst 46:20.
amount 189:14,
  197:8, 214:24,
  222:9.
ample 174:5.
amplification 133:4,
  133:13, 133:17.
amplify 30:23.
Analysis 28:17,
  53:24, 54:7,
  54:25, 155:13,
  157:15, 157:19,
  161:17, 167:13,
  169:10, 169:13,
  170:9, 171:7,
  171:13, 180:4,
  180:5, 181:5,
  195:14, 200:10,

200:16, 202:11.
analyzing 153:14.
anatomy 207:25.
Andrenna 149:16.
angle 210:16.
angles 23:14.
annotation 12:13,
  17:20.
answer 57:14, 65:20,
  67:8, 67:21, 68:1,
  74:2, 76:5,
  164:19, 174:3,
  175:9.
answered 82:2,
  100:23, 103:8,
  176:6.
answers 164:11,
  174:10.
anticipate 49:21.
anticipating
  54:22.
Antonio 68:10,
  68:24, 68:25,
  69:10, 120:2,
  136:3, 141:4,
  141:12, 169:3,
  178:10, 180:15.
anybody 86:5,
  86:24.
AP-1 13:25.
apart 167:25,
  168:2.
apartments 106:5.
apologize 186:10,
  193:13, 217:2.
apparent 208:18,
  208:22.
apparently 154:8.
Appeals 182:21.
appear 27:18, 81:15,
  81:17, 81:20,
  92:3, 141:11.
appearance 51:20,
  52:23.
appears 3:10, 4:17,
  111:25, 137:4,
  145:7, 197:20.
applicable 51:3.
apply 157:3.
appreciate 48:7,

155:7.
apprehension
  130:8.
apprehensive
  81:22.
approached 213:22.
appropriate 14:20,
  26:21, 28:15,
  32:12, 173:15,
  207:21, 208:13,
  215:2, 222:24,
  223:13, 228:13,
  228:22.
appropriately
  209:17.
appropriateness
  228:25.
approved 227:5.
approving 58:11.
Approximately 9:6,
  10:6, 10:23,
  10:25, 19:6, 19:9,
  87:19, 88:5,
  100:24, 204:9.
AR 41:12, 41:20,
  41:23.
arbiter 7:8.
area 11:23, 12:5,
  12:8, 13:3, 20:2,
  61:6, 61:12, 94:8,
  94:17, 94:19,
  94:20, 94:23,
  98:4, 98:9,
  108:10, 108:17,
  109:3, 109:6,
  109:7, 109:15,
  146:13, 150:19,
  207:11, 208:6.
argue 26:3,
  223:23.
argument 24:25,
  28:18, 45:9,
  45:11, 54:15,
  55:20, 225:21.
arguments 222:22.
arm 208:1, 208:5,
  211:10, 211:11.
armor 154:4.
armpit 207:11.
Arms 154:6, 154:8,

154:22, 154:23.
Aronica-pollak
  41:13, 41:16,
  41:22.
Around 12:8, 30:2,
  35:25, 38:12,
  44:4, 55:21,
  64:13, 64:15,
  90:8, 107:21,
  108:10, 110:8,
  110:14, 114:13,
  146:13, 205:4,
  205:17, 211:16,
  228:13.
arrays 65:15, 66:3,
  98:24, 117:16,
  117:19.
arrest 125:16,
  125:19, 126:5.
arrested 89:23,
  125:25.
arrival 150:15.
arrive 10:23, 104:9,
  106:15, 144:10,
  145:20.
arrived 10:6, 10:25,
  11:1, 11:14,
  19:23, 35:4, 40:3,
  81:24, 82:12,
  105:1, 105:21,
  106:9, 107:9,
  135:23, 144:10,
  144:13, 147:11,
  205:10.
arrives 106:16.
article 77:19.
articles 5:8, 50:9,
  50:11, 119:5,
  119:6, 182:1,
  182:3, 221:20.
articulate 227:20.
articulated
  142:11.
artificial 29:17.
as-yet 3:22.
ascertain 109:7.
ascribed 34:11,
  78:7.
Aside 85:3, 97:2,
  97:11, 98:19.

Asif 1:46, 230:6,
 230:11.
asks 15:17.
aspect 44:7,
 44:23.
assault 78:14,
 78:19, 219:11,
 224:12, 224:13,
 226:15.
assaults 204:19.
assembled 161:23.
assess 92:9,
 156:16.
assign 105:15,
 130:19.
assigned 104:6,
 104:22, 105:15,
 106:22, 139:22,
 139:25, 140:13,
 204:3, 204:19,
 204:24.
assignment 89:2,
 105:5, 122:7.
assist 156:10,
 176:4.
assistant 2:15,
 2:22.
assisted 156:18.
assisting 9:9,
 176:1.
assists 153:22.
Associated 128:19,
 128:24, 166:12,
 166:20, 174:2,
 180:20, 181:1,
 184:4, 191:8,
 192:11, 192:22,
 192:23, 193:14.
association
 179:25.
assume 54:1, 54:22,
 57:1.
assuming 27:25.
assumption 54:17,
 56:19, 67:3.
assumptions 54:13,
 54:16.
ATF 154:18.
attached 143:4.
attachment 4:8.

attack 57:11.
attacked 213:23.
attain 15:15.
attained 225:7.
attaining 225:11,
 226:17.
attempt 33:11,
 109:16, 137:7.
attempted 26:6,
 115:4, 124:21.
attempting 2:25,
 49:11.
attend 13:19,
 40:19.
attendance 40:21.
attended 43:7, 59:7,
 115:13, 154:4,
 154:14, 205:12.
attention 9:16,
 16:8, 19:12,
 61:17, 78:2,
 78:15, 78:21,
 122:10, 135:11,
 204:22.
attorney 2:16,
 2:22.
Audio 87:2, 90:11,
 90:13, 90:17,
 90:25, 101:14,
 101:15, 102:18.
auditory 101:14.
AUSA 1:25, 1:27,
 2:18, 4:19.
authenticate 51:5,
 52:25.
authenticating
 51:16.
authentication
 51:23, 57:6,
 142:25.
authored 170:8,
 171:6.
autopsy 13:19, 14:8,
 15:24, 20:11,
 40:19, 40:21,
 41:12, 42:16,
 43:8, 59:7, 59:11,
 115:13.
available 102:7,
 102:10, 195:6.

Avenue 92:10, 122:2,
 205:17, 210:9,
 210:15, 212:1.
average 9:13.
Avoid 50:12, 119:7,
 182:4, 221:22.
aware 75:4, 113:7,
 170:25.
away 29:19, 82:20,
 110:18, 130:2,
 167:18, 189:17,
 199:20.
.
.
< B >.
B-o-h-l-e-n 153:1,
 153:2.
B. 1:33, 86:12,
 86:14.
B4 51:2, 51:14,
 55:14.
B9 53:14, 142:24.
bachelors 154:3.
backing 38:6,
 40:1.
bag 55:9, 55:10,
 56:10.
baggie 52:14.
baggy 52:17.
bail 125:9.
bailed 125:1,
 125:11, 130:2.
Ballistic 5:20,
 5:21, 5:24, 13:14,
 35:17, 35:20,
 36:1, 36:9, 36:13,
 37:25, 39:15,
 42:15, 43:1,
 59:11, 59:14,
 66:10, 154:16.
Ballistics 5:25,
 6:1, 13:11, 47:4,
 173:14.
bandage 208:19,
 208:20.
Barclay 64:14,
 86:15, 135:20,
 138:20.
Barclay. 72:12.
barred 209:15.

barrel 161:25,
  162:1, 163:14,
  163:15, 163:18,
  163:24, 168:12.
base 161:19,
  187:20.
Based 26:4, 32:23,
  40:21, 75:4,
  85:25, 95:5, 98:4,
  115:20, 148:22,
  150:4, 175:14,
  195:14, 199:3,
  226:11.
basement 108:4,
  131:22, 131:24.
basic 111:7,
  223:20.
Basically 136:9,
  160:18, 168:17,
  169:18, 204:15.
Basis 44:11, 51:23,
  65:18, 66:18,
  82:23, 161:20,
  172:24.
battle 53:13.
Bear 159:12, 167:17,
  170:10, 193:11,
  229:4.
bears 75:8.
became 122:1,
  145:16, 226:4.
become 153:24.
becomes 142:17.
beef 219:17.
Beg 104:20,
  115:24.
began 83:5, 226:1.
begin 189:19.
beginning 55:3,
  82:13, 182:18,
  222:6.
Begins 221:5.
behalf 16:23, 26:1,
  155:22, 155:24,
  156:2, 229:21.
behind 198:12.
believed 2:18.
believes 173:23,
  174:6.
belong 227:12.

below 159:20.
Bench 8:2, 14:4,
  14:17, 14:18,
  14:22, 14:23,
  15:17, 20:8, 38:9,
  42:24, 50:24,
  55:7, 57:20, 60:4,
  66:19, 67:24,
  71:1, 74:24,
  136:22, 142:15,
  151:20, 166:2,
  170:14, 172:2,
  175:23, 177:7,
  206:10, 214:20,
  217:3.
benchmark 194:9.
bends 111:8.
benefit 133:17,
  176:22.
Beretta 154:12,
  154:22.
Bergmann-bayard
  190:13.
besides 60:18.
best 50:25, 115:2,
  123:16, 179:12,
  186:10, 222:15,
  222:19.
better 30:19, 96:6,
  147:25, 150:4,
  166:9, 186:20,
  225:12.
beyond 67:5, 174:6,
  182:17, 219:23.
big 133:12.
bigger 131:16.
biohazardous
  199:24.
biology 154:3.
birds 15:18.
bit 46:11, 104:5,
  153:11.
black 56:17,
  150:1.
blacked 3:13.
Blank 10:16,
  95:17.
bleach 199:2.
block 9:23, 141:3,
  147:9, 205:6,

205:16, 210:9,
  210:15, 210:21,
  211:25.
blocked 147:5,
  147:9, 147:12.
blood 11:13, 11:16,
  11:21, 13:9, 25:3,
  26:13, 27:14,
  28:4, 30:19, 44:3,
  202:8, 208:9,
  210:19, 210:20.
blown 161:11.
blue 109:13,
  145:7.
blurry 147:20.
boarding 106:2.
boats 122:4,
  122:5.
body 11:15, 12:6,
  13:1, 23:11,
  23:12, 24:7, 24:8,
  24:11, 24:22,
  31:9, 31:14,
  33:23, 36:16,
  59:16, 108:19,
  198:16, 208:18,
  211:15.
Bohlen 5:14, 55:24,
  119:24, 120:4,
  151:22, 152:11,
  152:17, 152:25,
  153:1, 153:7,
  155:5, 155:12,
  156:5, 157:13,
  157:24, 158:25,
  164:15, 166:19,
  166:25, 169:9,
  171:5, 174:21,
  175:1, 178:6,
  179:19, 181:19,
  182:11, 186:3,
  186:7, 193:10.
Bolt 154:9.
book 50:25.
bottom 63:25,
  159:22, 186:14,
  188:2, 213:16.
box 8:1, 8:10, 18:1,
  18:9, 121:5,
  133:24, 152:13,

152:22, 200:23,
203:6, 203:14,
213:19.
boys 64:13.
BPD 2:10, 9:1, 9:7,
19:2, 121:21,
135:6, 204:11.
BR 170:7, 171:5,
183:3, 184:1,
185:1, 185:2.
Brady 3:14.
bragging 123:8.
brain 28:6, 35:17.
brains 20:14.
Brass 190:3.
breach 162:3, 187:8,
187:10, 187:12,
187:13, 187:15,
187:16, 187:18,
187:22, 187:23,
187:24, 188:8,
188:9, 188:10,
188:22, 189:7,
201:13, 201:14.
break 17:8, 17:9,
17:21, 46:20,
49:25, 50:7,
119:2, 184:16,
222:4.
breaks 167:24,
168:2.
Bredar 1:18.
Brice 205:21, 206:3,
206:5, 210:23,
211:7, 211:10,
211:19, 211:22,
213:23, 215:15,
226:9, 226:11,
226:15.
Brice. 219:12.
brief 46:20, 118:5,
228:17.
briefly 112:25,
115:1, 117:15,
121:23, 183:1,
187:10.
briefness 73:19.
Bring 6:23, 7:14,
14:17, 20:24,
45:12, 47:12,

49:25, 59:1,
120:16, 120:17,
186:1.
bringing 87:24.
brings 189:2.
broader 193:2.
brought 52:7, 80:3,
89:17, 89:20,
158:1, 217:20,
217:22, 217:23,
218:4.
Bubba 68:10, 68:17,
68:18, 120:1.
bucket 226:14.
Bug 13:18.
building 19:25,
40:2, 84:21,
106:5.
builds 188:5.
bullets 159:8,
162:8, 162:11,
162:17, 162:23,
163:3, 163:7,
177:9, 181:14,
192:21, 197:15,
198:23, 199:5.
bunch 20:10.
business 5:7.
buy 194:25, 195:8.
.
.
< C >.
C. 183:18.
caliber 38:1, 126:9,
127:12, 168:14,
190:10, 190:12,
190:13, 191:13,
191:15.
calibers 190:14.
Call 7:18, 12:19,
19:21, 47:19,
53:21, 96:7,
104:16, 105:4,
107:11, 120:20,
130:23, 152:8,
190:22, 202:11,
203:3, 205:6,
218:12.
called 8:6, 18:5,
75:3, 104:25,

105:3, 105:11,
106:13, 108:4,
109:6, 112:23,
121:1, 134:5,
145:1, 152:18,
167:20, 168:1,
187:8, 194:17,
203:10, 204:14,
216:19, 216:20,
225:22.
caller 76:16.
calls 7:20, 17:23,
120:21, 133:6,
152:10, 204:15.
camera 13:2, 29:3.
cameras 61:11,
61:12, 109:14.
canvass 61:6,
109:6.
capability 6:18,
172:12.
capable 179:17.
caption 63:11.
capture 162:16.
car 125:9, 145:7,
145:8, 145:11,
184:22.
card 209:25,
217:24.
cards 31:25.
care 201:6.
career 9:7, 19:7.
cares 31:7.
Carmella 107:4.
carpet 28:6.
cars 147:2, 147:7,
147:8, 147:13,
150:18.
cartridges 13:13,
36:21, 111:12,
112:10, 113:15,
160:7, 160:12,
160:19, 160:22,
195:23, 199:21.
cases 47:7, 66:13,
159:24, 160:13,
161:2, 162:8,
162:11, 162:17,
162:23, 163:3,
163:5, 163:6,

165:14, 167:11,
170:2, 171:11,
171:15, 171:17,
174:23, 175:2,
178:15, 180:7,
180:8, 180:9,
180:10, 181:11,
190:3, 191:15,
191:21, 192:2.
catch 125:14.
category 21:2.
caught 228:3.
Cause 40:22, 41:17,
126:19, 127:20.
caused 173:25,
209:6.
causes 143:11,
160:25.
caution 4:21,
136:25.
cavernous 133:12.
cavity 209:5.
CCTV 109:13, 109:20,
144:24.
cell 116:8,
116:15.
central 34:12,
34:13, 165:8,
210:2, 210:4.
century 133:12,
133:14.
certain 43:13, 45:5,
46:4, 66:12,
106:9, 152:1,
156:23, 164:1,
164:2, 168:17,
171:20, 173:5,
173:7, 192:18.
Certainly 26:5,
28:4, 29:3, 48:2,
51:9, 53:5, 56:21,
159:5, 165:2,
189:13, 198:4,
223:10.
certainty 5:20,
5:21, 5:24, 6:24,
7:3, 54:4, 164:16,
164:22, 172:5,
173:10, 173:12,
173:13, 173:14,

174:22, 175:10,
178:7, 178:12,
178:22, 179:9,
179:14, 179:16,
180:14, 180:23,
180:24, 184:21,
228:6.
certify 230:6.
cetera 21:17.
challenge 44:19.
chamber 160:23,
161:5.
chance 58:5, 74:15,
90:25, 210:25.
change 189:11,
189:14, 189:17,
189:21, 197:4.
changed 6:2, 6:3,
165:10.
character 51:12.
characteristics
51:19, 51:21,
52:24, 54:11,
66:13, 163:9,
192:1, 193:24.
characteristics.
54:10.
characterization
165:25.
characterized
166:4.
charge 62:6, 77:14,
78:10, 78:17,
78:19, 89:23,
225:1, 225:15.
charged 62:4, 69:7,
69:8, 78:13,
78:24, 224:13,
225:15, 226:10,
226:23.
charges 77:23.
Charging 216:12,
216:13.
Charles 65:8, 98:5,
98:12, 98:14,
129:9.
chase 125:11.
chasing 125:9.
cheekbone 207:10.
chemical 44:3.

chest 209:5.
Chief 7:18, 42:3,
42:12, 199:4,
199:12.
choreograph 29:16.
Chris 68:16.
Christina 1:27.
Christine 1:46,
230:6, 230:11.
Christopher 2:16,
3:10, 4:17, 16:13,
16:16, 61:22,
61:25, 63:4,
63:15, 64:3,
64:20, 69:12,
94:4, 95:6.
CID 141:5.
Cioffoni 76:19,
76:24, 76:25,
77:2.
circle 12:8, 12:22,
12:25, 123:16,
123:25.
circled 13:5.
Circuit 61:11,
155:3, 225:5,
225:8, 225:22,
226:3.
circuits 225:10.
circumstance 54:22,
156:21, 174:7,
176:23.
circumstances 26:20,
51:22, 156:17,
173:20.
citing 36:1.
City 8:24, 18:21,
19:20, 20:5,
43:11, 60:25,
71:14, 94:20,
96:11, 98:9,
101:17, 121:18,
132:15, 134:23,
155:4, 204:1.
claims 51:18,
52:9.
clarification
177:24.
clarify 38:20,
178:1.

clarity 6:4.
class 192:1,
  193:23.
classify 31:13.
clean 199:20.
cleaned 200:2.
cleans 199:5.
clear 44:7, 96:24,
  106:12, 147:18,
  147:23, 150:14,
  164:9, 172:24,
  175:5, 189:18,
  193:3, 208:20,
  221:15, 224:4.
clearly 25:2, 25:4,
  30:18, 31:13.
CLERK 8:1, 8:3, 8:9,
  8:16, 10:14,
  10:17, 12:13,
  12:16, 17:15,
  18:1, 18:2, 18:8,
  18:14, 120:24,
  121:4, 123:10,
  133:25, 134:1,
  134:8, 134:14,
  152:14, 152:15,
  152:21, 203:7,
  203:8, 203:13,
  203:18.
clippings 115:19.
Close 24:17, 35:15,
  35:19, 151:14,
  161:13, 208:18,
  211:17.
close-up 24:7.
closed 61:11.
closer 35:8.
clothed 35:11,
  35:25.
clothing 77:20.
CM 63:14.
co-counsel 58:22.
co-examiner 169:17,
  169:19, 169:23,
  170:2, 175:17.
coagulated 28:4.
coat 126:9.
Coco 40:7.
coin 200:23.
coincides 58:6.

