IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,              )
                                       )
          Plaintiff,                   )
     vs.                               )
                                       )  **CRIMINAL NO.:** JKB-16-0363
GERALD JOHNSON, et al.,                )  **Jury Trial:**  Volume 8
                                       )
          Defendant.                   )
                                       )
_____)

Transcript of Proceedings
Before the Honorable James K. Bredar
Tuesday, December 5th, 2017
Baltimore, Maryland

For the Plaintiff:

     Peter J. Martinez, AUSA

     Christina A. Hoffman, AUSA

For Defendant Gerald Johnson:

     Paul F. Enzinna, Esquire

     Jeffrey B. O'Toole, Esquire

For Defendant Kenneth Jones:

     Alan R.L. Bussard, Esquire

For Defendant Marquise McCants:

     John R. Francomano, III, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning.  Be seated, please.

 3              (Pause in the proceedings.)

 4              THE COURT:  Mr. Francomano.

 5              MR. FRANCOMANO:  Yes, Your Honor.  We got a notice

 6     from the government, I think on the 29th, in which -- about

 7     the testimony of Mr. Gwaltney.  And in that testimony it

 8     mentions one of my clients, who's in CDF.  It mentions his

 9     nickname, Butt Butt.  I identified that that may be my client,

10     I sent an e-mail to Mr. Martinez.  He says it is in fact

11     Mr. Van McNutt and I just heard from Mr. Martinez that they're

12     going to elicit that testimony today.

13              THE COURT:  So it's testimony about him?

14              MR. FRANCOMANO:  Yes, Your Honor.

15              THE COURT:  But you're not going to call him?

16              MR. FRANCOMANO:  Correct, Your Honor.  I just wanted

17     the Court to be aware of that.

18              THE COURT:  Let me see Mr. Francomano and

19     Mr. Martinez at the bench.

20              (Sealed bench conference redacted.)

21              THE COURT:  We're back on the record.  You can

22     redistribute the ear pieces.

23              Mr. Vogan, can I see you?

24              (Bench conference off the record.)

25              THE COURT:  Are we ready for the jury, Mr. Martinez?
```

1          MR. MARTINEZ:  I believe we are, Your Honor.

2          THE COURT:  Mr. O'Toole, Mr. Enzinna.

3          MR. O'TOOLE:  Yes.

4          THE COURT:  Mr. Bussard.

5          MR. BUSSARD:  Yes, Your Honor.

6          THE COURT:  Mr. Francomano.

7          MR. FRANCOMANO:  Yes, Your Honor.

8          THE COURT:  Okay.  Who's your next witness?

9          MS. HOFFMAN:  Government will call Troy Kellam.

10         THE COURT:  In custody?

11         MS. HOFFMAN:  He is.

12         THE COURT:  Have we called for him?

13         MR. MARTINEZ:  I hope so.

14         THE COURT:  Why don't you call and make sure he's in

15  route.  Okay, they've got the word.

16              (Jury entered the courtroom.)

17         THE COURT:  Good morning, ladies and gentlemen.

18         JURORS:  Good morning.

19         THE COURT:  We're ready to begin our trial day.

20         Ms. Hoffman, the government may call their next

21  witness.

22         MS. HOFFMAN:  The government calls Troy Kellam.

23         THE COURT:  Troy Kellam.  And I understand there may

24  be a moment or two delay while Mr. Kellam is brought into the

25  courtroom; is that right, Ms. Hoffman?

1              MS. HOFFMAN:  I believe that's right.

2              (Pause in the proceedings.)

3              THE COURT:  Administer the oath, please.

4              THE CLERK:  Mr. Kellam, if you would stand and raise

5     your right hand to be put under oath please.

6                           TROY KELLAM,

7     called as a witness, being first duly sworn, was examined and

8     testified as follows:

9              THE WITNESS:  Yes.

10             THE CLERK:  Thank you, sir, you may have a seat.

11    And if you would adjust that microphone.  And if you would

12    please speak directly into it, state your first and last name

13    and spell your first and last name.

14             THE COURT:  Turn your chair so you're facing

15    directly the microphone and then move up --

16             THE WITNESS:  Troy Kellam.

17             THE COURT:  That's good.  Thank you.  Your witness,

18    ma'am.

19             MS. HOFFMAN:  I'm sorry.  Did you want the witness

20    to spell his name?

21             THE COURT:  Yes.  Spell your first name.

22             THE WITNESS:  T-r-o-y, K-e-l-l-a-m.

23             THE COURT:  And spell your last name.

24             THE WITNESS:  K-e-l-l-a-m.

25             THE COURT:  Thank you.  Your witness, ma'am.

```
 1                      DIRECT EXAMINATION

 2   BY MS. HOFFMAN:

 3   Q    Good morning, Mr. Kellam.

 4   A    Good morning.

 5   Q    How old are you?

 6   A    32.

 7   Q    Where are you from originally?

 8   A    Baltimore, Maryland.

 9   Q    Whereabouts in Baltimore?

10   A    West.

11   Q    West Baltimore?

12   A    Yes.

13   Q    Have you lived in Baltimore most of your life?

14   A    All of my life.

15   Q    Are you currently in the custody of the U.S. Marshals

16   awaiting sentencing in a criminal case?

17   A    Yes.

18   Q    What were you charged with in that case?

19   A    Murder and racketeering.

20   Q    And was that charge based on your involvement in the

21   Black Guerilla Family gang or BGF?

22   A    Yes.

23   Q    Did you plead guilty in that case?

24   A    Yes.

25   Q    Did you also plead guilty to murdering an individual
```

Direct Examination - Kellam (By Ms. Hoffman)

1    named George Nealy in furtherance of BGF?

2    A    Yes.

3    Q    Is Mr. Nealy also known as G-Bae?

4    A    Yes.

5    Q    When you pled guilty, did you enter into a plea agreement

6    with the government?

7    A    Yes.

8    Q    And as part of that plea agreement, did you also agree to

9    cooperate with law enforcement?

10   A    Yes.

11   Q    Does part of your agreement with the government require

12   you to testify truthfully as a witness in this case?

13   A    Yes.

14   Q    What are you hoping to get out of testifying today?

15   A    A clear conscience.

16   Q    Can you repeat that?

17   A    A clear conscience.

18   Q    Are you also hoping to get some sentencing leniency?

19   A    Yes.

20   Q    Does your eligibility for a sentencing reduction depend

21   in any way on whether the defendants in this case are

22   convicted or acquitted?

23   A    No.

24   Q    Under your plea agreement, what would happen if the

25   government found out that you testified untruthfully?

Direct Examination - Kellam (By Ms. Hoffman)

1    A    I would get nothing.

2    Q    Under your plea agreement, what would happen if the

3    government found out that you exaggerated?

4    A    I would get nothing.

5    Q    Has anyone made you any guarantees about what your

6    sentence will be in this case?

7    A    No.

8    Q    Who is ultimately responsible for determining your

9    sentence?

10   A    The judge.

11   Q    When you pled guilty in this case, Mr. Kellam, was that

12   your first criminal conviction?

13   A    No.

14   Q    Okay.  I want to start at the beginning, were you

15   convicted of possession with intent to distribute heroin in

16   2007?

17   A    Yes.

18   Q    Were you also convicted of possession with intent to

19   distribute narcotics in 2008?

20   A    Yes.

21   Q    And in 2014, were you convicted of attempting to

22   distribute narcotics?

23   A    Yes.

24   Q    And then in January 2015, were you arrested by the

25   Baltimore Police Department for the murder of George Nealy,

1    also known as G-Bae?

2    A    Yes.

3    Q    Is that the murder you said you pled guilty to as part of

4    your federal case?

5    A    Yes.

6    Q    When you were first arrested for that murder, did you

7    participate in an interview with a BPD homicide detective?

8    A    Yes.

9    Q    Was that interview recorded?

10    A    Yes.

11    Q    Did you tell the truth during that interview?

12    A    No.

13    Q    Why were you not truthful during that interview?

14    A    I was shocked I was locked up for it.

15    Q    Can you tell me a little bit more about that?

16    A    Surprised, didn't expect to get locked up for it, felt

17    remorseful, felt bad.

18    Q    Have you met with law enforcement officers on several

19    occasions since then?

20    A    Yes.

21    Q    Have you now told law enforcement officers the truth

22    about your involvement in that murder?

23    A    Yes.

24    Q    Can you explain to the ladies and gentlemen of the jury

25    why you killed Mr. Nealy?

Direct Examination – Kellam (By Ms. Hoffman)

1    A    I was ordered to.

2    Q    And who ordered you to kill him?

3    A    Uncle Mark.

4    Q    Who's Uncle Mark?

5    A    A bush member.

6    Q    And you referred to a bush member, what is a bush

7    member?

8    A    A high ranking BGF member.

9    Q    What would have happened to you if you didn't follow

10   Uncle Mark's order?

11   A    I would have became the mission.

12   Q    What does it mean to become the mission?

13   A    Means if you don't complete the mission you're ordered

14   to, you become it.  Which means if I didn't kill the person, I

15   was going to be killed regardless, just as well as him.

16   Q    Mr. Kellam, are you still in BGF today?

17   A    No.

18   Q    Why not?

19   A    I mean, you grow up, you get mature.  BGF never gave me

20   nothing.

21   Q    If and when you get out of prison, are you going to

22   return to BGF?

23   A    No.

24   Q    When did you first join BGF?

25   A    2007.

Direct Examination - Kellam (By Ms. Hoffman)

1   Q    And where were you at the time?

2   A    Baltimore City jail.

3   Q    Did you become a full-fledged member of BGF right away?

4   A    No.

5   Q    What was your status in the gang as of 2007 when you

6   first joined?

7   A    A fox.

8   Q    What is a fox?

9   A    Someone that's not fully a full-fledged member, he's

10  going through the training, the observation.

11  Q    Did you have a sponsor when you joined?

12  A    Yes.

13  Q    Who was that?

14  A    G-Bae's stepfather.

15  Q    And G-Bae is the individual you said whose real name is

16  George Nealy?

17  A    Yes.

18  Q    What did you have to do in order to join BGF?

19  A    Had to learn the rules, the 33s, 32s, the Silver Fox

20  Oath, show my heart that I can carry out certain things,

21  extortions things of that nature.

22  Q    What do you mean by extortion?

23  A    Pressing up on people.

24  Q    And was that in the jail?

25  A    Yes.

Direct Examination – Kellam (By Ms. Hoffman)

1    Q    And so what would you press up on them for?

2    A    Drugs, money, whatever was needed.

3    Q    And what would happen if they didn't give you the drugs

4    or money?

5    A    They would get harm done to them.

6    Q    Why did you join BGF?

7    A    It's like a second family, it's a brotherhood.

8    Q    Did you eventually become a full-fledged member of BGF?

9    A    Yes.

10    Q    When was that?

11    A    2008.

12    Q    And were you still in the Baltimore City jail at the

13    time?

14    A    Yes.

15    Q    Did you to take an oath when you joined?

16    A    Yes.

17    Q    Can you recite the oath for us now or as much of it as

18    you remember?

19    A    Should I be untrue and forsake the chosen few, this oath

20    shall kill me.  Shall I become lack in discipline in times of

21    strife and neglect my brothers, this oath shall kill me.  If I

22    do harm or allow harm to come to my brothers, this oath kill

23    me.  If at any time I refuse or deny my brothers, this oath

24    shall kill me.  If I reveal the sworn secrets of this oath,

25    this oath shall kill me.

Direct Examination – Kellam (By Ms. Hoffman)

1    Q    And you mentioned earlier that you also had to learn the

2    rules, which you referred to as the 22s and 33s; is that

3    right?

4    A    Yes.

5    Q    Can you give us some examples of the 22s and 33s?

6    A    If you're ordered to take care of a mission, you do not

7    carry it out, you should be killed, become the mission.

8    Q    Is there a rule against talking to the police?

9    A    Yes.

10    Q    Is there a rule requiring the payment of dues?

11    A    Yes.

12    Q    Are there repercussions if you break the BGF rules?

13    A    Yes.

14    Q    What are those repercussions called?

15    A    Depends which ones you break, but it is all sanctions.

16    Q    What types of sanctions are there?

17    A    You can get your body beat, you get a universal, get beat

18    totally or you can get killed, terminated.

19    Q    What is a universal?

20    A    Beat all over your body.

21    Q    So it's a more severe beating?

22    A    Yes.

23    Q    And who carries out the sanctions?

24    A    Other BGF members.

25    Q    When you first became a full-fledged member in BGF, what

Direct Examination - Kellam (By Ms. Hoffman)

1    was your rank?

2    A    A foot soldier.

3    Q    Did there come a time in 2010 when you were released from

4    the Baltimore City jail?

5    A    Yes.

6    Q    Where did you go?

7    A    Back around my way.

8    Q    And where's around the way?

9    A    South Baltimore.

10   Q    Did you say South Baltimore?

11   A    Yes.

12   Q    Did you eventually become a member of a BGF regime in

13   that area?

14   A    Yes.

15   Q    Which regime was that?

16   A    Uncle Mark regime, Uncle Mark MG.

17   Q    Where was that regime located?

18   A    Pratt and Payson.

19   Q    Pratt and Payson?

20   A    Yes.

21   Q    Approximately when was it that you joined that BGF

22   regime?

23   A    When I fully got into it, it was about 2014.

24   Q    Was the Pratt and Payson BGF Regime involved in criminal

25   activities on the street?

1    A    Yes.

2    Q    What sort of criminal activities?

3    A    Drug dealing, robbery.

4    Q    What was your initial rank in the Pratt and Payson BGF

5    Regime?

6    A    Finance.

7    Q    And what were your responsibilities as -- what were your

8    responsibilities in finance?

9    A    Collecting dues, making sure payments was paid.

10   Q    Did you have any role with respect to the drug dealing in

11   the neighborhood?

12   A    Yes.

13   Q    What was that?

14   A    I supplied the drugs.

15   Q    You mentioned collecting dues, what were members required

16   to pay in the way of dues?

17   A    Whichever was set, sometimes it could be 20, sometimes it

18   could be 40.

19   Q    And what did the dues consist of, how did members make

20   their money?

21   A    By any means necessary, some robbed, some sell drugs.

22   Q    Did you eventually climb the ranks in BGF?

23   A    Yes.

24   Q    What other ranks did you come to hold?

25   A    Became the overseer.

Direct Examination – Kellam (By Ms. Hoffman)

1    Q    And what is the overseer?

2    A    Pretty much he oversees everything that's going on and

3    reports it back to the bush member.

4    Q    Was there ever a point that you were the commander?

5    A    Yes.

6    Q    And what is the overseer's rank with respect to the

7    commander?

8    A    They mostly, like, they work hand in hand.

9    Q    I'm going to show you Government's Exhibit PHI, as in

10   photos of individuals, 33.

11   A    MG.

12   Q    Did you say MG?

13   A    Yes.

14   Q    So you recognize this individual?

15   A    Yes.

16   Q    And how do you know MG?

17   A    Used to come pick up money from me, come pick up drugs to

18   get high.

19   Q    Was he a member of BGF?

20   A    Yes.

21   Q    Do you know what his rank in BGF was?

22   A    Bush member.

23   Q    And you said he would come around, pick up money from you

24   and look to get high is that; right?

25   A    Yes.

Direct Examination – Kellam (By Ms. Hoffman)

1   Q    How often would he come around?

2   A    As much as he felt like it.

3   Q    Can you give me a number of times per month, estimated?

4   A    Maybe about three, four.

5   Q    And were drugs provided to him when he came around?

6   A    Yes.

7   Q    Did he have to pay for those drugs?

8   A    No.

9   Q    Why not?

10  A    You don't charge a bush member, you just give him what he

11  want.

12  Q    You said he would also come around to get money

13  sometimes?

14  A    Yes.

15  Q    Was money given to him?

16  A    Yes.

17  Q    Did you ever see him personally collect dues from the

18  gang?

19  A    Yes.

20  Q    And was that again, because of his rank in the gang?

21  A    Yes.

22  Q    To your knowledge, Mr. Kellam, were there BGF regimes in

23  other parts of Baltimore City?

24  A    Yes.

25  Q    As a ranking member of BGF yourself, did you have

Direct Examination – Kellam (By Ms. Hoffman)

1    interactions with members of other regimes in

2    Baltimore City?

3    A    Yes.

4    Q    Was there a regime in the Greenmount Avenue neighborhood

5    of Baltimore?

6    A    Yes.

7    Q    And did you become familiar with some of the members of

8    that Greenmount Avenue Regime?

9    A    Yes.

10   Q    How so?

11   A    Through different ways, the books, I knew a personal

12   person that introduced me to most of them.

13   Q    And who was that friend who introduced you to most of

14   them?

15   A    Mustafa.

16   Q    Can you give us some names of some of the members of the

17   BGF Greenmount Regime who you became familiar with through

18   Mustafa?

19   A    Geezy, Hood, Lil' Norm, Dave, Lil' Dave.

20   Q    I'm going to show you Government's Exhibit PHI, as in

21   photos of individuals, No. 45.

22   A    Lil' Dave.

23   Q    Did you say that's Lil' Dave?

24   A    Yes.

25   Q    How did you know him?

Direct Examination - Kellam (By Ms. Hoffman)

1   A    We got cool, we was locked up numerous time together.

2   Q    I missed the last part of what you said, can you repeat

3   that?

4   A    I said we was cool, we got to know each other personally.

5   We were locked up a lot of times together.

6   Q    You were locked up a lot of times together, did you get

7   to know him well in jail?

8   A    Yes.

9   Q    To your knowledge, was Dave involved in -- well, first of

10  all, let me back up, was Dave a member of BGF?

11  A    Yes.

12  Q    Was he a member of the Greenmount BGF Regime?

13  A    Yes.

14  Q    Was Dave involved in acts of violence in the jail?

15  A    Yes.

16  Q    Can you tell us about that?

17  A    He hired -- he had stabbings.

18  Q    He participated in stabbings?

19  A    Yes.

20  Q    How did you know Dave was a member of the

21  BGF Greenmount Regime, did he talk about it?

22  A    Yes.

23  Q    Did he ever talk about what he was in jail for?

24  A    Yes.

25  Q    What did he say he was in jail for?

Direct Examination – Kellam (By Ms. Hoffman)

1    A    For a murder.

2    Q    Was that the murder of someone named Henry Mills or

3    Nique?

4    A    Yes.

5              MR. BUSSARD:  Objection, Your Honor.

6              THE COURT:  Don't lead.  Sustained.

7    Q    (BY MS. HOFFMAN)  Do you know whose murder he was charged

8    with?

9    A    Yes.

10   Q    Whose murder was he charged with?

11   A    Nique.

12   Q    Did Dave indicate to you whether or not he was guilty of

13   that murder?

14   A    Yes.

15   Q    What did he say?

16   A    He said he killed him because it came down the pipeline,

17   he was ordered to.  Little dude didn't see it coming.

18   Q    Did he say anything about the evidence against him in

19   that case?

20   A    Yes.

21   Q    What did he say?

22   A    He hoped it didn't get through evidence, he was pretty

23   much worried about a tape.

24   Q    He said there was a tape he was worried about?

25   A    Yeah.

Direct Examination – Kellam (By Ms. Hoffman)

1    Q    By tape, do you mean -- what do you mean by tape?

2    A    I guess a video.

3    Q    Did he say anything about that video?

4    A    No, not too much, that it was just they could link things

5    back.

6    Q    Did he say anything about who was in the video?

7    A    Yes.

8    Q    What did he say about that?

9    A    Geezy was in it, big bro.

10   Q    Did he refer to Geezy as big bro?

11   A    Yes.

12   Q    And what did you understand that to mean?

13   A    I mean, that's his big man.

14   Q    Does that indicate any particular rank to you?

15   A    I mean, it's the go-to guy.

16   Q    Now, you mentioned he said that Geezy was in this video,

17   did he say whether he was in the video?

18   A    Yes.

19   Q    And was he?

20   A    I don't know, I never seen the video.

21   Q    Did he say that he was in the video?

22   A    Yes.

23   Q    Did Dave ever indicate to you what his plan was with

24   respect to the murder charge?

25   A    His plan, he pretty much was hoping that he -- well, he

Direct Examination – Kellam (By Ms. Hoffman)

1    was banking on that Geezy got in concert with the little dude

2    he used to always talk about to take the charge for him.

3    Q    So he was hoping that someone else would take the charge

4    for him?

5    A    Yes.

6    Q    Did he say who it was?

7    A    No.  He never said the little kid's name.

8    Q    And did he have -- you said he was hoping Geezy would get

9    this person to take the charge for him?

10   A    Yes.

11   Q    So did he have conversations with Geezy while he was in

12   jail?

13   A    Yes.

14              MR. O'TOOLE:  Objection, Your Honor.

15              THE COURT:  Foundation.  Sustained.

16   Q    (BY MS. HOFFMAN)  How did you know that he was trying to

17   get Geezy to get this guy to take the charge for him?

18   A    He kept trying to get in contact with Geezy.

19   Q    Did he say anything about whether the guy was going to

20   take the charge for him?

21   A    He said initially little dude was going to take the

22   charge, but he didn't know what was going on.

23   Q    And did he say anything about what his plan was when he

24   heard the little dude -- when he didn't know what was going

25   on?

Direct Examination - Kellam (By Ms. Hoffman)

1   A     He got frustrated, started getting mad.

2   Q     Going to show you Government's Exhibit PHI, as in photos

3   of individuals, No. 46.

4   A     Geezy.

5   Q     Is he sitting here in the courtroom today?

6   A     Yes.

7   Q     Can you point him out for the record?

8   A     (Indicating.)

9   Q     Can you describe an article of clothing he's wearing?

10  A     Gray sweater.

11            THE COURT:  Record will reflect that the witness has

12  identified the Defendant Johnson.

13  Q     (BY MS. HOFFMAN)  And is this the same Geezy who Dave

14  talked about in reference to the murder of Nique?

15  A     Yes.

16  Q     Have you ever interacted with Geezy in jail or on the

17  streets?

18  A     Yes.

19  Q     Whereabouts?

20  A     Greenmount, Greenmount and 30th.

21  Q     Can you tell us about that?

22  A     He was pretty much frustrated with some guys up the

23  street, they was Bloods, I think.

24  Q     When you say he, who are you referring to?

25  A     Geezy.

Direct Examination – Kellam (By Ms. Hoffman)

1    Q    And where were you at the time?

2    A    Towards -- going towards the McDonald's, I think it's a

3    McDonald's right there.

4    Q    Going to show you Government's Exhibit No. GM, as in

5    Google maps, 35.  What are we looking at --

6    A    McDonald's on the right-hand side.

7    Q    I'm sorry, I spoke over you.

8            THE COURT:  Wait for the question, sir.  Ask the

9    question, ma'am.

10    Q    (BY MS. HOFFMAN)  What are we looking at here,

11    Mr. Kellam?

12    A    Greenmount.

13    Q    And is this where you were when you had this interaction

14    with Geezy?

15    A    Yes.

16    Q    Was there anyone else with you at the time?

17    A    Yes.

18    Q    Do you remember who that was?

19    A    Lil' Dave.

20    Q    And what was the nature of your interaction with Dave

21    that day?

22    A    They had a situation over there that Dave caught that the

23    guy phoned about.

24    Q    What was the situation?

25    A    They had something that needed to be taken care of.

1    Q    Did he tell you anything about that?

2    A    They was beefing with the Bloods, so they needed somebody

3    to come over there and take care of a situation for them.

4    Q    Through talking to members of the Greenmount BGF Regime,

5    did you learn what Geezy's role was in the regime?

6    A    No, not specifically.

7    Q    Did you learn whether he was a member of the BGF

8    regime?

9    A    Yes.

10    Q    I'm going to show you Government's -- well, I should

11    follow up, was he a member of the BGF Greenmount Regime?

12    A    Yes.

13    Q    Going to show you Government's Exhibit PHI, as in photos

14    of individuals, 38.  Who are we looking at here?

15    A    Lil' Norm.

16    Q    Is this Lil' Norm you mentioned earlier as being a member

17    of the BGF Greenmount Regime?

18    A    Yes.

19    Q    Did you ever have interactions with him on the street?

20    A    Yes.

21    Q    Did he ever talk about crimes he committed in furtherance

22    of the BGF?

23    A    Yes.

24    Q    Tell us about that, what did he tell you?

25    A    He said he put in work, talked about a robbery, talked

Direct Examination - Kellam (By Ms. Hoffman)

1    about a body he had caught.

2    Q    He talked about a body he had caught?

3    A    Yeah.

4    Q    What does it mean to catch a body?

5    A    A murder.

6    Q    What did he tell you about this murder?

7    A    Said that he killed a little dude, but then he told him

8    that his brother cleaned this mess up.

9    Q    I'm sorry, I missed the last part.

10   A    He told me he killed a dude but that his brother cleaned

11   the mess up.

12   Q    His brother cleaned the mess up?

13   A    Yes.

14   Q    Did he tell you anything -- you mentioned robbery as

15   well, did he tell you anything about a specific robbery?

16   A    Yes.

17   Q    What did he tell you about that?

18   A    He didn't go by hisself, another guy went, but they

19   robbed a dude and came out with a couple pounds of weed and

20   some guns.

21   Q    Did he tell you who he did that robbery with?

22   A    I know it was him, Mustafa, I don't know who else was

23   with him.

24   Q    Going to show you Government's Exhibit PHI, as in photos

25   of individuals, No. 35.

Direct Examination – Kellam (By Ms. Hoffman)

1      I'm sorry, that's the wrong exhibit number.  It's CP13.

2  Do you recognize the person on the left here?

3  A    Lil' Hood.

4  Q    Lil' Hood?

5  A    Yes.

6  Q    And is this the Hood you mentioned earlier as being a

7  member of the BGF Greenmount Regime?

8  A    Yes.

9  Q    Did there come a time when you learned Hood was locked up

10 for a gun charge?

11 A    Yes.

12 Q    Did he tell you anything about that charge?

13 A    Yes.

14 Q    What did he say?

15 A    He locked up for a gun.  He pretty much was trying to get

16 out of the situation.

17 Q    Is Hood alive today?

18 A    No.

19 Q    What happened to him?

20 A    He got killed.

21 Q    Through your conversations with members of the

22 BGF Greenmount Regime, did you learn anything about why Hood

23 might have been killed?

24 A    Dave thought he might have been telling, that he was

25 going to tell on him.  He was going to fold.

Direct Examination – Kellam (By Ms. Hoffman)

1    Q    And how did you know that, who did you hear that from?

2    A    Dave.

3    Q    Was that while you were locked up together?

4    A    Yes.

5    Q    Going to show you Government's Exhibit PHI, as in photos

6    of individuals, 29.

7    A    Mustafa.

8    Q    And is this the Mustafa you mentioned earlier as being a

9    member of the BGF Greenmount Regime?

10   A    Yes.

11   Q    And how did you know him?

12   A    Me and Mustafa got a long relationship.  He started

13   hanging out my way.

14   Q    Is this the same Mustafa who you said committed the

15   robbery with Lil' Norm?

16   A    Yes.

17   Q    Mr. Kellam, are you familiar with the term "little

18   shooter"?

19   A    Yes.

20   Q    What does little shooter mean in the context of BGF?

21   A    A hitter.

22   Q    And what is a hitter?

23   A    The go-to guy, the person that take care of things for

24   you.

25   Q    When you say take care of things, can you be more

1    specific, what do you mean by take care of things?

2    A    Take hits, you shoot people.

3    Q    I'm going to play for you a clip from

4    Government's Exhibit CD 3, which has already been admitted

5    into evidence as videos from Gerald Johnson's Instagram

6    account.

7              (Video played.)

8    Q    (BY MS. HOFFMAN)  Mr. Kellam, for the record, can you

9    identify the person speaking in that video?

10   A    Geezy.

11   Q    Did you hear at the end when he said "free Dave, N-word,

12   my shooter"?

13   A    Yes.

14   Q    What does that mean to you?

15   A    Classified him as his hit man.

16   Q    Going to show you one more picture, which is

17   Government's Exhibit PHI, as in photos of individuals, 56.  Do

18   you recognize this individual?

19   A    Yes.

20   Q    Who is it?

21   A    Digga.

22   Q    When law enforcement officers first showed you this

23   picture, were you able to identify him immediately?

24   A    No.

25   Q    What helped you identify him?

1    A    I remember the tattoo.  I thought it was a mole at first,

2    but it was a tattoo.

3    Q    Have you ever had any personal interactions with Digga?

4    A    No.

5    Q    How do you know him -- or how do you know who he is?

6    A    Because he BGF.

7            MR. FRANCOMANO:  Objection, foundation.

8            THE COURT:  Sustained.  Let's see if we can develop

9    that before we ask that question.

10    Q    (BY MS. HOFFMAN)  Based on your conversations with other

11    members of BGF, do you know whether or not Digga is a member

12    of BGF?

13    A    Yes.

14    Q    And can you tell us about that, what those conversations

15    were or how you learned that?

16    A    I learned through a book, seeing him in a book.

17    Q    And what book is that?

18    A    The regime -- their regime book.

19    Q    Can you explain to the ladies and gentlemen of the jury

20    what the book or the regime book is?

21    A    Each regime has a book with all the members in it.

22    Q    And so you saw Digga in this book?

23    A    Yes.

24            MS. HOFFMAN:  Thank you, Mr. Kellam.  I have no

25    further questions.

Cross-examination – Kellam (By Mr. Enzinna)

```
1              THE COURT:  Cross-examination, Mr. Enzinna.

2              MR. ENZINNA:  Yes, Your Honor.

3                          CROSS-EXAMINATION

4   BY MR. ENZINNA:

5   Q    Mr. Kellam, I think you testified a few moments ago that

6   BGF was like a family; is that right?

7   A    Yes.

8   Q    You said it was like a brotherhood?

9   A    Yes.

10  Q    In fact, G-Bae, whose name was George Neal (sic) --

11  A    Yes.

12  Q    -- was like a brother to you, wasn't he?

13  A    Yes.

14  Q    But you killed him; right?

15  A    Yes.

16  Q    You shot him at point blank range?

17  A    Yes.

18  Q    In the head?

19  A    Yes.

20  Q    How many times?

21  A    Can't remember.

22  Q    Were you instructed to shoot him at least four times?

23  A    Yes.

24  Q    Did you shoot him at least four times?

25  A    Shot him more than four times.
```

1    Q    His father was a person named Man; is that right?

2    A    Yes.

3    Q    And Man was a friend of yours?

4    A    Yes.

5    Q    In fact, Man was your sponsor to get into BGF?

6    A    Yes.

7    Q    But you killed his son?

8    A    Yes.

9    Q    And you killed him the day after Father's Day; right?

10   A    Yes.

11   Q    Now, the reason you killed him was because you'd been

12   ordered to do so; correct?

13   A    Yes.

14   Q    By Mr. Bazemore?

15   A    Yes.

16   Q    And you said that you couldn't refuse that because if you

17   refused that order, you would become the mission; is that

18   right?

19   A    Yes.

20   Q    So if you had not killed Mr. Nealy -- if you had not

21   killed G-Bae, your life would not have been worth very much,

22   would it?

23   A    Right.

24   Q    So you killed him?

25   A    Right.

Cross-examination – Kellam (By Mr. Enzinna)

1    Q    Despite your relationship?

2    A    Yes.

3    Q    All right.  We will come back to that in a minute.  Now,

4    you -- you no longer belong to BGF; is that right?

5    A    No.

6    Q    And I think you told -- well, first of all, you were

7    arrested in January of 2015; correct?

8    A    Yes.

9    Q    For the murder of G-Bae?

10   A    Yes.

11   Q    And that's almost three years ago.

12   A    Yes.

13   Q    And during that three years you've met with government

14   agents?

15   A    Yes.

16   Q    Prosecutors?

17   A    Yes.

18   Q    Police?

19   A    Yes.

20   Q    And you've told them things; correct?

21   A    Yes.

22   Q    In fact, you met with them ten days ago; is that right?

23   A    Yes.

24   Q    And in that conversation, you told them that you weren't

25   in BGF because it was fun in the beginning but has done

```
 1      nothing for you; is that right?

 2      A    Yes.

 3      Q    And you said that BGF had taken you away from your

 4      family?

 5      A    Yes.

 6      Q    Is that true?

 7      A    Yes.

 8      Q    When did you leave BGF?

 9      A    Soon as I made my mind up to no longer be a part of it.

10      Q    When was that?

11      A    When I started cooperating.

12      Q    I'm sorry?

13      A    When I started cooperating.

14      Q    So that would be shortly after January of 2015?

15      A    Yes.

16      Q    You didn't cooperate at first; correct?

17      A    No.

18      Q    Yeah, we'll get to that.

19               THE COURT:  I'll see counsel.

20               (Bench conference on the record.)

21               THE COURT:  Just ask questions, nothing like "we'll

22      get to that, we'll talk about that later."  You're not in -- I

23      don't want to hear your editorial comments, just ask him

24      questions.  You may step back.

25               (The following proceedings were had in open court.)
```

1          THE COURT:  Next question, Mr. Enzinna.

2     Q    (BY MR. ENZINNA)  You said earlier that you were no

3     longer in BGF because you had grown up and become more mature;

4     is that right?

5     A    Yes.

6     Q    But in fact, you left because you started cooperating;

7     correct?

8     A    Yes.

9     Q    You talked about the -- you called it, I think, the

10    regime book?

11    A    Yes.

12    Q    And that was a book that listed the members of the

13    regime?

14    A    Yes.

15    Q    Did it include their photographs?

16    A    Yes.

17    Q    Did it include any other information?

18    A    Photograph, address, and phone number.

19    Q    Where was -- does each regime have that?

20    A    Yes.

21    Q    And where is that kept?

22    A    Where is it kept?

23    Q    Yeah.

24    A    I don't know where it's kept right now.

25    Q    Okay.  But you said that you saw the regime book for the

Cross-examination – Kellam (By Mr. Enzinna)

1    Greenmount Regime?

2    A    Yes.

3    Q    Where did you see it?

4    A    Seen it at Uncle Mark house.

5    Q    At?

6    A    Uncle Mark's.

7    Q    Uncle Mark is Mark Bazemore?

8    A    Yes.

9    Q    And he was -- who was he?

10   A    A bush member.

11   Q    Okay.  So does each regime give their book to the bush?

12   A    I don't know if they each give them to the bush, but they

13   got to notify them, they got to classify theirself.

14   Q    Why do they keep these books?

15   A    You said why?

16   Q    Yeah, why?

17   A    So you can know all the active members.

18   Q    I'm sorry?

19   A    So you can know who all the active members are.

20   Q    You talked earlier about Michael Gray; right?

21   A    Yes.

22   Q    And you said he was a bush member?

23   A    Yes.

24   Q    Did you know a gentleman named Brian Rainey?

25   A    Brian Rainey?

Cross-examination – Kellam (By Mr. Enzinna)

1   Q     Yeah.

2   A     No.

3   Q     Did you know a gentleman named Christopher Meadows?

4   A     No.

5   Q     Would it surprise you if I told you that none of them

6   mentioned any kind of regime book?

7   A     Maybe they didn't.

8   Q     All right.  You said that you met Gerald Johnson on one

9   occasion; is that right?

10  A     Yes.

11  Q     So the information that you've given about him is

12  information you claim to have received from Mr. Hunter;

13  correct?

14  A     Yes.

15  Q     And some of that is information that you interpreted; is

16  that right?

17  A     Yes.

18  Q     So for example, you talked about Mr. Hunter calling

19  Mr. Johnson "big bro," and you interpreted that to mean

20  something; right?

21  A     Yes.

22  Q     All right.  Now, you said you joined BGF in, I think you

23  said 2008; is that right?

24  A     2007.

25  Q     2007, and you were in prison at the time?

1    A    Yes.

2    Q    In fact, at one point you told government agents that BGF

3    was primarily active in the jail; right, and not so much on

4    the streets?

5    A    Yes.

6    Q    And while you were a member of BGF in the prison, you

7    extorted money and drugs from other prisoners?

8    A    Yes.

9    Q    I think the language you used was raising money by any

10   means necessary?

11   A    Yes.

12   Q    Is that the philosophy?

13            THE COURT:  You have to answer.

14   A    Yes.

15   Q    (BY MR. ENZINNA) All right.  Now, you were told -- to

16   join BGF, someone would have to basically vouch for you?

17   A    Yes.

18   Q    Someone has to sort of nominate you?

19   A    Yes.

20   Q    And after you became a member, you were told that you

21   were nominated because you were sneaky; is that right?

22   A    Yes.

23   Q    And because you were cunning?

24   A    Yes.

25   Q    Now let's talk about your arrest in January of 2015.  You

1   were arrested for the murder of G-Bae?

2   A    Yes.

3   Q    Correct?  And you said you didn't tell the truth to the

4   police officer who interviewed you.

5   A    Yes.

6   Q    You told them that you were the wrong person.

7   A    Yes.

8   Q    You told them that you weren't there.

9   A    Yes.

10  Q    You told them you were with your wife.

11  A    Yes.

12  Q    You told the detective that G-Bae was killed because he

13  was having an affair with a fellow BGF member; is that

14  right?

15  A    Don't remember saying that.

16  Q    Well, you don't remember testifying to that?

17  A    No.

18  Q    Is there anything that I could show you that would

19  refresh your recollection?

20  A    You could show me.  I said anything to take the motive

21  off of me.

22  Q    I'm sorry, can you repeat that?

23  A    I said anything to take the motive off me.

24  Q    You also told Detective Taylor, who was interviewing

25  you --

1    A    Yes.

2    Q    -- that someone named Dottie killed G-Bae; is that

3    right?

4    A    Yes.

5    Q    And Dottie was a BGF member?

6    A    Yes.

7    Q    Part of the brotherhood?

8    A    Yes.

9    Q    And you weren't very close to Dottie, were you?

10   A    Not going to say that.

11   Q    Okay.  Were you close to him?

12   A    Yeah.

13   Q    But you still felt like it would be a good idea to blame

14   him for the murder?

15   A    Yes.

16   Q    Anything to take the motive off you?

17   A    I knew he didn't do it, I knew I did it.

18   Q    Okay.  But so you thought you would blame him in order to

19   get the suspicion off yourself?

20   A    Yes.

21   Q    So you were lying then because you wanted to stay out of

22   prison; right?

23   A    Yes.

24   Q    You knew that if you told the truth, you would go to

25   prison for a long time.

1   A    Yes.

2   Q    And you didn't want that.

3   A    Right.

4   Q    So you lied.

5   A    Yes.

6   Q    But then you changed your strategy; right?

7   A    Yes.

8   Q    After you consulted with a lawyer?

9   A    Yes.

10  Q    And you decided to cooperate?

11  A    Yes.

12  Q    Because you thought that would be better for you.

13  A    Yes.

14  Q    So you entered into a plea agreement; correct?

15  A    Yes.

16  Q    Now, you mentioned a number of prior convictions.  You --

17  given your convictions, you are in danger of being found to be

18  a career offender; correct?  Is that correct?

19  A    Yes.

20  Q    And the -- what sentence -- you said you pled guilty to,

21  I think it -- I'm not sure how you put it exactly, but

22  racketeering and murder?

23  A    Racketeering and murder.

24  Q    At the same time you were charged -- that's a federal

25  indictment; correct?

Cross-examination – Kellam (By Mr. Enzinna)

1    A    Yes.

2    Q    You were also charged in state court; right?

3    A    Yes.

4    Q    With murder?

5    A    Yes.

6    Q    And you pled -- your plea addressed both of those

7    charges; right?

8    A    Yes.

9    Q    Now, what sentence were you facing in the federal case?

10    A    The sentence that I pleaded guilty to?

11    Q    Yes.

12    A    300 months.

13    Q    I'm sorry?

14    A    300 months.

15    Q    You weren't facing life imprisonment?

16    A    Yes.

17    Q    You were.  But in fact, the government agreed if you

18    cooperated to their satisfaction, to recommend 25 years; is

19    that right?

20    A    Yes.

21    Q    And part of the deal was that your state sentence,

22    whatever sentence you got in the state, would be concurrent

23    with your federal sentence; correct?

24    A    Yes.

25    Q    So you would be limiting your exposure to what you got in

1    the federal case?

2    A    Yes.

3    Q    So you would get -- you would serve a sentence for the

4    racketeering charge; correct?

5    A    Yes.

6    Q    And nothing after for the state charge for murder?

7    A    I don't understand what you're saying, I didn't even know

8    that.

9    Q    Well, the two sentences were going to run concurrent;

10   correct?

11   A    Okay.

12   Q    Meaning they would run at the same time?

13   A    Okay.

14   Q    Is that correct?

15   A    Yes.

16   Q    So you understood that your sentence was limited to what

17   you would receive in the federal case; correct?

18   A    Yes.

19   Q    And you would receive nothing additional to that for the

20   state murder charge?

21   A    Yes.

22   Q    Okay.  And if the government made the recommendation and

23   that recommendation was accepted, that would be limited to 25

24   years; correct?

25   A    Yes.

1          MS. HOFFMAN:  Objection.

2          THE COURT:  Basis.

3          MS. HOFFMAN:  Mis -- may I approach?

4          THE COURT:  You may.

5          (Bench conference on the record.)

6          THE COURT:  All right.  What?

7          MS. HOFFMAN:  What the plea agreement says is that

8    the government will not recommend less than 25 years.  So it's

9    not a limit of 25 years.

10          THE COURT:  Well, do you have a copy of the plea

11   agreement?

12          MR. ENZINNA:  I do.

13          THE COURT:  All right.  Do you agree that that's

14   what it says?

15          MR. ENZINNA:  I will check, and if it is, I will fix

16   that.

17          THE COURT:  Thank you.

18          (The following proceedings were had in open court.)

19          THE COURT:  Sustained.  You may continue.

20   Q    (BY MR. ENZINNA)  So in your plea agreement, the

21   government agreed that if you cooperated to their

22   satisfaction, they would recommend a sentence not less than 25

23   years; correct?

24   A    Yes.

25   Q    But it could be 25 years?

1    A    Yes.

2    Q    And you said you're 32 years old; correct?

3    A    Yes.

4    Q    So you testified earlier that you were here today because

5    you were hoping to clear your conscience; is that right?

6    A    Yes.

7    Q    But you're also hoping for a lighter sentence; right?

8    A    Yes.

9    Q    Because without the cooperation, you'd go to jail for the

10   rest of your life; correct?

11   A    Yes.

12   Q    And with it, you have a chance to be out in 25 years?

13   A    Yes.

14   Q    And as you said, you would do anything to take the motive

15   off you?

16   A    That was as far as my murder.

17   Q    I'm sorry?

18   A    That was as far as my murder.

19   Q    Okay.

20              MR. ENZINNA:  Nothing further, Your Honor.

21              THE COURT:  Mr. Bussard.

22              MR. BUSSARD:  No questions, Your Honor, thank you.

23              THE COURT:  Thank you.  Mr. Francomano.

24              MR. FRANCOMANO:  Yes, Your Honor.

25                      CROSS-EXAMINATION

1   BY MR. FRANCOMANO:

2   Q    Mr. Kellam, you said you saw Mr. McCants in a book;

3   right?

4   A    Yes.

5   Q    You never met him before?

6   A    Never.

7   Q    Never talked to him?

8   A    No, sir.

9   Q    Never seen him on the street?

10  A    No, sir.

11  Q    Don't know how old he is?

12  A    No.

13  Q    Don't know if he has kids or not?

14  A    No.

15  Q    Don't know where he lives?

16  A    No.

17  Q    The only thing is you've seen him in a book?

18  A    Yes.

19  Q    And you're saying that he's BGF; right?

20  A    Yes.

21  Q    Who's his sponsor?

22  A    I wouldn't be able to tell you that.

23  Q    When did he become BGF?

24  A    Wouldn't be able to tell you that either, sir.

25  Q    When did he take the oath?

1    A    Wouldn't be able to tell you that either, sir.

2    Q    Was he a fox?

3    A    He had to be a fox -- he had to be fox before he's BGF.

4    Q    So was he a fox or BGF or you don't know?

5    A    He was in the book, that's the most I can say.

6    Q    Okay.  So he's in the book, but you have no idea what he

7    is in the book; correct?

8    A    If you're in the book, you're BGF.

9    Q    That's what you say; right?

10    A    That's what I know because I'm also in that same book.

11    Q    Now, you met -- you actually testified back on

12    June 1st, 2016, in a federal trial; correct?

13    A    Yes, sir.

14    Q    You didn't say anything about Mr. McCants at that trial;

15    right?

16    A    No.

17    Q    And you met with the government on June 17th, 2015;

18    correct?

19    A    Yes.

20    Q    And in that one you spoke about BGF, BGF Greenmount;

21    correct?

22    A    I think so.

23    Q    You didn't say anything about Mr. McCants in that

24    interview, did you?

25    A    Can't remember, sir.

1    Q    Okay.  Would anything help to refresh your

2    recollection?

3    A    You said, would I think help?

4    Q    Would anything help to refresh your recollection?

5    A    If you have something.

6    Q    Okay.

7             MR. FRANCOMANO:  Your Honor, if I could show the

8    interview notes from that meeting, Your Honor.

9             THE COURT:  Yes, you may show them.

10   Q    (BY MR. FRANCOMANO)  I apologize, the meeting was

11   6/4/2015.  Please take a look at this, don't read it out loud.

12   A    Okay.

13   Q    When you're done, just look up and let me know.

14        Do you remember being at that meeting?

15   A    Yes.

16   Q    Do you remember talking about BGF at that meeting?

17   A    Yes.

18   Q    Do you remember saying you know Mark?

19   A    Yes.

20   Q    Remember saying you know Black?

21   A    Yes.

22   Q    Remember saying you know G Rock?

23   A    Yes.

24   Q    Remember saying you know Dorsey?

25   A    Yes.

1    Q    Calvin?

2    A    Yes.

3    Q    Mike Smith?

4    A    Yes.

5    Q    Day Day?

6    A    Yes.

7    Q    Veto?

8    A    Yes.

9    Q    Uncle D?

10    A    Yes.

11    Q    Uncle Mark?

12    A    Yes.

13    Q    Diddy?

14    A    Yes.

15    Q    Uncle D -- I'm sorry, I think I already said that.

16    Will?

17    A    Yes.

18    Q    Ack?

19    A    Who?

20    Q    Ack, A-c-k?

21    A    No.

22    Q    Bree?

23    A    Yes.

24    Q    Thirsty?

25    A    Yes.

1    Q    Day Day?

2    A    Yes.

3    Q    Murda?

4    A    Yes.

5    Q    Itchy?

6    A    Yes.

7    Q    Troy?

8    A    Me.

9    Q    Savage?

10   A    Yes.

11   Q    Ty?

12   A    Yes.

13   Q    Rick Dorsey?

14   A    Yes.

15   Q    Rah-Rah?

16   A    Yes.

17   Q    Blinky?

18   A    Yes.

19   Q    Moan?

20   A    Yes.

21   Q    You didn't say McCants, did you?

22   A    No.

23   Q    You met with the government again and that was on

24   April 11th, 2017.

25   A    Yes.

Redirect Examination – Kellam (By Ms. Hoffman)

1    Q    And in that meeting you were actually shown a picture of

2    Mr. McCants; correct?

3    A    Yes.

4    Q    And you said, "I don't know him."

5    A    Yes.

6            MR. FRANCOMANO:  I have no further questions.

7            THE COURT:  Redirect.

8                     REDIRECT EXAMINATION

9    BY MS. HOFFMAN:

10   Q    Mr. Kellam, you were asked some questions by Mr. Enzinna

11   about the murder of G-Bae.  Did you want to kill G-Bae?

12   A    No.

13   Q    Is it something you're proud of?

14   A    Not at all.

15   Q    You were also asked by Mr. Enzinna about why you left BGF

16   and you said part of it was that you started cooperating with

17   law enforcement; is that right?

18   A    Yes.

19   Q    Can you be in BGF if you're cooperating with law

20   enforcement?

21   A    No.  You get a green light placed over the top of you.

22   Q    And what is a green light?

23   A    Green light is order hit.  Anybody catch you, it's pretty

24   much a price tag on your head.  It's a bounty, fellow BGF

25   members going to carry it out.

1    Q    You were also asked by Mr. Enzinna about an interview

2    that you did with a Baltimore homicide detective in January of

3    2015 when you lied about killing G-Bae.  And you said that you

4    lied to stay out of prison; is that right?

5    A    Yes.

6    Q    Why did you later decide to tell the truth?

7    A    It was hard to -- it was hard to keep lying, knowing I

8    did it, knowing I took him away from his family.

9    Q    Mr. Francomano asked -- also asked you about a lot of

10   names that you mentioned during a meeting with the FBI in

11   2016, do you remember that?

12   A    Yes.

13   Q    Did the FBI ever ask you about Digga?

14   A    No.

15            MS. HOFFMAN:  No further questions.

16            THE COURT:  May the witness be excused?

17            MR. ENZINNA:  Yes, Your Honor.

18            MR. FRANCOMANO:  Yes, Your Honor.

19            THE COURT:  The witness is excused.  Thank you.

20            We'll take the morning break.  Ladies and gentlemen,

21   during this recess do not discuss the case among yourselves.

22   Do not discuss it with anyone else.  Do not allow yourselves

23   to be exposed to any news articles or reports that touch upon

24   the case or the issues it presents or any articles or reports

25   that relate to any of the participants in the case.  Avoid all

1    contact with any of the participants in the trial.  Do not

2    make any independent investigation of the law or the facts of

3    the case.  Do not look up anything related to the case or its

4    participants on the internet.  Do not consult an encyclopedia

5    or a dictionary.  15 minutes.  Please take the jury out.

6              (Jury left the courtroom.)

7              THE COURT:  Who's next?

8              MS. HOFFMAN:  The government's next witness will be

9    Joseph Davis.

10             THE COURT:  Thank you.  15 minutes.

11             (A recess was taken.)

12             THE COURT:  Are we ready for the jury?

13             MR. MARTINEZ:  Yes, sir.

14             THE COURT:  Let's bring them in.

15             (Jury entered the courtroom.)

16             THE COURT:  Be seated, please.  The government may

17   call its next witness.

18             MS. HOFFMAN:  The government calls Joseph Davis.

19             THE COURT:  Joseph Davis.  Stand next the witness

20   box there and face our clerk over here, please.

21             THE CLERK:  And sir, if would you please raise your

22   right hand to be placed under oath.

23                       JOSEPH DAVIS,

24   called as a witness, being first duly sworn, was examined and

25   testified as follows:

1              THE WITNESS:  Yes, ma'am.

2              THE CLERK:  You may have a seat, sir.  And sir, if

3    you would please speak into the microphone, state your first

4    and last name and spell your first and last name.

5              THE WITNESS:  Joseph Davis.

6              THE CLERK:  And if you could spell --

7              THE WITNESS:  J-o-s-e-p-h, D-a-v-i-s.

8              THE COURT:  Ms. Hoffman, your witness.

9                        DIRECT EXAMINATION

10   BY MS. HOFFMAN:

11   Q    Good morning, Mr. Davis.

12   A    Hmm.

13   Q    Do you go by any other nicknames?

14   A    Porky.

15   Q    Where are you from originally?

16   A    Greenmount, 20th Street, around that area.

17   Q    Have you lived in Balt- -- oh, I'm sorry, if you could,

18   I'm being told your voice is a little quiet.  Can you pull the

19   microphone towards your face a little bit?  Thank you.

20        Have you lived in Baltimore most of your life?

21   A    Yes, ma'am.

22   Q    How old are you now?

23   A    41.

24   Q    Are you currently in the custody of the U.S. Marshals

25   awaiting sentencing in a criminal case?

Direct Examination – Davis (By Ms. Hoffman)

1    A    Yes, ma'am.

2    Q    Can you tell the members of the jury how you came to be

3    arrested?

4    A    I was standing on the corner and police was watching me

5    on the camera and they came and searched me and found a

6    handgun on me and found drugs in the yard.

7    Q    And which corner were you on at the time?

8    A    North Avenue and Greenmount.

9    Q    What were you charged with?

10   A    Possession of a handgun; convicted felon in possession of

11   a handgun; and drug trafficking; and possession of marijuana,

12   heroin, and cocaine.

13   Q    Were you charged initially in state court?

14   A    Yes, ma'am.

15   Q    And were you ultimately charged for the same crimes in

16   federal court?

17   A    Yes, ma'am.

18   Q    Did you plead guilty in that federal case?

19   A    Yes, ma'am.

20   Q    And when you pled guilty, did you enter into a plea

21   agreement with the government?

22   A    Yes, ma'am.

23   Q    As part of that agreement, did you agree to cooperate

24   with law enforcement?

25   A    Yes, ma'am.

Direct Examination - Davis (By Ms. Hoffman)

1  Q    Does part of your agreement with the government require

2  you to testify truthfully as a witness in this case?

3  A    Yes, ma'am.

4  Q    What is your understanding of the benefit you will get if

5  you testify truthfully?

6  A    Reduction in my points.

7  Q    Is it your hope that you'll get a lesser sentence?

8  A    Yes, ma'am.

9  Q    And does your eligibility for a sentencing reduction

10  depend in any way on what happens to the defendants in this

11  case?

12         MR. O'TOOLE:  Object, Your Honor.  Leading.

13         THE COURT:  Yes.  Sustained.  Next question.

14  Q    (BY MS. HOFFMAN)  Under your plea agreement, what would

15  happen if the government found out that you testified

16  untruthfully?

17  A    Perjury, charge of perjury.

18  Q    And what would happen to your plea agreement?

19  A    It would be abolished.

20         THE COURT:  It would be --

21         THE WITNESS:  Tooken away, abolished.

22         MR. BUSSARD:  Your Honor, I couldn't hear --

23         THE WITNESS:  Tooken away, abolished.

24         THE COURT:  Abolished, is that --

25         THE WITNESS:  Be tooken away.

1          THE COURT:  It would be taken away.  Next

2    question.

3    Q    (BY MS. HOFFMAN)  Under your plea agreement, what would

4    happen if the government found out that you exaggerated?

5    A    That I would be charged with perjury also.

6    Q    And what would happen to your plea agreement?

7    A    Be tooken away.

8    Q    Has anyone made you any guarantees about what your

9    sentence will be in this case?

10   A    No, ma'am.

11   Q    And who is responsible for ultimately determining your

12   sentence?

13   A    The judge.

14   Q    When you pled guilty in this case, was that your first

15   criminal conviction?

16   A    No, ma'am.

17   Q    Were you convicted of a drug crime when you were 17 years

18   old?

19   A    Yes, ma'am.

20   Q    And when you were 18 years old, were you convicted of a

21   violent crime?

22   A    Yes, ma'am.

23   Q    What crime was that?

24   A    Malicious wounding.

25          MR. O'TOOLE:  I'm sorry, Your Honor, I couldn't

Direct Examination – Davis (By Ms. Hoffman)

1    hear.

2    A    Malicious wounding.

3    Q    (BY MS. HOFFMAN)   What sentence did you receive in that

4    case?

5    A    I received 19 years.

6    Q    When did you finish serving that sentence?

7    A    In Virginia, 2010.

8    Q    You said in Virginia, was it a Virginia criminal

9    conviction?

10    A    Yes, ma'am.

11    Q    Did you move back to Baltimore after you finished your

12    sentence in 2010?

13    A    Yes, ma'am.

14    Q    Where in Baltimore did you move to?

15    A    I moved to North Avenue and Poplar Grove when I first

16    came back to Baltimore.

17    Q    And where is Poplar Grove in relation to North and

18    Greenmount?

19    A    It's like -- North Avenue and Poplar Grove is like

20    West Baltimore.  And it's not that far, but it's like on the

21    same block.  As far as like North Avenue, it's probably like a

22    good 20 blocks down.

23    Q    Did you eventually move back to the Greenmount and North

24    area?

25    A    Yes, ma'am.

1    Q    And did you eventually go back to selling drugs in that

2    area?

3    A    Yes, ma'am.

4    Q    Were you convicted of possession with intent to

5    distribute marijuana in 2012?

6    A    Yes, ma'am.

7    Q    And when did you finish your sentence for the marijuana

8    conviction?

9    A    I was sentenced to probation in -- it was like 2012, I

10   finished in 2012.

11   Q    Okay.  Were you back on the streets by summer of 2012?

12   A    Yes, ma'am.

13   Q    And did you return to that Greenmount and North area

14   again?

15   A    Yes.

16           MR. BUSSARD:  Objection, Your Honor.

17           THE COURT:  Basis?

18           MR. BUSSARD:  The leading.

19           THE COURT:  Overruled.

20   Q    (BY MS. HOFFMAN)  Mr. Davis, are you familiar with the

21   gang the Black Guerilla Family, or BGF?

22   A    Yes, ma'am.

23   Q    And when you moved back to the Greenmount neighborhood,

24   was there a BGF regime in that neighborhood?

25   A    Yes, ma'am.

Direct Examination – Davis (By Ms. Hoffman)

1    Q    Were you a member of BGF at that time?

2    A    No, ma'am.

3    Q    Were you able to tell when others in the neighborhood

4    were in BGF, were there signs or symbols that they used?

5    A    I couldn't really tell the signs and symbols because they

6    was real secretive.  But you could tell like how they hung

7    together and how they came around trying to run people away

8    from their neighborhood or rob people or what -- so forth.

9    Q    Did you have some friends who were actually in that BGF

10   regime?

11   A    Yes, ma'am.

12   Q    And did they ever tell you about the goings on of --

13          MR. O'TOOLE:  Objection.

14          THE COURT:  Foundation.  Sustained.  Who?

15   Q    (BY MS. HOFFMAN)  Who were some of your friends in the

16   BGF regime there?

17   A    It was TJ, a guy named Tay, I used to socialize with a

18   guy named Stimey also.

19   Q    Did you learn about the BGF regime from TJ, Tay, and

20   Stimey?

21   A    Well, TJ.

22   Q    Did you learn about who some of the other members in that

23   BGF regime were from your friends, TJ and the others you

24   mentioned?

25          MR. O'TOOLE:  Asked and answered, Your Honor.

Direct Examination - Davis (By Ms. Hoffman)

1              THE COURT:  Overruled.

2    Q    (BY MS. HOFFMAN)  You can answer, Mr. Davis.

3    A    Yes, ma'am.

4    Q    And can you name some of the people who you learned to be

5    in that BGF Greenmount Regime?

6    A    It was Roscoe, Geezy, Stimey, Lil' -- it was Sneak.

7    That's the three that I knew of.

8    Q    Okay.  I'm going to show you some pictures, I'm going to

9    start with Government's Exhibit PHI, as in photos of

10   individuals, No. 46.  Who are we looking at here?

11   A    Geezy.

12   Q    And is he sitting here in the courtroom today?

13   A    Yes, ma'am.

14   Q    Can you point him out for the record?

15   A    (Indicating.)

16   Q    Can you identify an article of clothing he's wearing?

17   A    A gray sweater.

18             THE COURT:  Record will reflect the witness has

19   identified the Defendant Johnson without objection.

20   Q    (BY MS. HOFFMAN)  You mentioned that Geezy was one of the

21   people in the BGF Greenmount Regime; is that right?

22   A    Yes, ma'am.

23   Q    Did you have an understanding of what Geezy's role in

24   that regime was?

25   A    I don't really know his --

1        MR. O'TOOLE:  Objection, Your Honor.

2        THE COURT:  His answer to the question, she asked

3   him and he doesn't know.  Next question.

4   Q    (BY MS. HOFFMAN)  Did you see Geezy interacting with

5   other members of BGF in the area?

6   A    Yes, ma'am.

7   Q    And based on seeing those interactions between Geezy and

8   other members of BGF, did you gain an understanding of what

9   his role was in the regime?

10  A    Like he was basically --

11        MR. O'TOOLE:  Objection.

12        THE COURT:  Overruled.  You may answer.

13  A    He was basically kind of like running it, for real,

14  basically.

15  Q    (BY MS. HOFFMAN)  Did you ever see him direct other

16  members of BGF what to do?

17  A    Yeah, the younger guys like Little Wesley and all them,

18  yes, ma'am.

19  Q    Did you ever see him tax other members of the regime?

20  A    I didn't actually see him tax individuals, but we was in

21  the building one time and he was like -- we was in there

22  selling drugs and he was like, yeah, I'm going to start taxing

23  you all, you all are going to start paying taxes around

24  here.

25  Q    And what did he mean by taxes?

1          MR. O'TOOLE:  Objection.

2    Q    (BY MS. HOFFMAN)  What did you understand him to mean by

3    taxes?

4    A    To pay --

5          THE COURT:  Overruled.  You may answer.

6    A    To pay certain fees.  We was selling drugs in that area,

7    to pay certain fees for -- to be around that area to sell

8    drugs.

9    Q    (BY MS. HOFFMAN)  I'm going to show you

10   Government's Exhibit PHI 27.  Who are we looking at here?

11   A    Roscoe.

12   Q    And I believe you mentioned earlier that he was also a

13   member of the BGF Greenmount Regime?

14   A    Yes, ma'am.

15   Q    And do you know whether he had any familial relationship

16   with anyone else in that regime?

17   A    Yes, ma'am, that's Geezy brother.

18   Q    Going to show you Government's Exhibit PHI 45.  Do you

19   recognize this individual?

20   A    Yes, ma'am.

21   Q    Who is it?

22   A    David.

23   Q    And based on your interactions with members of the BGF

24   regime, did you learn whether he was a member of that

25   regime?

1    A    Yes, ma'am.

2    Q    And was he?

3    A    Yes, ma'am.

4    Q    Showing you now Government's Exhibit PHI 9.  Who are we

5    looking at here?

6    A    Slay -- I mean, um, that's Little Wesley.

7              MR. BUSSARD:  Objection, Your Honor.

8              THE COURT:  Basis?

9              MR. BUSSARD:  Just blurting out a name.

10             THE COURT:  Overruled.  You may answer.

11   A    That's Little Wesley.

12   Q    (BY MS. HOFFMAN)  And is this the Little Wes who you

13   mentioned before, who you saw was one of the people Geezy

14   would tell what to do?

15   A    Yes, ma'am.

16   Q    Did you ever observe him selling drugs in that

17   neighborhood?

18   A    Yes, ma'am.

19   Q    Did you ever purchase drugs from Lil' Wes?

20   A    Yeah, I purchased marijuana from him before.

21   Q    And where did you purchase those drugs from him?

22   A    Out his house on -- it was a little block.  I forgot the

23   little block, that little block he was staying in.

24   Q    Was it in the vicinity of Greenmount and North?

25   A    Yes, ma'am.

Direct Examination – Davis (By Ms. Hoffman)

1    Q    Going to show you Government's Exhibit PHI 81.  Do you

2    recognize this individual?

3    A    Yes, ma'am.

4    Q    Who is that?

5    A    Stimey.

6    Q    And is this the same Stimey you mentioned earlier as

7    being a member of the BGF Greenmount Regime?

8    A    Yes, ma'am.

9    Q    Going to show you Government's Exhibit PHI 30.  Do you

10   recognize this individual?

11   A    Yes, ma'am.

12   Q    Who is it?

13   A    Mustafa.

14   Q    And based on your interactions with members of the BGF

15   regime there, did you learn whether he was a member of the

16   regime?

17   A    Yes, ma'am.

18   Q    And was he?

19   A    Yes, ma'am.

20   Q    Mr. Davis, were members of BGF involved in criminal

21   activities in the Greenmount neighborhood?

22   A    Yes, ma'am.

23   Q    Were they involved in selling drugs in the

24   neighborhood?

25   A    Yes, ma'am.

1   Q    Were they involved in committing robberies in the

2   neighborhood?

3   A    Yes, ma'am.

4   Q    Did you have friends who were robbed by BGF?

5   A    Yes, ma'am.

6   Q    Did you observe some of those robberies with your own

7   eyes?

8   A    Yes, ma'am.

9   Q    Can you tell us about those incidents?

10  A    Well, one incident -- well, a friend of mine's was robbed

11  in the store and he ran out the store and he was shot at.  His

12  name was Lil' Black.  He was robbed by Dave.  And then another

13  incident, a friend of mine's, Little David, was robbed.  He

14  was robbed by a guy named Roscoe, which was Geezy's brother.

15  And then another robbery happened -- place -- when me and my

16  wife was robbed in the building.

17  Q    Now, I'll ask you -- I'll come back to that in a minute.

18  You mentioned that a friend of yours named Little Black was

19  robbed and shot at by Little Dave; is that right?

20  A    Yes, ma'am.

21  Q    And I'm going to put up Government's Exhibit No. PHI 45

22  again.  Is this who you were referring to when you said

23  Little Dave?

24  A    Yes, ma'am.

25  Q    And you mentioned that he was robbed in a store, which

1    store was that?

2    A    Chinese store on North Avenue and Barclay.

3    Q    Do you know whether Little Dave actually hit

4    Little Black, did he shoot him?

5    A    He shot him in his hand.

6    Q    And where were you standing when this happened?

7    A    I was standing like right there by the building looking

8    at it.

9    Q    And then you mentioned a second incident when a friend of

10   yours named Dave was robbed by Roscoe.  Is that the same Dave

11   or a different Dave?

12   A    A different Dave.

13   Q    I'm going to put Government's Exhibit PHI 27 back up on

14   the screen.  Is this who you meant when you said Roscoe?

15   A    Yes, ma'am.

16   Q    I'm going to show you Government's Exhibit GM 7.  What

17   are we looking at here?

18   A    That's Greenmount -- I mean, North Avenue and Barclay

19   where the Chinese store was.  Chinese store right here where

20   it says New World.  And the building I was standing at is

21   right here, these little connected part --

22            THE COURT:  You can draw, you can touch with your --

23   A    This is the building.  This is the Chinese store right

24   here.

25   Q    (BY MS. HOFFMAN)  And is that the same Chinese store

1    where you saw Black be robbed and shot by Little Dave?

2    A    Yes, ma'am.

3    Q    Now, you mentioned that when you returned to that

4    Greenmount area, you eventually went back to selling drugs; is

5    that right?

6    A    Yes, ma'am.

7    Q    And what drugs did you sell?

8    A    I sold marijuana and -- I mean, marijuana and coke,

9    cocaine and marijuana.

10   Q    And where were you selling drugs?

11   A    I was selling drugs in this building right here.

12   Q    And is that on North Avenue?

13   A    Yes, ma'am.

14   Q    Going to show you Government's Exhibit GM 8.  What are we

15   looking at here?

16   A    That's the same building, it's the front door of it right

17   here.

18   Q    What kind of building is that?

19   A    It's like a building that house probably low income

20   people.  I think it house low income people.

21   Q    And what's the structure of the building like inside?

22   A    You got like -- it's like three or four floor -- it's

23   like three floors.  It -- you got houses on each side, it's

24   probably like a good 30 to 40 people reside in there, inside

25   the building.

1    Q    So it's sort of like an apartment building?

2    A    Yes, ma'am.

3    Q    And are the entrances to those apartments on the inside

4    of the building or the outside?

5    A    Inside.

6    Q    Okay.  So you enter through this front door that you drew

7    a little mark on, and then inside you can enter various

8    apartments?

9    A    Right.  Yes, ma'am.

10    Q    Were members of BGF also selling drugs out of that

11    building?

12    A    Yes, ma'am.

13    Q    Who was selling drugs out of that building?

14    A    I was, I used to sell drugs.  I see Geezy sell drugs in

15    there also too.

16    Q    Anyone else?

17    A    Wesley, Roscoe, um --

18    Q    When you said you would see them selling drugs, would you

19    actually see hand-to-hand transactions?

20    A    Yes, ma'am.

21    Q    Was it your understanding that -- well, strike that.

22         To your understanding did members of BGF consider that

23    building to be their drug turf?

24              MR. O'TOOLE:  Objection.  To consider.

25              THE COURT:  Overruled.  You may answer.

1    A    Yes, ma'am.

2    Q    (BY MS. HOFFMAN)  And why did you believe that?

3    A    Because it was like a couple of my friends used to be

4    around there.  And we would be in the building -- be around,

5    and then they would come around and tell us we can't be around

6    there or try to run us away from around there.  Try to like

7    rock us to sleep and try to rob us and stuff like that

8    nature.

9    Q    You used the phrase "rock us to sleep," what does that

10   mean?

11   A    That means try to befriend us, try to like be our friends

12   and then send somebody else from a different neighborhood to

13   rob us, call somebody up from a different neighborhood to rob

14   us.

15   Q    So I want to direct your attention now, Mr. Davis, to

16   September and October of 2012, the fall of 2012 after you had

17   served your sentence for your marijuana conviction.  Did there

18   come a time when members of BGF warned you to stop selling

19   drugs around there?

20   A    I --

21            MR. O'TOOLE:  Objection, Your Honor.

22            THE COURT:  Basis?

23            MR. O'TOOLE:  Leading.

24            THE COURT:  Overruled.

25            MR. O'TOOLE:  Foundation and leading.

Direct Examination - Davis (By Ms. Hoffman)

1           THE COURT:  I'm sorry?

2           MR. O'TOOLE:  Foundation and leading.

3           THE COURT:  I understand your objection.  It's

4    overruled.  You may answer.

5    A    It was told to me through a friend that they want -- they

6    don't want me around there.  If I keep coming around there

7    selling drugs, I was going to end up getting robbed or my life

8    was going to be taken.

9    Q    (BY MS. HOFFMAN)  And was it your understanding that that

10   message was being passed from someone specifically?

11   A    Someone -- yes, it was sent from Geezy.

12   Q    So when this friend -- who was the friend of yours who

13   told you that?

14   A    It was TJ and D, a guy named TJ and D.

15   Q    So did TJ indicate to you he was passing on that message

16   from Geezy?

17   A    It assumed to me.  It got to me from him because -- yeah,

18   he was saying that Geezy said they don't want y'all around

19   here selling no drugs.  If you -- they catch you around, they

20   was going to rob you all or try to -- I mean, take y'all

21   life.

22   Q    Did there come a time when you were robbed in that

23   area?

24   A    Yes, ma'am.

25   Q    Where were you when that happened?

1   A    I was in this building right here.

2   Q    Were you inside?

3   A    Inside, yes, ma'am.

4   Q    Can you tell the members of the jury what happened?

5   A    I was inside sitting on the -- I was inside, it's a

6   little hallway path.  I was in the stairway.  It was me and my

7   wife was in there.  And me and my wife, we was talking on the

8   stairway, so I notice it got quiet, and I'm like, what's going

9   on?  Somebody -- everybody -- it was like a lot of people was

10  in there -- few guys in there, everybody just disappeared.  So

11  I told my wife, hold on, something ain't right, so I get up

12  off the stairway.

13       And I get up off the stairway, and in the process of

14  walking down the stairway -- this is inside the building

15  stairway in the hallway.  So I get up and a guy come to me

16  with a mask on.  He had green eyes.  He come to me with a mask

17  on.  And the other guy, he didn't have no mask on, which was

18  Mike Gwaltney.  He come to me, he had the gun out.  He asked

19  me -- he said, "Where the weed at?"  I said, "What weed?"  I

20  said, "I don't have no weed."  Then he said, "Then from what I

21  heard, you had weed."  And he was like, "Give me the weed and

22  the money."

23       So the other guy cocked the gun back and put it to my

24  wife and told my wife to take her money out and get out her

25  purse and stuff.  So she started taking money out of her

1    purse.  So the guy kept asking me where my money, I told him I

2    don't have no money, and then he cocked the gun back.  This is

3    Mike Gwaltney.  He cocked the gun back and he was -- my wife

4    is like "don't kill him, don't kill him."  I was like -- I

5    told my wife I'm already -- she's like just give him the drugs

6    and stuff.  And so I told him the drugs was in the light

7    fixture on the wall.  So he went and got the drugs out the

8    light fixture.  And they took me and my wife phones and threw

9    them in the hallway and ran out the front door.

10   Q    Were they both armed?

11   A    Yes, ma'am.

12   Q    And you mentioned they took the drugs from a light

13   fixture, what in the way of drugs did they take?

14   A    Marijuana and it was crack cocaine.

15   Q    Did they also take money from you?

16   A    Yes, ma'am.

17   Q    About how much money did they take?

18   A    Like $4- to $500.  Like $4- or $500.

19   Q    Now, you mentioned that one individual was masked and the

20   other was Michael Gwaltney.  Did you know at the time that it

21   was Michael Gwaltney?

22   A    No, ma'am.

23   Q    But you later identified him as Michael Gwaltney?

24   A    Yes, ma'am.

25   Q    How did you come to learn that the person who robbed you

1  was Michael Gwaltney?

2  A    Because I was looking on Facebook one day and a

3  homegirl -- a friend, which is Mike Gwaltney's sister, I never

4  knew.  And I'm looking and I see his picture on Facebook.  So

5  I was like that's Mike -- that's the dude that robbed me.  So

6  I showed my wife.  And she's like, yeah, that is him.  So I

7  called his sister up and was like, yeah, you know, your

8  brother robbed me, blah, blah, blah, this and that.  She's

9  like no, that's -- I ain't going to allow that to happen to

10 nobody, this and that.  She was like, he was locked up at the

11 time over at the jail.  She was like, okay, when he call, I'm

12 going to put you all on three-way.  You all need to squash

13 that, whatever, so forth.

14 Q    What does it mean to squash something?

15 A    Means to like, let the beef go and so forth.  So I

16 called -- I mean, he called and she had us on the three-way.

17 And he was like, no, Porky, blah, blah, blah, that -- if I

18 knew you was friends with my sister, I would have never had

19 nothing -- that would never have went down like that, this and

20 that.  It was -- they sent me around there to rob you.  This

21 and that, because he's not actually from around there.

22 Because they -- I mean, actually, they say -- he was telling

23 me that Roscoe and Geezy and them was the one, and Mustafa,

24 they didn't want me around.  They was the ones who sent him

25 around there to rob me.

Direct Examination – Davis (By Ms. Hoffman)

1    Q    Where was Michael Gwaltney from?

2    A    He be all, over to my knowledge.  He be -- he don't

3    usually hang around the Greenmount area where we talking about

4    though.

5    Q    So as a result of that conversation with

6    Michael Gwaltney, did you squash the beef?

7    A    Pretty much, yeah.  Yeah and -- yeah and no.

8    Q    Okay.  Are you on good terms with him now?

9    A    We -- I talk to him.  And I -- I have talked to him.

10   Q    I'm going to show you Government's Exhibit PHI 36.  Who

11   are we looking at here?

12   A    Mike Gwaltney.

13   Q    So I want to turn back to the September, October 2012

14   time frame -- well, first of all, let me ask you, when did you

15   have that conversation with Mike Gwaltney, was it -- when in

16   relation to the robbery?

17   A    It was probably -- I'd say a week or two after the

18   robbery, something like -- probably like a week or two after

19   the robbery, I had to -- no, probably -- it was probably

20   longer than that because I think it was -- I can't remember

21   the approximately -- I mean, the exact time, but I know it was

22   a good little -- probably like three weeks after the robbery,

23   three weeks.

24   Q    When you say three weeks, are you using that to mean

25   literally three weeks or --

1    A    Around.  I'm going to say around.

2    Q    So I want to turn your attention back to September or

3    October of 2012.  Before you had that conversation with

4    Mike Gwaltney, did you encounter him again after the

5    robbery?

6    A    Yes, ma'am.

7    Q    Can you tell us what happened on that occasion?

8    A    I was standing on the front step of the building that --

9    that you showed.  I was standing on the front step of the

10   building with a friend.

11   Q    I'm going to put Government's Exhibit GM 8 back up on the

12   screen.

13   A    I was standing -- there's a person right here, you can

14   see.  I was standing right where he was at and a friend was

15   beside me.  And Mike Gwaltney was walking up the street right

16   up this way and I -- when I spotted them, I seen them, and I

17   had a gun on me.  So I pulled the gun out because I told my

18   homeboy, I said, man, that's the guy right there that robbed

19   me.  He said, man, you sure that's the guy who robbed you?  He

20   said, you sure?  I said, yeah.  So when I pulled the gun out,

21   he started like fumbling and tried to turn around and like --

22   and run, like he be trying to grab his gun and try to -- had

23   his gun.  So I was parked -- my car was parked right here,

24   like right in this area.  So when I pulled the gun out, I

25   never shot.  I went and ran and got in the car and pulled off.

Direct Examination - Davis (By Ms. Hoffman)

1    Q    Did you end up firing any shots that day?

2    A    No, ma'am.

3    Q    Did Mike Gwaltney fire any shots that day?

4    A    No, ma'am.

5    Q    I want to draw your attention now to November 17th of

6    2012.  Did there come a time when you learned that members of

7    that BGF regime were actively trying to kill you?

8    A    Yes, ma'am.

9    Q    How did you learn that?

10   A    I was in -- we was in the building.  We was in this

11   building right here, we was in the apartment building.  And

12   first it was Geezy and Roscoe came in there and we was in the

13   little apartment building.  So they came in here and they were

14   like, yo, you know who robbed you, this and that.  So it was

15   like they was trying -- I knew they knew who robbed me.  But

16   he was like, man, ain't have nothing to do with.  That's what

17   he was telling me, ain't have nothing to do that.  I was like,

18   how you have nothing to do with that, in my mind, like, you

19   all be together and I know you all hang together.  So him and

20   Roscoe was telling me they had nothing to do with it.

21       So Mustafa came to the door, and like, he bought some

22   weed from me and shook my hand.  So I was like, man, something

23   don't seem -- something seem kind of odd.  So that's when TJ

24   and Tay came in there and was like, yo, something going --

25   something ain't right, yo.  Mike Gwaltney out walking around

1    the side of the building.  Somebody -- I mean, something

2    getting ready to happen, blah, blah, blah.

3         So they was like, Porky, you need to get up out of here,

4    man, because I think they trying to do something to you.  I

5    think they're trying to kill you or something, so you need to

6    get up out of here.  So I got -- and ran out the back of the

7    building.  And my car was parked in the alley part and I

8    pulled off.

9    Q    Going to show you Government's Exhibit GM 5.  Can you

10   tell what we're looking at here?

11   A    This is the back part of the building back here where you

12   could park cars at and stuff.  And it's a door, an exit door,

13   in the back right here where I ran out of.

14   Q    Were you able to escape unharmed?

15   A    Yes, ma'am.

16   Q    At that point did you decide to take matters into your

17   own hands?

18          MR. O'TOOLE:  Objection to the form of the

19   question.

20          THE COURT:  I couldn't hear the objection.

21          MR. O'TOOLE:  Objection to the form of the

22   question.

23          THE COURT:  Sustained.

24   Q    (BY MS. HOFFMAN)  What happened next?

25   A    What happened next was that I came back, like, I think

Direct Examination - Davis (By Ms. Hoffman)

1    within the next day or -- it was the next day I came back.  It

2    was at nighttime, we was around there.  It was me and a

3    friend.  We showed up around there.  And I was like, man, I'm

4    going to get them before they get me.  That's how -- I mean,

5    that's how I was.  So when I came around there, I was -- I

6    parked my car like up in this alley right here and then I

7    walked down the street.  I walked down towards the building.

8    It was an alley up across Guilford over here.  And I walked

9    down across the alley.  And I came -- it was a carry out --

10   where the carry out -- where the Chinese store I showed you.

11   Q    I'm going to show you Government's Exhibit No. GM 9.

12   A    This carry out right here, there's a split.  This little

13   split right here on the side.  So I came through the alley

14   right there and I was waiting right there.  And I seen it was

15   Geezy and Wesley, I think, was standing in front of the

16   building, like, they was standing out in front of the carry

17   out right here.  So I seen them, they walked past.  They had

18   got -- I guess they caught a sale because it was a fiend that

19   came, they caught a sale.

20   Q    What does it mean to catch a sale?

21   A    A fiend or a person who buy drugs come buy some drugs.

22   So they caught the sale.  They went and started walking and

23   they went inside the building.  And then I came and walked up

24   the street.  I started walking up the street after they --

25   into the -- walked up the street and went inside the building

1    with a hood on and I walked up to him and I shot him.

2    Q    When you say "him" who are you talking about?

3    A    Geezy.

4    Q    Mr. Davis, when were you locked up on your current

5    charge, do you remember?

6    A    I was locked up, 2015, August the 30th.

7    Q    And where were you in jail initially?

8    A    I was at Baltimore City -- WDC, Baltimore City jail.

9    Q    Is there a BGF presence in that jail?

10   A    Yes, ma'am.

11   Q    Is BGF dominant in that jail?

12   A    Yes, ma'am.

13   Q    Did there come a time when you decided to join BGF?

14   A    Yes, ma'am.

15   Q    Why?

16   A    Because it was like a life or death situation.  Like I

17   got a lot of friends that's in with the BGF too.  So they was

18   like, man -- they knew about my situation with Geezy and all

19   of them.  And they was like, man, you might as well come over,

20   blah, blah, blah, this and that.  Whereas, though, if you come

21   over, they won't be able to do nothing to you or harm you

22   because you'll be considered as a brother.

23   Q    So did you join for protection in effect?

24   A    Yes, ma'am.

25   Q    Did you have a sponsor?

Direct Examination - Davis (By Ms. Hoffman)

 1    A    Yes, ma'am.

 2    Q    Who was that?

 3    A    Skinny Pimp.

 4         MR. O'TOOLE:  I'm sorry, I couldn't hear the

 5    response.

 6         THE COURT:  Answer the question:  Who was your

 7    sponsor?

 8         THE WITNESS:  Skinny Pimp.

 9         THE COURT:  Skinny Pimp?

10         THE WITNESS:  Yeah.

11    Q    (BY MS. HOFFMAN)  Did there come a time when you had a

12    confrontation with other BGF members in the jail?

13    A    Yes, ma'am.

14    Q    Can you tell us what happened?

15    A    When I first got over there, it was like -- they was like

16    talking about the certain situation that happened between me

17    and Geezy situation as far as the robbery --

18         MR. O'TOOLE:  Objection.  Can we approach?  Can we

19    approach?

20         THE COURT:  Yes.

21         (Bench conference on the record.)

22         THE COURT:  It's going to be like the confession

23    booth.  Mr. O'Toole, I'm ready to hear you.  What is your

24    concern?

25         MR. O'TOOLE:  My concern is the line of responses.

He's -- the Court's been -- everybody's -- we're letting him
testify, but we don't know who's talking.  We don't know if
it's in furtherance of a conspiracy, we don't know if the
people are speaking are members of BGF or if they're not
members of BGF.  He's talking about "they" and all these
different people.

MS. HOFFMAN:  I can ask for clarification.

THE COURT:  We need more precision.  I've let it go
as well because there haven't been objections to it.  Other
times it's been implied who it was.  And then as the story has
proceeded in sort of interlocking circles as opposed to in a
lineal way, a lot of times the answer to the questions, in the
Court's mind, have ultimately been answered.  But you've got
an objection to this approach now.  And I think that the
defendant, Mr. Johnson, is within his rights to insist on
greater clarification about who it is he's talking about.

Now, I understand that the witness is inarticulate.
And it might be that, you know, it's hard for government
counsel to anticipate how he's going to answer a particular
question and whether or not it's going to be answered with
precision or without.  And so my expectation is that when you
get one of these nonspecific answers as to identity, that
you're going to immediately circle back and try to nail that
down before you go on to the next step in the story.  And I'll
permit that approach.

1          So it's going to happen one of two ways; he's going

2   to give one of these answers, Mr. O'Toole's going to object on

3   foundation grounds, and I'm going to sustain it.  Or

4   Mr. O'Toole's going to wait a second to see what your next

5   question is, and if your next question is clearly calculated

6   to develop the foundation, then, you know, we might be able to

7   proceed in that manner.

8          MR. O'TOOLE:  The only observation I would make, if

9   the Court would allow me, is that I don't think this gentleman

10  falls in the same category of the last gentleman that she

11  talked about, who was particularly inarticulate and you

12  allowed the government to lead him through the story.

13          THE COURT:  Well, we're not leading.  I'm not

14  authorizing leading.  And there are different species of

15  inarticulation.  This witness is able to explain the story

16  actually quite coherently.  It more has to do with his choice

17  of language that I think creates ambiguity.  But we'll allow

18  the government to attempt to resolve those ambiguities by

19  clarifying questions that will fill in the little bits of

20  foundation that we might otherwise be missing in the first

21  instance.  All right.  Let's keep going.

22          (The following proceedings were had in open court.)

23  Q    (BY MS. HOFFMAN)  Mr. Davis, I want to back up a step and

24  ask you who was it who confronted you.

25  A    Confronted me as far as?

1    Q    I'm sorry, before we took a little break there, we were

2    talking about a time when you were confronted in the jail by

3    members of BGF.

4    A    Yes, ma'am.

5    Q    Who was it who confronted you?

6    A    I had forgot the guy's name, but I know it was

7    Skinny Pimp was one of them.  It was another guy, Lil' -- his

8    name is Lil' C, something like that.  It was Lil' C.  It was

9    another little guy with Lil' C and --

10   Q    And how did you know they were in BGF?

11             MR. O'TOOLE:  Objection.  Assumes facts not in

12   evidence.

13             THE COURT:  Technically.  Sustained.  Back up.

14   Q    (BY MS. HOFFMAN)  I'm sorry, did you know whether they

15   were in BGF?

16   A    Yes, ma'am.

17   Q    And how did you know that?

18   A    Because he -- it's like, you go in the bathroom and they

19   ask you, "you know Ben?"  Or something like that.  I mean --

20   or they ask you -- like some people like first getting in,

21   some people don't know Ben, some people just know --

22   Q    You're using the term Ben --

23   A    The fox.

24             MR. O'TOOLE:  May I object and move to strike the

25   last response as in -- it's incoherent and not responsive.

Direct Examination - Davis (By Ms. Hoffman)

1          THE COURT:  I found it coherent.  Overruled.  But

2     the next question was not setting up in a way that I was

3     comfortable with.  So restate the question that you're about

4     to ask.  Go ahead.

5     Q    (BY MS. HOFFMAN)  What does it mean when someone asks "do

6     you know Ben?"

7     A    Do you know Ben, it's the Oatmeal, Two S's and Three

8     I's.

9     Q    And what are the Two S's and Three I's?

10    A    Two S's is basically like two sentences stating that

11    should I ever become untrue and forsake the chosen few, this

12    oath shall kill me.

13    Q    And what, if any, relationship does that have to BGF?

14    A    It's like their oath that they fall under.

15    Q    So how did -- let's move back again.  And how did you

16    know that these people who confronted you were members of

17    BGF?

18    A    Because I was in the bathroom and they asked me did I

19    know Ben and we started talking.  And then he was like,

20    yeah -- after I gave him the Two S's and Three I's, he was

21    like, yeah, we got to further investigate your situation due

22    to this certain fact, the situation about Geezy's situation

23    and stuff on the street.

24          THE COURT:  Mr. Davis, please slide your chair

25    forward.  A little more.  Thank you.

1    Q    (BY MS. HOFFMAN)  And when they said they had to

2    investigate your situation, what did you understand them to

3    mean by that?

4    A    Meaning that they was stripping me of my, I guess the

5    flag or whatever, so forth, until they find out what's really

6    going on with my situation with Geezy.

7          MS. HOFFMAN:  Thank you, Mr. Davis.  No further

8    questions.

9          THE COURT:  Mr. O'Toole.

10                        CROSS-EXAMINATION

11   BY MR. O'TOOLE:

12   Q    Mr. Davis, good afternoon.

13   A    Good afternoon, sir.

14   Q    Mr. Davis, I represent Mr. Gerald Johnson, who you

15   pointed out and referred to as Geezy.  Mr. Davis, I want to

16   start with the conversation you had with Ms. Hoffman about

17   your plea that you took in this case.  I want to ask you

18   something before I do that.  In the other cases that you

19   talked about where you went to jail and you got sentenced, had

20   you pled guilty or had you gone to trial?

21   A    I can't hear you.

22   Q    Pardon me?

23   A    I couldn't hear you.

24   Q    In the other cases where you talked about

25   with Ms. Hoffman, had you pled guilty in those cases or did

1    you go to trial?

2              MS. HOFFMAN:  Objection.

3              THE COURT:  Overruled.  Did you plead or did you --

4    A    I plead guilty.

5    Q    (BY MR. O'TOOLE)  All right.  Have you ever gone to trial

6    and been found guilty by a jury?

7    A    Have I gone to trial and been found guilty by a jury?

8    Q    Yeah, have you ever gone to trial or all of your

9    sentences, did they come from your pleading guilty?

10   A    No, ma'am -- I mean, no, sir, I went to trial.

11   Q    You went to trial.  Which case did you go to trial on?

12   A    Malicious wounding, two counts of malicious wounding.

13   Q    That's the one you got 19 years on?

14   A    Yes, ma'am -- I mean, yes, sir.

15   Q    You can call me whatever you want.  That's fine.

16   Mr. Davis, you're 41 years old?

17   A    Yes, sir.

18   Q    In 2015 when you caught the charge that we're talking

19   about today that you pled guilty to, how many years had you

20   spent in jail?  At that time you were what, you were 39 years

21   old?

22   A    30 --

23   Q    You were 39 years old when you were caught in this most

24   recent charge that you pled guilty to; right?

25   A    Yes, sir.

Cross-examination – Davis (By Mr. O'Toole)

1    Q    How many years had you been in jail in your adult life at

2    that point?

3    A    In my adult life at that point, as far as like --

4    Q    I'm just curious --

5    A    -- overall?

6    Q    Yeah, overall.  I'm curious from the time you became an

7    adult until you were 39 years old and you caught this most

8    recent charge, how many years had you been in jail?

9    A    How many years?  Probably like -- like 20, probably like

10   20.

11   Q    All right.  So by the time you were almost 40, you had

12   spent 20 years in jail as an adult?

13   A    I mean, approximately around 20.

14   Q    Okay.  So is it fair to say by the time you were 39, and

15   you caught this most recent charge that you talked about with

16   Ms. Hoffman, you had been in jail almost your entire adult

17   life?

18   A    Pretty much, yeah.

19   Q    All right.  Had you gotten used to jail or had you

20   decided you were tired of jail?

21            MS. HOFFMAN:  Objection.

22            THE COURT:  Overruled.  I'll allow him to answer.

23   A    I mean, what type -- I really ain't -- I didn't get used

24   to jail.  How can I get used to jail?

25   Q    (BY MR. O'TOOLE)  All right.  So you didn't want to be in

Cross-examination – Davis (By Mr. O'Toole)

1    jail anymore, did you?

2    A    Hmm.

3    Q    And you told us --

4         THE COURT:  Hold on.  We need an answer.  You didn't

5    want to be in jail anymore, is the question.

6    A    No.  No, sir.

7         THE COURT:  Next question.

8         MR. O'TOOLE:  So the answer is no.  Thank you,

9    Your Honor.

10   Q    (BY MR. O'TOOLE)  Mr. Davis, you told us when you -- I'm

11   going to skip forward and come back, but you told us that when

12   you were robbed, you were with your wife selling drugs in that

13   building you showed us; right?

14   A    Yes, sir.

15   Q    When did you get married?

16   A    I got married like 2011, 2011.

17   Q    Are you still married now?

18   A    Yes, sir.

19        MS. HOFFMAN:  Objection.

20        THE COURT:  Relevancy?

21        MS. HOFFMAN:  Relevance.

22        THE COURT:  I'll give you some latitude,

23   Mr. O'Toole.

24   Q    (BY MR. O'TOOLE)  Well, Ms. Hoffman -- Mr. Davis,

25   Ms. Hoffman asked you where you grew up and where you were in

Cross-examination - Davis (By Mr. O'Toole)

1    jail and where you lived, where you moved to.  I'm wondering,

2    so the jury can know, during this time period were you a

3    married man?

4    A    During this -- what time period?

5    Q    Well, you just got married and you were married in

6    2000 --

7    A    '11.

8    Q    When you got robbed; right?

9    A    Yes.

10   Q    And when was that, 2012?

11   A    I got robbed in 2012.

12   Q    '12, all right.  And you were married then.  When did you

13   get married before that?

14        MS. HOFFMAN:  Objection.

15        MR. O'TOOLE:  Your Honor, I'm just trying to find

16   out --

17   A    I said I got married in 2011 --

18        THE COURT:  You can't answer until we tell you to

19   answer, sir.

20   Q    (BY MR. O'TOOLE)  2011, so you had been married one year?

21        THE COURT:  The objection is overruled.

22        MR. O'TOOLE:  I'm sorry.

23        THE COURT:  You may ask and -- you may inquire,

24   Mr. O'Toole.

25        MR. O'TOOLE:  Thank you.  Your Honor, I apologize

1    for talking over you.  I didn't hear you speaking actually.

2    Q    (BY MR. O'TOOLE)  Mr. Davis, the Court asked you to

3    answer -- you were married in 2012 -- you had been married,

4    when did you get married?

5    A    I got married in 2011.

6    Q    All right.  Thank you.  It wasn't a trick question, I

7    just wanted to know.  And was that your first marriage?

8    A    Yes, sir.

9    Q    All right.  And you told us you're still married now?

10   A    Yes, sir.

11   Q    All right.  You talked about your plea of guilty in

12   this -- in the case that you pled guilty to; right?  The case

13   that you agreed to cooperate and pled guilty; correct?

14   A    Yes, sir.

15   Q    All right.  In that case you were caught -- you were

16   caught conspiring to rob somebody; is that right, it was a

17   object property?

18            MS. HOFFMAN:  Objection.

19            THE COURT:  What's the objection?

20            MS. HOFFMAN:  It misstates the evidence in the

21   record.

22            THE COURT:  What were you convicted of --

23            THE WITNESS:  Convicted of -- this sentence --

24            THE COURT:  Let's back up.  Mr. O'Toole.

25            MR. O'TOOLE:  Right.

Cross-examination – Davis (By Mr. O'Toole)

1    THE COURT:  You -- the objection is sustained.  You

2    may rephrase your question.

3    Q    (BY MR. O'TOOLE)  All right.  This most recent conviction

4    that you talked about with Ms. Hoffman, the conviction that

5    you agreed to testify and cooperate with the government, what

6    were you found guilty of, what did you plead guilty to?

7    A    I plead guilty to a possession of a handgun.

8    Q    Right.

9    A    Felon in possession of a handgun.  Intent to distribute

10   and distribute heroin, cocaine, marijuana.

11   Q    All right.  So I misstated --

12   A    And drug trafficking.

13   Q    So I misstated that it was robbery.  So the Count 1 was

14   possession and intent to distribute controlled dangerous

15   substances and possession of a handgun, having had a violent

16   conviction in the past; correct?

17   A    Yes, sir.

18        MS. HOFFMAN:  Objection.

19        THE COURT:  Let me see counsel.

20        (Bench conference on the record.)

21        THE COURT:  All right.  I'm trying to give you some

22   latitude --

23        MR. O'TOOLE:  I appreciate it.

24        THE COURT:  -- but in discovery you would have

25   gotten his rap sheet.

1          MR. O'TOOLE:  No, I have his rap sheet.

2          THE COURT:  So then confine your questions to

3    exactly what the rap sheet says.  I've heard you refer to

4    conspiracy, convicted of possession of a firearm after you had

5    a violent felony.  I don't know of any such federal offense.

6          MR. O'TOOLE:  Thank you.

7          THE COURT:  So just make it precise.  Otherwise,

8    she's going to keep chipping at you and you know --

9          MR. O'TOOLE:  Well, she can do that if she wants.

10         THE COURT:  And I will keep sustaining them until

11   you get the convictions correct.

12         MR. O'TOOLE:  Thank you.

13         (The following proceedings were had in open court.)

14         THE COURT:  Next question.

15   Q    (BY MR. O'TOOLE)  Mr. Davis, as I was asking you -- what

16   I'm trying to get to -- it's not a trick question.  What I'm

17   trying to find out, when you decided to plead guilty and

18   cooperate, this was back in 2016; correct, the date of your

19   plea was in October or -- October 31st of 2016; correct?

20   A    Yes, sir.

21   Q    All right.  And you had been arrested for that crime

22   about a year before; correct?

23   A    Yes, sir.

24   Q    So you'd already been in jail on that charge for about

25   one year?

1    A    Yes, sir.

2    Q    And you were told by your lawyer that if you were

3    sentenced in that case, the penalties for the crimes for which

4    you were offered to plead guilty could carry 20 years for the

5    Count 1 and ten years for Count 2; correct?

6    A    Yes, sir.

7    Q    All right.  Now, when you were caught with the drugs --

8    after you had been in jail for all this time and you're caught

9    with the drugs in 2015, is it true that you were -- you had 75

10   gel caps of heroin; is that correct?

11   A    I didn't have it on me.

12   Q    You had it in -- you had it nearby you; correct?

13   A    Uh-huh.

14   Q    You pled guilty to being in possession of 75 gel caps of

15   heroin; correct?

16            MS. HOFFMAN:  Objection.

17   A    Yes, I pled guilty.

18   Q    (BY MR. O'TOOLE)  All right.  And you also pled guilty --

19            THE COURT:  Is there an objection or not?

20            MS. HOFFMAN:  Objection.

21            THE COURT:  What's the objection?

22            MS. HOFFMAN:  It misstates facts in evidence.

23            THE COURT:  Well, he just -- he answered in the

24   affirmative.  So overruled.  The question was, did you have 75

25   gel caps of heroin and I heard the witness say yes.

```
1    Q    (BY MR. O'TOOLE)  And you also pled -- thank you.

2              THE COURT:  So do you continue to object?  I mean,

3    that's what the witness's answer is.

4              MS. HOFFMAN:  I'll withdraw it.

5    Q    (BY MR. O'TOOLE)  You also were in possession -- you were

6    arrested with 22 baggies of marijuana; correct?

7    A    It wasn't in my possession, but I was charged with it.

8    Q    But when you pled guilty, you pled guilty of being in

9    possession of it; correct?

10   A    Yes, sir.

11   Q    All right.  And you also had 16 vials of cocaine in your

12   possession that you pled guilty to in that conviction;

13   correct?

14   A    Yes, sir.

15   Q    All right.  And you also had 6.2 grams of cocaine powder;

16   correct?

17   A    Yes, sir.

18   Q    All right.  Now, you weren't asked about this in your

19   direct examination, but I want to ask you, what is a 5K, what

20   is a 5K?

21   A    A 5K?

22   Q    Do you know what that is?

23   A    No.

24   Q    Do you know that in your plea agreement the government

25   offered, if you were cooperative and if you told the truth and
```

Cross-examination - Davis (By Mr. O'Toole)

1    if you gave substantial assistance in the prosecution of

2    another, the government might file something called a 5K1.1 at

3    your sentencing.  Do you remember that?

4    A    Um -- it was basically -- it wasn't a 5K, it wasn't a 5K

5    that I know.  I think it was a plea agreement, just part of my

6    plea agreement.

7    Q    Mr. Davis, is there a document that I could show you that

8    would help you remember what a 5K was?  If I showed you your

9    plea agreement, would you remember what a 5K was?

10              MR. MARTINEZ:  Objection.

11              MS. HOFFMAN:  Objection.

12              MR. O'TOOLE:  Two objections, Your Honor.

13              THE COURT:  Overruled.  If you saw your plea

14   agreement, would it refresh your recollection about the terms

15   of your plea agreement?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Show him his plea agreement.

18   Q    (BY MR. O'TOOLE)  Look up when you're finished.

19   A    You said paragraph 3?

20              THE COURT:  Point out the paragraph you would like

21   the witness to read, Mr. O'Toole.

22   Q    (BY MR. O'TOOLE)  Paragraph 4.  This paragraph 4, from

23   the top to the bottom.

24        Are you finished?

25   A    (No verbal response.)

1    Q    Okay.  Now, Mr. Davis, I asked you before you read this

2    paragraph, do you remember if as part of your plea agreement

3    with the government, if you cooperated truthfully and if you

4    were of substantial assistance in the prosecution of another,

5    and if the government decided to do it, it could file

6    something with the Court called a 5K motion.  Do you remember

7    that?

8    A    Yes.  Yes, sir.  That's -- but that wasn't in my plea

9    agreement.

10   Q    All right.  But it was -- is it true that it was attached

11   to your plea agreement as a sealed part of your agreement?

12   A    Yes, sir.

13   Q    So that was all part -- it was sealed, but it was part of

14   your plea agreement.  And you knew if you pled guilty, if you

15   did what you were agreeing to do -- the government, the

16   prosecutors might decide, if you did what you were supposed to

17   do, to file a 5K; right, isn't that true?

18   A    Yes.

19   Q    All right.  Now, the 5K that you got --

20            MS. HOFFMAN:  Objection.

21            THE COURT:  Counsel you can approach.

22            MR. O'TOOLE:  I'll withdraw that, Your Honor.

23            THE COURT:  All right.  The question is withdrawn.

24   Q    (BY MR. O'TOOLE)  Mr. Davis, I'm not asking you -- let me

25   withdraw the question and ask you something different.  In the

Cross-examination – Davis (By Mr. O'Toole)

1  requirements of the 5K, in order for you to have a 5K in the

2  future, it was required for you to do something; correct?

3  A     In order for me to have a 5K in the -- what you mean?

4  Q     In order for you to have the possibility of getting your

5  sentence reduced by cooperating, all right, in order for that

6  to get -- happen, you would have to have the government file

7  what's called a 5K motion in connection to your sentencing;

8  correct?

9  A     I don't -- I don't -- I'm not really familiar with it.

10 Like, I'm not really familiar.  My lawyer go over it with

11 me.

12 Q     Now, when you were charged with this crime and you stayed

13 in jail for one year -- you were charged in the middle of

14 2015; correct?

15 A     Yes, sir.

16 Q     And you stayed in jail until October of 2016; correct?

17 A     Yes, sir.

18 Q     And at that time you had a lawyer; right?  And the lawyer

19 told you that you're going to go to jail for a long time, if

20 you're convicted for selling drugs and having a handgun;

21 correct?

22              MS. HOFFMAN:  Objection.

23              THE COURT:  Sustained.

24 Q     (BY MR. O'TOOLE)  I don't want to ask you what your

25 lawyer said to you, but --

1          THE COURT:  You just did.  Don't do that again.

2          MR. O'TOOLE:  I withdraw it, Your Honor.

3          THE COURT:  Next question.

4          MR. O'TOOLE:  Thank you.

5     Q    (BY MR. O'TOOLE)  After speaking with your lawyer over

6     the course of time, was it your understanding that you stood

7     the chance of spending a great deal of time in jail if you

8     were convicted of the charge you were -- that you had before

9     you; right?

10    A    If I found guilty, yes.

11    Q    Yeah.  Right.  So you were going to go for to jail for a

12    long time and you didn't want to do that, did you?  You didn't

13    want to go to jail for a long time, you'd rather go to jail

14    for a shorter time; right?

15    A    So I got to pay a lawyer.

16    Q    All right.  So you got a lawyer and after you talked with

17    the lawyer, it was your decision to plead guilty and cooperate

18    with the U.S. Attorney's Office; correct?

19    A    Well, actually, I cooperated at the police station.

20    Q    All right.  Let's go beyond there for just a second.

21    Indulge me.  What I'm asking you is, in the course of your

22    discussions with your lawyer and with the prosecutors, you

23    came to the decision that it was best for you to plead guilty

24    in hopes of getting a smaller sentence, as you told

25    Ms. Hoffman; right?

1    A    Yeah.

2    Q    All right.  This is not -- I'm not trying to trick you,

3    I'm just trying to ask you about this 5K.  And the 5K, if I

4    understand it right and tell me if I'm right, is that your

5    understanding that the government, at the sentencing, can ask

6    for a certain sentence, certain number of years; correct?

7    A    Yes.

8    Q    All right.  Isn't it true that under the agreement with

9    the 5K, the document that I just showed you, isn't it true

10   that you are not bound by that guideline range and you could

11   ask the Court to give you even a lower sentence; correct?

12   A    I'm not familiar.

13           MR. O'TOOLE:  Your Honor --

14   Q    (BY MR. O'TOOLE)  Mr. Davis, can I show you back the

15   document you just read?

16           MR. O'TOOLE:  Your Honor, can I approach?

17           THE COURT:  Are you seeking to refresh his

18   recollection?

19           MR. O'TOOLE:  Yes, sir.

20           THE COURT:  You may approach.  Point out to him

21   which paragraph you'd like him to read.

22   Q    (BY MR. O'TOOLE)  I ask you to read the very bottom of

23   the paragraph you read before.  It's actually highlighted in

24   yellow and there's some italics, there's some black bold

25   letters in there.  If you could read it to yourself, just pay

1    attention to the part that's marked.  Okay?

2    A    (No verbal response.)

3    Q    So I ask you again, okay -- give that back -- Mr. Davis,

4    is it true that if you cooperate, and if the government

5    decides to file this 5K that we've been discussing, the

6    government will suggest a certain sentence to the Court, is

7    that your understanding?

8    A    Yes.

9    Q    All right.  Is it also your understanding from what you

10   just looked at that -- your memory is refreshed, now I ask

11   you, are you able to ask for a sentence even lower than what

12   the government is asking for?

13   A    I'm not -- am I able to ask for a lower sentence?

14   Q    Yes, you and your lawyer?

15   A    I think my lawyer can argue for a lower sentence,

16   probably.

17   Q    Okay.  So let me just summarize this and move on.  With

18   the 5K -- and you were hoping to get a 5K; right, wasn't that

19   the point of the whole deal?

20   A    I mean, my point in the whole deal was to tell the

21   truth.

22   Q    And for what purpose?

23   A    Huh?  For what purpose?

24   Q    Correct.

25   A    Probably get a lesser sentence too.

Cross-examination - Davis (By Mr. O'Toole)

1    Q    Okay.  So the purpose of your cooperating is to get a

2    lesser sentence for you, Mr. Davis; correct?  Your purpose was

3    to help yourself by cooperating with the government; isn't

4    that right?

5    A    Yes.

6    Q    All right.  So the government says in there -- isn't it

7    true the government told you that if they believe you and if

8    your are substantially assisting them in the prosecution of

9    somebody else, that you -- they may file a 5K, which would

10   allow the Court to give you a lower sentence then you might

11   otherwise --

12           MS. HOFFMAN:  Objection.

13           THE COURT:  You may approach.

14           (Bench conference on the record.)

15           THE COURT:  Yes, ma'am.

16           MS. HOFFMAN:  I think number one, it's been asked

17   and answered, but number two --

18           THE COURT:  Well, it's cross-examination and that's

19   how that works, so there's no problem with asked and answered.

20   What else?

21           MS. HOFFMAN:  Number two, I think we're getting into

22   what the lawyers told him and I object to that.

23           THE COURT:  Well, I don't know that we're anymore in

24   there now than we have been previously.  Overruled.

25           But Mr. O'Toole, I think the problem is, you're --

1    you're trying to speak with him at a level that he can't get

2    it.  He understands his deal.  He just doesn't understand the

3    interplay of precise terminology like a 5K.  That's my own

4    observation.  It's your examination.

5            MR. O'TOOLE:  I think you're right.

6            THE COURT:  That's what's gone wrong here.  And

7    that's why he -- I don't think the witnesses is attempting to

8    be obstreperous or is trying to resist or anything.  He just

9    flat doesn't understand because of his level of

10   sophistication.  I do believe that he understands his deal.

11   He has acknowledged that he hopes to get a lighter sentence in

12   relation to his cooperation.  I really think the time we're

13   spending on the 5K is really not productive, but --

14           MR. O'TOOLE:  I agree with the Court and I accept

15   that and thank the Court.  However, I think that it hasn't

16   been testified to yet that he -- from his mouth, that the

17   level of cooperation may affect his ability to get a -- I want

18   to --

19           THE COURT:  Well, why don't you just lead him right

20   through that and state it just the way you've just said it to

21   me.

22           MR. O'TOOLE:  I promise you I'm trying to, but it's

23   not working.  I'll try again.

24           MR. MARTINEZ:  While we're addressing this issue, I

25   think some guidance from the Court would be helpful as to

1    where the boundary is in terms of cross-examining him about

2    specific sentences he expects to receive or specific guideline

3    departures or how big the departure is.  I think the case law

4    in this circuit, the *Cropp* case in particular, says that's

5    over the line.  I think what that case says is that you can

6    cross-examine somebody about, does your deal get -- are you

7    expecting a lesser sentence, do you do everything that's asked

8    of you.  You can't then get into quantifying.

9              THE COURT:  We haven't gone there yet.

10             MR. MARTINEZ:  I thought we were starting to.

11             THE COURT:  I haven't heard that.

12             MR. O'TOOLE:  The only thing that I think is

13    important -- I'm going to try to get it to the point where

14    it's -- I can communicate better than I've been doing, but

15    will be that his deal can be affected, he can ask for a

16    guideline different than the government's asking.

17             THE COURT:  Not a guideline, a sentence.

18             MR. O'TOOLE:  A sentencing range.

19             THE COURT:  I just encourage you to get down to

20    the --

21             MR. O'TOOLE:  All right.

22             THE COURT:  -- the most basic of facts and

23    circumstances.

24             MR. O'TOOLE:  All right.  Thank you.

25             THE COURT:  Very good.

1          (The following proceedings were had in open court.)

2          THE COURT:  Okay.  Next question, Mr. O'Toole.

3          MR. O'TOOLE:  Thank you.

4   Q   (BY MR. O'TOOLE)  Mr. Davis, we've been talking about

5   your plea deal, we've been talking a little bit about your

6   cooperation.  And do you understand that your sentence that

7   you get some day in the future can be affected by your help

8   that you give the government?

9   A   So you saying it can be -- you said it can be affected?

10  Q   Yeah, if you help the government, your sentence might be

11  lower.

12  A   My sentence might be low, uh-huh.

13  Q   Right?

14  A   Correct.

15  Q   All right.  So that's the goal.  You know what a goal is;

16  right, you know that a goal is something you try to get in the

17  future?

18  A   Yeah.

19  Q   All right.  So the goal here is for Mr. Davis to get a

20  smaller sentence, if you help; right, correct?

21  A   Correct, I guess.

22  Q   All right.  So do you understand that what the 5K does,

23  it opens the door -- opens the door for the Court to give you

24  a sentence that might be lower, is that your understanding?

25  A   Yes, sir.  But in my plea agreement it states that

1    neither the prosecutor or my lawyer can make a prediction of

2    my -- how much time I get.  The judge -- it's up to the judge.

3    Q    Right and --

4    A    They could just make a recommendation.

5    Q    Right.  And you told us before that there were no

6    promises, the judge and the prosecutor couldn't promise you

7    what the judge would do; right?

8    A    Yeah.

9    Q    And what the judge does in the future, he'll be thinking

10   about how much help you were to the government; right?

11        Is that right?  When the judge sentences you, he'll be

12   told -- he or she will be told that you were helpful to the

13   government; isn't that right?

14   A    I think that's how that work, I don't -- I mean --

15   Q    All right.  Have you ever had a cooperation agreement

16   before in any of your convictions?

17   A    No, sir.

18   Q    Have you ever testified in court before?

19   A    No -- yes, sir.

20   Q    In court or in grand jury?

21   A    In court.

22   Q    So when was that that you testified?

23   A    Probably -- let me see.  Probably like four months ago,

24   six months ago.

25   Q    Was it in a case related to the BGF?

1    A    No, sir.

2    Q    No.  Different case?

3    A    Uh-huh.

4    Q    All right.  And your purpose of testifying in that

5    case -- is that a different judge than you had in the case

6    we've been talking about?

7    A    What you mean different?

8    Q    Was that a different cooperating agreement or was that

9    under the same cooperation agreement?

10   A    Same agreement.

11   Q    All right.  So now this is your second chance, your

12   second try to help yourself; correct?

13              MS. HOFFMAN:  Objection.

14              THE COURT:  Overruled.

15   Q    (BY MR. O'TOOLE)  You may answer, sir.

16   A    Say that again.

17   Q    All right.  You testified once before under this

18   cooperating agreement that we've been talking about; right?

19   A    Yes.

20   Q    And you went to court with a jury and a judge and you

21   testified; right?

22              THE COURT:  You have to answer out loud.

23   A    Yes.

24   Q    (BY MR. O'TOOLE)  All right.  And the purpose of that

25   testimony was to help you get a smaller sentence; right?

Cross-examination - Davis (By Mr. O'Toole)

1    A    It was -- it's all combined.

2    Q    Right.  It's all in one --

3    A    One agreement.

4    Q    Exactly.  So under the agreement, you help as long as the

5    government is interested in your help; right?

6    A    Okay.

7    Q    If you have nothing else to say, then it's time to go to

8    sentencing; is that right?

9    A    Yes.

10   Q    All right.  So now you're here for a second time before

11   this jury and this judge to help the government in this case;

12   right?

13   A    Yes.

14   Q    Okay.  So the more -- is it fair to say that you think

15   the more you help the government, the more it's going to help

16   Mr. Davis; that's correct, isn't it?

17   A    I don't think it's -- it ain't the more help, we already

18   have a written plea agreement.

19   Q    All right.  But the plea agreement called for you to come

20   before this jury and tell them your story; right?

21   A    Yes.

22   Q    All right.  So you've been ready and you've been getting

23   ready to come here today to tell this jury your story;

24   correct?

25   A    What you mean ready?

1    Q    Well, you've been talking -- you've been meeting with the

2    government and talking about what you know from the past and

3    from the community; right?

4    A    Yes.

5    Q    And they've been helping you get ready for your

6    testimony; correct?

7    A    What you --

8    Q    I mean, they've been asking you or telling you what

9    they're going to ask you in court; right?

10    A    They just tell me to tell the truth.

11    Q    Right.  And they showed you pictures; right?

12    A    Hmm.

13    Q    Asked you if you know this person; right?

14    A    Yes.

15    Q    And you said yes or no; right?

16    A    Yeah.

17    Q    And they showed you another picture and asked you if you

18    know this person; correct?

19    A    Hmm.

20    Q    All right.  So when they came to this trial -- the other

21    trial you had didn't involve these two prosecutors, did it?

22    The other case you testified were different prosecutors;

23    right?

24    A    Yes, sir.

25    Q    All right.  So when these prosecutors started talking to

1   you, they wanted to know about the Black Guerilla Family;

2   right?

3   A    Yes, sir.

4   Q    And they wanted to know about Mr. Johnson; right?

5   A    Yes, sir.

6   Q    And they asked you if you knew Mr. McCants; right?

7   A    Yeah.

8   Q    They asked you -- and they asked you if you knew

9   Mr. Jones; right?

10  A    Yes, sir.

11  Q    All right.  And you told them what you knew -- what you

12  thought you knew about Mr. Johnson; correct?  That's right,

13  isn't it?

14  A    I told them what I knew.

15  Q    All right.  And they asked you -- they wanted to know

16  about Mr. Johnson; correct?

17  A    Uh-huh, I told them what I knew.

18  Q    Correct.  Okay.  That's exactly what I'm asking.

19       I want to ask you a little bit about the testimony that

20  you gave us about being robbed by Mr. Gwaltney.  Do you

21  remember that testimony --

22  A    Yes.

23  Q    -- earlier with Ms. Hoffman?  All right.

24       Did you know Mr. Gwaltney before he walked into that

25  stairwell with you and your wife?

1    A    No, sir.

2    Q    You had never seen him before?

3    A    No, sir.

4    Q    You didn't know him?

5         THE COURT:  You have to answer.

6    A    No, sir.

7    Q    (BY MR. O'TOOLE)  And the person with him had a mask;

8    right?

9    A    Yes, sir.

10    Q    Did you ever see who that person was?

11    A    No.  I didn't -- he had a mask.  I just seen his eyes.  I

12    knew his eye color.

13    Q    All right.  What color was his eyes?

14    A    Green.

15    Q    He had green eyes?

16    A    Uh-huh.

17    Q    You could tell that from seeing him?

18    A    Because he had a (indicating.)

19    Q    All right.  And you got robbed; right?

20    A    Yes.

21    Q    All right.  And you told the jury, you told Ms. Hoffman

22    that the -- it was your belief that Mr. Johnson told Gwaltney

23    to come rob you; is that right?

24    A    It was -- I told him that it was Mustafa, Geezy, and

25    Roscoe, all of them be together.  Because later on I found

 1    out -- when I spoke to Mike Gwaltney, he told me -- we spoke

 2    through the vent when I was up Supermax because he was in

 3    administration.  I talked to him and he said it was Roscoe and

 4    what you call -- Roscoe, Mustafa, and Geezy was the one who

 5    sent him -- sent me around -- to get me away from around

 6    there.

 7    Q    All right.  And that was the truth, as far as you knew

 8    it?

 9    A    Yes, sir.

10    Q    And when you talked to Mr. Martinez and Ms. Hoffman

11    getting ready for trial, back on October 17th of this -- last

12    month you talked to them, didn't you?

13    A    Yes, sir.

14    Q    Isn't it true that you told them at that time, just a

15    month ago, that you thought -- it was your understanding that

16    Gwaltney told you that Roscoe and Mustafa sent Gwaltney to rob

17    and not Mr. Johnson, isn't that true?

18    A    Yes.  Reason why I didn't mention his name because they

19    all be together any way, all of them be together.  They be

20    amongst each other.

21    Q    So this was a short hand -- this was just a short way for

22    you to say it.  When you said that he was sent by Davis --

23    excuse me, sent by Roscoe and Mustafa, what you really meant

24    was something else; right?

25    A    Yeah, I mean, I meant what was said.

1  Q    Did you mean what you say or did you mean what you meant?

2  I'm just asking, when you told them -- when you answered their

3  question, you tried to tell the truth; right?

4  A    I told the truth.

5  Q    All right.  And when you did, the truth on October 17th

6  was that it was your understanding that Roscoe and Mustafa

7  sent Gwaltney, and you said not Johnson; right?  Isn't that

8  right?

9  A    I know that Geezy and Roscoe -- well, Mike Gwaltney told

10  me.  I wasn't there to actually hear or see who sent -- who

11  sent them.  But it was said through Mike Gwaltney through the

12  vent that -- who sent -- who told him to come rob me, who he

13  told to come rob me -- who told him to come rob me.

14  Q    Sorry, I interrupted you.  But you're testifying today

15  differently than you told the people -- these two prosecutors

16  on October 17th; is that right?

17  A    Not that I recall.

18  Q    All right.  Is there a document that I could show you

19  that would refresh your memory?

20  A    Sure.

21         MR. O'TOOLE:  May I approach, Your Honor?

22         THE COURT:  You may approach.

23         MR. MARTINEZ:  Can we see what you're going to show

24  him?

25         MR. O'TOOLE:  Sure.  Short paragraph.

Cross-examination - Davis (By Mr. O'Toole)

1    Q    (BY MR. ENZINNA) Just read that and look up -- please

2    read that and look up when you're done.

3         Done?  Simple question:  When you spoke to the law

4    enforcement officials on October 17th, you told them that at

5    that time you thought it was Roscoe and Mustafa who sent

6    Gwaltney to rob you?

7    A    Yeah, and I specifically said too that I knew that Geezy

8    had something -- I mean, it was Geezy too.  The second

9    sentence also too said that he didn't specifically say his

10   name, but I could have sworn I thought I said his name.

11   Q    But when you talked to the people in October last month,

12   you specifically said "he did not say Geezy's name"; correct,

13   isn't that correct?

14   A    Yeah.

15   Q    All right.  Now, you saw -- you had never seen

16   Mr. Gwaltney before that night you told us; correct?

17   A    No, sir.

18   Q    And you saw him -- according to your testimony earlier,

19   you saw him a few days later on the street; right?

20   A    Yes, sir.

21   Q    All right.  And when you saw him, you recognized him as

22   the person who robbed you at gunpoint; right?

23   A    Yeah.

24   Q    The person who held a gun to your wife's head and cocked

25   it; right?

1    A    Yes, sir.

2    Q    The person who -- the other person held the gun to your

3    head and cocked it; right?

4    A    Yes, sir.

5    Q    And then he took your money; right?

6    A    Yes, sir.

7    Q    And he took your drugs; right?

8    A    Yes, sir.

9    Q    That really made you mad; right?

10   A    Yes.  Yes, sir.

11   Q    Of course.  So where was it that you saw Mr. Gwaltney,

12   was it the next day?

13   A    Yeah, it was -- it was exactly next day.

14   Q    All right.  And you saw him and you walked up to him and

15   he walked up to you and you put a gun up to his head about

16   three feet away and pulled the trigger, aiming your gun at his

17   head, didn't you?

18   A    No.

19   Q    You didn't?

20   A    I was standing on the steps.

21   Q    All right.  How far away were you?

22   A    I don't know -- I don't know the distance, but it was

23   quite distance from the steps when I showed on the picture.

24   Q    All right.  And when you pointed the gun at his head and

25   you pulled the trigger and the gun didn't work; right?

1    A    No, I pointed it at him.

2    Q    Right.  And then you pulled the trigger?

3    A    No, I ran.

4    Q    Would it surprise you to know that Mr. Gwaltney will

5    testify in this trial that when you pointed the gun to him,

6    three feet from his head, you pulled the trigger and he heard

7    the click, would that surprise you?

8              MS. HOFFMAN:  Objection.

9              THE COURT:  You may approach.

10             (Bench conference on the record.)

11             THE COURT:  You can't ask a question that way,

12   suppose they don't call Gwaltney.  You can ask the question,

13   but not that way.

14             MR. O'TOOLE:  I'll rephrase it.

15             THE COURT:  You can't predict the future.

16             MR. O'TOOLE:  I'll be happy to rephrase it.

17             THE COURT:  Thank you.

18             (The following proceedings were had in open court.)

19   Q    (BY MR. O'TOOLE)  Mr. Davis, Mr. Gwaltney hasn't

20   testified, so I'm going to ask you the question a different

21   way.

22        Would it surprise you if Mr. Gwaltney's story of that

23   event is that you pointed the gun right at him at close range,

24   clicked the trigger, and the gun misfired and then after that,

25   you ran away and after that, he tried to shoot you, but he

1    couldn't get his gun out fast enough; isn't that correct?

2    A    No, I never pulled the trigger.

3    Q    Okay.  All right.  Now, at the time that you're talking

4    about when you were robbed and selling drugs and on the street

5    in the Greenmount area, you knew Mr. Johnson; correct?

6    A    Yes, sir.

7    Q    You knew of him, he was a big personality in the

8    neighborhood, wasn't he?

9    A    I knew of him, I knew him he used to be --

10    Q    Right.  He was a big personality in the neighborhood,

11    wasn't he?  He was popular, he was a popular guy.

12    A    Yes, I guess.  Yeah.

13    Q    And he was a big man, is a big man, tall; correct?

14    A    Yeah.

15    Q    Mr. Johnson, could you stand up.

16        Mr. Davis, I'm six-feet-one, so he looks like a big man

17    to you; correct?

18    A    Yeah.

19    Q    So in the neighborhood he was hard to miss, wasn't he?

20    A    I would say so, I would assume.

21    Q    You saw him in the neighborhood; right?

22    A    Yeah.

23    Q    Did you ever see him on videos?

24    A    What you mean videos?

25    Q    Did you ever see -- on social media see a video of

1    Mr. Johnson?

2    A    Social media, not that I recall.  No.

3    Q    Okay.  Did you ever go to one of the parties that he

4    promoted?

5    A    No.

6    Q    All right.  If I told you that he promoted parties and

7    sold tickets for these parties, would that remind -- would

8    that remind you that perhaps --

9    A    I never seen him.

10   Q    You never saw parties?

11   A    No.  I ain't never seen him promote no parties or

12   nothing.

13   Q    All right.  But you knew him in the neighborhood, didn't

14   you?

15   A    Yeah.

16   Q    All right.  And you knew -- you could tell from what you

17   saw that people liked him; right?

18   A    I -- not the people that was around me.

19   Q    All right.  Well, so you don't think that he had a -- he

20   wasn't a big person in the neighborhood that people knew and

21   liked, is that your testimony?

22   A    I can't -- say that again?

23   Q    So you're saying that you don't think that he was a big

24   personality in the neighborhood who people liked?

25   A    Not the people around me, they didn't like him.

Cross-examination - Davis (By Mr. O'Toole)

1    Q    All right.  But you knew other people liked him; right?

2    A    Not that I know of.

3    Q    So you didn't know of anybody who liked Mr. Johnson;

4    correct?

5    A    Not --

6    Q    Nobody -- nobody?

7    A    Not that I know of.

8    Q    So in all the times you were around, you never saw a

9    single person who thought -- who you could see liked

10   Mr. Johnson?

11   A    The people that was around him, the little --

12   Q    All right.  And you didn't see any of his parties?

13   A    Huh?

14   Q    You didn't go to any of his parties, so you don't know

15   about that?

16   A    No.

17   Q    All right.  Let me ask you about the time that you shot

18   Mr. Johnson.

19        All right.  You knew after you were robbed that -- and

20   you pointed the gun at Mr. Gwaltney, you knew that you were

21   going to be talked about in the neighborhood; correct?

22   A    I knew I was going to be talked about?

23   Q    Yeah; right?

24   A    Not really, because I try to hide my face.

25   Q    I see.

Cross-examination - Davis (By Mr. O'Toole)

1   A    Try to be unknown.

2   Q    I see.  So there came a time that you decided that you

3   were going to get back at whoever robbed you; correct?

4   A    Yes, sir.

5   Q    Did you try to find Mr. Gwaltney to get back at him?

6   A    Not really.  I just was in the same neighborhood

7   basically because I knew that Geezy and them has -- they was

8   all together.  I knew all of them was together.

9   Q    So you decided to go and shoot Geezy; right?

10  A    Hmm.

11  Q    All right.  So you go to shoot Geezy and you see him and

12  he puts out his hand and says, "how you doing, and you know I

13  didn't have anything to do with that robbery of you," he did

14  that; right?

15  A    Not that I recall.

16  Q    He never shook your hand and said I had nothing to do

17  with the robbery?

18  A    Not that I recall.

19  Q    Court's indulgence.

20  A    He shook my hand when we was in -- when I stated earlier

21  we was in the building.

22  Q    Right.

23  A    With me him and his brother and he was like -- he was

24  like, you know who robbed you?  And I looked at him, I knew

25  who robbed me, and I knew who had something to do with it.

1    Q    I'm sorry, would you say that name again, you knew who?

2    A    Yeah, I knew who robbed me.

3              THE COURT:  I knew who robbed me.

4              MR. O'TOOLE:  Who robbed me, I'm sorry.  Thank you.

5    A    I knew who robbed me.  At the time I didn't, when it

6    first happened, until I seen the Facebook.  I knew who robbed

7    me, but I wasn't telling him that I knew who robbed me because

8    I know the games they play.  It's like they will like try to

9    rock you to sleep.  Rock to sleep meaning that they would try

10   to befriend you and then take your life away from you.

11   Q    (BY MR. O'TOOLE)  Okay.  So you could tell, from what you

12   knew in the community, that he was trying to rock you to

13   sleep?

14   A    Yeah.

15   Q    So when he told you and -- tried to shake your hand and

16   told you he didn't do it, he was --

17   A    Him and his brother.

18   Q    He was rocking you to sleep?

19   A    Yeah.

20   Q    But he denied being involved in it, didn't he?

21   A    Yeah.

22   Q    All right.  So you didn't believe that then, did you?

23   A    No, because I knew for a fact.  I knew.

24   Q    Is that when you shot him or did you shoot him later?

25   A    What you mean?

Cross-examination - Davis (By Mr. O'Toole)

1    Q    When did you shoot him, right after he told you he didn't
2    do it or did you wait a little bit?
3    A    It was probably like the next couple days, probably like
4    a day or two.
5    Q    All right.  The next couple days you went up and you had
6    a gun?
7    A    Yes.
8    Q    And where did you shoot him, where on his body?
9    A    I just put the gun up and shot him.
10   Q    How many times did you shoot?
11   A    Like seven times.
12   Q    How many times did you hit him?
13   A    I don't even know.
14   Q    You were trying to kill him; right?
15   A    My -- my motto was, when I first stated on the stand, was
16   like I was going to get them before they get me.
17   Q    You were trying to kill him; right?
18   A    Yeah.
19   Q    Did you ever get charged with that shooting?
20   A    No.
21   Q    So you shot somebody, trying to kill them, and you never
22   got charged; correct?
23   A    No.
24   Q    And you told the government about your shooting
25   Mr. Johnson and trying to kill him, you told them that;

Cross-examination – Davis (By Mr. O'Toole)

1    right?

2    A    Yeah.

3    Q    And part of your agreement is that whatever you tell

4    them, you don't get charged with if you cooperate; correct?

5           MS. HOFFMAN:  Objection.

6           MR. O'TOOLE:  I'll rephrase it.

7           THE COURT:  Rephrase the question.

8    Q    (BY MR. O'TOOLE)  Your understanding was that as part of

9    the deal to cooperate, this particular charge was not going to

10   be -- this particular shooting, attempted murder, was not

11   going to be charged against you; correct?

12          MS. HOFFMAN:  Objection.

13          THE COURT:  Well, let's approach.

14          (Bench conference on the record.)

15          THE COURT:  So does the defendant's plea agreement

16   give him immunity for the shooting of Mr. Johnson?

17          MS. HOFFMAN:  No.

18          THE COURT:  Mr. O'Toole, you've seen the plea

19   agreement.

20          MR. O'TOOLE:  I've seen the plea agreement.  It

21   doesn't state this particular charge, but it's clear he's not

22   being charged with anything further if he tells the truth.

23          THE COURT:  That wasn't the question.

24          MS. HOFFMAN:  That's not true.

25          THE COURT:  Well, you're saying that's also not

1    what's in the plea agreement?

2             MS. HOFFMAN:  All the plea agreement says is that if

3    he's truthful we can't use what he tells us against him.

4             MR. O'TOOLE:  I think we're splitting hairs, but

5    I'll be happy to rephrase the question.

6             MS. HOFFMAN:  I think it's a very important

7    distinction.

8             MR. MARTINEZ:  I can say it precisely.  There's a

9    standard immunity provision in the sealed supplement that goes

10   a step beyond what is typically in a proffer --

11            MS. HOFFMAN:  -- a piece.

12            MR. MARTINEZ:  -- proffer letters, if an individual

13   comes in and proffers after the cooperation agreement, we give

14   him use immunity, but we say we can use it derivatively.  The

15   standard sealed supplement goes a bit further and gives them

16   use and derivative use immunity, but does not go all the way

17   to transactional immunity.  So that is what is given to a

18   defendant who cooperates and continues to abide by the terms

19   of their agreement and is truthful.

20            MR. O'TOOLE:  Well, I'll ask him that question --

21            THE COURT:  The objection is sustained with respect

22   to whether or not he has immunity for this particular

23   shooting.

24            MR. O'TOOLE:  Right.

25            THE COURT:  That doesn't mean that you can't inquire

1    about the scope of the immunity that he has under the terms of

2    the plea agreement.  And as Mr. Martinez described it, that

3    sounds like a correct description of what is absolutely the

4    standard District of Maryland plea agreement.

5            MR. O'TOOLE:  Right.  And if I state it just like

6    that, we'll be here until 4:00 o'clock in the afternoon on

7    that question.

8            THE COURT:  Well, that may be the case.  But

9    regardless, you're not permitted to imply an answer to a

10   question that by virtue of what has been produced to you in

11   discovery, you know is not true.  Evidently, that's why I

12   wanted you up at the bench.  I wanted to know, does he have a

13   specific grant of immunity with respect to the shooting of

14   Gerald Johnson?

15           MR. O'TOOLE:  No, sir.

16           THE COURT:  And both sides agree that he doesn't, so

17   that can't be the premise of the question.

18           MR. O'TOOLE:  All right.  Thank you.

19           (The following proceedings were had in open court.)

20           THE COURT:  Sustained.  Next question.

21   Q    (BY MR. O'TOOLE)  Mr. Davis, when you spoke to the

22   government, you told them all about your shooting of

23   Mr. Johnson and trying to kill him; right?

24   A    Yes, I told them about it.

25   Q    And you were not charged with it; correct?

Cross-examination – Davis (By Mr. O'Toole)

```
1    A    No.

2    Q    Okay.  Let me ask you, do you -- have you become friends

3    with Mr. Gwaltney?

4    A    Have I --

5              THE COURT:  Become friends with who?

6    Q    (BY MR. O'TOOLE)  Mr. Gwaltney, Gwaltney.

7    A    Have become friends -- I wouldn't say we friends, but I

8    socialize -- I talk to him.

9    Q    How often do you talk to him?

10   A    I just talk to him when I was up Supermax.

11   Q    How long ago was that?

12   A    Like a year ago.

13   Q    And do you communicate with him now through anybody

14   else?

15   A    No, sir.

16   Q    So the last time you spoke to Mr. Gwaltney was about a

17   year ago?

18   A    Yeah.

19   Q    Okay.  And you were in Supermax together, did you talk

20   about your cooperation in this case a year ago?

21   A    No.

22   Q    All right.  Did you talk about any of his cases where

23   he's going to cooperate?

24   A    No.

25   Q    All right.  Did you talk about your plea agreement?
```

1    A    No.

2    Q    Did you talk about what you hoped your sentence was going

3    to be in your case?

4    A    No.

5    Q    When you were in Supermax, had you already pled guilty or

6    had you not pled guilty yet?

7    A    Did I plead guilty --

8    Q    This is back on Halloween of last year you pled guilty.

9    A    Yeah, I pled guilty already.  When I was at Supermax, I

10   pled guilty.

11   Q    So when you talked to him, you had already pled guilty;

12   right?  And you were --

13   A    I talked to him before I pled guilty.

14   Q    Okay.  Did you talk to him again after you pled guilty?

15   A    I don't think I talked to him after I pled guilty.

16   Q    Okay.  Before you pled guilty, you talked to him and you

17   told him you were going to cooperate?

18   A    No, I never told him I was going to cooperate.

19   Q    Never told him that?

20   A    No.

21   Q    Who have you talked about -- who have you talked to about

22   your cooperation with the United States?

23   A    Nobody.

24   Q    Nobody.  Not your wife?

25   A    Hmm --

Cross-examination - Davis (By Mr. O'Toole)

1          MS. HOFFMAN:  Objection.

2          THE COURT:  Sustained.

3    Q    (BY MR. O'TOOLE)  So your answer is, you've spoken to

4    nobody outside of law enforcement about your plea agreement?

5    A    No.

6    Q    All right.  Who is Michael Gray?

7    A    Who is Michael Gray?

8    Q    Right.

9    A    I heard about him.  I don't know --

10   Q    You know that he was a BGF member; correct?

11   A    I heard about him.

12   Q    All right.  You heard about him because you heard that he

13   was a BGF member?

14   A    I heard that he testified against some people.

15   Q    All right.  You heard that he was a cooperating witness,

16   like you are; correct?

17   A    Yeah.

18   Q    All right.  Have you ever met Mr. Gray?

19   A    No, sir.

20   Q    Now, you know that Mr. Gwaltney knows Mr. Gray, don't

21   you?

22   A    Not that I know of.

23   Q    All right.  But the government, the U.S. Attorney's

24   Office asked you if you knew Mr. Gray, didn't they?

25   A    Yes, sir.

1   Q    All right.  You talked to government, didn't you, about

2   the shooting of Mr. Henry Mills?

3   A    Who?

4   Q    Henry Mills.

5             MS. HOFFMAN:  Objection.

6             THE COURT:  You may approach.

7             (Bench conference on the record.)

8             MS. HOFFMAN:  Your Honor, I apologize, I thought you

9   were asking about what he testified about on direct.  If

10  you're asking about what we talked about in interviews, I

11  withdraw it.

12            THE COURT:  All right.  So it was a -- all right.

13  So you withdraw the objection?

14            MS. HOFFMAN:  Yeah.

15            THE COURT:  How much more have you got?

16            MR. O'TOOLE:  I think quite a bit.

17            THE COURT:  Okay.  So let's take the lunch break

18  now.  And remember, we have to go till 3:00 o'clock.  So

19  logical point to break or is there --

20            MR. O'TOOLE:  No, I think so.  I've confused him.  I

21  can confuse him later.  I've confused him now.

22            THE COURT:  All right.  We'll take the break.

23            (The following proceedings were had in open court.)

24            THE COURT:  Mr. Davis, you may step down and go with

25  the Marshal.

1          THE COURT:  Ladies and gentlemen, it's time for us

2     to stop and take our lunch break.  During the lunch break do

3     not discuss the case with anyone.  Do not discuss the case

4     even among yourselves.  You must wait until after you've heard

5     all the evidence, the closing arguments, and my instructions

6     as to the law.  Do not allow yourselves to be exposed to any

7     news articles or reports that touch upon the case or the

8     issues it presents or any articles or reports that relate to

9     any of the participants in the case.  Avoid all contact with

10    any of the participants in the trial.  Do not make any

11    independent investigation of the law or the facts of the case.

12    Do not look up anything on the internet.  Do not consult an

13    encyclopedia or dictionary.

14          Ladies and gentlemen, you'll remember that today we

15    have to take a break all the way until 3:00 o'clock.  You're

16    excused until 3:00 o'clock.  Please take the jury out.

17          (Jury left the courtroom.)

18          THE COURT:  So Mr. O'Toole, about how much longer do

19    you think?

20          MR. O'TOOLE:  20, 25 minutes.

21          THE COURT:  20, 25 minutes.  Let's see, Mr. Bussard,

22    are you going to have anything?

23          MR. BUSSARD:  No, Your Honor.

24          THE COURT:  Mr. Francomano.

25          MR. FRANCOMANO:  Not very much.

1          THE COURT:  Mr. Francomano, you have a sentencing in

2    this building?

3          MR. FRANCOMANO:  I do.

4          THE COURT:  Okay.  Mr. Martinez, what's up for the

5    rest of the afternoon?

6          MR. MARTINEZ:  Well, after Mr. Davis we have a

7    lengthy witness lined up who's related to the testimony that's

8    being given.

9          THE COURT:  Okay.

10          MR. MARTINEZ:  And then we had a sergeant testify --

11    or scheduled to testify after that witness.  But based on

12    Mr. O'Toole's proffer and the Court's timing, I think we're

13    going to excuse that person.  I think it's safe to assume --

14          THE COURT:  You're never going to get to him today.

15    Okay.  3:00 o'clock.  Defendants are remanded until then.

16          (A recess was taken.)

17          THE COURT:  Matter to take up before the jury?

18          MR. MARTINEZ:  Yes, Your Honor.

19          THE COURT:  Be seated, please.

20          MR. MARTINEZ:  During the break Mr. O'Toole and

21    Mr. Enzinna approached us to ask about playing portions of the

22    "Welcome Home" rap video while Mr. Davis is on

23    cross-examination.  And some of the portions they want us to

24    play include portions they previously raised objections to.

25    This is the video -- the eight-minute video we played during

1    the pretrial conference.

2            THE COURT:  That's fine.  They can put anything on

3    they want.

4            MR. MARTINEZ:  I understand that.

5            THE COURT:  Within reason and the door swings

6    open.

7            MR. MARTINEZ:  And that's why I wanted to raise the

8    issue.

9            THE COURT:  Whatever the defendant chooses to put in

10    evidence, provided that there is a legal basis for it coming

11    in and no objection that is sustained, will be in evidence.

12    And then once it's in evidence, it's evidence.  Evidence

13    doesn't come in for one side or the other, it's either in or

14    it's out.

15            MR. MARTINEZ:  Right.  And so the discussion we were

16    having, just to be fair to Mr. Enzinna and Mr. O'Toole, they

17    were asking us, well, we previously raised an objection to

18    these first nine seconds because there's the sound of machine

19    guns and credits from other people, et cetera, so we had

20    edited that clip out of the version we were going to play.  We

21    still have the unedited clip.  They want us to play the

22    unedited nine seconds, and so we just wanted to raise that

23    with the Court because --

24            THE COURT:  Play the unedited nine seconds of what?

25            MR. MARTINEZ:  Of the beginning of the video.

1          MS. HOFFMAN:  The first nine seconds.

2          MR. O'TOOLE:  The beginning of the video and then

3    just play the rest of it as the government has edited out, as

4    you directed.

5          MR. MARTINEZ:  So I don't know how this works --

6          THE COURT:  Well, how are you going to do that?

7    You've got to have a physical exhibit that comes into the

8    record of this case.  Now, I assume that what the government

9    has is an appropriately edited disk --

10         MR. MARTINEZ:  Correct.

11         THE COURT:  -- that shows only those segments that

12   are previously ruled admissible.

13         MR. MARTINEZ:  And that has come in as CD 9.

14         THE COURT:  Okay.  If you have a little additional

15   segment that you want to play, that can -- that's fine, but

16   it's got to be physically discrete.  It can't be some part of

17   some other disk because -- that has portions on it that are

18   not admissible.

19         MR. O'TOOLE:  If -- and that's something we probably

20   cannot do with the Court's schedule now, of course, but could

21   we do this:  To play the first nine seconds as

22   Defense Exhibit No. 1 and then simply go into the remaining of

23   the exhibit that the government has edited, so that we have --

24   we have one document and we're going to -- we have the

25   complete -- makes it look like a video and here it is.

1    Otherwise -- otherwise, we think that -- and we don't think

2    we're opening up any door to other people speaking.  There's

3    nobody speaking in this first nine seconds.

4          So that in -- outside the Court's hearing, we could

5    get an exhibit that is nine seconds, which will be

6    Defense Exhibit No. 1, and then Government's DC9 (sic) would

7    be followed immediately in front of the jury so that it's not

8    uncomfortable for anybody to wait and see different things.  I

9    realize this is not the best way to do it, Your Honor, but

10   it's the best we have at this moment.

11         THE COURT:  What would the record consist of after I

12   granted your request?  It would consist of the totality of the

13   government's evidence, which is already in evidence, which is

14   Exhibit No. --

15         MR. MARTINEZ:  CD 9.

16         THE COURT:  CD 9.  And then there would be -- having

17   been played in front of the jury, some audio and video, but we

18   don't have that memorialized physically, we don't have that

19   thing.  We just have had an experience in front of the jury

20   that the record doesn't properly reflect.

21         MR. O'TOOLE:  With the representation that by

22   tomorrow morning we will have that exact nine seconds to be

23   put into the record as Defense Exhibit No. 1, which is the

24   first -- which are the -- we're putting back into the video

25   what was there before it was taken out.  We didn't plan to do

1    this today, Your Honor.  Now that we find out that the first

2    part's taken out, we just ask the Court to allow us to put the

3    first nine seconds in front of Government's Exhibit DC9 (sic)

4    and play it, and then tomorrow morning we'll have a disk that

5    includes 9 seconds, which is Defense Exhibit No. 1.

6            THE COURT:  Well, is that technologically feasible

7    that the disk can be made that records the audio and video

8    that is the first nine seconds of the other exhibit?

9            MR. O'TOOLE:  Your Honor, that's -- my hope is that

10   Damon is --

11           MR. MARTINEZ:  I --

12           MR. O'TOOLE:  Or we can do it --

13           MR. MARTINEZ:  There is a CJA paralegal.

14           MR. O'TOOLE:  I was just told that we can --

15           THE COURT:  What's the government's position?

16           MR. MARTINEZ:  I share the Court's concerns.  I

17   mean, my questions were, once we get into picking and choosing

18   which portions come in and which don't, after we've litigated

19   this fully and the Court has already ruled, it gets a little

20   messy.  But also, the questions the Court raises about what

21   the record consists of are good ones.  If the Court's

22   satisfied that defense counsel can create a disk that just

23   contains the first nine seconds and submit it --

24           THE COURT:  Am I satisfied?  I'm satisfied legally

25   that they can do that.  I don't think there's a thing in the

1   world wrong with defense counsel changing their position in

2   light of how the testimony actually got presented at trial.

3   That's the nature of how criminal defense work goes and what

4   it's allowed to do.  I don't have the slightest concern about

5   that.  I solely have a concern about how we actually

6   accomplish this in a way that allows me to discharge one of my

7   fundamental responsibilities, which is to make sure that I

8   assemble a coherent cogent record of what happened here.

9   That's what I'm worried about, mechanics.

10          MR. O'TOOLE:  Here's what I think I need to add to

11  this conversation, if I could.  We asked -- Mr. Enzinna asked

12  that portions of the video be taken out, which were the

13  incendiary parts of people sticking their heads in --

14  Mr. Enzinna is talking, go ahead.

15          MR. ENZINNA:  Specifically, what we argued in our

16  motion of limine was that the videos should stay out in their

17  entirety.  One, because they're irrelevant; two, because their

18  prejudicial impact outweighs their relevance.  Then the third

19  piece of the argument was that the videos contained hearsay.

20  And we lost on the first two pieces of that, but won on the

21  third.  The judge, the Court said the government has to edit

22  out the hearsay.

23          Now, the nine seconds we're talking about today is

24  not hearsay.  The nine seconds we're talking about is

25  production of the video.  It's credits, it's music, it's not

1    anybody talking, so we're not changing our position.

2         THE COURT:  No, that's fine.  And I'm not contending

3    that you are.  But you know, the government edited their

4    exhibit and then they took out even more.  It's still their

5    case and their exhibit.  They can take out as much as they

6    want, so there's no fault on the part of the government here.

7    All I'm saying is that if the defense wants to put in an

8    exhibit, you've got to have it in some form or format where it

9    is susceptible to becoming a part of the record of this case.

10        And at the moment we don't have that.  And I'm a

11   little reluctant to put something in front of jury that

12   without certainty that I will have the record to back it up.

13   And I haven't heard enough about what the plan is to ensure

14   that.  You know, this is -- this is a genie that doesn't go

15   back in the bottle.  Once it's played, it's a part of the

16   record.  You might say, well, we don't have any concerns about

17   that, we want it played.  Well, I have a concern about it

18   because the Court has its own responsibilities here and that

19   is to make sure that the record that's assembled here actually

20   is accurate in terms of what happened in the trial over which

21   I presided.  And I take that duty seriously.

22        MR. O'TOOLE:  There's no question about that and we

23   do too.  What I think that -- and I'll stop talking after

24   this, but I think what we have here is, you have seen the

25   first part of this video.  All it is is the opening part.

1    You've seen it.  And you ordered that the government take out

2    parts of hearsay that we talked about.  And they took out the

3    first part and we didn't expect that to come out.  All we're

4    asking -- you know what it is and we know all what it is.  Our

5    technical person here says that she can have tomorrow morning

6    a disk with the first nine seconds of it.

7            THE COURT:  And she's going to make that from disks

8    that you already have that were already produced to you or

9    what?

10           MR. O'TOOLE:  Yeah, we've got whole videos --

11           THE COURT:  Are you dependant upon the government at

12   all to create this hard copy of the exhibit?

13           MR. O'TOOLE:  Not at all.  No dependency at all on

14   the government.  And the government can do today what I'm

15   asking, which is to play the first nine seconds of the video.

16   I can produce that as a combination of --

17           THE COURT:  How are they going to play the first

18   nine seconds?  They'll play the first nine seconds and then

19   stop and then they will switch disks.

20           MR. MARTINEZ:  I think that is what -- logistically,

21   that's how it's going to have to work.  We have one unabridged

22   file.  We would play the first nine seconds of that.  And just

23   for the record, that's the portion that contains all of the

24   gunshots that were objected to during the pretrial conference.

25   I know now it's being characterized as just an argument about

1    hearsay.  But remember, we had the whole conversation about

2    the production effects and the gun sounds.

3             THE COURT:  Well, that part of it was thought to be

4    inflammatory and violative of Rule 403.  But as Mr. Enzinna

5    correctly notes, he lost on that.

6             MR. MARTINEZ:  So we would play one file, and then

7    after nine seconds we would switch back to the edited version

8    that's on CD 9.

9             MS. HOFFMAN:  And I mean, technically, what I'm -- I

10   have copied the exhibits onto my desktop and that's what I

11   will literally be playing from.

12            THE COURT:  All right.  Well, let's have a dry run.

13   Show me that this can be done without the jury in the

14   courtroom.

15            MR. O'TOOLE:  Your Honor, thank you for your

16   patience here.

17            THE COURT:  Are we going to play the whole video as

18   part of the cross-examination; is that it?

19            MR. O'TOOLE:  Yes, and it's shorter now, it's

20   shorter than it was.

21            THE COURT:  Inevitably there's a gap.  They're going

22   to have to stop, reload.

23            MR. O'TOOLE:  I don't think it will be very long.  I

24   think Christina -- Ms. Hoffman now has it on --

25            THE COURT:  Yeah, but as soon as the first nine

1    seconds is finished on the complete disk, you're going to stop

2    playing that disk and you're going to remove that disk and not

3    play anymore from that disk for the danger that you might

4    accidentally play a portion of that disk that the Court's

5    ruled inadmissible.

6              MS. HOFFMAN:  That's right, except that I'm not

7    playing it from a disk, I'm playing it from my desktop.  So

8    I'll hit pause and then I'll go into the other folder that has

9    the contents of CD 9 and then play the edited version.

10             THE COURT:  Is that acceptable to you, Mr. O'Toole?

11             MR. O'TOOLE:  It is.  It is acceptable.  And I trust

12   the government to do the very best it's possible to do.  So I

13   don't have a problem with that.  The problem I have now is how

14   do I ask -- how will I introduce this hybrid exhibit.

15             THE COURT:  This is not good practice.  I'm not

16   saying we're not going to do it.  But this is not good

17   practice because now you're dependant upon Ms. Hoffman's

18   technical abilities, suppose she fouled up.  How soon do we

19   get to a inadmissible portion on the full disk, is there any

20   of that that comes very quickly?

21             MS. HOFFMAN:  Well, we can do a dry run right now.

22             THE COURT:  Show me not the first nine seconds, but

23   show me about the first 30 seconds, so I know that if we have

24   some kind of a technological glitch in here and a run away

25   computer, that I don't end up with some kind of contamination

1    of this jury three weeks into this trial.  It's no way to run

2    the railroad.

3            (Video played.)

4            THE COURT:  All right.  So how many seconds did we

5    play there?

6            MS. HOFFMAN:  30.

7            THE COURT:  Mr. O'Toole, do you agree in that first

8    30-second segment there was nothing that appeared there that

9    is subject to the Court's earlier order of exclusion?

10           MR. O'TOOLE:  It is.  In fact, I would ask for that

11   30 seconds to be put in, just use that 30 seconds.

12           THE COURT:  Well --

13           MR. O'TOOLE:  I know what you're going to say now,

14   it's obvious.  We're pretty close to pulling this

15   altogether.

16           THE COURT:  We're going to play nine seconds.  That

17   was the proposal.

18           MR. O'TOOLE:  Your Honor, I'm told that our

19   technical person can have a disk, the first 30 seconds of --

20   including -- included onto the government's thing.  So I know

21   it can be a problem with either relying on the government or

22   not having an exhibit number.  We were going to have a disk

23   that has it on.

24           THE COURT:  How soon is she going to have the first

25   30 seconds ready to play?

1          MR. O'TOOLE:  I think she's doing it right this

2     second.

3          THE COURT:  So then you would ask for two different

4     exhibits -- first of all, how are you going to mark this

5     exhibit?

6          MR. O'TOOLE:  Well, if we do get the government's

7     revised edition with our 30 seconds in the front of it, I'm

8     going to introduce it as Defense Exhibit No. 1.

9          THE COURT:  Johnson Exhibit No. 1, Ms. Powell, is

10    that the right number?

11         THE CLERK:  Yes, as of right now Mr. Johnson does

12    not have any exhibits.

13         THE COURT:  All right.  So this will be

14    Johnson Exhibit No. 1 and --

15         MR. O'TOOLE:  Your Honor, if we cannot do it in the

16    next two minutes, we'll pull the idea.

17         THE COURT:  If you can't do it in the next two

18    minutes, you'll pull the idea.  I have witnesses, Mr. O'Toole.

19         MR. O'TOOLE:  Are you asking for witnesses?

20         THE COURT:  No, I said I already have them.

21         MR. O'TOOLE:  Oh, you have witnesses.

22         THE COURT:  The clock is ticking.

23         MR. O'TOOLE:  Your Honor, you've been in enough

24    trials, some things don't always go as smoothly as you would

25    like them to.  It just doesn't happen.

1          THE COURT:  Without a doubt.  And I'm trying to

2    accommodate you here, but I've got to make a record.

3          MR. O'TOOLE:  You certainly are.  All right.  Here's

4    the latest:  Before the two minutes goes, I want to stop the

5    clock for a second.  We cannot have the disk in our hand until

6    about an hour from now.  However, we can play it from our

7    system as we discussed before, the first 30 seconds and then

8    the government's revised version.  If that's not agreeable to

9    the Court, then we'll do it later with some other witness.

10   It's not a problem.

11         THE COURT:  Well, the last statement is very

12   inviting.  It's not a problem and you'll do it with a later

13   witness, then why don't we do it that way?  If it's not

14   critical that it be done during this particular examination,

15   yes, I'd like to stop delaying the jury and get them in here

16   and get going.

17         MR. O'TOOLE:  Very well.

18         THE COURT:  But --

19         MR. O'TOOLE:  I've got time to spare, I'm going to

20   use this with some other argument.

21         THE COURT:  Okay.  Well, I'm not cutting you off,

22   Mr. O'Toole, if you want to do it with this witness, I'm

23   trying to find a way to do it.  But if you're telling me that

24   it's of equal value and significance to the defense if you do

25   it at some other time when you've got the exhibit in a more

1    proper form, then of course I would prefer to do it that way.

2    But what are you asking me?

3                MR. O'TOOLE:  I'm not asking you anything,

4    Your Honor.  I'm telling you we're pulling the idea for now

5    and I'll proceed with Mr. Davis as we were.

6                THE COURT:  Let's bring Mr. Davis into the courtroom

7    and bring the jury in and let's go.

8                (Jury entered the courtroom.)

9                THE COURT:  Be seated, please.  Mr. Davis, you

10    remain under oath.

11                Mr. O'Toole, you may continue your

12    cross-examination.

13                MR. O'TOOLE:  Thank you, sir.

14                      CROSS-EXAMINATION (Cont'd)

15    BY MR. O'TOOLE:

16    Q    Mr. Davis, good afternoon.

17    A    Good afternoon.

18    Q    Mr. Davis, before the lunch break we started talking

19    about a gentleman by the name of Henry Miller –– Henry Mills,

20    whose full name is Dominique Henry Mills, he's also known as

21    Nique.  Do you know that person?

22    A    He's also known as who?

23    Q    Nique.

24    A    Nique?

25    Q    Yeah.

1    A    (No verbal response.)

2    Q    Let me ask you this:  Did you talk to the government

3    lawyers and the law enforcement on November 30th, 2016 just

4    after your plea agreement on the 31st of October of last year,

5    do you remember talking to the -- to these prosecutors and

6    some other law enforcement officials?

7    A    Yes.

8    Q    All right.  And do you have a friend -- do you remember

9    talking about a friend of yours by the name of Michelle, who

10   had a brother Nique, who had been killed?

11   A    Yeah.

12   Q    Okay.  And you remember, don't you, that David Hunter,

13   who we know as Lil' Dave --

14   A    Yes.

15   Q    -- was charged with that murder and went on to be

16   convicted in court of that murder, do you remember that?

17   A    Yes.

18   Q    You're aware of that, aren't you?

19   A    Yes.

20   Q    Did you form an understanding or a belief that somebody

21   else was the perpetrator of the murder in that case beside

22   Mr. Hunter?

23   A    Yes.

24   Q    Could you tell the jury about that, please and how you

25   formed that opinion of yourself -- that belief?

1    A    It was TJ and a guy named D, because after it happened

2    they had came -- they tried to come to my house.  I was living

3    on Aisquith and Bonaparte at the time.  And they got in my car

4    and we drove up Druid Hill Park and we smoked a blunt and they

5    was telling me about what happened.

6    Q    What did they tell you?

7    A    They told me they seen a dude come down near Greenmount

8    and they followed him up Greenmount.  And they -- he say he

9    was trying to rush and hurry up to get to the house get his

10   gun or something, and they caught him before he got to his

11   sister Michelle house.  And said -- they said they ran him

12   down and shot him or something, shot him, killed him.

13   Q    And that was the killing -- was it your understanding

14   that was the killing of Mills, whose name is Nique?

15   A    Yes.

16   Q    All right.  And the same -- the same killing that was

17   charged on Mr. Hunter?

18   A    Yes.

19   Q    Lil' Dave.  Did you ever have a conversation with anybody

20   who was in the BGF about whether the person who did that

21   murder would actually let Hunter take the rap for a murder

22   that somebody else did?

23   A    Did I actually have -- I didn't actually have a

24   conversation about anybody taking a rap about the situation,

25   but we talked -- it was like they talked about it.

1    Q    What did you talk about?

2    A    It was like -- they was -- it was saying like he wasn't

3    the one who actually pulled the trigger.  I mean, he was

4    present, but he wasn't actually the one who killed the dude

5    Nique.  It was supposed to been somebody else.

6    Q    So you told the government, the law enforcement, that

7    based on what you heard from these two people, that they had

8    the wrong person?

9    A    Yes.

10   Q    Right.  And Mr. Hunter was not the person who did the

11   killing?

12   A    From -- to my understanding, that was told to me.

13   Q    Okay.

14           MR. O'TOOLE:  Your Honor, I think that's all I have

15   of Mr. Davis.  I thank the Court.

16           THE COURT:  Mr. Bussard.

17           MR. BUSSARD:  No, thank you.

18           THE COURT:  Mr. Francomano.

19           MS. HOFFMAN:  Your Honor, may we approach?

20           THE COURT:  Yes.

21           (Bench conference on the record.)

22           THE COURT:  Over by the microphone please,

23   Ms. Hoffman.

24           MR. MARTINEZ:  Your Honor, I wanted to raise a

25   concern about that last line of questioning.  We didn't object

1    contemporaneously to the questions, we were thinking about

2    objecting on hearsay grounds.  But the gist of that was

3    clearly to put before the jury that he had heard information

4    implicating somebody other than Hunter.  And to suggest that

5    he told us and that we didn't want to hear and we went ahead

6    with our theory.  And all of us know that David Hunter stood

7    up in this court and admitted to having killed Henry Mills.

8           And what I'm wondering is, if leaving that

9    suggestion hanging or by pursuing that questioning of

10    Mr. Davis, saying, well, you came in and you told them the

11    truth, the government had their theory and they just didn't

12    want to hear it, at what point does that open the door to the

13    jury being entitled to know that David Hunter saw who did it?

14           MR. O'TOOLE:  In what form do we hear --

15           THE COURT:  Why wouldn't the jury be entitled to

16    hear David Hunter say that he did it?

17           MR. MARTINEZ:  Well, in the form of admitting in his

18    plea agreement, that's what I'm wondering.

19           THE COURT:  Well, that's a different question.

20    That's hearsay.

21           MR. MARTINEZ:  So is what came out.

22           THE COURT:  You didn't object.  Failing to object on

23    one hearsay doesn't empower a party to thereafter admit other

24    hearsay.  But if there's a question as to the relevancy of

25    whether or not David Hunter admitted killing Mr. Mills,

1    there's no question whatsoever, it's highly relevant.  It's

2    just a question of how are you going to get that evidence

3    before the jury.  Mr. Hunter's testimony might be one avenue.

4    There might be others.

5         MR. MARTINEZ:  Well, we've already heard testimony

6    to that effect.  I'm just -- the line of questioning is

7    disingenuous because everybody knows he pled.  And to sit

8    there and suggest that we pursued the wrong guy when he was

9    telling us --

10        THE COURT:  I didn't really take it a criticism of

11   what the government had done, as much as it was a

12   demonstration of the fact that this particular witness might

13   be well-possessed of incorrect information.  It might -- who

14   knows how the defense might want to argue this.  They might

15   want to argue:  This, ladies and gentlemen, everybody knows

16   David Hunter committed that murder, except apparently

17   Mr. Jackson (sic), what does that tell us about him?  I mean,

18   there are a lot of different ways this could be of utility to

19   the defense that are not in the category that you're

20   describing, which was that it was some sort of gratuitous

21   unjustified attempt to discredit the prosecutors.  I don't see

22   it that way.

23        MR. MARTINEZ:  Okay.

24        (The following proceedings were had in open court.)

25        THE COURT:  Mr. Francomano, cross-examination.

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1              MR. FRANCOMANO:  Thank you, Your Honor.

2                        CROSS-EXAMINATION

3    BY MR. FRANCOMANO:

4    Q    Mr. Davis, have you ever heard of the BGF book?

5    A    BGF book?

6    Q    Yes, sir.

7    A    I heard the black -- yeah, I heard of it.

8    Q    You heard of the black book?

9    A    Yeah.

10   Q    Do you know what's in the black book?

11   A    I guess stuff about George Jackson, stuff about

12   George Jackson and the history of stuff.

13   Q    Have you ever read the black book or seen it before?

14   A    No.

15   Q    You've never seen it before?

16   A    Huh-uh.

17   Q    You don't personally know Mr. McCants; correct?

18   A    Mr. McCants?

19             MR. FRANCOMANO:  Exactly.  Thank you.

20             THE COURT:  Redirect.

21                        REDIRECT EXAMINATION

22   BY MS. HOFFMAN:

23   Q    Mr. Davis, we were talking earlier about the murder of

24   Henry Mills or Nique.  Did you see Nique get killed?

25   A    No, I didn't actually see him get killed.

Redirect Examination – Davis (By Ms. Hoffman)

1   Q     Did you ever talk to any of the eyewitnesses who saw with

2   their own eyes the murder?

3   A     Two of the dudes that was with me say they was present

4   and there because they try to come to my house after the

5   situation had occurred.

6   Q     Did you ever talk to Sharon Hawkins about the murder?

7   A     Sharon Hawkins?

8   Q     Do you know who that is?

9   A     No.  She go by anything else?

10  Q     Just Sharon Hawkins, as far as I'm aware.

11  A     No.

12  Q     Did you ever watch any video footage of the murder?

13  A     No, ma'am.

14  Q     Is your information about the murder limited to what you

15  heard from Twin and D?

16  A     What you mean limited, you say limited?

17  Q     Is the information that you have about the Nique murder,

18  does it just come from Twin and D?

19  A     Basically, yeah.  And I know -- well, his sister told me

20  a little bit about it too because his sister was my friend

21  Michelle.

22  Q     Mr. Davis, you told us earlier that you eventually ended

23  up joining BGF in 2015; is that right?

24  A     Yes, ma'am.

25  Q     Is there a chain of command in BGF?

1    A    Yes, ma'am.

2    Q    And under that chain of command, can senior members of

3    the gang tell younger members what to do?

4    A    Yes, ma'am.

5    Q    To give an example, could a senior member of the gang

6    tell a younger member of the gang to commit a robbery?

7              MR. O'TOOLE:  Objection.

8              THE COURT:  Basis.

9              MR. O'TOOLE:  Beyond the scope.

10             THE COURT:  Overruled.

11   Q    (BY MS. HOFFMAN)  Could a senior member of the gang tell

12   a younger member of the gang to commit a robbery?

13   A    Yes, ma'am.

14   Q    Could a senior member of the gang tell a younger member

15   of the gang to commit a shooting?

16   A    Yes, ma'am.

17   Q    And could a senior member of the gang tell a younger

18   member of the gang to take a charge for him?

19   A    More than likely, yes.

20             MS. HOFFMAN:  No further questions.  Thank you.

21             THE COURT:  Recross, Mr. O'Toole.

22             MR. O'TOOLE:  No, sir.  Thank you.

23             THE COURT:  May the witness be excused?

24             MR. O'TOOLE:  He may.

25             MR. FRANCOMANO:  Yes, Your Honor.

1                THE COURT:  You're excused, sir.  You may depart.

2                Next witness?

3                MR. MARTINEZ:  Your Honor, the government calls

4     Michael Gwaltney.

5                THE COURT:  Spell that last name for me, will you,

6     please.

7                MR. MARTINEZ:  Gwaltney.

8                THE COURT:  G-w-a-l-

9                MR. MARTINEZ:  -t-n-e-y.

10               THE COURT:  Michael Gwaltney.  Thank you.

11               THE CLERK:  Sir, if you would please raise your

12    right hand to be placed under oath.

13                          MICHAEL GWALTNEY,

14    called as a witness, being first duly sworn, was examined and

15    testified as follows:

16               THE WITNESS:  Yes.

17               THE CLERK:  Thank you, sir.  You may enter the

18    witness box and watch your step.  You may have a seat.  And if

19    you would please speak directly into the microphone, state

20    your first and last name and spell your first and last name.

21               THE WITNESS:  My name Michael Gwaltney,

22    M-i-c-h-a-e-l; last name Gwaltney, G-w-a-l-t-n-e-y.

23               THE CLERK:  Thank you, sir.

24               THE COURT:  Your witness, Mr. Martinez.

25               MR. MARTINEZ:  Thank you.

```
 1                    DIRECT EXAMINATION

 2   BY MR. MARTINEZ:

 3   Q    Mr. Gwaltney, good afternoon.

 4   A    Good afternoon.

 5   Q    Could you tell us how old you are, please?

 6   A    42.

 7   Q    Where are you from, sir?

 8   A    Baltimore, Maryland.

 9   Q    Where in Baltimore did you grow up?

10   A    East Baltimore.

11   Q    Do you go by any nicknames?

12   A    Mike G.

13   Q    Are you familiar with an organization called the

14   Black Guerilla Family or BGF?

15   A    Yes, I am.

16   Q    Is BGF a gang?

17   A    Yes, it is.

18   Q    Are you a member of BGF?

19   A    Yes, I am.

20   Q    Tell us when you became a member of BGF?

21   A    1997.

22   Q    Where did you become a member of BGF?

23   A    Maryland House of Correction.

24   Q    Is that facility referred to by any other name?

25   A    The Cut.
```

Direct Examination – Gwaltney (By Mr. Martinez)

1    Q    What were you locked up for when you joined BGF in the

2    Maryland House of Corrections?

3    A    Drug possession.

4    Q    How did you become a member of BGF?

5    A    Had to put in work.

6    Q    What does that mean?

7    A    Had to stab somebody.

8              MR. O'TOOLE:  I'm sorry, I couldn't hear that

9    response.

10   A    I had to stab somebody.

11   Q    (BY MR. MARTINEZ)  When you say you had to, did someone

12   tell you to?

13   A    Yes.

14   Q    Who told you to stab somebody?

15   A    My sponsor.

16   Q    Who was your sponsor?

17   A    Mike Gray.

18   Q    And who did you stab?

19   A    D.C. guy.

20   Q    Is that another inmate at the house of corrections from

21   D.C., is that what you're saying?

22   A    Yes, it is.

23   Q    You said Mike Gray ordered you to do that; is that

24   right?

25   A    Yes.

Direct Examination - Gwaltney (By Mr. Martinez)

1    Q    If I can get the document camera to come back up, I'll

2    show you an exhibit.  This is Government's Exhibit PHI 33, who

3    are we looking at here Mr. Gwaltney?

4    A    It's Mike Gray.

5    Q    Could you tell us where BGF got started?

6    A    Originally?

7    Q    Yes.

8    A    California.

9    Q    Could you tell us how it came to Maryland?

10   A    Guy named Ray Ray.

11   Q    And how was it that Ray Ray brought BGF to Maryland?

12   A    He did time in California.

13   Q    And did he later do time in Maryland?

14   A    Yes.

15   Q    Did you have to take an oath to join BGF?

16   A    Yes.

17   Q    Is the oath referred to by any other names?

18   A    Oatmeal.

19   Q    Do you remember the oath?

20   A    Somewhat, I ain't recite in a while.

21   Q    Can you recite what portions you do remember?

22   A    Should I ever be untrue and forsake the chosen few, this

23   oath shall kill me.  Shall I become lax in discipline in times

24   of strife and neglect my brother, this oath shall kill me.  If

25   I ever do harm or allow harm to touch my brother, this oath

1    shall kill me.  If ever at any time I refuse or give

2    assistance to this oath or reject my brother, this oath shall

3    kill me.  If I reveal the sworn secrets to this oath, this

4    oath shall kill me.

5    Q    Mr. Gwaltney, does BGF have a set of rules?

6    A    Yes.

7    Q    What are the rules called?

8    A    22s and 33s.

9    Q    Are BGF members expected to know and follow the 22s and

10   33s?

11   A    Yes, they do.

12   Q    Is there a rule in those 22s and 33s that addresses

13   cooperating with law enforcement?

14   A    Yes, it is.

15   Q    What does that rule say?

16   A    I can't recite it, but I know it's severe punishment.

17   Q    Are you violating the rule by testifying here today?

18   A    Yes, I am.

19   Q    What's the punishment for that violation?

20   A    Death.

21   Q    If a -- in your experience as a member of BGF, in

22   situations where a BGF member believes that somebody is

23   cooperating against him, how does that member go about

24   determining whether the person is in fact cooperating?

25   A    We got to investigate it.

Direct Examination – Gwaltney (By Mr. Martinez)

1    Q    And what do you do to investigate, what kind of things do

2    you look for?

3    A    Paperwork.

4    Q    What do you mean by paperwork?

5    A    Somebody name in somebody court paperwork.

6    Q    Based on your experience as a member of BGF in prison, is

7    it common or uncommon for inmates to ask other inmates for

8    their paperwork?

9    A    Yeah, it's common.

10   Q    What's the purpose of that?

11   A    Make sure nobody's snitching.

12   Q    Can you tell us whether BGF operates on the streets as

13   well as in prisons?

14   A    Yes, it does.

15   Q    How is BGF organized on the streets of Baltimore?

16   A    They have different sets of regimes throughout the

17   city.

18   Q    Are you familiar with what's called a bubble?

19   A    Yes.

20   Q    What's a bubble?

21   A    A bubble is a structure inside a regime.

22   Q    Are there different positions within the bubble?

23   A    Yes.

24   Q    What are some of those positions?

25   A    C, LTC, MOJ, MOD, field general, field Marshal.

Direct Examination – Gwaltney (By Mr. Martinez)

1    Q    Are you familiar with the term bushmen?

2    A    Yes.

3    Q    What's a bushman?

4    A    A high ranking BGF member.

5    Q    Are you a bushman?

6    A    Yes.

7    Q    Tell us roughly when you became a bushman.

8    A    2010.

9    Q    What, if anything, did you have to do to become a

10   bushman?

11   A    Had to put in work again.

12   Q    What kind of work did you have to put in this time?

13   A    I had to murder somebody.

14   Q    Who did you have to murder?

15   A    Another bush member.

16   Q    And do you know why that bush member had to be

17   murdered?

18   A    Yes, I do.

19   Q    Could you tell us?

20   A    For the same thing I was doing right here.

21   Q    He was testifying?

22   A    Yes.

23   Q    What was that person's name?

24   A    Darril Austin.

25   Q    And who asked you to kill Darril Austin?

1    A    Mike Gray.

2    Q    What was Mike Gray's role or rank in the gang at the time

3    he asked you to kill Darril Austin?

4    A    He was the joker.

5    Q    What do you mean by that?

6    A    High position inside the bubble of the bush member.

7    Q    So when Mike Gray told you to kill Darril Austin, did you

8    feel like you had a choice?

9    A    I didn't have no choice.

10    Q    Under the gang's rules, what would have happened had you

11    refused to kill Darril Austin?

12    A    I would have became the target.

13    Q    What does that mean?

14    A    If I refused to kill Darril, I would have been killed

15    myself.

16    Q    When you became a bush member, Mr. Gwaltney, did you have

17    to take another oath that was different from the Oatmeal?

18    A    Yes.

19    Q    How is that oath different from the Oatmeal?

20    A    It's very different.

21    Q    Will you tell us what you remember about it?

22    A    It just a different oath, that's all.

23    Q    Do you remember that oath?

24    A    Yes.

25    Q    Could you go ahead and recite it for us?

1    A    Well, had to be two people, two bush members were to

2    elaborate on it.  If I run across another bush member, I would

3    ask him where he sleep, he would say in the bush.  I would ask

4    him how you enter, he would tell me underground, beneath the

5    sea, use the dragon tooth as the key.  I would ask him what

6    books he read, he would say Acts 35, Verse 7.

7    Q    Is that all there is to it?

8    A    Yeah.

9    Q    During your time as a member of BGF, Mr. Gwaltney, did

10   you sell drugs?

11   A    No.

12   Q    Did you commit robberies?

13   A    Yes.

14   Q    You mentioned that you were serving a sentence for

15   drug-related conduct when you joined BGF in 1997; is that

16   right?

17   A    Yes.

18   Q    Do you have other felony convictions?

19   A    Yes.

20   Q    Were you convicted of possession with intent to

21   distribute in 2004?

22   A    Yes.

23   Q    How about unlawful manufactured CDS in '99?

24   A    Yes.

25   Q    How about burglary in '97?

Direct Examination – Gwaltney (By Mr. Martinez)

1    A    Yes.

2    Q    How about possession with intent to distribute in '95?

3    A    Yes.

4    Q    How about possession with intent to distribute in '94?

5    A    Yes.

6    Q    And finally, were you charged in this court and convicted

7    of a Hobbs Act robbery in 2013, I believe?

8    A    Yes, I was.

9    Q    So in connection with that federal Hobbs Act charge,

10   did -- you just said you were convicted; right?

11   A    Yes.

12   Q    Did you plead guilty?

13   A    Yes, I did.

14   Q    As part of your guilty plea, did you agree to

15   cooperate?

16   A    Yes.

17   Q    And does part of your cooperation agreement require you

18   to testify fully and truthfully today?

19   A    Yes, it does.

20   Q    If you do everything that's asked of you under your

21   cooperation agreement, what is it that you're hoping to get?

22   A    A lesser sentence.

23   Q    Has anybody made any promises or guarantees about what

24   kind of sentence you might get?

25   A    No, they haven't.

Direct Examination - Gwaltney (By Mr. Martinez)

1   Q    Is there any connection between your eligibility for a

2   sentencing reduction and the result in this case?

3   A    No, it ain't.

4   Q    Who's responsible for sentencing you?

5   A    The judge.

6   Q    What would happen to your plea agreement if you lied

7   today?

8   A    It would be terminated.

9   Q    What would happen if you exaggerated?

10  A    It would be terminated.

11  Q    So let's focus on -- change gears here and focus on the

12  2012 time period before you got locked up for that robbery

13  charge.  Were you living in Baltimore at the time?

14  A    Yes.

15  Q    What part of the city were you living?

16  A    East Baltimore.

17  Q    Were you familiar with BGF regimes operating in various

18  parts of East Baltimore?

19  A    Yes.

20  Q    Was there a BGF regime operating in the Greenmount

21  neighborhood?

22  A    Yes, there was.

23  Q    Did you ever hang out in the Greenmount neighborhood in

24  the 2012 time period?

25  A    Time to time.

1    Q    Were you familiar with BGF members in the area?

2    A    Yes.

3    Q    Were you using drugs in the 2012 time period?

4    A    Yes, I was.

5    Q    What kind of drugs were you using?

6    A    Cocaine, heroin.

7    Q    Did you ever get drugs in the Greenmount neighborhood?

8    A    Yes.

9    Q    I want to ask you, Mr. Gwaltney, if you're familiar with

10   a individual named Geezy?

11   A    Yes.

12   Q    Was Geezy a member of BGF?

13   A    Yes, he is.

14   Q    Was Geezy a member of the BGF Greenmount Regime?

15   A    Yes, he is.

16   Q    During this 2012 time period when you were taking cocaine

17   and heroin for personal use, did you ever go to the Greenmount

18   neighborhood to pick up drugs?

19   A    Yes.

20   Q    Did you ever get drugs from Geezy?

21   A    Yes.

22   Q    What kind of drugs would you get from him?

23   A    Cocaine.

24   Q    Approximately how many times in 2012 would you say you

25   got cocaine from Geezy?

1   A    Probably two or three times.

2   Q    Did you have to pay Geezy for that cocaine that you got

3   from him?

4   A    No.

5   Q    Why not?

6   A    To show homage to a bush member.

7   Q    I'm going to show you what's come into evidence as

8   Government's Exhibit PHI 27.  Do you recognized that person?

9   A    Yes.

10  Q    Who's that?

11  A    That's Roscoe.

12  Q    Is Roscoe a member of BGF?

13  A    Yes.

14  Q    Was Roscoe in the BGF Greenmount Regime?

15  A    Yes.

16  Q    Is Roscoe related to Geezy?

17  A    It's his brother.

18  Q    Did you ever get drugs from Roscoe?

19  A    Yes.

20  Q    What kind of drugs?

21  A    Cocaine.

22  Q    How often would you get cocaine from Roscoe?

23  A    Quite often.

24  Q    How often is quite often?

25  A    Three or four times a week.

Direct Examination - Gwaltney (By Mr. Martinez)

1    Q    Did you have to pay for those drugs?

2    A    Mostly not.

3    Q    So on the occasions when you did not have to pay, why

4    not?

5    A    Same reason, bush member.

6    Q    I want to show you PHI -- Government's Exhibit PHI 29,

7    who's that?

8    A    That's Mustafa.

9    Q    Is Mustafa in the BGF Greenmount Regime?

10   A    Yes.

11   Q    Were you getting cocaine from him as well?

12   A    Yes.

13   Q    Did you know someone in the Greenmount neighborhood named

14   Joe?

15   A    Yes.

16   Q    Was Joe in the BGF Greenmount Regime?

17   A    Yes, he was.

18   Q    Let me show you PHI 6, who's that?

19   A    That's Joe.

20   Q    Do you recall during this time period we're about talking

21   about, 2012, learning of a dispute of Roscoe, whose picture we

22   just showed you, and Joe?

23   A    Yes.

24   Q    Who told you about that dispute?

25   A    Roscoe.

Direct Examination - Gwaltney (By Mr. Martinez)

1    Q    What did he tell you?

2    A    Told me Joe hit him with a gun or something.

3    Q    And why was Roscoe telling you about that?

4    A    He was asking me permission to do something to him.

5    Q    What was he asking you permission -- what was he asking

6    for your permission to do?

7    A    Kill him.

8    Q    What did you tell Roscoe?

9    A    I told him he couldn't do that.

10   Q    Why not?

11   A    Because we had to investigate the situation, plus, it was

12   another bush member in that area and I didn't want to overstep

13   his boundaries.

14   Q    Who was the other bush member in that area that you just

15   mentioned?

16   A    His name is Stimey.

17   Q    Let me show you Government's Exhibit PHI 81, who's

18   that?

19   A    That's Stimey.

20   Q    Did Roscoe ultimately kill Joe?

21   A    No.

22   Q    I want to direct your attention to the fall of 2012, did

23   there come a time when Roscoe and Mustafa asked you to rob

24   someone in the Greenmount neighborhood?

25   A    Yes.

Direct Examination - Gwaltney (By Mr. Martinez)

1    Q    Who did they ask you to rob?

2    A    Guy named Porky.

3    Q    Did they tell you why they wanted you to rob Porky?

4    A    I guess they just ain't like him, I don't know.

5    Q    Did they tell you where you could find Porky?

6    A    Yes.

7    Q    Where was that?

8    A    On North Avenue inside an apartment building.

9    Q    Did they tell you what Porky looked like?

10   A    I can't recall.

11   Q    How did you know who you were looking for?

12   A    They told me where to find him.

13   Q    Okay.  Where in the building to find him?

14   A    Yes.

15   Q    I want to show you Government's Exhibit PHI 23.  Who's

16   that, Mr. Gwaltney?

17   A    It's Porky.

18   Q    Did there come a time where you carried out the robbery

19   of Porky?

20   A    Yes.

21   Q    Did you commit that robbery alone or was anyone else with

22   you?

23   A    My co-defendant was with me.

24   Q    And who's that?

25   A    Devon Martin.

1    Q    Where did the robbery take place?

2    A    Inside the apartment building on North Avenue.

3    Q    I'm going to show you what's come in as

4    Government's Exhibit GM 8.  What are we looking at there?

5    A    That's the apartment building.

6    Q    Where in the building did you find Porky?

7    A    In the back stairwell.

8    Q    Was anyone else with him when you found him?

9    A    Yeah, I believe his wife, his girlfriend or something.

10   Q    Were you carrying a weapon of any kind?

11   A    Yes.

12   Q    What were you carrying?

13   A    I believe I had a .45 at that time.

14   Q    How about Mr. Martin, who was with you?

15   A    I believe he had a .38.

16   Q    So you and Mr. Martin found Porky and his wife or

17   girlfriend, as you say, in the stairwell.  Tell us what

18   happened from there.

19   A    Just approached him and pulled out our guns and just

20   robbed him.

21   Q    What specifically did you take?

22   A    About 3- or 400 dollars and some cocaine and some

23   marijuana.

24   Q    And was that the end of the robbery on that particular

25   day?

Direct Examination – Gwaltney (By Mr. Martinez)

1   A    Yes.

2   Q    When was the next time you saw Porky after that robbery

3   was over?

4   A    The next day.

5   Q    Where did you see him the next day?

6   A    Same place, in front of the building this time, though.

7   Q    Can you point out on the picture, does the picture

8   capture where you saw Porky the next day?

9   A    Right here on the steps, here.

10  Q    Tell the ladies and gentlemen of the jury what happened

11  when you saw Porky on the steps the day after the robbery.

12  A    When I was walking up North Avenue, he seen me, he got

13  off the steps, started walking towards me.  He got like two

14  feet in front of me and pulled out a gun and started clicking

15  it in my face.

16  Q    What did you do?

17  A    I pulled out my gun.

18  Q    What happened then?

19  A    He turned around and ran, I dropped behind him.  He kept

20  straight down North Avenue, but I wanted him to cut down

21  Guilford, but he kept straight.

22  Q    Why did you want him to cut down Guilford?

23  A    So I could kill him.

24  Q    Did there come a time when you stopped chasing him?

25  A    Yes.

1    Q     What, if anything, did you do about the fact that Porky

2    had pulled a gun on you outside this building?

3    A     I just called Roscoe and told Roscoe what happened.

4    Q     What did Roscoe say when you told him that?

5    A     Told me don't worry about it, he would take care of

6    him.

7    Q     What did you mean Roscoe to mean by saying they would

8    take care of him?

9    A     They would kill him for me.

10   Q     What did you say when Roscoe told you about that plan?

11   A     I told him don't do that, just call me when he come back

12   there.

13   Q     Why were you telling Roscoe to hold off and call you?

14   A     Because I wanted to kill him myself.

15   Q     Did there come a time where you did get a call from

16   Roscoe?

17   A     Yes.

18   Q     What did he tell you?

19   A     That he's in the building.

20   Q     And by he, who do you mean?

21   A     Porky.

22   Q     And you're talking about the same building we're looking

23   at on GM 8?

24   A     Yes.

25   Q     After you got that call from Roscoe, did you go to the

1    building?

2    A    Yes, I did.

3    Q    And when you got there, tell us where you went, did you

4    go inside?

5    A    Inside the building.

6    Q    When you went inside, were there any other BGF members

7    there?

8    A    Yes.

9    Q    Who was there?

10   A    Roscoe, Mustafa, Wes, and some other little kids, I don't

11   remember their names.

12   Q    When you went inside, did you learn where Porky was?

13   A    Yes.

14   Q    Where was he?

15   A    He was inside one of the apartments.

16   Q    So did you go looking for him at that apartment?

17   A    No.  I just stayed out waiting for him to come out.

18   Q    How long did you wait for him to come out?

19   A    About half an hour.

20   Q    What happened after half an hour?

21   A    Geezy showed up.

22   Q    And actually, just for the record, I should have done

23   this earlier, but can you identify Geezy for the jury and

24   point out an article of clothing he's wearing?

25   A    Right there with the gray sweater.

1    Q    So what happened --

2             THE COURT:  Record will reflect the witness has

3    identified the Defendant Johnson.

4             THE WITNESS:  Excuse me?

5             THE COURT:  Nothing.  Next question.

6    Q    (BY MR. MARTINEZ)  What happened after Geezy showed up,

7    Mr. Gwaltney?

8    A    We was talking about the situation with -- Porky had did

9    and Geezy say he was going to get him out.  He knew who lived

10   in the apartment, he was going to get him to put him out.

11   Q    What did you say about those plans to get him out, what

12   did you tell Geezy?

13   A    I said, go ahead, nephew, go ahead, so I can wear him

14   out.

15   Q    When you say "go ahead, nephew," can you tell the ladies

16   and gentlemen of the jury what you meant by nephew?

17   A    It's a term bush members call other BGF members.

18   Q    And do younger BGF members in turn call bush members

19   uncle sometimes?

20   A    Yes.

21   Q    Now, the latter part of that statement, "go ahead, let

22   him out, so I can wear him out"; is that what you said?

23   A    Yes.

24   Q    What did you mean by wear him out?

25   A    Kill him.

Direct Examination - Gwaltney (By Mr. Martinez)

1    Q    So what happened then, did Geezy try to help you get

2    Porky out of the building -- or the apartment rather?

3    A    Yeah.  He went and knocked on the door but nobody

4    answer.

5    Q    So how much longer did you wait?

6    A    Five, ten minutes at the most.

7    Q    And what happened after those five to ten minutes?

8    A    I left.

9    Q    Where did you go?

10   A    I went to a party at the pool hall.

11   Q    Where was the pool hall?

12   A    25th.

13   Q    How long were you at the party at the pool hall?

14   A    Till it went out, 2:00 o'clock, 2:00 o'clock a.m.

15   Q    And after the pool hall closed, did you go back past the

16   apartment building where you had been looking for Porky

17   earlier in the night?

18   A    Yeah, I was going back there to look for him again.

19   Q    And why were you trying to look for him again?

20   A    So I can kill him.

21   Q    What did you notice as you passed the building?

22   A    Whole lot of police and yellow tape, ambulance, fire

23   trucks.

24   Q    Later that night, did there come a time you got a call

25   from Roscoe?

1    A    Yes.

2    Q    What, if anything, did Roscoe tell you about what

3    happened at the building after you left?

4    A    He told me Geezy just got shot.

5    Q    Did he say who shot him?

6    A    Said Porky shot him.

7    Q    So all this happened during the -- roughly the fall of

8    2012; is that right?

9    A    Yes, at the end.

10   Q    So let's fast forward a little bit.  Did there later come

11   a time that you learned that Porky had a connection to someone

12   in your family?

13   A    Yes.

14   Q    Who was that?

15   A    My sister and my daughter mother.

16   Q    And how did you come to learn about the connection

17   between Porky and your sister?

18   A    My sister told me.

19   Q    Did there come a time that your sister put you in touch

20   with Porky?

21   A    Yes.

22   Q    Tell us about that.

23   A    Well, she made us squash the beef we had between each

24   other.  We talked over the phone about it.  He know what I do

25   for a living, so he understood.  I just apologized for doing

1    that to him while he had his wife with him and as far --

2    Q    Did -- I'm sorry.  I interrupted you, I'll let you finish

3    your answer.

4    A    Excuse me?

5    Q    I'll let you finish your answer, I didn't mean to cut you

6    off.

7    A    We squashed whatever beef we had and I told him

8    everything's dead between me and him, but the situation with

9    him and Geezy, I can't control that.

10   Q    Why was it that you couldn't control that?

11   A    He shot him.

12   Q    During the answer you just gave, you said "he," i.e.,

13   that is Porky --

14   A    Yes.

15   Q    "I know what you do for a living," what is it you do for

16   a living?

17   A    Rob drug business.

18   Q    Are there other BGF members that do that for a living?

19   A    Quite a few.

20   Q    Are there people in every regime who do that for a

21   living?

22   A    No.

23   Q    Let's fast forward a little bit more.  Did -- was there a

24   time when you were incarcerated at the

25   Chesapeake Detention Facility here in Baltimore in connection

Direct Examination – Gwaltney (By Mr. Martinez)

1    with your federal case?

2    A    Yes.

3    Q    And while you were at CDF, did there come a time Porky

4    wound up there too?

5    A    Yes.

6    Q    And a little bit after that, did there come a time when

7    Geezy wound up there as well?

8    A    Yes.

9    Q    After Geezy got there, did you have a conversation with

10   Geezy about Porky?

11   A    Yes.

12   Q    What did he tell you?

13   A    He told me he wanted me to do something to him.

14   Q    And by doing something to him, what did you understand

15   that to mean?

16   A    Bring harm to him.

17   Q    What did you tell Geezy?

18   A    I told him no, he can't do that.

19   Q    Why not?

20   A    Because I didn't want him to get in no trouble.

21   Q    Few more questions about CDF.  So you told us earlier

22   that BGF started as a prison gang; right?

23   A    Yes.

24   Q    And over the years, based on your criminal history, it

25   sounds like you've been incarcerated in multiple different

1    facilities in Maryland; is that right?

2    A    Yes.

3    Q    Do you know whether BGF members smuggle drugs into

4    prisons in Maryland?

5    A    Yes.

6    Q    Have you participated in smuggling drugs into prisons in

7    Maryland?

8    A    Yes.

9    Q    What are some of the ways that drugs get smuggled into

10   prisons?

11   A    Visits, correctional officers.

12   Q    Let's take visits first:  What do you mean by that, how

13   does that facilitate smuggling?

14   A    Your loved one bring it into the visit.

15   Q    I'm sorry, I didn't catch that.

16   A    I said your loved ones, whoever come visit, bring you the

17   contraband.

18   Q    Is it that simple, you just grab the contraband from them

19   in a visiting room?

20           MR. O'TOOLE:  Objection, Your Honor.

21           THE COURT:  Overruled.  If he can answer.

22   A    Well, they leave it inside the visiting room.

23   Q    (BY MR. MARTINEZ)  Okay.

24   A    Somebody pick it up later on.

25   Q    Okay.  So it's not always the visitee, the person being

1    visited, who picks it up?

2    A    Right.

3    Q    How about the correctional officer route, how does that

4    work?

5    A    Correctional officers just bring it in.

6    Q    Do BGF members pay them to do that?

7    A    Some places.

8    Q    Have you participated in smuggling drugs into CDF?

9    A    Yes.

10    Q    What kind of drugs did you smuggle into the jail?

11    A    Suboxones, tobacco, marijuana.

12    Q    What's Suboxone?

13    A    Synthetic drug.

14    Q    Can you get high by taking it?

15    A    Yes.

16    Q    How do you take it?

17    A    I snort it.

18    Q    Can it be taken other ways?

19    A    Put it on your tongue.

20    Q    What does it look like, how is it packaged?

21    A    Little blue package, just a little orange strip.

22    Q    And when you were in CDF and you wanted to -- say you

23    wanted to buy some Suboxone from another person in the jail,

24    how much -- what was the going rate, how much would it cost?

25    A    $50 a strip.

1    Q    And if you went ahead and bought that Suboxone, how would

2    you go about paying for it?

3    A    Western Union or my family member take it to the person

4    family member.

5    Q    So the money would change hands on the outside?

6    A    Yes.

7    Q    While you were at CDF, were other BGF members getting

8    drugs in the jail?

9    A    Yes.

10   Q    Can you tell us whether Geezy had drugs in CDF?

11   A    Yes.

12   Q    Can you tell us whether you got drugs from Geezy in

13   CDF?

14   A    Yes.

15   Q    What kind of drugs did you get from him?

16   A    Suboxones.

17   Q    Did you ever ask Geezy to send you Suboxones to your

18   housing pod?

19   A    Yes.

20   Q    Did you wind up receiving the drugs you asked him to send

21   you?

22   A    Yes, I have.

23   Q    Can you tell us how the drugs were brought to you?

24   A    Through the working men, the workers in the facility.

25   Q    What's a working man?

1   A    Somebody that works in the facility.

2   Q    Is that an inmate or a detainee?

3   A    Yeah, inmate.

4   Q    So how does a -- how does a working man -- how does a

5   detainee who is a working man differ from a detainee who does

6   not have working man privileges?

7   A    He have the privilege to walk around the facility.

8   Q    So he's got skates?

9   A    Yes.

10  Q    I asked you earlier about Suboxone and you explained what

11  it is how it's taking and everything.  Are there any other

12  slang terms for Suboxone?

13  A    We call them Bupes.

14  Q    Bupes?

15  A    Bupes.

16  Q    Does CDF have a medical unit in the facility?

17  A    Yes.

18  Q    Would you visit the medical unit when you were detained

19  there?

20  A    Yes.

21  Q    Why would you go there?

22  A    Diabetic.

23  Q    So you were getting insulin?

24  A    Yes.

25  Q    Did you ever see Geezy at the medical unit?

1    A     Yes.

2    Q     Did you ever get Suboxone from Geezy when you were at the

3    medical unit?

4    A     Yes, I have.

5    Q     How many times did that happen?

6    A     Probably twice.

7    Q     Did you have to pay for the Suboxone that he gave you?

8    A     No, I didn't.

9    Q     Why not?

10   A     I guess he was just showing homage to a bush member.

11                MR. MARTINEZ:  Court's indulgence.

12                THE COURT:  Yes.

13                MR. MARTINEZ:  No further questions.

14                THE COURT:  Mr. O'Toole.

15                MR. O'TOOLE:  Thank you.

16                          CROSS-EXAMINATION

17   BY MR. O'TOOLE:

18   Q     Mr. Gwaltney, good afternoon, sir.

19   A     How are you doing?

20   Q     I'm Jeffrey O'Toole, I represent -- along with

21   Mr. Enzinna, I represent Gerald Johnson.

22   A     Okay.

23   Q     You had just told Mr. Martinez that you pled guilty to a

24   case in August of 2013; is that right?

25   A     Yes, I have.

1   Q    And involved in that plea was an offer or an agreement

2   for you to plead guilty and to cooperate with the government

3   in exchange for hoping your sentence would be shorter; is that

4   right?

5   A    Yes.

6   Q    All right.  Have you been sentenced in that case yet?

7   A    No, I haven't.

8   Q    So from August 2013 until today, you still have not been

9   sentenced?

10  A    Right.

11  Q    Is it the same judge who's sitting to your left?

12  A    Yes, it is.

13  Q    It is.  All right.  You've pled guilty to conspiring to

14  commit a robbery; is that right?

15  A    Yes.

16  Q    And you pled guilty to possession of a firearm; is that

17  correct?  So it's two counts.

18       You agreed in the course of your plea agreement that you

19  were -- all parties agree that you were something called a

20  career criminal; right?

21  A    Right.

22  Q    All right.  How old are you, 42?

23  A    Yes, I am.

24  Q    How long have you been -- since you were 20 years old,

25  how many years have you been in prison, incarcerated?

1    A    Since I was 20?

2    Q    Yeah.  The last 22 years, how many years have you been in

3    jail?

4    A    Over 17 years.

5    Q    So almost the whole time you've been an adult you've been

6    in prison?

7    A    Yes, I have.

8    Q    Have you gotten to the point where you're pretty tired of

9    being in prison?

10   A    Yes, I am.

11   Q    Have you gotten to the point where you'd like to get out

12   of prison as soon as you possibly could?

13   A    Anybody would.

14   Q    Right.  Now, when you pled guilty in August 2013 as a

15   career criminal, you were in big trouble, weren't you?

16   A    I was in trouble.

17   Q    You were likely to spend perhaps the rest of maybe the

18   good years of your life in prison, weren't you?

19   A    Probably so.

20   Q    And you finally came to an agreement that for

21   Mr. Gwaltney, the best thing for you to do was to plead guilty

22   and cooperate with the government; right?

23   A    I'm just here to tell truth and be honest, man.

24   Q    And the reason that you decided to tell the truth and be

25   honest was that Mr. Gwaltney was going to have hopefully --

1              MR. MARTINEZ:  Objection.  The witness's name is

2      Gwaltney.

3              MR. O'TOOLE:  Your Honor, I have to admit to having

4      a hard time pronouncing his name.  I'll be happy to do it,

5      whatever he wants me to, I'll try it.

6              THE COURT:  How do you pronounce your name?

7              THE WITNESS:  It's Gwaltney.

8              THE COURT:  Two syllables, Gwaltney.

9      Q   (BY MR. O'TOOLE)  So Mr. Gwaltney, your hope was to come

10     up with a way to make a deal with the government to get out of

11     jail before the end of your life; right?

12     A    I just answered that.

13     Q    Is that correct?

14     A    I'm just here to tell the truth and be honest.

15     Q    But as a side to that, the reason that you decided --

16     when you were -- in 2015 -- excuse me, 2013, four years ago,

17     you didn't wake up one day and say, you know, what I think the

18     best thing for me to do here is to just start telling the

19     truth.  That's not what happened, is it?  Is it?

20     A    I'm just here to tell the truth.  I just told you that

21     twice.

22     Q    You did tell me that twice.  I'm going to ask you again:

23     When you were talking and deciding what to do with this charge

24     that was looking to keep you in jail perhaps for the rest of

25     your life, you decided there had to be something else you

1  could do; correct?

2  A    No, sir.

3  Q    You didn't decide that, if I plead guilty and help the

4  government and testify, then maybe I won't spend as much time

5  in jail?

6  A    Well, that's why I'm here, I hope to get a lesser

7  sentence.

8  Q    That's all I'm trying to get -- that's all I'm --

9  A    You got to put it in other terms for me to understand.

10  Q    All right.  And that's my fault and I apologize.  I'm not

11  trying to trick you.

12      Part of your plea agreement was that if you cooperate

13  truthfully --

14  A    Right.

15  Q    -- and if you don't exaggerate and if you help us in the

16  prosecution of somebody else, we may be able to help you when

17  it comes to sentencing by filing something called a 5K motion.

18  Do you remember that?

19  A    Yes.

20  Q    All right.  So part of your plea agreement, part of the

21  sealed part that was afterwards, provides for the government

22  to file a 5K, if they believe you and if they trust your

23  testimony; right?

24  A    Right.

25  Q    And as Mr. Martinez asked you before, it wasn't depending

1    on what happens.  As long as you cooperate, you get the deal;

2    right?

3    A    I don't understand.  I'm not a lawyer, man.  I don't

4    understand the way you putting things.

5    Q    Let me try again, I apologize.  What I want to ask you

6    is, your deal with the government, your cooperation agreement

7    with the government, only requires you to tell the truth and

8    be helpful; correct?

9    A    Right.  Yes.

10   Q    And that's what you're doing here today?

11   A    Absolutely.

12   Q    All right.  You pled guilty on August 13th, 2013, how

13   many other trials have you testified in since that date?

14   A    None.

15   Q    So this is the very first trial that you've testified in

16   since the day that you negotiated the deal with the

17   government, decided to plead guilty and cooperate --

18   A    Right.

19   Q    -- in hopes of getting a smaller sentence --

20   A    Right.

21   Q    -- and here we are four years later and you're just

22   getting around to it?

23   A    Absolutely.

24   Q    All right.  So it's been a long way, but is this the --

25   is this the path you were hoping for all along, to have a way

1    to help your sentence get smaller, this was the goal?

2    A    A goal from the beginnings was to hope to get a lesser

3    sentence.

4    Q    All right.  Along the way, you met with law enforcement

5    in carrying out your deal to cooperate; correct?

6    A    Yes.

7    Q    All right.  Now I'm going to ask you, do you recall the

8    first time you sat with down prosecutors and law enforcement

9    was the 10th of December, 2014, which would have been more

10   than a year -- about a year -- almost a year and a half after

11   you pled guilty, do you remember that?

12   A    It might have been, I can't remember.

13   Q    Okay.  But it wasn't right away, you didn't plead guilty

14   and then cooperate immediately, did you?

15   A    Excuse me?

16   Q    You didn't plead guilty in August of 2013 and then

17   immediately start talking to the government about cases?

18   A    I can't -- I don't -- I can't remember.

19   Q    Okay.  Well, let me -- if I told you that the first time

20   you sat down was a year and some months later, would you think

21   that sounds about; right?

22   A    Okay, that probably --

23   Q    All right.  Now, do you remember -- this may get

24   complicated, but do you remember about six months after that,

25   you sat down with them one more time and talked to them?

1    A    Probably so.

2    Q    All right.  When you sat down with them, even the first

3    time in 2014, you started telling them about some murders you

4    had committed?

5    A    Yes.

6    Q    All right.  And you just told them one after another,

7    murders that you had been involved in; right?

8    A    Yes.

9    Q    So when Mr. Martinez was asking you about the murder of

10   Mr. Austin, who was a BGF member, that wasn't the only murder

11   that you told them about was it?

12   A    No, sir.

13   Q    Austin was an important murder for you because that was

14   your promotion; right?  That got you into the bush as a

15   bushman; correct?

16   A    It was also me doing it, yes.

17   Q    Yeah, so that was a milestone for you, you actually got

18   rank in BGF by doing that, didn't you?

19   A    That wasn't my goal.

20   Q    But that's what happened?

21   A    That's what happened.

22   Q    All right.  So you were told to do the work, you did the

23   work, you got the promotion; right?

24   A    Yes.

25   Q    And as a bushman, you got certain privileges, didn't

1    you?

2    A    Yes.

3    Q    You got drugs for free from people?

4    A    Basically.

5    Q    And you got -- people paid homage to you?

6    A    Yes.

7    Q    And you walked around -- you didn't have to sell drugs

8    yourself, did you?

9    A    That's not my line of work.

10   Q    Right.  You just rob people, steal money from somebody

11   else, somebody else who's got the money, and you steal money

12   from them; right?

13   A    That's what you want to call it.

14   Q    Well, what do you want to call it?

15   A    Supporting my habit.

16   Q    Support your habit, but you don't call it stealing?

17   A    No, it's a difference.

18   Q    It's different.  How is it different?

19   A    There's a difference between taking and stealing.

20   Q    Tell me the difference.

21   A    Difference is me taking something from you for me,

22   opposed to stealing something from you.

23   Q    I hear that you're saying the words.  Tell me what taking

24   something from somebody means.

25   A    Taking something from somebody is being up front taking

1    it from them.  Stealing is going behind their back, stealing

2    it from them.

3    Q    Okay.  So your business -- you said to Mr. Martinez your

4    business was robbing drug dealers; right?

5    A    Yes.

6    Q    Was that taking or stealing?

7    A    That's taking.

8    Q    That's just taking?

9    A    Yes.

10   Q    Give me an example of stealing.

11   A    Going behind somebody back, stealing without their

12   knowing.

13   Q    I'm sorry, I --

14   A    Stealing while they're not knowing about it.

15   Q    You mean sneaking in and taking --

16   A    Sneaking.  Like if I go to your car out there and take

17   something out your car without you knowing, that's stealing.

18   If I point a gun at you to take something from you, it's

19   taking.  That's a difference.

20   Q    So you were supporting your habit and supporting your

21   family with money, you were just taking drugs?

22   A    Yes.

23   Q    Did you ever take money from people who weren't drug

24   dealers?

25   A    No.

1    Q    Just took money from drug dealers?

2    A    Yes.

3    Q    Never robbed someone on the street who just happened to

4    be walking --

5    A    No.

6    Q    So you -- six months later from the first time you sat

7    down with the government -- now we're at six months later into

8    May 15th -- May 5th of 2015, you sat down with them again and

9    talked about some of your murders; correct?

10   A    Yes.

11   Q    Murders you had committed, and then another six months

12   passed and still you hadn't testified; right, you hadn't gone

13   to court; right?

14   A    Right.

15   Q    Another six months passed and you sat down and you talked

16   with them on the 5th of November of 2015; is that right?

17   A    Yes.

18   Q    And that's when you started getting into the details of

19   these murders, that's when you told them in great detail about

20   the murder of Mr. Austin, for instance; correct?

21   A    Yes.

22   Q    And you also told them about the murder of a guy named

23   Tim Harris?

24   A    Yes.

25   Q    Right.  You all got together, members up in the bushmen

Cross-examination – Gwaltney (By Mr. O'Toole)

1   people, and decided that he was a problem, he had to go, and

2   you did the work; right?

3   A    Yes.

4   Q    And you killed him?

5   A    Yes.

6   Q    Did you ever get charged with that murder?

7   A    No, I haven't.

8   Q    Did you ever get charged with the murder of Mr. Austin?

9   A    No, I haven't.

10  Q    Now, the 15th of November, you still haven't -- you still

11  haven't -- you still haven't had a chance to testify, but let

12  me ask you a question:  When you met with the law enforcement

13  on that day, did you talk about a long list of people that you

14  knew in the community?

15       Let me read some names to you and tell me if you remember

16  on the 5th of November 2015, you had a long conversation with

17  law enforcement, and tell me if this is a list of people that

18  you talked about when you talked to them, okay?

19       Did you talk about Gray?

20  A    Mike Gray?

21  Q    Yeah.

22  A    Probably so, yeah.

23  Q    Talked about Yaya?

24  A    Probably so, yeah.

25  Q    Tim?

```
 1    A    Yes.

 2    Q    Taz?

 3    A    Probably so, yeah.

 4    Q    Rough House?

 5    A    Probably so.

 6    Q    Noodles?

 7    A    Probably so.

 8    Q    Marcal?

 9    A    Who?

10    Q    M-a-r-c-a-l, Marcal?

11    A    Marcal, yeah.

12    Q    All right.  Talked about him.  Major?

13    A    Who?

14    Q    Major.

15    A    Yes.  Yes.

16    Q    Dorsey?

17    A    Dorsey?

18    Q    Yes, Dorsey.

19    A    Yes.

20    Q    Austin?

21    A    Yes.

22    Q    Jim Dog?

23    A    Yes.

24    Q    Talked about Jim Dog.  How about Fareem?

25    A    Who?
```

```
 1    Q    Fareem.

 2    A    I can't recall that name.

 3    Q    Don't recall that one.  How about a guy named Joe?

 4    A    What Joe?

 5    Q    Joe Lawrence, Mr. Joe Lawrence, did you talk about him?

 6    A    Probably so.

 7    Q    Probably but maybe you don't remember it.  LT?

 8    A    Probably so.

 9    Q    Person by the name of Mans, M-a-n-s?

10    A    Man or Manny.

11    Q    There's a Manny and there's Mans?

12    A    Probably so.

13    Q    Talked about both of them, didn't you?

14         A man by the name of Heads, H-e-a-d-s?

15    A    Yes.

16    Q    How about Joe?

17    A    Yes.

18    Q    Antonio?

19    A    Yes.

20    Q    Crip?

21    A    Yes.

22    Q    Ty?

23    A    Yes.

24    Q    Twan, Twang?

25    A    Twan?
```

```
 1    Q    Yeah, Twan.  Thank you.

 2    A    Yes.

 3    Q    Squirrel?

 4    A    Yes.

 5    Q    Monk?

 6    A    Monk?

 7    Q    Yeah, Monk.

 8    A    Yes.

 9    Q    All right.  And Silly Rabbit?

10    A    Yes.

11    Q    All right.  Silly Rabbit was the man who killed Twan;

12    right?

13    A    Yes.

14    Q    You told them about that?

15    A    Yes.

16    Q    Tony Heights?

17    A    Yes.

18    Q    Tony Fox?

19    A    Antonio Fox?

20    Q    Antonio Fox.

21    A    Yes.

22    Q    Mark?

23    A    Yes.

24    Q    Heads?

25    A    Two Heads?
```

1    Q    Just two heads, Heads plural?

2    A    No, you just asked me about Heads.

3    Q    Did I ask you that before?

4    A    Yes.

5    Q    There's probably just one Heads, but I'm not sure.  We'll

6    skip that one.

7         Reggie?

8    A    Yes.

9    Q    How about Drip?

10   A    Drip?

11   Q    Drip or Drop, is there two people named Drip or Drop?

12   A    Yes.  Drop is --

13   Q    All right.  Darren Cox?

14   A    Darren Cox?

15   Q    Yeah, Darren Cox, heard of that name?

16   A    Probably so, yeah.

17   Q    How about Revere?

18   A    Never heard of him.

19   Q    Never heard Revere.  How about Gralin?

20   A    Gralin?

21   Q    Yeah, Gralin, G-r-a-l-i-n?

22   A    Probably so.

23   Q    Do you remember that one?

24   A    Probably so.

25   Q    Rudy?

Cross-examination – Gwaltney (By Mr. O'Toole)

1    A    Probably so.

2    Q    How about Ken Burke?

3    A    Who?

4    Q    Ken Burke.

5    A    Kenneth Burton?

6    Q    That could be.  But I'm asking about Ken Burke, do you

7    recall a Ken Burke?

8    A    I don't know no Ken Burke.

9    Q    You don't know?

10   A    No.

11   Q    How about Ty Hutchinson?

12   A    Yes.

13   Q    How about Sweet Pea?

14   A    Yes.

15   Q    How about Darril?

16   A    Darrek, yes.

17   Q    Darril's the person you shot?

18   A    You say Darrek or Darril?

19   Q    Darril.

20   A    Darril?

21   Q    Yeah, D-a-r-r-i-l?

22   A    All right.

23   Q    And you shot him?

24   A    Darril?

25   Q    Yeah.

1    A    Darril Austin.

2    Q    Is that the Austin, Darril's first name?

3    A    I don't know what Darril you're talking about, that's why

4    I'm asking.

5    Q    Let's skip that one.

6              MR. MARTINEZ:  Your Honor, may we approach?

7              THE COURT:  Yes.

8              (Bench conference on the record.)

9              THE COURT:  Camille, what are we doing about the

10   temperature?  It's hot in here.  Everybody's falling asleep.

11             THE CLERK:  I'll call again.

12             MR. O'TOOLE:  I'm wide awake, unusual.

13             THE COURT:  I hope so.  What's up?

14             MR. MARTINEZ:  The issue I wanted to raise,

15   Your Honor, so we've gone through a long list of names now.  I

16   certainly understand.  The point Mr. O'Toole's making is

17   obvious.  But as we went through the list of names, what

18   occurred to me and what I wanted to bring to the Court's

19   attention, because I'm very sensitive to it, is this witness

20   actually testified on direct what paperwork means and what the

21   gang uses it for.  And I certainly appreciate Mr. O'Toole has

22   a client to represent, but at this point in the exercise, we

23   are adding names he's provided information about.  And every

24   time Mr. O'Toole rattles off another name, that name ends up

25   in the paperwork.

1            THE COURT:  That's a very long list of names.

2            MR. O'TOOLE:  Well, first of all, this list was

3    assembled -- not being assembled presently.  This was

4    assembled in November 2015, so this is a list that's already

5    been prepared and is assembled.  The long list is because he

6    didn't discuss my client --

7            THE COURT:  Keep your voice down.

8            MR. O'TOOLE:  He didn't discuss my client except one

9    time at the very end.  He said something about him and it was

10   inaccurate.  He said that he had killed -- my client shot and

11   killed Porky.  So he really didn't know what's going on, but

12   he's talking about all of those people, including saying that

13   my client shot Porky.

14           THE COURT:  "My client shot and killed Porky,"

15   Porky's not dead.

16           MR. O'TOOLE:  I know that.

17           THE COURT:  What are you saying, he said that --

18           MR. O'TOOLE:  Yeah, he said that to the law

19   enforcement.

20           MR. MARTINEZ:  That's what the report says.

21           MR. O'TOOLE:  Yeah, the report says --

22           MR. MARTINEZ:  That's not his statement.

23           MR. O'TOOLE:  I understand that, but I'm going to

24   ask him if he said that to them and if he doesn't remember

25   saying that, then I'll show him the document and go through

1      the routine.  If he doesn't remember it, I'll stop.

2                THE COURT:  Right.

3                MR. O'TOOLE:  But that's a different story.  The

4      list is nearly done and I think I'm entitled, as Mr. Martinez

5      says, entitled to show that there's a lot of people he's

6      talking about in the very community we're talking about and my

7      client doesn't come up, except when he does come up, he's

8      asked about him and he says it in the incorrect way.  And I

9      think I'm entitled to go through that.

10               THE COURT:  So what, the point is that he knows the

11     names of lots of different people in this underworld, and so

12     that shows that he's somebody with a great extent and breadth

13     of knowledge.  And yet with respect to your client, despite

14     that great extent of his knowledge, he actually knows very

15     little about Mr. Johnson.

16               MR. O'TOOLE:  Right, and he doesn't get to mention

17     Mr. Johnson until 2017, when -- in all fairness, the

18     government then points directly to a picture of Mr. Johnson,

19     says, is this Mr. Johnson, do you know about him and talk

20     about him.  Perhaps they didn't do that in 2015.  But I think

21     I'm entitled to say that he's talking about everybody in the

22     community.  He's talking about all the people out there

23     that he's telling these law enforcement officers about.  It's

24     a small point but a long list.  I apologize for the long list,

25     but it is what it is.  It's a list of people he talked about

1    on that particular day.  It's a long list because the

2    government made it a long list.

3              THE COURT:  Are you near the end of the list?

4              MR. O'TOOLE:  Close.

5              THE COURT:  How close?

6              MR. O'TOOLE:  Pretty close, maybe three-quarters of

7    the way through.

8              THE COURT:  What point do you -- what rhetorical or

9    proof point do you make by making it through the entire list?

10             MR. O'TOOLE:  Well, if the Court is directing me to

11   stop, I'll stop.

12             THE COURT:  I'm not.  The record does not reflect

13   that.  I'm asking a question.  I'm trying to decide whether

14   I'm going to direct you to stop.

15             MR. O'TOOLE:  I'm going to see if I can put half the

16   jury to sleep and we're almost done -- it's almost done.

17             MR. MARTINEZ:  Every other name that goes on the

18   list is somebody else who's going to have paperwork saying

19   another person who has justification under rules of BGF can

20   kill him.

21             MR. O'TOOLE:  That's not our problem.

22             MR. MARTINEZ:  I recognize it's not your problem,

23   but to the extent it's no longer relevant and the point has

24   been made, I think the Court should be made aware of

25   repercussions of that.

1        MR. O'TOOLE:  Same thing with that this morning

2   without objection.

3        MR. MARTINEZ:  He mentioned like four people, not

4   25.

5        THE COURT:  I think we've heard a long enough list.

6   Let's make the point.

7        (The following proceedings were had in open court.)

8        THE COURT:  Okay.  Next question, Mr. O'Toole.

9   Q    (BY MR. O'TOOLE)  Mr. Gwaltney, is it fair to say that

10  when you met on November 5th, 2015, you talked about a good

11  deal of names of people who were in that particular community;

12  right?

13  A    Yes.

14  Q    And the purpose of that discussion was to tell the

15  government what you knew about people in that community?

16  A    Yes.

17  Q    And when you talked to them --

18        MR. O'TOOLE:  Court's indulgence, please.

19  Q    (BY MR. O'TOOLE)  The conversation toward the end of the

20  day came around to whether or not you were aware of the

21  shooting and the robbery, the shooting by Porky and the

22  robbery by you of him.  The conversation with law enforcement

23  came around to that discussion, didn't it?

24  A    Say it again.

25  Q    You remember talking to law enforcement, toward the end

1    of that conversation with law enforcement, that the --

2              MR. MARTINEZ:  Your Honor, I don't have an

3    objection, I would just ask for Mr. Gwaltney and the jury's

4    benefit, it's so long since we heard what conversation we're

5    talking about because we went through the long list of names.

6              THE COURT:  All right.  Let's restate the question

7    beginning with the reference to the particular conversation.

8    Q    (BY MR. O'TOOLE)  Mr. Gwaltney, I'm going to ask you a

9    question, if you can't remember, I'll be happy to show you a

10   document.

11   A    The names you just named is very close friends of mine's

12   and it don't match up with Porky's situation, that's why I'm

13   lost what you're trying to ask me.

14   Q    (BY MR. O'TOOLE)  Did you have a chance to have a

15   conversation with the law enforcement that you had robbed

16   Porky?

17   A    Yes.

18   Q    All right.  And then you had a part of the conversation

19   where Porky shot Geezy?

20   A    Yes.

21   Q    And then you said that Geezy had gotten tired of waiting

22   around and went ahead and killed Porky?

23   A    I never said that.

24   Q    Is there a document that -- you do not remember saying

25   that?

1    A    I don't remember saying nothing like that.

2    Q    Is there a document that I could show you that might

3    refresh your memory?

4    A    That I said Geezy shot Porky?

5    Q    Shot and killed Porky.

6    A    No, I don't remember saying that.

7    Q    Is there a document I could show to help you --

8              MR. MARTINEZ:  Asked and answered.

9              THE COURT:  I don't -- we're not focused on the

10    document.  You can inquire further about the specific

11    question.  I'll allow you to ask him one more time.  No

12    reference to a document, ask him your core question.

13    Q    (BY MR. O'TOOLE)  All right.  Do you recall,

14    Mr. Gwaltney, do you recall telling the law enforcement people

15    at the meeting that Geezy says that he got tired of waiting

16    and go -- and goes out and kills Porky?

17    A    I don't remember.

18    Q    Don't remember that.  Is there a document --

19              MR. MARTINEZ:  Asked and answered.

20    Q    (BY MR. O'TOOLE)  -- something I could show you --

21              THE COURT:  Hold on, let me --

22    Q    (BY MR. O'TOOLE)  Is there something I could show you to

23    refresh your --

24              THE COURT:  Let me see the lawyers at the bench.

25              (Bench conference on the record.)

1          THE COURT:  Okay.  So Mr. Martinez, don't do that.

2          MR. MARTINEZ:  I'm sorry.

3          THE COURT:  You know, I understand that you are

4     trying your hardest here and that you feel that you are doing

5     the public's business to the best of your ability.  But

6     Mr. O'Toole has a job to do, he's entitled to ask questions.

7     If you've got an objection, raise the objection, but do it in

8     a neutral kind of voice, don't evince that sort of anger.

9     He's objecting on grounds of asked and answered.  Mr. O'Toole,

10    he's –– you've given him the opportunity to tell you whether

11    or not the document would help to refresh his recollection.

12         MR. O'TOOLE:  And he said yes, he said yes.  Part of

13    the problem is ––

14         THE COURT:  I didn't hear him say yes.

15         MR. O'TOOLE:  He did at the very –– he said ––

16         MR. MARTINEZ:  I don't know if he ever answered.

17         MR. ENZINNA:  I think what he said was "I don't

18    remember exactly."

19         MR. O'TOOLE:  I thought he did, but I want to ask

20    the Court a quick favor.

21         THE COURT:  You can ask him this question:  With

22    reference to the issue of whether or not you said Geezy killed

23    Porky, would it refresh your recollection to look at a law

24    enforcement report that purports to be about that?

25         MR. O'TOOLE:  That's fine, I'd be happy to do that.

1    I want to ask the Court --

2              THE COURT:  Keep it pretty close to that.

3              MR. O'TOOLE:  I'll do that.

4              THE COURT:  We'll see what his answer is to that.

5              MR. O'TOOLE:  If the Court could do this for me, I'm

6    having difficulty hearing the Court where I am and twice I

7    overspoke you when I didn't mean to.

8              THE COURT:  I'll get closer to my microphones.  Is

9    everybody --

10             MR. O'TOOLE:  Just pull your chair up a little bit

11   closer to the microphone.

12             THE COURT:  Orthopedic issues make that difficult,

13   Mr. O'Toole.  Are you having difficulty hearing me?  If

14   everybody's having that problem, I'll get myself closer to the

15   microphone.  All right.  Are you ready?

16             MR. MARTINEZ:  Can I just sort of finish flushing

17   out the concern here:  When this issue came up originally the

18   witness definitively said, no, I didn't say that.  Mr. O'Toole

19   is now bullying him into a corner where he's saying, oh, I

20   might --

21             THE COURT:  Bullying from your perspective,

22   cross-examination, from ours.  Let's go.

23             MR. MARTINEZ:  There is an ERROR IN --

24             THE COURT:  Let's go.

25             (The following proceedings were had in open court.)

1    Q    (BY MR. O'TOOLE)  Mr. Davis (sic), I asked you the

2    question, do you remember talking to law enforcement on

3    November 11th, 2015 and telling them that Geezy says he gets

4    tired of waiting and goes ahead and kills Porky?

5    A    You mean he as him hisself?

6    Q    Do you remember saying that to law enforcement?

7    A    I don't remember.

8    Q    All right.  Is there a law enforcement document that I

9    could show you that might refresh your memory?

10   A    I don't know.

11   Q    Can I show it to you and ask you?

12        MR. MARTINEZ:  Objection.

13        THE COURT:  You may.  You may show him the document.

14   He said he doesn't know.

15   Q    (BY MR. O'TOOLE)  Read that sentence, look up when you're

16   done.

17   A    What, read the yellow print?

18   Q    Right, the part that --

19   A    Geezy say he gets tired --

20        THE COURT:  Just read it to yourself.

21   Q    (BY MR. O'TOOLE)  Just read it to yourself and I'll ask

22   you -- see if your memory is refreshed.

23   A    Okay.

24        THE COURT:  Hand the document back to Mr. O'Toole.

25   Mr. O'Toole will return to the podium.

1    Q    (BY MR. O'TOOLE)  Thank you, sir.  Mr. Davis (sic), is

2    your memory on that issue refreshed?

3    A    I still can't recall.  I mean, I might have said, I might

4    have not.

5    Q    Okay.  Thank you.  I'm not going to inquire about that

6    further.

7         Let me ask you a question:  You told us that you saw

8    Geezy how many times a week, two or three times a week?

9    A    No, I didn't say that.

10   Q    How many times a week did you see him?

11   A    I seen him twice, about three times.

12   Q    Total?

13   A    Yes.

14   Q    Oh, total.  All right.  But you saw -- you saw his

15   brother Roscoe?

16   A    Yeah, frequently.

17   Q    All right.  Where did Roscoe live?

18   A    I don't know where he lived at.

19   Q    Did you remember who his girlfriend was?

20   A    No, I don't.

21   Q    Did you ever see who his family was?

22   A    No, I didn't.

23   Q    What kind of car did he drive?

24   A    No, I didn't.

25   Q    How about Geezy, did you know where he lived?

Cross-examination – Gwaltney (By Mr. Francomano)

1   A    No, I didn't.

2   Q    Did you ever go to his house?

3   A    No, I didn't.

4   Q    What kind of car did Mr. Johnson drive?

5   A    Never seen him in a car.

6   Q    Did you ever talk to him about anything at all?

7   A    Porky.

8   Q    Talked to him about Porky, so you talked to him about

9   business, but you never got to know him at all?

10  A    No, I haven't.

11  Q    All right.

12          MR. O'TOOLE:  Your Honor, I have no further

13  questions.  Thank you.

14          THE COURT:  Mr. Bussard.

15          MR. BUSSARD:  No questions.  Thank you.

16          THE COURT:  Mr. Francomano.

17          MR. FRANCOMANO:  Yes, Your Honor.

18                      CROSS-EXAMINATION

19  BY MR. FRANCOMANO:

20  Q    Mr. Gwaltney, have you -- I said that right, didn't I,

21  Gwaltney?

22  A    Yes.

23  Q    Mr. Gwaltney, have you ever heard of a BGF book?

24  A    The black book?

25  Q    The black book.

Redirect Examination – Gwaltney (By Mr. Martinez)

1    A    Yeah.

2    Q    Do you know what that is?

3    A    It's a black book.

4    Q    What's in the book?

5    A    All different kind of things, educational things.

6    Q    What do you mean by educational things?

7    A    Different type of things.  I haven't read it in a while,

8    so I can't recite it to you.

9    Q    If I showed you a copy of it, would you recognize it, if

10   I showed it to you?

11   A    Yes.

12   Q    I don't want you to read anything.  I just want you to

13   look at it, just -- if you go through it, just look up, and

14   let me know.

15   A    Yeah.

16   Q    Do you recognize that book?

17   A    Yes.

18   Q    What is that book?

19   A    It's called a black book.

20   Q    Okay.  And in the black book, are there any pictures?

21   A    No.

22           MR. FRANCOMANO:  No further questions.

23           THE COURT:  Redirect.

24                      REDIRECT EXAMINATION

25   BY MR. MARTINEZ:

Redirect Examination – Gwaltney (By Mr. Martinez)

1  Q    Mr. Gwaltney, I want to come back to some of the

2  questions Mr. O'Toole was asking you about the long interview.

3  Do you remember when you went through all of the names?

4  A    Yes.

5  Q    And at the end you talked about -- there was some

6  questions asked about information you provided regarding

7  Porky; right?

8  A    Right.

9  Q    That document that he showed you, was that your statement

10 or did someone else write it?

11 A    Had to have been somebody else because I don't remember

12 saying it.

13 Q    And the book you just looked at --

14 A    Yes.

15 Q    -- it's correct; right, it doesn't contain pictures or

16 lists of --

17 A    Right.

18 Q    -- who's in what regime; right?

19 A    Right.

20 Q    And if there was a book that contained those things,

21 would that be a different book?

22 A    It would be a different book, yeah.

23         MR. FRANCOMANO:  Objection.

24         THE COURT:  Overruled.

25 Q    (BY MR. MARTINEZ)  Would that be a different book?

```
1    A    Yes, yes.

2             MR. MARTINEZ:  That's it, Your Honor.  No further

3    questions.

4             THE COURT:  May the witness be excused?

5             MR. O'TOOLE:  Yes.

6             MR. FRANCOMANO:  Yes, Your Honor.

7             THE COURT:  You're excused.

8             Counsel, come on up.  Approach.

9             (Bench conference on the record.)

10            THE COURT:  I can't remember, did you tell me you

11   have one more after this or that's the guy you let go?

12            MR. MARTINEZ:  No, we did.  The guy we let go -- we

13   thought the Davis cross was going to take longer.

14            THE COURT:  Right.  So you don't have anymore

15   witnesses for today, it's almost 5:00 o'clock anyway, and then

16   we'll kick off tomorrow.  That's your expectation,

17   Mr. Martinez?

18            MR. MARTINEZ:  Yes.

19            THE COURT:  Okay.

20            (The following proceedings were had in open court.)

21            THE COURT:  Ladies and gentlemen, we've reached the

22   end of our trial day.  During this overnight recess do not

23   discuss the case with anyone.  Do not discuss it with your

24   fellow jurors.  Do not discuss it with your friends or family.

25   Once again, if anyone asks you what's going on with your jury
```

1    service, here's what you're allowed to tell them:  That you're

2    serving on a jury in federal court in a criminal case, that

3    the trial is expected to last until the third week of January,

4    that you've been instructed by the judge that you're not

5    allowed to talk to them or anyone about the case.

6            Do not allow yourselves to be exposed to any news

7    articles or reports that touch upon the case or the issues it

8    presents or the participants in the trial.  Avoid all contact

9    of any kind with any of the participants in the trial.  Do not

10   make my independent investigation of the law or the facts

11   relevant to the case.  Do not conduct internet searches with

12   respect to the issues presented or the persons participating

13   in the trial.  Do not consult external sources, such as

14   encyclopedias or dictionaries in reference to the issues and

15   terms that have been presented to you here.

16           We will plan to start at 9:30 tomorrow morning.  You

17   are excused until then.  Please take the jury out.

18           (Jury left the courtroom.)

19           THE COURT:  Anything outside the hearing of the

20   jury?

21           MR. MARTINEZ:  Not from us, Your Honor.

22           THE COURT:  Defense counsel?

23           MR. O'TOOLE:  No, Your Honor.

24           MR. MARTINEZ:  Actually, I spoke too soon.

25           MS. HOFFMAN:  I do have one correction to make.

1    Apparently, I referred to this exhibit as PHI 30 and it should

2    have been referred to as PHI 29, which is how it was

3    originally admitted into evidence.

4            THE COURT:  All right.  So Ms. Powell, do you show

5    PH30 to have been received in evidence?

6            THE CLERK:  I did not mark it in.  I --

7            THE COURT:  You assumed that she had made a mistake?

8            THE CLERK:  Yes.

9            THE COURT:  So for the record, PHI 30 is not in

10   evidence; correct?

11           THE CLERK:  Correct.

12           THE COURT:  And PHI 29 is in evidence; correct,

13   Ms. Powell?

14           THE CLERK:  Yes.

15           THE COURT:  Does anyone differ with that rendition

16   of the record?  Hearing none, that will be the state of

17   things.  When we conclude at the end of this week, perhaps

18   sometime on Thursday, I do direct all of you to meet with

19   Ms. Powell at sort of a -- for a midpoint check up on the

20   state of trial exhibits and to ascertain that all of the

21   records being maintained by respective counsel and the Court

22   are in perfect agreement with each other.  I have no doubt

23   about the status of the Court's record.  I'm sure that it is

24   perfect.  But nonetheless, we will check it against the

25   records being maintained by counsel and identify any issues.

1          So I'll ask the government to assist me in

2  remembering that this is a task that needs to be accomplished

3  before the close of business Thursday, a complete review of

4  the status of exhibits to make sure that everyone's records

5  indicate the same thing at roughly the midpoint of the trial.

6          All right.  I don't think there's anything else to

7  be addressed.  The defendants are remanded to the custody of

8  the Marshal.  Counsel are excused.  We will reconvene tomorrow

9  morning at 9:30.

10          (The proceedings were concluded.)

11

12          I, Christine Asif, RPR, FCRR, do hereby certify that
the foregoing is a correct transcript from the stenographic
record of proceedings in the above-entitled matter.

13

14          _____/s/_____
                   Christine T. Asif
                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2      Witness Name                                            Page

3      Troy Kellam

4          Direct Examination By Ms. Hoffman ........................   5

5          Cross-examination By Mr. Enzinna..........................  30

6          Cross-examination By Mr. Francomano.......................  45

7          Redirect Examination By Ms. Hoffman.......................  50

8      Joseph Davis

9          Direct Examination By Ms. Hoffman ........................  53

10         Cross-examination By Mr. O'Toole..........................  85

11         Cross-examination By Mr. O'Toole (cont'd)................ 143

12         Cross-examination By Mr. Francomano....................... 149

13         Redirect Examination By Ms. Hoffman....................... 149

14     Michael Gwaltney

15         Direct Examination By Mr. Martinez ....................... 153

16         Cross-examination By Mr. O'Toole.......................... 181

17         Cross-examination By Mr. Francomano....................... 209

18         Redirect Examination By Mr. Martinez...................... 210

19

20

21

22

23

24

25

< Dates >
2015, August 79:6.
6/4/2015. 47:11.
August 2013 182:8,
 183:14.
December 5th, 2017
 1:19.
December, 2014
 187:9.
January 2015 7:24.
June 17th, 2015
 46:17.
June 1st, 2016
 46:12.
May 15th 191:8.
May 5th 191:8.
November 17th
 76:5.
November 2015
 192:16, 199:4.
November 5th, 2015
 202:10.
October 17th 111:11,
 112:5, 112:16,
 113:4.
October 31st
 92:19.
September, october
 2012 74:13.
$4- 72:18.
$50 178:25.
$500 72:18.
$500. 72:18.
'11 89:7.
'12 89:12.
'94 161:4.
'95 161:2.
'97 160:25.
'99 160:23.
-t-n-e-y 152:9.
.38 168:15.
.45 168:13.
.
.
< 1 >.
1 91:13, 93:5,
 132:22, 133:6,
 133:23, 134:5,
 141:9, 141:14.
1. 141:8.

101 1:48.
10th 187:9.
11th 49:24, 207:3.
13th 186:12.
15 52:5, 52:10.
15th 192:10.
16 94:11.
17 56:17, 183:4.
18 56:20.
19 57:5, 86:13.
1997 153:21,
 160:15.
.
.
< 2 >.
2 93:5.
20 14:17, 57:22,
 87:9, 87:10,
 87:12, 87:13,
 93:4, 129:20,
 129:21, 182:24,
 183:1.
2000 89:6.
2004 160:21.
2007 7:16, 9:25,
 10:5, 36:24,
 36:25.
2008 7:19, 11:11,
 36:23.
2010 13:3, 57:7,
 57:12, 158:8.
2011 88:16, 89:17,
 89:20, 90:5.
2012 58:5, 58:9,
 58:10, 58:11,
 69:16, 89:10,
 89:11, 90:3,
 162:12, 162:24,
 163:3, 163:16,
 163:24, 165:21,
 166:22, 174:8.
2012. 75:3, 76:6.
2013 161:7, 181:24,
 184:16, 186:12,
 187:16.
2014 7:21, 13:23,
 188:3.
2015 32:7, 33:14,
 51:3, 79:6, 86:18,
 93:9, 97:14,

150:23, 184:16,
 191:8, 191:16,
 207:3.
2015. 37:25,
 200:20.
2016 51:11, 92:18,
 92:19, 97:16,
 144:3.
2017 200:17.
2017. 49:24.
20th 53:16.
21201 1:49.
22 94:6, 183:2.
22s 12:2, 12:5,
 156:8, 156:9,
 156:12.
23. 167:15.
25 41:18, 42:23,
 43:8, 43:9, 43:22,
 43:25, 44:12,
 129:20, 129:21,
 202:4.
25th 173:12.
27 66:13.
27. 62:10, 164:8.
29 165:6, 214:2,
 214:12.
29. 27:6.
29th 2:6.
2:00 173:14.
.
.
< 3 >.
3 28:4, 95:19.
3- 168:22.
30 67:24, 86:22,
 139:23, 140:6,
 140:11, 140:19,
 140:25, 141:7,
 142:7, 214:1,
 214:9.
30-second 140:8.
30. 64:9.
300 41:12, 41:14.
30th 22:20, 79:6,
 144:3.
31st 144:4.
32 5:6, 44:2.
32s 10:19.
33 155:2.

33. 15:10.
33s 10:19, 12:2,
  12:5, 156:8,
  156:10, 156:12.
35 160:6.
35. 23:5, 25:25.
36. 74:10.
38. 24:14.
39 86:20, 86:23,
  87:7, 87:14.
3:00 128:18, 129:15,
  129:16, 130:15.
.
.
< 4 >.
4 95:22.
4. 95:22.
40 14:18, 67:24,
  87:11.
400 168:22.
403. 138:4.
41 53:23, 86:16.
42 153:6, 182:22.
45 65:21.
45. 17:21, 62:18.
46. 22:3, 60:10.
4:00 124:6.
4th 1:48.
.
.
< 5 >.
5. 77:9.
56. 28:17.
5:00 212:15.
5K 94:19, 94:20,
  94:21, 95:4, 95:8,
  95:9, 96:6, 96:17,
  96:19, 97:1, 97:3,
  97:7, 99:3, 99:9,
  100:5, 100:18,
  101:9, 102:3,
  102:13, 104:22,
  185:17, 185:22.
5K1.1 95:2.
5th 191:16,
  192:16.
.
.
< 6 >.
6 165:18.

6.2 94:15.
.
.
< 7 >.
7 160:6.
7. 66:16.
75 93:9, 93:14,
  93:24.
.
.
< 8 >.
8 1:10, 75:11,
  170:23.
8. 67:14, 168:4.
81 166:17.
81. 64:1.
.
.
< 9 >.
9 132:13, 133:15,
  134:5, 138:8,
  139:9.
9. 63:4, 78:11,
  133:16.
9:30 213:16.
9:30. 215:9.
_____/s/_____
_____ 215:16.
.
.
< A >.
A-c-k 48:20.
A. 1:27.
a.m. 173:14.
abide 123:18.
abilities 139:18.
ability 102:17,
  205:5.
able 28:23, 45:22,
  45:24, 46:1, 59:3,
  77:14, 79:21,
  82:6, 82:15,
  100:11, 100:13,
  185:16.
Abolished 55:19,
  55:21, 55:23,
  55:24.
above-entitled
  215:14.
Absolutely 124:3,

186:11, 186:23.
accept 102:14.
acceptable 139:10,
  139:11.
accepted 42:23.
accidentally
  139:4.
accommodate 142:2.
accomplish 135:6.
accomplished
  215:2.
according 113:18.
account 28:6.
accurate 136:20.
Ack 48:18, 48:20.
acknowledged
  102:11.
acquitted 6:22.
across 78:8, 78:9,
  160:2.
Act 161:7, 161:9.
active 35:17, 35:19,
  37:3.
actively 76:7.
activities 13:25,
  14:2, 64:21.
Acts 18:14, 160:6.
Actually 46:11,
  50:1, 59:9, 61:20,
  66:3, 68:19,
  73:21, 73:22,
  82:16, 90:1,
  98:19, 99:23,
  112:10, 135:2,
  135:5, 136:19,
  145:21, 145:23,
  146:3, 146:4,
  149:25, 171:22,
  188:17, 198:20,
  200:14, 213:24.
add 135:10.
adding 198:23.
additional 42:19,
  132:14.
address 34:18.
addressed 41:6,
  215:7.
addresses 156:12.
addressing 102:24.
adjust 4:11.

Administer 4:3.
administration
    111:3.
admissible 132:12,
    132:18.
admit 147:23,
    184:3.
admitted 28:4,
    147:7, 147:25,
    214:3.
admitting 147:17.
adult 87:1, 87:3,
    87:7, 87:12,
    87:16, 183:5.
affair 38:13.
affect 102:17.
affected 103:15,
    104:7, 104:9.
affirmative 93:24.
afternoon 85:12,
    85:13, 124:6,
    130:5, 143:16,
    143:17, 153:3,
    153:4, 181:18.
afterwards 185:21.
agents 32:14,
    37:2.
ago 30:5, 32:11,
    32:22, 105:23,
    105:24, 111:15,
    125:11, 125:12,
    125:17, 125:20,
    184:16.
agree 6:8, 43:13,
    54:23, 102:14,
    124:16, 140:7,
    161:14, 182:19.
agreeable 142:8.
agreed 41:17, 43:21,
    90:13, 91:5,
    182:18.
agreeing 96:15.
ahead 84:4, 135:14,
    147:5, 159:25,
    172:13, 172:15,
    172:21, 179:1,
    203:22, 207:4.
aiming 114:16.
ain't 71:11, 73:9,
    76:16, 76:17,

76:25, 87:23,
    107:17, 117:11,
    155:20, 162:3,
    167:4.
Aisquith 145:3.
al 1:10.
Alan 1:37.
alive 26:17.
alley 77:7, 78:6,
    78:8, 78:9,
    78:13.
allow 11:22, 51:22,
    73:9, 82:9, 82:17,
    87:22, 101:10,
    129:6, 134:2,
    155:25, 204:11,
    213:6.
allowed 82:12,
    135:4, 213:1,
    213:5.
allows 135:6.
almost 32:11, 87:11,
    87:16, 183:5,
    187:10, 201:16,
    212:15.
alone 167:21.
already 28:4, 48:15,
    72:5, 92:24,
    107:17, 126:5,
    126:9, 126:11,
    133:13, 134:19,
    137:8, 141:20,
    148:5, 199:4.
altogether 140:15.
ambiguities 82:18.
ambiguity 82:17.
ambulance 173:22.
AMERICA 1:5.
among 51:21,
    129:4.
amongst 111:20.
anger 205:8.
Answer 37:13, 60:2,
    61:2, 61:12, 62:5,
    63:10, 68:25,
    70:4, 80:6, 81:12,
    81:19, 87:22,
    88:4, 88:8, 89:18,
    89:19, 90:3, 94:3,
    106:15, 106:22,

110:5, 124:9,
    127:3, 173:4,
    175:3, 175:5,
    175:12, 177:21,
    206:4.
answered 59:25,
    81:13, 81:20,
    93:23, 101:17,
    101:19, 112:2,
    184:12, 204:8,
    204:19, 205:9,
    205:16.
answers 81:22,
    82:2.
anticipate 81:19.
Antonio 194:18,
    195:19, 195:20.
Anybody 50:23,
    118:3, 125:13,
    133:8, 136:1,
    145:19, 145:24,
    161:23, 183:13.
anyway 212:15.
apartment 68:1,
    76:11, 76:13,
    167:8, 168:2,
    168:5, 171:16,
    172:10, 173:2,
    173:16.
apartments 68:3,
    68:8, 171:15.
apologize 47:10,
    89:25, 128:8,
    185:10, 186:5,
    200:24.
apologized 174:25.
Apparently 148:16,
    214:1.
appeared 140:8.
appreciate 91:23,
    198:21.
Approach 43:3,
    80:18, 80:19,
    81:14, 81:25,
    96:21, 99:16,
    99:20, 101:13,
    112:21, 112:22,
    115:9, 122:13,
    128:6, 146:19,
    198:6, 212:8.

approached 130:21,
    168:19.
appropriately
    132:9.
Approximately 13:21,
    74:21, 87:13,
    163:24.
April 49:24.
area 13:13, 53:16,
    57:24, 58:2,
    58:13, 61:5, 62:6,
    62:7, 67:4, 70:23,
    74:3, 75:24,
    116:5, 163:1,
    166:12, 166:14.
argue 100:15,
    148:14, 148:15.
argued 135:15.
argument 135:19,
    137:25, 142:20.
arguments 129:5.
armed 72:10.
arrest 37:25.
arrested 7:24, 8:6,
    32:7, 38:1, 54:3,
    92:21, 94:6.
article 22:9, 60:16,
    171:24.
articles 51:23,
    51:24, 129:7,
    129:8, 213:7.
ascertain 214:20.
Asif 1:46, 215:12,
    215:17.
asks 84:5, 212:25.
asleep 198:10.
assemble 135:8.
assembled 136:19,
    199:3, 199:4,
    199:5.
assist 215:1.
assistance 95:1,
    96:4, 156:2.
assisting 101:8.
assume 116:20,
    130:13, 132:8.
assumed 70:17,
    214:7.
Assumes 83:11.
attached 96:10.

attempt 82:18,
    148:21.
attempted 122:10.
attempting 7:21,
    102:7.
attention 69:15,
    75:2, 76:5, 100:1,
    166:22, 198:19.
Attorney 98:18,
    127:23.
audio 133:17,
    134:7.
August 181:24,
    186:12, 187:16.
AUSA 1:25, 1:27.
Austin 158:24,
    158:25, 159:3,
    159:7, 159:11,
    188:10, 188:13,
    191:20, 192:8,
    193:20, 198:1,
    198:2.
authorizing 82:14.
Avenue 17:4, 17:8,
    54:8, 57:15,
    57:19, 57:21,
    66:2, 66:18,
    67:12, 148:3,
    167:8, 168:2,
    169:12, 169:20.
Avoid 51:25, 129:9,
    213:8.
awaiting 5:16,
    53:25.
awake 198:12.
aware 2:17, 144:18,
    150:10, 201:24,
    202:20.
away 10:3, 33:3,
    51:8, 55:21,
    55:23, 55:25,
    56:1, 56:7, 59:7,
    69:6, 111:5,
    114:16, 114:21,
    115:25, 120:10,
    139:24, 187:13.
.
.
< B >.
B. 1:33.

bad 8:17.
baggies 94:6.
Balt- 53:17.
Baltimore 1:20,
    1:49, 5:8, 5:9,
    5:11, 5:13, 7:25,
    10:2, 11:12, 13:4,
    13:9, 13:10,
    16:23, 17:2, 17:5,
    51:2, 53:20,
    57:11, 57:14,
    57:16, 57:20,
    79:8, 153:8,
    153:9, 153:10,
    157:15, 162:13,
    162:16, 162:18,
    175:25.
banking 21:1.
Barclay 66:2,
    66:18.
Based 5:20, 29:10,
    61:7, 62:23,
    64:14, 130:11,
    146:7, 157:6,
    176:24.
basic 103:22.
Basically 37:16,
    61:10, 61:13,
    61:14, 84:10,
    95:4, 119:7,
    150:19, 189:4.
Basis 43:2, 58:17,
    63:8, 69:22,
    131:10, 151:8.
bathroom 83:18,
    84:18.
Bazemore 31:14,
    35:7.
Beat 12:17, 12:20.
beating 12:21.
Became 9:11, 12:25,
    14:25, 17:17,
    37:20, 87:6,
    153:20, 158:7,
    159:12, 159:16.
Become 9:12, 9:14,
    10:3, 11:8, 11:20,
    12:7, 13:12, 17:7,
    31:17, 34:3,
    45:23, 84:11,

125:2, 125:5,
125:7, 153:22,
154:4, 155:23,
158:9.
becoming 136:9.
beef 73:15, 74:6,
174:23, 175:7.
beefing 24:2.
befriend 69:11,
120:10.
begin 3:19.
beginning 7:14,
32:25, 131:25,
132:2, 203:7.
beginnings 187:2.
behind 169:19,
190:1, 190:11.
belief 110:22,
144:20, 144:25.
believe 3:1, 4:1,
62:12, 69:2,
101:7, 102:10,
120:22, 161:7,
168:9, 168:13,
168:15, 185:22.
believes 156:22.
belong 32:4.
Ben 83:19, 83:21,
83:22, 84:6, 84:7,
84:19.
Bench 2:19, 2:20,
2:24, 33:20, 43:5,
80:21, 91:20,
101:14, 115:10,
122:14, 124:12,
128:7, 146:21,
198:8, 204:24,
204:25, 212:9.
beneath 160:4.
benefit 55:4,
203:4.
beside 75:15,
144:21.
best 98:23, 133:9,
133:10, 139:12,
183:21, 184:18,
205:5.
better 40:12,
103:14.
Beyond 98:20,

123:10, 151:9.
big 20:9, 20:10,
20:13, 36:19,
103:3, 116:7,
116:10, 116:13,
116:16, 117:20,
117:23, 183:15.
bit 8:15, 53:19,
104:5, 109:19,
121:2, 123:15,
128:16, 150:20,
174:10, 175:23,
176:6, 206:10.
bits 82:19.
Black 5:21, 47:20,
58:21, 65:12,
65:18, 66:4, 67:1,
99:24, 109:1,
149:7, 149:8,
149:10, 149:13,
153:14, 209:24,
209:25, 210:3,
210:19, 210:20.
blah 73:8, 73:17,
77:2, 79:20.
blame 39:13,
39:18.
blank 30:16.
Blinky 49:17.
block 57:21, 63:22,
63:23.
blocks 57:22.
Bloods 22:23,
24:2.
blue 178:21.
blunt 145:4.
blurting 63:9.
body 12:17, 12:20,
25:1, 25:2, 25:4,
121:8.
bold 99:24.
Bonaparte 145:3.
books 17:11, 35:14,
160:6.
booth 80:23.
bottle 136:15.
bottom 95:23,
99:22.
bought 76:21,
179:1.

bound 99:10.
boundaries 166:13.
boundary 103:1.
bounty 50:24.
box 52:20, 152:18.
BPD 8:7.
breadth 200:12.
break 12:12, 12:15,
51:20, 83:1,
128:17, 128:19,
128:22, 129:2,
129:15, 130:20,
143:18.
Bredar 1:18.
Bree 48:22.
Brian 35:24,
35:25.
Bring 52:14, 143:6,
143:7, 176:16,
177:14, 177:16,
178:5, 198:18.
bro 20:9, 20:10,
36:19.
brother 25:8, 25:10,
25:12, 30:12,
62:17, 65:14,
73:8, 79:22,
119:23, 120:17,
144:10, 155:24,
155:25, 156:2,
164:17, 208:15.
brotherhood 11:7,
30:8, 39:7.
brothers 11:21,
11:22, 11:23.
brought 3:24,
155:11, 179:23.
bubble 157:18,
157:20, 157:21,
157:22, 159:6.
Bullying 206:19,
206:21.
Bupes 180:13,
180:14, 180:15.
burglary 160:25.
Burke 197:2, 197:4,
197:6, 197:7,
197:8.
Burton 197:5.
Bush 9:5, 9:6, 15:3,

15:22, 16:10,
35:10, 35:11,
35:12, 35:22,
158:15, 158:16,
159:6, 159:16,
160:1, 160:2,
160:3, 164:6,
165:5, 166:12,
166:14, 172:17,
172:18, 181:10,
188:14.
bushman 158:3,
158:5, 158:7,
158:10, 188:15,
188:25.
bushmen 158:1,
191:25.
business 175:17,
190:3, 190:4,
205:5, 209:9,
215:3.
BUSSARD 1:37, 3:4,
3:5, 19:5, 44:21,
44:22, 55:22,
58:16, 58:18,
63:7, 63:9,
129:21, 129:23,
146:16, 146:17,
209:14, 209:15.
Butt 2:9.
buy 78:21, 178:23.
.
.
< C >.
C. 83:8.
calculated 82:5.
California 155:8,
155:12.
call 2:15, 3:9,
3:14, 3:20, 52:17,
69:13, 73:11,
86:15, 111:4,
115:12, 170:11,
170:13, 170:15,
170:25, 172:17,
172:18, 173:24,
180:13, 189:13,
189:14, 189:16,
198:11.
called 3:12, 4:7,

12:14, 34:9,
52:24, 73:7,
73:16, 95:2, 96:6,
97:7, 107:19,
152:14, 153:13,
156:7, 157:18,
170:3, 182:19,
185:17, 210:19.
calling 36:18.
calls 3:22, 52:18,
152:3.
Calvin 48:1.
camera 54:5,
155:1.
Camille 198:9.
caps 93:10, 93:14,
93:25.
capture 169:8.
car 75:23, 75:25,
77:7, 78:6, 145:3,
190:16, 190:17,
208:23, 209:4,
209:5.
care 12:6, 23:25,
24:3, 27:23,
27:25, 28:1,
170:5, 170:8.
career 40:18,
182:20, 183:15.
carried 167:18.
carries 12:23.
carry 10:20, 12:7,
50:25, 78:9,
78:10, 78:12,
78:16, 93:4.
carrying 168:10,
168:12, 187:5.
cars 77:12.
cases 85:18, 85:24,
85:25, 125:22,
187:17.
catch 25:4, 50:23,
70:19, 78:20,
177:15.
category 82:10,
148:19.
caught 23:22, 25:1,
25:2, 78:18,
78:19, 78:22,
86:18, 86:23,

87:7, 87:15,
90:15, 90:16,
93:7, 93:8,
145:10.
CD 28:4, 132:13,
133:15, 133:16,
138:8, 139:9.
CDF 2:8, 176:3,
176:21, 178:8,
178:22, 179:7,
179:10, 179:13,
180:16.
CDS 160:23.
certain 10:20, 62:6,
62:7, 80:16,
84:22, 99:6,
100:6, 188:25.
certainly 142:3,
198:16, 198:21.
certainty 136:12.
certify 215:12.
cetera 131:19.
chain 150:25,
151:2.
chair 4:14, 84:24,
206:10.
chance 44:12, 98:7,
106:11, 192:11,
203:14.
change 162:11,
179:5.
changed 40:6.
changing 135:1,
136:1.
characterized
137:25.
charge 5:20, 16:10,
20:24, 21:2, 21:3,
21:9, 21:17,
21:20, 21:22,
26:10, 26:12,
42:4, 42:6, 42:20,
55:17, 79:5,
86:18, 86:24,
87:8, 87:15,
92:24, 98:8,
122:9, 122:21,
151:18, 161:9,
162:13, 184:23.
charged 5:18, 19:7,

19:10, 40:24,
41:2, 54:9, 54:13,
54:15, 56:5, 94:7,
97:12, 97:13,
121:19, 121:22,
122:4, 122:11,
122:22, 124:25,
144:15, 145:17,
161:6, 192:6,
192:8.
charges 41:7.
chasing 169:24.
check 43:15, 214:19,
214:24.
Chesapeake 175:25.
Chinese 66:2, 66:19,
66:23, 66:25,
78:10.
chipping 92:8.
choice 82:16, 159:8,
159:9.
chooses 131:9.
choosing 134:17.
chosen 11:19, 84:11,
155:22.
Christina 1:27,
138:24.
Christine 1:46,
215:12, 215:17.
Christopher 36:3.
circle 81:23.
circles 81:11.
circuit 103:4.
circumstances
103:23.
City 10:2, 11:12,
13:4, 16:23, 17:2,
79:8, 157:17,
162:15.
CJA 134:13.
claim 36:12.
clarification 81:7,
81:16.
clarifying 82:19.
Classified 28:15.
classify 35:13.
cleaned 25:8, 25:10,
25:12.
clear 6:15, 6:17,
44:5, 122:21.

clearly 82:5,
147:3.
CLERK 4:4, 4:10,
52:20, 52:21,
53:2, 53:6,
141:11, 152:11,
152:17, 152:23,
198:11, 214:6,
214:8, 214:11,
214:14.
click 115:7.
clicked 115:24.
clicking 169:14.
client 2:9, 198:22,
199:6, 199:8,
199:10, 199:13,
199:14, 200:7,
200:13.
clients 2:8.
climb 14:22.
clip 28:3, 131:20,
131:21.
clock 141:22,
142:5.
Close 39:9, 39:11,
115:23, 140:14,
201:4, 201:5,
201:6, 203:11,
206:2, 215:3.
closed 173:15.
closer 206:8,
206:11, 206:14.
closing 129:5.
clothing 22:9,
60:16, 171:24.
co-defendant
167:23.
Cocaine 54:12, 67:9,
72:14, 91:10,
94:11, 94:15,
163:6, 163:16,
163:23, 163:25,
164:2, 164:21,
164:22, 165:11,
168:22.
cocked 71:23, 72:2,
72:3, 113:24,
114:3.
cogent 135:8.
coherent 84:1,

135:8.
coherently 82:16.
coke 67:8.
collect 16:17.
Collecting 14:9,
14:15.
color 110:12,
110:13.
combination
137:16.
combined 107:1.
comes 123:13, 132:7,
139:20, 185:17.
comfortable 84:3.
coming 19:17, 70:6,
131:10.
command 150:25,
151:2.
commander 15:4,
15:7.
comments 33:23.
commit 151:6,
151:12, 151:15,
160:12, 167:21,
182:14.
committed 24:21,
27:14, 148:16,
188:4, 191:11.
committing 65:1.
common 157:7,
157:9.
communicate 103:14,
125:13.
community 108:3,
120:12, 192:14,
200:6, 200:22,
202:11, 202:15.
complete 9:13,
132:25, 139:1,
215:3.
complicated
187:24.
computer 139:25.
concern 80:24,
80:25, 135:4,
135:5, 136:17,
146:25, 206:17.
concerns 134:16,
136:16.
concert 21:1.

conclude 214:17.
concluded. 215:10.
concurrent 41:22,
  42:9.
conduct 160:15,
  213:11.
conference 2:20,
  2:24, 33:20, 43:5,
  80:21, 91:20,
  101:14, 115:10,
  122:14, 128:7,
  131:1, 137:24,
  146:21, 198:8,
  204:25, 212:9.
confession 80:22.
confine 92:2.
confrontation
  80:12.
Confronted 82:24,
  82:25, 83:2, 83:5,
  84:16.
confuse 128:21.
confused 128:20,
  128:21.
connected 66:21.
connection 97:7,
  161:9, 162:1,
  174:11, 174:16,
  175:25.
conscience 6:15,
  6:17, 44:5.
consider 68:22,
  68:24.
considered 79:22.
consist 14:19,
  133:11, 133:12.
consists 134:21.
conspiracy 81:3,
  92:4.
conspiring 90:16,
  182:13.
consult 52:4,
  129:12, 213:13.
consulted 40:8.
Cont'd 143:14.
contact 21:18, 52:1,
  129:9, 213:8.
contain 211:15.
contained 135:19,
  211:20.

contains 134:23,
  137:23.
contamination
  139:25.
contemporaneously
  147:1.
contending 136:2.
contents 139:9.
context 27:20.
continue 43:19,
  94:2, 143:11.
continues 123:18.
contraband 177:17,
  177:18.
control 175:9,
  175:10.
controlled 91:14.
conversation 32:24,
  74:5, 74:15, 75:3,
  85:16, 135:11,
  138:1, 145:19,
  145:24, 176:9,
  192:16, 202:19,
  202:22, 203:1,
  203:4, 203:7,
  203:15, 203:18.
conversations 21:11,
  26:21, 29:10,
  29:14.
Convicted 6:22,
  7:15, 7:18, 7:21,
  54:10, 56:17,
  56:20, 58:4,
  90:22, 90:23,
  92:4, 97:20, 98:8,
  144:16, 160:20,
  161:6, 161:10.
conviction 7:12,
  56:15, 57:9, 58:8,
  69:17, 91:3, 91:4,
  91:16, 94:12.
convictions 40:16,
  40:17, 92:11,
  105:16, 160:18.
cool 18:1, 18:4.
cooperate 6:9,
  33:16, 40:10,
  54:23, 90:13,
  91:5, 92:18,
  98:17, 100:4,

122:4, 122:9,
  125:23, 126:17,
  126:18, 161:15,
  182:2, 183:22,
  185:12, 186:1,
  186:17, 187:5,
  187:14.
cooperated 41:18,
  43:21, 96:3,
  98:19.
cooperates 123:18.
cooperating 33:11,
  33:13, 34:6,
  50:16, 50:19,
  97:5, 101:1,
  101:3, 106:8,
  106:18, 127:15,
  156:13, 156:23,
  156:24.
cooperation 44:9,
  102:12, 102:17,
  104:6, 105:15,
  106:9, 123:13,
  125:20, 126:22,
  161:17, 161:21,
  186:6.
cooperative 94:25.
copied 138:10.
copy 43:10, 137:12,
  210:9.
core 204:12.
corner 54:4, 54:7,
  206:19.
Correction 153:23,
  213:25.
Correctional 177:11,
  178:3, 178:5.
Corrections 154:2,
  154:20.
correctly 138:5.
cost 178:24.
Counsel 33:19,
  81:19, 91:19,
  96:21, 134:22,
  135:1, 212:8,
  213:22, 214:21,
  214:25, 215:8.
Count 91:13, 93:5.
counts 86:12,
  182:17.

couple 25:19, 69:3,
 121:3, 121:5.
course 98:6, 98:21,
 114:11, 132:20,
 143:1, 182:18.
court. 33:25, 43:18,
 82:22, 92:13,
 104:1, 115:18,
 124:19, 128:23,
 148:24, 202:7,
 206:25, 212:20.
courtroom 3:25,
 22:5, 60:12,
 138:14, 143:6.
courtroom. 3:16,
 52:6, 52:15,
 129:17, 143:8,
 213:18.
Cox 196:13, 196:14,
 196:15.
CP13 26:1.
crack 72:14.
create 134:22,
 137:12.
creates 82:17.
credits 131:19,
 135:25.
crime 56:17, 56:21,
 56:23, 92:21,
 97:12.
crimes 24:21, 54:15,
 93:3.
CRIMINAL 1:9, 5:16,
 7:12, 13:24, 14:2,
 53:25, 56:15,
 57:8, 64:20,
 135:3, 176:24,
 182:20, 183:15,
 213:2.
Crip 194:20.
critical 142:14.
criticism 148:10.
Cropp 103:4.
cross 212:13.
CROSS-EXAMINATION
 30:1, 30:3, 44:25,
 85:10, 101:18,
 130:23, 138:18,
 143:12, 143:14,
 148:25, 149:2,

 181:16, 206:22,
 209:18.
cross-examine
 103:6.
cross-examining
 103:1.
cunning 37:23.
curious 87:4,
 87:6.
current 79:4.
currently 5:15,
 53:24.
custody 3:10, 5:15,
 53:24, 215:7.
Cut 153:25, 169:20,
 169:22, 175:5.
cutting 142:21.
.
.
< D >.
D-a-r-r-i-l
 197:21.
D-a-v-i-s 53:7.
Damon 134:10.
danger 40:17,
 139:3.
dangerous 91:14.
Darrek 197:16,
 197:18.
Darren 196:13,
 196:14, 196:15.
Darril 158:24,
 158:25, 159:3,
 159:7, 159:11,
 159:14, 197:15,
 197:17, 197:18,
 197:19, 197:20,
 197:24, 198:1,
 198:2, 198:3.
date 92:18,
 186:13.
daughter 174:15.
Dave 17:19, 17:22,
 17:23, 18:9,
 18:10, 18:14,
 18:20, 19:12,
 20:23, 22:13,
 23:19, 23:20,
 23:22, 26:24,
 27:2, 28:11,

 65:12, 65:19,
 65:23, 66:3,
 66:10, 66:11,
 66:12, 67:1,
 144:13, 145:19.
David 62:22, 65:13,
 144:12, 147:6,
 147:13, 147:16,
 147:25, 148:16.
Day 3:19, 23:21,
 31:9, 48:5, 49:1,
 73:2, 76:1, 76:3,
 78:1, 104:7,
 114:12, 114:13,
 121:4, 168:25,
 169:4, 169:5,
 169:8, 169:11,
 184:17, 186:16,
 192:13, 201:1,
 202:20, 212:22.
days 32:22, 113:19,
 121:3, 121:5.
DC9 133:6, 134:3.
dead 175:8,
 199:15.
deal 41:21, 98:7,
 100:19, 100:20,
 102:2, 102:10,
 103:6, 103:15,
 104:5, 122:9,
 184:10, 186:1,
 186:6, 186:16,
 187:5, 202:11.
dealers 190:4,
 190:24, 191:1.
dealing 14:3,
 14:10.
Death 79:16,
 156:20.
decide 51:6, 77:16,
 96:16, 185:3,
 201:13.
decided 40:10,
 79:13, 87:20,
 92:17, 96:5,
 119:2, 119:9,
 183:24, 184:15,
 184:25, 186:17,
 192:1.
decides 100:5.

deciding 184:23.
decision 98:17,
    98:23.
Defendant 1:12,
    1:29, 1:35, 1:39,
    22:12, 60:19,
    81:15, 122:15,
    123:18, 131:9,
    172:3.
Defendants 6:21,
    55:10, 130:15,
    215:7.
Defense 132:22,
    133:6, 133:23,
    134:5, 134:22,
    135:1, 135:3,
    136:7, 141:8,
    142:24, 148:14,
    148:19, 213:22.
definitively
    206:18.
delay 3:24.
delaying 142:15.
demonstration
    148:12.
denied 120:20.
deny 11:23.
depart 152:1.
Department 7:25.
departure 103:3.
departures 103:3.
depend 6:20,
    55:10.
dependant 137:11,
    139:17.
dependency 137:13.
depending 185:25.
Depends 12:15.
derivative 123:16.
derivatively
    123:14.
describe 22:9.
described 124:2.
describing 148:20.
description 124:3.
desktop 138:10,
    139:7.
Despite 32:1,
    200:13.
detail 191:19.

details 191:18.
detained 180:18.
detainee 180:2,
    180:5.
Detective 8:7,
    38:12, 38:24,
    51:2.
Detention 175:25.
determining 7:8,
    56:11, 156:24.
develop 29:8,
    82:6.
Devon 167:25.
Diabetic 180:22.
dictionaries
    213:14.
dictionary 52:5,
    129:13.
Diddy 48:13.
differ 180:5,
    214:15.
Difference 189:17,
    189:19, 189:20,
    189:21, 190:19.
differently
    112:15.
difficult 206:12.
difficulty 206:6,
    206:13.
Digga 28:21, 29:3,
    29:11, 29:22,
    51:13.
DIRECT 5:1, 53:9,
    61:15, 69:15,
    94:19, 128:9,
    153:1, 166:22,
    198:20, 201:14,
    214:18.
directed 132:4.
directing 201:10.
directly 4:12, 4:15,
    152:19, 200:18.
disappeared 71:10.
discharge 135:6.
discipline 11:20,
    155:23.
discovery 91:24,
    124:11.
discredit 148:21.
discrete 132:16.

discuss 51:21,
    51:22, 129:3,
    199:6, 199:8,
    212:23, 212:24.
discussed 142:7.
discussing 100:5.
discussion 131:15,
    202:14, 202:23.
discussions 98:22.
disingenuous
    148:7.
disk 132:9, 132:17,
    134:4, 134:7,
    134:22, 137:6,
    139:1, 139:2,
    139:3, 139:4,
    139:7, 139:19,
    140:19, 140:22,
    142:5.
disks 137:7,
    137:19.
dispute 165:21,
    165:24.
distance 114:22,
    114:23.
distinction 123:7.
distribute 7:15,
    7:19, 7:22, 58:5,
    91:9, 91:10,
    91:14, 160:21,
    161:2, 161:4.
District 1:1, 1:2,
    124:4.
document 95:7, 99:9,
    99:15, 112:18,
    132:24, 155:1,
    199:25, 203:10,
    203:24, 204:2,
    204:7, 204:10,
    204:12, 204:18,
    205:11, 207:8,
    207:13, 207:24,
    211:9.
Dog 193:22,
    193:24.
doing 103:14,
    119:12, 141:1,
    158:20, 174:25,
    176:14, 181:19,
    186:10, 188:16,

188:18, 198:9,
205:4.
dollars 168:22.
dominant 79:11.
Dominique 143:20.
Done 11:5, 32:25,
47:13, 113:2,
113:3, 138:13,
142:14, 148:11,
171:22, 200:4,
201:16, 207:16.
door 67:16, 68:6,
72:9, 76:21,
77:12, 104:23,
131:5, 133:2,
147:12, 173:3.
Dorsey 47:24, 49:13,
193:16, 193:17,
193:18.
Dottie 39:2, 39:5,
39:9.
doubt 142:1,
214:22.
down 19:16, 57:22,
71:14, 73:19,
78:7, 78:9, 81:24,
103:19, 128:24,
145:7, 145:12,
169:20, 169:22,
187:8, 187:20,
187:25, 188:2,
191:7, 191:8,
191:15, 199:7.
dragon 160:5.
draw 66:22, 76:5.
drew 68:6.
Drip 196:9, 196:10,
196:11.
drive 208:23,
209:4.
Drop 196:11,
196:12.
dropped 169:19.
drove 145:4.
Drug 14:3, 14:10,
54:11, 56:17,
68:23, 91:12,
154:3, 175:17,
178:13, 190:4,
190:23, 191:1.

drug-related
160:15.
Druid 145:4.
dry 138:12,
139:21.
dude 19:17, 21:1,
21:21, 21:24,
25:7, 25:10,
25:19, 73:5,
145:7, 146:4.
dudes 150:3.
due 84:21.
dues 12:10, 14:9,
14:15, 14:16,
14:19, 16:17.
duly 4:7, 52:24,
152:14.
During 8:11, 8:13,
32:13, 51:10,
51:21, 89:2, 89:4,
129:2, 130:20,
130:25, 137:24,
142:14, 160:9,
163:16, 165:20,
174:7, 175:12,
212:22.
duty 136:21.
.
.
< E >.
e-mail 2:10.
ear 2:22.
earlier 12:1, 24:16,
26:6, 27:8, 34:2,
35:20, 44:4,
62:12, 64:6,
109:23, 113:18,
119:20, 140:9,
149:23, 150:22,
171:23, 173:17,
176:21, 180:10.
East 153:10, 162:16,
162:18.
edit 135:21.
edited 131:20,
132:3, 132:9,
132:23, 136:3,
138:7, 139:9.
edition 141:7.
editorial 33:23.

educational 210:5,
210:6.
effect 79:23,
148:6.
effects 138:2.
eight-minute
130:25.
either 45:24, 46:1,
131:13, 140:21.
elaborate 160:2.
elicit 2:12.
eligibility 6:20,
55:9, 162:1.
empower 147:23.
encounter 75:4.
encourage 103:19.
encyclopedia 52:4,
129:13.
encyclopedias
213:14.
end 28:11, 70:7,
76:1, 139:25,
168:24, 174:9,
184:11, 199:9,
201:3, 202:19,
202:25, 211:5,
212:22, 214:17.
ended 150:22.
ends 198:24.
enforcement 6:9,
8:18, 8:21, 28:22,
50:17, 50:20,
54:24, 113:4,
127:4, 144:3,
144:6, 146:6,
156:13, 187:4,
187:8, 192:12,
192:17, 199:19,
200:23, 202:22,
202:25, 203:1,
203:15, 204:14,
205:24, 207:2,
207:6, 207:8.
enough 116:1,
136:13, 141:23,
202:5.
ensure 136:13.
enter 6:5, 54:20,
68:6, 68:7,
152:17, 160:4.

entered 3:16, 40:14,
    52:15, 143:8.
entire 87:16,
    201:9.
entirety 135:17.
entitled 147:13,
    147:15, 200:4,
    200:5, 200:9,
    200:21, 205:6.
entrances 68:3.
ENZINNA 1:31, 3:2,
    30:1, 30:2, 30:4,
    34:1, 34:2, 37:15,
    43:12, 43:15,
    43:20, 44:20,
    50:10, 50:15,
    51:1, 51:17,
    113:1, 130:21,
    131:16, 135:11,
    135:14, 135:15,
    138:4, 181:21,
    205:17.
equal 142:24.
ERROR 206:23.
escape 77:14.
Esquire 1:31, 1:33,
    1:37, 1:41.
estimated 16:3.
et 1:10, 131:19.
event 115:23.
eventually 11:8,
    13:12, 14:22,
    57:23, 58:1, 67:4,
    150:22.
Everybody 71:9,
    71:10, 81:1,
    148:7, 148:15,
    198:10, 200:21,
    206:9, 206:14.
everyone 215:4.
everything 15:2,
    103:7, 161:20,
    175:8, 180:11.
Evidence 19:18,
    19:22, 28:5,
    83:12, 90:20,
    93:22, 129:5,
    131:10, 131:11,
    131:12, 133:13,
    148:2, 164:7,

214:3, 214:5,
    214:10, 214:12.
Evidently 124:11.
evince 205:8.
exact 74:21,
    133:22.
Exactly 40:21, 92:3,
    107:4, 109:18,
    114:13, 149:19.
exactly. 205:18.
exaggerate 185:15.
exaggerated 7:3,
    56:4, 162:9.
EXAMINATION 5:1,
    50:8, 53:9, 94:19,
    102:4, 142:14,
    149:21, 153:1,
    210:24.
examined 4:7, 52:24,
    152:14.
example 36:18,
    151:5, 190:10.
examples 12:5.
except 139:6,
    148:16, 199:8,
    200:7.
exchange 182:3.
exclusion 140:9.
Excuse 111:23,
    130:13, 172:4,
    175:4, 184:16,
    187:15.
excused 51:16,
    51:19, 129:16,
    151:23, 152:1,
    212:4, 212:7,
    213:17, 215:8.
exercise 198:22.
exhibits 138:10,
    141:4, 141:12,
    214:20, 215:4.
exit 77:12.
expect 8:16,
    137:3.
expectation 81:21,
    212:16.
expected 156:9,
    213:3.
expecting 103:7.
expects 103:2.

experience 133:19,
    156:21, 157:6.
explain 8:24, 29:19,
    82:15.
explained 180:10.
exposed 51:23,
    129:6, 213:6.
exposure 41:25.
extent 200:12,
    200:14, 201:23.
external 213:13.
extorted 37:7.
extortion 10:22.
extortions 10:21.
eye 110:12.
eyes 65:7, 71:16,
    110:11, 110:13,
    110:15, 150:2.
eyewitnesses
    150:1.
.
.
.
< F >.
F. 1:31.
face 52:20, 53:19,
    118:24, 169:15.
Facebook 73:2, 73:4,
    120:6.
facilitate 177:13.
facilities 177:1.
Facility 153:24,
    175:25, 179:24,
    180:1, 180:7,
    180:16.
facing 4:14, 41:9,
    41:15.
fact 2:10, 30:10,
    31:5, 32:22, 34:6,
    37:2, 41:17,
    84:22, 120:23,
    140:10, 148:12,
    156:24, 170:1.
facts 52:2, 83:11,
    93:22, 103:22,
    129:11, 213:10.
Failing 147:22.
fair 87:14, 107:14,
    131:16, 202:9.
fairness 200:17.
fall 69:16, 84:14,

166:22, 174:7.
falling 198:10.
falls 82:10.
familial 62:15.
familiar 17:7,
  17:17, 27:17,
  58:20, 97:9,
  97:10, 99:12,
  153:13, 157:18,
  158:1, 162:17,
  163:1, 163:9.
Family 5:21, 11:7,
  30:6, 33:4, 51:8,
  58:21, 109:1,
  153:14, 174:12,
  179:3, 179:4,
  190:21, 208:21,
  212:24.
far 44:16, 44:18,
  57:20, 57:21,
  80:17, 82:25,
  87:3, 111:7,
  114:21, 150:10,
  175:1.
Fareem 193:24,
  194:1.
fast 116:1, 174:10,
  175:23.
Father 31:1, 31:9.
fault 136:6,
  185:10.
favor 205:20.
FBI 51:10, 51:13.
FCRR 1:46, 215:12.
feasible 134:6.
Federal 1:47, 8:4,
  40:24, 41:9,
  41:23, 42:1,
  42:17, 46:12,
  54:16, 54:18,
  92:5, 161:9,
  176:1, 213:2.
feel 159:8, 205:4.
fees 62:6, 62:7.
feet 114:16, 115:6,
  169:14.
fellow 38:13, 50:24,
  212:24.
Felon 54:10, 91:9.
felony 92:5,

160:18.
felt 8:16, 8:17,
  16:2, 39:13.
Few 11:19, 30:5,
  71:10, 84:11,
  113:19, 155:22,
  175:19, 176:21.
field 157:25.
fiend 78:18,
  78:21.
file 95:2, 96:5,
  96:17, 97:6,
  100:5, 101:9,
  137:22, 138:6,
  185:22.
filing 185:17.
fill 82:19.
finally 161:6,
  183:20.
Finance 14:6,
  14:8.
find 85:5, 89:15,
  92:17, 119:5,
  134:1, 142:23,
  167:5, 167:12,
  167:13, 168:6.
fine 86:15, 131:2,
  132:15, 136:2,
  205:25.
finish 57:6, 58:7,
  175:2, 175:5,
  206:16.
finished 57:11,
  58:10, 95:18,
  95:24, 139:1.
fire 76:3, 173:22.
firearm 92:4,
  182:16.
firing 76:1.
Five 173:6, 173:7.
fix 43:15.
fixture 72:7, 72:8,
  72:13.
flag 85:5.
flat 102:9.
Floor 1:48, 67:22.
floors 67:23.
flushing 206:16.
focus 162:11.
focused 204:9.

fold 26:25.
folder 139:8.
follow 9:9, 24:11,
  156:9.
followed 133:7,
  145:8.
following 33:25,
  43:18, 82:22,
  92:13, 104:1,
  115:18, 124:19,
  128:23, 148:24,
  202:7, 206:25,
  212:20.
follows 4:8, 52:25,
  152:15.
foot 13:2.
footage 150:12.
foregoing 215:13.
forgot 63:22,
  83:6.
form 77:18, 77:21,
  136:8, 143:1,
  144:20, 147:14,
  147:17.
format 136:8.
formed 144:25.
forsake 11:19,
  84:11, 155:22.
forth 59:8, 73:13,
  73:15, 85:5.
forward 84:25,
  88:11, 174:10,
  175:23.
fouled 139:18.
found 6:25, 7:3,
  40:17, 54:5, 54:6,
  55:15, 56:4, 84:1,
  86:6, 86:7, 91:6,
  98:10, 110:25,
  168:8, 168:16.
Foundation 21:15,
  29:7, 59:14,
  69:25, 70:2, 82:3,
  82:6, 82:20.
four 16:4, 30:22,
  30:24, 30:25,
  67:22, 105:23,
  164:25, 184:16,
  186:21, 202:3.
Fox 10:7, 10:8,

10:19, 46:2, 46:3,
46:4, 83:23,
195:18, 195:19,
195:20.
frame 74:14.
free 28:11, 189:3.
frequently 208:16.
friend 17:13, 31:3,
65:10, 65:13,
65:18, 66:9, 70:5,
70:12, 73:3,
75:10, 75:14,
78:3, 144:8,
144:9, 150:20.
friends 59:9, 59:15,
59:23, 65:4, 69:3,
69:11, 73:18,
79:17, 125:2,
125:5, 125:7,
203:11, 212:24.
front 67:16, 68:6,
72:9, 75:8, 75:9,
78:15, 78:16,
133:7, 133:17,
133:19, 134:3,
136:11, 141:7,
169:6, 169:14,
189:25.
frustrated 22:1,
22:22.
full 139:19,
143:20.
full-fledged 10:3,
10:9, 11:8,
12:25.
fully 10:9, 13:23,
134:19, 161:18.
fumbling 75:21.
fun 32:25.
fundamental 135:7.
furtherance 6:1,
24:21, 81:3.
future 97:2, 104:7,
104:17, 105:9,
115:15.
.
.
< G >.
G-bae 6:3, 8:1,
10:14, 10:15,

30:10, 31:21,
32:9, 38:1, 38:12,
39:2, 50:11,
51:3.
G-r-a-l-i-n
196:21.
G-w-a-l- 152:8.
G-w-a-l-t-n-e-y
152:22.
gain 61:8.
games 120:8.
gang 5:21, 10:5,
16:18, 16:20,
58:21, 151:3,
151:5, 151:6,
151:11, 151:12,
151:14, 151:15,
151:17, 151:18,
153:16, 159:2,
159:10, 176:22,
198:21.
gap 138:21.
gave 9:19, 84:20,
95:1, 109:20,
175:12, 181:7.
gears 162:11.
gel 93:10, 93:14,
93:25.
general 157:25.
genie 136:14.
gentleman 35:24,
36:3, 82:9, 82:10,
143:19.
gentlemen 3:17,
8:24, 29:19,
51:20, 129:1,
129:14, 148:15,
169:10, 172:16,
212:21.
George 6:1, 7:25,
10:16, 30:10,
149:11, 149:12.
Gerald 1:10, 1:29,
28:5, 36:8, 85:14,
124:14, 181:21.
gets 134:19, 207:3,
207:19.
getting 22:1, 70:7,
77:2, 83:20, 97:4,
98:24, 101:21,

107:22, 111:11,
165:11, 179:7,
180:23, 186:19,
186:22, 191:18.
girlfriend 168:9,
168:17, 208:19.
gist 147:2.
Give 11:3, 12:5,
16:3, 16:10,
17:16, 35:11,
35:12, 71:21,
72:5, 82:2, 88:22,
91:21, 99:11,
100:3, 101:10,
104:8, 104:23,
122:16, 123:13,
151:5, 156:1,
190:10.
given 16:15, 36:11,
40:17, 123:17,
130:8, 205:10.
gives 123:15.
glitch 139:24.
GM 23:4, 66:16,
67:14, 75:11,
77:9, 78:11,
168:4, 170:23.
go-to 20:15,
27:23.
goal 104:15, 104:16,
104:19, 187:1,
187:2, 188:19.
goings 59:12.
Google 23:5.
gotten 87:19, 91:25,
183:8, 183:11,
203:21.
grab 75:22,
177:18.
Gralin 196:19,
196:20, 196:21.
grams 94:15.
grand 105:20.
grant 124:13.
granted 133:12.
gratuitous 148:20.
Gray 22:10, 35:20,
60:17, 127:6,
127:7, 127:18,
127:20, 127:24,

154:17, 154:23,
155:4, 159:1,
159:2, 159:7,
171:25, 192:19,
192:20.
great 98:7, 191:19,
200:12, 200:14.
greater 81:16.
Green 50:21, 50:22,
50:23, 71:16,
110:14, 110:15.
grew 88:25.
grounds 82:3, 147:2,
205:9.
Grove 57:15, 57:17,
57:19.
grow 9:19, 153:9.
grown 34:3.
guarantees 7:5,
56:8, 161:23.
Guerilla 5:21,
58:21, 109:1,
153:14.
guess 20:2, 78:18,
85:4, 104:21,
116:12, 149:11,
167:4, 181:10.
guidance 102:25.
guideline 99:10,
103:2, 103:16,
103:17.
Guilford 78:8,
169:21, 169:22.
gunpoint 113:22.
guns 25:20, 131:19,
168:19.
gunshots 137:24.
Guy 20:15, 21:17,
21:19, 23:23,
25:18, 27:23,
59:17, 59:18,
65:14, 70:14,
71:15, 71:17,
71:23, 72:1,
75:18, 75:19,
83:6, 83:7, 83:9,
116:11, 145:1,
148:8, 154:19,
155:10, 167:2,
191:22, 194:3,

212:11, 212:12.
guys 22:22, 61:17,
71:10.
.
.
.
< H >.
H-e-a-d-s 194:14.
habit 189:15,
189:16, 190:20.
hairs 123:4.
half 171:19, 171:20,
187:10, 201:15.
hall 173:10, 173:11,
173:13, 173:15.
Halloween 126:8.
hallway 71:6, 71:15,
72:9.
Hand 4:5, 15:8,
52:22, 66:5,
76:22, 111:21,
119:12, 119:16,
119:20, 120:15,
142:5, 152:12,
207:24.
hand-to-hand
68:17.
handgun 54:6, 54:10,
54:11, 91:7, 91:9,
91:15, 97:20.
hands 77:17,
179:5.
hang 74:3, 76:19,
162:23.
hanging 27:13,
147:9.
happen 6:24, 7:2,
11:3, 55:15,
55:18, 56:4, 56:6,
73:9, 77:2, 82:1,
97:6, 141:25,
162:6, 162:9,
181:5.
happens 55:10,
186:1.
happy 115:16, 123:5,
184:4, 203:9,
205:25.
hard 51:7, 81:18,
116:19, 137:12,
184:4.

hardest 205:4.
harm 11:5, 11:22,
79:21, 155:25,
176:16.
Harris 191:23.
Hawkins 150:6,
150:7, 150:10.
he'll 105:9,
105:11.
head 30:18, 50:24,
113:24, 114:3,
114:15, 114:17,
114:24, 115:6.
Heads 135:13,
194:14, 195:24,
195:25, 196:1,
196:2, 196:5.
hear 27:1, 28:11,
33:23, 55:22,
57:1, 77:20, 80:4,
80:23, 85:21,
85:23, 90:1,
112:10, 147:5,
147:12, 147:14,
147:16, 154:8,
189:23, 205:14.
heard 2:11, 21:24,
71:21, 92:3,
93:25, 103:11,
115:6, 127:9,
127:11, 127:12,
127:14, 127:15,
129:4, 136:13,
146:7, 147:3,
148:5, 149:4,
149:7, 149:8,
150:15, 196:15,
196:18, 196:19,
202:5, 203:4,
209:23.
Hearing 133:4,
206:6, 206:13,
213:19, 214:16.
hearsay 135:19,
135:22, 135:24,
137:2, 138:1,
147:2, 147:20,
147:23, 147:24.
heart 10:20.
Heights 195:16.

held 113:24,
  114:2.
help 47:1, 47:3,
  47:4, 95:8, 101:3,
  104:7, 104:10,
  104:20, 105:10,
  106:12, 106:25,
  107:4, 107:5,
  107:11, 107:15,
  107:17, 173:1,
  185:3, 185:15,
  185:16, 187:1,
  204:7, 205:11.
helped 28:25.
helpful 102:25,
  105:12, 186:8.
helping 108:5.
Henry 19:2, 128:2,
  128:4, 143:19,
  143:20, 147:7,
  149:24.
hereby 215:12.
heroin 7:15, 54:12,
  91:10, 93:10,
  93:15, 93:25,
  163:6, 163:17.
hide 118:24.
High 9:8, 15:18,
  15:24, 158:4,
  159:6, 178:14.
highlighted 99:23.
highly 148:1.
Hill 145:4.
him. 50:4, 72:4.
hired 18:17.
hisself 25:18,
  207:5.
history 149:12,
  176:24.
hit 28:15, 50:23,
  66:3, 121:12,
  139:8, 166:2.
hits 28:2.
hitter 27:21,
  27:22.
Hmm 53:12, 88:2,
  108:12, 108:19,
  119:10, 126:25.
Hobbs 161:7,
  161:9.

Hold 14:24, 71:11,
  88:4, 170:13,
  204:21.
homage 164:6,
  181:10, 189:5.
Home 130:22.
homeboy 75:18.
homegirl 73:3.
homicide 8:7,
  51:2.
honest 183:23,
  183:25, 184:14.
Honorable 1:18.
Hood 17:19, 26:3,
  26:4, 26:6, 26:9,
  26:17, 26:22,
  79:1.
hope 3:13, 55:7,
  134:9, 184:9,
  185:6, 187:2,
  198:13.
hoped 19:22,
  126:2.
hopefully 183:25.
hopes 98:24, 102:11,
  186:19.
hoping 6:14, 6:18,
  20:25, 21:3, 21:8,
  44:5, 44:7,
  100:18, 161:21,
  182:3, 186:25.
hot 198:10.
hour 142:6, 171:19,
  171:20.
House 35:4, 63:22,
  67:19, 67:20,
  145:2, 145:9,
  145:11, 150:4,
  153:23, 154:2,
  154:20, 193:4,
  209:2.
houses 67:23.
housing 179:18.
Huh-uh 149:16.
hung 59:6.
Hunter 36:12, 36:18,
  144:12, 144:22,
  145:17, 145:21,
  146:10, 147:4,
  147:6, 147:13,

  147:16, 147:25,
  148:3, 148:16.
hurry 145:9.
Hutchinson 197:11.
hybrid 139:14.
.
.
< I >.
idea 39:13, 46:6,
  141:16, 141:18,
  143:4.
identified 2:9,
  22:12, 60:19,
  72:23, 172:3.
identify 28:9,
  28:23, 28:25,
  60:16, 171:23,
  214:25.
identity 81:22.
III 1:41.
immediately 28:23,
  81:23, 133:7,
  187:14, 187:17.
immunity 122:16,
  123:9, 123:14,
  123:16, 123:17,
  123:22, 124:1,
  124:13.
impact 135:18.
implicating 147:4.
implied 81:10.
imply 124:9.
important 103:13,
  123:6, 188:13.
imprisonment
  41:15.
in. 214:6.
inaccurate 199:10.
inadmissible 139:5,
  139:19.
inarticulate 81:17,
  82:11.
inarticulation
  82:15.
incarcerated 175:24,
  176:25, 182:25.
incendiary 135:13.
incident 65:10,
  65:13, 66:9.
incidents 65:9.

include 34:15,
  34:17, 130:24.
included 140:20.
includes 134:5.
including 140:20,
  199:12.
incoherent 83:25.
income 67:19,
  67:20.
incorrect 148:13,
  200:8.
independent 52:2,
  129:11, 213:10.
indicate 19:12,
  20:14, 20:23,
  70:15, 215:5.
Indicating. 22:8,
  60:15, 110:18.
indictment 40:25.
individual 5:25,
  10:15, 15:14,
  28:18, 62:19,
  64:2, 64:10,
  72:19, 123:12,
  163:10.
individuals 15:10,
  17:21, 22:3,
  24:14, 25:25,
  27:6, 28:17,
  60:10, 61:20.
Indulge 98:21.
indulgence 119:19,
  181:11, 202:18.
Inevitably 138:21.
inflammatory
  138:4.
information 34:17,
  36:11, 36:12,
  36:15, 147:3,
  148:13, 150:14,
  150:17, 198:23,
  211:6.
initial 14:4.
initially 21:21,
  54:13, 79:7.
inmate 154:20,
  180:2, 180:3.
inmates 157:7.
inquire 89:23,
  123:25, 204:10,

208:5.
Inside 67:21, 67:24,
  68:3, 68:5, 68:7,
  71:2, 71:3, 71:5,
  71:14, 78:23,
  78:25, 157:21,
  159:6, 167:8,
  168:2, 171:4,
  171:5, 171:6,
  171:12, 171:15,
  177:22.
insist 81:15.
Instagram 28:5.
instance 82:21,
  191:20.
instructed 30:22,
  213:4.
instructions
  129:5.
insulin 180:23.
Intent 7:15, 7:18,
  58:4, 91:9, 91:14,
  160:20, 161:2,
  161:4.
interacted 22:16.
interacting 61:4.
interaction 23:13,
  23:20.
interactions 17:1,
  24:19, 29:3, 61:7,
  62:23, 64:14.
interested 107:5.
interlocking
  81:11.
internet 52:4,
  129:12, 213:11.
interplay 102:3.
interpreted 36:15,
  36:19.
interrupted 112:14,
  175:2.
interview 8:7, 8:9,
  8:11, 8:13, 46:24,
  47:8, 51:1,
  211:2.
interviewed 38:4.
interviewing
  38:24.
interviews 128:10.
introduce 139:14,

141:8.
introduced 17:12,
  17:13.
investigate 84:21,
  85:2, 156:25,
  157:1, 166:11.
investigation 52:2,
  129:11, 213:10.
inviting 142:12.
involve 108:21.
involved 13:24,
  18:9, 18:14,
  64:20, 64:23,
  65:1, 120:20,
  182:1, 188:7.
involvement 5:20,
  8:22.
irrelevant 135:17.
issue 102:24, 131:8,
  198:14, 205:22,
  206:17, 208:2.
issues 51:24, 129:8,
  206:12, 213:7,
  213:12, 213:14,
  214:25.
italics 99:24.
Itchy 49:5.
.
.
< J >.
J-o-s-e-p-h 53:7.
J. 1:25.
Jackson 148:17,
  149:11, 149:12.
James 1:18.
January 32:7, 33:14,
  37:25, 51:2,
  213:3.
Jeffrey 1:33,
  181:20.
Jim 193:22,
  193:24.
JKB-16-0363 1:9.
job 205:6.
Joe 165:14, 165:16,
  165:19, 165:22,
  166:2, 166:20,
  194:3, 194:4,
  194:5, 194:16.
John 1:41.

join 9:24, 10:18,
  11:6, 37:16,
  79:13, 79:23,
  155:15.
joined 10:6, 10:11,
  11:15, 13:21,
  36:22, 154:1,
  160:15.
joining 150:23.
joker 159:4.
Jones 1:35, 109:9.
Joseph 52:9, 52:18,
  52:19, 52:23,
  53:5.
judge 7:10, 56:13,
  105:2, 105:6,
  105:7, 105:9,
  105:11, 106:5,
  106:20, 107:11,
  135:21, 162:5,
  182:11, 213:4.
JURORS 3:18,
  212:24.
justification
  201:19.
.
.
< K >.
K-e-l-l-a-m 4:22,
  4:24.
K. 1:18.
Keep 35:14, 51:7,
  70:6, 82:21, 92:8,
  92:10, 184:24,
  199:7, 206:2.
Kellam 3:9, 3:22,
  3:23, 3:24, 4:4,
  4:6, 4:16, 5:3,
  7:11, 9:16, 16:22,
  23:11, 27:17,
  28:8, 29:24, 30:5,
  45:2, 50:10.
Ken 197:2, 197:4,
  197:6, 197:7,
  197:8.
Kenneth 1:35,
  197:5.
kept 21:18, 34:21,
  34:22, 34:24,
  72:1, 169:19,

  169:21.
key 160:5.
kick 212:16.
kid 21:7.
kids 45:13,
  171:10.
killing 51:3,
  145:13, 145:14,
  145:16, 146:11,
  147:25.
kills 204:16,
  207:4.
kind 36:6, 61:13,
  67:18, 76:23,
  139:24, 139:25,
  157:1, 158:12,
  161:24, 163:5,
  163:22, 164:20,
  168:10, 178:10,
  179:15, 205:8,
  208:23, 209:4,
  210:5, 213:9.
knocked 173:3.
knowing 51:7, 51:8,
  190:12, 190:14,
  190:17.
knowledge 16:22,
  18:9, 74:2,
  200:13, 200:14.
known 6:3, 8:1,
  143:20, 143:22.
knows 127:20, 148:7,
  148:14, 148:15,
  200:10, 200:14.
.
.
< L >.
lack 11:20.
Ladies 3:17, 8:24,
  29:19, 51:20,
  129:1, 129:14,
  148:15, 169:10,
  172:15, 212:21.
language 37:9,
  82:17.
last 4:12, 4:13,
  4:23, 18:2, 25:9,
  53:4, 82:10,
  83:25, 111:11,
  113:11, 125:16,

  126:8, 142:11,
  144:4, 146:25,
  152:5, 152:20,
  152:22, 183:2,
  213:3.
Later 51:6, 72:23,
  110:25, 113:19,
  120:24, 128:21,
  142:9, 142:12,
  155:13, 173:24,
  174:10, 177:24,
  186:21, 187:20,
  191:6, 191:7.
later. 33:22.
latest 142:4.
latitude 88:22,
  91:22.
latter 172:21.
Lawrence 194:5.
lawyer 40:8, 93:2,
  97:10, 97:18,
  97:25, 98:5,
  98:15, 98:16,
  98:17, 98:22,
  100:14, 100:15,
  105:1, 186:3.
lawyers 101:22,
  144:3, 204:24.
lax 155:23.
lead 19:6, 82:12,
  102:19.
Leading 55:12,
  58:18, 69:23,
  69:25, 70:2,
  82:13, 82:14.
learn 10:19, 12:1,
  24:5, 24:7, 26:22,
  59:19, 59:22,
  62:24, 64:15,
  72:25, 76:9,
  171:12, 174:16.
learned 26:9, 29:15,
  29:16, 60:4, 76:6,
  174:11.
learning 165:21.
least 30:22,
  30:24.
leave 33:8,
  177:22.
leaving 147:8.

left 26:2, 34:6,
  50:15, 52:6,
  129:17, 173:8,
  174:3, 182:11,
  213:18.
legal 131:10.
legally 134:24.
lengthy 130:7.
leniency 6:18.
less 43:8, 43:22.
lesser 55:7, 100:25,
  101:2, 103:7,
  161:22, 185:6,
  187:2.
letters 99:25,
  123:12.
letting 81:1.
level 102:1, 102:9,
  102:17.
lied 40:4, 51:3,
  51:4, 162:6.
life 5:13, 5:14,
  31:21, 41:15,
  44:10, 53:20,
  70:7, 70:21,
  79:16, 87:1, 87:3,
  87:17, 120:10,
  183:18, 184:11,
  184:25.
light 50:21, 50:22,
  50:23, 72:6, 72:8,
  72:12, 135:2.
lighter 44:7,
  102:11.
likely 151:19,
  183:17.
Lil 17:19, 17:22,
  17:23, 23:19,
  24:15, 24:16,
  26:3, 26:4, 27:15,
  60:6, 63:19,
  65:12, 83:7, 83:8,
  83:9, 144:13,
  145:19.
limine 135:16.
limit 43:9.
limited 42:16,
  42:23, 150:14,
  150:16.
limiting 41:25.

line 80:25, 103:5,
  146:25, 148:6,
  189:9.
lineal 81:12.
lined 130:7.
link 20:4.
list 192:13, 192:17,
  198:15, 198:17,
  199:1, 199:2,
  199:4, 199:5,
  200:4, 200:24,
  200:25, 201:1,
  201:2, 201:3,
  201:9, 201:18,
  202:5, 203:5.
listed 34:12.
lists 211:16.
literally 74:25,
  138:11.
litigated 134:18.
live 208:17.
lived 5:13, 53:17,
  53:20, 89:1,
  172:9, 208:18,
  208:25.
lives 45:15.
living 145:2,
  162:13, 162:15,
  174:25, 175:15,
  175:16, 175:18,
  175:21.
located 13:17.
locked 8:14, 8:16,
  18:1, 18:5, 18:6,
  26:9, 26:15, 27:3,
  73:10, 79:4, 79:6,
  154:1, 162:12.
logical 128:19.
logistically
  137:20.
Lombard 1:48.
long 27:12, 39:25,
  97:19, 98:12,
  98:13, 107:4,
  125:11, 138:23,
  171:18, 173:13,
  182:24, 186:1,
  186:24, 192:13,
  192:16, 198:15,
  199:1, 199:5,

200:24, 201:1,
  201:2, 202:5,
  203:4, 203:5,
  211:2.
longer 32:4, 33:9,
  34:3, 74:20,
  129:18, 173:5,
  201:23, 212:13.
Look 15:24, 47:11,
  47:13, 52:3,
  95:18, 113:1,
  113:2, 129:12,
  132:25, 157:2,
  173:18, 173:19,
  178:20, 205:23,
  207:15, 210:13.
looked 100:10,
  119:24, 167:9,
  211:13.
looking 23:5, 23:10,
  24:14, 60:10,
  62:10, 63:5, 66:7,
  66:17, 67:15,
  73:2, 73:4, 74:11,
  77:10, 155:3,
  167:11, 168:4,
  170:22, 171:16,
  173:16, 184:24.
looks 116:16.
lost 135:20, 138:5,
  203:13.
lot 18:5, 18:6,
  51:9, 71:9, 79:17,
  81:12, 148:18,
  173:22, 200:5.
lots 200:11.
loud 47:11,
  106:22.
loved 177:14,
  177:16.
low 67:19, 67:20,
  104:12.
lower 99:11, 100:11,
  100:13, 100:15,
  101:10, 104:11,
  104:24.
LT 194:7.
LTC 157:25.
lunch 128:17, 129:2,
  143:18.

lying 39:21, 51:7.
.
.
< M >.
M-a-n-s 194:9.
M-a-r-c-a-l
  193:10.
M-i-c-h-a-e-l
  152:22.
machine 131:18.
mad 22:1, 114:9.
maintained 214:21,
  214:25.
Major 193:12,
  193:14.
Malicious 56:24,
  57:2, 86:12.
Man 20:13, 28:15,
  31:1, 31:3, 31:5,
  75:18, 75:19,
  76:16, 76:22,
  77:4, 78:3, 79:18,
  79:19, 89:3,
  116:13, 116:16,
  179:25, 180:4,
  180:5, 180:6,
  183:23, 186:3,
  194:10, 194:14,
  195:11.
manner 82:7.
Manny 194:10,
  194:11.
Mans 194:9,
  194:11.
manufactured
  160:23.
maps 23:5.
Marcal 193:8,
  193:10, 193:11.
Marijuana 54:11,
  58:5, 58:7, 63:20,
  67:8, 67:9, 69:17,
  72:14, 91:10,
  94:6, 168:23,
  178:11.
Mark 9:3, 9:4, 9:10,
  13:16, 35:4, 35:6,
  35:7, 47:18,
  48:11, 68:7,
  141:4, 195:22,

214:6.
marked 100:1.
Marquise 1:39.
marriage 90:7.
married 88:15,
  88:16, 88:17,
  89:3, 89:5, 89:12,
  89:13, 89:17,
  89:20, 90:3, 90:4,
  90:5, 90:9.
Marshal 128:25,
  157:25, 215:8.
Marshals 5:15,
  53:24.
Martin 167:25,
  168:14, 168:16.
Maryland 1:2, 1:20,
  1:49, 5:8, 124:4,
  153:8, 153:23,
  154:2, 155:9,
  155:11, 155:13,
  177:1, 177:4,
  177:7.
mask 71:16, 71:17,
  110:7, 110:11.
masked 72:19.
match 203:12.
Matter 130:17,
  215:14.
matters 77:16.
mature 9:19, 34:3.
Mccants 1:39, 45:2,
  46:14, 46:23,
  49:21, 50:2,
  109:6, 149:17,
  149:18.
Mcdonald 23:2, 23:3,
  23:6.
Mcnutt 2:11.
Meadows 36:3.
Meaning 42:12, 85:4,
  120:9.
Means 9:13, 9:14,
  14:21, 37:10,
  69:11, 73:15,
  189:24, 198:20.
meant 66:14, 111:23,
  111:25, 112:1,
  172:16.
mechanics 135:9.

media 116:25,
  117:2.
medical 180:16,
  180:18, 180:25,
  181:3.
meet 214:18.
meeting 47:8, 47:10,
  47:14, 47:16,
  50:1, 51:10,
  108:1, 204:15.
memorialized
  133:18.
memory 100:10,
  112:19, 204:3,
  207:9, 207:22,
  208:2.
men 179:24.
mention 111:18,
  200:16.
mentioned 12:1,
  14:15, 20:16,
  24:16, 25:14,
  26:6, 27:8, 36:6,
  40:16, 51:10,
  59:24, 60:20,
  62:12, 63:13,
  64:6, 65:18,
  65:25, 66:9, 67:3,
  72:12, 72:19,
  160:14, 166:15,
  202:3.
mentions 2:8.
mess 25:8, 25:11,
  25:12.
message 70:10,
  70:15.
messy 134:20.
met 8:18, 32:13,
  32:22, 36:8, 45:5,
  46:11, 46:17,
  49:23, 127:18,
  187:4, 192:12,
  202:10.
MG 13:16, 15:11,
  15:12, 15:16.
Michael 35:20,
  72:20, 72:21,
  72:23, 73:1, 74:1,
  74:6, 127:6,
  127:7, 152:4,

152:10, 152:13,
152:21.
Michelle 144:9,
145:11, 150:21.
microphone 4:11,
4:15, 53:3, 53:19,
146:22, 152:19,
206:11, 206:15.
microphones 206:8.
middle 97:13.
midpoint 214:19,
215:5.
Mike 48:3, 71:18,
72:3, 73:3, 73:5,
74:12, 74:15,
75:4, 75:15, 76:3,
76:25, 111:1,
112:9, 112:11,
153:12, 154:17,
154:23, 155:4,
159:1, 159:2,
159:7, 192:20.
milestone 188:17.
Miller 143:19.
Mills 19:2, 128:2,
128:4, 143:19,
143:20, 145:14,
147:7, 147:25,
149:24.
mind 33:9, 76:18,
81:13.
mine 65:10, 65:13,
203:11.
minute 32:3,
65:17.
minutes 52:5, 52:10,
129:20, 129:21,
141:16, 141:18,
142:4, 173:6,
173:7.
Mis 43:3.
misfired 115:24.
missed 18:2, 25:9.
missing 82:20.
mission 9:11, 9:12,
9:13, 12:6, 12:7,
31:17.
misstated 91:11,
91:13.
misstates 90:20,

93:22.
mistake 214:7.
Moan 49:19.
MOD 157:25.
MOJ 157:25.
mole 29:1.
moment 3:24, 133:10,
136:10.
moments 30:5.
money 11:2, 11:4,
14:20, 15:17,
15:23, 16:12,
16:15, 37:7, 37:9,
71:24, 71:25,
72:1, 72:2, 72:15,
72:17, 114:5,
179:5, 189:10,
189:11, 190:21,
190:23, 191:1.
money. 71:22.
Monk 195:5, 195:6,
195:7.
month 16:3, 111:12,
111:15, 113:11.
months 41:12, 41:14,
105:23, 105:24,
187:20, 187:24,
191:6, 191:7,
191:11, 191:15.
morning 2:2, 3:17,
3:18, 5:3, 5:4,
51:20, 53:11,
133:22, 134:4,
137:5, 202:1,
213:16, 215:9.
Mostly 15:8,
165:2.
mother 174:15.
motion 96:6, 97:7,
135:16, 185:17.
motive 38:20, 38:23,
39:16, 44:14.
motto 121:15.
mouth 102:16.
move 4:15, 57:11,
57:14, 57:23,
83:24, 84:15,
100:17.
moved 57:15, 58:23,
89:1.

multiple 176:25.
Murda 49:3.
murdered 158:17.
murdering 5:25.
Murders 188:3,
188:7, 191:9,
191:11, 191:19.
music 135:25.
Mustafa 17:15,
17:18, 25:22,
27:7, 27:8, 27:12,
27:14, 64:13,
73:23, 76:21,
110:24, 111:4,
111:16, 111:23,
112:6, 113:5,
165:8, 165:9,
166:23, 171:10.
myself 159:15,
170:14, 206:14.
.
.
< N >.
N-word 28:11.
nail 81:23.
named 6:1, 19:2,
31:1, 35:24, 36:3,
39:2, 59:17,
59:18, 65:14,
65:18, 66:10,
70:14, 145:1,
155:10, 163:10,
165:13, 167:2,
191:22, 194:3,
196:11, 203:11.
names 17:16, 51:10,
155:17, 171:11,
192:15, 198:15,
198:17, 198:23,
199:1, 200:11,
202:11, 203:5,
203:11, 211:3.
narcotics 7:19,
7:22.
nature 10:21, 23:20,
69:8, 135:3.
Neal 30:10.
Nealy 6:1, 6:3,
7:25, 8:25, 10:16,
31:20.

near 145:7, 201:3.
nearby 93:12.
nearly 200:4.
necessary 14:21, 37:10.
need 73:12, 77:3, 77:5, 81:8, 88:4, 135:10.
needed 11:2, 23:25, 24:2.
needs 215:2.
neglect 11:21, 155:24.
negotiated 186:16.
neighborhood 14:11, 17:4, 58:23, 58:24, 59:3, 59:8, 63:17, 64:21, 64:24, 65:2, 69:12, 69:13, 116:8, 116:10, 116:19, 116:21, 117:13, 117:20, 117:24, 118:21, 119:6, 162:21, 162:23, 163:7, 163:18, 165:13, 166:24.
neither 105:1.
nephew 172:13, 172:15, 172:16.
neutral 205:8.
New 66:20.
news 51:23, 129:7, 213:6.
nickname 2:9.
nicknames 53:13, 153:11.
night 113:16, 173:17, 173:24.
nighttime 78:2.
nine 131:18, 131:22, 131:24, 132:1, 132:21, 133:3, 133:5, 133:22, 134:3, 134:8, 134:23, 135:23, 135:24, 137:6, 137:15, 137:18, 137:22, 138:7,

138:25, 139:22, 140:16.
Nique 19:3, 19:11, 22:14, 143:21, 143:23, 143:24, 144:10, 145:14, 146:5, 149:24, 150:17.
No. 1:9, 17:21, 21:7, 22:3, 23:4, 25:25, 50:21, 60:10, 65:21, 74:7, 78:11, 88:6, 88:8, 106:2, 110:11, 117:11, 132:22, 133:6, 133:14, 133:23, 134:5, 141:8, 141:9, 141:14, 150:9, 171:17.
Nobody 73:10, 118:6, 126:23, 126:24, 127:4, 133:3, 157:11, 173:3.
nominate 37:18.
nominated 37:21.
None 36:5, 186:14, 214:16.
nonetheless 214:24.
nonspecific 81:22.
Noodles 193:6.
Norm 17:19, 24:15, 24:16, 27:15.
North 54:8, 57:15, 57:17, 57:19, 57:21, 57:23, 58:13, 63:24, 66:2, 66:18, 67:12, 167:8, 168:2, 169:12, 169:20.
NORTHERN 1:2.
notes 47:8, 138:5.
Nothing 7:1, 7:4, 9:20, 33:1, 33:21, 42:6, 42:19, 44:20, 73:19, 76:16, 76:17, 76:18, 76:20,

79:21, 107:7, 117:12, 119:16, 140:8, 172:5, 204:1.
notice 2:5, 71:8, 173:21.
notify 35:13.
November 144:3, 191:16, 192:10, 207:3.
Number 16:3, 26:1, 34:18, 40:16, 99:6, 101:16, 101:17, 101:21, 140:22, 141:10.
numerous 18:1.
.
.
< O >.
o'clock 124:6, 128:18, 129:15, 129:16, 130:15, 173:14, 212:15.
Oath 4:3, 4:5, 10:20, 11:15, 11:17, 11:19, 11:21, 11:22, 11:23, 11:24, 11:25, 45:25, 52:22, 84:12, 84:14, 143:10, 152:12, 155:15, 155:17, 155:19, 155:23, 155:24, 155:25, 156:2, 156:3, 156:4, 159:17, 159:19, 159:22, 159:23.
Oatmeal 84:7, 155:18, 159:17, 159:19.
Object 55:12, 82:2, 83:24, 90:17, 94:2, 101:22, 146:25, 147:22.
objected 137:24.
objecting 147:2, 205:9.
objections 81:9, 95:12, 130:24.

observation 10:10,
 82:8, 102:4.
observe 63:16,
 65:6.
obstreperous
 102:8.
obvious 140:14,
 198:17.
occasion 36:9,
 75:7.
occasions 8:19,
 165:3.
occurred 150:5,
 198:18.
October 69:16, 75:3,
 92:19, 97:16,
 113:11, 144:4.
odd 76:23.
offender 40:18.
offense 92:5.
offer 182:1.
offered 93:4,
 94:25.
Office 98:18,
 127:24.
officer 38:4,
 178:3.
officers 8:18, 8:21,
 28:22, 177:11,
 178:5, 200:23.
Official 1:47,
 215:18.
officials 113:4,
 144:6.
often 16:1, 125:9,
 164:22, 164:23,
 164:24.
old 5:5, 44:2,
 45:11, 53:22,
 56:18, 56:20,
 86:16, 86:21,
 86:23, 87:7,
 153:5, 182:22,
 182:24.
Once 106:17, 131:12,
 134:17, 136:15,
 212:25.
one. 194:3, 196:6,
 198:5.
ones 12:15, 73:24,

 134:21, 177:16.
open 33:25, 43:18,
 82:22, 92:13,
 104:1, 115:18,
 124:19, 128:23,
 131:6, 147:12,
 148:24, 202:7,
 206:25, 212:20.
opening 133:2,
 136:25.
opens 104:23.
operates 157:12.
operating 162:17,
 162:20.
opinion 144:25.
opportunity
 205:10.
opposed 81:11,
 189:22.
orange 178:21.
order 9:10, 10:18,
 31:17, 39:18,
 50:23, 97:1, 97:3,
 97:4, 97:5,
 140:9.
ordered 9:1, 9:2,
 9:13, 12:6, 19:17,
 31:12, 137:1,
 154:23.
organization
 153:13.
organized 157:15.
Originally 5:7,
 53:15, 155:6,
 206:17, 214:3.
Orthopedic 206:12.
others 59:3, 59:23,
 148:4.
Otherwise 82:20,
 92:7, 101:11,
 133:1.
outside 68:4, 127:4,
 133:4, 170:2,
 179:5, 213:19.
outweighs 135:18.
overall 87:5,
 87:6.
overnight 212:22.
Overruled 58:19,
 60:1, 61:12, 62:5,

 63:10, 68:25,
 69:24, 70:4, 84:1,
 86:3, 87:22,
 89:21, 93:24,
 95:13, 101:24,
 106:14, 151:10,
 177:21, 211:24.
overseer 14:25,
 15:1, 15:6.
oversees 15:2.
overspoke 206:7.
overstep 166:12.
own 65:6, 77:17,
 102:3, 136:18,
 150:2.
.
.
< P >.
package 178:21.
packaged 178:20.
paid 14:9, 189:5.
Paperwork 157:3,
 157:4, 157:5,
 157:8, 198:20,
 198:25, 201:18.
Paragraph 95:19,
 95:20, 95:22,
 96:2, 99:21,
 99:23, 112:25.
paralegal 134:13.
Pardon 85:22.
Park 77:12, 145:4.
parked 75:23, 77:7,
 78:6.
participants 51:25,
 52:1, 52:4, 129:9,
 129:10, 213:8,
 213:9.
participate 8:7.
participated 18:18,
 177:6, 178:8.
participating
 213:12.
particular 20:14,
 81:19, 103:4,
 122:9, 122:10,
 122:21, 123:22,
 142:14, 148:12,
 168:24, 201:1,
 202:11, 203:7.

particularly
    82:11.
parties 117:3,
    117:6, 117:7,
    117:10, 117:11,
    118:12, 118:14,
    182:19.
parts 16:23, 135:13,
    137:2, 162:18.
party 147:23,
    173:10, 173:13.
passed 70:10,
    173:21, 191:12,
    191:15.
passing 70:15.
past 78:17, 91:16,
    108:2, 173:15.
path 71:6, 186:25.
patience 138:16.
Paul 1:31.
Pause 2:3, 4:2,
    139:8.
pay 14:16, 16:7,
    62:4, 62:6, 62:7,
    98:15, 99:25,
    164:2, 165:1,
    165:3, 178:6,
    181:7.
paying 61:23,
    179:2.
payment 12:10.
payments 14:9.
Payson 13:18, 13:19,
    13:24, 14:4.
Pea 197:13.
penalties 93:3.
per 16:3.
perfect 214:22,
    214:24.
Perhaps 117:8,
    183:17, 184:24,
    200:20, 214:17.
period 89:2, 89:4,
    162:12, 162:24,
    163:3, 163:16,
    165:20.
Perjury 55:17,
    56:5.
permission 166:4,
    166:5, 166:6.

permit 81:25.
permitted 124:9.
perpetrator
    144:21.
personal 17:11,
    29:3, 163:17.
personality 116:7,
    116:10, 117:24.
personally 16:17,
    18:4, 149:17.
persons 213:12.
perspective
    206:21.
Peter 1:25.
PH30 214:5.
PHI 15:9, 17:20,
    22:2, 24:13,
    25:24, 27:5,
    28:17, 60:9,
    62:10, 62:18,
    63:4, 64:1, 64:9,
    65:21, 66:13,
    74:10, 155:2,
    164:8, 165:6,
    165:18, 166:17,
    167:15, 214:1,
    214:2, 214:9,
    214:12.
philosophy 37:12.
phone 34:18,
    174:24.
phoned 23:23.
phones 72:8.
Photograph 34:18.
photographs 34:15.
photos 15:10, 17:21,
    22:2, 24:13,
    25:24, 27:5,
    28:17, 60:9.
phrase 69:9.
physical 132:7.
physically 132:16,
    133:18.
pick 15:17, 15:23,
    163:18, 177:24.
picking 134:17.
picks 178:1.
picture 28:16,
    28:23, 50:1, 73:4,
    108:17, 114:23,

165:21, 169:7,
    200:18.
pictures 60:8,
    108:11, 210:20,
    211:15.
piece 123:11,
    135:19.
pieces 2:22,
    135:20.
Pimp 80:3, 80:8,
    80:9, 83:7.
pipeline 19:16.
place 65:15, 168:1,
    169:6.
placed 50:21, 52:22,
    152:12.
places 178:7.
Plaintiff 1:7,
    1:23.
plan 20:23, 20:25,
    21:23, 133:25,
    136:13, 170:10,
    213:16.
plans 172:11.
Play 28:3, 120:8,
    130:24, 131:20,
    131:21, 131:24,
    132:3, 132:15,
    132:21, 134:4,
    137:15, 137:17,
    137:18, 137:22,
    138:6, 138:17,
    139:3, 139:4,
    139:9, 140:5,
    140:16, 140:25,
    142:6.
played 130:25,
    133:17, 136:15,
    136:17.
played. 28:7,
    140:3.
playing 130:21,
    138:11, 139:2,
    139:7.
plead 5:23, 5:25,
    54:18, 86:3, 86:4,
    91:6, 91:7, 92:17,
    93:4, 98:17,
    98:23, 126:7,
    161:12, 182:2,

183:21, 185:3,
186:17, 187:13,
187:16.
pleaded 41:10.
pleading 86:9.
Please 2:2, 4:3,
4:5, 4:12, 47:11,
52:5, 52:16,
52:20, 52:21,
53:3, 84:24,
113:1, 129:16,
130:19, 143:9,
144:24, 146:22,
152:6, 152:11,
152:19, 153:5,
202:18, 213:17.
plural 196:1.
plus 166:11.
pod 179:18.
podium 207:25.
Point 15:4, 22:7,
30:16, 37:2,
60:14, 77:16,
87:2, 87:3, 95:20,
99:20, 100:19,
100:20, 103:13,
128:19, 147:12,
169:7, 171:24,
183:8, 183:11,
190:18, 198:16,
198:22, 200:10,
200:24, 201:8,
201:9, 201:23.
point. 202:6.
pointed 85:15,
114:24, 115:1,
115:5, 115:23,
118:20.
points 55:6,
200:18.
Police 7:25, 12:8,
32:18, 38:4, 54:4,
98:19, 173:22.
pool 173:10, 173:11,
173:13, 173:15.
Poplar 57:15, 57:17,
57:19.
popular 116:11.
portion 137:23,
139:4, 139:19.

portions 130:21,
130:23, 130:24,
132:17, 134:18,
135:12, 155:21.
position 134:15,
135:1, 136:1,
159:6.
positions 157:22,
157:24.
Possession 7:15,
7:18, 54:10,
54:11, 58:4, 91:7,
91:9, 91:14,
91:15, 92:4,
93:14, 94:5, 94:7,
94:9, 94:12,
154:3, 160:20,
161:2, 161:4,
182:16.
possibility 97:4.
possible 139:12.
possibly 183:12.
pounds 25:19.
powder 94:15.
Powell 141:9, 214:4,
214:13, 214:19.
practice 139:15,
139:17.
Pratt 13:18, 13:19,
13:24, 14:4.
precise 92:7,
102:3.
precisely 123:8.
precision 81:8,
81:21.
predict 115:15.
prediction 105:1.
prefer 143:1.
prejudicial
135:18.
premise 124:17.
prepared 199:5.
presence 79:9.
present 146:4,
150:3.
presented 135:2,
213:12, 213:15.
presently 199:3.
presents 51:24,
129:8, 213:8.

presided 136:21.
press 11:1.
Pressing 10:23.
pretrial 131:1,
137:24.
Pretty 15:2, 19:22,
20:25, 22:22,
26:15, 50:23,
74:7, 87:18,
140:14, 183:8,
201:6, 206:2.
previously 101:24,
130:24, 131:17,
132:12.
price 50:24.
primarily 37:3.
print 207:17.
prior 40:16.
prison 9:21, 36:25,
37:6, 39:22,
39:25, 51:4,
157:6, 176:22,
182:25, 183:6,
183:9, 183:12,
183:18.
prisoners 37:7.
prisons 157:13,
177:4, 177:6,
177:10.
privilege 180:7.
privileges 180:6,
188:25.
probation 58:9.
problem 101:19,
101:25, 139:13,
140:21, 142:10,
142:12, 192:1,
201:21, 201:22,
205:13, 206:14.
proceed 82:7,
143:5.
proceeded 81:11.
Proceedings 1:17,
33:25, 43:18,
82:22, 92:13,
104:1, 115:18,
124:19, 128:23,
148:24, 202:7,
206:25, 212:20,
215:10, 215:14.

proceedings. 2:3,
 4:2.
process 71:13.
produce 137:16.
produced 124:10,
 137:8.
production 135:25,
 138:2.
productive 102:13.
proffer 123:10,
 123:12, 130:12.
proffers 123:13.
promise 102:22,
 105:6.
promises 105:6,
 161:23.
promote 117:11.
promoted 117:4,
 117:6.
promotion 188:14,
 188:23.
pronounce 184:6.
pronouncing 184:4.
proof 201:9.
proper 143:1.
properly 133:20.
property 90:17.
proposal 140:17.
prosecution 95:1,
 96:4, 101:8,
 185:16.
prosecutor 105:1,
 105:6.
Prosecutors 32:16,
 96:16, 98:22,
 108:21, 108:22,
 108:25, 112:15,
 144:5, 148:21,
 187:8.
protection 79:23.
proud 50:13.
provided 16:5,
 131:10, 198:23,
 211:6.
provides 185:21.
provision 123:9.
public 205:5.
pull 53:18, 141:16,
 141:18, 206:10.
pulled 75:17, 75:20,

75:24, 75:25,
 77:8, 114:16,
 114:25, 115:2,
 115:6, 116:2,
 146:3, 168:19,
 169:14, 169:17,
 170:2.
pulling 140:14,
 143:4.
punishment 156:16,
 156:19.
purchase 63:19,
 63:21.
purchased 63:20.
purports 205:24.
purpose 100:22,
 100:23, 101:1,
 101:2, 106:4,
 106:24, 157:10,
 202:14.
purse 71:25, 72:1.
pursued 148:8.
pursuing 147:9.
Put 4:5, 24:25,
 40:21, 65:21,
 66:13, 71:23,
 73:12, 75:11,
 114:15, 121:9,
 131:2, 131:9,
 133:23, 134:2,
 136:7, 136:11,
 140:11, 147:3,
 154:5, 158:11,
 158:12, 172:10,
 174:19, 178:19,
 185:9, 201:15.
puts 119:12.
putting 133:24,
 186:4.
.
.
< Q >.
quantifying 103:8.
questioning 146:25,
 147:9, 148:6.
questions 29:25,
 33:21, 33:24,
 44:22, 50:6,
 50:10, 51:15,
 81:12, 82:19,

85:8, 92:2,
 134:17, 134:20,
 147:1, 151:20,
 176:21, 181:13,
 205:6, 209:13,
 209:15, 210:22,
 211:2, 211:6,
 212:3.
quick 205:20.
quickly 139:20.
quiet 53:18, 71:8.
Quite 82:16, 114:23,
 128:16, 164:23,
 164:24, 175:19.
.
.
< R >.
R. 1:41.
Rabbit 195:9,
 195:11.
Racketeering 5:19,
 40:22, 40:23,
 42:4.
Rah-rah 49:15.
railroad 140:2.
Rainey 35:24,
 35:25.
raise 4:4, 52:21,
 131:7, 131:22,
 146:24, 152:11,
 198:14, 205:7.
raised 130:24,
 131:17.
raises 134:20.
raising 37:9.
ran 65:11, 72:9,
 75:25, 77:6,
 77:13, 115:3,
 115:25, 145:11,
 169:19.
range 30:16, 99:10,
 103:18, 115:23.
rank 13:1, 14:4,
 15:6, 15:21,
 16:20, 20:14,
 159:2, 188:18.
ranking 9:8, 16:25,
 158:4.
ranks 14:22,
 14:24.

rap 91:25, 92:1,
    92:3, 130:22,
    145:21, 145:24.
rate 178:24.
rather 98:13,
    173:2.
rattles 198:24.
Ray 155:10,
    155:11.
reached 212:21.
Read 47:11, 95:21,
    96:1, 99:15,
    99:21, 99:22,
    99:23, 99:25,
    113:1, 113:2,
    149:13, 160:6,
    192:15, 207:15,
    207:17, 207:20,
    207:21, 210:7,
    210:12.
ready 2:25, 3:19,
    52:12, 77:2,
    80:23, 107:22,
    107:23, 107:25,
    108:5, 111:11,
    140:25, 206:15.
real 10:15, 59:6,
    61:13.
realize 133:9.
really 59:5, 60:25,
    85:5, 87:23, 97:9,
    97:10, 102:12,
    102:13, 111:23,
    114:9, 118:24,
    119:6, 148:10,
    199:11.
Reason 31:11,
    111:18, 131:5,
    165:5, 183:24,
    184:15.
recall 112:17,
    117:2, 119:15,
    119:18, 165:20,
    167:10, 187:7,
    194:2, 194:3,
    197:7, 204:13,
    204:14, 208:3.
receive 42:17,
    42:19, 57:3,
    103:2.

received 36:12,
    57:5, 214:5.
receiving 179:20.
recent 86:24, 87:8,
    87:15, 91:3.
recess 51:21, 52:11,
    130:16, 212:22.
recite 11:17,
    155:20, 155:21,
    156:16, 159:25,
    210:8.
recognize 15:14,
    26:2, 28:18,
    62:19, 64:2,
    64:10, 201:22,
    210:9, 210:16.
recognized 113:21,
    164:8.
recollection 38:19,
    47:2, 47:4, 95:14,
    99:18, 205:11,
    205:23.
recommend 41:18,
    43:8, 43:22.
recommendation
    42:22, 42:23,
    105:4.
reconvene 215:8.
Record 2:21, 22:7,
    22:11, 28:8,
    60:14, 60:18,
    90:21, 132:8,
    133:11, 133:20,
    133:23, 134:21,
    135:8, 136:9,
    136:12, 136:16,
    136:19, 137:23,
    142:2, 171:22,
    172:2, 201:12,
    214:9, 214:16,
    214:23, 215:14.
record. 2:24, 33:20,
    43:5, 80:21,
    91:20, 101:14,
    115:10, 122:14,
    128:7, 146:21,
    198:8, 204:25,
    212:9.
recorded 8:9.
records 134:7,

214:21, 214:25,
    215:4.
Recross 151:21.
redacted. 2:20.
REDIRECT 50:7, 50:8,
    149:20, 149:21,
    210:23, 210:24.
redistribute 2:22.
reduced 97:5.
Reduction 6:20,
    55:6, 55:9,
    162:2.
refer 20:10, 92:3.
reference 22:14,
    203:7, 204:12,
    205:22, 213:14.
referred 9:6, 12:2,
    85:15, 153:24,
    155:17, 214:1,
    214:2.
referring 22:24,
    65:22.
reflect 22:11,
    60:18, 133:20,
    172:2, 201:12.
refresh 38:19, 47:1,
    47:4, 95:14,
    99:17, 112:19,
    204:3, 204:23,
    205:11, 205:23,
    207:9.
refreshed 100:10,
    207:22, 208:2.
refuse 11:23, 31:16,
    156:1.
refused 31:17,
    159:11, 159:14.
regarding 211:6.
regardless 9:15,
    124:9.
Reggie 196:7.
regimes 16:22, 17:1,
    157:16, 162:17.
reject 156:2.
relate 51:25,
    129:8.
related 52:3,
    105:25, 130:7,
    164:16.
relation 57:17,

74:16, 102:12.
relationship 27:12,
  32:1, 62:15,
  84:13.
released 13:3.
Relevance 88:21,
  135:18.
Relevancy 88:20,
  147:24.
relevant 148:1,
  201:23, 213:11.
reload 138:22.
reluctant 136:11.
relying 140:21.
remain 143:10.
remaining 132:22.
remanded 130:15,
  215:7.
remembering 215:2.
remind 117:7,
  117:8.
remorseful 8:17.
remove 139:2.
rendition 214:15.
repeat 6:16, 18:2,
  38:22.
repercussions 12:12,
  12:14, 201:25.
Rephrase 91:2,
  115:14, 115:16,
  122:6, 122:7,
  123:5.
report 199:20,
  199:21, 205:24.
Reporter 1:47,
  215:18.
reports 15:3, 51:23,
  51:24, 129:7,
  129:8, 213:7.
represent 85:14,
  181:20, 181:21,
  198:22.
representation
  133:21.
request 133:12.
require 6:11, 55:1,
  161:17.
required 14:15,
  97:2.
requirements 97:1.

requires 186:7.
requiring 12:10.
reside 67:24.
resist 102:8.
resolve 82:18.
respect 14:10, 15:6,
  20:24, 123:21,
  124:13, 200:13,
  213:12.
respective 214:21.
response 80:5,
  83:25, 154:9.
response. 95:25,
  100:2, 144:1.
responses 80:25.
responsibilities
  14:7, 14:8, 135:7,
  136:18.
responsible 7:8,
  56:11, 162:4.
responsive 83:25.
rest 44:10, 130:5,
  132:3, 183:17,
  184:24.
restate 84:3,
  203:6.
result 74:5,
  162:2.
return 9:22, 58:13,
  207:25.
returned 67:3.
reveal 11:24,
  156:3.
Revere 196:17,
  196:19.
review 215:3.
revised 141:7,
  142:8.
rhetorical 201:8.
Rick 49:13.
right-hand 23:6.
rights 81:15.
Rob 59:8, 69:7,
  69:13, 70:20,
  73:20, 73:25,
  90:16, 110:23,
  111:16, 112:12,
  112:13, 113:6,
  166:23, 167:1,
  167:3, 175:17,

189:10.
robberies 65:1,
  65:6, 160:12.
robbery 14:3, 24:25,
  25:14, 25:15,
  25:21, 27:15,
  65:15, 74:16,
  74:18, 74:19,
  74:22, 75:5,
  80:17, 91:13,
  119:13, 119:17,
  151:6, 151:12,
  161:7, 162:12,
  167:18, 167:21,
  168:1, 168:24,
  169:2, 169:11,
  182:14, 202:21,
  202:22.
robbing 190:4.
Rock 47:22, 69:7,
  69:9, 120:9,
  120:12.
rocking 120:18.
role 14:10, 24:5,
  60:23, 61:9,
  159:2.
room 177:19,
  177:22.
Rough 193:4.
roughly 158:7,
  174:7, 215:5.
route 3:15, 178:3.
routine 200:1.
RPR 1:46, 215:12.
Rudy 196:25.
Rule 12:8, 12:10,
  138:4, 156:12,
  156:15, 156:17.
ruled 132:12,
  134:19, 139:5.
rules 10:19, 12:2,
  12:12, 156:5,
  156:7, 159:10,
  201:19.
run 42:9, 42:12,
  59:7, 69:6, 75:22,
  138:12, 139:21,
  139:24, 140:1,
  160:2.
running 61:13.

rush 145:9.
.
.
< S >.
safe 130:13.
sale 78:18, 78:19,
  78:20, 78:22.
sanctions 12:15,
  12:16, 12:23.
sat 187:8, 187:20,
  187:25, 188:2,
  191:6, 191:8,
  191:15.
satisfaction 41:18,
  43:22.
satisfied 134:22,
  134:24.
Savage 49:9.
saw 29:22, 34:25,
  45:2, 63:13, 67:1,
  95:13, 113:15,
  113:18, 113:19,
  113:21, 114:11,
  114:14, 116:21,
  117:10, 117:17,
  118:8, 147:13,
  150:1, 169:2,
  169:8, 169:11,
  208:7, 208:14.
saying 38:15, 42:7,
  45:19, 47:18,
  47:20, 47:22,
  47:24, 70:18,
  104:9, 117:23,
  122:25, 136:7,
  139:16, 146:2,
  147:10, 154:21,
  170:7, 189:23,
  199:12, 199:17,
  199:25, 201:18,
  203:24, 204:1,
  204:6, 206:19,
  207:6, 211:12.
says 2:10, 43:7,
  43:14, 66:20,
  92:3, 101:6,
  103:4, 103:5,
  119:12, 123:2,
  137:5, 199:20,
  199:21, 200:5,

200:8, 200:19,
  204:15, 207:3.
schedule 132:20.
scheduled 130:11.
scope 124:1,
  151:9.
screen 66:14,
  75:12.
sea 160:5.
Sealed 2:20, 96:11,
  96:13, 123:9,
  123:15, 185:21.
searched 54:5.
searches 213:11.
seat 4:10, 53:2,
  152:18.
seated 2:2, 52:16,
  130:19, 143:9.
second 11:7, 66:9,
  82:4, 98:20,
  106:11, 106:12,
  107:10, 113:8,
  141:2, 142:5.
seconds 131:18,
  131:22, 131:24,
  132:1, 132:21,
  133:3, 133:5,
  133:22, 134:3,
  134:5, 134:8,
  134:23, 135:23,
  135:24, 137:6,
  137:15, 137:18,
  137:22, 138:7,
  139:1, 139:22,
  139:23, 140:4,
  140:11, 140:16,
  140:19, 140:25,
  141:7, 142:7.
secretive 59:6.
secrets 11:24,
  156:3.
seeing 29:16, 61:7,
  110:17.
seeking 99:17.
seem 76:23.
Seen 20:20, 35:4,
  45:9, 45:17,
  75:16, 78:14,
  78:17, 110:2,
  110:11, 113:15,

117:9, 117:11,
  120:6, 122:18,
  122:20, 136:24,
  137:1, 145:7,
  149:13, 149:15,
  169:12, 208:11,
  209:5.
segment 132:15,
  140:8.
segments 132:11.
sell 14:21, 62:7,
  67:7, 68:14,
  160:10, 189:7.
selling 58:1, 61:22,
  62:6, 63:16,
  64:23, 67:4,
  67:10, 67:11,
  68:10, 68:13,
  68:18, 69:18,
  70:7, 70:19,
  88:12, 97:20,
  116:4.
send 69:12, 179:17,
  179:20.
senior 151:2, 151:5,
  151:11, 151:14,
  151:17.
sensitive 198:19.
sent 2:10, 70:11,
  73:20, 73:24,
  111:5, 111:16,
  111:22, 111:23,
  112:7, 112:10,
  112:11, 112:12,
  113:5.
sentenced 58:9,
  85:19, 93:3,
  182:6, 182:9.
sentences 42:9,
  84:10, 86:9,
  103:2, 105:11.
sentencing 5:16,
  6:18, 6:20, 53:25,
  55:9, 95:3, 97:7,
  99:5, 103:18,
  107:8, 130:1,
  162:2, 162:4,
  185:17.
September 69:16,
  75:2.

sergeant 130:10.
seriously 136:21.
serve 42:3.
served 69:17.
service 213:1.
serving 57:6,
  160:14, 213:2.
set 14:17, 156:5.
sets 157:16.
setting 84:2.
seven 121:11.
several 8:18.
severe 12:21,
  156:16.
shake 120:15.
Shall 11:20, 11:21,
  11:24, 11:25,
  84:12, 155:23,
  155:24, 156:1,
  156:2, 156:4.
share 134:16.
Sharon 150:6, 150:7,
  150:10.
sheet 91:25, 92:1,
  92:3.
shocked 8:14.
shook 76:22, 119:16,
  119:20.
shoot 28:2, 30:22,
  30:24, 66:4,
  115:25, 119:9,
  119:11, 120:24,
  121:1, 121:8,
  121:10.
shooter 27:18,
  27:20, 28:12.
shooting 121:19,
  121:24, 122:10,
  122:16, 123:23,
  124:13, 124:22,
  128:2, 151:15,
  202:21.
Short 111:21,
  112:25.
shorter 98:14,
  138:19, 138:20,
  182:3.
shortly 33:14.
Shot 30:16, 30:25,
  65:11, 65:19,

66:5, 67:1, 75:25,
  79:1, 118:17,
  120:24, 121:9,
  121:21, 145:12,
  174:4, 174:5,
  174:6, 175:11,
  197:17, 197:23,
  199:10, 199:13,
  199:14, 203:19,
  204:4, 204:5.
shots 76:1, 76:3.
showed 28:22, 73:6,
  75:9, 78:3, 78:10,
  88:13, 95:8, 99:9,
  108:11, 108:17,
  114:23, 165:22,
  171:21, 172:6,
  210:9, 210:10,
  211:9.
Showing 63:4,
  181:10.
shown 50:1.
shows 132:11,
  200:12.
sic 30:10, 133:6,
  134:3, 148:17,
  207:1, 208:1.
side 23:6, 67:23,
  77:1, 78:13,
  131:13, 184:15.
sides 124:16.
significance
  142:24.
signs 59:4, 59:5.
Silly 195:9,
  195:11.
Silver 10:19.
Simple 113:3,
  177:18.
simply 132:22.
single 118:9.
sister 73:3, 73:7,
  73:18, 145:11,
  150:19, 150:20,
  174:15, 174:17,
  174:18, 174:19.
sit 148:7.
sitting 22:5, 60:12,
  71:5, 182:11.
situation 23:22,

23:24, 24:3,
  26:16, 79:16,
  79:18, 80:16,
  80:17, 84:21,
  84:22, 85:2, 85:6,
  145:24, 150:5,
  166:11, 172:8,
  175:8, 203:12.
situations 156:22.
six 105:24, 187:24,
  191:6, 191:7,
  191:11, 191:15.
six-feet-one
  116:16.
skates 180:8.
Skinny 80:3, 80:8,
  80:9, 83:7.
skip 88:11, 196:6,
  198:5.
slang 180:12.
Slay 63:6.
sleep 69:7, 69:9,
  120:9, 120:13,
  120:18, 160:3,
  201:16.
slide 84:24.
slightest 135:4.
small 200:24.
smaller 98:24,
  104:20, 106:25,
  186:19, 187:1.
Smith 48:3.
smoked 145:4.
smoothly 141:24.
smuggle 177:3,
  178:10.
smuggled 177:9.
smuggling 177:6,
  177:13, 178:8.
Sneak 60:6.
Sneaking 190:15,
  190:16.
sneaky 37:21.
snitching 157:11.
snort 178:17.
Social 116:25,
  117:2.
socialize 59:17,
  125:8.
sold 67:8, 117:7.

soldier 13:2.
solely 135:5.
Somebody 24:2,
    69:12, 69:13,
    71:9, 77:1, 90:16,
    101:9, 103:6,
    121:21, 144:20,
    145:22, 146:5,
    147:4, 154:7,
    154:10, 154:14,
    156:22, 157:5,
    158:13, 177:24,
    180:1, 185:16,
    189:10, 189:11,
    189:24, 189:25,
    190:11, 200:12,
    201:18, 211:11.
Someone 10:9, 19:2,
    21:3, 37:16,
    37:18, 39:2,
    70:10, 70:11,
    84:5, 154:11,
    165:13, 166:24,
    174:11, 191:3,
    211:10.
sometime 214:18.
sometimes 14:17,
    16:13, 172:19.
Somewhat 155:20.
son 31:7.
Soon 33:9, 138:25,
    139:18, 140:24,
    183:12, 213:24.
sophistication
    102:10.
Sorry 4:19, 23:7,
    25:9, 26:1, 33:12,
    35:18, 38:22,
    41:13, 44:17,
    48:15, 53:17,
    56:25, 70:1, 80:4,
    83:1, 83:14,
    89:22, 112:14,
    120:1, 120:4,
    154:8, 175:2,
    177:15, 190:13,
    205:2.
sort 14:2, 37:18,
    68:1, 81:11,
    148:20, 205:8,

    206:16, 214:19.
sound 131:18.
sounds 124:3, 138:2,
    176:25, 187:21.
sources 213:13.
South 13:9, 13:10.
spare 142:19.
speaking 28:9, 81:4,
    90:1, 98:5, 133:2,
    133:3.
species 82:14.
specific 25:15,
    28:1, 103:2,
    124:13, 204:10.
Specifically 24:6,
    70:10, 113:7,
    113:9, 113:12,
    135:15, 168:21.
Spell 4:13, 4:20,
    4:21, 4:23, 53:4,
    53:6, 152:5,
    152:20.
spend 183:17,
    185:4.
spending 98:7,
    102:13.
spent 86:20,
    87:12.
split 78:12,
    78:13.
splitting 123:4.
spoke 23:7, 46:20,
    111:1, 113:3,
    124:21, 125:16,
    213:24.
spoken 127:3.
sponsor 10:11, 31:5,
    45:21, 79:25,
    80:7, 154:15,
    154:16.
spotted 75:16.
squash 73:12, 73:14,
    74:6, 174:23.
squashed 175:7.
Squirrel 195:3.
stab 154:7, 154:10,
    154:14, 154:18.
stabbings 18:17,
    18:18.
stairway 71:6, 71:8,

    71:12, 71:13,
    71:14, 71:15.
stairwell 109:25,
    168:7, 168:17.
Stand 4:4, 52:19,
    116:15, 121:15.
standard 123:9,
    123:15, 124:4.
standing 54:4, 66:6,
    66:7, 66:20, 75:8,
    75:9, 75:13,
    75:14, 78:15,
    78:16, 114:20.
start 7:14, 60:9,
    61:22, 61:23,
    85:16, 184:18,
    187:17, 213:16.
started 22:1, 27:12,
    33:11, 33:13,
    34:6, 50:16,
    71:25, 75:21,
    78:22, 78:24,
    84:19, 108:25,
    143:18, 155:5,
    169:13, 169:14,
    176:22, 188:3,
    191:18.
starting 103:10.
state 4:12, 41:2,
    41:21, 41:22,
    42:6, 42:20, 53:3,
    54:13, 102:20,
    122:21, 124:5,
    152:19, 214:16,
    214:20.
stated 119:20,
    121:15.
statement 142:11,
    172:21, 199:22,
    211:9.
States 1:1, 1:5,
    104:25, 126:22.
stating 84:10.
station 98:19.
status 10:5, 214:23,
    215:4.
stay 39:21, 51:4,
    135:16.
stayed 97:12, 97:16,
    171:17.

staying 63:23.
steal 189:10,
  189:11.
Stealing 189:16,
  189:19, 189:22,
  190:1, 190:6,
  190:10, 190:11,
  190:14, 190:17.
stenographic
  215:13.
step 33:24, 75:8,
  75:9, 81:24,
  82:23, 123:10,
  128:24, 152:18.
stepfather 10:14.
steps 114:20,
  114:23, 169:9,
  169:11, 169:13.
sticking 135:13.
Stimey 59:18, 59:20,
  60:6, 64:5, 64:6,
  166:16, 166:19.
stood 98:6, 147:6.
stop 69:18, 129:2,
  136:23, 137:19,
  138:22, 139:1,
  142:4, 142:15,
  200:1, 201:11,
  201:14.
stopped 169:24.
store 65:11, 65:25,
  66:1, 66:2, 66:19,
  66:23, 66:25,
  78:10.
story 81:10, 81:24,
  82:12, 82:15,
  107:20, 107:23,
  115:22, 200:3.
straight 169:20,
  169:21.
strategy 40:6.
Street 1:48, 13:25,
  22:23, 24:19,
  45:9, 53:16,
  75:15, 78:7,
  78:24, 78:25,
  84:23, 113:19,
  116:4, 191:3.
streets 22:17, 37:4,
  58:11, 157:12,

  157:15.
strife 11:21,
  155:24.
strike 68:21,
  83:24.
strip 178:21,
  178:25.
stripping 85:4.
structure 67:21,
  157:21.
stuff 69:7, 71:25,
  72:6, 77:12,
  84:23, 149:11,
  149:12.
subject 140:9.
submit 134:23.
Suboxone 178:12,
  178:23, 179:1,
  180:10, 180:12,
  181:2, 181:7.
Suboxones 178:11,
  179:16, 179:17.
substances 91:15.
substantial 95:1,
  96:4.
substantially
  101:8.
suggest 100:6,
  147:4, 148:8.
suggestion 147:9.
summarize 100:17.
summer 58:11.
Supermax 111:2,
  125:10, 125:19,
  126:5, 126:9.
supplement 123:9,
  123:15.
supplied 14:14.
Support 189:16.
Supporting 189:15,
  190:20.
suppose 115:12,
  139:18.
supposed 96:16,
  146:5.
surprise 36:5,
  115:4, 115:7,
  115:22.
Surprised 8:16.
susceptible 136:9.

suspicion 39:19.
sustain 82:3.
Sustained 19:6,
  21:15, 29:8,
  43:19, 55:13,
  59:14, 77:23,
  83:13, 91:1,
  97:23, 123:21,
  124:20, 127:2,
  131:11.
sustaining 92:10.
sweater 22:10,
  60:17, 171:25.
Sweet 197:13.
swings 131:5.
switch 137:19,
  138:7.
sworn 4:7, 11:24,
  52:24, 113:10,
  152:14, 156:3.
syllables 184:8.
symbols 59:4,
  59:5.
Synthetic 178:13.
system 142:7.
.
.
.
< T >.
T-r-o-y 4:22.
T. 1:46, 215:17.
tag 50:24.
taken. 52:11,
  130:16.
tall 116:13.
tape 19:23, 19:24,
  20:1, 173:22.
target 159:12.
task 215:2.
tattoo 29:1, 29:2.
tax 61:19, 61:20.
taxes 61:23, 61:25,
  62:3.
taxing 61:22.
Tay 59:17, 59:19,
  76:24.
Taylor 38:24.
Taz 193:2.
technical 137:5,
  139:18, 140:19.
Technically 83:13,

138:9.
technological
    139:24.
technologically
    134:6.
tells 122:22,
    123:3.
temperature
    198:10.
ten 32:22, 93:5,
    173:6, 173:7.
term 27:17, 83:22,
    158:1, 172:17.
terminated 12:18,
    162:8, 162:10.
terminology 102:3.
terms 74:8, 95:14,
    103:1, 123:18,
    124:1, 136:20,
    180:12, 185:9,
    213:15.
testified 4:8, 6:25,
    30:5, 44:4, 46:11,
    52:25, 55:15,
    102:16, 105:18,
    105:22, 106:17,
    106:21, 108:22,
    115:20, 127:14,
    128:9, 152:15,
    186:13, 186:15,
    191:12, 198:20.
testify 6:12, 55:2,
    55:5, 81:2, 91:5,
    115:5, 130:10,
    130:11, 161:18,
    185:4, 192:11.
testifying 6:14,
    38:16, 106:4,
    112:14, 156:17,
    158:21.
testimony 2:7, 2:12,
    2:13, 106:25,
    108:6, 109:19,
    109:21, 113:18,
    117:21, 130:7,
    135:2, 148:3,
    148:5, 185:23.
theirself 35:13.
theory 147:6,
    147:11.

thereafter 147:23.
They'll 137:18.
they've 3:15, 108:5,
    108:8.
thinking 105:9,
    147:1.
third 135:18,
    135:21, 213:3.
Thirsty 48:24.
though 74:4, 79:20,
    169:6.
Three 16:4, 32:11,
    32:13, 60:7,
    67:22, 67:23,
    74:22, 74:23,
    74:24, 74:25,
    84:7, 84:9, 84:20,
    114:16, 115:6,
    140:1, 164:1,
    164:25, 208:8,
    208:11.
three-quarters
    201:6.
three-way 73:12,
    73:16.
threw 72:8.
throughout 157:16.
Thursday 214:18,
    215:3.
tickets 117:7.
ticking 141:22.
Till 128:18,
    173:14.
Tim 191:23,
    192:25.
timing 130:12.
tired 87:20, 183:8,
    203:21, 204:15,
    207:4, 207:19.
TJ 59:17, 59:19,
    59:21, 59:23,
    70:14, 70:15,
    76:23, 145:1.
tobacco 178:11.
today 2:12, 6:14,
    9:16, 22:5, 26:17,
    44:4, 60:12,
    86:19, 107:23,
    112:14, 129:14,
    130:14, 134:1,

135:23, 137:14,
    156:17, 161:18,
    162:7, 182:8,
    186:10, 212:15.
together 18:1, 18:5,
    18:6, 27:3, 59:7,
    76:19, 110:25,
    111:19, 119:8,
    125:19, 191:25.
tomorrow 133:22,
    134:4, 137:5,
    212:16, 213:16,
    215:8.
tongue 178:19.
Tony 195:16,
    195:18.
took 51:8, 72:8,
    72:12, 83:1,
    85:17, 114:5,
    114:7, 136:4,
    137:2, 191:1.
Tooken 55:21, 55:23,
    55:25, 56:7.
tooth 160:5.
top 50:21, 95:23.
Total 208:12,
    208:14.
totality 133:12.
totally 12:18.
touch 51:23, 66:22,
    129:7, 155:25,
    174:19, 213:7.
toward 202:19,
    202:25.
Towards 23:2, 53:19,
    78:7, 169:13.
trafficking 54:11,
    91:12.
training 10:10.
transactional
    123:17.
transactions
    68:19.
Transcript 1:17,
    215:13.
Trial 1:10, 3:19,
    46:12, 46:14,
    52:1, 85:20, 86:1,
    86:5, 86:7, 86:8,
    86:10, 86:11,

108:20, 108:21,
111:11, 115:5,
129:10, 135:2,
136:20, 140:1,
186:15, 212:22,
213:3, 213:8,
213:9, 213:13,
214:20, 215:5.
trials 141:24,
186:13.
trick 90:6, 92:16,
99:2, 185:11.
tried 75:21, 112:3,
115:25, 120:15,
145:2.
trigger 114:16,
114:25, 115:2,
115:6, 115:24,
116:2, 146:3.
trouble 176:20,
183:15, 183:16.
Troy 3:9, 3:22,
3:23, 4:6, 4:16,
49:7.
trucks 173:23.
true 33:6, 93:9,
96:10, 96:17,
99:8, 99:9, 100:4,
101:7, 111:14,
111:17, 122:24,
124:11.
trust 139:11,
185:22.
truth 8:11, 8:21,
38:3, 39:24, 51:6,
94:25, 100:21,
108:10, 111:7,
112:3, 112:4,
112:5, 122:22,
147:11, 183:23,
183:24, 184:14,
184:19, 184:20,
186:7.
truthful 8:13,
123:3, 123:19.
truthfully 6:12,
55:2, 55:5, 96:3,
161:18, 185:13.
Try 69:6, 69:7,
69:11, 70:20,

75:22, 81:23,
102:23, 103:13,
104:16, 106:12,
118:24, 119:1,
119:5, 120:8,
120:9, 150:4,
173:1, 184:5,
186:5.
Tuesday 1:19.
turf 68:23.
Turn 4:14, 74:13,
75:2, 75:21,
172:18.
turned 169:19.
Twan 194:24, 194:25,
195:1, 195:11.
Twang 194:24.
twice 181:6, 184:21,
184:22, 206:6,
208:11.
Twin 150:15,
150:18.
Ty 49:11, 194:22,
197:11.
type 87:23, 210:7.
types 12:16.
typically 123:10.
.
.
< U >.
ultimately 7:8,
54:15, 56:11,
81:13, 166:20.
unabridged 137:21.
Uncle 9:3, 9:4,
9:10, 13:16, 35:4,
35:6, 35:7, 48:9,
48:11, 48:15,
172:19.
uncomfortable
133:8.
uncommon 157:7.
underground 160:4.
understand 3:23,
20:12, 42:7, 62:2,
70:3, 81:17, 85:2,
99:4, 102:2,
102:9, 104:6,
104:22, 131:4,
176:14, 185:9,

186:3, 186:4,
198:16, 199:23,
205:3.
understanding 55:4,
60:23, 61:8,
68:21, 68:22,
70:9, 98:6, 99:5,
100:7, 100:9,
104:24, 111:15,
112:6, 122:8,
144:20, 145:13,
146:12.
understands 102:2,
102:10.
understood 42:16,
174:25.
underworld 200:11.
unedited 131:21,
131:22, 131:24.
unharmed 77:14.
Union 179:3.
unit 180:16, 180:18,
180:25, 181:3.
United 1:1, 1:5,
126:22.
universal 12:17,
12:19.
unjustified
148:21.
unknown 119:1.
unlawful 160:23.
until 85:5, 87:7,
89:18, 92:10,
97:16, 120:6,
124:6, 129:4,
129:15, 129:16,
130:15, 142:5,
182:8, 200:17,
213:3, 213:17.
untrue 11:19, 84:11,
155:22.
untruthfully 6:25,
55:16.
unusual 198:12.
uses 198:21.
using 74:24, 83:22,
163:3, 163:5.
utility 148:18.
.
.

< V >.
value 142:24.
Van 2:11.
various 68:7,
   162:17.
vent 111:2,
   112:12.
verbal 95:25, 100:2,
   144:1.
Verse 160:6.
version 131:20,
   138:7, 139:9,
   142:8.
Veto 48:7.
vials 94:11.
vicinity 63:24.
Video 20:2, 20:3,
   20:6, 20:16,
   20:17, 20:20,
   20:21, 28:7, 28:9,
   116:25, 130:22,
   130:25, 131:25,
   132:2, 132:25,
   133:17, 133:24,
   134:7, 135:12,
   135:25, 136:25,
   137:15, 138:17,
   140:3, 150:12.
videos 28:5, 116:23,
   116:24, 135:16,
   135:19, 137:10.
violating 156:17.
violation 156:19.
violative 138:4.
violence 18:14.
violent 56:21,
   91:15, 92:5.
Virginia 57:7,
   57:8.
virtue 124:10.
visit 177:14,
   177:16, 180:18.
visited 178:1.
visitee 177:25.
visiting 177:19,
   177:22.
Visits 177:11,
   177:12.
Vogan 2:23.
voice 53:18, 199:7,

   205:8.
Volume 1:10.
vouch 37:16.
vs 1:8.
.
.
< W >.
W. 1:48.
Wait 23:8, 82:4,
   121:2, 129:4,
   133:8, 171:18,
   173:5.
waiting 78:14,
   171:17, 203:21,
   204:15, 207:4.
wake 184:17.
walk 180:7.
walked 78:7, 78:8,
   78:17, 78:23,
   78:25, 79:1,
   109:24, 114:14,
   114:15, 189:7.
walking 71:14,
   75:15, 76:25,
   78:22, 78:24,
   169:12, 169:13,
   191:4.
wall 72:7.
wanted 2:16, 39:21,
   90:7, 109:1,
   109:4, 109:15,
   124:12, 131:7,
   131:22, 146:24,
   167:3, 169:20,
   170:14, 176:13,
   178:22, 178:23,
   198:14, 198:18.
wants 92:9, 136:7,
   184:5.
warned 69:18.
watch 150:12,
   152:18.
watching 54:4.
ways 17:11, 82:1,
   148:18, 177:9,
   178:18.
WDC 79:8.
weapon 168:10.
wear 172:13, 172:22,
   172:24.

wearing 22:9, 60:16,
   171:24.
weed 25:19, 71:19,
   71:21, 76:22.
weed. 71:20,
   71:21.
week 74:17, 74:18,
   164:25, 208:8,
   208:10, 213:3,
   214:17.
weeks 74:22, 74:23,
   74:24, 74:25,
   140:1.
Welcome 130:22.
well-possessed
   148:13.
Wes 63:12, 63:19,
   171:10.
Wesley 61:17, 63:6,
   63:11, 68:17,
   78:15.
West 5:10, 5:11,
   57:20.
Western 179:3.
Whatever 11:2,
   41:22, 73:13,
   85:5, 86:15,
   122:3, 131:9,
   175:7, 184:5.
whatsoever 148:1.
Whereabouts 5:9,
   22:19.
Whereas 79:20.
whether 6:21, 19:12,
   20:17, 21:19,
   24:7, 29:11,
   62:15, 62:24,
   64:15, 66:3,
   81:20, 83:14,
   123:22, 145:20,
   147:25, 156:24,
   157:12, 177:3,
   179:10, 179:12,
   201:13, 202:20,
   205:10, 205:22.
Whichever 14:17.
whoever 119:3,
   177:16.
Whole 100:19,
   100:20, 137:10,

138:1, 138:17,
173:22, 183:5.
wide 198:12.
wife 38:10, 65:16,
71:7, 71:11,
71:24, 72:3, 72:5,
72:8, 73:6, 88:12,
109:25, 113:24,
126:24, 168:9,
168:16, 175:1.
wind 179:20.
withdraw 94:4,
96:22, 96:25,
98:2, 128:11,
128:13.
withdrawn 96:23.
Within 78:1, 81:15,
131:5, 157:22.
Without 44:9, 60:19,
81:21, 136:12,
138:13, 142:1,
190:11, 190:17,
202:2.
witnesses 102:7,
141:18, 141:19,
141:21, 212:15.
won 135:20.
wondering 89:1,
147:8, 147:18.
word 3:15.
words 189:23.
work 15:8, 24:25,
105:14, 114:25,
135:3, 137:21,
154:5, 158:11,
158:12, 178:4,
188:22, 188:23,
189:9, 192:2.
workers 179:24.
working 102:23,
179:24, 179:25,
180:4, 180:5,
180:6.
works 101:19, 132:5,
180:1.
World 66:20,
135:1.
worried 19:23,
19:24, 135:9.
worry 170:5.

worth 31:21.
wound 176:4,
176:7.
wounding 56:24,
57:2, 86:12.
write 211:10.
written 107:18.
.
.
< Y >.
y'all 70:18,
70:20.
yard 54:6.
Yaya 192:23.
year 89:20, 92:22,
92:25, 97:13,
125:12, 125:17,
125:20, 126:8,
144:4, 187:10,
187:20.
yellow 99:24,
173:22, 207:17.
yo 76:14, 76:24,
76:25.
younger 61:17,
151:3, 151:6,
151:12, 151:14,
151:17, 172:18.
yourself 16:25,
39:19, 99:25,
101:3, 106:12,
144:25, 189:8,
207:20, 207:21.
yourselves 51:21,
51:22, 129:4,
129:6, 213:6.