IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
      vs.                          )
                                   )   **CRIMINAL NO.:** JKB-16-0363
GERALD JOHNSON, et al.,            )   **Jury Trial:**  Volume 9
                                   )
            Defendant.             )
                                   )
_____)


Transcript of Proceedings
Before the Honorable James K. Bredar
Wednesday, December 6th, 2017
Baltimore, Maryland


For the Plaintiff:

      Peter J. Martinez, AUSA

      Christina A. Hoffman, AUSA

For Defendant Gerald Johnson:

      Paul F. Enzinna, Esquire

      Jeffrey B. O'Toole, Esquire

For Defendant Kenneth Jones:

      Alan R.L. Bussard, Esquire

For Defendant Marquise McCants:

      John R. Francomano, III, Esquire

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

```
 1                     P R O C E E D I N G S

 2              THE COURT:  Good morning.  Are we ready for the

 3    jury?

 4              MR. MARTINEZ:  We are, Your Honor.

 5              MR. FRANCOMANO:  Yes, Your Honor.

 6              THE COURT:  Bring them in.  Who's our witness?

 7              MR. MARTINEZ:  Sergeant Jackson from the Baltimore

 8    Police.

 9              THE COURT:  From where?

10              MR. MARTINEZ:  BPD.

11              (Jury entered the courtroom.)

12              THE COURT:  Be seated, please.  Good morning, ladies

13    and gentlemen.

14              JURORS:  Good morning.

15              THE COURT:  Let the record reflect we actually

16    started court before 9:45 this morning.  I know you noticed,

17    that's why I'm acknowledging that we noticed.

18              Mr. Martinez, government may call the next

19    witness.

20              MR. MARTINEZ:  Your Honor, the government calls

21    Sergeant Glen Jackson of the Baltimore Police.

22              THE COURT:  Please swear the witness.

23              THE CLERK:  Sir, if you would please raise your

24    right hand to be placed under oath.

25                        SERGEANT GLEN JACKSON,
```

 1    called as a witness, being first duly sworn, was examined and

 2    testified as follows:

 3                    THE WITNESS:  I do.

 4                    THE CLERK:  Thank you, sir.  You may enter the

 5    witness box and watch your step.  And if you would please

 6    speak into the microphone, you can adjust the microphone if

 7    you need to.  Tell us your name and can you please spell your

 8    first and last name for the record.

 9                    THE WITNESS:  Glen Jackson, G-l-e-n,

10    J-a-c-k-s-o-n.

11                    THE CLERK:  Thank you, sir.

12                    THE COURT:  Sir, would you slide your chair a little

13    bit forward there just to keep you positioned right in front

14    of that microphone.  Thank you very much.

15                    Your witness, Mr. Martinez.

16                              DIRECT EXAMINATION

17    BY MR. MARTINEZ:

18    Q    Sergeant, good morning.

19    A    Good morning.

20    Q    Can you tell the ladies and gentlemen of the jury where

21    you work?

22    A    Baltimore City Police Department.

23    Q    What is your rank and assignment?

24    A    Sergeant and I'm currently in internal affairs

25    division.

Direct Examination – Jackson   (By Mr. Martinez)

1   Q    How long have you been with the

2   Baltimore City Police Department?

3   A    21 years.

4   Q    Could you walk us briefly through the various positions

5   you've held over your 21 years?

6   A    Patrol division, I was in a bike unit, I then went to the

7   district detective unit, from there internal affairs, got

8   promoted in '16, went back to patrol, and I'm currently back

9   in internal affairs.

10   Q    Sergeant, could you tell us what your rank and assignment

11   was as of the spring of 2013?

12   A    Detective.

13   Q    I want to direct your attention to March and April of

14   2013.  During that time period, Sergeant, were you the primary

15   investigator of a robbery and shooting that occurred near the

16   intersection of Greenmount and 25th?

17   A    Yes, I was.

18   Q    Do you recall the date of that robbery and shooting?

19   A    March the 23rd, I believe, 2013.

20   Q    I want to show you Government's Exhibit GM 10.  And I'll

21   ask you if you could, Sergeant, if you could use the touch

22   screen to your left there and show the ladies and gentlemen of

23   the jury the scene of the robbery and shooting on

24   March 23rd, 2013.

25   A    It would be in this section right here, if you can see

1    it, that point.

2            THE COURT:  Are you touching the screen?

3            THE WITNESS:  Yes, sir.  I put a pink dot, purple

4    dot on the screen.

5            THE COURT:  Okay.  You have a light touch.  Little

6    bit bigger mark.  Okay.  Thank you.

7    Q    (BY MR. MARTINEZ)  Sergeant, were you able to identify

8    the victim of the March 23rd, 2013 robbery and shooting?

9    A    Yes, we were.

10   Q    Who was that?

11   A    Mr. Moses Malone.

12   Q    I'm going to show you what's been marked

13   Government's PHI 54.  Who is that, Sergeant?

14   A    Mr. Malone.

15   Q    Did there come a time where you and -- where you met with

16   Mr. Malone at the Baltimore Police Department Eastern District

17   Detective Unit?

18   A    Yes.

19   Q    Do you recall when that meeting took place?

20   A    I believe April the 19th of 2013.

21   Q    And during the initial portion of your interview,

22   Sergeant, could you tell us whether or not Mr. Malone was

23   cooperative?

24   A    Uncooperative.

25   Q    Was he willing or unwilling to answer questions?

1   A    Unwilling.

2   Q    Was he willing or unwilling during the initial part of

3   the interview to complete photo arrays?

4   A    Unwilling.

5   Q    Did there come a point in time during the April 19th

6   interview where you were joined by another police officer?

7   A    Yes.

8   Q    Who was that?

9   A    Detective Dawnyell Taylor.

10  Q    And what part of BPD does she work for?

11  A    She works for the homicide division.

12  Q    Can you tell us whether Malone's willingness to

13  cooperate, did it change after Detective Taylor joined the

14  interview?

15  A    Yes, it did.

16  Q    Did Mr. Malone eventually agree to give a statement about

17  the robbery and shooting that happened at Greenmount and 25th

18  on March 23rd, 2015?

19  A    Yes, he did.

20  Q    Did he explain how the robbery happened?

21  A    Yes.

22  Q    What did he say?

23  A    Said he was sitting on some steps in the 2400 block of

24  Greenmount Avenue when two gentleman came out of an alley

25  wearing black hoodies or dark colored hoodies and told him

1    "you know what time it is?"

2    Q    Did Mr. Malone say what, if anything, the two gentleman

3    with the hoodies took from him?

4    A    Cell phone and I believe $3 in currency.

5    Q    Did Mr. Malone say what happened after the two guys in

6    the hoodies took his cell phone and his money?

7    A    He explained he attempted to walk across the street away

8    from them and that's when he was shot in the foot.

9    Q    Sergeant, during the portion of the interview that began

10   after Malone became cooperative and gave you a statement, did

11   you show Mr. Malone any photo arrays?

12   A    Yes, I did.

13   Q    I want to show you Government's Exhibit PHA 10.  Do you

14   recognize this exhibit, Sergeant?

15   A    Yes, I do.

16   Q    I want to walk through the document briefly with you.

17   See where we're looking here:  central complaint number, type

18   of investigation, location and name of viewer.  Whose

19   handwriting is in these fields?

20   A    That's mine.

21   Q    And then in the next box here, it begins with the

22   language "the six photographs," were those instructions read

23   to Mr. Malone before he completed the photo array?

24   A    Yes, they were.

25   Q    And here next to viewer's initials, whose initials are

 1    those?

 2    A    Mr. Malone's initials.

 3    Q    I'm going to come back to the bottom part of page 1 in a

 4    moment.  Now, I want to ask you whether in this array, did

 5    Mr. Malone pick anyone out in this array?

 6    A    Yes, the person in photo No. 4.

 7    Q    And who is the person in photo No. 4?

 8    A    I believe Mr. Norman Handy.

 9    Q    Is that Mr. Malone's handwriting above photo No. 4?

10    A    Yes, it is.

11    Q    I want to go back to the bottom portion of page 1 of

12    PHA 10.  In the comments field here, whose handwriting is this

13    towards the top of the document?

14    A    Mr. Malone's handwriting.

15    Q    And is this his signature above the diagonal line?

16    A    Yes, it is.

17    Q    And whose signature is in the bottom right-hand corner?

18    A    Detective Taylor.

19    Q    Could you read for the ladies and gentlemen of the jury

20    the information that Mr. Malone provided in the comments

21    section of PHA 10?

22    A    Yes.  "Photo No. 4 was the one that robbed me and tried

23    to take me out on a shirt.  They smacked me, took my phone and

24    money, was tussling with him, and that's when he said 'you

25    going to run?' then I said, 'hell, no,' and that's when I

Direct Examination - Jackson  (By Mr. Martinez)

1   walked across the street and that's when he busted at me left

2   foot, fucked up but grazed it, .38 mm."

3   Q    Sergeant, when you showed this photo array to Mr. Malone,

4   did you make any suggestions as to who he should pick out?

5   A    No, I didn't.

6   Q    Did you make any suggestions as to what he should say in

7   the comments field?

8   A    No, I didn't.

9   Q    Did Mr. Malone complete the array freely and

10  voluntarily?

11  A    Yes, he did.

12  Q    In addition to the exhibit we just looked at, PHA 10, did

13  Mr. Malone complete a second photo array during the interview

14  on April 19th, 2013?

15  A    Yes.

16         MR. ENZINNA:  Your Honor, objection.

17         THE COURT:  Objection.

18         MR. ENZINNA:  Can we approach?

19         THE COURT:  You may.

20         (Bench conference on the record.)

21         MR. ENZINNA:  Your Honor, I believe this is the

22  photo array where Mr. Malone identified Mr. Johnson, and I

23  think he states in the comments section something to the

24  effect that "Mr. Johnson got ranked, so I'm guessing he sent

25  them at me."  I object to that on grounds that it's hearsay,

1    it's not personal knowledge.

2            THE COURT:  What's the government's position?

3            MR. MARTINEZ:  This was litigated before the trial

4    began.  Ms. Hoffman filed a motion to admit Mr. Malone's

5    statements to law enforcement concerning the robbery and

6    shooting pursuant to the forfeiture by wrongdoing exception to

7    the rule against hearsay.  And the Court granted that motion.

8    So that would include the recorded statement, the whereabouts,

9    as well as the IDs that he made in the photo arrays.

10            THE COURT:  Is that true?

11            MR. ENZINNA:  Your Honor, as I understand the rule,

12    the forfeiture rule --

13            THE COURT:  No, is it true that this has already

14    been ruled on?

15            MR. ENZINNA:  Not this issue.

16            THE COURT:  Okay.  It's a different issue.

17            MR. ENZINNA:  The forfeiture doctrine provides that

18    we -- that someone who commits a wrong by excluding that

19    witness's evidence.  So basically what the forfeiture doctrine

20    does is, it says you treat it as though the witness were

21    available to testify.  It doesn't permit the witness to

22    testify -- that he is not able to testify.  If he were here,

23    he could say --

24            THE COURT:  So you're saying it's hearsay within

25    hearsay.

1          MR. ENZINNA:  And I'm also saying there's no

2    personal knowledge.

3          THE COURT:  All right.  So the statement from

4    Malone -- so you've got Malone on the witness stand at this

5    point.  He's not dead, instead he's here present and he's

6    testifying and he's prepared to say "He got ranked."  What is

7    that, what would that mean?

8          MR. MARTINEZ:  He got ranked in BGF.

9          THE COURT:  Ranked.

10         MR. MARTINEZ:  Within BGF and he does say --

11         THE COURT:  He got outranked, he got told by --

12         MR. MARTINEZ:  No, Mr. Johnson got ranked, he

13    obtained a rank.

14         THE COURT:  Oh.  "He got ranked."  So okay.  This is

15    a statement that accompanied the ID identification of

16    Mr. Johnson:  "So I'm guessing he sent them at me.  Plus, last

17    night somebody told me to watch out because I have some" --

18         MR. MARTINEZ:  "Stacks."

19         THE COURT:  -- "stacks on me."  Well, what's -- on

20    what premise does he identify Mr. Johnson, what has he asked?

21    The photo array is put in front of him and what, do you

22    recognize anybody, or?

23         MR. MARTINEZ:  The interview during which the array

24    was shown to him will be played through the -- but what

25    happened, as the detective explained a moment ago, Mr. Malone

1    originally wasn't cooperative, wouldn't complete the arrays.

2    Detective Taylor joins the interview and he does complete the

3    arrays.  And during the recorded portion, Taylor has him walk

4    through the robbery and he mentions that he was already

5    receiving threats from BGF and there was a point -- he

6    attributed that to Mr. Johnson.

7              THE COURT:  Hold on, let him finish.

8              MR. ENZINNA:  I apologize.

9              THE COURT:  So he attributed the threats to

10   Mr. Johnson.

11             MR. MARTINEZ:  Yes.

12             MS. HOFFMAN:  He did have -- he knew Mr. Johnson

13   from the neighborhood.  He did have --

14             THE COURT:  That came out in the interview with the

15   police officers?

16             MS. HOFFMAN:  Yes, and he knew he was in BGF and

17   that he had rank in the gang.  If he were here today, we would

18   be able to develop the foundation for this statement to come

19   in.  He's not here because the defendants killed him.

20             THE COURT:  Yes, I understand, but I have to be

21   persuaded that that in fact could happen before I can admit it

22   under the wrongful procurement doctrine.  Otherwise, I'm just

23   speculating.  So let's see -- what -- that's why I asked, what

24   did he tell the police officers, what did he tell them?

25             MR. MARTINEZ:  Your Honor actually has -- I think

1    Mr. Enzinna was about to get to the --

2              MR. ENZINNA:  This is a description of the

3    interview.  As I read it, he does not mention Mr. Johnson when

4    they show him the photo array.

5              THE COURT:  Okay.  But when they do show him a photo

6    array, he reacts to that.

7              MR. ENZINNA:  Yes.

8              THE COURT:  And his reaction is?

9              MR. ENZINNA:  He wrote those comments:  I'm guessing

10   that Mr. Johnson sent them to rob me.

11             MR. MARTINEZ:  Could I see your copy, Mr. Enzinna?

12             THE COURT:  Based on the evidence that's already

13   been presented during the life of this case where the Court

14   has made the threshold determinations about why Mr. Malone is

15   not here and who's responsible for that, I think the

16   government gets some latitude in this regard.  And I'm going

17   to admit it.  The officer will be subject to

18   cross-examination, including on the point that "I'm guessing,"

19   which is the most problematic aspect of this statement.  But

20   you know, we're going to put it out there as best we can, as

21   though Mr. Malone is actually here.

22             The "I'm guessing," for the record, the Court's

23   interpretation of that is not that it is a pure guess, but it

24   is a statement that was more along the lines of surmising,

25   which is not a guess.  A surmising is rooted in a totality of

1    information that he has that is based on his general knowledge

2    of people in the neighborhood, what their different roles and

3    functions are and so forth.  So it comes in.

4                MR. ENZINNA:  Thank you.

5                (The following proceedings were had in open court.)

6                THE COURT:  Overruled.  You may continue.

7    Q    (BY MR. MARTINEZ)  Sergeant, before the bench conference,

8    I was putting on the screen here Government's Exhibit PHA 11.

9    And you had just explained to the ladies and gentlemen of the

10   jury that during the interview you had with Moses Malone on

11   April 19th, 2013, you showed him a second photo array.  Do you

12   remember that?

13   A    Yes.

14   Q    So let's run quickly through the same kinds of questions

15   I just asked you.  In the top portion of the document here,

16   the complaint number and name of viewer, et cetera, is that

17   your handwriting?

18   A    Yes, it is.

19   Q    And the instructions beneath it, were those read to

20   Mr. Malone?

21   A    Yes, they were.

22   Q    Are those his initials in the bottom right-hand corner?

23   A    Yes.

24   Q    And again, we'll come back to the bottom half of page 1

25   in a moment.  Now I'd like to ask you whether Mr. Malone

Direct Examination - Jackson  (By Mr. Martinez)

1   identified any of the six individuals depicted in this array.

2   A    Yes, he did.  Photo No. 2.

3   Q    No. 2, you said?

4   A    Yes.

5   Q    Is that his handwriting above No. 2?

6   A    Yes, it is.

7   Q    Who's depicted in photo No. 2?

8   A    Mr. Gerald Johnson.

9   Q    Do you see Mr. Gerald Johnson in the courtroom today?

10  A    Yes, I do.

11  Q    Could you identify him and point out an article of

12  clothing he's wearing, please?

13  A    A plaid shirt at the defense table.

14        THE COURT:  Record will reflect the witness has

15  identified the Defendant Johnson.

16  Q    (BY MR. MARTINEZ)  Sergeant, I want to go back to page 1

17  of Government's PHA 11.  On the first four or five lines

18  there, whose handwriting is that?

19  A    Mr. Malone.

20  Q    And then the signature above the diagonal line, is that

21  Mr. Malone's?

22  A    Yes.

23  Q    And then I believe you told us earlier that the signature

24  on the bottom right-hand corner where we looked at a similar

25  signature, is that Detective Taylor?

1   A    Yes.

2   Q    All right.  I'm going to zoom in a little more.  Can you

3   see that, Sergeant?

4   A    Yes, I can.

5   Q    Could you please read those five lines for the ladies and

6   gentlemen of the jury?

7   A    "He got ranked, so I'm guessing he sent them at me.

8   Plus, last night somebody told me to watch out 'cuz I had some

9   stacks on me head and said he died by summertime, BGF."

10  Q    Sergeant, with respect to this photo array,

11  Government's PHA 11, did you make any suggestions to Mr.

12  Malone as to who he should pick out?

13  A    No.

14  Q    Did anyone make any suggestions as to what he should

15  write in the comments field?

16  A    No.

17  Q    Did he complete the photo array freely and voluntarily?

18  A    Yes, he did.

19  Q    Was your interview with Mr. Malone on April 19th of 2013,

20  was it recorded, Sergeant?

21  A    Yes, it was.

22  Q    I want to approach, show you Government's Exhibit CD 8.

23  Do you recognize that exhibit, Sergeant?

24  A    Yes.

25  Q    What is it?

1    A    A CD, a recorded statement.

2    Q    And the recorded statement from April 19th, 2013?

3    A    Yes.

4    Q    Have you listened to the contents of CD 8 before coming

5    to court today?

6    A    Yes.

7          MR. MARTINEZ:  Your Honor, with the Court's

8    permission, I would like to play CD 8 for the jury.  We have

9    transcripts prepared that were not included in the binders

10   distributed originally, so I would ask for Ms. Powell's help

11   in distributing the transcripts to the jury.

12          THE COURT:  Without objection.

13          MR. ENZINNA:  No, Your Honor.

14          THE COURT:  Distribute the transcripts, please,

15   Ms. Powell.

16          (Audio played.)

17          THE COURT:  Ladies and gentlemen, you can tuck these

18   transcripts into the little pocket in the front cover of your

19   transcript book.  Close up your transcript books and when

20   everyone's got that accomplished we'll move ahead.  And

21   Ms. Powell, there's one stray transcript because there was one

22   too many, we can collect that from the jury rail.

23          Mr. Martinez.

24          MR. MARTINEZ:  Thank you.

25   Q    (BY MR. MARTINEZ)  Sergeant, based on the interview that

1    we just listened to as well as the photo arrays that were

2    completed, did there come a time where you got an arrest

3    warrant for anyone in connection with the robbery and shooting

4    of Moses Malone?

5    A    Yes.

6    Q    Who did you get an arrest warrant for?

7    A    Mr. Norman Handy.

8    Q    Did you later learn that Mr. Handy had been arrested?

9    A    Yes.

10   Q    Do you know where he was arrested?

11   A    2466 Greenmount.

12   Q    I'm going to show you Government's Exhibit GM 36.  Can

13   you tell us what we're looking at there, Sergeant?

14   A    2400 block of Greenmount and 2466 Greenmount, the corner

15   house by the alley.

16   Q    Can you just put a mark on the front door?

17   A    (Indicating.)

18   Q    After Mr. Handy was arrested, Sergeant, did there come a

19   time where you got a search warrant for this house at

20   2466 Greenmount?

21   A    Yes.

22   Q    Why did you apply for a search warrant for that house?

23   A    In attempts to locate the weapon that was used in this

24   incident.

25   Q    I'm going to show you now what's marked as

Direct Examination - Jackson  (By Mr. Martinez)

1    Government's Exhibit SW 1.  Sergeant, do you recognize this

2    document?

3    A    Yes, I do.

4    Q    What is it?

5    A    A search and seizure warrant.

6    Q    What's the address here?

7    A    2466 Greenmount Avenue.

8    Q    And at the bottom here where it says "signature of

9    affiant and official rank," whose signature is that?

10   A    Mine.

11   Q    And is this the date here when these materials were sworn

12   and signed to?

13   A    Yes.

14   Q    Let's go to the second page of SW 1.  Can you tell us the

15   date on which the judge signed this sworn affidavit?

16   A    April the 20th, 2013.

17   Q    And I now want to go through with you, on page 3 do you

18   see where it begins at the top "affidavit"?

19   A    Yes.

20   Q    Who is the author, Sergeant, of this section?

21   A    I was.

22   Q    And what's the purpose of this section in the search

23   warrant application, what are you trying to do there?

24   A    To establish probable cause in attempts to get the

25   warrant approved.

Direct Examination - Jackson  (By Mr. Martinez)

1    Q    All right.  And can you summarize -- there's four

2    paragraphs here and then on the following page there's a few

3    more.  Can you summarize what you said in this section

4    regarding your investigation of the robbery and shooting of

5    Moses Malone?

6    A    The facts of how the incident occurred and what took

7    place and what was presented to us by Mr. Malone, the

8    victim.

9    Q    And so did -- in terms of what was presented by

10   Mr. Malone, the victim, were there statements in here

11   indicating that Mr. Malone had been interviewed by

12   Detective Jackson and Detective Taylor?

13   A    Yes.

14   Q    So here, for example, Detectives Dawnyell Taylor and

15   Jackson interviewed Mr. Malone at which time he gave a taped

16   statement indicating that he was approached by two black

17   suspects near the 2400 block of Greenmount Avenue; correct?

18   A    Yes.

19   Q    And then on the following page here, on the top

20   paragraph -- I'm sorry.  Does this contain information

21   regarding the photo array that Mr. Malone completed in which

22   he identified Norman Handy?

23   A    Yes, it does.

24   Q    And then in the last paragraph, does this explain the

25   circumstances under which Mr. Handy was arrested and where the

1    arrest took place?

2    A    Yes.

3    Q    And then lastly, you said the location of the dwelling,

4    2466 Greenmount, is a known Black Guerilla Family territory?

5    A    Yes.

6    Q    Was that true, Sergeant?

7    A    Yes.

8    Q    Did there come a time after this warrant was signed on

9    April 20th, did you execute the warrant and search

10   2466 Greenmount?

11   A    Yes, I did.

12   Q    Did the search uncover anything that was helpful to your

13   investigation?

14   A    No, it did not.

15   Q    I'm going to show you now the last page of SW 1 where it

16   says "return."  Sergeant, could you read that paragraph to the

17   jury?

18   A    Yes.  "I received attached search warrant on

19   April 20th, 2013 and have executed it as follows:  On

20   April 20th, 2013 at 10:42 p.m., I searched the premises

21   described in the warrant and I left a copy of the warrant

22   containing the inventory with on the kitchen table."

23   Q    So if I understand that correctly, Sergeant, were you

24   stating there that you left all of Government's SW 1 on the

25   kitchen table inside 2466 Greenmount after the search was

1    completed?

2    A    Yes.

3    Q    And did that include the affidavit that we reviewed on

4    pages 3 and 4 of SW 1?

5    A    Yes.

6    Q    And was that the affidavit that included the information

7    about Moses Malone providing a statement and identifying

8    Norman Handy?

9    A    Yes, it did.

10            MR. MARTINEZ:   Court's indulgence.

11   Q    (BY MR. MARTINEZ)   Detective Jackson, if you could

12   have -- if you could go back and do the search -- the

13   execution of the search differently at 2466 Greenmount, would

14   you have left the search warrant at the house?

15   A    No, I wouldn't.

16   Q    Why not?

17   A    Because I learned later on that you don't -- that things

18   change, the policy changes based on the different events.   I

19   was a fairly new detective at the time for shootings.   I was a

20   robbery detective and that was the protocol during robberies,

21   that you have to leave a copy of the warrant.   So I later

22   learned that it's different when it comes to shootings.

23   Q    Thank you, Detective.

24            MR. MARTINEZ:   No further questions.

25            THE COURT:   Mr. Enzinna, cross-examination.

1              MR. ENZINNA:  Very briefly.

2                        CROSS-EXAMINATION

3    BY MR. ENZINNA:

4    Q     Good morning, Sergeant Jackson.

5    A     Good morning, sir.

6    Q     That's correct; isn't it sergeant?

7    A     Yes.

8    Q     Thank you.  I'm Paul Enzinna, I represent Gerald Johnson

9    in this matter.  The tape that was played before of the

10   interview between Mr. Malone and Detective Taylor, you were

11   present for that; correct?

12   A     Yes.

13   Q     And you were present prior to that; correct?

14   A     Yes.

15   Q     In fact, it indicates in here that Mr. Malone was shown

16   the photographic arrays prior to the tape being made?

17   A     Yes.

18   Q     And you showed him the arrays?

19   A     Yes.

20   Q     I want to talk briefly about Government Exhibit PHA 11,

21   which you looked at earlier.  Now, Mr. Malone wrote here --

22   this is the photographic array where Mr. Malone identified

23   Mr. Johnson; correct?

24   A     Right.  Yes.

25   Q     And then on the backside in the comments section he

1    wrote, "He got ranked, so I'm guessing he sent them at me."

2    See that?

3    A    Yes.

4    Q    So when Mr. Malone wrote this, he was guessing;

5    correct?

6    A    That's just his statement.

7    Q    Okay.  Did he give you information, factual information

8    that indicated that Mr. Johnson had sent these people to rob

9    him?

10    A    No, just what you heard on the tape.

11    Q    Okay.  Now, he talked in a number of places about other

12    events that occurred here, beyond the -- well, first of all,

13    he said there were two people who robbed him; correct?

14    A    Yes.

15    Q    And he identified one of them?

16    A    Yes.

17    Q    And couldn't identify the other one?

18    A    Correct.

19    Q    He never indicated that that second person was

20    Mr. Johnson, did he?

21    A    No, he didn't.

22    Q    And he also talked about people saying things to him and

23    getting in scuffles with people?

24    A    Yes, he did.

25    Q    After the robbery?

1    A    Right.

2    Q    And he never indicated that Mr. Johnson was one of those

3    people, did he?

4    A    No, he didn't.

5              MR. ENZINNA:  Thank you, Sergeant.  Nothing

6    further.

7              THE COURT:  Mr. Bussard.

8              MR. BUSSARD:  Just very briefly, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. BUSSARD:

11   Q    Good morning, Sergeant.

12   A    Good morning, sir.

13   Q    You had occasion to interview Mr. Malone and you were

14   present when he did the -- when he looked at the photo arrays;

15   is that correct?

16   A    Correct.

17   Q    And I'm showing you what's been admitted into evidence as

18   Government's Exhibit PA 10.  Let me pull it back a little bit.

19   And is this the photo array that was shown to Mr. Malone?

20   A    Yes.

21   Q    And this is Mr. Malone's signature where my pen is?

22   A    Yes, it is.

23   Q    And the person depicted in the picture below his

24   signature is who?

25   A    Mr. Norman Handy.

1    Q    And based on your investigation, did you come to be aware

2    of whether Mr. Handy was related in any way to anyone else

3    associated with the Greenmount area?

4    A    Not that I'm aware of.

5    Q    And Mr. Handy was the person identified as the person

6    that shot Mr. Malone?

7    A    Yes.

8    Q    And robbed Mr. Malone?

9    A    Yes.

10   Q    Now, I just want to be clear, the government showed you

11   the search warrant and the affidavit.

12   A    Yes.

13   Q    It was not usual practice, it wasn't policy in the

14   Baltimore Police Department to leave the affidavit at the

15   scene of the search, was it?

16   A    Well, in the search and seizure -- well, like I said, on

17   robberies I was -- I had a history of doing robbery

18   investigations, so policy was that you leave a copy of the

19   warrant at the location, this being a search, so that the

20   owner is aware of what took place as far as the search and

21   seizure was -- when the search and seizure was conducted.  So

22   it is policy to leave a copy.

23   Q    Is the application for the warrant and the affidavit that

24   you identified, is that part of the warrant that is left or is

25   the warrant a separate piece of paper?

Cross-examination – Jackson   (By Mr. Bussard)

1   A    It's separate pieces of paper, but the -- as far as I'm

2   aware, the whole packet was left.

3   Q    So Baltimore Police Department had a policy then, that

4   back in 2013, that even for robbery cases, that if

5   confidential information and names were divulged to law

6   enforcement, they were included in the documents left at the

7   scene of a search?

8   A    No, they didn't have a policy of that.

9   Q    But that's what happened here; is that correct?

10   A    Yes, it is.

11   Q    Okay.

12           MR. BUSSARD:  I have no other questions.

13           THE COURT:  Mr. Francomano.

14           MR. FRANCOMANO:  No questions, Your Honor.

15           THE COURT:  Redirect.

16           MR. MARTINEZ:  None, Your Honor.

17           THE COURT:  May the witness be excused, counsel?

18           MR. ENZINNA:  Yes.

19           MR. MARTINEZ:  Yes, Your Honor.

20           THE COURT:  Sergeant, you're excused.  You may

21   depart.

22           THE WITNESS:  Thank you, sir.

23           THE COURT:  Next witness.

24           MS. HOFFMAN:  Government will call

25   Detective David Ciotti.

Direct Examination - Ciotti  (By Ms. Hoffman)

1           THE COURT:  Spell the last name, please.

2           MS. HOFFMAN:  C-i-o-t-t-i.

3           THE COURT:  Detective Ciotti.

4           Please come forward, sir, all the way to the witness

5      box.  Stand next to the American flag and face our clerk.

6                     DETECTIVE DAVID CIOTTI

7      called as a witness, being first duly sworn, was examined and

8      testified as follows:

9           THE WITNESS:  I do, ma'am.

10           THE CLERK:  Thank you.  You may have a seat in the

11     witness box and watch your step.

12           THE WITNESS:  Good morning, sir.

13           THE CLERK:  Please speak directly into the

14     microphone, state your first name and last name and spell your

15     first name and last name.

16           THE WITNESS:  It's David, D-a-v-i-d; the last name

17     is Ciotti, C-i-o-t-t-i.

18           THE CLERK:  Thank you.

19           THE COURT:  Ms. Hoffman.

20                     DIRECT EXAMINATION

21     BY MS. HOFFMAN:

22     Q    Good morning, Detective Ciotti, where are you currently

23     employed?

24     A    Baltimore City's Northern District, ma'am.

25     Q    What is your rank and title?

1    A    Police officer.

2    Q    How long have you been with

3    Baltimore Police Department?

4    A    Since March of 2006.

5    Q    Can you walk us through the various positions you've held

6    with BPD?

7    A    So I've been on foot patrol in the Southeast and the

8    Central.  I did Western Patrol.  I was in Western District

9    Violent Crime Impact Division, Eastern District Violent Crime

10   Impact Division, Northern District Patrol, and then I went

11   over to Lexington Market Drug Unit for a little bit, and I'm

12   currently in Northern District Patrol.

13   Q    As of April of 2013, were you on uniform patrol in the

14   Northern District at this point?

15   A    I was, ma'am.

16   Q    And I want to direct your attention to the evening of

17   April 22nd of 2013.  Were you working and on duty at that

18   time?

19   A    Yes, ma'am.

20   Q    Did there come a time when you were asked to assist with

21   a 911 call that came in?

22   A    Yes, ma'am.

23   Q    What were you asked to do?

24   A    So I was sent over to 427 East 27th Street in reference

25   to someone that said that he thought people were trying to

1    kill him.

2    Q    And did you respond to that location?

3    A    I did, ma'am.

4    Q    And did you locate the person who had called 911?

5    A    I did, ma'am.

6    Q    Going to show you Government's Exhibit No. GM, as in

7    Google maps, 2.  Can you tell us what we're looking at here?

8    A    Yes, ma'am.  So this is the south side of the 400 block

9    of East 27th Street.

10    Q    And can you point to where you located the individual who

11    had called 911?

12            THE COURT:  If you just draw right on the screen.

13    A    Oh, okay.  So he was back there behind the building.

14    Q    (BY MS. HOFFMAN)  Okay.  And did he identify himself?

15    A    He did, ma'am.

16    Q    Who was he?

17    A    Moses Malone.

18    Q    Did you speak to him?

19    A    I did, ma'am.

20    Q    And what did he tell you?

21    A    So I had a conversation with him, he said that he was a

22    CI, and that he was afraid that people were trying to kill

23    him.

24    Q    Did he elaborate on that?

25    A    Yes.  So he handed me a card with the detective's name

Direct Examination – Ciotti   (By Ms. Hoffman)

1    that he was a CI for.  And I believed him because he seemed

2    very upset, you know, because initially I wasn't sure exactly

3    what was going on.  It was kind of a weird call to get, but he

4    did seem genuinely concerned for his life.  And then I knew

5    the people that he was talking about, so then I started making

6    phone calls to see what to do with it.

7    Q    And by the people he was talking about, do you mean the

8    detectives who he was working for?

9    A    Yes, ma'am.

10   Q    Now, you said that he said -- he thought people were

11   trying to kill him.  Did he say anything about who was trying

12   to kill him?

13   A    He did specifically say that BGF was trying to kill

14   him.

15   Q    Did you say BGF?

16   A    Yes, the Black Guerilla Family.

17   Q    You said you made telephone calls, what happened when you

18   made those calls?

19   A    So essentially, I made a couple phone calls to a couple

20   different offices.  Essentially, they instructed me to bring

21   Mr. Malone down to the Eastern District for processing.

22   Q    Did you bring him down there for processing?

23   A    I did, ma'am.

24   Q    What happened when you got down to the

25   Eastern District?

Direct Examination - Ciotti  (By Ms. Hoffman)

1    A    So we met with the detectives, we went over the whole

2    story because I had just a very tiny part of it, you know, so

3    I transported him over there.  And then it was determined that

4    the witness relocation team was going to relocate him, but

5    they were going to take a little bit.  So in the interim, he

6    hadn't eaten, so we went over to the McDonald's down the

7    street and we had -- I got him dinner because he hadn't

8    eaten.

9    Q    Did the witness relocation unit eventually arrive?

10   A    They did, ma'am.

11   Q    And did they bring Mr. Malone into protective custody?

12   A    Yes.

13   Q    Did you later learn that Mr. Malone had been removed from

14   protective custody?

15   A    I did.

16            MS. HOFFMAN:  No further questions, thank you.

17            THE COURT:  Mr. O'Toole.

18            MR. O'TOOLE:  We have no questions.

19            THE COURT:  Mr. Bussard.

20            MR. BUSSARD:  No questions.

21            THE COURT:  Mr. Francomano.

22            MR. FRANCOMANO:  No questions, Your Honor.

23            THE COURT:  May the witness be excused?

24            MR. FRANCOMANO:  Yes, Your Honor.

25            THE WITNESS:  Thank you.

Direct Examination - Ciotti  (By Ms. Hoffman)

1          THE COURT:  Officer, you're excused, you may depart.

2     Next witness.

3          MR. MARTINEZ:  Your Honor, the government calls

4     Harry Caesar.

5          Your Honor, I apologize for the delay, I was just

6     told -- Agent Christy told me it's going to be another minute.

7          (Pause in the proceedings.)

8          THE COURT:  Please come forward, sir, all the way up

9     to the American flag.  Stand there and face our clerk.

10          THE CLERK:  And sir, if you would please raise your

11     right hand to be placed under oath.

12                         HARRY CAESAR,

13     called as a witness, being first duly sworn, was examined and

14     testified as follows:

15          THE WITNESS:  I do.

16          THE CLERK:  You may have a seat in the witness box,

17     sir, and watch your step.  And if you would please speak

18     directly into the microphone, you can adjust the microphone if

19     you need to.  Please state your first and last name and spell

20     your first and last name.

21          THE WITNESS:  First name Harry, H-a-r-r-y; last name

22     Caesar, C-a-e-s-a-r.

23          THE CLERK:  Thank you, sir.

24          THE COURT:  And Mr. Caesar, if you would slide your

25     chair up, pull that microphone down just an inch or two.

1          Your witness, Mr. Martinez.

2                    DIRECT EXAMINATION

3    BY MR. MARTINEZ:

4    Q    Mr. Caesar, good morning, sir.

5    A    Good morning.

6    Q    Can you please tell the ladies and gentlemen of the jury

7    how old you are?