cold 16:6.
collapsed 208:15,
  209:5, 209:7.
collect 104:25,
  148:17, 149:14,
  162:22.
collected 53:22,
  112:3, 149:13,
  150:12.
collection 104:24.
collects 52:1.
colored 159:18.
Colt 154:23.
column 160:18.
combination 6:12.
comes 51:25, 55:3,
  81:7, 149:9,
  160:9, 161:3,
  165:19, 225:13,
  226:3.
comfortable 80:21,
  80:25, 81:2, 81:5,
  81:7, 81:11.
coming 29:25, 30:22,
  31:2, 31:15,
  32:11, 33:3,
  49:15, 57:1, 96:6,
  108:2, 170:23,
  177:2, 228:8.
command 89:3.
comment 26:9,
  28:11.
comments 64:6,
  64:21, 70:17,
  70:18, 213:18,
  214:10.
commission 33:10.
committed 63:19,
  225:1, 229:2.
common 55:11, 73:13,
  73:16, 75:18,
  75:22, 108:10,
  108:16, 115:6,
  157:11, 163:11,
  190:16.
commonplace 20:1,
  35:1.
communicated
  79:17.
communicating

223:22.
communication
  223:15.
company 80:7.
compare 23:13,
  66:14, 67:12,
  163:1, 163:3,
  163:5, 163:7,
  175:1, 175:19,
  179:20, 180:6,
  181:11, 191:21.
compared 114:1,
  151:25, 162:25,
  181:1, 181:14,
  192:20.
comparing 67:4.
comparisons 155:1,
  161:14, 162:6,
  162:9, 168:8,
  169:23, 169:24,
  170:4, 181:20,
  188:24, 194:12.
Complaint 34:12,
  34:13, 105:10,
  141:18, 165:8,
  165:9, 196:16,
  210:2, 210:4.
complete 30:4, 49:3,
  62:22, 66:3,
  69:20, 72:20,
  77:3, 77:12,
  99:12, 204:7,
  212:14, 214:15.
completed 63:5,
  72:23, 73:3,
  135:3.
completely 45:10,
  167:19.
completeness
  219:10.
complexity 73:19.
compliance 151:23.
compliant 152:3.
complied 46:14.
component 164:3.
components 153:16,
  155:1, 157:16,
  157:19, 161:15,
  162:25, 164:1,
  164:16.

composed 163:13,
165:10.
composes 167:22.
composing 99:13.
computer 93:22,
93:25, 95:9,
154:16.
concept 7:6,
80:24.
concern 33:13.
concerned 6:19,
67:3, 67:16.
concerning 3:11,
4:18.
concerns 119:19,
227:22.
conclude 172:5,
175:14.
concluded. 230:4.
concludes 173:10.
conclusion 164:2,
164:4, 165:3,
165:5, 170:1,
171:16, 178:11,
181:15, 189:3,
194:16, 222:25.
conclusions 5:16,
169:24, 171:13,
181:8, 194:12,
222:13.
concurrent 92:2,
92:8.
conduct 15:25,
46:15, 85:14,
85:25, 92:16,
126:5, 161:14,
161:17, 162:9,
162:15, 162:16,
162:18, 169:9,
169:15, 169:22,
181:5, 188:24,
199:18, 221:24,
223:14, 225:7,
225:9, 225:13,
226:3, 227:10,
227:17, 229:13,
229:17.
conducted 91:4,
101:8, 102:12,
154:25, 162:6,

175:16, 176:2,
179:13, 180:11,
193:20, 199:16,
212:10.
conducting 74:6.
conducts 169:17,
169:23.
confer 17:16,
46:20.
conference 14:4,
20:8, 38:9, 42:24,
55:7, 60:4, 66:19,
67:24, 71:1,
74:24, 136:22,
142:15, 151:20,
166:2, 170:14,
172:2, 175:23,
206:10, 214:20,
217:3.
conferring. 58:24.
confessed 116:19.
confidence 45:23.
confirmed 63:18,
84:8.
confirming 95:6,
117:23.
conform 7:6, 7:9,
7:11.
confront 51:4.
confuse 177:18.
confusing 60:7.
confusion 176:15.
connect 53:6.
connected 166:20.
connection 41:14,
56:25, 62:22.
connectivity
66:13.
connects 53:24.
consider 91:13,
110:11, 157:1.
consideration 98:23,
156:19, 179:5,
222:11.
considerations
157:3.
considered 5:25,
6:16, 28:1,
168:4.
considering 21:10.

consistency
143:10.
consistent 63:16,
65:3, 192:8,
192:18, 193:18.
consists 167:10.
conspiracy 26:10,
71:17, 224:14,
224:19, 224:23,
224:24, 224:25,
225:6, 225:11,
226:1, 226:4,
226:13, 226:16,
226:23, 227:11,
227:20, 229:2.
conspiratorial
227:16.
construct 93:1,
93:21, 95:8.
constructed 97:24.
construction
97:20.
consult 50:15,
119:11, 182:8,
222:1.
consultation
227:4.
consulted 17:6,
126:25.
consulting 50:25.
contact 50:12,
119:7, 168:10,
182:4, 187:21,
221:22.
contained 53:11,
109:5.
containing 69:25.
contains 34:11,
37:24, 210:1.
content 170:23.
contents 51:20,
52:23, 195:23.
context 25:5, 25:10,
26:21, 30:24,
225:25.
continuance 46:21.
continue 7:17,
10:20, 39:1,
42:14, 60:22,
72:3, 137:15,

137:22, 138:10,
  225:10, 228:16.
continued 226:2,
  226:16.
continues 225:6.
continuing 139:16,
  141:25, 185:4.
continuously 44:9.
contours 6:12.
Control 46:22, 56:4,
  60:24, 61:3,
  90:21, 99:1, 99:9,
  99:12, 101:17,
  111:5, 112:15,
  112:24, 128:16,
  131:18, 131:20,
  131:21, 132:1,
  132:9, 136:16,
  139:13, 140:6,
  140:7, 140:8,
  143:5.
controversy 185:5.
conversation 2:15,
  71:21, 83:4,
  83:15, 84:25,
  85:4, 85:17,
  85:21, 116:6.
convey 74:18.
convicted 77:22,
  78:11.
convinced 173:22,
  229:11.
cooperating 2:23.
cooperation 62:12.
cooperative
  211:22.
copies 14:17.
copper 159:18,
  167:20.
copy 209:25.
core 167:22,
  168:4.
corner 205:17.
correctly 101:25,
  110:25, 144:8.
correlate 183:7.
corresponded 98:5.
corroborate 20:18,
  27:2.
Corto 190:14.

Counsel 2:4, 13:24,
  14:3, 15:18, 20:7,
  22:4, 48:12, 50:1,
  58:24, 75:2,
  75:14, 86:3,
  90:24, 100:23,
  103:9, 108:9,
  138:13, 151:12,
  174:16, 184:16,
  188:17, 206:9,
  213:12, 214:19,
  215:1, 217:1,
  220:13, 222:22,
  228:9.
count 29:18, 226:13,
  227:12.
country 194:20.
Couple 28:1, 133:19,
  214:22, 223:7.
course 9:7, 19:7,
  25:12, 29:5,
  57:16, 76:8,
  96:22, 144:23,
  154:15, 154:17,
  154:19, 176:3.
courses 154:5,
  154:14.
court. 15:22, 33:7,
  39:2, 50:5, 60:21,
  67:7, 68:21, 72:2,
  75:16, 137:14,
  143:18, 152:7,
  166:16, 171:3,
  174:19, 178:5,
  209:19, 215:4,
  220:6.
courthouse 47:22.
courtroom 7:25,
  40:8, 45:1, 45:13,
  54:16, 57:9, 71:8,
  77:18, 185:5,
  213:9, 223:14.
courtroom. 7:15,
  50:18, 59:3,
  119:13, 120:18,
  182:10, 186:2,
  223:6.
courtrooms 133:11,
  133:12.
cousins 72:9.

covered 71:16,
  167:19.
Craig 39:25, 64:11,
  64:12, 64:13,
  64:17, 64:19,
  72:7, 72:10,
  72:11, 183:13,
  183:14, 183:17,
  183:18, 188:18,
  192:24.
crease 207:15,
  207:16.
create 92:24,
  169:12.
created 176:14.
credibility 91:16.
credible 2:19, 3:10,
  4:17.
CRIMINAL 1:9,
  229:17.
cringing 223:18.
cross 214:21.
CROSS-EXAMINATION
  4:24, 16:22,
  56:22, 57:11,
  75:12, 79:3, 79:5,
  82:3, 88:21,
  117:6, 129:19,
  143:24, 186:5,
  215:5, 215:13.
cross-examinations
  75:15.
cross-examine 185:8,
  186:4.
Crown 124:2,
  124:3.
crux 49:8, 55:23.
culpability 224:21,
  225:14, 229:17.
culpable 224:25.
Cummings 144:17.
cumulative 31:6.
cups 155:8.
curious 32:17.
currently 204:3.
CURT 120:25.
custodian 47:8,
  47:13, 60:14.
customers 6:4.
cut 159:14, 167:18,

211:7, 213:5.
cutaway 159:13.
cutting 205:1,
  212:2.
cylinder 131:10,
  160:6, 160:7,
  160:8, 160:10,
  160:13.
.
.
< D >.
damage 198:4, 198:7,
  198:8, 198:13.
damaged 165:2,
  165:5.
danger 173:24,
  174:2.
Dante 13:18.
database 113:2,
  113:23.
date 3:10, 65:10,
  70:4, 70:9, 72:13,
  78:7, 78:9, 78:12,
  78:16, 78:18,
  78:23, 79:19,
  87:18, 100:19,
  141:2, 141:17,
  214:1.
dates 88:4, 221:3.
David 144:6.
day 2:3, 9:24,
  19:13, 19:21,
  49:19, 49:23,
  79:20, 86:4,
  104:13, 126:2,
  131:4, 135:12,
  135:17, 144:6,
  144:17, 144:21,
  148:13, 149:15,
  204:25, 205:3,
  220:17.
days 33:12, 46:10,
  120:2, 221:1,
  221:8, 221:9,
  222:5, 222:18.
dead 14:8, 23:12,
  24:7, 24:8, 24:11,
  24:23, 26:6,
  26:12, 28:3,
  31:10, 31:11,

31:13, 64:14.
deal 46:25, 48:8,
  99:3.
dealing 55:9.
dealt 172:24.
death 40:22, 41:14,
  41:17.
debate 54:23.
deceased 25:3, 25:4,
  104:3.
decide 41:9, 50:2,
  94:1.
decided 27:7.
deciding 157:4.
decision 148:16,
  156:12, 199:9.
decontaminate
  198:23, 200:7.
Decontaminated
  169:22, 200:5.
decontaminating
  199:19.
deeper 46:24.
Defendant 1:12,
  1:29, 1:35, 1:39,
  15:4, 20:13,
  23:24, 32:9,
  32:10, 46:12,
  48:2, 48:18,
  225:6, 226:6,
  226:9.
defendants 25:20,
  26:2, 41:7,
  229:14.
defense 4:23, 48:12,
  49:14, 75:14,
  220:13.
definition 6:7, 6:8,
  6:9.
definitional
  167:14.
degree 5:20, 5:24,
  7:3, 54:4, 78:13,
  78:19, 172:5,
  173:9, 173:12,
  173:13, 174:22,
  175:10, 178:7,
  178:11, 178:21,
  179:14, 179:16,
  180:13, 180:22,

180:24, 184:20.
delayed 133:19.
deleting 134:1.
DEM 158:23,
  158:24.
demonstrate 51:11.
demonstrated 53:2,
  53:3.
demonstration
  186:11.
demonstrative 158:8,
  158:20.
denied 177:18,
  177:23.
depart 133:2,
  151:14, 202:25,
  220:14.
Department 7:21,
  8:24, 18:21,
  18:25, 32:5,
  43:11, 60:15,
  60:25, 66:6, 89:3,
  102:4, 103:3,
  104:23, 105:16,
  120:15, 120:22,
  121:18, 132:15,
  135:2, 143:6,
  151:4, 153:9,
  153:19, 153:20,
  165:9, 204:1,
  204:6.
depending 51:11,
  75:14.
depends 9:14.
depict 27:18,
  34:5.
depicted 31:14,
  32:18, 56:9,
  63:11, 63:25,
  207:11, 208:6,
  209:10.
depicting 36:13.
depiction 35:3.
depicts 25:2, 28:3,
  34:25, 35:16,
  37:13, 207:10,
  208:17.
depth 216:17,
  219:6.
deputy 71:8.

describe 20:14,
  35:10, 99:19,
  112:25, 180:4,
  223:11.
described 31:2,
  33:9, 35:1, 94:3,
  101:11, 103:23,
  106:2, 175:15.
describes 143:12.
describing 53:14,
  55:7, 95:7,
  171:12.
description 143:11,
  193:2, 200:24.
descriptions
  98:16.
deserves 157:6.
Despite 52:25,
  174:17, 179:7.
determination 30:7,
  100:5, 110:11,
  157:11, 173:18,
  196:2.
determine 46:23,
  66:11, 151:25,
  153:16, 162:10,
  164:1, 165:19,
  169:25, 174:21,
  175:9, 178:7,
  178:21, 180:13.
determined 41:16,
  44:11, 169:25,
  170:16, 172:15.
determines 156:18.
determining 179:9.
develop 57:2,
  108:24.
developed 88:10,
  95:22, 109:11.
develops 75:20.
device 92:1, 92:16,
  100:8, 100:11,
  116:16.
devices 90:11,
  91:24.
diagram 158:1,
  158:2, 159:11,
  159:13, 167:16,
  187:19, 191:2.
Dick 195:3.

dictionaries
  222:2.
dictionary 50:16,
  119:11, 182:8.
difference 24:23,
  36:17, 95:24,
  140:2, 160:2,
  167:15.
Different 23:11,
  23:14, 45:10,
  48:7, 71:13,
  71:14, 95:23,
  125:24, 125:25,
  160:16, 161:21,
  161:24, 163:16,
  163:17, 179:3,
  187:5, 194:25,
  210:16.
difficulty 172:22.
Digga 213:5.
digit 165:12.
digits 165:11.
Dimakakos 137:4.
Dimakos 149:16,
  149:17.
dipping 198:25.
dire 155:14,
  155:18.
DIRECT 8:18, 9:16,
  18:16, 61:17,
  78:2, 82:6, 84:11,
  117:22, 121:13,
  122:10, 134:18,
  135:11, 153:5,
  203:22, 204:22.
Directing 16:8,
  19:12.
direction 29:4,
  39:10, 114:2,
  124:11.
directly 8:11,
  18:10, 29:2,
  121:6, 134:9,
  152:23, 162:25,
  163:1, 203:15.
disagree 174:12.
disappointed
  223:18.
disappointment
  223:16.

discharge 161:6,
  161:13, 188:1.
discharged 160:11,
  160:12, 160:24.
discourse 83:7,
  83:9.
discrete 143:4.
discretion 104:23,
  111:6.
discriminate
  20:23.
discuss 50:7, 50:8,
  119:2, 119:3,
  181:24, 181:25,
  217:8, 221:17,
  221:18.
discussed 49:5,
  57:20, 156:1,
  180:6.
discussing 50:24.
discussion 92:11,
  228:16.
dispatcher 105:17,
  128:7, 130:23.
display 223:14.
displayed 30:10,
  30:11, 158:9.
disposed 132:9,
  132:12.
Disposition 78:6,
  78:9, 78:11,
  78:16, 78:18.
dispute 43:1, 43:14,
  44:11, 45:8,
  48:13, 53:12,
  90:5.
disputed 48:6,
  53:18.
disputing 90:4.
distinctive 51:19,
  51:21, 52:24,
  54:10, 54:11,
  54:18, 54:21,
  55:12, 55:25.
distinguish 55:12.
distinguishes
  229:16.
distinguishing
  55:22.
District 1:1, 1:2,

135:7, 135:10,
141:4, 155:3,
165:11, 165:12,
204:13, 204:14,
204:18, 204:24.
disturbed 45:17.
DNA 115:16, 115:20,
200:15.
doctor 92:8,
92:10.
document 13:1, 29:3,
52:21, 77:25,
78:3, 78:6, 78:15,
78:22, 95:16,
105:19, 116:18,
126:21, 126:25,
127:16, 137:5,
138:19, 138:22,
139:2, 140:11,
169:12, 184:2,
184:24, 216:19,
218:20, 218:25,
219:11.
documentary 47:11.
documented 110:12.
documents 97:4,
184:1.
doing 75:9, 88:24,
109:10, 147:3,
150:8, 199:14.
domestic 135:7.
Don 72:6, 72:9,
73:4.
Donatello 70:6,
103:16, 125:20,
125:24, 127:4.
done 21:15, 46:2,
84:11, 93:21,
110:8, 149:25,
180:10, 209:1,
217:5, 219:20,
220:4.
door 34:21, 107:24,
218:1, 219:8.
doors 108:10.
double-blind 95:19,
95:21, 96:10.
doubt 6:19,
182:16.
dovetails 21:7.

down 12:18, 14:12,
24:20, 49:12,
50:19, 58:2,
58:20, 75:7,
86:22, 86:25,
87:11, 87:12,
102:22, 127:19,
137:8, 138:25,
147:3, 147:8,
148:4, 159:19,
161:25, 163:14,
168:12, 182:11,
182:22, 186:14,
188:6.
drained 28:4.
dramatic 189:14.
draw 12:7.
dreadlocks 125:25.
drill 29:19, 46:5.
driver 124:8, 125:1,
125:8, 125:11,
125:18, 127:11.
driving 127:7.
drop 131:11.
dropped 149:18.
drops 149:6.
Drugs 91:11,
91:12.
duly 8:6, 18:5,
121:1, 134:5,
152:18, 203:10.
duplication 6:11.
duplicative 25:9.
duties 144:23,
153:23.
duty 9:18, 19:13,
105:4, 122:11,
135:12.
dwelling 20:1,
105:24, 107:19,
108:4.
dwellings 108:12.
.
.
< E >.
e-mail 3:24, 4:8.
e-n-e-y 8:15.
earlier 5:15, 35:1,
72:22, 100:23,
109:25, 113:16,