8    A    40.

9    Q    Where are you from?

10   A    Baltimore City, Maryland.

11   Q    Where in Baltimore City did you grow up?

12   A    All around because I grew up as an orphan.

13   Q    Do you go by any nicknames?

14   A    Black Man or Man.

15   Q    Mr. Caesar, are you familiar with an organization called

16   the Black Guerilla Family or BGF?

17   A    Yes, sir.

18   Q    Can you tell us whether BGF is a gang?

19   A    Well, now it's a gang, supposed to have been an

20   organization.

21   Q    Do you know where BGF got started?

22   A    Well, originally came from San Quentin, came over here,

23   came from Cambone and Ben to combine BGF.

24   Q    You mentioned Cambone and Ben, what are Cambone and

25   Ben?

Direct Examination – Caesar  (By Mr. Martinez)

1   A    Cambone supposed to been a political movement in

2   San Quentin and on the West Coast and then brought over here.

3   They formed Ben and Ben is considered making money to finance

4   the Cambone side, so both together became BGF.

5   Q    I understand.  Can you tell us whether BGF operates in

6   the prisons of Maryland?

7   A    Yes, sir.

8   Q    Can you tell us whether BGF operates on the streets of

9   Baltimore City?

10  A    Yes, sir.

11  Q    Were you affiliated with BGF at one point in time?

12  A    Yes, sir.

13  Q    Do you know what a fox is in the context of BGF?

14  A    Yes, sir.  Technically ain't supposed to be a fox,

15  supposed to be a log, but they -- somebody else added like a

16  fox lesson into it.

17  Q    Tell us what a fox is.

18  A    Fox is just nothing but a recruit or rookie before they

19  get their 22s or 33s --

20  Q    Was there a --

21  A    -- become a full member.

22  Q    I'm sorry.

23  A    Before they become a full member, you know, like a rookie

24  stage, a beginner, a prospect.

25  Q    Was there a point in time when you were a fox?

1    A    Correct.

2    Q    Did you have to take an oath to become a fox?

3    A    Yes.

4    Q    Do you remember the full fox oath?

5    A    Majority of it.

6    Q    Can you recite for the jury the portions that you do

7    remember?

8    A    We live silver fox by day, we live gorilla by night.  We

9    live in the worst of hell holes, the coldest of pits.  When we

10   rise -- I mean, we live in the coldest of pits.  We live

11   underground.  We live under sea.  When we rise, who am I?  And

12   the correct response is either say nothing or say mystery.

13   Q    Mr. Caesar, before we get further into BGF, there are a

14   few questions I want to ask you.  Do you have a prior felony

15   conviction?

16   A    Yes, I do.

17   Q    Did you plead guilty to attempted murder in 2002?

18   A    Yes, sir.

19   Q    Are you testifying today under any kind of cooperation

20   agreement with the government?

21   A    No, sir.

22   Q    Are you currently a defendant in any pending case?

23   A    No, sir.

24   Q    Dating back to July of 2016, have payments been made on

25   your behalf by the ATF?

1   A    Only payments ever been paid to me, not directly, it was

2   indirectly for housing and location.

3   Q    You mentioned location, during the 2016 time period,

4   Mr. Caesar, did you have to be relocated from

5   Baltimore City?

6   A    Yes, sir.

7   Q    Why did you have to be relocated?

8   A    For safety reasons.

9   Q    Could you tell us more about that?

10  A    For, you know, safety reasons for -- I won't be killed or

11  any bodily harm permanently or anything like that, due to the

12  infiltration of me into BGF.

13  Q    So you mentioned you had safety concerns and you were

14  worried about bodily harm, was there any relationship between

15  those safety concerns and the fact that you are testifying

16  here today?

17  A    It's always safety concerns dealing with an organization

18  when I was the infiltrate; death, bodily harm, or anybody

19  close to me could be killed because of the simple fact of the

20  track record of BGF and the laws of the BGF.  If you piddle

21  talk or talk J business outside, that you could be sanctioned

22  and part of the sanction is killing.

23  Q    I understand.  Do you know how much money the ATF spent

24  on relocation and housing and those kinds of things on your

25  behalf?

Direct Examination – Caesar  (By Mr. Martinez)

1    A    No, not the exact amount, sir.

2    Q    So you mentioned a moment ago that you have a 2002

3    conviction for attempted murder; is that correct?

4    A    Well, I was locked up in 2001, but I guess the plea out

5    the conviction was 2002.

6    Q    Okay.  How long was your sentence for the attempted

7    murder conviction?

8    A    It was broken down to 20 years; eight suspended, all but

9    12, and 3 years probation, 12 years.

10    Q    And in what facilities did you serve that sentence,

11    Mr. Caesar?

12    A    I was moved multiple times from the penitentiary, WCI,

13    ECI East, ECI West, because the ECI split into two different

14    prisons.  I was st MCIJ.  I was at pretty much everywhere but

15    North Branch.  I was down in Supermax.

16    Q    While you were serving that attempted murder sentence in

17    all the different jails you just mentioned, Mr. Caesar, did

18    you meet any members of BGF?

19    A    Pretty much majority, yeah, because that's all was --

20    pretty much inside the system.  If you're going to be part of

21    an organization, either it's going to be BGF or Bloods or

22    Crips.

23    Q    Did there come a time where you met a BGF member named

24    Woo?

25    A    Yes, sir.

Direct Examination – Caesar   (By Mr. Martinez)

1    Q    I want to come back to Woo in a moment, but now I want to

2    ask you about the kinds of activities that BGF was engaged in

3    in Maryland's prisons.  What kinds of things did BGF do in the

4    jails of Maryland?

5    A    Everything from selling drugs, extortion, robbing people,

6    bringing horses in.  If you don't know what horse is, a CO

7    that's going to bring in and transport cell phones, drugs,

8    anything else.  At one point they brought a gun in the

9    penitentiary.

10   Q    When was that, Mr. Caesar?

11   A    I think that was around like 2003, 2004.  I don't know

12   the exact date, but it was a gun at one time that was brought

13   into one of the prison systems.

14   Q    What facility were you in at that point?

15   A    At that time I believe I was out WCI.

16   Q    Can you tell us when your sentence for the attempted

17   murder conviction ended?

18   A    I came home in 2010, but I still had three years

19   probation.  So technically, you know what I mean, 2013.

20   Q    I understand.  And when you said you came home in 2010,

21   where was home?

22   A    At that time Northeast Baltimore.

23   Q    Did there come a time shortly after you came home when

24   you moved to the west side of the city?

25   A    Yes, sir.

1    Q    Where on the west side were you living?

2    A    North Avenue and Monroe.

3    Q    When you moved to North and Monroe, did you know any BGF

4    members in the area?

5    A    Yes.  I known some of the ones I was locked up with and

6    especially Woo.

7    Q    So you mentioned Woo earlier.  You reconnected with Woo

8    in West Baltimore when you got out of jail?

9    A    Correct.

10   Q    And did there come a time when Woo introduced to you to

11   any of the other BGF members who were living on the west

12   side?

13   A    At that time they didn't have a legitimate regime there,

14   was just a bunch of brothers, individuals selling drugs and

15   stuff.  So I ended up meeting Uncle Perry, which was the

16   second in charge on the streets at that time for Double R,

17   which is Randy Russell, if I pronounced it right.

18   Q    So you mentioned Uncle Perry, you said he was second in

19   charge of BGF on the streets at the time you were living in

20   West Baltimore?

21   A    Correct.

22   Q    Have you ever heard the term bushman, Mr. Caesar?

23   A    Yes.

24   Q    What's a bushman?

25   A    Well, in the structure from -- you got your regular

1    so-called foxes, then you got your regular members, and then

2    you got your bushmen, is one that's oversee, pretty much like

3    a supervisor, somebody that's in charge.  Then you got a

4    senior bush member, which is the people that are running the

5    streets like Double R, Uncle Perry.

6    Q    Okay.

7    A    Mike Gray, you know, people like that.

8    Q    And you mentioned Mike Gray; is that correct?

9    A    Uh-huh.

10   Q    You told us earlier that you were a BGF fox at one point

11   in time, remember that?

12   A    Correct.

13   Q    And you said that you took an oath to become a fox?

14   A    Correct.

15   Q    Could you tell us who gave you the fox oath?

16   A    Uncle Perry and Hot Rod.

17   Q    Who's Hot Rod?

18   A    He was another bush member that ended up being in charge

19   of East Baltimore, most of the East Baltimore regimes.

20   Q    While you were a fox and living on the west side,

21   Mr. Caesar, did you ever do any work for Uncle Perry?

22   A    Well, they made a special case in my case because they

23   knew I had prior like -- by my past being prior security and

24   stuff like that and I used to do executive protection work and

25   stuff and I dealt with the Nation of Islam.  So I also done

Direct Examination - Caesar  (By Mr. Martinez)

1    work with celebrities and stuff, so I ended up being

2    Uncle Perry personal bodyguard and driver because at that time

3    he couldn't defend hisself because he was currently shot, he

4    was in a wheelchair.  So they needed somebody willing to

5    protect him at all times.

6    Q    And in connection with that responsibility, as

7    Uncle Perry's security person, did you have to carry a gun

8    around with you?

9    A    Correct.

10   Q    How long did you work as security for Uncle Perry?

11   A    Probably good like six months.

12   Q    You also told us about a guy named Double R; right?

13   A    Correct.

14   Q    And Double R was also a member of BGF?

15   A    He was what you call the gatekeeper, he was in charge of

16   the streets.

17   Q    Was Double R also a bushman?

18   A    He was a senior bushman.

19   Q    Did you ever do work for Double R?

20   A    Correct.

21   Q    What kinds of things would you do for him?

22   A    Whenever he call me up, either give him a ride somewhere

23   or if he need help with a certain situation.

24   Q    So as you were going through the process of becoming a

25   fox, did you learn about BGF's rules?

1    A    I was given the 22s and 33s, but then later during the

2    line, they said I was just a straight brother, straight

3    member, because of the position I held with Uncle Perry and

4    Double R.  So therefore, they didn't want me to have -- and

5    didn't have to recite everything.  Therefore, if they send me

6    out to do something, I can't be sanctioned because I don't

7    know that exact rule and responsibility.  So I was in what you

8    call like a blackout stage, where if I would do something

9    wrong, it's not going to fall back.  If I get sent to do

10   something that's against the rules, it won't come back on

11   me.

12   Q    I understand.  But did you also tell us that you did have

13   exposure to the rules for a period of time?

14   A    Correct.

15   Q    Is there a rule of the gang that addresses cooperating

16   with the police?

17   A    Yup.

18   Q    What does that rule say?

19   A    No talking Jamaa business.  Pretty much no talking Jamaa

20   business means pretty much if you're not a brother or a

21   sister, you don't speak amongst the 22 codes.  The 33s, I

22   really never got involved with.  But there is pretty much a

23   rule nobody state -- to say anything to the police unless

24   instructed.

25   Q    I understand.  So based on your experience as a fox and

1    your exposure to BGF, if one BGF member suspects or believes

2    that another member is cooperating with the police, how does

3    he go about determining whether that other member is, in fact,

4    cooperating?

5    A    Well, completely about the situation, if somebody come up

6    to a brother on the corner and state this person is a rat,

7    this person is a snitch, they're going to ask where the

8    paperwork at on black and white.  That supposed to have been

9    the procedures.  And the procedures in that case goes to

10   whatever regime it is and it go through the chain of command

11   in the bubble.  And the final say-so is going to come from the

12   C or -- the C.  If it's something that's real serious, it got

13   to go to a bush member to make the final call.

14   Q    So you mentioned paperwork and paperwork is one of the

15   ways in which you can figure out whether someone is

16   cooperating?

17   A    Correct.

18   Q    What kind of paperwork are you talking about?

19   A    The same type of paperwork that will be filled out to the

20   public after this trial, that anybody can get access to,

21   witnesses or statements.

22   Q    Oh, so are you saying that the transcript of your

23   testimony from today, for example?

24   A    Correct.

25   Q    When you were a fox in BGF, Mr. Caesar, did you learn

Direct Examination - Caesar  (By Mr. Martinez)

1    about how the gang is organized on Baltimore Streets?

2    A    Yes, sir.

3    Q    Do you know what a regime is?

4    A    A regime is a neighborhood.  And each neighborhood that

5    got BGF members in it, they got their own structure, so they

6    call it a regime.  So then they go to the bubble.  But every

7    brother is pretty much set in the neighborhood regime.  Like

8    in this case, mostly Barclay and 22nd, all of them know how

9    many grew up together.  So when BGF hit the street real hard,

10   all of them became BGF.

11   Q    You mentioned the term "bubble," what's a bubble?

12   A    A bubble is the command structure, as they try to use

13   like military, like structure as in you got your C, which is

14   your commander; your LTC, which is your lieutenant commander;

15   you got your MOJ; MOD; MOF, which is finance; you got your

16   secretary.  Just the same as the structure of any type of

17   organization.

18   Q    Let's go through some -- we don't have to go through all

19   of the positions, but just a few.  And I want you to explain

20   your understanding to the jury in terms of what those

21   positions do.  We'll start with the C or the commander, what

22   does he do?

23   A    He's the overseer.  He's in charge of that regime.  That

24   means unless a bush member overrank him, that is his

25   responsibility and that's his regime.  But he's not a bush

Direct Examination – Caesar  (By Mr. Martinez)

member, he's just in charge of that neighborhood.

Q    How about the lieutenant commander or LTC, what does that person do?

A    He's the second in charge.  When the C's not around, it's his responsibility.

Q    And the MOJ or the minister of justice?

A    Minister of justice job is if there's a situation that occurs, somebody need to be sanctioned, or let's -- in case of a hit or somebody got to be sanctioned or dealt with, the MOJ is responsible for carrying out them orders with the MOD, the minister of defense.

Q    Since you mentioned the minister of defense, what does he do?

A    Pretty much structured to -- how can I say it, plot and if -- instruction, how to carry out the mission and bring the people on that need to come and get them orders, they're from the MOJ.

Q    You mentioned a mission, what's a mission?

A    If you got to go kill somebody, rob somebody, they try to structure it as much as they can.  If it's a known person that they got to go get, if they know this person live here, but they deal with a group of people, they plan out an attack, a strategy how to get to them.

Q    How about field marshal, what does the field marshal do?

Direct Examination – Caesar   (By Mr. Martinez)

1   A    Field marshal, from my understanding, when I dealt with

2   it, pretty much the ones I already spoke of because they had

3   other positions but nobody used them positions.  So the field

4   marshal, I couldn't tell because I never met nobody that was

5   considered a field marshal.

6   Q    Fair enough.  So let's go back to the time you spent in

7   West Baltimore in 2010.  You mentioned that you were doing

8   work for both Uncle Perry and Double R around that time;

9   right?

10  A    Correct.

11  Q    So during that time period, did there come a time when

12  you also began working with law enforcement as a confidential

13  informant?

14  A    Well, I already been working alongside with a couple

15  detectives and there was a way in and I took advantage to that

16  way in.

17  Q    So are you saying you were working as an informant before

18  you went to jail in 2002 or 2001 for attempted murder?

19  A    Correct.

20  Q    Okay.  And based on that prior experience, did you have a

21  relationship with a detective named Geho?

22  A    Yes, I did.

23  Q    And so in 2010, when you began meeting these BGF members

24  in West Baltimore like Uncle Perry and Double R, can you tell

25  us whether you contacted Detective Geho about going to work as

1   an informant?

2   A    Well, I was already assigned with Geho, and at that time

3   Geho said that they did know somebody that was running, you

4   know, running cases against BGF.  And he assigned me with a

5   individual.  And I was working with DEA and I ended up working

6   with -- alongside with the DEA at the time.

7   Q    Did you become a registered informant for the DEA?

8   A    Correct.

9   Q    Were you paid by the DEA for working as an informant?

10  A    If you want to call it paid, but not no money as people

11  think you would be getting money.

12  Q    What do you mean by that?

13  A    In other words, like maybe like gas expense or something

14  like that, because of the fact I had several vehicles that was

15  miked up and camera'd up when I was driving Double R and

16  Uncle Perry around.  It was cameras and video, audio placed in

17  my vehicles.

18  Q    So you're telling us the DEA put recording devices in the

19  cars you were using to drive BGF members around Baltimore; is

20  that right?

21  A    Correct.

22  Q    Did you do anything else, what other investigative kinds

23  of things did you do to help the DEA?

24  A    On this case it was just the BGF.

25  Q    Yes, sir.

1   A    But then I went to city and other departments was, you

2   know, pretty much guns and drugs.

3   Q    Well, I want to stay with the DEA BGF investigation.  Did

4   you ever make phone calls that the DEA recorded?

5   A    Correct.  My phone was wiretapped as well as my car and

6   all of that.

7   Q    Did there come a time when you stopped working as an

8   informant for the DEA?

9   A    Correct.

10  Q    Could you tell us why that happened?

11  A    Because like any other organization, somebody always want

12  to be in the position that you is and they make up stories and

13  it was caught on a wiretap.  And from that situation, they

14  felt though my life was in jeopardy, which though I just --

15  they wanted me out of the city and out of the state.  But I

16  chose to stay because I was still able to prove that the

17  person was lying.  Because the person that they said that saw

18  me down Central Booking -- was physically impossible.  Because

19  when they brought the person to the person, it would have been

20  physically impossible.  If you was down Central Booking with

21  me in '01, that mean you would have been seven years old.

22  Q    All right.  Let's take that answer piece by piece.  So

23  you stopped working for the DEA as an informant because there

24  were rumors in the community about you; is that correct?

25  A    Yeah.  Somebody try to -- they really wanted the position

1    that I had.  They know Uncle Perry and Double R, they try to

2    discredit it.  But come to find out I was right, there was no

3    paperwork on it.

4    Q    Okay.  You say paperwork, are you saying that someone

5    within BGF at the time you were working there had put it out

6    there that you were an informant?

7    A    Correct.  Woo.  Woo wanted the position I had.  And he

8    made up a lie and said that somebody pulled him up, saying he

9    seen me talking to detectives back in '01 down Central

10   Booking.  Like I said, it was physically impossible because

11   that person age, if you would take back that amount of time,

12   he would have been like 8, 9 years old.  So everybody knew it

13   was a lie, it was physically impossible.

14   Q    Well, so Woo might have been wrong about you talking to

15   that detective at Central Booking, but wasn't it correct that

16   you were also -- you were an informant for the DEA; correct?

17   A    Not at that time.

18   Q    No, I'm talking about 2010.

19   A    Oh, 2010, yeah.

20   Q    So --

21   A    He was saying it was something that happened in '01.

22   Q    Did the DEA tell you why they didn't want to use you as a

23   informant anymore?

24   A    Because it came across on a phone conversation that when

25   Woo called, he actually called my phone and I passed my phone

1    to Double R.  And he told Double R that somebody recognized me

2    as being an informant and working alongside with the police

3    back in '01.  And like I said, math ain't add up.

4    Q    Okay.  But based on your conversations with the DEA, can

5    you tell us whether or not the DEA believed that your cover

6    had been blown?

7    A    Well, they said they didn't want to take no chance.

8    Q    Okay.

9    A    And I chose to stay.

10   Q    Let's fast forward to the spring of 2013.  During that

11   time period did there come a time where you moved to the

12   Greenmount neighborhood of Baltimore?

13   A    Correct.

14   Q    Were you still a BGF fox at that point in time?

15   A    Well, technically Uncle Perry and Double R said I was a

16   full member, but if you want to say fox --

17   Q    Well, I want to be right.  So tell us, what you were?

18   A    At that time I was considered a full member.

19   Q    Was there an active BGF Greenmount Regime when you moved

20   to the neighborhood in 2013?

21   A    Yes, there was.

22   Q    When you moved to the neighborhood, did you meet any

23   members of that regime?

24   A    Correct.

25   Q    Did you meet someone named Geezy?

1   A   Yes.

2   Q   Was Geezy a member of the BGF Greenmount Regime?

3   A   He was the C of the Greenmount Regime.

4   Q   Do you see Geezy in the courtroom today?

5   A   Yeah, right there.

6   Q   Could you point out an article of clothing he's wearing,

7   please?

8   A   The colorful shirt with the glasses and the beard.

9   Q   Did you meet someone named Slay?

10  A   Yes, sir.

11  Q   Do you see Slay in the courtroom today?

12  A   Right there at the end.

13  Q   Could you pick out an article of clothing he's wearing?

14  A   White, green tie.

15  Q   Was Slay in the BGF Greenmount Regime?

16  A   The time I moved up there he was in prison, but he came

17  out later.

18  Q   And did you learn whether or not he was in the regime?

19  A   He was in the regime.

20  Q   Did you meet anyone named Wes?

21  A   Correct.

22  Q   Was Wes in the BGF Greenmount Regime?

23  A   Yup.

24  Q   I'm going to show you Government's Exhibit PHI 9.  Who's

25  that, Mr. Caesar?

Direct Examination – Caesar   (By Mr. Martinez)

1  A   Mr. Wes.

2  Q   Did you meet someone named Country?

3  A   Correct.

4  Q   Was Country in the BGF Greenmount Regime?

5  A   Correct.

6  Q   This is PHI 83, who's that, Mr. Caesar?

7  A   Country.

8  Q   Did you meet someone named Norman?

9  A   Correct.

10  Q   Was Norman in the Greenmount Regime?

11  A   Correct.

12  Q   This is Government's PHI 38, who's that, Mr. Caesar?

13  A   That's Norman, which is Wes little brother.

14  Q   They were brothers you say?

15  A   Correct.

16  Q   How about a person named Hood, did you meet Hood?

17  A   Yes.

18  Q   Was Hood in the regime?

19  A   Yes.

20  Q   This is Government's PHI 35, who's that?

21  A   Hood.

22  Q   Mr. Caesar, can you tell us whether members of the

23  BGF Greenmount Regime sold drugs while you were living in the

24  neighborhood in 2013?

25  A   Yes.

1    Q    Can you tell us whether members of the regime committed

2    robberies while you were living in the neighborhood?

3    A    Yes.

4    Q    Do you have personal knowledge regarding murders

5    committed by members of the Greenmount Regime?

6    A    Only one, two -- two of them that I can speak of.

7    Q    Do you have personal knowledge regarding shootings by

8    members of the Greenmount Regime?

9    A    One of them, besides the two murders.

10   Q    Do you have personal knowledge regarding the retaliation

11   against witnesses by members of the Greenmount Regime?

12   A    One, Moses Malone.

13   Q    Before we talk about Mr. Malone, I'd like you to tell us

14   where specifically you were living in the Greenmount

15   neighborhood in 2013?

16   A    When I first moved in, was 2466.

17   Q    Let me show you Government's Exhibit GM 36.

18   A    Right there at the corner house, next to the little

19   parking thing because then it's a store.  I had the third

20   floor back bedroom.  It was -- the house was broken into rooms

21   for rent.

22   Q    So you can use the screen to your left and actually touch

23   it and make a mark.  Could you make a mark on the front door.

24   A    This house right here.  My back bedroom that I rented out

25   was right here, because only two rooms on the third floor.

Direct Examination - Caesar  (By Mr. Martinez)

1   Q    And you were starting to tell us that the house is broken

2   into rooms for rent; is that right?

3   A    Correct.

4   Q    Was there a common area in the house?

5   A    Well, besides the hallway you got the kitchen, the

6   kitchen -- the kitchen area is the kitchen/dining room area

7   and the one bathroom and then there was a back room.

8   Q    Okay.

9   A    Like a little like den type area.

10  Q    Was there another BGF member who lived in this house at

11  2466?

12  A    His name was Elliott Reed, Tech, that I allowed him and

13  his baby mama stay with me because they was going through

14  something at the time.

15  Q    You said Elliott Reed was his government name?

16  A    Right, nickname Tech.

17  Q    And you said he and his girlfriend were living with

18  you?

19  A    Correct.

20  Q    Let me show you some pictures.  This is

21  Government's Exhibit PHI 66.  Who's that, Mr. Caesar?

22  A    Elliott Reed, nickname Tech.

23  Q    You said Tech was a member of BGF?

24  A    Correct.  He wasn't Greenmount Regime, he was

25  Park Heights Regime.

1    Q    What part of town is Park Heights in?

2    A    West Baltimore.

3    Q    And there's a BGF regime in Park Heights; is that

4    right?

5    A    About three regimes in Park Heights.

6    Q    And Tech was a member of one of them?

7    A    Correct.

8    Q    What was -- you mentioned that Tech had a girlfriend that

9    was also living at 2466, do you remember what her name was?

10    A    Only thing I know about, nickname Cookie.

11    Q    Let me show you Government's PHI 75.  Who's that?

12    A    Cookie.  But she had no relations and dealings with BGF

13    but Tech.

14    Q    Mr. Caesar, when you were living in the Greenmount

15    neighborhood in 2013, can you tell us whether you were selling

16    drugs?

17    A    Correct.  To keep my cover.

18    Q    What kind of drugs did you sell?

19    A    Crack, cocaine.

20    Q    Where did you sell drugs?

21    A    Greenmount, 25th.

22    Q    How close was your house, 2466, to Greenmount and 25th?

23    A    Probably less than 20 yards.

24    Q    Did you work together with anyone else to sell drugs in

25    the neighborhood?

1   A    Elliott Reed, which is Tech.

2   Q    So during this time period in 2013 when you're living in

3   Greenmount and selling drugs with Tech, did there come a time

4   where you met someone named Moses Malone?

5   A    Correct.

6   Q    Let me show you Government's Exhibit PHI 54.  Who's

7   that?

8   A    Moses Malone.

9   Q    Did Mr. Moses Malone go by any nicknames?

10   A    Mo.

11   Q    Can you tell us whether Moses Malone was a member of a

12   gang?

13   A    Well, he always claimed he was a Blood, but I had no

14   recollection.  Anybody could say they anything, but I don't

15   have no dealings with them Bloods to actually know.

16   Q    Did the Bloods have a presence anywhere near the

17   Greenmount neighborhood in 2013?

18   A    Yes, they did.

19   Q    What part of the neighborhood was the Bloods'

20   neighborhood?

21   A    Everything that's -- if you coming up from North Avenue

22   up to Greenmount, once you cross over 25th Street, like 26th

23   on up to about 29th was Bloods and Muslims.  There was a lot

24   of hustling and selling drugs.  But they come over 25th, cross

25   that 25th line, they getting robbed and dealt with selling any

Direct Examination - Caesar  (By Mr. Martinez)

1   type of drugs.

2   Q    Why would a Blood who wanted to sell drugs get robbed or

3   dealt with if they crossed 25th?

4   A    People do stupid things chasing money.

5   Q    Yeah, but what's -- I'm showing you a map here, can you

6   show us where -- this is GM 10, for the record.  Can you show

7   us where 25th Street is?

8   A    Right here.

9   Q    You can make -- there you go.  So if a Blood member were

10  to cross -- go down Greenmount Avenue and cross 25th and keep

11  going south, whose territory would he be in then?

12  A    All that is BGF area right there.

13  Q    Okay.  What was the relationship between the Bloods and

14  BGF like when you were living --

15  A    No relationship.  They stayed their side.  They can go

16  to -- either sides can go to the store without no conflict.

17  As long as nobody come on the other person's side selling

18  drugs or breaking any -- breaking law, they all right as they

19  passing through.

20  Q    So let's go back to Moses Malone.  Can you tell us

21  whether he sold drugs in the Greenmount neighborhood?

22  A    Correct.

23  Q    Did you ever see him selling drugs?

24  A    Just weed.  Nickel, dime bags of weed.

25  Q    I want to direct your attention to the spring of 2013.

Direct Examination - Caesar   (By Mr. Martinez)

1    Did there come a time where you learned that Moses Malone owed

2    Tech some money?

3    A     Well, Tech said he owed him some money and he thought

4    Moses Malone -- Moses was delaying him.  And so that's when he

5    went and pretty much got Norman and whoever else Norman was

6    with to go rob him and dig in his pockets.  That's when he

7    ended up getting shot the first time, off a ricochet.

8    Q     Okay.  So you said Tech sent Norman and somebody else to

9    rob Mr. Malone; is that right?

10   A     Correct.

11   Q     Did you talk to Mr. Malone about what happened to him,

12   did that robbery -- did you learn about it from Mr. Malone?

13   A     Well, when I learned what happened, when I came home, I

14   guess Mo's bike was on my steps, but the police had my --

15   because it happened in the back of my alleyway, they had my --

16   you know, tape all around my -- where I stayed at.  So when

17   people came and told me what happened, the police at the time

18   didn't know who they -- got shot.  All they had was a report

19   that somebody got shot.  Because one of the police officers

20   was talking to me on the steps, and once I did my further

21   investigation, it was Moses Malone.  So at that point I went

22   and got in contact with Detective Taylor.

23   Q     Let me stop you for a second, Mr. Caesar, because there's

24   a lot of information in there.  You mentioned you did some

25   investigation.  After the robbery and shooting took place, did

Direct Examination - Caesar  (By Mr. Martinez)

1  you talk to Mr. Malone about what happened to him?

2  A    I got physically in contact with him two days -- about

3  two days later, couple days later.  So -- but people already

4  told me that it was Mo.

5  Q    Yeah.  What did Mo tell you himself about what had

6  happened?

7              MR. ENZINNA:  Objection.

8              MR. BUSSARD:  Objection, Your Honor.

9              THE COURT:  You can approach.

10             (Bench conference on the record.)

11             THE COURT:  Mo's dead and the Court's already found,

12 for purposes of this evidentiary issue, that there's

13 sufficient cause to conclude that your clients are culpable

14 for that.  So what's the objection?

15             MR. ENZINNA:  The objection is that if Mo -- if Mo

16 were here, he could testify to this.  If there were

17 out-of-court statements by Malone to this effect, they could

18 come in under the forfeiture doctrine.  But what's happening

19 now is that Mr. Caesar is testifying to what he was told by

20 Mr. Malone outside the courtroom.  That is hearsay not in

21 furtherance because Mr. Malone was not a member of the

22 conspiracy.

23             THE COURT:  Yes.  But the justification for allowing

24 Mr. Caesar to testify was that if he doesn't testify, then how

25 does the dead man's story get told?  He knows the dead man's

Direct Examination - Caesar  (By Mr. Martinez)

1    story, the dead man told him, so why isn't this exactly right

2    in the wheelhouse of the forfeiture doctrine?

3              MR. ENZINNA:  The forfeiture -- because if

4    Mr. Malone himself were here --

5              THE COURT:  He could say how the robbery went

6    down.

7              MR. ENZINNA:  Right.

8              THE COURT:  Now the Court is considering permitting

9    Mr. Caesar to say what Mr. Malone told him about how the

10   robbery went down.

11             MR. ENZINNA:  Right.

12             THE COURT:  Your objection is hearsay, out-of-court

13   statement by Malone offered for the truth of the matter

14   asserted.  Caesar can't testify to this; only Malone can.

15   Response:  Exception to the hearsay rule, forfeiture by

16   wrongdoing.  Hearsay comes in.  Seems open and shut.

17             MR. ENZINNA:  I understand --

18             THE COURT:  Mr. Bussard.

19             MR. BUSSARD:  Your Honor, I'm joining the objection

20   at this point.  Your Honor, Mr. Caesar, throughout this entire

21   testimony, is a government agent, he is not a

22   co-conspirator.

23             THE COURT:  Well, it's not coming in under

24   co-conspirator.  I'll give you your record on that.  That's

25   not the Court's thinking at all.

Direct Examination - Caesar  (By Mr. Martinez)

1          MR. BUSSARD:  And I understand Mr. Malone also is

2   not a co-conspirator, but that's a separate issue.

3          THE COURT:  Right.  But that's also not the

4   justification.  If Moses Malone was alive, he would be

5   permitted to testify about how the robbery went down and how

6   he was robbed by Norman and some person who is otherwise

7   unknown to him.  That would be relevant, admissible testimony.

8   But he's unavailable and the Court has made the threshold

9   determination as to culpability of the defendants for

10  wrongfully procuring that unavailability.  That's how I

11  understand the rule.  Overruled.

12         MR. FRANCOMANO:  Can I just join the objection?

13         THE COURT:  Noted.

14         (The following proceedings were had in open court.)

15         THE COURT:  Overruled.  Restate the question.

16  Q    (BY MR. MARTINEZ)  Mr. Caesar, before the bench

17  conference I had asked you whether or not you spoke to Malone,

18  Mo, about the robbery and shooting and you were beginning to

19  say that you talked to him a couple days after the robbery,

20  remember that?

21  A    Correct.

22  Q    And could you tell us about that conversation that took

23  place a couple days after the robbery?

24  A    Once I was able to find him and reach out to him, he

25  stated to me that Norman, and he didn't know who the other

1   person was at the time, they both trapped him in the alley,

2   pulled a gun out on him, robbed him.  And as they was leaving,

3   Norman had shot at him, which the bullet hit the ground and

4   ricocheted and hit him in the leg.

5   Q    Did you also talk to Norman about what had happened to

6   Malone?

7   A    Correct.

8   Q    What did he say?

9   A    Said the same thing, but he didn't mean to shoot him.

10   That he was giving a warning shot, but the warning shot was on

11   solid ground, concrete, and ricocheted.

12   Q    At this point in time, Mr. Caesar, were you again working

13   for law enforcement as an informant?

14   A    Correct.

15   Q    What law enforcement agency were you working with in

16   2013?

17   A    Baltimore City ATF Task Force.

18   Q    Were you working with a particular detective?

19   A    Correct.

20   Q    Who was that?

21   A    John Hayden.

22   Q    Before you -- and I'm sorry if I wasn't precise about the

23   timing, before you began working with Hayden, did you work for

24   another Baltimore police officer?

25   A    Well, it was Dawnyell Taylor.

1   Q     And what part of Baltimore –– the

2   Baltimore Police Department did she work for?

3   A     Homicide.

4   Q     After the robbery and shooting of Moses Malone, did you

5   tell Detective Taylor what had happened to Mo?

6   A     Correct.

7   Q     After you shared that information, can you recall whether

8   you were asked to help law enforcement find Moses Malone?

9   A     I was told if I see him to go ahead and try to get him to

10   a safe location and go ahead and call the police and somebody

11   would take him down to homicide for questioning.

12   Q     So after Mr. Malone was robbed, Mr. Caesar, did there

13   come a time where the two of you were out selling drugs at

14   25th and Greenmount?

15   A     At that time we was actually standing in front of the

16   store, but we got pulled up by a regular patrol officer at the

17   time.  I think his name was Burnett, I'm not sure.  I get a

18   couple of them officers mixed up because they look alike.

19   (Laughing) Excuse me, Your Honor.

20        But at that time I did –– what I did was I –– after

21   the officer went ahead and left us and when I was able by

22   myself, I ran across that same officer at the time.  As a

23   matter of fact, it is Officer Burnett.  And I explained to

24   Burnett that if he see Moses Malone again, he said, yeah, he

25   up the street.  I said, grab him, take him into custody, and

1    take him down to homicide.  Dawnyell Taylor needs to speak to

2    him.  And I explained to him what happened.  And the next

3    thing, he went up and got him, got in contact with Dawnyell

4    Taylor, Detective Taylor.  He transported Moses Malone down

5    homicide.

6    Q    Thank you, Mr. Caesar.

7    A    Or Eastern, I think Eastern District first.  But he ended

8    up meeting up with Dawnyell, Detective Taylor down at

9    homicide.

10            MR. MARTINEZ:  Your Honor, may I approach at this

11    time?

12            THE COURT:  Yes.

13            (Bench conference on the record.)

14            MR. MARTINEZ:  This is a break in the outline.

15    We're about to head into sort of --

16            THE COURT:  Good spot for the morning break?  Thank

17    you.

18            (The following proceedings were had in open court.)

19            THE COURT:  Time for the morning recess, ladies and

20    gentlemen.  Don't discuss the case with anyone.  Don't discuss

21    it even among yourselves.  Do not allow yourselves to be

22    exposed to any news articles or reports that touch upon the

23    case or the issues it presents or any articles or reports that

24    relate to any of the participants in the case.  Avoid all

25    contact with any of the participants in the trial.  Do not

Direct Examination - Caesar  (By Mr. Martinez)

1   make any independent investigation of the law or the facts of

2   the case.  Do not look up anything on the internet.  Do not

3   consult an encyclopedia or a dictionary.  15 minutes.  Please

4   take the jury out.

5              (Jury left the courtroom.)

6              THE COURT:  Mr. Caesar, you may step down and leave

7   the courtroom.  You must return in 15 minutes.

8              THE WITNESS:  Sir, yes, sir.

9              THE COURT:  15-minute recess.

10             (A recess was taken.)

11             THE COURT:  Are we ready for the jury?

12             MR. MARTINEZ:  Yes, Your Honor.

13             THE COURT:  Bring the jury in.

14             (Jury entered the courtroom.)

15             THE COURT:  Be seated, please.

16             Mr. Martinez, you may continue your examination.

17             Mr. Caesar, you remain under oath.

18             THE WITNESS:  Yes, sir.

19   Q   (BY MR. MARTINEZ)  Mr. Caesar, before the break you told

20   us that you met a BGF member named Norman when you were living

21   in the Greenmount neighborhood; right?