139:21, 145:12,
168:6, 171:19,
175:15, 183:21,
192:6, 195:7.
Early 9:16, 9:20,
19:12, 19:22,
83:4, 104:9.
easier 195:9.
easiest 151:3.
easily 53:3.
East 9:23, 19:19,
19:25, 34:18,
34:22, 35:2, 61:6,
76:11, 79:13,
104:11, 105:24,
107:15, 108:22,
115:3, 122:16,
124:13, 131:22,
136:5, 138:21,
141:3, 141:19.
Eastern 204:18,
204:24.
ECU 112:23, 113:1,
113:5, 113:7,
113:23, 114:3,
140:14.
education 156:15.
Edward 210:6.
effect 2:17, 82:16,
83:10.
efficient 2:7,
173:19.
effort 38:17.
Eight 30:13, 59:15,
90:7, 135:5.
Either 25:1, 46:21,
48:16, 57:17,
87:2, 132:16,
161:6, 176:1,
189:19, 228:17,
228:18.
eject 149:3.
Ejected 148:23,
161:1, 161:3,
161:8, 184:21,
186:20, 186:21,
186:22.
ejector 189:4,
189:10, 194:10,
201:15.

ejects 36:21, 36:22,
  36:25.
elbow 208:7.
electronic 116:16.
element 51:10.
elicit 29:1, 29:12,
  75:4, 174:10.
eliminate 181:17,
  193:22.
elude 124:21.
embrace 172:22.
emergency 124:20.
emotional 73:19.
emotions 223:22.
emphasize 222:5.
employed 18:20,
  134:22, 153:18,
  203:25.
empty 131:10.
enable 152:1.
encounter 73:18,
  97:7.
encountered 126:3.
encyclopedia 50:16,
  119:11, 119:16,
  182:8.
encyclopedias
  222:2.
end 4:20, 49:19,
  49:25, 220:17,
  221:13, 225:24,
  228:20.
endeavor 98:2,
  98:3.
ended 79:23,
  125:2.
ending 177:25,
  183:20, 183:24,
  188:16, 192:11.
ends 183:4,
  189:24.
enforcement 18:20,
  46:25, 89:18,
  89:20, 104:12,
  105:21, 144:13,
  144:21, 146:5,
  204:16.
engaged 179:9.
engaging 224:23.
enough 32:4, 81:11,

83:25, 165:4,
  194:14, 217:4,
  228:4.
ensure 6:4, 96:5,
  170:3.
entails 153:11,
  153:13.
enter 8:9, 18:8,
  203:13.
entered 7:15, 38:12,
  59:3, 120:18,
  186:2.
entire 47:4, 50:2,
  105:12, 140:4.
entirely 160:16.
entitled 3:2, 30:25,
  48:18, 57:11,
  57:25, 226:7.
entrance 34:21.
entry 44:23.
envelope 34:10,
  37:24, 53:11,
  56:3, 111:10,
  131:14, 131:15,
  131:16, 136:16,
  139:11, 140:25,
  141:1, 141:16,
  141:19, 142:21,
  143:4, 149:18,
  149:21, 149:22,
  149:23, 150:5,
  200:23.
enveloped 98:3.
envelopes 47:14,
  56:10, 57:23,
  131:17.
environment 45:15,
  80:20, 197:4.
ENZINNA 1:31,
  155:23, 158:14,
  176:25, 177:6,
  177:9, 177:20,
  183:13, 183:18,
  185:9, 185:10,
  206:15.
equation 27:21.
equipment 124:20.
equipped 90:11,
  91:24.
especially 222:5,

229:14.
Esquire 1:31, 1:33,
  1:37, 1:41.
essence 116:19.
essentially 15:5,
  89:11, 107:14.
establish 51:13.
estimation 28:14,
  29:23.
et 1:10, 21:17.
Evening 135:18,
  145:12, 205:4.
event 78:7.
events 33:12,
  114:23.
Eventually 13:16,
  13:17, 13:19,
  106:15, 135:25,
  205:18, 206:2,
  228:13.
everybody 10:17,
  55:1.
everyone 228:3.
everything 73:23,
  85:1, 85:22,
  111:25, 112:3,
  139:13, 159:16,
  199:20, 222:18.
evidenced 6:11.
evident 25:4.
evidentiary 43:19,
  44:6, 44:7, 53:20,
  137:24.
evidently 49:21.
evolves 86:1.
exact 69:14, 100:19,
  124:24, 141:16.
Exactly 29:19,
  44:21, 52:10,
  97:23, 117:11,
  126:16, 131:25,
  139:11, 176:6,
  217:19, 218:16,
  224:3.
exam 114:6.
EXAMINATION 5:13,
  8:18, 18:16, 66:7,
  66:14, 67:11,
  82:6, 109:17,
  113:9, 117:13,

121:13, 134:18,
153:5, 153:19,
155:13, 157:15,
157:18, 157:19,
169:18, 176:2,
179:13, 188:15,
188:16, 199:14,
202:1, 203:22,
215:2.
examine 47:18,
56:16, 66:10,
109:13, 144:24,
165:16, 166:19,
167:8.
examined 8:6, 18:5,
53:23, 121:1,
134:5, 152:18,
186:9, 191:16,
203:10.
Examiner 42:3,
42:13, 45:25,
47:17, 114:2,
119:23, 151:22,
152:10, 153:13,
153:25, 155:12,
169:20, 170:1,
185:9, 196:14,
198:19, 199:4,
199:5, 199:12,
201:2.
examiners 113:10.
examining 56:20,
170:12.
example 163:11,
187:13, 226:9.
examples 51:19.
exceed 6:20.
exceeds 6:18.
except 43:10,
55:21.
exceptional 189:8.
exchanged 100:11.
excluded 21:11.
exclusively
157:12.
Excuse 98:20, 154:7,
196:25, 214:25,
215:19, 217:21,
225:19.
excused 17:4,

118:20, 132:24,
133:2, 151:12,
202:20, 202:24,
220:11, 220:14.
exhibits 17:10,
21:20, 22:5,
38:24, 43:20,
43:22, 182:14,
182:17, 224:1.
exist 174:4.
exists 6:13,
101:20.
expand 157:17.
expanded 109:3.
expect 55:8, 57:18,
68:1.
expectation
221:12.
expects 57:17.
experience 73:14,
74:19, 75:1,
75:19, 156:15,
199:3, 223:10.
experienced 85:8,
85:11, 156:10.
expertise 156:19.
experts 17:6.
Explain 47:13,
47:15, 159:3,
160:2, 162:13,
163:8, 166:8,
167:14, 187:10,
211:13, 218:14.
explaining 5:16,
164:24.
explanation
174:17.
explicitly 157:18.
explosion 160:24,
188:4, 188:6.
exposed 50:9, 119:4,
182:1, 221:20.
express 5:19,
156:7.
expressed 6:20,
227:19.
expressions
223:16.
extending 208:6.
extensive 17:12,

153:24.
extent 17:10, 46:5,
198:5, 222:20.
external 161:10,
222:1.
extracted 201:17.
extractor 201:16.
Extremely 73:16,
75:22, 228:11.
extremities 41:20.
eye 28:3, 29:24.
eyes 26:15,
215:23.
eyewitness 16:9,
96:25.
eyewitnesses 49:13,
108:25, 109:10,
109:18, 212:2.
.
.
< F >.
F-o-o 97:21.
F-o-r-s-y- 134:15.
F-o-r-s-y-t-h-e
134:13.
F. 1:31.
face 8:1, 18:1,
26:13, 56:22,
133:25, 152:14,
162:3, 187:8,
187:10, 187:12,
187:13, 187:15,
187:17, 187:18,
187:22, 187:23,
187:24, 188:8,
188:9, 188:10,
188:22, 189:7,
201:14, 203:6,
211:7, 211:8.
facial 223:15.
facilitate 104:24,
110:13.
facilitated 112:5.
facilities 154:19.
facility 154:24.
fact 25:2, 26:5,
27:20, 38:12,
51:1, 54:14, 56:1,
65:22, 90:14,
94:10, 94:22,

114:9, 142:20,
170:3, 190:8,
195:11, 199:4,
199:8, 200:20,
229:4.
factor 91:13,
98:22.
facts 50:14, 119:9,
156:12, 157:12,
182:6, 221:24.
factual 41:5.
failed 123:20,
178:10.
fair 58:3, 92:19,
108:16, 166:14,
194:7.
fairly 80:21, 96:13,
161:13, 167:25.
faith 143:12,
150:4.
fall 55:12,
226:13.
falls 221:11.
familiar 37:20,
95:19, 107:4.
family 221:19.
far 6:19, 33:9,
43:18, 67:6,
98:16, 109:5,
114:22, 189:7,
222:24, 226:21.
fashion 14:25,
17:11, 101:14.
fault 46:16.
Fayette 79:13,
131:22.
FBI 154:14.
FCRR 1:46, 230:6.
features 98:17.
Federal 1:47, 62:6,
80:9, 155:3.
feel 81:10, 169:3.
feelings 33:13.
fellow 221:18.
Fenner 70:6, 103:10,
103:16, 103:17,
103:21, 103:24,
104:2, 115:23,
115:25, 125:20,
125:24, 126:6,

127:4, 127:6,
128:25, 129:24,
130:8, 178:2,
178:3, 183:20,
193:8.
fertile 56:21.
few 33:10, 33:15,
46:10, 46:17,
50:24, 52:4,
54:15, 89:10,
90:24, 120:2,
122:11, 133:4,
147:15, 164:5,
191:25.
fibers 202:9.
field 155:13,
156:10, 157:14,
157:20, 157:21,
179:1.
fight 49:14.
fighting 219:17.
figure 173:6,
209:11.
file 2:14, 2:17.
filed 49:4, 49:7.
filer 47:25.
filled 88:8,
210:1.
final 7:7, 181:19,
222:22.
finally 26:12,
124:24, 139:1,
155:1, 211:12.
find 3:12, 25:1,
25:6, 26:21,
47:10, 50:1,
76:13, 109:20,
126:8, 127:9,
142:23, 143:13,
157:6, 179:13,
194:10, 194:13,
199:5, 202:4,
207:19, 208:11,
209:14, 226:11.
finding 51:17,
157:13, 176:12,
177:13, 179:4,
193:15.
fine 12:23, 23:16,
55:4, 172:7.

finger 11:25, 12:9,
12:17, 12:18.
fingernails 115:17,
115:18.
fingerprint 200:10,
200:14.
fingerprints 115:4,
115:10, 115:25.
finish 28:17,
126:13.
finished 126:22.
fire 162:17, 162:22,
163:2, 163:4,
168:17.
fires 162:15,
193:21.
firing 55:23, 160:8,
162:3, 162:14,
187:25, 188:3,
188:25, 189:7,
189:11, 189:20,
201:20.
Five 2:9, 3:23,
9:13, 17:14, 38:5,
52:3, 52:11,
61:14, 94:16,
95:1, 98:8,
167:11, 171:10,
171:15, 174:22,
175:2, 178:15,
190:1, 191:9,
191:17, 204:9,
204:21.
five. 23:10.
fix 182:24.
Flex 122:2,
204:14.
flexible 49:18.
flight 6:2.
Flip 70:12,
213:18.
flood 102:1, 102:2,
102:3.
floods 131:24.
Floor 1:48, 20:2,
23:12, 24:7, 24:8,
24:11, 24:24,
26:16, 35:1,
57:22, 79:14,
107:14, 107:16,

107:17, 107:22,
108:7, 131:23.
floorboard 127:11.
floors 84:21.
fly 2:8.
focus 37:9, 222:7.
follow 87:13,
140:14, 178:10.
follow-up 85:25.
followed 17:11,
143:8.
following 15:22,
15:24, 22:5, 33:7,
39:2, 50:5, 51:24,
60:21, 67:7,
68:21, 72:2,
75:16, 120:5,
137:14, 143:18,
152:7, 166:16,
171:3, 174:19,
178:5, 209:19,
215:4, 220:6,
220:25, 221:1.
follows 8:7, 18:6,
105:12, 121:2,
134:6, 152:19,
203:11.
Foo 64:10, 64:11,
64:14, 64:15,
64:16, 64:23,
65:8, 72:7, 72:24,
97:15, 97:17,
97:21, 98:12,
98:14.
Force 122:2.
forces 161:10.
foregoing 230:7.
foreign 202:10.
Forensic 5:21,
45:25, 58:3,
173:13, 179:1,
179:14, 180:22,
184:21.
forensics 179:2.
foreseeable 226:8.
forever 113:8.
forget 30:14,
221:11.
forgets 52:2.
forgive 70:15,

79:16.
form 85:3, 150:11,
223:15.
formerly 119:25,
137:11.
formulation 5:15.
Forsythe 119:24,
133:7, 133:9,
133:10, 134:4,
134:12, 134:20,
137:2, 137:16,
137:23, 139:8,
140:13, 141:7,
144:1, 183:25,
184:7, 184:11.
forth 47:15, 63:17,
147:13, 172:19,
179:3.
forward 7:25, 17:25,
30:13, 61:18,
120:16, 131:11,
133:23, 152:12,
160:22, 161:4,
173:20, 203:5.
found 11:13, 12:6,
31:15, 35:3,
54:18, 85:22,
127:23, 130:11,
132:8, 201:3,
201:4.
foundation 21:20,
25:12, 25:13,
32:5, 32:12, 33:4,
51:7, 51:11,
51:14, 52:21,
54:5, 137:7,
143:14, 173:16,
207:22, 208:13,
209:17.
Four 17:13, 41:18,
41:19, 51:19,
221:9, 222:18.
fragment 167:15,
168:5, 168:8,
168:9.
frame 83:24.
frankly 228:8,
229:13.
free 169:3.
freedom 173:1.

freely 66:3, 72:20,
214:15.
Friday 220:24,
221:8.
Fridays 220:19.
friends 221:19.
front 7:25, 34:17,
34:21, 39:19,
44:20, 54:9, 56:9,
56:10, 60:7, 84:4,
85:18, 107:23,
107:24, 108:3,
136:5, 152:13,
159:1, 166:8,
225:21.
full 93:5, 99:12,
159:7, 190:16.
fully 35:11,
35:25.
functioning
208:16.
fungible 55:21.
furtherance 26:9,
224:13, 224:23,
226:22, 227:11,
229:2.
future 55:1.
.
.
< G >.
game 58:3.
Gang 71:14, 74:10,
86:8, 226:19,
227:4.
gaping 208:9.
gathered 143:3.
gathers 47:7.
gave 93:2, 93:11,
222:6.
Gay 122:15,
184:22.
Geezy 40:12, 64:11,
64:15, 71:12,
71:22, 72:7,
72:10, 72:24,
73:3, 77:17,
84:14, 84:15,
84:17.
general 114:5,
168:16, 216:14,

216:20.
Generally 14:5,
  179:1, 191:25.
generic 54:12,
  54:19, 55:9.
gentlemen 7:17,
  8:22, 33:8, 41:5,
  50:6, 119:1,
  133:11, 153:10,
  156:4, 164:10,
  178:25, 181:23,
  220:16, 221:16,
  222:4.
genuine 42:25.
Gerald 1:10, 1:29,
  20:13, 27:3, 40:6,
  40:12, 77:17.
German 190:19.
gets 47:9, 55:24,
  113:22, 191:3,
  197:7.
getting 85:12,
  124:7.
Giblin 2:18, 4:19.
girlfriend 77:9.
Give 14:6, 21:2,
  46:8, 49:18,
  49:20, 67:25,
  88:7, 90:9,
  130:23, 157:5,
  163:20, 192:2,
  211:5, 220:21.
given 9:14, 14:10,
  29:20, 30:24,
  43:5, 54:14, 72:9,
  73:20, 111:22,
  140:5.
gives 14:14.
giving 15:6, 15:7.
glasses 40:15.
glassine 56:10.
Glock 154:7.
gloved 111:8.
gloves 38:15,
  131:4.
GM 10:1, 11:19,
  11:21, 123:14,
  123:15, 125:5.
Google 123:14.
gore 25:3.

Gotcha 124:14.
gotten 4:3, 53:12,
  228:8.
grand 229:12.
granted 177:12,
  177:16, 177:17.
graphic 27:17,
  33:16, 209:15.
gray 124:8, 127:7.
great 154:2, 167:7,
  224:16.
greater 5:19, 6:4,
  219:5.
green 124:7.
Greenmount 94:17,
  94:19, 98:9,
  205:17, 210:9,
  210:15, 212:1.
Greg 183:17.
Gregory 2:11, 39:24,
  41:14, 59:8,
  59:17, 61:19,
  62:20, 69:6,
  72:24, 73:24,
  74:7, 76:9, 89:6,
  116:20, 165:24,
  166:21, 167:3,
  171:12, 178:8,
  180:16.
Grimm 6:20,
  172:25.
grip 160:20.
groove 163:15.
grooves 163:14,
  163:17, 163:22,
  193:25, 194:1.
gross 26:17,
  29:25.
grotesque 26:16.
ground 56:21,
  145:22, 149:17,
  149:20, 209:16,
  228:10.
grounds 229:12.
gruesome 14:7, 15:8,
  20:18, 25:2,
  26:22, 27:18,
  27:20, 27:22,
  28:1, 28:6, 28:14,
  28:15, 29:24,

30:1, 30:7, 30:8,
  30:17, 31:13,
  207:9, 207:20,
  208:11, 209:13,
  209:15.
gruesomeness 26:5,
  28:8.
GS25 113:5,
  113:22.
guess 4:11, 90:4,
  108:5, 149:1.
guilt 78:18.
Guilty 78:12,
  78:23.
Gun 54:5, 126:12,
  128:3, 154:14,
  161:9, 161:23,
  162:4, 163:22,
  164:6, 164:13,
  164:17, 168:11,
  168:15, 171:1,
  173:11, 179:10,
  179:15, 181:12,
  181:16, 181:18,
  187:15, 189:9,
  189:10, 195:3,
  201:17.
guns 83:16,
  194:22.
Gunshot 26:20,
  35:12, 40:25,
  41:17, 41:18,
  41:19, 154:14.
.
.
< H >.
HA3 65:1.
HA4 63:1.
HA5 69:23.
hair 40:15, 126:2,
  207:16.
hairstyles 63:17.
half 19:5, 159:13,
  185:17, 185:18.
hammer 160:11.
hand 8:4, 18:3,
  68:17, 68:19,
  112:14, 120:24,
  123:11, 123:16,
  152:16, 163:22,

169:8, 203:8.
handcuffs 80:16,
    80:17, 80:18.
handed 140:25.
handgun 36:19,
    78:24, 127:10,
    148:24.
handle 198:23,
    200:8, 204:15.
handled 113:24,
    173:19.
hands 49:24, 112:7,
    112:13, 196:13.
handwrite 21:12.
handwriting 64:20,
    70:20, 213:1.
hanging 176:22.
happen 56:18,
    75:23.
happened 48:14,
    76:3, 101:23,
    103:5, 103:17,
    124:5, 124:19,
    150:14, 218:6,
    218:9, 219:3.
happens 75:11,
    102:25, 112:25,
    113:1, 113:22,
    132:2, 139:8,
    139:10, 161:12,
    168:18.
happy 3:3, 223:20.
hard 11:22, 14:17,
    28:24, 45:8,
    55:11, 70:8,
    227:20.
harder 188:9.
hate 10:8, 15:5,
    198:15.
Hayden 68:15.
HCS 34:9.
HCS-1 11:9.
He'll 119:21.
HE25 39:14.
Head 14:15, 26:16,
    26:21, 29:25,
    35:17, 35:18,
    41:18, 188:10,
    219:4, 223:17.
headed 54:2, 67:1.