22   A    Correct, sir.

23   Q    And do you remember telling us about your conversations

24   with Norman regarding the robbery and shooting of

25   Moses Malone?

A    He admitted that he did what Tech ask him to do, as in
rob Moses Malone.  And in the event of him robbing him, he
said he just was doing a warning shot.  He didn't mean to
shoot him.  But the warning shot was on the ground, which is
concrete, and the bullet hit the ground and a fragment scraped
him on the leg.

Q    Did there come a time when Norman was arrested outside
your house at 2466 Greenmount?

A    Yes, sir.

Q    Where were you at the time?  Actually, wait, let me put
the picture here, GM 36, on the screen.  And I just asked you
where were you at the time Norman got arrested.

A    Me, Tech, and Cookie was sitting on the steps right here
at the time.  And Norman came from this direction, from the
24th –– that direction.  And he came quickly to the house and
asked if he could run inside and dispose –– to pick something
up and get rid of it because the police was like behind him
and kept circling the block on him.  In that case I said go
ahead because I couldn't deny it at the moment because Tech
was there.  So when he ran inside, he came out a minute later
and the officer then called back up.  And when we all came
out, we had about like ten guns pointed our directions.  And
at that time the officers sealed off the house and took me,
Tech, and Cookie down the Eastern police station for
questioning.

1   Q    All right.  Let me stop you for a moment.  You said that

2   Norman told you he was going in the house to put something up.

3   Did he say what he was going to put up?

4   A    He didn't say the exact words what he was going to put

5   up.  I knew he had a gun on him and some drugs.

6   Q    And you said that after Norman was arrested that the

7   police were sealing off the area of your residence; is that

8   right?

9   A    Correct, sir.

10  Q    And you said that you, Tech, and Cookie were taken to the

11  police station?

12  A    Correct.

13  Q    Did the police stay at your house after you went to the

14  police station?

15  A    Well, they was doing the stall tactic until they could

16  get in contact with a prosecutor and the prosecutor could get

17  in contact with a judge for search warrant.  And that's when

18  they held us down there until they had searched the

19  premises.

20  Q    Okay.  So did there come a time when the police searched

21  your house?

22  A    Yes, sir.

23  Q    Were you there when the police searched the house?

24  A    No, sir, Eastern police station.

25  Q    Approximately how long were you and Tech and Cookie at

1    the Eastern District?

2    A    Close -- anywhere between three to five hours.

3    Q    And after those three to five hours, where did you go

4    when you left the Eastern District?

5    A    The regular patrol gave us a ride back to my residence

6    and into the residence.

7    Q    So when you got back to the residence, were Tech and

8    Cookie still with you?

9    A    Correct.

10   Q    What happened when you got back inside?

11   A    When we got back inside, we went to go like search and

12   see what the police had done to the residence, but come to

13   find out they only had -- they had left the -- whatever

14   detective came in there, left a copy of the police statement

15   and warrant on my dining room table.  And Tech was the one who

16   noticed it and then we both read over the warrant and the

17   statement that Moses Malone --

18   Q    Let me stop you for just a minute.  So you said you came

19   in with Tech and Cookie and you found a warrant in the

20   residence; correct?

21   A    Yeah, the copy of the warrant and Moses Malone's

22   statement.

23   Q    Where in the residence did you find this paperwork?

24   A    On the dining room table.  Technically, you know,

25   kitchen/dining room, you know how some houses is the dining

1    room kitchen together, it's that type of set up, so it was on

2    the table.

3    Q     And who picked up the document first?

4    A     Tech.

5    Q     Did you see Tech pick it up?

6    A     Correct.

7    Q     You said that you and Tech both read it?

8    A     Correct.

9    Q     Did you see Tech reading the paperwork?

10   A     Yes.

11   Q     Can you remember whether Tech said anything to you about

12   what was in the paperwork?

13   A     Well, as he was reading it, he was pointing it out to me.

14   And inside the statements it was stating that Moses Malone

15   identified the person who shot him, which was Norman.  And

16   also inside the warrant it state my household is recognized as

17   a BGF house, BGF members living in that house.

18   Q     I'm going to show you Government's Exhibit SW 1.  Who's

19   address is that, Mr. Caesar, or whose address was it in

20   2013?

21   A     That was my address right there.

22   Q     All right.  I want to direct your attention to the third

23   page here, Mr. Caesar.  Do you recall reviewing these

24   paragraphs on the day Norman was arrested and the search

25   warrant was conducted at your house?

1   A    Yes, sir.

2   Q    I want to direct your attention to the first paragraph,

3   which refers to Detective Taylor receiving information from a

4   confidential source that indicated a black male named Mo had

5   been previously shot.  And it goes on and there are other

6   references to a confidential source in the paragraph.  The

7   confidential source indicated that the victim frequented the

8   area of Greenmount and 25th Street, for example.  Do you know

9   who the confidential source that was providing that

10  information to Detective Taylor was?

11  A    It was me, sir.

12  Q    And then in the next paragraph it says, "During the

13  course of the interview, Malone identified himself as a

14  Tree Top Piru Blood gang member."

15       You told us earlier Mr. Malone also told you he was a

16  Blood; correct?

17  A    Correct.  But just because you say you one, don't mean

18  you one.

19  Q    And in the fourth paragraph there, did you read this

20  paragraph when you saw the affidavit at your house?

21  A    I briefly was going over the part where pretty much Moses

22  was doing the statement on Norman.  So pretty much I read it

23  real quick with Tech when Tech was going over it in more

24  detail.

25  Q    Okay.  And I'm going to flip the page here.  Do you

Direct Examination - Caesar  (By Mr. Martinez)

1    remember seeing this portion that says photographic array was

2    shown to Moses Malone, at which time he positively identified

3    the photograph listed under SID number as the person who

4    robbed him, and it continues to say that that SID number is

5    identified with Norman Handy?

6    A    Correct.

7    Q    Do you remember seeing that?

8    A    Yes, sir.

9    Q    And then, finally, it says the location of this dwelling,

10   that is your house 2466 Greenmount, is in known

11   Black Guerilla Family territory.  Was that true, Mr. Caesar?

12   A    In certain cases, yes.

13   Q    Well, was your house in 2013, in April of 2013, was it in

14   BGF territory?

15   A    In BGF territory.

16   Q    So after you and Tech had read this affidavit, what did

17   he -- did he say anything about what to do with it?

18   A    At that time, because technically, Tech is not part of

19   the Greenmount Regime, it's just though he had been around

20   that neighborhood selling drugs for a long time.  And I'm not

21   part of the Greenmount Regime.  Therefore, we would assist

22   them and they would assist us if we need help or anything like

23   that.  So he said out of respect, he retook it, he called

24   Geezy and we went and met up with Geezy and gave Geezy the

25   copy of the warrant.

Direct Examination - Caesar  (By Mr. Martinez)

1  Q    Who actually gave Geezy -- did you see who actually gave
2  Geezy --
3  A    Tech had it in his hand and went inside the house and
4  gave it to Geezy.
5  Q    Did you go inside the house with Tech?
6  A    No, sir, stayed on the outside.
7  Q    You mentioned earlier that Tech called Geezy, were you
8  there when Tech made the call?
9  A    Yeah.
10 Q    Do you recall what -- if you don't recall the exact
11 words, it's fine, but do you recall what, in substance, Tech
12 told Geezy during that phone conversation?
13 A    We don't do too much talking over the phone, so he said
14 he needed to see him, it's very important, or something like
15 that.  And we went around there and handed him a copy, the
16 copy of the warrant and statement.
17 Q    How long was Tech in the house?
18 A    As in living there?
19 Q    No, no, I'm sorry.  When you and Tech went and you said
20 you saw him go up the steps and he went inside and you didn't,
21 how long was Tech in the house?
22 A    Probably less than five minutes.
23 Q    Did you wait for him, were you there when he came back
24 out?
25 A    I waited for him.

Direct Examination - Caesar   (By Mr. Martinez)

Q    Did you talk to him when he came back out of the house?

A    Yeah, that's when Tech indicated that Geezy went ahead, because he was the C, and placed a green light on Moses Malone head because he wrote a statement on another brother that supposedly had shot him.

Q    You said green light, could you tell the ladies and gentlemen of the jury what that term means?

A    In other words, he's the C, he's in charge of the regime. In other words, he gave the order for Moses Malone to be killed.

Q    You told us before the break, Mr. Caesar, that in the spring of 2013 you were providing information to Detective Taylor; correct?

A    Correct.

Q    After the conversation you just described with Tech and after discovering the search warrant affidavit in your house and seeing what you saw in terms of the affidavit being conveyed, did you call Detective Taylor?

A    Correct.

Q    Did you have her phone number?

A    Yes, I do.

Q    What did you tell her when you called her?

A    I told her that the order came from Geezy that Moses Malone has been green-lighted and he needs to be put up in safety.

Direct Examination - Caesar  (By Mr. Martinez)

1    Q    Why were you calling Detective Taylor to alert her of

2    that information?

3    A    Well, at that time I felt as though he was a little young

4    kid and I used to try to talk positive to him.  I didn't want

5    to see nothing happen.  And the reputation of what happens on

6    Greenmount and with the organization, I know eventually he

7    would be dead.  So therefore, I wanted to get him off the

8    street into safety, for his safety.

9    Q    And after the green light was issued and you called

10   Detective Taylor, did there come a point in time where

11   Moses Malone left the Greenmount neighborhood for a bit?

12   A    Yes.

13   Q    Do you know where he went?

14   A    It's my understanding he was placed -- well, I ain't

15   going to say I understand, I know he was placed in witness

16   relocation, placed in a hotel at an unknown location.

17   Q    Okay.  When you were living on Greenmount on 2013,

18   Mr. Caesar, did you meet a woman named Octavia or Oct for

19   short?

20   A    Yes, sir.

21   Q    Who was she?

22   A    Just somebody that Moses used to mess with on the side

23   because he had a baby mama.  It was another girl he dealt with

24   and somebody that just lived in the neighborhood around

25   somewhere -- the Cokesbury side.

Direct Examination - Caesar  (By Mr. Martinez)

1   Q    Do you remember her living on Cokesbury, is that what you
2   said?
3   A    I don't know the address, but I call it Cokesbury side,
4   back on the back side, other side of the park on 24th and
5   Greenmount.
6   Q    I want to show you Government's Exhibit PHI 25.
7   A    That's her.
8   Q    And by "that's her," do you mean that's Octavia?
9   A    Yes, sir.
10  Q    Did you know her as Octavia or Oct?
11  A    I just known her as Oct.
12  Q    So while Moses Malone was out of the Greenmount
13  neighborhood for a bit in the witness relocation program, as
14  you described, do you recall being present or overhearing a
15  conversation between Oct and Geezy?
16  A    Yes, sir.
17  Q    Can you remember where that conversation took place?
18  A    At the store on -- that's right on Greenmount called
19  Jolly's, right on Greenmount and 24th.
20  Q    What kind of store is Jolly's?
21  A    It's a Chinese, you know, sub shop, that type store, stay
22  open up late.
23  Q    I'm going to show you what we've marked as
24  Government's Exhibit GM 37.  Can you tell us what's in that
25  picture, Mr. Caesar?

Direct Examination - Caesar   (By Mr. Martinez)

1    A     Jolly's, that's the store.

2    Q     Do you recall where you were when this conversation

3    happened, can you point it out on the screen?

4    A     This is the store right here called Jolly's.  It's one of

5    the only stores besides the gas station that stay open up like

6    2:00, 3:00 in the morning.  You can go get subs, chicken,

7    whatever you want.

8    Q     So can you recall the conversation you heard, was it

9    during the day or night?

10   A     Nighttime.

11   Q     Was anything said during the conversation about

12   Moses Malone?

13   A     At that time when I was in there, it was a few other

14   people in there.  And Geezy was slapping the girl Oct on the

15   butt and told her, look, either you going to help us get

16   Geezy -- I mean, Geezy said you either going to help us get

17   Moses or we're going to kill you.  Because everybody knew that

18   she can bring Moses out to the open because it was a rumor

19   that somebody spotted Moses leaving and still coming back to

20   the Greenmount area on the sneak tip --

21   Q     Was there anything --

22   A     -- going to see Oct.

23   Q     I'm sorry, I cut you off.

24   A     He was sneaking out of the witness relocation motel where

25   they had him at to come see the girl Oct.

Direct Examination - Caesar  (By Mr. Martinez)

1   Q    Did you hear any discussion of a green light?

2   A    Yeah.

3   Q    Tell us about that.

4   A    He told couple of them other brothers that was in there

5   at the time that anybody spots Moses, there's a green light.

6   Q    And you told us what a green light means earlier;

7   correct?

8   A    It's an order to be killed, anybody catch him on sight.

9   Q    Did there come a time, Mr. Caesar, when Moses Malone

10  returned to the Greenmount neighborhood?

11  A    Yes, sir, the night of his death.

12  Q    I want to ask you some questions about the night of his

13  death.  On the night of Mr. Malone's death, Mr. Caesar, where

14  were you?

15  A    I -- me -- I was in my house, it was me, Tech, and Cookie

16  was together.

17  Q    Do you remember telling us earlier about a BGF member

18  named Country?

19  A    Correct.

20  Q    Did there come a time on the night of Mr. Malone's death

21  where Country joined you and Cookie and Tech in the house?

22  A    Yes, sir.

23  Q    So this is PHI 83 and this is the photo you identified as

24  Country; correct?

25  A    Yes, sir.

Direct Examination – Caesar  (By Mr. Martinez)

1  Q    What, if anything, did Country say when he came into your

2  house?

3  A    He stated that he spotted Moses, he had to make a phone

4  call.  And at that time he didn't have no phone, so I allowed

5  him to use one of my phones that I had that I knew was still

6  possibly wiretapped, I don't know, you know how it go in the

7  game.  But I allowed him to use my phone, therefore, he called

8  Wes and they went to go ambush him at the park.

9  Q    Let's take that in pieces.  You said Country -- you gave

10  Country your phone --

11  A    Correct.

12  Q    -- to make a call.  Did you see Country make that phone

13  call?

14  A    Yes, sir, right next to me.

15  Q    So did you hear what was said?

16  A    From my understanding of the conversation, Country went

17  to go -- Country told Wes that the one who's snitching on your

18  little brother is cutting through -- is at the store about to

19  cut through the park to go to Cokesbury.  And my

20  understanding, Country, he left out the house, but Wes --

21  Q    Let me stop you.  We'll take it step by step.  Now, when

22  Country came in the house and took your phone and you

23  overheard that conversation, were you able to see whether he

24  was armed while he was in your house?

25  A    At that time I know he had a long-nosed .357, which was

1   gold in color, like a gold-ish bronze color, and a short nose

2   .357, both of them was .357s.  Because earlier that day, he

3   came over with three, it was a .22 with a broken thing on

4   there, revolver with the pin out.

5   Q    What happened when Country was done using your phone?

6   A    He ran out the house to go to meet up with Wes, but

7   really -- they was really racing to go -- who going to get to

8   Moses first.  And at that time he ran out the house, I waited

9   probably about 30 seconds to a minute.  And I ran behind him,

10  act like I was carrying a jacket to him because he had a

11  bright coat on, so nobody can recognize him in something

12  bright, just to get outside the house to call Dawnyell

13  Taylor.

14  Q    So you left the house to call Detective Taylor, did you

15  call her?

16  A    Yup.

17  Q    In fact, did you call her multiple times that night?

18  A    I called multiple times.  She answered the phone, and

19  when she answered the phone, I explained what's going on.  She

20  said she about to get on her radio and radio some patrol

21  officers in that area.  But at that time, like a minute later,

22  you heard multiple gunshots and Moses was dead.

23  Q    So you mentioned that Country came out of your house and

24  you went after him; is that right?

25  A    Yes, sir.

1    Q    Let me put the map back on the screen.  This, for the

2    record, is Government's Exhibit GM 10.

3         All right.  Mr. Caesar, just for all of our benefit,

4    could you make a mark using your hand for the location of your

5    house?

6    A    My house on this map would probably be right about

7    here.

8    Q    Okay.  Can you make it a little brighter?  There you go.

9    So show us where Country went after he ran out of your house.

10   A    When he ran out of my house, he went this way to 24th,

11   and I caught up with him right there on the corner of 24th and

12   Greenmount to hand him a hoodie, a jacket.  And at that time I

13   stayed and placed myself on camera and that's when I was

14   talking to Dawnyell on the phone.  Because I had her on the

15   phone, told her hold on, I was catching up to Country, but he

16   still was running across.  He left my eyesight for a split

17   second.  And -- but he wasn't quick enough, long enough to

18   reach Moses, which was in the middle of the park because

19   Wes Brook (sic) already got to him before he was able to get

20   to him.

21   Q    So you said as you got to the corner there by the turn,

22   Country was out of your sight for a period of time, can you --

23   how long -- what's your best estimate how long Country was out

24   of your sight?

25   A    Now, if anybody know about this park right here on

1    24th Street, people always -- multiple -- break the lights

2    down because the police put one of them police lights up

3    there.  They break them too, it be pitch black.  So as soon as

4    you turn that corner, it's pitch black.  And he's probably out

5    of my eyesight less than six seconds, but it was physically

6    impossible to catch up with Moses Malone.

7    Q    How long after you lost sight of Country did you hear

8    shots?

9    A    Probably a couple seconds afterwards, but it -- I would

10   have saw the muzzle fire, anything like that because he wasn't

11   that far in front of me.

12   Q    Could you show us on the map where Cokesbury Avenue is?

13   A    You say Cokesbury?  Right here (indicating.)

14   Q    And in the period of time between when you lost sight of

15   Country and when you heard the gunshots, do you believe it's

16   possible -- it would have been possible for Country to make it

17   to Cokesbury?

18   A    No, sir.  He had a -- he was cutting through the park

19   because that's where Moses was found dead was in the park, not

20   exactly Cokesbury.  But the park is between Cokesbury,

21   Greenmount, and 24th.

22   Q    I want to focus, Mr. Caesar, on things that you have

23   personal knowledge of.  Can you recall whether Country came

24   back to where you were standing on Greenmount?

25   A    He came back where I was standing at.  He took out both

Direct Examination - Caesar  (By Mr. Martinez)

1    guns and I was sitting there playing with them and trying to

2    show him how to clean a gun because they was both revolvers.

3    Therefore, I know there was no burnt smell, no residue, or

4    anything as in being fired.  And at the time he did not have

5    the .22.  Wes had the .22.  He only had the .357s.

6    Q    Did Country say anything to you when he came back to

7    Greenmount?

8    A    He told me that Wes Brook already got to him before.

9    Q    You said Wes Brook?

10   A    I mean -- my fault, sorry.  Wes already got to him.

11   Q    I want to skip forward to the following day.  Do you

12   recall overhearing a conversation between Country, Wes, and

13   Tech?

14   A    Country, Wes, and Tech concerning which one -- about

15   what?

16   Q    Well, that's what I want I want to tell us, but the day

17   after Moses was killed, did you hear a conversation --

18   A    Oh --

19   Q    -- talking?

20   A    Yeah, that conversation right there you talking about is

21   when -- I don't know if they was -- I don't know, either Geezy

22   was getting promoted to run the whole, like that part of the

23   East Baltimore area, but the guy Mike Mike that came in the

24   picture, he was taking over the C position.  And I think they

25   was bumping Geezy up into the next like -- where though he be

Direct Examination - Caesar  (By Mr. Martinez)

1   in charge maybe like multiple regimes.  And Mike Mike was

2   taking over that regime at that time and Country didn't want

3   to work underneath Mike Mike and Wes didn't want to work

4   underneath Mike Mike.  So they was talking about giving it up

5   and all that or they just take sanctions or whatever, they're

6   not going to listen or they switching regimes.

7   Q    Okay.  And we'll come back to that conversation in a

8   moment, Mr. Caesar.  I apologize if my question was not

9   specific enough.  I'd like to know whether you ever heard a

10  conversation between Country, Wes, and Tech about Moses and

11  his murder?

12  A    No.  Wes just admitted killing him.  That's it.  You

13  know, it's not like a whole conversation.  We all know what

14  happened:  Somebody spotted him, they ambush him, killed him.

15  You don't have a whole blown conversation about it, but --

16  Q    Well, I do want to -- you said Wes admitted killing him.

17  Can you -- even four years after the fact, I want you to do

18  the best you can to recall the substance of what you overheard

19  Wes said.

20  A    He just admitted that he beat Country to it, he shot him,

21  and that was for his brother.  Not a word-for-word quote back

22  then because it was like limited conversation once you admit

23  to it and I heard it, you know what I mean, I'm going for what

24  you saying and as of what I seen at the time.

25  Q    I want to fast forward just a little bit.  Did there come

Direct Examination - Caesar   (By Mr. Martinez)

1    a time where you learned that Country had been killed?

2    A    Yes, sir.

3    Q    And around the same time period, did there come a time

4    where you got locked up?

5    A    Correct.

6    Q    What did you get locked up for?

7    A    Selling to an undercover cop, police officer the day

8    after, the next morning after Moses Malone got killed.

9    Q    When you got locked up for selling to the undercover, can

10   you tell us whether you made bail?

11   A    Yeah, I made bail couple days later.

12   Q    Were you also on parole or probation at the time?

13   A    Correct.

14   Q    So after you made bail, did there come a time where your

15   parole or probation officer violated you?

16   A    You automatically get violated in the arrest.

17   Q    Well, did there come a time you got locked back up?

18   A    Yes, sir.

19   Q    Can you remember what jail you got sent to when you were

20   locked back up?

21   A    Diagnostics.

22   Q    Is that already known as MRDCC?

23   A    Correct.

24   Q    Do you remember telling us earlier that you knew a member

25   of the Greenmount BGF Regime in 2013 named Slay?

1   A    Correct.

2   Q    Do you remember pointing him out before the break?

3   A    Yes, sir.

4   Q    Can you recall whether you bumped into Slay at any point

5   while you were locked up on the violation at MRDCC?

6   A    Yes, sir.  At that time, because of all that was going

7   on, I was placed on administrative custody and I was being

8   escorted down to the medical department.  And that's when I

9   bumped into Slay and the CO let me talk to him for a minute.

10  And he was telling me that what happened to Country and that

11  he did done it.

12  Q    Did he say anything more about what happened to

13  Country?

14  A    No, he said he was the one who killed him.

15  Q    Did he say whether it had been ordered?

16  A    The order came from Mike Mike.

17  Q    And you were telling us earlier that there came a point

18  in time after Moses was killed when Mike Mike became the C, is

19  that what you're saying?

20  A    Yeah, Mike Mike became the C.  And he -- Mike Mike knew

21  people wasn't going to fall in line underneath him, so sent

22  Slay to do his dirty work, to take Country out because Country

23  was -- he was young, but he wasn't that real, real dumb.  He

24  was one of them paranoid individuals, so ain't too many people

25  can get close to him.

1    Q    Last couple of questions, Mr. Caesar.  I asked you some

2    questions about your various phone calls that you made in the

3    spring of 2013, do you remember that?

4    A    Yes, sir.

5    Q    Do you remember telling us about the phone calls you made

6    to Detective Taylor?

7    A    Yes, sir.

8    Q    Do you remember telling us about the phone call that

9    Country made using your phone on the night that Moses was

10   murdered?

11   A    Correct.

12   Q    Has anyone ever showed you any records of or paperwork of

13   any kind showing you the numbers that were dialed to and from

14   your phone?

15   A    No, but I took my phone to Detective -- to

16   Detective Taylor and them.  And they seen the call was off my

17   call logs and was able -- probably to get it from the phone

18   company.

19   Q    Yeah, I'm asking you, have you ever seen those logs?

20   A    No, sir.

21            MR. MARTINEZ:  Court's indulgence.

22            THE COURT:  Yes.

23            MR. MARTINEZ:  No further questions.

24            THE COURT:  Thank you.  I think this is a logical

25   break point to take our lunch break.  Ladies and gentlemen,

1    we'll stop here.  During the lunch break do not discuss the

2    case with anyone.  Don't discuss it even among yourselves.  Do

3    not allow yourselves to be exposed to any news articles or

4    reports that touch upon the case or the issues it presents.

5    Avoid all contact with any of the participants in the trial.

6    Do not make any independent investigation of the law or the

7    facts of the case.  Do not look up anything on the internet.

8          I have another matter to attend to during the lunch

9    hour, ladies and gentlemen, so our lunch break again today

10   will be slightly longer than normal.  We'll be on lunch until

11   10 minutes past 2:00 o'clock.  2:10.  Take the jury out,

12   please.

13          (Jury left the courtroom.)

14          THE COURT:  Mr. Caesar, you may step down and leave

15   the courtroom, but you must return at 2:10 p.m.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Recess until 2:10.

18          (A recess was taken.)

19          THE COURT:  Are we ready for the jury?

20          MR. MARTINEZ:  We are, Your Honor.  And Mr. Bussard

21   and I were just discussing a scheduling issue briefly.  And so

22   before we bring the jury out I wanted to bring the Court into

23   the loop of what our witness line up looks like at the moment.

24   So obviously we have Mr. Caesar, who's still on cross.  We

25   don't know what redirect will be required.  We have

Ray Hunter, the homicide detective who was the investigator on
the Malone murder scheduled to go after Mr. Caesar.  And we
were worried this morning we may run out of witnesses after
Hunter.  I think we're going to be in good shape.  We have
Detective Thomas Jackson here, who's the investigator of the
Trevon White, Country, murder.  And --

             THE COURT:  This is a different detective --
different Jackson than the Sergeant Jackson who we heard
from.

             MR. MARTINEZ:  Glen Jackson was this morning and
Thomas is the homicide detective.  And we brought him here
because we had some other plans, Detective Taylor was going to
testify and we had disclosed her, but she had a medical issue
today.  We were worried about running out of witnesses, so in
a pinch we called Jackson.  But we had not yet told defense
counsel that Jackson might be on the agenda today.  So I
mentioned this to Mr. Bussard because I was sensitive to, you
know, the possibility of while on the one hand we don't want
to tell the Court and jury we're out of witnesses early, on
the other hand, I'm sensitive to not --

             THE COURT:  So back up.  You've got Caesar.  Who
would come on after Caesar?

             MR. MARTINEZ:  Hunter.

             THE COURT:  Hunter.  You know about that?

             MR. BUSSARD:  Yes, Your Honor.

1          THE COURT:  Okay.  And that's potentially --

2          MR. MARTINEZ:  I think that gets us there.  I just

3    wanted to flag the issue.  So I think after having spoken with

4    Mr. Bussard, in particular, who I think is most directly

5    impacted by what Detective Jackson --

6          THE COURT:  And you're concerned about it.

7          MR. BUSSARD:  Yes, I am.

8          THE COURT:  You would like another night's

9    preparation.

10          MR. BUSSARD:  Well, I don't even have the file with

11    me today.

12          THE COURT:  Sounds like we probably have our answer,

13    but let's see what happens.

14          MR. MARTINEZ:  Very good.

15          THE COURT:  Okay.  Let's bring them in.

16          (Jury entered the courtroom.)

17          THE COURT:  Good afternoon, ladies and gentlemen.

18    Ladies and gentlemen, going forward in the trial here, during

19    those times when counsel and I are involved with a bench

20    conference, it would be perfectly acceptable for jurors, if

21    they wish, to stand, take a stretch break during that time.  I

22    would ask you to remain silent, appropriate for the decorum

23    that we try to maintain in the courtroom.  But if you want to

24    stand up during those bench conferences and take the

25    opportunity to stretch out a little bit after sitting in those

1      chairs for as long as you sit, that's perfectly acceptable.

2              We're ready to continue with the examination of

3      Mr. Caesar, who remains under oath.

4              Cross-examination, Mr. Enzinna.

5              MR. ENZINNA:  Yes, Your Honor.

6                          CROSS-EXAMINATION

7      BY MR. ENZINNA:

8      Q    Good afternoon, Mr. Caesar.

9      A    Good afternoon.

10     Q    My name is Paul Enzinna, I represent Gerald Johnson.  I

11     wanted to start by asking you some questions about timing.

12     You said this morning that you're 40 years old; correct?

13     A    Correct.

14     Q    So you were born in 1977?

15     A    Correct.

16     Q    And you said that you went into prison in 2002; is that

17     correct?

18     A    Yeah.

19     Q    For attempted murder?

20     A    Correct.

21     Q    You were sentenced to 20 years, with all but 12

22     suspended?

23              THE COURT:  Okay.  Just a second.  Can you

24     reposition the microphone.  The microphone only picks you up

25     if you're within a certain -- you're close to it.  But if

Cross-examination – Caesar  (By Mr. Enzinna)

1    you're too close, then it starts getting other disturbance, so

2    it's kind of a fine thing.  About two inches is perfect.

3                THE WITNESS:  Yes, Your Honor.

4                THE COURT:  Go ahead, Mr. Enzinna.

5    Q    (BY MR. ENZINNA)  You were sentenced in 2002 for

6    attempted murder to 20 years with all but 12 suspended;

7    correct?

8    A    And three years probation.

9    Q    And three years probation.  And then you were released in

10   2010?

11   A    Correct.

12   Q    And you have worked as an informant since 2010;

13   correct?

14   A    Correct.

15   Q    Did you work as an informant before 2010?

16   A    Yes.

17   Q    While you were in prison?

18   A    Not in prison, but before prison.

19   Q    When did you first start working as an informant?

20   A    About 18.

21   Q    So that would be 1995?

22   A    Correct.

23   Q    So you did it for seven years before you went into

24   prison?

25   A    Correct.

1    Q    And now you've done it for seven years since you've been

2    out of prison?

3    A    Correct.

4    Q    So since you were 18, you have spent approximately 14

5    years working as an informant and eight years in prison?

6    A    Correct.

7    Q    But you also were in prison you said for a probation

8    violation at some point?

9    A    Correct.

10   Q    How long were you in prison for that?

11   A    I was only being held until the, you know, parole

12   revocation hearing.

13   Q    How long were you held?

14   A    About a year.

15   Q    A year, that was when?

16   A    Right the day after the incident with Moses.

17   Q    The day after Mr. Malone was killed?

18   A    The day after Moses I was picked up for the undercover

19   thing.  And then like a couple days after that, because once

20   you're named, you get locked up, your name go in the system,

21   parole and probation automatically come get you.

22   Q    I see.  So you were picked up the day after Moses Malone

23   was killed; correct?

24   A    Correct.

25   Q    For selling drugs?

Cross-examination – Caesar  (By Mr. Enzinna)

1   A    Correct.

2   Q    And then you were -- were you released and then picked up

3   again a couple days later?

4   A    Correct.  I made bail, then they didn't pick it up in the

5   system.  Made bail, then a couple days later I was picked

6   up.

7   Q    So like I said, since 18, you've spent eight years in

8   prison and 14 years as an informant; correct?

9   A    Something like that, yeah.

10  Q    So being an informant has really been your career;

11  correct?

12  A    No, because I always had a job.

13  Q    What job?

14  A    Construction.

15  Q    Construction, are you doing that now?

16  A    Where I'm at -- I was -- I just started another job.

17  Q    Okay.  Who do you work for?

18  A    Can't disclose that because I would be giving up my

19  location.

20  Q    Okay.  Can you describe the type of you work for?

21  A    Well, I work -- right now I'm working for doing delivery

22  work.

23  Q    Okay.  How long have you been doing that?

24  A    This particular job for about two months.  And before

25  that I was doing mechanic work and before that I was doing

Cross-examination – Caesar   (By Mr. Enzinna)

1    flood -- emergency flood damage.  And before that regular

2    construction company.  Before that working 4-, 500 feet in the

3    air on water towers.

4    Q    Okay.  So you have other jobs and the money you make as

5    an informant is just on top of that?

6    A    First of all, I don't make no real money.

7    Q    You don't.  Isn't it true that since 2016 you've been

8    paid $50,000 by the U.S. Government?

9    A    Incorrect.

10   Q    What is correct?

11   A    See, what you probably got down, that money that you

12   talking about dealing with the ATF is dealing with lodging and

13   relocation.  But if you want to be in particular where I know

14   where you're going at, I lost more than what I ever gained.  I

15   lost three, four vehicles and some more stuff doing this

16   stuff, so I lost more than what I gained.  But I see where

17   you're going at, sir.

18   Q    So is it your testimony that you -- that you received no

19   money directly for informing?

20   A    I received money to be relocated until I can establish

21   myself and daily expenses.  That's what I received.  I don't

22   receive no money to go out buy new shoes, buy vehicles,

23   houses, or anything like that.

24   Q    Why do you do it?

25   A    Why I do it?

1    Q     Yeah.

2    A     Maybe I like to make a change, maybe I can do the stuff

3    other people can't do and that's what I'm good at.

4    Q     Was the attempted murder part of that too?

5    A     The attempted murder, I'm not even going to get on the

6    case because the simple fact -- I'm just not going to get on

7    that because it's a long story behind that.  And I'm going

8    to -- somebody going to help me admit the falsify thing that

9    occurred in that.

10   Q     I'm sure there is a long story.  Now, you have -- in the

11   time you worked as an informant, you worked with differing

12   agencies; correct?

13   A     Correct.

14   Q     You worked for DEA at one point?

15   A     Correct.

16   Q     Baltimore City Police Department?

17   A     Well, technically I worked for Baltimore City Police

18   Department first.  But the same controlling agent I dealt with

19   was a high rank in there and was always on a different task

20   force.  So I ended up working for different agencies or if he

21   tell me something about something, he know the individuals

22   personally that's trustworthy, okay, because the dealings with

23   me and him, I would go work with a different agency if

24   something comes across of interest.

25   Q     Okay.  And in this matter you're working with ATF?

Cross-examination - Caesar  (By Mr. Enzinna)

1    A    Correct.

2    Q    And who's the agent you're working with?

3    A    Right now I'm working with John Hayden and Agent Lisa

4    right there.

5    Q    Okay.  And you have met with Mr. Martinez and

6    Ms. Hoffman; correct?

7    A    Correct.

8    Q    In fact, you met with them last night; right?

9    A    No.

10    Q    When was the last time --

11    A    Well, yeah, I did meet with them yesterday, not exactly

12    at night, evening.

13    Q    Okay.  I apologize.  When was the first time you met with

14    them, was it more than a year ago?

15    A    Yeah.

16    Q    Was it in February of 2016?

17    A    I met with them -- them personally, but I was already

18    dealing with Hayden.  But I met with them personally not too

19    long after Moses got killed.

20    Q    Okay.  All right.  Now, you testified earlier that you do

21    not have a cooperation agreement; correct?

22    A    A what?

23    Q    A cooperation agreement?

24    A    No.  There's no charges on me.  I don't owe the state or

25    the government nothing.  I'm doing this on my own free will.

Cross-examination – Caesar  (By Mr. Enzinna)

 1    There's no pay, there's no time being deducted, there's

 2    nothing that I'm getting out of this but to help the innocent

 3    individual that shouldn't have got killed from the get-go.

 4    Q    Okay.  You said -- you testified earlier today that you

 5    were arrested in 2013.  In fact, you just said it now, you

 6    were arrested in 2013 for drug distribution; correct?

 7    A    Correct.

 8    Q    What happened to those charges?

 9            MR. MARTINEZ:  Objection.

10            THE COURT:  You may approach.

11            (Bench conference on the record.)

12            THE COURT:  What's the objection?

13            MR. MARTINEZ:  I wanted to raise the same 609

14    objection that we dealt with a couple of weeks ago.

15    Mr. Caesar's criminal history has been disclosed as part of

16    our *Jencks* materials and that criminal history reflects that

17    that particular drug arrest that triggered the VOP that he was

18    held on for a little while didn't result in a felony

19    conviction.  So I don't think it's fair game for crossing.  So

20    that's the objection.

21            THE COURT:  Yes, so I would say that the whole

22    testimony up to this point has somewhat opened the door to an

23    explanation of what the charges were potentially, you know,

24    how -- in terms of how long -- how it impacted how long he was

25    locked up, because of how long he was in jail as opposed to on

Cross-examination – Caesar  (By Mr. Enzinna)

1    the street, seems to be independently relevant to the story

2    here.  So it's not a clear crisp 609 kind of problem.  What

3    did happen to the charges?  Was he convicted, were they

4    dismissed, do you know?

5        MR. MARTINEZ:  I am confident they did not result in

6    a felony conviction that would be admissible under 609.

7    Beyond that, I don't have the document in front of me.

8        THE COURT:  All right.  Well, then the next question

9    is was -- did the government -- was there any benefit

10   conferred by the government, the state's attorney's office,

11   the police department, et cetera, in relation to those charges

12   in relation to his work as an informant?

13       MR. MARTINEZ:  Nothing, certainly nothing we're

14   aware of, Your Honor.  He was not -- the investigation was

15   state side at that point in time, and we've retained that

16   file.  And there's no indication from anything we received

17   from the state's attorney's office or the BPD that they gave

18   him any kind of leniency.  In fact, he never testified for

19   them in the state proceeding against Mr. Johnson.