Headquarters 60:25,
    101:9, 112:21.
heads 14:10.
hear 67:18, 71:25,
    100:10, 137:2,
    163:21, 164:19.
heard 20:13, 30:24,
    33:8, 48:15, 56:7,
    71:22, 164:11,
    183:11, 183:21,
    222:8, 222:10,
    222:21, 222:22.
hearing 2:5, 183:7,
    185:6, 224:7.
Hearsay 5:3, 5:4,
    26:10, 71:16,
    71:18, 71:20,
    71:22, 75:10,
    82:24, 217:10,
    218:22, 218:23.
height 98:17.
held 121:24, 204:10,
    224:25.
help 216:2, 216:5,
    216:22, 221:3.
helpful 183:6.
hereby 230:6.
herself 166:8.
HI-58 16:15.
HI18 76:22.
HI58 61:24.
hideously 27:17.
high 173:9, 179:11,
    223:8.
higher 89:2,
    211:16.
highlight 176:14.
historical 76:9.
historically
    165:10.
history 190:19.
hits 186:22,
    186:23.
Hold 4:15, 23:20,
    29:7, 123:7,
    168:17, 218:12.
holding 214:24.
holds 159:18.
hole 46:24,
    187:24.

holes 26:15.
holiday 221:10.
home 52:2.
homicides 9:6, 9:11,
    9:14, 19:6, 19:9,
    33:10.
Honda 124:16, 127:7,
    127:9.
honestly 21:22.
Honorable 1:18.
hope 102:15, 110:24,
    147:21.
Hopefully 228:16.
Hopkins 205:14.
Hospital 205:14,
    206:2, 206:6,
    209:6, 209:8,
    210:22.
Hour 83:22, 119:12,
    147:15, 148:13,
    185:17, 185:18.
hours 9:17, 19:12,
    19:22, 83:22,
    104:9, 154:25.
house 64:11, 64:16,
    72:7, 72:24,
    84:15, 106:2,
    106:3, 106:7,
    109:6.
human 198:16,
    202:7.
humerus 208:6.
hundreds 9:10.
hyphens 21:2.
.
.
< I >.
IBIS 154:15.
idea 32:25, 60:8,
    148:10, 148:14,
    148:15, 150:14,
    150:20, 192:1,
    196:12.
ideas 85:14.
identifiable
    55:22.
Identification 6:1,
    6:6, 6:24, 7:5,
    51:24, 96:8,
    143:1, 154:16,

155:3, 161:19,
170:6, 170:16,
170:25, 192:19,
194:9.
identified 3:21,
63:18, 69:13,
103:7, 103:8,
105:22, 106:10,
107:11, 109:2,
110:20, 117:20,
118:12, 118:15,
125:20, 145:24,
165:23, 167:2,
171:10, 173:14,
173:24, 190:5,
196:18.
identifier 182:23.
identify 38:18,
40:1, 40:16,
44:14, 51:6,
52:25, 53:21,
61:9, 61:15,
64:23, 68:8,
76:16, 93:18,
115:11, 125:18,
125:22, 142:18,
142:20, 149:25,
181:17, 190:21,
193:21, 205:18,
212:2, 212:4,
213:6, 214:13.
identifying 51:16,
57:5, 142:18,
187:5, 196:9,
226:8.
identities 117:23.
identity 13:16,
13:17, 39:21,
84:8, 135:25.
ignites 188:4.
III 1:41.
imagine 26:14, 47:3,
51:24, 53:1,
55:17, 170:22.
immediately
110:20.
impacts 167:24.
impart 188:9.
imparted 161:24.
imparts 163:20.

implicated 51:4,
98:2.
implicit 178:20.
implies 6:24.
importance 47:24,
222:7.
important 27:1,
49:17, 91:13,
148:16, 201:2,
225:4.
imported 194:22.
impossibility.
6:16.
impressed 143:9.
impression 2:22.
impressions 74:18,
74:25, 189:1.
in. 6:23, 30:22,
31:23, 48:14,
53:19, 59:1,
120:17, 228:8.
inadmissible 55:5.
inadvertently
176:15, 179:8.
inappropriate
175:24.
inarticulately
45:3.
incapable 179:9.
incident 49:12,
76:25, 77:6,
126:5, 128:19,
184:5, 210:3,
216:14, 216:21,
218:10, 226:11.
incidents 49:12.
include 6:5, 6:7,
14:8, 98:6, 109:4,
157:17.
included 43:13.
includes 157:16.
including 52:1.
inconsistencies
76:2.
Incorporated
154:7.
incumbent 223:12.
independent 50:13,
119:8, 156:12,
182:5, 221:23.

independently
156:16, 169:19.
indicate 149:19.
indicated 54:8,
91:23, 118:11,
146:23.
indicates 71:8,
78:5.
indicating 31:15.
indicative 35:18.
indicators 35:25.
indicia 52:12.
indictment 229:7.
individual 20:20,
25:4, 28:3, 38:17,
58:1, 67:17, 81:3,
108:12, 110:9,
125:23, 126:2,
182:15, 200:23,
224:22.
individually
140:5.
individuals 40:8,
43:13, 98:18,
106:6.
induce 65:25, 72:17,
214:12.
indulgence 93:10,
111:11, 128:17.
inevitable 222:19.
inflammatory 25:6.
influence 81:17,
91:11, 91:14.
informal 21:8.
information 3:11,
4:18, 31:14,
61:19, 62:20,
73:7, 73:14,
74:13, 86:1, 88:8,
88:10, 92:11,
92:13, 93:2, 93:6,
93:18, 95:25,
96:1, 98:11, 99:9,
100:2, 101:22,
145:11, 176:15,
192:3, 200:18.
initial 3:20, 73:18,
91:25, 170:1,
191:18.
Initially 73:9,

74:7, 80:18,
103:23, 191:22.
initials 63:13.
initiated 85:17.
injured 207:8.
injuries 35:12,
40:25, 206:5,
208:12, 208:18,
208:21, 208:22,
210:25.
injury 207:10,
207:12, 208:25,
209:3.
Inner 154:6,
154:22.
Innovation 96:15.
inquire 157:22,
164:23, 171:4,
209:20.
inside 38:15, 109:5,
141:7, 160:18,
167:21, 168:11,
169:4, 200:22.
insist 46:13,
48:3.
instance 21:19,
95:6, 110:15,
114:1, 143:13,
197:24, 198:16.
instead 38:17.
instruct 179:17,
222:17.
instructed 28:21.
instruction 28:25,
29:8, 179:5,
226:7, 228:21.
instructions 84:5,
95:11, 220:21,
222:5, 222:23,
228:12.
Integrated 154:15.
intend 20:11.
intending 27:24.
intends 53:21, 57:2,
71:24, 173:4.
intent 24:19.
intention 175:25.
interaction 99:24.
interested 228:14.
interfere 205:13.

internal 51:20,
52:23, 159:15.
internally 105:16.
internet 50:15,
119:11, 182:7,
221:25.
interpose 22:7.
interposed 137:8.
interrupt 10:8,
137:20.
intersect 229:16.
intersection 122:15,
122:21.
intervene 29:20.
intervening 52:11.
interviewed 99:15,
99:16, 99:25,
100:15, 103:9.
intimidating 80:21,
80:23.
introduce 14:15,
33:11.
introduction
137:1.
investigate 9:12,
19:10, 66:11.
investigated 9:7,
19:7.
investigating
89:5.
investigations
85:25.
investigator 2:11,
73:21.
investigators
102:16, 114:12.
invitation 101:3,
101:5.
involved 3:11, 4:18,
35:15, 36:1, 73:4,
82:9, 102:17,
103:20, 103:22,
161:10, 223:13,
226:5.
involvement 226:4,
226:18, 227:19.
isolate 95:3.
issue 4:20, 5:9,
5:10, 15:4, 43:23,
44:21, 48:9, 49:4,

49:5, 50:24, 57:7,
57:20, 173:19,
177:1, 227:21,
228:4, 228:5.
issues 2:4, 50:10,
119:5, 182:2,
221:21, 221:25,
222:3, 222:11.
Item 13:9, 45:25,
51:6, 51:16,
51:17, 51:21,
55:21, 55:22,
111:4, 113:1,
140:5, 141:7,
148:22, 149:20,
159:18, 192:14.
items 38:21, 39:11,
43:9, 49:11,
78:16, 146:1,
165:2, 165:4,
195:14, 200:18,
200:21, 202:1,
202:5, 202:14.
itself 28:16, 99:13,
109:5, 153:15,
189:15, 191:23,
218:20, 219:1.
.
.
< J >.
J-a-m-e-s 18:12.
J. 1:25.
jacket 167:20,
168:3.
James 1:18, 2:10,
17:24, 18:4,
18:12.
January 83:5, 87:25,
89:10, 165:13,
221:7, 221:9,
221:13.
Jeffrey 1:33,
79:9.
jeopardy 91:16.
Jerome 205:21,
211:7, 211:10,
213:23, 219:12,
226:9.
JKB-16-0363 1:9.
job 153:11.

John 1:41, 68:15.
Johns 205:14.
Johnson 1:10, 1:29,
    20:13, 27:3,
    32:10, 40:6,
    40:12, 77:17,
    77:22, 79:9,
    155:22, 229:21.
join 32:23, 57:16,
    57:19, 58:14,
    174:15, 177:19.
joining 57:19,
    58:12.
Jones 1:35, 3:6,
    16:24, 26:1, 32:9,
    49:8, 49:9, 63:24,
    69:7, 69:8, 69:12,
    91:6, 93:7, 93:19,
    94:6, 94:14, 95:3,
    99:4, 102:6,
    113:12, 115:11,
    115:21, 116:6,
    116:11, 116:19,
    118:11, 118:12,
    155:24, 229:23.
Jordan 13:18, 15:25,
    16:10, 16:18.
Judge 6:20, 12:23,
    134:1, 172:25.
judgment 27:19,
    157:11.
July 9:17.
June 61:17, 73:22,
    74:5, 79:15,
    89:11, 89:18,
    96:23, 97:2, 97:6,
    117:17.
juror 156:14,
    222:15.
jurors 221:18.
justification
    173:21.
juvenile 224:24,
    227:17, 227:20.
juveniles 229:17.
.
.
< K >.
K-9 135:7.
K-u-r-t 121:8.

K. 1:18.
K1 193:18.
Keep 21:9, 26:17,
    62:8, 75:7,
    123:24, 140:7,
    214:24, 222:16,
    223:20, 223:21.
keeping 208:16,
    222:7.
keeps 112:14.
Kenneth 1:35, 63:24,
    115:11.
Kenny 64:10, 64:11,
    64:14, 64:15,
    64:16, 64:17,
    64:18, 69:13,
    72:7, 72:8, 72:9,
    72:24, 93:16,
    95:1, 95:4, 99:4,
    118:17.
kept 43:9, 75:25.
kicked 161:11,
    186:18.
kill 15:18, 71:12,
    72:10.
killed 16:18, 62:20,
    64:10, 64:12,
    64:15, 64:17,
    64:19, 72:8,
    72:24.
killing 69:5, 86:25,
    87:12.
kind 11:22, 14:19,
    19:25, 66:23,
    86:24, 93:6,
    95:10, 99:23,
    101:11, 116:5,
    149:5, 180:2,
    191:24, 192:2,
    197:8, 197:10,
    202:9, 221:22.
kinds 173:15,
    187:5.
knowing 45:8,
    150:17.
knowledge 32:4,
    62:11, 69:1, 69:6,
    74:12, 77:22,
    98:7, 113:21,
    115:2, 115:20,

115:22, 132:2,
    148:22, 156:8,
    156:15.
known 35:21, 36:10,
    36:23, 36:25,
    39:24, 40:12,
    48:5, 63:24, 65:8,
    77:17, 89:11,
    120:1, 160:6,
    160:17, 163:13,
    192:4, 213:4.
knows 32:22, 52:6,
    57:3.
Kurt 119:20, 120:22,
    121:8.
.
.
< L >.
L-l-o-y-d 18:13.
lab 20:4, 39:10,
    56:6, 138:25,
    139:10, 148:4,
    205:25, 210:1.
label 141:15,
    159:12, 200:25.
laboratory 153:8,
    153:15, 154:17,
    162:21, 198:22.
lacerations 208:7,
    208:8.
lack 52:12,
    225:12.
lacks 156:14.
Ladies 7:16, 8:22,
    33:8, 41:4, 50:6,
    119:1, 133:10,
    153:10, 156:4,
    164:10, 178:25,
    181:23, 220:16,
    221:16, 222:4.
laid 25:12, 25:13,
    33:23, 51:7, 54:5,
    143:14, 207:22,
    208:14, 209:17.
land 163:14.
lands 163:13,
    163:17, 163:22,
    193:25, 194:1.
Landsman 114:17,
    114:18.

Lane 77:10, 77:11,
  123:23.
Lanvale 64:13,
  72:11, 86:15.
large 114:24,
  162:6.
largely 110:13.
larger 109:3,
  146:13.
laser 56:16.
Last 8:12, 8:14,
  18:10, 18:11,
  18:13, 29:22,
  32:13, 49:4, 91:6,
  113:13, 121:7,
  121:8, 134:10,
  136:25, 152:24,
  153:1, 164:10,
  177:1, 177:6,
  203:15, 203:16,
  204:21, 222:18,
  224:7.
late 16:8.
later 3:24, 20:12,
  52:4, 57:23,
  87:15, 87:19,
  88:12, 102:25,
  112:18, 116:4,
  150:2, 151:3,
  161:22.
latitude 46:9,
  49:18.
latter 47:3.
Law 5:8, 18:20,
  46:24, 48:24,
  50:14, 51:1,
  89:18, 89:20,
  104:12, 105:21,
  119:9, 144:13,
  144:21, 146:5,
  173:1, 173:3,
  182:6, 221:24,
  222:23, 224:18,
  227:11, 229:16.
lawful 128:11.
lawyer 223:10.
lawyers 43:17,
  133:13, 223:8.
lay 35:9, 48:18,
  137:7, 156:24.

laying 32:11, 33:4,
  34:25, 35:11.
laymen 197:21.
lead 88:25, 105:4,
  106:19, 110:21,
  115:6, 144:6,
  167:15, 167:22,
  168:3, 168:4,
  168:8, 168:9,
  172:20, 173:21,
  174:9.
Leading 65:19,
  173:22, 173:25,
  174:2, 174:8,
  174:12, 174:16.
learn 13:16, 39:21,
  40:22, 73:14,
  135:25.
learned 13:17,
  101:19, 102:9,
  128:9, 128:12.
least 43:17, 49:11,
  67:5, 137:6,
  223:9.
leave 29:3, 198:1,
  198:2, 198:11,
  198:17, 220:2.
leaves 52:3.
left-hand 159:17.
legal 63:11, 179:5,
  215:1, 224:5,
  224:21, 227:6,
  229:12.
length 140:15,
  143:2.
lengthy 228:17.
less 2:19, 3:10,
  4:17, 24:8, 27:20,
  28:15, 29:24,
  30:8, 31:10,
  63:18, 73:20.
letter 165:13,
  201:1.
letters 21:2.
lies 7:9.
lifted 115:4,
  115:10, 116:2.
light 52:8, 58:18,
  109:14, 124:7,
  124:8, 124:16,

157:6, 173:15.
lights 124:20.
likelihood 6:14,
  224:17.
likely 228:10.
Lillian 212:5,
  212:6, 212:21.
limine 48:1.
limitations
  155:17.
limiting 30:6,
  226:7, 228:21.
line 7:2, 139:17,
  214:3, 217:13.
lines 207:21.
lingering 29:4.
link 49:11, 120:7.
linked 115:21.
linking 49:10.
list 21:8, 103:21,
  154:5, 154:21,
  195:11.
listed 116:2.
listened 87:7.
listening 176:4.
little 31:25, 52:14,
  52:17, 55:9,
  56:10, 70:8,
  104:5, 110:1,
  110:16, 111:7,
  145:20, 145:21,
  148:2, 153:11,
  211:16, 229:4.
live 167:11, 197:22,
  197:24.
lives 94:6.
Lloyd 2:10, 2:14,
  2:20, 2:21, 3:8,
  4:24, 14:13,
  17:24, 17:25,
  18:4, 18:12,
  18:18, 33:18,
  39:4, 50:19,
  53:22, 59:4, 59:6,
  60:23, 61:5, 64:9,
  72:4, 75:18,
  117:15, 166:6.
load 160:7.
loaded 126:14,
  127:4, 128:3,

159:19, 160:19,
160:20, 186:15,
187:22.
loading 160:16.
local 137:12.
locate 109:16,
205:15.
located 16:9, 16:13,
136:4, 200:20,
205:16, 210:20.
location 10:2,
12:22, 13:5,
45:14, 76:15,
104:7, 115:3,
122:20, 123:17,
125:6, 125:8,
144:24, 146:25,
147:12.
locations 110:9.
Lock 205:7.
locked 48:14.
lodged 45:18,
46:1.
logged 43:10, 113:2,
143:5.
Lombard 1:48.
long 9:3, 12:23,
17:13, 17:15,
18:24, 19:4,
83:19, 83:22,
85:6, 113:7,
121:21, 135:1,
135:4, 153:18,
185:16, 189:13,
204:5, 204:8,
214:21, 224:19,
225:10.
longer 11:4, 54:19,
101:20, 104:2.
Look 26:7, 26:23,
27:4, 50:15,
57:13, 119:10,
126:21, 126:22,
133:20, 162:5,
167:16, 169:3,
182:6, 187:6,
188:24, 188:25,
189:1, 189:4,
191:23, 195:19,
198:20, 228:24,