20       THE COURT:  Do you have any reason to believe that

21   he gained some benefit?

22       MR. ENZINNA:  Well, he has testified inconsistently

23   about his criminal record and I'm trying to figure out what

24   exactly the truth is.  I think he has gained a benefit from

25   it.

 1          THE COURT:  Well, as to what his criminal record is,

 2    normally matters of criminal conviction and adjudication and

 3    so forth are admissible only for impeachment purposes and only

 4    if they meet certain standards, such as did they ripen into a

 5    felony conviction, was there a crimen falsi involved and so

 6    forth.  But I think where you're trying to go is actually a

 7    little bit different direction.  And it has to do with, well,

 8    was he otherwise receiving benefits.  I think, Mr. Martinez,

 9    you would agree that if the government was routinely

10    dismissing misdemeanor petty offense charges against someone

11    as a payment, essentially, or compensation for their

12    cooperating, that that would be admissible because that is

13    something that tends to impact on their motivation to testify;

14    right?  I mean, that's a simple question.

15          MR. MARTINEZ:  And the answer to that in the

16    abstract is certainly yes.  There's no information --

17          THE COURT:  Your point is, what's the basis for --

18          MR. MARTINEZ:  Correct.

19          THE COURT:  And the question is really down to this:

20    Is there enough here to allow defense counsel to fish, which

21    is what we're doing, we're fishing.  And I'm looking for some

22    kind of a basis to allow you to do that.  What would justify

23    your being permitted to do that?  You started down a road of,

24    well, he's been inconsistent.  That doesn't help so much

25    because that just goes to the 609 issue.  But if you can

 1    persuade me there's something afoot here that reflects on what

 2    his motivations might be in testifying, then I'm interested.

 3              MR. ENZINNA:  Well, I think there is because he was

 4    charged in 2013, which is four years ago, with drug possession

 5    and drug distribution.  Those charges -- the statute of

 6    limitation has not run on those charges.  He could still be

 7    charged for that.

 8              THE COURT:  Yeah, but this is the context of the

 9    City of Baltimore and drug charges.  I mean, I guess it's a

10    theoretical probability.

11              MR. ENZINNA:  He could still be charged federally

12    too.

13              THE COURT:  I'm going to allow you to get into it,

14    but we'll see what the answers are to the questions.  And if

15    you don't hit pay dirt pretty quickly, you're going to --

16              MR. ENZINNA:  I don't plan to fish very deep.

17              THE COURT:  You got it.  Okay.  Let's go.

18              (The following proceedings were had in open court.)

19              THE COURT:  Overruled.  You may inquire.

20    Q    (BY MR. ENZINNA)  Mr. Caesar, what happened to those

21    charges?

22              THE COURT:  What happened -- the question is -- do

23    you know what charges he's asking you about?

24              THE WITNESS:  Yes, sir.

25              THE COURT:  So the question is, what happened to

1    those charges?

2    A    At that time I registered as an informant and I knew they

3    knew what I was doing and I was gathering information.  In

4    other words, to infiltrate something the same way as an

5    undercover cop, you got to break the law to get the law break.

6    Q    (BY MR. ENZINNA)  I understand.

7    A    So that's what it was.

8    Q    Okay.  I want to stay in chronological order for a

9    minute.  You said that in 2010 you were released from prison

10   and you were on three years of probation; correct?

11   A    Correct.

12   Q    And that's when you began to infiltrate BGF?

13   A    Correct.

14   Q    Who were you working for then?

15   A    DEA.

16   Q    DEA.  Did DEA instruct you to try to infiltrate BGF?

17   A    Correct.

18   Q    And you said you were living on the west side at that

19   time?

20   A    Correct.

21   Q    So you went from prison to the west side of Baltimore?

22   A    No.  I went from prison to northeast and then I went to

23   West Baltimore.

24   Q    Okay.

25            THE COURT:  Move the mike back up by your face.

1              THE WITNESS:  I apologize, Your Honor.  I went to

2     northeast, then to the west side on North Avenue and Monroe.

3     Q    (BY MR. ENZINNA)  So how did you go about infiltrating

4     BGF, what's the first thing you did?

5     A    They're not as smart as they think they are.

6     Q    So what did you do?

7     A    Do what I normally do, be me.  People like me,

8     unfortunately.

9     Q    Well, I mean, did you go knock on someone's door and say,

10    hey, I'd like to join BGF?

11    A    No, I didn't knock on no door.  I had a dummy that was

12    down -- excuse my language, Your Honor -- I had somebody that

13    wasn't bright and wasn't smart enough that was down

14    Central Booking, that's pretty much a lot of people dealt with

15    him because he was BGF.  Only knew me from coming out, when I

16    come out for rec, being down -- no, not Central Booking,

17    Supermax.  And so he was the one that introduced me and that

18    was the opportunity.  And the opportunity came knocking, I

19    took advantage.

20    Q    Okay.  Is that Woo?

21    A    Woo.

22    Q    Okay.  And he introduced you to who?

23    A    Uncle Perry.

24    Q    Uncle Perry.  And Uncle Perry, I think you said, was the

25    second ranking BGF person on the street?

1    A    Correct.

2    Q    And you said that you had a security background at this

3    point?

4    A    At one point, yeah, I was in the private sector.

5    Q    Okay.  And it was that security background that caused

6    Uncle Perry to take you in as his security?

7    A    Yeah, because inside the system, I dealt with the

8    organization the Nation of Islam.  I was always on point,

9    militant.  And I always had background on the street doing

10   private security.  So we got together a lot of them, including

11   even Geezy see me over at the penitentiary, he knew who I was.

12   A lot of people just like me.  A lot of people slide to me

13   because the way I carry myself.  And the security aspect,

14   anything dealing with the Nation of Islam, everybody knew it

15   was militant.  And the celebrities on the streets in the

16   background got Nation of Islam doing security.

17   Q    Let me try to unpack that.  You said that you did

18   security work in the private sector?

19   A    Yes, sir.

20   Q    So that would have been before 2002; correct?

21   A    Correct.

22   Q    And that was where?

23   A    I go all the way back to the old projects, to

24   Murphy Homes, Flag House, with Solidarity Security, which used

25   to be NOI.  But when the contract switched over, it went to

1    Solidarity and the other part of NOI Security went to

2    Starbright Security, and I was a sergeant down Flag House.

3    Q    So were you employed as a private security guard?

4    A    At a young age.

5    Q    Were you employed as a private security guard?

6    A    Yeah.

7    Q    How old were you?

8    A    That time I was like 18, 19 years old down Flag House

9    projects.

10   Q    How long did you do that job?

11   A    For a while.

12   Q    Until you went to prison?

13   A    I was there probably like about a year or so.

14   Q    So you were a private security guard for a year?

15   A    Yeah.

16   Q    Any other security background?

17   A    Yeah, I also used to run off-duty police.

18   Q    You used to run off-duty police?

19   A    In other words, had my own contracts, basically like

20   Upper Deck, Crazy John, stuff like that with off-duty police,

21   parties and stuff like that.  People hire off-duty police for

22   the parking lots or to secure their property and stuff like

23   that.  So I used to run my own contract.

24   Q    So people would come to you and say, I want to hire some

25   off-duty police to provide security at some event?

1    A    Same way you got the bailiffs up in here that's working

2    contracts for the U.S. Marshals up in here, it's a contract

3    company.

4    Q    Sure.

5    A    You go set up and you apply for contracts.  Either the

6    owners want you or the owners don't.  Same way.  Like I said,

7    my guards –– my guards were the off-duty police.  They was

8    high stakes and commodity of off-duty police back then.

9    Q    So let me make sure I understand.  People would come to

10   you and say, I want to hire some off-duty police to provide

11   security at my place or my event?

12   A    Correct.  You know, police officers are allowed to work

13   secondary employment like security guards.

14   Q    Yes.

15   A    And what I did was provided contracts and work for them

16   at a young age.

17   Q    Mr. Caesar, this will go a lot faster if you answer my

18   questions and just answer my question.

19               MR. MARTINEZ:  Objection.

20               THE COURT:  Sustained.  If you want a witness

21   instructed you know how to achieve that and that's not the

22   method.

23   Q    (BY MR. ENZINNA)  Mr. Caesar, so people would come to you

24   and say ––

25               THE WITNESS:  Excuse me a second, Your Honor,

1    instead of him  beating around the bush, can you just ask me a

2    question, because I'm getting confused?  He's going around the

3    bush --

4            THE COURT:  Stop talking.  Stop talking.  This is

5    how this is going to work:  Mr. Enzinna's going to ask

6    questions.  He's going to do it in a way that comports with

7    the Federal Rules of Evidence.  Mr. Caesar is going to answer

8    the questions.  Question and answer, the next question and the

9    next answer.  And if another lawyer thinks there's something

10   that's inappropriate about what's occurring, they will object,

11   and I'll rule on the objection and then we'll continue.  But

12   that's how it goes.  That's how it always goes.

13           Mr. Enzinna, you may inquire.

14   Q    (BY MR. ENZINNA)  How long did you have that business

15   placing off-duty police officers?

16   A    For about a year.

17   Q    Was that after you were a private security guard?

18   A    Pretty much, yeah.

19   Q    Okay.

20   A    During the same time, doing both at the same time.

21   Q    Okay.  Any other security experience?

22   A    Besides dealing with the Nation of Islam, nope.

23   Q    Okay.  Well, now, the Nation of Islam, was that while you

24   were in prison or while you were out of prison?

25   A    Beforehand and out.

1    Q    So before you went to prison and then again after you got

2    out of prison?

3    A    Correct.

4    Q    Okay.  And what exactly were you doing?

5    A    Both security aspects, celebrities come into town, we

6    secure the celebrities the VIPs, whatever the contract

7    consists of, working in messed up neighborhoods, apartment

8    complexes where we get sent, that's where we work.

9    Q    Were you working for the Nation of Islam?

10   A    Well, they had called and they do the subcontract through

11   the security part, yeah.

12   Q    Okay.  Who was your employer?

13   A    When?

14   Q    At that time when you were --

15   A    Solidarity Security.

16   Q    So you were still a private security guard?

17   A    Correct.  We had the housing contracts in the projects

18   before Murphy Homes and Flag House got torn down.  You can go

19   back and check, used to be NOI Security.  Because they tried

20   to say it was a religious thing, they broke down into two

21   different companies, which was Solidarity and

22   Starbright Security.

23   Q    Okay.

24   A    Did that answer your question?

25            THE COURT:  Just answer the questions.  No

1    editorializing.  Next question.

2    Q    (BY MR. ENZINNA)  All right.  So when you met

3    Uncle Perry, did you describe your security background to

4    him?

5    A    Correct.

6    Q    And he then hired you or asked you to be his security?

7    A    Correct.

8    Q    Did that all take place on one day?

9    A    No.  He did some type of, as they say, their

10   "background," and whatever came back, a lot of people approved

11   of me and knew me.  So that's how I got in that position.

12   Q    Okay.  Now, while you were working for Uncle Perry, you

13   were also working for the DEA; correct?

14   A    Correct.

15   Q    And in fact, at some point the DEA put a microphone in

16   your car?

17   A    Correct.

18   Q    And they put a video camera in your car?

19   A    Correct.

20   Q    Did they intercept your telephone calls?

21   A    Correct.

22   Q    And you recorded interactions with Uncle Perry?

23   A    Correct.

24   Q    Now, at this time, you talked earlier this morning about

25   being a fox and then being a full-fledged brother, do you

1    remember that?

2    A    Correct.

3    Q    Now, at this time when you became Uncle Perry's security

4    personnel, were you a fox or a full-fledged brother?

5    A    I was a fox, but as soon as I started working for

6    Uncle Perry, Uncle Perry and Double R decided to say that I

7    was a full-fledged brother.

8    Q    Okay.  And you testified this morning that you -- I think

9    you testified, correct me if I'm wrong, you testified about

10   the way you became a full-fledged brother was not the same as

11   the way other people became full-fledged brothers; is that

12   correct?

13   A    Correct.

14   Q    And specifically, you were not required to know the

15   rules, did I understand that correctly?

16   A    I was required to know certain things, but I didn't have

17   to recite like most of them.  I didn't have to recite because

18   they wanted to keep me -- if I was ordered to do something and

19   it was against the rules, I won't be held liable and

20   accountable for it because I had no knowledge of it.

21   Q    Okay.  So the leaders of BGF wanted you to serve as their

22   security personnel and wanted you not to understand the rules

23   so they could order you to do things that were against the

24   rules?

25   A    Pretty much, correct.

Cross-examination - Caesar  (By Mr. Enzinna)

1    Q    Okay.  Now, we talked a little bit about those rules this

2    morning and you said that one of the rules you were aware of

3    is the rule against cooperating; right?

4    A    Correct.

5    Q    And you said that if someone suspects a brother, a BGF

6    member of cooperating with the police, they have to -- I think

7    you said they have to show paperwork?

8    A    Correct.

9    Q    Right.  So they can confirm that the person is actually

10   cooperating; right?

11   A    Correct.

12   Q    And then once that paperwork is verified, then sanctions

13   can be applied; right?

14   A    Correct.

15   Q    And you said that either the C or a bush member makes the

16   final call about the sanctions?

17   A    Well, you want to know the protocol?  Everything supposed

18   to go to MOJ, the minister of justice.  The minister of

19   justice have to go to the C, which is the commander.  That

20   means from the C, supposed -- all depends how big the

21   situation is, then it's supposed to go to whoever the bush

22   member for that whole entire area.  And then from there,

23   whatever order is given is given.  But we all know, in all

24   actuality, some people take more power into their hands

25   thinking it won't go back up to the top.

1   Q    But the rule is that a BGF member is not supposed to take

2   matters into his own hands with respect to another brother;

3   right?

4   A    Correct.  That is the rules, but who listens to the

5   rules?

6   Q    Okay.  That rule doesn't apply to non BGF members, does

7   it?

8   A    Well, non BGF members, if the C gives an order and he

9   sees something on black and white, he's allowed to go ahead

10  and make whatever order it is, unless it's a conflict.  If

11  he's dealing with another big organization or anything like

12  that that could cause a big conflict, big war or something

13  like that, had to go to the hierarchy.  But for a regular

14  person on the street, if the C decide he want something taken

15  care of, it can be done if it just an ordinary person, if

16  there's one person you got to worry about, not a whole other

17  organization, get more people killed.

18  Q    But can a BGF member take action against someone who is

19  not a BGF member without getting authority?

20  A    Correct.

21  Q    They can?

22  A    Without -- if you's a civilian, you're not part of the

23  BGF, whatever they decide to do, they do.  But if it's

24  something major and that civilian is part of another

25  organization, like a Blood, Crip, or another type of

1    organization, and he does something, you got to think, if I do

2    this, what is the consequence afterwards, okay, what is the

3    repercussion?  Am I going to sit here and go to war with this

4    side of people over some nonsense?

5    Q    Understand.

6    A    That case, that was an individual, that was civilian

7    because it was never proven that Moses was a Blood.

8    Q    Okay.  Now, in -- you said that in 2013, I think you said

9    that you moved to the Greenmount area; is that right?

10   A    2012, 2013, in a minute on the date, approximately around

11   there.

12   Q    How long had you lived in Greenmount before Moses Malone

13   was killed?

14   A    How long I was living there?

15   Q    Yeah.

16   A    I was living in Greenmount area for probably about six or

17   seven months.

18   Q    Six or seven months, okay.  So when you got to -- let me

19   ask you this:  Why did you move to Greenmount, were you asked

20   to move to Greenmount?

21   A    No.  I moved to Greenmount because the simple fact it was

22   a cheap place to rent and that's when I ended up moving there.

23   Because I met the landlord, had dinner with him, other little

24   business before.  And I get in that location where I can lay

25   my head at.  And then I end up meeting the brothers around

1    there like Geezy, Country, and the rest of them that actually

2    be around there.

3    Q    When you first moved to BG -- to Greenmount, were you

4    still working for Uncle Perry?

5    A    Yes.

6    Q    You were.  So did you commute from Greenmount to

7    Uncle Perry?

8    A    I was still working for Uncle Perry, but as Uncle Perry

9    healed up, he didn't need me as much driving him around and

10   stuff.  Because Uncle Perry got shot on Pennsylvania Avenue

11   and North Avenue, that area, so he was riding around in a

12   wheelchair pretty much.  But as he healed, he didn't need

13   nobody personally driving him, helping him get in and out of

14   the vehicle and stuff like that.

15   Q    So you moved to Greenmount.  And did you talk with -- at

16   the time were you working as an informant?

17   A    Correct.

18   Q    And working for what agency?

19   A    ATF.

20   Q    ATF.  For Agent Hayden?

21   A    Yeah.

22   Q    Did you consult with him before you moved to

23   Greenmount?

24   A    No.  I consult and started dealing with Agent -- I mean,

25   Hayden after I moved to Greenmount.

1   Q    Okay.  All right.  So you moved to Greenmount and you met

2   BGF members in the neighborhood?

3   A    Correct.

4   Q    How did you do that?

5   A    It's just meeting people in the neighborhood.

6   Q    You just went out and introduced yourself to people?

7   A    I didn't introduce myself.  Some people introduced

8   theirself to me, just -- I always lived over east side, pretty

9   much grew up in foster homes and all that on the east side, so

10  always a lot of people knew me on the east side.  So people

11  introduced me to other people.  And then also dealt with

12  Hot Rod, which was like pretty much in charge of the whole

13  east side area as a senior bush member.  So Hot Rod was the

14  one who introduced me to Country and certain other people,

15  because the same person, Woo, tried to put a hit out on me and

16  tried to use the same -- tried to use Geezy and Country and

17  that regime to hold me because he was mad because he still

18  ain't get the position that I had dealing with Uncle Perry.

19  Q    Who introduced you to --

20  A    When Hot Rod came down there, he verified who I was and

21  stuff like that, that's when I started dealing with a bunch of

22  brothers from Greenmount.

23  Q    All right.  Who introduced you to Mr. Johnson?

24  A    Huh?

25  Q    Who introduced you to Mr. Johnson?

1   A    Country.

2   Q    Country did?

3   A    The first one I met around there was Country.  And I

4   started meeting everybody as individuals later on that time,

5   but you talked about Geezy --

6   Q    How soon after you moved to Greenmount --

7   A    -- I met Geezy in prison.

8          THE COURT:  Let him answer the question.  Go ahead.

9   You may finish.

10  A    I met Geezy in prison.  Geezy know me from the

11  penitentiary.

12  Q    (BY MR. ENZINNA)  What prison?

13  A    The penitentiary.

14  Q    Is that what it's called?

15  A    The old penitentiary right next to Central Booking, the

16  penitentiary.

17  Q    When was that?

18  A    Back in, I want to say '08, '09.

19  Q    Okay.  And were you housed in the same part of the

20  prison?

21  A    Well, we was on probably the same side but not the same

22  tier.

23  Q    Okay.  So how did you meet him?

24  A    I was locked up, he was locked up, and he did what he did

25  and then I had the status I had in the Nation of Islam.  So

1   you inside the prison system, you up there in different --

2   doesn't matter religious organization, groups, and stuff like

3   that, everybody end up knowing who's pretty much in charge of

4   what and what's what and who's what and what's going on.

5   Q    Okay.  So how did you meet Mr. Johnson?

6   A    In prison.

7   Q    I understand where you met him.

8   A    That's the first time I met him.  Then I ran across him

9   again on the street when I moved to Greenmount.

10  Q    But did you meet him in the rec yard, did you meet him in

11  a cafeteria?

12  A    On the tier.

13  Q    On the tier.  I thought you weren't on the same tiers.

14  A    No, but still you could walk the tiers.  The flat landing

15  is a tier.  It's not a rec hall in the penitentiary.  It's --

16  you got two -- one, two where you at, it's two sides,

17  everybody go to the flats.  The flats is also a tier for the

18  first level tier.  But that is considered a rec area too, but

19  it's also considered a tier.

20  Q    So you walked to Mr. Johnson's cell?

21  A    No, just met him in the midst of they know what I dealt

22  with in the Nation, talking to people, lot of people in BGF

23  come to Nation of Islam service, meet up and stuff like that.

24  They use the Nation of Islam or the Lost and Found Nation of

25  Islam, that would be the cover for them to meet up for their

Cross-examination - Caesar  (By Mr. Enzinna)

1    meetings in the prison system.

2    Q    So did you meet him at a Nation of Islam service?

3    A    No, I just met him out and about on the tier.

4    Q    While you were just mingling?

5    A    Not even mingling, I just met him.  I didn't hang with

6    him because some people I just don't directly -- was hanging

7    with like that in prison.

8    Q    Well, let's talk about 2013 when you moved to Greenmount.

9    You said Country was the first person you met?

10   A    Correct.

11   Q    How soon after you moved there did you meet him?

12   A    I probably met Country probably like a week later after I

13   moved there.

14   Q    Okay.  So you said that you moved to Greenmount about six

15   months before Mr. Malone was killed; correct?

16   A    Around -- approximately around that time.

17   Q    Okay.  So Mr. Malone was killed in May, I believe, so you

18   would have moved to the Greenmount in November?

19   A    Approximately around that time.

20   Q    So late in 2012?

21   A    I'm going to say approximately because you're talking

22   about from a long occurring event, exactly what day did I move

23   somewhere.  So I'm going to say approximately around that

24   time.

25   Q    Sure.  And you said Country introduced you to

1    Mr. Johnson?

2    A    Correct.

3    Q    But you already knew him?

4    A    Right.

5    Q    Where did he introduce you to him?

6    A    On Greenmount.

7    Q    On the street?

8    A    On the street.

9    Q    Okay.  Can you describe Mr. Johnson at that time?

10   A    Okay.  You want me to describe -- no offense -- that man

11   over here is about 6'3", he's almost 300 pounds.  He always

12   have a big long beard with dreads or braids in his hair.  You

13   cannot mistake that man.

14   Q    Okay.  Anything else unusual about his appearance?

15   A    No.  He -- you can't mistake somebody that's almost 6'3",

16   300-some pounds, and always joking around and playing around

17   and all that, you cannot mistaken -- nobody identity like

18   that.

19   Q    Okay.  He wasn't using a walker or on crutches?

20   A    No.

21   Q    Now, it's true, is it not, that you never paid any dues

22   to Mr. Johnson for BGF?

23   A    No.  I was never a part of their regime.

24   Q    So it is true?

25   A    It's true, I never paid no money to him because I wasn't

Cross-examination – Caesar  (By Mr. Enzinna)

1    part of their regime.  Only people had to pay anything to

2    Mr. Johnson and his bubble is those that are directly

3    underneath his regime.  Now, what me and Tech used to do is,

4    because we was hustling in their neighborhood, out of respect,

5    if they needed help with something, we would give them a

6    couple dollars, something like that.  Couple people might come

7    around with their personal problems, we might look out for

8    them and give them a couple dollars.  But directly paying to

9    their regime, no.

10   Q    You're familiar with the concept of taxes; right, are

11   you?

12   A    Yeah.

13   Q    That if someone is in an area controlled by an

14   organization and they're selling drugs outside that

15   organization, they might have to pay a tax; right?

16   A    Correct.  But in my situation I don't pay no taxes

17   because the simple fact you cannot charge another brother

18   taxes that's in the organization because technically nobody

19   own nothing.

20   Q    Okay.

21   A    So therefore, you know, it's another brother, you cannot

22   charge a tax to another brother, even though you do got some

23   people that try to do it.  But they would just be dumb just to

24   go ahead and pay it when you can take it up to the upper chain

25   of command.

1    Q    Okay.  How often did you see Mr. Johnson in this

2    period?

3    A    I probably would see Mr. Johnson probably at least once a

4    day as either going past, speaking, talking, or whatever the

5    situation was at the time.

6    Q    Okay.  You never taped any conversations with him, did

7    you?

8    A    You said tape?

9    Q    Yes, sir.

10   A    No.

11   Q    Now, you were also -- at this time you were selling drugs

12   in the neighborhood; right, you and Tech?

13   A    Correct.

14   Q    And you were also running an escort service, I believe?

15   A    Doing security, yeah.

16   Q    Well, were you doing security or running an escort

17   service?

18   A    Doing security for an escort.

19   Q    Did you tell the prosecutors last night that you ran an

20   escort service?

21   A    Well, really doing security because I can't force nobody

22   to do nothing, never have forced nobody, so running

23   security.

24   Q    Now, you said that -- we talked a little bit about

25   Moses Malone and you said that he owed Tech some money and

1    that Tech sent, I believe that you said Mr. Handy, to rob

2    him?

3    A    Mr. Norman, that's what I know him by Norman.  Other

4    names I don't know.  I just know Norman.  Just like Geezy, I

5    don't know Geezy's whole name until you keep saying.  I know

6    him by Geezy.  I know Slay by Slay.  I don't know his real

7    name.  I know Hood by Hood.  I know individuals by the

8    nicknames.  Just like they didn't know who my true identity

9    was until today.  Only thing they knew me by was Black Man,

10   not my government but Black Man.

11   Q    Understand.  So if Tech instructed Mr. Norman to rob

12   Mr. Malone, if Mr. Malone believed that Mr. Johnson, or as you

13   know him, Geezy, sent Mr. Norman to rob him, that would be

14   incorrect, wouldn't it?

15   A    Can you please repeat that?

16   Q    If Mr. Malone believed that Mr. Johnson sent Mr. Norman

17   to rob Mr. Malone, that would be incorrect; correct?

18   A    That would be incorrect because Tech was the one who

19   asked Norman and told Norman, look, he got some money in his

20   pocket, he got some weed on him.  And they like to smoke weed,

21   get high off Percocets and all different type of stuff, and so

22   Norman went and robbed.

23   Q    Okay.

24   A    Mr. Johnson, as in Geezy, did not send him to go rob

25   Norm.

1    Q    Great.  Now, you said that --

2    A    Tech did.

3    Q    -- after the robbery, Mr. Malone talked to you and said

4    that he was trapped by the robbers in the alley; is that

5    right?

6    A    Well, I was told they -- he told me that they robbed him,

7    Norman robbed him and then he shot at him.  And Norman told me

8    he shot that -- he made a mistake just shooting at the ground

9    just to scare him, but it ricocheted and a fragment hit him.

10   Q    But my question is, he told you that happened in the

11   alley; correct?

12   A    Yeah.

13   Q    All right.  We talked earlier also about the search

14   warrant for your residence?

15   A    Correct.

16   Q    And you said that when you got back from the police

17   department, the warrant papers were there in your residence

18   and Tech saw them?

19   A    Correct.

20   Q    And you said then that Tech called Geezy?

21   A    Correct.

22   Q    Whose phone did he use?

23   A    His own.

24   Q    His own phone.  Okay.  And you said that then you and

25   Tech -- you walked with Tech, Tech took the papers and left

1    your house; correct?

2    A    Correct.

3    Q    And walked over to where Geezy was?

4    A    Correct.

5    Q    And you went with him?

6    A    Correct.

7    Q    And then you stayed on the street or on the sidewalk,

8    where were you.  As he went up to the door, where were you?

9    A    I was on the sidewalk.

10   Q    Okay.  How far away were he and Geezy?

11   A    Was me in the door where Geezy was?

12   Q    No, how far away were you from Geezy and Tech?

13   A    And Tech?

14   Q    Yeah.

15   A    Okay.  If you're familiar with city homes, inside of the

16   row homes, I'm going to say, it's one, two, three, three steps

17   and it might be an extra little step to get up in the doorway.

18   I'm going to say less than four feet, as Tech went to go knock

19   on the door and stepped in the doorway.

20   Q    Okay.  So you could hear what they said?

21   A    Well, they shut the door.

22   Q    Okay.  But Tech handed Mr. -- handed Geezy the search

23   warrant?

24   A    Correct.

25   Q    On the steps?

1    A    Correct.

2    Q    Okay.  Did you ever tell the -- did you ever tell any

3    representatives of the United States Attorney's Office or ATF

4    that you did not see Tech hand the search warrant to

5    Mr. Johnson?

6    A    My statement always been the same since day one.  Me

7    and -- me and Elliott Reed, which is Tech, walked around there

8    and hand -- and Tech handed Geezy the letter, or the warrant,

9    the copy papers of the warrant and statement, because of what

10   happened with -- Norman and Mo started telling because they

11   kept pushing up on him.

12   Q    So you don't remember telling them that you never

13   actually saw Tech hand the search warrant to Geezy --

14   A    No, I always say I --

15   Q    Please let me finish my question.

16   A    -- went with him and he handed --

17          THE COURT:  Hold on just a second.  Mr. Enzinna, you

18   may finish your question.  Ask your question.

19   Q    (BY MR. ENZINNA)  You don't remember telling them that

20   you never actually saw Tech give the paper to Geezy, but you

21   just assumed that he did?

22   A    You are incorrect because since day one I been saying the

23   same thing.  Me and Tech went around there, Tech handed Geezy

24   the letter, and they stepped inside to talk about whatever it

25   is because I was not -- Tech, Elliott Reed, had more clout

1   around Greenmount than I had.  You know what I mean?  So never

2   to blow my cover, I don't intrude into stuff.  When you

3   intrude in stuff and you be nosey, that's when you blow your

4   cover.  When I sat there and I seen it and they shut the door

5   because of the weather condition, whatever it was at the time,

6   they talking about other stuff that's happening around

7   Greenmount, which I don't need to know until it comes to my

8   attention.  So therefore, I did not step in the location, but

9   I seen him hand Tech the search warrant -- I mean, hand Geezy

10  the search warrant.  Tech handed Geezy the search warrant,

11  that I seen.

12  Q    Thank you.  But my question was, do you remember telling

13  the United States Attorney's Office --

14          MR. MARTINEZ:  Objection.  Asked and answered

15  twice.

16          THE COURT:  Overruled.  Go ahead, Mr. Enzinna.

17  Q    (BY MR. ENZINNA)  Do you remember telling --

18  A    For about the fourth time, I'm saying the same thing.  I

19  seen and went with Tech while he handed him the search warrant

20  at the door and they went inside and whatever discussion

21  was -- and came out.

22  Q    So you are saying you do not remember telling them

23  that?

24  A    No, I don't.

25  Q    You don't.  Is there anything I could show you that would

Cross-examination – Caesar  (By Mr. Enzinna)

1  refresh your recollection?

2  A    No, because I recall me always saying me and Tech went

3  and he handed Geezy the letter.

4  Q    All right.  So after they went inside, what did you do?

5  A    I was outside waiting for Tech.

6  Q    You waited for him?

7  A    For a couple minutes.

8  Q    Was Country with Geezy at that time?

9  A    I have no recollection who else was inside that house at

10  that time because I was not inside the house.  The only person

11  came to the door was Geezy.

12  Q    Do you recall meeting with ATF agents and representatives

13  of the U.S. Attorney's Office in June of 2013?

14  A    If that was the date.  It's a possibility it was that

15  date, can't tell you.

16  Q    Do you remember telling them that Tech took the warrant

17  to Geezy and Country?

18  A    I said Tech took the warrant because I walked with him,

19  to Geezy and hand it to Geezy.  I didn't talk to Country until

20  after the fact.

21  Q    Okay.  So you don't remember telling them that Tech took

22  the warrant to Geezy and Country?

23  A    I know Country was informed because he was the MOJ.  But

24  all I can say out of my mouth is what I've been saying is --

25  for the hundredth time for you and I'm not going to change my

1    story and I'm telling you the truth:  I walked with Tech,

2    which name is Elliott Reed, to your client, Mr. Geezy,

3    whatever his real government name is, which I really don't

4    care, no offense, you know what I mean, because I know him as

5    Geezy, and watch Elliott Reed put the search warrant, with the

6    statement the detective left on the counter in Tech (sic) hand

7    and they went inside and talked for a couple minutes.  And

8    then Tech came back out and told me he got a green light.

9    Q     So if somebody says you didn't see him hand the search

10   warrant to Geezy, that would be wrong; correct?

11   A     It would be wrong because I know what I saw.

12   Q     And if somebody says that you told them that Country was

13   there, that would be wrong too?

14   A     It would be wrong because I never said Country was there.

15   I only said that we went to go take it to Geezy.

16   Q     Okay.  Do you remember telling the ATF agents that

17   Country told Geezy there was a green light to kill Malone?

18   A     You said what?

19   Q     Do you remember telling the ATF agents that Country told

20   Geezy that there was a green light to kill Malone?

21   A     So let me refresh what you just said, right.  You just

22   said, if I'm not mistaken, because I can barely hear you over

23   there, you're trying to play, you know, little lying tricks.

24   You just say that I said that Country told Geezy there's a

25   green light.  How is Country going -- that's the MOJ at the

1    time, going to tell the C what to do, and it's the final call

2    of the C, which is your client, that issued the green light in

3    the death of Moses Malone, when he could have been -- that's a

4    bunch of bull crap.

5    Q    Can you hear me better if I do this?

6    A    Yeah.

7    Q    Okay.  So if someone wrote down that you told them that

8    Country told Geezy that there was a green light, that would be

9    wrong; right?

10   A    Correct.  Because Country is under Geezy and Geezy was

11   the only one able to give that order because he's the C.

12   Q    Now, let me make sure I understand what you were saying

13   earlier about guns; right?

14   A    Uh-huh.

15   Q    You talked earlier about a number of guns that were

16   involved in the shooting of Moses Malone; right?

17   A    First of all, he got hit with one gun.

18   Q    Okay.

19   A    And that was a .22 revolver, if I'm not mistaken.  The

20   exact revolver ain't never came to my fault but come through

21   the sources, it was the same .22.

22   Q    Okay.  And did you give that .22 to somebody, did I

23   understand that correctly?

24   A    First of all, I ain't have possession of that .22.  I

25   didn't have possession of none of their guns.

1    Q    Okay.

2    A    Anything else?

3         THE COURT:  Don't say --

4         THE WITNESS:  My fault, Your Honor.

5         THE COURT:  You're going to get in trouble --

6         THE WITNESS:  I apologize.

7         THE COURT:  Just answer the questions.

8    Q    (BY MR. ENZINNA)  Now, you said the night of the shooting

9    Country came to your apartment and asked to use your phone?

10   A    Correct.

11   Q    And you said that he asked to use your phone because he

12   didn't have a phone?

13   A    Yes.  I guess that's what the case is, he asked to use my

14   phone.

15   Q    Well, that's what you said earlier today, wasn't it?

16   A    Yeah, he asked to use my phone.

17   Q    Do you remember testifying before the grand jury on

18   February 24th, 2016?

19   A    It could be around that time.  Which grand jury?

20   Q    Okay.  Do you remember being asked this question and

21   giving this answer:

22        "Question:  And did there come a time when Country

23   joined you in the house?

24        "Answer:  Well, Country was pretty much -- was there

25   pretty much throughout the day.  He had left out, then later

1  on that night, he ran up in the house.  And when he ran up in

2  the house, he was on the phone with somebody.  And then he got

3  off the phone, then he was saying he needed to use my phone.

4  So I let him use my throwaway -- and then I let him use my

5  throwaway.  He called Mr. Wes up."

6           Do you remember that?

7  A    Well, Country was there earlier that day.  Country also

8  was there probably the day before that.  The day before that

9  because Country not just only know me in the household because

10  rooms for rent, he knows multiple people that live in that

11  household.  So have Country been in that house probably

12  earlier that day?  Yes, it's a possibility.  And it's been a

13  possibility he was over there plenty of other times because

14  the simple fact he lives in the neighborhood.  He mess with

15  the girl next door and he was messing with one of the other

16  girls that was renting one of the other rooms in my house.  So

17  yeah, I run across Country all the time before he got

18  killed.

19  Q    Okay.

20  A    But as in what the case is, he asked to use my phone, I

21  let him hold my phone.  Reason why I let him hold my phone,

22  because the simple fact if you're dumb enough to break some

23  law, I'm going to have that number -- to go ahead and give the

24  ATF that number that you dialed, which in your case -- that's

25  how dumb it was.  When he called off my phone, I showed them

1    the call log on my phone, and they was able to probably

2    retrieve the bill with the number on there.  So anything --

3    yes, I would let him use the phone.  I would let the next

4    person, if they dumb enough to use my phone, do it.

5    Q    Okay.  But here's my question:  Today you said that

6    Country didn't have a phone.  And in front of the grand jury

7    you testified that --

8    A    Well, I didn't see him with a phone, he asked to use my

9    phone.

10            THE COURT:  Let him finish his question.  Go

11    ahead.

12    Q    (BY MR. ENZINNA)  Earlier today you testified that

13    Country came in and asked to use your phone because he didn't

14    have a phone.  And in February of 2016, under oath before the

15    grand jury, you said that when Country came in the house he

16    was already on the phone and then asked to use your phone.

17    Now, those two things are -- one of those things is not

18    correct; right?

19    A    Well, like I said, he asked to use my phone.  Was he on

20    somebody else's phone, you know, he asked to use my phone, so

21    I allowed him to use my phone.  But me personally, I didn't

22    know of him ever having a phone because he was always asking

23    to use somebody's phone.  So if you would have asked me back

24    then for a number on Country, I would not be able to give you

25    a number on Country because to my understanding, he ain't have

1    no phone.  But do he use other people phone to have other

2    people call?  Yes, it's a possibility.