228:25.
looked 11:20, 26:7,
26:13, 48:6,
56:14, 69:13,
88:8, 127:20,
224:17.
Looks 25:4, 33:2,
70:10, 142:21,
207:16.
losing 154:8.
lost 49:5.
lot 46:8, 117:15,
149:1, 170:10,
189:9, 189:10,
189:11, 189:20,
194:25.
Lotus 216:17.
loud 57:18.
louder 133:14.
lower 32:18.
Luger 190:9, 190:10,
190:11, 190:12,
190:15, 190:17,
190:18, 190:19,
190:20, 191:12,
191:13, 191:15.
lunch 119:2.
lung 208:15, 208:16,
209:4, 209:7.
lurking 52:15.
lying 24:11,
24:17.
.
.
< M >.
M-a-r-k 8:14.
Mack 39:25, 64:11,
64:12, 64:13,
64:17, 72:7,
72:10, 72:11,
183:13, 183:14,
188:18, 192:24.
Mack. 64:19.
Madame 102:22.
magazine 160:17,
160:18, 160:20.
magic 150:1.
maintain 101:17,
113:3.
maintained 45:19,

97:11.
maintains 112:14.
majority 225:7,
226:17.
man 24:23, 26:15,
40:14.
manila 56:10.
manner 41:16, 55:6,
107:11, 109:3.
manual 94:1.
manually 93:22,
93:25.
manufactured 162:2,
168:17, 187:16,
195:12.
manufacturer 162:3,
190:11, 190:18,
191:20, 194:18.
manufacturers
154:20, 154:21,
163:16, 195:11.
manufacturing
154:20, 154:24,
161:20, 161:22,
187:18.
map 11:6.
maps 123:14.
March 70:14.
marijuana 52:14,
52:17, 52:18,
55:10, 55:11.
Marine 122:3, 122:4,
122:5.
Mark 6:15, 7:21,
7:22, 8:5, 8:13,
11:25, 32:14,
36:5, 56:16,
56:17, 58:6, 58:7,
114:16, 142:20,
158:7, 158:22,
165:3, 169:21,
173:9, 179:11,
188:22, 188:23,
189:4, 189:5,
194:10, 201:13,
201:15, 201:16,
201:22, 212:5.
Marked 11:8, 17:10,
20:23, 24:15,
24:16, 34:19,

36:10, 36:14,
37:12, 122:18,
170:7, 180:10,
182:15, 224:2.
marker 56:17,
150:1.
markers 24:16,
24:20, 31:7, 31:8,
36:5.
marking 56:18,
139:3.
markings 54:19,
138:24, 138:25,
149:19, 164:3,
188:10, 189:1.
marks 6:11, 6:13,
54:21, 57:5, 57:6,
161:21, 161:22,
161:23, 162:1,
162:2, 162:6,
162:10, 163:8,
165:4, 187:5,
187:17, 189:7,
189:9, 189:11,
189:17, 189:22,
198:1, 198:2,
198:4, 198:12,
201:14.
Marquise 1:39,
117:8, 213:8.
marvel 133:11.
Mary 77:10.
Maryland 1:2, 1:20,
1:49, 41:13.
match 170:25,
173:14, 173:23.
matched 69:6,
170:17.
matches 170:18.
material 28:5, 76:2,
167:21, 202:10.
materials 199:25.
matter 26:16, 35:16,
35:17, 50:2,
98:13, 182:12,
215:1, 222:25,
227:24, 230:8.
matters 156:7,
156:23, 176:14,
222:14, 223:7.

Mccants 1:39, 32:10,
117:8, 156:2,
213:8, 215:15,
219:11, 224:8,
226:16, 229:14,
229:25.
meaning 9:9.
means 6:13, 15:6,
42:12, 55:15,
85:13, 190:22,
191:5, 193:25,
220:20, 222:9.
meant 32:14,
225:19.
meantime 87:21.
meanwhile 12:19.
mechanism 160:17,
189:15, 189:16.
Medical 42:3, 42:13,
199:5, 199:12,
207:13, 208:25.
medications 91:21.
meet 73:9, 90:1,
91:9.
meeting 90:6, 91:23,
91:25, 92:6, 97:2,
97:8, 97:11,
117:18, 214:23,
215:18, 215:22,
219:1, 219:3.
member 224:22.
members 159:3,
162:13, 163:9,
165:6, 221:19.
memorialize 92:15,
100:7, 102:13.
memorializing
97:11.
memory 40:7, 83:12,
84:24, 87:10,
88:15, 126:22,
127:1, 164:11,
166:3, 184:4,
225:24.
mental 2:22, 74:18,
74:25.
mention 84:9, 86:4,
194:15.
mentioned 84:14,
97:14, 161:14,

163:8, 163:25,
190:9, 195:7.
merely 30:16, 157:9,
194:16.
messy 49:16.
met 72:22, 73:2,
73:8, 74:5, 79:11,
79:12, 79:18,
79:20, 79:21.
metal 160:18,
167:21, 167:23,
188:9, 197:10.
method 95:22,
172:21.
microphone 8:11,
18:10, 121:6,
134:9, 152:23,
203:15.
microscope 57:13,
162:7, 163:25,
180:11.
Microscopic 154:25,
162:6, 162:10,
162:19, 169:23,
169:24, 175:14,
181:19, 199:14,
199:16, 199:18.
microscopically
171:16.
middle 63:25,
159:15, 187:24.
midnight 9:23,
122:11.
military 78:13.
millisecond 28:23,
28:24.
mind 45:2, 73:10,
141:6, 159:13,
182:13, 210:4,
221:15, 222:7,
222:16, 222:20,
223:2, 223:20.
minimum 46:19.
minor 208:21.
minute 4:17, 58:21,
96:5, 99:21,
170:12.
minutes 2:10, 3:24,
17:14, 46:17,
50:16, 50:20,

50:21, 89:10,
90:24, 119:12,
122:11, 133:4,
133:19, 147:15,
182:8, 182:12,
182:25, 185:21,
185:22, 214:22.
miracle 10:10,
10:11.
mispronouncing
76:20.
misrepresent
191:14.
missing 38:19.
mistake 222:12.
mistaken 62:7, 70:7,
70:10, 77:10,
80:11.
mistakenly 30:15,
159:6.
MLK 221:10.
mobile 105:4,
106:13, 106:19,
200:14.
model 180:3.
moment 53:7, 111:11,
168:13, 197:16.
moments 33:10,
33:15, 50:25.
Monday 217:8,
220:20, 220:24,
221:5, 221:11,
223:3, 223:4,
228:6, 228:15,
230:3.
monitor 10:9,
10:11.
Monitors 10:16.
month 76:15, 165:13,
165:14.
months 61:14, 87:19,
88:2, 88:12,
100:17, 100:24,
116:4.
morgue 13:21,
14:2.
morning 2:2, 2:9,
2:13, 3:23, 5:11,
7:16, 8:20, 8:21,
9:17, 9:20, 17:8,

17:9, 18:18,
18:19, 19:12,
19:22, 49:25,
50:7, 79:7, 104:9,
132:8, 134:21,
217:8, 223:3,
223:4, 230:3.
Mossberg 154:22.
motion 49:4, 177:12,
177:15, 177:16,
177:21.
motions 48:1,
49:7.
motives 75:3,
75:9.
move 12:12, 41:22,
160:25.
moves 52:4,
137:12.
movie 160:5.
moving 173:19.
multi-page 182:14.
multi-unit 20:1,
105:24.
multiple 40:25.
murdered 103:6,
103:18, 226:9.
murmured 56:7.
myself 80:19, 105:6,
133:16, 153:13,
175:16, 223:11,
227:6.
.
.
< N >.
N-u-t-t-r-o-y
107:1.
Nail 115:19.
naive 222:16.
named 117:23.
names 107:3, 183:9,
190:14.
Nancy 129:8.
narcotics 81:18.
narrow 174:8.
nature 44:8, 45:8,
223:9.
near 11:23,
122:15.
nearby 86:16.

necessarily 197:25,
229:3.
necessary 6:6, 44:1,
49:22, 51:14,
170:24, 194:10.
necessity 41:21.
neck 41:19.
need 3:4, 7:1, 8:10,
21:5, 21:8, 21:11,
21:22, 22:7,
27:11, 28:22,
30:12, 46:9,
46:24, 47:1,
60:10, 62:8,
98:25, 126:10,
129:1, 132:4,
180:7, 185:6,
217:8, 224:1,
227:5, 228:10.
needs 6:25, 169:21,
170:21, 172:10,
173:11, 173:12,
229:15.
neighborhood 71:14,
86:7, 86:14,
86:17, 86:19,
88:13, 94:6.
Neither 185:11.
nervous 81:20.
news 50:9, 119:4,
182:1, 221:20.
Nickelson 90:2,
212:5.
nickname 13:18,
68:25, 93:9,
93:12, 98:2, 98:6,
98:20, 183:8.
night 16:18.
nine 2:16, 41:17.
nobody 32:22,
102:21.
nodding 223:17.
nolle 2:18.
non 184:6.
non-fatal 184:8.
non-problematic
174:9.
non-rifled 163:11.
noncompliant
173:3.

none 177:17.
Nonetheless 52:24,
  223:11.
nonfatal 67:16,
  68:9, 68:13,
  69:10, 76:14,
  204:19.
Nonverbal 223:15.
Nor 157:10, 173:1.
normal 14:25, 15:14,
  104:15, 143:7.
normally 34:10.
Northern 1:2,
  204:13.
note 2:14, 2:17,
  3:16, 137:9,
  142:2, 176:17,
  177:1, 177:6,
  197:10, 197:11,
  217:9.
Noted 139:7, 140:23,
  176:16, 217:15.
Notes 3:9, 3:13,
  86:22, 87:11,
  97:10, 126:15,
  216:17.
Nothing 6:3, 15:13,
  33:3, 41:8, 55:12,
  94:22, 143:6,
  149:25, 161:12,
  163:1, 207:19,
  219:17, 219:23,
  220:8, 227:18.
notice 47:24,
  55:2.
notion 164:12.
November 1:19.
numbered 36:1.
numbers 21:15,
  110:2, 129:6,
  139:10, 163:17,
  184:25, 188:21,
  193:14.
numerical 165:12.
numerous 154:4,
  159:10, 161:11,
  199:3.
Nuttroy 107:1,
  110:24.
.

.
< O >.
o'clock 197:13.
oath 8:4, 18:3,
  59:5, 186:4.
Object 2:20, 25:14,
  25:17, 25:19,
  25:20, 25:25,
  26:2, 32:10,
  32:11, 32:17,
  32:22, 32:24,
  44:7, 142:19,
  142:20, 150:8,
  174:12, 174:16,
  176:10, 207:6,
  209:6, 217:13.
objected 44:23,
  177:2, 177:7.
objecting 136:25,
  139:6.
objections 15:1,
  22:7, 57:18,
  58:14, 174:18.
objects 32:10, 44:5,
  51:8, 196:9.
observe 33:22,
  39:11, 138:2,
  154:20, 210:25.
observed 34:5,
  59:10, 141:12,
  149:13.
observing 75:5.
obtained 90:19.
obvious 35:12.
Obviously 217:4.
occasion 88:7, 90:1,
  109:13, 113:4,
  132:2, 132:5,
  144:24.
occupant 84:20,
  129:24.
occupants 40:2.
occur 198:13,
  222:19.
occurred 48:15,
  76:14, 165:12,
  219:23, 228:7.
occurring 176:4,
  189:20.
occurs 51:24,

187:11, 188:4,
  188:7.
OCME 41:13, 42:2,
  42:12.
October 116:25.
odd 174:7.
offense 62:4, 62:5,
  63:19, 69:9,
  229:2.
offensive 209:13.
offer 2:25, 4:23,
  20:11, 21:20,
  21:21, 21:22,
  21:25, 22:5,
  27:24, 48:7,
  66:20, 71:24,
  156:20, 157:21,
  170:20.
offered 56:21,
  156:5, 184:20.
offering 26:24,
  142:3, 170:19.
Office 42:2, 42:12,
  79:13, 79:18,
  79:20, 79:23,
  79:24, 80:1, 80:3,
  80:20, 81:10,
  81:24, 86:4,
  87:23, 87:24,
  92:8, 102:1,
  199:4, 199:12.
Officer 11:2, 11:14,
  51:25, 52:15,
  121:25, 122:9,
  130:6, 133:18,
  141:4, 144:16,
  144:17, 145:16.
officers 80:2, 80:7,
  104:15, 146:10.
Official 1:47,
  230:12.
oftentimes 51:1,
  90:23, 105:6.
old 12:21, 85:10,
  133:11, 160:5,
  205:22, 212:6,
  212:7, 224:8.
Olin 154:24.
Oliver 68:10, 68:24,
  68:25, 69:10,

120:2, 122:15,
124:25, 125:3,
125:7, 136:3,
141:4, 141:12,
169:3, 177:25,
178:10, 180:15,
183:24, 184:2,
184:6, 184:19,
184:23, 188:18.
Once 105:18, 113:1,
126:21, 132:1,
136:10, 137:13,
140:6, 140:13,
160:12, 169:24,
180:10.
one-shot 99:3.
one. 22:9, 23:22,
55:14, 99:3,
142:22, 223:24,
227:21.
ones 22:2, 44:21,
45:10, 56:9, 57:9,
206:11.
open-ended 66:23.
opened 218:1, 218:8,
219:8.
opening 56:13,
141:6.
operability
162:16.
operate 45:22.
operated 143:12.
operates 104:23,
143:11.
operating 143:7.
operation 154:17.
Operations 204:16.
operator 105:17.
opinion 156:7,
156:23, 156:25,
171:16, 172:25.
opinions 66:20,
157:2, 157:21.
opportunity 29:21.
opposed 149:11.
option 46:3.
order 44:1, 44:13,
46:10, 48:6,
51:10, 71:12,
72:10, 102:19,

195:23, 195:24.
ordered 73:4, 86:5,
86:24, 87:12,
164:13, 205:25.
ordering 88:14.
ordinarily 157:3.
ordinary 32:4,
45:22, 47:13,
143:1, 156:14,
174:2.
Organized 227:4.
oriented 207:24.
originally 221:14.
others 26:25,
28:1.
Otherwise 21:7,
31:1, 174:1,
182:19, 198:23,
209:16, 223:24.
ourselves 46:20,
200:7.
outside 2:4, 56:15,
109:4, 109:8,
111:14, 142:18,
183:6, 185:6.
overall 220:23.
overnight 21:7,
220:21.
Overruled 65:20,
67:6, 67:8, 68:20,
68:22, 72:3, 76:6,
82:3, 82:25,
138:10, 139:7,
139:19, 140:23,
143:17, 143:19,
164:23, 167:5,
174:18, 176:17,
178:14, 180:19,
207:21, 216:5,
220:1.
overseeing 47:6.
overt 224:13,
224:23, 225:1,
226:22, 227:8,
227:9, 227:13,
227:15, 227:16,
229:1.
own 33:13, 107:8,
156:16, 157:10,
169:17, 169:24,

182:19, 201:1,
215:23.
owner 128:11,
132:13.
oxidation 197:7,
197:10.
oxidize 197:6.
.
.
< P >.
Pace 65:8, 98:5,
98:12, 98:14,
103:5, 115:23,
115:25.
package 38:16,
56:14, 56:15,
111:12, 111:14,
111:25, 112:3,
112:7, 112:10,
112:12, 113:4,
113:12, 113:22,
130:25, 142:18,
142:22, 195:17,
195:19, 195:22,
196:9, 196:10,
200:19.
packages 200:21.
packaging 56:20,
57:4, 142:21.
packet 38:15.
pad 21:12.
Page 11:7, 13:7,
13:25, 70:12,
78:2, 78:15,
78:21, 138:8,
138:11, 138:15,
138:18, 138:22,
139:1, 145:2,
147:18, 182:23,
213:16.
pages 170:10,
182:18, 182:20.
PANAS 10:11,
10:12.
paper 123:21, 137:3,
218:14.
Paragraph 41:3,
41:11.
paramedics 11:3,
11:14.

pardon 104:20.
part 4:14, 7:13,
  16:2, 30:9, 41:2,
  55:18, 61:5,
  71:14, 94:1, 95:9,
  103:2, 105:20,
  114:19, 114:24,
  117:2, 176:13,
  186:17, 186:18,
  186:25, 187:14,
  187:15, 187:18,
  191:2, 227:17,
  229:13.
partial 93:6.
participant
  103:25.
participants 50:12,
  50:13, 119:7,
  119:8, 119:10,
  182:3, 182:4,
  182:7, 221:21.
participate 116:24,
  212:8, 225:6,
  225:11, 226:17.
participates
  221:22.
participating
  116:20, 222:1,
  223:21, 226:1,
  226:2.
particular 9:24,
  44:10, 44:18,
  51:12, 53:25,
  54:20, 57:8, 68:7,
  75:12, 85:24,
  92:10, 95:6,
  106:18, 109:7,
  113:25, 139:23,
  143:4, 143:13,
  143:16, 162:18,
  164:16, 164:17,
  165:17, 189:21,
  227:8.
particularly 25:1,
  82:7, 119:17.
parties 41:6, 41:15,
  42:2.
partner 9:10,
  130:7.
parts 159:10,

159:15, 159:22,
  161:24.
party 176:1.
passage 44:25.
passed 7:4, 177:12,
  197:15, 197:23.
passes 197:25,
  198:16.
past 5:8.
Patricia 41:13.
patrol 104:15,
  121:25, 135:8,
  136:10, 204:13,
  204:14.
pattern 6:11,
  54:21.
patterns 6:12,
  51:20, 52:23.
Paul 1:31, 11:8,
  16:14, 34:8,
  39:14, 61:24,
  62:25, 65:1,
  69:19, 69:23,
  76:21.
Pause 17:13, 21:13,
  22:3, 133:22,
  211:4.
Peckoo 141:4, 144:6,
  144:7, 144:11,
  146:2.
pen 12:21, 12:22,
  13:4, 123:16,
  123:19, 196:22.
pending 137:9.
Pennsylvania
  122:2.
people 84:12, 94:16,
  94:22, 95:1, 98:8,
  103:20, 117:23,
  132:9, 146:20,
  149:1, 150:18,
  159:5, 159:8,
  222:17, 223:9.
per 9:11, 9:13,
  19:9, 111:5.
percent 131:5,
  164:16, 164:22,
  171:20, 173:5,
  173:7, 199:2.
perception 81:3.