3         Something that happened a long time ago like that, could

4    he have been on the phone when he came in using somebody

5    else's phone?  Yeah, but he asked to use my phone, so

6    therefore, I let him use my phone.  And that's why Wes number

7    is on my phone.  That's why when you dig up and they --

8    whatever information they gave you, they came across with

9    Wes's phone number and a couple of minutes before the murder.

10   Q    The night that Mr. Malone was killed, you did not see

11   Geezy, did you?

12   A    The night of the death of Moses, no, not to my

13   recollection.  But could I have seen him in passing throughout

14   the day?  Who knows.  But as in me having a whole long

15   conversation, hanging out with him, I never did like that.  I

16   see Geezy in passing, speak to him out of respect, ask him if

17   he need help with something, whatever, then I keep going on

18   about my business.

19          MR. ENZINNA:  Your Honor, may I ask the Court's

20   indulgence?

21          THE COURT:  Yes.

22          MR. ENZINNA:  Your Honor, nothing further.

23          THE COURT:  Mr. Bussard.

24          MR. BUSSARD:  Thank you, Your Honor.

25                        CROSS-EXAMINATION

1    BY MR. BUSSARD:

2    Q    Good afternoon, Mr. Caesar.

3    A    Good afternoon.

4    Q    I represent the gentleman down to the far right in the

5    white shirt that you've been calling Slay.  Can we agree to

6    call him Mr. Jones today?

7    A    I only know him as Slay.

8    Q    I'm asking you if you can agree to call him Mr. Jones,

9    since the government has been referring to you as Mr. Caesar.

10            MR. MARTINEZ:  Objection.

11            THE COURT:  Sustained.

12            THE WITNESS:  I don't know him as Mr. Jones --

13            THE COURT:  Just stop talking while the judge is

14    talking.  You can't interrupt the judge.  If you do, you're

15    going to get in trouble.

16            THE WITNESS:  Sorry, about that, Your Honor.

17            THE COURT:  The objection is sustained.  The witness

18    indicated how he knows the defendant.  He's entitled to refer

19    to him in a way that he knows him and to not accept some other

20    title if it's not otherwise known to him.  You may inquire.

21            MR. BUSSARD:  Thank you, Your Honor.

22    Q    (BY MR. BUSSARD)  The government counsel and one of the

23    defense counsel has asked you about your record and I'm not

24    going to dwell on it, but I do want to bring up one point.

25    You indicated in response to government's questions that you

1    were arrested the day after Mr. Malone was killed; correct?

2    A    Correct.

3    Q    And that was for selling to an undercover officer?

4    A    Correct.

5    Q    And you went to one of the Baltimore City facilities?

6    A    Correct.

7    Q    Correct?  And I believe you also testified a few minutes

8    ago that you made bail; correct?

9    A    Correct.

10   Q    And that bail was about $25,000?

11   A    I'm not sure the exact amount.

12   Q    And who paid that bail?

13   A    Somebody that's able to get access to money I'm not.

14   Q    And was that money you obtained from selling narcotics on

15   the street?

16   A    Could be obtained by working too.

17   Q    I'm asking you, where did that money come from?

18   A    Working.

19   Q    Working how?

20   A    How?  The last time -- at that time I was working for a

21   construction company and I was still doing private security on

22   the side.

23   Q    So you had private security, construction, and you were

24   selling drugs on the corner; correct?

25   A    Well, technically only reason I was selling drugs was the

1   simple fact the same way as an undercover cop would have to.

2   You have to have identity underneath you, you got to break law

3   to sit there to get the person, the targets that you have

4   to -- you know what I'm getting at.  So in other words, that

5   was the way into an organization.  And that's the way I went

6   into that organization and to infiltrate the organization for

7   the bigger better picture.

8   Q    So the drugs you were selling to the undercover officer

9   on May 3rd, 2013, did those drugs come from law enforcement?

10  A    No.

11  Q    Did they come from some illegal source on the street?

12  A    Perhaps.

13  Q    Okay.  And you were selling nickels and dimes, was

14  that -- is that an accurate statement?

15  A    I was selling drugs.

16  Q    Okay.  Crack?

17  A    Yeah.

18  Q    Heroin?

19  A    Nope.

20  Q    Weed?

21  A    Yup.

22  Q    And you were making some money off of that?

23  A    Yeah.

24  Q    And you were an informant while you were making money; is

25  that correct?

1   A    Correct.

2   Q    Did you have to turn in your profits at the end of every

3   day to Mr. Hayden, Special Agent Hayden, or to Special Agent

4   Christy here?

5   A    Hold on a second.

6              THE WITNESS:  Your Honor, I don't know --

7              THE COURT:  You can't ask me a question.

8              THE WITNESS:  If I answer anything about where you

9   trying to go at -- I do know one thing about the law, I plead

10  the 5th.  Anything about me breaking the law, anything like

11  that, I plead the 5th and my stuff is registered on paper.

12             MR. BUSSARD:  Your Honor, may we approach?

13             THE COURT:  Take the jury out.

14             (Jury left the courtroom.)

15             THE COURT:  Mr. Caesar, you'll step out of the

16  courtroom, just in the vestibule.  Don't go anywhere.

17             THE WITNESS:  Thank you.

18             THE COURT:  Be seated, please.  Make sure that door

19  is shut tight.  Thank you.  Witness is out of the courtroom.

20  The jury's out of the courtroom.  The witness has invoked the

21  5th Amendment.

22             Mr. Martinez, your thoughts about how the Court

23  ought to next proceed?

24             MR. MARTINEZ:  As I stand here, Your Honor, I'm not

25  sure there is any valid 5th Amendment privilege for him to be

1    invoking.  He's testified now freely about having committed

2    that offense and having sold drugs routinely in the

3    Greenmount Avenue neighborhood throughout 2013.  And so to the

4    extent that he may have -- I know he's not under a cooperation

5    agreement, there's no kind of immunity, et cetera, but to the

6    extent he may have had any 5th Amendment privilege, I think

7    it's been waived long ago by virtue of his testimony on direct

8    and thus far on cross-examination.  So --

9            THE COURT:  So probably, but does he have a lawyer?

10           MR. MARTINEZ:  He does not.

11           THE COURT:  I think he needs one.

12           MR. MARTINEZ:  That's probably not a bad idea.

13           THE COURT:  All right.  So what's the status of the

14   Federal Public Defender with respect to this matter?

15           MR. MARTINEZ:  It's compli- --

16           THE COURT:  If you know.

17           MR. MARTINEZ:  Well, I know that when we were first

18   charging the case and considering who may have conflicts, we

19   were aware -- I think this came out, in fact, during the

20   examination of Mr. Meadows.  I know it was certainly in the J

21   and C -- I forget which defense counsel had it, was trying to

22   introduce a J and C from his violation of supervised release.

23   Mr. Meadows was represented by the Federal Public Defender.

24   And I know they've had other BGF-related clients who sort of

25   are on the periphery of this organization.  So we steered

1  clear of them for conflict purposes at the beginning of this

2  case.  I can't imagine it would be the greatest idea now.

3           THE COURT:  Right.  Okay.  So my conclusion is that

4  we cannot proceed further with his cross-examination until he

5  has counsel and we resolve this invocation of the

6  5th Amendment.  In light of that, is the government's

7  preference that we stop for today and attempt to pick up

8  tomorrow if this witness is going to continue to testify, with

9  right where we are, having brought counsel into the equation

10 and addressed the issue?  Is it counsel's request that we

11 simply stop this particular examination, go on to another

12 witness, meanwhile, allow for the witness, Mr. Caesar, to meet

13 with his lawyer and separately later conduct a hearing outside

14 the hearing of the jury to resolve the question of whether the

15 5th Amendment has been lawfully invoked or not, then after

16 that determine where do we go from there?  What's your

17 preference, you want to stop for the day or do you want put

18 him on the side and go --

19          MR. MARTINEZ:  Your Honor, I'm certainly sensitive

20 to the Court's time and the jury's time.  And I know

21 Your Honor has reminded us early in this case about the

22 resources that go into this on a daily basis.  Notwithstanding

23 all of that, I think it's our strong preference to stop.  I

24 hope and expect that this is something that can be addressed

25 efficiently so that we can get Mr. Caesar back on the stand to

Cross-examination – Caesar  (By Mr. Bussard)

 1    pick up where we've left off.  I think from the jury's point

 2    of view, that will result in the least confusion.  We'll be

 3    able to pick up the story right where we are, rather than

 4    injecting another witness and putting Mr. Caesar back on.  So

 5    from our point of view, as the party presenting the evidence

 6    and the party with the burden of proof, I think that that

 7    option, proceeding in that manner, makes the most sense in

 8    terms of presenting a coherent story.

 9         THE COURT:  Well, I'm prepared within reason to

10    defer to your preference because we're in your case.  So we'll

11    do that.  We'll bring the jury back into the courtroom.  I'll

12    excuse them for the day.  Once they have been excused -- call

13    Maureen Essex, ask her to come to the courtroom, please.

14         Once they have been excused for the day, then we'll

15    immediately take up the problem of arranging for counsel for

16    the witness.  Hopefully we can get counsel here quickly.  And

17    we'll plan to reconvene at about 4:45 or so to take up the

18    invocation of the 5th and allow the Court the opportunity to

19    rule on that.  And then hopefully have ourselves situated for

20    tomorrow morning.  That's my general plan at this point.

21    Okay.  With that in mind, let's bring the jury back in.

22         (Jury entered the courtroom.)

23         THE COURT:  Be seated, please.  Ladies and

24    gentlemen, there are some matters that I need to address with

25    the lawyers outside of your hearing.  Accordingly, we will

1    stop for today and send you home with the direction to return

2    tomorrow at 9:30, as usual.

3            During the overnight recess do not discuss the case

4    with anyone.  Do not discuss it with your fellow jurors.  Do

5    not discuss it with any of your friends or family.  Do not

6    allow yourselves to be exposed to any news articles or reports

7    that touch upon the case or the issues it presents or the

8    participants in the trial.  Avoid all contact of any kind with

9    any of the participants in the trial.  Do not make any

10   independent investigation of the law or the facts relevant to

11   the case.  Do not conduct internet searches with respect to

12   the issues presented or the persons participating in the

13   trial.  Do not consult external sources such as encyclopedias

14   or dictionaries in reference to the issues and terms that have

15   been presented to you here.

16           You are excused until 9:30 tomorrow morning.  Please

17   take the jury out.

18           (Jury left the courtroom.)

19       THE COURT:  Bring the witness back into the

20   courtroom.  You may be seated.  You may be seated, Mr. Caesar.

21   Mr. Caesar, under the 5th Amendment to the United States

22   Constitution, you have the absolute right to not be compelled

23   to give testimony about a matter or on a topic with respect to

24   which your answer might tend to incriminate you.  Do you

25   understand what that means?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  So I'm advising you that you absolutely

3    and positively have that right.  During your testimony a few

4    minutes ago when the jury was still in the courtroom, in

5    response to a question that was put to you by one of the

6    lawyers on cross-examination, in my view, you invoked your

7    right under the 5th Amendment to the Constitution to not

8    answer a question or part of a question on the ground that you

9    felt that the answer might tend to incriminate yourself.  Is

10   that what happened?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Okay.  And so now that presents the

13   question of whether or not your invocation of your

14   5th Amendment right was lawful and appropriate in the

15   circumstances, given the situation that you are in.  I'm not

16   saying lawful in the sense of like criminal and lawful,

17   something like that.  It's whether or not it was appropriate,

18   whether or not the law allows you to invoke the 5th Amendment

19   in the circumstances that you're in.  That question is now

20   presented to me as the judge to decide.  I decide whether or

21   not that's legit, whether or not the witness can refuse to

22   answer the question that's been put to him by invoking his

23   5th Amendment right.  And there's some legal considerations to

24   take into account before I resolve that question.

25              But before we even get to that point, it strikes me

Cross-examination – Caesar  (By Mr. Bussard)

1    that you might benefit from receiving advice from a lawyer who

2    represents you and only you.  Doesn't represent the

3    government, doesn't represent any of these defendants here,

4    simply represents you.  And someone with whom you can

5    privately consult about whether or not you wish to and are

6    allowed to invoke your 5th Amendment right in the situation

7    that you are in.

8            Accordingly, I'm prepared to appoint a lawyer at no

9    cost to you to represent you and to advise you privately on

10   that question.  And then after that has occurred and only

11   then, take up the question of whether or not you in fact can

12   invoke the 5th Amendment and the related question, after

13   you've received that advice of whether you want to invoke the

14   5th Amendment.  So given that I am prepared to appoint a

15   lawyer to assist you in that regard, your own lawyer, who

16   would represent you and only you in this situation, do you

17   request that I do that?

18           THE WITNESS:  Just to speak to counsel --

19           THE COURT:  Yes.

20           THE WITNESS:  Yes.

21           THE COURT:  Very well.  Now you may step out of the

22   courtroom, back to the vestibule.  Please don't go anywhere.

23           THE WITNESS:  Thank you.  Sorry about that,

24   Your Honor, that's what I was trying to ask you, but I

25   know --

1          THE COURT:  No problem.  Just step on out.  We have

2    to do things according to certain procedures.  Off the

3    record.

4          (Pause in the proceedings.)

5          THE COURT:  We're going to take a recess until 4:30,

6    at which time we will hear from Mr. Caesar through his

7    counsel, Mr. Proctor, who has just been appointed to represent

8    him, whether in fact he truly is invoking the 5th Amendment or

9    not.  And if he is invoking the 5th Amendment, then we're

10   going to turn to the question of whether he can invoke the

11   5th, given the status of the case.  And in that regard, I'll

12   ask the court reporter to be as flexible as she can be in

13   supplying Mr. Proctor, in particular, with at least the rough

14   notes of what has transpired while Mr. Caesar has been on the

15   witness stand, given that Mr. Proctor wasn't in the courtroom.

16   So we're going to take a recess until 4:30.  At 4:30 we'll

17   first hear whether or not there is in fact an invocation of

18   the 5th.  There already has been one.  The question is whether

19   or not the witness is going to persist.  If he does, then

20   we'll turn to the question of whether or not it's a lawful

21   invocation or whether there's been waiver given the testimony

22   already given in this proceeding.  The defendants are

23   remanded.  Counsel are excused until 4:30.

24          (A recess was taken.)

25          THE COURT:  Be seated, please.  Mr. Proctor.

1          MR. PROCTOR:  Thank you, sir.

2          THE COURT:  You represent the witness, Mr. Caesar;

3    is that correct?

4          MR. PROCTOR:  Yes, sir, it is.

5          THE COURT:  Having been appointed earlier this

6    afternoon to do so; true?

7          MR. PROCTOR:  Correct.

8          THE COURT:  So have you had an opportunity to

9    consult with your client in relation to his testimony here in

10   this trial?

11         MR. PROCTOR:  Yes, sir.

12         THE COURT:  And what is his position with respect to

13   a desire to invoke his rights under the 5th Amendment to the

14   constitution and decline to answer questions being put to him

15   during cross-examination by Mr. Bussard?

16         MR. PROCTOR:  His position is he intends to be back

17   in the morning and will answer all questions put to him

18   regardless of who asks him.

19         THE COURT:  So there is no longer any invocation of

20   the 5th Amendment?

21         MR. PROCTOR:  Absolutely.

22         THE COURT:  Okay.  And is he still in the vestibule?

23         MR. PROCTOR:  He is right outside.

24         THE COURT:  Okay.  Would you ask him to join us here

25   in the courtroom?

1              MR. PROCTOR:  Yes, sir.  Would you like him at the

2     podium or the witness stand?

3              THE COURT:  We'll just take him on the witness

4     stand.

5              MR. PROCTOR:  Yes, sir.  May I be next to him?

6              THE COURT:  Yes.  Right back up here, Mr. Caesar.

7     And you can go ahead and take a seat in the witness stand and

8     your lawyer is seated nearby and if you wish to stop at any

9     point during my questioning of you to talk with your lawyer,

10    just indicate that you want to stop for a second and talk to

11    your lawyer, we will stop and allow you to communicate with

12    him.

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  In private.  Do you understand that?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  So earlier this afternoon when -- you

17    were being cross-examined by Mr. Bussard, counsel for

18    Mr. Jones; correct?

19             THE WITNESS:  Correct.

20             THE COURT:  And he had pursued a line of questions

21    and some of it related to prior involvement in the sale of

22    controlled substances, such as cocaine and heroin, do you

23    remember that?

24             THE WITNESS:  Correct.

25             THE COURT:  And while you were answering questions

1    in that regard, you invoked your right under the 5th Amendment

2    to the United States Constitution to not answer questions, the

3    answers to which might tend to incriminate you.  Do you

4    remember all that?

5              THE WITNESS:  Yes, sir.

6              THE COURT:  All this occurred; right?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  And then we had a pause in the

9    proceedings and then you came back into the courtroom and you

10   and I spoke a little bit more about the fact that you had

11   invoked your right under the 5th Amendment to the

12   constitution.  Do you remember that?

13             THE WITNESS:  Yeah.

14             THE COURT:  We had that additional conversation, and

15   during that conversation you affirmed what you had said

16   earlier in that you wished to invoke your 5th Amendment;

17   right, is that all true?

18             THE WITNESS:  Well, some of it was -- I don't

19   understand.

20             THE COURT:  You don't understand because I'm using

21   too much legal language.

22             THE WITNESS:  All I want -- no question due to --

23   because what I was doing -- something happened in the past.  I

24   just wanted to verify, just like when I was trying to talk to

25   you, but you couldn't because all the people was here.  I just

1    wanted to see if I could speak to my attorney first on certain

2    situations, but nothing get crossed over, anything like that.

3    I spoken to an attorney after -- continue to testify in the

4    trial.  I just wanted to make sure something was verified.

5                THE COURT:  All right.  So you're --

6                THE WITNESS:  Because the way I felt was -- the way

7    I was coming at is, like you're trying to ambush me or

8    something, which I wasn't in the wrong, which I was able to do

9    at the time, so I didn't want to say before I got -- just to

10   make sure everything was correct.

11               THE COURT:  Yes, I --

12               THE WITNESS:  That's why I needed that moment, time

13   out to speak to an attorney, ask my attorney to verify the way

14   I can continue to testify.

15               THE COURT:  I understand what you're saying to me

16   because -- but still bear with me because I want to take this

17   through a very simple analytical process.  So backing up to

18   where I was.  You recall that I brought you back into the

19   courtroom after I sent the jury away; right, and you came back

20   into the courtroom?

21               THE WITNESS:  Yes, sir.

22               THE COURT:  And I asked you then if you wished to

23   assert the 5th Amendment, take the 5th, I asked you if you

24   wished to take the fifth and you said words to the effect that

25   yes, you wanted to take the 5th and that's what happened.  We

1    stopped at that point; right?  You weren't required to answer

2    anymore questions; true?

3              THE WITNESS:  Correct.  And that's when we was

4    talking about go ahead and talk to an attorney, which I was

5    trying to do to verify something.

6              THE COURT:  I understand.  And in fact, that's

7    exactly what we did do is, we appointed a lawyer to represent

8    you under the Criminal Justice Act, Mr. Gary Proctor; true?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  And Mr. Proctor has come to court and

11   has -- evidently, Mr. Proctor, you conferred with the Court;

12   is that true?

13             MR. PROCTOR:  Yes, sir.

14             THE COURT:  And then you conferred with counsel for

15   the government.

16             MR. PROCTOR:  I did.

17             THE COURT:  And then you had a private consultation

18   with your client; is that right?

19             MR. PROCTOR:  Yes, sir.

20             THE COURT:  Okay.  So you've now had the opportunity

21   to consult with Mr. Proctor about this question of whether you

22   want to continue to assert your 5th Amendment right, whether

23   you want to continue to take the 5th, or whether you have

24   decided that, in fact, you're now prepared to continue to

25   testify and you do not wish to assert the 5th or take the 5th;

1    right?

2              THE WITNESS:  Correct.

3              THE COURT:  All right.  You've had the opportunity

4    to talk with Mr. Proctor about all of that?

5              THE WITNESS:  Right.

6              THE COURT:  You know what your choices are; right?

7              THE WITNESS:  Yes, sir.

8              THE COURT:  Do you feel like you've had an adequate

9    opportunity to talk to Mr. Proctor?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Do you feel like you understand what

12   your rights are with respect to the 5th Amendment and anything

13   else that's of concern to you at the moment?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Knowing what those rights are and

16   feeling that you understand them and having had a sufficient

17   opportunity to talk with Mr. Proctor about it, are you now

18   prepared to tell the Court whether you continue to assert the

19   5th Amendment or whether you revise your position, that you do

20   not wish to take the 5th and instead you wish to continue to

21   testify?

22             THE WITNESS:  I wish to not have the 5th and

23   continue to testify.

24             THE COURT:  So you do not want to take the 5th.

25             THE WITNESS:  No, sir.

1          THE COURT:  And you want to keep right on

2    testifying.

3          THE WITNESS:  Correct.

4          THE COURT:  And you're not going to decline to

5    answer questions.

6          THE WITNESS:  Correct.

7          THE COURT:  On the grounds that -- okay.  Very good.

8    I'm satisfied.  And Mr. Caesar, you are excused for the day.

9    You're required to return here tomorrow morning at 9:30 to

10   continue your appearance here in court.  Do you understand

11   that?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Okay.  You are excused until then and

14   you may depart.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  Mr. Proctor, are you able to be here

17   tomorrow?

18         MR. PROCTOR:  Yes, sir, I am.

19         THE COURT:  You will join us also at 9:30.

20         MR. PROCTOR:  Yes, sir.

21         THE COURT:  You're excused until then.  Thank you,

22   Mr. Proctor.

23         Okay.  So where are we, Mr. Martinez?  We'll start

24   at 9:30.

25         MR. MARTINEZ:  We'll start at 9:30.  I don't know

1    how much more Mr. Bussard has for --

2            THE COURT:  How much more do you think you've got?

3            MR. BUSSARD:  Half hour.

4            THE COURT:  Half an hour.

5            MR. BUSSARD:  Something, give or take, not -- it's

6    not going to take up the whole morning.

7            THE COURT:  Yeah, okay.  Mr. Francomano.

8            MR. FRANCOMANO:  If anything, it's not going to be

9    long.

10           THE COURT:  Okay.  Some redirect.

11           MR. MARTINEZ:  We'll have Detective Taylor here, I

12   believe -- Detective Hunter -- were both involved in murder.

13   And we had planned to start -- or actually, it had been our

14   hope to get all the way through another civilian witness whose

15   identity has been disclosed to counsel, but given the law

16   enforcement witnesses we have at the beginning of the day, I

17   think we need to huddle amongst ourselves knowing that there's

18   going to be a ten-day break, whether or not we want to put

19   that person on.

20           THE COURT:  Have them make it halfway.

21           MR. MARTINEZ:  Have them make it halfway and wait

22   until the 18th to continue.  So if there are moving pieces, it

23   would involve not calling that person and subbing in two or

24   three law enforcement officers in his stead.  What we need to

25   discuss amongst ourselves are the people we're prepared to do

1     that with.

2          THE COURT:  All right.  That's a helpful glimpse of

3     what lies ahead.  Anything else from the government that we

4     can productively address this afternoon?

5          MR. MARTINEZ:  Just a question and that also relates

6     to scheduling.  Did I understand correctly from the Court's

7     calendar that there's a 4:00 o'clock proceeding tomorrow?

8          THE COURT:  Let's check that, what is it?

9          THE CLERK:  It's a 4:00 sentencing, Judge.

10         THE COURT:  Is it an 084 or -- 085?

11         THE CLERK:  I'm sorry.

12         THE COURT:  I mean a 484, 485 case?

13         THE CLERK:  Yes.

14         THE COURT:  We'll move that back to 4:45.  So please

15    advise Ms. Cusatis that I just so determined and an order

16    should go out immediately postponing that until 4:45.

17         MR. MARTINEZ:  Nothing further from us.

18         THE COURT:  How about on the defense side?

19         MR. BUSSARD:  No, Your Honor.  I -- the only thing I

20    might suggest, I might be the only one who doesn't go back to

21    the office once I go tonight, I believe, so when I get e-mails

22    saying there's a witness coming, I don't have my files with me

23    again.

24         THE COURT:  Well, I guess you better bring a lot of

25    files, there's a lot of possibilities.

1          MR. BUSSARD:  I might need two carts tomorrow.

2          THE COURT:  The government has, I think, given a

3     pretty good indication what the possibilities are.

4     Mr. Francomano.

5          MR. FRANCOMANO:  Nothing, Your Honor.

6          THE COURT:  Defendants are remanded to the custody

7     of the Marshal.  Counsel are excused.  Court's in recess until

8     9:30 tomorrow morning.

9          (The proceedings were concluded.)

10

11          I, Christine Asif, RPR, FCRR, do hereby certify that
      the foregoing is a correct transcript from the stenographic
12    record of proceedings in the above-entitled matter.

              _____/s/_____
13                   Christine T. Asif
                  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          INDEX