Perfect 151:15.
performance
  153:23.
Perhaps 43:24,
  46:22, 49:22,
  53:10, 57:2,
  176:15, 184:15.
period 189:13,
  224:19.
periodically
  172:19.
periphery 108:10.
permission 92:14,
  92:18, 100:9.
permit 6:17, 7:7,
  156:9, 156:13,
  173:21.
permitted 156:17,
  156:22, 156:25,
  157:20, 158:20,
  174:18.
Personal 43:9,
  113:18.
Personally 39:6,
  59:21, 90:22,
  101:22, 113:19,
  138:4, 173:23.
persons 94:5,
  103:22, 222:1.
perspective 23:11,
  76:6, 176:5.
persuade 58:4.
pertaining 137:18.
pertinent 92:12.
Peter 1:25.
PH 94:11.
PHA 71:4, 71:5,
  71:7, 94:11,
  95:11, 96:18,
  97:3, 97:11,
  97:25, 99:10,
  103:11, 212:16.
PHC 21:18.
PHE 42:18, 168:21,
  169:5, 196:17,
  197:16, 200:1.
PHI 125:22.
phone 4:9, 4:12,
  116:8, 116:15,
  124:9.

photograph 26:22,
   27:17, 28:3, 30:7,
   30:25, 31:13,
   32:19, 35:8,
   35:24, 36:9,
   36:13, 56:14,
   65:9, 70:1, 70:9,
   108:9, 110:18,
   113:15, 118:12,
   138:20, 168:23,
   169:7, 207:9,
   212:25, 213:7.
photographic 63:3,
   63:4, 65:3, 69:25,
   95:23, 212:19,
   212:20, 212:21.
Photographs 20:3,
   32:13, 33:11,
   33:25, 34:3,
   34:11, 37:13,
   39:15, 63:16,
   94:1, 94:5, 99:9,
   99:10, 107:8,
   109:25, 113:17,
   113:18, 118:17,
   136:12, 146:12,
   182:15, 205:24,
   206:5, 209:22,
   210:19, 213:1.
photos 14:7, 14:8,
   14:14, 15:8,
   15:18, 20:11,
   20:12, 21:10,
   25:9, 27:22,
   28:13, 29:1,
   168:21, 206:1.
PHP25 113:15.
PHSC 138:11, 138:14,
   145:3, 147:19.
Physical 44:5, 45:5,
   45:6, 51:8.
physically 38:21,
   39:6, 138:4,
   160:14, 187:3.
pick 56:2, 58:19,
   63:7, 65:15, 66:1,
   72:15, 72:18,
   95:3, 110:21,
   111:8, 212:23,
   214:7.

picked 38:18, 38:21,
   38:24, 39:6, 56:1,
   56:6, 56:11, 57:9,
   57:22, 84:6,
   110:20, 112:5,
   138:4, 149:17,
   149:20, 212:25.
picking 111:3.
picks 38:14,
   111:1.
picture 14:2, 23:15,
   24:7, 24:9, 26:5,
   26:11, 26:15,
   27:13, 29:12,
   29:24, 34:25,
   35:16, 64:4, 72:6,
   84:6, 145:22,
   146:17, 186:15,
   209:10, 209:11,
   211:7.
pictured 213:6.
pictures 14:21,
   14:22, 20:17,
   33:14, 95:14,
   99:2.
piece 32:20, 33:2,
   148:17, 168:3,
   198:1, 218:14.
pieces 57:21, 59:15,
   200:24.
pin 55:23, 162:4,
   187:25, 188:3,
   188:25, 189:7,
   189:11, 201:20.
pinkish 28:5.
pistol 154:6,
   154:11, 154:12,
   160:16, 180:3,
   186:17, 189:15,
   190:19.
pistols 154:7,
   154:10, 154:13,
   188:12.
pitcher 155:6.
placard 110:16.
placards 110:1,
   110:4, 145:21,
   148:2, 148:4.
place 26:21, 80:25,
   83:5, 84:21,

110:4, 125:16,
   163:16, 173:2.
placed 8:4, 18:3,
   45:14, 58:6,
   63:15, 72:12,
   99:10, 125:18,
   143:3.
places 31:25, 63:13,
   110:15, 195:1,
   195:3, 195:5.
Plaintiff 1:7,
   1:23.
plaits 40:14.
plans 120:6.
plaque 31:25.
plastic 33:3.
player 100:6.
plays 47:24.
Please 2:2, 7:16,
   7:24, 17:25, 18:2,
   18:9, 50:16, 59:4,
   79:16, 119:12,
   120:19, 121:17,
   133:24, 138:12,
   152:12, 152:15,
   152:23, 155:10,
   182:8, 183:9,
   186:3, 203:5,
   203:14, 223:5,
   223:7, 223:20.
pleasure 79:10.
plus 142:12,
   218:19.
pocket 52:2, 52:16,
   126:9, 126:11,
   130:10, 130:15,
   130:16, 131:6,
   131:8, 201:3.
point. 228:16.
point: 3:5.
pointed 77:19,
   176:21.
points 227:7.
policy 15:21.
pool 11:13, 11:16,
   11:21, 13:9.
popular 15:6.
porch 108:1, 108:2,
   108:3.
portion 63:11,

63:14, 85:24,
88:15, 159:11,
163:15, 163:16,
168:11, 187:20,
188:2, 188:11.
portions 161:21,
162:4.
pose 45:4.
position 23:20,
23:25, 24:10,
24:13, 25:21,
27:8, 30:21,
33:22, 35:10,
71:16, 124:1,
129:16, 145:12,
177:11, 204:2,
219:25.
positions 121:23,
204:10.
possession 43:10,
132:16.
possibility 21:10,
97:22.
possible 75:13,
131:9, 201:19,
222:17.
Possibly 53:1,
57:12, 216:7.
postponement 46:9.
potential 44:24,
57:21, 61:6,
109:8, 156:6,
162:19, 199:24.
Potentially 162:1,
165:4, 167:24,
168:3, 188:25,
189:6, 189:14,
189:20, 189:21,
198:12, 198:18,
201:11, 201:16.
Powder 154:15,
159:20, 188:4.
Powell 12:11, 21:5,
30:12, 71:7,
123:8, 151:15.
practical 6:16.
practice 15:5,
45:22.
practices 32:4,
47:14.

preceded 176:11.
precise 179:7.
predicate 226:10,
226:12.
predicated 55:18.
predicates 226:8.
preemptively 2:20.
preinterview 92:6,
92:7, 99:16,
99:18, 99:19.
prejudicial 25:8,
25:11, 26:17,
33:1, 33:3, 207:7,
207:19, 208:12.
preliminary 25:12.
premajority 225:7,
225:9, 225:13,
226:3.
prepared 21:6,
41:13, 103:2,
105:19, 151:24,
174:6, 194:8,
225:21.
prerequisite 43:19,
43:21.
prerogative 48:24.
presence 115:17.
present 11:1, 11:2,
11:4, 19:23,
20:17, 29:21,
30:25, 33:20,
40:2, 50:23,
135:23, 205:10,
223:23, 225:21.
presented 65:4,
96:17, 156:9,
176:16, 176:19,
176:23, 195:15,
221:25, 222:3,
226:15.
presenting 2:21,
96:1.
presents 50:11,
119:6, 182:2,
221:21.
preserve 112:17,
150:8.
preserved 87:2.
press 15:6.
pressure 188:5.

presumably 55:18,
161:8.
pretrial 7:14, 46:6,
47:25, 49:7,
172:24.
pretty 28:24, 83:4,
85:8, 113:3,
187:12.
prevented 85:1.
preventing 150:18.
previously 17:11,
30:23, 101:11,
128:6, 165:23,
167:1, 169:1,
220:18.
primary 2:11, 9:8,
144:25, 226:19.
primer 159:22,
188:2, 188:10.
principle 7:10.
print 95:10.
prints 115:12.
Prior 27:4, 76:15,
79:19, 135:6.
Probable 126:19,
127:20.
Probably 27:12,
43:13, 45:3, 47:2,
47:25, 53:13,
85:9, 86:23,
98:10, 129:4,
156:14, 156:18,
161:18, 177:14,
185:18, 195:9,
224:16.
probative 25:8,
26:18, 30:17,
30:18, 44:9,
52:11, 207:7.
probativity 44:8.
problem 4:22, 5:9,
48:22, 51:4,
52:16, 52:21,
56:22, 60:6,
123:9, 171:1,
172:9, 182:24,
226:21.
problematic 6:25,
7:12.
problems 5:7,

123:7.
procedure 65:11,
 143:7, 209:1.
procedures 15:15,
 63:9.
proceed 33:16,
 124:7, 215:12.
proceeding 20:13,
 25:5, 224:21.
Proceedings 1:17,
 15:22, 33:7, 39:2,
 50:5, 60:21, 67:7,
 68:21, 72:2,
 75:16, 137:14,
 143:18, 152:7,
 156:24, 166:16,
 171:3, 174:19,
 178:5, 209:19,
 215:4, 220:6,
 230:4, 230:8.
proceedings. 21:13,
 22:3, 133:22.
Process 15:16,
 47:15, 51:10,
 53:14, 53:15,
 95:23, 102:9,
 112:6, 112:12,
 143:11, 143:12,
 161:22, 175:25,
 176:5, 187:18,
 223:1, 223:13,
 223:21.
processes 143:1,
 154:21.
produce 51:16.
produced 3:20.
produces 53:15.
productively
 229:18.
profession 7:4.
professionalism
 29:18, 143:9.
proffer 67:25.
proffered 28:7.
progress 3:9,
 3:13.
projectile 37:14.
projectiles 13:12,
 59:15, 59:18,
 59:24, 60:23,

61:2.
prolific 47:25.
promises 65:25,
 72:17, 214:12.
promoted 114:25.
pronoun 130:5.
pronouncing 110:25,
 144:8.
proof 48:6, 49:20,
 54:14, 57:8,
 229:15.
propellant 188:3.
proper 21:19, 25:11,
 33:4, 51:11,
 190:16.
property 46:22,
 139:25, 140:3,
 140:5, 195:21,
 196:15.
proponent 51:18.
proposes 22:5.
proposing 21:19.
prosecution 49:9.
prosecutor 29:18.
prossed 2:18.
protect 15:13.
protrude 187:25.
prove 44:13, 52:10,
 52:20, 54:24,
 55:6, 55:13,
 55:14, 55:15,
 227:8.
proven 41:8, 44:5,
 44:17, 48:3,
 52:13.
proves 40:7, 93:8,
 101:25, 106:25.
provide 2:14, 62:19,
 93:6, 97:4, 98:16,
 100:2, 156:22,
 156:25.
provided 6:8, 25:11,
 64:19, 73:7,
 74:13, 93:5,
 117:17, 207:21,
 208:13, 209:16.
providing 95:25.
proving 48:25, 51:9,
 51:12, 52:5.
provision 51:3.

published 172:25.
Pull 29:2, 49:20,
 70:25, 76:9,
 124:17, 124:18,
 131:6, 131:8,
 131:11, 132:5,
 161:4, 161:5.
pulled 27:6, 27:12,
 160:9, 160:21,
 181:20.
puncture 208:21,
 211:15, 211:17.
punctures 208:8.
pure 75:10.
purely 15:12.
purge 228:10.
purported 184:18.
purpose 146:19.
purposes 54:23,
 158:8, 158:21,
 176:1, 194:9,
 201:1, 225:9,
 229:9.
pursuant 142:24.
push 131:11.
puts 14:13, 38:15,
 52:1, 111:10,
 112:10, 138:25.
putting 55:1, 98:23,
 146:19, 196:17.
.
.
< Q >.
Q1 191:5.
Q1B 190:22.
Q3B 192:15, 192:16,
 193:5, 193:11,
 193:20.
qualifications
 157:1.
qualified 54:3,
 157:13, 172:10,
 173:12.
quality 6:14.
quantity 6:14.
questionable
 190:23.
questioned 43:15.
questioning 88:15,
 175:25, 176:4,

217:14.
Quick 121:25.
quickly 21:4.
quite 87:9.
quote 3:12, 4:16,
  5:23.
.
.
< R >.
R-e-a-s-s 203:17,
  203:19.
R-o-e-p-c-k-e 121:9,
  121:10.
R-y-a-n 203:17.
R. 1:41.
rabbit 46:24.
race 63:17.
racketeering 224:14,
  226:8, 226:22.
radiating 198:25.
radio 130:23.
raise 2:4, 8:3,
  18:2, 120:24,
  152:15, 203:8,
  224:18.
raised 45:3, 46:6,
  51:5, 163:15,
  163:16, 228:5.
raises 43:25.
ran 128:7, 130:2.
random 6:11.
randomly 12:17,
  58:6.
range 35:19.
rank 9:1, 18:22,
  121:19, 122:7,
  134:24, 204:2.
rate 9:14.
rather 6:1,
  128:18.
ratified 225:12.
Raven 205:7.
raw 198:15.
Ray 77:10.
re 177:13.
re-emphasize
  177:14.
reach 222:25.
reached 225:2,
  227:17.

reaching 156:11,
  222:13.
reactions 223:18.
reactive 223:9.
Read 4:5, 5:23, 6:9,
  15:6, 34:13, 41:2,
  41:7, 51:15,
  63:12, 64:9, 70:8,
  70:9, 70:22, 72:4,
  78:9, 78:16, 84:3,
  129:3, 129:6,
  136:17, 137:17,
  140:24, 213:3,
  214:1, 218:19,
  218:22, 219:1,
  219:20, 228:18.
reading 3:5, 71:18,
  126:23, 210:4.
reads 41:12,
  51:14.
ready 2:3, 7:17,
  58:19, 58:25,
  59:1, 120:11,
  124:7, 185:24.
real 21:10, 44:21,
  97:17, 198:15.
realize 43:14,
  170:15.
Really 5:25, 44:4,
  44:11, 46:16,
  48:20, 159:9,
  164:4, 181:16,
  199:6, 201:7,
  201:8, 224:1,
  227:15, 228:8.
rear 160:21,
  160:25.
reason 4:7, 81:14,
  94:25, 95:2,
  157:11.
reasonable 5:20,
  5:24, 7:2, 44:1,
  54:4, 54:15,
  172:5, 173:9,
  173:12, 173:13,
  174:22, 175:10,
  178:7, 178:11,
  178:21, 179:14,
  179:16, 180:13,
  180:22, 180:24,

184:20.
reasonably 152:1.
reasons 131:25,
  157:2.
Reass 203:4, 203:5,
  203:9, 203:17,
  203:24, 209:21,
  215:15, 217:10.
reassigned 114:25.
reboot 17:7,
  17:13.
rebooting 133:3.
receive 6:4, 145:18,
  161:21, 162:1,
  162:2, 169:20,
  199:11, 200:19.
received 30:9,
  30:11, 42:1,
  42:14, 43:21,
  158:19, 200:1.
receives 187:17.
recent 33:12,
  96:13.
recently 83:11,
  87:6, 95:22,
  165:10.
recess 50:20, 50:22,
  120:10, 181:24,
  185:23, 221:7,
  221:16, 230:2.
recognize 10:1,
  10:4, 48:2, 77:25,
  122:20, 125:6,
  141:7.
recollection 73:18,
  93:8, 97:23,
  101:25, 106:25,
  126:18, 127:17,
  127:21, 128:21,
  150:23, 170:24,
  205:12, 216:3,
  216:6, 216:15,
  216:24, 220:3,
  225:25.
record 13:4, 15:3,
  21:6, 21:11,
  21:14, 22:4, 30:4,
  30:9, 35:10, 41:2,
  41:23, 67:11,
  71:8, 92:14,

123:13, 133:23,
139:5, 182:20,
183:2, 213:6,
213:11, 218:19,
224:3, 228:7,
228:11, 230:8.
record. 14:4, 20:8,
38:9, 42:24, 60:4,
66:19, 67:24,
71:1, 74:24,
136:12, 142:15,
151:20, 166:2,
170:14, 172:2,
175:23, 206:10,
214:20, 217:3.
recorded 62:17,
62:19, 87:3,
101:13, 101:18,
212:12.
recording 87:5,
90:11, 90:14,
90:17, 90:19,
90:25, 91:24,
92:1, 92:16,
99:20, 100:8,
100:10, 101:16,
101:20, 101:23,
102:18, 116:5,
116:8, 116:15.
recordings 109:20.
records 31:1, 45:19,
46:21, 47:12.
recounting 5:3.
recover 13:11,
123:11, 151:15,
200:14.
recovered. 38:12,
38:22.
recovering 44:15.
Recovery 39:5,
122:6, 183:22.
RECROSS-EXAMINATION
118:9.
red 40:14, 123:25,
124:16, 213:13.
redacted 3:21,
4:14.
Redirect 75:13,
117:12, 117:13,
118:6, 132:22,

151:10, 151:11,
202:18, 202:19,
220:9, 220:10.
rediscovered 52:7.
redundant 21:22,
23:10, 23:12.
refamiliarize
227:6.
refer 126:15, 159:5,
159:8, 168:14,
170:21.
reference 36:5,
39:16, 53:3, 54:6,
181:10, 181:12,
183:10, 183:16,
183:19, 183:21,
183:23, 183:25,
190:8, 193:1,
193:2, 194:9,
210:2, 222:2.
referencing
188:17.
referred 119:16,
159:24, 168:13,
183:8.
referring 21:18,
224:3.
reflected 213:14.
reflective 208:12.
refrain 215:1.
Refresh 126:17,
127:15, 127:16,
128:21, 166:3,
170:24, 184:4,
216:2, 216:6,
216:15, 216:24,
220:2, 221:14.
refreshed 126:22,
127:1, 127:21.
regarding 2:15,
5:10, 16:17, 97:2,
130:19, 181:15,
194:12, 196:8,
226:15.
Regardless 30:22,
44:9.
regards 88:10,
188:15.
regular 143:1,
156:14, 156:24,