2   Witness Name                                   Page

3   Sergeant Glen Jackson

4       Direct Examination By Mr. Martinez ........................ 3

5       Cross-examination By Mr. Enzinna.......................... 23

6       Cross-examination By Mr. Bussard.......................... 25

7   Detective David Ciotti

8       Direct Examination By Ms. Hoffman......................... 28

9   Harry Caesar

10      Direct Examination By Mr. Martinez ....................... 34

11      Cross-examination By Mr. Enzinna.......................... 91

12      Cross-examination By Mr. Bussard.......................... 134
```

< Dates >
April 19th 6:5,
    16:19.
April 19th, 2013
    9:14, 14:11,
    17:2.
April 22nd 29:17.
December 6th, 2017
    1:19.
February 24th, 2016
    130:18.
March 23rd, 2013
    4:24, 5:8.
March 23rd, 2015
    6:18.
May 3rd, 2013
    136:9.
$25,000 135:10.
$3 7:4.
$50,000 95:8.
'01 49:21, 50:9,
    50:21.
'01. 51:3.
'08 116:18.
'09 116:18.
'16 4:8.
.22 80:3, 129:19,
    129:22.
.22. 83:5, 129:21,
    129:24.
.357 79:25, 80:2.
.357s 83:5.
.38 9:2.
.
.
< 0 >.
084 153:10.
085 153:10.
.
.
< 1 >.
1 8:3, 8:11, 14:24,
    15:16, 21:15,
    21:24, 22:4.
1. 19:1, 19:14,
    70:18.
10 8:21, 9:12, 58:6,
    88:11.
10. 4:20, 7:13,
    8:12, 25:18,

81:2.
101 1:48.
10:42 21:20.
11 16:11, 23:20.
11. 14:8, 15:17.
12 38:9, 91:21,
    92:6.
134 155:23.
14 93:4, 94:8.
15 66:3, 66:7.
15-minute 66:9.
18 92:20, 93:4,
    94:7, 105:8.
18th 152:22.
19 105:8.
1977 91:14.
1995 92:21.
19th 5:20.
.
.
< 2 >.
2 15:2, 15:3, 15:5,
    15:7.
2. 30:7.
20 38:8, 56:23,
    91:21, 92:6.
2001 38:4, 47:18.
2002 36:17, 38:2,
    38:5, 47:18,
    91:16, 92:5,
    104:20.
2003 39:11.
2004. 39:11.
2006 29:4.
2010 39:18, 39:20,
    47:23, 50:19,
    92:10, 92:12,
    92:15, 102:9.
2010. 47:7, 50:18.
2012 113:10,
    118:20.
2013 4:11, 4:19,
    5:20, 16:19,
    19:16, 21:19,
    21:20, 27:4,
    29:13, 39:19,
    51:20, 53:24,
    54:15, 56:15,
    57:2, 57:17,
    63:16, 70:20,

72:13, 74:12,
    75:17, 85:25,
    87:3, 98:6, 101:4,
    113:8, 113:10,
    118:8, 127:13.
2013. 4:14, 29:17,
    51:10, 58:25,
    98:5, 138:3.
2016 36:24, 37:3,
    95:7, 97:16,
    132:14.
20th 19:16, 21:9,
    21:19, 21:20.
21 4:3, 4:5.
21201 1:49.
22 43:21.
22nd 45:8.
22s 35:19, 43:1.
23 155:9.
23rd 4:19.
2400 6:23, 18:14,
    20:17.
2466 18:11, 18:14,
    18:20, 19:7, 21:4,
    21:10, 21:25,
    22:13, 54:16,
    55:11, 56:9,
    56:22, 67:8,
    72:10.
24th 67:15, 76:4,
    76:19, 81:10,
    81:11, 82:1,
    82:21.
25 155:11.
25. 76:6.
25th 4:16, 6:17,
    56:21, 56:22,
    57:22, 57:24,
    57:25, 58:3, 58:7,
    58:10, 64:14,
    71:8.
26th 57:22.
27th 29:24, 30:9.
28 155:15.
29th 57:23.
2:00 77:6, 88:11.
2:10 88:15.
2:10. 88:11,
    88:17.
.

.
< 3 >.
3 19:17, 22:4, 38:9,
  155:7.
30 80:9.
300 119:11.
300-some 119:16.
33s 35:19, 43:1,
  43:21.
34 155:19.
35 53:20.
357s 80:2.
36 67:11.
36. 18:12, 54:17.
37. 76:24.
38 53:12.
3:00 77:6.
.
.
< 4 >.
4 8:6, 8:7, 8:9,
  8:22, 22:4.
4- 95:2.
40 34:8, 91:12.
400 30:8.
427 29:24.
484 153:12.
485 153:12.
4:00 153:7, 153:9.
4:30 144:5,
  144:16.
4:30. 144:16,
  144:23.
4:45 140:17,
  153:16.
4:45. 153:14.
4th 1:48.
.
.
< 5 >.
500 95:2.
54. 5:13, 57:6.
.
.
< 6 >.
6'3" 119:11,
  119:15.
609 98:13, 99:2,
  100:25.
609. 99:6.

66. 55:21.
.
.
< 7 >.
75. 56:11.
.
.
< 8 >.
8 17:4, 17:8,
  50:12.
8. 16:22.
83 53:6, 78:23.
.
.
< 9 >.
9 50:12.
9. 52:24.
91 155:21.
911 29:21, 30:4,
  30:11.
9:30 141:2, 141:16,
  151:9, 151:19,
  151:24, 154:8.
9:30. 151:25.
9:45 2:16.
_____/s/_____
  _____ 154:15.
.
.
< A >.
A. 1:27.
able 5:7, 10:22,
  12:18, 49:16,
  62:24, 64:21,
  79:23, 81:19,
  87:17, 129:11,
  132:1, 132:24,
  135:13, 140:3,
  148:8, 151:16.
above 8:9, 8:15,
  15:5, 15:20.
above-entitled
  154:13.
absolute 141:22.
Absolutely 142:2,
  145:21.
abstract 100:16.
accept 134:19.
acceptable 90:20,
  91:1.

access 44:20,
  135:13.
accompanied 11:15.
accomplished
  17:20.
according 144:2.
Accordingly 140:25,
  143:8.
account 142:24.
accountable
  110:22.
accurate 136:14.
achieve 106:21.
acknowledging
  2:17.
across 7:7, 9:1,
  50:24, 64:22,
  81:16, 96:24,
  117:8, 131:17,
  133:8.
Act 80:10, 149:8.
action 112:18.
active 51:19.
activities 39:2.
actuality 111:24.
Actually 2:15,
  12:25, 13:21,
  50:25, 54:22,
  57:15, 64:15,
  67:10, 73:1,
  100:6, 111:9,
  114:1, 125:13,
  125:20, 152:13.
add 51:3.
added 35:15.
addition 9:12.
additional 147:14.
address 19:6, 70:19,
  70:21, 76:3,
  140:24, 153:4.
addressed 139:10,
  139:24.
addresses 43:15.
adequate 150:8.
adjudication
  100:2.
adjust 3:6, 33:18.
administrative
  86:7.
admissible 62:7,

99:6, 100:3,
100:12.
admit 10:4, 12:21,
13:17, 84:22,
96:8.
admitted 25:17,
67:1, 84:12,
84:16, 84:20.
advantage 47:15,
103:19.
advice 143:1,
143:13.
advise 143:9,
153:15.
advising 142:2.
affairs 3:24, 4:7,
4:9.
affiant 19:9.
affidavit 19:15,
19:18, 22:3, 22:6,
26:11, 26:14,
26:23, 71:20,
72:16, 74:16,
74:17.
affiliated 35:11.
affirmed 147:15.
afoot 101:1.
afraid 30:22.
afternoon 90:17,
91:8, 91:9, 134:2,
134:3, 145:6,
146:16, 153:4.
afterwards 82:9,
113:2.
age 50:11, 105:4,
106:16.
agencies 96:12,
96:20.
agency 63:15, 96:23,
114:18.
agenda 89:16.
Agent 33:6, 61:21,
96:18, 97:2, 97:3,
114:20, 114:24,
137:3.
agents 127:12,
128:16, 128:19.
ago 11:25, 38:2,
97:14, 98:14,
101:4, 133:3,

135:8, 138:7,
142:4.
agree 6:16, 100:9,
134:5, 134:8.
agreement 36:20,
97:21, 97:23,
138:5.
ahead 17:20, 64:9,
64:10, 64:21,
67:19, 74:2, 92:4,
112:9, 116:8,
120:24, 126:16,
131:23, 132:11,
146:7, 149:4,
153:3.
ain't 35:14, 51:3,
75:14, 86:24,
115:18, 129:20,
129:24, 132:25.
air 95:3.
al 1:10.
Alan 1:37.
alert 75:1.
alike 64:18.
alive 62:4.
alley 6:24, 18:15,
63:1, 123:4,
123:11.
alleyway 59:15.
allow 65:21, 88:3,
100:20, 100:22,
101:13, 139:12,
140:18, 141:6,
146:11.
allowed 55:12, 79:4,
79:7, 106:12,
112:9, 132:21,
143:6.
allowing 60:23.
allows 142:18.
almost 119:11,
119:15.
alongside 47:14,
48:6, 51:2.
already 10:13, 12:4,
13:12, 47:2,
47:14, 48:2, 60:3,
60:11, 81:19,
83:8, 83:10,
85:22, 97:17,

119:3, 132:16,
144:18, 144:22.
ambush 79:8, 84:14,
148:7.
Amendment 137:21,
137:25, 138:6,
139:6, 139:15,
141:21, 142:7,
142:14, 142:18,
142:23, 143:6,
143:12, 143:14,
144:8, 144:9,
145:13, 145:20,
147:1, 147:11,
147:16, 148:23,
149:22, 150:12,
150:19.
AMERICA 1:5.
American 28:5,
33:9.
among 65:21, 88:2.
amongst 43:21,
152:17, 152:25.
amount 38:1, 50:11,
135:11.
analytical 148:17.
Answer 5:25, 49:22,
90:12, 100:15,
106:17, 106:18,
107:7, 107:8,
107:9, 108:24,
108:25, 116:8,
130:7, 130:21,
130:24, 137:8,
141:24, 142:8,
142:9, 142:22,
145:14, 145:17,
147:2, 149:1,
151:5.
answered 80:18,
80:19, 126:14.
answering 146:25.
answers 101:14,
147:3.
Anybody 11:22,
37:18, 44:20,
57:14, 78:5, 78:8,
81:25.
apartment 108:7,
130:9.

apologize 12:8,
33:5, 84:8, 97:13,
103:1, 130:6.
appearance 119:14,
151:10.
application 19:23,
26:23.
applied 111:13.
apply 18:22, 106:5,
112:6.
appoint 143:8,
143:14.
appointed 144:7,
145:5, 149:7.
approach 9:18,
16:22, 60:9,
65:10, 98:10,
137:12.
approached 20:16.
appropriate 90:22,
142:14, 142:17.
approved 19:25,
109:10.
Approximately 68:25,
93:4, 113:10,
118:16, 118:19,
118:21, 118:23.
April 4:13, 5:20,
19:16, 21:9,
21:19, 21:20,
29:13, 72:13.
area 26:3, 40:4,
55:4, 55:6, 55:9,
58:12, 68:7, 71:8,
77:20, 80:21,
83:23, 111:22,
113:9, 113:16,
114:11, 115:13,
117:18, 120:13.
armed 79:24.
Around 34:12, 39:11,
42:8, 46:4, 47:8,
48:16, 48:19,
59:16, 72:19,
73:15, 75:24,
85:3, 107:1,
107:2, 113:10,
113:25, 114:2,
114:9, 114:11,
116:3, 118:16,

118:19, 118:23,
119:16, 120:7,
125:7, 125:23,
126:1, 126:6,
130:19.
arranging 140:15.
array 7:23, 8:4,
8:5, 9:3, 9:9,
9:13, 9:22, 11:21,
11:23, 13:4, 13:6,
14:11, 15:1,
16:10, 16:17,
20:21, 23:22,
25:19, 72:1.
arrays 6:3, 7:11,
10:9, 12:1, 12:3,
18:1, 23:16,
23:18, 25:14.
arrest 18:2, 18:6,
21:1, 85:16,
98:17.
arrested 18:8,
18:10, 18:18,
20:25, 67:7,
67:12, 68:6,
70:24, 98:5, 98:6,
135:1.
arrive 32:9.
article 15:11, 52:6,
52:13.
articles 65:22,
65:23, 88:3,
141:6.
Asif 1:46, 154:11,
154:16.
asks 145:18.
aspect 13:19,
104:13.
aspects 108:5.
assert 148:23,
149:22, 149:25,
150:18.
asserted 61:14.
assigned 48:2,
48:4.
assignment 3:23,
4:10.
assist 29:20, 72:21,
72:22, 143:15.
associated 26:3.

assumed 125:21.
ATF 36:25, 37:23,
63:17, 95:12,
96:25, 114:19,
114:20, 125:3,
127:12, 128:16,
128:19, 131:24.
attached 21:18.
attack 46:22.
attempt 139:7.
attempted 7:7,
36:17, 38:3, 38:6,
38:16, 39:16,
47:18, 91:19,
92:6, 96:4,
96:5.
attempts 18:23,
19:24.
attend 88:8.
attention 4:13,
29:16, 58:25,
70:22, 71:2,
126:8.
Attorney 99:10,
99:17, 125:3,
126:13, 127:13,
148:1, 148:3,
148:13, 149:4.
attributed 12:6,
12:9.
Audio 17:16,
48:16.
AUSA 1:25, 1:27.
author 19:20.
authority 112:19.
automatically 85:16,
93:21.
available 10:21.
Avenue 6:24, 19:7,
20:17, 40:2,
57:21, 58:10,
82:12, 103:2,
114:10, 114:11,
138:3.
Avoid 65:24, 88:5,
141:8.
aware 26:1, 26:4,
26:20, 27:2,
99:14, 111:2,
138:19.

away 7:7, 124:10,
    124:12, 148:19.
.
.
< B >.
B. 1:33.
baby 55:13, 75:23.
background 104:2,
    104:5, 104:9,
    104:16, 105:16,
    109:3, 109:10.
backing 148:17.
backside 23:25.
bad 138:12.
bags 58:24.
bail 85:10, 85:11,
    85:14, 94:4, 94:5,
    135:8, 135:10,
    135:12.
bailiffs 106:1.
Barclay 45:8.
barely 128:22.
Based 13:12, 14:1,
    17:25, 22:18,
    26:1, 43:25,
    47:20, 51:4.
basically 10:19,
    105:19.
basis 100:17,
    100:22, 139:22.
bathroom 55:7.
bear 148:16.
beard 52:8,
    119:12.
beat 84:20.
beating 107:1.
became 7:10, 35:4,
    45:10, 86:18,
    86:20, 110:3,
    110:10, 110:11.
become 35:21, 35:23,
    36:2, 41:13,
    48:7.
becoming 42:24.
bedroom 54:20,
    54:24.
Beforehand 107:25.
began 7:9, 10:4,
    47:12, 47:23,
    63:23, 102:12.

beginner 35:24.
beginning 62:18,
    139:1, 152:16.
begins 7:21,
    19:18.
behalf 36:25,
    37:25.
behind 30:13, 67:17,
    80:9, 96:7.
believe 4:19, 5:20,
    7:4, 8:8, 9:21,
    15:23, 39:15,
    82:15, 99:20,
    118:17, 121:14,
    122:1, 135:7,
    152:12, 153:21.
believed 31:1, 51:5,
    122:12, 122:16.
believes 44:1.
below 25:23.
Ben 34:23, 34:24,
    34:25, 35:3.
Bench 9:20, 14:7,
    60:10, 62:16,
    65:13, 90:19,
    90:24, 98:11.
beneath 14:19.
benefit 81:3, 99:9,
    99:21, 99:24,
    143:1.
benefits 100:8.
Besides 54:9, 55:5,
    77:5, 107:22.
best 13:20, 81:23,
    84:18.
better 129:5, 136:7,
    153:24.
Beyond 24:12,
    99:7.
BG 114:3.
Bgf-related
    138:24.
BGF. 16:9.
big 111:20, 112:11,
    112:12, 119:12.
bigger 5:6, 136:7.
bike 4:6, 59:14.
bill 132:2.
binders 17:9.
bit 3:13, 5:6,

25:18, 29:11,
    32:5, 75:11,
    76:13, 84:25,
    90:25, 100:7,
    111:1, 121:24,
    147:10.
Black 6:25, 20:16,
    21:4, 31:16,
    34:14, 34:16,
    44:8, 71:4, 72:11,
    82:3, 82:4, 112:9,
    122:9, 122:10.
blackout 43:8.
block 6:23, 18:14,
    20:17, 30:8,
    67:18.
Blood 57:13, 58:2,
    58:9, 71:14,
    71:16, 112:25,
    113:7.
Bloods 38:21, 57:15,
    57:16, 57:19,
    57:23, 58:13.
blow 126:2, 126:3.
blown 51:6, 84:15.
bodily 37:11, 37:14,
    37:18.
bodyguard 42:2.
book 17:19.
Booking 49:18,
    49:20, 50:10,
    50:15, 103:14,
    103:16, 116:15.
books 17:19.
born 91:14.
bottom 8:3, 8:11,
    8:17, 14:22,
    14:24, 15:24,
    19:8.
box 3:5, 7:21, 28:5,
    28:11, 33:16.
BPD 2:10, 6:10,
    29:6, 99:17.
braids 119:12.
Branch 38:15.
break 65:14, 65:16,
    66:19, 74:11,
    82:1, 82:3, 86:2,
    87:25, 88:1, 88:9,
    90:21, 102:5,

131:22, 136:2,
152:18.
breaking 58:18,
137:10.
Bredar 1:18.
briefly 4:4, 7:16,
23:1, 23:20, 25:8,
71:21, 88:21.
bright 80:11, 80:12,
103:13.
brighter 81:8.
Bring 2:6, 31:20,
31:22, 32:11,
39:7, 46:15,
66:13, 77:18,
88:22, 90:15,
134:24, 140:11,
140:21, 141:19,
153:24.
bringing 39:6.
broke 108:20.
broken 38:8, 54:20,
55:1, 80:3.
bronze 80:1.
Brook 81:19, 83:8,
83:9.
brother 43:2, 43:20,
44:6, 45:7, 53:13,
74:4, 79:18,
84:21, 109:25,
110:4, 110:7,
110:10, 111:5,
112:2, 120:17,
120:21, 120:22.
brothers 40:14,
53:14, 78:4,
110:11, 113:25,
115:22.
brought 35:2, 39:8,
39:12, 49:19,
89:11, 139:9,
148:18.
bubble 44:11, 45:6,
45:11, 45:12,
120:2.
building 30:13.
bull 129:4.
bullet 63:3, 67:5.
bumped 86:4, 86:9.
bumping 83:25.

bunch 40:14, 115:21,
129:4.
burden 140:6.
Burnett 64:17,
64:23, 64:24.
burnt 83:3.
bush 41:4, 41:18,
44:13, 45:24,
45:25, 107:1,
107:3, 111:15,
111:21, 115:13.
bushman 40:22,
40:24, 42:17,
42:18.
bushmen 41:2.
business 37:21,
43:19, 43:20,
107:14, 113:24,
133:18.
busted 9:1.
butt 77:15.
buy 95:22.
.
.
< C >.
C-a-e-s-a-r 33:22.
C-i-o-t-t-i 28:2,
28:17.
C. 44:12, 86:20.
cafeteria 117:11.
calendar 153:7.
called 3:1, 28:7,
30:4, 30:11,
33:13, 34:15,
50:25, 67:21,
72:23, 73:7,
74:22, 75:9,
76:18, 77:4, 79:7,
80:18, 89:15,
108:10, 116:14,
123:20, 131:5,
131:25.
calling 75:1, 134:5,
152:23.
calls 2:20, 31:6,
31:17, 31:18,
31:19, 33:3, 49:4,
87:2, 87:5,
109:20.
Cambone 34:23,

34:24, 35:1,
35:4.
camera 81:13,
109:18.
camera'd 48:15.
cameras 48:16.
car 49:5, 109:16,
109:18.
card 30:25.
care 112:15,
128:4.
career 94:10.
carry 42:7, 46:15,
104:13.
carrying 46:10,
80:10.
cars 48:19.
carts 154:1.
case 13:13, 36:22,
41:22, 44:9, 45:8,
46:8, 48:24,
65:20, 65:23,
65:24, 66:2,
67:18, 88:2, 88:4,
88:7, 96:6, 113:6,
130:13, 131:20,
131:24, 138:18,
139:2, 139:21,
140:10, 141:3,
141:7, 141:11,
144:11, 153:12.
cases 27:4, 48:4,
72:12.
catch 78:8, 82:6.
catching 81:15.
caught 49:13,
81:11.
cause 19:24, 60:13,
112:12.
caused 104:5.
CD 16:22, 17:1,
17:4, 17:8.
celebrities 42:1,
104:15, 108:5,
108:6.
Cell 7:4, 7:6, 39:7,
117:20.
Central 7:17, 29:8,
49:18, 49:20,
50:9, 50:15,

103:14, 103:16,
116:15.
certain 42:23,
72:12, 91:25,
100:4, 110:16,
115:14, 144:2,
148:1.
certainly 99:13,
100:16, 138:20,
139:19.
certify 154:11.
cetera 14:16, 99:11,
138:5.
chain 44:10,
120:24.
chair 3:12, 33:25.
chairs 91:1.
chance 51:7.
change 6:13, 22:18,
96:2, 127:25.
changes 22:18.
charge 40:16, 40:19,
41:3, 41:18,
42:15, 45:23,
46:1, 46:4, 74:8,
84:1, 115:12,
117:3, 120:17,
120:22.
charged 101:4,
101:7, 101:11.
charges 97:24, 98:8,
98:23, 99:3,
99:11, 100:10,
101:5, 101:6,
101:9, 101:21,
101:23, 102:1.
charging 138:18.
chasing 58:4.
cheap 113:22.
check 108:19,
153:8.
chicken 77:6.
Chinese 76:21.
choices 150:6.
chose 49:16, 51:9.
Christina 1:27.
Christine 1:46,
154:11, 154:16.
Christy 33:6,
137:4.

chronological
102:8.
CI 30:22, 31:1.
Ciotti 27:25, 28:3,
28:6, 28:17,
28:22, 155:13.
circling 67:18.
circumstances 20:25,
142:15, 142:19.
City 3:22, 4:2,
28:24, 34:10,
34:11, 35:9, 37:5,
39:24, 49:1,
49:15, 63:17,
96:16, 96:17,
101:9, 124:15,
135:5.
civilian 112:22,
112:24, 113:6,
152:14.
claimed 57:13.
clean 83:2.
clear 26:10, 99:2,
139:1.
CLERK 2:23, 3:4,
3:11, 28:5, 28:10,
28:13, 28:18,
33:9, 33:10,
33:16, 33:23,
153:9, 153:11,
153:13.
client 128:2, 129:2,
145:9, 149:18.
clients 60:13,
138:24.
Close 17:19, 37:19,
56:22, 69:2,
86:25, 91:25,
92:1.
clothing 15:12,
52:6, 52:13.
clout 125:25.
CO 39:6, 86:9.
co-conspirator
61:22, 61:24,
62:2.
Coast 35:2.
coat 80:11.
cocaine 56:19,
146:22.

codes 43:21.
coherent 140:8.
Cokesbury 75:25,
76:1, 76:3, 79:19,
82:12, 82:13,
82:17, 82:20.
coldest 36:9,
36:10.
collect 17:22.
color 80:1.
colored 6:25.
colorful 52:8.
combine 34:23.
comes 14:3, 22:22,
61:16, 96:24,
126:7.
coming 17:4, 57:21,
61:23, 77:19,
103:15, 148:7,
153:22.
command 44:10,
45:12, 120:25.
commander 45:14,
45:21, 46:2,
111:19.
comments 8:12, 8:20,
9:7, 9:23, 13:9,
16:15, 23:25.
commits 10:18.
committed 54:1,
54:5, 138:1.
commodity 106:8.
common 55:4.
communicate
146:11.
community 49:24.
commute 114:6.
companies 108:21.
company 87:18, 95:2,
106:3, 135:21.
compelled 141:22.
compensation
100:11.
complaint 7:17,
14:16.
complete 6:3, 9:9,
9:13, 12:1, 12:2,
16:17.
completed 7:23,
18:2, 20:21,

22:1.
completely 44:5.
complexes 108:8.
compli- 138:15.
comports 107:6.
concept 120:10.
concern 150:13.
concerned 31:4,
  90:6.
concerning 10:5,
  83:14.
concerns 37:13,
  37:15, 37:17.
conclude 60:13.
concluded. 154:9.
conclusion 139:3.
concrete 63:11,
  67:5.
condition 126:5.
conduct 139:13,
  141:11.
conducted 26:21,
  70:25.
conference 9:20,
  14:7, 60:10,
  62:17, 65:13,
  90:20, 98:11.
conferences 90:24.
conferred 99:10,
  149:11, 149:14.
confident 99:5.
confidential 27:5,
  47:12, 71:4, 71:6,
  71:7, 71:9.
confirm 111:9.
conflict 58:16,
  112:10, 112:12,
  139:1.
conflicts 138:18.
confused 107:2.
confusion 140:2.
connection 18:3,
  42:6.
consequence 113:2.
considerations
  142:23.
considered 35:3,
  47:5, 51:18,
  117:18, 117:19.
considering 61:8,

138:18.
consists 108:7.
conspiracy 60:22.
Constitution 141:22,
  142:7, 145:14,
  147:2, 147:12.
Construction 94:14,
  94:15, 95:2,
  135:21, 135:23.
consult 66:3,
  114:22, 114:24,
  141:13, 143:5,
  145:9, 149:21.
consultation
  149:17.
contact 59:22, 60:2,
  65:3, 65:25,
  68:16, 68:17,
  88:5, 141:8.
contacted 47:25.
contain 20:20.
containing 21:22.
contents 17:4.
context 35:13,
  101:8.
continue 14:6,
  66:16, 91:2,
  107:11, 139:8,
  148:3, 148:14,
  149:22, 149:23,
  149:24, 150:18,
  150:20, 150:23,
  151:10, 152:22.
continues 72:4.
contract 104:25,
  105:23, 106:2,
  108:6.
contracts 105:19,
  106:2, 106:5,
  106:15, 108:17.
controlled 120:13,
  146:22.
controlling 96:18.
conversation 30:21,
  50:24, 62:22,
  73:12, 74:15,
  76:15, 76:17,
  77:2, 77:8, 77:11,
  79:16, 79:23,
  83:12, 83:17,

83:20, 84:7,
  84:10, 84:13,
  84:15, 84:22,
  133:15, 147:14,
  147:15.
conversations 51:4,
  66:23, 121:6.
conveyed 74:18.
convicted 99:3.
conviction 36:15,
  38:3, 38:5, 38:7,
  39:17, 98:19,
  99:6, 100:2,
  100:5.
Cookie 56:10, 56:12,
  67:13, 67:24,
  68:10, 68:25,
  69:8, 69:19,
  78:15, 78:21.
cooperate 6:13.
cooperating 43:15,
  44:2, 44:4, 44:16,
  100:12, 111:3,
  111:6, 111:10.
cooperation 36:19,
  97:21, 97:23,
  138:4.
cooperative 5:23,
  7:10, 12:1.
cop 85:7, 102:5,
  136:1.
copy 13:11, 21:21,
  22:21, 26:18,
  26:22, 69:14,
  69:21, 72:25,
  73:15, 73:16,
  125:9.
corner 8:17, 14:22,
  15:24, 18:14,
  44:6, 54:18,
  81:11, 81:21,
  82:4, 135:24.
correctly 21:23,
  110:15, 129:23,
  153:6.
cost 143:9.
Counsel 27:17,
  89:16, 90:19,
  100:20, 134:22,
  134:23, 138:21,

139:5, 139:9,
139:10, 140:15,
140:16, 143:18,
144:7, 144:23,
146:17, 149:14,
152:15, 154:7.
counter 128:6.
Couple 31:19, 47:14,
60:3, 62:19,
62:23, 64:18,
78:4, 82:9, 85:11,
87:1, 93:19, 94:3,
94:5, 98:14,
120:6, 120:8,
127:7, 128:7,
133:9.
course 71:13.
court. 14:5, 62:14,
65:18, 101:18.
courtroom 15:9,
52:4, 52:11,
60:20, 66:7,
88:15, 90:23,
137:16, 137:19,
137:20, 140:11,
140:13, 141:20,
142:4, 143:22,
144:15, 145:25,
147:9, 148:19,
148:20.
courtroom. 2:11,
66:5, 66:14,
88:13, 90:16,
137:14, 140:22,
141:18.
cover 17:18, 51:5,
56:17, 117:25,
126:2, 126:4.
Crack 56:19,
136:16.
crap 129:4.
Crazy 105:20.
Crime 29:9.
crimen 100:5.
Criminal 1:9, 98:15,
98:16, 99:23,
100:1, 100:2,
142:16, 149:8.
Crip 112:25.
Crips 38:22.

crisp 99:2.
cross 57:22, 57:24,
58:10, 88:24.
Cross-examination
13:18, 22:25,
23:2, 25:9, 91:4,
91:6, 133:25,
138:8, 139:4,
142:6, 145:15,
155:9, 155:11,
155:21, 155:23.
cross-examined
146:17.
crossed 58:3,
148:2.
crossing 98:19.
crutches 119:19.
culpability 62:9.
culpable 60:13.
currency 7:4.
currently 3:24, 4:8,
28:22, 29:12,
36:22, 42:3.
Cusatis 153:15.
custody 32:11,
32:14, 64:25,
86:7, 154:6.
cut 77:23, 79:19.
cutting 79:18,
82:18.
cuz 16:8.
.
.
< D >.
D-a-v-i-d 28:16.
daily 95:21,
139:22.
damage 95:1.
dark 6:25.
date 4:18, 19:11,
19:15, 39:12,
113:10, 127:14,
127:15.
Dating 36:24.
David 27:25, 28:6,
28:16, 155:13.
Dawnyell 6:9, 20:14,
63:25, 65:1, 65:3,
65:8, 80:12,
81:14.

day 36:8, 70:24,
77:9, 80:2, 83:11,
83:16, 85:7,
93:16, 93:17,
93:18, 93:22,
109:8, 118:22,
121:4, 125:6,
125:22, 130:25,
131:7, 131:8,
131:12, 133:14,
135:1, 137:3,
139:17, 140:12,
140:14, 151:8,
152:16.
days 60:2, 60:3,
62:19, 62:23,
85:11, 93:19,
94:3, 94:5.
DEA 48:5, 48:6,
48:7, 48:9, 48:18,
48:23, 49:3, 49:4,
49:8, 49:23,
50:16, 50:22,
51:4, 51:5, 96:14,
102:15, 102:16,
109:13, 109:15.
dead 11:5, 60:11,
60:25, 61:1, 75:7,
80:22, 82:19.
deal 46:22.
dealing 37:17,
95:12, 97:18,
104:14, 107:22,
112:11, 114:24,
115:18, 115:21.
dealings 56:12,
57:15, 96:22.
dealt 41:25, 46:9,
47:1, 57:25, 58:3,
75:23, 96:18,
98:14, 103:14,
104:7, 115:11,
117:21.
death 37:18, 78:11,
78:13, 78:20,
129:3, 133:12.
decide 112:14,
112:23, 142:20.
decided 110:6,
149:24.

Deck 105:20.
decline 145:14,
  151:4.
decorum 90:22.
deducted 98:1.
deep 101:16.
defend 42:3.
Defendant 1:12,
  1:29, 1:35, 1:39,
  15:15, 36:22,
  134:18.
Defendants 12:19,
  62:9, 143:3,
  144:22, 154:6.
Defender 138:14,
  138:23.
defense 15:13,
  46:11, 46:12,
  89:15, 100:20,
  134:23, 138:21,
  153:18.
defer 140:10.
delay 33:5.
delaying 59:4.
delivery 94:21.
den 55:9.
deny 67:19.
depart 27:21, 33:1,
  151:14.
Department 3:22,
  4:2, 5:16, 26:14,
  27:3, 29:3, 64:2,
  86:8, 96:16,
  96:18, 99:11,
  123:17.
departments 49:1.
depends 111:20.
depicted 15:1, 15:7,
  25:23.
describe 94:20,
  109:3, 119:9,
  119:10.
described 21:21,
  74:15, 76:14.
description 13:2.
desire 145:13.
detail 71:24.
Detectives 20:14,
  31:8, 32:1, 47:15,
  50:9.

determination
  62:9.
determinations
  13:14.
determine 139:16.
determined 32:3,
  153:15.
determining 44:3.
develop 12:18.
devices 48:18.
Diagnostics 85:21.
diagonal 8:15,
  15:20.
dialed 87:13,
  131:24.
dictionaries
  141:14.
dictionary 66:3.
died 16:9.
different 10:16,
  14:2, 22:18,
  22:22, 31:20,
  38:13, 38:17,
  89:7, 89:8, 96:19,
  96:20, 96:23,
  100:7, 108:21,
  117:1, 122:21.
differently 22:13.
differing 96:11.
dig 59:6, 133:7.
dime 58:24.
dimes 136:13.
dining 69:15, 69:24,
  69:25.
dinner 32:7,
  113:23.
Direct 3:16, 4:13,
  28:20, 29:16,
  34:2, 58:25,
  70:22, 71:2,
  138:7, 155:7,
  155:15, 155:19.
direction 67:14,
  67:15, 100:7,
  141:1.
directions 67:22.
directly 28:13,
  33:18, 37:1, 90:4,
  95:19, 118:6,
  120:2, 120:8.

dirt 101:15.
dirty 86:22.
disclose 94:18.
disclosed 89:13,
  98:15, 152:15.
discovering 74:16.
discredit 50:2.
discuss 65:20, 88:1,
  88:2, 141:3,
  141:4, 141:5,
  152:25.
discussing 88:21.
discussion 78:1,
  126:20.
dismissed 99:4.
dismissing 100:10.
dispose 67:16.
Distribute 17:14.
distributed 17:10.
distributing
  17:11.
distribution 98:6,
  101:5.
District 1:1, 1:2,
  4:7, 5:16, 28:24,
  29:8, 29:9, 29:10,
  29:12, 29:14,
  31:21, 31:25,
  65:7, 69:1,
  69:4.
disturbance 92:1.
Division 3:25, 4:6,
  6:11, 29:9,
  29:10.
divulged 27:5.
doctrine 10:17,
  10:19, 12:22,
  60:18, 61:2.
document 7:16, 8:13,
  14:15, 19:2, 70:3,
  99:7.
documents 27:6.
Doing 26:17, 47:7,
  67:3, 68:15,
  71:22, 94:15,
  94:21, 94:23,
  94:25, 95:15,
  97:25, 100:21,
  102:3, 104:9,
  104:16, 107:20,

108:4, 121:15,
121:16, 121:18,
121:21, 135:21,
147:23.
dollars 120:6.
dollars. 120:8.
done 41:25, 69:12,
80:5, 86:11, 93:1,
112:15.
door 18:16, 54:23,
98:22, 103:9,
103:11, 124:8,
124:11, 124:19,
124:21, 126:4,
126:20, 127:11,
131:15, 137:18.
doorway 124:17,
124:19.
dot 5:3, 5:4.
Double 40:16, 41:5,
42:12, 42:14,
42:17, 42:19,
43:4, 47:8, 47:24,
48:15, 50:1, 51:1,
51:15, 110:6.
draw 30:12.
dreads 119:12.
drive 48:19.
driver 42:2.
driving 48:15,
114:9, 114:13.
Drug 29:11, 98:6,
98:17, 101:4,
101:5, 101:9.
drugs 39:5, 39:7,
40:14, 49:2,
53:23, 56:16,
56:18, 56:20,
56:24, 57:3,
57:24, 58:1, 58:2,
58:18, 58:21,
58:23, 64:13,
68:5, 72:20,
93:25, 120:14,
121:11, 135:24,
135:25, 136:8,
136:9, 136:15,
138:2.
due 37:11, 147:22.
dues 119:21.

duly 3:1, 28:7,
33:13.
dumb 86:23, 120:23,
131:22, 131:25,
132:4.
dummy 103:11.
duty 29:17.
dwell 134:24.
dwelling 21:3,
72:9.
.
.
< E >.
e-mails 153:21.
Earlier 15:23,
23:21, 40:7,
41:10, 71:15,
73:7, 78:6, 78:17,
80:2, 85:24,
86:17, 97:20,
98:4, 109:24,
123:13, 129:13,
129:15, 130:15,
131:7, 131:12,
132:12, 145:5,
146:16, 147:16.
early 89:19,
139:21.
East 29:24, 30:9,
38:13, 41:19,
83:23, 115:8,
115:9, 115:10,
115:13.
Eastern 5:16, 29:9,
31:21, 31:25,
65:7, 67:24,
68:24, 69:1,
69:4.
eaten 32:6, 32:8.
ECI 38:13.
editorializing
109:1.
effect 9:24, 60:17,
148:24.
efficiently
139:25.
eight 38:8, 93:5,
94:7.
Either 36:12, 38:21,
42:22, 58:16,

77:15, 77:16,
83:21, 106:5,
111:15, 121:4.
elaborate 30:24.
Elliott 55:12,
55:15, 55:22,
57:1, 125:7,
125:25, 128:2,
128:5.
emergency 95:1.
employed 28:23,
105:3, 105:5.
employer 108:12.
employment 106:13.
encyclopedia 66:3.
encyclopedias
141:13.
end 52:12, 113:25,
117:3, 137:2.
ended 39:17, 40:15,
41:18, 42:1, 48:5,
59:7, 65:7, 96:20,
113:22.
enforcement 10:5,
27:6, 47:12,
63:13, 63:15,
64:8, 136:9,
152:16, 152:24.
engaged 39:2.
enough 47:6, 81:17,
84:9, 100:20,
103:13, 131:22,
132:4.
enter 3:4.
entered 2:11, 66:14,
90:16, 140:22.
entire 61:20,
111:22.
entitled 134:18.
equation 139:9.
escort 121:14,
121:16, 121:18,
121:20.
escorted 86:8.
especially 40:6.
Esquire 1:31, 1:33,
1:37, 1:41.
Essentially 31:19,
31:20, 100:11.
Essex 140:13.

establish 19:24,
   95:20.
estimate 81:23.
et 1:10, 14:16,
   99:11, 138:5.
evening 29:16,
   97:12.
event 67:2, 105:25,
   106:11, 118:22.
events 22:18,
   24:12.
eventually 6:16,
   32:9, 75:6.
everybody 50:12,
   77:17, 104:14,
   116:4, 117:3,
   117:17.
everyone 17:20.
Everything 39:5,
   43:5, 57:21,
   111:17, 148:10.
everywhere 38:14.
Evidence 10:19,
   13:12, 25:17,
   107:7, 140:5.
evidentiary 60:12.
evidently 149:11.
exact 38:1, 39:12,
   43:7, 68:4, 73:10,
   129:20, 135:11.
exactly 31:2, 61:1,
   82:20, 97:11,
   99:24, 108:4,
   118:22, 149:7.
Examination 3:16,
   28:20, 34:2,
   66:16, 91:2,
   138:20, 139:11,
   155:7, 155:15,
   155:19.
examined 3:1, 28:7,
   33:13.
example 20:14,
   44:23, 71:8.
Exception 10:6,
   61:15.
excluding 10:18.
Excuse 64:19,
   103:12, 106:25,
   140:12.

excused 27:17,
   27:20, 32:23,
   33:1, 140:12,
   140:14, 141:16,
   144:23, 151:8,
   151:13, 151:21,
   154:7.
execute 21:9.
executed 21:19.
execution 22:13.
executive 41:24.
Exhibit 4:20, 7:13,
   7:14, 9:12, 14:8,
   16:22, 16:23,
   18:12, 19:1,
   23:20, 25:18,
   30:6, 52:24,
   54:17, 55:21,
   57:6, 70:18, 76:6,
   76:24, 81:2.
expect 139:24.
expense 48:13.
expenses 95:21.
experience 43:25,
   47:20, 107:21.
explain 6:20, 20:24,
   45:19.
explained 7:7,
   11:25, 14:9,
   64:23, 65:2,
   80:19.
explanation 98:23.
exposed 65:22, 88:3,
   141:6.
exposure 43:13,
   44:1.
extent 138:4,
   138:6.
external 141:13.
extortion 39:5.
extra 124:17.