204:15.
regularly 183:8.
reiterate 150:22,
186:25, 224:1.
relate 50:11, 119:6,
182:3, 201:11.
related 2:18, 6:10,
119:10, 182:7,
196:18.
relating 76:10.
relation 31:9,
33:11, 77:5,
168:14.
relationship
229:4.
relative 80:23.
Relevance 74:21,
226:19.
Relevancy 74:22.
relevant 29:2,
92:13, 156:23,
221:24, 222:10.
reliable 143:1.
rely 137:12,
142:25.
remain 59:5, 114:24,
160:13, 161:2,
181:12, 186:4,
187:1.
remains 14:8,
59:16.
remember 83:20,
129:4, 133:13,
161:1, 177:8,
193:24, 215:25,
216:1, 223:13,
225:23.
remind 222:20.
remote 6:15.
remove 160:13.
removed 113:9,
140:8.
removes 187:3.
render 131:8,
131:13.
repeat 67:10,
116:7.
Rephrase 80:24,
99:7, 99:8,
166:14, 166:15,

166:17, 166:24.
report 6:5, 41:12,
    42:14, 105:10,
    126:19, 131:2,
    169:12, 170:5,
    170:20, 170:23,
    188:23, 194:11,
    194:12, 197:11.
reported 128:6.
Reporter 1:47,
    102:22, 230:12.
reporting 6:3.
reports 6:5, 50:10,
    50:11, 76:10,
    119:5, 119:6,
    169:12, 170:2,
    170:3, 170:7,
    171:6, 182:2,
    182:3, 190:21,
    194:7, 194:14,
    194:15, 221:20.
represent 79:9.
request 2:13, 46:19,
    68:4, 80:3, 89:17,
    115:6, 177:18,
    205:3.
requested 3:23.
require 49:23, 55:8,
    228:17.
required 46:2,
    50:20, 102:18,
    179:4, 182:12,
    227:8.
requirement 51:15.
research 227:6,
    228:2, 228:20.
resetting 12:13.
residence 34:17,
    76:10.
residents 106:9,
    108:21.
Residue 154:15.
resolved 45:2,
    53:13, 228:6.
respect 5:17, 14:25,
    23:25, 24:22,
    29:1, 32:12, 41:9,
    43:23, 50:2, 51:8,
    142:3, 156:21,
    156:23, 170:8,

171:6, 171:13,
    174:11, 179:6,
    180:4, 181:5,
    181:8, 182:14,
    208:12, 221:25,
    223:25.
respectfully
    174:11.
respective 228:14.
respond 19:15,
    104:24, 135:14,
    135:21, 136:10,
    205:1, 205:8,
    206:2.
responded 33:19,
    137:18, 176:19,
    210:11, 210:16,
    210:22.
Response 122:1,
    177:7, 225:4.
responses 88:16.
responsibilities
    114:22.
responsibility
    48:21, 112:17,
    112:20, 176:3,
    176:13, 222:15,
    223:12, 223:20.
responsible 47:4,
    47:8, 48:25.
rest 165:14, 218:2,
    219:14.
Restate 68:22.
Restoration
    154:18.
rests 157:12.
result 53:16, 89:9,
    108:24, 109:10,
    109:17, 115:9,
    136:25, 176:20.
results 78:6,
    115:20.
resume 217:8.
retain 15:14.
retired 52:15.
Retires 52:3.
retrieve 102:6,
    102:8, 114:3,
    163:5, 163:6.
retrieved 11:15.

return 50:20, 114:3,
    151:16, 177:13,
    177:17, 182:12,
    185:5, 223:5.
returned 128:10,
    128:11, 132:12.
reverse 64:8.
review 5:8, 90:25,
    102:10, 170:3,
    220:22.
reviewed 34:3, 87:5,
    87:7, 91:3.
revolve 160:10.
revolver 126:9,
    129:8, 131:10,
    149:1, 160:3,
    160:4, 160:6,
    160:12, 161:2,
    181:4, 181:10,
    181:12, 181:13,
    181:15, 186:25,
    187:1, 189:16,
    192:21, 193:19,
    193:21, 193:23,
    194:3.
revolvers 188:13.
revolves 160:8.
RICO 226:13.
rifled 163:10,
    163:11, 163:12.
rifles 154:9.
Rifling 163:9,
    163:13, 163:24,
    193:16, 193:23.
right-hand 159:16.
rights 15:15.
ripe 217:15.
road 14:12, 49:12,
    58:20, 137:9.
Roepcke 119:20,
    120:14, 120:17,
    120:22, 120:23,
    120:25, 121:8,
    121:9, 121:15,
    129:21.
room 23:11, 31:11,
    43:11, 60:11,
    90:6, 90:7, 91:24,
    101:11.
rooming 106:2,

106:7.
Rooms 90:7, 108:13, 108:14.
rotate 208:2.
roughly 9:11, 11:6, 12:25.
round 37:4, 46:10, 160:7, 164:13.
rounds 131:11, 131:12.
routine 84:10.
RPR 1:46, 230:6.
rubber 38:14.
Ruger 154:10, 154:23.
Rule 25:7, 26:4, 50:25, 51:2, 51:14, 53:13, 137:12, 142:24, 142:25.
ruled 5:15.
rules 46:13, 51:3, 156:9.
ruling 30:22, 31:22, 151:24, 152:6, 172:23, 174:13, 209:12.
rulings 25:12, 223:18.
rumor 64:12.
run 12:18, 124:16, 161:6.
running 224:19.
Ryan 203:4, 203:5, 203:9, 203:17.
.
.
< S >.
S-a-n-d-r-a 134:13, 153:1.
Sadly 26:19.
safe 128:16, 131:8, 131:9, 131:13.
safely 200:8.
Salisbury 154:4.
Sam 134:12.
same. 172:8.
sample 44:3, 198:22.
sampling 115:16.

Sandra 5:14, 55:24, 119:24, 133:7, 133:9, 134:4, 134:12, 151:22, 152:11, 152:17, 152:25, 155:12.
satisfy 51:15.
sauce 20:15, 26:7, 26:8, 26:9, 26:13, 27:15, 30:20.
Sauer 127:10, 127:12, 128:5, 130:16, 132:12, 180:3, 192:9, 192:11, 194:18, 194:25, 195:5, 195:10.
Savage 154:8, 154:9.
save 128:23.
saw 13:1, 16:18, 56:6, 56:18, 83:11, 113:12, 123:17, 124:16, 125:8, 219:11, 219:16.
saying 26:13, 60:6, 68:13, 82:15, 84:14, 95:3, 103:19, 228:5.
says 3:9, 5:2, 5:23, 45:17, 53:22, 141:1, 191:5, 214:2, 219:10.
SC 77:21.
scale 28:2, 28:8.
scared 75:5.
scenario 51:24, 170:22, 200:20.
scenes 14:8, 66:11.
schedule 220:23.
school 12:21.
science 6:18, 6:19, 7:3, 7:8, 154:3, 172:13, 179:5, 179:8, 179:12, 179:17.
scientist 58:3.
scope 6:18, 7:3,

67:5, 118:6, 225:9.
Scott 212:5, 212:6, 212:8, 212:12, 212:22, 212:23, 212:25, 213:15, 213:18, 214:6, 215:19, 217:10, 217:16, 226:17.
scrapes 208:22.
screen 11:19, 12:18, 29:13, 29:15, 37:11, 70:24, 71:3, 97:25, 99:10, 122:24, 122:25, 124:11, 158:5, 159:1, 169:4, 196:18, 197:19, 202:2.
screens 137:21, 195:16.
screwed 129:4.
seal 112:7, 112:12.
sealed 45:15, 112:15, 131:17.
sealing 112:6, 112:12.
search 126:5, 126:8, 126:13, 127:7, 130:10.
searched 127:6.
searches 221:25.
seat 121:4, 134:8, 152:21.
seated 2:2, 7:16, 59:4, 77:17, 120:19, 186:3, 213:9, 223:7.
second 2:8, 7:13, 12:11, 12:12, 26:8, 29:7, 57:19, 69:20, 73:2, 73:7, 73:14, 78:13, 78:19, 97:7, 97:13, 100:19, 100:21, 134:2, 193:11, 211:16.
secondary 9:9.
Section 19:3, 64:7,

64:21, 70:18,
90:21, 111:5,
112:16, 227:4.
secure 136:6, 136:8,
136:9, 145:1.
secured 120:1,
136:10, 136:11,
139:13, 146:14.
SECURITY 133:18.
seeing 12:7, 189:17,
228:14.
seek 92:14.
seeking 82:7.
seem 33:2, 43:5,
43:16, 51:2, 67:5,
172:22.
seems 228:10,
228:11.
seen 4:4, 149:11,
158:10, 164:20,
222:18.
segregate 30:12.
seized 131:3,
141:21.
select 63:20, 63:23,
65:5, 65:7,
70:5.
selected 70:9.
sell 195:5.
selling 195:4.
semi-auto 161:3.
semi-automatic
36:20, 36:21,
127:10, 148:24,
160:3, 160:15,
160:16, 161:7,
186:17, 188:12.
semi-automatics
187:11.
sends 188:6.
sense 96:5, 99:13,
157:11, 159:7,
182:21.
sensibilities
15:13.
sensitivities
33:14.
sent 3:24.
separate 21:5.
separately 20:23,

182:15, 224:2.
separates 168:3.
Serial 127:14,
127:23, 128:24,
129:7, 154:18.
series 99:2, 124:21,
125:2, 154:6,
154:10, 154:11,
154:12, 154:13.
serious 119:19.
serving 9:4,
144:3.
session 220:23.
set 7:12, 20:24,
22:8, 27:23, 28:7,
221:14, 229:1.
several 108:10.
shake 219:4.
shaking 223:17.
sharpen 37:9.
Sharpie 123:22.
Sharpley 11:2.
sheet 21:5, 21:8.
sheets 46:22.
shells 56:23, 57:4,
159:25.
shift 9:23.
shirt 213:13.
shock 228:20.
shoes 13:10.
shooters 103:23.
shooting 2:18,
67:16, 68:8, 68:9,
68:13, 68:14,
69:10, 76:14,
77:14, 103:20,
120:1, 135:15,
137:18, 141:12,
141:18, 169:3,
178:10, 180:15,
183:24, 184:9,
184:20.
shootings 119:25,
204:20.
shoots 149:5,
149:8.
shops 195:3.
Short 119:21,
190:14, 214:24.
shortcut 46:15.

shortened 190:15.
shorter 126:2.
shot 35:18, 64:12,
64:17, 64:18,
68:17, 68:18.
shotgun 154:11,
154:13, 163:12.
shotguns 163:12.
shoulder 208:7.
shouldn't 17:15,
177:14.
showed 80:7, 108:9,
117:19, 158:11,
212:21.
showing 37:10,
53:15, 63:9,
65:11, 103:10,
145:2, 147:18,
197:16, 197:19,
200:1, 209:22.
shown 14:7, 15:8,
26:14, 33:15,
109:25, 113:16,
118:12, 158:20.
shows 23:10, 23:11,
24:17, 27:13,
27:14, 30:18,
30:19, 45:16,
58:7, 184:25,
213:22.
shut 45:15.
side 8:1, 12:6,
64:8, 124:15,
127:11, 159:16,
159:17, 162:8,
211:8, 211:15.
sidewalk 108:2,
186:23, 210:21.
Sig 127:10, 127:12,
128:5, 130:16,
132:12, 180:3,
192:9, 192:11,
194:18, 194:25,
195:5, 195:10.
Sigma 154:12.
sign 138:20,
170:5.
signal 14:17.
signature 45:16,
64:3, 64:19, 65:9,

70:2, 72:12, 213:15, 213:24.
signatures 47:14.
signed 45:25, 47:9, 47:10, 47:15, 137:3, 204:14, 214:5.
significance 27:22.
significant 6:10, 58:5, 194:14.
signs 35:12.
silver 159:11.
similar 95:22, 193:23, 194:1, 194:2.
similarities 63:16, 192:17, 193:16.
simply 68:3, 97:20, 117:22, 176:14, 177:13, 177:18, 195:19, 196:8, 217:9.
simultaneously 228:15.
single 26:22, 30:25, 143:15, 164:20, 184:8, 184:18, 199:11.
sirens 124:21.
sit 10:13, 150:22, 220:24, 220:25, 221:1, 221:2, 221:7, 221:8, 221:9, 221:10, 221:12.
site 10:5, 11:12.
sitting 40:8, 102:21, 145:22, 187:23, 213:12, 220:19.
situation 71:10, 223:3.
six 9:13, 52:4, 87:19, 88:2, 88:12, 95:14, 99:10, 100:17, 100:24, 116:4, 163:22, 163:23.
six-shooter 149:2.

size 168:16, 168:17, 168:18, 194:2.
sizes 163:17.
skull 28:5.
slams 188:7.
slanted 214:3.
Slay 63:24, 68:17, 93:16, 95:1, 118:17.
slide 160:21, 160:25, 161:3.
slightly 49:6, 145:8.
slipping 182:13.
small 52:14, 188:4, 208:7.
smaller 131:15, 200:23.
Smith 154:9, 154:11, 154:23.
so-and-so 3:9.
so-called 30:6.
soaking 199:2.
sobriety 143:9.
soft 167:23.
softer 167:21.
software 95:10.
Solely 33:13, 55:5, 157:12.
solid 229:12.
solution 199:1, 199:2.
solve 85:18.
solving 5:7.
Somebody 5:3, 26:6, 47:9, 56:3, 57:23, 71:13, 71:15, 72:11, 73:11, 80:5, 81:7, 87:11, 87:24, 97:14, 105:5, 145:24, 148:3, 148:16, 226:1.
Somehow 7:5, 21:5, 21:7, 43:24, 53:24.
someone 25:2, 26:12, 45:17, 47:12, 63:20, 72:18, 73:14, 77:14,

107:2, 156:10, 163:21, 169:16, 187:3, 214:13, 221:3.
Sometime 57:23, 87:15, 91:5.
Sometimes 44:5, 50:25, 106:17, 115:8, 159:8, 159:24, 168:7, 189:6, 197:3, 201:18.
somewhat 25:9, 45:3, 81:22.
Somewhere 9:10, 86:8, 161:8, 221:10.
Son 154:22.
soon 107:24, 147:11.
Sorry 15:20, 25:16, 36:22, 40:1, 40:13, 62:10, 70:15, 79:16, 79:25, 83:8, 100:16, 105:6, 119:24, 126:13, 128:22, 129:7, 133:15, 137:20, 140:18, 145:3, 146:7, 154:10, 158:12, 158:13, 198:14, 207:18, 227:13.
Sort 14:9, 21:24, 32:4, 44:2, 44:3, 49:20, 51:9, 55:7, 108:1, 150:1, 171:1, 197:7, 200:25, 208:19, 208:22, 222:25, 223:13, 228:5, 228:21.
sorted 184:17, 229:15.
sought 81:25, 82:4.
sound 107:4.
sounds 3:14.
source 14:10.

sources 222:2.
south 124:8.
southbound 123:23.
space 95:17,
  145:7.
spaghetti 20:14,
  26:7, 26:8, 26:9,
  26:13, 27:15,
  30:20.
spatter 210:19,
  210:20.
speaking 14:5,
  73:21, 95:5,
  96:24, 133:16.
special 111:3,
  156:8, 156:17,
  160:11, 208:19.
specialized 153:22,
  156:15.
specially 21:10,
  224:2.
specific 94:5,
  117:9.
specifically 38:1,
  41:2, 41:18,
  57:18, 58:12,
  136:4, 200:13.
specifics 194:15.
specified 157:20.
specimen 167:15,
  168:2, 181:14,
  181:16, 187:6.
spell 8:12, 18:11,
  121:7, 134:10,
  152:24, 203:16.
spelled 8:14, 97:21,
  153:1, 225:23.
spend 81:4.
spin 163:20.
spirit 176:7.
split 225:5,
  225:8.
spoke 62:13, 83:19,
  108:21, 192:6.
spoken 33:12, 79:17,
  79:21.
spoon 225:23.
Spoone 225:22,
  225:24, 225:25.
spread 84:1, 84:4,

88:9.
spring 160:18.
Squad 122:2.
squatting 106:7.
stabbed 215:16,
  215:23.
stabbing 209:8,
  219:17, 224:6,
  226:12, 226:13.
stacked 160:19.
Stackhouse 40:7.
stacks 22:1.
stage 143:1,
  170:16.
stains 208:9.
Stand 7:25, 17:25,
  50:1, 55:24, 59:2,
  203:6.
standard 7:11,
  173:8, 174:9.
standpoint 207:20,
  209:13.
stands 42:2, 86:10,
  165:8, 225:25.
start 2:3, 99:21,
  117:17, 150:18,
  171:9, 171:12,
  209:22, 222:13,
  222:25, 223:4,
  228:15.
started 133:5.
starting 96:22.
starts 49:10,
  49:15.
State 2:15, 2:22,
  3:6, 8:11, 18:10,
  62:6, 62:7, 62:9,
  73:10, 73:19,
  75:1, 80:9, 80:11,
  80:12, 91:6,
  121:6, 134:10,
  152:23, 203:15.
Statement 14:20,
  41:6, 71:19, 72:5,
  101:18, 126:19,
  127:20, 129:1,
  129:23, 176:12,
  216:10, 216:12,
  216:13, 216:16,
  216:23, 217:23,

218:4, 218:5,
  218:15, 218:22,
  219:15.
statements 217:21.
States 1:1, 1:5,
  194:23, 195:12.
statute 227:18.
stayed 113:7.
stays 150:5,
  167:25.
stenographic
  230:7.
step 8:10, 18:9,
  33:6, 38:19, 40:1,
  44:17, 50:19,
  121:5, 152:22,
  182:11, 203:14.
step-by-step
  44:11.
Stephen 76:19,
  76:24.
steps 48:23, 107:23,
  108:1, 108:2.
stickers 20:25.
stipulated 41:15.
Stipulation 41:2,
  41:3, 41:5, 41:11,
  41:23, 42:2,
  42:3.
stolen 128:6,
  128:8.
stone 15:19.
Stop 7:10, 29:23,
  46:9, 49:18,
  133:24, 134:2,
  152:13, 183:20,
  184:22, 193:8,
  217:7.
stopped 129:23.
storaged 113:3.
story 5:1, 53:25,
  76:2, 84:3.
straight 107:25.
straighter 163:20.
strategy 51:1.
stray 29:19.
Streets 122:15,
  124:24.
stricken 164:13,
  177:4, 177:10,

229:3, 229:6,
229:7.
strike 25:10, 33:1,
164:11, 172:3,
177:15, 177:17,
177:21, 188:1.
striking 124:25.
strips 160:22.
strong 24:25,
28:20.
struck 124:9,
125:10, 188:3.
structured 157:25,
159:4.
strung 223:9.
study 6:1.
stuff 29:25.
style 191:12.
subject 26:16,
32:11, 33:4,
120:4, 155:16,
155:25, 177:13,
177:15.
subjected 197:4,
200:10, 200:15.
subjects 105:23.
submarking 182:19.
submissions
228:14.
Submit 24:22, 111:5,
228:18.
submitted 37:17,
59:18, 59:21,
59:24, 60:24,
61:2, 90:21,
113:1, 128:15,
131:20, 139:14,
140:6, 140:14,
196:13, 196:15.
subsection 51:18.
substance 51:20,
52:23, 74:17,
91:14.
substantial 222:8.
Substantively
225:14.
substitute 157:10.
substituted 45:10.
subtle 227:21.
Sufficient 6:5, 6:7,

6:8, 6:10, 6:12,
51:6, 51:17,
143:14, 152:1.
suggest 26:8, 29:11,
46:12, 143:6.
suggestion 65:14,
71:24, 72:14,
214:6, 214:9,
227:16, 228:9.
suggestiveness
96:7.
supervising
153:12.
supervision. 56:8.
supervisor 153:8.
supplying 174:3.
support 51:17.
suppose 15:15,
43:21, 52:13.
supposed 213:5.
suppress 48:1.
suppressed 223:17.
surface 6:12.
surveillance
61:12.
survive 44:8.
suspect 43:23,
65:22, 84:18,
117:8.
suspected 71:15.
suspects 3:11, 4:18,
28:5, 61:15,
89:12, 92:22,
117:20.
Sustained 39:1,
39:3, 59:23,
60:22, 73:12,
74:1, 74:23,
75:15, 75:17,
80:24, 81:13,
164:8, 166:15,
166:17, 166:24,
171:24, 208:13.
SWAT 122:1, 122:9.
swear 134:3.
sworn 8:6, 18:5,
121:1, 134:5,
152:18, 203:10.
synopsis 216:14,
216:17, 216:20.