eyesight 81:16,
   82:5.
.
.
< F >.
F. 1:31.
face 28:5, 33:9,
   102:25.
facilities 38:10,

135:5.
facility 39:14.
fact 12:21, 23:15,
   37:15, 37:19,
   44:3, 48:14,
   64:23, 80:17,
   84:17, 96:6, 97:8,
   98:5, 99:18,
   109:15, 113:21,
   120:17, 127:20,
   131:14, 131:22,
   136:1, 138:19,
   143:11, 144:8,
   144:17, 147:10,
   149:6, 149:24.
facts 20:6, 66:1,
   88:7, 141:10.
factual 24:7.
Fair 47:6, 98:19.
fairly 22:19.
fall 43:9, 86:21.
falsi 100:5.
falsify 96:8.
familiar 34:15,
   120:10, 124:15.
Family 21:4, 31:16,
   34:16, 72:11,
   141:5.
far 26:20, 27:1,
   82:11, 124:10,
   124:12, 134:4,
   138:8.
fast 51:10, 84:25.
faster 106:17.
fault 83:10, 129:20,
   130:4.
FCRR 1:46, 154:11.
February 97:16,
   132:14.
Federal 1:47, 107:7,
   138:14, 138:23.
federally 101:11.
feel 150:8,
   150:11.
feeling 150:16.
feet 95:2, 124:18.
fellow 141:4.
felony 36:14, 98:18,
   99:6, 100:5.
felt 49:14, 75:3,

142:9, 148:6.
few 20:2, 36:14,
  45:19, 77:13,
  135:7, 142:3.
Field 8:12, 9:7,
  16:15, 46:24,
  47:1, 47:3,
  47:5.
fields 7:19.
fifth 148:24.
figure 44:15,
  99:23.
file 90:10, 99:16.
filed 10:4.
files 153:22,
  153:25.
filled 44:19.
final 44:11, 44:13,
  111:16, 129:1.
finally 72:9.
finance 35:3,
  45:15.
find 50:2, 62:24,
  64:8, 69:13,
  69:23.
fine 73:11, 92:2.
finish 12:7, 116:9,
  125:15, 125:18,
  132:10.
fire 82:10.
fired 83:4.
fish 100:20,
  101:16.
fishing 100:21.
five 15:17, 16:5,
  69:2, 69:3,
  73:22.
Flag 28:5, 33:9,
  90:3, 104:24,
  105:2, 105:8,
  108:18.
flat 117:14.
flats 117:17.
flexible 144:12.
flip 71:25.
flood 95:1.
Floor 1:48, 54:20,
  54:25.
focus 82:22.
following 14:5,

20:2, 20:19,
  62:14, 65:18,
  83:11, 101:18.
follows 3:2, 21:19,
  28:8, 33:14.
foot 7:8, 9:2,
  29:7.
Force 63:17, 96:20,
  121:21.
forced 121:22.
foregoing 154:12.
forfeiture 10:6,
  10:12, 10:17,
  10:19, 60:18,
  61:2, 61:3,
  61:15.
forget 138:21.
formed 35:3.
forth 14:3, 100:3,
  100:6.
forward 3:13, 28:4,
  33:8, 51:10,
  83:11, 84:25,
  90:18.
foster 115:9.
Found 60:11, 69:19,
  82:19, 117:24.
foundation 12:18.
four 15:17, 20:1,
  84:17, 95:15,
  101:4, 124:18.
fourth 71:19,
  126:18.
Fox 35:13, 35:14,
  35:16, 35:17,
  35:18, 35:25,
  36:2, 36:4, 36:8,
  41:10, 41:13,
  41:15, 41:20,
  42:25, 43:25,
  44:25, 51:14,
  51:16, 109:25,
  110:4, 110:5.
foxes 41:1.
fragment 67:5,
  123:9.
FRANCOMANO 1:41,
  2:5, 27:13, 27:14,
  32:21, 32:22,
  32:24, 62:12,

152:7, 152:8,
  154:4, 154:5.
free 97:25.
freely 9:9, 16:17,
  138:1.
frequented 71:7.
friends 141:5.
front 3:13, 11:21,
  17:18, 18:16,
  54:23, 64:15,
  82:11, 99:7,
  132:6.
fucked 9:2.
full 35:21, 35:23,
  36:4, 51:16,
  51:18.
full-fledged 109:25,
  110:4, 110:7,
  110:10, 110:11.
functions 14:3.
furtherance 60:21.
.
.
< G >.
G-l-e-n 3:9.
gained 95:14, 95:16,
  99:21, 99:24.
game 79:7, 98:19.
gang 12:17, 34:18,
  34:19, 43:15,
  45:1, 57:12,
  71:14.
Gary 149:8.
gas 48:13, 77:5.
gatekeeper 42:15.
gathering 102:3.
gave 7:10, 20:15,
  41:15, 69:5,
  72:24, 73:1, 73:4,
  74:9, 79:9, 99:17,
  133:8.
Geho 47:21, 47:25,
  48:2, 48:3.
general 14:1,
  140:20.
gentleman 6:24, 7:2,
  134:4.
gentlemen 2:13,
  3:20, 4:22, 8:19,
  14:9, 16:6, 17:17,

34:6, 65:20, 74:7,
87:25, 88:9,
90:17, 90:18,
140:24.
genuinely 31:4.
Gerald 1:10, 1:29,
15:8, 15:9, 23:8,
91:10.
get-go 98:3.
gets 13:16, 90:2.
getting 24:23,
48:11, 57:25,
59:7, 83:22, 92:1,
98:2, 107:2,
112:19, 136:4.
girl 75:23, 77:14,
77:25, 131:15.
girlfriend 55:17,
56:8.
girls 131:16.
give 6:16, 24:7,
42:22, 61:24,
120:5, 120:8,
125:20, 129:11,
129:22, 131:23,
132:24, 141:23,
152:5.
given 43:1, 111:23,
142:15, 143:14,
144:11, 144:15,
144:21, 144:22,
152:15, 154:2.
gives 112:8.
giving 63:10, 84:4,
94:18, 130:21.
glasses 52:8.
Glen 2:21, 2:25,
3:9, 89:10,
155:5.
glimpse 153:2.
GM 4:20, 18:12,
30:6, 54:17, 58:6,
67:11, 76:24,
81:2.
gold 80:1.
gold-ish 80:1.
Google 30:7.
gorilla 36:8.
grab 64:25.
grand 130:17,

130:19, 132:6,
132:15.
granted 10:7.
Gray 41:7, 41:8.
grazed 9:2.
Great 123:1.
greatest 139:2.
green 52:14, 74:3,
74:6, 75:9, 78:1,
78:5, 78:6, 128:8,
128:17, 128:20,
128:25, 129:2,
129:8.
green-lighted
74:24.
grew 34:12, 45:9,
115:9.
ground 63:3, 63:11,
67:4, 67:5, 123:8,
142:8.
grounds 9:25,
151:7.
group 46:22.
groups 117:2.
grow 34:11.
guard 105:3, 105:5,
105:14, 107:17,
108:16.
guards 106:7,
106:13.
Guerilla 21:4,
31:16, 34:16,
72:11.
guess 13:23, 13:25,
38:4, 59:14,
101:9, 130:13,
153:24.
guessing 9:24,
11:16, 13:9,
13:18, 13:22,
16:7, 24:1,
24:4.
guilty 36:17.
gun 39:8, 39:12,
42:7, 63:2, 68:5,
83:2, 129:17.
guns 49:2, 67:22,
83:1, 129:13,
129:15, 129:25.
gunshots 80:22,

82:15.
guy 42:12, 83:23.
guys 7:5.
.
.
< H >.
H-a-r-r-y 33:21.
hair 119:12.
Half 14:24, 152:3,
152:4.
halfway 152:20,
152:21.
hall 117:15.
hallway 55:5.
hand 2:24, 33:11,
73:3, 81:4, 81:12,
89:18, 89:20,
125:4, 125:8,
125:13, 126:9,
127:19, 128:6,
128:9.
handed 30:25, 73:15,
124:22, 125:8,
125:16, 125:23,
126:10, 126:19,
127:3.
hands 111:24,
112:2.
handwriting 7:19,
8:9, 8:12, 8:14,
14:17, 15:5,
15:18.
Handy 8:8, 18:7,
18:8, 18:18,
20:22, 20:25,
22:8, 25:25, 26:2,
26:5, 72:5,
122:1.
hang 118:5.
hanging 118:6,
133:15.
happen 12:21, 75:5,
99:3.
happening 60:18,
126:6.
happens 75:5,
90:13.
hard 45:9.
harm 37:11, 37:14,
37:18.

Harry 33:4, 33:12,
  33:21, 155:17.
Hayden 63:21, 63:23,
  97:3, 97:18,
  114:20, 114:25,
  137:3.
head 16:9, 65:15,
  74:4, 113:25.
healed 114:9,
  114:12.
hear 78:1, 79:15,
  82:7, 83:17,
  124:20, 128:22,
  129:5, 144:6,
  144:17.
heard 24:10, 40:22,
  77:8, 80:22,
  82:15, 84:9,
  84:23, 89:8.
hearing 93:12,
  139:13, 139:14,
  140:25.
Hearsay 9:25, 10:7,
  10:24, 10:25,
  60:20, 61:12,
  61:15, 61:16.
Heights 55:25, 56:1,
  56:3, 56:5.
held 4:5, 29:5,
  43:3, 68:18,
  93:11, 93:13,
  98:18, 110:19.
hell 8:25, 36:9.
help 17:10, 42:23,
  48:23, 64:8,
  72:22, 77:15,
  77:16, 96:8, 98:2,
  100:24, 120:5,
  133:17.
helpful 21:12,
  153:2.
helping 114:13.
hereby 154:11.
Heroin 136:18,
  146:22.
hierarchy 112:13.
high 96:19, 106:8,
  122:21.
hire 105:21, 105:24,
  106:10.

hired 109:6.
hisself 42:3.
history 26:17,
  98:15, 98:16.
hit 45:9, 46:9,
  63:3, 63:4, 67:5,
  101:15, 115:15,
  123:9, 129:17.
Hoffman 1:27, 10:4,
  12:12, 12:16,
  27:24, 28:2,
  28:19, 28:21,
  30:14, 32:16,
  97:6, 155:15.
Hold 12:7, 81:15,
  115:17, 125:17,
  131:21, 137:5.
holes 36:9.
home 39:18, 39:20,
  39:21, 39:23,
  59:13, 141:1.
Homes 104:24,
  108:18, 115:9,
  124:15, 124:16.
Homicide 6:11, 64:3,
  64:11, 65:1, 65:5,
  65:9, 89:1,
  89:11.
Honorable 1:18.
Hood 53:16, 53:18,
  53:21, 122:7.
hoodie 81:12.
hoodies 6:25, 7:3,
  7:6.
hope 139:24,
  152:14.
Hopefully 140:16,
  140:19.
horse 39:6.
horses 39:6.
Hot 41:16, 41:17,
  115:12, 115:13,
  115:20.
hotel 75:16.
hour 88:9, 152:3,
  152:4.
hours 69:2, 69:3.
housed 116:19.
household 70:16,
  131:9, 131:11.

houses 69:25,
  95:23.
housing 37:2, 37:24,
  108:17.
huddle 152:17.
hundredth 127:25.
Hunter 89:1, 89:4,
  89:23, 89:24,
  152:12.
hustling 57:24,
  120:4.
.
.
< I >.
ID 11:15.
idea 138:12,
  139:2.
identification
  11:15.
identified 9:22,
  15:1, 15:15,
  20:22, 23:22,
  24:15, 26:5,
  26:24, 70:15,
  71:13, 72:2, 72:5,
  78:23.
identify 5:7, 11:20,
  15:11, 24:17,
  30:14.
identifying 22:7.
identity 119:17,
  122:8, 136:2,
  152:15.
Ids 10:9.
III 1:41.
illegal 136:11.
imagine 139:2.
immediately 140:15,
  153:16.
immunity 138:5.
Impact 29:9, 29:10,
  100:13.
impacted 90:5,
  98:24.
impeachment 100:3.
important 73:14.
impossible 49:18,
  49:20, 50:10,
  50:13, 82:6.
in. 2:6, 12:19,

14:3, 39:6, 61:16,
66:13, 140:21,
142:15, 142:19,
143:7.
inappropriate
107:10.
inch 33:25.
inches 92:2.
incident 18:24,
20:6, 93:16.
include 10:8,
22:3.
included 17:9, 22:6,
27:6.
including 13:18,
104:10.
inconsistent
100:24.
inconsistently
99:22.
Incorrect 95:9,
122:14, 122:17,
122:18, 125:22.
incriminate 141:24,
142:9, 147:3.
independent 66:1,
88:6, 141:10.
independently
99:1.
INDEX 155:1.
indicate 146:10.
indicated 24:8,
24:19, 25:2, 71:4,
71:7, 74:2,
134:18, 134:25.
indicates 23:15.
indicating 20:11,
20:16.
Indicating. 18:17,
82:13.
indication 99:16,
154:3.
indirectly 37:2.
individual 30:10,
48:5, 98:3,
113:6.
individuals 15:1,
40:14, 86:24,
96:21, 116:4,
122:7.

indulgence 22:10,
87:21, 133:20.
infiltrate 37:18,
102:4, 102:12,
102:16, 136:6.
infiltrating
103:3.
infiltration
37:12.
informant 47:13,
47:17, 48:1, 48:7,
48:9, 49:8, 49:23,
50:6, 50:16,
50:23, 51:2,
63:13, 92:12,
92:15, 92:19,
93:5, 94:8, 94:10,
95:5, 96:11,
99:12, 102:2,
114:16, 136:24.
information 8:20,
14:1, 20:20, 22:6,
24:7, 27:5, 59:24,
64:7, 71:3, 71:10,
74:12, 75:2,
100:16, 102:3,
133:8.
informed 127:23.
informing 95:19.
initial 5:21, 6:2.
initially 31:2.
initials 7:25, 8:2,
14:22.
injecting 140:4.
innocent 98:2.
inquire 101:19,
107:13, 134:20.
inside 21:25, 38:20,
67:16, 67:20,
69:10, 69:11,
70:14, 70:16,
73:3, 73:5, 73:20,
104:7, 117:1,
124:15, 125:24,
126:20, 127:4,
127:9, 127:10,
128:7.
instead 11:5, 107:1,
150:20.
instruct 102:16.

instructed 31:20,
43:24, 106:21,
122:11.
instruction 46:15.
instructions 7:22,
14:19.
intends 145:16.
interactions
109:22.
intercept 109:20.
interest 96:24.
interested 101:2.
interim 32:5.
internal 3:24, 4:7,
4:9.
internet 66:2, 88:7,
141:11.
interpretation
13:23.
interrupt 134:14.
intersection 4:16.
interview 5:21, 6:3,
6:6, 6:14, 7:9,
9:13, 11:23, 12:2,
12:14, 13:3,
14:10, 16:19,
17:25, 23:10,
25:13, 71:13.
interviewed 20:11,
20:15.
introduce 115:7,
119:5, 138:22.
introduced 40:10,
103:17, 103:22,
115:6, 115:7,
115:11, 115:14,
115:19, 115:23,
115:25, 118:25.
intrude 126:2,
126:3.
inventory 21:22.
investigation 7:18,
20:4, 21:13, 26:1,
49:3, 59:21,
59:25, 66:1, 88:6,
99:14, 141:10.
investigations
26:18.
investigative
48:22.

investigator 4:15,
  89:1, 89:5.
invocation 139:5,
  140:18, 142:13,
  144:17, 144:21,
  145:19.
invoke 142:18,
  143:6, 143:12,
  143:13, 144:10,
  145:13, 147:16.
invoked 137:20,
  139:15, 142:6,
  147:1, 147:11.
invoking 138:1,
  142:22, 144:8,
  144:9.
involve 152:23.
involved 43:22,
  90:19, 100:5,
  129:16, 152:12.
involvement
  146:21.
Islam 41:25, 104:8,
  104:14, 104:16,
  107:22, 107:23,
  108:9, 116:25,
  117:23, 117:24,
  117:25, 118:2.
issue 10:15, 10:16,
  60:12, 62:2,
  88:21, 89:13,
  90:3, 100:25,
  139:10.
issued 75:9,
  129:2.
issues 65:23, 88:4,
  141:7, 141:12,
  141:14.
.
.
< J >.
J-a-c-k-s-o-n
  3:10.
J. 1:25.
jacket 80:10,
  81:12.
Jackson 2:7, 2:21,
  2:25, 3:9, 20:12,
  20:15, 22:11,
  23:4, 89:5, 89:8,

89:10, 89:15,
  89:16, 90:5,
  155:5.
jail 40:8, 47:18,
  85:19, 98:25.
jails 38:17, 39:4.
Jamaa 43:19.
James 1:18.
Jeffrey 1:33.
Jencks 98:16.
jeopardy 49:14.
JKB-16-0363 1:9.
job 46:7, 94:12,
  94:13, 94:16,
  94:24, 105:10.
jobs 95:4.
John 1:41, 63:21,
  97:3, 105:20.
join 62:12, 103:10,
  145:24, 151:19.
joined 6:6, 6:13,
  78:21, 130:23.
joining 61:19.
joins 12:2.
joking 119:16.
Jolly 76:19, 76:20,
  77:1, 77:4.
Jones 1:35, 134:6,
  134:8, 134:12,
  146:18.
Judge 19:15, 68:17,
  134:13, 134:14,
  142:20, 153:9.
July 36:24.
June 127:13.
JURORS 2:14, 90:20,
  141:4.
Justice 46:6, 46:7,
  111:18, 111:19,
  149:8.
justification 60:23,
  62:4.
justify 100:22.
.
.
< K >.
K. 1:18.
keep 3:13, 56:17,
  58:10, 110:18,
  122:5, 133:17,

151:1.
Kenneth 1:35.
kept 67:18,
  125:11.
kid 75:4.
kill 30:1, 30:22,
  31:11, 31:12,
  31:13, 46:19,
  77:17, 128:17,
  128:20.
killed 12:19, 37:10,
  37:19, 74:10,
  78:8, 83:17,
  84:14, 85:1, 85:8,
  86:14, 86:18,
  93:17, 93:23,
  97:19, 98:3,
  112:17, 113:13,
  118:15, 118:17,
  131:18, 133:10,
  135:1.
killing 37:22,
  84:12, 84:16.
kind 31:3, 36:19,
  44:18, 56:18,
  76:20, 87:13,
  92:2, 99:2, 99:18,
  100:22, 138:5,
  141:8.
kinds 14:14, 37:24,
  39:2, 39:3, 42:21,
  48:22.
kitchen 21:22,
  21:25, 55:5, 55:6,
  70:1.
kitchen/dining 55:6,
  69:25.
knock 103:9, 103:11,
  124:18.
knocking 103:18.
Knowing 117:3,
  150:15, 152:17.
knowledge 10:1,
  11:2, 14:1, 54:4,
  54:7, 54:10,
  82:23, 110:20.
known 21:4, 40:5,
  46:20, 72:10,
  76:11, 85:22,
  134:20.

173

knows 60:25, 131:10,
  133:14, 134:18,
  134:19.
.
.
< L >.
Ladies 2:12, 3:20,
  4:22, 8:19, 14:9,
  16:5, 17:17, 34:6,
  65:19, 74:6,
  87:25, 88:9,
  90:17, 90:18,
  140:23.
landing 117:14.
landlord 113:23.
language 7:22,
  103:12, 147:21.
Last 3:8, 11:16,
  16:8, 20:24,
  21:15, 28:1,
  28:14, 28:15,
  28:16, 33:19,
  33:20, 33:21,
  87:1, 97:8, 97:10,
  121:19, 135:20.
lastly 21:3.
late 76:22,
  118:20.
later 18:8, 22:17,
  22:21, 32:13,
  43:1, 52:17, 60:3,
  67:20, 80:21,
  85:11, 94:3, 94:5,
  116:4, 118:12,
  130:25, 139:13.
latitude 13:16.
Laughing 64:19.
law 10:5, 27:5,
  47:12, 58:18,
  63:13, 63:15,
  64:8, 66:1, 88:6,
  102:5, 131:23,
  136:2, 136:9,
  137:9, 137:10,
  141:10, 142:18,
  152:15, 152:24.
lawful 142:14,
  142:16, 144:20.
lawfully 139:15.
laws 37:20.

lawyer 107:9, 138:9,
  139:13, 143:1,
  143:8, 143:15,
  146:8, 146:9,
  146:11, 149:7.
lawyers 140:25,
  142:6.
lay 113:24.
leaders 110:21.
learn 18:8, 32:13,
  42:25, 44:25,
  52:18, 59:12.
learned 22:17,
  22:22, 59:1,
  59:13, 85:1.
least 121:3, 140:2,
  144:13.
leave 22:21, 26:14,
  26:18, 26:22,
  66:6, 88:14.
leaving 63:2,
  77:19.
left 4:22, 9:1,
  21:21, 21:24,
  22:14, 26:24,
  27:2, 27:6, 54:22,
  64:21, 66:5, 69:4,
  69:13, 69:14,
  75:11, 79:20,
  80:14, 81:16,
  88:13, 123:25,
  128:6, 130:25,
  137:14, 140:1,
  141:18.
leg 63:4, 67:6.
legal 142:23,
  147:21.
legit 142:21.
legitimate 40:13.
leniency 99:18.
less 56:23, 73:22,
  82:5, 124:18.
lesson 35:16.
letter 125:8,
  125:24, 127:3.
level 117:18.
Lexington 29:11.
liable 110:19.
lie 50:8, 50:13.
lies 153:3.

lieutenant 45:14,
  46:2.
life 13:13, 31:4,
  49:14.
light 5:5, 74:3,
  74:6, 75:9, 78:1,
  78:5, 78:6, 128:8,
  128:17, 128:20,
  128:25, 129:2,
  129:8, 139:6.
lights 82:1, 82:2.
limitation 101:6.
limited 84:22.
line 8:15, 15:20,
  43:2, 57:25,
  86:21, 88:23,
  146:20.
lines 13:24, 15:17,
  16:5.
Lisa 97:3.
listed 72:3.
listen 84:6.
listened 17:4,
  18:1.
listens 112:4.
litigated 10:3.
Little 3:12, 5:5,
  16:2, 17:18,
  25:18, 29:11,
  32:5, 53:13,
  54:18, 55:9, 75:3,
  79:18, 81:8,
  84:25, 90:25,
  98:18, 100:7,
  111:1, 113:23,
  121:24, 124:17,
  128:23, 147:10.
live 36:8, 36:9,
  36:10, 36:11,
  46:21, 131:10.
lived 55:10, 75:24,
  113:12, 115:8.
lives 131:14.
living 40:1, 40:11,
  40:19, 41:20,
  53:23, 54:2,
  54:14, 55:17,
  56:9, 56:14, 57:2,
  58:14, 66:20,
  70:17, 73:18,

75:17, 76:1,
102:18, 113:14,
113:16.
locate 18:23,
30:4.
located 30:10.
location 7:18, 21:3,
26:19, 30:2, 37:2,
37:3, 64:10, 72:9,
75:16, 81:4,
94:19, 113:24,
126:8.
locked 38:4, 40:5,
85:4, 85:6, 85:9,
85:17, 85:20,
86:5, 93:20,
98:25, 116:24.
lodging 95:12.
log 35:15, 132:1.
logical 87:24.
logs 87:17, 87:19.
Lombard 1:48.
long-nosed 79:25.
longer 88:10,
145:19.
look 64:18, 66:2,
77:15, 88:7,
120:7, 122:19.
looked 9:12, 15:24,
23:21, 25:14.
looking 7:17, 18:13,
30:7, 100:21.
looks 88:23.
loop 88:23.
Lost 82:7, 82:14,
95:14, 95:15,
95:16, 117:24.
lot 57:23, 59:24,
103:14, 104:10,
104:12, 106:17,
109:10, 115:10,
117:22, 153:24,
153:25.
lots 105:22.
LTC 45:14, 46:2.
lunch 87:25, 88:1,
88:8, 88:9,
88:10.
lying 49:17,
128:23.

.
.
< M >.
ma'am 28:9, 28:24,
29:15, 29:19,
29:22, 30:3, 30:5,
30:8, 30:15,
30:19, 31:9,
31:23, 32:10.
mad 115:17.
maintain 90:23.
major 112:24.
Majority 36:5,
38:19.
male 71:4.
mama 55:13, 75:23.
Man 34:14, 60:25,
61:1, 119:10,
119:13, 122:9,
122:10.
manner 140:7.
map 58:5, 81:1,
81:6, 82:12.
maps 30:7.
March 4:13, 4:19,
29:4.
mark 5:6, 18:16,
54:23, 81:4.
marked 5:12, 18:25,
76:23.
Market 29:11.
Marquise 1:39.
Marshal 46:24, 47:1,
47:4, 47:5,
154:7.
Marshals 106:2.
Maryland 1:2, 1:20,
1:49, 34:10, 35:6,
39:3, 39:4.
materials 19:11,
98:16.
math 51:3.
matter 23:9, 61:13,
64:23, 88:8,
96:25, 117:2,
138:14, 141:23,
154:13.
matters 100:2,
112:2, 140:24.
Maureen 140:13.

Mccants 1:39.
Mcdonald 32:6.
MCIJ 38:14.
me. 9:25, 11:19,
24:1.
Meadows 138:20,
138:23.
mean 11:7, 31:7,
36:10, 39:19,
48:12, 49:21,
63:9, 67:3, 71:17,
76:8, 77:16,
83:10, 84:23,
100:14, 101:9,
103:9, 114:24,
126:1, 126:9,
128:4, 153:12.
means 43:20, 45:24,
74:7, 78:6,
111:20, 141:25.
meanwhile 139:12.
mechanic 94:25.
medical 86:8,
89:13.
meet 38:18, 51:22,
51:25, 52:9,
52:20, 53:2, 53:8,
53:16, 75:18,
80:6, 97:11,
100:4, 116:23,
117:5, 117:10,
117:23, 117:25,
118:2, 118:11,
139:12.
meeting 5:19, 40:15,
47:23, 65:8,
113:25, 115:5,
116:4, 127:12.
meetings 118:1.
member. 71:14.
members 38:18, 40:4,
40:11, 41:1, 45:5,
47:23, 48:19,
51:23, 53:22,
54:1, 54:5, 54:8,
54:11, 70:17,
112:6, 112:8,
115:2.
mention 13:3.
mentioned 34:24,

37:3, 37:13, 38:2,
38:17, 40:7,
40:18, 41:8,
44:14, 45:11,
46:12, 46:18,
47:7, 56:8, 59:24,
73:7, 80:23,
89:17.
mentions 12:4.
mess 75:22,
131:14.
messed 108:7.
messing 131:15.
met 5:15, 32:1,
38:23, 47:4, 57:4,
66:20, 72:24,
97:5, 97:8, 97:13,
97:17, 97:18,
109:2, 113:23,
115:1, 116:3,
116:7, 116:10,
117:7, 117:8,
117:21, 118:3,
118:5, 118:9,
118:12.
method 106:22.
microphone 3:6,
3:14, 28:14,
33:18, 33:25,
91:24, 109:15.
middle 81:18.
midst 117:21.
Mike 41:7, 41:8,
83:23, 84:1, 84:3,
84:4, 86:16,
86:18, 86:20,
102:25.
miked 48:15.
militant 104:9,
104:15.
military 45:13.
mind 140:21.
Mine 7:20, 19:10.
mingling 118:4,
118:5.
Minister 46:6, 46:7,
46:11, 46:12,
111:18.
minute 33:6, 67:20,
69:18, 80:9,

80:21, 86:9,
102:9, 113:10.
minutes 66:3, 66:7,
73:22, 88:11,
127:7, 128:7,
133:9, 135:7,
142:4.
misdemeanor
100:10.
mission 46:15,
46:18.
mistake 119:13,
119:15, 123:8.
mistaken 119:17,
128:22, 129:19.
mixed 64:18.
mm. 9:2.
Mo 57:10, 59:14,
60:4, 60:5, 60:11,
60:15, 62:18,
64:5, 71:4,
125:10.
MOD 45:15, 46:10.
MOF 45:15.
MOJ 45:15, 46:6,
46:9, 46:17,
111:18, 127:23,
128:25.
moment 8:4, 11:25,
14:25, 38:2, 39:1,
67:19, 68:1, 84:8,
88:23, 148:12,
150:13.
money 7:6, 8:24,
35:3, 37:23,
48:10, 48:11,
58:4, 59:2, 59:3,
95:4, 95:6, 95:11,
95:19, 95:20,
95:22, 119:25,
121:25, 122:19,
135:13, 135:14,
135:17, 136:22,
136:24.
Monroe 40:2, 40:3,
103:2.
months 42:11, 94:24,
113:17, 113:18,
118:15.
morning 2:2, 2:12,

2:14, 2:16, 3:18,
3:19, 23:4, 23:5,
25:11, 25:12,
28:12, 28:22,
34:4, 34:5, 65:16,
65:19, 77:6, 85:8,
89:3, 89:10,
91:12, 109:24,
110:8, 111:2,
140:20, 141:16,
145:17, 151:9,
152:6, 154:8.
mostly 45:8.
motel 77:24.
motion 10:4, 10:7.
motivation 100:13.
motivations 101:2.
mouth 127:24.
Move 17:20, 102:25,
113:19, 113:20,
118:22, 153:14.
moved 38:12, 39:24,
40:3, 51:11,
51:19, 51:22,
52:16, 54:16,
113:9, 113:21,
114:3, 114:15,
114:22, 114:25,
115:1, 116:6,
117:9, 118:8,
118:11, 118:13,
118:14, 118:18.
movement 35:1.
moving 113:22,
152:22.
MRDCC 85:22, 86:5.
multiple 38:12,
80:17, 80:18,
80:22, 82:1, 84:1,
131:10.
murder 36:17, 38:3,
38:7, 38:16,
39:17, 47:18,
84:11, 89:2, 89:6,
91:19, 92:6, 96:4,
96:5, 133:9,
152:12.
murdered 87:10.
murders 54:4,
54:9.

176

Murphy 104:24,
    108:18.
Muslims 57:23.
muzzle 82:10.
myself 64:22, 81:13,
    95:21, 104:13,
    115:7.
mystery 36:12.
.
.
< N >.
Name 3:7, 3:8, 7:18,
    14:16, 28:1,
    28:14, 28:15,
    28:16, 30:25,
    33:19, 33:20,
    33:21, 55:12,
    55:15, 56:9,
    64:17, 91:10,
    93:20, 122:5,
    122:7, 128:2,
    128:3, 155:3.
named 38:23, 42:12,
    47:21, 51:25,
    52:9, 52:20, 53:2,
    53:8, 53:16, 57:4,
    66:20, 71:4,
    75:18, 78:18,
    85:25, 93:20.
names 27:5, 122:4.
narcotics 135:14.
Nation 41:25, 104:8,
    104:14, 104:16,
    107:22, 107:23,
    108:9, 116:25,
    117:22, 117:23,
    117:24, 118:2.
near 4:15, 20:17,
    57:16.
nearby 146:8.
need 3:7, 33:19,
    42:23, 46:8,
    46:16, 72:22,
    114:9, 114:12,
    126:7, 133:17,
    140:24, 152:17,
    152:24, 154:1.
needed 42:4, 73:14,
    120:5, 131:3,
    148:12.

needs 65:1, 74:24,
    138:11.
neighborhood 12:13,
    14:2, 45:4, 45:7,
    46:1, 51:12,
    51:20, 51:22,
    53:24, 54:2,
    54:15, 56:15,
    56:25, 57:17,
    57:19, 57:20,
    58:21, 66:21,
    72:20, 75:11,
    75:24, 76:13,
    78:10, 115:2,
    115:5, 120:4,
    121:12, 131:14,
    138:3.
neighborhoods
    108:7.
new 22:19, 95:22.
news 65:22, 88:3,
    141:6.
Next 2:18, 7:21,
    7:25, 27:23, 28:5,
    33:2, 54:18, 65:2,
    71:12, 79:14,
    83:25, 85:8, 99:8,
    107:8, 107:9,
    109:1, 116:15,
    131:15, 132:3,
    137:23, 146:5.
Nickel 58:24.
nickels 136:13.
nickname 55:16,
    55:22, 56:10.
nicknames 34:13,
    57:9, 122:8.
night 11:17, 16:8,
    36:8, 77:9, 78:11,
    78:12, 78:13,
    78:20, 80:17,
    87:9, 90:8, 97:8,
    97:12, 121:19,
    130:8, 131:1,
    133:10, 133:12.
Nighttime 77:10.
No. 1:9, 8:6, 8:7,
    8:9, 8:22, 15:2,
    15:3, 15:5, 15:7,
    30:6, 84:12,

97:24, 102:22,
    109:9, 113:21,
    114:24, 119:15,
    119:23.
nobody 43:23, 47:3,
    47:4, 58:17,
    80:11, 114:13,
    119:17, 120:18,
    121:21, 121:22.
NOI 104:25, 105:1,
    108:19.
non 112:6, 112:8.
None 27:16,
    129:25.
nonsense 113:4.
Nope 107:22,
    136:19.
Norm 122:25.
normal 88:10.
normally 100:2,
    103:7.
North 38:15, 40:2,
    40:3, 57:21,
    103:2, 114:11.
Northeast 39:22,
    102:22, 103:2.
Northern 1:2, 28:24,
    29:10, 29:12,
    29:14.
nose 80:1.
nosey 126:3.
Noted 62:13.
notes 144:14.
Nothing 25:5, 35:18,
    36:12, 75:5,
    97:25, 98:2,
    99:13, 120:19,
    121:22, 133:22,
    148:2, 153:17,
    154:5.
noticed 2:16, 2:17,
    69:16.
Notwithstanding
    139:22.
November 118:18.
number 7:17, 14:16,
    24:11, 72:3, 72:4,
    74:20, 129:15,
    131:23, 131:24,
    132:2, 132:24,

132:25, 133:6,
133:9.
numbers 87:13.
.
.
< O >.
o'clock 88:11,
153:7.
O'TOOLE 1:33, 32:17,
32:18.
oath 2:24, 33:11,
36:2, 36:4, 41:13,
41:15, 66:17,
91:3, 132:14.
object 9:25,
107:10.
Objection 9:16,
9:17, 17:12, 60:7,
60:8, 60:14,
60:15, 61:12,
61:19, 62:12,
98:9, 98:12,
98:14, 98:20,
106:19, 107:11,
126:14, 134:10,
134:17.
obtained 11:13,
135:14, 135:16.
obviously 88:24.
occasion 25:13.
occurred 4:15, 20:6,
24:12, 96:9,
143:10, 147:6.
occurring 107:10,
118:22.
occurs 46:8.
Oct 75:18, 76:10,
76:11, 76:15,
77:14, 77:22,
77:25.
Octavia 75:18, 76:8,
76:10.
off-duty 105:17,
105:18, 105:20,
105:21, 105:25,
106:7, 106:8,
106:10, 107:15.
offense 100:10,
119:10, 128:4,
138:2.

offered 61:13.
Office 99:10, 99:17,
125:3, 126:13,
127:13, 153:21.
Officer 6:6, 13:17,
29:1, 33:1, 63:24,
64:16, 64:21,
64:22, 64:23,
67:21, 85:7,
85:15, 135:3,
136:8.
officers 12:15,
12:24, 59:19,
64:18, 67:23,
80:21, 106:12,
107:15, 152:24.
offices 31:20.
Official 1:47, 19:9,
154:17.
often 121:1.
old 34:7, 49:21,
50:12, 91:12,
104:23, 105:7,
105:8, 116:15.
Once 57:22, 59:20,
62:24, 84:22,
93:19, 111:12,
121:3, 140:12,
140:14, 153:21.
one. 125:6,
144:18.
ones 40:5, 47:2.
open 14:5, 61:16,
62:14, 65:18,
76:22, 77:5,
77:18, 101:18.
opened 98:22.
operates 35:5,
35:8.
opportunity 90:25,
103:18, 140:18,
145:8, 149:20,
150:3, 150:9,
150:17.
opposed 98:25.
option 140:7.
order 74:9, 74:23,
78:8, 86:16,
102:8, 110:23,
111:23, 112:8,

112:10, 129:11,
153:15.
ordered 86:15,
110:18.
orders 46:10,
46:16.
ordinary 112:15.
organization 34:15,
34:20, 37:17,
38:21, 45:17,
49:11, 75:6,
104:8, 112:11,
112:17, 112:25,
113:1, 117:2,
120:14, 120:15,
120:18, 136:5,
136:6, 138:25.
organized 45:1.
originally 12:1,
17:10, 34:22.
orphan 34:12.
Otherwise 12:22,
62:6, 100:8,
134:20.
ought 137:23.
ourselves 140:19,
152:17, 152:25.
out-of-court 60:17,
61:12.
outline 65:14.
outranked 11:11.
outside 37:21,
60:20, 67:7, 73:6,
80:12, 120:14,
127:5, 139:13,
140:25, 145:23.
overheard 79:23,
84:18.
overhearing 76:14,
83:12.
overnight 141:3.
overrank 45:24.
Overruled 14:6,
62:11, 62:15,
101:19, 126:16.
oversee 41:2.
overseer 45:23.
owe 97:24.
owed 59:1, 59:3,
121:25.

own 45:5, 97:25,
  105:19, 105:23,
  112:2, 120:19,
  123:23, 123:24,
  143:15.
owner 26:20.
owners 106:6.
.
.
< P >.
p.m. 21:20, 88:15.
PA 25:18.
packet 27:2.
Page 8:3, 8:11,
  14:24, 15:16,
  19:14, 19:17,
  20:2, 20:19,
  21:15, 70:23,
  71:25, 155:3.
pages 22:4.
paid 37:1, 48:9,
  48:10, 95:8,
  119:21, 119:25,
  135:12.
paper 26:25, 27:1,
  125:20, 137:11.
papers 123:17,
  123:25, 125:9.
paperwork 44:8,
  44:14, 44:18,
  44:19, 50:3, 50:4,
  69:23, 70:9,
  70:12, 87:12,
  111:7, 111:12.
paragraph 20:20,
  20:24, 21:16,
  71:2, 71:6, 71:12,
  71:19, 71:20.
paragraphs 20:2,
  70:24.
paranoid 86:24.
Park 55:25, 56:1,
  56:3, 56:5, 76:4,
  79:8, 79:19,
  81:18, 81:25,
  82:18, 82:19,
  82:20.
parking 54:19,
  105:22.
parole 85:12, 85:15,

93:11, 93:21.
part 6:2, 6:10, 8:3,
  26:24, 32:2,
  37:22, 38:20,
  56:1, 57:19, 64:1,
  71:21, 72:18,
  72:21, 83:22,
  96:4, 98:15,
  105:1, 108:11,
  112:22, 112:24,
  116:19, 119:23,
  120:1, 142:8.
participants 65:24,
  65:25, 88:5,
  141:8, 141:9.
participating
  141:12.
particular 63:18,
  90:4, 94:24,
  95:13, 98:17,
  139:11, 144:13.
parties 105:21.
party 140:5,
  140:6.
passed 50:25.
passing 58:19,
  133:13, 133:16.
past 41:23, 88:11,
  121:4, 147:23.
Patrol 4:6, 4:8,
  29:7, 29:8, 29:10,
  29:12, 29:13,
  64:16, 69:5,
  80:20.
Paul 1:31, 23:8,
  91:10.
Pause 33:7, 144:4,
  147:8.
pay 98:1, 101:15,
  120:1, 120:15,
  120:16, 120:24.
paying 120:8.
payment 100:11.
payments 36:24,
  37:1.
pen 25:21.
pending 36:22.
penitentiary 38:12,
  39:9, 104:11,
  116:11, 116:13,

116:15, 116:16,
  117:15.
Pennsylvania
  114:10.
Percocets 122:21.
perfect 92:2.
perfectly 90:20,
  91:1.
Perhaps 136:12.
period 4:14, 37:3,
  43:13, 47:11,
  51:11, 57:2,
  81:22, 82:14,
  85:3, 121:2.
periphery 138:25.
permanently 37:11.
permission 17:8.
permit 10:21.
permitted 62:5,
  100:23.
permitting 61:8.
Perry 40:15, 40:18,
  41:5, 41:16,
  41:21, 42:2, 42:7,
  42:10, 43:3, 47:8,
  47:24, 48:16,
  50:1, 51:15,
  103:23, 103:24,
  104:6, 109:3,
  109:12, 109:22,
  110:3, 110:6,
  114:4, 114:7,
  114:8, 114:10,
  115:18.
persist 144:19.
personal 10:1, 11:2,
  42:2, 54:4, 54:7,
  54:10, 82:23,
  120:7.
personally 96:22,
  97:17, 97:18,
  114:13, 132:21.
personnel 110:4,
  110:22.
persons 141:12.
persuade 101:1.
persuaded 12:21.
Peter 1:25.
petty 100:10.
PHA 7:13, 8:12,

8:21, 9:12, 14:8,
15:17, 16:11,
23:20.
PHI 5:13, 52:24,
53:6, 53:12,
53:20, 55:21,
56:11, 57:6, 76:6,
78:23.
phones 39:7, 79:5.
Photo 6:3, 7:11,
7:23, 8:6, 8:7,
8:9, 8:22, 9:3,
9:13, 9:22, 10:9,
11:21, 13:4, 13:5,
14:11, 15:2, 15:7,
16:10, 16:17,
18:1, 20:21,
25:14, 25:19,
78:23.
photograph 72:3.
photographic 23:16,
23:22, 72:1.
photographs 7:22.
physically 49:18,
49:20, 50:10,
50:13, 60:2,
82:5.