System 12:14, 17:7,
53:14, 53:15,
113:2, 133:3,
150:5, 154:16,
154:18.
.
.
< T >.
T. 1:46, 230:11.
table 213:12.
taken. 50:22,
120:10, 185:23.
talked 5:14, 49:6,
73:22, 82:5, 86:4,
86:21, 87:11,
87:17, 116:10,
139:21, 187:17,
192:20, 193:24,
194:17.
tank 162:21.
tape 92:3, 99:20,
100:6, 131:18,
146:13, 146:20,
150:17, 150:23,
151:5, 207:14,
208:16, 209:3.
taped 45:15, 216:9,
216:16, 216:23,
219:15.
target 163:21.
Task 122:2.
Tata 13:18.
tattoos 98:17.
taught 122:2.
Taurus 130:14,
132:7, 181:4,
181:15, 192:21,
193:18, 193:21,
193:23, 194:3,
195:7, 195:8,
195:9.
Taylor 144:16.
Team 38:16, 122:1,
122:6.
teapot 51:2.
tear 189:10, 189:11,
189:16.
Tech 32:1, 38:14,
38:21, 38:24,
47:7, 106:13,

106:19, 106:21,
107:9, 109:24,
110:9, 110:15,
110:24, 112:20,
115:2, 115:7,
123:7, 137:4,
137:5, 139:10,
145:14, 145:18,
145:25, 149:14,
149:15, 205:25.
technical 104:22,
156:14.
technically 6:3.
Technician 20:4,
39:10, 56:6,
107:1, 107:2,
111:2, 111:19,
111:20, 210:1.
technicians 47:5.
technique 96:10.
technology 123:20.
techs 148:4.
television 61:11.
tempest 51:2.
ten 2:10, 2:16,
2:23, 52:11, 90:7,
107:6, 185:21.
tend 197:6.
tennis 13:10.
tension 7:9.
term 15:5, 95:19,
168:14, 170:25,
225:12.
terminology 60:11,
99:24, 186:10.
terms 24:10, 28:8,
43:22, 46:15,
52:21, 114:5,
168:16, 173:15,
199:24, 222:3,
226:7, 229:17.
terribly 25:10,
27:18.
test 7:4, 58:7,
162:13, 162:15,
162:17, 162:20,
162:22, 163:2,
163:4, 180:8,
193:21.
test-fired 163:5,

163:6, 164:21,
175:19, 179:21,
180:12, 181:14,
192:6, 192:21.
testified 2:12, 8:7,
18:6, 33:18,
33:25, 44:19,
53:9, 59:7, 59:10,
67:6, 68:16,
72:22, 73:2, 89:8,
117:22, 121:2,
134:6, 143:2,
149:18, 152:19,
155:2, 166:7,
168:6, 171:19,
183:25, 184:7,
203:11, 219:19,
219:20.
testify 20:12, 32:5,
46:1, 46:23,
55:25, 56:5, 56:8,
56:20, 68:3, 68:4,
71:11, 74:12,
157:13, 157:20,
179:7, 179:13,
201:8, 207:8,
226:18.
testifying 5:14,
74:19, 75:1, 75:3,
75:5, 75:6, 157:2,
179:1, 179:6.
themselves 56:23.
theory 156:10,
218:14, 226:19.
thereafter 103:23.
thereby 225:12.
they've 53:9,
179:13, 200:2,
200:9, 200:15,
227:17.
thinking 189:23.
thinks 30:2.
third 108:7,
224:5.
thoroughly 228:2.
though 30:2, 48:11,
55:4, 159:8,
159:9, 176:19,
190:18.
thoughts 223:2,

227:25.
thousands 154:25.
threats 65:25,
72:17, 214:12.
three 25:20, 26:2,
43:17, 78:16,
103:22, 184:25,
221:8, 221:12,
222:4.
three-day 221:16.
three-story
107:19.
thrilled 223:19.
Thursday 1:19,
49:19, 220:24,
221:6.
tightly 29:17.
tip 36:23.
tired 70:15.
tiring 133:17.
tissue 28:6,
202:7.
title 9:1, 18:22.
today 5:14, 21:9,
40:9, 56:2,
128:12, 182:16,
182:17, 182:18,
183:21, 213:9.
together 49:21,
51:22, 72:9, 86:8,
98:23.
token 197:12.
took 45:18, 83:5,
84:21, 101:18,
114:6, 114:12,
126:6, 128:24.
tool 6:11, 6:13,
6:15, 161:21,
161:22, 161:23,
162:1, 162:2,
162:5, 162:10,
163:8, 187:17.
top 63:14, 65:8,
95:11, 107:23,
137:5, 160:20,
208:19.
topic 26:19, 224:5,
228:13.
topics 156:13.
touch 12:8, 50:10,

75:25, 113:10,
114:9, 119:5,
122:25, 123:5,
182:2, 221:20.
toured 154:19.
Trace 198:17,
198:22, 199:8,
199:18, 202:4,
202:7, 202:11.
track 21:9, 140:7.
traffic 122:14,
122:23, 123:17,
124:6, 183:20,
193:8.
trail 16:5.
training 145:18,
153:22, 153:24,
156:8.
traits 193:18.
trajectory 163:21.
transcriber 103:4.
Transcript 1:17,
3:6, 3:15, 91:3,
102:15, 102:19,
216:16, 230:7.
Transcripts 103:2,
216:9.
transferred
161:24.
Transported 79:24,
80:1, 112:15,
205:14.
trash 32:21.
traveled 168:11.
traveling 161:25.
treated 206:3,
209:8, 210:23.
tree 12:4, 12:5.
trees 11:23.
Trial 1:10, 2:3,
3:6, 25:5, 46:10,
46:16, 49:19,
50:13, 75:1, 91:7,
102:6, 102:8,
113:12, 119:8,
176:3, 182:5,
220:17, 220:18,
220:19, 220:23,
221:14, 221:15,
221:22, 221:23,

222:1, 222:6,
222:8, 223:8,
223:10.
tried 3:12.
trigger 15:7, 160:9,
181:20.
trip 128:23.
troubling 7:13.
trouser 52:16.
trousers 52:3.
true 30:5, 32:12,
41:7, 41:8, 41:9,
42:13, 53:2, 56:5,
81:24, 82:4,
85:21, 117:25,
118:2, 172:12.
truly 27:22.
try 4:23, 12:7,
48:13, 81:2, 81:4,
99:8, 120:6,
123:8, 150:8,
153:16, 162:10,
163:25, 173:2.
trying 23:14, 85:18,
172:21, 173:6,
176:1.
Tuesday 221:7.
turn 10:14, 55:20,
100:5, 152:13,
211:25, 218:13,
223:23.
turned 4:11, 84:6,
92:1, 92:16,
124:7.
turning 78:15,
78:21.
turns 48:21, 124:22,
125:2.
twist 163:19,
163:23.
two 2:6, 6:13,
15:18, 22:1,
27:19, 28:13,
28:15, 28:19,
30:6, 36:19,
49:12, 57:15,
83:22, 84:12,
103:19, 103:23,
118:4, 129:6,
138:11, 162:7,

162:8, 162:10,
162:11, 164:10,
165:11, 185:20,
188:20, 219:8,
223:25.
two-sided 95:16.
type 51:12, 124:5,
160:5, 160:15,
160:16.
types 36:19, 45:5,
45:6, 192:18.
typical 83:24,
85:3.
Typically 55:8,
160:4, 160:20,
167:21, 167:22,
168:5, 181:11,
187:24, 190:15,
197:6, 197:9,
200:7, 200:13,
200:25, 202:9,
225:8.
Tyra 40:6.
.
.
< U >.
U-turn 124:17.
U116968 128:1.
ultimate 209:11.
ultimately 39:21,
77:14, 222:10.
unable 52:20,
115:12.
unavailable 47:11.
uncomfortable
81:15.
uncommon 73:9,
73:13, 75:19.
uncontaminated
45:15.
Uncooperative
211:22, 211:24.
underground
223:22.
underneath 95:14,
108:5, 213:1,
213:24.
understand 2:3,
6:25, 7:1, 7:2,
17:19, 29:7,

30:21, 47:23,
60:7, 99:5, 99:6,
99:15, 174:12,
176:11, 177:11,
184:3, 199:10,
219:24, 229:10.
understanding 106:6,
106:8, 156:11,
176:5, 176:23.
understands 29:19,
60:8, 63:13.
Understood 15:20.
Underwater 122:6.
underway 222:8,
223:1, 223:15.
undisclosed 3:22.
unduly 25:6, 207:20,
208:11, 209:12,
209:15.
unearth 46:24.
unfired 37:4,
159:6.
uniform 52:3.
uniformed 11:2,
11:13, 80:2.
union 127:25.
unique 56:18, 98:17,
148:8, 149:10,
149:19, 149:23,
188:22.
United 1:1, 1:5,
194:23, 195:12.
University 154:4.
unknown 171:17,
174:23, 178:9,
178:17, 191:17.
unlawful 227:10,
227:14, 227:16.
Unless 17:11, 38:17,
58:19, 113:9,
132:4, 137:11.
unlikely 58:4,
201:18, 228:11.
unmarked 124:2.
unredacted 3:22,
3:24, 4:1.
unrelated 62:5,
89:23.
unsolved 85:18.
Until 17:8, 17:20,

45:24, 89:14,
113:10, 113:12,
160:13, 187:3,
220:20, 221:7,
230:2.
unusual 156:21.
upper 41:19, 63:11,
208:5.
USA 154:22.
useful 24:8.
uses 160:17.
using 38:16, 99:23,
130:5, 152:2.
utensil 225:23.
.
.
< V >.
validity 45:5.
value 44:6, 44:8,
52:12, 53:20,
137:24, 198:5,
199:17.
various 47:14,
121:23, 154:5,
154:19, 204:10.
vault 45:18, 45:20,
45:23, 45:24,
47:13, 47:16,
47:17, 47:21.
vehicle 2:21, 124:8,
124:10, 124:17,
124:18, 124:21,
124:25, 125:1,
125:10, 125:12,
126:12, 127:24,
129:24, 129:25,
130:17.
Veney 7:21, 7:22,
8:5, 8:13, 8:20,
16:21, 114:15,
114:16.
Verbally 31:2,
118:16.
verbiage 5:24.
versa 7:12.
version 3:20, 3:24,
4:2.
versus 197:13.
vest 40:14.
Vic 124:2, 124:3.

vice 7:12.
vicinity 161:9.
Victor 8:15.
Victoria 124:3.
video 90:11, 90:12,
101:13.
view 6:19, 30:19,
35:8, 35:15,
35:24, 43:5,
145:8, 179:4,
184:20, 224:8,
226:14, 226:20.
viewed 57:24.
violate 25:7.
violates 227:18.
violation 122:15,
122:23, 123:18,
124:6.
violence 135:8.
Virtually 23:15,
24:6.
virtue 44:22.
visible 198:21.
visually 31:1.
voice 62:8, 75:7,
154:8.
voices 133:14.
voir 155:14,
155:18.
Volume 1:10.
voluntarily 66:4,
72:20, 214:16.
vs 1:8.
.
.
< W >.
W. 1:48.
Wait 4:16, 224:11.
waiting 92:21.
waived 44:22.
Wal-mart 195:3,
195:4.
walk 92:8, 107:25,
110:8, 110:14,
121:23, 146:20,
204:10.
walking 150:19.
walks 99:21.
Walther 154:6.
wanted 2:4, 4:22,

5:22, 6:4, 24:14,
  64:14, 152:4,
  211:5.
wants 58:20.
warn 14:6, 33:14.
warning 14:7, 15:7,
  15:12, 84:4, 84:5,
  228:4.
watch 8:10, 18:9,
  121:5, 152:22,
  160:5, 203:14.
watching 56:19.
water 155:6, 162:21,
  173:9, 179:11.
ways 51:5, 156:24.
weapon 36:20, 36:21,
  58:8, 66:12,
  130:11, 131:15,
  179:3, 184:22.
weapons 128:15,
  131:14, 132:16,
  179:3.
wear 189:9, 189:10,
  189:11, 189:16,
  189:17.
wearing 131:4.
weather 197:8.
weeds 48:19.
week 5:15, 49:4,
  49:19, 182:18,
  220:18, 220:24,
  220:25, 221:1,
  221:2, 221:8,
  221:9.
weekend 49:20,
  214:25, 223:2,
  228:2, 229:19.
weeks 30:13, 221:11,
  221:13.
weigh 175:25.
weighing 156:25.
weight 98:17,
  157:5.
Wesson 154:9,
  154:12, 154:23.
west 124:13,
  160:5.
westerns 149:2.
whatever 4:7, 32:15,
  56:17, 57:13,

60:17, 150:11,
  157:5, 189:1,
  217:10, 223:16,
  228:18.
whatsoever 52:9,
  58:5, 95:2.
Wheatley 40:6.
whenever 150:19.
white 131:16.
whoever 99:25,
  169:19, 169:20.
whole 4:25, 17:7,
  20:10, 36:25,
  47:15, 55:18,
  55:23, 139:17,
  140:4, 147:5,
  147:9, 167:19,
  167:25, 195:11.
whom 72:14, 80:1,
  141:2.
Wilson 154:23.
Winchester 154:24.
wind 228:22.
wish 33:14, 223:2.
withdrawn 23:18,
  23:24, 25:23.
withdrew 27:16.
Within 7:3, 54:4,
  103:3, 106:5,
  118:6, 154:17,
  157:21, 159:20,
  162:21, 163:15,
  163:18, 163:24,
  173:9, 179:14,
  179:15, 184:20.
Without 41:4, 41:21,
  41:24, 44:6,
  44:19, 45:8, 53:3,
  54:6, 56:23,
  57:24, 74:17,
  77:2, 77:11,
  161:10, 186:15,
  201:17, 211:18,
  211:21, 212:1,
  228:4.
witnessed 122:14,
  122:22.
witnesses 16:3,
  33:12, 40:16,
  45:13, 46:10,

46:25, 61:7, 61:9,
  75:21, 77:5,
  105:22, 105:23,
  109:8, 156:17,
  156:22, 156:24.
wondering 66:25.
wood 197:23, 198:1,
  198:2, 198:7,
  198:8, 198:11.
word 6:2, 38:11,
  38:12, 38:16,
  48:19, 81:23,
  96:6, 102:22,
  116:22, 150:4,
  163:8, 170:16,
  172:8, 186:20,
  190:9, 200:5.
worded 38:22.
wording 54:9.
words 6:5, 92:3,
  92:4, 100:10,
  100:11, 137:12,
  173:14, 174:2.
work 8:23, 8:24,
  10:11, 20:22,
  49:16, 51:10,
  80:17, 93:25,
  121:17, 121:18,
  145:3, 153:7,
  182:14.
worked 18:24, 122:1,
  135:1, 204:5,
  204:8.
worker 10:10.
working 9:17, 10:9,
  10:11, 12:10,
  12:15, 12:18,
  19:13, 93:2,
  122:11, 123:19,
  135:12, 145:4,
  204:23, 225:24.
works 10:19.
worth 227:5.
wound 26:20,
  41:19.
wounds 41:17, 41:18,
  41:19, 211:10,
  211:15, 211:17.
write 3:9, 21:9,
  64:6, 70:17,

```
    87:12, 127:18,          .
    213:18, 213:21,      < Z >.
    214:10.               Z. 44:5.
writes 170:2.
writing 5:8, 95:17,
    111:14, 111:16,
    111:20, 112:1.
written 84:7, 86:22,
    86:25, 87:10,
    116:18, 140:24,
    141:1.
wrote 5:22, 70:22,
    72:5, 213:3,
    217:24, 218:5,
    218:15.
    .
    .
< Y >.
y'all 64:15.
year 9:4, 9:11,
    9:13, 9:15, 19:9,
    83:6, 91:6,
    113:13, 165:11,
    204:17.
years 2:16, 2:23,
    19:1, 19:5, 52:4,
    52:11, 75:25,
    85:6, 85:7, 107:6,
    121:22, 129:23,
    135:3, 135:5,
    151:3, 151:4,
    153:20, 199:3,
    204:7, 204:9,
    204:21, 212:7,
    224:20, 225:19.
yellow 110:1,
    146:13, 146:19.
yesterday 2:12,
    68:16, 75:2,
    218:17.
young 40:14.
yourself 13:21,
    21:9, 92:24,
    169:16, 174:10,
    222:13, 222:20.
yourselves 46:17,
    50:8, 50:9, 119:4,
    181:25, 182:1,
    221:19.
    .
```