pick 8:5, 9:4,
16:12, 52:13,
67:16, 70:5, 94:4,
139:7, 140:1,
140:3.
picked 70:3, 93:18,
93:22, 94:2,
94:5.
picks 91:24.
picture 25:23,
67:11, 76:25,
83:24, 136:7.
pictures 55:20.
piddle 37:20.
piece 26:25,
49:22.
pieces 27:1, 79:9,
152:22.
pin 80:4.
pinch 89:15.
pink 5:3.
Piru 71:14.
pitch 82:3, 82:4.

pits 36:9, 36:10.
place 5:19, 20:7,
21:1, 26:20,
59:25, 62:23,
76:17, 106:11,
109:8, 113:22.
placed 2:24, 33:11,
48:16, 74:3,
75:14, 75:15,
75:16, 81:13,
86:7.
places 24:11.
placing 107:15.
plaid 15:13.
Plaintiff 1:7,
1:23.
plan 46:22, 101:16,
140:17, 140:20.
planned 152:13.
plans 89:12.
play 17:8, 128:23.
played 11:24,
23:9.
played. 17:16.
playing 83:1,
119:16.
plea 38:4.
plead 36:17, 137:9,
137:11.
Please 2:12, 2:22,
2:23, 3:5, 3:7,
15:12, 16:5,
17:14, 28:1, 28:4,
28:13, 33:8,
33:10, 33:17,
33:19, 34:6, 52:7,
66:3, 66:15,
88:12, 122:15,
125:15, 137:18,
140:13, 140:23,
141:16, 143:22,
144:25, 153:14.
plenty 131:13.
plot 46:14.
Plus 11:16, 16:8.
pocket 17:18,
122:20.
pockets 59:6.
podium 146:2.
point. 11:5, 61:20,

140:20.
pointed 67:22.
pointing 70:13,
86:2.
policy 22:18, 26:13,
26:18, 26:22,
27:3, 27:8.
political 35:1.
portion 5:21, 7:9,
8:11, 12:3, 14:15,
72:1.
portions 36:6.
position 10:2, 43:3,
49:12, 49:25,
50:7, 83:24,
109:11, 115:18,
145:12, 145:16,
150:19.
positioned 3:13.
positions 4:4, 29:5,
45:19, 45:21,
47:3.
positive 75:4.
positively 72:2,
142:3.
possession 101:4,
129:24, 129:25.
possibilities
153:25, 154:3.
possibility 89:18,
127:14, 131:12,
131:13, 133:2.
possible 82:16.
possibly 79:6.
postponing 153:16.
potentially 90:1,
98:23.
pounds 119:11,
119:16.
Powell 17:10, 17:15,
17:21.
power 111:24.
practice 26:13.
precise 63:22.
preference 139:7,
139:17, 139:23,
140:10.
premise 11:20.
premises 21:20,
68:19.

preparation 90:9.
prepared 11:6, 17:9,
  140:9, 143:8,
  143:14, 149:24,
  150:18, 152:25.
presence 57:16.
present 11:5, 23:11,
  23:13, 25:14,
  76:14.
presented 13:13,
  20:7, 20:9,
  141:12, 141:15,
  142:20.
presenting 140:5,
  140:8.
presents 65:23,
  88:4, 141:7,
  142:12.
Pretty 38:14, 38:19,
  38:20, 41:2,
  43:19, 43:20,
  43:22, 45:7,
  46:14, 47:2, 49:2,
  59:5, 71:21,
  71:22, 101:15,
  103:14, 107:18,
  110:25, 114:12,
  115:8, 115:12,
  117:3, 130:24,
  130:25, 154:3.
previously 71:5.
primary 4:14.
prior 23:13, 23:16,
  36:14, 41:23,
  47:20, 146:21.
prison 39:13, 52:16,
  91:16, 92:17,
  92:18, 92:24,
  93:2, 93:5, 93:7,
  93:10, 94:8,
  102:9, 102:21,
  102:22, 105:12,
  107:24, 108:1,
  108:2, 116:7,
  116:10, 116:12,
  116:20, 117:1,
  117:6, 118:1,
  118:7.
prisons 35:6, 38:14,
  39:3.

private 104:4,
  104:10, 104:18,
  105:3, 105:5,
  105:14, 107:17,
  108:16, 135:21,
  135:23, 146:14,
  149:17.
privately 143:5,
  143:9.
privilege 137:25,
  138:6.
probability
  101:10.
probable 19:24.
Probably 42:11,
  56:23, 73:22,
  80:9, 81:6, 82:4,
  82:9, 87:17,
  90:12, 95:11,
  105:13, 113:16,
  116:21, 118:12,
  121:3, 131:8,
  131:11, 132:1,
  138:9, 138:12.
probation 38:9,
  39:19, 85:12,
  85:15, 92:8, 92:9,
  93:7, 93:21,
  102:10.
problem 99:2,
  140:15, 144:1.
problematic 13:19.
problems 120:7.
procedures 44:9,
  144:2.
proceed 137:23,
  139:4.
proceeding 99:19,
  140:7, 144:22,
  153:7.
Proceedings 1:17,
  14:5, 62:14,
  65:18, 101:18,
  147:9, 154:9,
  154:13.
proceedings. 33:7,
  144:4.
process 42:24,
  148:17.
processing 31:21,

31:22.
Proctor 144:7,
  144:13, 144:15,
  144:25, 145:1,
  145:4, 145:7,
  145:11, 145:16,
  145:21, 145:23,
  146:1, 146:5,
  149:8, 149:10,
  149:11, 149:13,
  149:16, 149:19,
  149:21, 150:4,
  150:9, 150:17,
  151:16, 151:18,
  151:20, 151:22.
procurement 12:22.
procuring 62:10.
productively
  153:4.
profits 137:2.
program 76:13.
projects 104:23,
  105:9, 108:17.
promoted 4:8,
  83:22.
pronounced 40:17.
proof 140:6.
property 105:22.
prosecutor 68:16.
prosecutors
  121:19.
prospect 35:24.
protect 42:5.
protection 41:24.
protective 32:11,
  32:14.
protocol 22:20,
  111:17.
prove 49:16.
proven 113:7.
provide 105:25,
  106:10.
provided 8:20,
  106:15.
provides 10:17.
providing 22:7,
  71:9, 74:12.
Public 44:20,
  138:14, 138:23.
pull 25:18, 33:25.

pulled 50:8, 63:2,
  64:16.
pure 13:23.
purple 5:3.
purpose 19:22.
purposes 60:12,
  100:3, 139:1.
pursuant 10:6.
pursued 146:20.
pushing 125:11.
put 5:3, 11:21,
  13:20, 18:16,
  48:18, 50:5,
  67:10, 68:2, 68:3,
  68:4, 74:24, 81:1,
  82:2, 109:15,
  109:18, 115:15,
  128:5, 139:17,
  142:5, 142:22,
  145:14, 145:17,
  152:18.
putting 14:8,
  140:4.

.

.

< Q >.
Quentin 34:22,
  35:2.
questioning 64:11,
  67:25, 146:9.
questions 5:25,
  14:14, 22:24,
  27:12, 27:14,
  32:16, 32:18,
  32:20, 32:22,
  36:14, 78:12,
  87:1, 87:2, 87:23,
  91:11, 101:14,
  106:18, 107:6,
  107:8, 108:25,
  130:7, 134:25,
  145:14, 145:17,
  146:20, 146:25,
  147:2, 149:2,
  151:5.
quick 71:23,
  81:17.
quickly 14:14,
  67:15, 101:15,
  140:16.

quote 84:21.

.

.

< R >.
R. 1:41, 43:4,
  51:1.
racing 80:7.
radio 80:20.
rail 17:22.
raise 2:23, 33:10,
  98:13.
ran 64:22, 67:20,
  80:6, 80:8, 80:9,
  81:9, 81:10,
  117:8, 121:19,
  131:1.
Randy 40:17.
rank 3:23, 4:10,
  11:13, 12:17,
  19:9, 28:25,
  96:19.
Ranked 9:24, 11:8,
  11:9, 11:12, 16:7,
  24:1.
ranked. 11:6,
  11:14.
ranking 103:25.
rat 44:6.
rather 140:3.
Ray 89:1.
reach 62:24,
  81:18.
reaction 13:8.
reacts 13:6.
read 7:22, 8:19,
  13:3, 14:19, 16:5,
  21:16, 69:16,
  70:7, 71:19,
  71:22, 72:16.
reading 70:9,
  70:13.
ready 2:2, 66:11,
  88:19, 91:2.
real 44:12, 45:9,
  71:23, 86:23,
  95:6, 122:6,
  128:3.
really 43:22, 49:25,
  80:7, 94:10,
  100:19, 121:21,

128:3.
Reason 99:20,
  131:21, 135:25,
  140:9.
reasons 37:8,
  37:10.
rec 103:16, 117:10,
  117:15, 117:18.
recall 4:18, 5:19,
  64:7, 70:23,
  73:10, 73:11,
  76:14, 77:2, 77:8,
  82:23, 83:12,
  84:18, 86:4,
  127:2, 127:12,
  148:18.
receive 95:22.
received 21:18,
  95:18, 95:20,
  95:21, 99:16,
  143:13.
receiving 12:5,
  71:3, 100:8,
  143:1.
Recess 65:19, 66:9,
  66:10, 88:17,
  88:18, 141:3,
  144:5, 144:16,
  144:24, 154:7.
recite 36:6, 43:5,
  110:17.
recognize 7:14,
  11:22, 16:23,
  19:1, 80:11.
recognized 51:1,
  70:16.
recollection 57:14,
  127:1, 127:9,
  133:13.
reconnected 40:7.
reconvene 140:17.
Record 2:15, 3:8,
  13:22, 15:14,
  37:20, 58:6,
  61:24, 81:2,
  99:23, 100:1,
  134:23, 144:3,
  154:13.
record. 9:20, 60:10,
  65:13, 98:11.

182

recorded 10:8, 12:3,
    16:20, 17:1, 17:2,
    49:4, 109:22.
recording 48:18.
records 87:12.
recruit 35:18.
Redirect 27:15,
    88:25, 152:10.
Reed 55:12, 55:15,
    55:22, 57:1,
    125:7, 125:25,
    128:2, 128:5.
refer 134:18.
reference 29:24,
    141:14.
references 71:6.
referring 134:9.
refers 71:3.
reflect 2:15,
    15:14.
reflects 98:16,
    101:1.
refresh 127:1,
    128:21.
refuse 142:21.
regard 13:16,
    143:15, 144:11,
    147:1.
regarding 20:4,
    20:21, 54:4, 54:7,
    54:10, 66:24.
regardless 145:18.
regimes 41:19, 56:5,
    84:1, 84:6.
registered 48:7,
    102:2, 137:11.
regular 40:25, 41:1,
    64:16, 69:5, 95:1,
    112:13.
relate 65:24.
related 26:2,
    143:12, 146:21.
relates 153:5.
relation 99:11,
    99:12, 145:9.
relations 56:12.
relationship 37:14,
    47:21, 58:13,
    58:15.
release 138:22.

released 92:9, 94:2,
    102:9.
relevant 62:7, 99:1,
    141:10.
religious 108:20,
    117:2.
relocate 32:4.
relocated 37:4,
    37:7, 95:20.
relocation 32:4,
    32:9, 37:24,
    75:16, 76:13,
    77:24, 95:13.
remain 66:17,
    90:22.
remains 91:3.
remanded 144:23,
    154:6.
reminded 139:21.
removed 32:13.
rent 54:21, 55:2,
    113:22, 131:10.
rented 54:24.
renting 131:16.
repeat 122:15.
repercussion
    113:3.
report 59:18.
Reporter 1:47,
    144:12, 154:17.
reports 65:22,
    65:23, 88:4,
    141:6.
reposition 91:24.
represent 23:8,
    91:10, 134:4,
    143:2, 143:3,
    143:9, 143:16,
    144:7, 145:2,
    149:7.
representatives
    125:3, 127:12.
represented
    138:23.
represents 143:2,
    143:4.
reputation 75:5.
request 139:10,
    143:17.
required 88:25,

110:14, 110:16,
    149:1, 151:9.
residence 68:7,
    69:5, 69:6, 69:7,
    69:12, 69:20,
    69:23, 123:14,
    123:17.
residue 83:3.
resolve 139:5,
    139:14, 142:24.
resources 139:22.
respect 16:10,
    72:23, 112:2,
    120:4, 133:16,
    138:14, 141:11,
    141:23, 145:12,
    150:12.
respond 30:2.
Response 36:12,
    61:15, 134:25,
    142:5.
responsibility 42:6,
    43:7, 45:25,
    46:5.
responsible 13:15,
    46:10.
rest 114:1.
Restate 62:15.
result 98:18, 99:5,
    140:2.
retained 99:15.
retaliation 54:10.
retook 72:23.
retrieve 132:2.
return 66:7, 88:15,
    141:1, 151:9.
return. 21:16.
returned 78:10.
reviewed 22:3.
reviewing 70:23.
revise 150:19.
revocation 93:12.
revolver 80:4,
    129:19, 129:20.
revolvers 83:2.
ricochet 59:7.
ricocheted 63:4,
    63:11, 123:9.
rid 67:17.
ride 42:22, 69:5.

riding 114:11.
right-hand 8:17,
  14:22, 15:24.
rights 145:13,
  150:12, 150:15.
ripen 100:4.
rise 36:10, 36:11.
road 100:23.
rob 13:10, 24:8,
  46:19, 59:6, 59:9,
  67:2, 122:1,
  122:11, 122:13,
  122:17, 122:24.
robbed 8:22, 24:13,
  26:8, 57:25, 58:2,
  62:6, 63:2, 64:12,
  72:4, 122:22,
  123:6, 123:7.
robberies 22:20,
  26:17, 54:2.
robbers 123:4.
robbery 4:15, 4:18,
  4:23, 5:8, 6:17,
  6:20, 10:5, 12:4,
  18:3, 20:4, 22:20,
  24:25, 26:17,
  27:4, 59:12,
  59:25, 61:5,
  61:10, 62:5,
  62:18, 62:19,
  62:23, 64:4,
  66:24, 123:3.
robbing 39:5,
  67:2.
Rod 41:16, 41:17,
  115:12, 115:13,
  115:20.
roles 14:2.
rookie 35:18,
  35:23.
room 55:6, 55:7,
  69:15, 69:24,
  69:25, 70:1.
rooms 54:20, 54:25,
  55:2, 131:10,
  131:16.
rooted 13:25.
rough 144:13.
routinely 100:9,
  138:2.

row 124:16.
RPR 1:46, 154:11.
rule 10:7, 10:11,
  10:12, 43:7,
  43:15, 43:18,
  43:23, 61:15,
  62:11, 107:11,
  111:3, 112:1,
  112:6, 140:19.
ruled 10:14.
Rules 42:25, 43:10,
  43:13, 107:7,
  110:15, 110:19,
  110:22, 110:24,
  111:1, 111:2,
  112:4, 112:5.
rumor 77:18.
rumors 49:24.
run 8:25, 14:14,
  67:16, 83:22,
  89:3, 101:6,
  105:17, 105:18,
  105:23, 131:17.
running 41:4, 48:3,
  48:4, 81:16,
  89:14, 121:14,
  121:16, 121:22.
Russell 40:17.
.
.
< S >.
safe 64:10.
safety 37:8, 37:10,
  37:13, 37:15,
  37:17, 74:25,
  75:8.
sale 146:21.
San 34:22, 35:2.
sanction 37:22.
sanctioned 37:21,
  43:6, 46:8,
  46:9.
sanctions 84:5,
  111:12, 111:16.
sat 126:4.
satisfied 151:8.
saw 49:17, 71:20,
  73:20, 74:17,
  82:10, 123:18,
  125:13, 125:20,

  128:11.
say-so 44:11.
saying 10:24, 11:1,
  24:22, 44:22,
  47:17, 50:4, 50:8,
  50:21, 84:24,
  86:19, 122:5,
  125:22, 126:18,
  126:22, 127:2,
  127:24, 129:12,
  131:3, 142:16,
  148:15, 153:22.
says 10:20, 19:8,
  21:16, 71:12,
  72:1, 72:9, 128:9,
  128:12.
scare 123:9.
scene 4:23, 26:15,
  27:7.
scheduled 89:2.
scheduling 88:21,
  153:6.
scraped 67:5.
screen 4:22, 5:2,
  5:4, 14:8, 30:12,
  54:22, 67:11,
  77:3, 81:1.
scuffles 24:23.
sea 36:11.
sealed 67:23.
sealing 68:7.
searched 21:20,
  68:18, 68:20,
  68:23.
searches 141:11.
seat 28:10, 33:16,
  146:7.
seated 2:12, 66:15,
  137:18, 140:23,
  141:20, 144:25,
  146:8.
second 9:13, 14:11,
  19:14, 24:19,
  40:16, 40:18,
  46:4, 59:23,
  81:17, 91:23,
  103:25, 106:25,
  125:17, 137:5,
  146:10.
secondary 106:13.

seconds 80:9, 82:5,
  82:9.
secretary 45:16.
section 4:25, 8:21,
  9:23, 19:20,
  19:22, 20:3,
  23:25.
sector 104:4,
  104:18.
secure 105:22,
  108:6.
seeing 72:1, 72:7,
  74:17.
seem 31:4.
seemed 31:1.
Seems 61:16, 99:1.
seen 50:9, 84:24,
  87:16, 87:19,
  126:4, 126:9,
  126:11, 126:19,
  133:13.
sees 112:9.
seizure 19:5, 26:16,
  26:21.
sell 56:18, 56:20,
  56:24, 58:2.
Selling 39:5, 40:14,
  56:15, 57:3,
  57:24, 57:25,
  58:17, 58:23,
  64:13, 72:20,
  85:7, 85:9, 93:25,
  120:14, 121:11,
  135:3, 135:14,
  135:24, 135:25,
  136:8, 136:13,
  136:15.
send 43:5, 122:24,
  141:1.
senior 41:4, 42:18,
  115:13.
sense 140:7,
  142:16.
sensitive 89:17,
  89:20, 139:19.
sent 9:24, 11:16,
  13:10, 16:7, 24:1,
  24:8, 29:24, 43:9,
  59:8, 85:19,
  86:21, 108:8,

122:1, 122:13,
  122:16, 148:19.
sentence 38:6,
  38:10, 38:16,
  39:16.
sentenced 91:21,
  92:5.
sentencing 153:9.
separate 26:25,
  27:1, 62:2.
separately 139:13.
serious 44:12.
serve 38:10,
  110:21.
service 117:23,
  118:2, 121:14,
  121:17, 121:20.
serving 38:16.
set 45:7, 70:1,
  106:5.
seven 49:21, 92:23,
  93:1, 113:17,
  113:18.
several 48:14.
shape 89:4.
shared 64:7.
shirt 8:23, 15:13,
  52:8, 134:5.
shoes 95:22.
shoot 63:9, 67:4.
shooting 4:15, 4:18,
  4:23, 5:8, 6:17,
  10:6, 18:3, 20:4,
  59:25, 62:18,
  64:4, 66:24,
  123:8, 129:16,
  130:8.
shootings 22:19,
  22:22, 54:7.
shop 76:21.
short 75:19, 80:1.
shortly 39:23.
shot 7:8, 26:6,
  42:3, 59:7, 59:18,
  59:19, 63:3,
  63:10, 67:3, 67:4,
  70:15, 71:5, 74:5,
  84:20, 114:10,
  123:7, 123:8.
shots 82:8.

shouldn't 98:3.
show 4:20, 4:22,
  5:12, 7:11, 7:13,
  13:4, 13:5, 16:22,
  18:12, 18:25,
  21:15, 30:6,
  52:24, 54:17,
  55:20, 56:11,
  57:6, 58:6, 70:18,
  76:6, 76:23, 81:9,
  82:12, 83:2,
  111:7, 126:25.
showed 9:3, 14:11,
  23:18, 26:10,
  87:12, 131:25.
showing 25:17, 58:5,
  87:13.
shown 11:24, 23:15,
  25:19, 72:2.
shut 61:16, 124:21,
  126:4, 137:19.
sic 81:19, 128:6.
SID 72:3, 72:4.
side 30:8, 35:4,
  39:24, 40:1,
  40:12, 41:20,
  58:15, 58:17,
  75:22, 75:25,
  76:3, 76:4, 99:15,
  102:18, 102:21,
  103:2, 113:4,
  115:8, 115:9,
  115:10, 115:13,
  116:21, 135:22,
  139:18, 153:18.
sides 58:16,
  117:16.
sidewalk 124:7,
  124:9.
sight 78:8, 81:22,
  81:24, 82:7,
  82:14.
signature 8:15,
  8:17, 15:20,
  15:23, 15:25,
  19:8, 19:9, 25:21,
  25:24.
signed 19:12, 19:15,
  21:8.
silent 90:22.

silver 36:8.
similar 15:24.
simple 37:19, 96:6,
  100:14, 113:21,
  120:17, 131:14,
  131:22, 136:1,
  148:17.
simply 139:11,
  143:4.
sister 43:21.
sit 91:1, 113:3,
  136:3.
sitting 6:23, 67:13,
  83:1, 90:25.
situated 140:19.
situation 42:23,
  44:5, 46:7, 49:13,
  111:21, 120:16,
  121:5, 142:15,
  143:6, 143:16.
situations 148:2.
Six 7:22, 15:1,
  42:11, 82:5,
  113:16, 113:18,
  118:14.
skip 83:11.
slapping 77:14.
Slay 52:9, 52:11,
  52:15, 85:25,
  86:4, 86:9, 86:22,
  122:6, 134:5,
  134:7.
slide 3:12, 33:24,
  104:12.
slightly 88:10.
smacked 8:23.
smart 103:5,
  103:13.
smell 83:3.
smoke 122:20.
sneak 77:20.
sneaking 77:24.
snitch 44:7.
snitching 79:17.
so-called 41:1.
sold 53:23, 58:21,
  138:2.
solid 63:11.
Solidarity 104:24,
  105:1, 108:15,

  108:21.
someone 10:18,
  29:25, 44:15,
  50:4, 51:25, 52:9,
  53:2, 53:8, 57:4,
  100:10, 103:9,
  111:5, 112:18,
  120:13, 129:7,
  143:4.
somewhat 98:22.
somewhere 42:22,
  75:25, 118:23.
soon 82:3, 110:5,
  116:6, 118:11.
Sorry 20:20, 35:22,
  63:22, 73:19,
  77:23, 83:10,
  134:16, 143:23,
  153:11.
sort 65:15,
  138:24.
Sounds 90:12.
source 71:4, 71:6,
  71:7, 71:9,
  136:11.
sources 129:21,
  141:13.
south 30:8, 58:11.
Southeast 29:7.
speaking 121:4.
Special 41:22,
  137:3.
specific 84:9.
specifically 31:13,
  54:14, 110:14.
speculating 12:23.
Spell 3:7, 28:1,
  28:14, 33:19.
spent 37:23, 47:6,
  93:4, 94:7.
split 38:13,
  81:16.
spoke 47:2, 62:17,
  147:10.
spoken 90:3,
  148:3.
spot 65:16.
spots 78:5.
spotted 77:19, 79:3,
  84:14.

spring 4:11, 51:10,
  58:25, 74:12,
  87:3.
st 38:14.
stacks 11:19,
  16:9.
Stacks. 11:18.
stage 35:24, 43:8.
stakes 106:8.
stall 68:15.
Stand 11:4, 28:5,
  33:9, 90:21,
  90:24, 137:24,
  139:25, 144:15,
  146:2, 146:4,
  146:7.
standards 100:4.
standing 64:15,
  82:24, 82:25.
Starbright 105:2,
  108:22.
start 45:21, 91:11,
  92:19, 151:23,
  151:25, 152:13.
started 2:16, 31:5,
  34:21, 94:16,
  100:23, 110:5,
  114:24, 115:21,
  116:4, 125:10.
starting 55:1.
starts 92:1.
state 28:14, 33:19,
  43:23, 44:6,
  49:15, 70:16,
  97:24, 99:10,
  99:15, 99:17,
  99:19.
stated 62:25,
  79:3.
statement 6:16,
  7:10, 10:8, 11:3,
  11:15, 12:18,
  13:19, 13:24,
  17:1, 17:2, 20:16,
  22:7, 24:6, 61:13,
  69:14, 69:17,
  69:22, 71:22,
  73:16, 74:4,
  125:6, 125:9,
  128:6, 136:14.

statements 10:5,
   20:10, 44:21,
   60:17, 70:14.
States 1:1, 1:5,
   9:23, 125:3,
   126:13, 141:21,
   147:2.
stating 21:24,
   70:14.
station 67:24,
   68:11, 68:14,
   68:24, 77:5.
status 116:25,
   138:13, 144:11.
statute 101:5.
stay 49:3, 49:16,
   51:9, 55:13,
   68:13, 76:21,
   77:5, 102:8.
stayed 58:15, 59:16,
   73:6, 81:13,
   124:7.
stead 152:24.
steered 138:25.
stenographic
   154:12.
step 3:5, 28:11,
   33:17, 66:6,
   79:21, 88:14,
   124:17, 126:8,
   137:15, 143:21,
   144:1.
stepped 124:19,
   125:24.
steps 6:23, 59:14,
   59:20, 67:13,
   73:20, 124:16,
   124:25.
Stop 59:23, 68:1,
   69:18, 79:21,
   88:1, 107:4,
   134:13, 139:7,
   139:11, 139:17,
   139:23, 141:1,
   146:8, 146:10,
   146:11.
stopped 49:7, 49:23,
   149:1.
store 54:19, 58:16,
   64:16, 76:18,

76:20, 76:21,
   77:1, 77:4,
   79:18.
stores 77:5.
stories 49:12.
story 32:2, 60:25,
   61:1, 96:7, 96:10,
   99:1, 128:1,
   140:3, 140:8.
straight 43:2.
strategy 46:23.
stray 17:21.
Street 1:48, 7:7,
   9:1, 29:24, 30:9,
   32:7, 45:9, 57:22,
   58:7, 64:25, 71:8,
   75:8, 82:1, 99:1,
   103:25, 104:9,
   112:14, 117:9,
   119:7, 119:8,
   124:7, 135:15,
   136:11.
Streets 35:8, 40:16,
   40:19, 41:5,
   42:16, 45:1,
   104:15.
stretch 90:21,
   90:25.
strikes 142:25.
strong 139:23.
structure 40:25,
   45:5, 45:12,
   45:13, 45:16,
   46:20.
structured 46:14.
stuff 40:15, 41:24,
   41:25, 42:1,
   95:15, 95:16,
   96:2, 105:20,
   105:21, 105:22,
   114:10, 114:14,
   115:21, 117:2,
   117:23, 122:21,
   126:2, 126:3,
   126:6, 137:11.
stupid 58:4.
sub 76:21.
subbing 152:23.
subcontract
   108:10.

subject 13:17.
subs 77:6.
substance 73:11,
   84:18.
substances 146:22.
sufficient 60:13,
   150:16.
suggest 153:20.
suggestions 9:4,
   9:6, 16:11,
   16:14.
summarize 20:1,
   20:3.
summertime 16:9.
Supermax 38:15,
   103:17.
supervised 138:22.
supervisor 41:3.
supplying 144:13.
supposed 34:19,
   35:1, 35:14,
   35:15, 44:8,
   111:17, 111:20,
   111:21, 112:1.
supposedly 74:5.
surmising 13:24,
   13:25.
suspects 20:17,
   44:1, 111:5.
suspended 38:8,
   91:22, 92:6.
Sustained 106:20,
   134:11, 134:17.
SW 19:1, 19:14,
   21:15, 21:24,
   22:4, 70:18.
swear 2:22.
switched 104:25.
switching 84:6.
sworn 3:1, 19:11,
   19:15, 28:7,
   33:13.
system 38:20, 93:20,
   94:5, 104:7,
   117:1, 118:1.
systems 39:13.
.
.
< T >.
T. 1:46, 154:16.

table 15:13, 21:25,
  69:15, 69:24,
  70:2.
table. 21:22.
tactic 68:15.
taken. 66:10, 88:18,
  144:24.
talked 24:11, 24:22,
  62:19, 109:24,
  111:1, 116:5,
  121:24, 123:3,
  123:13, 128:7,
  129:15.
tape 23:9, 23:16,
  24:10, 59:16,
  121:8.
taped 20:15,
  121:6.
targets 136:3.
Task 63:17, 96:19.
tax 120:15,
  120:22.
taxes 120:10,
  120:16, 120:18.
Taylor 6:9, 6:13,
  8:18, 12:2, 12:3,
  15:25, 20:12,
  20:14, 23:10,
  59:22, 63:25,
  64:5, 65:1, 65:4,
  65:8, 71:3, 71:10,
  74:13, 74:18,
  75:1, 75:10,
  80:13, 80:14,
  87:6, 87:16,
  89:12, 152:11.
team 32:4.
Technically 35:14,
  39:19, 51:15,
  69:24, 72:18,
  96:17, 120:18,
  135:25.
telephone 31:17,
  109:20.
ten 67:22.
ten-day 152:18.
tend 141:24, 142:9,
  147:3.
tends 100:13.
term 40:22, 45:11,

74:7.
terms 20:9, 45:20,
  74:17, 98:24,
  140:8, 141:14.
territory 21:4,
  58:11, 72:11,
  72:14, 72:15.
testified 3:2, 28:8,
  33:14, 97:20,
  98:4, 99:18,
  99:22, 110:8,
  110:9, 132:7,
  132:12, 135:7,
  138:1.
testify 10:21,
  10:22, 60:16,
  60:24, 61:14,
  62:5, 89:13,
  100:13, 139:8,
  148:3, 148:14,
  149:25, 150:21,
  150:23.
testifying 11:6,
  36:19, 37:15,
  60:19, 101:2,
  130:17, 151:2.
testimony 44:23,
  61:21, 62:7,
  95:18, 98:22,
  138:7, 141:23,
  142:3, 144:21,
  145:9.
theirself 115:8.
theoretical
  101:10.
they've 138:24.
thinking 61:25,
  111:25.
thinks 107:9.
third 54:19, 54:25,
  70:22.
Thomas 89:5,
  89:11.
though 10:20, 13:21,
  49:14, 72:19,
  75:3, 83:25,
  120:22.
thoughts 137:22.
threats 12:5,
  12:9.

three 39:18, 56:5,
  69:2, 69:3, 80:3,
  92:8, 92:9, 95:15,
  102:10, 124:16,
  152:24.
threshold 13:14,
  62:8.
throughout 61:20,
  130:25, 133:13,
  138:3.
throwaway 131:4,
  131:5.
tie 52:14.
tier 116:22, 117:12,
  117:13, 117:15,
  117:17, 117:18,
  117:19, 118:3.
tiers 117:13,
  117:14.
tight 137:19.
timing 63:23,
  91:11.
tiny 32:2.
tip 77:20.
title 28:25,
  134:20.
Today 12:17, 15:9,
  17:5, 36:19,
  37:16, 44:23,
  52:4, 52:11, 88:9,
  89:14, 89:16,
  90:11, 98:4,
  122:9, 130:15,
  132:5, 132:12,
  134:6, 139:7,
  141:1.
together 35:4, 45:9,
  56:24, 70:1,
  78:16, 104:10.
tomorrow 139:8,
  140:20, 141:2,
  141:16, 151:9,
  151:17, 153:7,
  154:1, 154:8.
tonight 153:21.
took 5:19, 7:3, 7:6,
  8:23, 20:6, 21:1,
  26:20, 41:13,
  47:15, 59:25,
  62:22, 67:23,

76:17, 79:22,
82:25, 87:15,
103:19, 123:25,
127:16, 127:18,
127:21.
Top 8:13, 14:15,
19:18, 20:19,
71:14, 95:5,
111:25.
topic 141:23.
torn 108:18.
totality 13:25.
touch 4:21, 5:5,
54:22, 65:22,
88:4, 141:7.
touching 5:2.
towards 8:13.
towers 95:3.
town 56:1, 108:5.
track 37:20.
Transcript 1:17,
17:19, 17:21,
44:22, 154:12.
transcripts 17:9,
17:11, 17:14,
17:18.
transpired 144:14.
transport 39:7.
transported 32:3,
65:4.
trapped 63:1,
123:4.
treat 10:20.
Tree 71:14.
Trevon 89:6.
trial 10:3, 44:20,
65:25, 88:5,
90:18, 141:8,
141:9, 141:13,
145:10, 148:4.
tricks 128:23.
tried 8:22, 108:19,
115:15, 115:16.
triggered 98:17.
trouble 130:5,
134:15.
true 10:10, 10:13,
21:6, 72:11, 95:7,
119:21, 119:24,
119:25, 122:8,

145:6, 147:17,
149:2, 149:8,
149:12.
truly 144:8.
trustworthy 96:22.
truth 61:13, 99:24,
128:1.
try 45:12, 46:19,
49:25, 50:1, 64:9,
75:4, 90:23,
102:16, 104:17,
120:23.
trying 19:23, 29:25,
30:22, 31:11,
31:13, 83:1,
99:23, 100:6,
128:23, 137:9,
138:21, 143:24,
147:24, 148:7,
149:5.
tuck 17:17.
turn 81:21, 82:4,
137:2, 144:10,
144:20.
tussling 8:24.
twice 126:15.
two 6:24, 7:2, 7:5,
20:16, 24:13,
38:13, 54:6, 54:9,
54:25, 60:2, 60:3,
64:13, 92:2,
94:24, 108:20,
117:16, 124:16,
132:17, 152:23,
154:1.
two. 33:25.
type 7:17, 44:19,
45:16, 55:9, 58:1,
70:1, 76:21,
94:20, 109:9,
112:25, 122:21.
.
.
< U >.
unavailability
62:10.
unavailable 62:8.
Uncle 40:15, 40:18,
41:5, 41:16,
41:21, 42:2, 42:7,

42:10, 43:3, 47:8,
47:24, 48:16,
50:1, 51:15,
103:23, 103:24,
104:6, 109:3,
109:12, 109:22,
110:3, 110:6,
114:4, 114:7,
114:8, 114:10,
115:18.
Uncooperative
5:24.
uncover 21:12.
undercover 85:7,
85:9, 93:18,
102:5, 135:3,
136:1, 136:8.
underground 36:11.
underneath 84:3,
84:4, 86:21,
120:3, 136:2.
understanding 45:20,
47:1, 75:14,
79:16, 79:20,
132:25.
unfortunately
103:8.
uniform 29:13.
Unit 4:6, 4:7, 5:17,
29:11, 32:9.
United 1:1, 1:5,
125:3, 126:13,
141:21, 147:2.
unknown 62:7,
75:16.
unless 43:23, 45:24,
112:10.
unpack 104:17.
Until 68:15, 68:18,
88:10, 88:17,
93:11, 95:20,
105:12, 122:5,
122:9, 126:7,
127:19, 139:4,
141:16, 144:5,
144:16, 144:23,
151:13, 151:21,
152:22, 153:16,
154:7.
unusual 119:14.

Unwilling 5:25, 6:1,
  6:2, 6:4.
up. 131:5.
Upper 105:20,
  120:24.
upset 31:2.
using 48:19, 80:5,
  81:4, 87:9,
  119:19, 133:4,
  147:20.
usual 26:13,
  141:2.
.

.

< V >.
valid 137:25.
various 4:4, 29:5,
  87:2.
vehicle 114:14.
vehicles 48:14,
  48:17, 95:15,
  95:22.
verified 111:12,
  115:20, 148:4.
verify 147:24,
  148:13, 149:5.
vestibule 137:16,
  143:22, 145:22.
victim 5:8, 20:8,
  20:10, 71:7.
video 48:16,
  109:18.
view 140:2, 140:5,
  142:6.
viewer 7:18, 7:25,
  14:16.
violated 85:15,
  85:16.
violation 86:5,
  93:8, 138:22.
Violent 29:9.
Vips 108:6.
virtue 138:7.
voluntarily 9:10,
  16:17.
VOP 98:17.
vs 1:8.
.

.

< W >.

W. 1:48.
wait 67:10, 73:23,
  152:21.
waited 73:25, 80:8,
  127:6.
waiting 127:5.
waived 138:7.
waiver 144:21.
walk 4:4, 7:7, 7:16,
  12:3, 29:5,
  117:14.
walked 9:1, 117:20,
  123:25, 124:3,
  125:7, 127:18,
  128:1.
walker 119:19.
wanted 49:15, 49:25,
  50:7, 58:2, 75:7,
  88:22, 90:3,
  91:11, 98:13,
  110:18, 110:21,
  110:22, 147:24,
  148:1, 148:4,
  148:25.
war 112:12, 113:3.
warning 63:10, 67:3,
  67:4.
watch 3:5, 11:17,
  16:8, 28:11,
  33:17, 128:5.
water 95:3.
ways 44:15.
WCI 38:12, 39:15.
weapon 18:23.
wearing 6:25, 15:12,
  52:6, 52:13.
weather 126:5.
Wednesday 1:19.
Weed 58:24, 122:20,
  136:20.
week 118:12.
weeks 98:14.
weird 31:3.
Wes 52:20, 52:22,
  53:1, 53:13, 79:8,
  79:17, 79:20,
  80:6, 81:19, 83:5,
  83:8, 83:9, 83:10,
  83:12, 83:14,
  84:3, 84:10,

84:12, 84:16,
  84:19, 131:5,
  133:6, 133:9.
West 35:2, 38:13,
  39:24, 40:1, 40:8,
  40:11, 40:20,
  41:20, 47:7,
  47:24, 56:2,
  102:18, 102:21,
  102:23, 103:2.
Western 29:8.
whatever 44:10,
  69:13, 77:7, 84:5,
  108:6, 109:10,
  111:23, 112:10,
  112:23, 121:4,
  125:24, 126:5,
  126:20, 128:3,
  133:8, 133:17.
wheelchair 42:4,
  114:12.
wheelhouse 61:2.
Whenever 42:22.
whereabouts 10:8.
White 44:8, 52:14,
  89:6, 112:9,
  134:5.
whoever 59:5,
  111:21.
whole 27:2, 32:1,
  83:22, 84:13,
  84:15, 98:21,
  111:22, 112:16,
  115:12, 122:5,
  133:14, 152:6.
whom 143:4.
will 11:24, 13:17,
  15:14, 27:24,
  44:19, 88:10,
  88:25, 97:25,
  106:17, 107:10,
  140:2, 140:25,
  144:6, 145:17,
  146:11, 151:19.
willing 5:25, 6:2,
  42:4.
willingness 6:12.
wiretap 49:13.
wiretapped 49:5,
  79:6.

wish 90:21, 143:5,
  146:8, 149:25,
  150:20, 150:22.
wished 147:16,
  148:22, 148:24.
Within 10:24, 11:10,
  50:5, 91:25,
  140:9.
Without 17:12,
  58:16, 112:19,
  112:22.
witnesses 44:21,
  54:11, 89:3,
  89:14, 89:19,
  152:16.
woman 75:18.
Woo 38:24, 39:1,
  40:6, 40:7, 40:10,
  50:7, 50:14,
  50:25, 103:20,
  103:21, 115:15.
word-for-word
  84:21.
words 48:13, 68:4,
  73:11, 74:8, 74:9,
  102:4, 105:19,
  136:4, 148:24.
work 3:21, 6:10,
  41:21, 41:24,
  42:1, 42:10,
  42:19, 47:8,
  47:25, 56:24,
  63:23, 64:2, 84:3,
  86:22, 92:15,
  94:17, 94:20,
  94:21, 94:22,
  94:25, 96:23,
  99:12, 104:18,
  106:12, 106:15,
  107:5, 108:8.
worked 92:12, 96:11,
  96:14, 96:17.
works 6:11.
worried 37:14, 89:3,
  89:14.
worry 112:16.
worst 36:9.
write 16:15.
wrongdoing 10:6,
  61:16.

wrongful 12:22.
wrongfully 62:10.
wrote 13:9, 23:21,
  24:1, 24:4, 74:4,
  129:7.
.
.
< Y >.
yard 117:10.
yards 56:23.
year 93:14, 93:15,
  97:14, 105:13,
  105:14, 107:16.
years 4:3, 4:5,
  38:8, 38:9, 39:18,
  49:21, 50:12,
  84:17, 91:12,
  91:21, 92:6, 92:8,
  92:9, 92:23, 93:1,
  93:5, 94:7, 94:8,
  101:4, 102:10,
  105:8.
yesterday 97:11.
young 75:3, 86:23,
  105:4, 106:16.
yourself 115:6,
  142:9.
yourselves 65:21,
  88:2, 88:3,
  141:6.
Yup 43:17, 52:23,
  80:16, 136:21.
.
.
< Z >.
zoom 16:2.